CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
3/8/2023
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
       DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

| | |
|---|---|
| JERRY L. FALWELL, JR., <br><br> *Plaintiff,* <br><br> v. <br><br> LIBERTY UNIVERSITY, INC. <br><br> *and* <br><br> THE EXECUTIVE COMMITTEE OF THE BOARD OF TRUSTEES FOR LIBERTY UNIVERSITY, INC., as Plan Administrator for the Supplemental Executive Retirement Plan, <br><br> *Defendants.* | Civil Action No. <br><br> **6:23CV00011** |

## COMPLAINT

Plaintiff, Jerry L. Falwell, Jr. (**"Mr. Falwell"** or "**Plaintiff**"), by counsel, states the following for his Complaint (the **"Complaint"**) against the Defendants, Liberty University, Inc. (**"Liberty"**) and the Executive Committee of the Board of Trustees for Liberty University, Inc., as Plan Administrator for the Supplemental Executive Retirement Plan (the "**Executive Committee**" or "**Plan Administrator**," and together with Liberty, the **"Defendants"**).

## INTRODUCTION

1. Mr. Falwell brings this action against Liberty and the Executive Committee of the Board of Trustees for Liberty, as plan administrator, pursuant to the Employee Retirement Income Security Act of 1974 ("**ERISA**"), to recover retirement benefits wrongfully denied to Mr. Falwell, as set forth in his Supplemental Executive Retirement Plan ("**SERP**") following Liberty's

acceptance and affirmative announcement of his resignation as Liberty's president without Cause and for Good Reason. A copy of the SERP is attached as **Exhibit 1**.

2. Born in 1962 to the late Rev. Jerry L. Falwell, Sr. ("**Rev. Falwell**") and Mrs. Macel Pate Falwell, Mr. Falwell's entire life has centered around the creation and growth of Liberty, from its humble beginnings as Lynchburg Baptist College to the world-renowned institution Liberty is today.

3. Since the death of his father, Rev. Falwell, on May 15, 2007 and until August 24, 2020, Mr. Falwell served as Liberty's President. Prior to becoming the top executive at Liberty, Mr. Falwell had worked for Liberty in various capacities, including as Liberty's General Counsel, since the early 1990s.

4. During this span, Mr. Falwell dedicated significant time, energy, and resources to Liberty. In particular, during Mr. Falwell's time as Liberty's President, Liberty's enrollment increased from 9,600 residential students and 27,000 online students to 15,000 residential students and 108,000 online students. Through Mr. Falwell's leadership, he has helped steer Liberty away from financial ruin, while developing Liberty into the world's leading evangelical university and one of the largest private non-profit universities in the nation with an endowment close to $2 billion.

5. Mr. Falwell's leadership and the business model implemented at Liberty have resulted in the sustained growth of Liberty; even today. On October 28, 2022, Liberty boasted it had enrolled the largest student body in history, with more students than ever before in both its residential and online programs. For the first time, total enrollment exceeded 130,000 students, with 15,800 on-campus students and 115,000 students participating in Liberty's online programs.

6. As a result of Mr. Falwell's successes at Liberty and in recognition of his lifetime of service to Liberty, Liberty entered into the SERP to provide supplemental retirement benefits in the form of deferred compensation.

7. Liberty wrongfully has denied and withheld the benefits to which Mr. Falwell is entitled, despite Mr. Falwell meeting every requirement set forth in the SERP for payment of the benefits due on September 1, 2022.

## THE PARTIES

8. Mr. Falwell is a citizen and resident of Virginia. He currently resides in Bedford County, Virginia.

9. Liberty is a Virginia non-stock corporation headquartered in Lynchburg, Virginia, with its principal office located at 1971 University Boulevard, Lynchburg, Virginia 24515.

10. The Executive Committee[1] of Liberty, pursuant to the SERP, serves as plan administrator of the SERP, and currently consists of the following members: Mr. Carroll Hudson, Chairman and resident of Bedford County, Virginia; Dr. Jerry Prevo, former Chairman of Liberty's Executive Committee and Current Interim President and, upon information and belief, resident of Phoenix, Arizona; Evangelist Tim Lee, current Chairman of Liberty's Board of Trustees and resident of Rowlett, Texas; Dr. David Rhodenhizer, resident of Alexandria, Virginia; and Dr. Jerry Vines, resident of Canton, Georgia.

---

[1] Mr. Gilbert "Bud" Tinney, Jr. was a member of the Executive Committee. Sadly, on February 20, 2023, Mr. Tinney passed away.

3

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction to determine Mr. Falwell's claims for relief hereunder under Title I of ERISA, 29 U.S.C. §§ 10001, *et seq.*, and in particular ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1331.

12. The Court has personal jurisdiction over Liberty because Liberty's principal place of business is Lynchburg, Virginia.

13. Venue is proper in this district under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**A.  Mr. Falwell's Career at Liberty.**

14. Mr. Falwell graduated from the University of Virginia School of Law in 1987, passed the July 1987 bar exam, and began practicing law in and around Lynchburg, Virginia.

15. Old Time Gospel Hour became Mr. Falwell's primary client in early 1988. At the time, Old Time Gospel Hour provided Liberty financing and owned Liberty's campus until approximately 1990.

16. In or around this time, Mr. Falwell served as General Counsel for Old Time Gospel Hour and Liberty, officially joining Liberty's payroll as General Counsel in or around 1995.

17. One of Mr. Falwell's primary responsibilities was assisting with the debt restructuring of Old Time Gospel Hour's approximately $100 million debt load.

18. Over the course of the next few years, Mr. Falwell cultivated relationships with numerous financial lenders (banks, insurance companies, and individuals), identified real estate assets that could be utilized as collateral, and worked with outside counsel to create a

comprehensive debt-restructuring plan that successfully reduced the debt to approximately $20 million by 1997.

19. As part of this plan, Liberty purchased its campus from Old Time Gospel Hour in 1990 by assuming approximately $83 million of Old Time Gospel Hour's debt, which was secured by the campus, or guaranteed by Liberty.

20. Having assumed Old Time Gospel Hour's debts, Mr. Falwell worked with numerous donors in order to structure the purchase of those debts at a substantial discount to Liberty. Ultimately, the donors then forgave most of the debt they purchased in the 1990s.

21. Having successfully restructured Liberty's debt and playing a key role in facilitating donors to provide, among other gifts, cash donations, Mr. Falwell was promoted from General Counsel to Vice Chancellor in 2003.

22. As the new millennium began, Mr. Falwell created plans for Liberty's capital expansions and negotiated the capital improvement financing. The initial projects included dozens of new apartment-style dorms across US 460 from Liberty's main campus, construction of a pedestrian tunnel under US 460, linking Liberty's main campus with the new dorms, among other capital improvements and associated donor donations. This expansion resulted in exponential enrollment growth, which growth still occurs today.

23. In May, 2007, after the untimely death of Mr. Falwell's father, Rev. Falwell, Mr. Falwell became President/CEO of Liberty.

24. Between 2007 and the negotiation and signing of the 2012 Employment Agreement, Mr. Falwell was instrumental in Liberty's net assets increasing from approximately $100 million to over $800 million; enrollment increasing from approximately 9,600 students in residence to over 12,000 students in residence and from approximately 27,000 students studying

online to over 75,000 students studying online; and annual gross revenues increasing from $231,506,554.00 to $645,350,280.00, with Liberty's surplus of revenues over expenditures increasing from $52,514,469.00 to $221,188,918.00. All of these achievements resulted in a strong, solvent, university with an AA credit rating.

25. By the time of negotiation and signature of the 2019 Employment Agreement, Mr. Falwell had overseen additional growth at Liberty as Liberty's enrollment increased to over 15,000 students in residence and to over 86,000 students studying online. Annual gross revenues were now over $1 billion, and Liberty's surplus of revenues over expenditures had risen to $331,142,834.00.

26. From May 2007 to Mr. Falwell's resignation in 2020, Liberty experienced exponential growth across all metrics – financial, academic, athletic, campus footprint, and every other metric.

27. Overall, Mr. Falwell has been instrumental in the shaping of Liberty, beginning as early as 1988. Through decades of work, Mr. Falwell, along with others, have ensured that Liberty continues to train champions for Christ for many decades and centuries to come.

**B.     Mr. Falwell's Supplemental Executive Retirement Plan.**

28. Liberty, in recognition of Mr. Falwell's contributions and in an effort to compensate Mr. Falwell fairly and to formalize and reinforce the long-term employment relationship, entered into an employment agreement, effective April 1, 2012, with Mr. Falwell (the "**2012 Employment Agreement**").

29. The 2012 Employment Agreement provided for a term of seven years and three months, or until June 30, 2019.

30. By the conclusion of the 2012 Employment Agreement, Liberty and Mr. Falwell, with Liberty engaging FW Cook, a national consulting firm with expertise in compensation of executives in tax-exempt organizations, began negotiating an arms-length transaction regarding the terms of the employment agreement between Liberty and Mr. Falwell, effective July 1, 2019 (the "**2019 Employment Agreement**").

31. The 2019 Employment Agreement is substantially similar in form to the 2012 Employment Agreement. One key distinction is the 2019 Employment Agreement specifically provided the SERP, wherein Liberty:

> … agrees to adopt a defined contribution supplemental executive retirement plan for the benefit of Falwell ("SERP" or the "Plan") pursuant to a separate agreement that will (1) provide for annual credits designed to target a retirement benefit over the life of Falwell and Mrs. Falwell in an amount equal to seventy-five (75%) of Falwell's average Base Salary over the five (5) year period prior to his termination of employment, net of any required tax withholding, (2) have an initial notional account balance that represents prior years' deemed accumulations during Falwell's presidency through June 30, 2019 and (3) be paid in a lump sum. This lump sum shall be payable on the first day of the calendar month following the earliest of (1) provided that Falwell does not engage in any Competitive Activity [*infra*, ¶ 44] during the Non-Competition Period, as defined in Section 5.2 herein, the second anniversary of his termination of employment, (2) Falwell's death, or (3) Falwell's Disability, as defined in Section 6.6 herein.

2019 Employment Agreement, Section 4.1.

32. On July 22, 2020, in connection with the 2019 Employment Agreement, Mr. Falwell and Liberty entered into a letter agreement, setting forth the terms and conditions for the SERP.

33. At the time of the SERP's creation, the sole administrator of the SERP was the Executive Committee.

34. As set forth in the SERP, Liberty "established on its books a supplemental executive retirement account (the "**Account**") for the purpose of measuring its obligation to pay [Mr. Falwell] supplemental retirement benefits." **SERP, ¶ 1.**

35. The value of the Account (the "**SERP Amount**") was set forth based on specific guidelines set forth in the SERP that required no discretion on the part of the Plan Administrator.

36. As of July 1, 2020, the Account was credited with an amount equal to $7,635,927.00, the initial SERP Amount.

37. Additionally, each June 30th, the account shall be credited an investment return at the annual rate of six percent.

38. As of July 1, 2021, with the addition of the annual six percent investment return, or $458,155.62, the Account and SERP Amount totaled approximately $8,094,082.62.

39. As of July 1, 2022, with the addition of the annual six percent investment return, or $485,644.96, the Account and SERP Amount totaled approximately $8,579,727.58.

40. Mr. Falwell is entitled to receive the balance of the Account attributed to credits made, *supra* ¶¶ 20-23, in a single lump-sum payment on the first of the month following the earliest to occur of the following: Mr. Falwell's death, disability, or the second anniversary of Mr. Falwell's termination of employment with Liberty for *any* reason other than Cause (as defined in the 2019 Employment Agreement).

41. Further, the SERP provides that Mr. Falwell forfeits the Account only in the event that his employment is terminated for Cause (as defined in the 2019 Employment Agreement) or Mr. Falwell engages in any Competitive Activity, *infra* ¶ 44.

42. Mr. Falwell was entitled to receive the SERP Amount on September 1, 2022.

43. Liberty is aware and has admitted repeatedly that the SERP Amount was due to Mr. Falwell on September 1, 2022. As one example, counsel for Liberty, in a July 6, 2022, e-mail acknowledged that the SERP Amount "is presently eligible for distribution as of September 1."

44. Liberty, in an attempt to withhold the SERP Amount and have the Court give them permission to withhold the SERP Amount, reserved August 22, 2022 from the Circuit Court for the City of Lynchburg to hear argument on Liberty's announced (but never filed) motion for injunctive relief.

45. Recognizing that they would not meet the standards for an injunction and get injunctive relief due, among other reasons, to Mr. Falwell's undisputed right to the Account and SERP Amount on September 1, 2022, Liberty never filed its motion for injunctive relief and a hearing was never held.

46. Instead, despite having no basis to withhold the SERP Amount pursuant to the terms of the SERP, Liberty failed and refused to pay the SERP Amount, causing Mr. Falwell to go through the approximately six-month administrative appeal process and institute litigation, allowing for the payment of the SERP Amount (and recovery of attorneys' fees).

**C.     Mr. Falwell Resigns from Liberty Without Cause and For Good Reason.**

47. On August 24, 2020 Mr. Falwell resigned from Liberty without Cause and For Good Reason, as those terms are set forth in the 2019 Employment Agreement.

48. The Executive Committee met on the morning of August 25, 2020 and voted to accept the resignation without Cause and For Good Reason immediately and recommended ratification to Liberty's full Board of Trustees.

49. Later, on August 25, 2020, Liberty's full Board of Trustees unanimously voted to affirm the decision of the Executive Committee.

50. In its August 25, 2020 press release, Liberty notes that Mr. Falwell's severance compensation was dictated by the terms of his pre-existing employment agreement without any adjustment by Liberty or the Board of Trustees. *See Liberty University Board Accepts Jerry Falwell, Jr.'s Resignation as President*, August 25, 2020, located at https://www.liberty.edu/news/press_release/liberty-university-board-accepts-jerry-falwell-jr-s-resignation-as-president/ (last accessed February 23, 2023). A copy of the press release is attached hereto as **Exhibit 2**.

51. Liberty concludes its press release with the express declaration that "[t]he university's heartfelt prayers are with him and his family as he steps away from his life's work."

52. Since that time, Mr. Falwell, with or without compensation, directly or indirectly, as an owner, principal, partner, member, shareholder, independent contractor, consultant, joint venture, investor, licensor, lender or in any other capacity whatsoever, alone, or in association with any other person, has not carried on, engaged or taken part in, or rendered services or advice to, own, share in the earnings of, invested in the stocks, bonds or other securities of, or otherwise become financially interested in, any other college or university, whether for-profit or non-profit (the "**Competitive Activity**" or "**Competitive Activities**"). *See* ¶ 5.2 of the 2019 Employment Agreement.

53. More directly, Mr. Falwell has not worked and does not currently work for or have any interest in another college or university.

D. **Mr. Falwell's Exhaustion of Administrative Remedies.**

54. Mr. Falwell has exhausted his administrative remedies under the SERP.

55. Mr. Falwell's last day of employment with Liberty was August 24, 2020.

56. Pursuant to the SERP, Mr. Falwell was entitled to receive the SERP Amount, the Account, in a single lump-sum payment on the first of the month following the earliest to occur of the following: Mr. Falwell's death or disability (as defined in the 2019 Employment Agreement) or the second anniversary of Mr. Falwell's termination of employment with Liberty for any reason other than for Cause (as defined in the 2019 Employment Agreement). *See* SERP, ¶ 4. Therefore, Mr. Falwell's benefits were due to be paid on September 1, 2022.

57. Under ¶ 7(a) of the SERP, "[i]f you believe you are being denied rights or benefits under this Letter Agreement [SERP], you (or your authorized representative) may file a claim in writing with the Committee" (the Executive Committee of the University's Board of Trustees).

58. On September 14, 2022, having not received the benefits of the SERP, the Account, pursuant to ¶ 4 of the SERP, Mr. Falwell, utilizing counsel, filed a claim in writing with the Executive Committee demanding payment of the SERP Amount, or Account. A copy of Mr. Falwell's September 14, 2022 letter is attached hereto as **Exhibit 3**.

59. Pursuant to ¶ 7(a) of the SERP, "[i]f any such claim is wholly or partially denied, the [Executive] Committee will notify you of its decision in writing and contain such additional information as required by Section 503 of ERISA. Such notification will be given within 90 days after your claim is received by the Committee."

60. ERISA regulations also require any written denial of benefits to be issued within 90 days from the date the plan administrator receives the claim for benefits: "[I]f a claim is wholly or partially denied, the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, but not later than 90 days after receipt of the claim by the plan, unless the plan administrator

determines that special circumstances require an extension of time for processing the claim." 29 C.F.R. § 2560.503-1(f)(1).

61. If "the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 90-day period." 29 C.F.R. § 2560.503-1(f)(1).

62. On December 13, 2022, the 90th day, Mr. Hudson provided written notice to Mr. Falwell denying Mr. Falwell his SERP benefits. A copy of Mr. Hudson's December 13, 2022 letter is attached hereto as **Exhibit 4**.

63. Following Mr. Hudson's letter denying Mr. Falwell's entitlement to the SERP benefits, and pursuant to ¶ 7(a) of the SERP, Mr. Falwell filed a written request with the Executive Committee, seeking a review of the denied claim.

64. Under ¶ 7(a) of the SERP, "[w]ithin 60 days after the date on which you receive a written notice of a denied claim you (or your authorized representative) may (a) file a written request with the Committee for a review of your denied claim and of pertinent documents and (b) submit written issues and comments to the Committee."

65. On December 28, 2022, Mr. Falwell provided written notice of his request for Mr. Hudson and the Executive Committee to review the denial of the SERP benefits. A copy of Mr. Falwell's December 28, 2022 letter is attached hereto as **Exhibit 5**.

66. Under ¶ 7(a) of the SERP, "[t]he Committee (the Executive Committee of the University's Board of Trustees) will notify [Mr. Falwell] of its decision in writing. Such notification will contain specific reasons for its decision. The decision on review will be made within 60 days after [Mr. Falwell's] request for review is received by the Committee. If the

decision on review is not made within such period, [Mr. Falwell's] claim will be considered denied."

67. On February 24, 2023, Liberty responded to Mr. Falwell's December 28, 2022 letter, again denying the SERP benefits. A copy of Liberty's February 24, 2023, letter is attached hereto as **Exhibit 6**.

68. Pursuant to the SERP, there are no additional administrative remedies and any additional attempts of working with Liberty to receive the SERP benefits would be futile.

## COUNT ONE
### Claim for Benefits Wrongfully Denied (29 U.S.C. § 1132(a)(1)(B))

69. Mr. Falwell incorporates the foregoing paragraphs as if fully set forth herein.

70. Mr. Falwell was an executive with Liberty since at least May, 2007, when he became Liberty's President.

71. Liberty and Mr. Falwell entered into the SERP, and as of September 1, 2022, Mr. Falwell's benefits have vested.

72. Defendants have breached their obligations to Mr. Falwell under the SERP by not paying the SERP Amount, the Account, owed to Mr. Falwell on September 1, 2022.

73. Mr. Falwell made a timely written claim for benefits, which was presented to the Plan Administrator. *See* Exhibit 2.

74. In response to Mr. Falwell's claim, the Plan Administrator responded in writing that Liberty was denying his claim for benefits. *See* Exhibit 3.

75. Mr. Falwell, on December 28, 2022, filed written notice with the Plan Administrator appealing the Plan Administrator's December 13, 2022, decision denying Mr. Falwell his benefits. *See* Exhibit 4.

76. Sixty days have passed since Mr. Falwell's last administrative attempt to recover the SERP benefits and the benefits are past due.

77. Liberty's denial of benefits is arbitrary and capricious in direct contradiction to the terms of the SERP.

78. Mr. Falwell requests that this Court determine that he is entitled to his vested benefits under the SERP and award him those benefits, along with all attorneys' fees incurred in bringing this action.

### COUNT TWO (In the Alternative)
### Breach of Contract

79. Mr. Falwell incorporates the foregoing paragraphs as if fully set forth herein.

80. The SERP is a valid and enforceable contract between Mr. Falwell and Liberty.

81. Mr. Falwell was entitled to the SERP's benefits provided he was not terminated from Liberty with cause and has not engaged in any competitive activities during the two years following his termination.

82. Mr. Falwell's employment was terminated without cause and for good reason.

83. Mr. Falwell has not engaged in any competitive activity.

84. Liberty has breached the SERP by failing to timely pay Mr. Falwell the benefits to which he is entitled, pursuant to the SERP, which were due to be paid on September 1, 2022.

85. Mr. Falwell has been damaged by Liberty's breach of the SERP as a result of Liberty failing to provide Mr. Falwell the benefits set forth in the SERP valued at $7,635,927.00, as of July 1, 2020, plus the investment return at an annual rate of six percent pursuant to Paragraph 3(a) of the SERP, or $8,579,727.58, as of June 30, 2022.

**PRAYER FOR RELIEF**

WHEREFORE, for the reasons set forth herein, Plaintiff, Jerry L. Falwell, Jr., by counsel, respectfully requests that the Court grant the following relief:

1. The Court conduct an evidentiary hearing on Mr. Falwell's claim for recovery of benefits set forth in the SERP and conduct a *de novo* determination of whether Mr. Falwell is entitled to his accrued benefits under the SERP;

2. Enter judgment in Mr. Falwell's favor on his recovery of benefits claim;

3. Award Mr. Falwell his benefits under the SERP in an amount of $7,635,927.00 as of July 1, 2020, plus the investment return at an annual rate of six percent pursuant to Paragraph 3(a) of the SERP, or $8,579,727.58, as of June 30, 2022;

4. Award Mr. Falwell all court costs incurred in bringing this action;

5. Award Mr. Falwell prejudgment interest from the date that Mr. Falwell was entitled to be paid his accrued benefits under the SERP to the date of the Court's judgment;

6. Award Mr. Falwell post-judgment interest from the date of the Court's judgment to the date that his accrued benefits under the SERP are paid;

7. Award Mr. Falwell his attorneys' fees incurred in prosecuting this action; and

8. Award Mr. Falwell any and all such relief as the Court may deem just and proper.

Dated: March 8, 2023                              Respectfully submitted,

                                                      JERRY L. FALWELL, JR.

                                                     /s/ *Vernon E. Inge, Jr.*
                                                     Counsel

Vernon E. Inge, Jr., Esquire (VSB No. 32699)
Robert N. Drewry, Esquire (VSB No. 91282)
WHITEFORD, TAYLOR & PRESTON L.L.P.
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:     (804) 977-3300
Facsimile:      (804) 977-3299
E-Mail:          vinge@wtplaw.com
E-Mail:          rdrewry@wtplaw.com

*Counsel for Plaintiff, Jerry L. Falwell, Jr.*

16