UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

| | |
|---|---|
| JERRY L. FALWELL, JR., )<br>)<br>      *Plaintiff*, )<br>)<br>v. )<br>)<br>LIBERTY UNIVERSITY, INC., *et al.*, )<br>)<br>      *Defendants.* )<br>) | Civil Action No. 6:23cv00011 |

**JERRY L. FALWELL, JR.'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Jerry L. Falwell, Jr. ("**Mr. Falwell**"), by counsel, states the following for his Memorandum of Law in Support ("**Memo in Support**") of Motion for Summary Judgment ("**Mr. Falwell's Motion**").

## I.    INTRODUCTION

Mr. Falwell's claim and the benefits wrongly denied to Mr. Falwell are the culmination of Mr. Falwell devotedly serving Liberty University, Inc. ("**Liberty**") for over 30 years, including 13 years as Liberty's President. Mr. Falwell's tenure at Liberty, specifically as President, saw Liberty's enrollment increase from 9,600 residential students and 27,000 online students in 2007 to 15,000 residential students and 108,000 online students in 2020. Even today, these numbers continue to increase with Liberty's fall 2022 enrollment in its residential and online programs at more than 130,000 students – the largest in its history. In addition to enrollment and academic advancements, Mr. Falwell oversaw the growth of Liberty financially. Today, Liberty's endowment is one of the largest in the country and exponentially larger than when Mr. Falwell's presidency began. Mr. Falwell's leadership over his 13 years as President resulted in Liberty's

explosive growth, whether it was campus expansion, enrollment increases, or endowment size. Liberty's success, as a result of Mr. Falwell's leadership, has even resulted in Liberty recently paying off $189 million in bonds years early.

As a result of Liberty's successes and the growth Mr. Falwell spurred, Liberty and Mr. Falwell negotiated an arms-length employment contract, which contract had an effective date of July 1, 2019 (the "**2019 Employment Agreement**").

Pursuant to the 2019 Employment Agreement's terms, on July 22, 2020, Liberty and Mr. Falwell entered into a letter agreement (the "**Contract**"), with respect to the establishment of an unfunded supplemental executive retirement plan (the "**SERP**")[1] within the meaning of the Employee Retirement Income Security Act of 1974 ("**ERISA**") in order to provide Mr. Falwell retirement benefits. The Contract is unambiguous, the facts are undisputed, and interpretation is straightforward.

Mr. Falwell satisfied the requirements of the Contract for payment of the SERP to him, despite Liberty's attempted about-face. First, Mr. Falwell resigned from Liberty without Cause and For Good Reason on August 24, 2020. Second, Liberty accepted Mr. Falwell's resignation on August 25, 2020.[2] The only material issue in this case is that he was not terminated for Cause, he resigned, and Defendants accepted his resignation. Mr. Falwell is entitled to the retirement benefits

---

[1] In the Contract, the SERP benefit – with the money that is credited and the investment return that is accrued – is defined as the "**Account**."

[2] Liberty paid Mr. Falwell a severance payment on or about September 24, 2020. Pursuant to the 2019 Employment Agreement, Mr. Falwell would not have been entitled to receive the severance payment if he were terminated for Cause.

2

set forth in the Contract so long as he was not terminated for Cause.[3] There is not and cannot be any dispute that he was not terminated for Cause.[4]

Finally, Mr. Falwell did not engage in any Competitive Activity.[5] Therefore, as a matter of law, Mr. Falwell is entitled to the benefits under the Contract, and Defendants are obligated to pay.

---

[3] "**Cause**," in the 2019 Employment Agreement, "is defined restrictively to mean only the following: (a) the willful refusal or willful failure of Falwell to comply with the reasonable directives of the Board of Trustees, so long as such directives are not in conflict with the authority of the Board of Trustees as set forth in in [*sic*] the University's Articles of Incorporation and Bylaws, or in conflict with this Agreement; provided that such refusal or failure results in (or is substantially likely to result in) a material adverse consequence to LU; (b) the material failure of Falwell to comply substantially with written policies, standards and regulations of LU as from time-to-time established in writing, provided that such failure results in (or is substantially likely to result in) a material adverse consequence to LU;; [*sic*] (c) the willful refusal or willful failure of Falwell to faithfully or diligently perform his duties under this Agreement, provided that such refusal or failure results in (or is substantially likely to result in) a material adverse consequence to LU; (d) conviction of or entry of a plea of guilty, no contest or *nolo contendere* to any felony or to a misdemeanor involving moral turpitude (deferred disposition by a court, with or without a finding, admission or adjudication of guilt, such as withholding adjudication or taking the matter under advisement for some set period, meets the threshold for cause intended for Section 7.3(d)); (e) defamatory or slanderous comments in breach of Section 3.6 of this Agreement which cause serious damage to LU's reputation; (f) Any significant violation (which, for the avoidance of doubt, shall not include any Level III or Level IV violation) or repetitive violation (other than of a de minimis nature) of any legislation, rule, regulation, constitutional provision, bylaw, policy, procedure or guideline of the NCAA (or NCAA interpretation) by Falwell arising from any act or omission of Falwell (or Falwell's knowledge of any act or omission of another person and failure to take prompt and appropriate responsive action or Falwell's failure to monitor, supervise or report another person for whom Falwell has or, at the relevant time had, supervisory responsibility), or; (g) advocating a position that is materially inconsistent with the doctrinal statements found in the University's Articles of Incorporation, with the sole exception of such advocacy in private discussions with the Board of Trustees or Executive Committee in connection with proposed amendments to the Articles of Incorporation." (ECF 7-1, pp. 15-17, ¶ 7.3.)

[4] Liberty has made no claim and seeks no relief otherwise. Instead, Liberty seeks monetary damages for alleged torts in the state court case it has filed against Mr. Falwell. While not material here, Mr. Falwell believes there is no merit to Liberty's claims.

[5] "**Competitive Activity**" is defined in the 2019 Employment Agreement as "whether with our [*sic*] without compensation, directly or indirectly, as an owner, principal, partner, member, shareholder, independent contractor, consultant, joint venture, investor, licensor, lender or in any other capacity whatsoever, alone, or in association with any other Person, [Mr. Falwell] will not carry on, be engaged or take part in, or render services (other than services which are generally

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Liberty and Mr. Falwell entered into the 2019 Employment Agreement that was "adopted effective July 1, 2019." (Compl. ¶ 30, ECF 1; ECF 7-1, pp. 2-23 (attached as **Exhibit 1**).)

2. The 2019 Employment Agreement provides, in pertinent part, that Liberty "agrees to adopt a defined contribution supplemental executive retirement plan for the benefit of [Mr.] Falwell" and, among other things, "have an initial notational account balance that represents prior years' deemed accumulations during [Mr.] Falwell's presidency through June 30, 2019 and [] be paid in a lump sum." Further, that lump sum "shall be payable on the first day of the calendar month following the earliest of [] provided that [Mr.] Falwell does not engage in any Competitive Activity during the Non-Competition Period, as defined in Section 5.2 herein, the second anniversary of his termination of employment." (Compl. ¶ 31, ECF 1; ECF 7-1, pp. 9-10; 2019 Employment Agreement § 4.1(d).)

3. On July 22, 2020 and in connection with the 2019 Employment Agreement, Liberty and Mr. Falwell executed the Contract. (Compl. ¶ 32, ECF 1; Ex. 1, ECF 1-1 (attached as **Exhibit 2**).)

4. The Contract requires Liberty to establish "on its books" a SERP for Mr. Falwell's benefit. (Compl. ¶ 34, ECF 1; Ex. 1, ECF 1-1, p. 2, ¶ 1; ECF 7-1, p. 24, ¶ 1.)

5. The value of the SERP was set forth based on specific guidelines detailed in the Contract. (Compl. ¶ 35, ECF 1; Ex. 1, ECF 1-1, p. 2, ¶¶ 2, 3(a); ECF 7-1, p. 24, ¶¶ 2, 3(a).)

---

offered to third parties) or advice to, own, share in the earning of, invest in the stocks, bonds or other securities of, or otherwise become financially interested in, any other college or university, whether for-profit or non-profit." Defendants do not contend that Mr. Falwell engaged in any Competitive Activity.

6. As required by Paragraph 2(a) of the Contract, the value of the SERP was $7,635,927.00, as of July 1, 2020. (Compl. ¶ 36; Ex. 1, ECF 1-1, p. 2, ¶ 2(a); ECF 7-1, p. 24, ¶ 2(a).)

7. Paragraph 3(a) of the Contract requires an "investment return at an annual rate of 6%" to be credited each June 30th to the SERP until paid or forfeited. (Compl. ¶ 37; ECF 1, Ex. 1, ECF 1-1, p. 2, ¶ 3(a); ECF 7-1, p. 24, ¶ 3(a).)

8. Paragraph 4 of the Contract provides that Mr. Falwell is entitled to receive the amount in the SERP, including any investment earnings credited, in a single lump sum payment, "[s]ubject to Paragraph 5," on the first month following the second anniversary of Mr. Falwell's termination of employment with Liberty for any reason other than Cause. (Compl. ¶ 40, ECF 1; Ex. 1, ECF 1-1, p. 3, ¶ 4; ECF 7-1, p. 25, ¶ 4.)

9. The Contract provides that Mr. Falwell forfeits the SERP if Mr. Falwell's employment with Liberty is terminated for Cause or, pursuant to Paragraph 5, if Mr. Falwell engages in any Competitive Activity during the Non-Competition Period. (Compl. ¶ 41, ECF 1; Ex. 1, ECF 1-1, p. 3, ¶ 5; ECF 7-1, p. 25, ¶ 5.) These are the only circumstances by which Mr. Falwell could have forfeited benefits under the Contract.

10. The Contract's terms do not provide any other conditions that could have resulted in forfeiture by Mr. Falwell of the benefits under the Contract. (*Id.*)

11. On August 24, 2020, Mr. Falwell resigned from Liberty. (Compl. ¶ 47, ECF 1; Falwell Decl. ¶ 4 (attached as **Exhibit 3**).)

12. The Executive Committee of Liberty's Board of Trustees (the "**Executive Committee**" or "**Plan Administrator**") met on August 25, 2020 and voted to accept Mr. Falwell's

resignation without Cause and For Good Reason. (Compl. ¶ 48, ECF 1; ECF 7-1, p. 45, 47, 51, 55-58; Exhibit B of Exhibit 3 attached hereto.)

13. On that same date, Liberty's full Board of Trustees unanimously voted to affirm the decision of the Executive Committee to accept Mr. Falwell's resignation without Cause and For Good Reason. (Compl. ¶ 49, ECF 1; ECF 1-2; ECF 7-1, p. 45, 47, 51, 55-56, 62; Falwell Decl. ¶ 6.)

14. On or about September 24, 2020, Defendants paid Mr. Falwell his severance payment pursuant to the 2019 Employment Agreement. (Falwell Decl. ¶ 7.)

15. Pursuant to the 2019 Employment Agreement, the severance payment would not have been paid if Mr. Falwell was terminated for Cause. (Falwell Decl. ¶ 7; Exhibit 1 hereto.)

16. Since August 25, 2020, Mr. Falwell has not engaged in any competitive activity. (Compl. ¶ 52, ECF 1; ECF 7-1, p. 45, 51; Falwell Decl. ¶ 8.)

17. Pursuant to the Contract, on September 1, 2022, Mr. Falwell became entitled to the Account because the termination was not for Cause and Mr. Falwell did not engage in any competitive activity. (Compl. ¶ 42, ECF 1; Ex. 1, ECF 1-1, p. 3, ¶ 4; ECF 7-1, p. 45.)

18. Mr. Falwell, by counsel, made a written demand for benefits, which was presented to the Plan Administrator on September 14, 2022. (Compl. ¶ 58, ECF 1; ECF 7-1, p. 26, ¶ 7(a); ECF 7-1, p. 44-45.)

19. The Executive Committee of Liberty serves as plan administrator of the SERP, and, consisted of the following members during Mr. Falwell's demand for the SERP (September 1, 2022 through present): Mr. Carroll Hudson, Chairman; Dr. Jerry Prevo, former Chairman of Liberty's Executive Committee and then-Interim President; Evangelist Tim Lee, then-Chairman

of Liberty's Board of Trustees; Dr. David Rhodenhizer; Dr. Jerry Vines; and Mr. Gilbert "Bud" Tinney, Jr.[6] (Compl. ¶ 10, ECF 1; Falwell Decl. ¶ 5.)[7]

20.     On December 13, 2022, the Plan Administrator, by letter, denied Mr. Falwell's claim for benefits under the Contract. (ECF 7-1, pp. 46-49.) In denying Mr. Falwell's claim, the Plan Administrator stated that because there was a state court lawsuit pending between Liberty and Mr. Falwell, there was "dispute" under Section 9(i) of the Rabbi Trust Agreement, which, in turn, authorized a delay in any payment "until such time as the dispute has been fully and finally adjudicated by a court of competent jurisdiction." (*Id.* p. 48.)

21.     In accordance with the Contract, on December 28, 2022, Mr. Falwell, by counsel, appealed the Plan Administrator's December 13, 2022 denial (the "**Appeal Letter**") to that same Plan Administrator, as required. (ECF 7-1, pp. 50-54.) In particular, the Appeal Letter stated that the pendency of the state court lawsuit had "no bearing whatsoever on Mr. Falwell's rights to receive payments of the benefits due under the [Contract]." (*Id.* p. 51.) The Appeal Letter also stated that the Contract did "not provide for delay of payments in certain circumstances" and that the Rabbi Trust Agreement "cannot and does not amend or govern the time of payment due under the [Contract]," which was the "governing plan setting forth the amounts Mr. Falwell is entitled to and under what conditions." (*Id.* p. 52.) In addition, the Appeal Letter stated that Section 9(i) of the Rabbi Trust Agreement, while permitting the Trustee to refuse to take any action pursuant to the Rabbi Trust Agreement, did not alter the fact that Mr. Falwell was entitled to payment pursuant

---

[6] Mr. Gilbert "Bud" Tinney, Jr. recently passed away on February 20, 2023.

[7] At the time of Mr. Falwell's resignation on August 25, 2020, Mr. Carroll Hudson, Dr. Jerry Prevo, Mr. Gilbert "Bud" Tinney, Jr., and Dr. David Rhodenhizer were members of the Executive Committee along with Mr. Harvey Gainey.

to the Contract "either through the Rabbi Trust funds, or though payment directly by Liberty." (*Id.* p. 53.)

22.     On February 24, 2023, the Plan Administrator, by letter, denied Mr. Falwell's appeal for benefits under the Contract, notwithstanding its statement, "Liberty University agrees on the importance of the stand-alone [Contract] in the construction of Mr. Falwell's putative SERP benefits." (ECF 7-1, pp. 59-67.)

23.     The Plan Administrator noted in its February 24, 2023 denial that Mr. Falwell had a right to bring an action under ERISA § 502(a). (ECF 7-1, p. 67.)

### III.     LEGAL STANDARD

Summary judgment is proper where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Fourth Circuit recently observed that "[s]ummary judgment in [ERISA denial-of-benefit] cases is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 961 (4th Cir. 2022). And, "[i]n considering a motion for summary judgment, the court construes all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* at 958 (quotation marks and citations omitted).  Stated differently, "summary judgment is appropriate when the evidence is so one-sided that one party must prevail as a matter of law." *Id.* (quotation marks and citations omitted).

"A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Crown Packing Tech., Inc. v. Belvac Prod. Machinery, Inc.*, 591 F. Supp. 3d 52, 61 (W.D. Va. 2022) (quoting *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018)) (brackets in original). As the Fourth Circuit Court of Appeals noted, "Thus, at the summary judgment phase,

'[t]he pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Variety Stores, Inc.*, 888 F.3d at 659 (quoting *Reyazuddin v. Montgomery Cnty., Md.*, 789 F.3d 407, 413 (4th Cir. 2015)) (cleaned up).

In considering a motion for summary judgment, a district court must "must view the evidence "in the light most favorable to the opposing party," *Tolan v. Cotton*, 572 U.S. 650, 657, (2014) (*per curiam*) (internal citation and quotation marks omitted), and "refrain weigh[ing] the evidence or mak[ing] credibility determinations," *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (internal citation and quotation marks omitted). The initial burden on the moving party is "proving that judgment on the pleadings is appropriate." *Crown Packaging Tech., Inc.*, 591 F. Supp. 3d at 61 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once that burden is met, "[t]he burden is on the nonmoving party to show that there is a genuine issue of material fact for trial." *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)). To meet that burden, the nonmoving party "must present evidence such that reasonable jurors could find by a preponderance of evidence for the non-movant." *Crown Packaging Tech., Inc.*, 591 F. Supp. 3d at 61 (citing *Celotex Corp.*, 477 U.S. at 322-24). Thus, a summary judgment motion should be granted if "the entire record shows a right to judgment with such clarity as to leave no room for controversy and established affirmatively that the adverse party cannot prevail under any circumstance." *Campbell v. Hewitt, Coleman, & Assocs., Inc.,* 21 F.3d 52, 55 (4th Cir. 1994).

## IV.   ARGUMENT

**A.   Mr. Falwell Has Unequivocally Established He Has Met the Requirements of the Contract.**

This is a simple matter, and there are no material facts in dispute, as is evidenced by the record filed by Defendants (ECF 7-1). Mr. Falwell was due the SERP payment pursuant to the Contract on September 1, 2022 so long as he (1) was not terminated for Cause, and (2) did not compete with Liberty.

Neither occurred, and that is not disputed. Liberty unconditionally accepted Mr. Falwell's resignation without Cause and With Good Reason on August 25, 2022, and also unconditionally paid him the severance due him under the 2019 Employment Agreement – which was paid to Mr. Falwell because he was not terminated for Cause. Liberty cannot change that fact.

The Contract's requirement to pay Mr. Falwell is clear and unambiguous. The Court is required to construe the Contract in accordance with its plain terms in order to give effect to the intent of the parties, while not adding or deleting language that the parties did not choose. *See Plotnick v. Computer Scis. Corp. Deferred Comp. Plan for Key Executives*, 875 F.3d 160, 166 (4th Cir. 2017) ("This court applies the federal common law of contracts to interpret ERISA plans, and will enforce the plain language of an ERISA plan ... in accordance with its literal and natural meaning.") (internal quotation marks and citations omitted; ellipses in original); *United McGill Corp.*, 154 F.3d at 172 (noting that "the plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning") (internal quotation marks and citation omitted); *Clark v. Stanley Furniture Co., LLC*, 566 F. Supp. 3d 527, 534 (W.D. Va. 2021) (observing that a court construing an ERISA plan must look to the contract's language, and if the language is clear and unambiguous, the meaning is to be "ascertained in accordance with its plainly expressed intent") (quoting *M & G Polymers USA, LLC v. Tackett*, 574 U.S 427, 435 (2015)).

Here, Mr. Falwell submitted his resignation without Cause and For Good Reason on August 24, 2020. (Compl. ¶ 47; Falwell Decl. ¶ 4.) On the morning of August 25, 2020, Liberty's Executive Committee met and voted to accept the resignation without Cause and For Good Reason immediately and recommended ratification to Liberty's full Board of Trustees. (Compl. ¶ 48; ECF 7-1, p. 45, 47, 51, 55-56.)  Later that same day, Liberty's full Board of Trustees unanimously voted to affirm the Executive Committee's decision. (Compl. ¶ 49; ECF 7-1, p. 45, 47, 51, 55-56, 62; Falwell Decl. ¶ 6 and Exhibit B thereto.) On August 25, 2020, Mr. Falwell's employment with Liberty University ended (and it was not for Cause).  These facts cannot be disputed. Moreover, Liberty acknowledges Mr. Falwell resigned. (ECF 7-1, p. 47, 62.)[8] Further, Liberty cannot deny the actions taken by the Executive Committee and Board of Trustees in accepting Mr. Falwell's resignation, terminating his employment without Cause and For Good Reason, and paying Mr. Falwell the severance owed because of his resignation without Cause and For Good Reason.

The *only* circumstances specified in the Contract under which Mr. Falwell would forfeit his benefits were not met. Those circumstances were (1) if Mr. Falwell's termination was for Cause (which it was not) or (2) if he engaged in any competitive activity during the two-year Non-Competition Period (which he did not). (Compl. ¶ 49; ECF 7-1, p. 45, 47, 51, 55-56; Falwell Decl. ¶¶ 6-8.) Importantly, there is no other language in the Contract that otherwise inhibits, delays, or nullifies Mr. Falwell's entitlement to the benefits under the Contract.

---

[8] While the Contract's terms plainly establish Mr. Falwell's entitlement to benefits, even under the 2019 Employment Agreement, termination for "cause" is "defined restrictively" and "[a] dismissal in the absence of required, thirty (30) day notice is a dismissal *without* Cause." (ECF 7-1, p. 14-15 (emphasis added).) There was not a 30-day notice of Mr. Falwell's termination, of course.

11

B.  **Mr. Falwell's SERP Demand and Appeal Result in Plan Administrator's Arbitrary and Capricious Denial of SERP.**

On September 14, 2022, Mr. Falwell sent a letter, by counsel, to Mr. Carroll Hudson[9] demanding the SERP as Mr. Falwell had satisfied the conditions set forth in the contract. (ECF 7-1, pp. 44-45.) As detailed in the demand for SERP, Mr. Falwell noted that he "resigned as President of Liberty for '**Good Reason**' on August 25, 2020. Liberty accepted Mr. Falwell's resignation for '**Good Reason**.'" (*Id.*) Mr. Falwell detailed that "neither of the events that would result in forfeiture of the SERP account identified in Paragraph 5 of the [Contract] has occurred." (*Id.*)

In response to Mr. Falwell's demand, after taking the full 90 days to respond, the Plan Administrator stated it "does not dispute that Mr. Falwell resigned on August 25, 2020." (ECF 7-1, p. 47.) However, it noted that Liberty filed suit against Mr. Falwell in state court asserting claims for, among other things, breach of fiduciary duty,[10] which suit, the Plan Administrator asserted, would "clarify certain key factual issues related to the circumstances surrounding Mr. Falwell's separation." (*Id.*) Further, the Plan Administrator based its denial of the SERP on its reliance on that state court litigation and the perceived "dispute." (*Id.*)[11]

Thus, in order to manufacture the denial of Mr. Falwell's claim, the Plan Administrator acted improperly and looked outside the four corners of the Contract, but that excuse fails. The Plan Administrator's contrived denial is anchored on the importation into the Contract of a

---

[9] Mr. Carroll Hudson was also a member of the Executive Committee and Board when the Executive Committee and Board accepted Mr. Falwell's resignation without Cause and For Good Reason and paid Mr. Falwell his severance.

[10] The only relief Liberty seeks relating to alleged breach of fiduciary duty is monetary damages.

[11] Mr. Falwell has denied the material allegations and believes that state court case to be meritless, and the discovery conducted so far has demonstrated no support for Liberty's claims (and in many cases demonstrates Liberty's claims to be false). Liberty fruitlessly continues to change its case as facts continue to demonstrate the lack of merit.

"disagreement or dispute" provision from the separate Liberty University Rabbi Trust Agreement ("**Rabbi Trust Agreement**"), to which Mr. Falwell is not a party.[12]

By its terms, the intent of the Rabbi Trust Agreement is to govern a trust by which Liberty intended to "finance [Liberty's] potential obligations" to Mr. Falwell. (ECF 7-1, p. 30.) The subject "disagreement or dispute" was Liberty's lawsuit against Mr. Falwell filed approximately eight (8) months after Liberty unconditionally accepted Mr. Falwell's resignation without Cause and For Good Reason. Liberty's state court lawsuit does not challenge that Mr. Falwell's termination was not for Cause, and nor does it address payment of the SERP. There is, in fact, no claim for relief before the state court that relates to this payment of retirement benefits.

Although the lawsuit post-dated Mr. Falwell's resignation, the Plan Administrator illegally denied Mr. Falwell's claim notwithstanding Liberty's acknowledgment that Mr. "Falwell's severance compensation was dictated by the terms of his pre-existing agreement without any adjustment by the University or its Board," and that Liberty's Board of Trustees[13] accepted Mr. Falwell's resignation. (Compl. ¶ 49; ECF 7-1, p. 45, 47, 51, 55-56; Falwell Decl. ¶ 6.) Defendants were wrong to deny Mr. Falwell's claim. In short, the "disagreement or dispute" has nothing to do with the payment due under the SEPR and the Contract.

---

[12] Even if this Court were to conclude that the "dispute" provision from the Rabbi Trust Agreement was imported into the Contract, the outcome remains the same because Mr. Falwell submitted his resignation without Cause and For Good Reason, which resignation Liberty unconditionally accepted one day after Mr. Falwell submitted it. There is no dispute about that. Further, the dispute that does exist is about money damages – not payment of the retirement benefits.

[13] Notably, several members of Liberty's Board of Trustees are also members of the Executive Committee and comprise the Plan Administrator. *See* https://www.liberty.edu/trustees/ (last accessed May 3, 2023) (providing names of current members of Board of Trustees and Executive Committee.) Therefore, when the Board of Trustees accepted Mr. Falwell's without Cause and for Good Reason resignation, the Plan Administrator was fully aware of the relevant facts and circumstances. (*See* Falwell Decl. ¶¶ 6-7.)

Before filing this action, Mr. Falwell was required to appeal the decision to the same body that denied his valid claim. In appealing the Plan Administrator's decision to deny Mr. Falwell the SERP, Mr. Falwell reasserted that "Liberty acknowledges that Mr. Falwell resigned on August 25, 2020." (ECF 7-1, p. 51.) Moreover, Mr. Falwell pointed to Liberty's decision to accept Mr. Falwell's resignation without Cause and For Good Reason. (*See* ECF 7-1, pp. 51, 55-56.) With respect to the Rabbi Trust Agreement, Mr. Falwell noted specifically that:

> The [Contract] is the governing plan setting forth the amounts Mr. Falwell is entitled to and under what conditions. The Rabbi Trust [Agreement] cannot and does not amend or govern the timing of payment due under the SERP. Mr. Falwell has met the conditions set forth in the [Contract] and not only can Liberty pay the benefit through either their general accounts or the Rabbi Trust [Agreement], but Liberty must pay the amount set forth in the [Contract] immediately, as it was due September 1, 2022.

(ECF 7-1, p. 52).

**C.   Liberty's Final Denial Reiterates its Arbitrary and Capricious Decision to Deny Mr. Falwell the SERP.**

The Plan Administrator's denial of Mr. Falwell's December 28, 2022 appeal resulted in the instant action. On February 24, 2023, after taking 58 of the 60 days to respond,[14] the Plan Administrator denied Mr. Falwell's appeal and stated again that it "continues to acknowledge that Mr. Falwell resigned on August 25, 2020." (ECF 7-1, p. 62). The Plan Administrator reiterated the action Liberty filed in state court and the "*potential* existence of suppressed evidence" as a basis for the SERP denial, and strangely stated a basis for denial was the state court action "*might* impact [] Liberty University's *potential* remedy of recission [*sic*]." (ECF 7-1, pp. 61-62) (emphasis added). No remedy of rescission has *ever* been asserted or requested in the state court case.

---

[14] February 24, 2023 was a Friday; so, it was the last business day to respond.

Liberty accurately noted that "Mr. Falwell contends that the [Contract], not the [Rabbi] Trust Agreement, controls the timing of payment. Liberty University agrees on the importance of the stand-alone SERP in the construction of Mr. Falwell's putative SERP benefits." (ECF 7-1, p. 62.). In its final decision, to which Mr. Falwell responds through this litigation, the Plan Administrator, however, stated the Rabbi Trust Agreement was a controlling plan document. (*Id.*) Not only was that position wrong but, also, even if were true, the Plan Administrator arbitrarily cherry-picked provisions in an effort to avoid the clear and unambiguous terms of the Contract entitling Mr. Falwell to the SERP.

D.  **Even if the Rabbi Trust Agreement were Incorporated into the Contract, *Arguendo*, Liberty Still Must Pay Mr. Falwell the SERP.**

The Rabbi Trust Agreement does no more than provide *a* source – and not even *the only* source – to satisfy Liberty's obligations in the Contract, which obligation arises under the 2019 Employment Agreement and the Contract. The Contract makes plain that: "The University shall establish a so-called 'rabbi' trust pursuant to the Trust Agreement attached hereto (the 'Trust') for your benefit. ... The Trust is intended to be a grantor trust, of which the University is the grantor, within the meaning of subpart E, Part I, subchapter J, chapter 1, subtitle A of the Internal Revenue Code of 1986, as amended (the 'Code'), and shall be construed accordingly." (ECF 7-1, p. 25.) There is nothing in this language stating that the Rabbi Trust Agreement is to *also* delay, curtail, or eliminate benefits under the Contract.

In addition, the Rabbi Trust Agreement states the intent of Liberty and the Trustee with respect to the trust: "WHEREAS, in accordance with the requirements of the SERP *and to finance its potential obligation to the Participant*, the University desires to establish a trust ..."; and "WHEREAS, it is the intention of the University to make contributions to the *Trust to provide a source of funds to pay benefits under the SERP*" (emphasis added). (ECF 7-1, p. 30.) In Section

15

2(e), Liberty retained *the option* to make payments due under the Contract directly to Mr. Falwell outside of the Rabbi Trust if it so chose: "[Liberty] may make payment of benefits directly to [Mr. Falwell] or his beneficiaries as they become due under the terms of the [Contract]." (ECF 7-1, p. 32, ¶ 2(e).) Thus, the Rabbi Trust is, by its own terms, merely an optional funding mechanism by which Liberty could satisfy its obligation under the Contract.

The conditions in the Rabbi Trust Agreement with respect to the Trustee's duties and obligations *vis-à-vis* the trust or Liberty are immaterial to Mr. Falwell's entitlement to benefits conferred under the Contract. As already noted, Liberty states that the intent of the Rabbi Trust Agreement is to serve as a financing vehicle to satisfy the obligations in the Contract. (ECF 7-1, p. 30.) As to any intended effect on Mr. Falwell's entitlement to benefits under the Contract, the Rabbi Trust Agreement disclaims any effect: ***"[A]ny claim for such benefits [under the Contract] shall be considered and reviewed under the procedures set out in the [Contract]."*** (ECF 7-1, p. 32, ¶ 2(d) (emphasis added).) The Rabbi Trust Agreement even states, "In any case, in which a provision of this Trust Agreement conflicts with any provision of the SERP, *the SERP*[15] *shall control*." (ECF 7-1, p. 39, ¶ 9(j) (emphasis added).) Therefore, the Rabbi Trust Agreement has no relation at all to whether Mr. Falwell receives the SERP under the Contract, and the Rabbi Trust Agreement – to which Mr. Falwell was not a party – was not and cannot be incorporated into the Contract to justify Defendants' attempt to evade a clear legal obligation. Even if this Court were to conclude that a mere reference to the Rabbi Trust Agreement is sufficient to import it into the Contract, the Rabbi Trust's language makes plain the effect it is to have on Mr. Falwell's entitlement to benefits under Contract – none.

---

[15] As used by the Plan Administrator, "SERP" refers to the "Contract" as defined herein.

Moreover, the claimed "dispute" on which Defendants are completely reliant in denying the SERP has nothing to do with Mr. Falwell's claim here. Instead, Liberty's state court case seeks money damages from Mr. Falwell resulting from the alleged breach of fiduciary duty. Also, while the state court case is about several things, Mr. Falwell's entitlement to the SERP is not one of them.

**E.      The Plan Administrator's Denial Goes Beyond the Scope of the Contract.**

Had the parties to the Contract – Liberty and Mr. Falwell – intended to ***further*** condition Mr. Falwell's entitlement to benefits, they could have easily added such terms in Paragraphs 4 or 5 of the Contract, but they did not. That omission can only be considered deliberate. *See Adams v. Alcorn*, No. 5:15CV00012, 2015 WL 1524481, at *6 (W.D. Va. Apr. 2, 2015), *aff'd sub nom. 24th Senatorial Dist. Republican Comm. v. Alcorn*, 820 F.3d 624, 2016 WL 1567060 (4th Cir. 2016) (observing that inclusion of additional language in one provision, but not in others, "must be attributed to a deliberate choice and given meaning"); *Collier v. Land & Sea Rest. Co., LLC*, No. 7:13-CV-00104, 2014 WL 3587506, at *6 (W.D. Va. July 21, 2014) (applying the principle of *expressio unius est exclusio alterius* in construing a contract). Indeed, if the parties intended to provide other grounds to delay the retirement benefits, Liberty and Mr. Falwell could have negotiated those issues because they were free to add such language to address contingencies or circumstances in addition to the disqualifying events already stated.

The Rabbi Trust Agreement, which Defendants admit is a "stand-alone" document (ECF 7-1, pp. 59-67), imposed conditions ***on the Trustee's performance*** under the trust document, and it does not follow that Plan Administrator was entitled to graft those conditions onto the separate Contract and on Mr. Falwell's entitlement to benefits.[16] Not only would doing so add language to

---

[16] Note again that Mr. Falwell is not a party to the Rabbi Trust Agreement.

17

the Contract (which an interpreting court cannot do), but doing so would also create a conflict between the two documents by imposing additional conditions that were not reflected in the Contract. As the Rabbi Trust indicates, "any claim for such benefits [under the Contract] shall be considered and reviewed under the procedures set out in the [Contract]" – not the Contract *and* the Rabbi Trust Agreement.

Although the Contract appears to grant the Plan Administrator discretion in "administering" the contract,[17] that discretion does not extend to interpreting the Contract to import language from the separate Rabbi Trust Agreement to frustrate the intent of the Contract – to establish and to provide both the circumstances by which Mr. Falwell would receive the Contract's benefits and delineate the conditions under which he would not. Rather than simply fulfilling the clear legal obligation to pay Mr. Falwell the retirement benefits he is owed and despite the recognition that the claim is owed (*see* Compl. ¶¶ 43-46, ECF 1), Defendants have engaged in a protracted campaign to deny what is due immediately – all under the guise of the existence of a separate "disagreement or dispute" that has nothing at all to do with this action.

### F. The Plan Administrator's Denial Is Arbitrary and Capricious.

Mr. Falwell's claim for the SERP is plainly due, and Defendants as a matter of law must pay Mr. Falwell the amount that has accrued in a lump sum. It was due on September 1, 2022. The record establishes beyond argument that Mr. Falwell followed the procedure outlined in the Contract, that Mr. Falwell asserted his entitlement to the SERP, and that Mr. Falwell rebutted every specious argument thrown up by the Plan Administrator in Defendants' unlawful effort to shirk

---

[17] Any discretion to an ERISA plan administrator can be conferred either by express creation of discretionary authority or by implication. *Woods v. Prudential Co. of Am.*, 528 F.3d 320, 322 (4th Cir. 2008). Regardless of the method, "the plan [must] manifest a clear intent to confer such discretion." *Id.*

the legal obligation to pay Mr. Falwell. Under any standard, the decision to deny Mr. Falwell retirement benefits under the guise of state-court litigation and "maybe" claims that do not even address the SERP does not survive scrutiny. There is simply no factual or legal basis to support a denial of benefits under the Contract. Therefore, the denial of benefits to Mr. Falwell violates basic rules of contract interpretation, and is, without question, arbitrary and capricious.

## **PRAYER FOR RELIEF**

WHEREFORE, for the reasons set forth herein, Plaintiff, Jerry L. Falwell, Jr., by counsel, respectfully requests that this Honorable Court award summary judgment to Jerry L. Falwell, Jr.; order Defendants to comply with the Contract; require payment of $8,579,727.58, as of June 30, 2022; award pre- and post-judgment interest as demanded in the Complaint; award Mr. Falwell his attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and award Jerry L. Falwell, Jr. any and all such other relief as this Court may deem just and proper.

Dated:  May 4, 2023                    Respectfully submitted,

JERRY L. FALWELL, JR.

/s/ *Vernon E. Inge, Jr.*
Counsel

Vernon E. Inge, Jr (VSB No. 32699)
Robert N. Drewry (VSB No. 91282)
WHITEFORD, TAYLOR & PRESTON L.L.P.
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:    (804) 977-3300
Facsimile:    (804) 977-3299
E-Mail:    vinge@wtplaw.com
E-Mail:    rdrewry@wtplaw.com

*Counsel for Plaintiff, Jerry L. Falwell, Jr.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of May, 2023, I electronically filed the foregoing *Jerry L. Falwell, Jr.'s Memorandum of Law in Support of His Motion for Summary Judgment* with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

>Scott C. Oostdyk, Esq.
>Andrew F. Gann, Jr., Esq.
>MCGUIREWOODS LLP
>Gateway Plaza
>800 East Canal Street
>Richmond, Virginia 23219-3916
>
>*Counsel for Defendants, Liberty University, Inc. and the Executive Committee of the Board of Trustees for Liberty University, Inc.*

>/s/ *Vernon E. Inge, Jr.*
>Vernon E. Inge, Jr. (VSB No. 32699)
>Robert N. Drewry (VSB No. 91282)
>WHITEFORD, TAYLOR & PRESTON L.L.P.
>Two James Center
>1021 E. Cary Street, Suite 1700
>Richmond, Virginia 23219
>Telephone:  (804) 977-3300
>Facsimile:  (804) 977-3299
>E-Mail:  vinge@wtplaw.com
>E-Mail:  rdrewry@wtplaw.com
>
>*Counsel for Plaintiff, Jerry L. Falwell, Jr.*

20