# EXHIBIT 1

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement') is hereby adopted effective July 1, 2019 between LIBERTY UNIVERSITY, a Virginia nonstock corporation (referred to in this Agreement as "LU" or "the University") and JERRY L. FALWELL, JR., a resident of Virginia (referred to in this Agreement as "Falwell" or "the Employee").

WHEREAS LU is a university centered in the City of Lynchburg, Virginia, which is dedicated to excellence in higher education and scholarship within a Christian context;

WHEREAS, Falwell has served LU in several roles since 1988, including his current positions as Chancellor and President and in connection therewith had entered into a series of employment agreements;

WHEREAS, LU acknowledges that Falwell, among others, was instrumental in promoting and furthering the University's debt restructuring and return to a position of financial strength in 1997 after a period of severe financial hardships for the University that began in 1987 and in promoting and furthering the rapid expansion and continued success of the University, particularly since 2007;

WHEREAS, since Falwell became President and Chancellor in 2007, Liberty's net assets have increased from approximately $100,000,000 to over $2.1 billion in 2017 and Liberty's enrollment has increased from approximately 9,600 students in residence to over 15,000 students in residence and from approximately 27,000 students studying online to over 86,000 students studying online. During the same period, annual gross revenues have increased from $231,506,554 to $1,111,316,499 and the University's surplus of revenues over expenditures has increased from $52,514,469 to $331,142,834.  As a result of LU's strong financial performance, Standard & Poor's has assigned the University a credit rating of AA since 2011, placing the University among the 80 highest rated universities nationally;

{2625067-1, 116311-00009-01}

WHEREAS, in 2019 LU engaged FW Cook, a national consulting firm with expertise in compensation of executives in tax-exempt organizations, to review Falwell's compensation to determine whether it is in line with national standards, taking into account LU's growth and financial achievements and Falwell's historical compensation, and to make recommendations for program changes as needed to ensure that he is retained at LU for the long term and provided with a competitive and motivating compensation program;

WHEREAS, LU desires to adjust its executive compensation program so that it remains competitive with executive compensation programs of other comparable non-profit colleges and universities, adjusted for geography, performance and tenure;

WHEREAS, in recognition of Falwell's many significant contributions to the University and in an effort to compensate Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, LU wishes to formalize and reinforce the parties' long term employment relationship by entering into this Agreement; and

WHEREAS, Falwell likewise wishes to continue to contribute to the future success of LU through his employment as President and Chancellor of the University on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, LU and Falwell adopt the foregoing recitals and agree as follows:

<u>ARTICLE 1</u>

EMPLOYMENT STATUS

1.1     LU hereby agrees to continue employing Falwell and Falwell hereby accepts continued employment by LU as President and Chancellor on the terms and subject to the conditions set forth in this Agreement. Falwell shall continue to be classified as a full-time employee for all purposes, including fringe benefits.  Subject to the provisions of Article 7 and 8

hereof, Falwell is an at will employee of LU, and serves at the pleasure of the LU Board of Trustees.

## ARTICLE 2

## TERM

2.1    This Agreement shall commence on July 1, 2019 and shall continue until the earlier of: (a) June 30, 2030; or (b) the date the Agreement is terminated pursuant to Articles 6 through 9, inclusive, of this Agreement (the "Term").

## ARTICLE 3

## DUTIES AND RESPONSIBILITIES

3.1    Falwell shall continue to provide LU with dedicated, diligent and conscientious full time service in a manner that is generally consistent with the level of service he has provided during the nearly five (5) year period immediately preceding the effective date of this Agreement, with allowances for reasonable time to attend to personal investments.

3.2    Falwell's duties shall consist of the tasks, duties and responsibilities he has assumed and performed as President and Chancellor during the nearly five (5) year period immediately preceding the effective dates of this Agreement. These duties shall include but not necessarily be limited to the following:

(a)    ensuring the implementation of the University's mission and purposes as described or defined in the University's Articles of Incorporation, Bylaws, and other foundational documents.

(b)    performing the duties of Chancellor/President as described in the University's Bylaws.

(c)    overseeing the fiscal, administrative, admissions, academic, athletic and other operations, divisions, departments and offices of the University.

(d)     raising funds for the benefit of the University.

(e)     implementing and executing policies, orders and resolutions adopted or established by the LU Board of Trustees and its Executive Committee.

3.3     As Chancellor and President, Falwell shall have the executive and administrative powers to manage and control the day to day operations of the University, provide focus and direction for the University, make policy recommendations to the Board of Trustees, and provide spiritual and worldview leadership to the University in pursuit of excellence, subject to the ultimate authority of the Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws. That executive and administrative power shall include but not be limited to the absolute authority to hire, retain and dismiss administrative, professional, academic and athletic personnel, subject only to any contractual or tenurial rights of any such employee. Provided, however, that Falwell shall be accountable to the Board of Trustees for implementing its policies and carrying out his duties, including the handling of personnel matters.

3.4     Compliance with Rules Applicable to Athletics Program.

(a)     Falwell agrees to abide by and comply with the Constitution, Operating Bylaws, legislation and interpretations of the National Collegiate Athletic Association ("NCAA") (or any other conference in which the University becomes affiliated), and all NCAA and University rules and regulations relating to the conduct and administration of the University's general athletics program (collectively, the "Program") as now constituted or as any of the same may be amended or enacted during the term of Falwell's employment by the University.  In the event that Falwell becomes aware, or has reasonable cause to believe, that violations of any of the aforementioned rules or regulations may have taken place, he shall promptly report the same to the Board and the NCAA (or other applicable governing body).  Falwell agrees to adhere to, respect and follow the

academic standards and requirements of the University and the NCAA with regard to the recruitment and eligibility of prospective and current student athletes.  All academic standards, requirements and policies of the University and the NCAA shall also be observed at all times by Falwell and he shall use Best Efforts (as defined below) to ensure that the athletic director and members of the Program staff do the same.

(b)    If Falwell is involved in an act or omission that constitutes a violation by the Athletic Director, any University coach or the University of any legislation, rule, regulation, constitutional provision, bylaw, policy, procedure or guideline of the NCAA (or NCAA interpretation), including but not limited to failing to use Best Efforts to promote an atmosphere of compliance by the athletic director, coaches, their staffs or student-athletes in the Program or to monitor their activities for compliance with NCAA rules, or if he fails to notify the Board or NCAA of any such violations of which he has knowledge, Falwell shall be subject to disciplinary or corrective action as set forth in NCAA enforcement procedures and/or policies, procedures and guidelines established from time to time by the University for its administrators, including but not limited to, probation, suspension with or without pay (for up to thirty (30) days) or termination of employment.  Such disciplinary action may include termination for Cause (as defined in Section 7.3(g)). Notwithstanding the foregoing, before any such disciplinary action is imposed, Falwell will be provided with written notice of the alleged violation or violations and no less than fifteen (15) days to remedy the same, provided that such violation or violations are capable of cure, as determined in the reasonable and good faith judgment of the University.

(c)    For purposes of this Agreement, "Best Efforts" means with respect to Falwell, those efforts that a responsible and experienced President (other than Falwell) desirous of successfully achieving the specified result would use in similar circumstances; and (ii) with respect

to the University, those efforts that a prudent university desirous of successfully achieving the specified result would use in similar circumstances.

3.5     Falwell shall not undertake compensated work or activities for, or accept any employment or other compensation from, any other institution of higher education for work undertaken prior to the termination of this Agreement without receiving approval of the Board of Trustees or the Executive Committee of the Board of Trustees (the "Executive Committee") prior to undertaking such work or activities.

3.6     Falwell shall not author or publish any book or article relating to his employment at Liberty University hereunder without prior consent of the Executive Committee or Board of Trustees, which prior consent may be conditioned upon advance review and approval of the content of said book or article. This provision does not include letters to the editor or articles in University publications and other University media which are published to carry out Falwell's duties under this Agreement and advance the interests and mission of LU. Nor does this provision include brief communications on Twitter, Facebook and similar communication vehicles. The provision of this subsection shall survive termination of this Agreement.

3.7     The parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings. This prohibition includes defamatory remarks about the employees and members of the Board of Trustees of the University. Neither party, however, waives the protections afforded by otherwise applicable common law privileges and this Section 3.6 shall in no event apply to remarks made during meetings of either the University's Board of Trustees or its Executive Committee. If Falwell's employment is terminated for cause, the parties may truthfully explain the circumstances forming the basis for the determination of cause. The provision of this Section 3.6 shall survive termination of this Agreement.

3.8     Falwell shall continue to have access to confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly disclosed by LU ("'Confidential Information") during the course of his employment. Confidential Information remains the property of LU. Unauthorized disclosure of Confidential Information will cause definite and irreparable harm to LU. Falwell shall not disclose Confidential Information intentionally within the University except to fulfill the legitimate business purposes of LU and shall not disclose it directly or indirectly, outside the University without the express authorization of the Executive Committee or as required by law or to further the interests of LU. Under no circumstances shall the release of details of this Agreement be considered to further the interests of LU. Any Confidential Information in tangible form shall be immediately returned to LU upon request. The provisions of this subsection shall survive termination of this Agreement.

ARTICLE 4

COMPENSATION

4.1     In consideration of Falwell's continued service as President and Chancellor, LU shall compensate him as follows:

(a)     *Base Salary.* During the Term, LU shall pay Falwell an annual base salary at the rate of $1,250,000 per year, payable in accordance with the normal payroll practices of LU for its executives as in effect from time to time (but not less frequently than monthly).  The annual base salary shall not be reduced during the Term of the Agreement.  On an annual basis, the Board shall review Falwell's performance and consider in its discretion approval of an increase in base salary, with such approved increases to take effect on July 1, of each year. Such base salary, as so increased, is hereafter referred to as the "Base Salary."

(b)      *Discretionary Bonuses.* Falwell shall be eligible to receive bonuses in such amounts and at such times as the Executive Committee of the Board of Trustees may award based on its assessment of his performance, the financial condition of the University, and other considerations which the Executive Committee of the Board of Trustees in its sole discretion finds relevant.  The Board shall consider the award of such discretionary bonus no less often than annually.

(c)      *Severance Benefit*.   In the event the University terminates Falwell's employment without Cause, or Falwell resigns his employment with Good Reason, the University shall pay to Falwell a single lump sum payment in an amount equal to two times his Base Salary. Such amount shall be paid to Falwell within thirty (30) days following his termination of employment, subject to his execution of a release of claims (provided that if the period over which Falwell has to consider the execution of the release crosses tax years, the payment shall be made no earlier than the first business day of the second tax year).

(d)      *Supplemental Executive Retirement Plan.* The University agrees to adopt a defined contribution supplemental executive retirement plan for the benefit of Falwell ("SERP" or the "Plan") pursuant to a separate agreement that will (1) provide for annual credits designed to target a retirement benefit over the life of Falwell and Mrs. Falwell in an amount equal to seventy-five percent (75%) of Falwell's average Base Salary over the five (5) year period prior to his termination of employment, net of any required tax withholding, (2) have an initial notional account balance that represents prior years' deemed accumulations during Falwell's presidency through June 30, 2019 and (3) be paid in a lump sum.  This lump sum shall be payable on the first day of the calendar month following the earliest of (1) provided that Falwell does not engage in any Competitive Activity during the Non-Competition Period, as defined in Section 5.2 herein, the

second anniversary of his termination of employment, (2) Falwell's death, or (3) Falwell's Disability, as defined in Section 6.6 herein.

4.2     Except as set forth herein, LU shall provide Falwell the same fringe benefits and the same opportunity to participate in benefit plans that it offers other full-time executive employees. These benefits and programs currently include group family health insurance (medical, vision, dental), group family life insurance and disability insurance, employee assistance programs, retirement, savings and investment programs (including LU's Section 403(B) plan), sick/personal leave, holiday leave and voice and data phone payments under LU's Cellular Phone Policy and similar benefits made available to executive or managerial employees of the University. In addition to such benefits, conditioned on Falwell's continued employment, on each April 1 LU shall pay on Falwell's behalf an amount equal to the life insurance premiums owed in respect of whole life insurance policies issued by each of Pacific Life Insurance Company (issued October 3, 2016) and Protective Insurance Company (issued April 8, 2016) (together, the "Policies") on Falwell's life, except to the extent that such premiums are paid by the dividends accruing on the cash value of such Policies.  For this purpose such payment shall be made pursuant to a separate "split dollar agreement" pursuant to which the premium payments in respect of the Policies shall be repaid, without interest, to the University upon the payment of the death benefit or earlier termination of the Policies.  Once every eighteen months (18) months, Falwell shall undergo an annual Comprehensive Executive Medical Health Assessment, the cost of which shall be reimbursed by the institution upon submission of a receipt or statement for same.   The Comprehensive Executive Medical Health Assessment shall include a thorough physical examination by medical doctor(s), a full range of preventive screening tests for early detection of cancer, heart disease and other serious medical problems, a cardiovascular fitness evaluation,

including treadmill exercise test, a lifestyle assessment to discuss nutrition, exercise, personal safety and other indicators of risk of disease, a review and update of medications and immunizations, development and assessment of a long-term strategy for prolonged life and wellness, a full report of the test results and recommendations at the conclusion of the examination and a written report sent to Falwell confidentially for his personal use and for consultation with his private physician.  Neither the University nor the Executive Committee shall request or be entitled to a copy of the written report but the Executive Committee shall be entitled to receive a copy of the receipt or statement for such services as part of each of its formal annual evaluations of Falwell.

4.3     LU shall provide Falwell with an automobile allowance of Seven Hundred Fifty Dollars ($750) per month in accordance with LU's normal payroll policies and schedule and subject to any reporting and withholding requirement provided by law.  In addition, for each year that the Agreement remains in effect LU shall furnish on an annual basis up to fifty (50) hours of jet transportation on LU's jets for Falwell and members of his immediate family, with any unused hours expiring at the end of each year without further compensation to Falwell.   Any personal use of the jet transportation benefit described herein will be reported as a taxable benefit to Falwell. LU shall reimburse Falwell in accordance with LU's Travel and Entertainment Policy for reasonable and necessary travel and out-of-pocket expenses incurred by him, and where appropriate his spouse, in connection with the performance of his official duties under this Agreement.

4.4     LU shall provide Falwell and members of his immediate family with tuition at the University through the conclusion of each academic year during which he serves as President and/or Chancellor pursuant to LU's Dependent Grant-in-Aid Policy and Continuing Education

Policy. "Immediate family" shall be limited to Falwell's wife, children by birth or adoption and grandchildren by birth or adoption. Such tuition benefits shall be provided subject to any reporting and withholding requirements provided by law.

4.5     Falwell shall be entitled to six (6) weeks annual vacation during each year of the Term. No unused vacation may be carried forward to subsequent years or paid out as compensation.

4.6     LU agrees to provide memberships at the LaHaye Student Center and Sports Racket for use by Falwell and his immediate family or at another fitness center mutually agreeable to the parties.

4.7     LU agrees to provide general maintenance and upkeep at the primary residence of Falwell, including general repairs, maintenance and lawn care. The parties hereto acknowledge that the primary residence of Falwell is used by the University from time to time for student, faculty and staff events. A portion of the general maintenance and upkeep referenced above shall be deemed a business expense of the University in connection with said student, faculty and staff events and the remainder of said general maintenance and upkeep shall be deemed income to Falwell and reported to the IRS as such by the University.

<u>ARTICLE 5</u>

OTHER EMPLOYMENT

5.1     Falwell shall refrain from undertaking any other employment or compensated activities that hinder or impede successful performance of the services outlined in this Agreement. Except as provided in this Agreement, Falwell shall not engage in any compensated employment or compensated activities without first obtaining the written approval of the Executive Committee or the Board of Trustees. The University, however, acknowledges that Falwell is licensed by the Virginia State Bar and periodically engages in the practice of law on a limited basis in association

with another practitioner on discrete matters. Falwell hereby receives approval for such limited legal work and therefore shall not require any additional approval for such employment by the Executive Committee or the Board of Trustees. Passive investment activity such as buying, holding and selling real estate, stock and securities ("Passive Investment Activity") shall not be considered other employment or compensated activities for purposes of this Agreement and therefore shall not require any additional approval by the Executive Committee of the Board of Trustees.  In addition, Falwell shall have the right without seeking approval of the Executive Committee or Board of Trustees to participate as either a paid endorser or principal owner in an asset management venture. Falwell (alone or in conjunction with members of his family and/or others) shall be free to participate in an asset management venture, provided such venture conducts no business with the University or any entity owned or controlled by the University and receives no compensation from the University or any entity owned or controlled by the University.

5.2     In view of the unique and valuable services rendered by Falwell to LU and in connection with the SERP benefits to be paid to Falwell at or following termination of employment, Falwell agrees that during employment and for a period of two (2) years thereafter ("Non-Competition Period"), whether with our without compensation, directly or indirectly, as an owner, principal, partner, member, shareholder, independent contractor, consultant, joint venturer, investor, licensor, lender or in any other capacity whatsoever, alone, or in association with any other Person, he will not carry on, be engaged or take part in, or render services (other than services which are generally offered to third parties) or advice to, own, share in the earnings of, invest in the stocks, bonds or other securities of, or otherwise become financially interested in, any other college or university, whether for-profit or non-profit ("Competitive Activity").  The  record or beneficial ownership by Falwell of up to one percent (1%) of the shares of any corporation whose shares are publicly traded on

a national securities exchange or in the over-the-counter market shall not of itself constitute a breach hereunder.

## ARTICLE 6

## TERMINATION UPON DEATH

6.1     Falwell's death shall terminate this Agreement.  Falwell's executor, administrator or other personal representative or beneficiary, as applicable, shall be entitled to all the compensation and fringe benefits provided in Article 4 of this Agreement through the date of his death, along with the benefits payable pursuant to the SERP under subsection 4.l(e), and any benefits to which he or his executor, administrator or other personal representative or beneficiary, as applicable, is entitled under any applicable benefit plan as a deceased employee.  In addition, Falwell's executor, administrator or other personal representative or beneficiary, as applicable, shall be entitled to any and all survivorship death benefits payable under any savings, retirement, investment and other plans and programs in which Falwell was a participant.  Except as provided herein, Falwell shall not be entitled to receive any other payments or benefits after the date of his death, except that Falwell's surviving spouse or other eligible dependents shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at his date of death.

## ARTICLE 7

## TERMINATION FOR CAUSE OR DISABILITY

7.1     LU may terminate Falwell's employment only for Cause or Disability, as each such term is defined below, provided it first delivers to Falwell specific, written notice of the purported grounds for dismissal, and if in the reasonable opinion of the Executive Committee the Cause or Disability can be corrected or cured, a thirty (30) day opportunity to correct or cure the alleged Cause or Disability.  A dismissal in the absence of required, thirty (30) day notice is a dismissal

without Cause.  For avoidance of doubt, if Falwell is terminated for Cause based on a violation of Section 7.3(g) and the applicable governing body renders a final determination establishing facts indicating that Cause does not exist, provided there are no other facts or circumstances justifying termination for Cause, the termination shall be treated as a termination without Cause under Article 8 and the provisions of Article 8 shall apply.

7.2     If Falwell is terminated for Cause, LU shall be obligated to pay Falwell his salary, earned compensation and fringe benefits up to the date of termination (collectively, his "Accrued Compensation"), plus any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination.  Falwell's resignation from the Board of Trustees and its Executive Committee shall be effective immediately upon termination of his employment for Cause.

7.3     As used in this Agreement, the term "Cause" is defined restrictively to mean only the following:

(a)     the willful refusal or willful failure of Falwell to comply with the reasonable directives of the Board of Trustees, so long as such directives are not in conflict with the authority of the Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws, or in conflict with this Agreement; provided that such refusal or failure results in (or is substantially likely to result in) a material adverse consequence to LU;

(b)      the material failure of Falwell to comply substantially with written policies, standards and regulations of LU as from time-to-time established in writing, provided that such failure results in (or is substantially likely to result in) a material adverse consequence to LU;;

(c)      the willful refusal or willful failure of Falwell to faithfully or diligently perform his duties under this Agreement, provided that such refusal or failure results in (or is substantially likely to result in) a material adverse consequence to LU;

(d)      conviction of or entry of a plea of guilty, no contest or *nolo contendere* to any felony or to a misdemeanor involving moral turpitude (deferred disposition by a court, with or without a finding, admission or adjudication of guilt, such as withholding adjudication or taking the matter under advisement for some set period, meets the threshold for cause intended for Section 7.3 (d));

(e)      defamatory or slanderous comments in breach of Section 3.6 of this Agreement which cause serious damage to LU's reputation;

(f)      Any significant violation (which, for the avoidance of doubt, shall not include any Level III or Level IV violation) or repetitive violation (other than of a de minimis nature) of any legislation, rule, regulation, constitutional provision, bylaw, policy, procedure or guideline of the NCAA (or NCAA interpretation) by Falwell arising from any act or omission of Falwell (or Falwell's knowledge of any act or omission of another person and failure to take prompt and appropriate responsive action or Falwell's failure to monitor, supervise or report another person for whom Falwell has or, at the relevant time had, supervisory responsibility), or;

(g)      advocating a position that is materially inconsistent with the doctrinal statements found in the University's Articles of Incorporation, with the sole exception of such

advocacy in private discussions with the Board of Trustees or Executive Committee in connection with proposed amendments to the Articles of Incorporation.

7.4     In the event Falwell is the subject of a criminal arrest, criminal indictment, criminal information, criminal warrant for violation, criminal complaint or criminal charge for any felony or is the subject of such for a misdemeanor involving moral turpitude, LU may place Falwell on administrative leave, thereby suspending Falwell from performance of the duties and responsibilities outlined in Sections 3.1, 3.2 and 3 3, at a minimum of one-third (1/3) of the rate of his annual base salary in effect at the date of his suspension, which compensation rate can be increased at the discretion of the Executive Committee.

7.5     As used in this Agreement the term "Disability" is deemed restrictively to mean only the following: mental or physical incapacity or disability which prevents Falwell from performing a substantial and material portion of his duties under this Agreement on a continuous basis and that persists for more than 180 consecutive days.  A termination of Falwell's employment for Disability is neither a dismissal with Cause within the meaning of Sections 7.2 and 7.3 nor a dismissal without Cause within the meaning of Article 8 and Falwell shall be entitled to (1) Accrued Compensation, and (2) immediate commencement of benefits under the SERP, as provided under subsection 4.1(e) herein.

## ARTICLE 8

### TERMINATION BY UNIVERSITY WITHOUT CAUSE OR BY FALWELL FOR GOOD REASON

8.1     LU may terminate Falwell's employment as President and Chancellor at any time upon sixty (60) days advance, written notice to Falwell without Cause, and Falwell may resign his employment for "Good Reason" as set forth in Section 8.2. In the event LU elects to terminate

Falwell's employment as Chancellor and President without Cause or Falwell resigns his employment for "Good Reason," LU shall pay to Falwell as liquidated damages the severance benefit provided under subsection 4.1(c), and any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible (1) to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination, and (2) for benefits under the SERP, as provided under subsection 4.1(d).  Following termination of his employment, Falwell shall have no obligation to remain at the University or perform any services for the University.

8.2     For purposes of this Agreement, the term "<u>Good Reason</u>" shall mean (i) any action by LU that results in a material diminution in Falwell's position, authority, duties or responsibilities as President and Chancellor of LU set forth in Article III; (ii)  a reduction by LU in Falwell's Base Salary, or a material failure by LU to pay Falwell any such amounts when due; (iii) a relocation of Falwell's principal place of employment to more than thirty-five (35) miles from LU's Lynchburg, Virginia campus, and (iv) a material breach of this Agreement without Falwell's written consent.  Termination of employment for "Good Reason" shall not be effective (other than with respect to clause (iii) above) until Falwell delivers to the Board of Trustees a written notice specifically identifying the conduct of LU which Falwell believes constitutes "Good Reason" in accordance with this Section 8.2 within ninety (90) days of Falwell's knowledge of the initial occurrence of each specific event constituting Good Reason and Falwell provides the Board of Trustees at least thirty (30) days to remedy such conduct after receipt of such written notice,

and to the extent not cured, Falwell terminates his employment within thirty (30) days after such failure to cure.

8.3     The parties have bargained for this liquidated damages provision, giving careful consideration to the following circumstances:

(a)     this Agreement concerns personal services.

(b)     termination of this Agreement by the University prior to the end of the Term (or at any point after the Term) could damage his professional reputation. These damages to Falwell are difficult to determine with certainty. Therefore, the parties have agreed upon this liquidated damages provision and stipulate that it is neither a penalty nor an incentive for unsatisfactory performance.

## ARTICLE 9

## RESIGNATION

9.1     Falwell may resign, retire or otherwise terminate his employment with the University other than for Good Reason, provided he gives the Board of Trustees sixty (60) days advance written notice.  In the event Falwell should elect to resign, retire or otherwise terminate his employment other than for Good Reason, the University shall be obligated to pay Falwell his Accrued Compensation and any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible (1) to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") or the time specified by COBRA at the time of termination, and (2) for benefits under the SERP, as provided in Section 4.1(e).

## ARTICLE 10

### INDEMNIFICATION

10.1    To the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment. The indemnification afforded Falwell under this Section is in addition to any and all indemnity rights and protections the Employee may have pursuant to statute or under any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies.

## ARTICLE 11

### MISCELLANEOUS PROVISIONS

11.1    Neither party shall disclose this Agreement to anyone without the other party's prior, written consent, unless disclosure is required by law. The parties, however, shall be free to disclose and discuss this Agreement with their respective lawyers, accountants and tax advisors. Falwell shall be permitted to disclose the Agreement to his spouse.

11.2    For a notice or other communication to be valid under this Agreement, it must be written, signed and sent by at least one of the following methods: (a) personal delivery; (b) first class mail, postage prepaid; (c) registered or certified mail, return receipt requested, and postage prepaid; and (d) nationally recognized overnight courier (e.g., UPS or Federal Express).

11.3    If any provision of this Agreement is determined to be invalid, void, illegal or unenforceable to any extent, the remainder of this Agreement, or application of that provision to

any persons or circumstances other than those as to which it is held to be unenforceable, will remain valid, binding and enforceable.

11.4     (a)  The patties may waive a provision in this Agreement only by a writing executed by the party or parties against whom the waiver is sought to be enforced. Waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver by that party of any subsequent breaches.

(b)     No failure or delay in exercising any right or remedy, or in requiring the satisfaction of any condition, under this Agreement, and no act, omission or course of dealing between the parties, shall operate as a waiver or estoppel of any right, remedy or condition.

(c)     A waiver made in writing on one (1) occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver of any future occasion, unless expressly stated as such.

11.5     This Agreement constitutes the final Agreement between the parties concerning the terms and conditions of Falwell's employment with LU. This Agreement supersedes and invalidates any prior or contemporaneous agreement, oral or written, between them regarding the terms of Falwell's employment with LU. All such prior Agreements between the parties shall become null and void upon the execution of this Agreement. In entering into this Agreement, neither party has relied upon any statement, representation, warranty or agreement of the other party except for those expressly contained in this Agreement. The parties may amend this Agreement only by a written Agreement of the parties that identifies itself as an amendment to this Agreement.

11.6     This Agreement may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one instrument.

11.7     The rule of construction that ambiguity is construed against the drafting party shall have no application in any dispute over the interpretation of this Agreement. The parties represent and warrant to one another that they enter this Agreement with the benefit of counsel based on the independent analysis of each party of the facts and legal principles relevant to the terms and conditions of this Agreement.

11.8     Neither this Agreement as a whole nor any of its individual provisions is assignable by either party.

11.9     The descriptive headings of the articles and section of this Agreement are for convenience only, do not constitute a part of this Agreement, and do not affect this Agreement's construction or interpretation.

11.10   This Agreement shall be governed by and construed in accordance with the law of the Commonwealth of Virginia without regard to the Commonwealth's choice of law rules.

11.11   This Agreement shall be binding upon and inure to the benefit of the parties' respective successors, heirs, assigns, receivers and personal representatives.

11.12   The provisions of this Agreement to be performed upon and after termination of Falwell's employment survive termination of this Agreement.

11.13   The parties agree that any legal action or proceeding against the other party arising out of or relating to this Agreement or the University's employment of Falwell shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

IN WITNESS WHEREOF, Falwell and the authorized representative of the University have executed this Agreement on the date(s) written below.

LIBERTY UNIVERSITY, INC.

Chairman, Board of Trustees

Date: 8/30/2019

JERRY L. FALWELL, JR.

Jerry L. Falwell, Jr.

Date: AUG. 29, 2019