**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

JERRY L. FALWELL, JR.

                Plaintiff,

v.

LIBERTY UNIVERSITY, INC., et al.

                Defendant.

Civil Action No. 6:23cv00011

## LIBERTY UNIVERSITY, INC.'S NOTICE OF MEMORANDUM PRESENTING THE AUGMENTED ADMINISTRATIVE RECORD

Defendants Liberty University, Inc. ("Liberty") and the Executive Committee of the Board of Trustees for Liberty University, Inc. (the "Plan Administrator"),[1] by counsel, and pursuant to this Court's Order directing the parties to file the "administrative record of the denial of benefits and the plaintiff's appeal" (the "Order;" ECF No. 25), submit this Notice of Memorandum Presenting the Augmented Record.

## INTRODUCTION

Liberty appreciates that in most ERISA cases the reasonableness of the Plan Administrator's decision is tendered for judicial review based merely on beneficiary demand letters and the Plan Administrator's responses. In this matter, however, circumstances are vastly different. Here, (1) the Plan was created as part of an employment extension arrangement

---

[1] Once again, Liberty reminds this Court that the "Executive Committee of the Board of Trustees for Liberty University, Inc." is not a legal entity. Liberty is accordingly defending this matter as if Liberty University, Inc. is the real party in interest and the only defendant in the matter. Liberty reserves all rights as to this issue.

benefitting Jerry L. Falwell ("Falwell") as Liberty President and Chancellor, arranged in the form of a top hat plan known as a Supplemental Executive Retirement Plan ("SERP"); (2) the President and Chancellor of Liberty was, by specific, agreed designation, the chief spiritual officer at a faith-based college known for its careful dedication to Christian principles and moral conduct; (3) the SERP incorporated a provision permitting Liberty to withhold benefits during a period of "any dispute" with its spiritual leader; (4) Falwell departed Liberty under allegations of serious and salacious misconduct, undisclosed by him in advance, despite a fiduciary duty owed to Liberty, and denied by him, in many instances, despite significant countervailing evidence; (5) Liberty filed suit in a state court to gain the tools of discovery and of the confrontation of witnesses under oath so that it could establish the basis of rescinding the SERP (the "State Proceeding"); and, finally, (6) Liberty denied payment of the SERP benefits to Falwell pending resolution of the pending dispute, likely now to occur by the rescission of the tainted agreement.  Falwell filed this ERISA benefits claim during the middle of that above-described process, challenging both the reasonableness of Liberty's conclusion that it is in "dispute" with Falwell, and Liberty's refusal to pay Falwell pending resolution of that dispute.

Because of the complexity of the proceedings, which span two courts, and the fact that Liberty only made an interim decision not to pay Falwell, it appears this Court solicited a more robust set of reliance materials than the usual materials generated in the court of an ERISA benefits determination (the "Administrative Record").  Liberty submits this Notice of Memorandum Presenting the Augmented Record (the "Memo").  The purpose of this Memo is to present Liberty's interpretation of this Court's Order, and present the documents Liberty understood this Court to require.  Liberty will not elaborate on the content or meaning of the reliance materials,

deferring that discussion to the enhanced summary judgment memorandum solicited from Liberty by this Court.

## MEMORANDUM

### I.        Liberty's Understanding of this Court's Order

In response to Falwell's ERISA suit, on April 4, 2023, Liberty filed a motion to stay or dismiss, motion to dismiss, and motion for partial summary judgment (the "Motion to Dismiss"). (*See* ECF No. 8.)  The Motion to Dismiss argued, *inter alia*, that this Court should apply the *Colorado River* abstention doctrine and either dismiss or stay this action in deference to the State Proceeding.  For his part, Falwell filed his cross motion for summary judgment on May 4, 2023. (*See* ECF No. 13.)  After briefing on the issues and argument, this Court denied the Motion to Dismiss only on the basis of abstention, deciding that it was in a position to adjudicate the issues. (ECF No. 24.)  As a result, this Court has elected to resolve the parties' cross motions for summary judgment.  Liberty had earlier tendered to this Court the customary ERISA demand and claim resolution documents.  (ECF No. 7.)  To aid in ruling on the cross motions for summary judgment, the Court directed Liberty to file "the information integral to its decision process, including the administrative record of the denial of benefits and the plaintiff's appeal."  (ECF No. 25.)

Liberty agrees with this Court's wisdom in requesting a more robust reliance record.  In its Order, the Court cites to several cases that supply that authority, and support this Court's rationale. One example is *Booth v. Wal-Mart Stores Inc. Associates Health and Welfare Plan,* 201 F.3d 335, 344 (4th Cir. 2000).  In that case, the Fourth Circuit not only considered the lower court's analysis of the administrative record (consisting of medical materials and the Plan Administrator's reliance materials, *see id.*,) but also performed its own review of the medical records and reports and letters from various doctors that were contained in that record.  Similarly, the Court in *Colburn v. Hickory*

*Springs Manufacturing Company,* relying on *Booth,* was within its rights to conclude it needed additional reliance materials to "evaluate the reasonableness of defendant compensation committee's decision." 2020 WL 7129935, at *3 (E.D.N.C. Dec. 4, 2020).

In the same vein as the authorities selected by this Court is *Helton v. AT & T Inc.*, where AT & T Inc. "challenge[d] the district court's consideration of evidence outside of the administrative record[.]" 709 F.3d 343, 348 (4th Cir. 2013). The Fourth Circuit approved of the district court's consideration of reliance materials that were "known to the administrator at the time the administrator rendered its benefits determination." *Id.* at 353.

Pursuant to these decisions, Liberty has interpreted this Court's Order to submit materials that pre-existed the February 24, 2023 decision of the Liberty Plan Administrator, information that Liberty considered directly or indirectly through counsel in order to inform its decision to deny Falwell's benefit request on account of a pending intra-party dispute. Liberty agrees the proffered reliance material should only pre-exist the benefits determination but also consist of materials tending to aide this Court in arriving at "'the result of a deliberate, principled reasoning process [...] supported by substantial evidence.'" *Smith v. Reliance Std. Life Ins. Co.*, 2018 U.S. Dist. LEXIS 170036, *9, 2018 WL 4760490 (W.D.N.C. Oct. 2, 2018) (quoting *Piepenhagen v. Old Dominion Freight Line, Inc.*, 395 F. App'x 950, 954–55 (4th Cir. 2010)).

## II.   Overview of Liberty's Augmented Administrative Record

The Administrative Record Liberty has assembled and filed is comprised of five general categories of reliance documents. First are the petition and response documents Liberty has already submitted as ECF No. 7. Second, Liberty submits material pleadings and orders from the State Proceeding, tending to define the "dispute." Third, Liberty offers material documents produced in discovery in the State Proceeding, illustrating the issues in the State Proceeding.

4

Fourth. Liberty submits negotiation history from the 2019 Employment Agreement and 2020 SERP it effected with Falwell. Fifth, Liberty includes various additional documents, articles and publications upon which Liberty's Executive Committee relied when making its denial of benefits determination, or that were relied upon by counsel when advising Liberty.  The discussion below contributes brief thoughts on the relevance to the Administrative Record of each category.

### A.  The Summary Administrative Record

On April 4, 2023, Liberty filed with the Court an administrative record containing high level documents (the "Summary Administrative Record").  *See* ECF No. 7.  Liberty submitted within this Summary Administrative Record relevant overview documents that were created and exchanged during the administrative review process in which Liberty and Falwell engaged prior to February 24, 2023.  This packet includes the Falwell dispute letters, the Plan Administrator's rationale for denial, and affirmation by Liberty of its decision not to pay Falwell at this time.

Even without the augmented Administrative Record, Liberty's Summary Administrative Record would have been sufficient for this Court to make a reasonable decision based on the evidence.  *See, e.g.*, *Clarke v. Unum Life Ins. Co. of Am.*, 799 F. Supp. 2d 527, 536 (D.Md. Sept. 27, 2011) (finding the administrative record sufficient where it detailed the investigative process to determine whether there was a conflict of interest in the decision to terminate benefits).  As noted, however, Liberty concurs with this Court's election to direct Liberty to supplement its record of reliance.

### B. Material Pleadings and Orders from the State Proceeding

The second category of documents Liberty submits includes material pleadings from the State Proceeding.  The subject of the State Proceeding is Liberty's contention that "Falwell surreptitiously negotiated with Liberty a sweetened $2.5 million 'walkaway' severance for himself

(the 'Severance') and also blindly extracted from Liberty in 2020 a supportive $8.5 million Supplemental Executive Retirement Plan benefit."  (ECF No. 9 at 2.)  Based on the allegations that have come to light against Falwell since the 2020 SERP, as well as Falwell's revelation that he repudiated core concepts in his Employment Agreement, the "Liberty Way," and other concepts essential to the bargain for the SERP, Liberty is litigating in the State Proceeding to rescind the SERP and hold Falwell responsible for various breaches of his duties as Liberty's President and Chancellor.  As indicated, Liberty filed pleadings in the State Proceeding to gain the power of subpoena, force Falwell's disclosure, and to learn during discovery about contested secrets. Liberty has pleaded that "but for" Falwell's breach of fiduciary duty, it would not have entered into the SERP.

Liberty denied Falwell's SERP benefits on February 24, 2023, on the basis that the State Proceeding constituted a "dispute" between Liberty and Falwell, warranting delay of any payment to Falwell under the SERP.  Liberty contends the State Court Proceeding is the underlying "dispute" that justifies its decision to forestall payment of ERISA benefits to Falwell at this time.

### C. Select Discovery in the State Proceeding

Falwell and Liberty have both initiated and responded to discovery in the State Court Proceeding.  Liberty has taken depositions and collected a large assembly of documents.  The discovery in the State Proceeding has affirmed Liberty's belief that the SERP should be rescinded, and Liberty has petitioned for that remedy.  Some of the documents that formed the basis for Liberty's belief are material to the issues before this Court, and thus are provided in the enhanced Administrative Record.

**D**. **Liberty's Executive Committee's Negotiations with Falwell**

In 2019 and 2020, Liberty worked with Falwell to execute the Employment Agreement and SERP, respectively.  The negotiation of these documents was an opportune point for Falwell's full disclosure about his compromising relationships, activities and engagements. Liberty includes material negotiation documents in the enhanced Administrative Record.

**E**. **Liberty's Executive Committee's Deliberation and Decision**

In early 2023, Liberty's Executive Committee analyzed information, interacted with counsel, and considered whether the parties were in "dispute" over the SERP forming the basis for Falwell's claim for payment.  Based on its consideration and the materials in the augmented Administrative Record, Liberty opted to deny benefits to Falwell, concluding that the parties were in dispute over the validity of the SERP.  The documents in the augmented Administrative Record are those factored by the Executive Committee in its benefits decision, directly or indirectly, and are provided to this Court as the Administrative Record for its review.

<u>**CONCLUSION**</u>

For the reasons stated and the rationale outlined above, Liberty submits its augmented Administrative Record to satisfy the direction of this Court.


Dated: August 30, 2023                    Respectfully submitted,

                                          LIBERTY UNIVERSITY

                                          /s/ Scott C. Oostdyk
                                          Scott C. Oostdyk (VSB # 28512)
                                          MCGUIREWOODS LLP
                                          800 East Canal Street
                                          Richmond, VA 23219
                                          (804) 775-1000
                                          (804) 775-1061 (facsimile)
                                          soostdyk@mcguirewoods.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 30th day of August, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send a true and correct copy to all counsel of record.

/s/ Scott C. Oostdyk
Scott C. Oostdyk

**ADMINISTRATIVE RECORD**
**INDEX**

| Section | Heading | Bates Range |
|---|---|---|
| II. A | The Summary of Administrative Record | LUADMINREC000001 - LUADMINREC000066 |
| II.B | Material Pleadings and Orders from the State Proceeding | LUADMINREC000067 – LUADMINREC000616 |
| II.C | Select Discovery in the State Proceeding | LUADMINREC000617 – LUADMINREC000681 |
| II.D | Liberty's Executive Committee's Negotiation with Falwell | LUADMINREC000682 - LUADMINREC000769 |
| II.E | Liberty Executive Committee's Deliberation and Decision | LUADMINREC000770 – LUADMINREC001325 |

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement') is hereby adopted effective July 1, 2019 between LIBERTY UNIVERSITY, a Virginia nonstock corporation (referred to in this Agreement as "LU" or "the University") and JERRY L. FALWELL, JR., a resident of Virginia (referred to in this Agreement as "Falwell" or "the Employee").

WHEREAS LU is a university centered in the City of Lynchburg, Virginia, which is dedicated to excellence in higher education and scholarship within a Christian context;

WHEREAS, Falwell has served LU in several roles since 1988, including his current positions as Chancellor and President and in connection therewith had entered into a series of employment agreements;

WHEREAS, LU acknowledges that Falwell, among others, was instrumental in promoting and furthering the University's debt restructuring and return to a position of financial strength in 1997 after a period of severe financial hardships for the University that began in 1987 and in promoting and furthering the rapid expansion and continued success of the University, particularly since 2007;

WHEREAS, since Falwell became President and Chancellor in 2007, Liberty's net assets have increased from approximately $100,000,000 to over $2.1 billion in 2017 and Liberty's enrollment has increased from approximately 9,600 students in residence to over 15,000 students in residence and from approximately 27,000 students studying online to over 86,000 students studying online. During the same period, annual gross revenues have increased from $231,506,554 to $1,111,316,499 and the University's surplus of revenues over expenditures has increased from $52,514,469 to $331,142,834.  As a result of LU's strong financial performance, Standard & Poor's has assigned the University a credit rating of AA since 2011, placing the University among the 80 highest rated universities nationally;

{2625067-1, 116311-00009-01}

WHEREAS, in 2019 LU engaged FW Cook, a national consulting firm with expertise in compensation of executives in tax-exempt organizations, to review Falwell's compensation to determine whether it is in line with national standards, taking into account LU's growth and financial achievements and Falwell's historical compensation, and to make recommendations for program changes as needed to ensure that he is retained at LU for the long term and provided with a competitive and motivating compensation program;

WHEREAS, LU desires to adjust its executive compensation program so that it remains competitive  with  executive compensation programs of other comparable non-profit colleges and universities, adjusted for geography, performance and tenure;

WHEREAS, in recognition of Falwell's many significant contributions to the University and in an effort to compensate Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, LU wishes to formalize and reinforce the parties' long term employment relationship by entering into this Agreement; and

WHEREAS, Falwell likewise wishes to continue to contribute to the future success of LU through his employment as President and Chancellor of the University on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, LU and Falwell adopt the foregoing recitals and agree as follows:

<u>ARTICLE 1</u>

EMPLOYMENT STATUS

1.1     LU hereby agrees to continue employing Falwell and Falwell hereby accepts continued employment by LU as President and Chancellor on the terms and subject to the conditions set forth in this Agreement. Falwell shall continue to be classified as a full-time employee for all purposes, including fringe benefits.  Subject to the provisions of Article 7 and 8

LUADMINREC000002

hereof, Falwell is an at will employee of LU, and serves at the pleasure of the LU Board of Trustees.

## ARTICLE 2

### TERM

2.1     This Agreement shall commence on July 1, 2019 and shall continue until the earlier of: (a) June 30, 2030; or (b) the date the Agreement is terminated pursuant to Articles 6 through 9, inclusive, of this Agreement (the "Term").

## ARTICLE 3

### DUTIES AND RESPONSIBILITIES

3.1     Falwell shall continue to provide LU with dedicated, diligent and conscientious full time service in a manner that is generally consistent with the level of service he has provided during the nearly five (5) year period immediately preceding the effective date of this Agreement, with allowances for reasonable time to attend to personal investments.

3.2     Falwell's duties shall consist of the tasks, duties and responsibilities he has assumed and performed as President and Chancellor during the nearly five (5) year period immediately preceding the effective dates of this Agreement. These duties shall include but not necessarily be limited to the following:

(a)     ensuring the implementation of the University's mission and purposes as described or defined in the University's Articles of Incorporation, Bylaws, and other foundational documents.

(b)     performing the duties of Chancellor/President as described in the University's Bylaws.

(c)     overseeing the fiscal, administrative, admissions, academic, athletic and other operations, divisions, departments and offices of the University.

LUADMINREC000003

(d)      raising funds for the benefit of the University.

(e)      implementing and executing policies, orders and resolutions adopted or established by the LU Board of Trustees and its Executive Committee.

3.3      As Chancellor and President, Falwell shall have the executive and administrative powers to manage and control the day to day operations of the University, provide focus and direction for the University, make policy recommendations to the Board of Trustees, and provide spiritual and worldview leadership to the University in pursuit of excellence, subject to the ultimate authority of the Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws. That executive and administrative power shall include but not be limited to the absolute authority to hire, retain and dismiss administrative, professional, academic and athletic personnel, subject only to any contractual or tenurial rights of any such employee. Provided, however, that Falwell shall be accountable to the Board of Trustees for implementing its policies and carrying out his duties, including the handling of personnel matters.

3.4      Compliance with Rules Applicable to Athletics Program.

(a)      Falwell agrees to abide by and comply with the Constitution, Operating Bylaws, legislation and interpretations of the National Collegiate Athletic Association ("NCAA") (or any other conference in which the University becomes affiliated), and all NCAA and University rules and regulations relating to the conduct and administration of the University's general athletics program (collectively, the "Program") as now constituted or as any of the same may be amended or enacted during the term of Falwell's employment by the University.  In the event that Falwell becomes aware, or has reasonable cause to believe, that violations of any of the aforementioned rules or regulations may have taken place, he shall promptly report the same to the Board and the NCAA (or other applicable governing body).  Falwell agrees to adhere to, respect and follow the

LUADMINREC000004

academic standards and requirements of the University and the NCAA with regard to the recruitment and eligibility of prospective and current student athletes.  All academic standards, requirements and policies of the University and the NCAA shall also be observed at all times by Falwell and he shall use Best Efforts (as defined below) to ensure that the athletic director and members of the Program staff do the same.

(b)     If Falwell is involved in an act or omission that constitutes a violation by the Athletic Director, any University coach or the University of any legislation, rule, regulation, constitutional provision, bylaw, policy, procedure or guideline of the NCAA (or NCAA interpretation), including but not limited to failing to use Best Efforts to promote an atmosphere of compliance by the athletic director, coaches, their staffs or student-athletes in the Program or to monitor their activities for compliance with NCAA rules, or if he fails to notify the Board or NCAA of any such violations of which he has knowledge, Falwell shall be subject to disciplinary or corrective action as set forth in NCAA enforcement procedures and/or policies, procedures and guidelines established from time to time by the University for its administrators, including but not limited to, probation, suspension with or without pay (for up to thirty (30) days) or termination of employment.  Such disciplinary action may include termination for Cause (as defined in Section 7.3(g)). Notwithstanding the foregoing, before any such disciplinary action is imposed, Falwell will be provided with written notice of the alleged violation or violations and no less than fifteen (15) days to remedy the same, provided that such violation or violations are capable of cure, as determined in the reasonable and good faith judgment of the University.

(c)     For purposes of this Agreement, "Best Efforts" means with respect to Falwell, those efforts that a responsible and experienced President (other than Falwell) desirous of successfully achieving the specified result would use in similar circumstances; and (ii) with respect

to the University, those efforts that a prudent university desirous of successfully achieving the specified result would use in similar circumstances.

3.5     Falwell shall not undertake compensated work or activities for, or accept any employment or other compensation from, any other institution of higher education for work undertaken prior to the termination of this Agreement without receiving approval of the Board of Trustees or the Executive Committee of the Board of Trustees (the "Executive Committee") prior to undertaking such work or activities.

3.6     Falwell shall not author or publish any book or article relating to his employment at Liberty University hereunder without prior consent of the Executive Committee or Board of Trustees, which prior consent may be conditioned upon advance review and approval of the content of said book or article. This provision does not include letters to the editor or articles in University publications and other University media which are published to carry out Falwell's duties under this Agreement and advance the interests and mission of LU. Nor does this provision include brief communications on Twitter, Facebook and similar communication vehicles. The provision of this subsection shall survive termination of this Agreement.

3.7     The parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings. This prohibition includes defamatory remarks about the employees and members of the Board of Trustees of the University. Neither party, however, waives the protections afforded by otherwise applicable common law privileges and this Section 3.6 shall in no event apply to remarks made during meetings of either the University's Board of Trustees or its Executive Committee. If Falwell's employment is terminated for cause, the parties may truthfully explain the circumstances forming the basis for the determination of cause. The provision of this Section 3.6 shall survive termination of this Agreement.

LUADMINREC000006

3.8     Falwell shall continue to have access to confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly disclosed by LU ("'Confidential Information") during the course of his employment. Confidential Information remains the property of LU. Unauthorized disclosure of Confidential Information will cause definite and irreparable harm to LU. Falwell shall not disclose Confidential Information intentionally within the University except to fulfill the legitimate business purposes of LU and shall not disclose it directly or indirectly, outside the University without the express authorization of the Executive Committee or as required by law or to further the interests of LU. Under no circumstances shall the release of details of this Agreement be considered to further the interests of LU. Any Confidential Information in tangible form shall be immediately returned to LU upon request. The provisions of this subsection shall survive termination of this Agreement.

ARTICLE 4

COMPENSATION

4.1     In consideration of Falwell's continued service as President and Chancellor, LU shall compensate him as follows:

(a)     *Base Salary.* During the Term, LU shall pay Falwell an annual base salary at the rate of $1,250,000 per year, payable in accordance with the normal payroll practices of LU for its executives as in effect from time to time (but not less frequently than monthly).  The annual base salary shall not be reduced during the Term of the Agreement.  On an annual basis, the Board shall review Falwell's performance and consider in its discretion approval of an increase in base salary, with such approved increases to take effect on July 1, of each year. Such base salary, as so increased, is hereafter referred to as the "Base Salary."

LUADMINREC000007

(b)      *Discretionary Bonuses.* Falwell shall be eligible to receive bonuses in such amounts and at such times as the Executive Committee of the Board of Trustees may award based on its assessment of his performance, the financial condition of the University, and other considerations which the Executive Committee of the Board of Trustees in its sole discretion finds relevant.  The Board shall consider the award of such discretionary bonus no less often than annually.

(c)      *Severance Benefit*.   In the event the University terminates Falwell's employment without Cause, or Falwell resigns his employment with Good Reason, the University shall pay to Falwell a single lump sum payment in an amount equal to two times his Base Salary. Such amount shall be paid to Falwell within thirty (30) days following his termination of employment, subject to his execution of a release of claims (provided that if the period over which Falwell has to consider the execution of the release crosses tax years, the payment shall be made no earlier than the first business day of the second tax year).

(d)      *Supplemental Executive Retirement Plan.* The University agrees to adopt a defined contribution supplemental executive retirement plan for the benefit of Falwell ("SERP" or the "Plan") pursuant to a separate agreement that will (1) provide for annual credits designed to target a retirement benefit over the life of Falwell and Mrs. Falwell in an amount equal to seventy-five percent (75%) of Falwell's average Base Salary over the five (5) year period prior to his termination of employment, net of any required tax withholding, (2) have an initial notional account balance that represents prior years' deemed accumulations during Falwell's presidency through June 30, 2019 and (3) be paid in a lump sum.  This lump sum shall be payable on the first day of the calendar month following the earliest of (1) provided that Falwell does not engage in any Competitive Activity during the Non-Competition Period, as defined in Section 5.2 herein, the

LUADMINREC000008

second anniversary of his termination of employment, (2) Falwell's death, or (3) Falwell's Disability, as defined in Section 6.6 herein.

4.2     Except as set forth herein, LU shall provide Falwell the same fringe benefits and the same opportunity to participate in benefit plans that it offers other full-time executive employees. These benefits and programs currently include group family health insurance (medical, vision, dental), group family life insurance and disability insurance, employee assistance programs, retirement, savings and investment programs (including LU's Section 403(B) plan), sick/personal leave, holiday leave and voice and data phone payments under LU's Cellular Phone Policy and similar benefits made available to executive or managerial employees of the University. In addition to such benefits, conditioned on Falwell's continued employment, on each April 1 LU shall pay on Falwell's behalf an amount equal to the life insurance premiums owed in respect of whole life insurance policies issued by each of Pacific Life Insurance Company (issued October 3, 2016) and Protective Insurance Company (issued April 8, 2016) (together, the "Policies") on Falwell's life, except to the extent that such premiums are paid by the dividends accruing on the cash value of such Policies.  For this purpose such payment shall be made pursuant to a separate "split dollar agreement" pursuant to which the premium payments in respect of the Policies shall be repaid, without interest, to the University upon the payment of the death benefit or earlier termination of the Policies.  Once every eighteen months (18) months, Falwell shall undergo an annual Comprehensive Executive Medical Health Assessment, the cost of which shall be reimbursed by the institution upon submission of a receipt or statement for same.   The Comprehensive Executive Medical Health Assessment shall include a thorough physical examination by medical doctor(s), a full range of preventive screening tests for early detection of cancer, heart disease and other serious medical problems, a cardiovascular fitness evaluation,

LUADMINREC000009

including treadmill exercise test, a lifestyle assessment to discuss nutrition, exercise, personal safety and other indicators of risk of disease, a review and update of medications and immunizations, development and assessment of a long-term strategy for prolonged life and wellness, a full report of the test results and recommendations at the conclusion of the examination and a written report sent to Falwell confidentially for his personal use and for consultation with his private physician.  Neither the University nor the Executive Committee shall request or be entitled to a copy of the written report but the Executive Committee shall be entitled to receive a copy of the receipt or statement for such services as part of each of its formal annual evaluations of Falwell.

4.3     LU shall provide Falwell with an automobile allowance of Seven Hundred Fifty Dollars ($750) per month in accordance with LU's normal payroll policies and schedule and subject to any reporting and withholding requirement provided by law.  In addition, for each year that the Agreement remains in effect LU shall furnish on an annual basis up to fifty (50) hours of jet transportation on LU's jets for Falwell and members of his immediate family, with any unused hours expiring at the end of each year without further compensation to Falwell.    Any personal use of the jet transportation benefit described herein will be reported as a taxable benefit to Falwell. LU shall reimburse Falwell in accordance with LU's Travel and Entertainment Policy for reasonable and necessary travel and out-of-pocket expenses incurred by him, and where appropriate his spouse, in connection with the performance of his official duties under this Agreement.

4.4     LU shall provide Falwell and members of his immediate family with tuition at the University through the conclusion of each academic year during which he serves as President and/or Chancellor pursuant to LU's Dependent Grant-in-Aid Policy and Continuing Education

LUADMINREC000010

Policy. "Immediate family" shall be limited to Falwell's wife, children by birth or adoption and grandchildren by birth or adoption. Such tuition benefits shall be provided subject to any reporting and withholding requirements provided by law.

4.5     Falwell shall be entitled to six (6) weeks annual vacation during each year of the Term. No unused vacation may be carried forward to subsequent years or paid out as compensation.

4.6     LU agrees to provide memberships at the LaHaye Student Center and Sports Racket for use by Falwell and his immediate family or at another fitness center mutually agreeable to the parties.

4.7     LU agrees to provide general maintenance and upkeep at the primary residence of Falwell, including general repairs, maintenance and lawn care. The parties hereto acknowledge that the primary residence of Falwell is used by the University from time to time for student, faculty and staff events. A portion of the general maintenance and upkeep referenced above shall be deemed a business expense of the University in connection with said student, faculty and staff events and the remainder of said general maintenance and upkeep shall be deemed income to Falwell and reported to the IRS as such by the University.

ARTICLE 5

OTHER EMPLOYMENT

5.1     Falwell shall refrain from undertaking any other employment or compensated activities that hinder or impede successful performance of the services outlined in this Agreement. Except as provided in this Agreement, Falwell shall not engage in any compensated employment or compensated activities without first obtaining the written approval of the Executive Committee or the Board of Trustees. The University, however, acknowledges that Falwell is licensed by the Virginia State Bar and periodically engages in the practice of law on a limited basis in association

LUADMINREC000011

with another practitioner on discrete matters. Falwell hereby receives approval for such limited legal work and therefore shall not require any additional approval for such employment by the Executive Committee or the Board of Trustees. Passive investment activity such as buying, holding and selling real estate, stock and securities ("Passive Investment Activity") shall not be considered other employment or compensated activities for purposes of this Agreement and therefore shall not require any additional approval by the Executive Committee of the Board of Trustees.  In addition, Falwell shall have the right without seeking approval of the Executive Committee or Board of Trustees to participate as either a paid endorser or principal owner in an asset management venture. Falwell (alone or in conjunction with members of his family and/or others) shall be free to participate in an asset management venture, provided such venture conducts no business with the University or any entity owned or controlled by the University and receives no compensation from the University or any entity owned or controlled by the University.

5.2     In view of the unique and valuable services rendered by Falwell to LU and in connection with the SERP benefits to be paid to Falwell at or following termination of employment, Falwell agrees that during employment and for a period of two (2) years thereafter ("Non-Competition Period"), whether with our without compensation, directly or indirectly, as an owner, principal, partner, member, shareholder, independent contractor, consultant, joint venturer, investor, licensor, lender or in any other capacity whatsoever, alone, or in association with any other Person, he will not carry on, be engaged or take part in, or render services (other than services which are generally offered to third parties) or advice to, own, share in the earnings of, invest in the stocks, bonds or other securities of, or otherwise become financially interested in, any other college or university, whether for-profit or non-profit ("Competitive Activity").  The  record or beneficial ownership by Falwell of up to one percent (1%) of the shares of any corporation whose shares are publicly traded on

LUADMINREC000012

a national securities exchange or in the over-the-counter market shall not of itself constitute a breach hereunder.

## ARTICLE 6

## TERMINATION UPON DEATH

6.1     Falwell's death shall terminate this Agreement.  Falwell's executor, administrator or other personal representative or beneficiary, as applicable, shall be entitled to all the compensation and fringe benefits provided in Article 4 of this Agreement through the date of his death, along with the benefits payable pursuant to the SERP under subsection 4.l(e), and any benefits to which he or his executor, administrator or other personal representative or beneficiary, as applicable, is entitled under any applicable benefit plan as a deceased employee.  In addition, Falwell's executor, administrator or other personal representative or beneficiary, as applicable, shall be entitled to any and all survivorship death benefits payable under any savings, retirement, investment and other plans and programs in which Falwell was a participant.  Except as provided herein, Falwell shall not be entitled to receive any other payments or benefits after the date of his death, except that Falwell's surviving spouse or other eligible dependents shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at his date of death.

## ARTICLE 7

## TERMINATION FOR CAUSE OR DISABILITY

7.1     LU may terminate Falwell's employment only for Cause or Disability, as each such term is defined below, provided it first delivers to Falwell specific, written notice of the purported grounds for dismissal, and if in the reasonable opinion of the Executive Committee the Cause or Disability can be corrected or cured, a thirty (30) day opportunity to correct or cure the alleged Cause or Disability.  A dismissal in the absence of required, thirty (30) day notice is a dismissal

LUADMINREC000013

without Cause.  For avoidance of doubt, if Falwell is terminated for Cause based on a violation of Section 7.3(g) and the applicable governing body renders a final determination establishing facts indicating that Cause does not exist, provided there are no other facts or circumstances justifying termination for Cause, the termination shall be treated as a termination without Cause under Article 8 and the provisions of Article 8 shall apply.

7.2    If Falwell is terminated for Cause, LU shall be obligated to pay Falwell his salary, earned compensation and fringe benefits up to the date of termination (collectively, his "Accrued Compensation"), plus any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination.  Falwell's resignation from the Board of Trustees and its Executive Committee shall be effective immediately upon termination of his employment for Cause.

7.3    As used in this Agreement, the term "Cause" is defined restrictively to mean only the following:

(a)    the willful refusal or willful failure of Falwell to comply with the reasonable directives of the Board of Trustees, so long as such directives are not in conflict with the authority of the Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws, or in conflict with this Agreement; provided that such refusal or failure results in (or is substantially likely to result in) a material adverse consequence to LU;

LUADMINREC000014

(b)      the material failure of Falwell to comply substantially with written policies, standards and regulations of LU as from time-to-time established in writing, provided that such failure results in (or is substantially likely to result in) a material adverse consequence to LU;;

(c)      the willful refusal or willful failure of Falwell to faithfully or diligently perform his duties under this Agreement, provided that such refusal or failure results in (or is substantially likely to result in) a material adverse consequence to LU;

(d)      conviction of or entry of a plea of guilty, no contest or *nolo contendere* to any felony or to a misdemeanor involving moral turpitude (deferred disposition by a court, with or without a finding, admission or adjudication of guilt, such as withholding adjudication or taking the matter under advisement for some set period, meets the threshold for cause intended for Section 7.3 (d));

(e)      defamatory or slanderous comments in breach of Section 3.6 of this Agreement which cause serious damage to LU's reputation;

(f)      Any significant violation (which, for the avoidance of doubt, shall not include any Level III or Level IV violation) or repetitive violation (other than of a de minimis nature) of any legislation, rule, regulation, constitutional provision, bylaw, policy, procedure or guideline of the NCAA (or NCAA interpretation) by Falwell arising from any act or omission of Falwell (or Falwell's knowledge of any act or omission of another person and failure to take prompt and appropriate responsive action or Falwell's failure to monitor, supervise or report another person for whom Falwell has or, at the relevant time had, supervisory responsibility), or;

(g)      advocating a position that is materially inconsistent with the doctrinal statements found in the University's Articles of Incorporation, with the sole exception of such

advocacy in private discussions with the Board of Trustees or Executive Committee in connection with proposed amendments to the Articles of Incorporation.

7.4     In the event Falwell is the subject of a criminal arrest, criminal indictment, criminal information, criminal warrant for violation, criminal complaint or criminal charge for any felony or is the subject of such for a misdemeanor involving moral turpitude, LU may place Falwell on administrative leave, thereby suspending Falwell from performance of the duties and responsibilities outlined in Sections 3.1, 3.2 and 3 3, at a minimum of one-third (1/3) of the rate of his annual base salary in effect at the date of his suspension, which compensation rate can be increased at the discretion of the Executive Committee.

7.5     As used in this Agreement the term "Disability" is deemed restrictively to mean only the following: mental or physical incapacity or disability which prevents Falwell from performing a substantial and material portion of his duties under this Agreement on a continuous basis and that persists for more than 180 consecutive days.  A termination of Falwell's employment for Disability is neither a dismissal with Cause within the meaning of Sections 7.2 and 7.3 nor a dismissal without Cause within the meaning of Article 8 and Falwell shall be entitled to (1) Accrued Compensation, and (2) immediate commencement of benefits under the SERP, as provided under subsection 4.1(e) herein.

## ARTICLE 8

## TERMINATION BY UNIVERSITY WITHOUT CAUSE OR BY FALWELL FOR GOOD REASON

8.1     LU may terminate Falwell's employment as President and Chancellor at any time upon sixty (60) days advance, written notice to Falwell without Cause, and Falwell may resign his employment for "Good Reason" as set forth in Section 8.2. In the event LU elects to terminate

LUADMINREC000016

Falwell's employment as Chancellor and President without Cause or Falwell resigns his employment for "Good Reason," LU shall pay to Falwell as liquidated damages the severance benefit provided under subsection 4.1(c), and any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible (1) to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination, and (2) for benefits under the SERP, as provided under subsection 4.1(d).  Following termination of his employment, Falwell shall have no obligation to remain at the University or perform any services for the University.

8.2     For purposes of this Agreement, the term "<u>Good Reason</u>" shall mean (i) any action by LU that results in a material diminution in Falwell's position, authority, duties or responsibilities as President and Chancellor of LU set forth in Article III; (ii)  a reduction by LU in Falwell's Base Salary, or a material failure by LU to pay Falwell any such amounts when due; (iii) a relocation of Falwell's principal place of employment to more than thirty-five (35) miles from LU's Lynchburg, Virginia campus, and (iv) a material breach of this Agreement without Falwell's written consent.  Termination of employment for "Good Reason" shall not be effective (other than with respect to clause (iii) above) until Falwell delivers to the Board of Trustees a written notice specifically identifying the conduct of LU which Falwell believes constitutes "Good Reason" in accordance with this Section 8.2 within ninety (90) days of Falwell's knowledge of the initial occurrence of each specific event constituting Good Reason and Falwell provides the Board of Trustees at least thirty (30) days to remedy such conduct after receipt of such written notice,

LUADMINREC000017

and to the extent not cured, Falwell terminates his employment within thirty (30) days after such failure to cure.

8.3    The parties have bargained for this liquidated damages provision, giving careful consideration to the following circumstances:

(a)    this Agreement concerns personal services.

(b)    termination of this Agreement by the University prior to the end of the Term (or at any point after the Term) could damage his professional reputation. These damages to Falwell are difficult to determine with certainty. Therefore, the parties have agreed upon this liquidated damages provision and stipulate that it is neither a penalty nor an incentive for unsatisfactory performance.

## ARTICLE 9

## RESIGNATION

9.1    Falwell may resign, retire or otherwise terminate his employment with the University other than for Good Reason, provided he gives the Board of Trustees sixty (60) days advance written notice.  In the event Falwell should elect to resign, retire or otherwise terminate his employment other than for Good Reason, the University shall be obligated to pay Falwell his Accrued Compensation and any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible (1) to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") or the time specified by COBRA at the time of termination, and (2) for benefits under the SERP, as provided in Section 4.1(e).

LUADMINREC000018

## ARTICLE 10

### INDEMNIFICATION

10.1    To the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment. The indemnification afforded Falwell under this Section is in addition to any and all indemnity rights and protections the Employee may have pursuant to statute or under any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies.

## ARTICLE 11

### MISCELLANEOUS PROVISIONS

11.1    Neither party shall disclose this Agreement to anyone without the other party's prior, written consent, unless disclosure is required by law. The parties, however, shall be free to disclose and discuss this Agreement with their respective lawyers, accountants and tax advisors. Falwell shall be permitted to disclose the Agreement to his spouse.

11.2    For a notice or other communication to be valid under this Agreement, it must be written, signed and sent by at least one of the following methods: (a) personal delivery; (b) first class mail, postage prepaid; (c) registered or certified mail, return receipt requested, and postage prepaid; and (d) nationally recognized overnight courier (e.g., UPS or Federal Express).

11.3    If any provision of this Agreement is determined to be invalid, void, illegal or unenforceable to any extent, the remainder of this Agreement, or application of that provision to

LUADMINREC000019

any persons or circumstances other than those as to which it is held to be unenforceable, will remain valid, binding and enforceable.

11.4    (a)  The patties may waive a provision in this Agreement only by a writing executed by the party or parties against whom the waiver is sought to be enforced. Waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver by that party of any subsequent breaches.

(b)    No failure or delay in exercising any right or remedy, or in requiring the satisfaction of any condition, under this Agreement, and no act, omission or course of dealing between the parties, shall operate as a waiver or estoppel of any right, remedy or condition.

(c)    A waiver made in writing on one (1) occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver of any future occasion, unless expressly stated as such.

11.5    This Agreement constitutes the final Agreement between the parties concerning the terms and conditions of Falwell's employment with LU. This Agreement supersedes and invalidates any prior or contemporaneous agreement, oral or written, between them regarding the terms of Falwell's employment with LU. All such prior Agreements between the parties shall become null and void upon the execution of this Agreement. In entering into this Agreement, neither party has relied upon any statement, representation, warranty or agreement of the other party except for those expressly contained in this Agreement. The parties may amend this Agreement only by a written Agreement of the parties that identifies itself as an amendment to this Agreement.

11.6    This Agreement may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one instrument.

LUADMINREC000020

11.7     The rule of construction that ambiguity is construed against the drafting party shall have no application in any dispute over the interpretation of this Agreement. The parties represent and warrant to one another that they enter this Agreement with the benefit of counsel based on the independent analysis of each party of the facts and legal principles relevant to the terms and conditions of this Agreement.

11.8     Neither this Agreement as a whole nor any of its individual provisions is assignable by either party.

11.9     The descriptive headings of the articles and section of this Agreement are for convenience only, do not constitute a part of this Agreement, and do not affect this Agreement's construction or interpretation.

11.10   This Agreement shall be governed by and construed in accordance with the law of the Commonwealth of Virginia without regard to the Commonwealth's choice of law rules.

11.11   This Agreement shall be binding upon and inure to the benefit of the parties' respective successors, heirs, assigns, receivers and personal representatives.

11.12   The provisions of this Agreement to be performed upon and after termination of Falwell's employment survive termination of this Agreement.

11.13   The parties agree that any legal action or proceeding against the other party arising out of or relating to this Agreement or the University's employment of Falwell shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

LUADMINREC000021

IN WITNESS WHEREOF, Falwell and the authorized representative of the University have executed this Agreement on the date(s) written below.

JERRY L. FALWELL, JR.

LIBERTY UNIVERSITY, INC.

Chairman, Board of Trustees

Jerry L. Falwell, Jr.

Date: 8/30/2019

Date: AUG. 29, 2019

LUADMINREC000022

July 22, 2020

Jerry L. Falwell, Jr.
President of Liberty University

      Re:     Supplemental Executive Retirement Plan

Dear President Falwell:

The purpose of this letter is to describe the terms of the deferred compensation arrangement (the "Agreement") between you and Liberty University (the "University"). This Agreement is intended to satisfy the University's obligations set forth in Section 4.1(d) of your employment agreement with the University, dated July 1, 2019 (the "Employment Agreement") and, notwithstanding anything to the contrary in the Employment Agreement, constitutes the entire obligation of the University to provide supplemental retirement benefits to you. This Agreement is effective as of the date hereof.

1.     Deferred Compensation Account. The University has established on its books a supplemental executive retirement account (the "Account") for the purpose of measuring its obligation to pay you supplemental retirement benefits as described below.

2.     Credits to the Account.

     a.     Within thirty (30) days of the date hereof, the University will credit to the Account, as of July 1, 2020, an amount equal to $7,635,927.

     b.     On or about June 30, 2021 and each anniversary thereafter, provided you remain continuously employed as President of the University through each such crediting date, the University will credit to the Account, as of such June 30, an amount equal to Three Hundred Eighty Five Thousand Dollars ($385,000) less the annual employer contribution to the University's 403(b) plan (assuming the maximum employee contribution needed to achieve the maximum employer contribution for the plan year ending on such June 30 is made).

3.     Investment Return to the Account; Rabbi Trust.

     a.     As of each June 30th, as of the last day of the month immediately preceding the month in which payment is to be made under this Letter Agreement, and as of such other times, if any, as the University determines, investment return at an annual rate of 6% shall be credited to the Account. The Account will continue to be adjusted under this Paragraph 3 until all amounts due under this Letter Agreement have been paid to you or your beneficiary(ies) or have been forfeited. Upon full payment or forfeiture of benefits, the balance of the Account will be reduced to zero and no further amounts will be due under this Letter Agreement.

LUADMINREC000023

Jerry L. Falwell, Jr.                                                                    July 22, 2020

      b.      The University shall establish a so-called "rabbi" trust pursuant to the Trust Agreement attached hereto (the "<u>Trust</u>") for your benefit and shall deposit an amount equal to each credit described in Paragraph 2 and the investment return described in Paragraph 3 of this Letter Agreement within thirty (30) days of the applicable crediting date; provided, that if the balance of the Trust assets as of such applicable crediting date is no less than the balance of the Account (after taking into account the applicable credit and investment return), no such deposit requirement will apply for such applicable crediting date. The Trust is intended to be a grantor trust, of which the University is the grantor, within the meaning of subpart E, part I, subchapter J, chapter 1, subtitle A of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), and shall be construed accordingly.

4.     <u>Payment of the Account</u>. Subject to Paragraph 5 below, you (or, in the event of your death, your beneficiary or estate) will be entitled to receive the balance of the Account attributed to credits made pursuant to Paragraph 2 (together with the earnings related described in Paragraph 3) in a single lump sum payment on the first of the month following the earliest to occur of the following: your death, your Disability (as defined in your Employment Agreement), and the second anniversary of your termination of employment with the University for any reason other than Cause (as defined in your Employment Agreement).

5.     <u>Forfeiture of the Account</u>. Notwithstanding Paragraph 4 above, in the event that your employment is terminated for Cause (as defined in your Employment Agreement) or you engage in any Competitive Activity (as defined in your Employment Agreement) during the Non-Competition Period (as defined in your Employment Agreement), you will forfeit the right to the balance of the Account.

6.     <u>Designation of Beneficiary</u>. You may designate one or more beneficiaries in writing, which designation shall become effective upon receipt by the University. In the absence of an effective beneficiary designation, any amounts payable hereunder upon your death shall be paid to your estate.

7.     <u>ERISA; Taxes; Withholding</u>.

      a.      This Letter Agreement is intended to constitute a plan which is unfunded and is maintained primarily for the purpose of providing deferred compensation for a highly compensated management employee within the meaning of Sections 201(2), 301(a)(3), 401(a)(1) and 4021(b)(6) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"). This Letter Agreement shall be interpreted and administered to the extent possible in a manner consistent with the foregoing intention. This Letter Agreement shall be administered by the Executive Committee of the University's Board of Trustees (the "<u>Committee</u>") in its full discretion. Any determination made by the Committee with respect to this Letter Agreement will be final, binding and conclusive, in the absence of clear and convincing evidence that the Committee acted arbitrarily and capriciously.

77195221_6

LUADMINREC000024

Jerry L. Falwell, Jr.                                          July 22, 2020

The Committee shall be deemed to be the plan administrator with responsibility for complying with any reporting and disclosure requirements of ERISA.  If you believe you are being denied rights or benefits under this Letter Agreement, you (or your authorized representative) may file a claim in writing with the Committee.  If any such claim is wholly or partially denied, the Committee will notify you of its decision in writing and contain such additional information as required by Section 503 of ERISA.  Such notification will be given within 90 days after your claim is received by the Committee.  Within 60 days after the date on which you receive a written notice of a denied claim you (or your authorized representative) may (a) file a written request with the Committee for a review of your denied claim and of pertinent documents and (b) submit written issues and comments to the Committee. The Committee will notify you of its decision in writing. Such notification will contain specific reasons for its decision. The decision on review will be made within 60 days after your request for review is received by the Committee. If the decision on review is not made within such period, your claim will be considered denied.

b.      All payments made by the University under this Letter Agreement shall be reduced by any tax or other amounts required to be withheld by the University under applicable law.  The payments contemplated by this Letter Agreement are intended to comply with Section 409A of the Code and are intended to be subject to a substantial risk of forfeiture under Section 457(f) of the Code through the date of payment.  In the event that any portion of a payment under this Letter Agreement is deemed to be vested under Section 457(f) of the Code and therefore taxable prior to the time it is paid to you (or your beneficiary or estate), the University will satisfy the additional required withholding from the undistributed portion of any amount payable and treat such undistributed portion as if such amount had been paid to you as wages (in a manner consistent with Section 409A of the Code).  Any amount remitted or paid will be subtracted from the balance of the amounts payable.

c.      To the extent any amounts payable under this Letter Agreement result in current "wages" for FICA purposes, the University may reduce other pay of yours to satisfy withholding requirements related thereto, or may reduce the amounts payable pursuant to this Letter Agreement (in a manner consistent with Section 409A of the Code) by the amount of the required withholding.  Any amount remitted or paid will be subtracted from the balance of the amounts payable.

8.      Non-alienation; Assignment.  None of the payments hereunder shall be subject to any claim of any creditor, and, in particular, the same shall not be subject to attachment or garnishment or other legal process by any creditor.  You do not have any right to alienate, anticipate, commute, pledge, encumber or assign the payment or proceeds which you or your estate may expect to receive, contingently or otherwise, under this Letter Agreement.

77195221_6

LUADMINREC000025

July 22, 2020

LIBERTY UNIVERSITY

By: _____

Dr. Jerry Prevo, Chairman, Board of
Trustees

I accept and agree to the terms of the above Letter Agreement.

_____          _____

Date                               Jerry L. Falwell, Jr.

77195221_6

5

LUADMINREC000026

July 22, 2020

LIBERTY UNIVERSITY

By: _____
      Dr. Jerry Prevo, Chairman, Board of
      Trustees

I accept and agree to the terms of the above Letter Agreement.

_____      _____
7/21/2020                           Jerry L. Falwell, Jr.
Date

5

LUADMINREC000027

Jerry L. Falwell, Jr.                                                                    July 22, 2020

     I hereby designate the following beneficiary(ies) to receive the balance of the Account in the event of my death before the Account has been paid to me in full. The University shall pay each beneficiary equally unless otherwise indicated below. If I elect multiple Primary Beneficiaries and not all survive me, the University shall pay the survivors in proportion to their percentage allocations.

| Primary Beneficiary(ies) | Address | Percentage |
|---|---|---|
| Rebecca T. Falwell | 2100 Old Cifax Road<br>Goode, VA 24556 | 100% |

If I am not survived by any Primary Beneficiary, the balance of the Account will be paid to my designated Contingent Beneficiary(ies), if any. The University shall pay each Contingent Beneficiary equally unless otherwise indicated below. If I elect multiple Contingent Beneficiaries, and not all survive me, the University shall pay the survivors in proportion to their percentage allocations.

| Contingent Beneficiary(ies) | Address | Percentage |
|---|---|---|
| Jerry Lamon Falwell, III | 2819 Campbell Highway<br>Lynchburg, VA 24501 | 1/3 |
| Charles Wesley Falwell | 2899 Hawkins Ridge Road<br>Goode, VA 24556 | 1/3 |
| Caroline Grace Falwell | 2100 Old Cifax Road<br>Goode, VA 24556 | 1/3 |

77195221_6

LUADMINREC000028

Execution Version

# LIBERTY UNIVERSITY
# RABBI TRUST AGREEMENT

**THIS RABBI TRUST AGREEMENT** is made this 22nd day of July, 2020, by and between **Liberty University**, a not-for-profit corporation organized under the laws of the Commonwealth of Virginia (the "*University*"), and **John J. Regan**, an individual who is a resident of the State of New York, as trustee (the "*Trustee*").

## RECITALS

**WHEREAS,** the University has entered into a Supplemental Executive Retirement Plan dated July 22, 2020 and effective July 1, 2019 (the "*SERP*") with Jerry L. Falwell, Jr. (the "*Participant*") that provides for payment of "deferred compensation" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended (the "*Code*") upon the Participant's death, Disability, or the second anniversary following termination of employment with the University for any reason other than Cause (which terms "*Disability*" and "*Cause*" having the meanings as defined in the Employment Agreement dated July 1, 2019 between the University and the Participant); and

**WHEREAS,** in accordance with the requirements of the SERP and to finance its potential obligations to the Participant, the University desires to establish a trust (the "*Trust*") and to contribute to the Trust assets that shall be held therein, subject to the claims of creditors of the University in the event of Insolvency (as herein defined), until paid to the Participant and his beneficiaries in such manner and at such times as are specified in the SERP or paid to the University in accordance herewith; and

**WHEREAS,** it is the intention of the parties that the Trust shall constitute an unfunded arrangement and shall not affect the status of the SERP as an unfunded agreement maintained for the purpose of providing deferred compensation for the Participant as a select individual from management and a highly compensated employee according to Title I of the Employee Retirement Income Security Act of 1974 as amended; and

**WHEREAS,** it is the intention of the University to make contributions to the Trust to provide a source of funds to pay benefits under the SERP;

**NOW, THEREFORE,** the parties do hereby establish the Trust and agree that the Trust shall be comprised, held and disposed of as follows:

LUADMINREC000029

**Section 1.  ESTABLISHMENT OF TRUST**

(a)      The University hereby deposits with Trustee in trust $7,635,927, which shall become the principal of the Trust to be held, administered and disposed of by the Trustee as provided in this Trust Agreement.  Within 30 days following the University's fiscal year (ending June 30), the University shall deposit the amount required, if any, such that the balance of the Trust, net of any fees or compensation paid, is no less than the balance of the Account under the SERP, determined as of June 30th of each year.    The University shall have the right to make additional deposits from time to time in its sole discretion.

(b)      The Trust hereby established shall be irrevocable.

(c)      The Trust is intended to be a grantor trust, of which the University is the grantor, within the meaning of Subpart E, part I, subchapter J, chapter I, subtitle A of the Code, and shall be construed accordingly.

(d)      The principal of the Trust, and any earnings thereon shall be held separate and apart from other funds of University and shall be used exclusively for the uses and purposes of the Participant and general creditors as herein set forth.  The Participant and his beneficiaries shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust. Any rights created under the SERP and this Trust Agreement shall be mere unsecured contractual rights of the Participant and his beneficiaries against the University.  All assets held by the Trust will be subject to the claims of the University's general creditors under federal and state law in the event of the Insolvency as defined in Section 3(a) herein.

(e)      The University, in its sole discretion, may at any time, or from time to time, make additional deposits of cash or other property in Trust with the Trustee to augment the principal to be held, administered and disposed of by the Trustee as provided in this Trust Agreement. Neither the Trustee nor the Participant or his beneficiaries shall have any right to compel such additional deposits.

(f)      The Trustee agrees to accept additional deposits made by the University pursuant to Section 1(a) hereof, in accordance with the terms of this Trust Agreement.  Such additional deposits and contributions shall be in cash or in such other form that may be acceptable to the Trustee, including but not limited to policies of life insurance.  The Trustee shall have no duty to determine or collect contributions under the SERP and shall have no responsibility for any property until it is received and accepted by the Trustee.  The University shall have the sole duty and responsibility for the determination of the accuracy and sufficiency of the deposits and contributions to be made under the SERP, the transmittal of the same to the Trustee and compliance with any statute, regulation or rule applicable to contributions.

**Section 2.  PAYMENTS TO PARTICIPANT AND BENEFICIARIES**

(a)      The University may produce a schedule (the "*Payment Schedule*") that indicates the amounts payable in respect of the Participant (and his beneficiaries), that provides a formula or other instructions for determining the amounts payable, the form in which such amounts are to be paid (as provided for or available under the SERP), and the time of commencement for payment of such amounts.  Except as otherwise provided herein, the Trustee shall make

2

LUADMINREC000030

payments to the Participant and his beneficiaries in accordance with such Payment Schedule. Trustee shall make provision for the reporting and withholding of any federal, state or local taxes that may be required to be withheld with respect to the payment of benefits pursuant to the terms of the SERP and shall pay amounts withheld to the appropriate taxing authorities or determine that such amount have been reported, withheld and paid by the University.  The benefits contemplated by the SERP and this Trust are intended to comply with Section 409A of the Code and are intended to be subject to a substantial risk of forfeiture under Section 457(f) of the Code through the date of payment.

(b)     Upon the receipt by the Trustee of (i) a written notice from the University, indicating that the SERP has been completely terminated and (ii) a Payment Schedule, indicating how payments shall be made as a result of the termination of the SERP, the Trustee shall pay to the Participant his account balance under the SERP in accordance with the terms of such Payment Schedule.  Notwithstanding the foregoing, upon the termination of the SERP the University shall be entitled to make payment of benefits directly to the Participant or his beneficiaries in accordance with subsection (e) below.

(c)     The University hereby agrees that an Authorized Party (as defined below) shall have the exclusive responsibility, and the Trustee shall not have any responsibility or duty under this Trust Agreement for determining that the Payment Schedule is in accordance with the terms of the SERP and applicable law, including without limitation, the amount, timing or method of payment and the identity of each person to whom such payments shall be made.  The Trustee shall have no responsibility or duty to determine the tax effect of any payment or to see to the application of any payment.

(d)     The entitlement of the Participant or his beneficiaries to the benefits under the SERP shall be determined by the University or such party as it shall designate under the SERP, and any claim for such benefits shall be considered and reviewed under the procedures set out in the SERP.

(e)     The University may make payment of benefits directly to the Participant or his beneficiaries as they become due under the terms of the SERP.  The University shall notify the Trustee of its decision to make payment of benefits directly to the Participant or his beneficiaries. If the University makes payments according to this subsection (e) the University shall make provision for the reporting and withholding of any federal, state or local taxes that may be required to be withheld with respect to the payment of benefits pursuant to the terms of the SERP and shall pay amounts withheld to the appropriate taxing authorities.  In addition, if the principal of the Trust, and any earnings thereon, are not sufficient to make payments of benefits in accordance with the terms of the SERP, the University shall make the balance of each such payment as it falls due.  The Trustee shall notify the University where principal and earnings are not sufficient.

(f)     University shall furnish Trustee with a written list of the names, signatures and extent of authority of all persons authorized to direct Trustee and otherwise act on behalf of the University under the terms of this Trust Agreement (an "*Authorized Party*").  The Trustee shall be entitled to rely on and shall be fully protected in acting upon direction from an Authorized

3

LUADMINREC000031

Party (or a person that the Trustee reasonably believes to be an Authorized Party) until notified in writing by the University, as appropriate, of a change in the identity of an Authorized Party.

(g)     In accordance with the procedures mutually acceptable to the University and Trustee, all directions and instructions to Trustee from an Authorized Party, including but not limited to the Payment Schedule, shall be in writing, transmitted by mail or by facsimile or shall be an electronic transmission, provided Trustee may, in its discretion, accept oral directions and instructions and may require confirmation in writing ("*Authorized Instructions*").

## Section 3. TRUSTEE RESPONSIBILITY REGARDING PAYMENT TO TRUST BENEFICIARY WHEN UNIVERSITY IS INSOLVENT

(a)     The Trustee shall cease payments of benefits to the Participant and his beneficiaries if it receives written notice that the University is Insolvent. Such written notice shall also be provided to the Participant.  The University is  considered "*Insolvent*" for purposes of this Trust Agreement if (i) it is unable to pay its debts as they become due, or (ii) it is subject to a pending proceeding as a debtor under the United States Bankruptcy Code.

(b)     At all times during the continuance of this Trust, the principal and income of the Trust shall be subject to the claims of general creditors of the University under federal and state law, as set forth below.

(1)     The Board of Directors and the chief financial officer of the University shall have the duty to inform the Trustee in writing of the Insolvency of the University.  If a person claiming to be a creditor of any such entity alleges in writing to the Trustee that such entity has become Insolvent, the Trustee shall determine whether such entity is Insolvent and, pending such determination, the Trustee may discontinue payments of benefits to the Participant and his beneficiaries.

(2)     Unless the Trustee has actual knowledge of the University's Insolvency, or has received written notice from any such entity or from a person claiming to be a creditor alleging that any such entity is Insolvent, the Trustee shall have no duty to inquire whether any such entity is Insolvent. The Trustee may, in all events, rely on such evidence concerning the Insolvency of any such entity as may be furnished to the Trustee and that provides the Trustee with a reasonable basis for making a determination concerning the entity's Insolvency. For purposes of this Subsection, with respect to a corporate Trustee, the Trustee shall be deemed to have actual knowledge only of information known to its personnel administering this Trust.

(3)     If, at any time, the Trustee has determined that the University is Insolvent, the Trustee shall discontinue payments to the Participant and his beneficiaries and shall hold the Trust assets for the benefit of the general creditors of the Insolvent entity. Nothing in this Trust Agreement shall in any way diminish any rights of the Participant or his beneficiaries to pursue their rights as general creditors of the University with respect to benefits due under the terms of the SERP or otherwise.

(4)     The Trustee shall resume the payment of benefits to the Participant or his beneficiaries in accordance with Section 2 of this Trust Agreement only after the Trustee has

4

LUADMINREC000032

determined that the University is not Insolvent (or is no longer Insolvent). The Trustee may rely on such evidence concerning Insolvency as may be furnished to the Trustee and that provides the Trustee with a reasonable basis for making a determination concerning Insolvency. At any time during the term of this Trust Agreement, if there is a dispute about Insolvency, the Trustee shall have the right to require the University to employ and pay for the services of an independent expert to render a written opinion to the Trustee addressing the question of Insolvency.

(c)     Provided that there are sufficient assets, if the Trustee discontinues the payment of benefits from the Trust in accordance with the foregoing provisions of this Section and then subsequently resumes such payments, the first payment following such discontinuance shall include the aggregate amount of all payments due to a Participant or his beneficiaries according to the terms of the SERP in lieu of the payments provided for hereunder during any such period of discontinuance, less the aggregate amount of any payments made to the Participant or beneficiaries by the University in lieu of payments provided for hereunder during any such period of discontinuance.

## Section 4.  PAYMENTS TO UNIVERSITY

(a)     Except as provided in Sections 3 and in this Section 4, because the Trust is irrevocable the University shall not have the right or the power to direct the Trustee to return to the University or to divert to others any of the Trust assets before all payment of benefits have been made to Participant or his beneficiaries pursuant to the terms of the SERP.

(b)     In the event the University makes payment of benefits directly to the Participant pursuant to Section 1(e) hereof, the University may file proof of such payment with the Trustee and request to be reimbursed for said payment.  The Trustee shall reimburse the University for amounts not exceeding the amount the University pays to a Participant. The Trustee shall not be obligated to verify the amount of payment beyond receipt of reasonable proof (e.g. cancelled check).  Such reimbursement shall be made after all payment of benefits have been made to the Participants or their beneficiaries pursuant to the terms of the SERP.

## Section 5.  INVESTMENT AUTHORITY

(a)     The Trustee shall invest and reinvest the principal and income of the Trust as directed by University or an Authorized Party which directions may be changed from time to time.  To the maximum extent permitted by law, the Trustee shall have no duty or responsibility (i) to advise with respect to, or inquire as to the propriety of, any such investment direction or (ii) for any investment decisions made with respect to the Trust by the University.  In the absence of investment direction, the Trustee shall have no obligation to invest Trust assets, but may invest Trust assets in any manner permitted under Section 5(c).

(b)     All rights associated with assets of the Trust shall be exercised by the Trustee and shall in no event be exercised by or rest with the Participant, except that voting rights with respect to Trust assets will be exercised by the University, unless an investment adviser has been appointed and voting authority has been delegated to such investment adviser.

LUADMINREC000033

(c)     In administering the Trust and carrying out the instructions of the University, the Trustee shall be specifically authorized to:

(1)     To invest and reinvest the Trust assets, together with the income there from, in common stock, preferred stock, convertible preferred stock, bonds, debentures, convertible debentures and bonds, mortgages, notes, commercial paper and other evidences of indebtedness (including those issued by the Trustee), shares of mutual funds (including but not limited to mutual funds for which Trustee or its affiliates serve as advisor or perform other services and receive a fee therefor), guaranteed investment contracts, bank investment contracts, other securities, policies of life insurance, other insurance contracts, annuity contracts, options, options to buy or sell securities or other assets, and all other property of any type (personal, real or mixed, and tangible or intangible);

(2)     To deposit or invest all or any part of the assets of the Trust in savings accounts or certificates of deposit or other deposits in a bank or savings and loan association or other depository institution (including but not limited to the Trustee), provided such deposits bear a reasonable interest rate;

(3)     To submit or cause to be submitted to the University all information received by the Trustee regarding ownership rights pertaining to property held in the Trust;

(4)     To hold, manage, improve, repair and control all property, real or personal, forming part of the Trust; to sell, convey, transfer, exchange, partition, lease for any term, even extending beyond the duration of this Trust, and otherwise dispose of the same from time to time;

(5)     To make, execute and deliver any and all documents, agreements or other instruments in writing as are necessary or desirable for the accomplishment of any of the powers and duties set forth in this Trust Agreement;

(6)     To hold in cash, without liability for interest, such portion of the Trust as is pending investment, or payment of expenses, or the distribution of benefits;

(7)     To take such actions as may be necessary or desirable to protect the Trust from loss due to the default on mortgages held in the Trust including with the consent of an Authorized Party the appointment of agents or trustees in such other jurisdictions as may seem desirable, the transfer of property to such agents or trustees as is necessary, or the grant to such agents such powers as are necessary or desirable to protect the Trust.

(8)     To vote in person or by general or limited proxy, as directed by an Authorized Party, any securities in which the Trust is invested and similarly to exercise, personally or by general or limited power of attorney, as directed by an Authorized Party, any right appurtenant to any authorized investment held in the Trust.

(9)     To maintain accounts at, execute transactions through, and lend on an adequately secured basis stocks, bonds or other securities to, any brokerage or other firm, including any firm which is an affiliate of Trustee;

6

79511141_5

(10)    To exercise all of the further rights, powers, options and privileges granted, provided for, or vested in trustees generally under the laws of the state in which the Trustee has its principal place of business so that the powers conferred upon the Trustee herein shall not be in limitation of any authority conferred by law, but shall be in addition thereto.

(d)    The Trustee may exercise the powers described in this Section 5 with or without Authorized Instructions, but where the Trustee acts on Authorized Instructions, the Trustee shall be fully protected as described in Section 9.

## Section 6.  ADDITIONAL POWERS OF TRUSTEE.

(a)    To the extent necessary or which it deems appropriate to implement its powers or otherwise to fulfill any of its duties and responsibilities as Trustee of the Trust, the Trustee shall have the following additional powers and authority:

(1)    To register securities, or any other property, in its name or in the name of any nominee, including the name of any affiliate or the nominee name designated by any affiliate, with or without indication of the capacity in which property shall be held, or to hold securities in bearer form and to deposit any securities or other property in a depository or clearing corporation;

(2)    To make, execute and deliver, as Trustee, any and all deeds, leases, mortgages, conveyances, waivers, releases or other instruments in writing necessary or appropriate for the accomplishment of any of the powers listed in this Trust Agreement; and

(4)    Generally to do all other acts which the Trustee deems necessary or appropriate for the protection of the Trust.

(b)    The Trustee at the direction of the University may appoint a custodian of investments (a "*Custodian*") to safeguard the assets of the Trust.  The University hereby authorizes and directs the Trustee to enter into such agreements with a Custodian as may be necessary to establish an account with a Custodian.  For administrative purposes, contributions deposited to the appointed Custodian shall be deemed as contributions deposited with the Trustee on behalf of the Trust.

## Section 7.  DISPOSITION OF INCOME.

During the term of this Trust, all income received by the Trust, net of expenses and taxes, shall be accumulated and reinvested.

## Section 8.  ACCOUNTING BY TRUSTEE.

The Trustee shall keep accurate and detailed records of all investments, receipts, disbursements, and all other transactions required to be made, including such specific records as shall be agreed upon in writing between the University and the Trustee.  Within 30 days following the end of each fiscal year of the University (ending June 30) and within 30 days after removal or resignation of the Trustee, the Trustee shall deliver to the University a written account of its administration of the Trust during such calendar month or during the period from

7

79511141_5

the end of the last preceding calendar month to the date of such removal or resignation, setting forth all investments, receipts, disbursements and other transactions effected by it, including a description of all securities and investments purchased and sold with the cost or net proceeds of such purchases or sales (accrued interest paid or receivable being shown separately), and showing all cash, securities and other property held in the Trust at the end of such month or as of the date of such removal or resignation, as the case may be (the "*Report*").  Within 30 days following the University's fiscal year end (ending June 30), the Trustee shall provide a copy of the Report covering such fiscal year

To the Participant or his beneficiaries:
Jerry L. Falwell, Jr.
2100 Old Cifax Road
Goode, VA 24566

And to his counsel of record:
Abigail Meyer
Ropes & Gray, LLP
800 Boylston Street
Boston, MA 02199

## Section 9.  RESPONSIBILITY AND INDEMNITY OF THE TRUSTEE.

(a)     The Trustee shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

(b)     The Trustee shall incur no liability to any person for any action, or inaction that it (or the Custodian) takes pursuant to a direction, request or approval given by the University or an Authorized Party in writing which is contemplated by, and in conformity with, the terms of the SERP and this Trust  In the event of a dispute between the University and the Participant, the Trustee may apply to a court of competent jurisdiction to resolve the dispute before taking action.

(c)     The Trustee may, at the expense of the University, consult with legal counsel (who may also be counsel for the University generally) with respect to any of its duties or obligations hereunder.

(d)     The University hereby indemnifies the Trustee and each of its affiliates (collectively, the "*Indemnified Parties*") against, and shall hold them harmless from, any and all loss, claims, liability, and expense, including reasonable attorneys' fees, imposed upon or incurred by any Indemnified Party (i) as a result of any acts taken, or any failure to act, in accordance with the written directions from the University or an Authorized Party, (ii) or by reason of the Indemnified Party's good faith execution of its duties with respect to the Trust, including, but not limited to, its holding of assets of the Trust and investing the assets of the Trust, and (iii) as a result of any action, or inaction, taken by the Trustee pursuant to advice of counsel.  The University's obligations in the foregoing regard are to be satisfied promptly by the University, provided that in the event the loss, claim, liability or expense involved is determined

8

LUADMINREC000036

by a no longer appealable final judgment entered in a lawsuit or proceeding to have resulted from the gross negligence or willful misconduct of the Trustee, the Trustee shall promptly on request thereafter return to the University any amount previously received by the Trustee under this Section 9(d) with respect to such loss, claim, liability or expense.  If the University does not pay such costs, expenses and liabilities in a reasonably timely manner, the Trustee may obtain payment from the Trust without direction from the University.

(e)     The Trustee may, at the expense of the University, hire agents, accountants, actuaries, investment advisers, financial consultants or other professionals (including any financial advisory firm of which the Trustee is an owner or employee) to assist it in performing any of its duties or obligations hereunder.

(f)     The Trustee shall have, without exclusion, all powers conferred on the Trustee by applicable law, unless expressly provided herein, provided, however, that if an insurance policy is held as an asset of the Trust, the Trustee shall not have the power to name a beneficiary of the policy other than the Trust, to assign the policy (as distinct from conversion of the policy to a different form) other than to a successor trustee, or to loan to any person the proceeds of any borrowing against such policy.

(g)     Notwithstanding any powers granted to the Trustee pursuant to this Trust Agreement or applicable law, the Trustee shall not have any power that could give this Trust the objective of carrying on a business and dividing the gains therefrom, within the meaning of section 301.7701-2 of the Procedure and Administrative Regulations promulgated pursuant to the Code.

(h)     The Trustee shall not be liable for any expense, loss, claim or damage (including counsel fees) suffered by the Participant arising out of or caused by any delay in, or failure of, performance by the Trustee, in whole or in part, arising out of, or caused by, circumstances beyond the Trustee's control, including without limitation: acts of God, interruption, delay in, or loss (partial or complete) of electrical power or external computer (hardware or software) or communication services (including access to book-entry securities systems maintained by Federal Reserve Bank of New York and/or any clearing corporation); act of civil or military authority; sabotage; natural emergency; epidemic; war or other government actions; civil disturbance; flood, earthquake, fire, other catastrophe; strike or other labor disturbance by employees of non-affiliates; governmental, judicial, or self-regulatory organization order, rule or regulation; riot; energy or natural resource difficulty or shortage; and inability to obtain materials, equipment or transportation.

(i)     If (1) there is any disagreement or dispute in connection with the Trust or the subject matter hereof, including without limitation any dispute between the Trustee, the University and/or the Participant, or between the University, the Participant and/or any person not a party to the Trust or (2) there are adverse or inconsistent claims or demands upon, or inconsistent instructions to the Trustee, or (3) the Trustee in good faith is in doubt as to what action to take pursuant to the Trust, the Trustee may at its election refuse to comply with any such claims, demands or instructions, or refuse to take any other action pursuant to this Trust until (i) the rights of all persons involved in the dispute have been fully and finally adjudicated by a court of competent jurisdiction or the Trustee has resolved any such doubts to its good faith

9

LUADMINREC000037

satisfaction; or (ii) all disputes have been resolved between the persons involved and the Trustee has received written notice thereof satisfactory to it from all such persons.  Without limiting the generality of the foregoing, the Trustee may at its election interplead the subject matter of this Trust Agreement with a court of competent jurisdiction, or commence judicial proceedings for a declaratory judgment, and the Trustee shall be entitled to recover from the University the Trustee's attorneys' fees, expenses and costs in connection with any such interpleader or declaratory judgment action.

(j)     The Trustee is not a party to, and has no duties or responsibilities under, the SERP other than those that may be expressly contained in this Trust Agreement.  In any case, in which a provision of this Trust Agreement conflicts with any provision of the SERP, the SERP shall control.

## Section 10.    COMPENSATION AND EXPENSES OF TRUSTEE

The Trustee shall be entitled to compensation for services under this Trust Agreement, which fees shall be charged to and collected from the University.  The Trustee shall also be entitled to reimbursement for reasonable expenses incurred by it in the discharge of its duties under this Trust Agreement.  All such fees and expenses shall be charged to and collected from the University.  If the Trustee advances cash or securities for any purpose, including the purchase or sale of foreign exchange or of contracts for foreign exchange, or in the event that the Trustee shall incur or be assessed taxes, interest, charges, expenses, assessments, or other liabilities in connection with the performance of this Trust Agreement, except such as may arise from its own grossly negligent action, grossly negligent failure to act or willful misconduct, any property at any time held for the Trust shall be security therefor and the Trustee shall be entitled to collect from the University sufficient cash for reimbursement, and if such cash is insufficient, dispose of the assets of the Trust to the extent necessary to obtain reimbursement.  To the extent the Trustee advances funds to the Trust for disbursements or to effect the settlement of purchase transactions, the Trustee shall be entitled to collect from the University either (i) with respect to domestic assets, an amount equal to what would have been earned on the sums advanced (an amount approximating the "federal funds" interest rate) or (ii) with respect to non-domestic assets, the rate applicable to the appropriate foreign market.  In the event that any fee, expense or reimbursement is not paid by the University, then such payment shall be made from the Trust to the extent of accumulated income of the Trust.

## Section 11.    RESIGNATION AND REMOVAL OF TRUSTEE

(a)     The Trustee may resign at any time by written notice to the University, which shall be effective 30 days after receipt of such notice unless the University and the Trustee agree otherwise.

(b)     The Trustee may be removed by the University on 60 days' notice or upon shorter notice accepted by the Trustee.

(c)     Upon resignation or removal of the Trustee and appointment of a successor trustee, all assets shall subsequently be transferred to the successor trustee.  The transfer shall be

10

LUADMINREC000038

completed within 120 days after receipt of notice of resignation, removal or transfer, unless the University extends the time limit.

(d)     If Trustee resigns or is removed, a successor shall be appointed, in accordance with Section 12 hereof, by the effective date of resignation or removal under paragraphs (a) or (b) of this Section.  If no such appointment has been made, the Trustee may apply to a court of competent jurisdiction for appointment of a successor or for instructions.  All expenses of the Trustee in connection with the proceeding shall be allowed as administrative expenses of the Trust.

## Section 12.     APPOINTMENT OF SUCCESSOR.

(a)     If the Trustee resigns or is removed in accordance with Section 11(a) or (b) hereof, subject to the requirements of Section 11, the University may appoint any third party, such as a bank trust department or other entity that may be granted corporate trustee powers under state law, as a successor to replace the Trustee upon resignation or removal.  The appointment shall be effective when accepted in writing by the new trustee, who shall have all of the rights and powers of the former trustee, including ownership rights in the Trust assets.  The former trustee shall execute any instrument necessary or reasonably requested by the University or the successor trustee to evidence the transfer.

(b)     The successor trustee need not examine the records and acts of any prior trustee and may retain or dispose of existing Trust assets, subject to Sections 8 and 9 hereof.  The successor trustee shall not be responsible for and the University shall indemnify and defend the successor trustee from any claim or liability resulting from any action or inaction of any prior trustee or from any other past event, or any condition existing at the time it becomes successor trustee.

## Section 13.     AMENDMENT OR TERMINATION

(a)     This Trust Agreement may be amended by a written instrument executed by the Trustee and the University.  Notwithstanding the foregoing, no such amendment shall conflict with the terms of the SERP or shall make the Trust revocable.

(b)     The Trust shall not terminate until the date on which the Participant and his beneficiaries are no longer entitled to benefits pursuant to the terms of the SERP.  Upon termination of the Trust, any assets remaining in the Trust shall be returned to the University.

(c)     Upon written approval of the Participant or his beneficiaries entitled to payment of benefits pursuant to the terms of the SERP, the University may terminate this Trust prior to the time all benefit payments under the SERP have been made.  All assets in the Trust at termination shall be returned to the University.

## Section 14.     MISCELLANEOUS.

(a)     Any provision of this Trust Agreement prohibited by law shall be ineffective to the extent of any such prohibition, without invalidating the remaining provisions hereof.

LUADMINREC000039

(b)     Benefits payable to the Participant and his beneficiaries under this Trust Agreement may not be anticipated, assigned (either at law or in equity), alienated, pledged, encumbered or subjected to attachment, garnishment, levy, execution or other legal equitable process.

(c)     This Trust Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia.

(d)     Neither the University nor the Trustee may assign this Trust Agreement without the prior written consent of the other.  This Trust Agreement shall be binding upon, and inure to the benefit of, the University, the Trustee and their respective successors and permitted assigns. With respect to a corporate  Trustee, any entity, which shall by merger, consolidation, purchase, or otherwise, succeed to substantially all the trust business of the Trustee shall, upon each succession and without any appointment or other action by the University, be and become successor trustee hereunder, upon notification to University.

(e)     The provisions of this Trust Agreement are intended to benefit only the parties hereto, their respective successors and assigns, and the Participant and his beneficiaries under the SERP.  There are no other third party beneficiaries.

(f)     The University and the Trustee hereby each represents and warrants to the other that it has full authority to enter into this Trust Agreement upon the terms and conditions hereof and that the individual executing this Trust Agreement on its behalf has the requisite authority to bind the University or the Trustee to this Trust Agreement.

(g)     This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and such counterparts shall constitute but one and the same instrument and may be sufficiently evidenced by one counterpart.

[SIGNATURE PAGE TO FOLLOW]

12

LUADMINREC000040

IN WITNESS WHEREOF, the University and the Trustee have executed this Rabbi Trust Agreement as of the 22nd day of July, 2020.

**UNIVERSITY**:

**LIBERTY UNIVERSITY**

By: _Jerry Prevo_

Name: _JERRY PRIEVO_

Title: _CHAIRMAN OF BOARD_

**TRUSTEE**:

_____

**John J. Regan**

13

79511141_5

IN WITNESS WHEREOF, the University and the Trustee have executed this Rabbi Trust Agreement as of the 22nd day of July, 2020.


**UNIVERSITY:**

   **LIBERTY UNIVERSITY**

   By: _____

   Name: _____

   Title: _____


**TRUSTEE:**
   _____
   **John J. Regan**

13

LUADMINREC000042

# WHITEFORD, TAYLOR & PRESTON L.L.P.

TWO JAMES CENTER
1021 E. CARY STREET, SUITE 1700
RICHMOND, VIRGINIA 23219

MAIN TELEPHONE (804) 977-3300
FACSIMILE (804) 977-3299

DELAWARE*
DISTRICT OF COLUMBIA
KENTUCKY
MARYLAND
NEW YORK
PENNSYLVANIA
VIRGINIA

WWW.WTPLAW.COM
(800) 987-8705

VERNON E. INGE JR.
PARTNER
DIRECT LINE (804) 977-3301
DIRECT FAX (804) 977-3291
VInge@wtplaw.com

September 14, 2022

**_Via E-Mail Transmission ONLY (soostdyk@mcguirewoods.com)_**
Scott C. Oostdyk, Counsel for Liberty University
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916

**_Personal and Confidential_**
Executive Committee of the Liberty University Board of Trustees
ATTN.: Carroll Hudson, Chair

> **Re:     _Supplemental Executive Retirement Plan – Payment to Jerry L. Falwell, Jr._**

Dear Mr. Hudson:

As you are aware, I represent Jerry L. Falwell, Jr. ("**Mr. Falwell**"). Mr. Falwell devotedly served Liberty University ("**Liberty**") for over 30 years – 13 years as Liberty's President. As a long-term member of Liberty's Board of Trustees and friend to Mr. Falwell, you have seen Liberty's growth, and experienced – first-hand – Mr. Falwell's leadership that paved the way for Liberty's financial prosperity and status as the world's leading Christian University, ensuring that for years to come, Liberty continues "Training Champions for Christ."

In recognition for Mr. Falwell's leadership, among other reasons, Liberty and Mr. Falwell entered into a Supplemental Executive Retirement Plan ("**SERP**") dated July 22, 2020. As of September 1, 2022, according to the terms of the SERP, Mr. Falwell is entitled to payment of his supplemental executive retirement benefits and hereby makes demand for the SERP benefits.

This claim for benefits is being made in accordance with Section 503 of the Employee Retirement Income Security Act of 1974, as amended, 29 USC Section 1133, and Section 7(a) of the SERP.

Section 4 of the SERP provides as follows:

> 4.     _Payment of the Account._  Subject to Paragraph 5 below, you (or, in the event of your death, your beneficiary or estate) will be entitled to receive the

*Whiteford, Taylor & Preston L.L.P. is a limited liability partnership.  Our Delaware offices are operated under a separate Delaware limited liability company, Whiteford, Taylor & Preston L.L.C.

Executive Committee of the Liberty University Board of Trustees
September 14, 2022
Page 2

balance of the Account attributed to credits made pursuant to Paragraph 2 (together with the earnings related described in Paragraph 3) in a single lump sum payment on the first of the month following the earliest to occur of the following: your death, your Disability (as defined in your Employment Agreement), and the second anniversary of your termination of employment with the University for any reason other than Cause (as defined in your Employment Agreement).

Section 5 of the SERP provides as follows:

> 5. <u>Forfeiture of the Account</u>.  Notwithstanding Paragraph 4 above, in the event that your employment is terminated for Cause (as defined in your Employment Agreement) or you engage in any Competitive Activity (as defined in your Employment Agreement) during the Non-Competition Period (as defined in your Employment Agreement), you will forfeit the right to the balance of the Account.

Mr. Falwell resigned as President of Liberty for "**Good Reason**" on August 25, 2020. Liberty accepted Mr. Falwell's resignation for "**Good Reason**." Notably, Mr. Falwell's employment was not terminated by Liberty for "**Cause**" as defined in Article 7 of the Employment Agreement adopted effective July 1, 2019 ("**Employment Agreement**"). Additionally, Mr. Falwell has not engaged in "**Competitive Activity**" as defined in Section 5.2 of the Employment Agreement during the two-year period following his termination of employment.  Thus, neither of the events that would result in forfeiture of the SERP account identified in Paragraph 5 of the SERP has occurred.

Accordingly, Mr. Falwell is entitled to payment of the SERP account as of September 1, 2022.  Please contact me directly to arrange for this payment to be made to Mr. Falwell.

Very truly yours,

Vernon E. Inge Jr.

VEIjr:RND:ejs

cc:     Mr. Jerry L. Falwell, Jr. (*via e-mail transmission only*)

# LIBERTY UNIVERSITY.

December 13, 2022

***Via Federal Express and Electronic Mail***

Jerry L. Falwell, Jr.
c/o Vernon E. Inge Jr.
Whiteford, Taylor & Preston LLP
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, Virginia 23219
VInge@wtplaw.com

> Re:    Jerry L. Falwell Jr.'s Claim for Benefits under the Supplemental Executive
> Retirement Plan

Dear Mr. Inge:

I am writing on behalf of the Executive Committee of Liberty University's Board of Trustees (the "Executive Committee"), which administers the Supplemental Executive Retirement Plan dated July 22, 2020 (the "SERP"). The Executive Committee has reviewed and considered the SERP claim submitted on behalf of Mr. Jerry L. Falwell, Jr. on September 14, 2022. For the reasons discussed below, the Executive Committee has denied Mr. Falwell's demand for payment of the SERP benefits pending final resolution by a court of competent jurisdiction of the dispute between Liberty University and Mr. Falwell.

## Background

In the claim letter dated September 14, 2022, Mr. Falwell demands payment of his SERP benefit as of September 1, 2022. Mr. Falwell contends that payment is due as of that date pursuant to Sections 4 and 5 of the SERP.

Section 4 of the SERP provides:

> <u>Payment of the Account</u>. Subject to Paragraph 5 below, you (or, in the event of your death, your beneficiary or estate) will be entitled to receive the balance of the Account attributed to credits made pursuant to Paragraph 2 (together with the earnings related described in Paragraph 3) in a single lump sum payment on the first of the month following the earliest to occur of the following: your death, your Disability (as defined in your Employment Agreement), and the second anniversary of your termination of employment

LUADMINREC000045

with the University for any reason other than Cause (as defined in your Employment Agreement).

Section 5 of the SERP provides:

> Forfeiture of the Account. Notwithstanding Paragraph 4 above, in the event that your employment is terminated for Cause (as defined in your Employment Agreement) or you engage in any Competitive Activity (as defined in your Employment Agreement) during the Non-Competition Period (as defined in your Employment Agreement), you will forfeit the right to the balance of the Account.

According to Mr. Falwell's claim letter, he resigned on August 25, 2020 for Good Reason (as defined in his Employment Agreement) and has not engaged in Competitive Activity. Therefore, Mr. Falwell demands his SERP benefit be paid out as of September 1, 2022, the first of the month following the second anniversary of his termination.

## Specific Reasons For Denial

Although the Executive Committee does not dispute that Mr. Falwell resigned on August 25, 2020, it notes the legal dispute currently pending between the parties in the Circuit Court of the City of Lynchburg, Virginia (Case Number CL21000354-00). The Executive Committee expects this lawsuit will clarify certain key factual issues related to the circumstances surrounding Mr. Falwell's separation and the validity of and entry into his various employment contracts, including his July 1, 2019 Employment Agreement and the separate July 21, 2020 SERP.

In light of this outstanding legal dispute and the likelihood of further development in the factual record, the Executive Committee has determined that it cannot properly construe the terms SERP, and in particular Mr. Falwell's eligibility for SERP benefits, until these additional facts are finally determined. Pursuant to Section 7(a) of the SERP, in the absence of clear and convincing evidence that the Committee acted arbitrarily and capriciously, any determination made by the Executive Committee with respect to the SERP will be final, binding and conclusive.

In addition to the inadequate factual record, the Executive Committee notes that the SERP provides for the delay of payment under certain circumstances, which exist here, and the Trustee has in fact been directed to delay payment pending final resolution of the matter refenced above.

LUADMINREC000046

In connection with the SERP, Liberty University established a "rabbi" trust pursuant to a Trust Agreement, which was expressly incorporated into the SERP and attached thereto. SERP § 3(b). Under the Trust Agreement, an Authorized Party has the exclusive responsibility for determining when SERP benefits should be paid under the terms of the SERP and the Trust Agreement. Trust Agreement § 2(a), (c). The Executive Committee has been designated as the Authorized Party under Section 2(f) of the Trust Agreement.

The Trust Agreement also provides for a delay in payment of any SERP benefits under certain circumstances. Specifically, if there is "any disagreement or dispute in connection with the Trust or the subject matter hereof, including without limitation any dispute between the Trustee, the University, and/or the Participant, or between the University, the Participant and/or any person not a party to the Trust," then no payment need be made until "the rights of all persons involved in the dispute have been fully and finally adjudicated by a court of competent jurisdiction." Trust Agreement § 9(i).

Such a dispute has arisen between Liberty University and Mr. Falwell and is pending resolution in the Circuit Court of the City of Lynchburg, Virginia as Case Number CL21000354-00. The operative complaint currently asserts four causes of action against Mr. Falwell, each touching on and relating to the funds in the Trust and the circumstances giving rise to the creation and funding of the Trust.

Given the pending dispute between Liberty University and Mr. Falwell and consistent with the provisions of the SERP and Trust Agreement, the Executive Committee, in its capacity as Authorized Party and Plan Administrator, determined in its sole discretion to delay payment of any SERP benefit to Mr. Falwell until such time as the dispute has been fully and finally adjudicated by a court of competent jurisdiction. For these reasons, the Executive Committee has denied Mr. Falwell's demand for payment of SERP benefits as of September 1, 2022.

## Right To Appeal

This letter constitutes a determination of Mr. Falwell's claim under the SERP. Mr. Falwell has the right to file an appeal of this determination pursuant to the appeals process set forth in Section 7(a) of the SERP. Mr. Falwell, or his authorized representative, has up to 60 days following receipt of this letter to file a written request with the Executive Committee for a review of his denied claim. In addition to a written request, Mr. Falwell may submit written comments, documents, records, and other information that he feels are relevant to his claim. Mr. Falwell also has the right to obtain, upon request and free of charge, copies of all documents, records, and other information relevant to his claim.

LUADMINREC000047

Any written request to appeal this determination should be addressed to:

> Executive Committee of Liberty University's Board of Trustees
> c/o David Corry, Corporate Secretary
> 1971 University Blvd, Lynchburg, VA 24515
> dcorry@liberty.edu

Should Mr. Falwell file an appeal, he will receive a written determination on appeal within 60 days after receipt of the request for an appeal, unless special circumstances require an extension of time for processing the appeal. If an extension of time is necessary, the Executive Committee will provide Mr. Falwell with written notice of the extension prior to the end of the 60-day period.

If Mr. Falwell receives an adverse determination on appeal, he has the right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974, as amended. It is important to note that Mr. Falwell must follow the SERP's appeals process to completion before he may file a civil action.

Sincerely,

/s/ Carroll Hudson, Chairman

On behalf of the Executive Committee

LUADMINREC000048

WHITEFORD, TAYLOR & PRESTON L.L.P.

VERNON E. INGE JR.
PARTNER
DIRECT LINE (804) 977-3301
DIRECT FAX (804) 977-3291
VInge@wtplaw.com

TWO JAMES CENTER
1021 E. CARY STREET, SUITE 1700
RICHMOND, VIRGINIA 23219

MAIN TELEPHONE (804) 977-3300
FACSIMILE (804) 977-3299

DELAWARE*
DISTRICT OF COLUMBIA
KENTUCKY
MARYLAND
NEW YORK
PENNSYLVANIA
VIRGINIA

WWW.WTPLAW.COM
(800) 987-8705

December 28, 2022

# **CONFIDENTIAL**

Executive Committee of Liberty University's Board of Trustees
c/o David Corry, Corporate Secretary
1971 University Boulevard
Lynchburg, Virginia 24515
dcorry@liberty.edu

Executive Committee of Liberty University's Board of Trustees
c/o Carroll Hudson, Chairman
1971 University Boulevard
Lynchburg, Virginia 24515
dcorry@liberty.edu

## **THROUGH COUNSEL FOR LIBERTY UNIVERSITY:**

***Via E-Mail Transmission (soostdyk@mcguirewoods.com)***
***Confirmation by Hand Delivery***

Scott C. Oostdyk, Counsel for Liberty University
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916

> **Re:** ***Appeal of December 13, 2022 Denial of Supplemental Executive Retirement Plan Benefits Payable to Jerry L. Falwell, Jr.***

Gentlemen:

As you are aware, I represent Jerry L. Falwell, Jr. ("**Mr. Falwell**"). We are in receipt of Mr. Carroll Hudson's letter dated December 13, 2022 denying Mr. Falwell's claim for benefits payable under the Supplemental Executive Retirement Plan ("**SERP**") dated July 22, 2020 and established by Liberty University ("**Liberty**"). Mr. Falwell appeals the denial of his claim and requests a review of the denied claim in accordance with Section 503 of the Employee

*Whiteford, Taylor & Preston L.L.P. is a limited liability partnership. Our Delaware offices are operated under a separate Delaware limited liability company, Whiteford, Taylor & Preston L.L.C.

CONFIDENTIAL

Executive Committee of Liberty University's Board of Trustees
c/o David Corry, Corporate Secretary
c/o Carroll Hudson, Chairman
Through Scott C. Oostdyk, Counsel for Liberty University
December 28, 2022
Page 2

Retirement Income Security Act of 1974, as amended ("**ERISA**"); 29 USC Section 1133, Labor Regulation Section 29 CFR 2560.503-1(h); and Section 7(a) of the SERP. Pursuant to Mr. Hudson's letter, this written appeal is addressed to the Executive Committee of Liberty University's Board of Trustees, c/o David Corry, Corporate Secretary, in addition to the Chairman of the SERP's Committee, Mr. Carroll Hudson.

In the December 13, 2022 letter denying the claim for benefits, Liberty acknowledges that Mr. Falwell resigned on August 25, 2020. Liberty does not and cannot dispute that Mr. Falwell has met the requirements for eligibility to receive payment of the SERP benefits under the terms of the SERP – specifically, the lapse of two years following termination of employment, other than for Cause.

"Cause" is defined in the Employment Agreement dated July 1, 2019 ("**Employment Agreement**"). Liberty has agreed that Mr. Falwell was not terminated for "cause." In fact, Liberty agreed and accepted that Mr. Falwell could resign for good reason and without cause. *See* Liberty University Board Accepts Jerry Falwell, Jr.'s Resignation as President, August 25, 2020, located at https://www.liberty.edu/news/press_release/liberty-university-board-accepts-jerry-falwell-jr-s-resignation-as-president/ (last accessed December 22, 2022). Liberty does not allege that Mr. Falwell engaged in "Competitive Activity" as defined in the Employment Agreement during the "Non-Competition Period" as defined in Section 5.2 of the Employment Agreement. Mr. Falwell has not engaged in any "Competitive Activity."

Instead, the denial is based on a pending spurious lawsuit brought against Mr. Falwell in state court ("**Lawsuit**") and the purported need of Liberty to resolve the issues in the Lawsuit before meeting Liberty's obligations under the SERP to pay the benefits due. The pendency of the Lawsuit has no bearing whatsoever on Mr. Falwell's rights to receive payments of the benefits due under the SERP. In fact, any state law claims, as they may relate to the SERP, are entirely preempted by ERISA. Under ERISA, the plan documents – here, the SERP – control Mr. Falwell's eligibility for payment. *See* ERISA Section 514, 29 USC Section 1144.

Liberty notes as part of its specific reasons for denial that the SERP provides for the delay of payments under certain circumstances. The SERP does not provide for delay of payments in certain circumstances. In fact, the SERP is clear regarding the timing of payments. Paragraph 4 of the SERP is titled "Payment of the Account" and provides, in full:

Subject to Paragraph 5 below, you (or, in the event of your death, your beneficiary or estate) will be entitled to receive the balance of the Account attributed to credits made pursuant to Paragraph 2 (together with the earnings related described in Paragraph 3) in a single lump sum payment on the first of the

**CONFIDENTIAL**

Executive Committee of Liberty University's Board of Trustees
c/o David Corry, Corporate Secretary
c/o Carroll Hudson, Chairman
Through Scott C. Oostdyk, Counsel for Liberty University
December 28, 2022
Page 3

---

month following the earliest to occur of the following: your death, your Disability (as defined in your Employment Agreement), and the second anniversary of your termination of employment with the University for any reason other than Cause (as defined in your Employment Agreement).

As previously set forth in Mr. Falwell's September 14, 2022 letter, paragraph 5 is not applicable. Mr. Falwell was not terminated for Cause (as defined in the Employment Agreement) and has not engaged in any Competitive Activity (as defined in the Employment Agreement).

Liberty cites provisions of the Rabbi Trust Agreement established on July 22, 2020 ("**Rabbi Trust**") as a basis for delay of the payments to Mr. Falwell. The Rabbi Trust is a funding mechanism and means of protection for the payments due according to the SERP. It is an irrevocable trust, with payments to be provided to Mr. Falwell, or in the event of insolvency, which Liberty is not, Liberty's creditors. The SERP is the governing plan setting forth the amounts Mr. Falwell is entitled to and under what conditions. The Rabbi Trust cannot and does not amend or govern the timing of payment due under the SERP. Mr. Falwell has met the conditions set forth in the SERP and not only can Liberty pay the benefit through either their general accounts or the Rabbi Trust, but Liberty must pay the amount set forth in the SERP immediately, as it was due September 1, 2022.

Liberty asserts that Sections 2(a)[1] and 2(c)[2] of the Rabbi Trust give the Executive Committee of Liberty, as the "Authorized Party," the "exclusive responsibility for determining when SERP benefits should be paid under the terms of the SERP and the [Rabbi Trust]." Notwithstanding Sections 2(a) and 2(c) of the Rabbi Trust, the SERP, which governs, provides that Mr. Falwell is entitled to receive the SERP benefit "in a single lump sum payment." SERP, Paragraph 4. That payment, pursuant to the SERP, was due on September 1, 2022. The cited provisions, to the extent applicable, are not relevant to Mr. Falwell's SERP benefits claim and more importantly, do not authorize the Executive Committee as the "Authorized Party" to refuse to make payments due under the SERP.

---

[1]     Section 2(a) of the Rabbi Trust, to the extent applicable, is permissive. The "Payment Schedule" is designed to provide the parties the information for when payments should begin and how much the payment, or payments, should be. Here, Mr. Falwell is entitled to a lump sum payment, in an amount set forth by the SERP, "on the first of the month following the earliest to occur of the following: your death, your Disability (as defined in your Employment Agreement), and the second anniversary of your termination of employment with the University for any reason other than Cause (as defined in your Employment Agreement." SERP, Paragraph 4.

[2]     Section 2(c) of the Rabbi Trust simply provides that the Trustee is not responsible for determining when Mr. Falwell, or his beneficiary, should be paid, the amount of his payment, method of payment, or determining any tax consequences.

**CONFIDENTIAL**

Executive Committee of Liberty University's Board of Trustees
c/o David Corry, Corporate Secretary
c/o Carroll Hudson, Chairman
Through Scott C. Oostdyk, Counsel for Liberty University
December 28, 2022
Page 4

---

Liberty also cites Section 9(i) of the Rabbi Trust as a basis for delay of the payments to Mr. Falwell. Specifically, Liberty notes that the Lawsuit has arisen between Liberty and Mr. Falwell, and is currently pending resolution in the Circuit Court of the City of Lynchburg. Section 9 of the Rabbi Trust is titled "Responsibility and Indemnity of the Trustee." Section 9(i) provides the following:

> (i) If (1) there is any disagreement or dispute in connection with the Trust or the subject matter hereof, including without limitation any dispute between the Trustee, the University and/or the Participant, or between the University, the Participant and/or any person not a party to the Trust or (2) there are adverse or inconsistent claims or demands upon, or inconsistent instructions to the Trustee, or (3) the Trustee in good faith is in doubt as to what action to take pursuant to the Trust, the Trustee may at its election refuse to comply with any such claims, demands or instructions, or refuse to take any other action pursuant to this Trust until (i) the rights of all persons involved in the dispute have been fully and finally adjudicated by a court of competent jurisdiction or the Trustee has resolved any such doubts to its good faith satisfaction; or (ii) all disputes have been resolved between the persons involved and the Trustee has received written notice thereof satisfactory to it from all such persons. Without limiting the generality of the foregoing, the Trustee may at its election interplead the subject matter of this Trust Agreement with a court of competent jurisdiction, or commence judicial proceedings for a declaratory judgment, and the Trustee shall be entitled to recover from the University the Trustee's attorneys' fees, expenses and costs in connection with any such interpleader or declaratory judgment action.

In other words, it permits the *Trustee* to "refuse to comply ... or refuse to take any action pursuant to this Trust." Rabbi Trust, Section 9(i).[3] It does not alter the fact that pursuant to the SERP, Mr. Falwell is entitled to payment, according to the SERP, either through the Rabbi Trust funds, or through payment directly by Liberty. *See* Rabbi Trust, Section 2(e).

---

[3]     Notably, it was not the Trustee who made the initial determination not to make payments; instead, it was Liberty through its August 24, 2022, letter from Robert L. Ritz, Chief Financial Officer, to the Trustee, stating "Liberty directs you not to issue any payments to the Participant, or to any beneficiary, until such time as Liberty advises you by further Authorized Instructions."

**CONFIDENTIAL**

Executive Committee of Liberty University's Board of Trustees
c/o David Corry, Corporate Secretary
c/o Carroll Hudson, Chairman
Through Scott C. Oostdyk, Counsel for Liberty University
December 28, 2022
Page 5

_____

       For the foregoing reasons, Mr. Falwell appeals the denial of his claim for benefits.  Please contact me directly to arrange for the SERP benefit payment to be made to Mr. Falwell including all amounts of interest that have accrued since September 1, 2022. In the event Liberty chooses to not make the SERP benefit payment, Mr. Falwell will consider his appeal denied and take all appropriate steps afforded under ERISA following the 60-day period Liberty has to respond to Mr. Falwell's appeal, as set forth in Paragraph 7(a) of the SERP.

       Very truly yours,

       Vernon E. Inge Jr.

VEIjr:RND:MCC:ejs

cc:    Mr. Jerry L. Falwell, Jr. (*via e-mail transmission only*)



Home  >  Liberty News  >  Press Release  >

Liberty University Board Accepts Jerry Falwell, Jr.'s Resignation as President

Additional Navigation  ⌄

# Liberty University Board Accepts Jerry Falwell, Jr.'s Resignation as President

August 25, 2020 : By Office of Communications & Public Engagement



Lynchburg, VA—The Liberty University Board of Trustees acted today to accept the resignation of Jerry Falwell, Jr. as its President and Chancellor and also accepted his resignation from its Board of Directors. All were effective immediately.

After agreeing yesterday to immediately resign then reversing course, Falwell, through an attorney, sent the resignation letter late last night to members of the Board's Executive Committee pursuant to the terms of his contract of employment. The Executive Committee met this morning and voted to accept all the resignations immediately and recommend ratification to the full Board. Later this morning, the full Board gathered via conference call and unanimously voted to affirm the decision of the Executive Committee. Falwell's severance compensation was dictated by the terms of his pre-existing employment agreement without any adjustment by the University or its Board.

The Board, composed of a mix of alumni, pastors and business executives, active and retired, used most of its meeting to focus forward on the university's future and steps that could be taken to ensure it remained true to its mission. The Board set its next meeting in Lynchburg to select a search committee for its new President.

Acting Board Chairman Dr. Allen McFarland, said, "I am so encouraged by the unity of Christ that I saw exemplified by our Board today. Liberty University's future is very bright and in capable hands of leaders who are committed to being good stewards of what the Lord has entrusted!"

Jerry Prevo, who will stay on as Acting President, said, "Our students are ready to be world changers as Champions for Christ.  Their spirit is strong as they look to the future. I intend to do all I can to nurture their spiritual side as they grow academically and enjoy all our campus has to offer."

Falwell was the fourth president of Liberty University, assuming the role after his father, Liberty founder Dr. Jerry Falwell, Sr., passed away in 2007. He previously served as the university's general counsel. During his time as president, Falwell Jr. oversaw more than $1 billion of ongoing or planned construction as the campus was almost entirely transformed with new world-class academic buildings and athletics facilities. He worked with university leadership to achieve record enrollment in residential and online programs, which now stands at over 100,000 students. The university's heartfelt prayers are with him and his family as he steps away from his life's work.



Chat Live                    Request Info                    Apply Now                    Visit Liberty

LUADMINREC000055

Case 6:23-cv-00011-RSB Document 30 Filed 08/30/23 Page 65 of 414 Pageid#: 1314





Liberty University School of Business joins new online platform to connect students with alumni, build partnerships



Statement by Jerry Prevo, Chairman, Liberty University Board of Trustees



Liberty University's financial literacy program makes top 50 list, alongside Duke, Harvard, Yale, and others

Chat Live          Request Info          Apply Now          Visit Liberty

Case 6:23-cv-00011-RSB   Document 30   Filed 08/30/23   Page 66 of 414   Pageid#: 1315



Contact Information

- Chat Live

| | |
|---|---|
| Apply Now | Calendar & Events |
| Emergency Information | Departments & Offices |
| Visit Liberty | Work at Liberty |
| Request More Info | Free Mobile App |



Liberty Local Time: 5:03 p.m. ET

Privacy Policy    Non-Discrimination Policy    Site Map

Copyright © 2023 Liberty University. All rights reserved.

Chat Live            Request Info            Apply Now            Visit Liberty

# LIBERTY UNIVERSITY

February 24, 2023

***Via Federal Express and Electronic Mail***

Jerry L. Falwell, Jr.
c/o Vernon E. Inge Jr.
Whiteford, Taylor & Preston LLP
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, Virginia 23219
VInge@wtplaw.com

      Re:    Jerry L. Falwell Jr.'s Request for Review under the Supplemental Executive Retirement Plan

Dear Mr. Inge:

I am writing on behalf of the Executive Committee of Liberty University's Board of Trustees (the "Executive Committee"), which administers the Supplemental Executive Retirement Plan dated July 22, 2020 (the "SERP"). The Executive Committee has reviewed and considered the appeal and request for review submitted on behalf of Mr. Jerry L. Falwell, Jr. on December 28, 2022.

Under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the Executive Committee is required to administer the SERP in accordance with its written provisions and terms as interpreted by the Executive Committee, the Plan Administrator. The Executive Committee has reviewed all the arguments, information, and materials submitted on behalf of Mr. Falwell in connection with his initial claim for benefits and request for review and received advice of counsel. For the reasons discussed below, the Executive Committee upholds its denial of Mr. Falwell's demand for payment of the SERP benefits pending final resolution by a court of competent jurisdiction of the pending dispute between Liberty University and Mr. Falwell.

LUADMINREC000058

**Background**

In the September 14, 2022 claim letter, Mr. Falwell demanded payment of his SERP benefit, which he contends was due on September 1, 2022 pursuant to Sections 4 and 5 of the SERP.  According to Mr. Falwell's claim letter, he is entitled to SERP benefits as of September 1, 2022, the first of the month following the second anniversary of his termination, because he resigned on August 25, 2020 for what he asserted to be Good Reason (as defined in his Employment Agreement) and did not engage in Competitive Activity.

By letter dated December 13, 2022, the Executive Committee denied Mr. Falwell's demand for payment of SERP benefits as of September 1, 2022. The Executive Committee found that the legal dispute currently pending between Liberty University and Mr. Falwell in the Circuit Court of the City of Lynchburg, Virginia (Case Number CL21000354-00) warranted a delay of payment of any SERP benefit to Mr. Falwell until such time as the dispute has been fully and finally adjudicated by a court of competent jurisdiction and resolved by entry of a final order approving judgment or resolution by compromise.  In making this determination, the Executive Committee principally relied on Sections 2 and 9(i) of the Trust Agreement, as well as Section 3(b) of the SERP, which expressly incorporates the Trust Agreement.

The Executive Committee also found that resolution of the pending dispute between Liberty University and Mr. Falwell would clarify key factual issues related to the circumstances surrounding Mr. Falwell's separation and the validity of and entry into his various employment contracts, including his July 1, 2019 Employment Agreement and the wholly-separate July 21, 2020 SERP.  These factual issues could weigh on whether Liberty University amends its pending lawsuit against Falwell to exert a claim for recission of the SERP and Trust Agreement based on previously non-disclosed conduct by Falwell. The Executive Committee determined that further development of the factual record as to these issues was necessary for it to determine Mr. Falwell's eligibility for SERP benefits under Sections 4 and 5 of the SERP.

By letter dated December 28, 2022, Mr. Falwell appealed the denial of his payment demand and requested review of the same.

LUADMINREC000059

**<u>Specific Reasons for Upholding the Claim Denial</u>**

Mr. Falwell continues to assert an entitlement to a SERP benefit payment as of September 1, 2022 based on Sections 4 and 5 of the SERP.

Section 4 of the SERP provides:

> <u>Payment of the Account</u>. Subject to Paragraph 5 below, you (or, in the event of your death, your beneficiary or estate) will be entitled to receive the balance of the Account attributed to credits made pursuant to Paragraph 2 (together with the earnings related described in Paragraph 3) in a single lump sum payment on the first of the month following the earliest to occur of the following: your death, your Disability (as defined in your Employment Agreement), and the second anniversary of your termination of employment with the University for any reason other than Cause (as defined in your Employment Agreement).

Section 5 of the SERP provides:

> <u>Forfeiture of the Account</u>. Notwithstanding Paragraph 4 above, in the event that your employment is terminated for Cause (as defined in your Employment Agreement) or you engage in any Competitive Activity (as defined in your Employment Agreement) during the Non-Competition Period (as defined in your Employment Agreement), you will forfeit the right to the balance of the Account.

While Mr. Falwell contends that Section 4 dictates the timing of any payment, it is subject to Section 5, as he acknowledges. Section 5 restricts payment in the event of termination of employment for Cause as defined by the Employment Agreement. Mr. Falwell circumvents Section 5 by inaccurately contending that "Liberty does not and cannot dispute that Mr. Falwell has meet the requirements for eligibility to receive payment of the SERP benefits under the terms of the SERP – specifically, the lapse of two years following termination of employment, other than for Cause." The pending legal dispute between Liberty University and Mr. Falwell shows otherwise, and touches on the circumstances surrounding Mr. Falwell's separation and the validity of his various employment contracts, which might impact on Liberty University's potential remedy of recission.

LUADMINREC000060

The Executive Committee reviewed the August 25, 2020 press release cited in Mr. Falwell's appeal letter regarding the Liberty University Board's acceptance of Mr. Falwell's resignation and continues to acknowledge that Mr. Falwell resigned on August 25, 2020. But the Executive Committee finds that his resignation does not otherwise extinguish the potential existence of suppressed evidence of Cause that would otherwise support termination, and thus the ongoing litigation process may impact Mr. Falwell's ultimate eligibility for SERP benefits. Again, resolution of the pending litigation between Liberty University and Falwell will result in further development of the factual record related to the circumstances surrounding Mr. Falwell's separation.

For these reasons, the Executive Committee upholds the prior determination that it cannot properly construe Mr. Falwell's eligibility of SERP benefits absent further development of the factual record and resolution of the outstanding legal dispute between Liberty University and Mr. Falwell.

Mr. Falwell's request for review next challenges the Executive Committee's reliance on provisions in the Trust Agreement to delay payment of any SERP benefit. Mr. Falwell contends that the SERP, not the Trust Agreement, controls the timing of the payment. Liberty University agrees on the importance of the stand-alone SERP in the construction of Mr. Falwell's putative SERP benefits.  As even Mr. Falwell acknowledges, however, the overall plan documents control the terms and conditions of benefit eligibility.  The SERP itself references and incorporates the Trust Agreement SERP (§ 3(b).), making the Trust Agreement, too, a controlling plan governance document.

The Trust Agreement, which again is a plan governance document, provides for a delay of payment pending a dispute such as the litigation between Liberty University and Mr. Falwell. While Mr. Falwell contends that Sections 2 and 9 of the Trust Agreement are not relevant to his SERP benefits claim and does not authorize the Executive Committee to delay any SERP benefit payment, the Executive Committee finds otherwise after reviewing the SERP and Trust Agreement together.

Section 2 of the Trust Agreement governs when and how payments are made to Participants, such as Mr. Falwell.  It provides in full:

LUADMINREC000061

## Section 2. PAYMENTS TO PARTICIPANT AND BENEFICIARIES

(a)     The University may produce a schedule (the "Payment Schedule") that indicates the amounts payable in respect of the Participant (and his beneficiaries), that provides a formula or other instructions for determining the amounts payable, the form in which such amounts are to be paid (as provided for or available under the SERP), and the time of commencement for payment of such amounts. Except as otherwise provided herein, the Trustee shall make payments to the Participant and his beneficiaries in accordance with such Payment Schedule. Trustee shall make provision for the reporting and withholding of any federal, state or local taxes that may be required to be withheld with respect to the payment of benefits pursuant to the terms of the SERP and shall pay amounts withheld to the appropriate taxing authorities or determine that such amount have been reported, withheld and paid by the University. The benefits contemplated by the SERP and this Trust are intended to comply with Section 409A of the Code and are intended to be subject to a substantial risk of forfeiture under Section 457(f) of the Code through the date of payment.

(b)     Upon the receipt by the Trustee of (i) a written notice from the University, indicating that the SERP has been completely terminated and (ii) a Payment Schedule, indicating how payments shall be made as a result of the termination of the SERP, the Trustee shall pay to the Participant his account balance under the SERP in accordance with the terms of such Payment Schedule. Notwithstanding the foregoing, upon the termination of the SERP the University shall be entitled to make payment of benefits directly to the Participant or his beneficiaries in accordance with subsection (e) below.

(c)     The University hereby agrees that an Authorized Party (as defined below) shall have the exclusive responsibility, and the Trustee shall not have any responsibility or duty under this Trust Agreement for determining that the Payment Schedule is in accordance with the terms of the SERP and applicable law, including without limitation, the amount, timing or method of

LUADMINREC000062

payment and the identity of each person to whom such payments shall be made. The Trustee shall have no responsibility or duty to determine the tax effect of any payment or to see to the application of any payment.

(d)     The entitlement of the Participant or his beneficiaries to the benefits under the SERP shall be determined by the University or such party as it shall designate under the SERP, and any claim for such benefits shall be considered and reviewed under the procedures set out in the SERP.

(e)     The University may make payment of benefits directly to the Participant or his beneficiaries as they become due under the terms of the SERP. The University shall notify the Trustee of its decision to make payment of benefits directly to the Participant or his beneficiaries. If the University makes payments according to this subsection (e) the University shall make provision for the reporting and withholding of any federal, state or local taxes that may be required to be withheld with respect to the payment of benefits pursuant to the terms of the SERP and shall pay amounts withheld to the appropriate taxing authorities. In addition, if the principal of the Trust, and any earnings thereon, are not sufficient to make payments of benefits in accordance with the terms of the SERP, the University shall make the balance of each such payment as it falls due. The Trustee shall notify the University where principal and earnings are not sufficient.

(f)     University shall furnish Trustee with a written list of the names, signatures and extent of authority of all persons authorized to direct Trustee and otherwise act on behalf of the University under the terms of this Trust Agreement (an "*Authorized Party*"). The Trustee shall be entitled to rely on and shall be fully protected in acting upon direction from an Authorized Party (or a person that the Trustee reasonably believes to be an Authorized Party) until notified in writing by the University, as appropriate, of a change in the identity of an Authorized Party.

LUADMINREC000063

(g)     In accordance with the procedures mutually acceptable to the University and Trustee, all directions and instructions to Trustee from an Authorized Party, including but not limited to the Payment Schedule, shall be in writing, transmitted by mail or by facsimile or shall be an electronic transmission, provided Trustee may, in its discretion, accept oral directions and instructions and may require confirmation in writing ("*Authorized Instructions*").

This section makes clear that the Executive Committee, in its sole discretion as Plan Administrator and Authorized Party, has the authority to determine Mr. Falwell's eligibility for SERP benefits, as well as the timing of payment of any such benefits. The Trustee cannot make a payment absent specific instructions from the Executive Committee as an Authorized Party.

Section 9 of the Trust Agreement, which as you acknowledge outlines the Trustee's responsibilities—including its responsibility to make a SERP benefit payment—and provides for a delay of any such payment in the event of a dispute between Liberty University and a Participant. Specifically, Section 9(i) specifically provides:

If (1) there is any disagreement or dispute in connection with the Trust or the subject matter hereof, **including without limitation any dispute between the Trustee, the University and/or the Participant**, or between the University, the Participant and/or any person not a party to the Trust or (2) there are adverse or inconsistent claims or demands upon, or inconsistent instructions to the Trustee, or (3) the Trustee in good faith is in doubt as to what action to take pursuant to the Trust, the Trustee may at its election refuse to comply with any such claims, demands or instructions, or refuse to take any other action pursuant to this Trust until (i) the rights of all persons involved in the dispute have been fully and finally adjudicated by a court of competent jurisdiction or the Trustee has resolved any such doubts to its good faith satisfaction; or (ii) all disputes have been resolved between the persons involved and the Trustee has received written notice thereof satisfactory to it from all such persons. Without limiting the generality of the foregoing, the Trustee may at its election

LUADMINREC000064

> interplead the subject matter of this Trust Agreement with a court
> of competent jurisdiction, or commence judicial proceedings for a
> declaratory judgment, and the Trustee shall be entitled to recover
> from the University the Trustee's attorneys' fees, expenses and
> costs in connection with any such interpleader or declaratory
> judgment action.

Trust Agreement, Section 9(i) (emphasis added).

Reading these provisions together, the Executive Committee finds it has sole discretionary authority to determine Mr. Falwell's eligibility for and the timing of SERP benefits.  Part of the Executive Committee's license is to determine if the resolution of "any" dispute between Falwell Jr. and Liberty University would be aided by a particular timing of payment of the SERP benefits. The agreement of the parties that good faith is integral to the Trust Agreement impacts on this determination. Factors like the unwillingness of Mr. Falwell to sit for deposition despite an agreement to be deposed, and a valid notice of deposition, weighs on the Executive Committee's belief that good faith is not present in Falwell's dispute resolution. The Trustee, of course, can only make such payments if directed by an Authorized Party, here the Executive Committee. The plan governance documents provide that any SERP payment may be delayed in event of a dispute between Liberty University and a Participant. The referenced litigation constitutes such a dispute. Therefore, the Executive Committee, as the Authorized Party, properly directed the Trustee not to make payment pending resolution of that dispute.

Given the pending dispute between Liberty University and Falwell and consistent with the provisions of the SERP and Trust Agreement, the Executive Committee, in its capacity as Authorized Party and Plan Administrator, upholds the prior determination that any SERP benefit payment must be delayed until such time as the dispute has been fully and finally adjudicated by a court of competent jurisdiction on entry of a final order approving judgment or resolution by compromise.  The Executive Committee therefore upholds its denial of Mr. Falwell's demand for payment of SERP benefits as of September 1, 2022.

Pursuant to Section 7(a) of the SERP, in the absence of clear and convincing evidence that the Executive Committee acted arbitrarily and capriciously, any determination made by the Executive Committee with respect to the SERP will be final, binding, and conclusive.

LUADMINREC000065

**<u>Additional Rights</u>**

This letter constitutes a determination of Mr. Falwell's request for review under the SERP.

Mr. Falwell has the right to obtain, upon request and free of charge, copies of all documents, records, and other information relevant to his claim for benefits.  Any such request should be in writing addressed to:

> Executive Committee of Liberty University's Board of Trustees
> Chairman Carroll Hudson
> c/o David Corry, Corporate Secretary
> 1971 University Blvd, Lynchburg, VA 24515
> dcorry@liberty.edu

Mr. Falwell also has the right to bring a civil action under ERISA Section 502(a) should he disagree with this decision on appeal.

> Sincerely,
>
>
> /s/ Carroll Hudson, Chairman
> On behalf of the Executive Committee

LUADMINREC000066

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.

              Plaintiff,

v.

JERRY L. FALWELL, JR.,

              Defendant.

Case No. CL21000354-00

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Liberty University, Inc. ("Liberty" or the "University"), by counsel, states as follows for its claims against Defendant Jerry L. Falwell, Jr. ("Falwell Jr.").

### INTRODUCTION

1.      Liberty is one of the largest Christian academic communities in America, annually training over 100,000 online students, and educating more than 15,000 students on its 700-acre campus located at 1971 University Boulevard, Lynchburg, VA.

2.      Until he quit the office August 25, 2020, Falwell Jr., who resides in Goode, VA, was the President and Chancellor of Liberty, a role that he had held since succeeding Liberty's founder, and his father, Dr. Jerry L. Falwell Sr. ("Dr. Falwell").

3.      Liberty asserts this suit for several purposes, including (a) to recover University property that remains in the possession of Falwell Jr. post-resignation, (b) to redress breaches of various fiduciary duties that Falwell Jr. owed to Liberty while serving as the University's President

1

and Chancellor, and (c) to recover damages for violations by Falwell Jr. of Virginia's business conspiracy statute.

4.      Many of the facts supporting Liberty's latter two claims are helpfully spelled out in two writings: a media statement that Falwell Jr. released to the *Washington Examiner* in August 2020, and a lawsuit that Falwell Jr. lodged against Liberty in October 2020, two months after his abrupt resignation from Liberty's presidency.

5.      In the August 23, 2020 media statement Falwell Jr. tendered "exclusively" to the *Washington Examiner*, Falwell Jr. presented a 1,200-word narrative that divulged the saga of a "former family friend" who had an affair with Becki Falwell, the wife of Falwell Jr., and "was threatening to expose it" (the "Statement").

6.      In the Statement, attached hereto as Exhibit 1, and in his interview with the *Washington Examiner*, Falwell Jr. took pains to emphasize that he was divulging the extortive behavior for the first time outside his family. He stated he and Becki had been "suffering in silence" over it. He confessed he had wrongly been "bearing those burdens on [his] own." The *Washington Examiner* confirmed Falwell Jr. was "reveal[ing] his wife Becki's affair for the first time." The reporter noted Falwell Jr. "appeared to be relieved to have finally divulged the affair and the yearslong series of attacks the couple has faced."

7.      On October 28, 2020, Falwell Jr. filed in this Court a two-count, 117-paragraph Complaint against Liberty (the "Complaint.") In his Complaint, a copy attached hereto as Exhibit 2, Falwell again admits what he disclosed in the Statement – that Becki began an affair with a family friend in March 2012. Falwell identified the former friend as Giancarlo Granda of Miami ("Granda.") Complaint ¶41. When Becki and Falwell Jr., first met Granda he was a 20-year old working at the high-end resort hotel at which Falwells stayed while on one of their frequent family

Case 6:23-cv-00011-RSB   Document 30   Filed 08/30/23   Page 78 of 414   Pageid#: 1327

vacations in Miami. Complaint ¶40. Falwell Jr. admits that Becki – a mother of three adult children – had an on-and-off again sexual affair with Granda that purportedly lasted until 2014. Complaint ¶¶40, 41.

8.     Falwell admits that he knew of Becki's affair, Complaint ¶42, and also concedes he had not disclosed the affair to anyone material.

9.     In the Complaint, Falwell Jr. instead pled that when Becki broke off intimate relations with Granda in 2012, the young man refused to retire from the relationship.  Granda threatened to use the surreptitious sexual intimacy, and surrounding conduct, to "embarrass the Falwells *and Liberty University.*"  Complaint ¶43 (emphasis added). Falwell Jr. and Granda both knew that matters of infidelity, immodesty, and acceptance of a loose lifestyle would stand in stark contrast to the conduct expected of leaders at Liberty.  Granda had amassed considerable leverage over the Falwells, and, accordingly, they worked to keep Granda pacified and quiet.

10.     In the Statement, Falwell Jr. contends that he and Becki were "doing our best to respectfully unravel this 'fatal attraction.'" Accordingly, the Falwells "extended the spirit of fondness to [Granda] with respect and kindness, both for spiritual and religious reasons, and in the hope that we could help him find his way and allow us to put this behind us, without any harm or embarrassment to our family or to the LU community...."  In the Complaint, Falwell Jr. summarized this appeasement as cultivating a "positive relationship" with Granda.  Complaint ¶42.

11.     By filing of the lawsuit against Liberty on October 28, 2020, Falwell Jr. – an attorney and active member of the Virginia State Bar – endorsed the accuracy of the statements made in the Complaint.  Since the time this suit was docketed with this Court by counsel, Falwell Jr. has referred to that Complaint on several occasions in the press without retraction or correction.

3

Although he voluntarily dismissed the defamation suit against Liberty in December 2020, Falwell Jr. did so without rescinding or rejecting the factual allegations he made in the Complaint.

12.     Similarly, by issuing the remarks in August 2020, and by providing a phone interview to the *Washington Examiner* about their contents, Falwell Jr. endorsed the facts in the Statement.  He has since then neither contradicted nor corrected any of the factual allegations in the Statement.

### The Liberty Way

13.     The unique concept for Liberty's brand of Christian higher education arose out of the personal vision of Dr. Falwell. Dr. Falwell's unwavering agenda was for Liberty to be a university anchored in the principles of the "Liberty Way," the University's term for a way of life centered on rigorous educational instruction delivered by faculty and administrators who were intentionally committed to a written statement of faith and to Biblical standards of morality.

14.     In 1967, Dr. Falwell first began laying the foundation for Liberty's eventual success, building in Lynchburg a holistic Christian educational system for evangelical youth by establishing Lynchburg Christian Academy, an accredited Christian day school for grades K-12. In 1971, Dr. Falwell reached higher, founding Liberty, an accredited Christian university for evangelical students.  In 1985, Dr. Falwell announced his eventual goal of having 50,000 students attend Liberty.  Today, as noted, Liberty trains more than double that number.

15.     In addition to leading Liberty, Dr. Falwell was also an important public figure in the political spectrum, serving among other things as head of the Moral Majority – a political action group that promoted biblical standards of living as a community value, and forged a coalition of voters active on the "Religious Right." The Moral Majority – and Dr. Falwell – helped sweep Ronald Reagan to the U.S. presidency in 1980.

LUADMINREC000070

16.    At Liberty, Christian discipleship and academic instruction were integral to a cohesive educational package, and Liberty's policy documents incorporated this commitment. One of the principles that fueled Liberty's growth – and stability -- was the Biblical notion of inter-accountability among the Christians who make up the Liberty community.  Liberty's core conduct documents espouse this fundamental belief, pronouncing, as a closely-held religious value, the ability of those following the commonly-held faith to press other Christians toward adherence to Biblical mandates in the event of perceived lapse.

17.    The Liberty Articles of Incorporation, first put in place under Dr. Falwell's leadership, plainly state this principle:  "[Education] occurs most effectively when both instructor and student are properly related to God and each other through Christ." Articles, Exhibit A at 1. The Faculty Handbook repeats this quote at paragraph 42.

18.    The Liberty University honor code -- the *Liberty Way* – puts the practice of inter-accountability in these terms:

> Every student is expected to respect Liberty's Statement of Doctrine and Purpose and should avoid any activity, on or off campus, which would contradict the university's mission or purpose, compromise the testimony or reputation of the university, or disrupt Liberty's Christian learning environment. All members of the Liberty University community are asked to affirm the following: *"We have a responsibility to uphold the moral and ethical standards of Liberty University and personally confront those who do not."*

(Emphasis in original.)

19.    The following statement from the Liberty University Employee Handbook, under the heading "Philosophy of Education," reflects well these guiding principles, which are taken from the institution's Articles of Incorporation:

> Liberty University is a Christian academic community in the tradition of evangelical institutions of higher education. As such, Liberty continues the philosophy of education which first gave rise to the university and which is summarized in the following propositions:

5

- God, the infinite source of all things, has shown us the truth through the Scripture, nature, history, and above all, Christ.

- Persons are spiritual, rational, moral, social, and physical, created in the image of God. They are, therefore, able to know and value themselves and other persons, the universe, and God.

- Education, as the process of teaching and learning, involves the whole person, by developing the knowledge, values, and skills which enable each individual to change freely. Thus it occurs most effectively when both instructor and student are properly related to God and each other through Christ.

20.      It was Dr. Falwell's vision for the President of Liberty to be a standout spiritual leader for the college.  Under the Bylaws put in place to govern Liberty, it was Dr. Falwell's personal responsibility as President, and later as Chancellor and President simultaneously, to be at the same time Liberty's administrative leader and spiritual examplar.  During his tenure, Dr. Falwell achieved distinction in both roles in service to the Liberty community.

21.      This tradition of dual duty continues at Liberty. The Amended and Restated Bylaws, adopted by Liberty's Board of Trustees on April 5, 2019, preserves Dr. Falwell's conception of the President's role.  It states, "[The President] provides spiritual and worldview leadership to the University in pursuit of excellence." Falwell Jr. was among the Board members who voted to adopt these Restated Bylaws, and he later assented in his 2019 Employment Agreement to perform those duties.

22.      Finally, fearing spiritual erosion from the top, it was Dr. Falwell's vision that Liberty would always be subject to the authority of the local church in matters of doctrine and spiritual discipline.  Liberty's Board of Trustees was and is obligated to espouse Biblical principles.  After all, it was the Trustees that fashioned "Board policy" for Liberty. *See* Bylaws, Article II, Section 4.

23.      Guided by the standards of Dr. Falwell and the Liberty Way, the university grew exponentially until Dr. Falwell's untimely death in 2007.  From that point onward, Dr. Falwell's

LUADMINREC000072

chosen successors, sons Falwell Jr. and Jonathan Falwell ("Jonathan"), assumed aspects of their father's leadership roles. Jerry Jr. served as Liberty's President, Chancellor, and member of its Board of Trustees. Jonathan also served as a Liberty Board of Trustee member, as a Vice Chancellor for Spiritual Affairs, and also as Chairman of the Spiritual Mission Committee of the Liberty Board. Jonathan was further installed as the Head Pastor of Thomas Road Baptist Church, an institution designated to have an important oversight function with respect to Liberty. He has since acceded to the role of campus pastor at Liberty.

24.     In the Statement, Falwell Jr. indicated he had accepted fully his portion of the mantle of leadership at Liberty. He stated his "priority was to build on my father's vision and to work hard" doing so in the course of "serv[ing] Christ and community."

25.     One of Falwell Jr.'s attempts to "build on his father's vision" was to bring another generation of Falwell men into the leadership at Liberty. Effective January 1, 2016, Falwell Jr. extended to his first born son Trey Falwell a key employee services agreement ("Trey's Contract"). It designated Trey to function as "Administrative Assistant to the President" for a term ending July 1, 2030 – a span of nearly fifteen years. Trey's Contract elevated his Liberty salary from $65,000 to $88,000 to start, and he was provided a special car allowance that pushed his total initial compensation to $95,200, before accounting for retirement benefits. Trey's Contract came with a mandatory pay increase of 5% per year.

26.     In 2017, Trey was promoted and given the title of "Vice President of University Services." By July 1, 2017, Trey's salary was raised to $195.000, plus the car allowance – which raised his total compensation to $202,200, again before accounting for retirement benefits. In this new and advanced role, Trey technically reported to either the Chief Operating Officer or Chief

LUADMINREC000073

Financial Officer, but for all practical purposes he reported to his father, the President and Chancellor of Liberty.  Under the new agreement, Trey was an at-will employee of Liberty.

27.     As a new Vice President and group leader, Trey often accompanied his father into meetings of the Executive Committee of the Liberty Board of Directors ("Executive Committee"). Trey joined these inner circle meetings on at least May 24, 2018, September 12, 2018, and April 4 and 5, 2019.  The latter two of these sessions were in part meetings involving the negotiation of Falwell Jr.'s 2019 employment agreement.

28.     During Falwell Jr.'s tenure, Liberty capitalized on the explosive growth of online education, providing students worldwide with a quality experience of academic and biblical education remotely. Liberty also used the proceeds of on-line education to expand its beautiful campus, and build a sizeable endowment.

### The Granda Allegations

29.     Granda became enmeshed with the Falwells quickly after they met in Miami, in part because of the familial treatment the Falwells accorded him early in the relationship.   In addition to the intimate attention from Becki, Granda received invitations to Falwell family trips and gatherings, and a heady dose of access to important American business leaders.

30.     In 2012, for example. Falwell arranged for Granda to come from Miami to Lynchburg to be introduced to Donald Trump, as the future president made a stop at Liberty to tour campus.  In a keepsake photo capturing the occasion, Granda (right) posed with the future

8

leader of the free world while Becki (far left) and Falwell Jr. (center) looked on.



31.     By participating in close family contract, and by enjoying important associations within the Falwell's Liberty network, Granda came to understand how vulnerable the Falwells had made themselves by permitting his affair with Becki.  He became closely exposed to Liberty's high moral standards, which overtly clashed with Liberty's first couple's discordant sexual conduct.

32.     According to Falwell Jr., Granda began to undertake menacing actions toward the Falwells during this period.  For example, Granda allegedly sold his friends "intimate" pictures of Becki that he had somehow acquired.  Complaint ¶45.  (Falwell Jr. does not say in his Complaint how Granda came into possession of those pictures.)  Falwell Jr. alleges that *Granda's associates* used these covert pictures to "try to extort" the Falwells.  *Id.*

33.     On information and belief, Falwell Jr. was able to quell this particular controversy over racy photos.  According to news reports, Falwell Jr. allegedly enlisted high-level Washington legal assistance, and the picture problem seemed to have gone away.

9

34.     The experience with the racy photos no doubt suggested to Granda that Falwell Jr. could be leveraged, and taught the young man that with persistence, a price might be paid by the Falwells to avoid embarrassment.

35.     According to Falwell Jr., Granda's other aggressive action early on was to record his phone calls and FaceTime communications with Becki, for the purpose of enhancing "extortion attempts" against the Falwells.  Complaint ¶46.  The Complaint does not disclose the content of these calls, but implies the subject matter implicated the Falwells in some embarrassing or prejudicial way – otherwise Falwell Jr. would not contend that the recordings were intended to "strengthen [Granda's] extortion attempts." *Id.*   Reuters has released the contents of one such FaceTime call.   https://mobile.twitter.com/Reuters/status/1297941806970220545

36.     By late 2014, Granda was prepared to push further his scheme to press the Falwells. According to Falwell Jr.'s account, Granda approached Falwell Jr. for a payoff in exchange for staying silent about the Granda Allegations. Complaint ¶47.  Granda allegedly demanded hush money ranging from $600,000 to $2 million.  *Id.*   Falwell Jr. did not inform Liberty's Board of Trustees of this extortive conduct.

37.     The Falwells openly concede that Granda's behavior was targeted toward damaging not only the Falwells but also "Liberty University."   Complaint ¶¶43, 54, 62.  To Granda, threatening Falwell Jr.'s role at Liberty – particularly given Liberty's religious mission and detailed behavioral codes – was the center of his plot.  Complaint ¶¶43, 54.  It was Falwell Jr.'s prominent role at Liberty that fueled the Chancellor and President's vulnerability. *Id.*

38.     On information and belief, Granda had access to plenty of material that could have been deeply damaging to Falwell Jr. in the eyes of the evangelical community.

LUADMINREC000076

39.     In addition to the sexual affair, Granda has repeatedly mentioned in media reports the Falwells' fraternization in high-energy social establishments. Such behavior was prohibited for Liberty students, who, as a condition of enrollment at Liberty, would pledge to refrain from imbibing alcohol, engaging in immodest behavior, and having sex outside of a Biblical marriage. By agreement, these rules govern the students' lives both on campus and off, and during school years and in the summer between academic years.

40.     In contrast to the high behavioral standards that Falwell expected others at Liberty to follow, the Falwells frequented Miami-area clubs and were pictured at times amongst revelers, such as in the photos of Falwell Jr. and Becki below that were posted to social media.



41.     The Falwells' dealings with Granda also involved a significant financial investment in 2013 in property located in an underdeveloped part of Miami, which directly benefited Granda. The new company formed to buy the property was substantially financed by Falwell, Jr, who loaned the venture $1.8 million.  Ownership of the enterprise was given to Becki, Trey, and Granda.  Once the development company was formed, it continued to house a liquor store despite being a location frequented by college-aged students staying in the on-site hostel, and despite Liberty's general discouragement of the use of alcohol.

LUADMINREC000077

42.    When the Miami business dealings between Granda, Falwell Jr., and Trey resulted in litigation, questions began to swirl about Falwell Jr.'s business ethics and other issues arising from the transactions.  On information and belief, Granda was in position to expound on many such concerns, to the detriment of Falwell Jr., and thus, vicariously, to the detriment of Liberty.

43.    Most damaging, Falwell Jr. knew that Granda would be able to provide detail about the fact of the affair with Becki, its duration, Falwell Jr.'s role in abetting it, the attendant circumstances of the affair, and the specific activities in which Granda, Falwell Jr., and Becki engaged during and after the affair ("the Granda Allegations").

44.    There is little doubt that Granda maintains a cache of material harmful to the Falwells.  At times since August 2020, media outlets have reported they were shown compromising documents, photographs, texts, and videos by Granda – material Granda shared with the media to bolster his credibility.  Granda has implied in the media that he has more such information within his possession.

45.    Since 2014, Falwell Jr. had every reason to fear what Granda might do with the Granda Allegations and supporting material.  In his Complaint, in fact, Falwell Jr. emphasizes that at various times from 2014 to 2019 Granda was not only acting opportunistically toward the Falwells, but even proceeding illegally.  See Complaint ¶¶44, 45, 46, 47.

46.    Falwell Jr. also took great pains to assert Granda's overall volatility during this dark time.  From Falwell Jr.'s own observation, Granda was demonstrating behavior that was "deeply disturbed," "unstable," "unbalanced," "erratic," "manipulative," "self destructive," "crazy," and "verbally abusive."  Complaint ¶¶42, 44, 48, 49.

47.    Falwell Jr. further  accumulated some third-party assessments of Granda's state of mind.  In his Complaint, Falwell Jr. indicates that he was advised by some in Granda's close circle

12

LUADMINREC000078

that the young man was "racist," "legitimately scary," and someone with "unresolved psychological issues," who was given to "rages," and capable of tearing up his parents' house. Complaint ¶¶49, 50.

48.    Clearly, given Granda's perceived plan to "destroy [the Falwells'] lives," and Granda's decaying stability, Falwell Jr. came to believe that something drastic and protective had to be done.   After all, Falwell Jr. was the Chancellor, President, and a Trustee of Liberty, one of the country's premier evangelical universities.

### Falwell Jr.'s "Granda Plan"

49.    Instead of divulging to Liberty's Board of Truistee's Granda's active attempts at extortion, Falwell Jr. instead led a scheme to cover up the illicit conduct.   As alleged in the Complaint, Falwell worked diligently to coopt Granda into total confidentiality about the most perilous details of the young man's relationship with the Falwells, and to suppress the damaging Granda Allegations.

50.    The Falwells knew they shared a unity of interests with Granda.  They had an important goal in common: silence about the Falwells' salacious acts. The Falwell needed silence from Granda in order to safeguard their personal reputation, Jerry Jr.'s professional standing, and his employment with America's leading evangelical university.

51.    Granda needed the Falwells to remain silent, too; Granda could not afford to let his "dirt" on the Falwells leak.  If the media reported the bad facts that Granda had stored up about Falwell Jr. and Becki before Falwell Jr. paid hush money to Granda, then all leverage was lost. Granda's scheme for a pay day from Falwell Jr would be valueless.   Clearly Granda wanted to pressure Falwell Jr., but only so as to secure payment in exchange for Granda's promise to hush the controversy.

13

52.     Faced with Granda's mounting extortive pressure, the Falwells had a decision to make: either they had to go public and expose Granda to Liberty, the authorities, and/or the media, or Falwell Jr. had to pay Granda off, and convince Granda to remain quiet forever.  Despite his clear duties as an executive and officer at Liberty, Falwell Jr. chose personal protection.  He committed himself to non-disclosure, and actively developed an approach to muzzle Granda.

53.     To effectuate Granda's silence, Falwell Jr. and Becki accelerated efforts to build Granda's friendship in the hopes that the young man would mature, would accept Becki's rejection, and would move forward in a way that would result in everyone involved being able to live a productive life.

54.     The Falwells drew Granda ever closer into their family life, effectuating a "Granda Plan."  They attempted to make Granda loyal to their family in order to curb Granda's bent toward the destruction of Falwell Jr., and his role at Liberty.

55.     For six years – from 2014 to 2020 – the Granda Plan worked.  Although they described Granda as a "deeply disturbed and unstable individual," Complaint ¶42, the Falwells managed to cultivate a "positive relationship" with him.  Complaint ¶44.  It is evident that the Falwells' aim was to "placate" Granda, and in large part they succeeded for a long time.  *Id.* According to the Statement, they "manage[d] [Granda's] increasingly erratic behavior...."

56.     The following were among the acts of appeasement that the Falwells used over the years to maintain Granda's cooperative silence:

> a.      The Falwells hosted Granda socially at their Virginia farm, pairing him with their son Trey on an ATV outing around their sprawling country property;
>
> b.      Granda joined the Falwells in the Florida Keys.  During this trip, Falwell Jr. posed with Granda paternalistically – arm around the him, drink in hand:

14

LUADMINREC000080



c.  Posing outside the Liberty jet, the Falwells took pictures with Granda and

    former Miami business partner Gordon Bello.



d.  The Falwells also brought Granda along for other family excursions, pairing

    him with Trey. For example, on September 6, 2018, the Falwells arranged

    for Congressman Bob Goodlatte to host them on a tour of the U.S Capitol.

    Granda joined with Jerry, Becki, Trey, and Trey's wife Sarah. Granda once

    again appeared in the family photos – one set on a rooftop vista atop the

    Capitol, and another of the group gathered in front of the Thomas Jefferson

    statute.

15



(Granda is third from the left, in the rear.)



(Granda is second from the left.)

e.    Finally, the Falwells befriended some of Granda's girlfriends.    These
proactive relationships helped the Falwells amass useful information about
Granda, permitting them to understand his tendencies and manage Granda
with more awareness.    Complaint ¶¶ 48-50.

57.    As 2019 began, Falwell had shrewdly controlled Granda for nearly five years.    In
that span, Granda had not disclosed externally the sensitive information about the Falwells. Given

16

what Falwell Jr. had observed of Granda's troubled character, and of the voracious appetite of the media for negative news about Liberty, Falwell had no reason to believe the détente he had built with Granda at Liberty's expense would much longer hold.

58.     Falwell Jr.'s employment contract at Liberty was set to expire June 30, 2019, and Falwell Jr. knew the negotiation of a new agreement was the optimal time to profit personally from Liberty's considerable growth in finances and enrollment that occurred during his tenure. Falwell Jr. took space in his Complaint to proudly display that financial legacy.  The time for Falwell Jr. to cash in on Liberty's prodigious success had arrived.

### Outside Pressures on the Falwell Presidency

59.     While he had overseen a one billion dollar building campaign on Liberty's campus, and had set in place a plan to create a sizeable endowment, Falwell Jr. had also launched a substantial campaign to attract notable public and private figures to Liberty's campus. Through this process, Falwell Jr. was augmenting the school's growing reputation as a forum for the discussion of important public issues.  But Falwell Jr.'s success was also attracting national attention, and his outspoken personal support for major public figures was engendering opponents that harshly criticized and targeted him personally.

60.     In 2016, Falwell Jr. surprised the evangelical world by endorsing Donald Trump for the presidency. This move was particularly delicate because Senator Ted Cruz, a leading Trump competitor in the primaries, had used an earlier appearance at Liberty to give his first speech after announcing a presidential candidacy of his own.

61.     According to his lengthy Facebook post of January 27, 2016, Falwell Jr. became convinced that Trump was the optimal choice for President due to his business acumen and conservative social principles. Falwell Jr. thought Trump could get things done, even if it meant

LUADMINREC000083

disrupting entrenched special interests. Trump was an outsider, distanced from the usual suspects who were toiling away in the engine room of Washington politics.

62.     The problem for Falwell Jr. was that Trump – a thrice-married man – was hardly a natural cultural hero for evangelicals. Falwell Jr, took steps to redress this challenge. Falwell Jr. committed to work with his peer evangelicals to help make Trump's checkered past something Christian leaders could accept and overlook.

63.     To address this agenda, Falwell Jr. endeavored to sidestep defending Trump's character and instead advance a theological argument to persuade Christian leaders and voters to forgive Trump rather than judge him. Like Jesus, Falwell exhorted his evangelical colleagues to examine the sin in their own lives and then reconsider their criticism of candidate Trump accordingly.

64.     Falwell Jr. took to major social media platforms and news outlets to advocate this apologetic stance. The following are a few examples of that message:

       a.     In the aforementioned Facebook post of 2016, Falwell Jr. wrote that no Christian voter has standing to dismiss Trump's spiritual fitness because "all of us are sinners and only Jesus was perfect." Embracing evangelical doctrine, Falwell Jr. pointed to a "sinner" class – and then included within it Trump, himself, and every potential evangelical critic and voter.

       b.     In the same Facebook post, Falwell Jr. advised the evangelical community to refrain from picking the best Christians as Presidential candidates – because no one but God could ever really know their heart. Falwell Jr. argued that Christians do not get to play God because "we are all sinners."

LUADMINREC000084

c.   On January 25, 2018, Falwell returned to this theme during a CNN interview conducted by anchor Erin Burnett. Falwell Jr. repeated the justification that Trump deserved to be a political leader embraced by Christians because "we're equally bad, we are all sinners; we all need Christ's forgiveness. That's why evangelicals are so quick to forgive."

https://www.cnn.com/videos/politics/2018/01/25/jerry-falwell-jr-trump-forgiveness-ebof-sot.cnn

d.   Later in 2018, Falwell Jr. once again appeared on CNN, and he again advanced this theme, stating "we are all sinners; nobody understands that better than evangelicals. That's why we're Christians because we all know we need forgiveness."

https://www.cnn.com/videos/us/2020/08/24/jerry-falwell-jr-public-controversies-athena-jones-pkg-ebof-vpx.cnn

65.   As 2019 approached, Falwell Jr. openly conceded that he was worrying about what had become the omnipresent "threat that [Granda] posed." Complaint ¶44. In fact, the stress of managing Granda and avoiding discovery was wearing Falwell down. At any moment, Falwell Jr. knew Granda could destroy Falwell's reputation as a Christian leader and reduce to rubble his value to Liberty as a business asset. Falwell Jr. would then be in the well-known category of leaders requiring substantial forgiveness. Falwell Jr. was wracked with "constant anxiety." *Id.* He desperately needed to cut Granda off completely, a course fraught with substantial risk. Because Falwell Jr. wanted more financial protection to weather the fallout if he could no longer manage Granda, Falwell Jr. began to fashion a well-resourced exit strategy.

LUADMINREC000085

66.     To confront the Granda Allegations with more than the shaky barrier of the Granda Plan, Falwell Jr. fashioned a deceitful scheme to manipulate the Executive Committee of Liberty. In the course of the employment contract negotiations, Falwell Jr. planned to accentuate to the Executive Committee the new leagues into which Falwell Jr. had brought Liberty, and that some of the actions he undertook in that league, such as the rough-and-tumble of Presidential politics, might damage Falwell Jr.'s utility to the non-profit Liberty. There could come a time when the school might need to separate from Falwell Jr. for non-material actions. Falwell Jr. planned to use his growing awareness of personal attack which he had encountered in honorable service raising Liberty's profile in his attempt to relax the severance policies in the President's existing contract. Falwell wanted to create a new contract that permitted Liberty the option to part with Falwell amicably while making it palatable financially for Falwell to accept that protective action. In 2019, Falwell Jr. acted on this undertaking.

### The 2019 Falwell Jr. Employment Agreement

67.     On or about July 6, 2012, Falwell Jr. had entered into a Presidential employment agreement with Liberty (the "2012 Employment Agreement"). This deal, which became effective April 1, 2012, provided for a seven-year compensation schedule that rewarded Falwell Jr. with annual raises. It also provided, in Section 9, that if Falwell resigned he would receive *one year* of compensation as severance.

68.     The 2012 Employment Agreement expired on June 30, 2019. In Section 3.1 of the 2012 Employment Agreement, the parties agreed that "[t]he University is not obligated to offer Falwell employment for any period beyond the expiration date of this Agreement."

69.     By the time Falwell Jr. and Liberty had to announce a new agreement, Falwell Jr. knew he was under active threat of extortion from Granda. Falwell Jr. also knew that Liberty's

20

Executive Committee did not know that fact. Although he was President and Chancellor, and had the highest level of obligation to be candid and truthful with Liberty's board, Falwell's Jr. did not inform the Executive Committee about Granda's extortive threats during the 2019 contract negotiations, or give the Liberty board any reason to understand the serious reputational damage to Liberty that Granda's threats represented.

70.     True to his previous plan, Falwell Jr. did not reveal to the Executive Committee the danger that Granda represented to Liberty. Instead, Falwell Jr. sought from the Executive Committee to provide him with a safety valve to protect him from such actions as having raised his profile in 2016 by being the first major evangelical leader to personally endorse Donald Trump for President. Falwell Jr. claimed that he wanted an escape hatch for political and personal fallout.

71.     After negotiation, the Executive Committee agreed to a new services deal (the 2019 Employment Agreement). Falwell Jr. succeeded in sweetening the new deal in at least the following material ways: first, he negotiated a significant annual raise to $1,250,000 a year, which became his "permanent" pay all the way through 2030; second, in Section 8 and Section 9 of the 2019 Employment Agreement, Falwell Jr. arranged for a severance of *two years' pay,* or $2,500,000 if he resigned for "Good Reason," or if Liberty terminated his employment without "Cause." Third, he obtained a catch-up "rabbi trust" plan for retirement benefits that would cover his entire career of service at Liberty but had not been part of any previous employment agreement.

72.     Falwell Jr. wanted Liberty to pay severance and retirement benefits to him if Granda revealed the Granda Allegations, and Falwell Jr. thus knowingly withheld from Liberty material information that would have altered the nature of the negotiations of the 2019 Employment Agreement. Falwell Jr. said nothing of his belief that procuring Granda's silence

21

might in time require a higher price unless Granda was confronted and completely managed.  To be sure, Falwell Jr. knew that family photos taken in nice places would not contain Granda forever.

### Falwell's Auspicious Acts of August of 2020

73.    The pressure of Granda's threats was increasingly getting to Falwell Jr.  With his new 2019 contract in hand, and with Liberty none the wiser about Granda's extortive behavior, Falwell had an opportunity to take a firmer stand against his blackmailer.

74.    Emboldened by the financial security that he had negotiated for himself, Falwell struck out at Granda, unleashing the obvious prospect of damaging retaliation by Granda. Falwell Jr. states in his Complaint that on June 30, 2019, he told Granda in electronic communication that Falwell Jr. would provide no payday and the extortion attempts would have to end.  Complaint ¶¶55, 56.

75.    To manage his stress, Falwell Jr. began drinking significantly.  There were concerns that he smelled of alcohol during work interactions, but to the outside world, Falwell Jr. remained mostly within the baselines of his obligations. That ended in August 2020.

76.    The Falwell family took some floating vacations on yachts provided by business partners of Liberty.  One such excursion took place during late July 2020.  During that span, the Falwells held a costume party centered around the characters of the Canadian mockumentary the *Trailer Park Boys.* https://www.swearnet.com/shows/trailer-park-boys.  Promotional copy for the show bills the series as exploits by "three lovable career criminals as they rob liquor stores, fence stolen goods and dream of pulling off one last, big score." Overall, the tone and content of the show is vulgar.

77.    The most crafty of the three prime characters is ex-convict Julian, whose trademark look is a black goatee, black T-shirt, pair of black jeans, and an omnipresent glass of rum and Coke

22

in his hand.   Julian runs illegal businesses.   A sidekick, Trinity, is a redheaded woman who becomes pregnant in one episode and, due to a hapless mix-up, later delivers a baby bearing on his birth certificate the moniker "The Motel."  The little boy became nicknamed "Mo."

78.     Falwell, Jr.'s entire immediate family was part of this event with attendees dressing as *Trailer Park Boys* characters of their respective choosing.  Falwell, Jr also invited his personal assistant, Sam Stone, and Stone's wife, Kathleen, who was a Liberty employee, to come on the trip.  During this event, Falwell, Jr. outfitted himself in a costume to emulate the character Julian, Falwell Jr.'s beard blackened in part for the occasion. Kathleen Stone, who was pregnant at the time, dressed up correspondingly as "Trinity," mother of the character Mo, which meant she donned a pair of Daisy-Duke cutoff jeans, unbuttoning them to accommodate her real-life pregnancy.  Falwell, Jr., as "Julian," similarly unbuttoned his jeans – in apparent solidarity with "Trinity's" actual condition.  "Julian" toted his obligatory tumbler of black liquid in his left hand.

79.     Over Kathleen and Sam Stone's objections, Becki Falwell took a picture of "Julian" and "Trinity" posing in character, pants both unbuttoned.  Falwell, Jr. promised not to show this photo to others.

80.     On August 3rd, Falwell Jr. – breaking his promise to the Stones – shared this  image with his entire Instagram following.   The picture went viral, and became an immediate internet sensation.  It was paired soon thereafter with a video of the Falwells' *Trailer Park Boys* party that also went viral on the internet.  https://pulpitandpen.org/2020/08/04/bizzare-jerry-falwell-jr-yacht-pictures-were-from-trailer-park-boys-themed-party/.

81.     Following is Falwell Jr.'s Instagram post, and one commentator's reaction.

23



82.   Media reaction to the Falwells' exploit was swift, and harsh. Critical articles soon appeared in numerous high-profile media outlets, including the *Washington Post*, *Huffington* Post, and *Politico*, and from commentators on CNN and the View.

83.   One online commentator performed an analysis to attempt to gauge the punishment that a Liberty student might endure for posing in this photo, based on the code of conduct in the *Liberty Way*. The analyst concluded there were 63 counts of potential violation, which would

LUADMINREC000090

conceivably net a student up to $9,000 in collective financial fines, with a further punishment possible of up to 900 hours of community service.

84.     Realizing that he had made a serious mistake – Falwell, Jr. deleted the Instagram post shortly after its August 3rd release.  But Falwell Jr. soon made a compounding blunder. Rather than engage Liberty's public relations group to assist with the fallout, Falwell Jr. instead took to the airwaves attempting his own clean up.  He called in to a local Lynchburg radio station on August 5, 2020 and offered a slurred explanation of the unzipped pants photo, dismissing it as "good fun" and drawling that he had apologized to his family and promised going forward he would be a "good boy." https://pulpitandpen.org/2020/08/07/liberty-pres-jerry-falwell-jr-justifies-scandalous-yacht-pictures-whatever-whatever-it-was-all-in-good-fun/.

85.     Commentators on social media questioned Falwell's sobriety during the radio show call-in. While he addressed the world about this unseemly subject through radio access, Falwell Jr. issued no August 5th apology to the Board at Liberty regarding the incident, nor did he issue a promise to Liberty of improved behavior going forward.

86.     At this low juncture for Falwell Jr., his wife Becki stepped in.  After the radio show incident, she contacted three members of the Liberty Executive Committee to alert them to what she described as her husband's excessive use of alcohol.  She expressed concern that drinking was adversely overtaking Falwell Jr.'s thinking and actions.   She believed he needed to go away for treatment, and that it was time to take that course. Becki's heartfelt appeal made an impact on Liberty's leaders and helped provide a context for understanding Falwell's questionable public comments, worrying behavior, and inappropriate social media posts.

87.     On August 7, 2020, the Executive Committee conferred with Falwell Jr, and he concurred it was best that he take time off to heal physically and spiritually.  In the meeting, Falwell

25

Jr. conceded that he had fallen short of Presidential standards and he took full responsibility for his actions. He committed to a sabbatical to treat and refresh, which the Executive Committee was inclined to support.

88.     Importantly, Falwell Jr. indicated in the August 7th meeting that he had considered providing deeper detail about personal matters that might have driven him to lodge the offending vacation posts, but he concluded he did not think it was necessary. This comment did not strike the Executive Committee as particularly compelling at the time, although it would become pivotal as events unfolded.

89.     On a more superficial level, Falwell Jr. did muse in the meeting that he might have become bored during the slowdown caused by COVID-19. Falwell conceded he had been doing silly things that he should not have let distract him. The prospect of a cure to a pattern of antics heartened Liberty's Board leaders.

90.     The August 7th meeting ended with the Executive Committee's expression of love for Falwell Jr. and the members' commitment to pray for him. It was agreed that Liberty would place Falwell Jr. on a leave of absence during which it would pay for Falwell Jr.'s rehab. The Executive Committee further agreed to recommend this course of action to the full Board for ratification, and determined that it would release a brief statement followed by a more expansive one. The Executive Committee lastly decided that President Falwell Jr. *would not* issue a statement of his own.

91.     True to plan, Liberty briefly announced Falwell Jr.'s leave of absence immediately, and circumspectly. Once that message was out, communication professionals worked on a longer statement from the Chairman of the Board of Trustees. The Executive Committee then proceeded

26

toward resolving a treatment plan for Falwell Jr., leaving latitude for him to define details within the parameters of the previously-understood course.

92.     As the days wore on, however, it was obvious Falwell Jr. was forming a vastly different conception about the leave of absence than Liberty had outlined.  By August 17, 2020, Falwell Jr. was suggesting more superficial approaches, while Liberty continued to insist on residential treatment acceptable to the Executive Committee.

93.     If there was a breaking point in Falwell Jr's relationship with the Executive Committee, it was arriving at the appropriate type of treatment that had been in discussion since Becki had called for it.  Falwell Jr's change of heart, and the lapse into denial that it reflected, deeply worried the Executive Committee.

94.     Frustratingly, Falwell's indiscretions continued. On August 20, 2020, just under two weeks into his leave of absence, a video was posted online showing Falwell working out in his trainer's gym.  Falwell Jr. was performing pelvic thrust exercises on a weight bench with two young women, likely Liberty students, inexplicably riding either end of the barbell as Falwell Jr. exerted himself.  The photo was posted to social media after the point at which it had been taken.



LUADMINREC000093

95.     Although the image was not contemporaneous with its release, this weight room exhibition stirred yet another round of mockery and consternation in the media. https://julieroys.com/falwell-bizarre-video-bikini/

96.     On August 24, 2020, Falwell Jr. arced yet another bombshell into the Executive Committee's path. On that day, the Executive Committee learned from counsel that the day before, on August 23, 2020, Falwell Jr. had submitted the Statement to the *Washington Examiner,* his attempt to pre-empt a tell-all feature that Granda himself had been preparing to publish with *Reuters.* This revelation was coupled with a suggestion to Liberty by Falwell Jr. and his attorneys that the Liberty President could just tender his resignation under the contract as a viable resolution to the swirl of controversy that would inevitably ensue on the heels of the disclosure of the dueling versions of the long-concealed extra-marital affair and attempt at extortion.

97.     Falwell Jr.'s employment contract forbade him from publishing without the Liberty Executive Committee's prior assent to the copy. The Executive Committee had expressly forbidden a post about Falwell's sabbatical.  Regardless, with the briefest of advance notice to Liberty, Falwell Jr. self-issued the Statement, a 1200-word statement that the *Washington Examiner* published verbatim, bracketed by some reporting and analysis by the publication, and Falwell' Jr.'s own commentary.  In the Statement, Falwell Jr.'s "confession," Falwell Jr. advised the *Washington Examiner* about matters he never revealed to the Liberty Executive Committee.

98.     In the Statement, Falwell Jr. acknowledged it was wrong of him to have suppressed the information about Granda's extortion from his Board and the wider Liberty family.  He admitted that "the Liberty community deserved to hear" the salacious story directly.  He concluded that "the only way to stop [Granda's] predatory behavior [was] to go public."  He conceded that "I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from

28

mental health professionals…." Falwell Jr. ended his admission with an appeal for the community to extend to the Falwells their "forgiveness."

99.    Through these media communications, Falwell Jr. offered detail to Liberty that the Executive Committee never had at the time of the 2019 Employment Agreement, namely the sordid backstory behind his August 2020 blow-up with Granda, and the demise of the Granda Plan that was prompted by Falwell's alleged final rejection of Granda's demands on June 30, 2020.

100.    At the time of his soul-searching August 23 disclosure to the *Washington Examiner*, Falwell Jr. knew that his new Employment Agreement was signed. He also knew that he had negotiated a severance and retirement package that credited him with more base pay, twice the severance, a funded retirement plan, and a right, perhaps, to collect all of that *even if Liberty fired him*.

101.    On August 24, 2020, Granda unveiled his side of the sordid story, in the form of an explosive *Reuters* article. https://www.reuters.com/investigates/special-report/usa-falwell-relationship/. Video and audio recordings supporting some key details of Granda's story were posted online.

102.    Granda hit Falwell Jr. while the Liberty President was being pilloried in the media. Granda's retaliation took full advantage of Falwell Jr.'s self-inflicted wounds over the "unzipped pants" picture. Granda unveiled all the embarrassing details that Falwell Jr. had worked with Granda since 2014 to suppress. Granda and *Reuters* spun an account of predatory action by the Falwells against a boy the age of a Liberty student.

103.    Out of the *Reuters* piece came Granda's version of the longstanding affair between Becki and Granda, and a cover-up process led by Falwell Jr.  These were issues about which Falwell Jr. had actively kept Liberty in the dark, as Falwell Jr. had confessed for the very first time

LUADMINREC000095

the day earlier to a third party, in his unauthorized *Washington Examiner* submission. The media coverage from other outlets mostly used Falwell Jr.'s own statement from the *Washington Examiner* to bolster Granda's credibility.

104.    After consultation, the Executive Committee authorized negotiations to take Falwell Jr. up on his offer to resign.  After considering delay, the Executive Committee and the Board advised Falwell Jr. that he should resign at once or face the prospect that the Executive Committee would recommend his termination to the full Board.

105.    The Executive Committee's decision was driven by a number of factors: the litany of compromising decisions entered into by Falwell Jr., Becki's revelation about the alcohol abuse that was fueling this erratic string of events, Falwell Jr.'s denial of an alcohol problem. Falwell Jr.'s resistance to commit to treatment deemed appropriate by the Executive Committee, Falwell's now-admitted concealment and misrepresentation of the Granda Allegations, and Falwell Jr.'s unwillingness to take seriously the grave threat that his aggregate actions posed to Liberty.

106.    On August 25, 2020, Falwell Jr. finally conceded that complete resignation was in his best interest.  He did so, however, after changing his mind about resignation and trying to negotiate for more in separation from Liberty than his contract afforded him.

107.    While Falwell, Jr. agreed to step aside, it was with shallow appreciation for the far-ranging damage he had caused. In unauthorized commentary to the media, Falwell stated: "The board put me on leave for showing my belly in a picture and my contract doesn't allow that…I'm 58 years old, and I think there's something else in the cards for me. And so the board was gracious in accepting my resignation … and it's time to move on." https://wset.com/news/local/we-have-the-strongest-relationship-becki-speaks-out-on-affair-denies-jerry-watched.

LUADMINREC000096

### Falwell Migrates From Forgiveness-Seeker to Fighter

108.    Falwell Jr.'s resignation from the Presidency did not unfold as contemplated. The Executive Committee became growingly concerned that Falwell Jr. was honoring neither his commitment to leave nor his contract. On information and belief, and according to news reports, Falwell – a practicing Virginia lawyer – had conferred improperly about his employment situation with counsel that Liberty had retained on other cases in which Falwell Jr. had been a fiduciary of the Board, and witness. https://www.reuters.com/article/us-usa-falwell-relationship-exclusive/exclusive-business-partner-of-falwells-says-he-had-long-affair-with-evangelical-power-couple-idUSKBN25K1ZO.    The subject matter of the interaction with *Liberty's* chosen counsel was Falwell Jr.'s personal employment rights *against Liberty.* As Falwell knows, Virginia ethics laws do not permit such consultation.

109.    Falwell Jr. soon retained appropriate, non-conflicted counsel. Falwell Jr. began pushing back against the terms of his resignation. Falwell improperly and errantly announced to the media a $10.5 million expectation for his severance. The agreement Falwell Jr. negotiated specified $2,500,000 – two years' pay, at the President's newly-negotiated and expanded rate.

110.    Liberty was unsure if Falwell Jr.'s representation to the media was just puffery and bragging or some attempt to set up a claim for additional compensation above and beyond what appeared in Falwell Jr.'s contract as stated pay for resignation.

111.    On August 28, 2020, the Executive Committee agreed to satisfy Falwell's demand for a "Good Reason"- resignation, together with its severance payout.    Falwell Jr. was thus able to take advantage of the escape hatch that he had negotiated into the 2019 Employment Agreement, his insurance policy against the simmering Granda Allegations that he told the *Washington Examiner* was "predatory behavior," and a "'fatal attraction' type situation."

31

**Falwell Jr.'s Hard Fall**

112.    A 911 call on August 31, 2020 brought police to the Falwells farm on Becki's report that Falwell Jr. had locked himself in, and had stumbled down stairs, experiencing injuries. Police and medics attended.  Falwell Jr. was reported to present with abrasions and slurred speech. Media obtained the 911 call and subsequent reports. First responders spotted alcoholic beverage containers about the premises.  While Falwell Jr. advised the *Washington Examiner* on August 23rd that he was in the "early stages of addressing" issues of mental health, the process appeared not have proceeded very far.

113.    Though momentarily humbled by news media's extensive examination of and criticism about his private failings, Falwell Jr. had re-emerged willing again to practice his particular brand of disdain for those who would challenge him – even those who built the platform that made him the household name Falwell Jr. is today.  On October 28, 2020 Falwell filed a lawsuit against Liberty alleging defamation.

114.    In the Complaint, Falwell in the main blames Becki for the Granda affair and cover-up.  He shows little empathy for the woman who sought treatment for him for alcohol abuse, and whose loyalty and fear for his well-being fueled her outreach to Liberty's Executive Committee.

## COUNT ONE: BREACH OF CONTRACT / CONVERSION

115.    Liberty incorporates paragraphs 1 to 114 above.

116.    The 2019 Employment Agreement, at Section 3.8, permits Falwell Jr. access to "confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly

LUADMINREC000098

disclosed by LU ('Confidential Information.')  Confidential Information remains the property of LU."

117.    Falwell Jr. consistently refused to use his assigned liberty.edu email address for his communications about Liberty business, insisting instead on maintaining an email address with a third party internet service provider, for which Liberty paid.

118.    While Falwell, Jr. went to great lengths to avoid storing his communications and other business data on Liberty's system, he did require Liberty to provide him with devices, computers, phones, laptops, etc. for his use, and to pay for the services charged by the third party services.  Specifically, Falwell Jr. was issued by Liberty a Surface Pro 3 laptop, bearing serial number 57462443253.

119.    During his employment, Falwell Jr. worked independently on many of the deals, strategies, negotiations, and undertakings impacting Liberty.  He had complete access to files, records, notes, emails, data, and information pertinent to the categories of Confidential Information detailed above.   At the same time, many key documents relating Liberty's business, including Confidential Information, is stored on devices provided by the University, or in third party systems, to which Falwell, Jr. has control and access, but he has refused to return to Liberty or provide access codes.

120.    As Liberty's President and Chancellor, Falwell Jr. also had an independent duty to keep all of this information confidential, and not to use it other than on Liberty's behalf.

121.    Such information was and remains at all times the property of Liberty.

122.    Falwell Jr. has been put on notice repeatedly to preserve and not destroy such Confidential Information as it is necessary for Liberty Jr. to defend and prosecute various lawsuits, both pending and contemplated.

LUADMINREC000099

123.    Upon termination of his employment Falwell, Jr. had a duty to return all of Liberty's property – including computers, devices, as well as all Confidential Information.

124.    Falwell Jr. has been asked but has refused fully to return Liberty's Confidential Information and other personal property in breach of the agreement, and his fiduciary duties to Liberty.

125.    In the alternative, the property mentioned in ¶¶117, 118 and 119 above is the personal property of Liberty.

126.    Falwell Jr. came into control of this property, but has failed fully to return the materials and data in full.

127.    Falwell Jr.'s acts of dominion have deprived Liberty of the possession of this property is in derogation of the rights and privileges of Liberty.

128.    On information and belief, Liberty has been damaged in an amount in excess of $250,000, a number that it may have to revisit as discovery progresses.

## COUNT TWO: BREACH OF FIDUCIARY DUTY

129.    Liberty incorporates paragraphs 1 to 128 above.

130.    As Liberty's President, Chancellor, and a member of its Board of Trustees, Falwell had a fiduciary duty to provide material information to the Board, refrain from acts harmful to the interests of Liberty, avoid conflicts of interest, and reject opportunities to benefit his personal interests to the detriment of Liberty.

131.    Falwell Jr. refused to disclose to Liberty the Granda Allegations and Granda's extortive threats while the Liberty President was negotiating for and entering into a 2019 Employment Agreement that raised Falwell Jr.'s pay, created a retirement plan and enriched his severance. The sweetened severance provision and funded retirement plan advantaged Falwell Jr.

34

if adverse conditions caused him to choose resignation knowing he was impaired by extortion threats, and by therefore passing the financial risk to Liberty that Granda's extortion would end Falwell Jr.'s employment with Liberty.

132.     Falwell Jr. breached his fiduciary duties to Liberty by accepting a severance payment from Liberty in 2020 that Liberty was required to pay pursuant to the 2019 Employment Agreement.

133.     Had Liberty's Executive Committee known in 2018 or 2019 that Granda was attempting to extort Falwell Jr., and thus planning to damage Liberty, and had it known the full circumstances of Granda's extortion of Falwell Jr., then the Executive Committee would have refrained from entering into the 2019 Employment Agreement.

134.     On information and belief, Falwell Jr. procured Liberty's outside counsel to advise him with respect to his personal causes of action, including those against Liberty, in derogation of Falwell's duty.

135.     Falwell Jr. failed to timely disclose and address the issue of his personal impairment by alcohol, which impairment led Falwell Jr. to actions and courses of conduct detrimental to the spiritual mission of Liberty.

136.     The several actions of Falwell Jr. in breach of his fiduciary duty have induced injury to Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the improper 2019 Employment Agreement, and damaged Liberty's reputation.

137.     Falwell Jr.'s actions in breaching the fiduciary duty he owed to Liberty were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

138.     For this count, Liberty seeks damages in excess of $10,000,000 plus pre- and post-judgment interest, and punitive damages at the statutory limit of $350,000.

LUADMINREC000101

## COUNT THREE:  STATUTORY CONSPIRACY

139.   Liberty incorporates paragraphs 1 to 138 above.

140.   Virginia Code. § 8.01-499, 500 prohibits two or more persons from agreeing to injure another in their trade or business.

141.   The business of Liberty is the provision of higher education through the perspective of Christian values.  High moral standards are a part of the educational experience at Liberty and administrators and faculty are expected to comport themselves in a way that promotes the Liberty Way, and upholds the values in Liberty's foundational documents.  Additionally, officers and Board members like Falwell, Jr. must observe applicable fiduciary duties.

142.   Up to August 2020, Falwell Jr., Becki and Granda, and potentially others,  acted in concert under a preconceived plan to conceal the Granda Allegations and Granda's extortive acts from disclosure to Liberty's Board of Trustees.

143.   Falwell Jr., Becki and Granda, and potentially others acted intentionally, purposefully and without lawful justification, and thus with legal malice.

144.   Falwell Jr, as leader of the Falwell/Granda conspiracy, had a fiduciary duty to disclose Granda's extortive actions, and to disclose the potential for serious harm to Liberty once the Granda Allegations were in fact disclosed to the Liberty's Executive Committee.

145.   Instead of disclosure, Falwell Jr. furthered the conspiracy of silence and negotiated a 2019 Employment Agreement that contained a higher salary from Liberty. Moreover, anticipating revival of Granda's threats, Falwell Jr. also negotiated a revised severance provision that doubled the separation benefits provided in the 2012 Employment Agreement and a funded retirement plan.

36

146.    Had Liberty's Executive Committee known in 2018 and 2019 that Granda was attempting to extort Falwell Jr., and thus planning to damage Liberty, and had it known the full circumstances of Granda's extortion of Falwell, then the Executive Committee would have refrained from entering into the 2019 Employment Agreement.

147.    The actions of Falwell Jr. and Granda have injured Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the 2019 Employment Agreement that proved detrimental to Liberty's interests, and damaged Liberty's reputation.

148.    By operation of Va. Code 18.2 §500(A), Liberty's damages must be trebled.  That section also provides for Liberty recover reasonable attorneys' fees. *See* Va. Code 18.2 §500 (A) and (B).

149.    Falwell Jr.'s actions were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

150.    Liberty seeks $10,000,000 in compensatory damages, trebled as provided by statute, and the statutory limit of $350,000 in punitive damages plus any other damages provable at trial. Liberty additionally seeks pre-judgment and post-judgment interest and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, for the reasons stated above, Defendant Liberty requests this Court to:

a.    Award Liberty the damages identified above;

b.    Award Liberty punitive damages;

c.    Award Liberty its statutory attorneys' fees;

d.    Award Liberty its pre-judgment and post-judgment interest;

e.    Enjoin Falwell from retaining possession of property belong to Liberty; and

f.    Provide any other relief this Court deems appropriate.

LUADMINREC000103

Liberty demands trial by jury of its claim.

Respectfully submitted,

LIBERTY UNIVERSITY, INC.

Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
McGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

R. Craig Wood (VSB # 24264)
McGUIREWOODS LLP
652 Peter Jefferson Parkway, Ste. 350
P. O. Box 1288
Charlottesville, VA 22911
(434) 977-2558
(434) 980-2274 (facsimile)
cwood@mcguirewoods.com

FILED IN THE CLERK'S OFFICE OF THE CIRCUIT
COURT OF THE CITY OF LYNCHBURG

APR 1 5 2021        TIME
                   1:44 P.M.

TESTE: TODD SWISHER, CLERK

BY: _____ Dep. Clerk

LUADMINREC000104

Exclusive: Falwell says Fatal Attraction threat led to depression    Page 1 of 5

    ☰    🔍    

# Exclusive: Falwell says Fatal Attraction threat led to depression

🐦  f  in

by Paul Bedard, Washington Secrets Columnist | ✉ | August 23, 2020 09:32 PM

**Just in...**

Cuomo, top lawmakers reach deal for $212 billion New York budget, including tax hike for high earners

Those doomsday predictions for post-mask Texas? They are now coming true, but in Michigan

Majority of Michigan voters, 72%, support voter ID laws, including 58% of black voters: Poll

'Nothing is off the table' in sending vaccines and help to Michigan amid pandemic surge, Biden administration says

'Woke' hiring: Endorsing Trump is top reason for job rejection

Why corporate America is lining up against tax hikes

Daily on Energy: Carbon capture industry sees huge boost within reach

Jerry Falwell Jr., suspended as president of Virginia's Christian-focused Liberty University after a string of embarrassing acts, said that he has suffered depression caused by a former family friend who had an affair with his wife and who has been threatening to expose it.

In a statement exclusively to Secrets, Falwell revealed his wife Becki's affair for the first time and said that it was short lived and that the two reconciled quickly.

But, they claimed, her former lover has threatened them over the past several years and that they are done with it hanging over their heads.

"I'm just tired of it," said Falwell of the anxiety he's felt about the affair becoming public and embarrassing his family and Liberty. "It's just got to end," he added.

The 1,200-word statement, shown below, followed the Liberty board's decision to put Falwell on paid leave after he posted a "costume party" picture of him on a yacht with his pants partially unzipped and his arm around his wife's assistant.

His social media presence has raised eyebrows in the Liberty community, though he is often praised for his success at building up the school and keeping the coronavirus at bay from the university. He has also drawn fire for his strong support of President Trump.

The board's statement about Falwell on Friday referred to "various rumors and claims," which may be related to indications that a news service planned to air new claims from the man whom Becki Falwell had the affair with, a pool attendant the Falwells met and befriended in 2012 while staying at the Fontainebleau Miami Beach.

The statement did not name the attendant, but he has been identified as Giancarlo Granda in dozens of news stories.

In the statement and phone call with Secrets, Falwell appeared to be relieved to have finally divulged the affair and yearslong series of attacks the couple has faced.

"It was like living on a roller coaster," he said in the statement. "While completely dedicating ourselves to Liberty, we were also suffering in silence during our personal time together,



Exclusive: Falwell says Fatal Attraction threat led to depression

Unaccompanied
children at Fort
Bliss regularly
tested for
coronavirus in
expanding Defense
Department role

While simultaneously trying to mediate issues with this increasingly threatening behavior, which only worsened over time. We were doing our best to respectfully unravel this 'fatal attraction' type situation to protect our family and the university."

He said that while they tried to remain friendly with the man and his family, the threats and texts demanding huge amounts of money led them to cut him off.

"While we tried to distance ourselves from him over time, he unfortunately became increasingly angry and aggressive. Eventually, he began threatening to publicly reveal this secret relationship with Becki and to deliberately embarrass my wife, family, and Liberty University unless we agreed to pay him substantial monies," the couple said.

In 2012, the Falwells said they were impressed with the pool assistant and wanted to help him start in business. Falwell's wife worked a deal to buy a Miami hostel and put him in charge. The deal has been tangled in legal challenges.

It was while Jerry Falwell was working long hours to build up the university, which he took over after his father Jerry Falwell Sr. died in 2007, that Becki had the affair.

At the time, Falwell was working overtime to build Liberty into an online powerhouse and expand its modern campus.

Granda, who was 21 at the time, dismissed the charges of threats in an email to Secrets. He emailed, "Any allegation of extortion is falsely, defamatory and belied by clear documentary evidence. The Falwell's attempt to sandbag me, and the *Examiner*, with a last minute story without providing the *Examiner* clear evidence that this was not simply an 'affair' with concocted allegations of extortion reeks desperation. The WHOLE truth will come out."

Falwell's team provided emails and texts that it said substantiate its allegations.

After Falwell found out about the affair, he said in the statement, he lost 80 pounds and suffered mental stress, especially as Granda switched from being thankful for Falwell's help to demanding money.

"Becki and I forgave each other, because while her indiscretion may have been more obvious and apparent, I realized that there were important smaller things I needed to do better too," he said.

Falwell said that now that his family has revealed its troubles, he plans to urge others in stressful situations to seek mental help.

"Even though I continued successfully working with our entire Liberty team to achieve so many of our goals, I am now dealing with things in a way that I should have done before— including seeking to address the emotional toll this has taken. I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from the mental health professionals

Exclusive: Falwell says Fatal Attraction threat led to depression                 Page 3 of 5

☰    🔍

Who could have alleviated this pain. I am also now
committed to speaking out and sharing with others at Liberty
the importance of seeking counseling instead of thinking you
need to be tough and try to bear these burdens on your own. I
am in the early stages of addressing these issues," he wrote.

And, he added, "The trauma of this experience has brought us
to a very challenging point in our lives, but we are strong, our
faith in Christ is greater than ever, and with His help and with
those in the community who we love and who appreciate the
impact of forgiveness, we will get through this. We ask for
your prayers and support."

**STATEMENT BY JERRY FALWELL, JR.**

<u>Aug. 23, 2020</u>

*My family has been blessed with the opportunity to serve
Christ and our community over the past 50 years— from
when my father founded Liberty in the early 1970's through
today. When my father suddenly passed away in 2007, I
quickly and unexpectedly went from being the lawyer
working in the background on the business aspects of the
school to becoming a very public person, having to overcome
my fears of speaking in front of audiences of tens of
thousands, with many more responsibilities to the Liberty
community and to my own family.*

*My priority was to build on my father's vision and to work hard.
Thanks to the help of the Board and the extraordinary Liberty
faculty, executives, staff and community, we have ensured the
University's sustained growth and financial health while
providing the best and most modern on-campus and online
educational and spiritual resources to a wider range of
students both in person and through digital platforms.*

*My commitment to Liberty became and has remained my
primary focus— and while I am so grateful and thankful for
our collective successes, I also realize in hindsight that there
was a toll that this took on me, which extended to my family
too. During this time of reflection for us and this especially
challenging year, and even more so following the events of
the past few weeks, my wife Becki and I agreed that this was
the right time for me to share more of our story, because the
Liberty community deserves to hear it directly from me and
from us.*

*During a vacation over eight years ago, Becki and I met an
ambitious young man who was working at our hotel and was
saving up his money to go to school. We encouraged him to
pursue an education and a career and we were impressed by
his initiative in suggesting a local real estate opportunity. My
family members eventually made an investment in a local
property, included him in the deal because he could play an
active role in managing it, and became close with him and his
family.*

*Shortly thereafter, Becki had an inappropriate personal
relationship with this person, something in which I was not
involved— it was nonetheless very upsetting to learn about.*

Exclusive: Falwell says Fatal Attraction threat led to depression                     Page 4 of 5

☰   🔍

*After I learned this, I lost 80 pounds. Anyone who saw me regularly thought that I was physically unwell, when in reality I was just balancing how to be most supportive of Becki, who I love, while also reflecting and praying about whether there were ways I could have been more supportive of her and given her proper attention. I came to realize that while it may be easy to judge others on their behavior, the King James Bible reminds us— "Thou shalt not commit adultery, but I sayeth unto you, that whoever looketh upon a woman to lust after her hath committed adultery with her in his heart." In fact, there are ways we may all be sinning, but the Lord believes in this self-reflection.*

*I was and have always remained fully devoted to Becki and we have shared many private conversations to better understand and support each other and to strengthen our marriage. Thankfully, our love has never been stronger. Becki and I forgave each other, because while her indiscretion may have been more obvious and apparent, I realized that there were important smaller things I needed to do better too.*

*In Ephesians 4:32 we learn— "Be kind to one another, tender hearted, forgiving as God in Christ forgave you."*

*We extended the spirit of forgiveness to this man with respect and kindness, both for spiritual and religious reasons, and in the hope that we could help him find his way and allow us to put this behind us, without any harm or embarrassment to our family or to the LU community to which we have dedicated our lives.*

*During the years that followed, we got to know his family and other loved ones, good people who also really care about him. They shared and confirmed to us that he has periodically demonstrated emotionally unstable behaviors with some destructive tendencies, seemingly in response to his inability to achieve his professional goals. Based on information from other sources, we believe that he may have targeted other successful women in similar ways.*

*While we tried to distance ourselves from him over time, he unfortunately became increasingly angry and aggressive. Eventually, he began threatening to publicly reveal this secret relationship with Becki and to deliberately embarrass my wife, family, and Liberty University unless we agreed to pay him substantial monies. While this was very upsetting, we had been advised by trusted legal counsel that it was best to maintain contact with this person, as we tried to manage his increasingly erratic behavior and unreasonable demands while extricating ourselves from him both on a personal level and from that real estate transaction.*

*It was like living on a roller coaster.*

*While completely dedicating ourselves to Liberty, we were also suffering in silence during our personal time together, while simultaneously trying to manage and deal with this increasingly threatening behavior, which only worsened over*

Exclusive: Falwell says Fatal Attraction threat led to depression                    Page 5 of 5

time. We were doing our best to respectfully remove this 'fatal attraction' type situation to protect our family and the University.

Even years after the improper relationship had ended, this person continued to be aggressive with Becki and me in a variety of ways. We finally decided that we had to further withdraw completely from him, which resulted in him stepping up his threats to share more outrageous and fabricate claims about us (under the guise of that business entity). He clearly moved forward with this plan through a specific member of the media who has continued to badger us, as well as other members of the media, regarding the false claims about the nature of the relationship based on the individual's misrepresentations. Over the course of the last few months this person's behavior has reached a level that we have decided the only way to stop this predatory behavior is to go public.

We have categorically rejected this person's demands while dealing with him and this particular member of the media who seemed just as obsessed with the prurient, untrue aspects of this story, however fantastic.

Even though I continued successfully working with our entire Liberty team to achieve so many of our goals, I am now dealing with things in a way that I should have done before— including seeking to address the emotional toll this has taken. I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from the mental health professionals who could have alleviated this pain and stress. I am committed to speaking out and sharing with others at Liberty the importance of seeking counseling instead of thinking you need to be tough and try to bear these burdens on your own. I am in the early stages of addressing these issues.

Proverbs 3:5-6 says "trust in the Lord with all your heart and lean not on thine own understanding in all your ways acknowledge him and he will guide straight thy path."

The trauma of this experience has brought us to a very challenging point in our lives, but we are strong, our faith in Christ is greater than ever, and with His help and with those in the community who we love and who appreciate the impact of forgiveness, we will get through this. We ask for your prayers and support.

Reccipt : 20000019518  Page 1 of 1



**OFFICIAL RECEIPT**
**LYNCHBURG CIRCUIT COURT**
**CIVIL**

**DATE :** 10/28/2020   **TIME :** 15:59:18   **CASE # :** 680CL2000105100

**RECEIPT # :** 20000019518   **TRANSACTION # :** 20102800068

**CASHIER :** NRS   **REGISTER # :** C705   **FILING TYPE :** COM   **PAYMENT :** FULL PAYMENT

**CASE COMMENTS :** F v. L

**SUIT AMOUNT :** $0.00

**ACCOUNT OF :** F

**PAID BY :** F

**CHECK :** $86.00   **CHECK NUMBER :** 10776

**DESCRIPTION 1 :** COM:COMPLAINT - CATCH-ALL

2 : PLAINTIFF: F

3 : NO HEARING SCHEDULED

| ACCOUNT CODE | DESCRIPTION | PAID |
|---|---|---|
| 049 | WRIT TAX (CIVIL) | $5.00 |
| 106 | TECHNOLOGY TRST FND | $5.00 |
| 123 | LEGAL AID SERVICES | $9.00 |
| 147 | INDIGENT ASSISTANCE (INA) | $1.00 |
| 170 | COURT TECHNOLOGY FUND | $10.00 |

| ACCOUNT CODE | DESCRIPTION | PAID |
|---|---|---|
| 219 | LAW LIBRARY | $4.00 |
| 229 | COURTHOUSE MAINTENANCE FEE (CHMF) | $2.00 |
| 304 | CIVIL FILING FEE (LAW & EQUITY) | $50.00 |

**TENDERED : $** 86.00

**AMOUNT PAID : $** 86.00



EXHIBIT
2

PAYOR'S COPY   *CLERK OF COURT :* *TODD SWISHER*   RECEIPT COPY 1 OF 2

**COVER SHEET FOR FILING CIVIL ACTIONS** COPY    Case No. .................................
COMMONWEALTH OF VIRGINIA    (CLERK'S OFFICE USE ONLY)

.................................................... City of Lynchburg .................................................... Circuit Court

.......... Jerry Falwell, Jr. .......... v./In re: .......... Liberty University ..........
PLAINTIFF(S)    DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

**GENERAL CIVIL**
**Subsequent Actions**
[ ] Claim Impleading Third Party Defendant
    [ ] Monetary Damages
    [ ] No Monetary Damages
[ ] Counterclaim
    [ ] Monetary Damages
    [ ] No Monetary Damages
[ ] Cross Claim
[ ] Interpleader
[ ] Reinstatement (other than divorce or driving privileges)
[ ] Removal of Case to Federal Court
**Business & Contract**
[ ] Attachment
[ ] Confessed Judgment
[ ] Contract Action
[ ] Contract Specific Performance
[ ] Detinue
[ ] Garnishment
**Property**
[ ] Annexation
[ ] Condemnation
[ ] Ejectment
[ ] Encumber/Sell Real Estate
[ ] Enforce Vendor's Lien
[ ] Escheatment
[ ] Establish Boundaries
[ ] Landlord/Tenant
    [ ] Unlawful Detainer
[ ] Mechanics Lien
[ ] Partition
[ ] Quiet Title
[ ] Termination of Mineral Rights
**Tort**
[ ] Asbestos Litigation
[ ] Compromise Settlement
[ ] Intentional Tort
[ ] Medical Malpractice
[ ] Motor Vehicle Tort
[ ] Product Liability
[ ] Wrongful Death
[X] Other General Tort Liability

**ADMINISTRATIVE LAW**
[ ] Appeal/Judicial Review of Decision of (select one)
    [ ] ABC Board
    [ ] Board of Zoning
    [ ] Compensation Board
    [ ] DMV License Suspension
    [ ] Employee Grievance Decision
    [ ] Employment Commission
    [ ] Local Government
    [ ] Marine Resources Commission
    [ ] School Board
    [ ] Voter Registration
    [ ] Other Administrative Appeal

**DOMESTIC/FAMILY**
[ ] Adoption
    [ ] Adoption – Foreign
[ ] Adult Protection
[ ] Annulment
    [ ] Annulment – Counterclaim/Responsive Pleading
[ ] Child Abuse and Neglect– Unfounded Complaint
[ ] Civil Contempt
[ ] Divorce (select one)
    [ ] Complaint – Contested◆
    [ ] Complaint – Uncontested◆
    [ ] Counterclaim/Responsive Pleading
    [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
[ ] Separate Maintenance
    [ ] Separate Maintenance Counterclaim

**WRITS**
[ ] Certiorari
[ ] Habeas Corpus
[ ] Mandamus
[ ] Prohibition
[ ] Quo Warranto

**PROBATE/WILLS AND TRUSTS**
[ ] Accounting
[ ] Aid and Guidance
[ ] Appointment (select one)
    [ ] Guardian/Conservator
    [ ] Standby Guardian/Conservator
    [ ] Custodian/Successor Custodian (UTMA)
[ ] Trust (select one)
    [ ] Impress/Declare/Create
    [ ] Reformation
[ ] Will (select one)
    [ ] Construe
    [ ] Contested

**MISCELLANEOUS**
[ ] Amend Death Certificate
[ ] Appointment (select one)
    [ ] Church Trustee
    [ ] Conservator of Peace
    [ ] Marriage Celebrant
[ ] Approval of Transfer of Structured Settlement
[ ] Bond Forfeiture Appeal
[ ] Declaratory Judgment
[ ] Declare Death
[ ] Driving Privileges (select one)
    [ ] Reinstatement pursuant to § 46.2-427
    [ ] Restoration – Habitual Offender or 3rd Offense
[ ] Expungement
[ ] Firearms Rights – Restoration
[ ] Forfeiture of Property or Money
[ ] Freedom of Information
[ ] Injunction
[ ] Interdiction
[ ] Interrogatory
[ ] Judgment Lien-Bill to Enforce
[ ] Law Enforcement/Public Official Petition
[ ] Name Change
[ ] Referendum Elections
[ ] Sever Order
[ ] Taxes (select one)
    [ ] Correct Erroneous State/Local
    [ ] Delinquent
[ ] Vehicle Confiscation
[ ] Voting Rights – Restoration
[ ] Other (please specify)

FILED IN THE CLERK'S OFFICE OF THE CIRCUIT COURT OF THE CITY OF LYNCHBURG

OCT 28 2020    TIME ....... M.

TESTE: TODD SWISHER, CLERK

BY: ....................................... Dep. Clerk

[ ] Damages in the amount of $ .................................... are claimed.

10/28/2020
DATE

James I. Gilbert, IV VSB #38229
PRINT NAME

310 S. Jefferson Street
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

Roanoke, VA 24011

jgilbert@gbsattorneys.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

[ ] PLAINTIFF   [ ] DEFENDANT   [X] ATTORNEY FOR   [X] PLAINTIFF / DEFENDANT

◆"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 07/16

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

JERRY FALWELL, JR.,

                Plaintiff,

v.

LIBERTY UNIVERSITY,

                Defendant.

Case No. _____

JURY TRIAL DEMANDED

### COMPLAINT

Plaintiff Jerry Falwell, Jr., as and for his Complaint against Defendant Liberty University ("Liberty" or the "University"), by and through undersigned counsel, hereby alleges as follows:

### INTRODUCTION

1.  This defamation action against Liberty University by its former President and Chancellor, Jerry Falwell, Jr., is necessitated by Liberty's abdication of its legal, contractual, and moral obligations not to defame him. Jerry Falwell, Jr., has dedicated much of his adult life to Liberty University, which was founded by his father, Jerry Falwell, Sr. ("Dr. Falwell"), in 1971. Following his father's death in 2007, Jerry Falwell, Jr. stepped in as President and Chancellor of the University, saving the institution from financial collapse and developing Liberty into the world's leading evangelical university and the largest private nonprofit university in the nation. In return, Liberty set out to destroy Mr. Falwell's reputation through numerous defamatory statements that affirm the outrageous lies of an unstable individual who attempted to extort the Falwells and who, on information and belief, conspired against Mr. Falwell with politically

LUADMINREC000112

motivated backers, including Aaron Resnick and the political action committee The Lincoln Project.

2.      Under Mr. Falwell's stewardship, Liberty University's stature increased exponentially by almost every metric, especially enrollment and financials. Between just 2007 and 2020 alone, attendance increased from 9,600 students in residence and 27,000 students online to 15,000 students in residence and 108,000 students studying online. And, after decades of financial hardship, Liberty now boasts a $1.6 billion endowment—one of the nation's largest. More students enrolled and more donors gave because of Mr. Falwell's tireless efforts in carrying out his father's vision for Liberty.

3.      When Mr. Falwell and his family became the targets of a malicious smear campaign incited by anti-evangelical forces, Liberty University not only accepted the salacious and baseless accusations against the Falwells at face value, but directly participated in the defamation. This action seeks redress for the damage Liberty has caused to the reputation of Mr. Falwell and his family.

4.      For years, Mr. Falwell and his wife, Rebecca Falwell, have been the victims of an ongoing extortion scheme by Giancarlo Granda—efforts which have recently been absorbed into a smear campaign by political operatives who are opposed to Mr. Falwell's support of President Trump. Granda repeatedly demanded enormous cash payments from the Falwells to stay silent about a brief affair with Mrs. Falwell that ended in 2014. Granda is an unstable and manipulative individual who saw the Falwells' kindness, and his involvement with Mrs. Falwell, as opportunities ripe for exploitation.

5.      The Falwells refused to pay, and Granda's disturbing behavior became increasingly erratic and threatening.

2

6.      On information and belief, Granda began conspiring with political operatives to defame Mr. Falwell.  Granda recently admitted in an ABC News interview that he is being represented free of charge by Kurt Bardella, a senior advisor to The Lincoln Project.  The Lincoln Project is a political action committee that has a self-described mission to "Defeat President Trump and Trumpism at the ballot box."  The Lincoln Project's animosity towards Mr. Falwell presumably arises from the fact that President Trump's evangelical support is often attributed to Mr. Falwell's early endorsement of him during the 2016 primaries.  It has been reported that Bardella is also arranging Granda's interviews with the press.  Granda further admitted to being introduced to The Lincoln Project by his attorney, Aaron Resnick, a politically prominent lawyer in Miami, Florida.  On information and belief, Resnick has been financing Granda's personal expenses.

7.      In June 2020, Mr. Falwell made clear to Granda in no uncertain terms that he would not be extorted, no payments would be forthcoming, and Granda should cease and desist from contacting him.  Shortly thereafter, Granda—backed by The Lincoln Project—embarked on a hit job against Mr. Falwell in the press.  On August 24, 2020, Granda stated publicly for the first time the outrageous, false, and defamatory lies that Mr. Falwell had "looked on" and "watched" as Granda had sex with his wife and participated in the affair.

8.      The lies had the effect that Granda and The Lincoln Project intended.  Within a day, Liberty turned on Mr. Falwell and forced his resignation as University President and Chancellor.  Liberty conducted zero investigation into Granda's lies and willfully ignored information demonstrating their falsity.  Soon after his resignation, the University began to systematically erase Mr. Falwell from Liberty University history:  scrubbing any mention of him from the University website; removing portraits of Mr. Falwell from campus (including a portrait

3

of Mr. Falwell as a boy attending a University football game with his late father); prohibiting Liberty faculty and staff members from speaking with him; and banning him from visiting campus grounds—which include the gravesites of his mother and father.

9.      The University also moved quickly to destroy Mr. Falwell's reputation in the Liberty community and nationwide.  On August 26, 2020, in its high-profile and publicly-broadcasted Community Service event, before thousands of gathered students and faculty—and the world—Liberty lent credence to Granda's lies, stating that Mr. Falwell had engaged in "disobedient" behavior "in secret" that was "shameful" and a "sin."  Liberty then repeated similar statements in a press release and its official magazine.

10.      Up until that point, Granda's lies were just that—lies, vigorously denied by Mr. Falwell.  But Liberty gave those lies an air of truth and righteousness.  With the exercise of even the slightest diligence, Liberty would have quickly confirmed that Granda's outrageous lies are false.  Instead, Liberty gave Granda's lies an air of truth by immediately forcing Mr. Falwell's resignation and publicly defaming him.

11.      Liberty's actions are antithetical to the teachings of Christ.  Liberty's conduct has damaged Mr. Falwell's standing among Liberty faculty, students, and alumni, the broader evangelical community, and beyond.  Liberty's conduct has also damaged *Liberty* itself, and the evangelical community, by playing right into the hands of sinister operatives with ulterior motives.  Liberty has rejected Mr. Falwell's attempts to reach an amicable resolution, forcing Mr. Falwell to bring this action to restore his reputation.

## THE PARTIES

12.      Plaintiff Jerry Falwell, Jr. is a citizen and resident of Virginia.  He currently resides in Bedford County, Virginia.  Mr. Falwell has a Juris Doctorate from the University of

4

Virginia and was a practicing lawyer for many years.  Mr. Falwell began working at Liberty University in 1988 as General Counsel, a position that he held until May 2007.  Following the death of Dr. Falwell in May 2007, Mr. Falwell served as the President and Chancellor of Liberty University until his August 25, 2020 resignation.

13.      Defendant Liberty University is a Virginia nonstock corporation headquartered in Lynchburg, Virginia with its principal office located at 1971 University Blvd, Lynchburg, Virginia 24515.

## JURISDICTION AND VENUE

14.      This Court has jurisdiction over this matter pursuant to Va. Code §§ 17.1-513, 8.01-328.1.  Defendant is organized as a nonstock corporation under the laws of the Commonwealth of Virginia and has its principal office in the Commonwealth of Virginia.

15.      Venue properly lies in this Court under Va. Code Ann. §§ 8.01-257 and 8.01-262 because it is a forum convenient to the parties and witnesses, where justice can be administered without prejudice or delay.  Liberty University's principal office is located in Lynchburg, Virginia.

16.      Furthermore, the Employment Agreement entered into between Mr. Falwell and Liberty, which provides the basis for at least one of the claims in this action, specifies that any legal action or proceeding arising out of or relating to the Employment Agreement shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

## FACTUAL BACKGROUND

### A.  The Falwell Family and the Founding of Liberty University

17.      Born on June 17, 1962 in Lynchburg, Virginia, Mr. Falwell comes from storied Virginian roots.  His late father, Dr. Falwell, is among the most respected leaders in the

5

evangelical Christian community, described by The Economist as a "quintessentially American type: a poor man who won fame and fortune by preaching the Word."

18.     In 1952, Dr. Falwell decided to dedicate his life to Christ and preaching Christianity.  After graduating college, he returned home to Lynchburg to start a church in a disused soda-bottling plant with a congregation consisting of just 35 adults and their families.

19.     Dr. Falwell steadily grew his congregation using nothing but his charisma, and, at first, his own two feet, visiting 100 or so homes a day to seek new congregation members, carrying only a yellow legal pad and a Bible.

20.     Dr. Falwell's breakthrough came from using the technology of the era to spread the gospel.  Soon after his church opened, he began a half-hour daily radio broadcast, like the ones his mother would play on Sunday nights.  And only a few months later, he began televising his services, which quickly gained him a national audience.  He called the show "Old-Time Gospel Hour," and it started to skyrocket his congregation's numbers almost immediately.  In the first year, his congregation grew from 35 to nearly a thousand, and that was only the beginning. By the 1970s, his church sat thousands, and Old-Time Gospel Hour was broadcast nationally to hundreds of thousands of homes.

21.     In 1971, just a few blocks from his church, Dr. Falwell founded Lynchburg Baptist College, which would eventually become known as Liberty University.  The school's mission was "Training Champions for Christ," and like Dr. Falwell's church, it originally started small, with only 154 students, a tuition of $200, and four full-time faculty members.  It quickly began to grow.  Just 10 years after its founding, over 3,500 students were enrolled, and by 1988 it had become the largest private university in Virginia with a combined enrollment of 11,000 students from all 50 states and 30 nations.

6

22.     While Liberty University grew, Dr. Falwell became a titan in Christian evangelicalism as well as American politics. In 1979, after hosting a series of "I Love America" rallies across the country to raise awareness of social issues, Dr. Falwell founded the Moral Majority, a political organization headquartered in Lynchburg, Virginia, that, at its height, claimed more than four-million members and two-million donors.

23.     Although Dr. Falwell became a national figure through his work with the Moral Majority and the Old-Time Gospel Hour, his passion lay in being a pastor and a Christian educator. And in 1989, he disbanded the Moral Majority, allowing himself more time to concentrate his efforts on heading his church and Liberty University. Dr. Falwell dreamed that Liberty would grow to 50,000 students and be to fundamentalist Christians what The University of Notre Dame is to Catholics and Brigham Young University is to Mormons.

**B.     Mr. Falwell's Contributions to Liberty University**

24.     Despite Dr. Falwell's best efforts, he had difficulty keeping Liberty afloat financially. Donors and family friends had to step in to help manage the finances and arrange for companies to write-off Liberty's debt, and even with their help, by the 1990s, Liberty University was on the verge of financial collapse.

25.     Fortunately, when the school was nearing its financial nadir, facing bankruptcy and potential collapse, Jerry Falwell, Jr. was fully grown and able to assist his father in not only keeping the school alive, but achieving Dr. Falwell's dream for Liberty University. In 1987, Jerry Falwell, Jr. was a practicing lawyer and commercial real estate developer. In 1988, he joined Liberty as General Counsel.

26.     While Dr. Falwell focused on maintaining the school's religious education, Mr. Falwell worked to keep the creditors at bay, which was no small feat. By 1990, the school had

7

nearly $100 million in debt. Liberty's accrediting body, the Southern Association of Colleges and Schools Commission on Colleges, had even placed it on a one-year probation and was scrutinizing its every move, going so far as to issue Liberty more than 100 "recommendations" to maintain its accreditation, most of which centered around restructuring the school's debt.

27.    With Mr. Falwell's assistance, Liberty University not only climbed out of its financial hole, but began to thrive. As Dr. Falwell himself put it, "God sent [Jerry Falwell, Jr.] to me just in time. He is more responsible, humanly speaking, for the miraculous financial survival of this ministry than any other single person."

28.    In 2000, Mr. Falwell joined Liberty University's Board of Trustees, and in 2003 he became the school's Vice Chancellor. As a board member and Vice Chancellor, he assisted his father with running the school's day-to-day operations and managed the University's debt for years.

29.    On May 15, 2007, Dr. Falwell passed away. In accordance with his wishes, upon his passing, his two sons took control of the two pinnacles of his legacy: Jonathan took over his church, Thomas Road Baptist Church, and Jerry, Jr. became President and Chancellor of Liberty University.

30.    Mr. Falwell rose to the occasion. He has been widely recognized as having led Liberty University not only through difficult financial straits, but also for steering its transformation into the world's leading evangelical university.

31.    Dr. Falwell passed away before Liberty University achieved his dream of 50,000 enrolled students. Under Mr. Falwell's stewardship, however, Dr. Falwell's dream was achieved, and then surpassed: during his tenure as President and Chancellor, Mr. Falwell grew Liberty University's enrollment from 38,000 to 110,000 students, making it the one of the largest

8

evangelical Christian universities in the world, and one of the largest private non-profit universities in the United States.

32.     Under Mr. Falwell's leadership, Liberty University's finances have transformed from being crippled by debt to possessing nearly $3.5 billion in net assets and one of the largest and fastest-growing endowments of any university in the nation. The University's sports teams play in Division 1 of the National Collegiate Athletic Association (alongside The University of Notre Dame and Brigham Young University, as Dr. Falwell always wanted). In 2017, its football team joined the Football Bowl Subdivision, college sports' most competitive level. Its sprawling campus, which overlooks Lynchburg, Virginia, comprises 7,000 acres and 17 colleges. Under Mr. Falwell's stewardship, Liberty has built a $50 million library with a high-tech robotic book-retrieval system (one of only a few in the country); renovated its 25,000-seat football stadium (Williams Stadium); and built a year-round outdoor ski slope (the only one of its kind in North America) that is free for students. In January 2017, President Donald Trump gave the commencement speech at Liberty University—one of his very first speeches as President of the United States.

**C.     Liberty Recognizes Mr. Falwell's Outstanding Leadership in the 2019 Employment Agreement**

33.     Mr. Falwell's outstanding leadership of Liberty endeared him to students, faculty, alumni, and donors alike. Indeed, Liberty students would often chant his name when he appeared at school events. And his success with donors is undeniable: as noted above, in the first ten years of Mr. Falwell's tenure as President and Chancellor, Liberty's endowment grew exponentially.

9

34.     In 2019, Liberty University and Mr. Falwell negotiated and entered into the Employment Agreement, which was intended to fairly compensate Mr. Falwell for his significant contributions and to bring his compensation in line with market compensation.

35.     In light of his proven track record as President and Chancellor, in 2019, the University took steps to ensure that Mr. Falwell was properly compensated for the success his stewardship had brought Liberty.  The University retained FW Cook, a national consulting firm with expertise in the compensation of executives in tax-exempt organizations, to review Mr. Falwell's compensation.  The University tasked FW Cook with determining whether Mr. Falwell's compensation was in line with national standards, taking into account Liberty University's growth and financial achievements and Mr. Falwell's historical compensation.  FW Cook made recommendations for program changes as needed to ensure that Mr. Falwell was retained at Liberty University for the long term and provided with a competitive and motivating compensation program.

36.     In recognition of Mr. Falwell's numerous significant contributions to Liberty University, and in an effort to compensate Mr. Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, under advisement from FW Cook, Liberty University entered into the Employment Agreement.

37.     As Liberty University specifically recognized in the Employment Agreement:

a)      In his first ten years with Liberty University, Mr. Falwell was instrumental in promoting and furthering the University's debt restructuring and returning the University to a position of financial strength by 1997 from a period of severe financial hardship.

10

b)      During Mr. Falwell's tenure with Liberty University, he was instrumental in promoting and furthering the rapid expansion and continued success of the University, especially since 2007, when Mr. Falwell became President and Chancellor.

c)      Under Mr. Falwell's leadership, between 2007 and 2017 Liberty University's net assets increased from approximately $100 million to over $2.1 billion.  During the same time period, the University's annual gross revenues increased from $231,506,554 to over $1 billion, and its surplus of revenues over expenditures increased from $52,514,469 to $331,142,834.

d)      Likewise, under Mr. Falwell's leadership, between 2007 and 2017 Liberty University's attendance increased from 9,600 students in residence and 27,000 students online in 2007 to 15,000 students in residence and 86,000 students studying online in 2017.

e)      As a result of its strong financial performance under Mr. Falwell's leadership, Liberty University's Standard & Poor's credit rating has been AA since 2011, placing Liberty among the 80 highest rated universities nationally.

38.     The Employment Agreement includes a non-disparagement clause, which provides that "[t]he parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings."  It further provides that the parties may, if Mr. Falwell is terminated for cause, "truthfully explain the circumstances forming the basis for the determination of cause."  This non-disparagement provision expressly survives termination of the Employment Agreement.

39.     The Employment Agreement provides indemnification rights above and beyond "any and all indemnity rights and protections [Mr. Falwell] may have pursuant to statute or under

11

LUADMINREC000122

any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies." Section 10.1 of the Employment Agreement provides that:

> [t]o the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment.

**D.      Granda's Attempts to Extort the Falwells**

*(i) Granda's Lies Regarding the Affair*

40.      Jerry and Rebecca Falwell have been married since 1987 and have three children together.  In March of 2012, Mr. and Mrs. Falwell were on vacation with their family, as well as two other families, at the Fontainebleau Miami Beach hotel in Miami, Florida.  There, they met Giancarlo Granda, who was employed at the resort as a pool attendant.  At first, Granda impressed the Falwells with his entrepreneurial attitude and ambition, and the Falwells befriended him.  With the Falwell's help and encouragement, Granda decided to return to college and received his bachelor's degree in finance from Florida International University.

41.      Unbeknownst to Mr. Falwell, on rare occasions between 2012 and 2014, Mr. Granda and Mrs. Falwell engaged in an affair.  The Falwells later learned that Granda used his job at the Fontainebleau Miami Beach hotel to prey on hotel guests, especially women.

42.      When Mr. Falwell learned of the affair, he was heartbroken.  However, after working on their marriage, he and Mrs. Falwell reconciled.  Unfortunately, Mr. and Mrs. Falwell's reconciliation did not put an end to the trouble Granda would cause their family.  Notwithstanding all the support the Falwell family gave to Granda, he soon revealed himself to be a deeply disturbed and unstable individual who was bent on continually threatening the

12

Falwells and exploiting the affair to his financial advantage. As explained below, when it became clear the Falwells would not be extorted and would never pay for his silence, he publicly unleashed falsehoods in an attempt to destroy their lives.

43.    When the affair ended in 2014, the Falwells initially attempted to distance themselves from Granda, but Granda responded with aggression and threats to publicize his relationship with Mrs. Falwell to publicly embarrass the Falwells and Liberty University.

44.    Granda's threats placed an enormous amount of strain on the Falwells' well-being—the constant anxiety contributed to Mr. Falwell losing 80 pounds over just two years. Although the Falwells wished to distance themselves from Granda completely, given the threat that he posed, the Falwells believed it best to maintain a positive relationship with him to placate his increasingly erratic behavior and manage his extortive demands while extricating themselves. Granda became obsessed, however, with the prospect of leveraging his relationship with the Falwells into a payday.

45.    For example, Granda had sold intimate pictures of Mrs. Falwell to his friends, who then used those pictures to try to extort the Falwells for money. When Granda learned of his friends' extortion attempt, rather than apologize for the emotional and financial toll it took on the Falwells, Granda expressed awe that he had possessed pictures that were apparently so valuable, and that the friends to whom he had sold the pictures stood to gain more than he had from selling them to them.

46.    Granda also illegally recorded phone calls and FaceTime communications with Mrs. Falwell without her consent. On information and belief, he made these recordings to strengthen his extortion attempts and to support his later public allegations with out-of-context clips that purportedly verified his ludicrous allegations.

13

47.     Afterwards, in late 2014, Granda repeatedly threatened to publicize the affair unless the Falwells gave him large sums of money, ranging from $600,000 to $2 million.

*(ii) Granda's History of Unstable Behavior.*

48.     Recently, Granda's ex-girlfriends, with whom the Falwells grew close in their effort to maintain a positive relationship with Granda, have confided in the Falwells that Granda was unbalanced and manipulative.

49.     On more than one occasion, Granda's (now ex) girlfriends texted the Falwells to seek their help in managing Granda's self-destructive and unbalanced behavior, stating that Granda was "crazy and verbally abusive" to his girlfriend, his family, and anyone that grew close to him; and that he exhibited frequent "rages," including virtually destroying his parents' house and "saying really [expletive] up stuff to others."

50.     One ex-girlfriend told the Falwells that Granda often hurled racist insults at her and her family.  As she put it, "he had truly unresolved psychological issues that make him hurt people who love him . . . he did the same to his family growing up and now he is doing it to me . . . his snapping and explosive behavior is legitimately scary."  She further described that he would say "the most [expletive] up things about my family" and her, and that she had "never heard such disgusting racist [expletive] in [her] life."

*(iii) Granda's Efforts to Extort The Falwells*

51.     While the Falwells were successful in placating Granda for a time, his extortive threats never stopped.  Indeed, they only became more outrageous and potentially damaging.

52.     When the Falwells eventually decided to attempt disengaging with Granda completely, it was then that Granda changed the threat behind his extortion to something more damaging.  Rather than just reveal the affair Granda had engaged in with Mrs. Falwell, Granda

14

threatened to falsely claim that Mr. Falwell had been a willing participant in the affair, even watching the two engage sexually.

53.     This was not true.  Mr. Falwell did not participate in the affair and he certainly did not watch Granda having sex with his wife.

54.     Upon information and belief, Granda had cooked up this lie hoping that it would provide him a more powerful threat for purposes of accomplishing his intended extortion of the Falwells.  He was aware of Mr. Falwell's role at Liberty University, an evangelical institution, his father's legacy as a national evangelical leader, and his involvement with the Republican Party.

55.     On June 30, 2020, Mr. Falwell communicated to Granda, in no uncertain terms, that he would not be extorted; he would not give Granda any money; and Granda should cease and desist from contacting the Falwells.  Granda has not ceased contacting the Falwells and has continued to attempt to communicate with the Falwells though texts and calls, including in harassing communications as recently as October 2020.

56.     After receiving the June 30 communication and apparently realizing his extortion scheme would fail, rather than refrain from contacting the Falwells, Granda then set out to destroy them in public.  In other words, if the Falwells would not pay Granda to stay silent, perhaps someone else would pay him to go public.

57.     The Presidential election season and Mr. Falwell's long-standing and vocal support for the President in media and public appearances, including his early endorsement of the President in 2016, gave Granda the perfect opportunity.

58.     On information and belief, by this point Granda was no longer acting alone on his plan to publicly reveal his lies but was now conspiring with political operatives to defame Mr.

15

Falwell. Because of the salacious nature of Granda's false allegations, and because of Mr. Falwell's family name, reputation among evangelicals, and public and vocal support for President Trump, political operatives who are opposed to President Trump's re-election worked with Granda on his defamatory media campaign against Mr. Falwell.

59.     Among these individuals was Kurt Bardella, a Senior Advisor to The Lincoln Project—a political organization that accused President Trump of "crimes, corruption and corrosive nature" and that has dedicated its efforts to "defeating President Trump and Trumpism at the ballot box." On information and belief, Bardella and The Lincoln Project have been advising Granda in an attempt to use his defamatory statements to harm President Trump's chances at re-election. Further, Granda recently admitted in an ABC News interview that he is being represented free of charge by a senior adviser to The Lincoln Project, to whom he was introduced by his attorney. It has also been publicly reported that Bardella was organizing interviews for Granda.

60.     The Lincoln Project was reportedly brought in by Aaron Resnick, Granda's attorney, who is a politically prominent lawyer in Miami, Florida.

61.     Furthermore, on information and belief, Mr. Bardella, The Lincoln Project, and potentially other questionably motivated supporters of Granda have gone so far in their support for his false allegations that they have financially compensated Granda and paid his bills. Granda has been observed paying for expenses with a credit card that was not his own. On information and belief, this card belongs to Resnick.

62.     On August 23, 2020, faced with Granda's threat to not only his wife but his own reputation, and the reputation of Liberty University, Mr. Falwell decided that the best thing to do

16

was to try and explain the suffering he and his family had endured from Granda's attempted extortion over the past years. Mr. Falwell gave a statement to the Washington Examiner.

63.    Notably, Mr. Falwell's statements to the Examiner detailed the Falwells' interactions with Granda and made clear that Granda had attempted to extort the Falwells through salacious allegations that were utterly false.

64.    The next day, on August 24, 2020, Granda followed through with his extortive threat to accuse Mr. Falwell of participating in Granda's affair with Mrs. Falwell. In a *Reuters* article titled *The Falwell Affair*, Granda made the outrageously false claim that Mr. Falwell participated in Granda's affair with Becki Falwell and "enjoyed watching" them have sex. The *Reuters* article also noted that Mr. Falwell "categorically denies" the allegations.

65.    Even the article's headline revealed that its purpose, and indeed the entire motive behind Granda and his co-conspirators' defamation of Mr. Falwell, was to attack Mr. Falwell *and* the institutions with which he was connected: Liberty University and President Trump. The byline reads, "[Granda] says he had sex with Becki Falwell while Jerry Falwell, Jr., *head of Liberty University and a staunch supporter of President Trump*, looked on." (emphasis added).

E.    Liberty Forces Mr. Falwell's Resignation Without Investigation of Granda's Lies

66.    On the same day that *Reuters* published Granda's false and defamatory statements, the Executive Committee of Liberty University's Board of Trustees forced Mr. Falwell to tender his resignation as President and Chancellor of the University.

67.    On information and belief, the Board of Trustees and the Executive Committee were aware of Mr. Falwell's August 23, 2020 statement in the Washington Examiner noting that he was the subject of extortive attempts by an individual who was using an affair with Mrs.

17

LUADMINREC000128

Falwell to fabricate outrageous claims regarding Mr. Falwell to harm his reputation, as well as his categorical denial in the *Reuters* article.

68.    Moreover, at the time of Mr. Falwell's resignation, Liberty further possessed information that Granda's statements were false because Mr. Falwell had previously disclosed information regarding the affair to a top official who was then, and is now, a member of the University's Board of Trustees.

69.    Yet, despite this knowledge, when the *Reuters* article was published, not one member of the Board or the Executive Committee asked Mr. Falwell about the veracity of Granda's lies before forcing Mr. Falwell's resignation and then defaming him by repeating and endorsing the lies. Liberty still has not inquired with Mr. Falwell about Granda's lies. Further, Liberty performed no investigation whatsoever into the veracity of Granda's claims before forcing Mr. Falwell's resignation or before making its defamatory statements.

70.    Upon information and belief, certain key individuals directly involved in the decisions and actions to force Mr. Falwell's resignation and then defame him were fulfilling a long-held goal to end Mr. Falwell's fruitful thirty-two-year relationship with the University. Purportedly acting in the University's interest to disassociate the University from Mr. Falwell's alleged indiscretions, these individuals had engaged, or were engaged, in various illegal, unlawful, and immoral or otherwise dubious acts in their stewardship of other institutions and otherwise which, if known to the public generally, would unquestionably tarnish the reputation of Liberty University by association. It is therefore hypocritical in the extreme for these key individuals to cast any action of Mr. Falwell as disqualifying Mr. Falwell from leading Liberty, as he had done successfully for many years.

18

71. Mr. Falwell was told to tender his resignation from Liberty, or he would be forced to resign. On August 24, 2020, Mr. Falwell provided Liberty University with written notice of his resignation for "good reason," as that term was defined in the Employment Agreement.

72. On August 25, 2020, Liberty University accepted Mr. Falwell's resignation for good reason through a vote of its Executive Committee, which was affirmed on the same day through a full vote of the Board of Trustees, thus terminating Mr. Falwell's employment with the University.

73. By forcing Mr. Falwell's resignation from Liberty immediately following Granda's false and defamatory statements, Liberty sent the unmistakable message to the public that Granda's false statements were, in fact, true.

F.     **Liberty University Defames Mr. Falwell Following His Resignation**

74. After severing his relationship from Liberty, and despite Liberty's acceptance of Granda's false story, Mr. Falwell looked forward to the next chapter in his life. Liberty, however, immediately began a campaign to tarnish, minimize, and outright destroy the legacy of the Falwell family and Mr. Falwell's reputation.

75. The very next day, on August 26, 2020, David Nasser, Liberty University's Senior Vice President for Spiritual Development, presented a speech at the University's Community Service, an event at the start of a new school year where thousands of students and faculty were present and which Liberty also broadcasted online.

76. Nasser helped secure a wide-spread attendance and media presence for this event by promoting it, including at Liberty's Convocation, which was held earlier that day, broadcasted online, and considered mandatory for all staff, faculty, and students. During Liberty's

19

Convocation, Nasser told the audience that he would be discussing the events leading to Mr. Falwell's resignation that night.

77.     On information and belief, Nasser's speech later that day at Community Service was largely scripted; other Liberty employees participated in drafting the speech, and Mr. Nasser was reading from a script during his speech.

78.     Nasser began the defamatory portion of the speech by stating, "There are those who have told me to lay low and to not mention any of the things that lead to Jerry Falwell's resignation yesterday." Moments later, Nasser tells the audience, "you're also right if you wanna see stern and swift accountable action for sinful behavior." A moment later, he tells the audience, "the embarrassment that's been brought upon you as a Liberty student and more importantly brought upon the name of Christ is wrong." A moment later, he tells the audience, "Your concerns, if you're concerned, are valid. If you're not concerned, you should be concerned." Later in the speech, Nasser returns to the topic, again prefacing his remarks by referring to Granda's lies: "Then the summer came to a close, and we opened the semester with a series of revelation about Jerry Falwell that can only be described as shameful. That's okay, by the way, to say it. It's okay to call sin, sin. Paul says in Ephesians. Have nothing to do with the fruitless deeds of darkness but rather, expose them. It is shameful to even mention what the disobedient do in secret. But everything exposed by the light becomes visible." A moment later, he proceeds to state again, "It's okay to call sin, sin." These remarks together are referred to herein as the "Defamatory Speech."

79.     The Defamatory Speech is false and defamatory. Taken together, Liberty's statements repeat, as a statement of fact, Granda's lies that Mr. Falwell watched him have sex with his wife and participated in their affair. Granda's lies were first reported in the *Reuters*

20

article two days before the speech and instantly garnered national press attention.   Upon information and belief, every or virtually every Liberty student and faculty member present for the speech was aware of Granda's lies and understood that they were "the things that led to Jerry Falwell's resignation yesterday," as Nasser put it.   Upon information and belief, that is exactly what Liberty intended to convey and intended for listeners to understand and what the audience in fact understood.   By saying, "[y]our concerns, if you're concerned, are valid," referring to the subject matter of Granda's lies as "sinful behavior" and a "sin," and as something "shameful" the "disobedient do in secret," Liberty unequivocally told its audience and the world that Mr. Falwell had done what Granda had falsely said he did, in other words, that Granda's lies were "valid."

80.     The Defamatory Speech was the subject of much media attention and was attended by members of the national press, as Liberty was no doubt aware it would be.

81.     Liberty published a video of the Defamatory Speech online to its website, and it remains online as of the time of this filing.

82.     On information and belief, Nasser was authorized to speak on behalf of Liberty at the Community Service event.   In fact, Nasser did so in the course and scope of his employment and in furtherance of Liberty's interests, and was acting as Liberty's agent in his role as Senior Vice President.   Furthermore, the Community Service event was an official Liberty University event where thousands of Liberty students were in attendance, alongside Liberty's faculty and leadership, including its acting President and Chairman Jerry Prevo.

83.     On August 31, 2020, Liberty University issued a press release affirming its prior condemnation of Mr. Falwell.   In the statement, Liberty accused Mr. Falwell of a "lack of spiritual stewardship" and suggested that he had not "demonstrate[d] a full commitment to the spiritual mission of Liberty University by words, actions, and example."   Liberty clearly

21

connected its accusation of a lack of spiritual leadership with Granda's false allegations by noting that "all the signs were not there until the start of last week," *i.e.,* when Granda's false allegations were publicized, and that while Liberty "still didn't' know the full scope of the matter, [it] had learned enough . . . ." This statement was posted online, and it remains online as of the time of this filing. These statements together are referred to as the "Defamatory Press Release."

84.   The Defamatory Press Release is false and defamatory because, as with the Defamatory Speech, it suggests that Mr. Falwell's presidency came to an end because of Granda's lies and that, by claiming Mr. Fallwell "lack[ed] spiritual stewardship" and conducted himself inconsistently with the "spiritual mission" of Liberty, said lies were truthful.

85.   Liberty has also defamed Mr. Falwell in the pages of its own publication, providing statements that it knew would be disseminated by a media biased against Mr. Falwell. For example, a number of articles in the September 24, 2020 issue of the *Liberty Journal*, an official magazine published by the University and distributed nationally to media outlets and alumni, further accused Mr. Falwell of inappropriate behavior.   Specifically, one article republished Liberty's August 31, 2020 accusation in the Defamatory Press Release of a "lack of spiritual stewardship" from Mr. Falwell.   Another article said that "[r]ecent events involving Liberty's fourth president, Jerry Falwell, Jr., have broken trust for most in Liberty University, and some question Liberty's commitment to its nearly 50-year mission of *Training Champions for Christ*." These statements together are referred to as the "Defamatory Journal Articles."

86.   Liberty published this issue of the *Liberty Journal* online, and it remains online as of the time of the filing of this Complaint.   The *Liberty Journal* is also distributed publicly by mail, nationwide.

22

87.     The Defamatory Journal Articles are false and defamatory because, as with the Defamatory Speech and Defamatory Press Release, they suggest that Mr. Falwell's presidency came to an end because of Granda's lies, including by asserting the lies are true by claiming Mr. Falwell "lack[ed] spiritual stewardship" and that he had "broken trust for most in Liberty University."

88.     The Defamatory Speech, Defamatory Press Release, and Defamatory Journal Articles are herein referred to as the "Defamatory Statements."

89.     In tandem with their attempts to savage Mr. Falwell's reputation, Liberty has engaged in a campaign to erase history and blot out the Falwell family's legacy at Liberty. Liberty has prohibited Mr. Falwell from speaking to its staff; prohibited faculty from speaking to Mr. Falwell; and banned Mr. Falwell from visiting campus, despite the fact that both of Mr. Falwell's parents are interred on Liberty's grounds. The University has even gone so far as to take down photos of Mr. Falwell, including a portrait of a young Mr. Falwell standing with his father, Dr. Falwell, on the sidelines of Liberty University's first football game in 1973.

90.     Again, prior to making the Defamatory Statements and taking these actions, on information and belief, Liberty was aware of Mr. Falwell's August 23, 2020 statement in the Washington Examiner and categorical denial in the *Reuters* article. Indeed, at the time of the Defamatory Statements, Liberty was even aware of the fact that Mr. Falwell was receiving therapy for stress-induced depression, which Mr. Falwell incurred in part because of the anxiety Granda's attempted extortion was causing. Yet, not one member of the Board or the Executive Committee asked Mr. Falwell about the veracity of Granda's allegations, and on information and belief, Liberty never undertook its own investigation.

23

91.     In fact, for Liberty the issue has never actually been about whether Mr. Falwell did anything wrong.  On information and belief, Liberty forced Mr. Falwell's resignation and issued these statements because certain high-ranking individuals (for reasons known only to themselves now but are to become known broadly during this litigation) wanted him replaced as President and Chancellor of Liberty University.  Upon information and belief, Liberty engaged in this defamatory campaign to seal the deal and ensure the permanent termination of Mr. Falwell's relationship with the school his father founded.

92.     Yet, as recently as October 23, 2020, Liberty's acting President and Chairman, Jerry Prevo, noted that "in the time I have been here I have not seen any wrong-doing on [Mr. Falwell's part]."  Nevertheless, despite acknowledging that there had not been any wrongdoing, Liberty apparently stands by its Defamatory Statements against Mr. Falwell as each remains publicly available on Liberty's website, and Liberty has never apologized or retracted the Defamatory Statements.

## G.     Harm to Mr. Falwell As a Result of Liberty's Defamation

93.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell's reputation, profession, and future employment prospects and business opportunities have been harmed.

94.     Upon information and belief, there is widespread knowledge of the Defamatory Statements within the Liberty University community, the evangelical community, the real estate industry, the academic field, the political world, and media outlets.

95.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell has a drastically reduced ability to attach his name to, or be otherwise publicly involved in, business

24

and charity organizations and events without a real and justifiable fear that his damaged reputation will erode the reputation of such organizations.

96.     For instance, prior to Liberty's statements, Mr. Falwell received a number of invitations to appear on television or at public events to discuss, among other things, Liberty, evangelicalism, and politics.   Indeed, Mr. Falwell has considered becoming a recurring contributor on news outlets.  Since Liberty's Defamatory Statements, Mr. Falwell has received no such invitations and has lost any prospect of becoming a contributor.

97.     As a direct and proximate result of Liberty's Defamatory Statements, Mr. Falwell has a drastically reduced ability to attend industry-related academic, political, or real-estate conferences, and to seek business and professional opportunities in those fields, without a real and justifiable fear that any new business contacts he develops will have knowledge of the Defamatory Statements and associate his damaged reputation with any companies he establishes, manages, and/or owns.  In the past, Mr. Falwell has attended a number of such conferences per year.

98.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell has a drastically reduced ability to attend community social events, such as events at his relatives' school and with his neighborhood association, without a real and justifiable fear that any people he meets will have knowledge of the Defamatory Statements and associate him with such statements.

99.     Both the Defamatory Statements and the attendant fear that others will associate Mr. Falwell's businesses, charities, family, and friends with his damaged reputation have caused Mr. Falwell significant anguish and humiliation.

LUADMINREC000136

100.     That Mr. Falwell now rarely speaks or appears publicly on behalf of the businesses and charity organizations he supports—a form of support that Mr. Falwell formerly enjoyed—has also caused Mr. Falwell significant anguish. In addition, the Defamatory Statements have caused Mr. Falwell immense anguish as he now is deeply concerned that third parties will hold horribly false impressions of him.

101.     As a direct and proximate result of Liberty's statements, Mr. Falwell has also become the subject of much ire and hatred over the "sin" Liberty claimed he committed in its Defamatory Statements. Upon information and belief, members of the public have written numerous hateful messages on social media in reliance on Liberty's Defamatory Statements.

## COUNT ONE: DEFAMATION

102.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 101 with the same force and effect as if fully stated herein.

103.     Liberty made and published the Defamatory Statements, which are statements of fact of and concerning Mr. Falwell. These statements are false and exposed Mr. Falwell to contempt, ridicule, hatred, and obloquy.

104.     The Defamatory Statements are also defamatory *per se* because they impute to Mr. Falwell unfitness to perform the duties of an office or employment and prejudice him in his profession or trade.

105.     Liberty made and published the Defamatory Statements knowing that such statements would be disseminated throughout the world.

106.     Liberty made and published the Defamatory Statements without any applicable privilege.

26

LUADMINREC000137

107.     Liberty made and published the Defamatory Statements with knowledge that they were false and/or with reckless disregard for the truth or falsity of the statements, or with at least negligent disregard for the truth or falsity of the statements.

108.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell has suffered damage to his reputation, damage to his profession, humiliation, and anguish, lost business opportunities, and suffered other pecuniary damage.

## COUNT TWO:  BREACH OF CONTRACT

109.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 108 with the same force and effect as if fully stated herein.

110.     On July 1, 2019, Mr. Falwell and Liberty University executed the Employment Agreement.

111.     Pursuant to Section 3.7 of the Employment Agreement, Liberty University was barred from "mak[ing] defamatory or slanderous remarks about [Mr. Falwell] in public fora and settings."

112.     Liberty breached the foregoing provision by making and publishing the Defamatory Statements.

113.     Furthermore, pursuant to Section 3.7 of the Employment Agreement, Liberty University was permitted to discuss the reasons for the conclusion of Mr. Falwell's employment only if Mr. Falwell was terminated for cause.

114.     Liberty breached the foregoing provision because Mr. Falwell was not terminated for cause and therefore Liberty was not allowed to discuss the circumstances surrounding the conclusion of Mr. Falwell's employment as it did by making and publishing the Defamatory Statements.

27

115.   The terms of Section 3.7 survive termination of the Employment Agreement.

116.   As a direct and proximate result of Liberty's breach of contract, Mr. Falwell has suffered damage to his reputation, damage to his profession, humiliation, and anguish; lost business opportunities; and suffered other pecuniary damage.

## PRAYER FOR RELIEF

117.   WHEREFORE, for the reasons set forth herein, Plaintiff Jerry Falwell, Jr. respectfully requests this Honorable Court:

a)   Enter judgment in Mr. Falwell's favor;

b)   Award Mr. Falwell damages for Liberty's acts in defaming him and breaching the Employment Agreement;

c)   Award Mr. Falwell punitive damages;

d)   Award Mr. Falwell pre-judgment interest;

e)   Award Mr. Falwell his attorney's fees and costs incurred in prosecuting this action pursuant to Section 10 of the Employment Agreement;

f)   Enjoin Liberty University from repeating the Defamatory Statements regarding Mr. Falwell; and

g)   Provide any other relief this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Jerry Falwell, Jr. hereby demands a trial by jury.

LUADMINREC000139

Respectfully submitted,

GBSR ATTORNEYS, LLP

James I. Gilbert, IV (VSB #38229)
Timothy S. Bird (VSB # 38139)
Jordan K. Sharpes (VSB #79394)
13595 Booker T. Washington Highway
Moneta, VA 24121
phone - 540-721-5110
fax- 540-721-5112
jgilbert@gbsrattorneys.com
tsbird@gbsrattorneys.com
jsharpes@gbsrattorneys.com

Dated: October 28, 2020
Lynchburg, VA

**QUINN·EMANUEL URQUHART & SULLIVAN LLP**

Robert L. Raskopf
   (pro hac vice application pending)
Julia M. Beskin
   (pro hac vice application pending)
robertraskopf@quinnemanuel.com
juliabeskin@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000 (tel.)
(212) 849-7100 (fax)

*Attorneys for Plaintiff Jerry Falwell, Jr.*

29

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.,            )
                                     )
    *Plaintiff*,                       )
                                     )
v.                                   )     Case No. CL21000354-00
                                     )
JERRY L. FALWELL, JR.,               )
                                     )
    *Defendant*.                       )

## **DEFENDANT'S DEMURRER TO COMPLAINT**

Defendant, Jerry L. Falwell, Jr. ("**Falwell**" or "**Defendant**"), by counsel, pursuant to Virginia Code § 8.01-273, states the following as his Demurrer to the Complaint filed against him herein by Plaintiff, Liberty University, Inc. ("**Liberty**" or "**Plaintiff**").

## **LEGAL STANDARD**

"The standard of review applicable to the circuit court's decision to sustain a demurrer is well established. 'A demurrer accepts as true all facts properly pled, as well as reasonable inferences from those facts.'" *Friends of the Rappahannock, et al. v. Caroline Co. Bd. of Supervisors, et al.*, 286 Va. 38, 44 (2013) (quoting *Steward v. Holland Family Props., LLC*, 284 Va. 282, 286 (2012)). "To survive a challenge by demurrer, a pleading must be made with 'sufficient definiteness to enable the court to find the existence of a legal basis for its judgment.'" *Id.* (quoting *Eagle Harbor, L.L.C. v. Isle of Wight County*, 271 Va. 603, 611, (2006) (internal quotation marks omitted)). While a demurrer admits the truth of all properly pled facts, it "does not admit the correctness of the pleader's conclusions of law." *Ward's Equip., Inc. v. New Holland North America, Inc.*, 254 Va. 379, 382 (1997). Therefore, "the purpose of a demurrer is to determine whether a motion for judgment states a cause of action upon which relief may be

granted." *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 557 (2011) (quoting *Abi–Najm v. Concord Condominium, LLC*, 280 Va. 350, 356–57, (2010) (citations and internal quotation marks omitted).

## INTRODUCTION

Over the course of Liberty's Complaint, Liberty goes to great lengths to defame and diminish Falwell's reputation with allegations that have nothing whatsoever to do with its claims. It appears that Liberty's motivation in filing the Complaint was to air inflammatory and embarassing allegations about Falwell (or, more accurately, his wife) instead of actually trying to state a cause of action. While the narrative is repetitive, what is more concerning is, even treating all the allegations as true, as required by a demurrer, most of the averments are completely irrelevant to Liberty's attempted claims of breach of contract, breach of fiduciary duty, and statutory conspiracy.

Liberty states that, "[m]any of the facts supporting Liberty's latter two claims are helpfully spelled out in two writings." *Compl.* ¶ 4. Those documents are attached as exhibits. Those two writings only address the actions of Falwell's wife, and not the actions of Falwell in connection with his role as President of Liberty. As another example, in an effort to embarrass Falwell and his family, Liberty includes nine pictures in the Complaint's text, with inaccurate or misleading descriptions. The pictures and false descriptions have nothing whatsoever to do with the claims Liberty asserts.

Since Liberty's founding in 1971, Liberty and the Falwell name have been synonymous, and continue to be. Since May 15, 2007, upon the Rev. Jerry Falwell's ("**Rev. Falwell**") untimely passing, and until August 25, 2020, Falwell served as President and Chancellor of Liberty. During that 13-year period, Liberty experienced tremendous growth in both enrollment numbers and

LUADMINREC000142

financial independence through the growth in Liberty's endowment and assets. *See* Compl., Exhibit 2 (¶¶ 24-32 identifying a snippet of Falwell's contributions to Liberty). This growth began in 2007 and continued through Falwell's resignation in 2020.

In recognition of Falwell's impact on Liberty, Liberty attempts to assert three claims against Falwell: Breach of Contract, Breach of Fiduciary Duty, and Statutory Conspiracy. In support of its three claims, Liberty presents a novella complete with titles and pictures detailing the salacious personal details of an affair Rebecca Falwell ("**Becki**") had with Giancarlo Granda ("**Granda**") and the extortion attempts on Becki and Falwell. The rehashing of these events and protected defamation of Falwell through litigation serves one mission – ruining Falwell's reputation through mischaracterization of events and public shaming through out-of-context pictures filed in a public complaint.

The Complaint publicizes the personal story surrounding Granda, Becki, and Falwell. It also adds made up "facts" around pictures included in the Complaint, while detailing the "Liberty Way."  Yet, through Liberty's alleged indignation that Falwell's averred actions are bad and Liberty is good, the Complaint does not address Falwell's actions as the leader of Liberty – instead, Liberty focuses on his wife's personal life, when the two are separate and distinct.

Ultimately, Liberty's Complaint fails to state a claim against Falwell for Breach of Contract, Breach of Fiduciary Duty, or Statutory Conspiracy. Instead of providing facts to support its claims, Liberty purposefully includes out-of-context pictures and irrelevant and salacious false allegations to disparage Falwell. Its claims that Falwell breached his fiduciary duty to Liberty and conspired to injure Liberty appear to be an afterthought or excuse to file the sensational allegations about Falwell. Liberty does not plead sufficient facts to support the claims it pretends to try to

3

allege. Because statements made in a complaint are privileged, Liberty appears to have filed this with the purpose of defaming Falwell rather than to truly state claims.

## ARGUMENT

### I.      Liberty Fails to State a Claim in Count One.

The crux of Liberty's Count One is a breach of contract claim. In order to maintain a claim for breach of contract, a plaintiff must establish: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of the obligation." *Navar, Inc. v. Federal Business Council*, 291 Va. 338, 344 (2016). In this matter, Liberty goes to great length to detail the personal accounts of Becki and Falwell, but Liberty fails to include the 2019 Employment Agreement.[1] A breach of contract claim, however, requires more than identifying the obligation.

Liberty claims Falwell breached his duty under Section 3.8 of the 2019 Employment Agreement by failing to return Liberty's property. *See* Compl. ¶¶ 116, 123. Section 3.8 of the 2019 Employment Agreement provides "[a]ny Confidential Information *in tangible form* shall be immediately returned to LU upon request" (emphasis added). Here, Liberty avers that "Falwell, Jr. went to great lengths to avoid storing his communications and other business data on Liberty's system." Compl. ¶ 118. Liberty also alleges that Falwell has failed to return "many key documents relating [to] Liberty's business, including Confidential Information, is stored on devices provided by the University, or in third party systems." Compl. ¶ 119. "[C]omputer data . . . [is] not 'tangible' property in the common sense understanding of the word. The plain and ordinary meaning of the term 'tangible' is property that can be touched. Computer data . . . [is] incapable of perception by any of the senses and [is] therefore intangible." *America Online, Inc. v. St. Paul Mercury Ins. Co.*,

---

[1]      A Motion Craving Oyer is being filed with this Demurrer, and Falwell asks that the Employment Agreement be considered as part of this Demurrer.

LUADMINREC000144

207 F. Supp. 2d 459, 462 (E.D.Va. 2002). Additionally, Liberty attempts to alternatively plead conversion within Count One. "In general, a cause of action for conversion applies only to tangible property." *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994). As stated herein, the property consisting of "computer data" is not tangible property. Therefore, Liberty fails to state a claim for breach of contract or conversion for any and all Confidential Data that "is stored on devices" because that data is not tangible.

For the entire claim, Liberty fails to state the injury or damage Falwell caused by the purported breach. Liberty simply sets forth the conclusory claim of $250,000.00 in purported damages.[2] Compl. ¶ 128. "[A]n *essential* element in a breach of contract action is that the defendant's breach of a contractual obligation caused injury or damage to the plaintiff." *Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 323 (2015) (emphasis added). "Accordingly, the plaintiff must allege facts setting forth injury or damage incurred as a result of defendant's breach." *Id*; citing *Squire v. Virginia Housing Development Authority*, 287 Va. 507, 518 (2014). Here, Liberty fails to set forth facts establishing that the alleged retention of Liberty's Confidential Information has damaged or injured Liberty. All the Complaint provides is that Falwell refused to use his assigned liberty.edu email address, avoided storing communications and data on Liberty's system, worked independently on Liberty deals, and had a duty to return Liberty's property. Compl. ¶¶ 117-124. These facts do not provide the requisite factual support to show Liberty's purported damage or injury.

Therefore, because Liberty fails to show a breach of returning intangible property and fails to show the injury or damage the purported breach caused, and because intangible property is not subject to a conversion claim, this Court must dismiss Count I of the Complaint with prejudice.

---

[2] "As a general rule, damages for breach of contracts are limited to the pecuniary loss sustained." *Wright v. Everett*, 197 Va. 608, 615 (1956).

5

## II.     Liberty Fails to State a Claim Against Falwell for Breach of Fiduciary Duty.

In order to state a claim for breach of fiduciary duty under Virginia law, Liberty must allege "(1) a fiduciary duty, (2) breach, and (3) damages resulting from the breach." *Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F.Supp.2d 400, 424 (E.D. Va. 2011). Here, Liberty alleges Falwell "had a fiduciary duty to provide material information to the Board, refrain from acts harmful to the interests of Liberty, avoid conflicts of interest, and reject opportunities to benefit his personal interests to the detriment of Liberty." Compl. ¶ 130. Yet, regardless of the allegations, Liberty remains unable to show how Falwell himself, under the facts alleged, breached any of his alleged fiduciary duties to Liberty and, moreover, how Liberty was damaged beyond the conclusory allegations of Liberty's reputation being damaged, among others. Compl. ¶ 136.

Here, the best Liberty can allege is that Becki engaged in an affair with Granda that Falwell learned about. Compl. ¶ 8. The remaining allegations state embarrassing allegations that have no bearing on Liberty or its claims in this lawsuit. At most, the affair is ultimately a personal issue between Granda and Becki, to which Falwell, as Becki's husband, learned about. To the extent Liberty seeks to utilize this "Granda Plan" into a breach of fiduciary duty, it is unable.

In Virginia, while the Code does not abrogate the common law duties of loyalty and care of a director, the Code does set the standard by which a director is to discharge those duties. *Williard ex rel. Moneta Bldg. Supply, Inc. v. Moneta Bldg. Supply, Inc.*, 258 Va. 140, 151 (1999); *see also* Va. Code § 13.1-870 (General standards of conduct for directors). Here, Liberty claims Falwell had a fiduciary duty to provide material information to the Board, refrain from acts harmful to the interests of Liberty, avoid conflicts of interest, and reject opportunities to benefit his personal interests to the detriment of Liberty. Compl. ¶ 130.

6

The duties Liberty claims are similar to a lawsuit involving comedian Kevin Hart ("**Hart**"). There, Hart posted a video on social media apologizing to his wife and kids for an affair that was the subject of a private extortion attempt at the same time he, and more specifically, a company of which he was a director, was promoting a mobile video game. *See Stand Up Digital, Inc. v. Hart*, No. 1:18-cv-919, 2019 WL 6257734, *3 (E.D.Va. Nov. 22, 2019).

In. *Hart*, the plaintiff makes "the general proposition that a director has a duty to 'tell his principal about anything which might affect the principal's decision whether or how to act.'" *Stand Up Digital, Inc. v. Hart*, 2019 WL 6257734, *3 (E.D.Va. Nov. 22, 2019) (quoting *Allen Realty Corp v. Holbert*, 227 Va. 441, 446 (1984)); *Cf.* Compl. ¶ 130. The plaintiff in *Hart* also argues "these duties forbid the director from 'placing himself in a position where his individual interest clashes with his duty to his corporation.'" *Id.* (quoting *Rowland v. Kable*, 174 Va. 343, 366 (1940)). The Court in *Hart*, however, ruled that the plaintiff's argument over-extends the *Holbert* and *Rowland* cases cited. "*Rowland* and *Holbert* involved classic cases of self-dealing, where a director stood to gain personally or financially in direct conflict with the interests of the corporation." *Id.* As the Court states, "[v]ery significantly, these cases [*Rowland* and *Holbert*] involved decisions made by a director or fiduciary that involved the corporation's business interests on the one hand, and the director's interests on the other." *Id.* Here, the factual scenario is similar to Hart with one distinct difference; Hart committed the affair and Falwell did not. Regardless, just as Hart went public, Becki and Falwell's "decision to go public regarding the extortion attempt was [] not one where [they] stood to gain personally or financially to the direct detriment of [Liberty]. *Id.* Consequently, just as the Court ruled in favor of Hart's motion, the Court should grant the Demurrer and dismiss Liberty's Complaint.

7

In addition to Liberty's failure to state of claim for breach of fiduciary duty, Falwell is protected from liability when "business decisions [are] made 'in accordance with his good faith judgment of the best interests of the corporation.'" *Lake Monticello Owners' Ass'n v. Lake*, 250 Va. 565, 571 (1995) (quoting Virginia Code § 13.1-870(A)). "Courts are reticent to review directors' decisions made in accordance with the law and its corporate powers." *Bennett v. Loudoun Valley Home Owners Ass'n*, 73 Va. Cir. 466, 2007 WL 6013706, *3 (July 30, 2007 Loudoun Co. Cir. Ct.). Here, the crux of Liberty's claim involves Falwell's treatment of a private matter and publicizing the details of Becki's affair and the subsequent extortive attempts. Falwell's duties to Liberty do not prohibit Falwell from derailing, in any legal manner, Granda's plan.

Overall, Falwell breached no fiduciary duty to Liberty, as a matter of law, by handling Falwell's private matters that only indirectly clashed with Liberty's interest, including negotiating the 2019 Employment Agreement. Notably, in every negotiation of an employment agreement, the interests of the employee (even a President/CEO), are inherently adverse to the interests of the employer. *See Official Committee of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins*, No. Civ.A. 20228-NC, 2004 WL 1949290, *16 (Del. Ct. of Chancery Aug. 24, 2004) ("Employees negotiating employment agreements with their employers have the right to seek an agreement containing the best terms possible for themselves"). In fact, the 2019 Employment Agreement was not an employment agreement sought because of Falwell's private matters, but was an employment agreement in the due course, as the 2012 Employment Agreement "provided for a seven-year compensation schedule with annual raises." Compl. ¶ 67.

As described above, Falwell owed no duty to tell Liberty of private matters involving Becki. Furthermore, the actions and duties Liberty claims are unsupported and do not rise to a cognizable claim. In sum, Liberty can point to no breach that implicates a duty Falwell owed to

8

Liberty. Falwell, as President, Chancellor, and member of the Board of Trustees, acted in furtherance of Liberty's mission to become the pre-eminent evangelical college in the world and fulfilled his duties of care and loyalty to Liberty, its faculty and staff, and its students. Consequently, Count II must be dismissed with prejudice.

## III.   Liberty Fails to State a Claim Against Falwell for Statutory Conspiracy.

Liberty fails to state a plausible claim for statutory business conspiracy under Virginia Code § 18.2-499. Virginia Code § 18.2-499 provides: "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act." More succinctly, in order to state a claim, "a plaintiff must establish: '(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business; and (2) resulting damage to plaintiff.'" *Dunlap v. Cottman Transmissions*, 287 Va. 207, 214 (2014) (citing *Allen Realty Corp. v. Holbert*, 227 Va. 441, 449, (1984)).

More importantly, however, is that for a plaintiff to survive a demurrer, the conduct must be directly aimed toward damaging Liberty and "an allegation of conspiracy, whether criminal or civil, must at least allege an unlawful act or an unlawful purpose." *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 402 (1985). This is because "there can be no civil conspiracy to do an act that the law allows . . . an allegation of conspiracy . . . must at least allege an unlawful act or an unlawful purpose [to survive dismissal] . . . .  In other words, actions for common law civil conspiracy and statutory business conspiracy lie only if a plaintiff sustains damages as a result of an act that is itself wrongful or tortious." *Dunlap*, 287 Va. at 215 (internal citations omitted).

9

The alleged "conspiracy" alone is not enough to state a cause of action. *Id.* Instead, conspiracy claims serve to impose vicarious liability on the conspirators for the underlying tort. *Id.*

When pleading business conspiracy, a plaintiff must allege "concerted action, legal malice, and causally related injury . . . set[ting] forth core facts to support the claim." *Kayes v. Keyser*, 72 Va. Cir. 549, 552 (Charlottesville Cir. Ct., 2007) (quoting *Atlantic Fulton v. Tempur-Pedic, Inc.*, 67 Va. Cir. 269, 271 (Charlottesville Cir. Ct., 2005). Moreover, "it is not enough for [a] plaintiff merely to track the language of the conspiracy statute without alleging the fact that the alleged co-conspirators did, in fact, agree to do something the statute forbids." *Id.*

Here, Liberty is unable to show how Falwell combined with any other person or persons to ***willfully*** injure Liberty (emphasis added). Instead, the Complaint shows how Granda's actions were done to harm Falwell. Compl. ¶ 32, 34-38. Granda's plan was to damage Falwell and Liberty. Compl. ¶ 37. Falwell was leading Liberty through meteoric growth, not acting with Granda to willfully injure Liberty. *See* Compl., Exhibit 2 (¶¶ 24-32). Additionally, the harmful act, as Liberty describes, is an affair Becki had with Granda and the attempt to conceal the allegations and extortive acts from Liberty. Compl. ¶ 142. The problem with the facts alleged is the purported acts are apparently alleged to be for Granda's, Becki's, or Falwell's personal benefit, not to harm Liberty. When evaluating the injury to one's business, "[t]he injury must ***not*** be a result or secondary effect of an action taken for mere personal gain." *Nationwide Mut. Fire Ins. Co. v. Jones*, 577 F.Supp. 968, 970 (W.D.Va. 1984) (emphasis added).[3] The statutory conspiracy statutes "are inapplicable to one isolated incident in which a combination of persons defraud a company for their own personal enrichment." *Id.* at 970-71.

---

[3]    The Court in *Nationwide* illustrated direct injury to business interests as: "(1) interfering in business activity such as boycotts and pickets; (2) injuring a company's tradename and good will; (3) stealing customer lists and trade secrets."

LUADMINREC000150

Again, Liberty fails to even try to allege how the alleged conspiracy among Falwell, Granda, and Becki was entered into for the purposes of harming Liberty's business interest. Any damage to personal reputation or interest in employment is excluded from the statute's purview. *See Andrews v. Ring*, 266 Va. 311, 319 (2003); *see also Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d. 246, 267 (W.D.Va. 2001) (stating the Fourth Circuit and the district courts employ broad language with regard to the exclusion of employment interests from the scope of Section 18.2-499). In attempting to establish harm to Liberty's business interests, Liberty simply, and in a conclusory manner, says: "[t]he actions of Falwell Jr. and Granda have injured Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the 2019 Employment Agreement that proved detrimental to Liberty's interests, and damaged Liberty's reputation." Compl. ¶ 147. Nowhere in Liberty's Complaint does Liberty allege the critical element that Falwell, Granda, and Becki were purposefully combining to willfully and maliciously injure Liberty and its business interest. Instead, Liberty utilizes Falwell's October 28, 2020 complaint against Liberty, which describes the contributions Falwell made to Liberty in solidifying Liberty as one of not only the top Christian colleges and universities, but one of the country's top colleges and universities.

Liberty tries to utilize Falwell's 2019 Employment Agreement as a fact establishing Falwell furthered the conspiracy by negotiating the 2019 Employment Agreement, and had Liberty known about the extortion attempt, they would have refrained from entering the 2019 Employment Agreement. Compl. ¶¶ 145-46. "Va. Code § 18.2-499 does not mention employment as a protected activity. The section is aimed at conduct which injures a 'business.'" *Campbell v. Board of Sup'rs of Charlotte County*, 553 F.Supp. 644, 645 (E.D.Va. 1982); *see also Ward v. Connor*, 495 F. Supp. 434, 439 (E.D.Va. 1980), rev'd on other grounds, (describing lost profits as an explanation of what

11

business-related damages may be recovered). Falwell's negotiation of an employment agreement and the compensation associated therewith is an employment interest and not a business interest. Beyond pontificating the impact of Falwell's 2019 Employment Agreement, Liberty alleges, in a conclusory fashion, their business interests were harmed through enrollment, its donor base impacted, the faculty disrupted, and Liberty's reputation was damaged. Yet, there are no actual allegations to show the extent of the injury, such as a decrease in enrollment, decrease and correlation in donations, or how Liberty's reputation was damaged.

Therefore, instead of setting forth facts showing two or more people combined, with legal malice, to directly harm Liberty's business interests, it ultimately appears Liberty's "Granda Plan" is solely to continue its efforts of discrediting and publicly humiliating Falwell because of his wife's affair. As a result, this Court must dismiss Count III with prejudice.

## CONCLUSION

WHEREFORE, Defendant, Jerry L. Falwell, Jr., by counsel respectfully requests that this Court sustain its Demurrer to the Complaint; dismiss Counts I, II and III of the Complaint with prejudice; and order such other relief as the Court deems necessary and appropriate.

LUADMINREC000152

Dated:  June 1, 2021

JERRY L. FALWELL, JR.

_____
Counsel

Vernon E. Inge, Jr. (Va. Bar No. 32699)
Robert N. Drewry (Va. Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:     804.977.3301 / 804.977.3304
Facsimile:     804.977.3298 / 804.762.6865
E-Mail:        vinge@wtplaw.com
               rdrewry@wtplaw.com

*Counsel for Defendant, Jerry L. Falwell, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of June, 2021, a true and correct copy of the foregoing ***Defendant's Demurrer to Complaint*** was served *via* e-mail transmission and first-class, postage-prepaid, U.S. Mail upon the following:

Scott C. Oostdyk, Esq.
Andrew F. Gann, Jr., Esq.
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
E-Mail:        soostdyk@mcguirewoods.com
               agann@mcguirewoods.com

— *and* —

R. Craig Wood, Esq.
MCGUIREWOODS LLP
Post Office Box 1288
Charlottesville, Virginia 22902-1288
E-Mail:        cwood@mcguirewoods.com

*Counsel for Plaintiff, Liberty University, Inc.*

_____
Vernon E. Inge, Jr.

13

LUADMINREC000153

VIRGINIA:

## IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.

                    Plaintiff,

v.

JERRY L. FALWELL, JR.,

                    Defendant.

Case No. CL21000354-00



FILED IN THE CLERK'S OFFICE OF THE CIRCUIT COURT OF THE CITY OF LYNCHBURG

JUL 16 2021    TIME 3:09 p.M.

TESTE: TODD SWISHER, CLERK

BY: _____ Dep. Clerk

### LIBERTY UNIVERSITY, INC.'S OPPOSITION TO DEMURRER

    Plaintiff Liberty University, Inc. ("Liberty"), by counsel, states as follows for its Opposition[1] to the demurrer ("Demurrer") of Defendant Jerry L. Falwell, Jr. ("Falwell Jr."). [2]

### INTRODUCTION

    Falwell Jr. approaches his Demurrer as he approached his Presidency—by disregarding some established legal standards. He presents an "Introduction" that attempts to attack the veracity of Liberty's pleaded facts and tries to interject an affirmative narrative that he wants this Court to comprehend and embrace. On demurrer, a defendant is disallowed from introducing new facts or attempting to undermine the veracity of the facts pled by the plaintiff. *Hale v. Town of Warrenton*, 293 Va. 366, 368 (2017) (a trial court must merely "consider as true all the material facts pled in the complaint, all facts impliedly alleged, and all reasonable inferences that may be drawn from

---

[1] By agreement of the parties, Liberty is submitting this brief in opposition by June 16, 2021, 14 days before the July 30, 2021 demurrer hearing before this Court, to which Falwell Jr. is free to reply by July 23, 2021.
[2] Liberty does not oppose Defendant's Motion Craving Oyer. As it is Defendant's Motion, Defendant will properly file the subject document.

1

such facts."). The tightly disciplined nature of a demurrer is why the General Assembly admonished parties to challenge only "the grounds on which the demurrant concludes that the pleading is insufficient at law." Va. Code §8.01 – 273(A). It is axiomatic that "[a] demurrer tests the *legal* sufficiency of the facts, not the strength of proof." *Coutlakis v. CSX Transportation Inc.*, 293 Va. 212, 216 (2017) (emphasis added). It is thus black-letter law that a defendant may not try to use a factual narrative on demurrer to feed a trial court an independent version of the facts. *Anthony v. Verizon Virginia, Inc.*, 288 Va. 20, 36 (2014) ("[a]t the demurrer stage, we are obligated to accept the truthfulness of [plaintiff's] allegations and are not permitted to construct alternative factual scenarios to test the plaintiffs' allegations."). Accordingly, The Supreme Court of Virginia compels trial courts to refrain from invitations to "short-circuit[] litigation pretrial and decide the dispute without permitting the parties to reach a trial on the merits." *Assurance Data, Inc. v. Malyevac*, 286 Va. 137, 139 (2013) (internal quotations and citations omitted); *Hale*, 293 Va. at 369 (trial court erred in sustaining a demurrer despite "a disputed issue of fact").

With a blind eye to the dictates of Virginia procedure, Falwell Jr. spreads before this Court a set of self-conflicting gripes. For instance, in a sworn lawsuit lodged in this Court on October 28, 2020, and included by Liberty as Exhibit 2 to its Complaint, Falwell Jr. boasted that his personal reputation was conjoined with that of Liberty. Compl. at Ex. 2, ¶¶ 1–2; 11, 24–37, 54. He also insisted in that suit that a purported extortionist had simultaneously threatened "not only his wife" but also "the reputation of Liberty University." Compl. Ex. 2 ¶ 62; Ex A ¶ 4; *see also* Compl. Ex. 2 ¶¶ 30, 33-35, 37, 54, 56, 65. Rather than stick to prior-sworn facts, however, Falwell Jr. now insists the extortionist's attempt to shake down Liberty's President was a purely "private" Falwell-family matter, legally severable from any "bearing on Liberty." Demurrer at 2, 3, 6, 8. Such "about faces" not only doom a demurrer, but also damage credibility.

2

There are other important facial contradictions. At several junctures in his Demurrer, Falwell Jr. chides Liberty for purportedly *over-pleading* its suit, supposedly to advance his "public shaming." Demurrer at 2, 3, 6. Elsewhere, however, Falwell Jr. accuses Liberty of conspicuously *understating* supportive content to his detriment. Demurrer at 5, 12. Moreover, while Falwell Jr. conceded in a confessional *Washington Examiner* article that he was wholly at fault for poor choices in managing interactions with Miami interloper Giancarlo Granda (*see* Compl. Ex. 1, 2-3; Demurrer at 8), Falwell Jr. pivots markedly in his Demurrer. Now Falwell Jr. blames his wife Becki for his suppression of the "Granda Plan" (Compl. p. 13) while he served as Liberty President, Demurrer at 8, a weak attempt to dodge the fiduciary duty of disclosure that Liberty alleges Falwell Jr. owed to Liberty as a board member and officer. Finally, while Falwell Jr. gratuitously protests that Liberty salted its Complaint with numerous statements that would "disparage" him if Liberty was somehow unprotected by litigation privilege, Demurer at 3-4, Falwell Jr. identifies none.

The reason trial courts defer solely to plaintiff's factual allegations is the overriding purpose of pleading in Virginia. Pleadings exist to "inform a defendant of the nature and character of the claim." *Malyevac*, 286 Va. at 807, *citing CaterCorp Inc, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 24 (1993). To state a claim, a plaintiff need only prepare a complaint that "informs the opposite party of the true nature of the claim or defense…." Supreme Court of Virginia Rule 1:4(d); *CaterCorp*, 246 Va. at 22 ("[o]n demurrer, a court may examine not only the substantive allegations of the pleading attacked but also any accompanying exhibit mentioned in the pleading.") (internal quotations and citations omitted). It is not proper for the plaintiff at pleading stage to "descend into statements giving details of proof in order to withstand demurrer…." *Malyevac*, 286 Va. at 808. Moreover, even mixed questions of law and fact cannot be resolved through demurrer. *Welding, Inc. v. Bland County Service Authority*, 261 Va. 218, 228 (2001).

LUADMINREC000156

Falwell Jr. has blatantly ignored the rules controlling demurrers.  Even with the facts he improperly interjects, Falwell Jr. has failed to identify any deficiency in Liberty's pleadings.  The Demurrer should be dismissed.

## ARGUMENT

I.   **COUNT I OF THE COMPLAINT STATES A COGNIZABLE CLAIM FOR BREACH OF CONTRACT, OR IN THE ALTERNATIVE CONVERSION.**

To state a claim for breach of contract, Liberty merely had to allege facts tending to show: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 267 Va. 612, 619 (2004).  Liberty has done so.  To the extent this Court finds certain duties for Falwell Jr. to preserve Liberty's property arose by common law and not by contract, then Liberty has properly pled an alternative claim for conversion.  In either event, Falwell Jr. fails to sustain his Demurrer.

A.   **Liberty Pled Facts That State a Claim for Damages.**

Falwell Jr. contends "Liberty fails to state the injury or damage Falwell caused by the purported breach" for Count I.  Demurrer at 5.  This is false.  Liberty pled that Falwell Jr. failed to return Liberty's property, including computers and Confidential Information, depriving Liberty of the possession of such property in derogation of contractual responsibilities.  *See* Compl. ¶¶ 123–127.; *Perk v. Vector Res. Grp., Ltd.*, 253 Va. 310, 315 (1997).  Liberty specified that Falwell Jr's acts of wrongful dominion have damaged Liberty in excess of $250,000.  *Id.* ¶ 128.  This states a claim.  *Blue Stone Land Co., Inc. v. Neff*, 526 S.E.2d 517, 519 (Va. 2000) (breach of contract damages may be plead generally); *Foster v. Wintergreen Real Estate Co*, No. CL09000086, 2010 WL 11020447, at *6 (Va. Cir. Ct. 2010) (demurrer overruled because "[t]he issue of damages is a

4

factual issue that must be developed through discovery and the presentation of evidence at trial.").[3]

Falwell Jr. cites to *Ramos v. Wells Fargo Bank, NA*, and *Squire v. Virginia Housing Dev. Auth.*

Demurrer at 5. Neither case is controlling. In *Ramos*, the plaintiff "fail[ed] to set forth a single

factual allegation of any injury or damage" and omitted an *ad damnum* clause. 289 Va. 321, 323

(2015). In *Squire*, the plaintiff alleged monetary damages and a negative impact to her credit

reports. 287 Va. 507, 518 (2014). This general allegation of loss was sufficient at pleading stage.

### B.     Liberty Pled Facts That State a Claim for the Other Elements of Breach

Liberty has alleged that during the performance of his tripartite roles as Liberty's

employee, board member, and officer—each post the product of contractual obligations to Liberty-

-Falwell Jr. took possession of computers and technological equipment belonging to and provided

to him by Liberty. Compl. ¶¶ 117–119. Liberty has alleged that Falwell Jr. accessed an internet

service provider contracted by Liberty and used this service under contract with Liberty to transmit

or receive content that Falwell Jr. created as Liberty's President. *Id.* ¶ 118. Liberty alleges that

part of his contractual obligations to Liberty was to return "property" belonging to the university

when he departed. *Id.* ¶ 121. Falwell Jr. thus readily concedes, as he must, that as a Liberty

employee he controlled confidential data and devices belonging to Liberty. Demurrer at 5; Compl.

Ex. 1 at 54, 55. He did so, of course, pursuant to his contract to serve as Liberty's Chancellor and

President, and to policies and provisions incumbent on his service as a board member and officer

of Liberty. *Id.* ¶¶ 120–123. Liberty alleges that it owns its devices *and* data, both of which are

part of its property provided to Falwell Jr. *Id.* ¶¶ 118–121. Liberty thus alleges it is entitled to

---

[3] Liberty alleged damages of several types, in fact, and that is enough at this stage in the case. The precise value of Liberty's property that Falwell Jr. unlawfully retained is unknown given Falwell Jr. has refused to inventory and return it. Compl. ¶ 124. Liberty nevertheless pled an *ad damnum*, alleging that Falwell Jr., by harboring Liberty's property, has caused Liberty damages in excess of $250,000. *Id.* ¶128. Liberty indicated that it would have to revisit this dollar figure as "discovery progresses." *Id.*

LUADMINREC000158

control any content created, received, and maintained by its President on and through its devices, and on and through its internet service provider. *Id.* ¶ 119.   Falwell Jr. was the chief executive office of Liberty. *Id.* ¶ 120. As such, Liberty contends Falwell Jr. was not only tasked with abiding by Liberty's computer data and storage policies, but also administering the enforcement of these policies against other Liberty employees. *Id.* ¶ 119–123.

Liberty alleges four distinct but intersecting reasons rooted in contractual obligations why Liberty required Falwell Jr. to preserve and return its property: (1) because material that Falwell Jr. generated or received electronically while an officer of Liberty was Liberty's actual "property," and Falwell Jr. was contractually required by policy to return Liberty's property at his departure (*Id.* ¶¶ 120,121); (2) because material that Falwell Jr. generated or received through an internet service provider paid for by Liberty was under Liberty's actual contractual control, and this was Liberty's property, not that of Falwell Jr. (*Id.* ¶¶ 119-121, 123-125); (3) because information and documents that Falwell Jr. was required to retain by virtue of a formal "legal hold" in effect during Falwell Jr.'s tenure as a Liberty employee was under Liberty's legal control, and thus the affected materials were Liberty's property, not that of Falwell Jr. (*Id.* ¶ 122, 123-125) ; and (4) because Falwell Jr. was required to return "immediately" on demand material that fell within a narrower category of "Confidential Material," as defined in the President's employment agreement— material that was thus Liberty's property, and not that of Falwell Jr. (*Id.* ¶ 116, 117).

In its Complaint, Liberty alleged that Falwell Jr. breached all four of these duties by failing to return, after demand, Liberty's various types of stated property. *Id.* ¶¶ 119–124. A party that alleges the existence of contractual obligations states a contractual claim, even if that party must prove later the contractually mandated duties, practices, and provisions. *Fun v. Virginia Military Institute*, 245 Va. 249, 253 (1993).

LUADMINREC000159

Given all these allegations must be taken as true, Liberty has more than established a cognizable cause of action for breach of contract. This is so for *three* reasons. First, Liberty has alleged broadly Falwell's contractual duty to return Liberty's "property." Compl. ¶¶ 116, 120–123. Computer data sent or received by Falwell Jr. during his tenure as a Liberty officer using Liberty's devices and services was thus Liberty's *property*—plain and simple. *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 2011 WL 4625760, at *3–5 (E.D. Va. 2011). This suit is in its infancy, and because of Liberty's well-pleaded Complaint, Falwell Jr. is on clear notice of his duty to identify and return all of Liberty's property—of all types.

Falwell Jr.'s demurrer argument fails because Section 3.8 of the Agreement clearly provides "Confidential Information remains the property" of Liberty. Compl. ¶ 116. Up to his resignation, Falwell Jr. had "complete access to files, records, notes, emails, data" and "Confidential Information." *Id.* ¶ 119. He stored Liberty's Confidential Information on devices provided by Liberty, but he has failed to fully return this Confidential Information. *Id.* Regardless of whether this Confidential Information is considered tangible or intangible, such information, pursuant to Section 3.8 of the Agreement, is Liberty's property. Falwell Jr.'s failure to turn it all back to Liberty is a breach of the Agreement, plain and simple.

Second, while Falwell Jr. claims a carve out among Liberty's property for special treatment of "intangible" property, Demurrer at 4-5, he cannot establish that interpretation on demurrer, as it is actually an *affirmative defense*. Liberty has pleaded that upon cessation of his employment, Falwell Jr. "had a duty to return all of Liberty's property." *Comp*l. ¶ 123. Falwell Jr. concedes this pleaded allegation. Demurrer at 4. Falwell Jr. nevertheless claims that Section 3.8 of the 2019 Employment Agreement somehow trumps any other data ownership pronouncement because it specifies in a limiting fashion that "'[a]ny Confidential Information in tangible form [had to be]

LUADMINREC000160

*immediately* returned to LU upon request.'" Demurrer at 4 (emphasis added.)   Falwell Jr. affirmatively finds in that language of Section 3.8 license to keep beyond retirement any *intangible* property of Liberty because Section 3.8 did not include *intangible* material in the category of that which must be immediately returned.  Falwell Jr. thus asserts, as a matter of law, the fantastical interpretation that his Employment Agreement gave him co-ownership over  confidential computer data that is in intangible form up to the point of his departure as President—at which juncture Falwell Jr. became the *sole* residual owner of that data.

By taking this preposterous position, Falwell Jr. does not stand on a grant of authority from the contract, but rather on the fact the contract created different temporal treatment of tangible and non-tangible information.  Liberty pleaded that Section 3:8 was only one of several sources of contractual duty incumbent on Falwell Jr.   *See* Compl. ¶¶ 119-125.   It is axiomatic that this Court's or a jury's need to harmonize these contracts, policies, and provisions defeats demurrer. *Fun,* 245 Va. at 253*; Grossman v. Saunders,* 237 Va. 113, 120–21. Far from containing transmittal language that is self-operative, or establishing facially some form of preemption over other sources of obligation by Falwell Jr. to return Liberty's data, Section 3.8 merely states that, upon demand, Falwell Jr. had to return Liberty's tangible property to Liberty *at once.*  Section 3.8 thus permitted Falwell Jr. to return the rest of Liberty's property within a reasonable time frame thereafter. This is so because when a contract does not specify a specific time for performance, in Virginia the proper deadline for performance is a jury question. *Grossman,* 237 Va. at 121. Jury issues cannot be resolved by demurrer. *Id.* And there is no contractual clause giving Falwell Jr. ownership of the non-tangible property of Liberty.

Moreover, nowhere does Section 3.8 convey to Falwell Jr. the property rights to any Confidential Information, rights that *Liberty* expressly retains in Section 3.8.  Compl. ¶116, 121.

LUADMINREC000161

Section 3.8 only assured Falwell Jr. "access" to this protected material. *Id.* ¶116. Because Liberty pled that Section 3.8 conveyed access rather than ownership by Falwell Jr. of any Confidential Material, this makes Liberty the presumed owner of the devices and computer data for purposes of demurrer. Falwell Jr.'s claimed carve-out presents a jury question on whether Falwell Jr. had to return tangible and non-tangible information, just on different compulsory time schedules.

Third, to the extent this Court finds as a matter of law that Section 3.8 grants to Falwell Jr. a property right in Liberty's non-tangible Confidential Information (which it should not), then there are still pending issues of fact that defeat his Demurrer. Section 3.8 nowhere defines "intangible." Adopting an outmoded appreciation of technology, Falwell Jr. tries to create a privilege to retain *all* of Liberty's computer data in his possession on the claim that it is not "tangible." Demurrer at 4-5.

It is absurd for Falwell Jr. to claim residual ownership in perpetuity over material he only had rights to "access" according to Liberty's complaint. Compl. ¶ 116. But in any event, the line between tangible and intangible is not determinable as a matter of law. A division point would still have to be drawn, and thus cannot possibly be done by this Court on Demurrer. Falwell Jr. claims that *all computer data* is regarded as intangible, citing a federal court case from nearly two decades ago. Demurrer at 4-5. For the reasons stated in the next section below, the Virginia Supreme Court is modernizing the distinction between tangible and intangible computer data all the time, and, if hearing the question today, would join the majority in ruling that computer data is tangible property.

Without pointing to any contract language granting him title to computer data, Falwell Jr. claims he can flout Liberty—and Liberty's document retention and legal hold process he was

LUADMINREC000162

required to administer as General Counsel and then President—by categorically commanding ownership of Liberty's computer data at the demurrer stage. Obviously, Falwell Jr. cannot.

### C.   In the Alternative, Liberty Stated a Claim for Conversion

Liberty pled in the alternative that Falwell Jr. wrongfully converted Liberty's property. To state a claim for conversion, Liberty must allege facts that show either "any wrongful exercise or assumption of authority over another's goods, depriving him of their possessions" or "any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *Handberg v. Goldberg*, 297 Va. 660, 673 (2019). Count I of the Complaint satisfies these requirements as it alleges that Falwell Jr. came into control of Liberty's property permissibly, including Liberty's Confidential Information, and that he has failed to return such property without valid claim of residual ownership or control, depriving Liberty in the process of rightful ownership and possession. *See* Compl. ¶¶ 125–128.

Falwell Jr. makes only one single unavailing argument against Liberty's conversion claim—that Liberty fails to state a claim for conversion because "'computer data' is not tangible property." Demurrer at 5. This argument falters for two reasons. First, computer data is not the only property at issue. As explained above, Falwell Jr. has failed to fully return a variety of Liberty's property, including computers, papers, and other devices. *See* Compl. ¶¶ 118–119; 123–126. By failing to demur to Liberty's claim for tangible information, or answer Liberty's suit, Falwell Jr. has defaulted on Liberty's demand for tangible information.

Second, regardless of whether this Court classifies Liberty's Confidential Information as tangible or intangible, such property is properly the subject of a conversion claim. Falwell Jr. cites *United Leasing Corp. v. Thrift Ins. Corp.* for the proposition that "[i]n general, a cause of action for conversion applies only to tangible property." 247 Va. 299, 305 (1994). However, in *United*

10

*Leasing*, the Supreme Court recognized that "many courts have recognized the tort of conversion in cases where intangible property rights arise from or are merged with a document." *Id.* Indeed, at least one Virginia court has already held that electronic data *could* be the subject of a conversion claim under Virginia law. *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, No. 3:09cv58, 2011 WL 4625760, at *5 (E.D. Va. 2011) (concluding that "confidential business information" in electronic data could be the subject of a Virginia conversion claim because "a decision to limit conversion to tangible property or intangible property merged in a document symbolizing ownership would leave" many individuals unprotected "[i]n this technology-driven world").

Similarly, in *Thyroff v. Nationwide Mut. Ins. Co.*, the New York Court of Appeals held that "electronic records…stored on a computer" are "subject to a claim of conversion." 864 N.E.2d 1272, 1278 (N.Y. 2007). The court in *Thyroff* reasoned that there is no "compelling reason to prohibit conversion for redress of a misappropriation of intangible property." *Id.* at 1277. The court recognized "that society's reliance on computers and electronic data is substantial, if not essential. Computers and digital information are ubiquitous and pervade all aspects of business, financial and personal communication activities." *Id.*

Notably, *Thyroff* was decided in 2007 and *Kolon* in 2011. Their rationale is ever more applicable today. Computers and electronic data dominate the business landscape in today's technology-driven, post-pandemic world. Accordingly, many jurisdictions have followed *Thyroff* and *Kolon* in recognizing that a claim for conversion may include intangible, electronic property. *See e.g.*, *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2013) ("Conversion was originally a remedy for the wrongful taking of another's lost goods, so it applied only to tangible property[, but v]irtually every jurisdiction, however, has discarded this rigid limitation to some degree. Many courts ignore or expressly reject it."); *Children's Hosp., Corp. v. Cakir*, No. 15-cv-13281, 2017

11

WL 4012661, at *4 (D. Mass. 2017) (awarding summary judgment to plaintiff on conversion claim based on conversion of electronically stored data); *Integrated Direct Mktg., LLC v. May*, 143 F. Supp. 3d 418, 428 (E.D. Va. 2015) (holding that a claim for conversion under Arkansas law could include "claims for conversion of copied electronic data"). This Court should follow these jurisdictions and recognize that intangible computer data is properly the subject of a conversion claim.

Virginia is moving ever closer to the mainstream embodied in *Kolon* and *Thyroff*, and many other cases.[4] In *Mackey v. McDonnald*, 298 Va. 645 (2020) the Supreme Court refined some rules for recognizing the conversion of intangible data, standards that closely fit Liberty's current facts. In determining that a "Mrs. Viar" had a right to intangible stock shares, the Supreme Court noted the shares were "documented" by stock certificates. The possessory interest of Mr. Viar in the stock certificates was "readily ascertainable." *Id.* at 662. Upon Mr. Viar's death, Mrs. Viar had a duty as executor to resolve the estate's outstanding debts and assets. Mrs. Viar was thus entitled to immediate possession of the stock proceeds to complete her responsibilities, if not as imminent heir. *Id.* The fact that another suitor fought her for control of the stock did not detract from Mrs. Viar's *right* to possess the shares immediately in her role as executor. Mrs. Viar's right to the intangible items was thus sufficiently "clear, definite, undisputed, and obvious," the standard for establishing the conversion of intangible materials. *Id.* Liberty pled all of these elements in this case, with respect to computer data recovery. Liberty has to comply with discovery requests

---

[4] *See e.g. FMC Corp. v. Capital Cities/ABC, Inc.*, 915 F.2d 300, 305 (7th Cir. 1990) (no valid reason against "conversion of intangible property"); *Network Sys. Architects Corp. v. Dimitruk*, No. 06-4717-BLS2, 2007 WL 4442349, *10 (Mass. Super. Ct. 2007) ("[i]n the modern world, computer files hold the same place as physical documents have in the past. If paper documents can be converted...no reason appears that computer files cannot."); *Meridian Fin. Advisors, Ltd. Pence*, 763 F. Supp. 2d 1046, 1059 (S.D. Ind. 2011) ("intangible electronic records can be converted"; *Eysoldt v. ProScan Imaging*, 194 Ohio App.3d 630, 957 N.E.2d 780, 786 (Ohio App. 2011) ("the law has changed, and courts have held that identifiable intangible property rights can also be converted.").

LUADMINREC000165

implicating the Falwell Jr. materials, control its own affairs, and separate Falwell Jr. as a former employee—all matters of responsibility pleaded in the lawsuit. Were it to decide Liberty's access to computer data under the *Mackey* analysis, the Supreme Court of Virginia would follow *Kolon* and *Thyroff* because Liberty satisfied the elements the Supreme Court has laid down for a plaintiff's right over control of intangible property.

## II.   COUNT II OF THE COMPLAINT STATES A COGNIZABLE CLAIM FOR BREACH OF FIDUCIARY DUTY.

To state a claim for breach of fiduciary duty, Liberty must allege facts that show: "(1) a fiduciary duty, (2) a breach, and (3) damages resulting from the breach." *Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 424 (E.D. Va. 2011). Liberty has done so. Its Complaint alleges: (1) as "Liberty's President, Chancellor, and a member of its Board of Trustees, Falwell Jr." owed Liberty various fiduciary duties. Compl. ¶ 130; (2) Falwell Jr. breached these duties by refusing "to disclose to Liberty the Granda Allegations and Granda's extortive threats" and "by accepting a severance payment from Liberty in 2020." *Id.* ¶¶ 131–132; and (3) his breach "induced injury to Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the improper 2019 Employment Agreement, and damaged Liberty's reputation." *Id.* ¶ 136.

Nevertheless, Falwell Jr. claims that he is entitled to the protection of the business judgment rule. Demurrer at 8. This argument ignores the well-settled principle that the business judgment rule does not apply to corporate officers. *See Simmons v. Miller*, 261 Va. 561, 576 n.3 (2001) ("By its express terms Code § 13.1-690 [and § 13.1-870] appl[y] to directors only…the General Assembly elected not to enact a statutory standard of conduct for officers.") (internal quotations and citations omitted). Liberty sued Falwell Jr. in his capacity as "Liberty's President, Chancellor, and a member of its Board of Trustees." Compl. ¶ 130. Accordingly, Falwell Jr. cannot claim protection of the business judgment rule for his actions as Liberty's President, only

13

as a board member.  In negotiating terms of employment, withholding information from the Board and accepting the modified pay and severance, it can hardly be said that these breaches alleged by Liberty concern only his duties as a director—they impugn his actions as President and Chancellor.

Similarly, Falwell Jr. is also not entitled to protection for his actions as one of Liberty's directors because his actions do not *qualify for protection* under the business judgment rule.  First, only an *affirmative exercise* of business judgment or business *decision* satisfy the business judgment rule.  *See Lake Monticello Owners' Ass'n v. Lake*, 250 Va. 565, 571 (1995) ("As the name implies, a necessary predicate for the application of the business judgment rule is that the directors' decision be that of a *business* judgment…"); *Colgate*, 2012 WL at *5 (recognizing that one of the elements of the business judgment rule is an "actual…informed decision").  Thus, it is doubtful that Falwell Jr.'s refusal to timely disclose the "Granda Allegations and Granda's extortive threats" even qualifies as an actual decision under the business judgment rule, much less for the Court to determine this question as a matter of law on demurrer.[5]

Even if, as a technical matter, Falwell Jr.'s actions qualify as "decisions" under the business judgment rule, they still fall outside of the rule's scope.  Under Virginia law, the business judgment rule "offers no protection to a corporate director who has not exercised his or her business judgment on behalf of the corporation.  If the director has acted on his or her own account, and contrary to the interests of the corporation, the business judgment rule does not apply." *Colgate*, 2012 WL at *6.  *See also Simmons*, 261 Va. at 577 (holding director that secretly orchestrated the organization of a corporate competitor was not entitled to protection of business judgment rule). Falwell Jr.'s failure to timely disclose the Granda extortion and his subsequent negotiation and

---

[5] Indeed, virtually all cases involving the business judgment rule concern director voting and other formal corporate actions. *See e.g., Flippo v. CSC Assoc. III, LLC*, 262 Va. 48, 56 (2001) (director's acceptance of offer to form joint venture); *Willard ex rel. Moneta Bldg. Supply, Inc. v. Moneta Bldg. Supply, Inc.*, 258 Va. 140, 151–52 (1999) (director's decision to sell corporate assets).

LUADMINREC000167

acceptance of the increased pay and severance payment are actions that he took on his own account, directly contrary to Liberty's interests. Falwell Jr. did not exercise any business judgment on behalf of Liberty. As such, the business judgment rule affords him no protection.

Falwell Jr. focuses on the affair between his wife Becki and Granda, which he labels "a personal issue." Demurrer at 6. Falwell Jr. argues that Liberty has not alleged a breach of fiduciary duties because he himself did not commit the affair. *Id.* at 7. Yet, this myopic focus on the affair ignores the subsequent actions that actually constitute the breach of the fiduciary duties he owed Liberty. Specifically, the affair was merely the gateway to Falwell Jr.'s failure to timely disclose Granda's extortive threats while he negotiated the 2019 Agreement that raised his pay, "created a retirement plan and enriched his severance." Compl. ¶ 131.

In response, Falwell Jr. argues that, "in every negotiation of an employment agreement, the interests of the employee (even a President/CEO), are inherently adverse to the interests of the employer." Demurrer at 8. Yet, in *Elkins*, the case cited by Falwell Jr., the court made clear that "once an employee becomes a fiduciary of an entity, he has a duty to negotiate further compensation agreements honestly and in good faith so as not to advantage himself at the expense of the entity's shareholders." *Official Comm. Of Unsecured Creditors of Integrated Health Serv., Inc. v. Elkins*, No. Civ.A. 20228-NC, 2004 WL 1949290, at *16 (Del. Ch. 2004). *See also Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 389 A.2d 887, 903 (Md. 1978) ("[T]he principle of utmost good faith covers not only dealings and transactions occurring during the fiduciary relationship but also those taking place during the negotiations leading to the formation of the fiduciary relationship.") (internal quotations and citations omitted). By failing to disclose the extortive threats and imminent damage to Liberty before he negotiated a pay raise and generous severance package, Falwell Jr. failed to negotiate the Agreement honestly and in good faith.

LUADMINREC000168

Additionally, Falwell Jr. improperly argues that the Agreement "was not an employment agreement sought because of Falwell's private matters, but was an employment agreement in the due course." Demurrer at 8. Aside from raising irrelevant facts that are in conflict and thus form a jury question, see *infra* p. 2-3, Falwell Jr.'s motive in renewing the Agreement is a jury question of the purest kind, and, thus, inappropriate for demurrer.

Furthermore, Falwell Jr. argues that Liberty failed to allege a breach of fiduciary duty by classifying the affair and extortive threats as "personal issue[s]" and "private matters." Demurrer at 6, 8. Yet, these statements directly contradict his admission, earlier in the Demurrer, that "[s]ince Liberty's founding in 1971, Liberty and the Falwell name have been synonymous, and continue to be." *Id.* at 2. There are many other conflicting references in the Complaint and Demurrer. *See infra* at p. 2. Thus, Falwell Jr. expressly admits that allegedly "private" matters involving his family are very much public and inextricably linked to Liberty.

Accordingly, Falwell Jr.'s reliance on *Stand Up Digital, Inc. v. Hart* is misplaced because *Hart* is easily distinguishable. The court in *Hart* distinguished case law cited by the plaintiff-developer, claiming those cases involved "decisions made by a fiduciary that involved the corporation's business interests on the one hand, and the director's interests on the other." 2019 WL 6257734, at *4 (E.D. Va. 2019). The comedian's decision to post publicly, the court reasoned, was "not one where he stood to gain personally or financially to the direct detriment" of the developer. *Id.* The court also held the comedian was protected by the business judgment rule because the developer "presented no evidence that Defendant's failure to warn it regarding the attempted extortion or his Instagram post was in bad faith." *Id.* at *4.

Unlike *Hart*, Falwell Jr.'s refusal to disclose the Granda Allegations and extortive threats came directly at Liberty's financial and reputational expense. Falwell Jr. knew the Granda

LUADMINREC000169

Allegations threatened his tenure as Liberty's President and Chancellor. Aware that he needed an escape hatch, Falwell Jr. negotiated a substantial pay raise and severance package as part of the 2019 Agreement, knowing that Liberty would be contractually obligated to pay him if things eventually went awry, as he feared. *See* Compl. ¶¶ 58; 67–72; 131–133. As such, the case at issue has *exactly* what the *Hart* case was lacking: bad faith and self-dealing.

*Allen Realty Corp. v. Holbert* is directly on point. 227 Va. 441 (1984). The court in *Hart* described *Holbert* as a "classic case[] of self-dealing, where a director stood to gain personally or financially in direct conflict with interests of the corporation." *Hart*, 2019 WL at *4. In *Holbert*, an accountant withheld the existence of an offer from his firm's client in favor of an offer from the accountant's friend. *Holbert*, 227 Va. at 444–45. The client accepted a different offer but one that was worth less than the offer kept secret by the accountant. *Id.* After it learned of the accountant's misconduct, the client alleged that it would not have sold its property had it known of the offer that the accountant failed to disclose. *Id.* Reasoning "the fiduciary must tell his principal about anything which might affect the principal's decision whether or how to act," the court found that the client sufficiently alleged a breach of fiduciary duty. *Id.* at 446–48.

Like *Holbert*, the facts at issue here present another classic case of self-dealing. Falwell Jr., like the accountant in *Holbert*, failed to timely disclose material information to his principal. By withholding the Granda Allegations and extortive threats during the Agreement negotiations, Falwell Jr. put his own personal and financial interests into direct conflict with Liberty's financial and business interests. Just as the client in *Holbert* alleged that it would not have sold its property had it known of the undisclosed offer, Liberty alleged that it "would have refrained from entering into the" Agreement had it known of Falwell Jr.'s breach. Compl. ¶ 133. Liberty has alleged sufficient facts for a fiduciary duty breach. The Demurrer to Count II should be overruled.

LUADMINREC000170

### III. COUNT III OF THE COMPLAINT STATES A COGNIZABLE CLAIM FOR STATUTORY CONSPIRACY.

To state a claim for statutory business conspiracy under Virginia Code § 8.01-499 and § 8.01-500, Liberty must allege facts that show: "(1) concerted action between two or more people; (2) legal malice towards Plaintiff's business; and (3) that the conspiratorial actions caused Plaintiff's business damages." *Rogers v. Deane*, 992 F. Supp. 2d 621, 635 (E.D. Va. 2014). Liberty has done so. The Complaint alleges: (1) Falwell Jr., Becki, and Granda purposefully acted together to conceal the Granda Allegations and extortive threats from Liberty in violation of Falwell Jr.'s fiduciary duties. Compl. ¶ 142; (2) Falwell Jr. acted intentionally to conceal the extortion and violate his fiduciary duties, knowing that injury to Liberty was certain to occur. *Id.* ¶¶ 142–145; and (3) these actions caused Liberty injuries to its business interests. *Id.* ¶¶ 146–147.

Falwell Jr. improperly claims that Liberty has not alleged that he combined with any other person to injure Liberty. Demurrer at 10. This is patently false. Indeed, Liberty clearly alleges that Falwell Jr., Becki, and Granda "acted in concert under a preconceived plan to conceal the Granda Allegations and Granda's extortive acts." *See* Compl. ¶¶ 49–58; 142. Moreover, the harmful act is not, as Falwell Jr. argues, simply the affair between Becki and Granda. Demurrer at 10. Instead, the harmful act committed by the co-conspirators is the extortion and nondisclosure to Liberty's Board, coupled with the negotiation of compensation that Falwell Jr. knew would not be available if he provided the Board the information to which it was entitled, all in violation of Falwell Jr.'s fiduciary duties. *See CaterCorp.*, 246 Va. at 26–28 (1993) (holding trial court erred in sustaining demurrer on statutory business conspiracy claim where the alleged unlawful acts included conversion and breach of fiduciary duties). Virginia law is clear that the withholding or suppressing of information is sufficient to impose liability for statutory business conspiracy. *See College Loan Corp. v. SLM Corp.*, 2002 U.S. Dist. LEXIS 27744, at *20 (E.D. Va. 2002), rev'd

LUADMINREC000171

on other grounds, (holding claim of statutory business conspiracy was sufficient to withstand motion to dismiss where the conspirators "agreed to withhold certain information from Plaintiff"); *Holbert*, 227 Va. at 449 (holding claim of statutory business conspiracy "was sufficient to withstand a demurrer" where the conspiracy was the suppression of material information).

Similarly, Falwell Jr.'s argument that Liberty has not sufficiently pled legal malice also fails. The conspiracy statute does "not require proof that a conspirator's primary and overriding purpose is to injure another in his trade or business." *Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 249 Va. 39, 47 (1995). In its Complaint, Liberty clearly alleged that Falwell Jr. acted intentionally to conceal the extortion and violate his fiduciary duties. Compl. ¶¶ 142–143. That Falwell Jr. might argue that his actions also had a lawful or legitimate purpose is irrelevant. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 526–27 (4th Cir. 1997) (rejecting defendant's argument that it did not act with "the requisite malice" because it had also had "legitimate and legal motives" for its unlawful actions). Falwell Jr. knew that injury to Liberty was certain to result from his unlawful acts from day one of the newly negotiated contract when the salary increase to which he was not entitled was paid. *See Feddeman & Co., C.P.A. v. Langan Assoc., P.C.*, 260 Va. 35, 45 (2000) (holding trial court erred in concluding that defendant did not act with requisite legal malice where "[i]njury to the plaintiff was a known and intended result of the [defendant's] plan").

Additionally, legal malice may be pled generally. *See College Loan Corp.*, 2002 U.S. Dist. LEXIS at * 20 ("That this last element of malice was not pled by specifically alleging particular facts supporting the legal standard of malice is not fatal to the Complaint. Indeed, the [rules] state that 'malice...may be averred generally.' Fed. R. Civ. P. 9(b)."). The allegations in Liberty's Complaint pass muster, but Falwell Jr.'s motives are at least a contested factual issue for the jury.

LUADMINREC000172

Finally, while damages for statutory business conspiracy must be *business* damages, Falwell Jr. incorrectly claims Liberty has alleged damages only to its employment interests. Demurrer at 11–12. Liberty alleged that the actions of Falwell Jr., Becki, and Granda "injured its enrollment, impacted its donor base, disrupted its faculty, enabled the 2019 Employment Agreement that proved detrimental to Liberty's interests, and damaged Liberty's reputation." Compl. ¶ 147. Liberty's business "is the provision of higher education through the perspective of Christian values." *Id.* ¶ 141. Accordingly, these injuries are injuries Liberty suffered to its business interests. *See Federated It, Inc. v. Anthony*, No. 1:18cv1484, 2020 WL 4747784, at *9 (E.D. Va. 2020) (finding plaintiff sufficiently pled claim of statutory business conspiracy where complaint alleged that defendant "caused damage to plaintiff to include monetary costs and damage to its professional reputation"); *Luckett v. Jennings*, 246 Va. 303, 307 (1993) (holding plaintiff alleged injury to a business interest when he pled the details of his business as a developer and what he did as part of that business, along with acts by the defendants to damage that business). Again, Liberty is not required to *prove* these damages at the demurrer stage; simple allegation of damages is sufficient. *PJS Assoc., L.P. v. Cosby*, No. LF-2420-1, 2000 WL 1618100, at *3 (Va. Cir. Ct. 2000). Therefore, the Demurrer to Count III should be overruled.[6]

## CONCLUSION

For the foregoing reasons, Liberty respectfully requests that this Court overrule Falwell Jr.'s Demurrer to all counts of Liberty's Complaint.

---

[6] Even if the Court were to sustain all or parts of the Demurrer—which it should not—the Court should nevertheless grant Liberty leave to amend its Complaint. "After sustaining a demurrer, a court should grant a motion for leave to amend except when, for example, the proffered amendments are legally futile, when the amendment is untimely...." *AGCS Marine Ins. Co. v. Arlington County*, 293 Va. 469, 487 (2017) (holding trial court abused its discretion in denying leave to amend where the "amended allegations and the reasonable inferences from them support[ed] a viable legal theory of recovery").

LUADMINREC000173

Date: July 16, 2021

Respectfully submitted,

LIBERTY UNIVERSITY, INC.

_____
Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
McGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

R. Craig Wood (VSB # 24264)
McGUIREWOODS LLP
652 Peter Jefferson Parkway, Ste. 350
P. O. Box 1288
Charlottesville, VA  22911
(434) 977-2558
(434) 980-2274 (facsimile)
cwood@mcguirewoods.com

LUADMINREC000174

## CERTIFICATE OF SERVICE

I certify that on July 16, 2021, I emailed and caused to be mailed a copy of the foregoing to the following counsel:

Vern E Inge Jr.
Robert N. Drewery
WHITEFORD TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary St., Suite 1700
Richmond, Va. 23219
Email: vinge@wtplaw.com
        rdrewery@wtplaw.com

*Counsel for Defendant Jerry L. Falwell Jr.*

Scott C. Oostdyk

22

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

| | |
|---|---|
| LIBERTY UNIVERSITY, INC., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) Case No. CL21000354-00 |
| | ) |
| JERRY L. FALWELL, JR., | ) |
| | ) |
| *Defendant.* | ) |

## **DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEMURRER**

Defendant, Jerry L. Falwell, Jr. ("**Falwell**" or "**Defendant**"), by counsel, states the following as his Reply to Plaintiff, Liberty University, Inc.'s ("**Liberty**" or "**Plaintiff**") Opposition to Falwell's Demurrer ("**Opposition**").

### **Introduction and Legal Standard**

Demurrers are "guided by well-settled principles." *Fuste v. Riverside Healthcare Ass'n, Inc.*, 265 Va. 127, 131 (2003). "A demurrer admits the truth of all properly pleaded material facts. All reasonable factual inferences fairly and justly drawn from the facts alleged must be considered in aid of the pleading." *Id.* (citing *Ward's Equipment, Inc. v. New Holland N. America, Inc.*, 254 Va. 379, 382 (1997) (internal quotations omitted). Moreover, the "court may also consider the contents of documents that are a part of the pleading or mentioned in the pleading and produced pursuant to a motion craving oyer." *Foster v. Wintergreen Real Estate Co.*, 81 Va. Cir. 353, *1 (Nelson Co. Cir. Ct. Nov. 16, 2010).

Liberty does not state a claim in its Complaint and uses the Complaint to make embarrassing and inflammatory allegations that are unrelated to its alleged claims.

## ARGUMENT

**I.      Liberty Fails to State a Claim for Breach of Contract.**

Liberty's build up to its attempted breach of contract claim centers around the affair of Becki Falwell ("**Becki**") with Giancarlo Granda ("**Granda**") and includes unrelated and falsely detailed pictures that are used solely to embarrass Falwell.  A breach of contract claim is properly alleged when a plaintiff alleges facts showing "(1) a legally enforceable obligation under a contract, (2) a breach of that obligation, and (3) injury or damage to the plaintiff flowing from that breach." *Federico v. Lincoln Military Housing, LLC*, 127 F.Supp.3d 623, 646 (E.D.Va. 2015). Liberty is unable to state a claim for breach of contract. Because the cited provision of the 2019 Employment Agreement specifically relates to tangible personal property. Liberty alleges the Confidential Information is "stored on devices." Therefore, this Court must sustain Falwell's demurrer.

Liberty has stated it does not oppose Falwell's Motion Craving Oyer.  Opposition at 1, Footnote 2.  Consequently, this Court should review the Employment Agreement and consider it as part of this Demurrer. *See Byrne v. City of Alexandria*, 298 Va. 694 (2020) (providing analysis that documents made part of the pleading as a result of a motion craving oyer are properly before the court in its demurrer analysis); *see also Ward's Equipment, Inc. v. New Holland North America, Inc.*, 254 Va. 379, 382 (holding "when a demurrant's motion craving oyer has been granted, the court in ruling on the demurrer may properly consider the facts alleged as amplified by any written agreement added to the record on the motion").  Liberty's Complaint specifically sets forth the contract upon which it relies and specifically, the provision upon which the purported breach lies. That is Section 3.8 of the 2019 Employment Agreement.

Under Falwell's Employment Agreement with Liberty, "[a]ny Confidential Information *in tangible form* shall be immediately returned to LU upon request." Employment Agreement, Sec.

2

3.8 (emphasis added.)  Confidential Information is "confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not properly disclosed by LU."  This clause is the obligation set forth in the Employment Agreement and, more importantly, is the only obligation set forth by Liberty in its Complaint.  Compl. ¶ 116.  The purported breach of contract is a breach of Section 3.8 of the 2019 Employment Agreement.  *Id.*  While Liberty's Opposition purports to raise "four distinct but intersecting reasons rooted in contractual obligations" for how Falwell allegedly breached those obligations, the Complaint fails to aver the legal obligation under the sued-upon contract.  Opposition at 6.  The Complaint limits Falwell's obligation and purported breach to Section 3.8. Compl. ¶ 116, 124.

In its lengthy Complaint, Liberty only alleges a breach of Section 3.8 of the 2019 Employment Agreement. Compl. ¶ 116. Section 3.8 addresses only specific tangible property. Liberty then alleges that Falwell did not return *intangible* property. *See* Compl. ¶ 119 (alleging Falwell failed to return Confidential Information "stored on devices").  That cannot be a breach of Section 3.8. Virginia does have other claims for return of property to the extent Liberty has any valid claims.

## II.      Liberty Fails to State a Claim for Conversion.

Liberty's valid claim is not, however, conversion. Virginia does not recognize conversion claims for intangible property.

Liberty's Opposition goes to great lengths to posit "Virginia is moving ever closer to the mainstream" with respect to recognizing conversion for intangible property.  Opposition at 12. Regardless of what Liberty thinks of it, Virginia law is clear.  "Conversion is the wrongful assumption or exercise of the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights." *Darton Environmental, Inc. v. FJUVO*

3

*Collections, LLC*, 332 F. Supp. 3d 1022, 1032 (W.D.Va. 2018) (internal citation omitted). Moreover, "a cause of action for conversion applies only to tangible property." *Id.; see also 3D Glob. Sols., Inc. v. MVM, Inc.*, 552 F.Supp.2d 1, 10 (D.D.C. 2008) ("Neither District of Columbia nor Virginia law recognizes a cause of action for conversion of intangible property"); *see also Grayson v. Westwood Buildings, L.P.*, No. 191413, 2021 WL 2583226, *23 (June 24, 2021) (a cause of action for conversion typically applies only to tangible property, or intangible property that arises from or is merged with ... a valid stock certificate, promissory note, or bond.).

The Confidential Information Liberty uses to support its conversion claim is allegedly stored on devices or in third-party systems and computer data is not tangible property. Compl. ¶ 119; *see America Online, Inc. v. St. Paul Mercury Ins. Co.*, 207 F. Supp. 2d 459, 462 (E.D.Va. 2002); *see also Tangible, Black's Law Dictionary* (11th ed. 2019) (1. Having or possessing physical form; 2. Capable of being touched and seen; perceptible to the touch; capable of being possessed or realized. 3. Capable of being understood by the mind). Virginia Courts are clear with respect to intangible property and a conversion claim.

Therefore, because intangible property is not subject to a conversion claim, Liberty fails to state a claim for conversion and this Court must sustain Falwell's Demurrer.

**III.     Liberty Fails to State a Claim for Breach of Fiduciary Duty.**

Liberty claims that Falwell breached his fiduciary duty by failing "to disclose to Liberty the Granda Allegations and Granda's extortive threats" and by "accepting a severance payment from Liberty in 2020" that "Liberty was required to pay" while Liberty's President, Chancellor, and member of its Board of Trustees and while negotiating his 2019 Employment Agreement. Opposition at 13; *see also* Compl. ¶¶ 130-132.

In *Official Comm. Of Unsecured Creditors of Integrated Health Serv., Inc. v. Elkins*, the Court provides that while a fiduciary "has a duty to negotiate further compensation agreements

4

honestly and in good faith so as not to advantage himself at the expense of the [entity's] shareholders," the Court also stated the "requirement does not prevent fiduciaries from negotiating their own employment agreements so long as such negotiations are ***performed in an adversarial and arms-length manner***." [1] *Elkins*, No. Civ.A. 20228-NC, 2004 WL 1949290, \*16 (Del. Ch. Aug. 24, 2004) (emphasis added).   There are no allegations that Falwell attempted to influence Liberty's actions through coercion of Board members, or otherwise.   Instead, it is solely that "Falwell Jr. refused to disclose to Liberty the Granda Allegations and Granda's extortive threats while the Liberty President was negotiating for and entering into a 2019 Employment Agreement." Compl. ¶ 131.   This alleged failure to disclose information does not rise to the level of a breach of fiduciary duty and "courts must be mindful that the fact that particular conduct of an employee caused harm to his employer does not establish that the conduct breached any fiduciary duty to the employer.   This is so because the law will not provide relief to every disgruntled player in the rough-and-tumble world comprising the competitive marketplace, especially where, through more prudent business practices, the harm complained of could easily have been avoided." *Williams v. Dominion Technology Partners, L.L.C.*, 265 Va. 280, 290 (2003) (internal quotations omitted).

Liberty posits *Allen Realty Corp. v. Holbert* is analogous to the adversarial and arms-length manner of an employment negotiation. *Allen Realty Corp. v. Holbert*, 227 Va. 441 (1984). Opposition at 17.   *Holbert's* proposition is that "the fiduciary must tell his principal about anything 'which might affect the principal's decision whether or how to act'" is based on *Owen v. Shelton*, 221 Va. 1051, 1054 (1981)).   In *Owen*, the disclosure requirement is premised on the ongoing relationship between agent and principal.   Here, the decision to act, or whether to continue

---

[1] Black's Law Dictionary defines arm's-length as "[o]f, relating to, or involving dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship <an arm's-length transaction does not create a fiduciary duty between the parties>." Black's Law Dictionary (11th ed. 2019).

LUADMINREC000180

employing Falwell occurred during an adversarial and arms-length employment negotiation. *Cf. Barnes v. Barnes*, 231 Va. 39, 41-43 (1986) (Detailing that a couple negotiating a settlement do not owe a duty to disclose infidelity and "the duty rests on each negotiating party to discover such facts as are relevant to the dispute").

Liberty's argument and claim infer that Falwell must disclose to Liberty during a contract negotiation every personal detail of his life, or risk breaching his fiduciary duty. This premise is untenable in any negotiation between employer (potential or current) and employee. In fact, "[i]t is well-settled in Virginia law that a duty to disclose information does not normally arise when the parties are engaged in an arm's length transaction," such as negotiating an employment agreement. *Noell Crane Systems GmbH v. Noell Crane and Service, Inc.*, 677 F.Supp.2d 852, 872 (E.D.Va. 2009).

"Certainly the law cannot impose a burden to disclose information in an arm's length transaction, in the event that the information might, at some point in time, be relevant to the other party who is represented by counsel and not at any disadvantage in bargaining power." *Id.* at 873. Liberty's Complaint attempts to impose such a burden on Falwell, culminating with the allegation that "[h]ad Liberty's Executive Committee known in 2018 or 2019 that Granda was attempting to extort Falwell Jr. ... then the Executive Committee would have refrained from entering into the 2019 Employment Agreement." Compl. ¶ 133. Consequently, because Liberty's Breach of Fiduciary Claim surrounds Falwell's alleged failure to disclose information to Liberty during an employment negotiation, Liberty fails to state a claim for breach of fiduciary duty as a matter of law.

**IV.    Liberty Fails to State a Claim for Statutory Conspiracy.**

In stating a claim for statutory conspiracy, the Plaintiff must show "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business;

LUADMINREC000181

and (2) resulting damage to the plaintiff." *Dunlap v. Cottman Transmission Systems, LLC*, 287 Va. 207, 214 (2014).  Further, actions for statutory business conspiracy lie "only if a plaintiff sustains damages as a result of an act that is itself wrongful or tortious." *Id.* at 215.

Here, not only in Liberty's Complaint, but in its Opposition, Liberty makes the argument that Falwell conspired with Granda. As Liberty concedes, Granda was working to harm Falwell and Liberty.  Compl. ¶¶ 37, 42.  Granda, who was actively attempting to harm Falwell could not be conspiring with Falwell.  Bluntly, the "concerted action" required to state a claim is not present when one of the actors, Granda, is attempting to harm Falwell.

Moreover, Liberty alleges that the "harmful act committed by the co-conspirators is the extortion and nondisclosure to Liberty's Board, coupled with the negotiation of compensation." Opposition at 18.  Liberty does not allege in its Complaint Granda and Falwell, or even Becki, combined to hide information for the purposes of obtaining the 2019 Employment Agreement. Instead, the Complaint details Granda's extortion, and Falwell's alleged plan to handle the situation.

Lastly, there is no indication of the alleged conspirators' plan to willfully and maliciously injure Liberty.  Instead, the allegations surround controlling Granda's extortive threats while Falwell negotiated his 2019 Employment Agreement.

Liberty's conclusory allegation that Falwell, Granda, and Becki acted in concert to purposefully injure Liberty's business interests fail because there is no allegation that the three, or any of them acted together to not disclose the information and Liberty's very allegations aver the opposite. Granda was trying to harm Falwell. Therefore, this Court must sustain Falwell's Demurrer.

LUADMINREC000182

## CONCLUSION

WHEREFORE, Defendant, Jerry L. Falwell, Jr., by counsel, respectfully requests that this Court sustain its Demurrer to the Complaint; dismiss Counts I, II, and III of the Complaint with prejudice; and order such other relief as the Court deems necessary and appropriate.

Dated:  July 23, 2021

JERRY L. FALWELL, JR.

_____
Counsel

Vernon E. Inge, Jr. (Va. Bar No. 32699)
Robert N. Drewry (Va. Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:    804.977.3301 / 804.977.3304
Facsimile:    804.977.3298 / 804.762.6865
E-Mail:       vinge@wtplaw.com
              rdrewry@wtplaw.com

*Counsel for Defendant, Jerry L. Falwell, Jr.*

8

LUADMINREC000183

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of July, 2021, a true and correct copy of the foregoing *Defendant's Reply to Plaintiff's Opposition to Demurrer* was served *via* e-mail transmission and first-class, postage-prepaid, U.S. Mail upon the following:

Scott C. Oostdyk, Esq.
Andrew F. Gann, Jr., Esq.
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
E-Mail:       soostdyk@mcguirewoods.com
               agann@mcguirewoods.com

— *and* —

R. Craig Wood, Esq.
McGuireWoods LLP
Post Office Box 1288
Charlottesville, Virginia 22902-1288
E-Mail:       cwood@mcguirewoods.com

*Counsel for Plaintiff, Liberty University, Inc.*

Vernon E. Inge, Jr.

LUADMINREC000184

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC., )
)
     *Plaintiff,* )
)
v. )     Case No. CL21000354-00
)
JERRY L. FALWELL, JR., )
)
     *Defendant.* )

## ORDER ON DEMURRER

This matter is before the Court on Defendant, Jerry L. Falwell, Jr.'s demurrer to Plaintiff Liberty University, Inc.'s Complaint.

After consideration of all the papers filed and oral argument, it is hereby **ORDERED, ADJUDGED**, and **DECREED** that:

1.    Defendant's Demurrer to Count I is **SUSTAINED IN PART AND OVERRULED IN PART**. The Demurrer to Count I is sustained as to the intangible property of Plaintiff that has never been located or stored on any of Plaintiff's tangible property. The Demurrer to Count I is overruled as to Plaintiff's tangible property that has been located or stored on tangible property of the Plaintiff or has been within Defendant's physical possession.

2.    Defendant's Demurrer to Count II and III is **OVERRULED**.

3.    Plaintiff shall have 21 days from entry of this Order to file an Amended Complaint.

4.    Defendant shall have 21 days from the filing of the Amended Complaint to file responsive pleadings or an Answer.

The Clerk shall send a *teste* copy of this Order to all counsel of record.

ENTERED this ___10th___ day of ~~August~~, 2021

September

_____
JUDGE J. FREDERICK WATSON
CIRCUIT COURT FOR THE CITY OF LYNCHBURG

CC: Listed parties

2

**WE ASK FOR THIS:**   EXCEPT PLAINTIFF OBJECTS, BASED ON BRIEFS AND ARGUMENT, TO THE RULING THAT INTANGIBLE PROPERTY DOES NOT FORM THE BASIS OF CONTRACTUAL BREACH OR CONVERSION ON THE FACTS AS PLED.

Scott C. Oostdyk (Va. Bar No. 28512)
Andrew F. Gann, Jr. (Va. Bar No. 89189)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
Telephone:    804.775.4743
Facsimile:    804.698.2133
E-Mail:        soostdyk@mcguirewoods.com
                   agann@mcguirewoods.com

— and —

R. Craig Wood (Va. Bar No. 24264)
MCGUIREWOODS LLP
Post Office Box 1288
Charlottesville, Virginia 22902-1288
Telephone:    434.977.2558
Facsimile:    434.980.2274
E-Mail:        cwood@mcguirewoods.com

*Counsel for Plaintiff, Liberty University, Inc.*

**SEEN AND OBJECTED TO FOR THE REASONS STATED IN BRIEFING AND ON THE RECORD, INCLUDING DEFENDANT DOES NOT OWE A FIDUCIARY DUTY WHEN ENGAGING IN AN ARMS LENGTH NEGOTIATION:**

Vernon E. Inge, Jr. (Va. Bar No. 32699)
Robert N. Drewry (Va. Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:    804.977.3301 / 804.977.3304
Facsimile:    804.977.3298 / 804.762.6865
E-Mail:        vinge@wtplaw.com
                   rdrewry@wtplaw.com

*Counsel for Defendant, Jerry L. Falwell, Jr.*

A TRUE COPY-TESTE
[seal: CIRCUIT COURT OF THE CITY OF LYNCHBURG VIRGINIA]
Mark Dellinger, Clerk
Deputy Clerk
Electronic Certification Made
Pursuant to § 17.1-258.3:2

gdellinger
Sep 13 2021 3:14 PM

LUADMINREC000187

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

|  |  |
|---|---|
| LIBERTY UNIVERSITY, INC.<br><br>                     Plaintiff,<br><br>v.<br><br>JERRY L. FALWELL, JR.,<br><br>                     Defendant. | Case No. CL21000354-00<br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

Plaintiff Liberty University, Inc. ("Liberty" or the "University"), by counsel, states as follows for its claims against Defendant Jerry L. Falwell, Jr. ("Falwell Jr.").

### INTRODUCTION

1.     Liberty is one of the largest Christian academic communities in America, annually training over 100,000 online students, and educating more than 15,000 students on its 700-acre campus located at 1971 University Boulevard, Lynchburg, VA.

2.     Until he quit the office August 25, 2020, Falwell Jr., who resides in Goode, VA, was the President and Chancellor of Liberty, a role that he had held since succeeding Liberty's founder, and his father, Dr. Jerry L. Falwell Sr. ("Dr. Falwell").

3.     Liberty asserts this suit for several purposes, including (a) to recover University property that remains in the possession of Falwell Jr. post-resignation, (b) to redress breaches of various fiduciary duties that Falwell Jr. owed to Liberty while serving as the University's President

1

and Chancellor, and (c) to recover damages for violations by Falwell Jr. of Virginia's business conspiracy statute.

4.      Many of the facts supporting Liberty's latter two claims are helpfully spelled out in two writings: (a) a media statement that Falwell Jr. released to the *Washington Examiner* in August 2020, and (b) a lawsuit that Falwell Jr. lodged against Liberty in October 2020, two months after his abrupt resignation from Liberty's presidency.

5.      In the August 23, 2020 media statement Falwell Jr. tendered "exclusively" to the *Washington Examiner*, Falwell Jr. presented a 1,200-word narrative that divulged the saga of a "former family friend" who had an affair with Becki Falwell, the wife of Falwell Jr., and "was threatening to expose it" (the "Statement").

6.      In the Statement, attached hereto as Exhibit 1, and in his interview with the *Washington Examiner*, Falwell Jr. took pains to emphasize that he was divulging the extortive behavior for the first time outside his family.  He stated he and Becki had been "suffering in silence" over it.  He confessed he had wrongly been "bearing those burdens on [his] own."  The *Washington Examiner* confirmed Falwell Jr. was "reveal[ing] his wife Becki's affair for the first time."  The reporter noted Falwell Jr. "appeared to be relieved to have finally divulged the affair and the years-long series of attacks the couple has faced."

7.      On October 28, 2020, Falwell Jr. filed in this Court a two-count, 117-paragraph Complaint against Liberty (the "Complaint.")  In his Complaint, a copy attached hereto as Exhibit 2, Falwell again admits what he disclosed in the Statement – that Becki began an affair with a family friend in March 2012.  Falwell identified the former friend as Giancarlo Granda of Miami ("Granda.")  Complaint ¶41. When Becki and Falwell Jr. first met Granda, he was a 20-year old working at the high-end resort hotel at which the Falwells stayed while on one of their frequent

2

family vacations in Miami. Complaint ¶40. Falwell Jr. admits that Becki – a mother of three adult children – had an on-and-off again sexual affair with Granda that purportedly lasted until 2014. Complaint ¶¶40, 41.

8.　Falwell admits that he knew of Becki's affair, Complaint ¶42, and also concedes he had not disclosed the affair to anyone material.

9.　In the Complaint, Falwell Jr. instead pled that when Becki broke off intimate relations with Granda in 2012, the young man refused to retire from the relationship. Granda threatened to use the surreptitious sexual intimacy, and surrounding conduct, to "embarrass the Falwells *and Liberty University.*" Complaint ¶43 (emphasis added). Falwell Jr. and Granda both knew that matters of infidelity, immodesty, and acceptance of a loose lifestyle would stand in stark contrast to the conduct expected of leaders at Liberty. Granda had amassed considerable leverage over the Falwells, and, accordingly, they worked to keep Granda pacified and quiet.

10.　In the Statement, Falwell Jr. contends that he and Becki were "doing our best to respectfully unravel this 'fatal attraction.'" Accordingly, the Falwells "extended the spirit of fondness to [Granda] with respect and kindness, both for spiritual and religious reasons, and in the hope that we could help him find his way and allow us to put this behind us, without any harm or embarrassment to our family or to the LU community...." In the Complaint, Falwell Jr. summarized this appeasement as cultivating a "positive relationship" with Granda. Complaint ¶42.

11.　By filing of the lawsuit against Liberty on October 28, 2020, Falwell Jr. – an attorney and active member of the Virginia State Bar – endorsed the accuracy of the statements made in the Complaint. Since the time this suit was docketed with this Court by counsel, Falwell Jr. has referred to that Complaint on several occasions in the press without retraction or correction.

LUADMINREC000190

Although he voluntarily dismissed the defamation suit against Liberty in December 2020, Falwell Jr. did so without rescinding or rejecting the factual allegations he made in the Complaint.

12.       Similarly, by issuing the remarks in August 2020, and by providing a phone interview to the *Washington Examiner* about their contents, Falwell Jr. endorsed the facts in the Statement.  He has since then neither contradicted nor corrected any of the factual allegations in the Statement.

### The Liberty Way

13.       The unique concept for Liberty's brand of Christian higher education arose out of the personal vision of Dr. Falwell. Dr. Falwell's unwavering agenda was for Liberty to be a university anchored in the principles of the "Liberty Way," the University's term for a way of life centered on rigorous educational instruction delivered by faculty and administrators who were intentionally committed to a written statement of faith and to Biblical standards of morality.

14.       In 1967, Dr. Falwell first began laying the foundation for Liberty's eventual success, building in Lynchburg a holistic Christian educational system for evangelical youth by establishing Lynchburg Christian Academy, an accredited Christian day school for grades K-12. In 1971, Dr. Falwell reached higher, founding Liberty, an accredited Christian university for evangelical students.  In 1985, Dr. Falwell announced his eventual goal of having 50,000 students attend Liberty.  Today, as noted, Liberty trains more than double that number.

15.       In addition to leading Liberty, Dr. Falwell was also an important public figure in the political spectrum, serving among other things as head of the Moral Majority – a political action group that promoted biblical standards of living as a community value, and forged a coalition of voters active on the "Religious Right."  The Moral Majority – and Dr. Falwell – helped sweep Ronald Reagan to the U.S. presidency in 1980.

LUADMINREC000191

16.    At Liberty, Christian discipleship and academic instruction were integral to a cohesive educational package, and Liberty's policy documents incorporated this commitment. One of the principles that fueled Liberty's growth – and stability – was the Biblical notion of inter-accountability among the Christians who make up the Liberty community. Liberty's core conduct documents espouse this fundamental belief, pronouncing, as a closely-held religious value, the ability of those following the commonly-held faith to press other Christians toward adherence to Biblical mandates in the event of perceived lapse.

17.    The Liberty Articles of Incorporation, first put in place under Dr. Falwell's leadership, plainly state this principle: "[Education] occurs most effectively when both instructor and student are properly related to God and each other through Christ." Articles, Exhibit A at 1. The Faculty Handbook repeats this quote at paragraph 42.

18.    The Liberty University honor code – the *Liberty Way* – puts the practice of inter-accountability in these terms:

> Every student is expected to respect Liberty's Statement of Doctrine and Purpose and should avoid any activity, on or off campus, which would contradict the university's mission or purpose, compromise the testimony or reputation of the university, or disrupt Liberty's Christian learning environment. All members of the Liberty University community are asked to affirm the following: ***"We have a responsibility to uphold the moral and ethical standards of Liberty University and personally confront those who do not."***

(Emphasis in original.)

19.    The following statement from the Liberty University Employee Handbook, under the heading "Philosophy of Education," reflects well these guiding principles, which are taken from the institution's Articles of Incorporation:

> Liberty University is a Christian academic community in the tradition of evangelical institutions of higher education. As such, Liberty continues the

5

LUADMINREC000192

philosophy of education which first gave rise to the university and which is summarized in the following propositions:

- God, the infinite source of all things, has shown us the truth through the Scripture, nature, history, and above all, Christ.

- Persons are spiritual, rational, moral, social, and physical, created in the image of God. They are, therefore, able to know and value themselves and other persons, the universe, and God.

- Education, as the process of teaching and learning, involves the whole person, by developing the knowledge, values, and skills which enable each individual to change freely. Thus it occurs most effectively when both instructor and student are properly related to God and each other through Christ.

20.     It was Dr. Falwell's vision for the President of Liberty to be a standout spiritual leader for the college.   Under the Bylaws put in place to govern Liberty, it was Dr. Falwell's personal responsibility as President, and later as Chancellor and President simultaneously, to be at the same time Liberty's administrative leader and spiritual exemplar.   During his tenure, Dr. Falwell achieved distinction in both roles in service to the Liberty community.

21.     This tradition of dual duty continues at Liberty. The Amended and Restated Bylaws, adopted by Liberty's Board of Trustees on April 5, 2019, preserves Dr. Falwell's conception of the President's role.   It states, "[The President] provides spiritual and worldview leadership to the University in pursuit of excellence."  Falwell Jr. was among the Board members who voted to adopt these Restated Bylaws, and he later assented in his 2019 Employment Agreement to perform those duties.

22.     Finally, fearing spiritual erosion from the top, it was Dr. Falwell's vision that Liberty would always be subject to the authority of the local church in matters of doctrine and spiritual discipline.   Liberty's Board of Trustees was and is obligated to espouse Biblical principles.   After all, it was the Trustees that fashioned "Board policy" for Liberty. *See* Bylaws, Article II, Section 4.

6

23.     Guided by the standards of Dr. Falwell and the Liberty Way, the university grew exponentially until Dr. Falwell's untimely death in 2007. From that point onward, Dr. Falwell's chosen successors, sons Falwell Jr. and Jonathan Falwell ("Jonathan"), assumed aspects of their father's leadership roles. Jerry Jr. served as Liberty's President, Chancellor, and member of its Board of Trustees. Jonathan also served as a Liberty Board of Trustee member, as a Vice Chancellor for Spiritual Affairs, and also as Chairman of the Spiritual Mission Committee of the Liberty Board. Jonathan was further installed as the Head Pastor of Thomas Road Baptist Church, an institution designated to have an important oversight function with respect to Liberty. He has since acceded to the role of campus pastor at Liberty.

24.     In the Statement, Falwell Jr. indicated he had accepted fully his portion of the mantle of leadership at Liberty. He stated his "priority was to build on my father's vision and to work hard" doing so in the course of "serv[ing] Christ and community."

25.     One of Falwell Jr.'s attempts to "build on his father's vision" was to bring another generation of Falwell men into the leadership at Liberty. Effective January 1, 2016, Falwell Jr. extended to his firstborn son Trey Falwell a key employee services agreement ("Trey's Contract"). It designated Trey to function as "Administrative Assistant to the President" for a term ending July 1, 2030 – a span of nearly fifteen years. Trey's Contract elevated his Liberty salary from $65,000 to $88,000 to start, and he was provided a special car allowance that pushed his total initial compensation to $95,200, before accounting for retirement benefits. Trey's Contract came with a mandatory pay increase of 5% per year.

26.     In 2017, Trey was promoted and given the title of "Vice President of University Services." By July 1, 2017, Trey's salary was raised to $195.000, plus the car allowance – which raised his total compensation to $202,200, again before accounting for retirement benefits. In this

7

new and advanced role, Trey technically reported to either the Chief Operating Officer or Chief Financial Officer, but for all practical purposes he reported to his father, the President and Chancellor of Liberty.  Under the new agreement, Trey was an at-will employee of Liberty.

27.    As a new Vice President and group leader, Trey often accompanied his father into meetings of the Executive Committee of the Liberty Board of Directors ("Executive Committee"). Trey joined these inner circle meetings on at least May 24, 2018, September 12, 2018, and April 4 and 5, 2019.  The latter two of these sessions were in part meetings involving the negotiation of Falwell Jr.'s 2019 employment agreement.

28.    During Falwell Jr.'s tenure, Liberty capitalized on the explosive growth of online education, providing students worldwide with a quality experience of academic and biblical education remotely. Liberty also used the proceeds of on-line education to expand its beautiful campus, and build a sizeable endowment.

### The Granda Allegations

29.    Granda became enmeshed with the Falwells quickly after they met in Miami, in part because of the familial treatment the Falwells accorded him early in the relationship.  In addition to the intimate attention from Becki, Granda received invitations to Falwell family trips and gatherings, and a heady dose of access to important American business leaders.

30.    In 2012, for example. Falwell arranged for Granda to come from Miami to Lynchburg to be introduced to Donald Trump, as the future president made a stop at Liberty to tour campus.  In a keepsake photo capturing the occasion, Granda (right) posed with the future

LUADMINREC000195

leader of the free world while Becki (far left) and Falwell Jr. (center) looked on.



31.     By participating in close family contact with the Falwells, and by enjoying important associations within the Falwell's Liberty network, Granda came to understand how vulnerable the Falwells had made themselves by permitting his affair with Becki. Granda became closely exposed to Liberty's high moral standards, which overtly clashed with Liberty's first couple's discordant sexual conduct and provided Granda with a tactical opening.

32.     According to Falwell Jr., Granda began to undertake menacing actions toward the Falwells during this period. For example, Granda allegedly sold his friends "intimate" pictures of Becki that he had somehow acquired. Complaint ¶45. (Falwell Jr. does not say in his Complaint how Granda came into possession of those pictures.) Falwell Jr. alleges that *Granda's associates* used these covert pictures to "try to extort" the Falwells. *Id.*

33.     On information and belief, Falwell Jr. was able to quell this particular controversy over the racy photos. According to news reports, Falwell Jr. allegedly enlisted high-level Washington legal assistance, and the picture problem seemed to have gone away.

LUADMINREC000196

34.    The experience with the racy photos no doubt suggested to Granda that Falwell Jr. could be leveraged, and taught the young man that with persistence, a price might be paid by the Falwells to avoid embarrassment.

35.    According to Falwell Jr., Granda's other aggressive action early on was to record his phone calls and FaceTime communications with Becki, for the purpose of enhancing "extortion attempts" against the Falwells.  Complaint ¶46.  The Complaint does not disclose the content of these calls, but implies the subject matter implicated the Falwells in some embarrassing or prejudicial way -- otherwise Falwell Jr. would not contend that the recordings were intended to "strengthen [Granda's] extortion attempts." *Id.*  Reuters has released the contents of one such FaceTime call.  https://mobile.twitter.com/Reuters/status/1297941806970220545

36.    By late 2014, Granda was prepared to push further his scheme to press the Falwells. According to Falwell Jr.'s account, Granda approached Falwell Jr. for a payoff in exchange for staying silent about the Granda Allegations. Complaint ¶47.  Granda allegedly demanded hush money ranging from $600,000 to $2 million.  *Id.*  Falwell Jr. did not inform Liberty's Board of Trustees of this extortive conduct.

37.    The Falwells openly concede that Granda's behavior was targeted toward damaging not only the Falwells but also "Liberty University."   Complaint ¶¶43, 54, 62.  To Granda, threatening Falwell Jr.'s role at Liberty – particularly given Liberty's religious mission and detailed behavioral codes – was the center of his plot.  Complaint ¶¶43, 54.  It was Falwell Jr.'s prominent role at Liberty that fueled the Chancellor and President's vulnerability. *Id.*

38.    On information and belief, Granda had access to plenty of material that could have been deeply damaging to Falwell Jr. in the eyes of the evangelical community.

LUADMINREC000197

39.    The Falwells' dealings with Granda also involved a significant financial investment in 2013 in property located in an underdeveloped part of Miami, which directly benefited Granda. The new company formed to buy the property was substantially financed by Falwell Jr., who loaned the venture $1.8 million.   Ownership of the enterprise was given to Becki, Trey, and Granda.  Once the development company was formed, it continued to house a liquor store despite being a location frequented by college-aged students staying in the on-site hostel, and despite Liberty's general discouragement of the use of alcohol.

40.    When the Miami business dealings between Granda, Falwell Jr., and Trey resulted in litigation, questions began to swirl about Falwell Jr.'s business ethics and other issues arising from the transactions.  On information and belief, Granda was in position to expound on many such concerns, to the detriment of Falwell Jr., and thus, vicariously, to the detriment of Liberty.

41.    Most damaging, Falwell Jr. knew that Granda would be able to provide detail about the fact of the affair with Becki, its duration, Falwell Jr.'s role in abetting it, the attendant circumstances of the affair, and the specific activities in which Granda, Falwell Jr., and Becki engaged during and after the affair ("the Granda Allegations").

42.    There is little doubt that Granda maintains a cache of material harmful to the Falwells.   At times since August 2020, media outlets have reported they were shown compromising documents, photographs, texts, and videos by Granda – material Granda shared with the media to bolster his credibility.  Granda has implied in the media that he has more such information within his possession.

43.    Since 2014, Falwell Jr. had every reason to fear what Granda might do with the Granda Allegations and supporting material.  In his Complaint, in fact, Falwell Jr. emphasizes that

LUADMINREC000198

at various times from 2014 to 2019 Granda was not only acting opportunistically toward the Falwells, but even proceeding illegally. See Complaint ¶¶44, 45, 46, 47.

44.     Falwell Jr. also took great pains to assert Granda's overall volatility during this dark time. From Falwell Jr.'s own observation, Granda was demonstrating behavior that was "deeply disturbed," "unstable," "unbalanced," "erratic," "manipulative," "self destructive," "crazy," and "verbally abusive." Complaint ¶¶42, 44, 48, 49.

45.     Falwell Jr. further accumulated some third-party assessments of Granda's state of mind. In his Complaint, Falwell Jr. indicates that he was advised by some in Granda's close circle that the young man was "racist," "legitimately scary," and someone with "unresolved psychological issues," who was given to "rages," and capable of tearing up his parents' house. Complaint ¶¶49, 50.

46.     Clearly, given Granda's perceived plan to "destroy [the Falwells'] lives," and Granda's decaying stability, Falwell Jr. came to believe that something drastic and protective had to be done.   After all, Falwell Jr. was the Chancellor, President, and a Trustee of Liberty, one of the country's premier evangelical universities.

### Falwell Jr.'s "Granda Plan"

47.     Instead of divulging to Liberty's Board of Trustee's Granda's active attempts at extortion, Falwell Jr. instead led a scheme to cover up the illicit conduct.   As alleged in the Complaint, Falwell worked diligently to coopt Granda into total confidentiality about the most perilous details of the young man's relationship with the Falwells, and to suppress the damaging Granda Allegations.

48.     The Falwells knew they shared a unity of interests with Granda.   They had an important goal in common: silence about the Falwells' salacious acts. The Falwell needed silence

LUADMINREC000199

from Granda in order to safeguard their personal reputation, Jerry Jr.'s professional standing, and his employment with America's leading evangelical university.

49.     Granda needed the Falwells to remain silent, too; Granda could not afford to let his "dirt" on the Falwells leak.  If the media reported the bad facts that Granda had stored up about Falwell Jr. and Becki before Falwell Jr. paid hush money to Granda, then all leverage was lost.  Granda's scheme for a pay day from Falwell Jr would be valueless.  Clearly Granda wanted to pressure Falwell Jr., but only so as to secure payment in exchange for Granda's promise to hush the controversy.

50.     Faced with Granda's mounting extortive pressure, the Falwells had a decision to make: either they had to go public and expose Granda to Liberty, the authorities, and/or the media, or Falwell Jr. had to pay Granda off, and convince Granda to remain quiet forever.  Despite his clear duties as an executive and officer at Liberty, Falwell Jr. chose personal protection.  He committed himself to non-disclosure, and actively developed an approach to muzzle Granda.

51.     To effectuate Granda's silence, Falwell Jr. and Becki accelerated efforts to build Granda's friendship in the hopes that the young man would mature, would accept Becki's rejection, and would move forward in a way that would result in everyone involved being able to live a productive life.

52.     The Falwells drew Granda ever closer into their family life, effectuating a "Granda Plan."  They attempted to make Granda loyal to their family in order to curb Granda's bent toward the destruction of Falwell Jr., and his role at Liberty.

53.     For six years – from 2014 to 2020 – the Granda Plan worked.  Although they described Granda as a "deeply disturbed and unstable individual," Complaint ¶42, the Falwells managed to cultivate a "positive relationship" with him.  Complaint ¶44.  It is evident that the

LUADMINREC000200

Falwells' aim was to "placate" Granda, and in large part they succeeded for a long time. *Id.* According to the Statement, they "manage[d] [Granda's] increasingly erratic behavior...."

54.     The following were among the acts of appeasement that the Falwells used over the years to maintain Granda's cooperative silence:

   a.     The Falwells hosted Granda socially at their Virginia farm, pairing him with their son Trey on an ATV outing around their sprawling country property;

   b.     Granda joined the Falwells in the Florida Keys.  During this trip, Falwell Jr. posed with Granda paternalistically – arm around the him, drink in hand:



   c.     Posing outside the Liberty jet, the Falwells took pictures with Granda and former Miami business partner Gordon Bello.



   d.     The Falwells also brought Granda along for other family excursions, pairing him with Trey.  For example, on September 6, 2018, the Falwells arranged

LUADMINREC000201

for then-Congressman Bob Goodlatte to host them on a tour of the U.S Capitol.   Granda joined with Jerry, Becki, Trey, and Trey's wife Sarah. Granda once again appeared in the family photos – one set on a rooftop vista atop the Capitol, and another of the group gathered in front of the Thomas Jefferson statute.



(Granda is third from the left, in the rear.)



(Granda is second from the left.)

15

    e.    Finally, the Falwells befriended some of Granda's girlfriends. These proactive relationships helped the Falwells amass useful information about Granda, permitting them to understand his tendencies and manage Granda with more awareness. Complaint ¶¶ 48-50.

55.    As 2019 began, Falwell Jr. had shrewdly controlled Granda for nearly five years. In that span, Granda had not disclosed externally the sensitive information about the Falwells. Given what Falwell Jr. had observed of Granda's troubled character, and of the voracious appetite of the media for negative news about Liberty, Falwell Jr. had no reason to believe the détente he had built with Granda at Liberty's expense would much longer hold.

56.    Falwell Jr.'s employment contract at Liberty was set to expire June 30, 2019, and Falwell Jr. knew the negotiation of a new agreement was the optimal time to profit personally from Liberty's considerable growth in finances and enrollment that occurred during his tenure. Falwell Jr. took space in his Complaint to proudly display that financial legacy. The time for Falwell Jr. to cash in on Liberty's prodigious success had arrived.

**Outside Pressures on the Falwell Presidency**

57.    While he had overseen a one billion dollar building campaign on Liberty's campus, and had set in place a plan to create a sizeable endowment, Falwell Jr. had also launched a substantial campaign to attract notable public and private figures to Liberty's campus. Through this process, Falwell Jr. was augmenting the school's growing reputation as a forum for the discussion of important public issues. But Falwell Jr.'s success was also attracting national attention, and his outspoken personal support for major public figures was engendering opponents that harshly criticized and targeted him personally.

LUADMINREC000203

58.     In 2016, Falwell Jr. surprised the evangelical world by endorsing Donald Trump for the presidency. This move was particularly delicate because Senator Ted Cruz, a leading Trump competitor in the primaries, had used an earlier appearance at Liberty to give his first speech after announcing a presidential candidacy of his own.

59.     According to his lengthy Facebook post of January 27, 2016, Falwell Jr. became convinced that Trump was the optimal choice for President due to his business acumen and conservative social principles. Falwell Jr. thought Trump could get things done, even if it meant disrupting entrenched special interests. Trump was an outsider, distanced from the usual suspects who were toiling away in the engine room of Washington politics.

60.     The problem for Falwell Jr. was that Trump – a thrice-married man – was hardly a natural cultural hero for evangelicals.  Falwell Jr. took steps to redress this challenge.  Falwell Jr. committed to work with his peer evangelicals to help make Trump's checkered past something Christian leaders could accept and overlook.

61.     To address this agenda, Falwell Jr. endeavored to sidestep defending Trump's character and instead advance a theological argument to persuade Christian leaders and voters to forgive Trump rather than judge him.  Like Jesus, Falwell Jr. exhorted his evangelical colleagues to examine the sin in their own lives and then reconsider their criticism of candidate Trump accordingly.

62.     Falwell Jr. took to major social media platforms and news outlets to advocate this apologetic stance. The following are a few examples of that message:

    a.      In the aforementioned Facebook post of 2016, Falwell Jr. wrote that no Christian voter has standing to dismiss Trump's spiritual fitness because "all of us are sinners and only Jesus was perfect."  Embracing evangelical

17

LUADMINREC000204

doctrine, Falwell Jr. pointed to a "sinner" class – and then included within it Trump, himself, and every potential evangelical critic and voter.

b.   In the same Facebook post, Falwell Jr. advised the evangelical community to refrain from picking the best Christians as Presidential candidates – because no one but God could ever really know their heart. Falwell Jr. argued that Christians do not get to play God because "we are all sinners."

c.   On January 25, 2018, Falwell Jr. returned to this theme during a CNN interview conducted by anchor Erin Burnett. Falwell Jr. repeated the justification that Trump deserved to be a political leader embraced by Christians because "we're equally bad, we are all sinners; we all need Christ's forgiveness. That's why evangelicals are so quick to forgive."

https://www.cnn.com/videos/politics/2018/01/25/jerry-falwell-jr-trump-forgiveness-ebof-sot.cnn

d.   Later in 2018, Falwell Jr. once again appeared on CNN, and he again advanced this theme, stating "we are all sinners; nobody understands that better than evangelicals. That's why we're Christians because we all know we need forgiveness."

https://www.cnn.com/videos/us/2020/08/24/jerry-falwell-jr-public-controversies-athena-jones-pkg-ebof-vpx.cnn

63.   As 2019 approached, Falwell Jr. openly conceded that he was worrying about what had become the omnipresent "threat that [Granda] posed." Complaint ¶44. In fact, the stress of managing Granda and avoiding discovery was wearing Falwell down. At any moment, Falwell Jr. knew Granda could destroy Falwell's reputation as a Christian leader and reduce to rubble his

LUADMINREC000205

value to Liberty as a business asset. Falwell Jr. would then be in the well-known category of leaders requiring substantial forgiveness. Falwell Jr. was wracked with "constant anxiety." *Id.* He desperately needed to cut Granda off completely, a course fraught with substantial risk. Because Falwell Jr. wanted more financial protection to weather the fallout if he could no longer manage Granda, Falwell Jr. began to fashion a well-resourced exit strategy.

64.    To confront the Granda Allegations with more than the shaky barrier of the Granda Plan, Falwell Jr. fashioned a deceitful scheme to manipulate the Executive Committee of Liberty. In the course of the employment contract negotiations, Falwell Jr. planned to accentuate to the Executive Committee the new leagues into which Falwell Jr. had brought Liberty, and that some of the actions he undertook in that league, such as the rough-and-tumble of Presidential politics, might damage Falwell Jr.'s utility to the non-profit Liberty. There could come a time when the school might need to separate from Falwell Jr. for non-material actions. Falwell Jr. planned to use his growing awareness of personal attack which he had encountered in honorable service raising Liberty's profile in his attempt to relax the severance policies in the President's existing contract. Falwell wanted to create a new contract that permitted Liberty the option to part with Falwell amicably while making it palatable financially for Falwell to accept that protective action. In 2019, Falwell Jr. acted on this undertaking.

<u>The 2019 Falwell Jr. Employment Agreement</u>

65.    On or about July 6, 2012, Falwell Jr. had entered into a Presidential employment agreement with Liberty (the "2012 Employment Agreement"). This deal, which became effective April 1, 2012, provided for a seven-year compensation schedule that rewarded Falwell Jr. with annual raises. It also provided, in Section 9, that if Falwell resigned he would receive *one year* of compensation as severance.

LUADMINREC000206

66.     The 2012 Employment Agreement expired on June 30, 2019. In Section 3.1 of the 2012 Employment Agreement, the parties agreed that "[t]he University is not obligated to offer Falwell employment for any period beyond the expiration date of this Agreement."

67.     By the time Falwell Jr. and Liberty had to announce a new agreement, Falwell Jr. knew he was under active threat of extortion from Granda. Falwell Jr. also knew that Liberty's Executive Committee did not know that fact. Although he was President and Chancellor, and had the highest level of obligation to be candid and truthful with Liberty's board, Falwell Jr. did not inform the Executive Committee about Granda's extortive threats during the 2019 contract negotiations, or give the Liberty board any reason to understand the serious reputational damage to Liberty that Granda's threats represented.

68.     True to his previous plan, Falwell Jr. did not reveal to the Executive Committee the danger that Granda represented to Liberty. Instead, Falwell Jr. sought from the Executive Committee to provide him with a safety valve to protect him from such actions as having raised his profile in 2016 by being the first major evangelical leader to personally endorse Donald Trump for President. Falwell Jr. claimed that he wanted an escape hatch for political and personal fallout.

69.     After negotiation, the Executive Committee agreed to a new services deal (the 2019 Employment Agreement). Falwell Jr. succeeded in sweetening the new deal in at least the following material ways: first, he negotiated a significant annual raise to $1,250,000 a year, which became his "permanent" pay all the way through 2030; second, in Section 8 and Section 9 of the 2019 Employment Agreement, Falwell Jr. arranged for a severance of *two years' pay,* or $2,500,000 if he resigned for "Good Reason," or if Liberty terminated his employment without "Cause." Third, he obtained a catch-up "rabbi trust" plan for retirement benefits that would cover his entire career of service at Liberty but had not been part of any previous employment agreement.

20

70.     Falwell Jr. wanted Liberty to pay severance and retirement benefits to him if Granda revealed the Granda Allegations, and Falwell Jr. thus knowingly withheld from Liberty material information that would have altered the nature of the negotiations of the 2019 Employment Agreement.  Falwell Jr. said nothing of his belief that procuring Granda's silence might in time require a higher price unless Granda was confronted and completely managed.  To be sure, Falwell Jr. knew that family photos taken in nice places would not contain Granda forever.

### Falwell's Auspicious Acts of August of 2020

71.     The pressure of Granda's threats was increasingly getting to Falwell Jr.  With his new 2019 contract in hand, and with Liberty none the wiser about Granda's extortive behavior, Falwell Jr. had an opportunity to take a firmer stand against his blackmailer.

72.     Emboldened by the financial security that he had negotiated for himself, Falwell Jr. struck out at Granda, unleashing the obvious prospect of damaging retaliation by Granda. Falwell Jr. states in his Complaint that on June 30, 2019, he told Granda in electronic communication that Falwell Jr. would provide no payday and the extortion attempts would have to end.  Complaint ¶¶55, 56.

73.     To manage his stress, Falwell Jr. began drinking significantly.  There were concerns that he smelled of alcohol during work interactions, but to the outside world, Falwell Jr. remained mostly within the baselines of his obligations. That ended in August 2020.

74.     The Falwell family took some floating vacations on yachts provided by business partners of Liberty.  One such excursion took place during late July 2020.  During that span, the Falwells held a costume party centered around the characters of the Canadian mockumentary the *Trailer Park Boys*. https://www.swearnet.com/shows/trailer-park-boys. Promotional copy for the show bills the series as exploits by "three lovable career criminals as they rob liquor stores, fence

LUADMINREC000208

stolen goods and dream of pulling off one last, big score." Overall, the tone and content of the show is vulgar.

75.     The most crafty of the three prime characters is ex-convict Julian, whose trademark look is a black goatee, black T-shirt, pair of black jeans, and an omnipresent glass of rum and Coke in his hand.  Julian runs illegal businesses.  A sidekick, Trinity, is a redheaded woman who becomes pregnant in one episode and, due to a hapless mix-up, later delivers a baby bearing on his birth certificate the moniker "The Motel."  The little boy became nicknamed "Mo."

76.     Falwell Jr.'s entire immediate family was part of this event with attendees dressing as *Trailer Park Boys* characters of their respective choosing.  Falwell Jr. also invited his personal assistant, Sam Stone, and Stone's wife, Kathleen, who was a Liberty employee, to come on the trip.  During this event, Falwell, Jr. outfitted himself in a costume to emulate the character Julian, Falwell Jr.'s beard blackened in part for the occasion. Kathleen Stone, who was pregnant at the time, dressed up correspondingly as "Trinity," mother of the character Mo, which meant she donned a pair of Daisy-Duke cutoff jeans, unbuttoning them to accommodate her real-life pregnancy.  Falwell, Jr., as "Julian," similarly unbuttoned his jeans – in apparent solidarity with "Trinity's" actual condition.  "Julian" toted his obligatory tumbler of black liquid in his left hand.

77.     Over Kathleen and Sam Stone's objections, Becki Falwell took a picture of "Julian" and "Trinity" posing in character, pants both unbuttoned.  Falwell Jr. promised not to show this photo to others.

78.     On August 3rd, Falwell Jr. – breaking his promise to the Stones – shared this image with his entire Instagram following.  The picture went viral and became an immediate internet sensation.  It was paired soon thereafter with a video of the Falwells' *Trailer Park Boys* party that

22

also went viral on the internet.  https://pulpitandpen.org/2020/08/04/bizzare-jerry-falwell-jr-yacht-pictures-were-from-trailer-park-boys-themed-party/.

79.   Following is Falwell Jr.'s Instagram post, and one commentator's reaction.



80.   Media reaction to the Falwells' exploit was swift, and harsh. Critical articles soon appeared in numerous high-profile media outlets, including the *Washington Post*, *Huffington* Post, and *Politico*, and from commentators on CNN and the View.

LUADMINREC000210

81.     One online commentator performed an analysis to attempt to gauge the punishment that a Liberty student might endure for posing in this photo, based on the code of conduct in the *Liberty Way.* The analyst concluded there were 63 counts of potential violation, which would conceivably net a student up to $9,000 in collective financial fines, with a further punishment possible of up to 900 hours of community service.

82.     Realizing that he had made a serious mistake – Falwell Jr. deleted the Instagram post shortly after its August 3rd release. But Falwell Jr. soon made a compounding blunder. Rather than engage Liberty's public relations group to assist with the fallout, Falwell Jr. instead took to the airwaves attempting his own clean up. He called in to a local Lynchburg radio station on August 5, 2020 and offered a slurred explanation of the unzipped pants photo, dismissing it as "good fun" and drawling that he had apologized to his family and promised going forward he would be a "good boy." https://pulpitandpen.org/2020/08/07/liberty-pres-jerry-falwell-jr-justifies-scandalous-yacht-pictures-whatever-whatever-it-was-all-in-good-fun/.

83.     Commentators on social media questioned Falwell's sobriety during the radio show call-in. While he addressed the world about this unseemly subject through radio access, Falwell Jr. issued no August 5th apology to the Board at Liberty regarding the incident, nor did he issue a promise to Liberty of improved behavior going forward.

84.     At this low juncture for Falwell Jr., his wife Becki stepped in. After the radio show incident, she contacted three members of the Liberty Executive Committee to alert them to what she described as her husband's excessive use of alcohol. She expressed concern that drinking was adversely overtaking Falwell Jr.'s thinking and actions. She believed he needed to go away for treatment, and that it was time to take that course. Becki's heartfelt appeal made an impact on

LUADMINREC000211

Liberty's leaders and helped provide a context for understanding Falwell's questionable public comments, worrying behavior, and inappropriate social media posts.

85.     On August 7, 2020, the Executive Committee conferred with Falwell Jr, and he concurred it was best that he take time off to heal physically and spiritually. In the meeting, Falwell Jr. conceded that he had fallen short of Presidential standards and he took full responsibility for his actions. He committed to a sabbatical to treat and refresh, which the Executive Committee was inclined to support.

86.     Importantly, Falwell Jr. indicated in the August 7th meeting that he had considered providing deeper detail about personal matters that might have driven him to lodge the offending vacation posts, but he concluded he did not think it was necessary. This comment did not strike the Executive Committee as particularly compelling at the time, although it would become pivotal as events unfolded.

87.     On a more superficial level, Falwell Jr. did muse in the meeting that he might have become bored during the slowdown caused by COVID-19. Falwell conceded he had been doing silly things that he should not have let distract him. The prospect of a cure to a pattern of antics heartened Liberty's Board leaders.

88.     The August 7th meeting ended with the Executive Committee's expression of love for Falwell Jr. and the members' commitment to pray for him. It was agreed that Liberty would place Falwell Jr. on a leave of absence during which it would pay for Falwell Jr.'s rehab. The Executive Committee further agreed to recommend this course of action to the full Board for ratification, and determined that it would release a brief statement followed by a more expansive one. The Executive Committee lastly decided that President Falwell Jr. *would not* issue a statement of his own.

LUADMINREC000212

89.     True to plan, Liberty briefly announced Falwell Jr.'s leave of absence immediately, and circumspectly.  Once that message was out, communication professionals worked on a longer statement from the Chairman of the Board of Trustees.  The Executive Committee then proceeded toward resolving a treatment plan for Falwell Jr., leaving latitude for him to define details within the parameters of the previously-understood course.

90.     As the days wore on, however, it was obvious Falwell Jr. was forming a vastly different conception about the leave of absence than Liberty had outlined.  By August 17, 2020, Falwell Jr. was suggesting more superficial approaches, while Liberty continued to insist on residential treatment acceptable to the Executive Committee.

91.     If there was a breaking point in Falwell Jr.'s relationship with the Executive Committee, it was arriving at the appropriate type of treatment that had been in discussion since Becki had called for it.  Falwell Jr.'s change of heart, and the lapse into denial that it reflected, deeply worried the Executive Committee.

92.     On August 24, 2020, Falwell Jr. arced yet another bombshell into the Executive Committee's path.  On that day, the Executive Committee learned from counsel that the day before, on August 23, 2020, Falwell Jr. had submitted the Statement to the *Washington Examiner,* his attempt to pre-empt a tell-all feature that Granda himself had been preparing to publish with *Reuters.* This revelation was coupled with a suggestion to Liberty by Falwell Jr. and his attorneys that the Liberty President could just tender his resignation under the contract as a viable resolution to the swirl of controversy that would inevitably ensue on the heels of the disclosure of the dueling versions of the long-concealed extra-marital affair and attempt at extortion.

93.     Falwell Jr.'s employment contract forbade him from publishing without the Liberty Executive Committee's prior assent to the copy. The Executive Committee had expressly

26

forbidden a post about Falwell's sabbatical.  Regardless, with the briefest of advance notice to Liberty, Falwell Jr. self-issued the Statement, a 1200-word statement that the *Washington Examiner* published verbatim, bracketed by some reporting and analysis by the publication, and Falwell' Jr.'s own commentary.  In the Statement, Falwell Jr.'s "confession," Falwell Jr. advised the *Washington Examiner* about matters he never revealed to the Liberty Executive Committee.

94.     In the Statement, Falwell Jr. acknowledged it was wrong of him to have suppressed the information about Granda's extortion from his Board and the wider Liberty family.  He admitted that "the Liberty community deserved to hear" the salacious story directly.  He concluded that "the only way to stop [Granda's] predatory behavior [was] to go public."  He conceded that "I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from mental health professionals...."  Falwell Jr. ended his admission with an appeal for the community to extend to the Falwells their "forgiveness."

95.     Through these media communications, Falwell Jr. offered detail to Liberty that the Executive Committee never had at the time of the 2019 Employment Agreement, namely the sordid backstory behind his August 2020 blow-up with Granda, and the demise of the Granda Plan that was prompted by Falwell's alleged final rejection of Granda's demands on June 30, 2020.

96.     By choosing to release the Statement to the public before fully vetting the Granda Allegations to Liberty, Falwell Jr. deprived  Liberty of the ability to handle this matter as a purely internal Liberty employment affair.

97.     At the time of his soul-searching August 23 disclosure to the *Washington Examiner*, Falwell Jr. knew that his new Employment Agreement was signed. He also knew that he had negotiated a severance and retirement package that credited him with more base pay, twice the

LUADMINREC000214

severance, a funded retirement plan, and a right, perhaps, to collect all of that *even if Liberty fired him*.

98.    On August 24, 2020, Granda unveiled his side of the sordid story, in the form of an explosive *Reuters* article. https://www.reuters.com/investigates/special-report/usa-falwell-relationship/. Video and audio recordings supporting some key details of Granda's story were posted online.

99.    Granda struck out at Falwell Jr. while the Liberty President was being pilloried in the media. Granda's retaliation took full advantage of Falwell Jr.'s self-inflicted wounds over the "unzipped pants" picture. Granda unveiled all the embarrassing details that Falwell Jr. had worked with Granda since 2014 to suppress. Granda and *Reuters* spun an account of predatory action by the Falwells against a boy the age of a Liberty student.

100.    Out of the *Reuters* piece came Granda's version of the longstanding affair between Becki and Granda, and a cover-up process led by Falwell Jr. These were issues about which Falwell Jr. had actively kept Liberty in the dark, as Falwell Jr. had confessed for the very first time the day earlier to a third party, in his unauthorized *Washington Examiner* submission. The media coverage from other outlets mostly used Falwell Jr.'s own statement from the *Washington Examiner* to bolster Granda's credibility.

101.    After consultation, the Executive Committee authorized negotiations to take Falwell Jr. up on his offer to resign. After considering delay, the Executive Committee and the Board advised Falwell Jr. that he should resign at once or face the prospect that the Executive Committee would recommend his termination to the full Board.

102.    The Executive Committee's decision was driven by a number of factors: the litany of compromising decisions entered into by Falwell Jr., Becki's revelation about the alcohol abuse

LUADMINREC000215

that was fueling this erratic string of events, Falwell Jr.'s denial of an alcohol problem. Falwell Jr.'s resistance to commit to treatment deemed appropriate by the Executive Committee, Falwell's now-admitted concealment and misrepresentation of the Granda Allegations, and Falwell Jr.'s unwillingness to take seriously the grave threat that his aggregate actions posed to Liberty.

103.    On August 25, 2020, Falwell Jr. finally conceded that complete resignation was in his best interest.  He did so, however, after changing his mind about resignation and trying to negotiate for more in separation from Liberty than his contract afforded him.

104.    While Falwell, Jr. agreed to step aside, it was with shallow appreciation for the far-ranging damage he had caused. In unauthorized commentary to the media, Falwell stated: "The board put me on leave for showing my belly in a picture and my contract doesn't allow that…I'm 58 years old, and I think there's something else in the cards for me. And so the board was gracious in accepting my resignation … and it's time to move on." https://wset.com/news/local/we-have-the-strongest-relationship-becki-speaks-out-on-affair-denies-jerry-watched.

**Falwell Migrates From Forgiveness-Seeker to Fighter**

105.    Falwell Jr.'s resignation from the Presidency did not unfold as contemplated. The Executive Committee became growingly concerned that Falwell Jr. was honoring neither his commitment to leave nor his contract. On information and belief, and according to news reports, Falwell Jr. – a practicing Virginia lawyer – had conferred improperly about his employment situation with counsel that Liberty had retained on other cases in which Falwell Jr. had been a fiduciary of the Board, and witness. https://www.reuters.com/article/us-usa-falwell-relationship-exclusive/exclusive-business-partner-of-falwells-says-he-had-long-affair-with-evangelical-power-couple-idUSKBN25K1ZO.  The subject matter of the interaction with *Liberty's* chosen

LUADMINREC000216

counsel was Falwell Jr.'s personal employment rights *against Liberty.* As Falwell Jr. knows, Virginia ethics laws do not permit such consultation.

106.    Falwell Jr. soon retained appropriate, non-conflicted counsel. Falwell Jr. began pushing back against the terms of his resignation. Falwell Jr. improperly and errantly announced to the media a $10.5 million expectation for his severance. The agreement Falwell Jr. negotiated specified $2,500,000 – two years' pay, at the President's newly-negotiated and expanded rate.

107.    Liberty was unsure if Falwell Jr.'s representation to the media was just puffery and bragging or some attempt to set up a claim for additional compensation above and beyond what appeared in Falwell Jr.'s contract as stated pay for resignation.

108.    On August 28, 2020, the Executive Committee agreed to satisfy Falwell Jr.'s demand for a "Good Reason"- resignation, together with its severance payout.   Falwell Jr. was thus able to take advantage of the escape hatch that he had negotiated into the 2019 Employment Agreement, his insurance policy against the simmering Granda Allegations that he told the *Washington Examiner* was "predatory behavior," and a "'fatal attraction' type situation."

### Falwell Jr.'s Hard Fall

109.    A 911 call on August 31, 2020 brought police to the Falwells farm on Becki's report that Falwell Jr. had locked himself in, and had stumbled down stairs, experiencing injuries. Police and medics attended. Falwell Jr. was reported to present with abrasions and slurred speech. Media obtained the 911 call and subsequent reports. First responders spotted alcoholic beverage containers about the premises.  While Falwell Jr. advised the *Washington Examiner* on August 23rd that he was in the "early stages of addressing" issues of mental health, the process appeared not have proceeded very far.

LUADMINREC000217

110. Though momentarily humbled by news media's extensive examination of and criticism about his private failings, Falwell Jr. had re-emerged willing again to practice his particular brand of disdain for those who would challenge him – even those who built the platform that made him the household name Falwell Jr. is today. On October 28, 2020 Falwell filed a lawsuit against Liberty alleging defamation.

111. In the Complaint, Falwell in the main blames Becki for the Granda affair and cover-up. He shows little empathy for the woman who sought treatment for him for alcohol abuse, and whose loyalty and fear for his well-being fueled her outreach to Liberty's Executive Committee.

## COUNT ONE: BREACH OF CONTRACT

112. Liberty incorporates paragraphs 1 to 111 above.

113. The 2019 Employment Agreement, at Section 3.8, permits Falwell Jr. access to "confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly disclosed by LU ('Confidential Information.') Confidential Information remains the property of LU."

114. During his employment, Falwell Jr. worked independently on many of the deals, strategies, negotiations, and undertakings impacting Liberty. He had complete access to files, records, notes, emails, data, and information pertinent to the categories of Confidential Information detailed above.

115. Falwell Jr. also had access to a wide variety of key Liberty documents including, but not limited to: email, letters, correspondence, memoranda, telegrams, notes, reports, compilations, data, notebooks, laboratory, notebooks, work papers, graphs, charts, blueprints, books, pamphlets, brochures, circulars, manuals, instructions, ledgers, drawings (including

31

engineering, assembly and detail drawings), sketches, photographs, diaries, sales literature, advertising literature, agreements, meeting minutes, punch cards, magnetic tape or wire, other machine producible records including films, video and sound reproductions, printout sheets, electronic records such as text messages, summaries or records of telephone conversations, personal conversations or interviews, and any and all other writings, typings, printings, drafts, copies and/or mechanical, magnetic, optic, or photographic reproductions or recordings ("Documents").

116.    There are several distinct but intersecting sources rooted in employee and contractual obligations that imposed a duty upon Falwell Jr. to preserve and return Liberty property, including Documents and Confidential Information.

117.    First, as Liberty's Chief Executive Officer, Falwell Jr. was tasked with abiding by and administering the enforcement of Liberty's technology policies, including those related to computer data and storage policies. For example:

    a.    Section 2.7 of the Liberty University Employee Handbook provides that "[a]ny and all materials and information ('Confidential Information') provided by the University, any related subsidiaries, its employees or agents during the course of an employee's employment by the University and thereafter shall remain the property of the University." Section 2.7 also provides that "[u]pon termination of employment, the employee shall return all such Confidential Information to the University."

    b.    -Section 7.3 of the Handbook (Computer Use) provides that "All information created or contained on the University's computers and

LUADMINREC000219

network, including electronic mail (E-mail), remains the property of the University."

    c.    Section 7.15 of the Handbook (Return of Property) provides that "On or before the employee's last day of work, the employee is required to return all property."

118.    Second, the technology security policy governing all Liberty-affiliated technology, to which all users must consent as a condition to accessing Liberty-owned technology, ensures that all Documents and Confidential Information remain the property of Liberty.

119.    Third, to cater to Falwell Jr.'s executive convenience, on information and belief, Liberty paid for and provided Falwell Jr. with a variety of devices and systems which allowed Falwell Jr. to store Documents and Confidential Information both within and outside of Liberty's technology systems. These devices and systems include, but are not limited to: (a) an Aruba Cape Sensor and yearly technical support; (b) Lumos Inc. internet wiring; (c) a Surface Pro 3 laptop, bearing serial number 57462443253; (d) an Apple MacBook Pro 11 with expanded storage memory, bearing serial number C02LG708FH00; (e) an HP EliteOne 1000 G2, bearing serial number 8CC9204VH0; (f) an Apple iMac 27" with expanded storage memory, bearing serial number C02YH3HRJV40; (g) a Carbonite Backup cloud backup system for which Liberty was paying as early as August 2, 2016; (h) a Dropbox cloud storage account for which Liberty was paying as early as January 27, 2018; and (i) a personal Earthlink email account to which Falwell Jr. forwarded all emails that he sent and received at his assigned liberty.edu email address.

120.    Falwell Jr. used these Liberty-provided devices and systems, among others, to create, receive, and store Liberty Documents and Confidential Information.

LUADMINREC000220

121.    Fourth, Liberty's general document preservation and retention policy imposed a duty upon all Liberty employees, including Falwell Jr., to preserve and, upon termination of employment, return all Liberty Documents and Confidential Information.

122.    Fifth, Section 3.8 of the 2019 Employment Agreement expressly provides that "Confidential Information remains the property of LU."

123.    In addressing the timing of the return of Confidential Information, the Agreement treats tangible and non-tangible information differently.  Specifically, Section 3.8 provides that "[a]ny Confidential Information in tangible form shall be *immediately* returned to LU upon request" (emphasis added).  Section 3.8 thus required Falwell Jr. to return any tangible property immediately upon demand, and any non-tangible property within a reasonable time frame thereafter.

124.    Six, Liberty's governance documents, including its Bylaws and Articles of Incorporation, imposed a duty upon Falwell Jr. to administer and follow all Liberty policies.  For example, Article III, Section II of Liberty's Amended and Restated Bylaws provides that the "President is responsible for the adoption of administrative policies, rules and regulations that govern the day to day operations of the University."  Such policies include technology and property preservation and retention policies.

125.    Seventh, during his employment with Liberty, first as General Counsel, then as President and Chancellor, Falwell Jr. was subject to various legal holds.  These legal holds imposed a duty upon Falwell Jr. to retain and preserve certain Liberty Documents and Confidential Information.

LUADMINREC000221

126.     Thus, upon termination of his employment, Falwell Jr. had a contractual duty, drawn from multiple sources, including those specified above, to return all Liberty property, including Documents and Confidential Information.

127.     Falwell Jr. breached his contractual duty by failing to fully return all Liberty property after termination of his employment even though Liberty has asked for its return, a demand Falwell has heretofore breached

128.     On information and belief, Liberty has been damaged in an amount in excess of $250,000, a number that it may have to revisit as discovery progresses.

## COUNT TWO: DETINUE

129.     Liberty incorporates paragraphs 1 to 128 above, and also, in order to preserve issues on appeal, incorporates Count One of its Initial Complaint as considered by the Court's Order of September 10, 2021

130.     Liberty is the sole lawful owner of the property described above, including Documents and Confidential Information that Falwell created, received, or stored, at any point, on devices or systems provided by Liberty.

131.     For several reasons enumerated above, Liberty has an immediate right to possession of this property, including Documents and Confidential Information, because Falwell Jr.'s employment with Liberty terminated on August 25, 2020.

132.     Liberty's Documents and Confidential Information are easily identifiable because they are currently or were at one time located or stored on devices or systems provided by Liberty. Falwell Jr. also knows of their identity and location.

133.     Liberty's Documents and Confidential information are highly valuable to Liberty because they contain confidential and proprietary information related to a variety of deals,

LUADMINREC000222

strategies, and negotiations impacting Liberty's business. They are also necessary for Liberty to defend and prosecute various lawsuits, both pending and contemplated.

134.   Liberty has asked for the return of its Documents and Confidential Information, but Falwell Jr. has failed to fully return all such property that remains in his possession and/or control.

## COUNT THREE: BREACH OF FIDUCIARY DUTY

135.   Liberty incorporates paragraphs 1 to 134 above.

136.   As Liberty's President, Chancellor, and a member of its Board of Trustees, Falwell had a fiduciary duty to provide material information to the Board, refrain from acts harmful to the interests of Liberty, avoid conflicts of interest, and reject opportunities to benefit his personal interests to the detriment of Liberty.

137.   Falwell Jr. refused to disclose to Liberty the Granda Allegations and Granda's extortive threats while the Liberty President was negotiating for and entering into a 2019 Employment Agreement that raised Falwell Jr.'s pay, created a retirement plan and enriched his severance. The sweetened severance provision and funded retirement plan advantaged Falwell Jr. if adverse conditions caused him to choose resignation knowing he was impaired by extortion threats, and by therefore passing the financial risk to Liberty that Granda's extortion would end Falwell Jr.'s employment with Liberty.

138.   Falwell Jr. breached his fiduciary duties to Liberty by accepting a severance payment from Liberty in 2020 that Liberty was required to pay pursuant to the 2019 Employment Agreement.

139.   Had Liberty's Executive Committee known in 2018 or 2019 that Granda was attempting to extort Falwell Jr., and thus planning to damage Liberty, and had it known the full

LUADMINREC000223

circumstances of Granda's extortion of Falwell Jr., then the Executive Committee would have refrained from entering into the 2019 Employment Agreement.

140.    On information and belief, Falwell Jr. procured Liberty's outside counsel to advise him with respect to his personal causes of action, including those against Liberty, in derogation of Falwell's duty.

141.    Falwell Jr. failed to timely disclose and address the issue of his personal impairment by alcohol, which impairment led Falwell Jr. to actions and courses of conduct detrimental to the spiritual mission of Liberty.

142.    The several actions of Falwell Jr. in breach of his fiduciary duty have induced injury to Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the improper 2019 Employment Agreement, and damaged Liberty's reputation.

143.    Falwell Jr.'s actions in breaching the fiduciary duty he owed to Liberty were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

144.    For this count, Liberty seeks damages in excess of $10,000,000 plus pre- and post-judgment interest, and punitive damages at the statutory limit of $350,000.

### COUNT FOUR:  STATUTORY CONSPIRACY / COMMON LAW CONSPIRACY

145.    Liberty incorporates paragraphs 1 to 144 above.

146.    Virginia Code. § 8.01-499, 500 prohibits two or more persons from agreeing to injure another in their trade or business.

147.    The business of Liberty is the provision of higher education through the perspective of Christian values.  High moral standards are a part of the educational experience at Liberty and administrators and faculty are expected to comport themselves in a way that promotes the Liberty

LUADMINREC000224

Way, and upholds the values in Liberty's foundational documents.  Additionally, officers and Board members like Falwell, Jr. must observe applicable fiduciary duties.

148.    Up to August 2020, Falwell Jr., Becki and Granda, and potentially others, acted in concert under a preconceived plan to conceal the Granda Allegations and Granda's extortive acts from disclosure to Liberty's Board of Trustees.

149.    Falwell Jr., Becki and Granda, and potentially others acted intentionally, purposefully and without lawful justification, and thus with legal malice.

150.    Falwell Jr, as leader of the Falwell/Granda conspiracy, had a fiduciary duty to disclose Granda's extortive actions, and to disclose the potential for serious harm to Liberty once the Granda Allegations were in fact disclosed to the Liberty's Executive Committee.

151.    Instead of disclosure, Falwell Jr. furthered the conspiracy of silence and negotiated a 2019 Employment Agreement that contained a higher salary from Liberty. Moreover, anticipating revival of Granda's threats, Falwell Jr. also negotiated a revised severance provision that doubled the separation benefits provided in the 2012 Employment Agreement and a funded retirement plan.

152.    Had Liberty's Executive Committee known in 2018 and 2019 that Granda was attempting to extort Falwell Jr., and thus planning to damage Liberty, and had it known the full circumstances of Granda's extortion of Falwell, then the Executive Committee would have refrained from entering into the 2019 Employment Agreement.

153.    The actions of Falwell Jr. and Granda have injured Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the 2019 Employment Agreement that proved detrimental to Liberty's interests, and damaged Liberty's reputation.

LUADMINREC000225

154.    By operation of Va. Code 18.2 §500(A), Liberty's damages must be trebled. That section also provides for Liberty recover reasonable attorneys' fees. *See* Va. Code 18.2 §500 (A) and (B).

155.    Falwell Jr.'s actions were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

156.    In the alternative, Falwell Jr., Becki, Granda, and potentially others, acted in concert under a preconceived plan to unlawfully conceal the Granda Allegations and Granda's extortive acts from disclosure to Liberty's Board of Trustees in violation of Falwell Jr.'s fiduciary duties.

157.    The conspiracy between Falwell Jr., Becki, and Granda injured Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the 2019 Employment Agreement that proved detrimental to Liberty's interests, and damaged Liberty's reputation.

158.    Liberty seeks $10,000,000 in compensatory damages, trebled as provided by statute, and the statutory limit of $350,000 in punitive damages plus any other damages provable at trial. Liberty additionally seeks pre-judgment and post-judgment interest and attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, for the reasons stated above, Defendant Liberty requests this Court to:

a.    Award Liberty the damages identified above;

b.    Award Liberty punitive damages;

c.    Award Liberty its statutory attorneys' fees;

d.    Award Liberty its pre-judgment and post-judgment interest;

e.    Enjoin Falwell from retaining possession of property belong to Liberty; and

f.    Provide any other relief this Court deems appropriate.

LUADMINREC000226

Liberty demands trial by jury of its claim.

Respectfully submitted,

LIBERTY UNIVERSITY, INC.

Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

R. Craig Wood (VSB # 24264)
McGuireWoods LLP
652 Peter Jefferson Parkway, Ste. 350
P. O. Box 1288
Charlottesville, VA  22911
(434) 977-2558
(434) 980-2274 (facsimile)
cwood@mcguirewoods.com

LUADMINREC000227

## CERTIFICATE OF SERVICE

I certify that a copy of the First Amended Complaint was sent via electronic mail and

U.S. Mail to Vernon E. Inge Jr. and Robert N. Drewry at Whiteford Taylor & Preston, this 30th

day of September, 2021.

Scott C. Oostdyk

Exclusive: Falwell says Fatal Attraction threat led to depression

Page 1 of 5

☰  🔍    𝕷

# Washington Examiner

## Exclusive: Falwell says Fatal Attraction threat led to depression

🐦  f  in

by Paul Bedard, Washington Secrets Columnist | ✉ | August 23, 2020 09:32 PM

**Just In...**

Cuomo, top lawmakers reach deal for $212 billion New York budget, including tax hike for high earners

Those doomsday predictions for post-mask Texas? They are now coming true, but in Michigan

Majority of Michigan voters, 72%, support voter ID laws, including 58% of black voters: Poll

'Nothing is off the table' in sending vaccines and help to Michigan amid pandemic surge, Biden administration says

'Woke' hiring: Endorsing Trump is top reason for job rejection

Why corporate America is lining up against tax hikes

Daily on Energy: Carbon capture industry sees huge boost within reach

Jerry Falwell Jr., suspended as president of Virginia's Christian-focused Liberty University after a string of embarrassing acts, said that he has suffered depression caused by a former family friend who had an affair with his wife and who has been threatening to expose it.

In a statement exclusively to Secrets, Falwell revealed his wife Becki's affair for the first time and said that it was short lived and that the two reconciled quickly.

But, they claimed, her former lover has threatened them over the past several years and that they are done with it hanging over their heads.

"I'm just tired of it," said Falwell of the anxiety he's felt about the affair becoming public and embarrassing his family and Liberty. "It's just got to end," he added.

The 1,200-word statement, shown below, followed the Liberty board's decision to put Falwell on paid leave after he posted a "costume party" picture of him on a yacht with his pants partially unzipped and his arm around his wife's assistant.

His social media presence has raised eyebrows in the Liberty community, though he is often praised for his success at building up the school and keeping the coronavirus at bay from the university. He has also drawn fire for his strong support of President Trump.

The board's statement about Falwell on Friday referred to "various rumors and claims," which may be related to indications that a news service planned to air new claims from the man whom Becki Falwell had the affair with, a pool attendant the Falwells met and befriended in 2012 while staying at the Fontainebleau Miami Beach.

The statement did not name the attendant, but he has been identified as Giancarlo Granda in dozens of news stories.

In the statement and phone call with Secrets, Falwell appeared to be relieved to have finally divulged the affair and yearslong series of attacks the couple has faced.

"It was like living on a roller coaster," he said in the statement. "While completely dedicating ourselves to Liberty, we were also suffering in silence during our personal time together,



EXHIBIT

1

LU-SON-REC-00012

Unaccompanied
children at Fort
Bliss regularly
tested for
coronavirus in
expanding Defense
Department role

While simultaneously trying to manage and deal with this increasingly threatening behavior, which only worsened over time. We were doing our best to respectfully unravel this 'fatal attraction' type situation to protect our family and the university."

He said that while they tried to remain friendly with the man and his family, the threats and texts demanding huge amounts of money led them to cut him off.

"While we tried to distance ourselves from him over time, he unfortunately became increasingly angry and aggressive. Eventually, he began threatening to publicly reveal this secret relationship with Becki and to deliberately embarrass my wife, family, and Liberty University unless we agreed to pay him substantial monies," the couple said.

In 2012, the Falwells said they were impressed with the pool assistant and wanted to help him start in business. Falwell's wife worked a deal to buy a Miami hostel and put him in charge. The deal has been tangled in legal challenges.

It was while Jerry Falwell was working long hours to build up the university, which he took over after his father Jerry Falwell Sr. died in 2007, that Becki had the affair.

At the time, Falwell was working overtime to build Liberty into an online powerhouse and expand its modern campus.

Granda, who was 21 at the time, dismissed the charges of threats in an email to Secrets. He emailed, "Any allegation of extortion is falsely, defamatory and belied by clear documentary evidence. The Falwell's attempt to sandbag me, and the *Examiner*, with a last minute story without providing the *Examiner* clear evidence that this was not simply an 'affair' with concocted allegations of extortion reeks desperation. The WHOLE truth will come out."

Falwell's team provided emails and texts that it said substantiate its allegations.

After Falwell found out about the affair, he said in the statement, he lost 80 pounds and suffered mental stress, especially as Granda switched from being thankful for Falwell's help to demanding money.

"Becki and I forgave each other, because while her indiscretion may have been more obvious and apparent, I realized that there were important smaller things I needed to do better too," he said.

Falwell said that now that his family has revealed its troubles, he plans to urge others in stressful situations to seek mental help.

"Even though I continued successfully working with our entire Liberty team to achieve so many of our goals, I am now dealing with things in a way that I should have done before — including seeking to address the emotional toll this has taken. I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from the mental health professionals

LUADMNRECS00238

Exclusive: Falwell says Fatal Attraction threat led to depression                                    Page 3 of 5

Who could have alleviated this pain sooner. I have now committed to speaking out and sharing with others at Liberty the importance of seeking counseling instead of thinking you need to be tough and try to bear these burdens on your own. I am in the early stages of addressing these issues," he wrote.

And, he added, "The trauma of this experience has brought us to a very challenging point in our lives, but we are strong, our faith in Christ is greater than ever, and with His help and with those in the community who we love and who appreciate the impact of forgiveness, we will get through this. We ask for your prayers and support."

**STATEMENT BY JERRY FALWELL, JR.**

Aug. 23, 2020

*My family has been blessed with the opportunity to serve Christ and our community over the past 50 years— from when my father founded Liberty in the early 1970's through today. When my father suddenly passed away in 2007, I quickly and unexpectedly went from being the lawyer working in the background on the business aspects of the school to becoming a very public person, having to overcome my fears of speaking in front of audiences of tens of thousands, with many more responsibilities to the Liberty community and to my own family.*

*My priority was to build on my father's vision and to work hard. Thanks to the help of the Board and the extraordinary Liberty faculty, executives, staff and community, we have ensured the University's sustained growth and financial health while providing the best and most modern on-campus and online educational and spiritual resources to a wider range of students both in person and through digital platforms.*

*My commitment to Liberty became and has remained my primary focus— and while I am so grateful and thankful for our collective successes, I also realize in hindsight that there was a toll that this took on me, which extended to my family too. During this time of reflection for us and this especially challenging year, and even more so following the events of the past few weeks, my wife Becki and I agreed that this was the right time for me to share more of our story, because the Liberty community deserves to hear it directly from me and from us.*

*During a vacation over eight years ago, Becki and I met an ambitious young man who was working at our hotel and was saving up his money to go to school. We encouraged him to pursue an education and a career and we were impressed by his initiative in suggesting a local real estate opportunity. My family members eventually made an investment in a local property, included him in the deal because he could play an active role in managing it, and became close with him and his family.*

*Shortly thereafter, Becki had an inappropriate personal relationship with this person, something in which I was not involved— it was nonetheless very upsetting to learn about.*

☰   🔍

*After I learned this, I lost 80 pounds and people who saw me regularly thought that I was physically unwell, when in reality I was just balancing how to be most supportive of Becki, who I love, while also reflecting and praying about whether there were ways I could have been more supportive of her and given her proper attention. I came to realize that while it may be easy to judge others on their behavior, the King James Bible reminds us— "Thou shalt not commit adultery, but I sayeth unto you, that whoever looketh upon a woman to lust after her hath committed adultery with her in his heart." In fact, there are ways we may all be sinning, but the Lord believes in this self-reflection.*

*I was and have always remained fully devoted to Becki and we have shared many private conversations to better understand and support each other and to strengthen our marriage. Thankfully, our love has never been stronger. Becki and I forgave each other, because while her indiscretion may have been more obvious and apparent, I realized that there were important smaller things I needed to do better too.*

*In Ephesians 4:32 we learn— "Be kind to one another, tender hearted, forgiving as God in Christ forgave you."*

*We extended the spirit of forgiveness to this man with respect and kindness, both for spiritual and religious reasons, and in the hope that we could help him find his way and allow us to put this behind us, without any harm or embarrassment to our family or to the LU community to which we have dedicated our lives.*

*During the years that followed, we got to know his family and other loved ones, good people who also really care about him. They shared and confirmed to us that he has periodically demonstrated emotionally unstable behaviors with some destructive tendencies, seemingly in response to his inability to achieve his professional goals. Based on information from other sources, we believe that he may have targeted other successful women in similar ways.*

*While we tried to distance ourselves from him over time, he unfortunately became increasingly angry and aggressive. Eventually, he began threatening to publicly reveal this secret relationship with Becki and to deliberately embarrass my wife, family, and Liberty University unless we agreed to pay him substantial monies. While this was very upsetting, we had been advised by trusted legal counsel that it was best to maintain contact with this person, as we tried to manage his increasingly erratic behavior and unreasonable demands while extricating ourselves from him both on a personal level and from that real estate transaction.*

*It was like living on a roller coaster.*

*While completely dedicating ourselves to Liberty, we were also suffering in silence during our personal time together, while simultaneously trying to manage and deal with this increasingly threatening behavior, which only worsened over*

LOADMINREC000833

*time. We were doing our best to deal with our level this 'fatal Attraction' type situation to protect our family and the University.*

*Even years after the improper relationship had ended, this person continued to be aggressive with Becki and me in a variety of ways. We finally decided that we had to further withdraw completely from him, which resulted in him stepping up his threats to share more outrageous and fabricate claims about us (under the guise of that business entity). He clearly moved forward with this plan through a specific member of the media who has continued to badger us, as well as other members of the media, regarding the false claims about the nature of the relationship based on the individual's misrepresentations. Over the course of the last few months this person's behavior has reached a level that we have decided the only way to stop this predatory behavior is to go public.*

*We have categorically rejected this person's demands while dealing with him and this particular member of the media who seemed just as obsessed with the prurient, untrue aspects of this story, however fantastic.*

*Even though I continued successfully working with our entire Liberty team to achieve so many of our goals, I am now dealing with things in a way that I should have done before— including seeking to address the emotional toll this has taken. I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from the mental health professionals who could have alleviated this pain and stress. I am committed to speaking out and sharing with others at Liberty the importance of seeking counseling instead of thinking you need to be tough and try to bear these burdens on your own. I am in the early stages of addressing these issues.*

*Proverbs 3:5-6 says "trust in the Lord with all your heart and lean not on thine own understanding in all your ways acknowledge him and he will guide straight thy path."*

*The trauma of this experience has brought us to a very challenging point in our lives, but we are strong, our faith in Christ is greater than ever, and with His help and with those in the community who we love and who appreciate the impact of forgiveness, we will get through this. We ask for your prayers and support.*

Receipt : 20000019518

Page 1 of 1

**OFFICIAL RECEIPT**
**LYNCHBURG CIRCUIT COURT**
**CIVIL**

DATE : 10/28/2020    TIME : 15:59:18
RECEIPT # : 20000019518    TRANSACTION # : 20102800088
CASHIER : NRS    REGISTER # : C705
CASE COMMENTS : F v. L
SUIT AMOUNT : $0.00
ACCOUNT OF : F
PAID BY : F
  CHECK : $86.00    CHECK NUMBER : 10776
DESCRIPTION 1 : COM:COMPLAINT - CATCH-ALL
   2 : PLAINTIFF: F
   3 : NO HEARING SCHEDULED

CASE # : 680CL2000105100

FILING TYPE : COM      PAYMENT : FULL PAYMENT

| ACCOUNT CODE | DESCRIPTION | PAID |
|---|---|---|
| 049 | WRIT TAX (CIVIL) | $5.00 |
| 106 | TECHNOLOGY TRST FND | $5.00 |
| 123 | LEGAL AID SERVICES | $9.00 |
| 147 | INDIGENT ASSISTANCE (INA) | $1.00 |
| 170 | COURT TECHNOLOGY FUND | $10.00 |

| ACCOUNT CODE | DESCRIPTION | PAID |
|---|---|---|
| 219 | LAW LIBRARY | $4.00 |
| 229 | COURTHOUSE MAINTENANCE FEE (CHMF) | $2.00 |
| 304 | CIVIL FILING FEE (LAW & EQUITY) | $50.00 |

TENDERED : $    86.00
AMOUNT PAID : $    86.00

**EXHIBIT**
**2**
tabbies.

RECEIPT COPY 1 OF 2

CLERK OF COURT : TODD SWISHER

PAYOR'S COPY

LUADMINREC000234

# COVER SHEET FOR FILING CIVIL ACTIONS COPY

COMMONWEALTH OF VIRGINIA

Case No. ............................................
(CLERK'S OFFICE USE ONLY)

City of Lynchburg ................................................ Circuit Court

Jerry Falwell, Jr. .......................... v./In re: .......... Liberty University
PLAINTIFF(S)                                           DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

## GENERAL CIVIL

**Subsequent Actions**
- [ ] Claim Impleading Third Party Defendant
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Counterclaim
  - [ ] Monetary Damages
  - [ ] No Monetary Damages
- [ ] Cross Claim
- [ ] Interpleader
- [ ] Reinstatement (other than divorce or driving privileges)
- [ ] Removal of Case to Federal Court

**Business & Contract**
- [ ] Attachment
- [ ] Confessed Judgment
- [ ] Contract Action
- [ ] Contract Specific Performance
- [ ] Detinue
- [ ] Garnishment

**Property**
- [ ] Annexation
- [ ] Condemnation
- [ ] Ejectment
- [ ] Encumber/Sell Real Estate
- [ ] Enforce Vendor's Lien
- [ ] Escheatment
- [ ] Establish Boundaries
- [ ] Landlord/Tenant
  - [ ] Unlawful Detainer
- [ ] Mechanics Lien
- [ ] Partition
- [ ] Quiet Title
- [ ] Termination of Mineral Rights

**Tort**
- [ ] Asbestos Litigation
- [ ] Compromise Settlement
- [ ] Intentional Tort
- [ ] Medical Malpractice
- [ ] Motor Vehicle Tort
- [ ] Product Liability
- [ ] Wrongful Death
- [X] Other General Tort Liability

## ADMINISTRATIVE LAW

- [ ] Appeal/Judicial Review of Decision of (select one)
  - [ ] ABC Board
  - [ ] Board of Zoning
  - [ ] Compensation Board
  - [ ] DMV License Suspension
  - [ ] Employee Grievance Decision
  - [ ] Employment Commission
  - [ ] Local Government
  - [ ] Marine Resources Commission
  - [ ] School Board
  - [ ] Voter Registration
  - [ ] Other Administrative Appeal

## DOMESTIC/FAMILY

- [ ] Adoption
  - [ ] Adoption – Foreign
- [ ] Adult Protection
- [ ] Annulment
  - [ ] Annulment – Counterclaim/Responsive Pleading
- [ ] Child Abuse and Neglect – Unfounded Complaint
- [ ] Civil Contempt
- [ ] Divorce (select one)
  - [ ] Complaint – Contested◆
  - [ ] Complaint – Uncontested◆
  - [ ] Counterclaim/Responsive Pleading
  - [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
- [ ] Separate Maintenance
  - [ ] Separate Maintenance Counterclaim

## WRITS

- [ ] Certiorari
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Prohibition
- [ ] Quo Warranto

## PROBATE/WILLS AND TRUSTS

- [ ] Accounting
- [ ] Aid and Guidance
- [ ] Appointment (select one)
  - [ ] Guardian/Conservator
  - [ ] Standby Guardian/Conservator
  - [ ] Custodian/Successor Custodian (UTMA)
- [ ] Trust (select one)
  - [ ] Impress/Declare/Create
  - [ ] Reformation
- [ ] Will (select one)
  - [ ] Construe
  - [ ] Contested

## MISCELLANEOUS

- [ ] Amend Death Certificate
- [ ] Appointment (select one)
  - [ ] Church Trustee
  - [ ] Conservator of Peace
  - [ ] Marriage Celebrant
- [ ] Approval of Transfer of Structured Settlement
- [ ] Bond Forfeiture Appeal
- [ ] Declaratory Judgment
- [ ] Declare Death
- [ ] Driving Privileges (select one)
  - [ ] Reinstatement pursuant to § 46.2-427
  - [ ] Restoration – Habitual Offender or 3rd Offense
- [ ] Expungement
- [ ] Firearms Rights – Restoration
- [ ] Forfeiture of Property or Money
- [ ] Freedom of Information
- [ ] Injunction
- [ ] Interdiction
- [ ] Interrogatory
- [ ] Judgment Lien-Bill to Enforce
- [ ] Law Enforcement/Public Official Petition
- [ ] Name Change
- [ ] Referendum Elections
- [ ] Sever Order
- [ ] Taxes (select one)
  - [ ] Correct Erroneous State/Local
  - [ ] Delinquent
- [ ] Vehicle Confiscation
- [ ] Voting Rights – Restoration
- [ ] Other (please specify)

FILED IN THE CLERK'S OFFICE OF THE CIRCUIT COURT OF THE CITY OF LYNCHBURG

OCT 28 2020    TIME

TESTE: TODD SWISHER, CLERK

BY: _____ Dep. Clerk

[ ] Damages in the amount of $ ........................ are claimed.

10/28/2020
DATE

James I. Gilbert, IV VSB #38229
PRINT NAME

[ ] PLAINTIFF  [ ] DEFENDANT  [X] ATTORNEY FOR  [ ] PLAINTIFF [ ] DEFENDANT

310 S. Jefferson Street
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

Roanoke, VA 24011

jgilbert@gfbratttorneys.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

> ◆"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 07/16

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

| | |
|---|---|
| JERRY FALWELL, JR., | |
| Plaintiff, | Case No. _____ |
| v. | |
| LIBERTY UNIVERSITY, | JURY TRIAL DEMANDED |
| Defendant. | |

## COMPLAINT

Plaintiff Jerry Falwell, Jr., as and for his Complaint against Defendant Liberty University ("Liberty" or the "University"), by and through undersigned counsel, hereby alleges as follows:

## INTRODUCTION

1.     This defamation action against Liberty University by its former President and Chancellor, Jerry Falwell, Jr., is necessitated by Liberty's abdication of its legal, contractual, and moral obligations not to defame him. Jerry Falwell, Jr., has dedicated much of his adult life to Liberty University, which was founded by his father, Jerry Falwell, Sr. ("Dr. Falwell"), in 1971. Following his father's death in 2007, Jerry Falwell, Jr. stepped in as President and Chancellor of the University, saving the institution from financial collapse and developing Liberty into the world's leading evangelical university and the largest private nonprofit university in the nation. In return, Liberty set out to destroy Mr. Falwell's reputation through numerous defamatory statements that affirm the outrageous lies of an unstable individual who attempted to extort the Falwells and who, on information and belief, conspired against Mr. Falwell with politically

motivated backers, including Aaron Resnick and the political action committee The Lincoln Project.

2.      Under Mr. Falwell's stewardship, Liberty University's stature increased exponentially by almost every metric, especially enrollment and financials. Between just 2007 and 2020 alone, attendance increased from 9,600 students in residence and 27,000 students online to 15,000 students in residence and 108,000 students studying online. And, after decades of financial hardship, Liberty now boasts a $1.6 billion endowment—one of the nation's largest. More students enrolled and more donors gave because of Mr. Falwell's tireless efforts in carrying out his father's vision for Liberty.

3.      When Mr. Falwell and his family became the targets of a malicious smear campaign incited by anti-evangelical forces, Liberty University not only accepted the salacious and baseless accusations against the Falwells at face value, but directly participated in the defamation. This action seeks redress for the damage Liberty has caused to the reputation of Mr. Falwell and his family.

4.      For years, Mr. Falwell and his wife, Rebecca Falwell, have been the victims of an ongoing extortion scheme by Giancarlo Granda—efforts which have recently been absorbed into a smear campaign by political operatives who are opposed to Mr. Falwell's support of President Trump. Granda repeatedly demanded enormous cash payments from the Falwells to stay silent about a brief affair with Mrs. Falwell that ended in 2014. Granda is an unstable and manipulative individual who saw the Falwells' kindness, and his involvement with Mrs. Falwell, as opportunities ripe for exploitation.

5.      The Falwells refused to pay, and Granda's disturbing behavior became increasingly erratic and threatening.

2

LUADMINREC000237

6.     On information and belief, Granda began conspiring with political operatives to defame Mr. Falwell.  Granda recently admitted in an ABC News interview that he is being represented free of charge by Kurt Bardella, a senior advisor to The Lincoln Project.  The Lincoln Project is a political action committee that has a self-described mission to "Defeat President Trump and Trumpism at the ballot box."  The Lincoln Project's animosity towards Mr. Falwell presumably arises from the fact that President Trump's evangelical support is often attributed to Mr. Falwell's early endorsement of him during the 2016 primaries.  It has been reported that Bardella is also arranging Granda's interviews with the press.  Granda further admitted to being introduced to The Lincoln Project by his attorney, Aaron Resnick, a politically prominent lawyer in Miami, Florida.  On information and belief, Resnick has been financing Granda's personal expenses.

7.     In June 2020, Mr. Falwell made clear to Granda in no uncertain terms that he would not be extorted, no payments would be forthcoming, and Granda should cease and desist from contacting him.  Shortly thereafter, Granda—backed by The Lincoln Project—embarked on a hit job against Mr. Falwell in the press.  On August 24, 2020, Granda stated publicly for the first time the outrageous, false, and defamatory lies that Mr. Falwell had "looked on" and "watched" as Granda had sex with his wife and participated in the affair.

8.     The lies had the effect that Granda and The Lincoln Project intended.  Within a day, Liberty turned on Mr. Falwell and forced his resignation as University President and Chancellor.  Liberty conducted zero investigation into Granda's lies and willfully ignored information demonstrating their falsity.  Soon after his resignation, the University began to systematically erase Mr. Falwell from Liberty University history:  scrubbing any mention of him from the University website; removing portraits of Mr. Falwell from campus (including a portrait

3

LUADMINREC000238

of Mr. Falwell as a boy attending a University football game with his late father); prohibiting Liberty faculty and staff members from speaking with him; and banning him from visiting campus grounds—which include the gravesites of his mother and father.

9.    The University also moved quickly to destroy Mr. Falwell's reputation in the Liberty community and nationwide.  On August 26, 2020, in its high-profile and publicly-broadcasted Community Service event, before thousands of gathered students and faculty—and the world—Liberty lent credence to Granda's lies, stating that Mr. Falwell had engaged in "disobedient" behavior "in secret" that was "shameful" and a "sin."  Liberty then repeated similar statements in a press release and its official magazine.

10.    Up until that point, Granda's lies were just that—lies, vigorously denied by Mr. Falwell.  But Liberty gave those lies an air of truth and righteousness.  With the exercise of even the slightest diligence, Liberty would have quickly confirmed that Granda's outrageous lies are false.  Instead, Liberty gave Granda's lies an air of truth by immediately forcing Mr. Falwell's resignation and publicly defaming him.

11.    Liberty's actions are antithetical to the teachings of Christ.  Liberty's conduct has damaged Mr. Falwell's standing among Liberty faculty, students, and alumni, the broader evangelical community, and beyond.  Liberty's conduct has also damaged *Liberty* itself, and the evangelical community, by playing right into the hands of sinister operatives with ulterior motives.  Liberty has rejected Mr. Falwell's attempts to reach an amicable resolution, forcing Mr. Falwell to bring this action to restore his reputation.

**THE PARTIES**

12.    Plaintiff Jerry Falwell, Jr. is a citizen and resident of Virginia.  He currently resides in Bedford County, Virginia.  Mr. Falwell has a Juris Doctorate from the University of

4

Virginia and was a practicing lawyer for many years.  Mr. Falwell began working at Liberty University in 1988 as General Counsel, a position that he held until May 2007.  Following the death of Dr. Falwell in May 2007, Mr. Falwell served as the President and Chancellor of Liberty University until his August 25, 2020 resignation.

13.     Defendant Liberty University is a Virginia nonstock corporation headquartered in Lynchburg, Virginia with its principal office located at 1971 University Blvd, Lynchburg, Virginia 24515.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter pursuant to Va. Code §§ 17.1-513, 8.01-328.1.  Defendant is organized as a nonstock corporation under the laws of the Commonwealth of Virginia and has its principal office in the Commonwealth of Virginia.

15.     Venue properly lies in this Court under Va. Code Ann. §§ 8.01-257 and 8.01-262 because it is a forum convenient to the parties and witnesses, where justice can be administered without prejudice or delay.  Liberty University's principal office is located in Lynchburg, Virginia.

16.     Furthermore, the Employment Agreement entered into between Mr. Falwell and Liberty, which provides the basis for at least one of the claims in this action, specifies that any legal action or proceeding arising out of or relating to the Employment Agreement shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

## FACTUAL BACKGROUND

### A.  The Falwell Family and the Founding of Liberty University

17.     Born on June 17, 1962 in Lynchburg, Virginia, Mr. Falwell comes from storied Virginian roots.  His late father, Dr. Falwell, is among the most respected leaders in the

5

evangelical Christian community, described by The Economist as a "quintessentially American type: a poor man who won fame and fortune by preaching the Word."

18.     In 1952, Dr. Falwell decided to dedicate his life to Christ and preaching Christianity. After graduating college, he returned home to Lynchburg to start a church in a disused soda-bottling plant with a congregation consisting of just 35 adults and their families.

19.     Dr. Falwell steadily grew his congregation using nothing but his charisma, and, at first, his own two feet, visiting 100 or so homes a day to seek new congregation members, carrying only a yellow legal pad and a Bible.

20.     Dr. Falwell's breakthrough came from using the technology of the era to spread the gospel. Soon after his church opened, he began a half-hour daily radio broadcast, like the ones his mother would play on Sunday nights. And only a few months later, he began televising his services, which quickly gained him a national audience. He called the show "Old-Time Gospel Hour," and it started to skyrocket his congregation's numbers almost immediately. In the first year, his congregation grew from 35 to nearly a thousand, and that was only the beginning. By the 1970s, his church sat thousands, and Old-Time Gospel Hour was broadcast nationally to hundreds of thousands of homes.

21.     In 1971, just a few blocks from his church, Dr. Falwell founded Lynchburg Baptist College, which would eventually become known as Liberty University. The school's mission was "Training Champions for Christ," and like Dr. Falwell's church, it originally started small, with only 154 students, a tuition of $200, and four full-time faculty members. It quickly began to grow. Just 10 years after its founding, over 3,500 students were enrolled, and by 1988 it had become the largest private university in Virginia with a combined enrollment of 11,000 students from all 50 states and 30 nations.

LUADMINREC000241

22.     While Liberty University grew, Dr. Falwell became a titan in Christian evangelicalism as well as American politics. In 1979, after hosting a series of "I Love America" rallies across the country to raise awareness of social issues, Dr. Falwell founded the Moral Majority, a political organization headquartered in Lynchburg, Virginia, that, at its height, claimed more than four-million members and two-million donors.

23.     Although Dr. Falwell became a national figure through his work with the Moral Majority and the Old-Time Gospel Hour, his passion lay in being a pastor and a Christian educator. And in 1989, he disbanded the Moral Majority, allowing himself more time to concentrate his efforts on heading his church and Liberty University. Dr. Falwell dreamed that Liberty would grow to 50,000 students and be to fundamentalist Christians what The University of Notre Dame is to Catholics and Brigham Young University is to Mormons.

**B.     Mr. Falwell's Contributions to Liberty University**

24.     Despite Dr. Falwell's best efforts, he had difficulty keeping Liberty afloat financially. Donors and family friends had to step in to help manage the finances and arrange for companies to write-off Liberty's debt, and even with their help, by the 1990s, Liberty University was on the verge of financial collapse.

25.     Fortunately, when the school was nearing its financial nadir, facing bankruptcy and potential collapse, Jerry Falwell, Jr. was fully grown and able to assist his father in not only keeping the school alive, but achieving Dr. Falwell's dream for Liberty University. In 1987, Jerry Falwell, Jr. was a practicing lawyer and commercial real estate developer. In 1988, he joined Liberty as General Counsel.

26.     While Dr. Falwell focused on maintaining the school's religious education, Mr. Falwell worked to keep the creditors at bay, which was no small feat. By 1990, the school had

7

nearly $100 million in debt. Liberty's accrediting body, the Southern Association of Colleges and Schools Commission on Colleges, had even placed it on a one-year probation and was scrutinizing its every move, going so far as to issue Liberty more than 100 "recommendations" to maintain its accreditation, most of which centered around restructuring the school's debt.

27.     With Mr. Falwell's assistance, Liberty University not only climbed out of its financial hole, but began to thrive. As Dr. Falwell himself put it, "God sent [Jerry Falwell, Jr.] to me just in time. He is more responsible, humanly speaking, for the miraculous financial survival of this ministry than any other single person."

28.     In 2000, Mr. Falwell joined Liberty University's Board of Trustees, and in 2003 he became the school's Vice Chancellor. As a board member and Vice Chancellor, he assisted his father with running the school's day-to-day operations and managed the University's debt for years.

29.     On May 15, 2007, Dr. Falwell passed away. In accordance with his wishes, upon his passing, his two sons took control of the two pinnacles of his legacy: Jonathan took over his church, Thomas Road Baptist Church, and Jerry, Jr. became President and Chancellor of Liberty University.

30.     Mr. Falwell rose to the occasion. He has been widely recognized as having led Liberty University not only through difficult financial straits, but also for steering its transformation into the world's leading evangelical university.

31.     Dr. Falwell passed away before Liberty University achieved his dream of 50,000 enrolled students. Under Mr. Falwell's stewardship, however, Dr. Falwell's dream was achieved, and then surpassed: during his tenure as President and Chancellor, Mr. Falwell grew Liberty University's enrollment from 38,000 to 110,000 students, making it the one of the largest

8

LUADMINREC000243

evangelical Christian universities in the world, and one of the largest private non-profit universities in the United States.

32.    Under Mr. Falwell's leadership, Liberty University's finances have transformed from being crippled by debt to possessing nearly $3.5 billion in net assets and one of the largest and fastest-growing endowments of any university in the nation.   The University's sports teams play in Division 1 of the National Collegiate Athletic Association (alongside The University of Notre Dame and Brigham Young University, as Dr. Falwell always wanted).   In 2017, its football team joined the Football Bowl Subdivision, college sports' most competitive level.   Its sprawling campus, which overlooks Lynchburg, Virginia, comprises 7,000 acres and 17 colleges. Under Mr. Falwell's stewardship, Liberty has built a $50 million library with a high-tech robotic book-retrieval system (one of only a few in the country); renovated its 25,000-seat football stadium (Williams Stadium); and built a year-round outdoor ski slope (the only one of its kind in North America) that is free for students.   In January 2017, President Donald Trump gave the commencement speech at Liberty University—one of his very first speeches as President of the United States.

**C.    Liberty Recognizes Mr. Falwell's Outstanding Leadership in the 2019 Employment Agreement**

33.    Mr. Falwell's outstanding leadership of Liberty endeared him to students, faculty, alumni, and donors alike.   Indeed, Liberty students would often chant his name when he appeared at school events.   And his success with donors is undeniable:   as noted above, in the first ten years of Mr. Falwell's tenure as President and Chancellor, Liberty's endowment grew exponentially.

LUADMINREC000244

34.    In 2019, Liberty University and Mr. Falwell negotiated and entered into the Employment Agreement, which was intended to fairly compensate Mr. Falwell for his significant contributions and to bring his compensation in line with market compensation.

35.    In light of his proven track record as President and Chancellor, in 2019, the University took steps to ensure that Mr. Falwell was properly compensated for the success his stewardship had brought Liberty.  The University retained FW Cook, a national consulting firm with expertise in the compensation of executives in tax-exempt organizations, to review Mr. Falwell's compensation.  The University tasked FW Cook with determining whether Mr. Falwell's compensation was in line with national standards, taking into account Liberty University's growth and financial achievements and Mr. Falwell's historical compensation.  FW Cook made recommendations for program changes as needed to ensure that Mr. Falwell was retained at Liberty University for the long term and provided with a competitive and motivating compensation program.

36.    In recognition of Mr. Falwell's numerous significant contributions to Liberty University, and in an effort to compensate Mr. Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, under advisement from FW Cook, Liberty University entered into the Employment Agreement.

37.    As Liberty University specifically recognized in the Employment Agreement:

a)    In his first ten years with Liberty University, Mr. Falwell was instrumental in promoting and furthering the University's debt restructuring and returning the University to a position of financial strength by 1997 from a period of severe financial hardship.

10

b)   During Mr. Falwell's tenure with Liberty University, he was instrumental in promoting and furthering the rapid expansion and continued success of the University, especially since 2007, when Mr. Falwell became President and Chancellor.

c)   Under Mr. Falwell's leadership, between 2007 and 2017 Liberty University's net assets increased from approximately $100 million to over $2.1 billion. During the same time period, the University's annual gross revenues increased from $231,506,554 to over $1 billion, and its surplus of revenues over expenditures increased from $52,514,469 to $331,142,834.

d)   Likewise, under Mr. Falwell's leadership, between 2007 and 2017 Liberty University's attendance increased from 9,600 students in residence and 27,000 students online in 2007 to 15,000 students in residence and 86,000 students studying online in 2017.

e)   As a result of its strong financial performance under Mr. Falwell's leadership, Liberty University's Standard & Poor's credit rating has been AA since 2011, placing Liberty among the 80 highest rated universities nationally.

38.   The Employment Agreement includes a non-disparagement clause, which provides that "[t]he parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings." It further provides that the parties may, if Mr. Falwell is terminated for cause, "truthfully explain the circumstances forming the basis for the determination of cause." This non-disparagement provision expressly survives termination of the Employment Agreement.

39.   The Employment Agreement provides indemnification rights above and beyond "any and all indemnity rights and protections [Mr. Falwell] may have pursuant to statute or under

11

LUADMINREC000246

any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies." Section 10.1 of the Employment Agreement provides that:

> [t]o the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment.

**D.    Granda's Attempts to Extort the Falwells**

*(i) Granda's Lies Regarding the Affair*

40.    Jerry and Rebecca Falwell have been married since 1987 and have three children together.  In March of 2012, Mr. and Mrs. Falwell were on vacation with their family, as well as two other families, at the Fontainebleau Miami Beach hotel in Miami, Florida.  There, they met Giancarlo Granda, who was employed at the resort as a pool attendant.  At first, Granda impressed the Falwells with his entrepreneurial attitude and ambition, and the Falwells befriended him.  With the Falwell's help and encouragement, Granda decided to return to college and received his bachelor's degree in finance from Florida International University.

41.    Unbeknownst to Mr. Falwell, on rare occasions between 2012 and 2014, Mr. Granda and Mrs. Falwell engaged in an affair.  The Falwells later learned that Granda used his job at the Fontainebleau Miami Beach hotel to prey on hotel guests, especially women.

42.    When Mr. Falwell learned of the affair, he was heartbroken.  However, after working on their marriage, he and Mrs. Falwell reconciled.  Unfortunately, Mr. and Mrs. Falwell's reconciliation did not put an end to the trouble Granda would cause their family. Notwithstanding all the support the Falwell family gave to Granda, he soon revealed himself to be a deeply disturbed and unstable individual who was bent on continually threatening the

12

Falwells and exploiting the affair to his financial advantage. As explained below, when it became clear the Falwells would not be extorted and would never pay for his silence, he publicly unleashed falsehoods in an attempt to destroy their lives.

43. When the affair ended in 2014, the Falwells initially attempted to distance themselves from Granda, but Granda responded with aggression and threats to publicize his relationship with Mrs. Falwell to publicly embarrass the Falwells and Liberty University.

44. Granda's threats placed an enormous amount of strain on the Falwells' well-being—the constant anxiety contributed to Mr. Falwell losing 80 pounds over just two years. Although the Falwells wished to distance themselves from Granda completely, given the threat that he posed, the Falwells believed it best to maintain a positive relationship with him to placate his increasingly erratic behavior and manage his extortive demands while extricating themselves. Granda became obsessed, however, with the prospect of leveraging his relationship with the Falwells into a payday.

45. For example, Granda had sold intimate pictures of Mrs. Falwell to his friends, who then used those pictures to try to extort the Falwells for money. When Granda learned of his friends' extortion attempt, rather than apologize for the emotional and financial toll it took on the Falwells, Granda expressed awe that he had possessed pictures that were apparently so valuable, and that the friends to whom he had sold the pictures stood to gain more than he had from selling them to them.

46. Granda also illegally recorded phone calls and FaceTime communications with Mrs. Falwell without her consent. On information and belief, he made these recordings to strengthen his extortion attempts and to support his later public allegations with out-of-context clips that purportedly verified his ludicrous allegations.

13

47.     Afterwards, in late 2014, Granda repeatedly threatened to publicize the affair unless the Falwells gave him large sums of money, ranging from $600,000 to $2 million.

*(ii) Granda's History of Unstable Behavior.*

48.     Recently, Granda's ex-girlfriends, with whom the Falwells grew close in their effort to maintain a positive relationship with Granda, have confided in the Falwells that Granda was unbalanced and manipulative.

49.     On more than one occasion, Granda's (now ex) girlfriends texted the Falwells to seek their help in managing Granda's self-destructive and unbalanced behavior, stating that Granda was "crazy and verbally abusive" to his girlfriend, his family, and anyone that grew close to him; and that he exhibited frequent "rages," including virtually destroying his parents' house and "saying really [expletive] up stuff to others."

50.     One ex-girlfriend told the Falwells that Granda often hurled racist insults at her and her family.  As she put it, "he had truly unresolved psychological issues that make him hurt people who love him . . . he did the same to his family growing up and now he is doing it to me . . . his snapping and explosive behavior is legitimately scary."  She further described that he would say "the most [expletive] up things about my family" and her, and that she had "never heard such disgusting racist [expletive] in [her] life."

*(iii) Granda's Efforts to Extort The Falwells*

51.     While the Falwells were successful in placating Granda for a time, his extortive threats never stopped.  Indeed, they only became more outrageous and potentially damaging.

52.     When the Falwells eventually decided to attempt disengaging with Granda completely, it was then that Granda changed the threat behind his extortion to something more damaging.  Rather than just reveal the affair Granda had engaged in with Mrs. Falwell, Granda

14

LUADMINREC000249

threatened to falsely claim that Mr. Falwell had been a willing participant in the affair, even watching the two engage sexually.

53.    This was not true. Mr. Falwell did not participate in the affair and he certainly did not watch Granda having sex with his wife.

54.    Upon information and belief, Granda had cooked up this lie hoping that it would provide him a more powerful threat for purposes of accomplishing his intended extortion of the Falwells. He was aware of Mr. Falwell's role at Liberty University, an evangelical institution, his father's legacy as a national evangelical leader, and his involvement with the Republican Party.

55.    On June 30, 2020, Mr. Falwell communicated to Granda, in no uncertain terms, that he would not be extorted; he would not give Granda any money; and Granda should cease and desist from contacting the Falwells. Granda has not ceased contacting the Falwells and has continued to attempt to communicate with the Falwells though texts and calls, including in harassing communications as recently as October 2020.

56.    After receiving the June 30 communication and apparently realizing his extortion scheme would fail, rather than refrain from contacting the Falwells, Granda then set out to destroy them in public. In other words, if the Falwells would not pay Granda to stay silent, perhaps someone else would pay him to go public.

57.    The Presidential election season and Mr. Falwell's long-standing and vocal support for the President in media and public appearances, including his early endorsement of the President in 2016, gave Granda the perfect opportunity.

58.    On information and belief, by this point Granda was no longer acting alone on his plan to publicly reveal his lies but was now conspiring with political operatives to defame Mr.

LUADMINREC000250

Falwell.  Because of the salacious nature of Granda's false allegations, and because of Mr. Falwell's family name, reputation among evangelicals, and public and vocal support for President Trump, political operatives who are opposed to President Trump's re-election worked with Granda on his defamatory media campaign against Mr. Falwell.

59.   Among these individuals was Kurt Bardella, a Senior Advisor to The Lincoln Project—a political organization that accused President Trump of "crimes, corruption and corrosive nature" and that has dedicated its efforts to "defeating President Trump and Trumpism at the ballot box."  On information and belief, Bardella and The Lincoln Project have been advising Granda in an attempt to use his defamatory statements to harm President Trump's chances at re-election.  Further, Granda recently admitted in an ABC News interview that he is being represented free of charge by a senior adviser to The Lincoln Project, to whom he was introduced by his attorney.  It has also been publicly reported that Bardella was organizing interviews for Granda.

60.   The Lincoln Project was reportedly brought in by Aaron Resnick, Granda's attorney, who is a politically prominent lawyer in Miami, Florida.

61.   Furthermore, on information and belief, Mr. Bardella, The Lincoln Project, and potentially other questionably motivated supporters of Granda have gone so far in their support for his false allegations that they have financially compensated Granda and paid his bills. Granda has been observed paying for expenses with a credit card that was not his own.  On information and belief, this card belongs to Resnick.

62.   On August 23, 2020, faced with Granda's threat to not only his wife but his own reputation, and the reputation of Liberty University, Mr. Falwell decided that the best thing to do

16

was to try and explain the suffering he and his family had endured from Granda's attempted extortion over the past years. Mr. Falwell gave a statement to the Washington Examiner.

63.    Notably, Mr. Falwell's statements to the Examiner detailed the Falwells' interactions with Granda and made clear that Granda had attempted to extort the Falwells through salacious allegations that were utterly false.

64.    The next day, on August 24, 2020, Granda followed through with his extortive threat to accuse Mr. Falwell of participating in Granda's affair with Mrs. Falwell. In a *Reuters* article titled *The Falwell Affair*, Granda made the outrageously false claim that Mr. Falwell participated in Granda's affair with Becki Falwell and "enjoyed watching" them have sex. The *Reuters* article also noted that Mr. Falwell "categorically denies" the allegations.

65.    Even the article's headline revealed that its purpose, and indeed the entire motive behind Granda and his co-conspirators' defamation of Mr. Falwell, was to attack Mr. Falwell *and* the institutions with which he was connected: Liberty University and President Trump. The byline reads, "[Granda] says he had sex with Becki Falwell while Jerry Falwell, Jr., *head of Liberty University and a staunch supporter of President Trump,* looked on." (emphasis added).

E.    **Liberty Forces Mr. Falwell's Resignation Without Investigation of Granda's Lies**

66.    On the same day that *Reuters* published Granda's false and defamatory statements, the Executive Committee of Liberty University's Board of Trustees forced Mr. Falwell to tender his resignation as President and Chancellor of the University.

67.    On information and belief, the Board of Trustees and the Executive Committee were aware of Mr. Falwell's August 23, 2020 statement in the Washington Examiner noting that he was the subject of extortive attempts by an individual who was using an affair with Mrs.

17

LUADMINREC000252

Falwell to fabricate outrageous claims regarding Mr. Falwell to harm his reputation, as well as his categorical denial in the *Reuters* article.

68.     Moreover, at the time of Mr. Falwell's resignation, Liberty further possessed information that Granda's statements were false because Mr. Falwell had previously disclosed information regarding the affair to a top official who was then, and is now, a member of the University's Board of Trustees.

69.     Yet, despite this knowledge, when the *Reuters* article was published, not one member of the Board or the Executive Committee asked Mr. Falwell about the veracity of Granda's lies before forcing Mr. Falwell's resignation and then defaming him by repeating and endorsing the lies.  Liberty still has not inquired with Mr. Falwell about Granda's lies.  Further, Liberty performed no investigation whatsoever into the veracity of Granda's claims before forcing Mr. Falwell's resignation or before making its defamatory statements.

70.     Upon information and belief, certain key individuals directly involved in the decisions and actions to force Mr. Falwell's resignation and then defame him were fulfilling a long-held goal to end Mr. Falwell's fruitful thirty-two-year relationship with the University. Purportedly acting in the University's interest to disassociate the University from Mr. Falwell's alleged indiscretions, these individuals had engaged, or were engaged, in various illegal, unlawful, and immoral or otherwise dubious acts in their stewardship of other institutions and otherwise which, if known to the public generally, would unquestionably tarnish the reputation of Liberty University by association.  It is therefore hypocritical in the extreme for these key individuals to cast any action of Mr. Falwell as disqualifying Mr. Falwell from leading Liberty, as he had done successfully for many years.

18

LUADMINREC000253

71.     Mr. Falwell was told to tender his resignation from Liberty, or he would be forced to resign.  On August 24, 2020, Mr. Falwell provided Liberty University with written notice of his resignation for "good reason," as that term was defined in the Employment Agreement.

72.     On August 25, 2020, Liberty University accepted Mr. Falwell's resignation for good reason through a vote of its Executive Committee, which was affirmed on the same day through a full vote of the Board of Trustees, thus terminating Mr. Falwell's employment with the University.

73.     By forcing Mr. Falwell's resignation from Liberty immediately following Granda's false and defamatory statements, Liberty sent the unmistakable message to the public that Granda's false statements were, in fact, true.

F.     **Liberty University Defames Mr. Falwell Following His Resignation**

74.     After severing his relationship from Liberty, and despite Liberty's acceptance of Granda's false story, Mr. Falwell looked forward to the next chapter in his life.  Liberty, however, immediately began a campaign to tarnish, minimize, and outright destroy the legacy of the Falwell family and Mr. Falwell's reputation.

75.     The very next day, on August 26, 2020, David Nasser, Liberty University's Senior Vice President for Spiritual Development, presented a speech at the University's Community Service, an event at the start of a new school year where thousands of students and faculty were present and which Liberty also broadcasted online.

76.     Nasser helped secure a wide-spread attendance and media presence for this event by promoting it, including at Liberty's Convocation, which was held earlier that day, broadcasted online, and considered mandatory for all staff, faculty, and students.  During Liberty's

19

Convocation, Nasser told the audience that he would be discussing the events leading to Mr. Falwell's resignation that night.

77.     On information and belief, Nasser's speech later that day at Community Service was largely scripted; other Liberty employees participated in drafting the speech, and Mr. Nasser was reading from a script during his speech.

78.     Nasser began the defamatory portion of the speech by stating, "There are those who have told me to lay low and to not mention any of the things that lead to Jerry Falwell's resignation yesterday." Moments later, Nasser tells the audience, "you're also right if you wanna see stern and swift accountable action for sinful behavior." A moment later, he tells the audience, "the embarrassment that's been brought upon you as a Liberty student and more importantly brought upon the name of Christ is wrong." A moment later, he tells the audience, "Your concerns, if you're concerned, are valid. If you're not concerned, you should be concerned." Later in the speech, Nasser returns to the topic, again prefacing his remarks by referring to Granda's lies: "Then the summer came to a close, and we opened the semester with a series of revelation about Jerry Falwell that can only be described as shameful. That's okay, by the way, to say it. It's okay to call sin, sin. Paul says in Ephesians. Have nothing to do with the fruitless deeds of darkness but rather, expose them. It is shameful to even mention what the disobedient do in secret. But everything exposed by the light becomes visible." A moment later, he proceeds to state again, "It's okay to call sin, sin." These remarks together are referred to herein as the "Defamatory Speech."

79.     The Defamatory Speech is false and defamatory.   Taken together, Liberty's statements repeat, as a statement of fact, Granda's lies that Mr. Falwell watched him have sex with his wife and participated in their affair.  Granda's lies were first reported in the *Reuters*

20

article two days before the speech and instantly garnered national press attention. Upon information and belief, every or virtually every Liberty student and faculty member present for the speech was aware of Granda's lies and understood that they were "the things that led to Jerry Falwell's resignation yesterday," as Nasser put it. Upon information and belief, that is exactly what Liberty intended to convey and intended for listeners to understand and what the audience in fact understood. By saying, "[y]our concerns, if you're concerned, are valid," referring to the subject matter of Granda's lies as "sinful behavior" and a "sin," and as something "shameful" the "disobedient do in secret," Liberty unequivocally told its audience and the world that Mr. Falwell had done what Granda had falsely said he did, in other words, that Granda's lies were "valid."

80.     The Defamatory Speech was the subject of much media attention and was attended by members of the national press, as Liberty was no doubt aware it would be.

81.     Liberty published a video of the Defamatory Speech online to its website, and it remains online as of the time of this filing.

82.     On information and belief, Nasser was authorized to speak on behalf of Liberty at the Community Service event. In fact, Nasser did so in the course and scope of his employment and in furtherance of Liberty's interests, and was acting as Liberty's agent in his role as Senior Vice President. Furthermore, the Community Service event was an official Liberty University event where thousands of Liberty students were in attendance, alongside Liberty's faculty and leadership, including its acting President and Chairman Jerry Prevo.

83.     On August 31, 2020, Liberty University issued a press release affirming its prior condemnation of Mr. Falwell. In the statement, Liberty accused Mr. Falwell of a "lack of spiritual stewardship" and suggested that he had not "demonstrate[d] a full commitment to the spiritual mission of Liberty University by words, actions, and example." Liberty clearly

21

LUADMINREC000256

connected its accusation of a lack of spiritual leadership with Granda's false allegations by noting that "all the signs were not there until the start of last week," *i.e.,* when Granda's false allegations were publicized, and that while Liberty "still didn't' know the full scope of the matter, [it] had learned enough . . . ." This statement was posted online, and it remains online as of the time of this filing. These statements together are referred to as the "Defamatory Press Release."

84.     The Defamatory Press Release is false and defamatory because, as with the Defamatory Speech, it suggests that Mr. Falwell's presidency came to an end because of Granda's lies and that, by claiming Mr. Falwell "lack[ed] spiritual stewardship" and conducted himself inconsistently with the "spiritual mission" of Liberty, said lies were truthful.

85.     Liberty has also defamed Mr. Falwell in the pages of its own publication, providing statements that it knew would be disseminated by a media biased against Mr. Falwell. For example, a number of articles in the September 24, 2020 issue of the *Liberty Journal*, an official magazine published by the University and distributed nationally to media outlets and alumni, further accused Mr. Falwell of inappropriate behavior. Specifically, one article republished Liberty's August 31, 2020 accusation in the Defamatory Press Release of a "lack of spiritual stewardship" from Mr. Falwell. Another article said that "[r]ecent events involving Liberty's fourth president, Jerry Falwell, Jr., have broken trust for most in Liberty University, and some question Liberty's commitment to its nearly 50-year mission of *Training Champions for Christ.*" These statements together are referred to as the "Defamatory Journal Articles."

86.     Liberty published this issue of the *Liberty Journal* online, and it remains online as of the time of the filing of this Complaint. The *Liberty Journal* is also distributed publicly by mail, nationwide.

22

87.     The Defamatory Journal Articles are false and defamatory because, as with the Defamatory Speech and Defamatory Press Release, they suggest that Mr. Falwell's presidency came to an end because of Granda's lies, including by asserting the lies are true by claiming Mr. Falwell "lack[ed] spiritual stewardship" and that he had "broken trust for most in Liberty University."

88.     The Defamatory Speech, Defamatory Press Release, and Defamatory Journal Articles are herein referred to as the "Defamatory Statements."

89.     In tandem with their attempts to savage Mr. Falwell's reputation, Liberty has engaged in a campaign to erase history and blot out the Falwell family's legacy at Liberty. Liberty has prohibited Mr. Falwell from speaking to its staff; prohibited faculty from speaking to Mr. Falwell; and banned Mr. Falwell from visiting campus, despite the fact that both of Mr. Falwell's parents are interred on Liberty's grounds. The University has even gone so far as to take down photos of Mr. Falwell, including a portrait of a young Mr. Falwell standing with his father, Dr. Falwell, on the sidelines of Liberty University's first football game in 1973.

90.     Again, prior to making the Defamatory Statements and taking these actions, on information and belief, Liberty was aware of Mr. Falwell's August 23, 2020 statement in the Washington Examiner and categorical denial in the *Reuters* article. Indeed, at the time of the Defamatory Statements, Liberty was even aware of the fact that Mr. Falwell was receiving therapy for stress-induced depression, which Mr. Falwell incurred in part because of the anxiety Granda's attempted extortion was causing. Yet, not one member of the Board or the Executive Committee asked Mr. Falwell about the veracity of Granda's allegations, and on information and belief, Liberty never undertook its own investigation.

23

91.     In fact, for Liberty the issue has never actually been about whether Mr. Falwell did anything wrong.  On information and belief, Liberty forced Mr. Falwell's resignation and issued these statements because certain high-ranking individuals (for reasons known only to themselves now but are to become known broadly during this litigation) wanted him replaced as President and Chancellor of Liberty University.  Upon information and belief, Liberty engaged in this defamatory campaign to seal the deal and ensure the permanent termination of Mr. Falwell's relationship with the school his father founded.

92.     Yet, as recently as October 23, 2020, Liberty's acting President and Chairman, Jerry Prevo, noted that "in the time I have been here I have not seen any wrong-doing on [Mr. Falwell's part]."  Nevertheless, despite acknowledging that there had not been any wrongdoing, Liberty apparently stands by its Defamatory Statements against Mr. Falwell as each remains publicly available on Liberty's website, and Liberty has never apologized or retracted the Defamatory Statements.

G.      **Harm to Mr. Falwell As a Result of Liberty's Defamation**

93.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell's reputation, profession, and future employment prospects and business opportunities have been harmed.

94.     Upon information and belief, there is widespread knowledge of the Defamatory Statements within the Liberty University community, the evangelical community, the real estate industry, the academic field, the political world, and media outlets.

95.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell has a drastically reduced ability to attach his name to, or be otherwise publicly involved in, business

LUADMINREC000259

and charity organizations and events without a real and justifiable fear that his damaged reputation will erode the reputation of such organizations.

96.    For instance, prior to Liberty's statements, Mr. Falwell received a number of invitations to appear on television or at public events to discuss, among other things, Liberty, evangelicalism, and politics.   Indeed, Mr. Falwell has considered becoming a recurring contributor on news outlets.  Since Liberty's Defamatory Statements, Mr. Falwell has received no such invitations and has lost any prospect of becoming a contributor.

97.    As a direct and proximate result of Liberty's Defamatory Statements, Mr. Falwell has a drastically reduced ability to attend industry-related academic, political, or real-estate conferences, and to seek business and professional opportunities in those fields, without a real and justifiable fear that any new business contacts he develops will have knowledge of the Defamatory Statements and associate his damaged reputation with any companies he establishes, manages, and/or owns.  In the past, Mr. Falwell has attended a number of such conferences per year.

98.    As a direct and proximate result of the Defamatory Statements, Mr. Falwell has a drastically reduced ability to attend community social events, such as events at his relatives' school and with his neighborhood association, without a real and justifiable fear that any people he meets will have knowledge of the Defamatory Statements and associate him with such statements.

99.    Both the Defamatory Statements and the attendant fear that others will associate Mr. Falwell's businesses, charities, family, and friends with his damaged reputation have caused Mr. Falwell significant anguish and humiliation.

25

100.   That Mr. Falwell now rarely speaks or appears publicly on behalf of the businesses and charity organizations he supports—a form of support that Mr. Falwell formerly enjoyed—has also caused Mr. Falwell significant anguish.   In addition, the Defamatory Statements have caused Mr. Falwell immense anguish as he now is deeply concerned that third parties will hold horribly false impressions of him.

101.   As a direct and proximate result of Liberty's statements, Mr. Falwell has also become the subject of much ire and hatred over the "sin" Liberty claimed he committed in its Defamatory Statements.   Upon information and belief, members of the public have written numerous hateful messages on social media in reliance on Liberty's Defamatory Statements.

## COUNT ONE:  DEFAMATION

102.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 101 with the same force and effect as if fully stated herein.

103.   Liberty made and published the Defamatory Statements, which are statements of fact of and concerning Mr. Falwell.   These statements are false and exposed Mr. Falwell to contempt, ridicule, hatred, and obloquy.

104.   The Defamatory Statements are also defamatory *per se* because they impute to Mr. Falwell unfitness to perform the duties of an office or employment and prejudice him in his profession or trade.

105.   Liberty made and published the Defamatory Statements knowing that such statements would be disseminated throughout the world.

106.   Liberty made and published the Defamatory Statements without any applicable privilege.

26

107.   Liberty made and published the Defamatory Statements with knowledge that they were false and/or with reckless disregard for the truth or falsity of the statements, or with at least negligent disregard for the truth or falsity of the statements.

108.   As a direct and proximate result of the Defamatory Statements, Mr. Falwell has suffered damage to his reputation, damage to his profession, humiliation, and anguish, lost business opportunities, and suffered other pecuniary damage.

## COUNT TWO: BREACH OF CONTRACT

109.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 108 with the same force and effect as if fully stated herein.

110.   On July 1, 2019, Mr. Falwell and Liberty University executed the Employment Agreement.

111.   Pursuant to Section 3.7 of the Employment Agreement, Liberty University was barred from "mak[ing] defamatory or slanderous remarks about [Mr. Falwell] in public fora and settings."

112.   Liberty breached the foregoing provision by making and publishing the Defamatory Statements.

113.   Furthermore, pursuant to Section 3.7 of the Employment Agreement, Liberty University was permitted to discuss the reasons for the conclusion of Mr. Falwell's employment only if Mr. Falwell was terminated for cause.

114.   Liberty breached the foregoing provision because Mr. Falwell was not terminated for cause and therefore Liberty was not allowed to discuss the circumstances surrounding the conclusion of Mr. Falwell's employment as it did by making and publishing the Defamatory Statements.

LUADMINREC000262

115.   The terms of Section 3.7 survive termination of the Employment Agreement.

116.   As a direct and proximate result of Liberty's breach of contract, Mr. Falwell has suffered damage to his reputation, damage to his profession, humiliation, and anguish; lost business opportunities; and suffered other pecuniary damage.

### PRAYER FOR RELIEF

117.   WHEREFORE, for the reasons set forth herein, Plaintiff Jerry Falwell, Jr. respectfully requests this Honorable Court:

a)   Enter judgment in Mr. Falwell's favor;

b)   Award Mr. Falwell damages for Liberty's acts in defaming him and breaching the Employment Agreement;

c)   Award Mr. Falwell punitive damages;

d)   Award Mr. Falwell pre-judgment interest;

e)   Award Mr. Falwell his attorney's fees and costs incurred in prosecuting this action pursuant to Section 10 of the Employment Agreement;

f)   Enjoin Liberty University from repeating the Defamatory Statements regarding Mr. Falwell; and

g)   Provide any other relief this Court deems appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff Jerry Falwell, Jr. hereby demands a trial by jury.

LUADMINREC000263

Respectfully submitted,

GBSR ATTORNEYS, LLP

Dated: October 28, 2020
Lynchburg, VA

James J. Gilbert, IV (VSB #38229)
Timothy S. Bird (VSB # 38139)
Jordan K. Sharpes (VSB #79394)
13595 Booker T. Washington Highway
Moneta, VA 24121
phone - 540-721-5110
fax- 540-721-5112
jgilbert@gbsrattorneys.com
tsbird@gbsrattorneys.com
jsharpes@gbsrattorneys.com

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

Robert L. Raskopf
    (pro hac vice application pending)
Julia M. Beskin
    (pro hac vice application pending)
robertraskopf@quinnemanuel.com
juliabeskin@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000 (tel.)
(212) 849-7100 (fax)

*Attorneys for Plaintiff Jerry Falwell, Jr.*

29

LUADMINREC000264

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.,          )
                                    )
          *Plaintiff,*              )
                                    )
v.                                  )          Case No. CL21000354-00
                                    )
JERRY L. FALWELL, JR.,              )
                                    )
          *Defendant.*              )

### DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO LIBERTY UNIVERSITY, INC.'S FIRST AMENDED COMPLAINT

Defendant, Jerry L. Falwell, Jr. ("**Falwell**" or "**Defendant**"), by counsel, states the following as his Answer and Affirmative Defenses to the First Amended Complaint (the "**Complaint**") filed against him by Plaintiff, Liberty University, Inc. ("**Liberty**" or "**Plaintiff**").

No response is required to the headings or to the unnumbered introductory paragraph that precedes paragraph 1 of the Complaint. To the extent any response is required, it is denied. Except as admitted explicitly in this answer, all allegations of the Complaint are denied.

I.     **ANSWER**

1.     Falwell admits the allegations contained in paragraph 1.

2.     Falwell denies the allegations contained in paragraph 2. Falwell further states he did not "quit." Falwell admits he resides in Goode, Virginia. Further, Falwell admits he was President and Chancellor of Liberty.

3.     The allegations contained in paragraph 3 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

4.      The allegations contained in paragraph 4 of the Complaint reference two writings which speak for themselves and Falwell denies the allegations to the extent that they are inconsistent with those documents. To the extent a response is required, Falwell denies the allegations therein.

5.      The allegations contained in paragraph 5 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 5 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents.

6.      The allegations contained in paragraph 6 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 6 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents. Responding further, Falwell states he had told certain members of Liberty's Board of Trustees about Granda and Granda's claims.

7.      The allegations contained in paragraph 7 of the Complaint refer to a document which speaks for itself. Falwell denies any allegations inconsistent therewith. Falwell denies Becki's affair began in March 2012. Responding further, Falwell denies taking many family vacations in Miami.

8.      Falwell denies the allegations contained in paragraph 8.

9.      The allegations contained in paragraph 9 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 9 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents. Falwell denies the remaining allegations contained in paragraph 9.

LUADMINREC000266

10.     The allegations contained in paragraph 10 of the Complaint refer to documents which speaks for themselves. To the extent the allegations contained in paragraph 10 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents. Falwell denies any remaining allegations in paragraph 10.

11.     The allegations contained in paragraph 11 of the Complaint are denied. Responding further, Falwell states he is not an active member of the Virginia State Bar and has been an associate member of the Virginia State Bar since 2012.

12.     Falwell denies the allegations contained in paragraph 12. To the extent the allegations contained in paragraph 12 refer or reference a document, Falwell states the document speaks for itself. To the extent the allegations contained in paragraph 12 seek to paraphrase or characterize the contents, Falwell denies the allegations.

13.     Falwell denies the allegations in paragraph 13 and lacks sufficient information to admit or deny Dr. Falwell's personal vision and, therefore, denies same.

14.     Falwell lacks sufficient information to admit or deny when Dr. Falwell's began laying the foundation for Liberty and, therefore, denies same. Further, Falwell states Liberty was not accredited until 1980. Responding further, Falwell admits Liberty has more than 100,000 students in part due to Falwell's leadership.

15.     Falwell lacks sufficient information to admit or deny Dr. Falwell's role in the Moral Majority and therefore, denies same.

16.     Falwell lacks sufficient information to admit or deny the allegations contained in paragraph 16 and therefore, denies same. Responding further, the allegations contained in paragraph 16 reference specific documents which speak for themselves. Falwell denies any allegations inconsistent therewith and denies the remaining allegations in paragraph 16.

3

17.     The allegations contained in paragraph 17 reference specific documents which speak for themselves. Falwell denies any allegations inconsistent therewith.

18.     The allegations contained in paragraph 18 reference a document which speaks for itself. Falwell denies any allegations inconsistent therewith. Further, Falwell denies the *Liberty Way* applies to him as an Administrator and further states the *Liberty Way* applies to students and Falwell has not been a student since 1984.

19.     The allegations contained in paragraph 19 reference a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

20.     Falwell lacks sufficient information to admit or deny the allegations in paragraph 20 and, therefore, denies same.

21.     The allegations contained in paragraph 21 reference a document which speaks for itself. Falwell denies any allegations inconsistent therewith. Falwell admits he was a board member in 2019 and states the minutes of the board April 5, 2019 board meeting speak for themselves.

22.     Falwell lacks sufficient information to admit or deny Dr. Falwell's vision and, therefore, denies the allegations contained in paragraph 22. Responding further, the allegations contained in paragraph 22 reference a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

23.     With regard to the allegations in paragraph 23, Falwell denies Liberty grew exponentially until Dr. Falwell's death in 2007. Falwell admits he served as Liberty's President, Chancellor, and member of its Board of Trustee's upon Dr. Falwell's 2007 death. Falwell lacks sufficient information to either admit or deny the allegations concerning Jonathan Falwell and therefore, denies same. Falwell denies the remaining allegations in paragraph 23.

4

LUADMINREC000268

24.     The allegations contained in paragraph 24 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 10 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents.

25.     With regard to the allegations contained in paragraph 25, Falwell denies he was "attempting to build on his father's legacy" by bringing another generation of Falwell men into leadership. Falwell lacks sufficient information to either admit or deny the remaining allegations in paragraph 25 and, therefore, denies same.

26.     Falwell denies Trey "reported to his father, the President and Chancellor of Liberty." Falwell lacks sufficient information to either admit or deny the allegations concerning Trey's employment and, therefore, denies same.

27.     Falwell denies "Trey often accompanied his father into meetings of the Executive Committee of the Liberty Board of Directors." Responding further, Falwell states Trey often attended meetings of the Executive Committee at the invitation of his boss, Randy Smith. Falwell lacks sufficient information to either admit or deny the allegations in the second sentence of paragraph 27 and, therefore, denies same. Falwell lacks sufficient information to either admit or deny the allegations contained in the third sentence of paragraph 27 and, therefore, denies same.

28.     Falwell admits the allegations contained in paragraph 28 and further states the explosive growth of online education was enhanced by building and creating a strong resident program.

29.     Falwell denies the allegations contained in paragraph 29.

30.     Falwell admits Granda came to Lynchburg for Donald Trump's 2012 event at Liberty and admits Falwell introduced Granda to Donald Trump. Responding further, Falwell

LUADMINREC000269

states at least approximately 100 other individuals were part of the introductions to Donald Trump. Further, the allegations in contained in paragraph 30 reference a photograph which speaks for itself. Falwell denies any allegations inconsistent therewith.

31. Falwell denies the allegations contained in paragraph 31.

32. Falwell admits the allegations contained in paragraph 32.

33. Falwell denies the allegations contained in paragraph 33.

34. Falwell denies the allegations contained in paragraph 34.

35. The allegations contained in paragraph 35 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 35 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents. Responding further, the allegations contained in paragraph 35 reference an audio recording, which, upon information and belief, was illegally obtained and which speaks for itself. Falwell denies any allegations inconsistent therewith. Falwell denies the remaining allegations of paragraph 35.

36. The allegations contained in paragraph 36 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 36 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents. Responding further, Falwell denies he did not inform Liberty's Board of Trustees and states he informed at least one member of the Board of Trustees.

37. The allegations contained in paragraph 37 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 37 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with

LUADMINREC000270

the document. Responding further, Falwell lacks sufficient information to admit or deny the allegations in paragraph 37 regarding Granda's plot and, therefore, denies same.

38.   Falwell lacks sufficient information to admit or deny the allegations in paragraph 38 and, therefore, denies same.

39.   Falwell denies the allegations in paragraph 39.

40.   Falwell denies the allegations in paragraph 40.

41.   Falwell denies the allegations in paragraph 41.

42.   Falwell denies that there is a cache of materials that is harmful to the Falwells. Responding further, Falwell lack sufficient information to either admit or deny the allegations contained in the second and third sentences of paragraph 42 and, therefore, denies same.

43.   With regard to the allegations in paragraph 43, Falwell denies the allegations contained in the first sentence. Responding further, the remaining allegations in paragraph 43 refer to a document which speaks for itself. To the extent the allegations contained in paragraph 43 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents.

44.   With regard to the allegations in paragraph 44, Falwell denies Granda's behavior was from Falwell's own observation. Responding further, the allegations in paragraph 44 refer to a document which speaks for itself. To the extent the allegations contained in paragraph 44 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents.

45.   The allegations contained in paragraph 45 refer to a document which speaks for itself. To the extent the allegations contained in paragraph 45 seek to paraphrase or characterize

LUADMINREC000271

the contents, Falwell denies the allegations to the extent they are inconsistent with those documents. Responding further, Falwell admits the allegations contained in paragraph 45.

46.    Falwell denies the allegations contained in paragraph 46. Responding further, Falwell admits Liberty is one of the country's premier evangelical universities.

47.    Falwell denies the allegations contained in paragraph 47. Responding further, Falwell states he did inform a member of Liberty's Board of Trustees in or around December 2018/January 2019.

48.    Falwell denies the allegations contained in paragraph 48.

49.    Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 49 and, therefore, denies same.

50.    Falwell denies the allegations contained in paragraph 50.

51.    Falwell denies the allegations contained in paragraph 51.

52.    Falwell denies the allegations contained in paragraph 52. Responding further, Falwell states there was no "Granda Plan" as alleged in the Amended Complaint and in various media/podcast recordings.

53.    With regard to the allegations in paragraph 53, Falwell denies the first sentence. The remaining allegations contained in paragraph 53 refer to documents which speak for themselves. To the extent the allegations contained in paragraph 53 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents.

54.    Falwell denies the allegations contained in paragraph 54 that there were "acts of appeasement . . . to maintain Granda's cooperative silence."

LUADMINREC000272

a.   Falwell admits Granda visited the Falwell's farm and further states the visits occurred with Granda's girlfriend, mother, and/or sister. Responding further, Falwell denies Granda was "paired" with Trey.

b.   The allegations contained in subparagraph (b) of paragraph 54 reference a picture which speaks for itself. Falwell denies any allegation inconsistent therewith. Responding further, Falwell denies "pos[ing] with Granda paternalistically."

c.   The allegations contained in subparagraph (c) of paragraph 54 reference a picture which speaks for itself. Falwell denies any allegations inconsistent therewith. Responding further, Falwell admits taking a picture with Granda outside the Liberty jet. Falwell denies the remaining allegations.

d.   Falwell denies bringing Granda on other family excursions and pairing him with Trey. Responding further, the allegations contained in subparagraph (d) of paragraph 54 reference a picture which speaks for itself. Falwell denies any allegations inconsistent therewith and further states Granda was living in the Washington D.C area.

e.   The allegations contained in subparagraph (e) of paragraph 54(e) refer to a document which speaks for itself. To the extent the allegations contained in paragraph 54(e) seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents. Responding further, Falwell denies amassing "useful information."

55.   Falwell denies the allegations contained in paragraph 55.

LUADMINREC000273

56.     With regard to the allegations contained in paragraph 56, Falwell admits his employment contract was set to expire on June 30, 2019. Falwell denies the remaining allegations contained in paragraph 56. Falwell further states many of the components of the 2019 Employment Agreement were carryovers from his previous employment agreement or were the result of an outside consultant Liberty engaged to review Falwell's compensation and make recommendations "to ensure Falwell is retained at Liberty for the long term and provided with a competitive and motivating compensation program." 2019 Employment Agreement, p. 2.

57.     Falwell admits the allegations contained in the first two sentences of paragraph 57. Falwell lacks sufficient information to either admit or deny the remaining allegations contained in paragraph 57 and therefore, denies same.

58.     Falwell admits that in 2016, he endorsed Donald Trump for the presidency. Falwell denies the endorsement was "particularly delicate." Responding further, Falwell admits Senator Ted Cruz made an appearance at Liberty for his first speech after announcing his presidential candidacy.

59.     The allegations contained in paragraph 59 of the Complaint reference a Facebook post which speaks for itself. Falwell denies the allegations to the extent they are inconsistent therewith. Responding further, Falwell admits Trump was an outsider.

60.     Falwell denies the allegations contained in paragraph 60.

61.     With regard to the allegations contained in paragraph 61, Falwell denies the allegations contained in the first sentence of the Complaint. Responding further, Falwell denies he is "Like Jesus." The remaining allegations in the second sentence of paragraph 61 are admitted.

62.     Falwell admits he utilized social media platforms and news outlets in advocating for Trump. Falwell denies any allegations inconsistent therewith.

LUADMINREC000274

a.   Falwell admits the allegations contained in subparagraph (a) of paragraph 62.

b.   Falwell admits the allegations contained in subparagraph (b) of paragraph 62.

c.   The allegations contained in subparagraph (c) of paragraph 62 refer to a CNN interview with Falwell which speaks for itself. Falwell denies any allegations inconsistent therewith. Responding further, Falwell admits the allegations contained in subparagraph (c) of paragraph 62.

d.   The allegations contained in subparagraph (d) of paragraph 62 refer to a CNN interview with Falwell which speaks for itself. Falwell denies any allegations inconsistent therewith. Responding further, Falwell admits the allegations contained in subparagraph (d) of paragraph 62.

63.   The allegations contained in the first sentence of paragraph 63 refer to a document which speaks for itself. To the extent the allegations contained in paragraph 63 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents. Responding further, Falwell denies the remaining allegations contained in paragraph 63.

64.   Falwell denies the allegations contained in paragraph 64.

65.   The allegations contained in the first sentence of paragraph 63 refer to a document which speaks for itself. Falwell denies any allegations inconsistent therewith. Responding further, with regard to the allegations contained in paragraph 65, Falwell admits the first sentence. Falwell admits the allegations contained in the second sentence of paragraph 65. Falwell further states the term of the agreement was seven years and three months. Responding further, Falwell states

11

Liberty and he entered into an addendum to the employment agreement, which amended the severance payment to three years' annual base salary. Liberty and Falwell entered into the addendum on or around June 20, 2017, with an effective date of May 24, 2017.

66.    The allegations contained in the first sentence of paragraph 63 refer to a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

67.    Falwell denies the allegations contained in paragraph 69. Responding further, Falwell states he informed a member or members of Liberty's Board regarding Granda and his actions.

68.    With regard to the allegations contained paragraph 68, Falwell denies having the alleged plan and states he informed a certain member(s) regarding Granda. Responding further, Falwell denies seeking a safety valve and/or escape hatch. Falwell denies the remaining allegations contained in paragraph 68.

69.    With regard to the allegations contained in paragraph 69, Falwell admits he and the executive committee/Board negotiated the 2019 Employment Agreement. Falwell denies he was successful in sweetening the new 2019 Employment Agreement. Responding further, Falwell states the remaining allegations refer to the 2019 Employment Agreement which is a document that speaks for itself. Falwell denies any allegations inconsistent therewith. Falwell denies the remaining allegations contained in paragraph 69.

70.    Falwell denies the allegations contained in paragraph 70.

71.    Falwell denies the allegations contained in paragraph 71.

72.    Falwell denies the allegations contained in the first sentence of paragraph 72. Responding further, the remaining allegations in paragraph 72 refer to a document which speaks for itself. To the extent the allegations contained in paragraph 72 seek to paraphrase or characterize

LUADMINREC000276

the contents, Falwell denies the allegations to the extent they are inconsistent with those documents.

73.    Falwell denies the allegations contained in paragraph 73.

74.    Falwell admits the allegations contained in paragraph 74.

75.    The allegations contained in paragraph 75 refer to the shows plot, which speaks for itself. Responding further, Falwell admits the allegations contained in paragraph 75.

76.    Falwell admits the allegations contained in paragraph 76. Responding further, Falwell states the "obligatory tumbler of black liquid" is a prop consisting of BLK brand black water.

77.    Falwell admits the allegations contained in paragraph 77.

78.    Falwell admits the allegations contained in the first sentence of paragraph 78 of the Complaint. Responding further, Falwell lacks sufficient information to admit or deny whether the photo or video referenced in paragraph 78 "went viral and became an immediate internet sensation" and, therefore, denies same.

79.    The allegations contained in paragraph 79 reference a photo which speaks for itself. Falwell denies any allegations inconsistent therewith.

80.    Falwell lacks sufficient information to admit or deny the allegations contained in paragraph 80 and, therefore, denies same.

81.    Falwell lacks sufficient information to admit or deny the allegations contained in paragraph 80 and, therefore, denies same. Responding further, Falwell states the *Liberty Way* only applies to Liberty students.

82.    Falwell admits he deleted the Instagram post shortly after its August 3 release. Falwell denies he made a "compounding blunder." The remaining allegations in paragraph 90

13

reference a radio station recording which speaks for itself. Falwell denies any allegations to the extent they are inconsistent therewith. Responding further, shortly after the August 5, 2020 radio show, Falwell was diagnosed with having pulmonary emboli, or clots in the lungs, causing Falwell's oxygen levels to fall to dangerously low levels and cause adverse health reactions. Falwell's medical condition ultimately required a medical procedure and is still being monitored.

83.   Falwell lacks sufficient information to admit or deny the allegations contained in paragraph 83 and, therefore, denies same.

84.   Falwell lacks sufficient information to admit or deny the allegations contained in paragraph 84 and the actions Becki took and, therefore, denies same.

85.   Falwell admits the allegations contained in the first sentence of paragraph 85. Falwell denies the allegations contained in the second sentence of paragraph 85. Responding further, Falwell admits he requested a sabbatical. Falwell denies the Executive Committee was inclined to support. Falwell denies any remaining allegations contained in paragraph 85.

86.   Falwell lacks sufficient knowledge to either admit or deny the allegations contained in paragraph 86 and, therefore, denies same.

87.   Falwell lacks sufficient knowledge to either admit or deny the allegations contained in paragraph 87 and, therefore, denies same.

88.   Falwell lacks sufficient knowledge to either admit or deny the allegations contained in paragraph 88 and, therefore, denies same.

89.   Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 89 and therefore, denies same.

90.   Falwell denies the allegations contained in paragraph 90.

14

91.     Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 91 and, therefore, denies same.

92.     Falwell lacks sufficient knowledge to either admit or deny the allegations contained in the first two sentences of paragraph 92 and, therefore, denies same. Responding further, Falwell denies the remaining allegations contained in paragraph 92.

93.     The allegations contained in paragraph 93 reference documents which speaks for themselves. Falwell denies any allegations inconsistent therewith and further states he published a number of unrelated articles without the Executive Committee's prior assent. Responding further, Falwell states he revealed information relating to Granda to certain member(s) of the Board. Falwell denies the remaining allegations in paragraph 93.

94.     The allegations contained in paragraph 94 reference documents which speaks for themselves. Falwell denies any allegations inconsistent therewith.

95.     The allegations contained in paragraph 95 refer to an article which speaks for itself.

96.     Falwell denies the allegations contained in paragraph 96.

97.     Falwell denies the allegations contained in paragraph 97. Responding further, the allegations contained in paragraph 97 refer to a document which speaks for itself.

98.     The allegations contained in paragraph 98 refer to an article which speaks for itself. Falwell denies any allegations inconsistent therewith and lacks sufficient information relating to Granda's side and the attendant article to either admit or deny and, therefore, denies the same. Falwell denies remaining allegations in paragraph 98.

99.     Falwell denies the allegations contained in paragraph 99.

100.    The allegations contained in paragraph 100 refer to an article which speaks for itself. Falwell denies any allegations inconsistent therewith. Specifically, Falwell denies he

LUADMINREC000279

participated in or led any cover-up process. Responding further, Falwell denies the remaining allegations contained in paragraph 100 and further states Falwell informed a member(s) of Liberty's Board of Trustees regarding Granda.

101.   Falwell admits the allegations contained in paragraph 101. Responding further, Falwell states he never spoke to the full board regarding resignation.

102.   Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 102 and, therefore, denies same. Responding further, Falwell denies an alcohol problem.

103.   Falwell denies the allegations contained in paragraph 103. Responding further, Falwell states he resigned on August 24, 2020.

104.   The allegations contained in paragraph 104 refer to an article which speaks for itself. Falwell denies any allegations inconsistent therewith.

105.   Falwell denies the allegations contained in paragraph 105. Falwell further states he is not an active member of the Virginia State Bar, but is an associate member.

106.   With regard to the allegations contained in paragraph 106, Falwell denies pushing back against the terms of resignation, and Falwell denies announcing to the media a $10.5 million severance expectation. Responding further, Falwell admits the negotiated severance was $2,500,000.00.

107.   Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 107 and, therefore, denies same.

108.   Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 108 regarding when the Executive Committee "agreed to satisfy Falwell

16

Jr.'s demand for a 'Good Reason'" and, therefore, denies same. Responding further, Falwell denies the remaining allegations contained in paragraph 108.

109.   Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 109 regarding the 911 call, media reports, and what first responders spotted and, therefore, denies same. Falwell denies the remaining allegations contained in paragraph 109.

110.   Falwell denies the allegations contained in the first sentence of paragraph 110. Responding further, Falwell admits he filed a lawsuit against Liberty alleging defamation on October 28, 2020.

111.   Falwell denies the allegations contained in paragraph 111.

<u>**COUNT ONE:**</u>
**BREACH OF CONTRACT/CONVERSION**

112.   Defendant repeats and realleges his answers to the allegations in the foregoing paragraphs as if set forth fully herein.

113.   The allegations contained in paragraph 113 refer to the 2019 Employment Agreement, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

114.   The allegations contained in the first sentence of paragraph 114 of the Complaint are denied as stated. Responding further, Falwell admits he had complete access to files, records, notes, emails, data, and information.

115.   Falwell admits the allegations contained in paragraph 115.

116.   The allegations contained in paragraph 116 state conclusions of law to which no response is necessary. To the extent an answer is required, Falwell denies the allegations.

117.   The allegations contained in paragraph 117 refer to Liberty policies which speak for themselves. Falwell denies any allegations inconsistent therewith.

LUADMINREC000281

a.   The allegations contained in subparagraph (a) of paragraph 117 refer to the Liberty University Employee Handbook, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

b.   The allegations contained in subparagraph (b) of paragraph 117 refer to the Liberty University Employee Handbook, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

c.   The allegations contained in subparagraph (c) of paragraph 117 refer to the Liberty University Employee Handbook, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

118.   The allegations contained in paragraph 118 refer to the technology security policy, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

119.   Falwell admits Liberty provided various devices and systems to allow Falwell to utilize Liberty's documents and information. Falwell lacks sufficient knowledge to admit or deny the remaining allegations contained in paragraph 119 and, therefore, denies same. Responding further, Falwell states many of the devices Liberty lists were provided to Becki as a courtesy. Falwell states Becki was not employed by Liberty and, upon information and belief, did not conduct Liberty business.  Falwell denies the remaining allegations contained in paragraph 119.

120.   Falwell admits the allegations contained in paragraph 120. Falwell further states he remitted payment soon after being invoiced by Liberty in September 2020 and/or returned the devices Liberty provided to Becki and systems Liberty provided for internet services.

121.   The allegations contained in paragraph 121 refer to the general document preservation and retention policy, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

LUADMINREC000282

122.     The allegations contained in paragraph 122 refer to the 2019 Employment Agreement, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

123.     The allegations contained in paragraph 123 refer to the 2019 Employment Agreement, a document which speaks for itself. Falwell denies any allegations inconsistent therewith. Responding further, the last sentence in paragraph 123 states a conclusion of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

124.     The allegations contained in paragraph 124 refer to various Liberty governance documents which speak for themselves. Falwell denies any allegations inconsistent therewith.

125.     Falwell admits there are various legal holds relating to Liberty. Responding further, the remaining allegations contained in paragraph 125 state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

126.     The allegations contained in paragraph 126 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

127.     The allegations contained in paragraph 127 of the Complaint are denied.

128.     The allegations contained in paragraph 128 of the Complaint are denied, and Falwell demands strict proof thereof.

**COUNT TWO:**
**DETINUE**

129.     Defendant repeats and realleges his answers to the allegations in the foregoing paragraphs as if set forth fully herein.

19

130.    The allegations contained in paragraph 130 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

131.    The allegations contained in paragraph 131 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied. Falwell further admits his employment with Liberty ended on August 25, 2020 and denies any allegations inconsistent therewith.

132.    Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 132 of the Complaint, and, therefore, the allegations are denied.

133.    Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 133 of the Complaint, and, therefore, the allegations are denied.

134.    The allegations contained in paragraph 134 of the Complaint are denied.

<u>**COUNT THREE**</u>:
**BREACH OF FIDUCIARY DUTY**

135.    Defendant repeats and realleges his answers to the allegations in the foregoing paragraphs as if set forth fully herein.

136.    The allegations in paragraph 136 state legal conclusions to which no response is necessary. To the extent a response is deemed necessary, Falwell denies the allegations in paragraph 136 of the Complaint and denies he breached any fiduciary duty to Liberty.

137.    Falwell denies the allegations contained in paragraph 137.

138.    Falwell denies the allegations contained in paragraph 138.

139.    Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 139 of the Complaint and, therefore, denies same.

140.    Falwell denies the allegations contained in paragraph 140.

20

141.    Falwell denies the allegations contained in paragraph 141.

142.    Falwell denies the allegations contained in paragraph 142. Falwell further states that Liberty's website indicates an enrollment record for Fall 2021. *See* *https://www.liberty.edu/champion/2021/08/liberty-sets-student-enrollment-record-in-2021/* (last accessed October 8, 2021).

143.    Falwell denies the allegations contained in paragraph 143.

144.    Falwell denies the allegations contained in paragraph 144. Falwell further denies he breached his fiduciary duty to Liberty and demands strict proof of damages asserted.

## COUNT FOUR:
## STATUTORY CONSPIRACY

145.    Defendant repeats and realleges his answers to the allegations in the foregoing paragraphs as if set forth fully herein.

146.    The allegations contained in paragraph 146 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

147.    With regard to the allegations contained in paragraph 147, Falwell admits the business of Liberty is the provision of higher education through the perspective of Christian Values. Falwell denies administrators and faculty are expected to comport themselves to the *Liberty Way*. Falwell further states the *Liberty Way* is applicable to students. Responding further, Falwell admits all Liberty Board members and officers must observe applicable fiduciary duties.

148.    Falwell denies the allegations contained in paragraph 148.

149.    Falwell denies the allegations contained in paragraph 149.

LUADMINREC000285

150.    The allegations contained in paragraph 150 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

151.    Falwell denies the allegations contained in paragraph 151.

152.    Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 152 of the Complaint and, therefore, denies same.

153.    Falwell denies the allegations contained in paragraph 153.

154.    The allegations contained in paragraph 154 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

155.    Falwell denies the allegations contained in paragraph 155.

156.    Falwell denies the allegations contained in paragraph 156.

157.    Falwell denies the allegations contained in paragraph 157.

158.    Falwell denies the allegations contained in paragraph 158. Falwell demands strict proof of any and all damages.

159.    The remainder of the Complaint states Plaintiff's prayer for relief, to which no response is necessary. To the extent a response is appropriate, all allegations contained therein are denied.

160.    All allegations not specifically admitted are denied.

## II.    **AFFIRMATIVE DEFENSES**

Having fully answered the allegations contained in the First Amended Complaint, Defendant, Jerry L. Falwell, Jr., by counsel, pursuant to the Rules of the Supreme Court of

LUADMINREC000286

Virginia, submits the following Affirmative Defenses, reserving the right to assert additional affirmative defenses should discovery in this case reveal others.

1.      Defendant denies Plaintiff has suffered damages to the extent alleged, if at all, and calls for strict proof thereof.

2.      Expressly denying any wrongdoing on his part and expressly denying that Plaintiff has been damaged as alleged, Defendant states that Plaintiff has failed to mitigate any damages that it allegedly sustained.

3.      Defendant states that he intends to rely upon the defense, as may be developed through discovery and the evidence, that Plaintiff's action is barred by the doctrines of waiver and estoppel.

4.      Defendant states that the Complaint fails to state a claim and fails to state facts upon which the relief demanded can be granted against it.

5.      Defendant denies that he is liable to Plaintiff in any amount or in any manner whatsoever.

6.      Defendant states that he intends to rely upon the defense, as may be developed through discovery and the evidence, that Plaintiff's action is barred by the doctrine of unclean hands.

7.      Defendant states Plaintiff's claim in Count III is barred by Defendant's Plea in Bar.

8.      Defendant states he intends to rely on the Indemnity provision in the 2019 Employment Agreement.

9.      Defendant states that Plaintiff has not suffered any damage that it allegedly sustained.

LUADMINREC000287

10.    Defendant states that he intends to rely upon any and all other available defenses as may be developed in discovery and the evidence.

### **PRAYER FOR RELIEF**

WHEREFORE, Defendant, Jerry L. Falwell, Jr., respectfully requests that this Court dismiss this First Amended Complaint filed against him by Plaintiff, Liberty University, Inc., with prejudice, and that he be granted all such other and further relief as this Court deems appropriate under the circumstances.

Dated: October 21, 2021                    JERRY L. FALWELL, JR.

                                            _____
                                            Counsel

Vernon E. Inge, Jr. (Va. Bar No. 32699)
Robert N. Drewry (Va. State Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:    804.977.3301
Facsimile:    804.977.3291
E-Mail:       vinge@wtplaw.com
              rdrewry@wtplaw.com

*Counsel for Defendant, Jerry L. Falwell, Jr.*

24

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of October, 2021, a true and correct copy of the foregoing ***Defendant's Answer and Affirmative Defenses to Liberty University, Inc.'s First Amended Complaint*** was served *via* e-mail transmission and first-class, postage-prepaid, U.S. Mail upon the following:

> Scott C. Oostdyk, Esq.
> Andrew F. Gann, Jr., Esq.
> MCGUIREWOODS LLP
> Gateway Plaza
> 800 East Canal Street
> Richmond, Virginia 23219
> E-Mail:      soostdyk@mcguirewoods.com
>                  agann@mcguirewoods.com
> — and —
>
> R. Craig Wood, Esq.
> MCGUIREWOODS LLP
> Post Office Box 1288
> Charlottesville, Virginia 22902-1288
> E-Mail:      cwood@mcguirewoods.com

*Counsel for Plaintiff, Liberty University, Inc.*

Robert N. Drewry

LUADMINREC000289

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

| | | |
|---|---|---|
| LIBERTY UNIVERSITY, INC., | ) | |
| | ) | |
| *Plaintiff/Counterclaim Defendant,* | ) | |
| | ) | |
| v. | ) | Case No. CL21000354-00 |
| | ) | |
| JERRY L. FALWELL, JR., | ) | |
| | ) | |
| *Defendant/Counterclaim Plaintiff.* | ) | |

### DEFENDANT'S COUNTERCLAIM AGAINST PLAINTIFF

Defendant and Counterclaim Plaintiff, Jerry L. Falwell, Jr. ("**Mr. Falwell**" or "**Defendant**"), by counsel, states the following as his Counterclaim (the "**Counterclaim**") against Plaintiff and Counterclaim Defendant, Liberty University, Inc. ("**Liberty**" or "**Plaintiff**").

### Introduction

1.      Mr. Falwell brings this breach of contract and defamation action against Liberty following his resignation with good cause and the actions taken by Liberty employees in the wake of Mr. Falwell's resignation. Additionally, Mr. Falwell brings claims to recover Mr. Falwell's personal property Liberty still has control over following Mr. Falwell's resignation.

2.      Liberty's actions directly breach their duty not to defame or disparage Mr. Falwell and on August 26, 2020, Liberty's actions were in breach of the agreement between Mr. Falwell and Liberty.

3.      Over the course of his adult life, Mr. Falwell has dedicated significant time, energy, and resources to Liberty. Following his father's, and Liberty's founder, death in 2007, Mr. Falwell was appointed President and Chancellor of Liberty, beginning the exponential growth Liberty sees today. From 2007 to 2020 alone, Liberty's enrollment increased from 9,600 residential students

and 27,000 online students to 15,000 residential students and 108,000 online students. Through Mr. Falwell's leadership, he has helped steer Liberty away from financial ruin, while developing Liberty into the world's leading evangelical university and one of the largest private non-profit universities in the nation.

4.     In August of 2020, although at least certain members of Liberty's Board of Trustees were aware, it became public that Mr. Falwell's wife, Rebecca Falwell ("**Becki**"), engaged in an extramarital affair with Giancarlo Granda, who was also attempting to extort Mr. Falwell and Becki.

## Parties

5.     Mr. Falwell is a citizen and resident of Virginia. He currently resides in Bedford County, Virginia.

6.     Liberty is a Virginia non-stock corporation headquartered in Lynchburg, Virginia with its principal office located at 1971 University Boulevard, Lynchburg, Virginia 24515.

## Jurisdiction

7.     This Court has jurisdiction over this matter pursuant to Va. Code §§ 17.1-513 and 8.01-328.1. Liberty is organized as a non-stock corporation under the laws of the Commonwealth of Virginia and has its principal office in the Commonwealth of Virginia.

8.     Venue is proper in this Court pursuant to Va. Code § 8.01-262(1).

## Factual Background

9.     On August 24, 2020, Mr. Falwell provided Liberty with written notice of his resignation for "Good Reason," as defined in Mr. Falwell's 2019 Employment Agreement with Liberty (the "**Employment Agreement**").

2

10.    The Employment Agreement provides in Section 3.7 that "[t]he parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings .... Neither party, however, waives the protections afforded by otherwise applicable common law privileges."

11.    "The provisions of this Section 3.6 [*sic*] shall survive termination of this Agreement.

12.    Additionally, Section 3.7 of the Employment Agreement provides that in only one situation may the Board discuss the reasoning and circumstances forming the Board's determination. Section 3.7 states, "[i]f Falwell's employment is terminated *for cause*, the parties may truthfully explain the circumstances forming the bases for the determination of cause." (Emphasis added). Mr. Falwell's termination was not for cause.

13.    Falwell resigned and the Board accepted his resignation for "Good Reason." As part of Mr. Falwell's resignation for Good Reason and payment of severance, Mr. Falwell agreed to and executed a release of all claims he may have against Liberty up to and including August 25, 2020.

14.    Prior to Mr. Falwell's resignation, Mr. Falwell provided a statement to the *Washington Examiner* that detailed Mr. Falwell's and Becki's interactions with Granda and made clear that Granda had attempted to extort the Falwells through salacious allegations that were false.

15.    At the time of Mr. Falwell's resignation, Liberty possessed information that Granda's statements were false because Mr. Falwell had previously disclosed information regarding the affair to a top official who was then, and until recently, a member of Liberty's Board of Trustees.

LUADMINREC000292

16.     On August 24, 2020, Granda followed through with his extortive threat to accuse Mr. Falwell of participating in Granda's affair with Becki. In a *Reuters* article titled *The Falwell Affair,* Granda made the outrageously false claim that Mr. Falwell participated in Granda's affair with Becki and "enjoyed watching" them. The *Reuters* article also noted that Mr. Falwell "categorically denies" the allegations.

17.     Yet, despite Liberty's knowledge, when the *Reuters* article was published, not one member of the Board or the Executive Committee asked Mr. Falwell about the veracity of Granda's lies before requesting Mr. Falwell's resignation and then defaming him by repeating and endorsing the lies. Liberty performed no investigation whatsoever into the veracity of Granda's claims before requesting Mr. Falwell's resignation or before making the Defamatory Statements, as defined below.

18.     On August 26, 2020, David Nasser ("**Nasser**"), Liberty's Senior Vice President for Spiritual Development, presented a speech at Liberty's Campus Community, an event at the start of a new school year where thousands of Liberty's residential students and Liberty's faculty are in attendance.  Liberty also broadcasts the program online.

19.     In the lead-up to Liberty's Campus Community, Nasser helped secure a widespread attendance and media presence by promoting the event, including at Liberty's Convocation, which was held earlier in the day, broadcasted online, and considered mandatory for all faculty, staff, and students. During Convocation, Nasser told the attendees that he would be discussing the events leading to Mr. Falwell's resignation at Liberty's Campus Community event.

20.     On information and belief, Nasser's speech later that day at Liberty's Campus Community was largely scripted; other Liberty employees participated in drafting the speech, and Nasser was reading from a script during his speech.

4

21.     Nasser began the defamatory and disparaging remarks about Mr. Falwell by stating in his speech, "[t]here are those who have told me to lay low and to not mention any of the things that led to Jerry Falwell's resignation yesterday." Moments later, Nasser tells the audience, "you're also right if you wanna see stern and swift accountable action for sinful behavior." A moment later, he tells the audience, "the embarrassment that's been brought upon you as a Liberty student and more importantly brought upon the name of Christ is wrong." A moment later, he tells the audience, "[y]our concerns, if you're concerned, are valid. If you're not concerned, you should be concerned." Later in the speech, Nasser returns to discussing Mr. Falwell and Granda's lies by directly referring to the same lies: "[t]hen the summer came to a close, and we opened the semester with a series of revelations about Jerry Falwell that can only be described as shameful. That's okay, by the way, to say it. It's okay to call sin, sin. Paul says in Ephesians. Have nothing to do with the fruitless deeds of darkness but rather, expose them. It is shameful to even mention what the disobedient do in secret. But everything exposes by the light becomes visible." A moment later, he proceeds to state again, "[i]t's okay to call sin, sin." These comments taken together are referred to herein as the "**Defamatory Speech**."

22.     The Defamatory Speech is false and defamatory. Taken together, Liberty's statements repeat, as a statement of fact, Granda's lies, specifically that Mr. Falwell watched Granda have sexual intercourse with Becki and participated in their affair. Granda's lies were first reported in the *Reuters* article two days before Nasser's speech garnering national attention. Upon information and belief, every or virtually every Liberty student and faculty member present for Nasser's speech was aware of Granda's lies and understood that the lies were "the things that led to Jerry Falwell's resignation yesterday," as Nasser put it. Upon information and belief, that is exactly what Liberty intended to convey and intended for listeners to understand and what the

LUADMINREC000294

audience in fact understood. By saying, "[y]our concerns, if you're concerned, are valid," referring to the subject matter of Granda's lies as "sinful behavior" and a "sin," and as something "shameful" the "disobedient do in secret," Liberty unequivocally told its audience and the world that Mr. Falwell had done what Granda had falsely said he did — in other words, that Granda's lies were "valid."

23.     The Defamatory Speech was subject of much media attention and was attended by members of the national press, as Liberty was no doubt aware it would be.

24.     Liberty published a video of Campus Community and the Defamatory Speech online to its website, where the video remains online. *See https://watch.liberty.edu/playlist/dedicated/82178711/1_4qg5ezeh/1_p48anqx0* (last accessed October 19, 2021).

25.     On information and belief, Nasser was authorized or directed to speak on behalf of Liberty at the Campus Community event. In fact, Nasser did so in the course and scope of his employment and in furtherance of Liberty's interests, and was acting as Liberty's agent in his role as Senior Vice President. Furthermore, the Campus Community event was an official Liberty event where thousands of Liberty students were in attendance, alongside Liberty's faculty, staff, and leadership, including its acting President and Chairman Jerry Prevo.

26.     On August 31, 2020, Liberty University issued a press release affirming its prior condemnation of Mr. Falwell. In the statement, Liberty accused Mr. Falwell of a "lack of spiritual stewardship" and suggested that he had not "demonstrate[d] a full commitment to the spiritual mission of Liberty University by words, actions, and example." Liberty clearly connected its accusation of a lack of spiritual leadership with Granda's false allegations by noting that "all the signs were not there until the start of last week," *i.e.*, when Granda's false allegations were

6

publicized, and that while Liberty "still didn't know the full scope of the matter, [it] had learned enough … ." These statements together are referred to as the "**Defamatory Press Release**."

27.     Liberty posted the statement online, where it remains currently. *See https://www.liberty.edu/news/2020/08/31/liberty-university-board-pledges-full-commitment-to-spiritual-mission-and-launches-independent-investigation/* (last accessed October 19, 2021).

28.     The Defamatory Press Release is false and defamatory because, as with the Defamatory Speech, it suggests that Mr. Falwell's presidency came to an end because of Granda's lies and that by claiming Mr. Falwell "lack[ed] spiritual stewardship" and conducted himself inconsistently with the "spiritual mission" of Liberty, said lies were truthful.

29.     Liberty has also defamed Mr. Falwell in the pages of its own publication, providing statements that it knew would be disseminated by the media. For example, a number of articles in the September 24, 2020 issue of the *Liberty Journal*, an official magazine published by the University and distributed nationally to media outlets and alumni, further accused Mr. Falwell of inappropriate behavior. Specifically, one article republished the August 31, 2020 accusation in the Defamatory Press Release of a "lack of spiritual stewardship" from Mr. Falwell. Another article said that "[r]ecent events involving Liberty's fourth president, Jerry Falwell, Jr., have broken trust for most in Liberty University, and some question Liberty's commitment to its nearly 50-year mission of *Training Champions for Christ*." These statements together are referred to as the "**Defamatory Journal Articles**," and together with the Defamatory Speech and Defamatory Press Release, the "**Defamatory Statements**."

30.     Liberty published the September 24, 2020 issue of the *Liberty Journal* online, where it remains online. *See https://issuu.com/libertyuniversity/docs/fall2020_libertyjournal/1?ff* (last accessed October 19, 2021).

LUADMINREC000296

31.     The Defamatory Journal Articles are false and defamatory because, as with the Defamatory Speech and Defamatory Press Release, they suggest that Mr. Falwell's presidency came to an end because of Granda's lies, including by asserting the lies are true by claiming Mr. Falwell "lack[ed] spiritual stewardship" and that he had "broken trust for most in Liberty University."

32.     Despite Liberty's current President, Jerry Prevo, stating on October 23, 2020 that "in the time I have been here I have not seen any wrong-doing on [Mr. Falwell's part]," Liberty stands by its Defamatory Statements against Mr. Falwell as each remains publicly available on Liberty's website, and Liberty has never apologized or retracted the Defamatory Statements.

33.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell's reputation, profession, and future employment prospects and business opportunities have been harmed.

34.     Upon information and belief, there is widespread knowledge of the Defamatory Statements within the Liberty community, the evangelical community, the legal community, the real estate industry, the academic field, the political world, and various media outlets.

35.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell has a drastically reduced ability to attach his name to, or be otherwise publicly involved in, business and charity organizations and events without a real and justifiable fear that his damaged reputation will erode the reputation of such organizations.

36.     For instance, prior to the Defamatory Statements, Mr. Falwell received a number of invitations to appear on television or at public events to discuss, among other things, Liberty, evangelicalism, and politics. Indeed, Mr. Falwell has considered becoming a recurring contributor

LUADMINREC000297

on news outlets. Since, Liberty's Defamatory Statements, Mr. Falwell has lost invitations and has lost any prospect of becoming a media contributor.

37.     As a direct and proximate result of Liberty's Defamatory Statements, Mr. Falwell has a drastically reduced ability to attend industry-related academic, political, legal, or real-estate conferences, and to seek business and professional opportunities in those fields, without a real and justifiable fear that any new business contacts he develops will have knowledge of the Defamatory Statements and associate his damaged reputation with any companies he establishes, manages, and/or owns. In the past, Mr. Falwell has attended a number of such conferences per year.

38.     Both the Defamatory Statements and the attendant fear that others will associate Mr. Falwell's businesses, charities, family, and friends with his damaged reputation have caused Mr. Falwell significant anguish and humiliation.

39.     As a direct and proximate result of Liberty's Defamatory Statements, Mr. Falwell has also become the subject of much ire and hatred over the "sin" Liberty claimed he committed in its Defamatory Statements. Upon information and belief, members of the public have written numerous hateful messages on social media in reliance on Liberty's Defamatory Statements.

**COUNT I:  BREACH OF EMPLOYMENT AGREEMENT**

40.     Mr. Falwell repeats and realleges the allegations contained in the foregoing paragraphs as if fully stated herein.

41.     On July 1, 2019, Mr. Falwell and Liberty executed the 2019 Employment Agreement.

42.     Pursuant to Section 3.7 of the 2019 Employment Agreement, Liberty was barred from "mak[ing] defamatory or slanderous remarks about [Mr. Falwell] in public fora and settings."

9

43.     Pursuant to Section 3.7 of the 2019 Employment Agreement, the parties agreed that "[t]he provisions of Section 3.6 *[sic]* shall survive termination of this Agreement."

44.     Liberty breached the foregoing provision by making and publishing the Defamatory Statements after Mr. Falwell's resignation.

45.     Furthermore, pursuant to Section 3.7 of the 2019 Employment Agreement, Liberty was permitted to "truthfully explain the circumstances forming the basis" of termination if "Falwell's employment is terminated ***for cause***." (Emphasis added).

46.     Liberty breached the foregoing provision because Mr. Falwell was not terminated for cause. Mr. Falwell resigned for Good Reason. Therefore, Liberty agreed not to discuss the circumstances surrounding the conclusion of Mr. Falwell's employment as it did by making and publishing the Defamatory Statements.

47.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell has suffered damage to his reputation, damage to his profession, humiliation, and anguish, lost business opportunities, and suffered other pecuniary damage.

## COUNT II: DEFAMATION

48.     Mr. Falwell repeats and realleges the allegations contained in the foregoing paragraphs as if fully stated herein.

49.     Liberty made and published the Defamatory Statements, which are statements of fact of and concerning Mr. Falwell. These Defamatory Statements are false and exposed Mr. Falwell to contempt, ridicule, and hatred.

50.     The Defamatory Statements are also defamatory *per se* because they impute to Mr. Falwell unfitness to perform the duties of an office or employment and prejudice him in his profession or trade.

LUADMINREC000299

51.     Liberty made and published the Defamatory Statements knowing that such statements would be disseminated throughout the country and world.

52.     Liberty made and published the Defamatory Statements without any applicable privilege.

53.     Liberty made and published the Defamatory Statements with knowledge that the statements were false and/or with reckless disregard for the truth or falsity of the statements, or with at least negligent disregard for the truth or falsity of the statements.

54.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell has suffered damage to his reputation, damage to his profession, humiliation, and anguish, lost business opportunities, and suffered other pecuniary damage.

## COUNT III:  CONVERSION

55.     Mr. Falwell repeats and realleges the allegations contained in the foregoing paragraphs as if fully stated herein.

56.     Upon Mr. Falwell's resignation, Liberty maintained certain property belonging to Mr. Falwell.[1]

57.     Following Mr. Falwell's resignation, Liberty took certain steps to ensure Mr. Falwell did not return to Liberty's campus. Liberty has banned Mr. Falwell and Becki from visiting campus and upon information and belief, has provided Liberty police instructions to issue citations to Mr. Falwell and Becki for trespass, despite the fact that both of Mr. Falwell's parents are interred on Liberty's campus.

---

[1] Liberty has been working with Mr. Falwell to return the certain property belonging to Mr. Falwell and Mr. Falwell intends to continue working with Liberty regarding return of his property. There remains additional property Mr. Falwell owns that Liberty maintains.

11

58.     Facing potential trespass citations, Mr. Falwell has been intentionally deprived of many of his personal possessions.

59.     Mr. Falwell owns and has the right to immediate possession of all personal property belonging to him, including, but not limited to:

      a.     a large collection of books, including numerous volumes of the Virginia Code and other legal texts;

      b.     various legal files from Mr. Falwell's time as an active member of the Virginia bar from 1988 to 2007;

      c.     a .38 revolver

      d.     the website JerryFalwell.com

      e.     various personal items and pictures from Mr. Falwell's Liberty offices;

      f.     many historical items owned by Mr. Falwell residing in the Jerry Falwell Museum;

      g.     the personal property located at 6024 Piedmont Place, Lynchburg, Virginia;

      h.     various personal items stored in multiple Liberty Warehouses; and

      i.     three horses provided to Liberty's equestrian center.

60.     Since Mr. Falwell's resignation, Liberty has wrongfully possessed and controlled Mr. Falwell's property.

61.     As a result of Liberty's conversion, Mr. Falwell has been damaged in an amount that will be determined at trial.

## COUNT IV:  DETINUE (in the alternative)

62.     Mr. Falwell repeats and realleges the allegations contained in the foregoing paragraphs as if fully stated herein.

LUADMINREC000301

63.     Mr. Falwell is the lawful owner of the property previously described in paragraph 59 and has an immediate right to possession of the property.

64.     Mr. Falwell's property that remains in Liberty's possession is easily identifiable and of value.

65.     Liberty has maintained Mr. Falwell's property in its possession prior to the institution of this claim, and Mr. Falwell has been damaged by its detention in an amount that will be determined at trial.

## COUNT V:  TRESPASS TO CHATTELS (in the alternative)

66.     Mr. Falwell repeats and realleges the allegations contained in the foregoing paragraphs as if fully stated herein.

67.     Upon Mr. Falwell's resignation, Liberty maintained certain property belonging to Mr. Falwell.

68.     Following Mr. Falwell's resignation, Liberty took certain steps to ensure Mr. Falwell did not return to Liberty's campus. Liberty has banned Mr. Falwell and Becki from visiting campus and, upon information and belief, has provided Liberty police instructions to issue citations to Mr. Falwell and Becki for trespass, despite the fact that both of Mr. Falwell's parents are interred on Liberty's campus.

69.     Facing potential trespass citations, Mr. Falwell has been intentionally deprived of many of his personal possessions.

70.     Mr. Falwell owns and has the right to immediate possession of all personal property belonging to him, including, but not limited to:

      a.     a large collection of books, including numerous volumes of the Virginia Code and other legal texts;

LUADMINREC000302

     p.     various legal files from Mr. Falwell's time as an active member of the Virginia bar from 1988 to 2007;

     c.     a .38 revolver;

     d.     the website JerryFalwell.com;

     e.     various personal items and pictures from Mr. Falwell's Liberty offices;

     f.     many historical items owned by Mr. Falwell residing in the Jerry Falwell Museum;

     g.     various personal items stored in multiple Liberty Warehouses; and

     h.     three horses provided to Liberty's equestrian center.

71.     Since Mr. Falwell's resignation Liberty has wrongfully possessed and controlled Mr. Falwell's property.

72.     As a result of Liberty's trespass to Mr. Falwell's chattel, Mr. Falwell has been damaged in an amount that will be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, for the reasons set forth herein, Counterclaim Plaintiff, Jerry Falwell, Jr., respectfully requests this Honorable Court:

     a.     enter judgment in Mr. Falwell's favor;

     b.     award Mr. Falwell damages to be determined at trial for Liberty's acts in breaching the 2019 Employment Agreement;

     c.     award Mr. Falwell damages to be determined at trial for Liberty's conversion of Mr. Falwell's property, or in the alternative award Mr. Falwell damages for his action in detinue and Liberty's trespass to chattel;

     d.     award Mr. Falwell punitive damages;

LUADMINREC000303

e.   enjoin Liberty from retaining possession of the property belonging to Mr. Falwell;

f.   award Mr. Falwell pre-judgment interest; and

g.   provide Mr. Falwell any other relief this Court deems appropriate.


Dated: October 21, 2021                          Respectfully submitted,

                                                 JERRY L. FALWELL, JR.

                                                 _____
                                                 Counsel

Vernon E. Inge, Jr. (Va. Bar No. 32699)
Robert N. Drewry (Va. State Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:     804.977.3301
Facsimile:     804.977.3291
E-Mail:        vinge@wtplaw.com
               rdrewry@wtplaw.com

*Counsel for Counterclaim Plaintiff/Defendant, Jerry L. Falwell, Jr.*

LUADMINREC000304

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of October, 2021, a true and correct copy of the foregoing *Defendant's Counterclaim Against Plaintiff* was served *via* e-mail transmission and first-class, postage-prepaid, U.S. Mail upon the following:

> Scott C. Oostdyk, Esq.
> Andrew F. Gann, Jr., Esq.
> McGuireWoods LLP
> Gateway Plaza
> 800 East Canal Street
> Richmond, Virginia 23219
> E-Mail:    soostdyk@mcguirewoods.com
>              agann@mcguirewoods.com
>
> — and —
>
> R. Craig Wood, Esq.
> McGuireWoods LLP
> Post Office Box 1288
> Charlottesville, Virginia 22902-1288
> E-Mail:    cwood@mcguirewoods.com

*Counsel for Plaintiff, Liberty University, Inc.*

Robert N. Drewry

16

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.,                )
                                          )
           *Plaintiff,*                   )
                                          )
v.                                        )          Case No. CL21000354-00
                                          )
JERRY L. FALWELL, JR.,                    )
                                          )
           *Defendant.*                   )

## **DEFENDANT'S PLEA IN BAR**

Defendant, Jerry L. Falwell, Jr. ("**Falwell**" or "**Defendant**"), by counsel, states the following as his Plea in Bar to the First Amended Complaint filed against him by Plaintiff, Liberty University, Inc. ("**Liberty**" or "**Plaintiff**").

### **Legal Standard**

1.      "A plea in bar asserts a single issue, which, if proved, creates a bar to a plaintiff's recovery."[1] *Hawthorne v. VanMarter*, 279 Va. 566, 577 (2010).

2.      While pleas in bar typically bar the plaintiff's entire claim, Virginia courts "have recognized that a plea in bar 'constitutes [either] a complete defense to the [complaint], ***or to that part of the [complaint] to which it is pleaded.***'" *Smith v. McLaughlin*, 289 Va. 241, 252 (2015) (quoting *Campbell v. Johnson*, 203 Va. 43, 47 (1961) (emphasis original)). Succinctly, a plea in bar can be sustained to part of the Plaintiff's complaint.

3.      "The party asserting a plea in bar carries the burden of proof." *Cooper Industries, Inc. v. Melendez*, 260 Va. 578, 594 (2000).

---

[1]      In preparation for a hearing on the Plea in Bar and pursuant to Rule 4:15(c) of the Rules of Supreme Court of Virginia, Defendant reserves the right to file a Memorandum in Support of his Plea in Bar.

LUADMINREC000306

## Plea in Bar to Count III – Breach of Fiduciary Duty

4.        Plaintiff's claim in Count III is barred.

5.        Liberty's Board of Trustees (the "**Board**"), or at least one member of the Board, knew about Granda's extortion attempts, the actions leading to Granda's attempts, and Falwell's actions relating to the Granda Allegations.

6.        Liberty is accredited by the Southern Association of Colleges and Schools Commission on Colleges ("**SACSCOC**") and as part of the principles of accreditation, the institution has a governing board of at least five members and is not controlled by a minority of board members. This standard, Section 4.1, is a Core Requirement for accreditation, and is a threshold institutional characteristic required of all SACSCOC institutions seeking accreditation or maintaining accreditation. If an institution is out of compliance with a Core Requirement, the institution must be provided a sanction.

7.        The Board was provided material information relating to Falwell, which the Amended Complaint claims was not provided to the Board. This fact – *i.e.*, Falwell providing material information to the Board – bars Count III.

8.        Liberty also maintains Falwell breached his fiduciary duty by failing to inform Liberty regarding his alleged personal impairment by alcohol. Amend. Compl. ¶ 141. Falwell's medical records will indicate that the actions alleged in the summer of 2020 purportedly by excessive alcohol intake were, instead, the result of Falwell's diagnosis with pulmonary emboli, or clots in the lungs, causing Falwell's oxygen levels to fall to dangerously low levels and cause adverse health reactions. Falwell's medical condition ultimately required two medical procedures in the last year and is still being monitored.

2

9.      Therefore, Falwell, by asserting the above and through evidence he will introduce at a hearing on the Plea in Bar, clearly establishes that Liberty is barred from succeeding on its Breach of Fiduciary Duty claim.

WHEREFORE, Defendant, Jerry L. Falwell, Jr., by counsel, respectfully requests that this Court sustain its Plea in Bar to Count III; dismiss Count III of the Amended Complaint with prejudice; and order such other and further relief as the Court deems just and proper.

Dated:  October 21, 2021                                         JERRY L. FALWELL, JR.

_____
Counsel

Vernon E. Inge, Jr. (Va. Bar No. 32699)
Robert N. Drewry (Va. Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:    804.977.3301 / 804.977.3304
Facsimile:     804.977.3298 / 804.762.6865
E-Mail:        vinge@wtplaw.com
                rdrewry@wtplaw.com

*Counsel for Defendant, Jerry L. Falwell, Jr.*

3

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of October, 2021, a true and correct copy of the foregoing *Defendant's Plea in Bar* was served *via* e-mail transmission and first-class, postage-prepaid, U.S. Mail upon the following:

> Scott C. Oostdyk, Esq.
> Andrew F. Gann, Jr., Esq.
> MCGUIREWOODS LLP
> Gateway Plaza
> 800 East Canal Street
> Richmond, Virginia 23219
> E-Mail:        soostdyk@mcguirewoods.com
>                    agann@mcguirewoods.com
>
> — *and* —
>
> R. Craig Wood, Esq.
> MCGUIREWOODS LLP
> Post Office Box 1288
> Charlottesville, Virginia 22902-1288
> E-Mail:        cwood@mcguirewoods.com

*Counsel for Plaintiff, Liberty University, Inc.*

Robert N. Drewry

4

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.,

*Plaintiff/Counterclaim Defendant,*

v.

JERRY L. FALWELL, JR.,

*Defendant/Counterclaim Plaintiff.*

Case No. CL21000354-00

JURY TRIAL DEMANDED

## DEMURRER

Plaintiff Liberty University, Inc. ("Liberty"), by counsel, states as follows for its Demurrer to the Counterclaim of Defendant Jerry Falwell, Jr.'s ("Falwell" or "Falwell Jr."). For the reasons stated below, and for the support to be more fully set forth in Liberty's Memorandum in Support of this Demurrer and its Reply brief, Falwell's Counterclaim fails to state a claim, and it should be dismissed with prejudice.

## I.    Falwell's Counterclaim Fails To Enumerate Damages.

1.    Falwell's Counterclaim fails to include an ad damnum clause. Under Virginia Supreme Court Rule 3:2(c)(ii), "[e]very complaint requesting an award of money damages shall contain an ad damnum clause stating the amount of damages sought." Ample case law reinforces the requirement. *Smith v. McLaughlin*, 289 Va. 241, 270 (2015); *Wells Ramos v. Wells Fargo, NA*, 289 Va. 321, 322 (2015); *Sawyer v. C. Pincus, Jr. & Co., Inc.*, 83 Va. Cir. 251 (2011).

2.    Despite the clear dictates of Virginia law, Falwell states only that he "has suffered damage to his reputation . . . [and] other pecuniary damage" and asks that the Court "[a]ward Mr. Falwell damages[.]" (Counterclaim ¶ 47, prayer for relief.) Because he fails to plead and ad

1

damnum, Falwell's complaint must be dismissed in its entirety.

## II.   Falwell Fails to State A Claim for Breach Of Contract.

3.      For two reasons, Falwell fails to state a claim for breach of contract. **First,** Falwell claims that Liberty made statements that supposedly violated Liberty's obligations under his 2019 Employment Agreement (the "Agreement"). Specifically, Falwell pleads that the parties promised that they would "not make defamatory or slanderous remarks about the other in public fora or settings." (Counterclaim ¶ 10, 42). Falwell asserts that Liberty breached the Agreement.

4.      Notably, the Agreement does contain a provision prohibiting "disparagement," which is the usual way the parties bind each other into contractual constraints around future criticism. Falwell therefore had to isolate and excoriate "defamatory or slanderous" speech in Count I, his breach of contract allegation. By committing the parties to avoid "defamatory or slanderous speech, however, the parties merely committed to follow the already-existing common law. Any such lapse is not actionable on a contract theory.

5.      Because the parties were already obligated to refrain from common law harms, neither party gained nor gave up anything when they incorporated their pre-existing tort obligation into Section 3.7 of the Agreement. In Virginia, truly "defamatory and slanderous" remarks are always unlawful, regardless of whether the parties agreed to refrain from them in their employment contract. Absent a benefit to one party or a detriment to the other, therefore, no consideration supports this portion of Section 3.7 of the Agreement. Under Virginia law, a promise "to perform an obligation already legally incumbent on [each party] without any detriment to [the other] is unsupported by consideration." *Poe v. Poe*, 16 Va. Cir. 202 (1989) (citing Chesapeake & Ohio Co. *v. Westinghouse*, 138 Va. 647 (1924); *see also Bojorquez-Moreno v. Shores & Ruark Seafood* Co., 92 F. Supp. 3d 459, 468 (E.D. Va. Mar. 17, 2015) (noting that "a party's agreement to do or refrain

2

from doing something that it is already legally obligated to do or refrain from doing is not consideration") (internal citation and quotation marks omitted).

6.      In attempting to redress as a breach of contract some supposedly "defamatory and slanderous" speech by Liberty, Falwell asserted no unique or legally-enforceable obligation that was incumbent on Liberty at law.   Falwell thus failed, as required, to plead an independent claim for breach of contract.  His putative contract claim thus fails because it is the mirror image of his tort allegations (which are themselves deficient for the reasons stated in Section III below).

7.      **Second**, Falwell further claims that Liberty violated the Agreement by breaching the provision permitting Liberty to "truthfully explain the circumstances forming the basis" of termination if "Falwell's employment is terminated for cause." (Counterclaim ¶ 45.) Falwell argues that Liberty violated this provision because he "was not terminated for cause." (*Id.* ¶ 46.) Nowhere in the Agreement is there a provision prohibiting Liberty from commenting if Falwell were to be terminated for any other reason, including if Falwell resigned for "good reason." Accordingly, Falwell attempts to claim that Liberty breached a term that does not exist in the Agreement.  On this additional basis, Falwell fails to state a claim for breach of contract.

**III.**   **Falwell Fails to State a Cognizable Claim for Defamation.**

8.      For three reasons, Falwell's defamation claim fails to state a claim cognizable in tort.  **First**, Falwell's claim of subject matter jurisdiction to the contrary (Counterclaim ¶ 7), the Virginia Supreme Court has determined that courts in the Commonwealth lack jurisdiction to resolve a defamation claim where the court would be compelled to parse the truth or falsity of religious "doctrine and beliefs[.]" *Cha v. Korean Presbyterian Church of Washington*, 262 Va. 604, 615 (2001).  The trial court must perform the "gatekeeping function" in defamation actions. *Schaecher v. Bouffault*, 290 Va. 83, 92 (2015).  Thus, this Court has to decide as a matter of law

3

if the speech targeted as defamatory is factual in nature, which speech can be regulated by defamation law, or whether it is actually opinion speech – in which case courts cannot chastise it.

9.      To adjudicate Falwell's defamation claim, the Court would be called upon to evaluate words that originated within the confines of a student church service and would have to analyze religious judgments that were delivered by Liberty's Campus Pastor, David Nasser (Liberty's Senior Vice President for Spiritual Development.)  (Counterclaim ¶¶ 18, 21, 26.)  In this process, this Court would have to unpack what Liberty (an ecclesiastically-controlled college) regarded to be "sinful" by its doctrinal standards, and to evaluate the concepts such as "spiritual stewardship," from Liberty's vantage point. (Counterclaim ¶ 26).  It would have to weigh whether or not Falwell's stated actions were commensurate with Liberty's "spiritual mission[.]" *Id.*  It is difficult to imagine concerns more fundamentally doctrinal than the meaning of "sin," "spiritual" leadership, or evangelical mission.  For this reason, this Court is without jurisdiction to decide Falwell's defamation claim, as a matter of law.

10.      **Second,** Falwell fails to plead the very elements of defamation.  Under Virginia law, a defamation plaintiff must prove "(1) publication of (2) an actionable statement with (3) the requisite [defamatory] intent." *Jordan v. Kollman*, 269 Va. 569, 575 (2005). To be "actionable," the specific words of the identified statement must "harm the reputation of another as to lower him in the estimation of the community…." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). Because truth is a defense to defamation, the focal statements must be provably true…or false.  This Court must determine whether the alleged statements are non-actionable opinion, or potentially-actionable fact – and do so at the demurrer stage. *Schaecher,* 290 Va. at 94.

11.      The jurisdictional issue aside, the Liberty statements about which Falwell

4

affirmatively complains – regarding lapse in the requisite degree of sin, spirituality, and devotion to religious mission – are inherently incapable of being established factually. Whether Falwell engaged in "sinful" behavior, whether he showed a "lack of spiritual stewardship," whether he defaulted on his devotion to "mission," or whether Liberty is right in reporting Falwell had "broken trust for most in Liberty University" cannot be proven or disproven as a matter of fact. Such sweeping characterizations by Falwell land squarely within the category of opinion and cannot be determined to be defamatory, as a matter of law. *See e.g.*, *Padula-Wilson v. Landry*, 841 S.E.2d 864, 872-73 (2020) (statements that a mother had "contributed to" her child's "deterioration," that she had acted "inappropriate[ly]," and that she had demonstrated a "lack of boundaries" were non-actionable opinion); *see also Gibson v. Boy Scouts of Am.*, 360 F. Supp. 2d 776, 781 (E.D. Va. 2005) (statement that the plaintiff was "unfit to be a Scoutmaster" was pure opinion).

12.   **Third**, the snippets of speech that have been isolated by Falwell do not convey the requisite defamatory "sting" to be facially regarded as actionable. *See Schaecher*, 290 Va. at 92 ("[a] false statement must have the requisite defamatory 'sting' to one's reputation.") For his defamation claim, Falwell asks this Court to determine the perceptions of a mass gathering of people who attended a student church service, and to take the temperature of an audience of college newsletter readers. Falwell claims that Liberty's statements about "sin" and a lapse of "spiritual" leadership are defamatory because such attendees at Liberty's Community Service, or alumni seeing a circular, would have inherently understood these messages to convey that Falwell actively participated in his wife's affair by watching from the corner. (Counterclaim ¶ 22.)

13.   Falwell does not plead any occasion in which this concept of voyeurism was ever spoken about or written about by anyone within the Liberty fold. Even Falwell does not claim a direct attribution such as this. Falwell concedes in his own Counterclaim that he disclosed in

LUADMINREC000314

media that he made many mistakes. (Counterclaim ¶14).   Somehow, Falwell still pleads that Liberty's references in a church service and press and alumni communications were a cognizable reference to sexual aberration alleged against Falwell by one Giancarlo Granda. (Counterclaim ¶22).  To arrive at this allegation, Falwell pleads an inference from an inference, with a phenomenally thin basis.  His pleading is a leap too far from the nexus between actual words and a listener's or reader's reasonable perception or comprehension.   Falwell fails to state the requirement of defamatory speech that is cognizable in a defamation action.

15.     The context of the comments Falwell alleged prove the strained nexus that Falwell Jr. attempts in his defamation count, and the lack of viability in his pleading of defamatory words. Falwell pleads that Nasser's church service remarks were "largely scripted." Liberty has craved oyer to put before this Court the entire transcript of the worship service speech that Falwell contends to be the basis of his defamation claim, along with a copy of the follow-on press release and newsletter.  This will provide this Court with the full context of the allegedly-defamatory words.

15.     Context here is vitally important.  While discussing Falwell's "sin" during this church speech, Pastor Nasser referenced Falwell's own admission that Falwell had for years concealed both an affair and extortion from the conservative Christian community that he led – a deception admitted in Falwell's Counterclaim (Counterclaim ¶ 14).  Falwell's admitted dishonesty alone is enough to support action on "Defamatory Statements," and not enough to establish as a matter of law they are non-defamatory on their face.  To achieve the requisite defamatory "sting," a plaintiff cannot just "pile one inference upon the other." *Mann v. Heckler & Koch Defense, Inc.*, 639 F. Supp. 2d 619, 635 (E.D. Va. 2009).  Falwell pled no stinging statements attributable to Liberty.

6

16.     **Fourth**, even if the Court could logically interpret Liberty's statements in the manner that Falwell requests, Falwell still fails to plead that Liberty had any defamatory intent. Falwell, like his father before him, was the President and Chancellor at Liberty, and a public figure. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 57 (1988) ("it is clear that respondent Falwell is a 'public figure' for purposes of First Amendment law.")  As a public figure, Falwell must plausibly allege that Liberty spoke the alleged words with "actual malice." *Besen v. Parents & Friends of Ex-Gays, Inc.*, 2012 WL 1440183, at *5 (E.D. Va. Apr. 25, 2012) (footnote omitted).

17.     This Falwell did not do. He alleges that Liberty must have known that Granda's allegations were false because Falwell had already denied them. (Counter ¶¶ 14-16.) This fails to be a statement of malicious intent, as a matter of law.  Falwell believes Liberty was obligated as a matter of law to take his word. A defamation defendant "need not accept denials, however vehement." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 792 n.37 (1989). Falwell's own denials of misconduct are insufficient on their face to plead a cognizable element of actual malice.  Falwell elsewhere pleads no malicious intent by Liberty.

**IV.     Falwell Has Not Stated Claims for Conversion, Detinue, or Trespass to Chattels.**

18.     Falwell also includes in his suit claims for conversion, detinue, and trespass to chattels arising out of various property that Falwell alleges is wrongfully in Liberty's possession. These claims fail because Falwell has failed to plead that Liberty willfully deprived him of any of his personal property.

19.     Falwell does not contend Liberty forced him to leave the subject property behind at his resignation or that Liberty has refused a repossession request.  In fact, Falwell concedes that "Liberty has been working with Mr. Falwell to return the certain property belonging to Mr. Falwell and [that] Mr. Falwell intends to continue working with Liberty regarding return of his property."

7

LUADMINREC000316

(Counterclaim ¶ 56 n.1.)  Falwell admits Liberty concedes Falwell's right to repossess any property allegedly owned by Falwell, and that the whole personal property issue is merely one of the timing of the impending transfer. For this reason, Falwell's property-based claims fail as a matter of law.

20.     Alternatively, the stated facts allege Falwell has abandoned the property described in his Counterclaim by failing to timely remove it from Liberty's property when his employment with Liberty ended.  As such, Falwell fails to state a claim for conversion, detinue, and trespass to chattels.

## V.     Falwell Fails to State A Claim for Punitive Damages.

21.     Falwell Jr. asks the Court to "award Mr. Falwell punitive damages." (Counter at ¶14.) He states no facts in support. Punitive damages are only available when "a defendant's alleged conduct was so willful or wanton as to show a conscious disregard for the right of others." *Rife v. Buchanan County Hospice*, 2013 WL 9564179, at *2 (Va. Cir. Ct. 2013).  Nowhere in the Counterclaim does Falwell allege any shocking, vexatious, or spiteful conduct by Liberty.

WHEREFORE, for the foregoing reasons, and for the reasons to be more specifically set forth in the Memorandum of Law in Support of this Demurrer, Liberty prays for this Court to sustain this Demurrer, and to dismiss the Counterclaim in its entirety, with prejudice.


Dated: November 11, 2021

8

Respectfully submitted,

LIBERTY UNIVERSITY

_____
Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was sent via electronic mail and caused to be sent by U.S. mail to Vernon E. Inge Jr. and Robert N. Drewry at Whiteford Taylor & Preston, this 11th day of November, 2021.

_____
Scott C. Oostdyk

LUADMINREC000318

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.,

*Plaintiff/Counterclaim Defendant,*

v.

JERRY L. FALWELL, JR.,

*Defendant/Counterclaim Plaintiff.*

Case No. CL21000354-00

### MOTION TO STRIKE DEFENDANT'S PLEA IN BAR

Plaintiff and Counterclaim Defendant Liberty University, Inc. ("Liberty"), by counsel, moves to strike the Pleas in Bar filed by Defendant and Counterclaim Plaintiff Jerry Falwell Jr. ("Falwell" or "Falwell Jr."). For the reasons below, to be more fully set forth in Liberty's Memorandum in Support of this Motion and Reply brief, Falwell's Plea in Bar is legally deficient and must be stricken with prejudice. In support of this Motion, Liberty states as follows:

1.      On October 21, 2021, Falwell filed a plea in bar to Count III (Breach of Fiduciary Duty) of Liberty's First Amended Complaint. Falwell's plea in bar is legally deficient for two reasons: (a) because it improperly raises multiple triable issues rather than a single dispositive, narrow one, and (b) because it merely attacks Liberty's ability to prove one of the elements of its breach of fiduciary duty claim.

2.      First, it is clear Falwell Jr.'s plea in bar asserts multiple unmanageable matters. Falwell himself admits that a proper plea in bar asserts but a "single narrow issue." (Plea in Bar ¶ 1). He is right. *Tomlin v. McKenzie*, 251 Va. 478, 480 (1996) ("The defensive plea in bar shortens

the litigation by reducing it to *a distinct issue of fact* which, if proven, creates a bar to the plaintiff's right of recovery. The moving party carries the burden of proof on that issue of fact.") (emphasis added); *HCP Properties-Fair Oaks of Fairfax VA, LLC v. County of Fairfax*, No. CL-2017-18207, 2019 WL 8883742, at *5 (Va. Cir. Ct. May 24, 2019) ("A plea in bar does not address the merits of the complaint but raises *a single issue* of fact that might constitute an absolute defense to the suit.") (emphasis added); *Post Apartment Homes, L.P., v. RTKL Assoc., Inc.*, No. 03-313, 2003 WL 22533493, at *2 (Va. Cir. Ct. Nov. 5, 2003) (denying plea in bar because there was "no 'single issue' that [could] be resolved through a plea in bar").

3.      A plea in bar is a discrete form of defensive pleading that alleges a single set of facts such as those substantiating matters like a breach of the "Statute of Limitation or Statute of Frauds—which, if proven, constitutes an absolute defense to that claim." *Brooks v. City of Roanoke*, No. CL13-1531, 2015 WL 6395736, at *2 (Va. Cir. Ct. Jan. 28, 2015). *See, e.g., Plofchan v. Plofchan*, 299 Va. 534 (2021) (plea in bar based on collateral estoppel); *Tomlin v. McKenzie*, 251 Va. 478 (1996) (plea in bar based on sovereign immunity); *Sparks v. Lucas*, No. CL-2017-5282, 2018 WL 6794665 (Va. Cir. Ct. March 23, 2018) (plea in bar based on statute of limitations); *Miles v. Virginia Intern. Terminals, Inc.*, No. CL07-4346, 2008 WL 5546245 (Va. Cir. Ct. March 26, 2008) (plea in bar based on workers compensation bar).

4.      Far from asserting an insular issue, Falwell's submission raises at least *three* different complex factual matters, each toting ill-defined subissues. Falwell's plea in bar interposes questions such as (a) whether he disclosed the Granda Allegations and extortive threats to an un-named fellow member of Liberty's Board of Trustees who had the power or duty on the Liberty board to do some unpled, prophylactic things to impact on Liberty's suit; (2) whether putative accreditation requirements supposedly imposed on Liberty may or may not have rendered the

2

manner in which Liberty approved the subject Falwell 2019 Employment Agreement void or voidable, generating a determination of unspecified impact; and (3) whether damaging actions alleged in Liberty's Complaint were the result of alcohol impairment suffered by Falwell (Liberty's position) or rather medical issues triggered by Falwell's pulmonary embolism. (Falwell's position). *See* Plea in Bar ¶¶ 5-8. Falwell's hodge-podge approach to his plea in bar is entirely impermissible. Only those matters that focally end a case or claim are suited for accelerated treatment. Falwell raises none.

5.      The futility of Falwell's approach becomes especially clear with the examination of one of Falwell's focal issues – the issue of the impact of his alleged impairment by alcohol. In order to adjudicate this issue, the parties would need to produce and vet medical records, take depositions, and then engage expert medical witnesses before putting the issue to this Court. This type of intricate evidentiary process is unsuited for a plea in bar. *See Pridemore v. Hryniewich*, No. CL16-3261-00/01, 2017 WL 10978856, at *15 (Va. Cir. Ct. Aug. 18, 2017) (observing that an issue was "not appropriate for a plea in bar" where "without uncontested facts or more complete discovery, it cannot be determined whether the evidence is clearly insufficient to support the theory") (internal quotations and citations omitted).

6.      Second, Falwell's plea in bar should be stricken because it will require Falwell to reach the factual merits of disputed issues to resolve any claims. It is well-settled that "a defendant may not use a plea in bar as a plea of the general issue of the case, or more specifically, to attack the plaintiff's ability to prove a certain part of his case." *Fee v. Ellison*, No. CL13-6544, 2015 WL 10521465, at *1 (Va. Cir. Ct. May 8, 2015) (denying defendant's plea in bar because it would "improperly adjudicate an element of Plaintiffs' case before trial").

LUADMINREC000321

7.      Here, Falwell improperly uses his plea in bar to attack one of the elements of Liberty's breach of fiduciary duty claim—the element of breach. *See Plumbers and Steamfitters Union Local No. 10 v. Waters*, 451 F. Supp. 3d 543, 550 (E.D. Va. 2020) ("Under Virginia law, the elements of a breach of fiduciary duty claim are: (1) the defendant owes a fiduciary duty, (2) the defendant breached that fiduciary duty, and (3) the breach of fiduciary duty resulted in damages.").

8.      Because Falwell improperly raises in his Plea in Bar issues surrounding (a) Falwell's alleged disclosure of the Granda Allegations to a Liberty Board member and (b) Falwell's alleged medical condition, Falwell uses his plea in bar to argue that he did not breach his fiduciary duties.  Since "breach" is an element of Liberty's claim that Liberty must prove at trial, the law forbids Falwell to do so on plea in bar.  *See Stockbridge v. Gemini Air Cargo, Inc.*, 269 Va. 609, 617–18 (2005) (observing that trial court overruled "the plea in bar on the ground that it constituted nothing more than a plea of the general issue," which is "a general denial of the plaintiff's whole declaration or an attack upon some fact the plaintiff would be required to prove in order to prevail on the merits"); *Lott v. Wheeler*, No. CL19-5985, 2020 WL 10315411, at *2 (Va. Cir. Ct. Oct. 9, 2020) (reasoning plea in bar would be "improper" because it "address[ed] the merits of the issues raised by the complaint") (internal quotations omitted).

WHEREFORE, for the foregoing reasons, and for the reasons to be more specifically set forth in the Memorandum of Law in Support of this Motion and Reply brief, Liberty prays for this Court to grant Liberty's Motion to Strike, and to dismiss Falwell's plea in bar with prejudice.

Dated: November 11, 2021

4

Respectfully submitted,

LIBERTY UNIVERSITY

BY COUNSEL

_____

Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was sent via

electronic mail and U.S. mail to Vernon E. Inge Jr. and Robert N. Drewry at Whiteford Taylor

& Preston, this 11th day of November, 2021.

_____
Scott C. Oostdyk

LUADMINREC000323

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.,

*Plaintiff/Counterclaim Defendant,*

v.

JERRY L. FALWELL, JR.,

*Defendant/Counterclaim Plaintiff.*

Case No. CL21000354-00

JURY TRIAL DEMANDED

## LIBERTY UNIVERSITY, INC.'S MEMORANDUM IN SUPPORT OF DEMURRER

Plaintiff Liberty University, Inc. ("Liberty"), by counsel, states as follows in support of its Demurrer to Defendant Jerry Falwell, Jr.'s ("Falwell") Counterclaim.  For the reasons below, Falwell's Counterclaim fails to state a claim, and it should be dismissed with prejudice.

## INTRODUCTION

In his Counterclaim, Falwell alleges a religiously-oriented dispute that is principally among two people: Falwell and David Nasser, Liberty's Senior Vice President for Spiritual Development. (Counter. ¶18.)  The two had things in common.  They were both proud of Liberty's arc of growth as a Christian university.  Falwell pled that he was the former head of the "world's leading evangelical university."  (Counter. ¶¶ 3, 18.)  At the August 26, 2020 Campus Community bible study and worship service Falwell partly chronicled in the Counterclaim, Nasser labeled the weekly service he led at Liberty "one of the largest [b]ible studies in the world."  *See* Plaintiff's Motion Craving Oyer ("Motion"), Exhibit C, at Tr. 23 l. 7-9.  Falwell pled other similarities. Falwell followed the Reverend Jerry Falwell Sr. into the role as Liberty's leader in 2007.  (Counter. ¶3.)  Falwell contends that, like his father, he was a sought after national speaker regarding

1

LUADMINREC000324

"evangelicalism." (Counter. ¶36.) Accordingly, Falwell regarded his reference groups to include

national members of "the evangelical community." (Counter. ¶34.) Nasser, too, was a speaker

and commentator within the evangelical Christian community. Like Falwell, he tried to associate

at the lectern with the biggest of names in Christianity. At Campus Community, Nasser prayed:

> We pray… that Jesus, you would be the guest speaker tonight. That when we
> open your word that's living and active, sharper than any two-edged sword,
> cutting through bone and marrow, and judging the attitudes of life. That we would
> say, [this] is about your mercy, your glory, coming into our lives tonight and
> telling us truth even if it's hard to hear.

Motion, Ex. C, Tr. 20 l.9-16.

What Falwell did not like, and what set the two apart, is Falwell did not appreciate that

Nasser said his "guest speaker" (Jesus) held the Falwell presidency to account against the agreed

standards of the office of President. In his Counterclaim, Falwell pled aspects of Nasser's remarks

from the August 26, 2020 bible study and worship service (the "Bible Study"). Falwell plead that

Nasser's Bible Study remarks probed the contours of "sinful behavior," (Counter. ¶21), discussed

what the Apostle Paul thought about "darkness" and "light," and explored the impact of personal

conduct on "the name of Christ." (*Id.*) Falwell includes in his list of defamatory conduct Nasser's

readings from the book of Ephesians, his counsel to students on the parameters of "sin," and his

urging that they be "concerned" about such things. (*Id.*) Falwell pleads that Nasser's comments

touching on the former president's resignation were "scripted." (*Id.*) Falwell therefore pleads that

other campus leaders at Liberty thereby joined the Senior Vice President for Spiritual

Development's perspectives. In fact, Falwell expressly pled that Nasser's spiritual instruction to

students regarding "sinful behavior" and "sin" (through the prism of Paul, and against the standard

of Christ) was "authorized" from Nasser's superiors. (*Id.* ¶ 25.) It is a fair inference that Falwell

was thus referencing a group that included Dr. Jerry Prevo, a 50-year pastor who was in his first

day on the job as Liberty's acting President, following Falwell's resignation. (*Id.*); Motion, Ex.

LUADMINREC000325

C, Tr. 2 l. 18.

In addition to criticizing how Nasser led the Bible Study, Falwell also bristles at Liberty's opinions in an August 31, 2020 press release (the "Press Release") that said Falwell exhibited a "lack of spiritual stewardship," and that Falwell lapsed in steering the "spiritual mission" of Liberty. (Counter. ¶26.) Finally, Falwell lambasts Liberty for suggesting in a September 24, 2020 edition of the *Liberty Journal* that some in the Liberty circles had questioned Falwell's care for Liberty's "nearly 50-year mission of *Training Champions for Christ*." (Counter. ¶29.) (Emphasis in original).

From the launchpad of this factual predicate, Falwell pleads counts for (1) Breach of Contract; (2) Defamation; and (3) Conversion, Detinue (in the alternative), and Trespass to Chattels (in the alternative). Like his demurrer to Liberty's Complaint, Falwell's counterclaims are deficient, for several reasons. First, Falwell failed to include an ad damnum clause as required by black-letter Virginia law. This dispositive act warrants automatic dismissal. Second, Falwell's defamation claim fails because, this Court lacks jurisdiction over a claim that would thrust the Commonwealth into adjudicating concepts inextricably intertwined with the parties' respective religious doctrine and beliefs. Moreover, Falwell has failed to plausibly plead all the requisite elements of defamation, such as misrepresented facts and malicious motive.

Third, Falwell's breach of contract claim fails because the provision upon which Falwell relies is not supported by either cognizable consideration or the words of the contract, and because Falwell has not asserted facts that can substantiate contractual breach. Fourth, Falwell's property-based claims are deficient because Falwell fails in his conversion count to plead requisite intent and because he negates his claim by pleading he is working with Liberty to gain the property he left behind. Fifth and finally, Falwell's claim for "punitive damages" fails because he has not

3

LUADMINREC000326

plausibly alleged willful, wanton, or egregious conduct by Liberty, as the standard requires.  For these reasons, expanded below, the Court should dismiss Falwell's Counterclaim with prejudice.

## LEGAL STANDARD

It is well-established that the "purpose of a demurrer is to determine whether the pleading and any proper attachments state a cause of action upon which relief can be given." *Steward ex rel. Steward v. Holland Family Prop., LLC*, 284 Va. 282, 286 (2012).  When a party craves oyer, the materials subject to the motion, if granted, are incorporated into the written pleadings as attachments. *Culpeper Nat'l Bank v. Morris*, 168 Va. 379, 382-83 (1937).  A "demurrer accepts as true all facts properly pled, as well as reasonable inferences from those facts." *Id.*  Because words matter in a defamation claim, a plaintiff cannot substitute "conclusory statements" for stated facts. *Dean v. Dearing*, 263 Va. 485, 490 (2002).  While a demurrer admits the truth of all properly pled facts, it "does not admit the correctness of the pleader's conclusions of law." *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 382 (1997).

## ARGUMENT

### I.   Falwell Fails to Enumerate Any of His Damages in a Cognizable Ad Damnum.

As a threshold matter, Falwell's Counterclaim fails in its entirety because it does not include an ad damnum clause.  A fully-quantified ad damnum is indisputably required in all damage actions filed in the Commonwealth.  Va. Sup. Ct. Rule 3:2(c)(ii) ("[e]very complaint requesting an award of money damages shall contain an ad damnum clause stating the amount of damages sought.").  The Supreme Court of Virginia has determined that the failure to include an ad damnum is not only demurrable but also the basis of dismissal. *Ramos v. Wells Fargo, NA*, 289 Va. 321, 322 (2015).  Accordingly, this Court must dismiss Falwell's Counterclaim.

Ad damnum clauses are not archaic, nettlesome technicalities that plaintiffs can

4

volitionally omit as vestiges of bygone days. To the contrary, "the *ad damnum* serves a useful purpose." *Powell v. Sears, Roebuck & Co.*, 231 Va. 464, 468 (1986) (italics in original). Since a party pleads its damages in full appreciation of its own harm, an ad damnum creates a ceiling on the plaintiff's damages, based on the principles of estoppel. *West v. Anderson,* 186 Va. 554, 563-64 (1947). Parties thus cannot obtain recovery beyond the amount in their pleading. *Id.* The ad damnum further serves to put on notice those who may be responsible for paying a judgment that exposure may exist. *Powell*, 231 Va. at 469. The ad damnum prohibits zealous lawyers from inflaming juries by reference to outsized prospective damage awards. *Smith v. McLaughlin*, 289 Va. 241, 270 (2015) (despite a $6 million ad damnum plaintiff impermissibly asked the jury to award $10 million). The ad damnum provides insurers with notice to determine if a claim is within or exceeds policy limits. *Powell,* 231 Va. 464 at 469.

Because a litigant seldom shies from quantifying a putative loss, and because a deficiency so blatant would be unlikely a point of appeal, much of the jurisprudence over the failure to include ad damnum clauses arises in Virginia's trial courts. *See, e.g., Solentus, Inc. v. Lam*, 2017 WL 9833483, at *4 (Va. Cir. Ct. 2017) ("[A] demurrer to an improper ad damnum clause…should be sustained."); *Sawyer v. C.L. Pincus, Jr. & Co., Inc.*, 2011 WL 8947564, at *2 (Va. Cir. Ct. 2011) (sustaining demurrer where the "ad damnum lack[ed] a value"); *EER Sys. Corp. v. Armfield, Harrison & Thomas, Inc.*, 1999 WL 1499532, at *11 (Va. Cir. Ct. 1999) ("[t]he Court sustains the demurrer to the Amended Motion for Judgment for failure to mention a specific amount sought in the ad damnum.").

Falwell has failed the foundational requirement of specifically quantifying his damage claim. A cause of action sounding in tort must allege duty, breach, causation, and damage. *See, e.g., Atrium Unit Owners Ass'n v. King*, 585 S.E.2d 545, 548 (2003). A breach of contract claim

5

must allege an enforceable agreement, breach, and damage. *Filak v. George,* 267 Va. 612, 619 (2004). In either instance, alleging the fact of damage without quantifying the amount in an ad damnum clause means the party asserting a cause of action has failed to state properly a requisite element – damage. In his Counterclaim, Falwell states only that he "has suffered damage to his reputation . . . [and] other pecuniary damage and asks that the Court award [him] damages." (Counter. ¶ 47, prayer for relief.) This pleading fixes Falwell's requested damages at zero. Because the Counterclaim does not, as required, enumerate "the *amount* of damages requested" as mandated by Va. Sup. Ct. Rule 3:2(c)(ii) (emphasis added), if fails to state a cognizable claim, and the whole case must be dismissed.

## II.    Falwell Fails to State a Claim for Defamation.

Falwell claims in Count II that Liberty abridged his rights by making allegedly defamatory statements in the following three specific venues: (i) the Bible Study, a teaching by Campus Pastor David Nasser to Liberty students and faculty at the August 26, 2020 Campus Community service; (ii) the Press Release of August 31, 2020; and (iii) the Alumni Communication in the September 24, 2020 edition of the *Liberty Journal.* (Counter. ¶¶ 18-39, 48-54.)

Under Virginia law, to state a claim, a defamation plaintiff must plead sufficient facts to substantiate a "(1) publication of (2) an actionable statement with (3) the requisite [defamatory] intent." *Jordan v. Kollman,* 269 Va. 569, 575 (2005). The plaintiff must allege the specific actionable words, so the court can measure them for objective meaning and subjective intent. *See Federal Land Bank of Baltimore* v. *Birchfield,* 173 Va. 200, 215 (1939) ("Good pleading requires that the exact words spoken or written must be set out in the [complaint] *in haec verba*...the pleading must...give the exact words.") (emphasis in original.) To survive demurrer, the specific words of the identified statement must "harm the reputation of another as to

6

lower him in the estimation of the community." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). Because truth is a defense to defamation, the focal statements must be provably true or false. *Morrissey v. WTVR, LLC*, 432 F. Supp. 3d 617, 624 (E.D. Va. 2020). As the "gatekeep[er]," the trial court must determine, at the demurrer stage, whether the alleged statements are nonactionable opinion or potentially actionable fact. *Schaecher v. Bouffault*, 290 Va. 83, 92–94 (2015).

Falwell's defamation claim fails for four separate reasons. First, as a threshold matter, this Court lacks jurisdiction to resolve the defamation claim because the Court would be required to consider the definitions of words deriving their meaning from decidedly religious doctrinal beliefs that were embraced, practiced and incumbent at Liberty. Second, the allegedly defamatory statements upon which Falwell bases his claim are nonactionable opinion—words incapable of being proven or disproven factually. Third, the allegedly defamatory statements are temperate and lack the requisite defamatory "sting." Fourth, even if the court had subject matter jurisdiction over religious speech, and the allegedly defamatory statements were statements of fact with defamatory sting, Falwell still has not plausibly pled that Liberty had the requisite defamatory intent. For these reasons, the Court should sustain Liberty's Demurrer and dismiss the defamation claim with prejudice.

### A. This Court cannot try a case about the meaning of ecclesiastical concepts.

Defamation claims often present courts with an inherent tension between the speaker's Constitutional right to free speech protected by the First Amendment and the plaintiff's common law right to be free from libel and slander. *See, e.g., New York Times v. Sullivan*, 376 U.S. 254 (1964). While courts have developed tools to accommodate this tension, there is another weighty consideration in defamation law that manifests itself when the alleged source of the defamation is

7

religiously-derived speech regarding matters of faith and ecclesiastical standards. That third pillar is the First Amendment's free exercise and non-establishment provisions.

Because of the separation required by the Establishment Clause, courts are to remain free from entanglement in "essentially religious controversies." *Serbian Eastern Orthodox Diocese v. Miliovich,* 426 U.S. 696, 709 (1976). Accordingly, the Virginia Supreme Court has precluded trial courts from deciding defamation claims that compel the court to parse the truth or falsity of "doctrine and beliefs." *Cha v. Korean Presbyterian Church of Washington*, 262 Va. 604, 615 (2001) (contract breach and defamation claim dismissed between pastor and church leaders for want of subject matter jurisdiction); *see also Conway v. Mount Lebanon Missionary Baptist Church*, 2010 WL 6814497, at *7 (Va. Cir. Ct. 2010) ("As stated in *Cha*, Courts are not permitted to review what amounts to ecclesiastical disputes."); *Denny v. Price*, 2005 WL 1939949, at *21 (Va. Cir. Ct. 2005) (holding, under *Cha*, that the court could not "apply neutral principles to decide plaintiff Denny's [defamation] claims against these individual defendants").

In *Cha*, a spiritual leader alleged that comments in a church meeting led him to believe others had imputed to him an "unfitness to discharge his duties as a pastor at the Church," and implied that he lacked integrity" to be the group's spiritual leader. *Cha*, 262 Va. at 615. The plaintiff was purportedly terminated for failing to discharge his organization's spiritual mission and to provide proper spiritual stewardship. *Id.* at 610. He wanted redress in civil court. *Id.* The Supreme Court of Virginia refused to address his contractual and defamation claims, finding that ecclesiastical decisions regarding the leadership of a spiritual leader and statements of fitness made in that process are beyond the jurisdiction of secular courts." *Id.* at 613.

In similar fashion, the allegedly defamatory words Falwell pled are all ones that would be defined in the context by the religious doctrine espoused against the backdrop of Liberty's

8

covenants and commitments to Christian steadfastness as a church-based school. Specifically, the defamation claim calls this Court to evaluate and analyze religious judgments delivered by campus pastor, Nasser, whom Falwell himself managed in August 2020 as the school's Senior Vice President for *Spiritual* Development. (Counter. ¶ 18.) Falwell's pleading rightly focuses the court on Nasser's concepts of "sin" and "spiritual mission." (*See* Counter. ¶¶ 21, 26.) Just reading what Falwell pled about the Bible Study is enough to regard the expressions there as within ecclesiastical protection from state-court oversight, but the point is even more resolved when the Court considers the complimenting material over which Liberty has craved oyer.

Prior to campus pastor David Nasser's focal remarks in the Bible Study, both he and Dr. Jerry Prevo led prayer, and there was worshipful singing. The allegedly defamatory words arise in the unmistakable context of this spiritual devotion and celebration. Motion, Tr. 23 l.7-9. To adjudicate Falwell's defamation claim, this Court would have to engage in exactly the type of doctrinal analysis forbidden by *Cha*. The Court would have to unpack what Liberty (an ecclesiastically-controlled college) regarded as "sinful" by one of its leader's doctrinal standards. (*Id.* ¶ 21.) Because Falwell claims the target speech was delivered by Nasser from prepared text approved by Liberty leadership, the Court would have to evaluate Liberty's slate of leaders' concepts of "spiritual stewardship"—not just Nasser's alone. This Court would have to weigh whether or not Falwell's stated actions were commensurate with Liberty's declared "spiritual mission." (*Id.* ¶ 26.) It is difficult to imagine matters more fundamentally doctrinal and ecclesiastical than the meaning of sin, spiritual leadership, and evangelical mission. Courts around the country that have considered broaching this church/state question share's Virginia's wisdom in shying away from disputes invading the subject of ecclesiastical judgement about conduct and province.

9

In point of fact, when other state courts have edged toward the point of parsing religious doctrine as a matter of fact, they did not do so. *See, e.g., Bandstra v. Covenant Reformed Church,* 913 N.W.2d 19, 49–50 (Iowa 2018) (affirming summary judgment for defendant on defamation claims based on statements that plaintiff had "sinned"); *Pfeil v. St. Matthews Evangelical Lutheran Church,* 877 N.W.2d 528, 538 (Minn. 2016) (holding statements that plaintiffs "were engaged in a 'public display of sin'" could not serve "as the basis for a defamation claim" because "adjudicating the truth or falsity of the statements would require the court to consider and interpret matters of church doctrine"); *Anderson v. Watchtower Bible and Tract Soc. of New York, Inc.,* 2007 WL 161035, at \*32–33 (Tenn. Ct. App. 2007) (holding that defamation claims based on references to "sins and spiritual violations" were "outside the courts' authority to adjudicate"). In *Cha,* Virginia—smartly—declined to try. Likewise, this Court lacks subject matter jurisdiction to decide Falwell's defamation claim, as a matter of law.

## B.  This Court Cannot Try a Claim Rooted in Opinions Not Facts.

Second, even if the Court did have jurisdiction over ecclesiastical speech, the defamation claim would still fail because the allegedly defamatory statements are nonactionable opinion, focusing this Court on statements that are incapable of being proven or disproven as a matter of fact. It is this Court's responsibility to examine the fact/opinion divide first on demurrer. "Whether an alleged defamatory statement is one of fact or opinion is a question of law to be resolved by the trial court." *WJLA-TV v. Levin,* 264 Va. 140, 156–57 (2002).

When a court evaluates the divide between opinion and fact, the starting point is whether the speech has an objective connotation or rather construction must test the viewpoint of the speaker. *See Hyland v. Raytheon Tech. Servs. Co.,* 277 Va. 40, 47 (2009) ("When a statement is relative in nature and depends largely on a speaker's viewpoint, that statement is an expression of

10

opinion."); *Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127, 132 (2003) ("statements that are relative in nature and depend largely upon the speaker's viewpoint" are not defamatory).

At bottom, Falwell invites this Court to measure whom Nasser and Liberty regard to be a "sinner," what to Liberty, doctrinally, is "sinful behavior," what to Liberty, conceptually, is its "spiritual mission," and what to the university are the contours of "spiritual stewardship." (Counter. ¶¶ 21, 26, 29.)  Whether or not the overall actions of Falwell as Liberty's President showed requisite "lack of spiritual stewardship" is a matter of spiritual discernment by Liberty, and must of necessity be measured through the prism of Liberty's Christian doctrine.  Whether Falwell failed the code of conduct that Liberty would apply in spotting a "sinner," whether Falwell defaulted on his devotion to Liberty's conception of its "spiritual mission," and whether Falwell had "broken trust for most in Liberty University" are all issues necessarily infused with the viewpoint of the speaker—value-infused perspectives that cannot be disproven as a matter of fact.

The Supreme Court of Virginia has evaluated numerous situations involving a defendant's criticism of the plaintiff's performance in a given role, as conceptualized by the speaker.  The Supreme Court has regarded such situations to involve nonactionable opinion, as a matter of law. *See, e.g., Padula-Wilson v. Landry*, 298 Va. 565, 579–81 (2020) (statements that a mother had acted "inappropriate[ly]," and that she had demonstrated a "lack of boundaries" were nonactionable opinion); *Fuste,* 265 Va. at 132 (relativistic statements were non-actionable); *Cashion v. Smith,* 286 Va. 327, 331, 749 S.E.2d 526, 528 (2013); *Am. Commc'n Network, Inc. v. Williams*, 264 Va. 336, 341 (2002) (statement that plaintiff "failed to establish effective operations" was a "matter of opinion that cannot form the basis of a defamation action").  There are many, many others.  Falwell's defamation claim invites this Court to parse the job performance of what Liberty, with a particular and rigid set of doctrinal expectations, expected of a spiritual

11

leader of a university community. This stance fails as the allegedly defamatory statements Falwell isolated are just the opinion of Christian university leaders regarding one of Liberty's spiritual leaders.

### C. This Court cannot try a claim with words that lack the requisite "sting."

Third, the defamation claim also fails because the statements upon which Falwell relies lack the requisite defamatory bite or derision. Under Virginia law, to be actionable, a "false statement must have the requisite defamatory 'sting' to one's reputation." *Schaecher*, 290 Va. at 92 (accusation that plaintiff "was not totally truthful" was nonactionable). It is the words themselves in the context delivered that must contain that requisite sting. *Federal Land Bank of Baltimore,* 173 Va. at 217 (1939). Stinging words "hold [plaintiff] up to scorn, ridicule, or contempt, or [are] calculated to render him infamous, odious, or ridiculous." *Moss v. Harwood,* 102 Va. 386 (1904). Speech that is highly critical, overly instructional, bluntly corrective, or vociferous in its dissent is still not actionable, unless it packs a discernible outward punch. Accordingly, in Virginia "statements can be made that are offensive, unpleasant, harsh, and critical without necessarily constituting defamation." *Bryant-Shannon v. Hampton Roads Cmty. Action Program, Inc.*, 299 Va. 579, 588 (2021).

Allegedly defamatory statements must be considered in context not isolation, hence Liberty's motion to crave oyer over the whole Bible Study, Press Release and Alumni Communication. To the extent a plaintiff relies on contextual or inferential meaning, the allegedly defamatory words themselves must still bring direct, unmistakable, and impactful zing and palpable scorn to the plaintiff. To achieve this requisite defamatory sting, a plaintiff cannot just "pile one inference upon the other." *Mann v. Heckler & Koch Defense, Inc.*, 639 F. Supp. 2d 619, 635 (E.D. Va. 2009). Speech alleged to have mere inferential impact on the hearer, as here, must

12

be non-attenuated and the urged deductions must be reasonable. *Webb v. Virginian-Pilot Media Companies*, LLC, 287 Va. 84, 89 (2014) (where a plaintiff "alleges that he has been defamed not by statements of fact that are literally true but by an implication arising from them, the alleged implication must be reasonably drawn from the words actually used") (citations omitted).

For his defamation claim, Falwell asks this Court to determine the perceptions of a mass gathering of people, nearly all Liberty students, who attended the Bible Study, and also to take the temperature of an audience of university newsletter readers. Falwell claims that Liberty's statements about "sin" and a lapse of "spiritual" leadership are defamatory because such attendees at Liberty's Campus Community service, or alumni seeing a circular, would have inherently understood these messages to convey that Falwell actively participated in his wife's affair by watching from the corner. (Counter. ¶ 22, 29-31.) In his Counterclaim, however, Falwell does not plead any occasion in which this concept of voyeurism was ever spoken about or written about by *anyone* within the Liberty leadership structure. Falwell does not allege that Nasser told students that the former President's sinful affliction was Granda's allegation that Falwell occupied a vantage point in the corner. Such an interpretation is inference on inference. Rather, Nasser said we are *all* sinners.

By the measure of case law, Falwell has not come close to pleading any "stinging" statements attributable to Liberty. *See Bryant-Shannon*, 299 Va. at 588 (holding allegedly defamatory statements in plaintiff's "Disciplinary Action Form did not convey defamatory 'sting' and rightfully did not survive demurrer"); *Wall v. Wal-Mart Stores*, 2021 WL 3671188, at *4 (E.D Va. Aug. 18, 2021) (dismissing defamation claim because "the relevant statements lack the requisite defamatory sting"); *Echtenkamp v. Loudon County Pub. Sch.*, 263 F. Supp. 2d 1043, 1063–64 (E.D. Va. 2003) (accusations "that plaintiff behaved inappropriately during a student-

13

counseling group by insulting and contradicting a social worker" lacked defamatory sting, as did

the accusation "that plaintiff was inept at handling a situation involving two disabled students.")

*Morrissey*, 432 F. Supp. 3d at 624 (finding that while terms like "fool," famously and stupidly,"

and "this clown, this nonstop, one ring circus, this liar" might "be insulting and derogatory, [they]

do not have the requisite defamatory sting"). Falwell's defamation claim fails because it is based

upon nonactionable statements that also lack the requisite defamatory sting.

### D. This Court cannot try a public-figure claim that omits allegation of malice.

Fourth and finally, even if the allegedly defamatory statements were actionable, the

defamation claim would still fail because Falwell has not plausibly pled that Liberty had the

requisite defamatory intent.  Although "it is within the province of the states to define the

appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious

to a private individual, public figure plaintiffs are governed by the standard established in *New

York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)." *Jordan*, 269 Va. at 576.  Under the

standard announced in *Sullivan*, a public figure is prohibited "from recovering damages for a

defamatory falsehood relating to his official conduct unless he proves that the statement was made

with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether

it was false or not." *Sullivan*, 376 U.S. at 279–80.

"[R]eckless disregard for the truth…requires more than a departure from reasonably

prudent conduct. There must be sufficient evidence to permit the conclusion that the defendant in

fact entertained serious doubts as to the truth of his publication…and that the defendant actually

had a high degree of awareness of probable falsity." *Jordan*, 269 Va. at 580 (quoting *Harte-Hanks

Commc'n, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)); *see also Ryan v. Brooks*, 634 F.2d 726,

731–32 (E.D. Va. 2007) (observing that actual malice requires "much more than a mere failure to

LUADMINREC000337

exercise ordinary care in verifying statements").

Here, Jerry Falwell Jr., like his father Jerry Falwell Sr. before him, was the President at Liberty, and in that role—a public figure. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 57 (1988) ("it is clear that respondent Falwell is a 'public figure' for purposes of First Amendment law"). Falwell the younger does not shy from his father's stature, pleading that in his own right he was high profile as leader of the "world's leading evangelical university." (Counter ¶ 3.) He claims opportunities to appear as a "recurring contributor on news outlets." (*Id.* ¶36). Accordingly, Falwell must plausibly allege that Liberty made the allegedly defamatory statements with actual malice. Falwell fails to even approach doing so. He weakly alleges that Liberty must have known that Granda's allegations were false because Falwell had already denied them. (Counter. ¶¶ 14-16.) As a matter of law, this allegation fails to rise to the level of actual malice as a defamation defendant "need not accept denials, however vehement." *Harte-Hanks Commc'n, Inc. v. Connaughton*, 491 U.S. 657, 792 n.37 (1989).

Because Falwell's denials of misconduct fail to support a plausible allegation of actual malice, Falwell's defamation claim lacks defamatory intent. *See CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 298 (4th Cir. 2008) (no actual malice because plaintiff lacked "reckless disregard as to whether the statement was false or not"); *Hatfill v. New York Times Co.*, 488 F. Supp. 2d 522, 530–31 (E.D. Va. 2007) (no "actual malice" because there was no evidence to defendant "knew of the falsity of his statements, or that he harbored a 'high degree of awareness' of the probable falsity of his statements"). The reason Nasser knew Falwell was a "sinner" prone to "sinful behavior" is because Falwell agreed to Liberty's "Doctrinal Position," attached as Exhibit A to the Liberty Bylaws. One of these tenets was that "all persons are sinners from conception...." Motion, Exhibit A, p. 12. Nasser's judgment had everything to do with

15

conservative Christian views about all having sinned and fallen short of the glory of God, and nothing about "Granda's lies." (Counter. ¶¶ 21, 22.)    This Court should sustain Liberty's Demurrer and dismiss the claim with prejudice.[1]

### III.    Falwell Fails to State a Claim for Breach of Contract.

Falwell's breach of contract builds off his defamation claim and fails for three distinct reasons.  First, the contract claim is deficient because there is no consideration for the focal contractual provision in which the parties merely agreed to follow common law and refrain from defaming one another.  Second, Falwell does not plead sufficient facts to establish that Liberty ever defamed Falwell as a matter of law because the words alleged are non-justiciable, lack "sting," are opinions not facts, and do not rise to actual malice.  Third, the breach of contract claim also fails because Falwell claims that Liberty breached a non-existent contractual term.

Falwell's breach of contract claim (styled "Breach of Employment Agreement") is rooted in the Employment Agreement that the parties executed on July 1, 2019 (the "2019 Agreement") (Counter. ¶ 41.)  Falwell principally relies on Section 3.7 of the 2019 Agreement, in which the parties promised they would "not make defamatory or slanderous remarks about the other in public fora or settings." (*Id.* ¶¶ 10, 42.) Relying on Section 3.7, Falwell pleads that Liberty breached the 2019 Agreement by making defamatory statements about him after his resignation, namely in the Bible Study, the Press Release, and the Alumni Communication.  (*Id.* ¶ 44.)

Falwell fails to plead any cognizable consideration for Section 3.7.  For there to be consideration, and an enforceable promise, the term identified must introduce new bargained-for

---

[1] *See Perk v. Vector Res. Grp., Ltd.*, 253 Va. 310, 316–17 (1997) (holding trial court properly sustained demurrer to defamation claim where plaintiff failed to sufficiently plead requisite elements); *SolA Verde, LLC v. Town of Front Royal*, 2011 WL 8947562, at *2 (Va. Cir. Ct. 2011) (sustaining demurrer to defamation claim "because no defamatory statements have been alleged"); *Taylor v. Southside Voice, Inc.*, 2011 WL 12663587, at *4 (Va. Cir. Ct. 2011) (sustaining defendant's demurrer to plaintiff's defamation claim).

LUADMINREC000339

value. Virginia is quite specific about this rule of law, acknowledging that a promise "to perform an obligation *already legally incumbent* on [each party] without any detriment to [the other] is unsupported by consideration." *Poe v. Poe*, 1989 WL 646294, at *2 (Va. Cir. Ct. 1989) (citing *Chesapeake & Ohio Co. v. Westinghouse*, 138 Va. 647 (1924) (emphasis added); *see also Bojorquez-Moreno v. Shores & Ruark Seafood Co.*, 92 F. Supp. 3d 459, 468 (E.D. Va. 2015) (noting that "a party's agreement to do or refrain from doing something that it is already legally obligated to do or refrain from doing is not consideration") (internal quotations and citation omitted). In Virginia, "defamatory and slanderous" remarks are always unlawful. *See generally Tharpe v. Saunders*, 285 Va. 476, 737 S.E.2d 890 (2013). Slander, for its part, is just a species of defamation. *Id.* Regardless of whether the parties agreed to refrain from defamatory acts in an employment contract, the duty is still incumbent upon them. Accordingly, a promise to avoid defamation is unenforceable.

Instead of containing a provision prohibiting a duty that is not a term of art for a cause of action, such as the term "disparagement," the 2019 Agreement merely prohibits the parties from making "defamatory or slanderous remarks." (Counter. ¶ 42.) Thus, by committing to avoid "defamatory or slanderous remarks," the parties committed only to follow the already-existing common law. Neither Liberty nor Falwell gained anything or gave anything up by incorporating that pre-existing tort law obligation into the Agreement. Absent a benefit to one party or a detriment to the other, there is no consideration for this portion of the 2019 Agreement. *See Greenwood Assoc., Inc. v. Crestar Bank*, 248 Va. 265, 268–69 (1994) (noting that consideration is required for a valid contract). Count I of Falwell's claim is simply a mirror image of Count II (Falwell's defamation claim). For the many reasons outlined above, Falwell fails to plead Liberty defamed him, as a matter of law.

LUADMINREC000340

The breach of contract claim also fails for the second reason that Falwell never pled facts to establish the standards of a cognizable "defamation" claim, given Section 3.7 of the 2019 Agreement asks this Court to determine if Liberty defamed Falwell, and that phrase is a term of art, fully defined by the common law. Even if there was consideration to support the avoidance of defamation as a contractual provision (which there was not), Falwell cannot ask this Court to interpret the definitions of the ecclesiastical terms "sinner," "spiritual stewardship," and "spiritual mission." (Counter. ¶ 21.) Falwell cannot ask this Court to measure these religious opinions about inferential conduct. These terms are inherently opinion, and they lack "sting" to a community of evangelical Christians, who all believed that all have sinned, and all are sinners. The speech Falwell pleads as a contractual breach, and the context in which Falwell pleads it, do not establish the requisite intent that would establish Liberty to be responsible for defamation.

Finally, Falwell's contract claim is deficient because of Falwell's ill-formed claim that Liberty breached Section 3.7 of the Agreement by violating the provision therein permitting Liberty to "truthfully explain the circumstances forming the basis" of termination only if "Falwell's employment is terminated for cause." (*Id.* ¶ 45.) Falwell argues that Liberty violated this provision because he "was not terminated for cause," so it cannot explain his departure. (*Id.* ¶ 46.) He is wrong. Nowhere in the 2019 Agreement is there a provision prohibiting Liberty from commenting on Falwell's unceremonious exit if Falwell were terminated for any other reason, including resignation for "good reason." As such, Falwell attempts to claim that Liberty breached a term that does not exist in the Agreement. A "party cannot be sued for breaching an obligation it never had in the first place." *ACA Fin. Guaranty Corp. v. City of Buena Vista, Virginia*, 917 F.3d 206, 213 (4th Cir. 2019). Thus, Falwell wholly fails to state a breach claim. Liberty's Demurrer should be sustained, and Count I should be dismissed with prejudice.

18

## IV.   Falwell Fails to State Claims for Conversion, Detinue, and Trespass to Chattels.

Falwell's Counterclaim includes claims for conversion, detinue (in the alternative), and trespass to chattels (in the alterative), with the claims arising out of property Falwell alleges to be in Liberty's wrongful possession. (Counter. ¶¶ 55-72.) Falwell declined to plead that Liberty ever willfully deprived him of anything. Falwell's personal property claims fail.

Under Virginia law, conversion is the "wrongful exercise or assumption of authority over another's goods, depriving him of their possession; and any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *Mackey v. McDannald*, 298 Va. 645, 659 (2020) (internal quotations and citation omitted). Similarly, an action for detinue "is employed to recover a chattel from one in possession who unlawfully detains it from either the true owner or one lawfully entitled to its possession." *Broad Street Auto Sales, Inc. v. Baxter*, 230 Va. 1, 2–3 (1985). Finally, trespass to chattels is the "intentional use or intermeddling with the personal property of another without authorization from the property's owner." *Arias v. Jokers Wild, Inc.*, 2007 WL 6013198, at *13 (Va. Cir. Ct. 2007).

Falwell pleads no seizure or hostile control by Liberty of the property he left behind after resigning. In fact, he asserts the opposite. He explicitly concedes that "Liberty has been working with Mr. Falwell to return the certain property belonging to Mr. Falwell and Mr. Falwell intends to continue working with Liberty regarding return of his property." (Counter. ¶ 56 n.1.) This admission is fatal to Falwell's claims. Rather than contend that Liberty forced him to leave the subject property behind at his resignation or that Liberty has refused a request to repossess the property, Falwell truthfully admits that Liberty has not wrongfully claimed or exerted ownership over any Falwell property. Indeed, the only issue surrounding the subject property is logistics—*i.e.,* the timing of the impending transfer of what Falwell left behind. Falwell's property-based

19

claims thus fail as a matter of law.  This Court should sustain Liberty's Demurrer and dismiss Counts III-V with prejudice.

**V.      Falwell Fails to State a Claim for Punitive Damages.**

Finally, Falwell asks the Court to "award Mr. Falwell punitive damages."  (Counter. ¶ 14.) Falwell fails to allege anything like the facts supporting the "egregious conduct" that is a prequisite to a punitive damages claim in Virginia. *Bowers v. Westvaco Corp.*, 244 Va. 139, 150 (1992) (punitive damages claims disfavored); *see also Harris v. Harman*, 253 Va. 336, 341 (1997) (punitive damages claims require alleged conduct which "shocks fair-minded people").  Calling an evangelical Christian a "sinner" shocks no one since even Falwell assented it was his state at conception.  This claim should be stricken with prejudice.

## CONCLUSION

WHEREFORE, Plaintiff and Counterclaim Defendant Liberty University, Inc., by counsel, respectfully requests that the Court sustain its Demurrer to Defendant and Counterclaim Plaintiff Jerry Falwell Jr.'s Counterclaim; dismiss Counts I, II, III, IV, and V of the Counterclaim with prejudice; and order such other relief as the Court deems necessary and appropriate.

Dated: December 14, 2021

Respectfully submitted,

LIBERTY UNIVERSITY

Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

20

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was sent via electronic mail and U.S. mail to Vernon E. Inge Jr. and Robert N. Drewry at Whiteford Taylor & Preston, this 14th day of December, 2021.

_____
Scott C. Oostdyk

> FILED IN THE CLERK'S OFFICE OF THE CIRCUIT
> COURT OF THE CITY OF LYNCHBURG
>
> DEC 1 4 2021        TIME 3:14 P.M.
>
> TESTE: TODD SWISHER, CLERK
>
> BY: _____ Dep. Clerk

21

VIRGINIA:

## IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.,

*Plaintiff/Counterclaim Defendant,*

v.

JERRY L. FALWELL, JR.,

*Defendant/Counterclaim Plaintiff.*

Case No. CL21000354-00

JURY TRIAL DEMANDED

## LIBERTY UNIVERSITY, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO STRIKE DEFENDANT'S PLEA IN BAR

Plaintiff Liberty University, Inc. ("Liberty"), by counsel, states as follows in support of its Motion to Strike Defendant Jerry Falwell, Jr.'s ("Falwell") Plea in Bar. For the reasons below, Falwell's Plea in Bar is legally deficient and must be stricken with prejudice.

## INTRODUCTION

Liberty sued Falwell for breach of contract, business torts, property claims, and business conspiracy. Falwell demurred but this Court upheld Liberty's causes of action in the main. Liberty then filed a First Amended Complaint, to adjust some of its counts, and in response Falwell did not demur to this pleading. Instead, Falwell attempted to use a plea in bar to Count III (Breach of Fiduciary Duty) to level a broadside and improperly accelerate the trial of several intertwined and complex issues in the case. Falwell's attempt to rush forward a substantial piece of the action ahead of discovery and trial is legally deficient for two reasons. First, instead of raising a single, narrow issue of fact, the plea in bar impermissibly raises multiple, complex issues that will require expert opinion to resolve. Second, the plea in bar improperly utilizes the form of a preliminary proceeding to attack the merits of Liberty's breach of fiduciary duty claim, specifically Liberty's

1

LUADMINREC000345

ability to prove the element of "breach."   Accordingly, for these reasons, explained more fully below, the Court should grant Liberty's Motion and strike Falwell's plea in bar with prejudice.

## LEGAL STANDARD

Under Virginia law, the "defensive plea in bar shortens the litigation by reducing it to a distinct issue of fact which, if proven, creates a bar to the plaintiff's right of recovery.  The moving party carries the burden of proof on that issue of fact." *Tomlin v. McKenzie*, 251 Va. 478, 480 (1996); *see also Randel v. FCA US, LLC*, 2020 WL 10315454, at *4 (Va. Cir. Ct. 2020) ("The function of a plea in bar is to narrow the litigation by resolving an issue that will determine whether a plaintiff may proceed to trial on a particular cause of action.") (internal quotations and citations omitted).  Because it is an extraordinary proceeding, "defendant may not use a plea in bar as a plea of the general issue of the case, or more specifically, to attack the plaintiff's ability to prove a certain part of his case." *Fee v. Ellison*, 2015 WL 10521465, at *1 (Va. Cir. Ct. 2015).  A Court may strike, as legally deficient, a demand for proceedings that unduly impair judicial resources and the rights of opposing counsel to a fair trial.  *See, e.g.*, Castelow v. *Clancy & Theys Const. Co.*, 2013 WL 8019587, at *2 (Va. Cir. Ct. 2013) (granting plaintiff's motion to strike defendant's plea in bar); *Royal Ins. Co. v. Kelley*, 1987 WL 889323, at *3 (Va. Cir. Ct. 1987) (same).

## ARGUMENT

I.     **The Plea in Bar Improperly Raises Multiple Issues Rather than a Single, Dispositive Narrow Issue.**

Falwell's Plea in Bar is legally deficient because it improperly raises multiple unmanageable issues.  Virginia law is clear that a plea in bar is only appropriate to resolve a *single narrow issue.  See Tomlin*, 251 Va. at 480 ("The defensive plea in bar shortens the litigation by reducing it to a *distinct issue of fact* which, if proven, creates a bar to the plaintiff's right of recovery.") (emphasis added); *HCP Properties-Fair Oaks of Fairfax VA, LLC v. County of*

2

*Fairfax*, 2019 WL 8883742, at *5 (Va. Cir. Ct. 2019) ("A plea in bar does not address the merits of the complaint but raises a *single issue of fact* that might constitute an absolute defense to the suit.") (emphasis added); *Post Apartment Homes, L.P., v. RTKL Assoc., Inc.*, 2003 WL 22533493, at *2 (Va. Cir. Ct. 2003) (denying plea in bar because there was "no 'single issue' that [could] be resolved through a plea in bar"). Indeed, even Falwell himself admits that a plea in bar is proper only for a "single issue." (Plea In Bar ¶ 1.)

Accordingly, case law throughout the Commonwealth reflects the fact that the plea in bar raises a single issue based on an established legal doctrine that can be resolved with the proof of a narrow fact. Examples of appropriate pleas in bar include the resolution of matters like sovereign immunity, the workers compensation exclusive remedy bar, or the statute of limitations. *Miles v. Virginia Intern. Terminals, Inc.*, 2008 WL 5546245 (Va. Cir. Ct. 2008) (plea in bar based on workers compensation exclusive remedy bar); *Tomlin v. McKenzie*, 251 Va. 478 (1996) (plea in bar based on sovereign immunity); *Nelms v. Nelms*, 236 Va. 281, 289 (1988) (statute of limitations); *Sparks v. Lucas*, 2018 WL 6794665 (Va. Cir. Ct. 2018) (statute of limitations). "A Plea in Bar is a discrete form of defensive pleading that does not address the merits of the issue; rather, it alleges a single set of facts-such as Statute of Limitation or Statute of Frauds—which, if proven, constitutes an absolute defense to the claim." *Brooks v. City of Roanoke*, 2015 WL 6395736, at *2 (Va. Cir. Ct. 2015).

Here, however, rather than raise a single, narrow issue, Falwell's plea in bar raises at least three different complex factual issues: 1) whether Falwell disclosed the "Granda Allegations" and extortive threats to an unnamed member of Liberty's Board of Trustees; 2) whether putative accreditation requirements supposedly imposed on Liberty may or may not have rendered the manner in which Liberty approved the subject Falwell 2019 Employment Agreement void or

3

voidable; and 3) whether damaging actions alleged in Liberty's Complaint were the result of alcohol impairment suffered by Falwell (Liberty's position) or rather medical issues triggered by Falwell's pulmonary embolism (Falwell's position) (Plea in Bar ¶¶ 5-8.)

      As if unaware of the standard, Falwell has not even bothered to indicate in his plea in bar how he can attempt to prove a single fact surrounding the Granda Allegations that will bar Liberty's ability to convince a factfinder of the opposite factual conclusion. Moreover, that issue necessarily invites proof of Defendant's governance structure, for the court to determine whether private disclosures to a member of the Board can constitute sufficient notice to the appropriate governing body under the circumstances. Similarly, because he cannot, Falwell did not establish in his plea in bar any plausible basis for how an accrediting agency or Liberty's accreditation justifies early extraordinary consideration as a single dispositive fact.

      Falwell also portends to prove excess alcohol did not impair his judgment and violate his fiduciary duty to Liberty. Falwell suggests instead that a pulmonary condition was the accurate causation of slurred speech and dereliction of duty to Liberty. Obviously, medical causation is an issue for expert opinion and beyond the ability of Falwell to attest himself. *See, e.g.,* *Velazquez v. Commonwealth,* 263 Va. 95, 104 (2002) (recognizing that "nurses and other healthcare professionals with the proper training, expertise, and experience are qualified to give expert opinions on medical causation"). At the plea in bar hearing Falwell envisions, therefore, Liberty of course would offer medical opinion of its own. This would occur after full discovery of Falwell's medical records, and the deposition of the competing doctors – plus a potential independent medical examination. Medical causation requires testimony as to medical foundation. *See, e.g., McMunn v. Tatum,* 237 Va. 558 (1989). This is precisely the type of ultimate issue to be resolved by a properly instructed jury in a fully-contested trial, not early on plea in bar. *Cf.*

LUADMINREC000348

*Pridemore v. Hryniewich*, 2017 WL 10978856, at \*15 (Va. Cir. Ct. 2017) (observing that an issue was "not appropriate for a plea in bar" where "without uncontested facts or more complete discovery, it cannot be determined whether the evidence is clearly insufficient to support the theory" (internal quotations and citations omitted).

Accordingly, because Falwell's plea in bar improperly raises multiple, complex issues rather than a single, narrow issue, the Court should grant Liberty's Motion and strike the plea in bar with prejudice. *See Post*, 2003 WL 22533493 at \*2 (denying plea in bar because there was "no 'single issue' that [could] be resolved through a plea in bar").

## II.   The Plea in Bar Improperly Attacks Liberty's Ability to Prove its Breach of Fiduciary Duty Claim.

Falwell's plea in bar is also legally deficient because he uses it as a "plea of the general issue of the case, or more specifically, to attack [Liberty's] ability to prove a certain part of [its] case." *Fee*, 2015 WL 10521465 at \*1 (overruling defendant's plea in bar because it would "improperly adjudicate an element of Plaintiff's case before trial"); *see also Stockbridge v. Gemini Air Cargo, Inc.*, 269 Va. 609, 617–18 (2005) (observing trial court overruled "the plea in bar on the ground that it constituted nothing more than a plea of the general issue," which is "a general denial of the plaintiff's whole declaration or an attack upon some fact that plaintiff would be required to prove in order to prevail on the merits"); *Lott v. Wheeler*, 2020 WL 10315411, at \*2 (Va. Cir. Ct. 2020) ("Defendants are not entitled to a separate adjudication of one of the facts that Plaintiff will be required to prove at trial. It is not the office of the special plea in bar to pluck one essential ingredient from the plaintiff's case and cause it to be adjudicated – with a jury, if requested – prior to trial."); *Ratcliffe v. Fogus*, 2010 WL 7372577, at \*1 (Va. Cir. Ct. 2010) (denying plea in bar where defendant raised the issue of probable cause because "[l]ack of probable cause is an element of malicious prosecution that Plaintiff must prove at trial" and a plea in bar

5

cannot be a plea of the general issue).

As explained above, Falwell improperly raises issues surrounding (1) his alleged disclosure of the Granda Allegations to a Liberty Board member and (2) his alleged medical condition.  (Plea In Bar ¶ 5, 8.)  By raising these issues, Falwell is effectively arguing that he did not breach or is legally excused from breaching the fiduciary duties he owed Liberty, which is the cause of action as pled.  It is undisputed, however, that "breach" is an element of *Liberty's* breach of fiduciary duty claim—an element it will have to prove at trial, following discovery, in order to succeed on the merits.  *See Plumbers and Steamfitters Union Local No. 10 v. Waters*, 451 F. Supp. 3d 543, 550 (E.D. Va. 2020) ("Under Virginia law, the elements of a breach of fiduciary duty claim are: (1) the defendant owes a fiduciary duty, (2) *the defendant breached that fiduciary duty*, and (3) the breach of fiduciary duty resulted in damages.") (emphasis added).

As such, Falwell impermissibly uses his plea in bar to accelerate the weighing of evidence and undermine Liberty's ability to produce facts to prove part of its case at trial.  The law forbids this.  *See Lott*, 2020 WL 10315411 at *2 (reasoning plea in bar would be "improper" because it "address[ed] the merits of the issues raised by the complaint") (internal quotations omitted); *Phoenix Med. Elec. Servs., Inc. v. Klamm*, 1989 WL 646529, at *1 (Va. Cir. Ct. 1989) (denying plea in bar to misrepresentation claim based on defendant's argument that it "did not make any misrepresentations" because "the plea in bar constitutes nothing more than a plea of the general issue").

Accordingly, because Falwell's plea in bar impermissibly attacks the general merits of Liberty's breach of fiduciary duty claim, the Court should grant Liberty's Motion and strike the plea in bar with prejudice.

6

## CONCLUSION

WHEREFORE, Plaintiff and Counterclaim Defendant Liberty University, Inc., by counsel, respectfully requests that the Court grant its Motion to Strike Defendant's Plea in Bar; strike the Plea in Bar with prejudice; and order such other relief as the Court deems necessary and appropriate.

Dated: December 14, 2021

Respectfully submitted,

LIBERTY UNIVERSITY

Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
hsiegmund@mcguirewoods.com
agann@mcguirewoods.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was sent via electronic mail and U.S. mail to Vernon E. Inge Jr. and Robert N. Drewry at Whiteford Taylor & Preston, this 14th day of December, 2021.

Scott C. Oostdyk

7

LUADMINREC000351

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

| | | |
|---|---|---|
| LIBERTY UNIVERSITY, INC., | ) | |
| | ) | |
| *Plaintiff/Counterclaim Defendant,* | ) | |
| | ) | |
| v. | ) | Case No. CL21000354-00 |
| | ) | |
| JERRY L. FALWELL, JR., | ) | |
| | ) | |
| *Defendant/Counterclaim Plaintiff.* | ) | |

### JERRY L. FALWELL, JR.'S MEMORANDUM IN OPPOSITION TO LIBERTY UNIVERSITY, INC.'S DEMURRER

Defendant/Counterclaim Plaintiff, Jerry L. Falwell, Jr. ("**Mr. Falwell**" or "**Defendant**"), by counsel, states the following in opposition to Plaintiff/Counterclaim Defendant, Liberty University, Inc.'s ("**Liberty**" or "**Plaintiff**") Demurrer.[1]

### Introduction

On Monday, August 24, 2020, a *Reuters* article was published detailing one individual's, Giancarlo Granda ("**Granda**"), version of an affair Granda had with Mr. Falwell's wife. In the article, which Mr. Falwell has and continues to categorically deny, Granda indicated Mr. Falwell "enjoyed watching" while Granda was having sex with Mrs. Falwell. (Counterclaim ¶ 16). This article was widely circulated, and by August 26, 2020, without any representative from Liberty asking about the article and the encapsulated lies, Liberty apparently gave credence to Granda's lies. (Counterclaim ¶ 17).

---

[1]      Liberty has also filed a Motion Craving Oyer. After review, Mr. Falwell does not oppose Liberty's Motion Craving Oyer with respect to Liberty's proposed Exhibits A, B, D, and E. As explained in Mr. Falwell's Memorandum in Opposition to the Motion Craving Oyer, Mr. Falwell objects to Exhibit C – the purported transcript of the Campus Community event.

Instead of "lay[ing] low and [] not mention[ing] any of the things that led to Jerry Falwell's resignation yesterday," Liberty chose to act differently. (Counterclaim ¶ 21). First, David Nasser detailed in veiled words, but not any less harmful or damaging, that Liberty opened its semester (classes began August 24) "with a series of revelations about Jerry Falwell that can only be described as shameful." (Counterclaim ¶ 21). The "revelations" refer to the *Reuters* article and the demonstrably false statements regarding Mr. Falwell's involvement in his wife's affair. Second, Liberty issued a press release on Monday, August 31, 2020, stating "the signs were not there until the start of last week" (August 24, or the date of the *Reuters* article) that Mr. Falwell had a "lack of spiritual stewardship" and had not "demonstrate[d] a full commitment to the spiritual mission of Liberty University by words, actions, and example." (Counterclaim ¶ 26). Lastly, Liberty "further accused Mr. Falwell of inappropriate behavior" in "a number of articles in the September 24, 2020 issue of the *Liberty Journal*. (Counterclaim ¶ 29). Liberty treated the demonstrably false statements in the *Reuters* article as truth, without any attempt to determine the comments veracity and, by publishing these Defamatory Statements, harmed Mr. Falwell's professional reputation and standing in the Liberty and higher-ed community. *See* (Counterclaim ¶¶ 33-37).

In a matter of days, instead of moving forward together, Liberty turned its back on Mr. Falwell by supporting Granda's lies in the *Reuters* article. Since then, Mr. Falwell has been banned from Liberty's campus, the very place his parents are interred, and has been deprived of certain personal property. (Counterclaim ¶ 57-59).

Mr. Falwell brings claims for defamation, breach of contract, conversion, detinue (in the alternative), and trespass to chattels (in the alternative) and for the reasoning set forth below and upon Virginia's long-standing demurrer standard, Liberty's demurrer must be overruled.

LUADMINREC000353

## Legal Standard

"A demurrer tests the legal sufficiency of facts alleged in pleadings, not the strength of proof." *Abi-Najm v. Concord Condominium*, 280 Va. 350, 357 (2010) (internal citations omitted). In Virginia, "[t]he standard of review applicable to the circuit court's decision to sustain a demurrer is well established. 'A demurrer accepts as true all facts properly pled, as well as reasonable inferences from those facts.'" *Friends of the Rappahannock, et al. v. Caroline Co. Bd. of Supervisors, et al.*, 286 Va. 38, 44 (2013) (quoting *Steward v. Holland Family Props., LLC*, 284 Va. 282, 286 (2012)). "To survive a challenge by demurrer, a pleading must be made with 'sufficient definiteness to enable the court to find the existence of a legal basis for its judgment.'" *Id.* (quoting *Eagle Harbor, L.L.C. v. Isle of Wight County*, 271 Va. 603, 611, (2006) (internal quotation marks omitted)). While a demurrer admits the truth of all properly pled facts, it "does not admit the correctness of the pleader's conclusions of law." *Ward's Equip., Inc. v. New Holland North America, Inc.*, 254 Va. 379, 382 (1997). Therefore, "the purpose of a demurrer is to determine whether a motion for judgment states a cause of action upon which relief may be granted." *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 557 (2011) (quoting *Abi–Najm v. Concord Condominium, LLC*, 280 Va. 350, 356–57, (2010) (citations and internal quotation marks omitted).

Notice pleading is the standard in Virginia civil litigation, and a complaint is sufficient if it clearly informs the opposing party of the nature of the claim or defense. Rule 1:4(d); *see also CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 24 (1993) (stating when "a bill of complaint contains sufficient allegations of material facts to inform a defendant of the nature and character of the claim, it is unnecessary for the pleader to descend into statements giving details of proof in order to withstand demurrer"). As stated in *Gov't Micro Res., Inc. v. Jackson*, 271 Va.

LUADMINREC000354

29, 38 (2006), a complaint "asserting a claim for defamation that does not recite all the specifics of the alleged defamatory statement, although not good pleading, may nevertheless state a substantial cause of action imperfectly."

**Material Factual Allegations in Counterclaim**

Mr. Falwell entered into the 2019 Employment Agreement[2] on July 1, 2019, which, in part, provided that neither Liberty nor Mr. Falwell will make defamatory or slanderous remarks about the other in public fora or settings – a provision which survived termination of Mr. Falwell's employment. (Counterclaim ¶¶ 10, 41-47). On August 26, 2020, Liberty's Senior Vice-President for Spiritual Development, David Nasser, gave a publicly broadcasted speech, which had been promoted as part of Liberty's Campus Community event, at which he spoke as an employee and agent of Liberty, about Mr. Falwell by stating, among other things, "the embarrassment that's been brought upon you as a Liberty student [by Mr. Falwell] and more importantly brought upon the name of Christ is wrong" and that "if you're not concerned, you should be concerned" regarding the "series of revelations about Jerry Falwell that can only be described as shameful." (Counterclaim ¶¶ 18, 19, 21, 25). Following the Campus Community event, Liberty, on August 31, 2020 following Mr. Falwell's resignation for Good Reason, issued a press release, which was posted and remains online, accusing Mr. Falwell of a lack of spiritual stewardship and that Mr. Falwell had not demonstrated a commitment to the mission of Liberty, which was not evident until the start of last week. (Counterclaim ¶¶ 26, 27).

**Argument**

Mr. Falwell's Counterclaim provides sufficient information to inform Liberty of the claims Mr. Falwell asserts. The demurrer "does not allow the court to evaluate and decide the merits of a

---

[2]   Terms not defined herein shall have the meaning ascribed to them in Mr. Falwell's Counterclaim.

4

claim." *Fun v. Virginia Military Inst.*, 245 Va. 249, 252 (1993). Here, Mr. Falwell's counterclaim "contains sufficient allegations of material facts to inform a defendant of the nature and character of the claim." *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 24 (1993). As a result, Mr. Falwell is not required "to descend into statements giving details of proof in order to withstand demurrer." *Id.*

I.    **This Court has Jurisdiction over Mr. Falwell's Defamation Claim Against Liberty.**

Liberty is attempting to use its status as holier than thou to ensure their insulation from any wrongdoing. "[A] civil court may neither interfere in matters of ***church government*** nor in matters of faith and doctrine." *Cha v. Korean Presbyterian Church of Washington*, 262 Va. 604, 611 (2001) (emphasis added). Similarly, in *Reid v. Gholson*, 229 Va. 179, 187 (1985), the court stated the civil courts are prohibited "from resolving ***ecclesiastical disputes*** which depend upon inquiry into questions of faith or doctrine." (Emphasis added). Ecclesiastical is defined as "[o]f, relating to, or involving the church, esp. as an institution." *Black's Law Dictionary* (11th ed. 2019), ecclesiastical.[3]

This concept of civil courts staying out of church government and ecclesiastical disputes is primarily centered around the governance of the church and the selection, or removal, of ministers. *See Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1167-68 (1985) (holding the "right to choose ministers without government restriction underlies the well-being of religious community ... for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its

---

[3]      Ecclesiastical matter is defined as "[a] matter that concerns church doctrine, creed, or form of worship, or the adoption and enforcement, within a religious association, of laws and regulations to govern the membership, including the power to exclude from such an association those deemed unworthy of membership." *Black's Law Dictionary* (11th ed. 2019), ecclesiastical matter.

LUADMINREC000356

own membership and to the world at large. Any attempt by government to restrict a church's free choice of its leaders thus constitutes a burden on the church's free exercise rights").

Certainly, Liberty operates under the backdrop of Christian values, just as other colleges, but that operation does not allow Liberty to operate with impunity. It must not, or Liberty is free to act without restraint, ramification, or oversight. There is a distinction between Thomas Road Baptist Church and Liberty. Were David Nasser espousing his beliefs as a pastor of Thomas Road Baptist Church and Mr. Falwell a church member, the analysis would be different, but David Nasser and others at Liberty were making Defamatory Statements as employees and agents of Liberty at a Liberty event directed toward Mr. Falwell as former President of Liberty. (Counterclaim ¶ 25).

Permitting Liberty to characterize the context of the Campus Community event as "ecclesiastical" would "immunize one who intentionally defames another by a careful choice of words to ensure that they state no falsehoods if read out of context but convey a defamatory innuendo in the circumstances in which they were uttered." *Pendleton v. Newsome*, 290 Va. 162, 174 (2015). Just as Liberty wants the Campus Community event to be read in connection with David Nasser's and Liberty's Defamatory Statements, "a defamatory charge need not be made in direct terms; rather, it may be made by inference, implication, or insinuation." *Perk v. Vector Resources Group, Ltd.*, 253 Va. 310, 316 (1997). Just as the court in *Cha* did not consider the individual defendants' statements in isolation, separate and apart from the church's decision, *see Cha*, 262 Va. at 615, this Court cannot consider the *Reuters* article and the inference and implications made by Liberty separate and apart, nor can this Court permit Liberty to utilize its Campus Community event, or any other event that includes prayer and/or scripture, as a way to

6

impugn any person with defamatory comments because the purported actions do not fit their lifestyle.

Therefore, Liberty's Demurrer should be overruled, as this Court has jurisdiction over this matter and Mr. Falwell has stated a valid claim for defamation.

## II.      Mr. Falwell States a Claim for Defamation.

In Virginia, to state a claim for defamation, a plaintiff is required to plead the elements of "(1) publication of (2) an actionable statement with (3) the requisite intent." *Tharpe v. Saunders*, 285 Va. 476, 480 (2013). "Historically, a cause of action for defamation has been viewed as the means to protect a basic right because the individual's right to personal security includes his uninterrupted entitlement to enjoyment of his reputation." *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713 (2006). "Society has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966). Moreover, "[a] defamatory statement may be made 'by inference, implication or insinuation.'" *Fuste v. Riverside Healthcare Ass'n, Inc.*, 265 Va. 127, 132 (2003) (citing *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 7 (1954).

### a.      The Defamatory Statements were Publications.

In order to satisfy the first element[4] of a defamation claim, Mr. Falwell "must show that the alleged [defamation] was published 'of or concerning' him. He need not show that he was mentioned by name in the publication. Instead, the plaintiff satisfies the 'of or concerning' test if he shows that the publication was intended to refer to him and would be so understood by persons reading [or hearing] it who knew him." *WJLA-TV v. Levin*, 264 Va. 140, 152 (2002) (citing *The Gazette, Inc. v. Harris*, 229 Va. 1, 37 (1985)).  However, "if the publication on its face does not

---

[4]      Liberty does not appear to argue Mr. Falwell fails to allege publication of the Defamatory Statements. To the extent Liberty does, its argument fails.

LUADMINREC000358

show that it applies to the plaintiff, the publication is not actionable, unless the allegations and supporting contemporaneous facts connect the [defamatory] words to the plaintiff." *Id.*

Here, Liberty issued statements in various mediums, through David Nasser's speech as part of a widely broadcasted Campus Community Event, a press release, and an article published for the *Liberty Journal* concerning Mr. Falwell and the Granda Allegations. (Counterclaim ¶¶ 18, 24, 27, and 30). In each instance of publication, Liberty directly references Mr. Falwell, and the reader certainly knew the Defamatory Statements were in reference to Mr. Falwell and the outlandish Granda Allegations, as supported by, among others, the following statements:

- David Nasser at the Campus Community event stating: "There are those who have told me to lay low and to not mention any of the things that led to Jerry Falwell's resignation yesterday." (Counterclaim ¶ 21).

- David Nasser at the Campus Community event stating: "the embarrassment that's been brought upon you as a Liberty student and more importantly brought upon the name of Christ is wrong." (Counterclaim ¶ 21).

- David Nasser at the Campus Community event stating: "Then the summer came to a close, and we opened the semester with a series of revelations about Jerry Falwell that can only be described as shameful. ... Have nothing to do with the fruitless deeds of darkness but rather, expose them. It is shameful to even mention what the disobedient do in secret. But everything exposes [sic] by the light becomes visible." (Counterclaim ¶ 21).

- Liberty's Press Release stating: there was "a lack of spiritual stewardship" and "all the signs were not there until last week." (Counterclaim ¶ 26).

- *Liberty Journal* Article: republishing the press release and also stating "Recent events involving Liberty's fourth president, Jerry Falwell, Jr., have broken trust for most in Liberty University, and some question Liberty's commitment to its nearly 50-year mission of *Training Champions for Christ*." (Counterclaim ¶ 29).

Overall, the publication of Liberty's Defamatory Statements centered around the publication of the Granda Allegations and the suggestion that Mr. Falwell's tenure as Liberty's President came to an end because of Granda's lies, and the implication by Liberty the lies were true, provide the

LUADMINREC000359

necessary publication to show the "defamatory implication proceedings from [Liberty's] statements were aimed directly at [Mr. Falwell] and at no other person." *Pendleton v. Newsome*, 290 Va. 162, 172 (2015). Therefore, Mr. Falwell satisfies the first element of his defamation claim to survive demurrer.

### b.    Liberty's Defamatory Statements Constitute an Actionable Statement.

"An actionable statement is both false and defamatory. Defamatory words are those tending so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Schaecher v. Bouffault*, 290 Va. 83, 91-92 (2015) (internal quotations and citations omitted). "A false statement must have the requisite defamatory 'sting' to one's reputation." *Id.* at 92. Courts have stated that in order to obtain the level of "sting" required for defamation, the "defamatory language 'tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous.'" *Id.* (quoting *Moss v. Harwood*, 102 Va. 386, 392 (1904). "In evaluating whether language is actionable, we take all inferences in favor of the plaintiff, but such inferences cannot rise above the language of the documents or statements themselves." *Id.* at 93.

Additionally, "[s]peech that does not contain a provable false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person, are not actionable." *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 714 (2006).

While an actionable statement generally requires "sting," there are certain defamatory words that Virginia considers actionable *per se*. "At common law, defamatory words that are actionable per se are: ... (3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office

9

or employment. (4) Those which prejudice such person in his or her profession or trade." *Tronfeld*, 272 Va. at 713.

In either instance, Liberty's Defamatory Statements certainly had the effect of imputing Mr. Falwell's unfitness for employment at Liberty, as well as prejudiced Mr. Falwell in his profession. More directly, however, the Defamatory Statements certainly cast shame on Mr. Falwell and provide the requisite sting, as David Nasser specifically stated on August 26, 2020, "the summer came to a close, and we opened the [Fall 2020] semester with a series of revelations about Jerry Falwell that can only be described as *shameful*." (Counterclaim ¶ 21) (emphasis added); *see Schaecher* 290 Va. at 92 (detailing what defamatory language results in the level of sting required).

The series of revelations Nasser and Liberty reference as "the summer came to a close" is the August 24, 2020 *Reuters* article, wherein Granda made the outlandishly false claim that Mr. Falwell participated in Granda's affair with Mrs. Falwell, and enjoyed watching them. (Counterclaim ¶16). While Liberty seeks to claim that the Defamatory Statements are opinion and, thus, cannot be proven false, "the factual portions of an allegedly defamatory statement may not be evaluated for truth or falsity in isolation, but must be considered in view of any accompanying opinion and other stated facts." *Hyland v. Raytheon Tech. Servs. Co.*, 277 Va. 40, 48 (2009). When viewed as part of the larger narrative, Liberty's Defamatory Statements are capable of being proven false, irrespective of the "spiritual discernment by Liberty" or other doctrinal limitations Liberty seeks. Mr. Falwell establishes the backdrop of the entirety of the Defamatory Statements is the *Reuters* article, for which Liberty asserts truth to through their defamatory actions.

Liberty claims Mr. Falwell is incapable of succeeding on his defamation claim because this court must view the Defamatory Statements "through the prism of Liberty's Christian doctrine,"

10

(Memo in Support, p. 11), but "simply couching ... statements in terms of opinion does not dispel factual implications." *Raytheon Tech. Servs. Co. v. Hyland*, 273 Va. 292, 303 (2007). Therefore, couching the Defamatory Statements as opinion because a "sinner" is incapable of being proven does not dispel the underlying factual support or factual implication of the Defamatory Statements. In this case, Liberty's statements rely on the demonstrably false statement that Mr. Falwell watched his wife have an affair from a corner, and consequently, his actions were, among others, "shameful." (Counterclaim ¶ 21). There can be no doubt about Liberty's implications in making the Defamatory Statements given they said the signs of Mr. Falwell's lack of spiritual leadership were not there until the start of last week, or when the *Reuters* article was published. (Counterclaim ¶ 26).

Liberty's Defamatory Statements are actionable statements and not opinion. As a result, Mr. Falwell continues to support the assertion of a properly pled defamation claim resulting in this Court overruling Liberty's demurrer.

**c.    Mr. Falwell Establishes the Requisite Intent Necessary to State a Claim for Defamation.**

"The requisite intent a plaintiff must prove in a defamation action depends upon the plaintiff's status as a public or private figure and the damages sought." *Jordan v. Kollman*, 269 Va. 569, 576 (2005). While Mr. Falwell does not concede he is a public figure for purposes of a defamation claim, he nonetheless meets the heightened standard. Under the standard established in *New York Times Co. v. Sullivan*, a public official is prohibited "from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.*, 376 U.S. 254, 279-80 (1964). In Virginia, a plaintiff can prove actual or common law malice through the following non-exhaustive list: "(1) the statements

11

were made with knowledge that they were false or with reckless disregard for their truth; (2) the statements were communicated to third parties who have no duty or interest in the subject matter; (3) the statements were motivated by personal spite or ill will; (4) the statements included strong or violent language disproportionate to the occasion; or (5) the statements were not made in good faith." *Cashion v. Smith*, 286 Va. 327, 339 (2013) (internal citations and quotations omitted); *see also Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 665 (E.D.Va. 2015).

Here, Mr. Falwell pleads malice, for purposes of defamation as a public figure and for his request for punitive damages, by Liberty making the statements "with reckless disregard for their truth" and "the statements were communicated to third parties who have no duty or interest in the subject matter." *Id.* Mr. Falwell pleads that after the *Reuters* article was published, "not one member of the Board or Executive Committee asked Mr. Falwell about the veracity of Granda's lies before ... defaming him by repeating and endorsing the lies." (Counterclaim ¶ 17). Succinctly, Mr. Falwell, in support of his purported status as a public figure and in support of his claim for punitive damages, specifically pleads "Liberty made and published the Defamatory Statements ... with reckless disregard for the truth or falsity of the statements." (Counterclaim ¶ 53). Moreover, Mr. Falwell pleads Liberty's Defamatory Statements were not limited to Liberty, but were transmitted to media outlets and made available to the public, including, but not limited to the legal community, the real estate industry, the academic field, and the political world. (*See* Counterclaim ¶ 19, 23, 24, 27, 29. 30, 34, 39, and 51 (describing the various methods Liberty ensured the Defamatory Statements were received by anyone and everyone).

Therefore, Mr. Falwell pleads a claim sufficient to withstand demurrer, evidencing malice. Regardless of whether Mr. Falwell is a public figure or not, he meets the requisite intent required in pleading defamation and Liberty's demurrer must be overruled.

12

**III.     Mr. Falwell States a Claim for Breach of Contract (Employment Agreement).**

In order to state a claim for breach of contract, Mr. Falwell need only plead: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ulloa v. QSP, Inc.*, 271 Va. 72, 79 (2006) (internal quotations omitted).   Mr. Falwell has satisfied the pleading requirements to withstand demurrer.

First, the parties have a legally enforceable contract, the 2019 Employment Agreement, (Counterclaim ¶ 41), and the obligations on both parties, pursuant to Section 3.7. (Counterclaim ¶ 42). Specifically, Section 3.7 states: "The parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings. . . . The provisions of this Section 3.6 [sic] shall survive termination of this Agreement." (2019 Employment Agreement, 3.7). Second, Liberty breached its obligation, as set forth in Section 3.7, by making and publishing defamatory remarks, the Defamatory Statements. (Counterclaim ¶ 44).

In order to succeed on a breach of contract claim, Mr. Falwell need only show that Liberty made defamatory or slanderous remarks. There is no requirement for Mr. Falwell's breach of contract claim that requires showing Liberty's defamatory remarks were done with malice, or even that a party must prove common law defamation. *See Ames v. American Nat. Bank of Portsmouth*, 163 Va. 1, 39 (1934) (providing "[w]ords used by the parties are to be given their usual, ordinary, and popular meaning, unless it can be clearly shown in some legitimate way that they were used in some other sense, and the burden of showing this is always upon the party alleging it"). In this instance Liberty and Mr. Falwell simply agreed to not make defamatory or slanderous remarks, or put another way, words that go beyond simply disparaging remarks.[5]   *Black Law Dictionary*

---

[5]     Generally, parties include "non-disparagement" clauses in employment and settlement agreements. For example, "disparage" means: "1. To speak slightingly of; to criticize (someone or something) in a way showing that

LUADMINREC000364

defines defamatory as "([o]f a statement or communication) tending to harm a person's reputation, usu. by subjecting the person to public contempt, disgrace, or ridicule." *Black's Law Dictionary* (11th ed. 2019), defamatory.[6]

Mr. Falwell pleads defamatory remarks, and no more is required for a breach of the obligations under the agreement. Here, Mr. Falwell has specifically pled that Liberty made defamatory remarks that harm Mr. Falwell's reputation. *See Counterclaim*, ¶¶ 21-38 (detailing Liberty's Defamatory Statements and the impact on Mr. Falwell's reputation). These Defamatory Statements are sufficient to withstand demurrer and show that Liberty breached its agreement with Mr. Falwell to not make defamatory or slanderous remarks.[7]

Therefore, for the reasons set forth above, Mr. Falwell pleads sufficient facts to support his claim for breach of contract. Not only does Mr. Falwell clearly set forth a claim for breach of contract, specifically that Liberty made defamatory remarks, but Mr. Falwell's claim meets the requirements for common law defamation, too. As a result, Liberty's demurrer to Mr. Falwell's Breach of Contract claim should be overruled.

---

one considers the subject of discussion neither good nor important. 2. To degrade in estimation by disrespectful or sneering treatment." *Black's Law Dictionary* (11th ed. 2019), disparage.

[6] A Defamatory Statement is defined as "A statement that tends to injure the reputation of a person referred to in it. • The statement is likely to lower that person in the estimation of reasonable people and in particular to cause that person to be regarded with feelings of hatred, contempt, ridicule, fear, or dislike. — Also termed defamatory communication." *Black's Law Dictionary* (11th ed. 2019), defamatory statement.

[7] While Mr. Falwell properly pleads and supports his claim that Liberty breached the agreement with Mr. Falwell by making and publishing defamatory remarks, as set forth above, Mr. Falwell has similarly pled a claim for common law defamation by establishing "(1) publication of (2) an actionable statement with (3) the requisite intent." Tharpe, 285 Va. at 480. "Contracts are construed as written, without adding terms that were not included by the parties." *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C.*, 263 Va. 116, 119 (2002). There is no term applying common law defamation principles.

LUADMINREC000365

## IV.    Mr. Falwell States a Claim for Conversion, or in the Alternative, Detinue and Trespass to Chattels.

While Liberty and Mr. Falwell are working to return certain property belonging to Mr. Falwell, (Counterclaim ¶ 56, n.1), there is additional property that Liberty has not purported to return and upon which Mr. Falwell, in an effort to protect his rights to such property, has brought claims, both direct and in the alternative.[8] The property Mr. Falwell owns that has not been accounted for or categorized as part of Liberty's return of property, consists of, among other items: a large collection of books, including the Virginia Code; various legal files; a .38-caliber revolver; personal items of Mr. Falwell that reside in the Jerry Falwell Museum; Mr. Falwell's personal property located at 6024 Piedmont Place; and three horses located at the Liberty equestrian center. (*See* Counterclaim ¶ 59).

### a.    Mr. Falwell States a Claim for Conversion.

Mr. Falwell first brings a direct claim for conversion, which is the "wrongful assumption or exercise of the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights." *Economopoulos v. Kolaitis*, 259 Va. 806, 814 (2000) (citing *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 75-76 (1956). In addition, "[a]n action for conversion can be maintained only by the person having a property interest in and entitled to the immediate possession of the item alleged to have been wrongfully converted." *Id.* (citing *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994).

In Mr. Falwell's Counterclaim, he pleads facts to show that Liberty has wrongfully possessed and controlled the property; Liberty has intentionally continued to deprive Mr. Falwell of his property; and Mr. Falwell has an immediate right to possession of the property.

---

[8]    Mr. Falwell agrees that certain property, not referenced in his claims, is being slowed by the logistics of return, but Mr. Falwell owns additional property, which is the subject of his claims.

LUADMINREC000366

(Counterclaim ¶¶ 58-60). Moreover, while Mr. Falwell does not use the term "hostile," this Court can infer that the property belonging to Mr. Falwell and controlled by Liberty is being possessed in a hostile manner by the fact, as alleged in ¶ 57 of Mr. Falwell's Counterclaim, that "Liberty has banned Mr. Falwell and Becki from visiting campus and ... has provided Liberty police instructions to issue citations to Mr. Falwell and Becki for trespass."[9]

### b.   Mr. Falwell States a Claim in the Alternative for Detinue and Trespass to Chattels.

In the alternative, Mr. Falwell brings claims for Detinue and Trespass to Chattels for the property previously mentioned above and in ¶ 59 of the Counterclaim. "The object of a detinue action is to recover specific personal property and damages for its detention." *Broad Street Auto Sales, Inc. v. Baxter*, 230 Va. 1, 2 (1985). A detinue action is used "to recover a chattel [or chattels] from one in possession who unlawfully detains it from either the true owner or one lawfully entitled to its possession." *Id.* at 3. Mr. Falwell has pled he is the lawful owner of the above-mentioned property, and Liberty has detained the property, thereby damaging Mr. Falwell. (*See* Counterclaim ¶¶ 63-65).

Additionally, in Virginia, when "a person has illegally seized the personal property of another and converted it to his own use, the owner may bring an action in trespass." *Vines v. Branch*, 244 Va. 185, 190 (1992). "A trespass to chattels occurs when one party intentionally uses or intermeddles with personal property in rightful possession of another without authorization." *America Online, Inc. v. IMS*, 24 F. Supp. 2d 548, 550 (E.D.Va. 1998). As with Mr. Falwell's claim for conversion and detinue, he again pleads that Liberty has intentionally deprived Mr. Falwell of

---

[9]      Liberty's Police Department is a full-service law enforcement agency having comprehensive arrest powers. *See https://www.liberty.edu/police/campus-safety-and-security/* (last accessed December 28, 2021).

LUADMINREC000367

certain personal property that he has the right to immediate possession. (*See* Counterclaim ¶¶ 67-71).

In each instance, Mr. Falwell has provided sufficient notice to Liberty that through their actions, including banning Mr. Falwell and his wife from Liberty's campus with the threat of a trespass citation, they have intentionally held certain property belonging to Mr. Falwell, not inclusive of the property Mr. Falwell is working with Liberty to have returned. By prohibiting Mr. Falwell from rightful possession of his property, Liberty has wrongfully assumed control over and/or possessed Mr. Falwell's property. As stated above, "[a]t the demurrer stage, it is not the function of the trial court to decide the merits of the allegations set forth in a complaint, but only to determine whether the factual allegations pled and the reasonable inferences drawn therefrom are sufficient to state a cause of action." *Friends of the Rappahannock v. Caroline County Bd. of Sup'rs*, 286 Va. 38, 44 (2013). Mr. Falwell has adequately pled his claims, and Liberty's Demurrer as to Mr. Falwell's claims for conversion, detinue, and trespass to chattels must be overruled.

Mr. Falwell has set forth proper claims against Liberty for Defamation, Breach of Contract, and Conversion or Detinue or Trespass to Chattels, in the alternative. Therefore, Liberty's Demurrer should be overruled in its entirety.[10]

---

[10]   While Liberty's Demurrer must be overruled, in the event this Court were to sustain all, or part, of the Demurrer, the Court should nonetheless grant Mr. Falwell leave to amend his Counterclaim. "After sustaining a demurrer, a court should grant a motion for leave to amend except when, for example, the proffered amendments are legally futile, when the amendment is untimely under an order granting leave to amend by a certain deadline or fails to satisfy other conditions in the scheduling order, when there is no proffer or description of the new allegations, when amendment would be unduly prejudicial to the responding party, or when the amending party has engaged in improper litigation tactics." *AGCS Marine Insurance Co. v. Arlington County*, 293 Va. 469, 487 (2017). Moreover, Rule 1:8 states in part: "[l]eave to amend shall be liberally granted in furtherance of the ends of justice."

LUADMINREC000368

## Conclusion

WHEREFORE, Defendant and Counterclaim Plaintiff, Jerry L. Falwell, Jr., by counsel, respectfully requests that this Court overrule Liberty University's Demurrer and order such other relief as the Court deems necessary and appropriate.

Dated: January 4, 2022                    Respectfully submitted,

                                          JERRY L. FALWELL, JR.

                                          _____
                                          Counsel

Vernon E. Inge, Jr. (Va. Bar No. 32699)
Robert N. Drewry (Va. State Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:    804.977.3301
Facsimile:    804.977.3291
E-Mail:       vinge@wtplaw.com
              rdrewry@wtplaw.com

*Counsel for Defendant/Counterclaim Plaintiff, Jerry L. Falwell, Jr.*

LUADMINREC000369

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of January, 2022, a true and correct copy of the foregoing *Jerry L. Falwell, Jr.'s Memorandum in Opposition to Liberty University, Inc.'s Demurrer* was served *via* e-mail transmission and first-class, postage-prepaid, U.S. Mail upon the following:

> Scott C. Oostdyk, Esq.
> Andrew F. Gann, Jr., Esq.
> MCGUIREWOODS LLP
> Gateway Plaza
> 800 East Canal Street
> Richmond, Virginia 23219
> E-Mail:     soostdyk@mcguirewoods.com
>             agann@mcguirewoods.com
>
> — *and* —
>
> R. Craig Wood, Esq.
> MCGUIREWOODS LLP
> Post Office Box 1288
> Charlottesville, Virginia 22902-1288
> E-Mail:     cwood@mcguirewoods.com

*Counsel for Plaintiff/Counterclaim Defendant, Liberty University, Inc.*

Robert N. Drewry

LUADMINREC000370

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

| | | |
|---|---|---|
| LIBERTY UNIVERSITY, INC., | ) | |
| | ) | |
| *Plaintiff/Counterclaim Defendant,* | ) | |
| | ) | |
| v. | ) | Case No. CL21000354-00 |
| | ) | |
| JERRY L. FALWELL, JR., | ) | |
| | ) | |
| *Defendant/Counterclaim Plaintiff.* | ) | |

## <u>JERRY L. FALWELL, JR.'S MEMORANDUM IN OPPOSITION TO LIBERTY UNIVERSITY, INC.'S MOTION TO STRIKE DEFENDANT'S PLEA IN BAR</u>

Defendant/Counterclaim Plaintiff, Jerry L. Falwell, Jr. ("**Mr. Falwell**" or "**Defendant**"), by counsel, states the following in opposition to Plaintiff/Counterclaim Defendant, Liberty University, Inc.'s ("**Liberty**" or "**Plaintiff**") Motion to Strike Defendant's Plea in Bar.

### <u>Introduction</u>

Mr. Falwell, in response to Liberty's Amended Complaint, filed a Plea in Bar in order to bring forth a single factual issue that would bar Liberty's claim for breach of fiduciary duty. While this Court has overruled Mr. Falwell's demurrer as to Liberty's main claims, following the Demurrer, Liberty filed its First Amended Complaint. In response, Mr. Falwell filed an Answer and asserted his Plea in Bar to Count Three of Liberty's First Amended Complaint. By asserting a specific factual issue, namely that a member of Liberty's Board of Trustee's was aware of Giancarlo Granda ("**Granda**") and the Granda Allegations, Liberty is barred from succeeding on its Breach of Fiduciary Duty claim – at least as to asserting the Board of Trustees was unaware of the Granda Allegations. Moreover, as this Court has not yet received briefing on or set a hearing

1

on the Plea in Bar, it is premature to rule on Liberty's Motion to Strike, particularly given the ramifications of the issue and the standard on a motion to strike.

### Legal Standard

"[A] plea in bar is a defensive pleading that reduces the litigation to a single issue." *Kroger Co. v. Appalachian Power Co.*, 244 Va. 560, 562, 422 S.E.2d 757, 758 (1992). In Virginia, "[a] plea in bar asserts a single issue, which, if proved, creates a bar to a plaintiff's recovery." *Hawthorne v. VanMarter*, 279 Va. 566, 577 (2010). "The party asserting a plea in bar bears the burden of proof on the issue presented." *Id.* "Two possible standards of review apply, depending on whether the plea's proponent elects to meet that burden by ***presenting evidence*** or relying on the pleadings. In the former situation, in which the 'parties present evidence on the plea ore tenus, the circuit court's factual findings are accorded the weight of a jury finding and will not be disturbed on appeal unless they are plainly wrong or without evidentiary support.'" *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019) (quoting *Hawthorne*, 279 Va. at 577) (emphasis added). "Distilled to its simplest concept, a plea in bar presents the legal equivalent to the colloquial 'So What?' to a complaint." *Sea Bay Hotel, LLC v. Gosnell*, 2017 WL 10901028, at *4 (Va. Cir. Ct. Fairfax Co. Dec. 7, 2017). A plea in bar's function, therefore, "is to narrow the litigation by resolving an issue that will determine whether a plaintiff may proceed to trial on a particular cause of action." *Hawthorne*, 279 Va. at 578.

A motion to strike tests the legal sufficiency of a defensive pleading – not its merits. Va. Code Ann. § 8.01-274. "In considering a motion to strike, the trial court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the [non-moving party]." *Izadpanah v. The Boeing Joint Venture*, 243 Va. 81, 82 (1992). Or, stated differently, "[a] motion to strike is in effect a motion for summary judgment which is not to be

LUADMINREC000372

granted if any material fact is genuinely in dispute." *Costner v. Lackey*, 223 Va. 377, 381 (1982); *see also Casilear v. Casilear*, 168 Va. 46, 52 (1937) (stating a motion to strike asserts that, even if the factual assertions of the plea are true, it fails as a matter of law to show that the plaintiff's claim is barred).

## Argument

Mr. Falwell's Plea in Bar must be permitted to be heard. Mr. Falwell brings a Plea in Bar as to Liberty's Count III – Breach of Fiduciary Duty attempting to "narrow the litigation by resolving an issue that will determine whether [Liberty] may proceed to trial" on its breach of fiduciary duty claim. *Hawthorne*, 279 Va. at 578. Mr. Falwell's Plea in Bar is sufficient and presents a singular issue that is entitled to adjudication and does not impede on Liberty's ability to prove its case, beyond barring the breach of fiduciary duty claim, either wholly or in part.[1]

In the underlying matter, Mr. Falwell filed his Plea in Bar, while reserving the right to file a memorandum, pursuant to Rule 4:15(c) of the Rules of Supreme Court of Virginia.[2] In his Plea in Bar, he identifies the singular issue – "[t]he Board was provided material information relating to Falwell, which the Amended Complaint claims was not provided to the Board. This fact – *i.e.*, Falwell providing material information to the Board – bars Count III." (Plea in Bar ¶ 7).[3]

Mr. Falwell's Plea in Bar alleges "a single state of facts or circumstances (usually not disclosed or disclosed only in part by the record) which, if proven, constitutes an absolute defense

---

[1] A defendant is able to file multiple pleas. *See Speciality Mechanical, L.L.C. v. Virginia Commonwealth University*, 2003 WL 549971 (Richmond Cir. Ct. Jan. 31, 2003) (analyzing Defendant's multiple pleas). To the extent this Court seeks separate pleadings or otherwise grants Liberty's Motion to Strike, Mr. Falwell requests leave to amend his Plea in Bar.

[2] Mr. Falwell has not noticed a hearing on his Plea in Bar and intends to brief the issue in accordance with the Rules of the Supreme Court of Virginia, or as otherwise agreed to by the parties.

[3] While Mr. Falwell characterizes the barred claim as the Board having material information relating to the Granda Allegations, the barred action can be boiled down to Liberty waiving its ability to bring a breach of fiduciary duty claim because of the knowledge held by at least one member of the Board.

LUADMINREC000373

to the claim. S*ee Nelms v. Nelms*, 236 Va. 281, 289 (1988). Even though Liberty attempts to assert that Mr. Falwell has used the Plea in Bar to "level a broadside and improperly accelerate the trial of several intertwined and complex issues in the case," (Memorandum in Support, 1), by a certain member, or members, of Liberty's board having knowledge of certain events underlying Liberty's complaint, Liberty is barred from prevailing on its claim because Mr. Falwell is alleging "a single state of facts or circumstances (usually not disclosed or disclosed only in part by the record) which, if proven, constitutes an absolute defense to the claim." *Lott v. Wheeler*, 2020 WL 10315411, at *2 (Norfolk Cir. Ct. 2020).

Alternatively, "[a]lthough pleas in bar typically present a complete bar to the plaintiff's recovery, we have recognized that a plea in bar constitutes either a complete defense to the complaint, ***or to that part of the complaint to which it is pleaded***." *Smith v. McLaughlin*, 289 Va. 241, 252 (2015) (emphasis in original) (internal quotations omitted). In *Smith*, the Court stated the circuit court had the ability to rule that, to the extent the issue of fact prevented McLaughlin from pursuing certain theories of Shevlin Smith's breach, the plea in bar presented a partial bar to McLaughlin's recovery." *Id.* The Court analyzed *Smith* to indicate that a Circuit Court in hearing a Plea in Bar could rule on whether the defendant breached his duty to the Plaintiff. While *Smith* deals with legal malpractice, the claims are not completely dissimilar.

In Virginia, claims for a breach of fiduciary duty and legal malpractice require that a defendant breach a respective duty. *See Plumbers and Steamfitters Union Local No. 10 v. Waters*, 451 F. Supp. 3d 543, 550 (E.D. Va. 2020) (detailing the elements of a breach of fiduciary duty claim); *Smith*, 289 Va. at 253 (quoting *Shipman v. Kruck*, 267 Va. 495, 501 (2004) (detailing the elements for legal malpractice). In *Smith,* Shevlin Smith argues McLaughlin was barred from recovering on his legal malpractice claim because, as a matter of law, Shevlin Smith did not breach

4

the prevailing standard of care." *Smith*, 289 Va. at 251. In overruling the circuit court, the Court in *Smith* held "Smith's plea in bar presented an issue of fact that constituted a potential bar to some, but not all, of McLaughlin's theories of how Shevlin Smith committed malpractice." *Id.* at 252. "Accordingly, the circuit court had the ability to rule that, to the extent the issue of fact prevented McLaughlin from pursuing certain theories of Shevlin Smith's breach, the plea in bar presented a partial bar to McLaughlin's recovery." *Id.*

Here, Mr. Falwell seeks to introduce evidence as part of his plea in bar that would bar Liberty from relying on the theory that Mr. Falwell breached his fiduciary duty by failing to tell the Board about Granda and his actions.[4] This does not foreclose Liberty from relying on other theories of breach, but does prevent Liberty from succeeding on its breach of fiduciary duty claim on the basis that Mr. Falwell failed to provide material information to the Board. Mr. Falwell is utilizing the plea in bar to demonstrate, through the presentation of evidence, that the Board of Trustees knew about Granda and his extortion attempts. As in *Smith*, here, the plea in bar would provide, at a minimum, a partial bar to Liberty's breach of fiduciary duty claim and their ability to recover.

Therefore, Mr. Falwell's Plea in Bar reduces Liberty's breach of fiduciary duty claim to a single issue that, if proven, bars Liberty's claim. The Court must deny Liberty's Motion to Strike and permit Mr. Falwell to fully brief and present his Plea in Bar.

## Conclusion

WHEREFORE, Defendant/Counterclaim Plaintiff, Jerry L. Falwell, Jr., by counsel, respectfully requests that this Court overrule Plaintiff/Counterclaim Defendant, Liberty

---

[4]    Mr. Falwell intends on providing a full memorandum in support of his Plea in Bar in advance of an evidentiary hearing on his pleading.

LUADMINREC000375

University, Inc.'s Motion to Strike Defendant's Plea in Bar; permit Mr. Falwell to present his Plea

in Bar at a future date; and order such other relief as the Court deems necessary and appropriate.

Dated: January 4, 2022

Respectfully submitted,

JERRY L. FALWELL, JR.

Counsel

Vernon E. Inge, Jr. (Va. Bar No. 32699)
Robert N. Drewry (Va. Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:     804.977.3301
Facsimile:     804.977.3291
E-Mail:        vinge@wtplaw.com
               rdrewry@wtplaw.com

*Counsel for Defendant/Counterclaim Plaintiff, Jerry L. Falwell, Jr.*

6

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of January, 2022, a true and correct copy of the foregoing ***Jerry L. Falwell, Jr.'s Memorandum in Opposition to Liberty University, Inc.'s Motion to Strike Defendant's Plea in Bar*** was served *via* e-mail transmission and first-class, postage-prepaid, U.S. Mail upon the following:

> Scott C. Oostdyk, Esq.
> Andrew F. Gann, Jr., Esq.
> McGuireWoods LLP
> Gateway Plaza
> 800 East Canal Street
> Richmond, Virginia 23219
> E-Mail:      soostdyk@mcguirewoods.com
>                    agann@mcguirewoods.com
>
> — and —
>
> R. Craig Wood, Esq.
> McGuireWoods LLP
> Post Office Box 1288
> Charlottesville, Virginia 22902-1288
> E-Mail:      cwood@mcguirewoods.com
> *Counsel for Plaintiff, Liberty University, Inc.*

_____
Robert N. Drewry

LUADMINREC000377

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

| | |
|---|---|
| LIBERTY UNIVERSITY, INC., | |
| *Plaintiff/Counterclaim Defendant*, | Case No. CL21000354-00 |
| v. | |
| JERRY L. FALWELL, JR., | JURY TRIAL DEMANDED |
| *Defendant/Counterclaim Plaintiff*. | |

### LIBERTY UNIVERSITY, INC.'S REPLY MEMORANDUM IN SUPPORT OF DEMURRER

Plaintiff Liberty University, Inc. ("Liberty"), by counsel, states as follows in support of its Demurrer to Defendant Jerry Falwell, Jr.'s ("Falwell Jr.") Counterclaim. For the reasons below and those explained in Liberty's initial memorandum, Falwell Jr.'s Counterclaim fails to state a claim, and it should be dismissed with prejudice.

### INTRODUCTION

In his brief in opposition ("Opposition"), Falwell Jr. openly discerns the weakness of a defamation counterclaim that he rooted solely in religious concepts, and he furtively tries to recast it. In his Counterclaim, Falwell Jr. maintained that when Liberty's campus pastor David Nasser stated in an August 26, 2020 Bible study that Falwell Jr. was a "sinner," had committed "sinful behavior," had lapsed in his "spiritual mission," and had acted "shameful[ly]," squandering "spiritual stewardship," that those words carried their own stand-alone meaning in the English language dictionary, and were thus defamatory. (Counter. ¶¶ 21, 26, 29.) Because Liberty proved in its Opening Brief that to discern Nasser's meaning, those specific spiritually-driven terms must

1

be defined through a religious not secular prism, Falwell Jr. tries to pivot to an alternate source of meaning.  He newly accentuates that these spotlight religious terms really have an *inferential* meaning, not an actual one.  Falwell Jr.'s revisionist angle is that when Nasser preached on "sin," "shame," and failed leadership on August 26, 2020, that Liberty's minister was inherently pointing the crowd to the current event of an August 24th *Reuters* article in which, among many other damaging revelations, Giancarlo Granda charged he had consensual sex with Becki Falwell while Falwell Jr. peaked from the corner.  To point to a factual issue as core, and a tangible reference instead of spiritual platitudes as the Court's unit to measure, Falwell Jr. calls the *Reuters* article – all of it – "the backdrop of the entirety of the Defamatory Statements…."  (Opposition p. 10.)  A copy of the defining *Reuters* article is attached hereto, as **Exhibit 1**.

What makes Falwell Jr.'s new *Reuters* tack so far-fetched is that in the August 26th Bible study session (the "Bible Study"), Nasser never uttered the words "*Reuters*," "Granda," "corner," or "article."  In fact, Nasser did absolutely nothing to steer the large and diverse Christian audience to any particular internet piece, publication, or periodical as his source of concern about Liberty's recently-resigned leader.  Nasser's only text that night was the Bible.  Further, Nasser attributed his comments to no singular event at all.  Falwell Jr. openly concedes Nasser's stated impetus for his August 26th remarks to be the onset of "revelations," "events," "things," and "signs." (Opposition p. 8, *citing* Counter. ¶¶ 21, 26, 29).  By conceding that Nasser spoke of the percipient events for his remarks in the plural, Falwell Jr. *admits* a direct contradiction between Nasser's words and Falwell Jr.'s new narrative.  This blatant admission that Nasser was influenced by multiple conditions and stimuli – not just the Granda allegations in *Reuters* – disallows the reasonable conclusion that Nasser was dog-whistling his listeners to the buried reference in *Reuters* to voyeurism.

2

The *Reuters* article is pivotal to this case because it was not the single-issue screed that Falwell Jr. tries to frame it for this Court.  Rather, it was chock full of all kinds of salacious news about Falwell Jr. that broke in the "summer" of 2020 – Falwell Jr.'s temporal period of focus. (Counter. ¶21.)  *Reuters* reported that in early August 2020, Falwell Jr. posted a lewd costume-party snap of himself yacht-side drink in hand, chumming with a female Liberty colleague (their pants unbuttoned at the top).  *Reuters* further revealed that on August 24th, Falwell Jr. had penned a *Washington Examiner* article to confess – for the first time publicly – the long affair by Becki that festered into a damaging extortion attempt by her partner, Granda.  Finally, *Reuters* characterized Falwell Jr. as a problem drinker who called a radio station in August 2020, perceived to be under the influence, trying to explain the booze cruise was all in good "fun."  *See* Exhibit 1.

Any one of those show-stopping reveals could well have led the average Bible-adhering Christian (though armed with St. Paul's admonition in Romans 3:23 that "for all have sinned and fall short of the glory of God") to feel that Falwell Jr. had specifically "sinned."  With the facts Falwell Jr. himself pleads – the closeted affair and extortion – they would have no trouble concluding reasonably that Falwell Jr. conducted himself "shameful[ly]," slipped into "inappropriate behavior," and squandered "spiritual stewardship."  (Counter. ¶¶ 21, 26, 29).  The voyeurism was icing, not cake.  It's simply impossible to link these statements of Nasser to any singular item in the way Falwell Jr. argues because Nasser was speaking at the first evening service since the students returned from a summer break chock full of controversial revelations about Falwell.

Falwell Jr. can try to isolate voyeurism as the only thing on Nasser's crowded mind, but this court is the "gatekeeper" of defamatory meaning in "innuendo" cases such as this, and it cannot.  Pleadings passing off hyper-strained innuendo must be dismissed at pleading stage.  *Cf.*

3

*Schaecher v. Bouffault*, 290 Va. 83, 94 (2015).  If the *Reuters* article was in fact top of mind to the sprawling Bible Study crowd and broadcast listeners, and was prodding Nasser (as Falwell Jr. must convince this Court or his case fails), then it was Falwell Jr.'s burden to present facts tending to prove that.  No matter how hard Falwell Jr. strains to elevate "peeking" to be a primary and solitary charge, voyeurism is just part of a tawdry *Reuters* ensemble.  Falwell Jr. fails in his attempt to blind this Court to the infidelity, extortion, and boozing that are also splayed across the pleadings.

In his Opposition, Falwell Jr. has also failed to isolate any truly defamatory words – citing no utterances from Nasser or writings that are non-opinion, or non-religious phrases that come packed with requisite sting.  Falwell Jr. has also failed to allege facts substantiating the actual malice that is a prerequisite for a claim against a public figure like himself.  Equally serious is Falwell Jr.'s stubborn failure to include an ad damnum anywhere in his suit, which damns his entire damages claim, with prejudice.  What is more, with respect to his contract claim, Falwell Jr. weakly contends that the words "slanderous" and "defamatory" are not terms of art in the common law, but lawful rather a prohibition against "disparagement" – even though *that* word is nowhere in the contract.  The terms "defamatory" and "slanderous" take their meaning from tort law, and the Supreme Court of Virginia blocks parties from making contracts to follow laws they have to adhere to anyway.  Lastly, Falwell's property claims and punitive damages allegations are facially deficient and fail to survive demurrer.

## ARGUMENT

### I.   Falwell Jr.'s Counterclaim Must be Dismissed for Lack of an Ad Damnum.

In its Opening Brief, Liberty proved that an ad damnum clause is required in every Virginia action for money damages, and that Falwell Jr. failed to plead one.  (Opening Brief pp. 4-6.)  The Supreme Court of Virginia codified that mandate crisply: ("[e]very complaint requesting an award

4

of money damages shall contain an ad damnum clause stating the amount of damages sought."
Va. Sup. Ct. R. 3:2(c)(ii).  The Court enforces the requirement strictly.  *See, e.g.*, *Lee v. Spoden*,
290 Va. 235, 253 (2015) ("[i]t is elementary that one cannot recover a greater amount than he sets
out or claims in an action brought by him….")  Falwell Jr. quantified zero damages.  Failing to
join issue during briefing with this dispositive point ends his action.[1]  His claim must be terminated.
*See Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 323–24 (2015) (claim dismissed with prejudice
for failure to plead "injury or damage" in an ad damnum).

II.    **Falwell Jr. Fails to State a Claim for Defamation.**

    **A. Falwell Jr. Fails to Refute That This Court Lacks Jurisdiction over a Dispute Involving Purely Religious Concepts and Standards.**

    Falwell Jr. claims that the core concepts in his claim – *i.e.,* "sin," "shame" and "spiritual
leadership" – are ordinary workplace terms that take on fixed, specific meaning through
dictionaries.  (Opposition pp. 10-11.)  A growing body of law states otherwise.  It is established
now that courts cannot weigh into matters that would require them to divine the tenets of private
religious education or spiritual leadership because the judges would have to vet faith-based codes.
*Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. __, 140 S.Ct. 2049, 2064 (2020).
Here, that authority is the Bible and Liberty's foundational governance documents, built from
Biblical principles.   The U.S. Constitution bars Virginia courts from interpreting religious
concepts. *Id.*  Terms like "sin," "shame" and "spiritual leadership" could not be more ecclesiastical.

    Ironically, Falwell Jr. agrees that when he executed his employment agreement, he was
under the authority of Biblical principles and subject to the interpretation of them by Liberty and

---

[1] *See, e.g.*, *Porter v. Woods*, 2017 WL 10966679, at *3-4 fn. 5 (Va. Cir. Ct. 2017) (plaintiff "failed to address his
negligent training claim *at all* in his opposition brief" to defendant's demurrer) (italics in original); *see also West
Virginia Coal Workers' Pneumoconiosis Fund v. Bell*, 781 F. App'x 214, 226 (4th Cir. 2019) ("[A party's]
wholesale failure to respond to a conspicuous, nonfrivolous argument in the [opposing party's] brief ordinarily
constitutes a forfeiture.").

LUADMINREC000382

the Thomas Road Baptist Church. Falwell Jr. pled that as the former President of Liberty, he executed a 2019 Employment Agreement ("2019 Agreement").[2] (Counter. ¶¶ 3, 41.) Thus, Falwell Jr. subordinated to the Liberty Articles of Incorporation ("Articles") and Liberty's Bylaws, both of which are now incorporated into Falwell Jr.'s pleadings by stipulation of the parties.[3] The Articles specify in Article V Section (4) that the Board of Trustees (of which the President is a member) is "organized as a Christian body governed by Christian tenets…." The Bylaws also pronounced it was a job requirement for President Jerry Falwell Jr. to "provide[] spiritual and worldwide leadership to the University in pursuit of excellence." (Bylaws, Article II Section 2.) Falwell Jr. agreed to accept Liberty's Doctrinal Position, attached to the Bylaws as Exhibit A, which required Falwell Jr. to accept that "all persons are sinners from conception, which is evidenced in their willful acts of sin." In short, President Falwell Jr. agreed to regard himself (and others) as a "sinner," and to act at all times as a Christian spiritual leader adhering to Biblical truth.

In addition to defining the contours of his job by reference to Biblical code, the Articles and Bylaws uniquely placed Falwell Jr. – in his role as Trustee – under guidance from Thomas Road Baptist Church's governing body as to spiritual matters because it oversaw Liberty's "Christian mission," and the applicable "Doctrinal Position" to be espoused at Liberty. (Bylaws, Article II Section 5.) The Opposition did nothing to refute that the Bible, Church, Bylaws, and Articles are the sources this Court would discern to vet the spiritual performance of Falwell Jr.

Virginia law forbids such an incursion. Falwell Jr. rightly concedes that in *Cha v. Korean*

---

[2] As part of his demurrer to Liberty's Complaint, Falwell Jr. craved oyer over the 2019 Employment Agreement to make it part of this case.

[3] On November 11, 2021, Liberty filed a motion craving oyer. The parties have stipulated to oyer over the following documents: 1) the Articles and Bylaws; 2) the transcript of the August 26, 2020 Campus Community session; 3) Liberty's August 31, 2020 press release; 4) and the September 24, 2020 edition of the *Liberty Journal*. Additionally, the parties are in the process of conferring about oyer over the August 24, 2020 *Reuters* article. Either this piece will be added to the oyer list by agreement, or Liberty will amend its existing craving oyer to request the addition of this focal document.

LUADMINREC000383

*Presbyterian Church of Washington*, the Virginia Supreme Court barred courts from adjudging "matters of faith and doctrine."  262 Va. 604, 611 (2001).  (*See* Opposition p. 5.)  As Liberty explained fully in its Opening Brief, in *Cha* the Court refused to address a spiritual leader's employment claims, holding that decisions regarding standards of spiritual leadership are matters of doctrine and wholly beyond the jurisdiction of secular courts.  *Cha*, 262 Va. at 613.  Falwell Jr. tries two arguments to sidestep this decision.

First, he claims *Cha* applies narrowly only to churches – not to faith-based colleges or the contracts of spiritual leaders who do not wear the so-called cloth.  (Opposition pp. 5-6.)  Not so. Falwell Jr. himself defines "ecclesiastical" as those religious doctrines applying "within an association."  (Opposition, p. 5 fn. 3).  In *Eastern Orthodox Diocese for the U.S. of America and Canada v. Milivojevich*, 426 U.S. 696, 710 (1976), cited in *Cha*, the U.S. Supreme Court concurred on this broad application, noting, generically, that "the right to organize *voluntary religious associations* to assist in the expression and dissemination of any religious doctrine…for the decision of controverted questions of faith…is unquestioned." (Emphasis added.)  Recently, when the high court considered a case involving religious schools and their employees, it readily expanded to religious school associations the broad principles of abstention paralleled in *Cha*.  In the aforementioned *Our Lady of Guadalupe School v. Morrissey-Berru*, the Court preserved a school's autonomy from judicial interference in matters concerning the fitness of employees "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of a private religious school's mission."  140 S.Ct. at 2064.  This puts to rest any doubt that religious colleges can freely vet the spiritual leadership of presidents who are under contract to advance a spiritual mission.

Second, Falwell Jr. claims *Cha* might have selectively outlawed religious employment

LUADMINREC000384

actions in courts but that defamation somehow is different. (Opposition pp. 5-7.) Again, not so. In *Cha,* the Court ruled that employment standards governing a fired spiritual leader were issues of ecclesiastical determination, so defamation allegations rooted in accusations about the nature and quality of the former employee's spiritual leadership were equally beyond the court's jurisdiction. *Cha*, 262 Va. at 615.

The wisdom of the courts' abstention is compelling. Falwell Jr. focuses his defamation claim primarily on the remarks given by David Nasser at the August 26, 2020 Campus Community Bible study and worship service (the "Bible Study"). The Bible Study was a wholly religious event. (*See* Transcript, attached as **Exhibit 2**, at 23:2-6, 21.) Nasser, himself the lead campus pastor, introduced acting President Jerry Prevo that night by calling him a "pastor at heart." (Tr. 2:17.) After making a few introductory remarks, Prevo began the Bible Study by asking the audience to "bow [their] heads for prayer." (Tr. 7:8-16.) At the conclusion of the Prevo-led prayer, Nasser began his teaching, noting that he had invited Jesus to be a "speaker," through him. (Tr. 20:9-16.) In his message, Nasser then discussed "sin" and "shameful" behavior – always in the context of Liberty's spiritual standards. (Tr. 31:18 – 32:16.)

In his Counterclaim, Falwell Jr. himself pleads that Nasser's remarks at the Bible Study were delivered "in the course and scope of [Nasser's] employment and in furtherance of Liberty's interests." (Counter. ¶ 25.) Thus, by Falwell Jr.'s own admission, Nasser's remarks about Falwell Jr.'s spiritual leadership reflected conclusions of Liberty's leadership regarding the ex-President's fitness for spiritual office. Just as the court in *Cha* refused to consider defamation allegations regarding a minister's spiritual fitness, this Court must refuse to consider allegedly defamatory statements regarding Falwell Jr.'s qualification to be the spiritual leader of the "world's leading evangelical university." (Counter. ¶ 3.) As outlined, Liberty's Bylaws, incorporated into the 2019

8

Agreement, unquestionably obligate the President and Chancellor to effect "spiritual…leadership…in pursuit of excellence." (Bylaws, Article II Section 2.)

Liberty is different, by design. The contracts of the Presidents of the University of Virginia or Virginia Tech most certainly do not obligate "spiritual" leadership, as Liberty's does because it elects to be different. Falwell Jr. volitionally contracted to adhere to and uphold the unique standards of Liberty University. How, without delving into religious concepts, would this Court evaluate whether Falwell Jr.'s impactful decisions to cover up Granda's extortion, to tolerate the compromising marital affair that gave it legs, and to Instagram an unbuttoned photo glorifying shipboard revelry was sound Christian "spiritual leadership" in the eyes of Liberty's management? Since Falwell Jr. contracted to believe all persons are "sinners" by the human condition, then how could being termed a "sinner" himself in a campus Bible Study, in remarks made to a student audience who themselves pledged to follow that same doctrine, possibly cause Falwell Jr. any "sting," and defame him? (Tr. 31:22.) And what code or standard would this Court use to make such determinations, if not Liberty's subjective spiritual standards and its stated source authority – the Bible – which the Supreme Courts of Virginia and the country have proscribed?

When Falwell Jr. re-accepted the Presidency of Liberty in 2019, he willingly subordinated to the Apostle Paul's writings and to the words of Jesus. Now, Falwell Jr. awkwardly proposes to substitute the authority of Merriam Webster for that Scripture. (*See* Opposition pp. 6-7.) Analyzing religious concepts with secular tools is forbidden by *Cha*, which drew on the United States Supreme Court's long line of cases carving out ecclesiastical values. *See, e.g.*, *Kedroff v. St. Nicoholas Cathedral of Russian Orthodox Churches in North America*, 344 U.S. 94, 121 (1952) (when "power to exert religious authority" is "at stake," then "[t]he judiciary has heeded, naturally enough, the menace to a society like ours of attempting to settle such religious struggles by state

9

action." Frankfurter, J., concurring).

Decisions like *Cha*, *Kedroff*, and *Our Lady of Guadalupe School* cement Liberty's right to comment in a campus Bible Study about the high spiritual bar it set for Falwell Jr., and that the revelations of an array of low and dicey actions fell short of the standards. For these reasons, this Court lacks subject matter jurisdiction over Falwell Jr.'s defamation claim, as a matter of law.

### B. Falwell Jr. Cannot Draw a Defamatory Inference From a Wide-Ranging *Reuters* Article that Nasser Never Mentioned, and Likely His Listeners Never Read.

In his Opposition, Falwell Jr. functionally points this Court to but one real source of alleged defamation: the August 24, 2020 *Reuters* article. Even if this Court did have jurisdiction over Falwell's religiously-rooted defamation claim (which it does not), the focal *Reuters* allegation would fail as a plausible defamatory inference, for the reasons below.

It is without contradiction that a Virginia trial court must act early to gauge at pleading stage the efficacy of the defamation plaintiff's allegations, deciding "as a threshold matter of law whether a statement is reasonably capable of defamatory meaning before allowing the matter to be presented to a finder of fact." *Schaecher,* 290 Va. at 94 (2015); *see also Webb v. Virginian-Pilot Media Co., LLC*, 287 Va. 84, 90 (2014) ("[e]nsuring that defamation suits proceed only upon statements which actually may defame a plaintiff.") Rather than measure the snippets and sound bites to which a plaintiff points, the trial court must consider the *full context* of speech in the pleadings when evaluating a defamation claim on demurrer. *See Schaecher,* 290 Va. at 101 (2015) ("[a]s with all evaluations of defamatory statements, however, context is of the utmost importance."); *Hyland v. Raytheon Tech. Serv. Co.*, 277 Va. 40, 47–48 (2009).

As such, the Court must consider *all* of the allegedly defamatory speech pled by Falwell Jr., especially the *Reuters* article (since he hyper-elevates its importance). Falwell Jr. focuses on *Reuters* because he tries to invent a nexus between that one article and his alleged defamation

10

allegations.  Falwell Jr. argues that when Nasser, at the Bible Study, said "that Liberty opened its semester (classes began August 24) 'with a series of revelations about Jerry Falwell that can only be described as shameful,'" Nasser could **only** have been referring to *Reuters.*  (Opposition p. 2; Counter. ¶ 21.)  Then he baldly argues for slicing out a small part of that article, asking this Court to believe that "[t]he [Nasser] 'revelations' refer [only] to the *Reuters* Article and the demonstrably false statements regarding Mr. Falwell's involvement in his wife's affair."  (Opposition p. 2.)

This is a preposterous construct.  In one place, Falwell Jr. terms the *Reuters* piece to be the whole "backdrop" for his suit, not part of it.  (Opposition p. 10.)  He reprises this *Reuters*-reliance a half dozen times, never carving up the article. (*See* Counter. ¶¶ 16, 17, 22; Opposition pp. 6, 10-12.)  This intense rhetorical focus in the brief on one part of one article presents three problems for Falwell Jr., all fatal.  First, Nasser's words could not possibly have been regarded to be a roadmap right to the *Reuters* allegations about voyeurism because Nasser only expressed dissent with Falwell Jr. by reference to *pluralities,* never by any singular motivation.  Accordingly, as laid out in Counterclaim ¶ 21 and presented again in the Opposition, Nasser spoke of a "*series of revelations*" that disturbed him about Falwell Jr., not one; he identified "*things*" that led to Falwell Jr.'s resignation, not one; and he fretted over "recent *events*" that enmeshed Liberty and Falwell Jr., not a single event. (Opposition pp. 2, 8, emphasis added.)  As such, there is no way the Court can reasonably infer that Nasser meant to narrowly call out Falwell Jr.'s alleged voyeurism because Nasser's actual words kept referring to a *smorgasbord* of allegations involving Falwell Jr.  Nasser spoke of Falwell Jr.'s comprehensive abdication of moral duty, not one lapse.

Second, the pleadings themselves (and the documents made a part of the pleadings via the parties' joint stipulation) reveal a panoply of current events that were intertwined with Falwell Jr.'s resignation, in addition to Granda's voyeuristic charges.  As noted, and as detailed in *Reuters*,

11

these events include the affair with Granda and Falwell Jr.'s attempts to conceal it; Granda's involvement with the Falwells in the Alston Hostel LLC business venture; Falwell Jr.'s statement to the *Washington Examiner*, in which he publicly disclosed the Granda affair for the first time; the photo Falwell Jr. posted on Instagram of himself (pants unbuttoned) astride a younger female Liberty employee; a radio interview Falwell Jr. gave after the fallout from the Instagram photo in which his voice sounded slurred and he described the dumfounding "pants" photo as a good-natured "joke;" a prurient FaceTime conversation Granda says he recorded with the Falwells in 2019; an audio recording Granda made of a salacious conversation with the Falwells in 2018; and a 2012 text message chain between Granda and Becki Falwell.  In this stew of excess were ample ingredients that soured Liberty on its leader.

Third, there is no reasonable basis to infer that the audience of thousands that listened to Nasser's remarks at the Bible Study would have readily linked Nasser's comments about "sin" and "shameful" behavior to the glancing references to Granda's allegations of voyeurism in the *Reuters* article.  While it is true in Virginia that defamation can arise via inference, "such inferences cannot rise above the language of the documents or statements themselves."  *Schaecher*, 290 Va. at 93. "[T]he meaning of the alleged defamatory language cannot, by innuendo, be extended beyond its ordinary and common acceptation.  The province of the innuendo is to show how the words used are defamatory, and how they relate to the plaintiff, but it cannot introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain."  *Webb*, 287 Va. at 89; *see also Baylor v. Comprehensive Pain Mgmt. Ctr., Inc.*, 2011 WL 1327396, at *7 (W.D. Va. Apr. 6, 2011) ("[i]n addition, a plaintiff cannot combine the damaging nature of certain true statements with the falsity of other, immaterial statements in order to provide the basis for a defamation claim."); *Jenkins v. Snyder*, 2001 WL 755818, at *4 (E.D. Va. Feb. 6, 2001) ("[w]hen

12

the alleged defamation is implied…the language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference, thereby ensuring that implied meanings are not manufactured from words not reasonably capable of sustaining such a meaning.") (internal citations and quotations omitted).

Here, it is palpably unreasonable to infer that Nasser's audience, and the readers of the Press Release and *Liberty Journal*, would have understood cogent pastoral remarks about "sin," "shameful" behavior, and a lack of "spiritual stewardship" to be laser-like references to Falwell Jr.'s alleged voyeurism – or that voyeurism was more spiritually impactful than the deceit, extortion, or substance abuse elsewhere on those pages. Falwell Jr. offers the strained inference that any significant portion of Nasser's audience subscribed to *Reuters*, or actually read the publication over which Falwell Jr. preoccupies. But neither the Press Release, the pertinent issue of the *Liberty Journal*, nor Nasser mentioned the *Reuters* article or any allegation of voyeurism, so it is a false inference that Nasser automatically led his listeners to just one of Falwell Jr.'s transgressions, among the many batched misdeeds chronicled in *Reuters.*

Virginia law uniformly blocks a court from a flight of fancy in the guise of a claim of defamation. *Webb*, 287 Va. at 91; *see also Mann v. Heckler & Koch Defense, Inc.*, 639 F. Supp. 3d 619, 635–36 (E.D. Va. 2009) (holding allegedly defamatory statements were not "defamatory per se as a matter of law" because the plaintiff's "proposed interpretation stretches the 'natural meaning' of [the defendant's] statement too far"); *Yeagle v. Collegiate Times*, 255 Va. 293, 297–98 (1998) (affirming dismissal of defamation claim because "the litigated phrase itself [could not] be taken as asserting actual facts" and there was "nothing which support[ed] a [defamatory] inference"); *Perk v. Vector Res. Grp., Ltd.*, 253 Va. 310, 316–17 (1997) (statement that an attorney did not report certain payments cannot be extended by inference to mean that the attorney acted

13

improperly, for purposes of a defamation action).  Accordingly, because Falwell Jr. cannot "pile

one inference upon the other," and certainly cannot draw inferences that contradict plain words,

he fails to state a claim for defamation.  *Mann*, 639 F. Supp. 2d at 635.

### C. The Terms "Sin," "Shameful," and "Spiritual Leadership" do not Possess Defamatory Sting, and the *Per Se* Defamation Rule does not apply to a Spiritual Leader.

Falwell Jr.'s defamation claim also fails because the allegedly defamatory statements do

not invoke the requisite defamatory "sting," and the *per se* defamation rule does not apply to

statements regarding ecclesiastical and spiritual leaders terminated by their authorities.

Falwell Jr. bases his defamation claim primarily on statements surrounding "sin,"

"shameful" behavior, and a lack of "spiritual stewardship," among other similar ecclesiastically-

based words and phrases.  (Counter. ¶¶ 21-22, 26.)  However, as with all allegedly defamatory

statements, these terms must be measured in context.  *PBM Prod., LLC v. Mead Johnson Nutrition

Co.*, 678 F. Supp. 2d 390, 401 (E.D. Va. 2009) (observing that allegedly defamatory statements

may be measured by "the context of the challenged statement within the writing or speech as a

whole, and the broader social context into which the statement fits.") (internal citations omitted).

When viewed by their meaning within the Liberty community, these statements are not exceptional

concepts – they merely represent the biblical belief of the Liberty community in the fallen state of

man.  *See Romans* 3:23.  This is reinforced, for example, by Liberty's Doctrinal Position, which

provides that "all persons are sinners from conception, which is evidenced in their willful acts of

sin."  As such, these words do not hold Falwell Jr. "up to scorn, ridicule, or contempt," and they

are not "calculated to render him infamous, odious, or ridiculous."  *Moss v. Harwood*, 102 Va.

386, 391 (1904).  Instead, when spoken by a Liberty campus pastor to Liberty students in a Bible

study, they merely reflect a commonly-held belief amongst the Liberty community – that sin

14

happens – and thus being categorized as a "sinner" would never inflict defamatory sting.

Falwell Jr.'s attempt to rely on *per se* defamation fails for the same underlying reasons.  In his Opposition, Falwell Jr. claims the allegedly defamatory statements "had the effect of imputing Mr. Falwell's unfitness for employment at Liberty, as well as prejudiced Mr. Falwell in his profession." (Opposition p. 10.)  However, as explained above, none of Nasser's remarks at the Bible Study criticized Falwell Jr. in any professional phase of his fundraising, management of the endowment, or promotion of academics.  Instead, these remarks were leveled at Falwell Jr.'s conduct as spiritual leader of the "world's leading evangelical university." (Counter. ¶ 3.)  As such, *Cha* and *Our Lady of Guadalupe School* forbid this Court from evaluating Falwell Jr.'s defamation claim, regardless of whether he alleges *per se* defamation or any other variety.  *See Cha*, 262 Va. at 614–15.

### D.  The Allegedly Defamatory Statements are Nonactionable Opinion.

Falwell Jr. also fails to state a defamation claim because the allegedly defamatory statements are nonactionable opinion.  In his Opposition, Falwell Jr. argues that the *Reuters* article furnishes a factual "backdrop" that is necessary to evaluate the allegedly defamatory statements. (Opposition p. 10.)  Yet, as explained above, the purported inference upon which Falwell Jr. relies is totally untenable.  Even a cursory review of the Nasser statements reveals that his remark that a "series of revelations" brought sin, shame, and concerns over spiritual stewardship to Liberty is merely the opinion of Nasser and Liberty leadership.  (Tr. 31:19.)  There is no basis to believe that Nasser spoke to a specific event or act of unfitness – *i.e.*, voyeurism – he spoke plainly to multiple "things" that amounted to an opinion of spiritual unfitness.  (Tr. 25:9-10.)  Indeed, the allegedly defamatory statements are, at their core, simply value-infused perspectives that cannot be disproven as a matter of fact.  *See, e.g., Padula-Wilson v. Landry*, 298 Va. 565, 579–81 (2020)

15

(statements that a mother had acted "inappropriate[ly]," and that she had demonstrated a "lack of boundaries" were nonactionable opinion.)  Some in the crowd August 26, 2020 might disagree that releasing a picture of party-boat floating with unbuttoned pants mars one's spiritual leadership. Nasser and Liberty concluded otherwise.  Accordingly, the allegedly defamatory statements are nonactionable opinion.

### E.  Falwell Jr. is a Public Figure as a Matter of Law.

In his Opposition, Falwell Jr. contends that he is not a "public figure for purposes of a defamation claim."  (Opposition p. 11.)  He claims refuge in the negligence standard, instead of the heightened requirement of having to allege "actual malice."  Falwell Jr. did not try to justify his conclusion about his status, and his stance is preposterous.  When the pleadings permit, the trial court must determine the pleader's public figure status at the demurrer stage.  *See Matthew v. Carr,* 70 Va. Cir. 297 (Va. Cir. Ct. 2006); *Steinla v. Jackson*, 42 Va. Cir. 281 (Va. Cir. Ct. 1997). The pleadings prove Falwell Jr. is a public figure, and he has pled nothing close to "actual malice" by Liberty, and on this ground his entire defamation claim must fail.

The Supreme Court of the United States originated the "actual malice" requirement for "public figure" defendants and set out guidance for trial courts.  A public figure is someone who has "achieve[d] such pervasive fame or notoriety that he [or she] becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

For two reasons, Jerry Falwell Jr. is without doubt a public figure.  *First*, the United States Supreme Court has already created the template for decision in his case, determining that a

16

President of Liberty University who inserts himself into American politics and speaks and writes about his views and positions is a public figure. *Hustler Magazine, Inc. v. Falwell*. 485 U.S. 46, 57 n.5 (1988) ("it is clear that respondent Falwell [Sr.] is a 'public figure' for purposes of First Amendment law" for reasons of the Liberty presidency, his political organization, and his national communications and speech). *Second,* Falwell Jr. has relied on media sources that unabashedly assert he is a public figure. *Reuters* proclaims Falwell Jr., "one of the most influential figures in the American Christian conservative movement." (*See* Exhibit 1.) In the caption of a picture showing Falwell Jr. clasping hands with Donald Trump, *Reuters* reports that Falwell Jr. "helped swing evangelical Christians toward [candidate] Trump." *Id.* That alone is more than enough, and Falwell Jr. readily agrees in his Counterclaim.[4]

To establish actual malice, the defamation plaintiff must prove the defendant "entertained serious doubts as to the truth of his publication…and that the defendant actually had a high degree of awareness of probably falsity." *Jordan v. Kollman*, 269 Va. 569, 580 (2005) (internal quotations and citations omitted). Attempting to muster some semblance of actual malice, Falwell Jr. weakly and obliquely alleges but two things: (1) that no "member of the Board or the Executive Committee asked Mr. Falwell about the veracity of Granda's lies." (Counter. ¶ 17; Opposition p. 12.); and (2) that Liberty "transmitted [the allegedly defamatory statements] to media outlets." (Opposition p. 12.) This paltry effort fails, quite dramatically.

Actual malice requires affirmative acts "much more than a mere failure to exercise ordinary

---

[4] Falwell Jr. reminds the Court that he was the President of "the world's leading evangelical university." (Counter. ¶ 3.) Falwell Jr. contends he was awash in "invitations to appear on television or at public events to discuss, among other things, Liberty, evangelicalism, and politics." (Counter. ¶ 36.) By comparison to his lofty credentials, trial courts in Virginia have determined rather pedestrian people to be public figures in defamation actions. An Associate Dean of Students, positioned far below the office of the President, was deemed a public figure in litigation over the false *Rolling Stone* article that roiled the University of Virginia. *Eramo v. Rolling Stone*, LLC, 209 F. Supp. 3d 862 (W.D. Va. 2016).

17

care in verifying statements." *Ryan v. Brooks*, 634 F.2d 726, 731–32 (E.D. Va. 2007). The allegations must assert actual evidence that Liberty was aware of falsity. Liberty knew Falwell Jr. imprudently posted his "pants" photo and had no reason to inquire if he lied in the *Washington Examiner* article *Reuters* says that Falwell Jr. wrote himself. Liberty knew from Falwell Jr.'s wife that alcohol was ravaging him. Falwell Jr. never denied the three-way phone recordings involving Becki and Granda, information anyone can access on the internet. Liberty had no reason to probe Falwell Jr. about the truth of Granda's undercard voyeurism charge because the pungent portrayal in *Reuters*, even if untrue, is a revelation impacting fitness for continuing to lead a Christian university. The voyeurism charge was realistically one of a series of events giving rise to Liberty's conclusion Falwell Jr. failed at spiritual leadership of the world's largest evangelical university. Falwell Jr. focuses solely on his contention that "sin" and "shameful behavior" was a euphemism for *Reuters's* assertion that Falwell Jr. was a "corner peaker." Nasser did not. It is uncontroverted he focused on "revelations," "events" and "things" – in combination.

Similarly, citing press announcement of Liberty's conclusion about Falwell Jr.'s failed spiritual leadership is ineffectual as evidence of actual malice. Once again, the wide swath of criticism against Falwell Jr.'s spiritual leadership – the party-picture posting, the extortion suppression, the long tolerance of a marital affair, and the substance abuse – all erase Falwell Jr.'s focal preoccupation with voyeurism as the Big Sin. Moreover, there is nothing vitriolic or spiteful about a simple, banal news release in the context of Falwell's infamous record.

Falwell Jr.'s two flimsy allegations do not in fact allege Nasser thought he was relaying conclusions contained in the unmentioned *Reuters* article, or that there was any reason, given the market basket of rogue incidents of spiritual failure in *Reuters* and elsewhere, for Liberty to look specifically into Granda's sideshow allegation of corner peaking. Falwell Jr. fails to present

18

sufficient facts tending to establish actual malice, and for this reason, too, he fails to state a claim

for defamation.   For all the reasons explained above, Falwell Jr.'s defamation claim fails as a

matter of law.   The Court should sustain Liberty's demurrer and dismiss Count II with prejudice.

### III.   Falwell Jr. Fails to State a Claim for Breach of Contract.

In its Opening Brief, Liberty established that the 2019 Agreement was unenforceable

because the terms "defamatory" and "slanderous" were terms of art and already bound the parties

by virtue of the tort law.   (Opening Brief pp. 16-17.)   Falwell Jr. counters by reciting dictionary

meanings outside the tort law to try to define these terms independent of law.   (Opposition pp. 13-

14.)   This effort fails.   Virginia law requires terms of legal significance employed in contracts to

be construed first as the law defines them.[5]   The chosen terms "defamatory" and "slanderous" have

well-established legal definitions dating to the English common law.   The elements of these terms

are precise.   *See Jordan*, 269 Va. at 575 (defamation and slander are defined as the "(1) publication

of (2) an actionable statement with (3) the requisite intent").   As proven in Section II above, Falwell

Jr. failed to contend persuasively that the parties picked terms in the contract that are not already

part of the common law.   This lapse in drafting curtails contractual enforcement.   Conscious of the

defect, Falwell Jr. tries to substitute the concept of "disparagement" for the specific concept of

defamation and slander in the agreement.   Disparagement was not the word the parties used,

however, and Falwell Jr. freely concedes a court cannot remake their contract in litigation.   Falwell

Jr. is free to enforce his defamation and slander concerns in a well-crafted complaint, but, as

determined above, he fails to plead an "actionable" claim for defamation or slander.   His contract

---

[5] *See City of Roanoke v. Blair*, 107 Va. 639, 641–42 (1907) (when interpreting contractual provisions, "words of a definite legal significance, or which have a well defined primary meaning, are to be understood as used in such sense, unless there appear in the writing a manifest intention of using them in a different sense"); *Dempsey v. Dempsey*, 2021 WL 1537252, at *4 (Va. Cir. Ct. 2021) ("[w]e acknowledge that in interpreting contractual provisions, technical terms or words of art will be given their technical meaning.") (internal citations and quotations omitted); *Brandenstein v. Brandenstein*, 2015 WL 6143646, at *5 (Va. Ct. App. 2015) (same).

LUADMINREC000396

and tort claims are thus equally flawed, and Count I must be dismissed with prejudice.

### IV.     Falwell Jr.'s Claims for Conversion, Detinue, and Trespass to Chattels Fail.

In his Opposition, Falwell Jr. concedes he left certain property at Liberty when he resigned. He also concedes remedy is underway, stating: "Liberty and Mr. Falwell are working to return certain property belonging to Mr. Falwell." (Opposition p. 15.) Liberty asserts no right to property actually owned by Falwell Jr. that he failed to take with him. Accordingly, there is no conflict: what is Falwells, he volitionally left behind, but he will arrange for receiving. Falwell Jr. thus fails to state a cognizable claim for conversion, detinue, and trespass to chattels. The Court should sustain Liberty's demurrer and dismiss Counts III-V with prejudice.

### V.     Falwell Jr. Fails to State a Claim for Punitive Damages.

Finally, as Liberty explained in its Opening Brief, Falwell Jr. does not allege in his Counterclaim any *New York Times* malice or malicious behavior by Liberty sufficient to warrant the imposition of punitive damages. Punitive damages are reserved for "the most egregious conduct." *Bowers v. Westvaco Corp.*, 244 Va. 139, 150 (1992). In the Bible Study, Nasser denounced any intent at hostility to Falwell Jr., stating: "[i]f you're looking for me to punch [Falwell Jr.] down, his family down, I'm not doing that and you're not going to be happy." (Tr. 26:3-19.)

### CONCLUSION

WHEREFORE, Plaintiff and Counterclaim Defendant Liberty University, Inc., by counsel, respectfully requests that the Court sustain its Demurrer to Defendant and Counterclaim Plaintiff Jerry Falwell Jr.'s Counterclaim; dismiss Counts I, II, III, IV, and V of the Counterclaim with prejudice; and order such other relief as the Court deems necessary and appropriate.

20

Dated: January 24, 2022

Respectfully submitted,

LIBERTY UNIVERSITY

_____
Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was sent via

electronic mail and U.S. mail to Vernon E. Inge Jr. and Robert N. Drewry at Whiteford Taylor

& Preston, this 24th day of January, 2022.

_____
Scott C. Oostdyk

21





A REUTERS EXCLUSIVE

## Business partner of Falwells says affair with evangelical power couple spanned seven years

LUADMINREC000399

1/24/22, 4:00 PM                                                    Business partner of Falwells says he had affair with the power couple

'IDEAL TARGET': Giancarlo Granda, who says he had a years-long sexual relationship with the Falwells that began when he was 20, said he now believes the Falwells preyed upon him. "Whether it was immaturity, naïveté, instability, or a combination thereof, it was this 'mindset' that the Falwells likely detected in deciding that I was the ideal target for their sexual escapades," he said. REUTERS/Jonathan Ernst

Giancarlo Granda says his sexual relationship with the Falwells began when he was 20. He says he had sex with Becki Falwell while Jerry Falwell Jr, head of Liberty University and a staunch supporter of President Trump, looked on.

By ARAM ROSTON  |  Filed Aug. 24, 2020, 4 p.m. GMT

WASHINGTON — In a claim likely to intensify the controversy surrounding one of the most influential figures in the American Christian conservative movement, a business partner of Jerry Falwell Jr has come forward to say he had a years-long sexual relationship involving Falwell's wife and the evangelical leader.

Giancarlo Granda says he was 20 when he met Jerry and Becki Falwell while working as a pool attendant at the Fontainebleau Miami Beach hotel in March 2012. Starting that month and continuing into 2018, Granda told Reuters that the relationship involved him having sex with Becki Falwell while Jerry Falwell looked on.

**RELATED CONTENT**


Jerry Falwell Jr takes indefinite leave from Liberty University post


Exclusive: Trump fixer Cohen says he helped Falwell handle racy photos


Exclusive: Falwell blasted Liberty student as 'retarded,' police chief as 'half-wit' in emails


Exclusive: Falwell steered Liberty University land deal benefiting his personal trainer

Granda showed Reuters emails, text messages and other evidence that he says demonstrate the sexual nature of his relationship with the couple, who have been married since 1987. "Becki and I developed an intimate relationship and Jerry enjoyed watching from the corner of the room," Granda said in an interview. Now 29, he described the liaisons as frequent — "multiple times per year" — and said the encounters took place at hotels in Miami and New York, and at the Falwells' home in Virginia.

His friendship with the Falwells eventually soured, Granda told Reuters, in part because he wanted to dissolve his ties with the couple and fell into a business dispute with them.


STAUNCH SUPPORTER: Jerry Falwell Jr's decision to endorse Donald Trump for the presidency in 2016 helped swing evangelical Christians toward Trump. REUTERS/Scott Morgan

LUADMINREC000400

1/24/22, 4:00 PM                                                        Business partner of Falwells says he had affair with the power couple

Granda first emerged as a figure in the Falwells' circle two years ago, when BuzzFeed News reported that the couple had befriended Granda and gone into business with him, buying a Miami Beach youth hostel in 2013. At the time of the BuzzFeed article, a representative of the Falwell family said Granda was "offered a share" in Alton Hostel LLC because Granda lived in Miami and would act as a manager of the youth hostel. Corporate records show that Granda currently has a stake in that venture.

Becki Falwell did not respond to emails or phone and text messages from Reuters. After Reuters presented its initial reporting early last week to the Falwells, a lawyer for Jerry Falwell, Michael Bowe, said the evangelical leader "categorically denies everything you indicated you intend to publish about him."

On Sunday night, however, as Reuters was preparing to publish this article, Jerry Falwell issued a statement to the Washington Examiner in which he said that his wife had had an affair with Granda and that Granda had been trying to extort money from the couple over the matter. Granda denies any such intent, saying he was seeking to negotiate a buyout from a business arrangement he says he had with the couple.



In this recording from a 2018 phone call that Giancarlo Granda provided to Reuters, Granda said he and the Falwells discussed Becki Falwell's jealousy about Granda dating other women.

Falwell's statement Sunday to the Examiner said nothing about Granda's account alleging that the evangelical leader had his own role in the affair, and Falwell didn't address questions from Reuters about it. In the statement quoted by the Examiner, Falwell said that "Becki had an inappropriate personal relationship with this person, something in which I was not involved."

Several hours after the Reuters article appeared, the Washington Post and other U.S. media reported that Falwell had stepped down as head of Liberty University, the Christian school he has run since 2007. But later Monday, Falwell disputed those accounts. "I have not resigned," he told Politico. "I will be on indefinite leave."

Liberty and Falwell did not respond to Reuters requests for comment on his status.

Falwell, 58, had taken an indefinite leave of absence earlier this month from Liberty. That step, announced in a terse statement from the school's board of trustees, came days after Falwell posted, then deleted, an Instagram photo of himself with his pants unzipped, standing with his arm around a young woman whose pants were also partly undone. Falwell later told a local radio station that the picture was meant as a good-natured joke.

If Falwell does step down, his departure from that high-profile perch would represent a remarkable fall from grace for a man who has been a potent force in American conservative politics. His surprise 2016 endorsement of Donald Trump helped the twice-divorced New Yorker win the Republican nomination for president.

1/24/22, 4:00 PM                                                    Business partner of Falwells says he had affair with the power couple

Becki Falwell, 53, is a political figure in her own right. She
served on the advisory board of the group Women for Trump,
which advocates for the president's reelection campaign. She
also spoke as part of a panel with her husband and Donald
Trump Jr at last year's Conservative Political Action Conference,
or CPAC, the signature annual gathering of conservatives. Jerry
Falwell and others refer to her as "the first lady of Liberty
University."



The university, based in Lynchburg, Virginia, was founded in
1971 by Falwell's televangelist father, the Rev. Jerry Falwell. The
younger Falwell took over in 2007. Today, the university boasts
an online and on-campus enrollment that exceeds 100,000
students and holds those who attend to an exacting honor code.
"Sexual relations outside of a biblically ordained marriage
between a natural-born man and a natural-born woman are not
permissible at Liberty University," the code reads.

The material Granda showed Reuters includes screenshots from
what Granda said was a FaceTime conversation he had with the
Falwells in 2019. During that call, Granda said, Becki was naked
as the two discussed their relationship while Jerry peeked from
behind a door. Reuters was able to verify Granda's description of
the screenshots.

Granda also shared an audio recording that he says captures a
conversation he had with the Falwells in 2018. In it, Becki
complained about Granda describing his relationships with
other people: "He's like telling me every time he hooks up with
people. Like I don't have feelings or something." Jerry then
chimed in: "You're going to make her jealous." "I'm not trying to
do that," Granda replied.

FALWELL POST: The photo on Instagram that was posted, then quickly deleted. Falwell
later explained that the post was meant as a joke and the woman was his wife's
pregnant assistant.

Earlier texts show a friendly and romantic dynamic between Granda and Becki Falwell. One
2012 text message, which Granda said came from Becki, read in part: "Right now I am just
missing you like crazy .... Have you had this effect on all of your lady friends?"

Other more recent text messages, such as an exchange from this June that Granda provided to
Reuters, show Granda growing angry and frustrated as his relationship with the Falwells frayed.

"Since you're okay with ruining my life, I am going to take the kamikaze route," Granda wrote to
Jerry Falwell. "It really is a shame because I wanted to reach a peaceful resolution and just move
on with our lives but if conflict is what you want, then so be it."

In the same message string, Falwell replied: "You should by now
understand that I will not be extorted. I have always treated you
fairly and been restrained in response to your threats because I
did not wish to ruin your life. Going forward, stop contacting me
and my family."

REUTERS INVESTIGATES



More Reuters investigations and long-form narratives

Granda said that while he entered into the sexual relationship
with the Falwells willingly, today he feels the couple preyed upon
him. "Whether it was immaturity, naïveté, instability, or a
combination thereof, it was this 'mindset' that the Falwells likely
detected in deciding that I was the ideal target for their sexual
escapades," Granda said.



Got a confidential news tip? Reuters Investigates offers
several ways to securely contact our reporters

In a statement released Friday, before news of the relationship with Granda became public,
Liberty University said its "decision whether or not to retain Falwell as president has not yet
been made." Its board of trustees, the statement read, "requested prayer and patience as they
seek the Lord's will and also seek additional information for assessment."

1/24/22, 4:00 PM                    Business partner of Falwells says he had affair with the power couple

*Editor's note: This story was updated after publication to reflect conflicting news reports that Jerry Falwell Jr had stepped down from Liberty University.*



POWER COUPLE: Liberty University President Jerry Falwell Jr and his wife, Becki Falwell, join U.S. Vice President Mike Pence and his wife, Karen Pence, in a prayer after the 2019 commencement ceremonies at Liberty. REUTERS/Jonathan Drake

**The Falwell Affair**
By Aram Roston
Photo editing: Stelios Varias
Video: Megan Revell
Design: Pete Hausler
Edited by Blake Morrison

f  t  in  ⊙  ✉  🖶

Follow Reuters Investigates   f  t

OTHER REUTERS INVESTIGATIONS



**Bitter legacy**

Ethiopian troops have driven back Tigrayan forces that had advanced on the capital. Reuters visited areas formerly held by the rebels and documented accounts of rapes and killings.



**T-DAY: The Battle for Taiwan**

The island dominates production of chips powering advanced civilian and military technologies. If conflict erupted, its fabrication plants would be in jeopardy.

LUADMINREC000403

1/24/22, 4:00 PM

Business partner of Falwells says he had affair with the power couple



### T-DAY: The Battle for Taiwan

Taiwanese President Tsai Ing-wen is wielding a mixture of soft and hard power as she seeks to fend off a more assertive China.



### Bloody Harvest

Fighting over farmland in Honduras has led to nearly 150 murders and disappearances. But few cases have been fully investigated, let alone solved.





## Planet **Depos**®

*We Make It Happen*™

# Transcript of Campus Community at Liberty University

**Date:** August 26, 2020
**Case:** Transcription Services

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

LUADMINREC000405