Transcript of Campus Community at Liberty University
Conducted on August 26, 2020                                    41

| | | | |
|---|---|---|---|
| shameful<br>26:11, 31:20,<br>32:3, 32:13<br>shameful-<br>32:12<br>shaping<br>12:10<br>share<br>21:21, 51:8,<br>60:20<br>sharper<br>20:12<br>shepherds<br>34:20<br>shine<br>72:21, 73:7<br>ship<br>53:9<br>short<br>58:1<br>should<br>28:5, 39:17,<br>53:22, 66:14<br>should've<br>6:11<br>shouldn't<br>28:12<br>shout<br>16:1, 16:2,<br>18:2<br>show<br>16:9, 16:10,<br>16:11, 16:18,<br>16:19, 16:20,<br>16:21, 16:22,<br>17:1, 17:15,<br>17:17, 19:14,<br>19:19, 19:21,<br>19:22, 20:1,<br>20:3, 34:3,<br>41:14, 41:19,<br>47:20, 54:4,<br>66:12<br>showing<br>49:18, 58:16<br>shown<br>19:4, 34:6,<br>38:3, 55:3, 55:4 | shows<br>40:18, 60:17<br>side<br>12:20, 27:2,<br>63:9<br>signature-8swms<br>74:11<br>signed<br>28:8<br>simple<br>36:9<br>simply<br>32:11, 44:16<br>sin<br>31:22, 32:9,<br>36:13, 40:14,<br>44:19, 45:3,<br>45:5, 45:19,<br>52:9, 54:12,<br>72:18<br>since<br>3:5, 27:2,<br>67:16, 69:16<br>sinful<br>9:5, 27:12<br>sing<br>9:3, 9:14,<br>9:18, 10:5,<br>10:10, 10:20,<br>10:21, 11:5,<br>11:8, 11:17,<br>11:21, 13:9,<br>13:19, 13:22,<br>14:5, 14:8,<br>15:1, 15:6,<br>15:8, 15:9,<br>15:11, 15:15,<br>15:19, 15:21,<br>17:16, 17:19,<br>18:4, 18:5,<br>19:15, 19:17,<br>19:22, 62:6<br>singer1<br>8:19, 9:15,<br>9:16, 10:2,<br>10:17, 10:18,<br>10:21, 10:22,<br>13:13, 15:12, | 15:19, 15:21,<br>16:3, 19:19<br>singer2<br>12:1, 61:5<br>singer3<br>62:19<br>singers<br>15:11, 15:18,<br>15:20<br>singing<br>14:18<br>single<br>36:8, 40:3,<br>55:18, 56:2,<br>56:3<br>sinless<br>59:11<br>sinner<br>59:14, 59:20<br>sinners<br>47:9, 59:12<br>sinning<br>44:18, 45:4,<br>45:6, 45:18<br>sins<br>7:20, 41:16,<br>41:17, 54:12,<br>56:9, 60:4<br>sister<br>8:2<br>sit<br>2:9, 47:12,<br>64:15<br>sits<br>51:22<br>sitting<br>3:8, 5:4, 5:12,<br>29:21, 52:19<br>situation<br>3:12<br>six<br>23:4, 54:21,<br>55:5<br>sky<br>9:10, 61:10,<br>61:20<br>slaughtered<br>14:14, 15:3 | slave<br>54:12<br>slip<br>6:9<br>slow<br>35:4<br>sneaks<br>43:16<br>soar<br>39:15<br>social<br>49:19, 50:14,<br>50:15, 51:3<br>socially<br>48:2, 66:4,<br>68:12, 68:19,<br>73:10<br>sold<br>65:12<br>solution<br>55:19<br>somber<br>64:17<br>some<br>4:7, 4:21,<br>6:22, 8:5, 8:6,<br>22:17, 25:4,<br>25:5, 25:7,<br>34:22, 35:12,<br>35:21, 40:22,<br>41:2, 41:3,<br>42:13, 48:11,<br>48:15, 55:8,<br>61:4, 67:5,<br>72:11<br>somebody<br>22:3, 41:1,<br>42:18, 50:19,<br>66:12, 69:7<br>someone<br>30:22, 32:7,<br>41:15, 41:16,<br>41:18, 43:19,<br>54:22, 58:14,<br>70:9<br>something<br>18:16, 18:21,<br>21:15, 22:15, |

LUADMINREC000446

Transcript of Campus Community at Liberty University
Conducted on August 26, 2020                                    42

31:1, 31:2,
31:3, 31:7,
33:15, 36:13,
54:3, 58:18,
70:8, 70:16,
70:20, 70:22,
71:9, 71:13
**sometimes**
35:2, 35:13,
35:18, 36:3,
44:3, 57:9,
57:20, 58:1,
58:15, 69:9,
71:9, 72:1
**son**
7:18, 14:3,
38:18, 38:20,
39:3, 47:18,
48:20, 54:13,
59:8, 63:2,
63:12, 64:6,
64:9
**song**
8:22, 10:8,
13:18, 15:1,
15:21, 72:12
**soon**
72:13
**sophomore**
6:1
**sorry**
27:20, 28:15,
33:21, 59:10
**soul**
49:14
**souls**
63:20
**sound**
21:4, 36:16,
61:14, 61:19,
62:2, 62:15
**sounding**
57:17
**sounds**
43:22
**sour**
42:22
**space**
18:14

**speak**
4:21, 58:13,
61:11, 61:12,
61:21, 61:22,
62:3, 62:4,
62:12, 62:15,
62:16, 62:17
**speaker**
20:10
**speaking**
27:14
**special**
5:3
**spend**
31:10, 33:7
**spent**
24:16, 24:18
**spirit**
13:1, 13:5,
38:19, 38:20,
40:12, 61:7,
63:3, 63:13,
64:1, 64:7, 64:9
**spirits**
14:15
**spiritual**
7:14, 29:2,
29:8, 30:5,
53:9, 70:10
**stadium**
3:4, 18:11,
19:10, 48:9,
57:4, 69:12
**staff**
23:10, 26:9,
29:10
**stakeholders**
22:1
**stand**
2:20, 3:9,
3:10, 3:16,
3:19, 4:12, 5:5,
5:6, 6:16, 8:20,
32:14, 61:2
**standard**
37:15, 37:21,
46:3
**standards**
37:19, 53:19,

57:8
**standing**
14:14
**stanley**
73:14
**start**
27:15, 32:11,
65:1
**started**
29:20
**state**
3:22, 4:4,
19:11
**statement**
68:7
**states**
4:3
**stay**
20:19, 30:11,
31:15, 32:11,
32:19, 32:20,
32:22, 73:10
**stays**
61:6
**step**
54:16
**steph**
1:22, 74:2,
74:14
**stepped**
52:15, 52:16
**stern**
27:11
**still**
13:18, 31:11,
33:2, 51:2,
65:16
**sting**
14:4
**stone**
13:17, 25:20,
63:17
**stood**
60:7, 63:19
**stop**
35:4, 45:4,
45:6, 47:2
**store**
8:12, 47:13

**stories**
46:16
**strong**
62:10
**strongholds**
62:5, 62:7
**struggle**
57:20, 58:16
**stuck**
31:11
**student**
6:20, 7:2,
23:20, 27:21,
28:1, 30:12,
69:10, 70:3
**students**
4:7, 4:10,
4:21, 8:5, 8:12,
24:1, 24:5,
24:7, 24:8,
25:5, 36:3,
69:18
**studies**
23:8
**study**
19:3, 23:21,
26:6, 44:8
**studying**
24:14, 34:6,
34:7
**stuff**
67:10, 71:21,
72:7
**stumble**
36:12
**style**
23:14
**submit**
60:2
**submitted**
73:2
**substitution**
60:6
**sudden**
52:22
**suffering**
63:8
**sufficient**
25:20

LUADMINREC000447

Transcript of Campus Community at Liberty University
Conducted on August 26, 2020                                    43

summer
24:15, 28:10,
29:9, 29:11,
31:13, 31:18
sun
12:10, 14:10
sundays
43:9
supporting
74:6
supposed
33:20, 53:4
sure
3:13, 21:16,
22:11, 33:3,
42:2, 65:21
surrender
16:10, 16:19,
16:22, 17:16,
19:20, 20:2
surrendered
11:7, 11:12
survey
49:4
sweet
43:1
sweethearts
6:1
swift
27:11
sword
20:12

**T**

t-shirt
28:10
take
5:21, 21:1,
36:22, 37:6,
43:6, 45:22,
47:4, 50:1,
51:14, 53:16,
60:10, 65:21,
67:12
taken
14:19
taking
37:8, 42:1,

66:8
talk
21:10, 25:13,
26:4, 71:13
talked
36:21, 53:15,
73:1
talking
6:7, 20:7,
38:22
tax
47:9
teacher
35:19
teaches
38:8
teaching
2:9
team
3:9, 8:9, 29:4,
30:2, 30:4,
30:16, 30:18,
30:19, 34:19,
65:14
team-
30:15
teammate
30:20
teammates
30:19
tears
13:16
tell
5:8, 24:16,
24:17, 25:1,
26:20, 31:6,
32:9, 32:18,
46:7, 46:16,
50:11, 54:11,
55:1, 58:14,
66:13, 68:2
telling
20:15, 55:11
telling-
29:20
tells
33:22, 49:10
temporary
51:10

tend
57:7, 58:1,
58:7, 72:1
tendency
66:7
tension
42:15, 42:16
texans
3:19, 3:20, 4:1
texas
3:22, 4:3, 4:4,
4:5
text
68:2, 68:5,
70:18
thank
3:1, 3:12,
6:18, 7:17,
7:18, 7:20, 8:8,
13:7, 13:8,
21:9, 34:13,
56:2, 56:4,
63:4, 63:10,
63:11, 64:13,
67:20, 69:22,
73:12
thanks
66:3
that-
4:10, 60:9
that's
35:8
the-
4:11, 13:20
thee
9:1, 9:4, 9:6
themselves
6:20, 7:2, 8:15
theologians
48:11, 48:15
theology
24:17, 34:7,
37:5
they-
31:3
they've
67:19
thing
6:6, 27:13,

41:22, 49:14,
50:9, 69:3
things
8:12, 21:10,
22:7, 22:17,
25:9, 26:20,
44:2, 51:4,
55:8, 64:20,
65:13, 66:16,
67:8
think
4:4, 5:19,
21:18, 24:4,
29:10, 35:2,
35:15, 35:16,
36:3, 36:4,
36:6, 36:7,
39:18, 42:2,
44:16, 45:21,
46:13, 46:19,
48:14, 48:16,
48:22, 50:1,
55:6, 57:5,
57:21, 58:8,
58:11, 58:16,
58:22, 65:6,
66:5, 67:13,
67:14
thinking
22:6, 25:14
third
4:3, 14:2
this-
3:12, 21:19,
27:17
thou
9:6
thought
6:9, 20:20,
22:18, 54:9,
70:12
thoughts
61:4, 64:16
thousand
65:6
three
3:18, 9:2,
9:12, 63:3,

LUADMINREC000448

Transcript of Campus Community at Liberty University
Conducted on August 26, 2020                                    44

| | | | |
|---|---|---|---|
| 63:13, 64:7, 64:9 | 71:17 | 37:2, 38:4, | **transfixed** |
| **thrilled** | **told** | 42:3, 44:5, | 14:11 |
| 24:10 | 25:8, 29:11, | 46:21, 48:1, | **transformed** |
| **throne** | 29:15, 38:6, | 48:6, 56:12, | 53:6, 53:7 |
| 14:12, 14:19, | 65:15, 68:2 | 56:18, 57:5, | **transpiring** |
| 16:6, 63:1 | **tolerance** | 57:11, 57:19, | 35:10 |
| **through** | 43:17, 43:22, | 58:4, 59:4, | **treat** |
| 10:11, 12:8, | 44:3 | 59:7, 60:19, | 3:20, 4:1 |
| 20:7, 20:13, | **tomb** | 60:20, 64:17, | **tree** |
| 21:6, 33:22, | 13:17, 60:11, | 66:4, 66:21, | 13:15 |
| 59:3 | 60:12 | 67:11, 67:22, | **trenches** |
| **thy** | **tombs** | 68:1, 72:2, | 70:12 |
| 9:5, 9:9, 9:10, | 63:19 | 72:14, 72:17, | **tribe** |
| 15:13, 15:16 | **tomorrow** | 73:1, 73:3 | 15:4 |
| **tickets** | 12:2 | **tons** | **tried-** |
| 65:9 | **ton** | 52:12 | 2:17 |
| **till** | 43:10, 43:11 | **took** | **trinity** |
| 62:20, 63:17 | **tone** | 2:19, 14:17, | 9:2, 9:12 |
| **time** | 66:15 | 65:13 | **true** |
| 2:11, 2:16, | **tone-deaf** | **top** | 26:22, 30:11, |
| 4:18, 4:20, 6:8, | 65:1 | 40:3 | 31:9, 47:7, 74:3 |
| 6:13, 20:9, | **tonight** | **tower** | **trued** |
| 22:12, 27:3, | 2:4, 2:8, 2:9, | 4:6, 62:10 | 2:17 |
| 28:22, 29:2, | 2:10, 3:2, 3:6, | **track** | **truly** |
| 30:10, 31:16, | 3:19, 4:8, 4:9, | 39:8, 39:9 | 47:18 |
| 33:14, 36:8, | 6:4, 6:9, 6:12, | **tracks** | **trust** |
| 70:20, 70:22, | 6:14, 6:16, | 39:6, 39:7, | 35:20, 71:1 |
| 71:8 | 6:22, 7:7, 7:8, | 39:8, 39:9 | **trusted** |
| **times** | 7:17, 8:5, 8:7, | **train** | 35:18, 35:19 |
| 43:11, 54:5, | 8:10, 8:13, | 7:12, 7:13, | **truth** |
| 55:5, 58:12 | 8:14, 8:18, | 39:7 | 20:16, 23:19, |
| **to-** | 8:20, 18:7, | **training** | 27:6, 32:9, |
| 5:14, 8:1 | 18:10, 18:11, | 34:16, 34:17 | 32:14, 34:7, |
| **today** | 19:3, 19:7, | **trampled** | 34:14, 36:19, |
| 4:6, 4:21, 6:7, | 19:14, 20:6, | 14:3, 14:4 | 37:8, 37:15, |
| 43:15 | 20:11, 20:15, | **transcribed** | 37:16, 37:17, |
| **together** | 20:17, 20:21, | 1:22, 74:5 | 37:21, 38:2, |
| 5:1, 7:8, 9:3, | 21:9, 21:11, | **transcriber** | 38:3, 39:5, |
| 17:4, 18:5, | 21:14, 21:18, | 74:1 | 39:19, 39:22, |
| 19:18, 20:9, | 21:22, 24:2, | **transcript** | 40:4, 40:6, |
| 31:10, 33:3, | 24:4, 24:6, | 74:3 | 40:11, 40:22, |
| 36:9, 37:18, | 25:4, 25:7, | **transfer** | 42:4, 42:7, |
| 39:5, 42:17, | 26:2, 26:4, | 69:6, 69:18, | 42:8, 42:10, |
| 47:1, 56:1, | 26:6, 26:9, | 70:3 | 42:14, 43:10, |
| 61:2, 65:18, | 27:4, 27:14, | **transferred** | 43:12, 43:19, |
| 65:22, 67:1, | 30:13, 30:18, | 69:8 | 43:20, 49:18, |
| 69:1, 69:11, | 30:22, 32:22, | **transfers** | 51:20, 52:7, |
| | 34:12, 36:22, | 33:1 | 53:13, 53:21, |

LUADMINREC000449

53:22, 54:8,
54:11, 54:12,
54:15, 55:2,
55:4, 55:12,
55:15, 55:17,
55:22, 56:15,
57:8, 57:12,
57:13, 58:2,
58:14, 59:2,
60:18, 64:1,
66:13, 71:14,
73:5
**truth's**
26:5
**try**
5:2, 41:19,
45:22
**trying**
5:13
**tsunami**
37:12
**tuesday**
42:12
**tuning**
18:12
**turns**
65:21
**twice**
65:11
**twitter**
72:6, 72:8
**two**
3:18, 4:2,
5:19, 5:20,
6:10, 21:10,
39:4, 39:8,
39:15, 65:20,
66:16
**two-edged**
20:12
**typically**
22:22

**U**

**ultimate**
49:13
**ultimately**
35:19

**unbelieving**
33:15
**uncompromised**
37:15, 37:21
**uncompromising**
37:17
**uncreated**
38:13
**under**
2:9, 48:5
**understand**
31:5, 44:11,
56:14
**understanding**
51:7, 59:18
**understood**
29:16, 45:22
**undeserving**
37:10
**undone**
16:16
**unfolding**
61:17
**unforgiving**
25:22, 58:12
**union**
3:22
**university**
1:3, 2:3, 6:17,
7:10, 8:11,
22:2, 29:14
**unknown**
15:11, 15:18,
15:20
**unless**
12:5, 12:12,
12:14, 13:10
**unmerited**
37:9, 37:13,
37:16, 37:20
**unpack**
21:14, 23:3,
37:1, 46:17
**unrelenting**
37:11
**unrepentant**
53:18
**unstoppable**
37:11

**until**
10:4
**upload**
67:22
**upper**
65:8, 68:11
**urgent**
71:1
**us-**
5:10
**use**
8:9, 23:14,
65:4, 66:15,
67:22, 71:2

**V**

**vacation**
29:21
**valid**
28:5, 28:6
**valley**
12:9
**verses**
25:18
**victorious**
7:21, 19:8
**victory**
13:19
**virgin**
62:22
**visible**
32:5
**vision**
33:2, 33:5
**vocational**
7:12
**voice**
10:11, 36:6,
56:13

**W**

**wait**
16:5, 24:19,
50:17, 65:4,
65:7, 68:19,
70:1
**waiting**
61:6, 62:19

**wake**
10:4, 70:20,
70:21
**walk**
12:8, 50:22,
51:1
**walking**
6:20
**want**
2:4, 5:3, 6:19,
6:20, 7:1, 7:9,
12:6, 12:13,
12:16, 13:11,
17:17, 17:18,
21:2, 21:10,
22:10, 25:16,
26:3, 26:7,
27:10, 27:11,
28:11, 30:17,
31:4, 31:7,
35:14, 35:15,
35:21, 36:22,
39:18, 41:10,
42:1, 42:12,
42:19, 42:20,
42:22, 43:1,
43:4, 43:5,
43:17, 43:21,
45:11, 46:2,
46:3, 46:4,
46:12, 47:7,
47:8, 48:7,
52:4, 52:10,
54:4, 54:6,
54:17, 55:1,
55:13, 55:14,
55:17, 57:11,
58:10, 59:1,
59:2, 59:4,
59:17, 60:20,
67:4, 67:8,
68:8, 70:6,
70:7, 70:13,
70:21, 70:22,
71:3, 71:12,
71:19
**wanted**
2:8, 21:15,

LUADMINREC000450

Transcript of Campus Community at Liberty University
Conducted on August 26, 2020

46

| | | | |
|---|---|---|---|
| 22:14, 33:11, 33:13, 69:16, 72:8, 73:15 | 73:10, 73:13 | 23:22, 65:18 | **willing** 32:14 |
| **wanting** 55:2 | **we'll** 5:1, 18:4, 19:3, 22:21, | **week** 23:10, 25:1, 34:16, 34:17, | **wind** 21:1, 61:13, 62:1, 62:13 |
| **wants** 2:13, 22:9, 46:10, 51:10, 58:5 | 23:4, 34:2, 37:1, 37:2, 37:3, 37:4, 50:20, 64:14, 71:5, 73:11 | 65:3, 66:20, 72:22, 73:11 | **wing** 39:12, 39:13, 39:14 |
| **warped** 45:19 | **we're** 3:2, 3:13, 4:2, | **week's** 67:2 | **wings** 39:11, 39:15 |
| **was–** 30:4 | 4:16, 4:17, 4:18, 4:19, | **weeks** 32:18, 34:17, 35:8, 64:19 | **winners** 3:11 |
| **watch** 67:15, 69:14 | 7:11, 7:13, 8:3, 16:16, 18:20, | **weep** 30:1 | **wish** 30:21 |
| **watching** 18:11, 21:19, 21:22, 30:13, | 20:7, 23:16, 27:18, 30:5, 32:13, 33:3, | **weeping** 30:10 | **without** 42:22, 43:2, 46:1, 62:20 |
| 30:22, 57:2 | 33:4, 38:1, 38:6, 38:22, | **weight** 18:8, 56:9 | **witness** 33:19 |
| **water** 50:10, 50:20 | 41:14, 50:14, 50:15, 51:1, | **welcome** 19:17, 22:11, | **woman** 51:21, 51:22 |
| **waters** 61:19 | 51:2, 53:10, 55:14, 61:2, | 60:22, 69:17, 69:20 | **women** 48:13, 72:16 |
| **waves** 61:13, 62:1, 62:13 | 64:19, 65:2, 65:16, 65:18, 65:19, 65:20, | **welcomed** 47:9, 47:12 | **wonder** 4:7, 16:10, 16:19, 16:22, |
| **way** 3:3, 5:4, 16:7, | 65:21, 66:1, 66:16, 68:20, | **went** 14:17 | 17:16, 19:20, 20:2, 61:16 |
| 17:3, 24:5, 28:12, 29:7, | 69:16, 69:19, 69:21, 69:22, | **wept** 30:3 | **wonderful** 7:11, 62:10 |
| 31:21, 32:7, 32:10, 35:13, | 72:13 | **were–** 5:10, 26:5 | **wondering** 22:8 |
| 36:2, 37:21, 39:11, 40:18, | **we've** 6:2, 21:3, | **weren't** 60:13, 67:21 | **word** 7:9, 20:11, |
| 40:19, 40:20, 41:11, 41:13, | 24:22, 34:16, 34:17, 34:21, | **whatever** 22:10, 41:19, 45:11, 71:13 | 21:9, 21:14, 23:4, 24:4, |
| 41:15, 42:9, 42:11, 44:4, | 36:8, 64:20, 65:17, 68:13 | **whether** 65:19 | 26:5, 34:2, 34:5, 35:20, |
| 44:15, 50:10, 50:18, 54:19, | **weakness** 12:10 | **whew** 16:16 | 35:22, 38:5, 38:7, 38:8, |
| 55:17, 57:6, 57:13, 58:8, | **wear** 46:10, 55:2 | **white** 14:9 | 38:9, 38:10, 38:15, 38:16, |
| 59:17, 60:7, 60:18, 65:1, | **wearing** 28:10 | **who've** 8:5 | 38:22, 39:1, 62:22 |
| 67:17, 68:10, 68:17, 68:22, | **wedding** 41:5 | **whole** 2:14, 37:4, | **word–** 21:8 |
| 71:14, 71:21, 72:3, 72:10, | **wednesday** 20:10, 23:1, | 40:22, 63:7, 65:8 | **words** 39:5, 52:7, |
| | | **wife** 2:14, 5:4, 26:9 | |

LUADMINREC000451

Transcript of Campus Community at Liberty University
Conducted on August 26, 2020

47

| | | | |
|---|---|---|---|
| 52:8 | wronged | 14 | 72:5 |
| work | 36:14 | 38:5 | 56 |
| 26:21, 26:22, | wrote | 183 | 6:2 |
| 29:13, 50:14, | 68:6 | 51:14 | **6** |
| 50:15, 51:3, | **Y** | 1870 | 6:1-3 |
| 53:9, 59:1, | y'all | 66:22 | 21:13 |
| 68:14 | 8:20, 63:15, | 1971 | **7** |
| worked | 72:11 | 22:3 | 7 |
| 28:7, 65:11, | yeah | 1979 | 1:5 |
| 65:12 | 3:22, 9:21, | 33:3 | 74 |
| works | 11:10, 11:14, | **2** | 1:21 |
| 9:10, 45:8 | 12:20, 13:7, | 20 | **8** |
| world | 63:2 | 36:22 | 8: |
| 7:19, 19:13, | year | 20,000 | 54:11 |
| 23:9, 32:15, | 3:11, 4:18, | 48:15 | **9** |
| 43:15, 50:19, | 6:2, 6:17, 22:4, | 2000 | 99 |
| 53:3, 53:5, | 28:22, 29:1 | 19:7 | 71:7 |
| 53:6, 53:7, | year-old | 2020 | **@** |
| 72:20 | 72:5 | 1:4 | @davidnasser |
| worship | years | 24 | 72:6 |
| 2:9, 6:12, | 6:2, 19:7, | 14:20 | |
| 8:18, 8:20, | 23:7, 29:8, | 24502 | |
| 23:2, 23:14, | 54:21, 54:22, | 68:3 | |
| 45:9, 53:10, | 55:6 | 25,000 | |
| 60:18, 61:3 | yesterday | 48:4 | |
| worthy | 25:10 | 26 | |
| 9:19, 9:21, | you- | 1:4 | |
| 9:22, 15:1 | 25:4, 27:19, | **3** | |
| wouldn't | 31:8, 71:13 | 338920 | |
| 6:14 | young | 1:20 | |
| wounds | 4:10, 46:19 | 36 | |
| 13:14 | yourself | 54:11 | |
| wow | 7:4, 19:1, | **4** | |
| 64:14 | 52:13, 52:14, | 4,000 | |
| wrap | 68:9 | 33:1, 69:5 | |
| 54:10 | **0** | 45 | |
| wrath | 00 | 1:5 | |
| 60:7 | 68:2, 70:21 | **5** | |
| write | **1** | 5,000 | |
| 37:8 | 1 | 48:1, 48:5, | |
| writing | 38:5, 53:4, | 48:7, 48:9, | |
| 22:17 | 70:21 | 48:12, 48:17, | |
| written | 10 | 48:18 | |
| 38:8 | 68:2 | 50 | |
| wrong | 12 | 39:17, 39:19, | |
| 27:9, 28:2, | 53:4 | | |
| 42:16, 55:21, | | | |
| 55:22 | | | |

LUADMINREC000452

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

|  |  |
|---|---|
| LIBERTY UNIVERSITY, INC., | |
| *Plaintiff/Counterclaim Defendant*, | Case No. CL21000354-00 |
| v. | |
| JERRY L. FALWELL, JR., | JURY TRIAL DEMANDED |
| *Defendant/Counterclaim Plaintiff*. | |

### LIBERTY UNIVERSITY, INC.'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO STRIKE DEFENDANT'S PLEA IN BAR

Plaintiff Liberty University, Inc. ("Liberty"), by counsel, states as follows in support of its Motion to Strike Defendant Jerry Falwell Jr.'s ("Falwell Jr.") Plea in Bar.  For the reasons below and those explained in Liberty's initial memorandum, Falwell Jr.'s Plea in Bar is legally deficient and must be stricken with prejudice.

### INTRODUCTION

Nothing Falwell Jr. raises in his Opposition brief ("Opposition") to Liberty's Motion to Strike Falwell's Plea in Bar changes the fact that the Plea in Bar is legally deficient.  As a matter of pleading, Falwell Jr.'s Plea in Bar fails to assert a single, specific issue as required by law.  *See Tomlin v. McKenzie*, 251 Va. 478, 480 (1996) ("The defensive plea in bar shortens the litigation by reducing it to a *distinct issue of fact* which, if proven, creates a bar to the plaintiff's right of recovery.") (emphasis added).  Although Falwell Jr. himself admits that a plea in bar must raise a "single issue," (Opposition p. 2), his Plea in Bar nevertheless asserts at least *two* distinct issues: 1) whether Falwell Jr. disclosed the "Granda Allegations" to an unnamed member of Liberty's Board of Trustees; and 2) whether damaging actions alleged in Liberty's Complaint were the result of

1

alcohol impairment or rather medical issues triggered by a pulmonary embolism.  (Plea in Bar ¶¶ 5-8.)

That the Plea in Bar raises multiple issues makes it procedurally improper and legally deficient.  Additionally, both of the issues Falwell Jr. raises are merely threshold issues that would not resolve Liberty's breach of fiduciary duty claim, nor "shorten[] the litigation" by "creat[ing] a bar to [Liberty's] right of recovery."  *Tomlin*, 251 Va. at 480.  Accordingly, the Court should grant Liberty's Motion and strike Falwell Jr.'s Plea in Bar with prejudice.

## ARGUMENT

I.     **The First Issue Falwell Jr. Raises is Inappropriate for Resolution on a Plea in Bar.**

In his Plea in Bar, Falwell Jr. argues that "at least one member of the [Liberty] Board, knew about Granda's extortion attempts, the actions leading to Granda's attempts, and Falwell's actions relating to the Granda Allegations."  (Plea in Bar ¶ 5.)  However, nowhere in the Plea in Bar itself or in his Opposition does Falwell Jr. explain how this fact, if proved, is dispositive of Liberty's breach of fiduciary duty claim.

In the First Amended Complaint ("FAC"), Liberty pled that Falwell Jr. breached the fiduciary duties he owed Liberty in *multiple* ways: he "refused to disclose to Liberty the Granda Allegations and Granda's extortive threats while the Liberty President was negotiating for and entering into a 2019 Employment Agreement;" he "breached his fiduciary duties to Liberty by accepting a severance payment from Liberty in 2020;" he "procured Liberty's outside counsel to advise him with respect to his personal causes of action, including those against Liberty, in derogation of [his] duty;" and he "failed to timely disclose and address the issue of his personal impairment by alcohol, which impairment led Falwell Jr. to actions and courses of conduct detrimental to the spiritual mission of Liberty."  (FAC ¶¶ 137-141.)  As such, even if Falwell Jr.

2

were able to prove that he told one Board member about the "Granda Allegations," resolution of this issue would not "narrow the litigation by resolving an issue that will determine whether [Liberty] may proceed to trial on" its breach of fiduciary duty claim. *Randel v. FCA US, LLC*, 2020 WL 10315454, at \*4 (Va. Cir. Ct. 2020).

Additionally, the issue Falwell Jr. raises—whether one unnamed Board member was aware of the "Granda Allegations"—is itself merely a threshold issue. To resolve this issue would require the resolution of several other issues, including proof of Liberty's governance structure to determine whether private disclosures to a member of the Board can constitute sufficient notice to the appropriate governing body under the circumstances. Falwell Jr. fails to explain how one Board member's alleged knowledge of the "Granda Allegations" could, as a matter of law, resolve the issue of whether Liberty's Executive Committee knew of this issue, and whether such knowledge invalidated Executive Committee action as a matter of Liberty Board governance. Relevant to these inquiries is also the necessary temporal analysis of when the unnamed Board member allegedly became aware of the "Granda Allegations." Accordingly, resolution of these factually complex issues would be a far cry from the comparatively simple statute of limitations analysis typical for a plea in bar. *See, e.g.*, *Nelms v. Nelms*, 236 Va. 281 (1988); *Sparks v. Lucas*, 2018 WL 6794665 (Va. Cir. Ct. 2018).

In his Opposition, Falwell Jr. claims, in a footnote, that "the barred action can be boiled down to Liberty waiving its ability to bring a breach of fiduciary duty claim because of the knowledge held by at least one member of the Board." (Opposition p. 3 n.3.) Falwell Jr., however, offers no authority whatsoever to support this proposition.[1] As such, Falwell Jr. is relying on his

---

[1] Additionally, throughout his Opposition, Falwell Jr. fails to distinguish the case law cited by Liberty in its Opening Brief. Instead, Falwell Jr. relies largely on *Smith v. McLaughlin*, 289 Va. 241 (2015), an inapposite case involving legal malpractice.

3

ability to prove a fact with no legal significance.  And, because it is merely a threshold issue, resolution of this issue alone would not even, as Falwell Jr. suggests, create "a partial bar to Liberty's breach of fiduciary duty claim," much less a complete bar.  (Opposition p. 5.)

Finally, Falwell Jr. fails to counter Liberty's argument that his Plea in Bar impermissibly attacks Liberty's ability to prove its breach of fiduciary duty claim.  It is well-established that "a defendant may not use a plea in bar as a plea of the general issue of the case, or more specifically, to attack the plaintiff's ability to prove a certain part of his case." *Ratcliffe v. Fogus*, 2010 WL 7372577, at *1 (Va. Cir. Ct. 2010).  In *Ratcliffe*, a defendant brought a plea in bar to attack the plaintiff's claim of malicious prosecution. *Id.*  Specifically, the defendant argued that she had probable cause for the criminal complaint that she filed against the plaintiff. *Id.*  The court, however, relied on precedent from the Virginia Supreme Court, reasoning that a plea in bar must "not address the merits of the issues" raised by the complaint. *Id.* (quoting *Nelms v. Nelms*, 236 Va. 281, 289 (1988)).[2]  The defendant's plea in bar directly attacked the merits of the plaintiff's claim because "[l]ack of probable cause is an element of malicious prosecution that Plaintiff must prove at trial." *Id.*  Since a plea in bar cannot "attack the plaintiff's ability to prove a certain part of his case," the court overruled the plea in bar. *Id.*

Here, just like the defendant's plea in bar in *Ratcliffe*, Falwell Jr.'s Plea in Bar impermissibly attacks Liberty's ability to prove its breach of fiduciary duty claim.  Specifically, by arguing that he disclosed the "Granda Allegations" to one member of the Liberty Board, Falwell Jr. is arguing that he did not breach his fiduciary duties or is excused from breach.  However, just as lack of probable cause was an element of the malicious prosecution claim in *Ratcliffe*, breach is

---

[2] The *Ratcliffe* court also noted that "[f]amiliar illustrations of the use of a plea [in bar] would be: [t]he statute of limitations; absence of proper parties (where this does not appear from the bill itself); *res judicata*; usury; a release; an award; infancy; bankruptcy; denial of partnership; *bona fide* purchaser; denial of an essential jurisdictional fact alleged in the bill, etc." *Ratcliffe*, 2010 WL 7372577, at *1 (quoting *Nelms*, 236 Va. at 289).

4

an element of Liberty's fiduciary duty claim. *See Plumbers and Steamfitters Union Local No. 10 v. Waters*, 451 F. Supp. 3d 543, 550 (E.D. Va. 2020).  As Liberty must prove the element of breach at trial, Falwell Jr.'s Plea in Bar is improper because it attacks the general merits of Liberty's breach of fiduciary duty claim.  *See Fee v. Ellison*, 2015 WL 10521465, at *2 (Va. Cir. Ct. 2015) (denying plea in bar that "would improperly adjudicate an element of Plaintiffs' case before trial").

## II.   The Second Issue Falwell Jr. Raises is Inappropriate for Resolution on a Plea in Bar.

Although a plea in bar must assert "a single issue of fact," Falwell Jr.'s Plea in Bar improperly raises a second issue: whether damaging actions alleged in Liberty's Complaint were the result of alcohol impairment (Liberty's position) or rather medical issues triggered by a pulmonary embolism (Falwell Jr.'s position).  *HCP Properties-Fair Oaks of Fairfax VA, LLC v. County of Fairfax*, 2019 WL 8883742, at *5 (Va. Cir. Ct. 2019); (Plea in Bar ¶ 8.)  Perhaps in recognition of his error, Falwell Jr. tries to bury this second issue by omitting it entirely from his Opposition.  Nevertheless, the inclusion of multiple issues alone makes Falwell Jr.'s Plea in Bar procedurally improper.  *See Post Apartment Homes, L.P. v. RTKL Assoc., Inc.*, 2003 WL 22533493, at *2 (Va. Cir. Ct. 2003) (denying plea in bar because there was "no 'single issue' that [could] be resolved through a plea in bar").

Furthermore, this issue is also inappropriate for resolution on a plea in bar.  As Liberty explained in its Opening Brief, this issue is one of complex medical causation.  Resolution of the issue could occur only after extensive discovery and dueling expert testimony.  *Cf. Velazquez v. Commonwealth*, 263 Va. 95, 104 (2002).  Additionally, just like the first issue Falwell Jr. raises, this issue is also a mere threshold issue.  To resolve whether the actions alleged by Liberty were the result of alcohol impairment or a pulmonary embolism, the Court would have to consider first at what point Falwell Jr. even alleges his "actions" were caused by a pulmonary embolism.  (Plea

5

in Bar ¶ 8.)  It is unclear, for example, whether Falwell Jr. alleges his actions were medically impaired at the time he called into a local Lynchburg radio station after the controversy surrounding an Instagram photo, or not until later at the time of his botched resignation.  (*See* FAC ¶¶ 82-111.)  As such, Falwell Jr. cannot use his Plea in Bar to improperly accelerate complex, multi-faceted inquiries of the type that must be resolved by a jury at trial.

Accordingly, for the reasons explained above, Falwell Jr.'s Plea in Bar is legally deficient. The Court should grant Liberty's Motion and strike the Plea in Bar with prejudice.

## CONCLUSION

WHEREFORE, Plaintiff and Counterclaim Defendant Liberty University, Inc., by counsel, respectfully requests that the Court grant its Motion to Strike Defendant's Plea in Bar; strike the Plea in Bar with prejudice; and order such relief as the Court deems necessary.

Dated: January 24, 2022

Respectfully submitted,

LIBERTY UNIVERSITY

Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

LUADMINREC000458

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was sent via electronic mail and U.S. mail to Vernon E. Inge Jr. and Robert N. Drewry at Whiteford Taylor & Preston, this 24th day of January, 2022.

Scott C. Oostdyk

7

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.

*Plaintiff/Counterclaim Defendant,*

v.

JERRY L. FALWELL, JR.,

*Defendant/Counterclaim Plaintiff.*

Case No. CL21000354-00

## <u>ORDER</u>

THIS MATTER comes before the Court on Liberty University, Inc.'s ("Liberty") Demurrer to Jerry L. Falwell, Jr.'s ("Falwell Jr.") Counterclaim. The Court hereby ORDERS as follows:

1.      By agreement of the parties, Liberty's Demurrer is SUSTAINED.

2.      Falwell Jr. shall have 60 days from the entry of this Order to amend Counts 1 and 2 of his counterclaim should he choose to assert causes of action that are materially distinct from those asserted in the original Counterclaim. For purposes of paragraph 2 of this Order, materially distinct shall include, but not be limited to, additional allegations providing further support for Falwell Jr.'s causes of action set forth in Count 1 and 2 or to address pleading defects asserted by Liberty.

3.      Further, by stipulation of the parties, and in an effort to resolve the outstanding issues surrounding the return of Falwell Jr.'s property, Falwell Jr. shall have 60 days from the entry

1

of this Order to either replead or amend the remaining causes of action asserted in the Original Counterclaim if Falwell Jr. has not been reunited with his property by that time.

4.      Liberty shall have 21 days from the filing of any amended counterclaim to file responsive pleadings.

5.      Liberty expressly reserves the right to assert all dispositive objections and defenses to any amended Counterclaim.

The Clerk shall send a teste copy of this Order to all counsel of record.

ENTERED this __18th__ day of February, 2022

_____

JUDGE J. FREDERICK WATSON

CIRCUIT COURT FOR THE CITY OF LYNCHBURG

2

**WE ASK FOR THIS:**

Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

*Counsel for Liberty University, Inc.*

Vernon E. Inge, Jr. (VSB # 32699)
Robert N. Drewry (VSB # 91282)
Whiteford, Taylor & Preston, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, VA 23219
(804) 977-3301 / (804) 977-3304
(804) 977-3298 / (804) 762-6865 (facsimile)
vinge@wtplaw.com
rdrewry@wtplaw.com

*Counsel for Jerry L. Falwell, Jr.*

A Copy, Teste:
Todd Swisher, **Clerk**
By: _____ **Deputy Clerk**

cc: parties

3

# TWENTY-FOURTH JUDICIAL CIRCUIT
## OF VIRGINIA

J. FREDERICK WATSON, JUDGE
900 COURT STREET
P.O. BOX 4
LYNCHBURG, VA 24505
(434) 455-2600
(434) 847-1350 (FAX)



F. PATRICK YEATTS, JUDGE
900 COURT STREET
P.O. BOX 4
LYNCHBURG, VA 24505
(434) 455-2600
(434) 847-1350 (FAX)

COMMONWEALTH OF VIRGINIA
CITY OF LYNCHBURG AND COUNTIES OF
AMHERST, BEDFORD, CAMPBELL AND NELSON

March 1, 2022

Scott C. Oostdyk, Esq.
Andrew F. Gann, Jr., Esq.
McGuire Woods LLP
800 East Canal Street
Richmond, VA 23219

Vernon E. Inge, Jr., Esq.
Robert N. Drewry, Esq.
Whiteford, Taylor & Preston LLP
Two James Center
1021 East Cary Street, Ste. 1700
Richmond, Virginia 23219

R. Craig Wood, Esq.
McGuire Woods LLP
652 Peter Jefferson Parkway, Ste. 350
P.O. Box 1288
Charlottesville, VA 22911

Re:   <u>Liberty University, Inc. v. Jerry L. Falwell Jr.</u>
      Case No. CL21000354-00

Dear Counsel:

This matter is before the Court on Liberty University's motion to strike Jerry L.
Falwell, Jr.'s plea in bar. A hearing on the motion was held on February 18, 2022, after
which the Court took the matter under advisement. Having reviewed and considered the
pleadings, briefs, and arguments of counsel, and for the reasons stated below, the Court
grants Liberty's motion and strikes Falwell's plea in bar.

I.

In its First Amended Complaint, Liberty University, Inc. ("Liberty") alleges, among
other things, that Jerry L. Falwell, Jr. ("Falwell"), in his capacity as Liberty's president,
chancellor, and member of its Board of Trustees, breached his fiduciary duty to Liberty.
Liberty asserts that Falwell's fiduciary duty required him to "provide material information
to the Board, refrain from acts harmful to the interests of Liberty, avoid conflicts of
interest, and reject opportunities to benefit his personal interests to the detriment of
Liberty." First Am. Compl. ¶ 136.

Among its various theories as to how Falwell breached his fiduciary duty, Liberty
alleges that Falwell failed to disclose to Liberty's Board of Trustees, prior to the 2019

Liberty University, Inc. v. Jerry L. Falwell Jr.
March 1, 2022
Page 2

Employment Contract negotiations, certain allegations and extortive threats allegedly made by an individual named Giancarlo Granda ("Granda"), and that Falwell failed to disclose or address his alleged excessive alcohol use.

In response to the Amended Complaint, Falwell filed, among other responsive pleadings, a plea in bar, which Liberty now moves to strike.

## II.

A plea in bar "is a pleading which alleges a single state of facts or circumstances (usually not disclosed or disclosed only in part by the record) which, if proven, constitutes an absolute defense to the claim." Nelms v. Nelms, 236 Va. 281, 289, 374 S.E.2d 4 (1988). A plea in bar, while often presenting a complete bar to the plaintiff's recovery, may constitute "either a complete defense to the complaint, or to that part of the complaint to which it is pleaded." Smith v. McLaughlin, 289 Va. 241, 252, 769 S.E.2d 7, 13 (2015) (citing Campbell v. Johnson, 203 Va. 43, 47, 122 S.E.2d 907, 910 (1961)).

Generally, a plea in bar does not address the merits of the issues raised by a complaint. Nelms, 236 Va. at 282, 374 S.E.2d at 9 ("[a]s distinguished from an answer or grounds of defense, [a plea in bar] does not address the merits of the issues raised by the bill of complaint or the motion for judgment"). Indeed, in most instances, a plea in bar addresses dispositive issues separate and apart from the merits of a case. See, e.g., Hawthorne v. VanMarter, 279 Va. 566, 692 S.E.2d 226 (2010) (discussing, in part, a plea in bar related to sovereign immunity). "It is not the office of the special plea in bar to pluck one essential ingredient from the plaintiff's case and cause it to be adjudicated – with a jury, if requested – prior to trial." Joyce v. Center for Brief Counselling, Inc., 29 Va. Cir. 209 (Spotsylvania Co. Cir. 1992). Issues commonly addressed by pleas in bar include, among others, the statute of limitations, res judicata, infancy, the statute of repose, sovereign immunity, and statutory immunity.

A plea and bar, however, may address the merits of a complaint when there are no disputed facts relevant to the plea and it presents a pure question of law. See McLaughlin, 289 Va. at 252, 769 S.E.2d at 12.

## III.

Liberty argues that Falwell's plea in bar should be struck because it raises multiple triable issues rather than a single dispositive issue. Falwell's plea in bar does indeed allege two sets of facts: (1) that he disclosed the Granda allegations and extortion threats to one or more members of Liberty's Board of Directors, which constituted disclosure to the full Board of Trustees; and (2) that a medical condition -- pulmonary emboli -- caused behaviors that may have been misconstrued as alcohol intoxication. However, each set of facts addresses different theories offered by Liberty in its breach of fiduciary duty claim. To the extent that each issue of fact, if resolved in Falwell's favor, would prevent Liberty from

<u>Liberty University, Inc. v. Jerry L. Falwell Jr.</u>
March 1, 2022
Page 3

pursuing certain theories of Falwell's alleged breach, the plea in bar seeks a partial bar to two of Liberty's theories of recovery, which is permitted under Virginia law. <u>See</u> <u>McLaughlin</u>, 289 Va. at 252, 769 S.E.2d at 13.

Liberty next argues that Falwell's plea in bar should be struck because it merely attacks Liberty's ability to prove one of the elements of its breach of fiduciary duty claim. The elements for a breach of fiduciary claim are duty, breach, causation, and damages. <u>See</u> <u>Carstensen v. Chrisland Corp.</u>, 247 Va. 433, 444 (1994); <u>see</u> <u>generally</u> Kent Sinclair, Sinclair on Virginia Remedies § 8-7[A]-[B], at 8-40 to -41 (5th ed. 2016).

Ruling on Falwell's plea in bar would require the Court to consider the merits of Liberty's claim prior to trial. Falwell's plea specifically challenges the merits of Liberty's allegation that Falwell breached his fiduciary duty to Liberty by failing to disclose to the Board of Trustees, prior to the 2019 Employment Contract negotiations, certain allegations and extortive threats allegedly made by Granda, and by failing to disclose or address his alleged excessive alcohol use. In other words, Falwell attempts to pluck one essential ingredient from two of Liberty's theories of the case and cause them to be adjudicated prior to trial. This would be permitted if resolution of these issues involved undisputed facts and presented pure questions of law, which, of course, they do not.

IV.

Because Falwell's plea in bar challenges disputed facts that go to the merits of Liberty's complaint, the Court grants Liberty's motion to strike Falwell's plea in bar. Falwell is granted leave to file an amended plea in bar, which, if he chooses to do so, shall be filed within twenty-one days after entry of the Order reflecting the Court's ruling. I ask Mr. Ooostdyk to prepare the Order and circulate it for counsels' endorsements.

Very truly yours,

J. Frederick Watson, Judge

cc:   Hon. K. Todd Swisher, Clerk

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.

           Plaintiff,

v.

JERRY L. FALWELL, JR.,

           Defendant.

Case No. CL21000354-00

JURY TRIAL DEMANDED

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiff Liberty University, Inc. ("Liberty" or the "University"), by counsel, states as follows for its claims against Defendant Jerry L. Falwell, Jr. ("Falwell Jr.").

### <u>INTRODUCTION</u>

1.     Liberty is one of the largest Christian academic communities in America, annually training over 100,000 online students, and educating more than 15,000 students on its 700-acre campus located at 1971 University Boulevard, Lynchburg, VA.

2.     Until he quit the office August 25, 2020, Falwell Jr., who resides in Goode, VA, was the President and Chancellor of Liberty, a role that he had held since succeeding Liberty's founder, and his father, Dr. Jerry L. Falwell Sr. ("Dr. Falwell").

3.     Liberty asserts this suit for several purposes, including (a) to recover University property that remains in the possession of Falwell Jr. post-resignation, (b) to redress breaches of various fiduciary duties that Falwell Jr. owed to Liberty while serving as the University's President

1

and Chancellor, and (c) to recover damages for violations by Falwell Jr. of Virginia's business conspiracy statute.

4.      Many of the facts supporting Liberty's latter two claims are helpfully spelled out in two writings: (a) a media statement that Falwell Jr. released to the *Washington Examiner* in August 2020, and (b) a lawsuit that Falwell Jr. lodged against Liberty in October 2020, two months after his abrupt resignation from Liberty's presidency.

5.      In the August 23, 2020 media statement Falwell Jr. tendered "exclusively" to the *Washington Examiner*, Falwell Jr. presented a 1,200-word narrative that divulged the saga of a "former family friend" who had an affair with Becki Falwell, the wife of Falwell Jr., and "was threatening to expose it" (the "Statement").

6.      In the Statement, attached hereto as Exhibit 1, and in his interview with the *Washington Examiner*, Falwell Jr. took pains to emphasize that he was divulging the extortive behavior for the first time outside his family.  He stated he and Becki had been "suffering in silence" over it.  He confessed he had wrongly been "bearing those burdens on [his] own."  The *Washington Examiner* confirmed Falwell Jr. was "reveal[ing] his wife Becki's affair for the first time."  The reporter noted Falwell Jr. "appeared to be relieved to have finally divulged the affair and the years-long series of attacks the couple has faced."

7.       On October 28, 2020, Falwell Jr. filed in this Court a two-count, 117-paragraph Complaint against Liberty (the "Complaint.")  In his Complaint, a copy attached hereto as Exhibit 2, Falwell again admits what he disclosed in the Statement – that Becki began an affair with a family friend in March 2012.  Falwell identified the former friend as Giancarlo Granda of Miami ("Granda.") Complaint ¶41. When Becki and Falwell Jr. first met Granda, he was a 20-year old working at the high-end resort hotel at which the Falwells stayed while on one of their frequent

LUADMINREC000467

family vacations in Miami. Complaint ¶40.  Falwell Jr. admits that Becki – a mother of three adult children – had an on-and-off again sexual affair with Granda that purportedly lasted until 2014. Complaint ¶¶40, 41.

8.      Falwell admits that he knew of Becki's affair, Complaint ¶42, and also concedes he had not disclosed the affair to anyone material.

9.      In the Complaint, Falwell Jr. instead pled that when Becki broke off intimate relations with Granda in 2012, the young man refused to retire from the relationship.  Granda threatened to use the surreptitious sexual intimacy, and surrounding conduct, to "embarrass the Falwells *and Liberty University*."  Complaint ¶43 (emphasis added). Falwell Jr. and Granda both knew that matters of infidelity, immodesty, and acceptance of a loose lifestyle would stand in stark contrast to the conduct expected of leaders at Liberty.  Granda had amassed considerable leverage over the Falwells, and, accordingly, they worked to keep Granda pacified and quiet.

10.     In the Statement, Falwell Jr. contends that he and Becki were "doing our best to respectfully unravel this 'fatal attraction.'" Accordingly, the Falwells "extended the spirit of fondness to [Granda] with respect and kindness, both for spiritual and religious reasons, and in the hope that we could help him find his way and allow us to put this behind us, without any harm or embarrassment to our family or to the LU community…."  In the Complaint, Falwell Jr. summarized this appeasement as cultivating a "positive relationship" with Granda.  Complaint ¶42.

11.     By filing of the lawsuit against Liberty on October 28, 2020, Falwell Jr. – an attorney and active member of the Virginia State Bar – endorsed the accuracy of the statements made in the Complaint.  Since the time this suit was docketed with this Court by counsel, Falwell Jr. has referred to that Complaint on several occasions in the press without retraction or correction.

LUADMINREC000468

Although he voluntarily dismissed the defamation suit against Liberty in December 2020, Falwell Jr. did so without rescinding or rejecting the factual allegations he made in the Complaint.

12.     Similarly, by issuing the remarks in August 2020, and by providing a phone interview to the *Washington Examiner* about their contents, Falwell Jr. endorsed the facts in the Statement.  He has since then neither contradicted nor corrected any of the factual allegations in the Statement.

### The Liberty Way

13.     The unique concept for Liberty's brand of Christian higher education arose out of the personal vision of Dr. Falwell. Dr. Falwell's unwavering agenda was for Liberty to be a university anchored in the principles of the "Liberty Way," the University's term for a way of life centered on rigorous educational instruction delivered by faculty and administrators who were intentionally committed to a written statement of faith and to Biblical standards of morality.

14.     In 1967, Dr. Falwell first began laying the foundation for Liberty's eventual success, building in Lynchburg a holistic Christian educational system for evangelical youth by establishing Lynchburg Christian Academy, an accredited Christian day school for grades K-12. In 1971, Dr. Falwell reached higher, founding Liberty, an accredited Christian university for evangelical students.  In 1985, Dr. Falwell announced his eventual goal of having 50,000 students attend Liberty.  Today, as noted, Liberty trains more than double that number.

15.     In addition to leading Liberty, Dr. Falwell was also an important public figure in the political spectrum, serving among other things as head of the Moral Majority – a political action group that promoted biblical standards of living as a community value, and forged a coalition of voters active on the "Religious Right."  The Moral Majority – and Dr. Falwell – helped sweep Ronald Reagan to the U.S. presidency in 1980.

LUADMINREC000469

16.     At Liberty, Christian discipleship and academic instruction were integral to a cohesive educational package, and Liberty's policy documents incorporated this commitment. One of the principles that fueled Liberty's growth – and stability – was the Biblical notion of inter-accountability among the Christians who make up the Liberty community.  Liberty's core conduct documents espouse this fundamental belief, pronouncing, as a closely-held religious value, the ability of those following the commonly-held faith to press other Christians toward adherence to Biblical mandates in the event of perceived lapse.

17.     The Liberty Articles of Incorporation, first put in place under Dr. Falwell's leadership, plainly state this principle: "[Education] occurs most effectively when both instructor and student are properly related to God and each other through Christ."  The Faculty Handbook repeats this quote at paragraph 42.

18.     The Liberty University honor code – the *Liberty Way* – puts the practice of inter-accountability in these terms:

> Every student is expected to respect Liberty's Statement of Doctrine and Purpose and should avoid any activity, on or off campus, which would contradict the university's mission or purpose, compromise the testimony or reputation of the university, or disrupt Liberty's Christian learning environment. All members of the Liberty University community are asked to affirm the following: ***"We have a responsibility to uphold the moral and ethical standards of Liberty University and personally confront those who do not."***

(Emphasis in original.)

19.     The following statement from the Liberty University Employee Handbook, under the heading "Philosophy of Education," reflects well these guiding principles, which are taken from the institution's Articles of Incorporation:

> Liberty University is a Christian academic community in the tradition of evangelical institutions of higher education. As such, Liberty continues the

5

LUADMINREC000470

philosophy of education which first gave rise to the university and which is summarized in the following propositions:

- God, the infinite source of all things, has shown us the truth through the Scripture, nature, history, and above all, Christ.

- Persons are spiritual, rational, moral, social, and physical, created in the image of God. They are, therefore, able to know and value themselves and other persons, the universe, and God.

- Education, as the process of teaching and learning, involves the whole person, by developing the knowledge, values, and skills which enable each individual to change freely. Thus it occurs most effectively when both instructor and student are properly related to God and each other through Christ.

20.     It was Dr. Falwell's vision for the President of Liberty to be a standout spiritual leader for the college.  Under the Bylaws put in place to govern Liberty, it was Dr. Falwell's personal responsibility as President, and later as Chancellor and President simultaneously, to be at the same time Liberty's administrative leader and spiritual exemplar.  During his tenure, Dr. Falwell achieved distinction in both roles in service to the Liberty community.

21.     This tradition of dual duty continues at Liberty. The Amended and Restated Bylaws, adopted by Liberty's Board of Trustees on April 5, 2019, preserves Dr. Falwell's conception of the President's role.  It states, "[The President] provides spiritual and worldview leadership to the University in pursuit of excellence."  Falwell Jr. was among the Board members who voted to adopt these Restated Bylaws, and he later assented in his 2019 Employment Agreement to perform those duties.

22.     Finally, fearing spiritual erosion from the top, it was Dr. Falwell's vision that Liberty would always be subject to the authority of the local church in matters of doctrine and spiritual discipline.  Liberty's Board of Trustees was and is obligated to espouse Biblical principles.  After all, it was the Trustees that fashioned "Board policy" for Liberty.  *See* Bylaws, Article II, Section 4.

6

23.     Guided by the standards of Dr. Falwell and the Liberty Way, the university grew exponentially until Dr. Falwell's untimely death in 2007.  From that point onward, Dr. Falwell's chosen successors, sons Falwell Jr. and Jonathan Falwell ("Jonathan"), assumed aspects of their father's leadership roles.  Jerry Jr. served as Liberty's President, Chancellor, and member of its Board of Trustees.  Jonathan also served as a Liberty Board of Trustee member, as a Vice Chancellor for Spiritual Affairs, and also as Chairman of the Spiritual Mission Committee of the Liberty Board.  Jonathan was further installed as the Head Pastor of Thomas Road Baptist Church, an institution designated to have an important oversight function with respect to Liberty.  He has since acceded to the role of campus pastor at Liberty.

24.     In the Statement, Falwell Jr. indicated he had accepted fully his portion of the mantle of leadership at Liberty.  He stated his "priority was to build on my father's vision and to work hard" doing so in the course of "serv[ing] Christ and community."

25.     One of Falwell Jr.'s attempts to "build on his father's vision" was to bring another generation of Falwell men into the leadership at Liberty.  Effective January 1, 2016, Falwell Jr. extended to his firstborn son Trey Falwell a key employee services agreement ("Trey's Contract"). It designated Trey to function as "Administrative Assistant to the President" for a term ending July 1, 2030 – a span of nearly fifteen years. Trey's Contract elevated his Liberty salary from $65,000 to $88,000 to start, and he was provided a special car allowance that pushed his total initial compensation to $95,200, before accounting for retirement benefits. Trey's Contract came with a mandatory pay increase of 5% per year.

26.     In 2017, Trey was promoted and given the title of "Vice President of University Services." By July 1, 2017, Trey's salary was raised to $195.000, plus the car allowance – which raised his total compensation to $202,200, again before accounting for retirement benefits.  In this

LUADMINREC000472

new and advanced role, Trey technically reported to either the Chief Operating Officer or Chief Financial Officer, but for all practical purposes he reported to his father, the President and Chancellor of Liberty.  Under the new agreement, Trey was an at-will employee of Liberty.

27.     As a new Vice President and group leader, Trey often accompanied his father into meetings of the Executive Committee of the Liberty Board of Directors ("Executive Committee"). Trey joined these inner circle meetings on at least May 24, 2018, September 12, 2018, and April 4 and 5, 2019.  The latter two of these sessions were in part meetings involving the negotiation of Falwell Jr.'s 2019 employment agreement.

28.     During Falwell Jr.'s tenure, Liberty capitalized on the explosive growth of online education, providing students worldwide with a quality experience of academic and biblical education remotely. Liberty also used the proceeds of on-line education to expand its beautiful campus, and build a sizeable endowment.

### The Granda Allegations

29.     Granda became enmeshed with the Falwells quickly after they met in Miami, in part because of the familial treatment the Falwells accorded him early in the relationship.  In addition to the intimate attention from Becki, Granda received invitations to Falwell family trips and gatherings, and a heady dose of access to important American business leaders.

30.     In 2012, for example. Falwell arranged for Granda to come from Miami to Lynchburg to be introduced to Donald Trump, as the future president made a stop at Liberty to tour campus.  In a keepsake photo capturing the occasion, Granda (right) posed with the future

LUADMINREC000473

leader of the free world while Becki (far left) and Falwell Jr. (center) looked on.



31.    By participating in close family contact with the Falwells, and by enjoying important associations within the Falwell's Liberty network, Granda came to understand how vulnerable the Falwells had made themselves by permitting his affair with Becki.  Granda became closely exposed to Liberty's high moral standards, which overtly clashed with Liberty's first couple's discordant sexual conduct and provided Granda with a tactical opening.

32.    According to Falwell Jr., Granda began to undertake menacing actions toward the Falwells during this period.  For example, Granda allegedly sold his friends "intimate" pictures of Becki that he had somehow acquired.  Complaint  ¶45.  (Falwell Jr. does not say in his Complaint how Granda came into possession of those pictures.)  Falwell Jr. alleges that *Granda's associates* used these covert pictures to "try to extort" the Falwells.  *Id.*

33.    On information and belief, Falwell Jr. was able to quell this particular controversy over the racy photos.  According to news reports, Falwell Jr. allegedly enlisted high-level Washington legal assistance, and the picture problem seemed to have gone away.

LUADMINREC000474

34.     The experience with the racy photos no doubt suggested to Granda that Falwell Jr. could be leveraged, and taught the young man that with persistence, a price might be paid by the Falwells to avoid embarrassment.

35.     According to Falwell Jr., Granda's other aggressive action early on was to record his phone calls and FaceTime communications with Becki, for the purpose of enhancing "extortion attempts" against the Falwells.  Complaint ¶46.  The Complaint does not disclose the content of these calls, but implies the subject matter implicated the Falwells in some embarrassing or prejudicial way – otherwise Falwell Jr. would not contend that the recordings were intended to "strengthen [Granda's] extortion attempts." *Id.*  Reuters has released the contents of one such FaceTime call.   https://mobile.twitter.com/Reuters/status/1297941806970220545

36.     By late 2014, Granda was prepared to push further his scheme to press the Falwells. According to Falwell Jr.'s account, Granda approached Falwell Jr. for a payoff in exchange for staying silent about the Granda Allegations. Complaint ¶47.  Granda allegedly demanded hush money ranging from $600,000 to $2 million.  *Id.*   Falwell Jr. did not inform Liberty's Board of Trustees of this extortive conduct.

37.     The Falwells openly concede that Granda's behavior was targeted toward damaging not only the Falwells but also "Liberty University."  Complaint ¶¶43, 54, 62.  To Granda, threatening Falwell Jr.'s role at Liberty – particularly given Liberty's religious mission and detailed behavioral codes – was the center of his plot.  Complaint ¶¶43, 54.  It was Falwell Jr.'s prominent role at Liberty that fueled the Chancellor and President's vulnerability. *Id.*

38.     On information and belief, Granda had access to plenty of material that could have been deeply damaging to Falwell Jr. in the eyes of the evangelical community.

10

39.     The Falwells' dealings with Granda also involved a significant financial investment in 2013 in property located in an underdeveloped part of Miami, which directly benefited Granda. The new company formed to buy the property was substantially financed by Falwell Jr., who loaned the venture $1.8 million.  Ownership of the enterprise was given to Becki, Trey, and Granda.  Once the development company was formed, it continued to house a liquor store despite being a location frequented by college-aged students staying in the on-site hostel, and despite Liberty's general discouragement of the use of alcohol.

40.     When the Miami business dealings between Granda, Falwell Jr., and Trey resulted in litigation, questions began to swirl about Falwell Jr.'s business ethics and other issues arising from the transactions.  On information and belief, Granda was in position to expound on many such concerns, to the detriment of Falwell Jr., and thus, vicariously, to the detriment of Liberty.

41.     Most damaging, Falwell Jr. knew that Granda would be able to provide detail about the fact of the affair with Becki, its duration, Falwell Jr.'s role in abetting it, the attendant circumstances of the affair, and the specific activities in which Granda, Falwell Jr., and Becki engaged during and after the affair ("the Granda Allegations").

42.     There is little doubt that Granda maintains a cache of material harmful to the Falwells.  At times since August 2020, media outlets have reported they were shown compromising documents, photographs, texts, and videos by Granda – material Granda shared with the media to bolster his credibility.  Granda has implied in the media that he has more such information within his possession.

43.     Since 2014, Falwell Jr. had every reason to fear what Granda might do with the Granda Allegations and supporting material.  In his Complaint, in fact, Falwell Jr. emphasizes that

11

at various times from 2014 to 2019 Granda was not only acting opportunistically toward the Falwells, but even proceeding illegally.  See Complaint ¶¶44, 45, 46, 47.

44.    Falwell Jr. also took great pains to assert Granda's overall volatility during this dark time.  From Falwell Jr.'s own observation, Granda was demonstrating behavior that was "deeply disturbed," "unstable," "unbalanced," "erratic," "manipulative," "self destructive," "crazy," and "verbally abusive."  Complaint ¶¶42, 44, 48, 49.

45.    Falwell Jr. further accumulated some third-party assessments of Granda's state of mind.  In his Complaint, Falwell Jr. indicates that he was advised by some in Granda's close circle that the young man was "racist," "legitimately scary," and someone with "unresolved psychological issues," who was given to "rages," and capable of tearing up his parents' house.  Complaint ¶¶49, 50.

46.    Clearly, given Granda's perceived plan to "destroy [the Falwells'] lives," and Granda's decaying stability, Falwell Jr. came to believe that something drastic and protective had to be done.   After all, Falwell Jr. was the Chancellor, President, and a Trustee of Liberty, one of the country's premier evangelical universities.

## Falwell Jr.'s "Granda Plan"

47.    Instead of divulging to Liberty's Board of Trustee's Granda's active attempts at extortion, Falwell Jr. instead led a scheme to cover up the illicit conduct.  As alleged in the Complaint, Falwell worked diligently to coopt Granda into total confidentiality about the most perilous details of the young man's relationship with the Falwells, and to suppress the damaging Granda Allegations.

48.    The Falwells knew they shared a unity of interests with Granda.  They had an important goal in common: silence about the Falwells' salacious acts. The Falwell needed silence

LUADMINREC000477

from Granda in order to safeguard their personal reputation, Jerry Jr.'s professional standing, and his employment with America's leading evangelical university.

49.     Granda needed the Falwells to remain silent, too; Granda could not afford to let his "dirt" on the Falwells leak.  If the media reported the bad facts that Granda had stored up about Falwell Jr. and Becki before Falwell Jr. paid hush money to Granda, then all leverage was lost.  Granda's scheme for a pay day from Falwell Jr would be valueless.  Clearly Granda wanted to pressure Falwell Jr., but only so as to secure payment in exchange for Granda's promise to hush the controversy.

50.     Faced with Granda's mounting extortive pressure, the Falwells had a decision to make: either they had to go public and expose Granda to Liberty, the authorities, and/or the media, or Falwell Jr. had to pay Granda off, and convince Granda to remain quiet forever.  Despite his clear duties as an executive and officer at Liberty, Falwell Jr. chose personal protection.  He committed himself to non-disclosure, and actively developed an approach to muzzle Granda.

51.     To effectuate Granda's silence, Falwell Jr. and Becki accelerated efforts to build Granda's friendship in the hopes that the young man would mature, would accept Becki's rejection, and would move forward in a way that would result in everyone involved being able to live a productive life.

52.     The Falwells drew Granda ever closer into their family life, effectuating a "Granda Plan."  They attempted to make Granda loyal to their family in order to curb Granda's bent toward the destruction of Falwell Jr., and his role at Liberty.

53.     For six years – from 2014 to 2020 – the Granda Plan worked. Although they described Granda as a "deeply disturbed and unstable individual," Complaint ¶42, the Falwells managed to cultivate a "positive relationship" with him.  Complaint ¶44.  It is evident that the

13

Falwells' aim was to "placate" Granda, and in large part they succeeded for a long time.  *Id*. According to the Statement, they "manage[d] [Granda's] increasingly erratic behavior…."

54.     The following were among the acts of appeasement that the Falwells used over the years to maintain Granda's cooperative silence:

a.      The Falwells hosted Granda socially at their Virginia farm, pairing him with their son Trey on an ATV outing around their sprawling country property;

b.      Granda joined the Falwells in the Florida Keys.  During this trip, Falwell Jr. posed with Granda paternalistically – arm around him, drink in hand:



c.      Posing outside the Liberty jet, the Falwells took pictures with Granda and former Miami business partner Gordon Bello.



d.      The Falwells also brought Granda along for other family excursions, pairing him with Trey.  For example, on September 6, 2018, the Falwells arranged

14

for then-Congressman Bob Goodlatte to host them on a tour of the U.S

Capitol.   Granda joined with Jerry, Becki, Trey, and Trey's wife Sarah.

Granda once again appeared in the family photos – one set on a rooftop vista

atop the Capitol, and another of the group gathered in front of the Thomas

Jefferson statute.



(Granda is third from the left, in the rear.)



(Granda is second from the left.)

15

e.     Finally, the Falwells befriended some of Granda's girlfriends.   These proactive relationships helped the Falwells amass useful information about Granda, permitting them to understand his tendencies and manage Granda with more awareness.  Complaint ¶¶ 48-50.

55.     As 2019 began, Falwell Jr. had shrewdly controlled Granda for nearly five years. In that span, Granda had not disclosed externally the sensitive information about the Falwells. Given what Falwell Jr. had observed of Granda's troubled character, and of the voracious appetite of the media for negative news about Liberty, Falwell Jr. had no reason to believe the détente he had built with Granda at Liberty's expense would much longer hold.

56.     Falwell Jr.'s employment contract at Liberty was set to expire June 30, 2019, and Falwell Jr. knew the negotiation of a new agreement was the optimal time to profit personally from Liberty's considerable growth in finances and enrollment that occurred during his tenure. Falwell Jr. took space in his Complaint to proudly display that financial legacy.  The time for Falwell Jr. to cash in on Liberty's prodigious success had arrived.

**Outside Pressures on the Falwell Presidency**

57.     While he had overseen a one billion dollar building campaign on Liberty's campus, and had set in place a plan to create a sizeable endowment, Falwell Jr. had also launched a substantial campaign to attract notable public and private figures to Liberty's campus. Through this process, Falwell Jr. was augmenting the school's growing reputation as a forum for the discussion of important public issues.  But Falwell Jr.'s success was also attracting national attention, and his outspoken personal support for major public figures was engendering opponents that harshly criticized and targeted him personally.

LUADMINREC000481

58.     In 2016, Falwell Jr. surprised the evangelical world by endorsing Donald Trump for the presidency. This move was particularly delicate because Senator Ted Cruz, a leading Trump competitor in the primaries, had used an earlier appearance at Liberty to give his first speech after announcing a presidential candidacy of his own.

59.     According to his lengthy Facebook post of January 27, 2016, Falwell Jr. became convinced that Trump was the optimal choice for President due to his business acumen and conservative social principles. Falwell Jr. thought Trump could get things done, even if it meant disrupting entrenched special interests. Trump was an outsider, distanced from the usual suspects who were toiling away in the engine room of Washington politics.

60.     The problem for Falwell Jr. was that Trump – a thrice-married man – was hardly a natural cultural hero for evangelicals.  Falwell Jr. took steps to redress this challenge.  Falwell Jr. committed to work with his peer evangelicals to help make Trump's checkered past something Christian leaders could accept and overlook.

61.     To address this agenda, Falwell Jr. endeavored to sidestep defending Trump's character and instead advance a theological argument to persuade Christian leaders and voters to forgive Trump rather than judge him.  Like Jesus, Falwell Jr. exhorted his evangelical colleagues to examine the sin in their own lives and then reconsider their criticism of candidate Trump accordingly.

62.     Falwell Jr. took to major social media platforms and news outlets to advocate this apologetic stance. The following are a few examples of that message:

    a.     In the aforementioned Facebook post of 2016, Falwell Jr. wrote that no Christian voter has standing to dismiss Trump's spiritual fitness because "all of us are sinners and only Jesus was perfect."  Embracing evangelical

17

doctrine, Falwell Jr. pointed to a "sinner" class – and then included within it Trump, himself, and every potential evangelical critic and voter.

b.   In the same Facebook post, Falwell Jr. advised the evangelical community to refrain from picking the best Christians as Presidential candidates – because no one but God could ever really know their heart. Falwell Jr. argued that Christians do not get to play God because "we are all sinners."

c.   On January 25, 2018, Falwell Jr. returned to this theme during a CNN interview conducted by anchor Erin Burnett. Falwell Jr. repeated the justification that Trump deserved to be a political leader embraced by Christians because "we're equally bad, we are all sinners; we all need Christ's forgiveness. That's why evangelicals are so quick to forgive."

https://www.cnn.com/videos/politics/2018/01/25/jerry-falwell-jr-trump-forgiveness-ebof-sot.cnn

d.   Later in 2018, Falwell Jr. once again appeared on CNN, and he again advanced this theme, stating "we are all sinners; nobody understands that better than evangelicals. That's why we're Christians because we all know we need forgiveness."

https://www.cnn.com/videos/us/2020/08/24/jerry-falwell-jr-public-controversies-athena-jones-pkg-ebof-vpx.cnn

63.   As 2019 approached, Falwell Jr. openly conceded that he was worrying about what had become the omnipresent "threat that [Granda] posed." Complaint ¶44.  In fact, the stress of managing Granda and avoiding discovery was wearing Falwell down.  At any moment, Falwell Jr. knew Granda could destroy Falwell's reputation as a Christian leader and reduce to rubble his

LUADMINREC000483

value to Liberty as a business asset.  Falwell Jr. would then be in the well-known category of leaders requiring substantial forgiveness.  Falwell Jr. was wracked with "constant anxiety." *Id*.  He desperately needed to cut Granda off completely, a course fraught with substantial risk.  Because Falwell Jr. wanted more financial protection to weather the fallout if he could no longer manage Granda, Falwell Jr. began to fashion a well-resourced exit strategy.

64.     To confront the Granda Allegations with more than the shaky barrier of the Granda Plan, Falwell Jr. fashioned a deceitful scheme to manipulate the Executive Committee of Liberty.  In the course of the employment contract negotiations, Falwell Jr. planned to accentuate to the Executive Committee the new leagues into which Falwell Jr. had brought Liberty, and that some of the actions he undertook in that league, such as the rough-and-tumble of Presidential politics, might damage Falwell Jr.'s utility to the non-profit Liberty.  There could come a time when the school might need to separate from Falwell Jr. for non-material actions.  Falwell Jr. planned to use his growing awareness of personal attack which he had encountered in honorable service raising Liberty's profile in his attempt to relax the severance policies in the President's existing contract.  Falwell wanted to create a new contract that permitted Liberty the option to part with Falwell amicably while making it palatable financially for Falwell to accept that protective action.  In 2019, Falwell Jr. acted on this undertaking.

<u>The 2019 Falwell Jr. Employment Agreement</u>

65.     On or about July 6, 2012, Falwell Jr. had entered into a Presidential employment agreement with Liberty (the "2012 Employment Agreement").  This deal, which became effective April 1, 2012, provided for a seven-year compensation schedule that rewarded Falwell Jr. with annual raises.  It also provided, in Section 9, that if Falwell resigned he would receive *one year* of compensation as severance.

LUADMINREC000484

66.     The 2012 Employment Agreement expired on June 30, 2019. In Section 3.1 of the 2012 Employment Agreement, the parties agreed that "[t]he University is not obligated to offer Falwell employment for any period beyond the expiration date of this Agreement."

67.     By the time Falwell Jr. and Liberty had to announce a new agreement, Falwell Jr. knew he was under active threat of extortion from Granda. Falwell Jr. also knew that Liberty's Executive Committee did not know that fact.  Although he was President and Chancellor, and had the highest level of obligation to be candid and truthful with Liberty's board, Falwell Jr. did not inform the Executive Committee about Granda's extortive threats during the 2019 contract negotiations, or give the Liberty board any reason to understand the serious reputational damage to Liberty that Granda's threats represented.

68.     True to his previous plan, Falwell Jr. did not reveal to the Executive Committee the danger that Granda represented to Liberty. Instead, Falwell Jr. sought from the Executive Committee to provide him with a safety valve to protect him from such actions as having raised his profile in 2016 by being the first major evangelical leader to personally endorse Donald Trump for President.  Falwell Jr. claimed that he wanted an escape hatch for political and personal fallout.

69.     After negotiation, the Executive Committee agreed to a new services deal (the 2019 Employment Agreement). Falwell Jr. succeeded in sweetening the new deal in at least the following material ways: first, he negotiated a significant annual raise to $1,250,000 a year, which became his "permanent" pay all the way through 2030; second, in Section 8 and Section 9 of the 2019 Employment Agreement, Falwell Jr. arranged for a severance of *two years' pay,* or $2,500,000 if he resigned for "Good Reason," or if Liberty terminated his employment without "Cause."  Third, he obtained a catch-up "rabbi trust" plan for retirement benefits that would cover his entire career of service at Liberty but had not been part of any previous employment agreement.

LUADMINREC000485

70.     Falwell Jr. wanted Liberty to pay severance and retirement benefits to him if Granda revealed the Granda Allegations, and Falwell Jr. thus knowingly withheld from Liberty material information that would have altered the nature of the negotiations of the 2019 Employment Agreement.  Falwell Jr. said nothing of his belief that procuring Granda's silence might in time require a higher price unless Granda was confronted and completely managed.  To be sure, Falwell Jr. knew that family photos taken in nice places would not contain Granda forever.

### Falwell's Auspicious Acts of August of 2020

71.     The pressure of Granda's threats was increasingly getting to Falwell Jr.  With his new 2019 contract in hand, and with Liberty none the wiser about Granda's extortive behavior, Falwell Jr. had an opportunity to take a firmer stand against his blackmailer.

72.     Emboldened by the financial security that he had negotiated for himself, Falwell Jr. struck out at Granda, unleashing the obvious prospect of damaging retaliation by Granda. Falwell Jr. states in his Complaint that on June 30, 2019, he told Granda in electronic communication that Falwell Jr. would provide no payday and the extortion attempts would have to end.  Complaint ¶¶55, 56.

73.     To manage his stress, Falwell Jr. began drinking significantly.  There were concerns that he smelled of alcohol during work interactions, but to the outside world, Falwell Jr. remained mostly within the baselines of his obligations. That ended in August 2020.

74.     The Falwell family took some floating vacations on yachts provided by business partners of Liberty.  One such excursion took place during late July 2020.  During that span, the Falwells held a costume party centered around the characters of the Canadian mockumentary the *Trailer Park Boys*. https://www.swearnet.com/shows/trailer-park-boys.  Promotional copy for the show bills the series as exploits by "three lovable career criminals as they rob liquor stores, fence

stolen goods and dream of pulling off one last, big score." Overall, the tone and content of the show is vulgar.

75.    The most crafty of the three prime characters is ex-convict Julian, whose trademark look is a black goatee, black T-shirt, pair of black jeans, and an omnipresent glass of rum and Coke in his hand.  Julian runs illegal businesses.  A sidekick, Trinity, is a redheaded woman who becomes pregnant in one episode and, due to a hapless mix-up, later delivers a baby bearing on his birth certificate the moniker "The Motel."  The little boy became nicknamed "Mo."

76.    Falwell Jr.'s entire immediate family was part of this event with attendees dressing as *Trailer Park Boys* characters of their respective choosing.  Falwell Jr. also invited his personal assistant, Sam Stone, and Stone's wife, Kathleen, who was a Liberty employee, to come on the trip.  During this event, Falwell, Jr. outfitted himself in a costume to emulate the character Julian, Falwell Jr.'s beard blackened in part for the occasion. Kathleen Stone, who was pregnant at the time, dressed up correspondingly as "Trinity," mother of the character Mo, which meant she donned a pair of Daisy-Duke cutoff jeans, unbuttoning them to accommodate her real-life pregnancy.  Falwell, Jr., as "Julian," similarly unbuttoned his jeans – in apparent solidarity with "Trinity's" actual condition.  "Julian" toted his obligatory tumbler of black liquid in his left hand.

77.    Over Kathleen and Sam Stone's objections, Becki Falwell took a picture of "Julian" and "Trinity" posing in character, pants both unbuttoned.  Falwell Jr. promised not to show this photo to others.

78.    On August 3rd, Falwell Jr. – breaking his promise to the Stones – shared this image with his entire Instagram following.  The picture went viral and became an immediate internet sensation.  It was paired soon thereafter with a video of the Falwells' *Trailer Park Boys* party that

22

LUADMINREC000487

also went viral on the internet.  https://pulpitandpen.org/2020/08/04/bizzare-jerry-falwell-jr-yacht-pictures-were-from-trailer-park-boys-themed-party/.

79.     Following is Falwell Jr.'s Instagram post, and one commentator's reaction.



80.     Media reaction to the Falwells' exploit was swift, and harsh. Critical articles soon appeared in numerous high-profile media outlets, including the *Washington Post*, *Huffington* Post, and *Politico*, and from commentators on CNN and the View.

LUADMINREC000488

81.     One online commentator performed an analysis to attempt to gauge the punishment that a Liberty student might endure for posing in this photo, based on the code of conduct in the *Liberty Way*. The analyst concluded there were 63 counts of potential violation, which would conceivably net a student up to $9,000 in collective financial fines, with a further punishment possible of up to 900 hours of community service.

82.     Realizing that he had made a serious mistake – Falwell Jr. deleted the Instagram post shortly after its August 3rd release. But Falwell Jr. soon made a compounding blunder. Rather than engage Liberty's public relations group to assist with the fallout, Falwell Jr. instead took to the airwaves attempting his own clean up. He called in to a local Lynchburg radio station on August 5, 2020 and offered a slurred explanation of the unzipped pants photo, dismissing it as "good fun" and drawling that he had apologized to his family and promised going forward he would be a "good boy." https://pulpitandpen.org/2020/08/07/liberty-pres-jerry-falwell-jr-justifies-scandalous-yacht-pictures-whatever-whatever-it-was-all-in-good-fun/.

83.     Commentators on social media questioned Falwell's sobriety during the radio show call-in. While he addressed the world about this unseemly subject through radio access, Falwell Jr. issued no August 5th apology to the Board at Liberty regarding the incident, nor did he issue a promise to Liberty of improved behavior going forward.

84.     At this low juncture for Falwell Jr., his wife Becki stepped in. After the radio show incident, she contacted three members of the Liberty Executive Committee to alert them to what she described as her husband's excessive use of alcohol. She expressed concern that drinking was adversely overtaking Falwell Jr.'s thinking and actions. She believed he needed to go away for treatment, and that it was time to take that course. Becki's heartfelt appeal made an impact on

LUADMINREC000489

Liberty's leaders and helped provide a context for understanding Falwell's questionable public comments, worrying behavior, and inappropriate social media posts.

85.     On August 7, 2020, the Executive Committee conferred with Falwell Jr, and he concurred it was best that he take time off to heal physically and spiritually.  In the meeting, Falwell Jr. conceded that he had fallen short of Presidential standards and he took full responsibility for his actions.  He committed to a sabbatical to treat and refresh, which the Executive Committee was inclined to support.

86.     Importantly, Falwell Jr. indicated in the August 7th meeting that he had considered providing deeper detail about personal matters that might have driven him to lodge the offending vacation posts, but he concluded he did not think it was necessary. This comment did not strike the Executive Committee as particularly compelling at the time, although it would become pivotal as events unfolded.

87.     On a more superficial level, Falwell Jr. did muse in the meeting that he might have become bored during the slowdown caused by COVID-19.  Falwell conceded he had been doing silly things that he should not have let distract him.  The prospect of a cure to a pattern of antics heartened Liberty's Board leaders.

88.     The August 7th meeting ended with the Executive Committee's expression of love for Falwell Jr. and the members' commitment to pray for him. It was agreed that Liberty would place Falwell Jr. on a leave of absence during which it would pay for Falwell Jr.'s rehab. The Executive Committee further agreed to recommend this course of action to the full Board for ratification, and determined that it would release a brief statement followed by a more expansive one.  The Executive Committee lastly decided that President Falwell Jr. *would not* issue a statement of his own.

LUADMINREC000490

89.      True to plan, Liberty briefly announced Falwell Jr.'s leave of absence immediately, and circumspectly.  Once that message was out, communication professionals worked on a longer statement from the Chairman of the Board of Trustees.  The Executive Committee then proceeded toward resolving a treatment plan for Falwell Jr., leaving latitude for him to define details within the parameters of the previously-understood course.

90.      As the days wore on, however, it was obvious Falwell Jr. was forming a vastly different conception about the leave of absence than Liberty had outlined.  By August 17, 2020, Falwell Jr. was suggesting more superficial approaches, while Liberty continued to insist on residential treatment acceptable to the Executive Committee.

91.      If there was a breaking point in Falwell Jr.'s relationship with the Executive Committee, it was arriving at the appropriate type of treatment that had been in discussion since Becki had called for it.  Falwell Jr.'s change of heart, and the lapse into denial that it reflected, deeply worried the Executive Committee.

92.      On August 24, 2020, Falwell Jr. arced yet another bombshell into the Executive Committee's path.  On that day, the Executive Committee learned from counsel that the day before, on August 23, 2020, Falwell Jr. had submitted the Statement to the *Washington Examiner,* his attempt to pre-empt a tell-all feature that Granda himself had been preparing to publish with *Reuters.* This revelation was coupled with a suggestion to Liberty by Falwell Jr. and his attorneys that the Liberty President could just tender his resignation under the contract as a viable resolution to the swirl of controversy that would inevitably ensue on the heels of the disclosure of the dueling versions of the long-concealed extra-marital affair and attempt at extortion.

93.       Falwell Jr.'s employment contract forbade him from publishing without the Liberty Executive Committee's prior assent to the copy. The Executive Committee had expressly

LUADMINREC000491

forbidden a post about Falwell's sabbatical.  Regardless, with the briefest of advance notice to Liberty, Falwell Jr. self-issued the Statement, a 1200-word statement that the *Washington Examiner* published verbatim, bracketed by some reporting and analysis by the publication, and Falwell' Jr.'s own commentary.  In the Statement, Falwell Jr.'s "confession," Falwell Jr. advised the *Washington Examiner* about matters he never revealed to the Liberty Executive Committee.

94.      In the Statement, Falwell Jr. acknowledged it was wrong of him to have suppressed the information about Granda's extortion from his Board and the wider Liberty family.   He admitted that "the Liberty community deserved to hear" the salacious story directly.  He concluded that "the only way to stop [Granda's] predatory behavior [was] to go public."  He conceded that "I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from mental health professionals…."  Falwell Jr. ended his admission with an appeal for the community to extend to the Falwells their "forgiveness."

95.      Through these media communications, Falwell Jr. offered detail to Liberty that the Executive Committee never had at the time of the 2019 Employment Agreement, namely the sordid backstory behind his August 2020 blow-up with Granda, and the demise of the Granda Plan that was prompted by Falwell's alleged final rejection of Granda's demands on June 30, 2020.

96.      By choosing to release the Statement to the public before fully vetting the Granda Allegations to Liberty, Falwell Jr. deprived  Liberty of the ability to handle this matter as a purely internal Liberty employment affair.

97.      At the time of his soul-searching August 23 disclosure to the *Washington Examiner*, Falwell Jr. knew that his new Employment Agreement was signed. He also knew that he had negotiated a severance and retirement package that credited him with more base pay, twice the

27

severance, a funded retirement plan, and a right, perhaps, to collect all of that *even if Liberty fired him*.

98.     On August 24, 2020, Granda unveiled his side of the sordid story, in the form of an explosive *Reuters* article.   https://www.reuters.com/investigates/special-report/usa-falwell-relationship/. Video and audio recordings supporting some key details of Granda's story were posted online.

99.     Granda struck out at Falwell Jr. while the Liberty President was being pilloried in the media.  Granda's retaliation took full advantage of Falwell Jr.'s self-inflicted wounds over the "unzipped pants" picture. Granda unveiled all the embarrassing details that Falwell Jr. had worked with Granda since 2014 to suppress. Granda and *Reuters* spun an account of predatory action by the Falwells against a boy the age of a Liberty student.

100.    Out of the *Reuters* piece came Granda's version of the longstanding affair between Becki and Granda, and a cover-up process led by Falwell Jr.  These were issues about which Falwell Jr. had actively kept Liberty in the dark, as Falwell Jr. had confessed for the very first time the day earlier to a third party, in his unauthorized *Washington Examiner* submission. The media coverage from other outlets mostly used Falwell Jr.'s own statement from the *Washington Examiner* to bolster Granda's credibility.

101.    After consultation, the Executive Committee authorized negotiations to take Falwell Jr. up on his offer to resign.  After considering delay, the Executive Committee and the Board advised Falwell Jr. that he should resign at once or face the prospect that the Executive Committee would recommend his termination to the full Board.

102.    The Executive Committee's decision was driven by a number of factors: the litany of compromising decisions entered into by Falwell Jr., Becki's revelation about the alcohol abuse

28

that was fueling this erratic string of events, Falwell Jr.'s denial of an alcohol problem. Falwell Jr.'s resistance to commit to treatment deemed appropriate by the Executive Committee, Falwell's now-admitted concealment and misrepresentation of the Granda Allegations, and Falwell Jr.'s unwillingness to take seriously the grave threat that his aggregate actions posed to Liberty.

103.     On August 25, 2020, Falwell Jr. finally conceded that complete resignation was in his best interest.  He did so, however, after changing his mind about resignation and trying to negotiate for more in separation from Liberty than his contract afforded him.

104.     While Falwell, Jr. agreed to step aside, it was with shallow appreciation for the far-ranging damage he had caused. In unauthorized commentary to the media, Falwell stated: "The board put me on leave for showing my belly in a picture and my contract doesn't allow that…I'm 58 years old, and I think there's something else in the cards for me. And so the board was gracious in accepting my resignation ... and it's time to move on." https://wset.com/news/local/we-have-the-strongest-relationship-becki-speaks-out-on-affair-denies-jerry-watched.

### Falwell Migrates From Forgiveness-Seeker to Fighter

105.     Falwell Jr.'s resignation from the Presidency did not unfold as contemplated. The Executive Committee became growingly concerned that Falwell Jr. was honoring neither his commitment to leave nor his contract. On information and belief, and according to news reports, Falwell Jr. – a practicing Virginia lawyer – had conferred improperly about his employment situation with counsel that Liberty had retained on other cases in which Falwell Jr. had been a fiduciary of the Board, and witness. https://www.reuters.com/article/us-usa-falwell-relationship-exclusive/exclusive-business-partner-of-falwells-says-he-had-long-affair-with-evangelical-power-couple-idUSKBN25K1ZO.  The subject matter of the interaction with *Liberty's* chosen

LUADMINREC000494

counsel was Falwell Jr.'s personal employment rights *against Liberty*.  As Falwell Jr. knows, Virginia ethics laws do not permit such consultation.

106.     Falwell Jr. soon retained appropriate, non-conflicted counsel. Falwell Jr. began pushing back against the terms of his resignation.  Falwell Jr. improperly and errantly announced to the media a $10.5 million expectation for his severance. The agreement Falwell Jr. negotiated specified $2,500,000 – two years' pay, at the President's newly-negotiated and expanded rate.

107.     Liberty was unsure if Falwell Jr.'s representation to the media was just puffery and bragging or some attempt to set up a claim for additional compensation above and beyond what appeared in Falwell Jr.'s contract as stated pay for resignation.

108.     On August 28, 2020, the Executive Committee agreed to satisfy Falwell Jr.'s demand for a "Good Reason"- resignation, together with its severance payout.   Falwell Jr. was thus able to take advantage of the escape hatch that he had negotiated into the 2019 Employment Agreement, his insurance policy against the simmering Granda Allegations that he told the *Washington Examiner* was "predatory behavior," and a "'fatal attraction' type situation."

### Falwell Jr.'s Hard Fall

109.     A 911 call on August 31, 2020 brought police to the Falwells farm on Becki's report that Falwell Jr. had locked himself in, and had stumbled down stairs, experiencing injuries. Police and medics attended.  Falwell Jr. was reported to present with abrasions and slurred speech. Media obtained the 911 call and subsequent reports. First responders spotted alcoholic beverage containers about the premises.  While Falwell Jr. advised the *Washington Examiner* on August 23rd that he was in the "early stages of addressing" issues of mental health, the process appeared not have proceeded very far.

LUADMINREC000495

110.    Though momentarily humbled by news media's extensive examination of and criticism about his private failings, Falwell Jr. had re-emerged willing again to practice his particular brand of disdain for those who would challenge him – even those who built the platform that made him the household name Falwell Jr. is today.   On October 28, 2020 Falwell filed a lawsuit against Liberty alleging defamation.

111.    In the Complaint, Falwell in the main blames Becki for the Granda affair and cover-up.   He shows little empathy for the woman who sought treatment for him for alcohol abuse, and whose loyalty and fear for his well-being fueled her outreach to Liberty's Executive Committee.

## COUNT ONE: BREACH OF CONTRACT

112.    Liberty incorporates paragraphs 1 to 111 above.

113.    The 2019 Employment Agreement, at Section 3.8, permits Falwell Jr. access to "confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly disclosed by LU ('Confidential Information.')   Confidential Information remains the property of LU."

114.    During his employment, Falwell Jr. worked independently on many of the deals, strategies, negotiations, and undertakings impacting Liberty.   He had complete access to files, records, notes, emails, data, and information pertinent to the categories of Confidential Information detailed above.

115.    Falwell Jr. also had access to a wide variety of key Liberty documents including, but not limited to: email, letters, correspondence, memoranda, telegrams, notes, reports, compilations, data, notebooks, laboratory, notebooks, work papers, graphs, charts, blueprints, books, pamphlets, brochures, circulars, manuals, instructions, ledgers, drawings (including

LUADMINREC000496

engineering, assembly and detail drawings), sketches, photographs, diaries, sales literature, advertising literature, agreements, meeting minutes, punch cards, magnetic tape or wire, other machine producible records including films, video and sound reproductions, printout sheets, electronic records such as text messages, summaries or records of telephone conversations, personal conversations or interviews, and any and all other writings, typings, printings, drafts, copies and/or mechanical, magnetic, optic, or photographic reproductions or recordings ("Documents").

116.   There are several distinct but intersecting sources rooted in employee and contractual obligations that imposed a duty upon Falwell Jr. to preserve and return Liberty property, including Documents and Confidential Information.

117.   First, as Liberty's Chief Executive Officer, Falwell Jr. was tasked with abiding by and administering the enforcement of Liberty's technology policies, including those related to computer data and storage policies.  For example:

      a.    Section 2.7 of the Liberty University Employee Handbook provides that "[a]ny and all materials and information ('Confidential Information') provided by the University, any related subsidiaries, its employees or agents during the course of an employee's employment by the University and thereafter shall remain the property of the University."  Section 2.7 also provides that "[u]pon termination of employment, the employee shall return all such Confidential Information to the University."

      b.    -Section 7.3 of the Handbook (Computer Use) provides that "All information created or contained on the University's computers and

LUADMINREC000497

network, including electronic mail (E-mail), remains the property of the University."

c.     Section 7.15 of the Handbook (Return of Property) provides that "On or before the employee's last day of work, the employee is required to return all property."

118.   Second, the technology security policy governing all Liberty-affiliated technology, to which all users must consent as a condition to accessing Liberty-owned technology, ensures that all Documents and Confidential Information remain the property of Liberty.

119.   Third, to cater to Falwell Jr.'s executive convenience, on information and belief, Liberty paid for and provided Falwell Jr. with a variety of devices and systems which allowed Falwell Jr. to store Documents and Confidential Information both within and outside of Liberty's technology systems.  These devices and systems include, but are not limited to: (a) an Aruba Cape Sensor and yearly technical support; (b) Lumos Inc. internet wiring; (c) a Surface Pro 3 laptop, bearing serial number 57462443253; (d) an Apple MacBook Pro 11 with expanded storage memory, bearing serial number C02LG708FH00; (e) an HP EliteOne 1000 G2, bearing serial number 8CC9204VH0; (f) an Apple iMac 27" with expanded storage memory, bearing serial number C02YH3HRJV40; (g) a Carbonite Backup cloud backup system for which Liberty was paying as early as August 2, 2016; (h) a Dropbox cloud storage account for which Liberty was paying as early as January 27, 2018; and (i) a personal Earthlink email account to which Falwell Jr. forwarded all emails that he sent and received at his assigned liberty.edu email address.

120.   Falwell Jr. used these Liberty-provided devices and systems, among others, to create, receive, and store Liberty Documents and Confidential Information.

LUADMINREC000498

121.    Fourth, Liberty's general document preservation and retention policy imposed a duty upon all Liberty employees, including Falwell Jr., to preserve and, upon termination of employment, return all Liberty Documents and Confidential Information.

122.    Fifth, Section 3.8 of the 2019 Employment Agreement expressly provides that "Confidential Information remains the property of LU."

123.    In addressing the timing of the return of Confidential Information, the Agreement treats tangible and non-tangible information differently.  Specifically, Section 3.8 provides that "[a]ny Confidential Information in tangible form shall be *immediately* returned to LU upon request" (emphasis added).  Section 3.8 thus required Falwell Jr. to return any tangible property immediately upon demand, and any non-tangible property within a reasonable time frame thereafter.

124.    Six, Liberty's governance documents, including its Bylaws and Articles of Incorporation, imposed a duty upon Falwell Jr. to administer and follow all Liberty policies.  For example, Article III, Section II of Liberty's Amended and Restated Bylaws provides that the "President is responsible for the adoption of administrative policies, rules and regulations that govern the day to day operations of the University."  Such policies include technology and property preservation and retention policies.

125.    Seventh, during his employment with Liberty, first as General Counsel, then as President and Chancellor, Falwell Jr. was subject to various legal holds.  These legal holds imposed a duty upon Falwell Jr. to retain and preserve certain Liberty Documents and Confidential Information.

LUADMINREC000499

126.    Thus, upon termination of his employment, Falwell Jr. had a contractual duty, drawn from multiple sources, including those specified above, to return all Liberty property, including Documents and Confidential Information.

127.    Falwell Jr. breached his contractual duty by failing to fully return all Liberty property after termination of his employment even though Liberty has asked for its return, a demand Falwell has heretofore breached

128.    On information and belief, Liberty has been damaged in an amount in excess of $250,000, a number that it may have to revisit as discovery progresses.

## COUNT TWO: BREACH OF CONTRACT– EXCESS BENEFITS TRANSACTIONS

129.    Liberty incorporates paragraphs 1 to 128 above.

130.    Falwell Jr. has also engaged in other actions in violation of contractual provisions that resulted in improper excess benefits to Falwell Jr. and his family.

131.    Pursuant to the 2012 Employment Agreement, as amended effective May 24, 2017, attached hereto as Exhibit 3, and the 2019 Employment Agreement, attached hereto as Exhibit 4, Falwell Jr. was Liberty's President and Chancellor.  As Liberty's President and Chancellor, Falwell Jr. was tasked with overseeing the implementation and enforcement of Liberty's policies and procedures.

132.    Specifically, Sections 3.2 of the 2012 Employment Agreement and the 2019 Employment Agreement task Falwell Jr. with "ensuring the implementation of the University's mission and purposes as described or defined in the University's Articles of Incorporations, Bylaws, and other foundational documents," "overseeing the fiscal, administrative, admissions, academic, athletic and other operations, divisions, departments and offices of the University," and

35

"implementing and executing policies, orders and resolutions adopted or established by the LU Board of Trustees and its Executive Committee."

133.     Moreover, Sections 3.3 of the 2012 Employment Agreement and the 2019 Employment Agreement provide that Falwell Jr. "shall be accountable to the Board of Trustees for implementing its policies and carrying out his duties."

134.     Article III, Section 2 of the Liberty Bylaws, which are incorporated into the 2012 Employment Agreement and the 2019 Employment Agreement, provides that Falwell Jr., as President, "shall see that all Board policies and resolutions of the Board are administered and implemented under his general supervision."

135.     As such, under the 2012 Employment Agreement, as amended, the 2019 Employment Agreement, and the incorporated foundational documents, Falwell Jr. had a contractual duty to administer and implement all Liberty policies and procedures.

136.     One such duty was Falwell Jr.'s personal obligation to ensure that accurate factual information and supporting documentation were submitted to persons responsible for financial controls such that proper determinations could be made regarding which of an employee's claimed expenses were Liberty business and which were in fact personal.  Under Liberty's policies and practices, it was the employee's non-delegable duty to ensure that correct information and contemporaneous documentation were provided to those involved in achieving compliance with Liberty's expense policies and practices.

137.     Another such duty was Falwell Jr.'s obligation to ensure Liberty's compliance with applicable IRS standards and regulations.  As part of this larger duty, Falwell Jr. not only had a nondelegable duty to properly classify and submit any paperwork and explanations he offered to Liberty's compliance managers personally or through designees, but then to also approve any final

LUADMINREC000501

expense reports prepared on the basis of and reflecting his representations, and to properly direct those individuals responsible for processing financial matters.

138.    From 2017 to 2020, Falwell Jr. breached this duty at times by improperly classifying personal expenses as authorized Liberty business expenses.  Falwell Jr. directly benefited from these transactions personally as Liberty has already paid for or provided fringe benefits, and Falwell Jr. has not reimbursed Liberty for them.

139.    Liberty has advised Falwell Jr. on multiple occasions that, based on the standards set forth in section 4958 of the Internal Revenue Code of 1986, as amended (26 U.S.C. § 4958), and the IRS' underlying regulations, Liberty had identified various excess benefit transactions ("EBTs"). These EBTs were ascribed to Falwell Jr. and totaled approximately $1,188,750.  Liberty advised Falwell Jr. that Liberty would be forced to report these EBTs to the IRS, and would seek to be reimbursed.

140.    In response, Falwell Jr., through his counsel, largely denied that the transactions were EBTs.  Falwell Jr., through his counsel, offered only a token reimbursement of $9,087 to Liberty demand for reimbursement for all of the EBTs to which Falwell Jr. benefitted.

141.    Liberty filed its Form 990 in May 2022, as required by the Internal Revenue Code. Form 990 requires the reporting of any excess benefit transactions as required by Internal Revenue Code section 4958.  Federal tax law requires Liberty to reasonably pursue collection of EBTs, as part of Liberty's efforts to maintain the requirements of its tax exempt status under Internal Revenue Code section 501(c)(3).

142.    From May 13, 2022, to June 30, 2022, Falwell Jr. did nothing to reimburse Liberty for these EBTs except to tender to Liberty $9,087 against a reported obligation of $1,188,750, plus interest.

LUADMINREC000502

143.    On June 27, 2022, counsel for Liberty again notified counsel for Falwell Jr. regarding Falwell Jr.'s chance once again to reimburse Liberty for a subset of these EBTs, a proposed compromise Liberty was willing to effect in view of the costs of litigation and debt collection.

144.    In sum, Falwell Jr. breached the 2012 Employment Agreement and 2019 Employment agreement, and the applicable Liberty policies and procedures, by classifying unauthorized personal expenses improperly as authorized Liberty business expenses, which resulted in the EBTs described above.  Liberty seeks reimbursement of the $786,413.78, plus interest, that it paid for in excess of 120 EBTs received by Falwell Jr. for which he has not reimbursed Liberty.

145.    For more detail on the EBTs that Falwell Jr. wrongfully incurred, Liberty incorporates its 2022 IRS Form 990 filing.

146.    On information and belief, Liberty has been damaged in an amount in excess of $786,413.78, a number that it may have to revisit as discovery progresses.

## COUNT THREE: DETINUE

147.    Liberty incorporates paragraphs 1 to 146 above, and also, in order to preserve issues on appeal, incorporates Count One of its Initial Complaint as considered by the Court's Order of September 10, 2021

148.    Liberty is the sole lawful owner of the property described above, including Documents and Confidential Information that Falwell created, received, or stored, at any point, on devices or systems provided by Liberty.

LUADMINREC000503

149.    For several reasons enumerated above, Liberty has an immediate right to possession of this property, including Documents and Confidential Information, because Falwell Jr.'s employment with Liberty terminated on August 25, 2020.

150.    Liberty's Documents and Confidential Information are easily identifiable because they are currently or were at one time located or stored on devices or systems provided by Liberty. Falwell Jr. also knows of their identity and location.

151.    Liberty's Documents and Confidential information are highly valuable to Liberty because they contain confidential and proprietary information related to a variety of deals, strategies, and negotiations impacting Liberty's business.  They are also necessary for Liberty to defend and prosecute various lawsuits, both pending and contemplated.

152.    Liberty has asked for the return of its Documents and Confidential Information, but Falwell Jr. has failed to fully return all such property that remains in his possession and/or control.

## **COUNT FOUR: BREACH OF FIDUCIARY DUTY**

153.    Liberty incorporates paragraphs 1 to 152 above.

154.    As Liberty's President, Chancellor, and a member of its Board of Trustees, Falwell had a fiduciary duty to provide material information to the Board, refrain from acts harmful to the interests of Liberty, avoid conflicts of interest, and reject opportunities to benefit his personal interests to the detriment of Liberty.

155.    Falwell Jr. refused to disclose to Liberty the Granda Allegations and Granda's extortive threats while the Liberty President was negotiating for and entering into a 2019 Employment Agreement that raised Falwell Jr.'s pay, created a retirement plan and enriched his severance. The sweetened severance provision and funded retirement plan advantaged Falwell Jr. if adverse conditions caused him to choose resignation knowing he was impaired by extortion

threats, and by therefore passing the financial risk to Liberty that Granda's extortion would end Falwell Jr.'s employment with Liberty.

156.    Falwell Jr. breached his fiduciary duties to Liberty by accepting a severance payment from Liberty in 2020 that Liberty was required to pay pursuant to the 2019 Employment Agreement.

157.    Had Liberty's Executive Committee known in 2018 or 2019 that Granda was attempting to extort Falwell Jr., and thus planning to damage Liberty, and had it known the full circumstances of Granda's extortion of Falwell Jr., then the Executive Committee would have refrained from entering into the 2019 Employment Agreement.

158.    On information and belief, Falwell Jr. procured Liberty's outside counsel to advise him with respect to his personal causes of action, including those against Liberty, in derogation of Falwell's duty.

159.    Falwell Jr. failed to timely disclose and address the issue of his personal impairment by alcohol, which impairment led Falwell Jr. to actions and courses of conduct detrimental to the spiritual mission of Liberty.

160.    The several actions of Falwell Jr. in breach of his fiduciary duty have induced injury to Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the improper 2019 Employment Agreement, and damaged Liberty's reputation.

161.    Falwell Jr.'s actions in breaching the fiduciary duty he owed to Liberty were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

162.    For this count, Liberty seeks damages in excess of $10,000,000 plus pre- and post-judgment interest, and punitive damages at the statutory limit of $350,000.

**COUNT FIVE:  STATUTORY CONSPIRACY / COMMON LAW CONSPIRACY**

LUADMINREC000505

163.    Liberty incorporates paragraphs 1 to 162 above.

164.    Virginia Code. § 8.01-499, 500 prohibits two or more persons from agreeing to injure another in their trade or business.

165.    The business of Liberty is the provision of higher education through the perspective of Christian values.  High moral standards are a part of the educational experience at Liberty and administrators and faculty are expected to comport themselves in a way that promotes the Liberty Way, and upholds the values in Liberty's foundational documents.  Additionally, officers and Board members like Falwell, Jr. must observe applicable fiduciary duties.

166.    Up to August 2020, Falwell Jr., Becki and Granda, and potentially others, acted in concert under a preconceived plan to conceal the Granda Allegations and Granda's extortive acts from disclosure to Liberty's Board of Trustees.

167.    Falwell Jr., Becki and Granda, and potentially others acted intentionally, purposefully and without lawful justification, and thus with legal malice.

168.    Falwell Jr, as leader of the Falwell/Granda conspiracy, had a fiduciary duty to disclose Granda's extortive actions, and to disclose the potential for serious harm to Liberty once the Granda Allegations were in fact disclosed to the Liberty's Executive Committee.

169.    Instead of disclosure, Falwell Jr. furthered the conspiracy of silence and negotiated a 2019 Employment Agreement that contained a higher salary from Liberty. Moreover, anticipating revival of Granda's threats, Falwell Jr. also negotiated a revised severance provision that doubled the separation benefits provided in the 2012 Employment Agreement and a funded retirement plan.

170.    Had Liberty's Executive Committee known in 2018 and 2019 that Granda was attempting to extort Falwell Jr., and thus planning to damage Liberty, and had it known the full

41

circumstances of Granda's extortion of Falwell, then the Executive Committee would have refrained from entering into the 2019 Employment Agreement.

171.    The actions of Falwell Jr. and Granda have injured Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the 2019 Employment Agreement that proved detrimental to Liberty's interests, and damaged Liberty's reputation.

172.    By operation of Va. Code 18.2 §500(A), Liberty's damages must be trebled.  That section also provides for Liberty recover reasonable attorneys' fees. *See* Va. Code 18.2 §500 (A) and (B).

173.    Falwell Jr.'s actions were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

174.    In the alternative, Falwell Jr., Becki, Granda, and potentially others, acted in concert under a preconceived plan to unlawfully conceal the Granda Allegations and Granda's extortive acts from disclosure to Liberty's Board of Trustees in violation of Falwell Jr.'s fiduciary duties.

175.    The conspiracy between Falwell Jr., Becki, and Granda injured Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the 2019 Employment Agreement that proved detrimental to Liberty's interests, and damaged Liberty's reputation.

176.    Liberty seeks $10,000,000 in compensatory damages, trebled as provided by statute, and the statutory limit of $350,000 in punitive damages plus any other damages provable at trial. Liberty additionally seeks pre-judgment and post-judgment interest and attorneys' fees.

### COUNT SIX: UNJUST ENRICHMENT (IN THE ALTERNATIVE)

177.    Liberty incorporates paragraphs 1 to 176 above.

178.    As detailed above, Liberty has conferred numerous benefits on Falwell Jr.

LUADMINREC000507

179.    Falwell Jr. has not reimbursed or paid Liberty for these benefits.

180.    If Falwell Jr. is not required to reimburse Liberty, Falwell Jr. will be unjustly enriched in an amount in excess of $11,000,000, plus interest.

181.    In the alternative, Liberty seeks damages for unjust enrichment in an amount in excess of $11,000,000.

## **PRAYER FOR RELIEF**

WHEREFORE, for the reasons stated above, Defendant Liberty requests this Court to:

a.      Award Liberty the damages identified above;

b.      Award Liberty punitive damages;

c.      Award Liberty its statutory attorneys' fees;

d.      Award Liberty its pre-judgment and post-judgment interest;

e.      Enjoin Falwell from retaining possession of property belong to Liberty; and

f.      Provide any other relief this Court deems appropriate.

Liberty demands trial by jury of its claim.

LUADMINREC000508

DATE: 6/30/22

Respectfully submitted,

LIBERTY UNIVERSITY, INC.

Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

44

Exclusive: Falwell says Fatal Attraction threat led to depression                    Page 1 of 5



# Exclusive: Falwell says Fatal Attraction threat led to depression

by Paul Bedard, Washington Secrets Columnist | ✉ | August 23, 2020 09:32 PM

**Just In...**

Cuomo, top lawmakers reach deal for $212 billion New York budget, including tax hike for high earners

Those doomsday predictions for post-mask Texas? They are now coming true, but in Michigan

Majority of Michigan voters, 72% support voter ID laws, including 68% of black voters: Poll

'Nothing is off the table' in sending vaccines and help to Michigan amid pandemic surge, Biden administration says

'Woke' hiring; Endorsing Trump is top reason for job rejection

Why corporate America is lining up against tax hikes

Daily on Energy: Carbon capture industry sees huge boost within reach

Jerry Falwell Jr., suspended as president of Virginia's Christian-focused Liberty University after a string of embarrassing acts, said that he has suffered depression caused by a former family friend who had an affair with his wife and who has been threatening to expose it.

In a statement exclusively to Secrets, Falwell revealed his wife Becki's affair for the first time and said that it was short lived and that the two reconciled quickly.

But, they claimed, her former lover has threatened them over the past several years and that they are done with it hanging over their heads.

"I'm just tired of it," said Falwell of the anxiety he's felt about the affair becoming public and embarrassing his family and Liberty. "It's just got to end," he added.

The 1,200-word statement, shown below, followed the Liberty board's decision to put Falwell on paid leave after he posted a "costume party" picture of him with his pants partially unzipped and his arm around his wife's assistant.

His social media presence has raised eyebrows in the Liberty community, though he is often praised for his success at building up the school and keeping the coronavirus at bay from the university. He has also drawn fire for his strong support of President Trump.

The board's statement about Falwell on Friday referred to "various rumors and claims," which may be related to indications that a news service planned to air new claims from the man whom Becki Falwell had the affair with, a pool attendant the Falwells met and befriended in 2012 while staying at the Fontainebleau Miami Beach.

The statement did not name the attendant, but he has been identified as Giancarlo Granda in dozens of news stories.

In the statement and phone call with Secrets, Falwell appeared to be relieved to have finally divulged the affair and yearslong series of attacks the couple has faced.

"It was like living on a roller coaster," he said in the statement. "While completely dedicating ourselves to Liberty, we were also suffering in silence during our personal time together,



EXHIBIT 1  ALL-STATE LEGAL®

LUADMINREC000510

Exclusive: Falwell says Fatal Attraction threat led to depression                         Page 2 of 5

**Unaccompanied children at Fort Bliss regularly tested for coronavirus in expanding Defense Department role**

While simultaneously trying to manage through this increasingly threatening behavior, which only worsened over time. We were doing our best to respectfully unravel this 'fatal attraction' type situation to protect our family and the university."

He said that while they tried to remain friendly with the man and his family, the threats and texts demanding huge amounts of money led them to cut him off.

"While we tried to distance ourselves from him over time, he unfortunately became increasingly angry and aggressive. Eventually, he began threatening to publicly reveal this secret relationship with Becki and to deliberately embarrass my wife, family, and Liberty University unless we agreed to pay him substantial monies," the couple said.

In 2012, the Falwells said they were impressed with the pool assistant and wanted to help him start in business. Falwell's wife worked a deal to buy a Miami hostel and put him in charge. The deal has been tangled in legal challenges.

It was while Jerry Falwell was working long hours to build up the university, which he took over after his father Jerry Falwell Sr. died in 2007, that Becki had the affair.

At the time, Falwell was working overtime to build Liberty into an online powerhouse and expand its modern campus.

Granda, who was 21 at the time, dismissed the charges of threats in an email to Secrets. He emailed, "Any allegation of extortion is falsely, defamatory and belied by clear documentary evidence. The Falwell's attempt to sandbag me, and the *Examiner*, with a last minute story without providing the *Examiner* clear evidence that this was not simply an 'affair' with concocted allegations of extortion reeks desperation. The WHOLE truth will come out."

Falwell's team provided emails and texts that it said substantiate its allegations.

After Falwell found out about the affair, he said in the statement, he lost 80 pounds and suffered mental stress, especially as Granda switched from being thankful for Falwell's help to demanding money.

"Becki and I forgave each other, because while her indiscretion may have been more obvious and apparent, I realized that there were important smaller things I needed to do better too," he said.

Falwell said that now that his family has revealed its troubles, he plans to urge others in stressful situations to seek mental help.

"Even though I continued successfully working with our entire Liberty team to achieve so many of our goals, I am now dealing with things in a way that I should have done before—including seeking to address the emotional toll this has taken. I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from the mental health professionals

LUADMINREC000511

Exclusive: Falwell says Fatal Attraction threat led to depression

who could have alleviated this pain sooner. I am now committed to speaking out and sharing with others at Liberty the importance of seeking counseling instead of thinking you need to be tough and try to bear these burdens on your own. I am in the early stages of addressing these issues," he wrote.

And, he added, "The trauma of this experience has brought us to a very challenging point in our lives, but we are strong, our faith in Christ is greater than ever, and with His help and with those in the community who we love and who appreciate the impact of forgiveness, we will get through this. We ask for your prayers and support."

**STATEMENT BY JERRY FALWELL, JR.**

Aug. 23, 2020

*My family has been blessed with the opportunity to serve Christ and our community over the past 50 years — from when my father founded Liberty in the early 1970's through today. When my father suddenly passed away in 2007, I quickly and unexpectedly went from being the lawyer working in the background on the business aspects of the school to becoming a very public person, having to overcome my fears of speaking in front of audiences of tens of thousands, with many more responsibilities to the Liberty community and to my own family.*

*My priority was to build on my father's vision and to work hard. Thanks to the help of the Board and the extraordinary Liberty faculty, executives, staff and community, we have ensured the University's sustained growth and financial health while providing the best and most modern on-campus and online educational and spiritual resources to a wider range of students both in person and through digital platforms.*

*My commitment to Liberty became and has remained my primary focus — and while I am so grateful and thankful for our collective successes, I also realize in hindsight that there was a toll that this took on me, which extended to my family too. During this time of reflection for us and this especially challenging year, and even more so following the events of the past few weeks, my wife Becki and I agreed that this was the right time for me to share more of our story, because the Liberty community deserves to hear it directly from me and from us.*

*During a vacation over eight years ago, Becki and I met an ambitious young man who was working at our hotel and was saving up his money to go to school. We encouraged him to pursue an education and a career and we were impressed by his initiative in suggesting a local real estate opportunity. My family members eventually made an investment in a local property, included him in the deal because he could play an active role in managing it, and became close with him and his family.*

*Shortly thereafter, Becki had an inappropriate personal relationship with this person, something in which I was not involved — it was nonetheless very upsetting to learn about.*

LUADMINREC000512

Exclusive: Falwell says Fatal Attraction threat led to depression

☰   🔍

*After I learned this, I lost 80 pounds when people saw me regularly thought that I was physically unwell, when in reality I was just balancing how to be most supportive of Becki, who I love, while also reflecting and praying about whether there were ways I could have been more supportive of her and given her proper attention. I came to realize that while it may be easy to judge others on their behavior, the King James Bible reminds us— "Thou shalt not commit adultery, but I sayeth unto you, that whoever looketh upon a woman to lust after her hath committed adultery with her in his heart." In fact, there are ways we may all be sinning, but the Lord believes in this self-reflection.*

*I was and have always remained fully devoted to Becki and we have shared many private conversations to better understand and support each other and to strengthen our marriage. Thankfully, our love has never been stronger. Becki and I forgave each other, because while her indiscretion may have been more obvious and apparent, I realized that there were important smaller things I needed to do better too.*

*In Ephesians 4:32 we learn— "Be kind to one another, tender hearted, forgiving as God in Christ forgave you."*

*We extended the spirit of forgiveness to this man with respect and kindness, both for spiritual and religious reasons, and in the hope that we could help him find his way and allow us to put this behind us, without any harm or embarrassment to our family or to the LU community to which we have dedicated our lives.*

*During the years that followed, we got to know his family and other loved ones, good people who also really care about him. They shared and confirmed to us that he has periodically demonstrated emotionally unstable behaviors with some destructive tendencies, seemingly in response to his inability to achieve his professional goals. Based on information from other sources, we believe that he may have targeted other successful women in similar ways.*

*While we tried to distance ourselves from him over time, he unfortunately became increasingly angry and aggressive. Eventually, he began threatening to publicly reveal this secret relationship with Becki and to deliberately embarrass my wife, family, and Liberty University unless we agreed to pay him substantial monies. While this was very upsetting, we had been advised by trusted legal counsel that it was best to maintain contact with this person, as we tried to manage his increasingly erratic behavior and unreasonable demands while extricating ourselves from him both on a personal level and from that real estate transaction.*

*It was like living on a roller coaster.*

*While completely dedicating ourselves to Liberty, we were also suffering in silence during our personal time together, while simultaneously trying to manage and deal with this increasingly threatening behavior, which only worsened over*

LUADMINREC000513

≡  🔍

time. We were doing our best to ~~responsibly manage~~ this 'fatal
attraction' type situation to protect our family and the
University.

Even years after the improper relationship had ended, this
person continued to be aggressive with Becki and me in a
variety of ways. We finally decided that we had to further
withdraw completely from him, which resulted in him
stepping up his threats to share more outrageous and
fabricate claims about us (under the guise of that business
entity). He clearly moved forward with this plan through a
specific member of the media who has continued to badger
us, as well as other members of the media, regarding the false
claims about the nature of the relationship based on the
individual's misrepresentations. Over the course of the last few
months this person's behavior has reached a level that we
have decided the only way to stop this predatory behavior is
to go public.

We have categorically rejected this person's demands while
dealing with him and this particular member of the media
who seemed just as obsessed with the prurient, untrue
aspects of this story, however fantastic.

Even though I continued successfully working with our entire
Liberty team to achieve so many of our goals, I am now
dealing with things in a way that I should have done before—
including seeking to address the emotional toll this has taken.
I shouldn't have been afraid to admit my vulnerabilities and to
reach out for assistance from the mental health professionals
who could have alleviated this pain and stress. I am
committed to speaking out and sharing with others at Liberty
the importance of seeking counseling instead of thinking you
need to be tough and try to bear these burdens on your own. I
am in the early stages of addressing these issues.

Proverbs 3:5-6 says "trust in the Lord with all your heart and
lean not on thine own understanding in all your ways
acknowledge him and he will guide straight thy path."

The trauma of this experience has brought us to a very
challenging point in our lives, but we are strong, our faith in
Christ is greater than ever, and with His help and with those in
the community who we love and who appreciate the impact
of forgiveness, we will get through this. We ask for your
prayers and support.

LUADMINREC000514

Receipt : 2000019518

Page 1 of 1

**OFFICIAL RECEIPT**
**LYNCHBURG CIRCUIT COURT**
**CIVIL**

DATE : 10/23/2020
RECEIPT # : 2000019518
CASHIER : NRS
CASE COMMENTS : F v. L
SUIT AMOUNT : $0.00
ACCOUNT OF : F
PAID BY : F
CHECK : $86.00

TIME : 15:52:18
TRANSACTION # : 20102800063
REGISTER # : C705

CHECK NUMBER : 10776

DESCRIPTION 1 : COM:COMPLAINT - CATCH-ALL
2 : PLAINTIFF: F
3 : NO HEARING SCHEDULED

CASE # : 680CL2000105100
FILING TYPE : COM
PAYMENT : FULL PAYMENT

| ACCOUNT CODE | DESCRIPTION | PAID |
|---|---|---|
| 049 | WRIT TAX (CIVIL) | $5.00 |
| 106 | TECHNOLOGY TRST FND | $5.00 |
| 123 | LEGAL AID SERVICES | $9.00 |
| 147 | INDIGENT ASSISTANCE (INA) | $1.00 |
| 170 | COURT TECHNOLOGY FUND | $10.00 |

| ACCOUNT CODE | DESCRIPTION | PAID |
|---|---|---|
| 219 | LAW LIBRARY | $4.00 |
| 229 | COURTHOUSE MAINTENANCE FEE (CHMF) | $2.00 |
| 304 | CIVIL FILING FEE (LAW & EQUITY) | $50.00 |

TENDERED : $ 86.00
AMOUNT PAID : $ 86.00

PAYOR'S COPY

CLERK OF COURT : TODD SWISHER

RECEIPT COPY 1 OF 2

EXHIBIT
2
ALL-STATE LEGAL®

LUADMINREC000515

**COVER SHEET FOR FILING CIVIL ACTIONS** COPY   Case No. ........................................
COMMONWEALTH OF VIRGINIA                                                (CLERK'S OFFICE USE ONLY)

............................ City of Lynchburg ............................ ................ Circuit Court

........... Jerry Falwell, Jr. ........... v./In re: ........... Liberty University ...........
PLAINTIFF(S)                                                    DEFENDANT(S)

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

**GENERAL CIVIL**
**Subsequent Actions**
[ ] Claim Impleading Third Party Defendant
  [ ] Monetary Damages
  [ ] No Monetary Damages
[ ] Counterclaim
  [ ] Monetary Damages
  [ ] No Monetary Damages
[ ] Cross Claim
[ ] Interpleader
[ ] Reinstatement (other than divorce or driving privileges)
[ ] Removal of Case to Federal Court
**Business & Contract**
[ ] Attachment
[ ] Confessed Judgment
[ ] Contract Action
[ ] Contract Specific Performance
[ ] Detinue
[ ] Garnishment
**Property**
[ ] Annexation
[ ] Condemnation
[ ] Ejectment
[ ] Encumber/Sell Real Estate
[ ] Enforce Vendor's Lien
[ ] Escheatment
[ ] Establish Boundaries
[ ] Landlord/Tenant
  [ ] Unlawful Detainer
[ ] Mechanics Lien
[ ] Partition
[ ] Quiet Title
[ ] Termination of Mineral Rights
**Tort**
[ ] Asbestos Litigation
[ ] Compromise Settlement
[ ] Intentional Tort
[ ] Medical Malpractice
[ ] Motor Vehicle Tort
[ ] Product Liability
[ ] Wrongful Death
[X] Other General Tort Liability

**ADMINISTRATIVE LAW**
[ ] Appeal/Judicial Review of Decision of (select one)
  [ ] ABC Board
  [ ] Board of Zoning
  [ ] Compensation Board
  [ ] DMV License Suspension
  [ ] Employee Grievance Decision
  [ ] Employment Commission
  [ ] Local Government
  [ ] Marine Resources Commission
  [ ] School Board
  [ ] Voter Registration
  [ ] Other Administrative Appeal

**DOMESTIC/FAMILY**
[ ] Adoption
  [ ] Adoption – Foreign
[ ] Adult Protection
[ ] Annulment
  [ ] Annulment – Counterclaim/Responsive Pleading
[ ] Child Abuse and Neglect -- Unfounded Complaint
[ ] Civil Contempt
[ ] Divorce (select one)
  [ ] Complaint -- Contested*
  [ ] Complaint -- Uncontested*
  [ ] Counterclaim/Responsive Pleading
  [ ] Reinstatement -- Custody/Visitation/Support/Equitable Distribution
[ ] Separate Maintenance
  [ ] Separate Maintenance Counterclaim

**WRITS**
[ ] Certiorari
[ ] Habeas Corpus
[ ] Mandamus
[ ] Prohibition
[ ] Quo Warranto

FILED IN CLERK'S OFFICE OF THE CIRCUIT COURT OF THE CITY OF LYNCHBURG

OCT 28 2020     TIME ........... M.

TESTE: TODD SWISHER, CLERK

BY: ........................... Dep. Clerk

**PROBATE/WILLS AND TRUSTS**
[ ] Accounting
[ ] Aid and Guidance
[ ] Appointment (select one)
  [ ] Guardian/Conservator
  [ ] Standby Guardian/Conservator
  [ ] Custodian/Successor Custodian (UTMA)
[ ] Trust (select one)
  [ ] Impress/Declare/Create
  [ ] Reformation
[ ] Will (select one)
  [ ] Construe
  [ ] Contested

**MISCELLANEOUS**
[ ] Amend Death Certificate
[ ] Appointment (select one)
  [ ] Church Trustee
  [ ] Conservator of Peace
  [ ] Marriage Celebrant
[ ] Approval of Transfer of Structured Settlement
[ ] Bond Forfeiture Appeal
[ ] Declaratory Judgment
[ ] Declare Death
[ ] Driving Privileges (select one)
  [ ] Reinstatement pursuant to § 46.2-427
  [ ] Restoration – Habitual Offender or 3rd Offense
[ ] Expungement
[ ] Firearms Rights -- Restoration
[ ] Forfeiture of Property or Money
[ ] Freedom of Information
[ ] Injunction
[ ] Interdiction
[ ] Interrogatory
[ ] Judgment Lien-Bill to Enforce
[ ] Law Enforcement/Public Official Petition
[ ] Name Change
[ ] Referendum Elections
[ ] Sever Order
[ ] Taxes (select one)
  [ ] Correct Erroneous State/Local
  [ ] Delinquent
[ ] Vehicle Confiscation
[ ] Voting Rights -- Restoration
[ ] Other (please specify)

[ ] Damages in the amount of $ ........................ are claimed.

10/28/2020
DATE                    [ ] PLAINTIFF  [ ] DEFENDANT  [X] ATTORNEY FOR [X] PLAINTIFF/DEFENDANT

James I. Gilbert, IV VSB #38229
PRINT NAME

310 S. Jefferson Street
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

Roanoke, VA 24011

jgilbert@abeattorneys.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 07/16

LUADMINREC000516

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

JERRY FALWELL, JR.,

               Plaintiff,

v.

LIBERTY UNIVERSITY,

               Defendant.

Case No. _____.

JURY TRIAL DEMANDED

### COMPLAINT

Plaintiff Jerry Falwell, Jr., as and for his Complaint against Defendant Liberty University ("Liberty" or the "University"), by and through undersigned counsel, hereby alleges as follows:

### INTRODUCTION

1.     This defamation action against Liberty University by its former President and Chancellor, Jerry Falwell, Jr., is necessitated by Liberty's abdication of its legal, contractual, and moral obligations not to defame him. Jerry Falwell, Jr., has dedicated much of his adult life to Liberty University, which was founded by his father, Jerry Falwell, Sr. ("Dr. Falwell"), in 1971. Following his father's death in 2007, Jerry Falwell, Jr. stepped in as President and Chancellor of the University, saving the institution from financial collapse and developing Liberty into the world's leading evangelical university and the largest private nonprofit university in the nation. In return, Liberty set out to destroy Mr. Falwell's reputation through numerous defamatory statements that affirm the outrageous lies of an unstable individual who attempted to extort the Falwells and who, on information and belief, conspired against Mr. Falwell with politically

motivated backers, including Aaron Resnick and the political action committee The Lincoln Project.

2.     Under Mr. Falwell's stewardship, Liberty University's stature increased exponentially by almost every metric, especially enrollment and financials.  Between just 2007 and 2020 alone, attendance increased from 9,600 students in residence and 27,000 students online to 15,000 students in residence and 108,000 students studying online.  And, after decades of financial hardship, Liberty now boasts a $1.6 billion endowment—one of the nation's largest. More students enrolled and more donors gave because of Mr. Falwell's tireless efforts in carrying out his father's vision for Liberty.

3.     When Mr. Falwell and his family became the targets of a malicious smear campaign incited by anti-evangelical forces, Liberty University not only accepted the salacious and baseless accusations against the Falwells at face value, but directly participated in the defamation.  This action seeks redress for the damage Liberty has caused to the reputation of Mr. Falwell and his family.

4.     For years, Mr. Falwell and his wife, Rebecca Falwell, have been the victims of an ongoing extortion scheme by Giancarlo Granda—efforts which have recently been absorbed into a smear campaign by political operatives who are opposed to Mr. Falwell's support of President Trump.  Granda repeatedly demanded enormous cash payments from the Falwells to stay silent about a brief affair with Mrs. Falwell that ended in 2014.   Granda is an unstable and manipulative individual who saw the Falwells' kindness, and his involvement with Mrs. Falwell, as opportunities ripe for exploitation.

5.     The Falwells refused to pay, and Granda's disturbing behavior became increasingly erratic and threatening.

2

LUADMINREC000518

6.      On information and belief, Granda began conspiring with political operatives to defame Mr. Falwell.   Granda recently admitted in an ABC News interview that he is being represented free of charge by Kurt Bardella, a senior advisor to The Lincoln Project.   The Lincoln Project is a political action committee that has a self-described mission to "Defeat President Trump and Trumpism at the ballot box." The Lincoln Project's animosity towards Mr. Falwell presumably arises from the fact that President Trump's evangelical support is often attributed to Mr. Falwell's early endorsement of him during the 2016 primaries.   It has been reported that Bardella is also arranging Granda's interviews with the press.   Granda further admitted to being introduced to The Lincoln Project by his attorney, Aaron Resnick, a politically prominent lawyer in Miami, Florida.   On information and belief, Resnick has been financing Granda's personal expenses.

7.      In June 2020, Mr. Falwell made clear to Granda in no uncertain terms that he would not be extorted, no payments would be forthcoming, and Granda should cease and desist from contacting him. Shortly thereafter, Granda—backed by The Lincoln Project—embarked on a hit job against Mr. Falwell in the press. On August 24, 2020, Granda stated publicly for the first time the outrageous, false, and defamatory lies that Mr. Falwell had "looked on" and "watched" as Granda had sex with his wife and participated in the affair.

8.      The lies had the effect that Granda and The Lincoln Project intended.   Within a day, Liberty turned on Mr. Falwell and forced his resignation as University President and Chancellor.   Liberty conducted zero investigation into Granda's lies and willfully ignored information demonstrating their falsity.   Soon after his resignation, the University began to systematically erase Mr. Falwell from Liberty University history:  scrubbing any mention of him from the University website; removing portraits of Mr. Falwell from campus (including a portrait

3

LUADMINREC000519

of Mr. Falwell as a boy attending a University football game with his late father); prohibiting Liberty faculty and staff members from speaking with him; and banning him from visiting campus grounds—which include the gravesites of his mother and father.

9.      The University also moved quickly to destroy Mr. Falwell's reputation in the Liberty community and nationwide.  On August 26, 2020, in its high-profile and publicly-broadcasted Community Service event, before thousands of gathered students and faculty—and the world—Liberty lent credence to Granda's lies, stating that Mr. Falwell had engaged in "disobedient" behavior "in secret" that was "shameful" and a "sin."  Liberty then repeated similar statements in a press release and its official magazine.

10.     Up until that point, Granda's lies were just that—lies, vigorously denied by Mr. Falwell.  But Liberty gave those lies an air of truth and righteousness.  With the exercise of even the slightest diligence, Liberty would have quickly confirmed that Granda's outrageous lies are false.  Instead, Liberty gave Granda's lies an air of truth by immediately forcing Mr. Falwell's resignation and publicly defaming him.

11.     Liberty's actions are antithetical to the teachings of Christ.  Liberty's conduct has damaged Mr. Falwell's standing among Liberty faculty, students, and alumni, the broader evangelical community, and beyond.  Liberty's conduct has also damaged *Liberty* itself, and the evangelical community, by playing right into the hands of sinister operatives with ulterior motives.  Liberty has rejected Mr. Falwell's attempts to reach an amicable resolution, forcing Mr. Falwell to bring this action to restore his reputation.

### THE PARTIES

12.     Plaintiff Jerry Falwell, Jr. is a citizen and resident of Virginia.  He currently resides in Bedford County, Virginia.  Mr. Falwell has a Juris Doctorate from the University of

4

Virginia and was a practicing lawyer for many years. Mr. Falwell began working at Liberty University in 1988 as General Counsel, a position that he held until May 2007. Following the death of Dr. Falwell in May 2007, Mr. Falwell served as the President and Chancellor of Liberty University until his August 25, 2020 resignation.

13.     Defendant Liberty University is a Virginia nonstock corporation headquartered in Lynchburg, Virginia with its principal office located at 1971 University Blvd, Lynchburg, Virginia 24515.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter pursuant to Va. Code §§ 17.1-513, 8.01-328.1. Defendant is organized as a nonstock corporation under the laws of the Commonwealth of Virginia and has its principal office in the Commonwealth of Virginia.

15.     Venue properly lies in this Court under Va. Code Ann. §§ 8.01-257 and 8.01-262 because it is a forum convenient to the parties and witnesses, where justice can be administered without prejudice or delay. Liberty University's principal office is located in Lynchburg, Virginia.

16.     Furthermore, the Employment Agreement entered into between Mr. Falwell and Liberty, which provides the basis for at least one of the claims in this action, specifies that any legal action or proceeding arising out of or relating to the Employment Agreement shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

## FACTUAL BACKGROUND

### A.  The Falwell Family and the Founding of Liberty University

17.     Born on June 17, 1962 in Lynchburg, Virginia, Mr. Falwell comes from storied Virginian roots. His late father, Dr. Falwell, is among the most respected leaders in the

5

evangelical Christian community, described by The Economist as a "quintessentially American type: a poor man who won fame and fortune by preaching the Word."

18.    In 1952, Dr. Falwell decided to dedicate his life to Christ and preaching Christianity.  After graduating college, he returned home to Lynchburg to start a church in a disused soda-bottling plant with a congregation consisting of just 35 adults and their families.

19.    Dr. Falwell steadily grew his congregation using nothing but his charisma, and, at first, his own two feet, visiting 100 or so homes a day to seek new congregation members, carrying only a yellow legal pad and a Bible.

20.    Dr. Falwell's breakthrough came from using the technology of the era to spread the gospel.  Soon after his church opened, he began a half-hour daily radio broadcast, like the ones his mother would play on Sunday nights.  And only a few months later, he began televising his services, which quickly gained him a national audience.  He called the show "Old-Time Gospel Hour," and it started to skyrocket his congregation's numbers almost immediately.  In the first year, his congregation grew from 35 to nearly a thousand, and that was only the beginning. By the 1970s, his church sat thousands, and Old-Time Gospel Hour was broadcast nationally to hundreds of thousands of homes.

21.    In 1971, just a few blocks from his church, Dr. Falwell founded Lynchburg Baptist College, which would eventually become known as Liberty University.  The school's mission was "Training Champions for Christ," and like Dr. Falwell's church, it originally started small, with only 154 students, a tuition of $200, and four full-time faculty members.  It quickly began to grow.  Just 10 years after its founding, over 3,500 students were enrolled, and by 1988 it had become the largest private university in Virginia with a combined enrollment of 11,000 students from all 50 states and 30 nations.

6

22.     While Liberty University grew, Dr. Falwell became a titan in Christian evangelicalism as well as American politics. In 1979, after hosting a series of "I Love America" rallies across the country to raise awareness of social issues, Dr. Falwell founded the Moral Majority, a political organization headquartered in Lynchburg, Virginia, that, at its height, claimed more than four-million members and two-million donors.

23.     Although Dr. Falwell became a national figure through his work with the Moral Majority and the Old-Time Gospel Hour, his passion lay in being a pastor and a Christian educator. And in 1989, he disbanded the Moral Majority, allowing himself more time to concentrate his efforts on heading his church and Liberty University. Dr. Falwell dreamed that Liberty would grow to 50,000 students and be to fundamentalist Christians what The University of Notre Dame is to Catholics and Brigham Young University is to Mormons.

**B.     Mr. Falwell's Contributions to Liberty University**

24.     Despite Dr. Falwell's best efforts, he had difficulty keeping Liberty afloat financially. Donors and family friends had to step in to help manage the finances and arrange for companies to write-off Liberty's debt, and even with their help, by the 1990s, Liberty University was on the verge of financial collapse.

25.     Fortunately, when the school was nearing its financial nadir, facing bankruptcy and potential collapse, Jerry Falwell, Jr. was fully grown and able to assist his father in not only keeping the school alive, but achieving Dr. Falwell's dream for Liberty University. In 1987, Jerry Falwell, Jr. was a practicing lawyer and commercial real estate developer. In 1988, he joined Liberty as General Counsel.

26.     While Dr. Falwell focused on maintaining the school's religious education, Mr. Falwell worked to keep the creditors at bay, which was no small feat. By 1990, the school had

7

nearly $100 million in debt. Liberty's accrediting body, the Southern Association of Colleges and Schools Commission on Colleges, had even placed it on a one-year probation and was scrutinizing its every move, going so far as to issue Liberty more than 100 "recommendations" to maintain its accreditation, most of which centered around restructuring the school's debt.

27.     With Mr. Falwell's assistance, Liberty University not only climbed out of its financial hole, but began to thrive. As Dr. Falwell himself put it, "God sent [Jerry Falwell, Jr.] to me just in time. He is more responsible, humanly speaking, for the miraculous financial survival of this ministry than any other single person."

28.     In 2000, Mr. Falwell joined Liberty University's Board of Trustees, and in 2003 he became the school's Vice Chancellor. As a board member and Vice Chancellor, he assisted his father with running the school's day-to-day operations and managed the University's debt for years.

29.     On May 15, 2007, Dr. Falwell passed away. In accordance with his wishes, upon his passing, his two sons took control of the two pinnacles of his legacy: Jonathan took over his church, Thomas Road Baptist Church, and Jerry, Jr. became President and Chancellor of Liberty University.

30.     Mr. Falwell rose to the occasion. He has been widely recognized as having led Liberty University not only through difficult financial straits, but also for steering its transformation into the world's leading evangelical university.

31.     Dr. Falwell passed away before Liberty University achieved his dream of 50,000 enrolled students. Under Mr. Falwell's stewardship, however, Dr. Falwell's dream was achieved, and then surpassed: during his tenure as President and Chancellor, Mr. Falwell grew Liberty University's enrollment from 38,000 to 110,000 students, making it the one of the largest

8

evangelical Christian universities in the world, and one of the largest private non-profit universities in the United States.

32.     Under Mr. Falwell's leadership, Liberty University's finances have transformed from being crippled by debt to possessing nearly $3.5 billion in net assets and one of the largest and fastest-growing endowments of any university in the nation.  The University's sports teams play in Division 1 of the National Collegiate Athletic Association (alongside The University of Notre Dame and Brigham Young University, as Dr. Falwell always wanted).  In 2017, its football team joined the Football Bowl Subdivision, college sports' most competitive level.  Its sprawling campus, which overlooks Lynchburg, Virginia, comprises 7,000 acres and 17 colleges. Under Mr. Falwell's stewardship, Liberty has built a $50 million library with a high-tech robotic book-retrieval system (one of only a few in the country); renovated its 25,000-seat football stadium (Williams Stadium); and built a year-round outdoor ski slope (the only one of its kind in North America) that is free for students.  In January 2017, President Donald Trump gave the commencement speech at Liberty University—one of his very first speeches as President of the United States.

**C.    Liberty Recognizes Mr. Falwell's Outstanding Leadership in the 2019 Employment Agreement**

33.     Mr. Falwell's outstanding leadership of Liberty endeared him to students, faculty, alumni, and donors alike.  Indeed, Liberty students would often chant his name when he appeared at school events.  And his success with donors is undeniable:  as noted above, in the first ten years of Mr. Falwell's tenure as President and Chancellor, Liberty's endowment grew exponentially.

9

34.     In 2019, Liberty University and Mr. Falwell negotiated and entered into the Employment Agreement, which was intended to fairly compensate Mr. Falwell for his significant contributions and to bring his compensation in line with market compensation.

35.     In light of his proven track record as President and Chancellor, in 2019, the University took steps to ensure that Mr. Falwell was properly compensated for the success his stewardship had brought Liberty.  The University retained FW Cook, a national consulting firm with expertise in the compensation of executives in tax-exempt organizations, to review Mr. Falwell's compensation.  The University tasked FW Cook with determining whether Mr. Falwell's compensation was in line with national standards, taking into account Liberty University's growth and financial achievements and Mr. Falwell's historical compensation.  FW Cook made recommendations for program changes as needed to ensure that Mr. Falwell was retained at Liberty University for the long term and provided with a competitive and motivating compensation program.

36.     In recognition of Mr. Falwell's numerous significant contributions to Liberty University, and in an effort to compensate Mr. Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, under advisement from FW Cook, Liberty University entered into the Employment Agreement.

37.     As Liberty University specifically recognized in the Employment Agreement:

a)      In his first ten years with Liberty University, Mr. Falwell was instrumental in promoting and furthering the University's debt restructuring and returning the University to a position of financial strength by 1997 from a period of severe financial hardship.

LUADMINREC000526

b)      During Mr. Falwell's tenure with Liberty University, he was instrumental in promoting and furthering the rapid expansion and continued success of the University, especially since 2007, when Mr. Falwell became President and Chancellor.

c)      Under Mr. Falwell's leadership, between 2007 and 2017 Liberty University's net assets increased from approximately $100 million to over $2.1 billion.  During the same time period, the University's annual gross revenues increased from $231,506,554 to over $1 billion, and its surplus of revenues over expenditures increased from $52,514,469 to $331,142,834.

d)      Likewise, under Mr. Falwell's leadership, between 2007 and 2017 Liberty University's attendance increased from 9,600 students in residence and 27,000 students online in 2007 to 15,000 students in residence and 86,000 students studying online in 2017.

e)      As a result of its strong financial performance under Mr. Falwell's leadership, Liberty University's Standard & Poor's credit rating has been AA since 2011, placing Liberty among the 80 highest rated universities nationally.

38.     The Employment Agreement includes a non-disparagement clause, which provides that "[t]he parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings." It further provides that the parties may, if Mr. Falwell is terminated for cause, "truthfully explain the circumstances forming the basis for the determination of cause." This non-disparagement provision expressly survives termination of the Employment Agreement.

39.     The Employment Agreement provides indemnification rights above and beyond "any and all indemnity rights and protections [Mr. Falwell] may have pursuant to statute or under

11

any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies." Section 10.1 of the Employment Agreement provides that:

> [t]o the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment.

**D.    Granda's Attempts to Extort the Falwells**

*(i) Granda's Lies Regarding the Affair*

40.    Jerry and Rebecca Falwell have been married since 1987 and have three children together. In March of 2012, Mr. and Mrs. Falwell were on vacation with their family, as well as two other families, at the Fontainebleau Miami Beach hotel in Miami, Florida. There, they met Giancarlo Granda, who was employed at the resort as a pool attendant. At first, Granda impressed the Falwells with his entrepreneurial attitude and ambition, and the Falwells befriended him. With the Falwell's help and encouragement, Granda decided to return to college and received his bachelor's degree in finance from Florida International University.

41.    Unbeknownst to Mr. Falwell, on rare occasions between 2012 and 2014, Mr. Granda and Mrs. Falwell engaged in an affair. The Falwells later learned that Granda used his job at the Fontainebleau Miami Beach hotel to prey on hotel guests, especially women.

42.    When Mr. Falwell learned of the affair, he was heartbroken. However, after working on their marriage, he and Mrs. Falwell reconciled. Unfortunately, Mr. and Mrs. Falwell's reconciliation did not put an end to the trouble Granda would cause their family. Notwithstanding all the support the Falwell family gave to Granda, he soon revealed himself to be a deeply disturbed and unstable individual who was bent on continually threatening the

12

LUADMINREC000528

Falwells and exploiting the affair to his financial advantage. As explained below, when it became clear the Falwells would not be extorted and would never pay for his silence, he publicly unleashed falsehoods in an attempt to destroy their lives.

43.     When the affair ended in 2014, the Falwells initially attempted to distance themselves from Granda, but Granda responded with aggression and threats to publicize his relationship with Mrs. Falwell to publicly embarrass the Falwells and Liberty University.

44.     Granda's threats placed an enormous amount of strain on the Falwells' well-being—the constant anxiety contributed to Mr. Falwell losing 80 pounds over just two years. Although the Falwells wished to distance themselves from Granda completely, given the threat that he posed, the Falwells believed it best to maintain a positive relationship with him to placate his increasingly erratic behavior and manage his extortive demands while extricating themselves. Granda became obsessed, however, with the prospect of leveraging his relationship with the Falwells into a payday.

45.     For example, Granda had sold intimate pictures of Mrs. Falwell to his friends, who then used those pictures to try to extort the Falwells for money. When Granda learned of his friends' extortion attempt, rather than apologize for the emotional and financial toll it took on the Falwells, Granda expressed awe that he had possessed pictures that were apparently so valuable, and that the friends to whom he had sold the pictures stood to gain more than he had from selling them to them.

46.     Granda also illegally recorded phone calls and FaceTime communications with Mrs. Falwell without her consent. On information and belief, he made these recordings to strengthen his extortion attempts and to support his later public allegations with out-of-context clips that purportedly verified his ludicrous allegations.

13

47.     Afterwards, in late 2014, Granda repeatedly threatened to publicize the affair unless the Falwells gave him large sums of money, ranging from $600,000 to $2 million.

*(ii) Granda's History of Unstable Behavior.*

48.     Recently, Granda's ex-girlfriends, with whom the Falwells grew close in their effort to maintain a positive relationship with Granda, have confided in the Falwells that Granda was unbalanced and manipulative.

49.     On more than one occasion, Granda's (now ex) girlfriends texted the Falwells to seek their help in managing Granda's self-destructive and unbalanced behavior, stating that Granda was "crazy and verbally abusive" to his girlfriend, his family, and anyone that grew close to him; and that he exhibited frequent "rages," including virtually destroying his parents' house and "saying really [expletive] up stuff to others."

50.     One ex-girlfriend told the Falwells that Granda often hurled racist insults at her and her family. As she put it, "he had truly unresolved psychological issues that make him hurt people who love him . . . he did the same to his family growing up and now he is doing it to me . . . his snapping and explosive behavior is legitimately scary." She further described that he would say "the most [expletive] up things about my family" and her, and that she had "never heard such disgusting racist [expletive] in [her] life."

*(iii) Granda's Efforts to Extort The Falwells*

51.     While the Falwells were successful in placating Granda for a time, his extortive threats never stopped. Indeed, they only became more outrageous and potentially damaging.

52.     When the Falwells eventually decided to attempt disengaging with Granda completely, it was then that Granda changed the threat behind his extortion to something more damaging. Rather than just reveal the affair Granda had engaged in with Mrs. Falwell, Granda

14

threatened to falsely claim that Mr. Falwell had been a willing participant in the affair, even watching the two engage sexually.

53.     This was not true. Mr. Falwell did not participate in the affair and he certainly did not watch Granda having sex with his wife.

54.     Upon information and belief, Granda had cooked up this lie hoping that it would provide him a more powerful threat for purposes of accomplishing his intended extortion of the Falwells. He was aware of Mr. Falwell's role at Liberty University, an evangelical institution, his father's legacy as a national evangelical leader, and his involvement with the Republican Party.

55.     On June 30, 2020, Mr. Falwell communicated to Granda, in no uncertain terms, that he would not be extorted; he would not give Granda any money; and Granda should cease and desist from contacting the Falwells. Granda has not ceased contacting the Falwells and has continued to attempt to communicate with the Falwells though texts and calls, including in harassing communications as recently as October 2020.

56.     After receiving the June 30 communication and apparently realizing his extortion scheme would fail, rather than refrain from contacting the Falwells, Granda then set out to destroy them in public. In other words, if the Falwells would not pay Granda to stay silent, perhaps someone else would pay him to go public.

57.     The Presidential election season and Mr. Falwell's long-standing and vocal support for the President in media and public appearances, including his early endorsement of the President in 2016, gave Granda the perfect opportunity.

58.     On information and belief, by this point Granda was no longer acting alone on his plan to publicly reveal his lies but was now conspiring with political operatives to defame Mr.

LUADMINREC000531

Falwell. Because of the salacious nature of Granda's false allegations, and because of Mr. Falwell's family name, reputation among evangelicals, and public and vocal support for President Trump, political operatives who are opposed to President Trump's re-election worked with Granda on his defamatory media campaign against Mr. Falwell.

59.     Among these individuals was Kurt Bardella, a Senior Advisor to The Lincoln Project—a political organization that accused President Trump of "crimes, corruption and corrosive nature" and that has dedicated its efforts to "defeating President Trump and Trumpism at the ballot box." On information and belief, Bardella and The Lincoln Project have been advising Granda in an attempt to use his defamatory statements to harm President Trump's chances at re-election. Further, Granda recently admitted in an ABC News interview that he is being represented free of charge by a senior adviser to The Lincoln Project, to whom he was introduced by his attorney. It has also been publicly reported that Bardella was organizing interviews for Granda.

60.     The Lincoln Project was reportedly brought in by Aaron Resnick, Granda's attorney, who is a politically prominent lawyer in Miami, Florida.

61.     Furthermore, on information and belief, Mr. Bardella, The Lincoln Project, and potentially other questionably motivated supporters of Granda have gone so far in their support for his false allegations that they have financially compensated Granda and paid his bills. Granda has been observed paying for expenses with a credit card that was not his own. On information and belief, this card belongs to Resnick.

62.     On August 23, 2020, faced with Granda's threat to not only his wife but his own reputation, and the reputation of Liberty University, Mr. Falwell decided that the best thing to do

16

was to try and explain the suffering he and his family had endured from Granda's attempted extortion over the past years. Mr. Falwell gave a statement to the Washington Examiner.

63.     Notably, Mr. Falwell's statements to the Examiner detailed the Falwells' interactions with Granda and made clear that Granda had attempted to extort the Falwells through salacious allegations that were utterly false.

64.     The next day, on August 24, 2020, Granda followed through with his extortive threat to accuse Mr. Falwell of participating in Granda's affair with Mrs. Falwell. In a *Reuters* article titled *The Falwell Affair*, Granda made the outrageously false claim that Mr. Falwell participated in Granda's affair with Becki Falwell and "enjoyed watching" them have sex. The *Reuters* article also noted that Mr. Falwell "categorically denies" the allegations.

65.     Even the article's headline revealed that its purpose, and indeed the entire motive behind Granda and his co-conspirators' defamation of Mr. Falwell, was to attack Mr. Falwell *and* the institutions with which he was connected: Liberty University and President Trump. The byline reads, "[Granda] says he had sex with Becki Falwell while Jerry Falwell, Jr., *head of Liberty University and a staunch supporter of President Trump*, looked on." (emphasis added).

E.     Liberty Forces Mr. Falwell's Resignation Without Investigation of Granda's Lies

66.     On the same day that *Reuters* published Granda's false and defamatory statements, the Executive Committee of Liberty University's Board of Trustees forced Mr. Falwell to tender his resignation as President and Chancellor of the University.

67.     On information and belief, the Board of Trustees and the Executive Committee were aware of Mr. Falwell's August 23, 2020 statement in the Washington Examiner noting that he was the subject of extortive attempts by an individual who was using an affair with Mrs.

17

Falwell to fabricate outrageous claims regarding Mr. Falwell to harm his reputation, as well as his categorical denial in the *Reuters* article.

68.    Moreover, at the time of Mr. Falwell's resignation, Liberty further possessed information that Granda's statements were false because Mr. Falwell had previously disclosed information regarding the affair to a top official who was then, and is now, a member of the University's Board of Trustees.

69.    Yet, despite this knowledge, when the *Reuters* article was published, not one member of the Board or the Executive Committee asked Mr. Falwell about the veracity of Granda's lies before forcing Mr. Falwell's resignation and then defaming him by repeating and endorsing the lies. Liberty still has not inquired with Mr. Falwell about Granda's lies. Further, Liberty performed no investigation whatsoever into the veracity of Granda's claims before forcing Mr. Falwell's resignation or before making its defamatory statements.

70.    Upon information and belief, certain key individuals directly involved in the decisions and actions to force Mr. Falwell's resignation and then defame him were fulfilling a long-held goal to end Mr. Falwell's fruitful thirty-two-year relationship with the University. Purportedly acting in the University's interest to disassociate the University from Mr. Falwell's alleged indiscretions, these individuals had engaged, or were engaged, in various illegal, unlawful, and immoral or otherwise dubious acts in their stewardship of other institutions and otherwise which, if known to the public generally, would unquestionably tarnish the reputation of Liberty University by association. It is therefore hypocritical in the extreme for these key individuals to cast any action of Mr. Falwell as disqualifying Mr. Falwell from leading Liberty, as he had done successfully for many years.

18

71.     Mr. Falwell was told to tender his resignation from Liberty, or he would be forced to resign.  On August 24, 2020, Mr. Falwell provided Liberty University with written notice of his resignation for "good reason," as that term was defined in the Employment Agreement.

72.     On August 25, 2020, Liberty University accepted Mr. Falwell's resignation for good reason through a vote of its Executive Committee, which was affirmed on the same day through a full vote of the Board of Trustees, thus terminating Mr. Falwell's employment with the University.

73.     By forcing Mr. Falwell's resignation from Liberty immediately following Granda's false and defamatory statements, Liberty sent the unmistakable message to the public that Granda's false statements were, in fact, true.

F.      Liberty University Defames Mr. Falwell Following His Resignation

74.     After severing his relationship from Liberty, and despite Liberty's acceptance of Granda's false story, Mr. Falwell looked forward to the next chapter in his life.  Liberty, however, immediately began a campaign to tarnish, minimize, and outright destroy the legacy of the Falwell family and Mr. Falwell's reputation.

75.     The very next day, on August 26, 2020, David Nasser, Liberty University's Senior Vice President for Spiritual Development, presented a speech at the University's Community Service, an event at the start of a new school year where thousands of students and faculty were present and which Liberty also broadcasted online.

76.     Nasser helped secure a wide-spread attendance and media presence for this event by promoting it, including at Liberty's Convocation, which was held earlier that day, broadcasted online, and considered mandatory for all staff, faculty, and students.  During Liberty's

19

Convocation, Nasser told the audience that he would be discussing the events leading to Mr.

Falwell's resignation that night.

77.     On information and belief, Nasser's speech later that day at Community Service

was largely scripted; other Liberty employees participated in drafting the speech, and Mr. Nasser

was reading from a script during his speech.

78.     Nasser began the defamatory portion of the speech by stating, "There are those

who have told me to lay low and to not mention any of the things that lead to Jerry Falwell's

resignation yesterday." Moments later, Nasser tells the audience, "you're also right if you wanna

see stern and swift accountable action for sinful behavior." A moment later, he tells the

audience, "the embarrassment that's been brought upon you as a Liberty student and more

importantly brought upon the name of Christ is wrong." A moment later, he tells the audience,

"Your concerns, if you're concerned, are valid.  If you're not concerned, you should be

concerned." Later in the speech, Nasser returns to the topic, again prefacing his remarks by

referring to Granda's lies: "Then the summer came to a close, and we opened the semester with

a series of revelation about Jerry Falwell that can only be described as shameful. That's okay, by

the way, to say it.  It's okay to call sin, sin.  Paul says in Ephesians.  Have nothing to do with the

fruitless deeds of darkness but rather, expose them.  It is shameful to even mention what the

disobedient do in secret.  But everything exposed by the light becomes visible." A moment later,

he proceeds to state again, "It's okay to call sin, sin." These remarks together are referred to

herein as the "Defamatory Speech."

79.     The Defamatory Speech is false and defamatory.  Taken together, Liberty's

statements repeat, as a statement of fact, Granda's lies that Mr. Falwell watched him have sex

with his wife and participated in their affair.  Granda's lies were first reported in the *Reuters*

20

article two days before the speech and instantly garnered national press attention. Upon information and belief, every or virtually every Liberty student and faculty member present for the speech was aware of Granda's lies and understood that they were "the things that led to Jerry Falwell's resignation yesterday," as Nasser put it. Upon information and belief, that is exactly what Liberty intended to convey and intended for listeners to understand and what the audience in fact understood. By saying, "[y]our concerns, if you're concerned, are valid," referring to the subject matter of Granda's lies as "sinful behavior" and a "sin," and as something "shameful" the "disobedient do in secret," Liberty unequivocally told its audience and the world that Mr. Falwell had done what Granda had falsely said he did, in other words, that Granda's lies were "valid."

80.    The Defamatory Speech was the subject of much media attention and was attended by members of the national press, as Liberty was no doubt aware it would be.

81.    Liberty published a video of the Defamatory Speech online to its website, and it remains online as of the time of this filing.

82.    On information and belief, Nasser was authorized to speak on behalf of Liberty at the Community Service event. In fact, Nasser did so in the course and scope of his employment and in furtherance of Liberty's interests, and was acting as Liberty's agent in his role as Senior Vice President. Furthermore, the Community Service event was an official Liberty University event where thousands of Liberty students were in attendance, alongside Liberty's faculty and leadership, including its acting President and Chairman Jerry Prevo.

83.    On August 31, 2020, Liberty University issued a press release affirming its prior condemnation of Mr. Falwell. In the statement, Liberty accused Mr. Falwell of a "lack of spiritual stewardship" and suggested that he had not "demonstrate[d] a full commitment to the spiritual mission of Liberty University by words, actions, and example." Liberty clearly

21

connected its accusation of a lack of spiritual leadership with Granda's false allegations by noting that "all the signs were not there until the start of last week," *i.e.*, when Granda's false allegations were publicized, and that while Liberty "still didn't' know the full scope of the matter, [it] had learned enough . . . ." This statement was posted online, and it remains online as of the time of this filing. These statements together are referred to as the "Defamatory Press Release."

84.     The Defamatory Press Release is false and defamatory because, as with the Defamatory Speech, it suggests that Mr. Falwell's presidency came to an end because of Granda's lies and that, by claiming Mr. Fallwell "lack[ed] spiritual stewardship" and conducted himself inconsistently with the "spiritual mission" of Liberty, said lies were truthful.

85.     Liberty has also defamed Mr. Falwell in the pages of its own publication, providing statements that it knew would be disseminated by a media biased against Mr. Falwell. For example, a number of articles in the September 24, 2020 issue of the *Liberty Journal*, an official magazine published by the University and distributed nationally to media outlets and alumni, further accused Mr. Falwell of inappropriate behavior.   Specifically, one article republished Liberty's August 31, 2020 accusation in the Defamatory Press Release of a "lack of spiritual stewardship" from Mr. Falwell.   Another article said that "[r]ecent events involving Liberty's fourth president, Jerry Falwell, Jr., have broken trust for most in Liberty University, and some question Liberty's commitment to its nearly 50-year mission of *Training Champions for Christ*." These statements together are referred to as the "Defamatory Journal Articles."

86.     Liberty published this issue of the *Liberty Journal* online, and it remains online as of the time of the filing of this Complaint.   The *Liberty Journal* is also distributed publicly by mail, nationwide.

22

87.    The Defamatory Journal Articles are false and defamatory because, as with the Defamatory Speech and Defamatory Press Release, they suggest that Mr. Falwell's presidency came to an end because of Granda's lies, including by asserting the lies are true by claiming Mr. Falwell "lack[ed] spiritual stewardship" and that he had "broken trust for most in Liberty University."

88.    The Defamatory Speech, Defamatory Press Release, and Defamatory Journal Articles are herein referred to as the "Defamatory Statements."

89.    In tandem with their attempts to savage Mr. Falwell's reputation, Liberty has engaged in a campaign to erase history and blot out the Falwell family's legacy at Liberty. Liberty has prohibited Mr. Falwell from speaking to its staff; prohibited faculty from speaking to Mr. Falwell; and banned Mr. Falwell from visiting campus, despite the fact that both of Mr. Falwell's parents are interred on Liberty's grounds. The University has even gone so far as to take down photos of Mr. Falwell, including a portrait of a young Mr. Falwell standing with his father, Dr. Falwell, on the sidelines of Liberty University's first football game in 1973.

90.    Again, prior to making the Defamatory Statements and taking these actions, on information and belief, Liberty was aware of Mr. Falwell's August 23, 2020 statement in the Washington Examiner and categorical denial in the *Reuters* article. Indeed, at the time of the Defamatory Statements, Liberty was even aware of the fact that Mr. Falwell was receiving therapy for stress-induced depression, which Mr. Falwell incurred in part because of the anxiety Granda's attempted extortion was causing. Yet, not one member of the Board or the Executive Committee asked Mr. Falwell about the veracity of Granda's allegations, and on information and belief, Liberty never undertook its own investigation.

23

LUADMINREC000539

91.     In fact, for Liberty the issue has never actually been about whether Mr. Falwell did anything wrong.  On information and belief, Liberty forced Mr. Falwell's resignation and issued these statements because certain high-ranking individuals (for reasons known only to themselves now but are to become known broadly during this litigation) wanted him replaced as President and Chancellor of Liberty University.  Upon information and belief, Liberty engaged in this defamatory campaign to seal the deal and ensure the permanent termination of Mr. Falwell's relationship with the school his father founded.

92.     Yet, as recently as October 23, 2020, Liberty's acting President and Chairman, Jerry Prevo, noted that "in the time I have been here I have not seen any wrong-doing on [Mr. Falwell's part]."  Nevertheless, despite acknowledging that there had not been any wrongdoing, Liberty apparently stands by its Defamatory Statements against Mr. Falwell as each remains publicly available on Liberty's website, and Liberty has never apologized or retracted the Defamatory Statements.

G.      **Harm to Mr. Falwell As a Result of Liberty's Defamation**

93.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell's reputation, profession, and future employment prospects and business opportunities have been harmed.

94.     Upon information and belief, there is widespread knowledge of the Defamatory Statements within the Liberty University community, the evangelical community, the real estate industry, the academic field, the political world, and media outlets.

95.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell has a drastically reduced ability to attach his name to, or be otherwise publicly involved in, business

24

LUADMINREC000540

and charity organizations and events without a real and justifiable fear that his damaged reputation will erode the reputation of such organizations.

96.     For instance, prior to Liberty's statements, Mr. Falwell received a number of invitations to appear on television or at public events to discuss, among other things, Liberty, evangelicalism, and politics.   Indeed, Mr. Falwell has considered becoming a recurring contributor on news outlets.  Since Liberty's Defamatory Statements, Mr. Falwell has received no such invitations and has lost any prospect of becoming a contributor.

97.     As a direct and proximate result of Liberty's Defamatory Statements, Mr. Falwell has a drastically reduced ability to attend industry-related academic, political, or real-estate conferences, and to seek business and professional opportunities in those fields, without a real and justifiable fear that any new business contacts he develops will have knowledge of the Defamatory Statements and associate his damaged reputation with any companies he establishes, manages, and/or owns.  In the past, Mr. Falwell has attended a number of such conferences per year.

98.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell has a drastically reduced ability to attend community social events, such as events at his relatives' school and with his neighborhood association, without a real and justifiable fear that any people he meets will have knowledge of the Defamatory Statements and associate him with such statements.

99.     Both the Defamatory Statements and the attendant fear that others will associate Mr. Falwell's businesses, charities, family, and friends with his damaged reputation have caused Mr. Falwell significant anguish and humiliation.

25

LUADMINREC000541

100.    That Mr. Falwell now rarely speaks or appears publicly on behalf of the businesses and charity organizations he supports—a form of support that Mr. Falwell formerly enjoyed—has also caused Mr. Falwell significant anguish.   In addition, the Defamatory Statements have caused Mr. Falwell immense anguish as he now is deeply concerned that third parties will hold horribly false impressions of him.

101.    As a direct and proximate result of Liberty's statements, Mr. Falwell has also become the subject of much ire and hatred over the "sin" Liberty claimed he committed in its Defamatory Statements.   Upon information and belief, members of the public have written numerous hateful messages on social media in reliance on Liberty's Defamatory Statements.

## COUNT ONE: DEFAMATION

102.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 101 with the same force and effect as if fully stated herein.

103.    Liberty made and published the Defamatory Statements, which are statements of fact of and concerning Mr. Falwell.   These statements are false and exposed Mr. Falwell to contempt, ridicule, hatred, and obloquy.

104.    The Defamatory Statements are also defamatory *per se* because they impute to Mr. Falwell unfitness to perform the duties of an office or employment and prejudice him in his profession or trade.

105.    Liberty made and published the Defamatory Statements knowing that such statements would be disseminated throughout the world.

106.    Liberty made and published the Defamatory Statements without any applicable privilege.

26

107.   Liberty made and published the Defamatory Statements with knowledge that they were false and/or with reckless disregard for the truth or falsity of the statements, or with at least negligent disregard for the truth or falsity of the statements.

108.   As a direct and proximate result of the Defamatory Statements, Mr. Falwell has suffered damage to his reputation, damage to his profession, humiliation, and anguish, lost business opportunities, and suffered other pecuniary damage.

### COUNT TWO: BREACH OF CONTRACT

109.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 108 with the same force and effect as if fully stated herein.

110.   On July 1, 2019, Mr. Falwell and Liberty University executed the Employment Agreement.

111.   Pursuant to Section 3.7 of the Employment Agreement, Liberty University was barred from "mak[ing] defamatory or slanderous remarks about [Mr. Falwell] in public fora and settings."

112.   Liberty breached the foregoing provision by making and publishing the Defamatory Statements.

113.   Furthermore, pursuant to Section 3.7 of the Employment Agreement, Liberty University was permitted to discuss the reasons for the conclusion of Mr. Falwell's employment only if Mr. Falwell was terminated for cause.

114.   Liberty breached the foregoing provision because Mr. Falwell was not terminated for cause and therefore Liberty was not allowed to discuss the circumstances surrounding the conclusion of Mr. Falwell's employment as it did by making and publishing the Defamatory Statements.

27

LUADMINREC000543

115.    The terms of Section 3.7 survive termination of the Employment Agreement.

116.    As a direct and proximate result of Liberty's breach of contract, Mr. Falwell has suffered damage to his reputation, damage to his profession, humiliation, and anguish; lost business opportunities; and suffered other pecuniary damage.

### PRAYER FOR RELIEF

117.    WHEREFORE, for the reasons set forth herein, Plaintiff Jerry Falwell, Jr. respectfully requests this Honorable Court:

        a)     Enter judgment in Mr. Falwell's favor;

        b)     Award Mr. Falwell damages for Liberty's acts in defaming him and breaching the Employment Agreement;

        c)     Award Mr. Falwell punitive damages;

        d)     Award Mr. Falwell pre-judgment interest;

        e)     Award Mr. Falwell his attorney's fees and costs incurred in prosecuting this action pursuant to Section 10 of the Employment Agreement;

        f)     Enjoin Liberty University from repeating the Defamatory Statements regarding Mr. Falwell; and

        g)     Provide any other relief this Court deems appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff Jerry Falwell, Jr. hereby demands a trial by jury.

LUADMINREC000544

Respectfully submitted,

**GBSR ATTORNEYS, LLP**

Dated: October 28, 2020
Lynchburg, VA

James J. Gilbert, IV (VSB #38229)
Timothy S. Bird (VSB # 38139)
Jordan K. Sharpe (VSB #79394)
13595 Booker T. Washington Highway
Moneta, VA 24121
phone - 540-721-5110
fax- 540-721-5112
jgilbert@gbsrattorneys.com
tsbird@gbsrattorneys.com
jsharpes@gbsrattorneys.com

**QUINN·EMANUEL URQUHART & SULLIVAN LLP**

Robert L. Raskopf
    (pro hac vice application pending)
Julia M. Beskin
    (pro hac vice application pending)
robertraskopf@quinnemanuel.com
juliabeskin@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000 (tel.)
(212) 849-7100 (fax)

*Attorneys for Plaintiff Jerry Falwell, Jr.*

29

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is effective April 1, 2012, and is between LIBERTY UNIVERSITY, a Virginia nonstock corporation (referred to in this Agreement as "LU" or "the University") and JERRY L. FALWELL, JR., a resident of Virginia (referred to in this Agreement as "Falwell" or "the Employee").

WHEREAS, LU is a university centered in the City of Lynchburg, Virginia, which is dedicated to excellence in higher education and scholarship within a Christian context;

WHEREAS, Falwell has served LU in several roles since 1988, including his current positions as Chancellor and President;

WHEREAS, LU acknowledges that Falwell, among others, was instrumental in promoting and furthering the University's debt restructuring and return to a position of financial strength in 1997 after a period of severe financial hardships for the University that began in 1987 and, more recently, in promoting and furthering the rapid expansion and continued success, particularly since 2007;

WHEREAS, since Falwell became President and Chancellor in 2007, Liberty's net assets have increased from approximately $100,000,000 to over $800,000,000 and are projected to exceed $1,500,000,000 within five years and Liberty's enrollment has increased from approximately 9,600 students in residence to over 12,000 students in residence and from approximately 27,000 students studying online to over 75,000 students studying online. During the same period, annual gross revenues have increased from $231,506,554 to $645,350,280 and the University's surplus of revenues over expenditures has increased from

1



$52,514,469 to $221,188,918.  As a result of such financial performance, Standard & Poor's has assigned the University a credit rating of AA for two consecutive years, placing the University among the 80 highest rated universities nationally;

WHEREAS, LU acknowledges that Falwell's annual compensation has been consistently below national standards and norms prevailing in the field of university education, all as documented by the independent consultant's report dated August 11, 2011, by Dixon Hughes Goodman, LLP;

WHEREAS, LU desires to raise its executive compensation to near the median of executive compensation for comparable non-profit colleges and universities, adjusted for geography, performance and tenure.

WHEREAS, in recognition of Falwell's past contributions to the University and in an effort to compensate Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, LU wishes to formalize and reinforce the parties' long term employment relationship by entering into this Agreement; and

WHEREAS, Falwell likewise wishes to continue his employment as President and Chancellor of the University on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, LU and Falwell adopt the foregoing recitals and agree as follows:

2

## ARTICLE 1

### EMPLOYMENT STATUS

1.1     LU hereby agrees to continue employing Falwell and Falwell hereby accepts

continued employment by LU as President and Chancellor for the seven (7) year and three

(3) month period designated in Article 2 ("the Term") on the terms and subject to the

conditions set forth in this Agreement. Falwell shall continue to be classified as a full-time

employee for all purposes, including fringe benefits.

## ARTICLE 2

### TERM

2.1     The Term of this Agreement shall be for a period of seven (7) years and three

(3) months beginning on April 1, 2012, and expiring on June 30, 2019 ("the Term") subject

to earlier termination as provided for in this Agreement. The University is not obligated to

offer Falwell employment for any period beyond the expiration of this Agreement.

## ARTICLE 3

### DUTIES AND RESPONSIBILITIES

3.1     Falwell shall continue to provide LU with dedicated, diligent and

conscientious full time service in a manner that is generally consistent with the level of

service he has provided during the nearly five (5) year period immediately preceding the

effective date of this Agreement, with allowances for reasonable time to attend to personal

investments.

3

3.2    Falwell's duties shall consist of the tasks, duties and responsibilities he has assumed and performed as President and Chancellor during the nearly five (5) year period immediately preceding the effective dates of this Agreement. These duties shall include but not necessarily be limited to the following:

(a)    ensuring the implementation of the University's mission and purposes as described or defined in the University's Articles of Incorporation, Bylaws, and other foundational documents.

(b)    performing the duties of Chancellor/President as described in the University's Bylaws.

(c)    overseeing the fiscal, administrative, admissions, academic, athletic and other operations, divisions, departments and offices of the University.

(d)    raising funds for the benefit of the University.

(e)    implementing and executing policies, orders and resolutions adopted or established by the LU Board of Trustees and its Executive Committee.

3.3    As Chancellor and President, Falwell shall have the executive and administrative powers to manage and control the day to day operations of the University, provide focus and direction for the University, make policy recommendations to the Board of Trustees, and provide spiritual and worldview leadership to the University in pursuit of excellence, subject to the ultimate authority of the Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws.   That executive and administrative power shall include but not be limited to the absolute authority to hire, retain and dismiss

4

administrative, professional, academic and athletic personnel, subject only to any contractual or tenurial rights of any such employee.   Provided, however, that Falwell shall be accountable to the Board of Trustees for implementing its policies and carrying out his duties, including the handling of personnel matters.

3.4    Falwell shall not undertake compensated work or activities for, or accept any employment or other compensation from, any other institution of higher education for work undertaken prior to the termination of this Agreement without receiving approval of the Board of Trustees or the Executive Committee of the Board of Trustees prior to undertaking such work or activities.

3.5    Falwell shall not author or publish any book or article relating to his employment at Liberty University hereunder without prior consent of the Executive Committee or Board of Trustees, which prior consent may be conditioned upon advance review and approval of the content of said book or article.  This provision does not include letters to the editor or articles in University publications and other University media which are published to carry out Falwell's duties under this Agreement and advance the interests and mission of LU.   Nor does this provision include brief communications on Twitter, Facebook and similar communication vehicles.   The provisions of this subsection shall survive termination of this Agreement.

3.6    The parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings. This prohibition includes defamatory remarks about the employees and members of the Board of Trustees of the University.

5

LUADMINREC000550

Neither party, however, waives the protections afforded by otherwise applicable common law privileges and this Section 3.6 shall in no event apply to remarks made during meetings of either the University's Board of Trustees or its Executive Committee.   If Falwell's employment is terminated for cause, the parties may truthfully explain the circumstances forming the basis for the determination of cause. The provisions of this Section 3.6 shall survive termination of this Agreement.

  3.7  Falwell shall continue to have access to confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly disclosed by LU ("Confidential Information") during the course of his employment. Confidential Information remains the property of LU.  Unauthorized disclosure of Confidential Information will cause definite and irreparable harm to LU.   Falwell shall not disclose Confidential Information intentionally within the University except to fulfill the legitimate business purposes of LU and shall not disclose it directly or indirectly, outside the University without the express authorization of the Executive Committee of the Board of Trustees or as required by law or to further the interests of LU. Under no circumstances shall the release of details of this Agreement be considered to further the interests of LU.  Any Confidential Information in tangible form shall be immediately returned to LU upon request.   The provisions of this subsection shall survive termination of this Agreement.

6

ARTICLE 4

COMPENSATION

4.1    In consideration of Falwell's continued service as President and Chancellor, LU shall compensate him as follows:

(a)    *Base Salary*.  LU shall pay Falwell an annual base salary which shall rise each year during the Term as itemized below:

(i)    First Year and Three Months = $835,000

(ii)    Second Year = $865,000

(iii)    Third Year = $895,000

(iv)    Fourth Year = $925,000

(v)    Fifth Year = $960,000

(vi)    Sixth Year = 990,000

(vii)    Seventh Year = $1,025,000

(b)    *Discretionary Bonuses*.   Falwell shall be eligible to receive bonuses in such amounts and at such times as the Executive Committee of the Board of Trustees may award based on its assessment of his performance, the financial condition of the University, the rate of inflation and cost of living increases in Lynchburg, Virginia, and other considerations which the Executive Committee of the Board of Trustees in its sole discretion finds relevant.

(c)    *Termination Payment*. In addition to the compensation set forth above in subsection (b) and (c) in this Section 4.1, Falwell shall receive a severance payment at the

7

LUADMINREC000552

termination of his employment equal to the amount of one year's annual base salary at the rate in effect at the date of his termination. Falwell or, in the event of his death or disability his administrator, executor, or other personal representative, shall be entitled to this severance payment regardless of the reason his employment ends. Provided however, Falwell shall not be entitled to this payment in the event the University terminates his employment for "cause" as that is defined in Article 7 of this Agreement or terminates his employment without cause as described in Article 8 of this Agreement, in which case Falwell's compensation upon termination is detailed in said Articles.

4.2    LU shall provide Falwell the same fringe benefits and the same opportunity to participate in benefit plans that it offers other full-time executive employees. These benefits and programs currently include group family health insurance (medical, vision, dental), group family life insurance and disability insurance, employee assistance programs, retirement, savings and investment programs (including LU's Section 403(B) plan), sick/personal leave, holiday leave and voice and data phone payments under LU's Cellular Phone Policy and similar benefits made available to executive or managerial employees of the University. During the quarter prior to each formal annual evaluation by the Executive Committee, Falwell shall undergo an annual Comprehensive Executive Medical Health Assessment, the cost of which shall be reimbursed by the institution upon submission of a receipt or statement for same. The Comprehensive Executive Medical Health Assessment shall include a thorough physical examination by medical doctor(s), a full range of preventive screening tests for early detection of cancer, heart disease and other serious

8

LUADMINREC000553

medical problems, a cardiovascular fitness evaluation, including treadmill exercise test, a lifestyle assessment to discuss nutrition, exercise, personal safety and other indicators of risk of disease, a review and update of medications and immunizations, development and assessment of a long-term strategy for prolonged life and wellness, a full report of the test results and recommendations at the conclusion of the examination and a written report sent to Falwell confidentially for his personal use and for consultation with his private physician. Neither the University nor the Executive Committee shall request or be entitled to a copy of the written report but the Executive Committee shall be entitled to receive a copy of the receipt or statement for such services as part of each of its formal annual evaluations of Falwell.

4.3    LU shall provide Falwell with an automobile allowance of Seven Hundred Fifty Dollars ($750) per month in accordance with LU's normal payroll policies and schedule and subject to any reporting and withholding requirements provided by law.

4.4    LU shall reimburse Falwell in accordance with LU's Travel and Entertainment Policy for reasonable and necessary travel and out-of-pocket expenses incurred by him, and where appropriate his spouse, in connection with the performance of his official duties under this Agreement.

4.5    LU shall provide Falwell and members of his immediate family with tuition at the University through the conclusion of each academic year during which he serves as President and/or Chancellor pursuant to LU's Dependent Grant-in-Aid Policy and Continuing Education Policy. "Immediate family" shall be limited to Falwell's wife and

9

children by birth or adoption. Such tuition benefits shall be provided subject to any reporting and withholding requirements provided by law.

4.6    Falwell shall be entitled to six (6) weeks annual vacation during each year of the Term. No unused vacation may be carried forward to subsequent years or paid out as compensation.

4.7    LU agrees to provide memberships at the LaHaye Student Center and Sports Racket for use by Falwell and his immediate family or at another fitness center mutually agreeable to the parties.

4.8    LU agrees to provide general maintenance and upkeep at the primary residence of Falwell, including general repairs, maintenance and lawn care. The parties hereto acknowledge that the primary residence of Falwell is used by the University from time to time for student, faculty and staff events. A portion of the general maintenance and upkeep referenced above shall be deemed a business expense of the University in connection with said student, faculty and staff events and the remainder of said general maintenance and upkeep shall be deemed income to Falwell and reported to the IRS as such by the University.

4.9    Anything in this Agreement to the contrary notwithstanding, in the event that it shall be determined that any payment or distribution by the University to or for the benefit of the Employee, whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, would constitute an "excess parachute payment" within the meaning of §280G of the Internal Revenue Code of 1986, as amended (the "Code") (each such payment, a "Parachute Payment") and would result in the imposition on the Employee

10

of an excise tax under Code §4999, then, in addition to any other benefits to which the Employee is entitled under this Agreement or otherwise, the Employee shall be paid an amount in cash equal to the sum of the excise taxes payable by the Employee by reason of receiving Parachute Payments plus the amount necessary to place the Employee in the same after-tax position (taking into account any and all applicable federal, state and local excise, income or other taxes at the highest possible applicable rates on such Parachute Payments (including, without limitation, any payments under this subsection )) as if no excise taxes had been imposed with respect to Parachute Payments (the "Parachute Gross-up"). Any Parachute Gross-up otherwise required by this subsection shall not be made later than the time of the corresponding payment or benefit hereunder giving rise to the underlying Code §4999 excise tax (to the extent such determination has been made prior to such time), even if the payment of the excise tax is not required under the Code until a later time. Any Parachute Gross-up otherwise required under this subsection shall be made whether or not payments or benefits are payable under this Agreement and whether or not the Employee's employment with the University shall have been terminated.

## ARTICLE 5

### OTHER EMPLOYMENT

5.1    Falwell shall refrain from undertaking any other employment or compensated activities that hinder or impede successful performance of the services outlined in this Agreement. Except as provided in this Agreement, Falwell shall not engage in any compensated employment or compensated activities without first obtaining the written

11

approval of the Executive Committee or the Board of Trustees. The University, however, acknowledges that Falwell is licensed by the Virginia State Bar and periodically engages in the practice of law on a limited basis in association with another practitioner on discrete matters. Falwell hereby receives approval for such limited legal work and therefore shall not require any additional approval for such employment by the Executive Committee or the Board of Trustees. Passive investment activity such as buying, holding and selling real estate, stock and securities ("Passive Investment Activity") shall not be considered other employment or compensated activities for purposes of this Agreement and therefore shall not require any additional approval by the Executive Committee of the Board of Trustees.

ARTICLE 6

TERMINATION UPON DEATH

6.1     Falwell's death shall terminate this Agreement. Falwell's executor, administrator or other personal representative shall be entitled to all the compensation and fringe benefits provided in Article 4 of this Agreement through the date of his death, along with the severance payment provided under subsection 4.1(c) and any benefits to which he or his executor, administrator or other personal representative is entitled under any applicable benefit plan as a deceased employee. All benefits available to Falwell's immediate family under subsection 4.5 and 4.7 shall continue in place for the remainder of the Term in addition to any and all survivorship death benefits payable under any savings, retirement, investment and other plans and programs in which Falwell was a participant. Falwell shall not be entitled to receive any other payments or benefits after the date of his death.

12

ARTICLE 7

TERMINATION FOR CAUSE OR DISABILITY

7.1    LU may terminate Falwell's employment only for cause or disability as defined below, provided it first delivers to Falwell specific, written notice of the purported grounds for dismissal, and if in the opinion of the Executive Committee the cause or disability can be corrected or cured, a thirty (30) day opportunity to correct or cure the alleged "cause" or "disability".  A dismissal in the absence of a required, thirty (30) day notice is a dismissal without cause.

7.2    If Falwell is terminated for cause, LU shall be obligated to pay Falwell his salary, earned compensation and fringe benefits up to the date of termination only, plus any benefits to which he is entitled under any applicable benefit plan as a former employee. Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination.  Falwell's resignation from the Board of Trustees and its Executive Committee shall be effective immediately upon termination of his employment for cause.

7.3    As used in this Agreement, the term "cause" is defined restrictively to mean only the following:

        (a)    the refusal or willful failure of Falwell to comply with the directives of the Board of Trustees so long as such directives are not in conflict with the authority of the

13

Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws, or in conflict with this Agreement;

(b)     the material failure of Falwell to comply substantially with written policies, standards and regulations of LU as from time-to-time established;

(c)     the refusal or willful failure of Falwell to faithfully or diligently perform his duties under this Agreement;

(d)     conviction of or entry of a plea of guilty, no contest or *nolo contendere* to any felony or to a misdemeanor involving moral turpitude (deferred disposition by a court, with or without a finding, admission or adjudication of guilt, such as withholding adjudication or taking the matter under advisement for some set period, meets the threshold for cause intended for Section 7.3 (d));

(e)     conviction of or entry of a plea of guilty, no contest or *nolo contendere* to any felony or  to a misdemeanor involving moral turpitude by others about which Falwell had actual knowledge and could have prevented (deferred disposition by a court, with or without a finding, admission or adjudication of guilt, such as withholding adjudication or taking the matter under advisement for some set time period, meets the threshold for cause intended for Section 7.3 (e));

(f)     defamatory or slanderous comments in breach of Section 3.6 of this Agreement which cause serious damage to LU's reputation; or

(g)     advocating a position that is inconsistent with the doctrinal statements found in the University's Articles of Incorporation, with the sole exception of such advocacy

14

in private discussions with the Board of Trustees or Executive Committee in connection with proposed amendments to the Articles of Incorporation.

7.4    In the event Falwell is the subject of a criminal arrest, criminal indictment, criminal information, criminal warrant for violation, criminal complaint or criminal charge for any felony or is the subject of such for a misdemeanor involving moral turpitude, LU may place Falwell on administrative leave, thereby suspending Falwell from performance of the duties and responsibilities outlined in Sections 3.1, 3.2 and 3.3, at a minimum of one-third (1/3) of the rate of his annual base salary in effect at the date of his suspension, which compensation rate can be increased at the discretion of the Executive Committee.

7.5    As used in this Agreement the term "disability" is defined restrictively to mean only the following:   mental or physical incapacity or disability which prevents Falwell from performing a substantial and material portion of his duties under this Agreement on a continuous basis and that persists for more than 180 days. A termination of Falwell's employment for disability is neither a dismissal with cause within the meaning of Sections 7.2 and 7.3 nor a dismissal without cause within the meaning of Article 8 and Falwell shall be entitled to double the severance payment provided under Section 4.1(c).

## ARTICLE 8

### TERMINATION BY UNIVERSITY WITHOUT CAUSE

8.1    LU may terminate Falwell's employment as President and Chancellor at any time upon sixty (60) days advance, written notice to Falwell without cause.  In the event LU elects to terminate Falwell's employment as Chancellor and President without cause, LU

15

shall continue to provide Falwell as liquidated damages his full annual base salary at the rate in effect at the date of his termination  through the remainder of the Term, and any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination. Following termination of his employment, Falwell shall have no obligation to remain at the University or perform any services for the University for the remainder of the Term. Falwell shall have the right but not the obligation to seek and secure alternative employment for the balance of the Term.  Should Falwell secure other employment or engage in  compensated activities prior to the end of the time period for which LU is obligated to compensate him under this Agreement, he shall notify the University of the salary and other compensation he receives from any new employer or compensation source other than Passive Investment Activity sources of compensation. One (1) year after termination, LU shall have the right to reduce, on a month-to-month comparison basis, any remaining continuing payment obligations to Falwell to the extent that he earns such other salary and compensation (excluding compensation from Passive Investment Activity).

8.2    The parties have bargained for this liquidated damages provision, giving careful consideration to the following circumstances:

(a)    this Agreement concerns personal services.

16

(b)      termination of this Agreement by the University prior to the end of the Term (or at any point after the Term) could cause Falwell to lose compensation opportunities relating to his employment at the University and damage his professional reputation.  These and related damages to Falwell are difficult to determine with certainty. Therefore, the parties have agreed upon this liquidated damages provision and stipulate that it is neither a penalty nor an incentive for unsatisfactory performance.

ARTICLE 9

RESIGNATION

9.1      Falwell may resign, retire or otherwise terminate his employment with the University for any reason at any point during the Term (or during any renewal or extended Term) provided he gives the Board of Trustees sixty (60) days advance written notice.  In the event Falwell should elect to resign, retire or otherwise terminate his employment prior to the end of the Term, the University shall be obligated to pay Falwell his salary, earned compensation and fringe benefits through the date of termination only along with the severance payment provided under Section 4.1(c) and any benefits to which he is entitled under any applicable benefit plan as a former employee.   Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination.

17

LUADMINREC000562

ARTICLE 10

INDEMNIFICATION

10.1   To the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment. The indemnification afforded Falwell under this Section is in addition to any and all indemnity rights and protections the Employee may have pursuant to statute or under any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies.

ARTICLE 11

MISCELLANEOUS PROVISIONS

11.1   Neither party shall disclose this Agreement to anyone without the other party's prior, written consent, unless disclosure is required by law. The parties, however, shall be free to disclose and discuss this Agreement with their respective lawyers, accountants and tax advisors. Falwell shall be permitted to disclose the Agreement to his spouse.

11.2   For a notice or other communication to be valid under this Agreement, it must be written, signed and sent by at least one of the following methods: (a) personal delivery; (b) first class mail, postage prepaid; (c) registered or certified mail, return receipt requested,

18

and postage prepaid; and (d) nationally recognized overnight courier (e.g., UPS or Federal Express).

11.3   If any provision of this Agreement is determined to be invalid, void, illegal or unenforceable to any extent, the remainder of this Agreement, or application of that provision to any persons or circumstances other than those as to which it is held to be unenforceable, will remain valid, binding and enforceable.

11.4   (a)   The parties may waive a provision in this Agreement only by a writing executed by the party or parties against whom the waiver is sought to be enforced. Waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver by that party of any subsequent breaches.

(b)   No failure or delay in exercising any right or remedy, or in requiring the satisfaction of any condition, under this Agreement, and no act, omission or course of dealing between the parties, shall operate as a waiver or estoppel of any right, remedy or condition.

(c)   A waiver made in writing on one (1) occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver of any future occasion, unless expressly stated as such.

11.5   This Agreement constitutes the final Agreement between the parties concerning the terms and conditions of Falwell's employment with LU. This Agreement supersedes and invalidates any prior or contemporaneous agreement, oral or written, between them regarding the terms of Falwell's employment with LU.  All such prior Agreements

19

between the parties shall become null and void upon the execution of this Agreement. In entering into this Agreement, neither party has relied upon any statement, representation, warranty or agreement of the other party except for those expressly contained in this Agreement. The parties may amend this Agreement only by a written Agreement of the parties that identifies itself as an amendment to this Agreement.

11.6   This Agreement may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one instrument.

11.7   The rule of construction that ambiguity is construed against the drafting party shall have no application in any dispute over the interpretation of this Agreement. The parties represent and warrant to one another that they enter this Agreement with the benefit of counsel based on the independent analysis of each party of the facts and legal principles relevant to the terms and conditions of this Agreement.

11.8   Neither this Agreement as a whole nor any of its individual provisions is assignable by either party.

11.9   The descriptive headings of the articles and sections of this Agreement are for convenience only, do not constitute a part of this Agreement, and do not affect this Agreement's construction or interpretation.

11.10   This Agreement shall be governed by and construed in accordance with the law of the Commonwealth of Virginia without regard to the Commonwealth's choice of law rules.

20

11.11  This Agreement shall be binding upon and inure to the benefit of the parties' respective successors, heirs, assigns, receivers and personal representatives.

11.12  The provisions of this Agreement to be performed upon and after termination of Falwell's employment survive termination of this Agreement.

11.13  The parties agree that any legal action or proceeding against the other party arising out of or relating to this Agreement or the University's employment of Falwell shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

IN WITNESS WHEREOF, Falwell and the authorized representative of the University have executed this Agreement on the date(s) written below.

LIBERTY UNIVERSITY, INC.

JERRY L. FALWELL, JR.

_____
Chairman, Board of Trustees

Date: July 6, 2012

_____
Jerry L. Falwell, Jr.

Date: July 5, 2012

21

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement') is hereby adopted effective July 1, 2019 between LIBERTY UNIVERSITY, a Virginia nonstock corporation (referred to in this Agreement as "LU" or "the University") and JERRY L. FALWELL, JR., a resident of Virginia (referred to in this Agreement as "Falwell" or "the Employee").

WHEREAS LU is a university centered in the City of Lynchburg, Virginia, which is dedicated to excellence in higher education and scholarship within a Christian context;

WHEREAS, Falwell has served LU in several roles since 1988, including his current positions as Chancellor and President and in connection therewith had entered into a series of employment agreements;

WHEREAS, LU acknowledges that Falwell, among others, was instrumental in promoting and furthering the University's debt restructuring and return to a position of financial strength in 1997 after a period of severe financial hardships for the University that began in 1987 and in promoting and furthering the rapid expansion and continued success of the University, particularly since 2007;

WHEREAS, since Falwell became President and Chancellor in 2007, Liberty's net assets have increased from approximately $100,000,000 to over $2.1 billion in 2017 and Liberty's enrollment has increased from approximately 9,600 students in residence to over 15,000 students in residence and from approximately 27,000 students studying online to over 86,000 students studying online. During the same period, annual gross revenues have increased from $231,506,554 to $1,111,316,499 and the University's surplus of revenues over expenditures has increased from $52,514,469 to $331,142,834.  As a result of LU's strong financial performance, Standard & Poor's has assigned the University a credit rating of AA since 2011, placing the University among the 80 highest rated universities nationally;

{2625067-1, 116311-00009-01}

EXHIBIT
4

WHEREAS, in 2019 LU engaged FW Cook, a national consulting firm with expertise in compensation of executives in tax-exempt organizations, to review Falwell's compensation to determine whether it is in line with national standards, taking into account LU's growth and financial achievements and Falwell's historical compensation, and to make recommendations for program changes as needed to ensure that he is retained at LU for the long term and provided with a competitive and motivating compensation program;

WHEREAS, LU desires to adjust its executive compensation program so that it remains competitive with executive compensation programs of other comparable non-profit colleges and universities, adjusted for geography, performance and tenure;

WHEREAS, in recognition of Falwell's many significant contributions to the University and in an effort to compensate Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, LU wishes to formalize and reinforce the parties' long term employment relationship by entering into this Agreement; and

WHEREAS, Falwell likewise wishes to continue to contribute to the future success of LU through his employment as President and Chancellor of the University on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, LU and Falwell adopt the foregoing recitals and agree as follows:

ARTICLE 1

EMPLOYMENT STATUS

1.1     LU hereby agrees to continue employing Falwell and Falwell hereby accepts continued employment by LU as President and Chancellor on the terms and subject to the conditions set forth in this Agreement. Falwell shall continue to be classified as a full-time employee for all purposes, including fringe benefits. Subject to the provisions of Article 7 and 8

{2625067-1, 116311-00009-01}                    -2-

hereof, Falwell is an at will employee of LU, and serves at the pleasure of the LU Board of Trustees.

## ARTICLE 2

## TERM

2.1     This Agreement shall commence on July 1, 2019 and shall continue until the earlier of: (a) June 30, 2030; or (b) the date the Agreement is terminated pursuant to Articles 6 through 9, inclusive, of this Agreement (the "Term").

## ARTICLE 3

## DUTIES AND RESPONSIBILITIES

3.1     Falwell shall continue to provide LU with dedicated, diligent and conscientious full time service in a manner that is generally consistent with the level of service he has provided during the nearly five (5) year period immediately preceding the effective date of this Agreement, with allowances for reasonable time to attend to personal investments.

3.2     Falwell's duties shall consist of the tasks, duties and responsibilities he has assumed and performed as President and Chancellor during the nearly five (5) year period immediately preceding the effective dates of this Agreement. These duties shall include but not necessarily be limited to the following:

(a)     ensuring the implementation of the University's mission and purposes as described or defined in the University's Articles of Incorporation, Bylaws, and other foundational documents.

(b)     performing the duties of Chancellor/President as described in the University's Bylaws.

(c)     overseeing the fiscal, administrative, admissions, academic, athletic and other operations, divisions, departments and offices of the University.

{2625067-1, 116311-00009-01}                    -3-

LUADMINREC000569

(d)     raising funds for the benefit of the University.

(e)     implementing and executing policies, orders and resolutions adopted or established by the LU Board of Trustees and its Executive Committee.

3.3     As Chancellor and President, Falwell shall have the executive and administrative powers to manage and control the day to day operations of the University, provide focus and direction for the University, make policy recommendations to the Board of Trustees, and provide spiritual and worldview leadership to the University in pursuit of excellence, subject to the ultimate authority of the Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws. That executive and administrative power shall include but not be limited to the absolute authority to hire, retain and dismiss administrative, professional, academic and athletic personnel, subject only to any contractual or tenurial rights of any such employee. Provided, however, that Falwell shall be accountable to the Board of Trustees for implementing its policies and carrying out his duties, including the handling of personnel matters.

3.4     Compliance with Rules Applicable to Athletics Program.

(a)     Falwell agrees to abide by and comply with the Constitution, Operating Bylaws, legislation and interpretations of the National Collegiate Athletic Association ("NCAA") (or any other conference in which the University becomes affiliated), and all NCAA and University rules and regulations relating to the conduct and administration of the University's general athletics program (collectively, the "Program") as now constituted or as any of the same may be amended or enacted during the term of Falwell's employment by the University.  In the event that Falwell becomes aware, or has reasonable cause to believe, that violations of any of the aforementioned rules or regulations may have taken place, he shall promptly report the same to the Board and the NCAA (or other applicable governing body).  Falwell agrees to adhere to, respect and follow the

LUADMINREC000570

academic standards and requirements of the University and the NCAA with regard to the recruitment and eligibility of prospective and current student athletes. All academic standards, requirements and policies of the University and the NCAA shall also be observed at all times by Falwell and he shall use Best Efforts (as defined below) to ensure that the athletic director and members of the Program staff do the same.

(b)     If Falwell is involved in an act or omission that constitutes a violation by the Athletic Director, any University coach or the University of any legislation, rule, regulation, constitutional provision, bylaw, policy, procedure or guideline of the NCAA (or NCAA interpretation), including but not limited to failing to use Best Efforts to promote an atmosphere of compliance by the athletic director, coaches, their staffs or student-athletes in the Program or to monitor their activities for compliance with NCAA rules, or if he fails to notify the Board or NCAA of any such violations of which he has knowledge, Falwell shall be subject to disciplinary or corrective action as set forth in NCAA enforcement procedures and/or policies, procedures and guidelines established from time to time by the University for its administrators, including but not limited to, probation, suspension with or without pay (for up to thirty (30) days) or termination of employment. Such disciplinary action may include termination for Cause (as defined in Section 7.3(g)). Notwithstanding the foregoing, before any such disciplinary action is imposed, Falwell will be provided with written notice of the alleged violation or violations and no less than fifteen (15) days to remedy the same, provided that such violation or violations are capable of cure, as determined in the reasonable and good faith judgment of the University.

(c)     For purposes of this Agreement, "Best Efforts" means with respect to Falwell, those efforts that a responsible and experienced President (other than Falwell) desirous of successfully achieving the specified result would use in similar circumstances; and (ii) with respect

LUADMINREC000571

to the University, those efforts that a prudent university desirous of successfully achieving the specified result would use in similar circumstances.

3.5     Falwell shall not undertake compensated work or activities for, or accept any employment or other compensation from, any other institution of higher education for work undertaken prior to the termination of this Agreement without receiving approval of the Board of Trustees or the Executive Committee of the Board of Trustees (the "Executive Committee") prior to undertaking such work or activities.

3.6     Falwell shall not author or publish any book or article relating to his employment at Liberty University hereunder without prior consent of the Executive Committee or Board of Trustees, which prior consent may be conditioned upon advance review and approval of the content of said book or article. This provision does not include letters to the editor or articles in University publications and other University media which are published to carry out Falwell's duties under this Agreement and advance the interests and mission of LU. Nor does this provision include brief communications on Twitter, Facebook and similar communication vehicles. The provision of this subsection shall survive termination of this Agreement.

3.7     The parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings. This prohibition includes defamatory remarks about the employees and members of the Board of Trustees of the University. Neither party, however, waives the protections afforded by otherwise applicable common law privileges and this Section 3.6 shall in no event apply to remarks made during meetings of either the University's Board of Trustees or its Executive Committee. If Falwell's employment is terminated for cause, the parties may truthfully explain the circumstances forming the basis for the determination of cause. The provision of this Section 3.6 shall survive termination of this Agreement.

LUADMINREC000572

3.8      Falwell shall continue to have access to confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly disclosed by LU ("'Confidential Information") during the course of his employment. Confidential Information remains the property of LU. Unauthorized disclosure of Confidential Information will cause definite and irreparable harm to LU. Falwell shall not disclose Confidential Information intentionally within the University except to fulfill the legitimate business purposes of LU and shall not disclose it directly or indirectly, outside the University without the express authorization of the Executive Committee or as required by law or to further the interests of LU. Under no circumstances shall the release of details of this Agreement be considered to further the interests of LU. Any Confidential Information in tangible form shall be immediately returned to LU upon request. The provisions of this subsection shall survive termination of this Agreement.

ARTICLE 4

COMPENSATION

4.1      In consideration of Falwell's continued service as President and Chancellor, LU shall compensate him as follows:

(a)      *Base Salary.* During the Term, LU shall pay Falwell an annual base salary at the rate of $1,250,000 per year, payable in accordance with the normal payroll practices of LU for its executives as in effect from time to time (but not less frequently than monthly).  The annual base salary shall not be reduced during the Term of the Agreement.  On an annual basis, the Board shall review Falwell's performance and consider in its discretion approval of an increase in base salary, with such approved increases to take effect on July 1, of each year. Such base salary, as so increased, is hereafter referred to as the "Base Salary."

LUADMINREC000573

(b)     *Discretionary Bonuses.* Falwell shall be eligible to receive bonuses in such amounts and at such times as the Executive Committee of the Board of Trustees may award based on its assessment of his performance, the financial condition of the University, and other considerations which the Executive Committee of the Board of Trustees in its sole discretion finds relevant.   The Board shall consider the award of such discretionary bonus no less often than annually.

(c)     *Severance Benefit.*   In the event the University terminates Falwell's employment without Cause, or Falwell resigns his employment with Good Reason, the University shall pay to Falwell a single lump sum payment in an amount equal to two times his Base Salary. Such amount shall be paid to Falwell within thirty (30) days following his termination of employment, subject to his execution of a release of claims (provided that if the period over which Falwell has to consider the execution of the release crosses tax years, the payment shall be made no earlier than the first business day of the second tax year).

(d)     *Supplemental Executive Retirement Plan.* The University agrees to adopt a defined contribution supplemental executive retirement plan for the benefit of Falwell ("SERP" or the "Plan") pursuant to a separate agreement that will (1) provide for annual credits designed to target a retirement benefit over the life of Falwell and Mrs. Falwell in an amount equal to seventy-five percent (75%) of Falwell's average Base Salary over the five (5) year period prior to his termination of employment, net of any required tax withholding, (2) have an initial notional account balance that represents prior years' deemed accumulations during Falwell's presidency through June 30, 2019 and (3) be paid in a lump sum.  This lump sum shall be payable on the first day of the calendar month following the earliest of (1) provided that Falwell does not engage in any Competitive Activity during the Non-Competition Period, as defined in Section 5.2 herein, the

LUADMINREC000574

second anniversary of his termination of employment, (2) Falwell's death, or (3) Falwell's Disability, as defined in Section 6.6 herein.

4.2      Except as set forth herein, LU shall provide Falwell the same fringe benefits and the same opportunity to participate in benefit plans that it offers other full-time executive employees. These benefits and programs currently include group family health insurance (medical, vision, dental), group family life insurance and disability insurance, employee assistance programs, retirement, savings and investment programs (including LU's Section 403(B) plan), sick/personal leave, holiday leave and voice and data phone payments under LU's Cellular Phone Policy and similar benefits made available to executive or managerial employees of the University. In addition to such benefits, conditioned on Falwell's continued employment, on each April 1 LU shall pay on Falwell's behalf an amount equal to the life insurance premiums owed in respect of whole life insurance policies issued by each of Pacific Life Insurance Company (issued October 3, 2016) and Protective Insurance Company (issued April 8, 2016) (together, the "Policies") on Falwell's life, except to the extent that such premiums are paid by the dividends accruing on the cash value of such Policies.  For this purpose such payment shall be made pursuant to a separate "split dollar agreement" pursuant to which the premium payments in respect of the Policies shall be repaid, without interest, to the University upon the payment of the death benefit or earlier termination of the Policies.  Once every eighteen months (18) months, Falwell shall undergo an annual Comprehensive Executive Medical Health Assessment, the cost of which shall be reimbursed by the institution upon submission of a receipt or statement for same.   The Comprehensive Executive Medical Health Assessment shall include a thorough physical examination by medical doctor(s), a full range of preventive screening tests for early detection of cancer, heart disease and other serious medical problems, a cardiovascular fitness evaluation,

LUADMINREC000575

including treadmill exercise test, a lifestyle assessment to discuss nutrition, exercise, personal safety and other indicators of risk of disease, a review and update of medications and immunizations, development and assessment of a long-term strategy for prolonged life and wellness, a full report of the test results and recommendations at the conclusion of the examination and a written report sent to Falwell confidentially for his personal use and for consultation with his private physician.  Neither the University nor the Executive Committee shall request or be entitled to a copy of the written report but the Executive Committee shall be entitled to receive a copy of the receipt or statement for such services as part of each of its formal annual evaluations of Falwell.

4.3     LU shall provide Falwell with an automobile allowance of Seven Hundred Fifty Dollars ($750) per month in accordance with LU's normal payroll policies and schedule and subject to any reporting and withholding requirement provided by law.  In addition, for each year that the Agreement remains in effect LU shall furnish on an annual basis up to fifty (50) hours of jet transportation on LU's jets for Falwell and members of his immediate family, with any unused hours expiring at the end of each year without further compensation to Falwell.    Any personal use of the jet transportation benefit described herein will be reported as a taxable benefit to Falwell. LU shall reimburse Falwell in accordance with LU's Travel and Entertainment Policy for reasonable and necessary travel and out-of-pocket expenses incurred by him, and where appropriate his spouse, in connection with the performance of his official duties under this Agreement.

4.4     LU shall provide Falwell and members of his immediate family with tuition at the University through the conclusion of each academic year during which he serves as President and/or Chancellor pursuant to LU's Dependent Grant-in-Aid Policy and Continuing Education

LUADMINREC000576

Policy. "Immediate family" shall be limited to Falwell's wife, children by birth or adoption and grandchildren by birth or adoption. Such tuition benefits shall be provided subject to any reporting and withholding requirements provided by law.

4.5     Falwell shall be entitled to six (6) weeks annual vacation during each year of the Term. No unused vacation may be carried forward to subsequent years or paid out as compensation.

4.6     LU agrees to provide memberships at the LaHaye Student Center and Sports Racket for use by Falwell and his immediate family or at another fitness center mutually agreeable to the parties.

4.7     LU agrees to provide general maintenance and upkeep at the primary residence of Falwell, including general repairs, maintenance and lawn care. The parties hereto acknowledge that the primary residence of Falwell is used by the University from time to time for student, faculty and staff events. A portion of the general maintenance and upkeep referenced above shall be deemed a business expense of the University in connection with said student, faculty and staff events and the remainder of said general maintenance and upkeep shall be deemed income to Falwell and reported to the IRS as such by the University.

ARTICLE 5

OTHER EMPLOYMENT

5.1     Falwell shall refrain from undertaking any other employment or compensated activities that hinder or impede successful performance of the services outlined in this Agreement. Except as provided in this Agreement, Falwell shall not engage in any compensated employment or compensated activities without first obtaining the written approval of the Executive Committee or the Board of Trustees. The University, however, acknowledges that Falwell is licensed by the Virginia State Bar and periodically engages in the practice of law on a limited basis in association

LUADMINREC000577

with another practitioner on discrete matters. Falwell hereby receives approval for such limited legal work and therefore shall not require any additional approval for such employment by the Executive Committee or the Board of Trustees. Passive investment activity such as buying, holding and selling real estate, stock and securities ("Passive Investment Activity") shall not be considered other employment or compensated activities for purposes of this Agreement and therefore shall not require any additional approval by the Executive Committee of the Board of Trustees.   In addition, Falwell shall have the right without seeking approval of the Executive Committee or Board of Trustees to participate as either a paid endorser or principal owner in an asset management venture. Falwell (alone or in conjunction with members of his family and/or others) shall be free to participate in an asset management venture, provided such venture conducts no business with the University or any entity owned or controlled by the University and receives no compensation from the University or any entity owned or controlled by the University.

    5.2    In view of the unique and valuable services rendered by Falwell to LU and in connection with the SERP benefits to be paid to Falwell at or following termination of employment, Falwell agrees that during employment and for a period of two (2) years thereafter ("Non-Competition Period"), whether with our without compensation, directly or indirectly, as an owner, principal, partner, member, shareholder, independent contractor, consultant, joint venturer, investor, licensor, lender or in any other capacity whatsoever, alone, or in association with any other Person, he will not carry on, be engaged or take part in, or render services (other than services which are generally offered to third parties) or advice to, own, share in the earnings of, invest in the stocks, bonds or other securities of, or otherwise become financially interested in, any other college or university, whether for-profit or non-profit ("Competitive Activity").  The  record or beneficial ownership by Falwell of up to one percent (1%) of the shares of any corporation whose shares are publicly traded on

LUADMINREC000578

a national securities exchange or in the over-the-counter market shall not of itself constitute a breach hereunder.

## ARTICLE 6

## TERMINATION UPON DEATH

6.1    Falwell's death shall terminate this Agreement.  Falwell's executor, administrator or other personal representative or beneficiary, as applicable, shall be entitled to all the compensation and fringe benefits provided in Article 4 of this Agreement through the date of his death, along with the benefits payable pursuant to the SERP under subsection 4.l(e), and any benefits to which he or his executor, administrator or other personal representative or beneficiary, as applicable, is entitled under any applicable benefit plan as a deceased employee.  In addition, Falwell's executor, administrator or other personal representative or beneficiary, as applicable, shall be entitled to any and all survivorship death benefits payable under any savings, retirement, investment and other plans and programs in which Falwell was a participant.  Except as provided herein, Falwell shall not be entitled to receive any other payments or benefits after the date of his death, except that Falwell's surviving spouse or other eligible dependents shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at his date of death.

## ARTICLE 7

## TERMINATION FOR CAUSE OR DISABILITY

7.1    LU may terminate Falwell's employment only for Cause or Disability, as each such term is defined below, provided it first delivers to Falwell specific, written notice of the purported grounds for dismissal, and if in the reasonable opinion of the Executive Committee the Cause or Disability can be corrected or cured, a thirty (30) day opportunity to correct or cure the alleged Cause or Disability.  A dismissal in the absence of required, thirty (30) day notice is a dismissal

{2625067-1, 116311-00009-01}                          -13-

without Cause.  For avoidance of doubt, if Falwell is terminated for Cause based on a violation of Section 7.3(g) and the applicable governing body renders a final determination establishing facts indicating that Cause does not exist, provided there are no other facts or circumstances justifying termination for Cause, the termination shall be treated as a termination without Cause under Article 8 and the provisions of Article 8 shall apply.

7.2     If Falwell is terminated for Cause, LU shall be obligated to pay Falwell his salary, earned compensation and fringe benefits up to the date of termination (collectively, his "Accrued Compensation"), plus any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination.  Falwell's resignation from the Board of Trustees and its Executive Committee shall be effective immediately upon termination of his employment for Cause.

7.3     As used in this Agreement, the term "Cause" is defined restrictively to mean only the following:

(a)     the willful refusal or willful failure of Falwell to comply with the reasonable directives of the Board of Trustees, so long as such directives are not in conflict with the authority of the Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws, or in conflict with this Agreement; provided that such refusal or failure results in (or is substantially likely to result in) a material adverse consequence to LU;

LUADMINREC000580

(b)      the material failure of Falwell to comply substantially with written policies, standards and regulations of LU as from time-to-time established in writing, provided that such failure results in (or is substantially likely to result in) a material adverse consequence to LU;;

(c)      the willful refusal or willful failure of Falwell to faithfully or diligently perform his duties under this Agreement, provided that such refusal or failure results in (or is substantially likely to result in) a material adverse consequence to LU;

(d)      conviction of or entry of a plea of guilty, no contest or *nolo contendere* to any felony or to a misdemeanor involving moral turpitude (deferred disposition by a court, with or without a finding, admission or adjudication of guilt, such as withholding adjudication or taking the matter under advisement for some set period, meets the threshold for cause intended for Section 7.3 (d));

(e)      defamatory or slanderous comments in breach of Section 3.6 of this Agreement which cause serious damage to LU's reputation;

(f)      Any significant violation (which, for the avoidance of doubt, shall not include any Level III or Level IV violation) or repetitive violation (other than of a de minimis nature) of any legislation, rule, regulation, constitutional provision, bylaw, policy, procedure or guideline of the NCAA (or NCAA interpretation) by Falwell arising from any act or omission of Falwell (or Falwell's knowledge of any act or omission of another person and failure to take prompt and appropriate responsive action or Falwell's failure to monitor, supervise or report another person for whom Falwell has or, at the relevant time had, supervisory responsibility), or;

(g)      advocating a position that is materially inconsistent with the doctrinal statements found in the University's Articles of Incorporation, with the sole exception of such

LUADMINREC000581

advocacy in private discussions with the Board of Trustees or Executive Committee in connection with proposed amendments to the Articles of Incorporation.

7.4    In the event Falwell is the subject of a criminal arrest, criminal indictment, criminal information, criminal warrant for violation, criminal complaint or criminal charge for any felony or is the subject of such for a misdemeanor involving moral turpitude, LU may place Falwell on administrative leave, thereby suspending Falwell from performance of the duties and responsibilities outlined in Sections 3.1, 3.2 and 3 3, at a minimum of one-third (1/3) of the rate of his annual base salary in effect at the date of his suspension, which compensation rate can be increased at the discretion of the Executive Committee.

7.5    As used in this Agreement the term "Disability" is deemed restrictively to mean only the following: mental or physical incapacity or disability which prevents Falwell from performing a substantial and material portion of his duties under this Agreement on a continuous basis and that persists for more than 180 consecutive days. A termination of Falwell's employment for Disability is neither a dismissal with Cause within the meaning of Sections 7.2 and 7.3 nor a dismissal without Cause within the meaning of Article 8 and Falwell shall be entitled to (1) Accrued Compensation, and (2) immediate commencement of benefits under the SERP, as provided under subsection 4.1(e) herein.

ARTICLE 8

TERMINATION BY UNIVERSITY WITHOUT CAUSE OR BY FALWELL FOR GOOD REASON

8.1    LU may terminate Falwell's employment as President and Chancellor at any time upon sixty (60) days advance, written notice to Falwell without Cause, and Falwell may resign his employment for "Good Reason" as set forth in Section 8.2. In the event LU elects to terminate

LUADMINREC000582

Falwell's employment as Chancellor and President without Cause or Falwell resigns his employment for "Good Reason," LU shall pay to Falwell as liquidated damages the severance benefit provided under subsection 4.1(c), and any benefits to which he is entitled under any applicable benefit plan as a former employee. Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible (1) to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act (''COBRA'') for the time specified by COBRA at the time of termination, and (2) for benefits under the SERP, as provided under subsection 4.1(d). Following termination of his employment, Falwell shall have no obligation to remain at the University or perform any services for the University.

     8.2    For purposes of this Agreement, the term "<u>Good Reason</u>" shall mean (i) any action by LU that results in a material diminution in Falwell's position, authority, duties or responsibilities as President and Chancellor of LU set forth in Article III; (ii) a reduction by LU in Falwell's Base Salary, or a material failure by LU to pay Falwell any such amounts when due; (iii) a relocation of Falwell's principal place of employment to more than thirty-five (35) miles from LU's Lynchburg, Virginia campus, and (iv) a material breach of this Agreement without Falwell's written consent. Termination of employment for "Good Reason" shall not be effective (other than with respect to clause (iii) above) until Falwell delivers to the Board of Trustees a written notice specifically identifying the conduct of LU which Falwell believes constitutes "Good Reason" in accordance with this Section 8.2 within ninety (90) days of Falwell's knowledge of the initial occurrence of each specific event constituting Good Reason and Falwell provides the Board of Trustees at least thirty (30) days to remedy such conduct after receipt of such written notice,

LUADMINREC000583

and to the extent not cured, Falwell terminates his employment within thirty (30) days after such failure to cure.

8.3    The parties have bargained for this liquidated damages provision, giving careful consideration to the following circumstances:

(a)    this Agreement concerns personal services.

(b)    termination of this Agreement by the University prior to the end of the Term (or at any point after the Term) could damage his professional reputation. These damages to Falwell are difficult to determine with certainty. Therefore, the parties have agreed upon this liquidated damages provision and stipulate that it is neither a penalty nor an incentive for unsatisfactory performance.

## ARTICLE 9

## RESIGNATION

9.1    Falwell may resign, retire or otherwise terminate his employment with the University other than for Good Reason, provided he gives the Board of Trustees sixty (60) days advance written notice.  In the event Falwell should elect to resign, retire or otherwise terminate his employment other than for Good Reason, the University shall be obligated to pay Falwell his Accrued Compensation and any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible (1) to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") or the time specified by COBRA at the time of termination, and (2) for benefits under the SERP, as provided in Section 4.1(e).

LUADMINREC000584

## ARTICLE 10

### INDEMNIFICATION

10.1    To the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment. The indemnification afforded Falwell under this Section is in addition to any and all indemnity rights and protections the Employee may have pursuant to statute or under any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies.

## ARTICLE 11

### MISCELLANEOUS PROVISIONS

11.1    Neither party shall disclose this Agreement to anyone without the other party's prior, written consent, unless disclosure is required by law. The parties, however, shall be free to disclose and discuss this Agreement with their respective lawyers, accountants and tax advisors. Falwell shall be permitted to disclose the Agreement to his spouse.

11.2    For a notice or other communication to be valid under this Agreement, it must be written, signed and sent by at least one of the following methods: (a) personal delivery; (b) first class mail, postage prepaid; (c) registered or certified mail, return receipt requested, and postage prepaid; and (d) nationally recognized overnight courier (e.g., UPS or Federal Express).

11.3    If any provision of this Agreement is determined to be invalid, void, illegal or unenforceable to any extent, the remainder of this Agreement, or application of that provision to

{2625067-1, 116311-00009-01}                            -19-

any persons or circumstances other than those as to which it is held to be unenforceable, will remain valid, binding and enforceable.

11.4    (a) The patties may waive a provision in this Agreement only by a writing executed by the party or parties against whom the waiver is sought to be enforced. Waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver by that party of any subsequent breaches.

(b)    No failure or delay in exercising any right or remedy, or in requiring the satisfaction of any condition, under this Agreement, and no act, omission or course of dealing between the parties, shall operate as a waiver or estoppel of any right, remedy or condition.

(c)    A waiver made in writing on one (1) occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver of any future occasion, unless expressly stated as such.

11.5    This Agreement constitutes the final Agreement between the parties concerning the terms and conditions of Falwell's employment with LU. This Agreement supersedes and invalidates any prior or contemporaneous agreement, oral or written, between them regarding the terms of Falwell's employment with LU. All such prior Agreements between the parties shall become null and void upon the execution of this Agreement. In entering into this Agreement, neither party has relied upon any statement, representation, warranty or agreement of the other party except for those expressly contained in this Agreement. The parties may amend this Agreement only by a written Agreement of the parties that identifies itself as an amendment to this Agreement.

11.6    This Agreement may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one instrument.

LUADMINREC000586

11.7   The rule of construction that ambiguity is construed against the drafting party shall have no application in any dispute over the interpretation of this Agreement. The parties represent and warrant to one another that they enter this Agreement with the benefit of counsel based on the independent analysis of each party of the facts and legal principles relevant to the terms and conditions of this Agreement.

11.8   Neither this Agreement as a whole nor any of its individual provisions is assignable by either party.

11.9   The descriptive headings of the articles and section of this Agreement are for convenience only, do not constitute a part of this Agreement, and do not affect this Agreement's construction or interpretation.

11.10   This Agreement shall be governed by and construed in accordance with the law of the Commonwealth of Virginia without regard to the Commonwealth's choice of law rules.

11.11   This Agreement shall be binding upon and inure to the benefit of the parties' respective successors, heirs, assigns, receivers and personal representatives.

11.12   The provisions of this Agreement to be performed upon and after termination of Falwell's employment survive termination of this Agreement.

11.13   The parties agree that any legal action or proceeding against the other party arising out of or relating to this Agreement or the University's employment of Falwell shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

LUADMINREC000587

IN WITNESS WHEREOF, Falwell and the authorized representative of the University have executed this Agreement on the date(s) written below.

JERRY L. FALWELL, JR.

Jerry L. Falwell, Jr.

LIBERTY UNIVERSITY, INC.

Chairman, Board of Trustees

Date: 8/30/2019

Date: AUG. 29, 2019

LUADMINREC000588

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.,      )
                                      )
        *Plaintiff,*          )
                                      )
v.                               )     Case No. **CL21000354-00**
                                      )
JERRY L. FALWELL, JR.,       )
                                      )
        *Defendant.*       )

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO LIBERTY UNIVERSITY, INC.'S SECOND AMENDED COMPLAINT

Defendant, Jerry L. Falwell, Jr. ("**Falwell**" or "**Defendant**"), by counsel, states the following as his Answer and Affirmative Defenses to the Second Amended Complaint (the "**Complaint**") filed against him by Plaintiff, Liberty University, Inc. ("**Liberty**" or "**Plaintiff**").

No response is required to the headings or to the unnumbered introductory paragraph that precedes paragraph 1 of the Complaint. To the extent any response is required, it is denied. Except as admitted explicitly in this answer, all allegations of the Complaint are denied.

## I.    ANSWER

1.    Falwell admits the allegations contained in paragraph 1.

2.    Falwell denies the allegations contained in paragraph 2. Falwell further states he did not "quit." Falwell admits he resides in Goode, Virginia. Further, Falwell admits he was President and Chancellor of Liberty.

3.    The allegations contained in paragraph 3 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

LUADMINREC000589

4.     The allegations contained in paragraph 4 of the Complaint reference two writings which speak for themselves, and Falwell denies the allegations to the extent that they are inconsistent with those documents. To the extent a response is required, Falwell denies the allegations therein.

5.     The allegations contained in paragraph 5 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 5 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents.

6.     The allegations contained in paragraph 6 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 6 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents. Responding further, Falwell states he had told certain members of Liberty's Board of Trustees about Granda and Granda's claims.

7.     The allegations contained in paragraph 7 of the Complaint refer to a document which speaks for itself. Falwell denies any allegations inconsistent therewith. Falwell denies Becki's affair began in March, 2012. Responding further, Falwell denies taking frequent family vacations in Miami.

8.     Falwell denies the allegations contained in paragraph 8.

9.     The allegations contained in paragraph 9 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 9 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents. Falwell denies the remaining allegations contained in paragraph 9.

LUADMINREC000590

10.     The allegations contained in paragraph 10 of the Complaint refer to documents which speak for themselves. To the extent the allegations contained in paragraph 10 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents. Falwell denies any remaining allegations in paragraph 10.

11.     The allegations contained in paragraph 11 of the Complaint are denied. Responding further, Falwell states he is not an active member of the Virginia State Bar and has been an associate member of the Virginia State Bar since 2012.

12.     Falwell denies the allegations contained in paragraph 12. To the extent the allegations contained in paragraph 12 refer or reference a document, Falwell states the document speaks for itself. To the extent the allegations contained in paragraph 12 seek to paraphrase or characterize the contents, Falwell denies the allegations.

### The Liberty Way

13.     Falwell denies the allegations in paragraph 13 and lacks sufficient information to admit or deny Dr. Falwell's personal vision and, therefore, denies same.

14.     Falwell lacks sufficient information to admit or deny when Dr. Falwell began laying the foundation for Liberty and, therefore, denies same. Further, Falwell states Liberty was not accredited until 1980. Responding further, Falwell admits Liberty has more than 100,000 students in part due to Falwell's leadership.

15.     Falwell lacks sufficient information to admit or deny Dr. Falwell's role in the Moral Majority and, therefore, denies same.

16.     Falwell lacks sufficient information to admit or deny the allegations contained in paragraph 16 and, therefore, denies same. Responding further, the allegations contained in

3

paragraph 16 reference specific documents which speak for themselves. Falwell denies any allegations inconsistent therewith and denies the remaining allegations in paragraph 16.

17. The allegations contained in paragraph 17 reference specific documents which speak for themselves. Falwell denies any allegations inconsistent therewith.

18. The allegations contained in paragraph 18 reference a document which speaks for itself. Falwell denies any allegations inconsistent therewith. Further, Falwell denies the *Liberty Way* applies to him as an Administrator and further states the *Liberty Way* applies to students and Falwell has not been a student since 1984.

19. The allegations contained in paragraph 19 reference a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

20. Falwell lacks sufficient information to admit or deny the allegations in paragraph 20 and, therefore, denies same.

21. The allegations contained in paragraph 21 reference a document which speaks for itself. Falwell denies any allegations inconsistent therewith. Falwell admits he was a board member in 2019 and states the minutes of the April 5, 2019 board meeting speak for themselves.

22. Falwell lacks sufficient information to admit or deny Dr. Falwell's vision and, therefore, denies the allegations contained in paragraph 22. Responding further, the allegations contained in paragraph 22 reference a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

23. With regard to the allegations in paragraph 23, Falwell denies Liberty grew exponentially until Dr. Falwell's death in 2007. Falwell admits he served as Liberty's President, Chancellor, and member of its Board of Trustees upon Dr. Falwell's 2007 death. Falwell lacks

LUADMINREC000592

sufficient information to either admit or deny the allegations concerning Jonathan Falwell and, therefore, denies same. Falwell denies the remaining allegations in paragraph 23.

24.    The allegations contained in paragraph 24 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 10 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with the document.

25.    With regard to the allegations contained in paragraph 25, Falwell denies he was "attempting to build on his father's legacy" by bringing another generation of Falwell men into leadership. Falwell lacks sufficient information to either admit or deny the remaining allegations in paragraph 25 and, therefore, denies same.

26.    Falwell denies Trey "reported to his father, the President and Chancellor of Liberty." Falwell lacks sufficient information to either admit or deny the allegations concerning Trey's employment and, therefore, denies same.

27.    Falwell denies "Trey often accompanied his father into meetings of the Executive Committee of the Liberty Board of Directors." Responding further, Falwell states Trey often attended meetings of the Executive Committee at the invitation of his boss, Randy Smith. Falwell lacks sufficient information to either admit or deny the allegations in the second sentence of paragraph 27 and, therefore, denies same. Falwell lacks sufficient information to either admit or deny the allegations contained in the third sentence of paragraph 27 and, therefore, denies same.

28.    Falwell admits the allegations contained in paragraph 28 and further states the explosive growth of online education was enhanced by building and creating a strong resident program.

LUADMINREC000593

### *The Granda Allegations*

29.      Falwell denies the allegations contained in paragraph 29.

30.      Falwell admits Granda came to Lynchburg for Donald Trump's 2012 event at Liberty and admits Falwell introduced Granda to Donald Trump. Responding further, Falwell states at least approximately 100 other individuals were part of the introductions to Donald Trump. Further, the allegations in contained in paragraph 30 reference a photograph which speaks for itself. Falwell denies any allegations inconsistent therewith.

31.      Falwell denies the allegations contained in paragraph 31.

32.      Falwell admits the allegations contained in paragraph 32.

33.      Falwell denies the allegations contained in paragraph 33.

34.      Falwell denies the allegations contained in paragraph 34.

35.      The allegations contained in paragraph 35 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 35 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with those documents. Responding further, the allegations contained in paragraph 35 reference an audio recording, which, upon information and belief, was illegally obtained and which speaks for itself. Falwell denies any allegations inconsistent therewith. Falwell denies the remaining allegations of paragraph 35.

36.      The allegations contained in paragraph 36 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 36 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with the document. Responding further, Falwell denies he did not inform Liberty's Board of Trustees and states he informed at least one member of the Board of Trustees.

LUADMINREC000594

37.     The allegations contained in paragraph 37 of the Complaint refer to a document which speaks for itself. To the extent the allegations contained in paragraph 37 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with the document. Responding further, Falwell lacks sufficient information to admit or deny the allegations in paragraph 37 regarding Granda's plot and, therefore, denies same.

38.     Falwell lacks sufficient information to admit or deny the allegations in paragraph 38 and, therefore, denies same.

39.     Falwell denies the allegations in paragraph 39.

40.     Falwell denies the allegations in paragraph 40.

41.     Falwell denies the allegations in paragraph 41.

42.     Falwell denies that there is a cache of materials that is harmful to the Falwells. Responding further, Falwell lack sufficient information to either admit or deny the allegations contained in the second and third sentences of paragraph 42 and, therefore, denies same.

43.     With regard to the allegations in paragraph 43, Falwell denies the allegations contained in the first sentence. Responding further, the remaining allegations in paragraph 43 refer to a document which speaks for itself. To the extent the allegations contained in paragraph 43 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with the document.

44.     With regard to the allegations in paragraph 44, Falwell denies Granda's behavior was from Falwell's own observation. Responding further, the allegations in paragraph 44 refer to a document which speaks for itself. To the extent the allegations contained in paragraph 44 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with the document.

LUADMINREC000595

45.     The allegations contained in paragraph 45 refer to a document which speaks for itself. To the extent the allegations contained in paragraph 45 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with the document. Responding further, Falwell admits the allegations contained in paragraph 45.

46.     Falwell denies the allegations contained in paragraph 46. Responding further, Falwell admits Liberty is one of the country's premier evangelical universities.

### *Falwell Jr.'s "Granda Plan"*

47.     Falwell denies the allegations contained in paragraph 47. Responding further, Falwell states he did inform a member of Liberty's Board of Trustees in or around December 2018/January 2019.

48.     Falwell denies the allegations contained in paragraph 48.

49.     Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 49 and, therefore, denies same.

50.     Falwell denies the allegations contained in paragraph 50.

51.     Falwell denies the allegations contained in paragraph 51.

52.     Falwell denies the allegations contained in paragraph 52. Responding further, Falwell states there was no "Granda Plan" as alleged in the Complaint and in various media/podcast recordings.

53.     With regard to the allegations in paragraph 53, Falwell denies the first sentence. The remaining allegations contained in paragraph 53 refer to documents which speak for themselves. To the extent the allegations contained in paragraph 53 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with the document.

LUADMINREC000596

54.    Falwell denies the allegations contained in paragraph 54 that there were "acts of appeasement . . . to maintain Granda's cooperative silence."

    a.    With regard to the allegations contained in subparagraph (a) of paragraph 54, Falwell admits Granda visited the Falwell's farm and further states the visits occurred with Granda's girlfriend, mother, and/or sister. Responding further, Falwell denies Granda was "paired" with Trey.

    b.    The allegations contained in subparagraph (b) of paragraph 54 reference a picture which speaks for itself. Falwell denies any allegation inconsistent therewith. Responding further, Falwell denies "pos[ing] with Granda paternalistically."

    c.    The allegations contained in subparagraph (c) of paragraph 54 reference a picture which speaks for itself. Falwell denies any allegations inconsistent therewith. Responding further, Falwell admits taking a picture with Granda outside the Liberty jet. Falwell denies the remaining allegations.

    d.    With regard to the allegations contained in subparagraph (d) of paragraph 54, Falwell denies bringing Granda on other family excursions and pairing him with Trey. Responding further, the allegations contained in subparagraph (d) of paragraph 54 reference a picture which speaks for itself. Falwell denies any allegations inconsistent therewith and further states Granda was living in the Washington, D.C. area.

    e.    The allegations contained in subparagraph (e) of paragraph 54(e) refer to a document which speaks for itself. To the extent the allegations contained in paragraph 54(e) seek to paraphrase or characterize the contents, Falwell

LUADMINREC000597

denies the allegations to the extent they are inconsistent with those documents. Responding further, Falwell denies amassing "useful information."

55.     Falwell denies the allegations contained in paragraph 55.

56.     With regard to the allegations contained in paragraph 56, Falwell admits his employment contract was set to expire on June 30, 2019. Falwell denies the remaining allegations contained in paragraph 56. Falwell further states many of the components of the 2019 Employment Agreement were carryovers from his previous employment agreement or were the result of an outside consultant Liberty engaged to review Falwell's compensation and make recommendations "to ensure Falwell is retained at Liberty for the long term and provided with a competitive and motivating compensation program." 2019 Employment Agreement, p. 2.

### *Outside Pressures on the Falwell Presidency*

57.     Falwell admits the allegations contained in the first two sentences of paragraph 57. Falwell lacks sufficient information to either admit or deny the remaining allegations contained in paragraph 57 and, therefore, denies same.

58.     Falwell admits that in 2016, he endorsed Donald Trump for the presidency. Falwell denies the endorsement was "particularly delicate." Responding further, Falwell admits Senator Ted Cruz made an appearance at Liberty for his first speech after announcing his presidential candidacy.

59.     The allegations contained in paragraph 59 of the Complaint reference a Facebook post which speaks for itself. Falwell denies the allegations to the extent they are inconsistent therewith. Responding further, Falwell admits Trump was an outsider.

60.     Falwell denies the allegations contained in paragraph 60.

10

61.     With regard to the allegations contained in paragraph 61, Falwell denies the allegations contained in the first sentence of the Complaint. Responding further, Falwell denies he is "Like Jesus." The remaining allegations in the second sentence of paragraph 61 are admitted.

62.     Falwell admits he utilized social media platforms and news outlets in advocating for Trump. Falwell denies any allegations inconsistent therewith.

    a.      Falwell admits the allegations contained in subparagraph (a) of paragraph 62.

    b.      Falwell admits the allegations contained in subparagraph (b) of paragraph 62.

    c.      The allegations contained in subparagraph (c) of paragraph 62 refer to a CNN interview with Falwell which speaks for itself. Falwell denies any allegations inconsistent therewith. Responding further, Falwell admits the allegations contained in subparagraph (c) of paragraph 62.

    d.      The allegations contained in subparagraph (d) of paragraph 62 refer to a CNN interview with Falwell which speaks for itself. Falwell denies any allegations inconsistent therewith. Responding further, Falwell admits the allegations contained in subparagraph (d) of paragraph 62.

63.     The allegations contained in the first sentence of paragraph 63 refer to a document which speaks for itself. To the extent the allegations contained in paragraph 63 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with the document. Responding further, Falwell denies the remaining allegations contained in paragraph 63.

64.     Falwell denies the allegations contained in paragraph 64.

11

*The 2019 Falwell Jr. Employment Agreement*

65.    The allegations contained in the first sentence of paragraph 65 refer to a document which speaks for itself. Falwell denies any allegations inconsistent therewith. Responding further, with regard to the allegations contained in paragraph 65, Falwell admits the first sentence. Falwell admits the allegations contained in the second sentence of paragraph 65. Falwell further states the term of the agreement was seven years and three months. Responding further, Falwell states Liberty and he entered into an addendum to the employment agreement, which amended the severance payment to three years' annual base salary. Liberty and Falwell entered into the addendum on or around June 20, 2017, with an effective date of May 24, 2017.

66.    The allegations contained in the first sentence of paragraph 66 refer to a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

67.    Falwell denies the allegations contained in paragraph 67. Responding further, Falwell states he informed a member or members of Liberty's Board regarding Granda and his actions.

68.    With regard to the allegations contained paragraph 68, Falwell denies having the alleged plan and states he informed a certain member(s) regarding Granda. Responding further, Falwell denies seeking a safety valve and/or escape hatch. Falwell denies the remaining allegations contained in paragraph 68.

69.    With regard to the allegations contained in paragraph 69, Falwell admits he and the Executive Committee/Board negotiated the 2019 Employment Agreement. Falwell denies he was successful in sweetening the new 2019 Employment Agreement. Responding further, Falwell states the remaining allegations refer to the 2019 Employment Agreement which is a document

LUADMINREC000600

that speaks for itself. Falwell denies any allegations inconsistent therewith. Falwell denies the remaining allegations contained in paragraph 69.

70.    Falwell denies the allegations contained in paragraph 70.

### *Falwell's Auspicious Acts of August of 2020*

71.    Falwell denies the allegations contained in paragraph 71.

72.    Falwell denies the allegations contained in the first sentence of paragraph 72. Responding further, the remaining allegations in paragraph 72 refer to a document which speaks for itself. To the extent the allegations contained in paragraph 72 seek to paraphrase or characterize the contents, Falwell denies the allegations to the extent they are inconsistent with the document.

73.    Falwell denies the allegations contained in paragraph 73.

74.    Falwell admits the allegations contained in paragraph 74.

75.    The allegations contained in paragraph 75 refer to the show's plot, which speaks for itself. Responding further, Falwell admits the allegations contained in paragraph 75.

76.    Falwell admits the allegations contained in paragraph 76. Responding further, Falwell states the "obligatory tumbler of black liquid" is a prop consisting of BLK brand black water.

77.    Falwell admits the allegations contained in paragraph 77.

78.    Falwell admits the allegations contained in the first sentence of paragraph 78 of the Complaint. Responding further, Falwell lacks sufficient information to admit or deny whether the photo or video referenced in paragraph 78 "went viral and became an immediate internet sensation" and, therefore, denies same.

79.    The allegations contained in paragraph 79 reference a photo which speaks for itself. Falwell denies any allegations inconsistent therewith.

LUADMINREC000601

80.      Falwell lacks sufficient information to admit or deny the allegations contained in paragraph 80 and, therefore, denies same.

81.      Falwell lacks sufficient information to admit or deny the allegations contained in paragraph 80 and, therefore, denies same. Responding further, Falwell states the *Liberty Way* only applies to Liberty students.

82.      Falwell admits he deleted the Instagram post shortly after its August 3 release. Falwell denies he made a "compounding blunder." The remaining allegations in paragraph 90 reference a radio station recording which speaks for itself. Falwell denies any allegations to the extent they are inconsistent therewith. Responding further, shortly after the August 5, 2020 radio show, Falwell was diagnosed with having pulmonary emboli, or clots in the lungs, causing Falwell's oxygen levels to fall to dangerously low levels and cause adverse health reactions. Falwell's medical condition ultimately required a medical procedure and is still being monitored.

83.      Falwell lacks sufficient information to admit or deny the allegations contained in paragraph 83 and, therefore, denies same.

84.      Falwell lacks sufficient information to admit or deny the allegations contained in paragraph 84 and the actions Becki took and, therefore, denies same.

85.      Falwell admits the allegations contained in the first sentence of paragraph 85. Falwell denies the allegations contained in the second sentence of paragraph 85. Responding further, Falwell admits he requested a sabbatical. Falwell denies the Executive Committee was inclined to support. Falwell denies any remaining allegations contained in paragraph 85.

86.      Falwell lacks sufficient knowledge to either admit or deny the allegations contained in paragraph 86 and, therefore, denies same.

LUADMINREC000602

87.     Falwell lacks sufficient knowledge to either admit or deny the allegations contained in paragraph 87 and, therefore, denies same.

88.     Falwell lacks sufficient knowledge to either admit or deny the allegations contained in paragraph 88 and, therefore, denies same.

89.     Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 89 and therefore, denies same.

90.     Falwell denies the allegations contained in paragraph 90.

91.     Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 91 and, therefore, denies same.

92.     Falwell lacks sufficient knowledge to either admit or deny the allegations contained in the first two sentences of paragraph 92 and, therefore, denies same. Responding further, Falwell denies the remaining allegations contained in paragraph 92.

93.     The allegations contained in paragraph 93 reference documents which speak for themselves. Falwell denies any allegations inconsistent therewith and further states he published a number of unrelated articles without the Executive Committee's prior assent. Responding further, Falwell states he revealed information relating to Granda to certain member(s) of the Board. Falwell denies the remaining allegations in paragraph 93.

94.     The allegations contained in paragraph 94 reference documents which speak for themselves. Falwell denies any allegations inconsistent therewith.

95.     The allegations contained in paragraph 95 refer to an article which speaks for itself.

96.     Falwell denies the allegations contained in paragraph 96.

97.     Falwell denies the allegations contained in paragraph 97. Responding further, the allegations contained in paragraph 97 refer to a document which speaks for itself.

LUADMINREC000603

98.     The allegations contained in paragraph 98 refer to an article which speaks for itself. Falwell denies any allegations inconsistent therewith and lacks sufficient information relating to Granda's side and the attendant article to either admit or deny and, therefore, denies the same. Falwell denies remaining allegations in paragraph 98.

99.     Falwell denies the allegations contained in paragraph 99.

100.    The allegations contained in paragraph 100 refer to an article which speaks for itself. Falwell denies any allegations inconsistent therewith. Specifically, Falwell denies he participated in or led any cover-up process. Responding further, Falwell denies the remaining allegations contained in paragraph 100 and further states Falwell informed a member(s) of Liberty's Board of Trustees regarding Granda.

101.    Falwell admits the allegations contained in paragraph 101. Responding further, Falwell states he never spoke to the full Board regarding resignation.

102.    Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 102 and, therefore, denies same. Responding further, Falwell denies an alcohol problem.

103.    Falwell denies the allegations contained in paragraph 103. Responding further, Falwell states he resigned on August 24, 2020.

104.    The allegations contained in paragraph 104 refer to an article which speaks for itself. Falwell denies any allegations inconsistent therewith.

### *Falwell Migrates From Forgiveness-Seeker to Fighter*

105.    Falwell denies the allegations contained in paragraph 105. Falwell further states he is not an active member of the Virginia State Bar, but is an associate member.

LUADMINREC000604

106.    With regard to the allegations contained in paragraph 106, Falwell denies pushing back against the terms of resignation, and Falwell denies announcing to the media a $10.5 million severance expectation. Responding further, Falwell admits the negotiated severance was $2,500,000.00.

107.    Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 107 and, therefore, denies same.

108.    Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 108 regarding when the Executive Committee "agreed to satisfy Falwell Jr.'s demand for a 'Good Reason'" and, therefore, denies same. Responding further, Falwell denies the remaining allegations contained in paragraph 108.

### *Falwell Jr.'s Hard Fall*

109.    Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 109 regarding the 911 call, media reports, and what first responders spotted and, therefore, denies same. Falwell denies the remaining allegations contained in paragraph 109.

110.    Falwell denies the allegations contained in the first sentence of paragraph 110. Responding further, Falwell admits he filed a lawsuit against Liberty alleging defamation on October 28, 2020.

111.    Falwell denies the allegations contained in paragraph 111.

### COUNT ONE:
### BREACH OF CONTRACT/CONVERSION

112.    Falwell repeats and realleges his answers to the allegations in the foregoing paragraphs as if set forth fully herein.

LUADMINREC000605

113.    The allegations contained in paragraph 113 refer to the 2019 Employment Agreement, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

114.    The allegations contained in the first sentence of paragraph 114 of the Complaint are denied as stated. Responding further, Falwell admits he had complete access to files, records, notes, emails, data, and information.

115.    Falwell admits the allegations contained in paragraph 115.

116.    The allegations contained in paragraph 116 state conclusions of law to which no response is necessary. To the extent an answer is required, Falwell denies the allegations.

117.    The allegations contained in paragraph 117 refer to Liberty policies which speak for themselves. Falwell denies any allegations inconsistent therewith.

      a.    The allegations contained in subparagraph (a) of paragraph 117 refer to the Liberty University Employee Handbook, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

      b.    The allegations contained in subparagraph (b) of paragraph 117 refer to the Liberty University Employee Handbook, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

      c.    The allegations contained in subparagraph (c) of paragraph 117 refer to the Liberty University Employee Handbook, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

118.    The allegations contained in paragraph 118 refer to the technology security policy, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

18

119.    Falwell admits Liberty provided various devices and systems to allow Falwell to utilize Liberty's documents and information. Falwell lacks sufficient knowledge to admit or deny the remaining allegations contained in paragraph 119 and, therefore, denies same. Responding further, Falwell states many of the devices Liberty lists were provided to Becki as a courtesy. Falwell states Becki was not employed by Liberty and, upon information and belief, did not conduct Liberty business.  Falwell denies the remaining allegations contained in paragraph 119.

120.    Falwell admits the allegations contained in paragraph 120. Falwell further states he remitted payment soon after being invoiced by Liberty in September, 2020, and/or returned the devices Liberty provided to Becki and systems Liberty provided for internet services.

121.    The allegations contained in paragraph 121 refer to the general document preservation and retention policy, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

122.    The allegations contained in paragraph 122 refer to the 2019 Employment Agreement, a document which speaks for itself. Falwell denies any allegations inconsistent therewith.

123.    The allegations contained in paragraph 123 refer to the 2019 Employment Agreement, a document which speaks for itself. Falwell denies any allegations inconsistent therewith. Responding further, the last sentence in paragraph 123 states a conclusion of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

124.    The allegations contained in paragraph 124 refer to various Liberty governance documents which speak for themselves. Falwell denies any allegations inconsistent therewith.

LUADMINREC000607

125.     Falwell admits there are various legal holds relating to Liberty. Responding further, the remaining allegations contained in paragraph 125 state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

126.     The allegations contained in paragraph 126 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

127.     The allegations contained in paragraph 127 of the Complaint are denied.

128.     The allegations contained in paragraph 128 of the Complaint are denied, and Falwell demands strict proof thereof.

<u>**COUNT TWO:**</u>
**BREACH OF CONTRACT – EXCESS BENEFITS TRANSACTIONS**

129.     Falwell repeats and realleges his answers to the allegations in the foregoing paragraphs as if set forth fully herein.

130.     The allegations contained in paragraph 130 of the Complaint are denied.

131.     The allegations contained in paragraph 131 refer to the 2012 and 2019 Employment Agreements, documents which speak for themselves. Falwell denies any allegations inconsistent therewith.

132.     The allegations contained in paragraph 132 refer to the 2012 and 2019 Employment Agreements, documents which speak for themselves. Falwell denies any allegations inconsistent therewith.

133.     The allegations contained in paragraph 133 refer to the 2012 and 2019 Employment Agreements, documents which speak for themselves. Falwell denies any allegations inconsistent therewith.

LUADMINREC000608

134.    The allegations contained in paragraph 134 refer to the 2012 and 2019 Employment Agreements, documents which speak for themselves. Falwell denies any allegations inconsistent therewith.

135.    The allegations contained in paragraph 135 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

136.    The allegations contained in paragraph 136 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

137.    The allegations contained in paragraph 137 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

138.    The allegations contained in paragraph 138 of the Complaint are denied.

139.    The allegations contained in paragraph 139 of the Complaint refer to letters which speak for themselves. Responding further, the allegations contained in paragraph 139 reference Internal Revenue Code sections and underlying regulations which speak for themselves. Falwell denies any allegations inconsistent therewith. Responding further, Falwell denies receiving any excess benefit transactions.

140.    The allegations contained in paragraph 140 refer to a letter which speaks for itself. Falwell denies any allegations inconsistent therewith.

141.    Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 141 of the Complaint, and, therefore, the allegations are denied. Responding further, the allegations contained in paragraph 141 reference Internal Revenue Code

LUADMINREC000609

sections which speak for themselves. Falwell denies any allegations inconsistent therewith. Further, Falwell denies that he received any Excess Benefit Transactions and, if Liberty filed such a Form 990, denies that it is accurate.

142.    Falwell admits he paid Liberty $9,087.00 in May of 2022. Falwell denies the remaining allegations contained in paragraph 142.

143.    The allegations contained in paragraph 143 refer to a letter which speaks for itself. Falwell denies any allegations inconsistent therewith.

144.    Falwell denies the allegations contained in paragraph 144 of the Complaint.

145.    The allegations contained in paragraph 145 refer to a document which speaks for itself. Falwell denies any allegations inconsistent therewith and denies receiving any Excess Benefit Transactions Liberty seeks reimbursement for.

146.    The allegations contained in paragraph 146 of the Complaint are denied, and Falwell demands strict proof thereof.

## COUNT THREE:
### DETINUE

147.    Falwell repeats and realleges his answers to the allegations in the foregoing paragraphs as if set forth fully herein.

148.    The allegations contained in paragraph 148 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

149.    The allegations contained in paragraph 149 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied. Falwell further admits his employment with Liberty ended on August 25, 2020 and denies any allegations inconsistent therewith.

LUADMINREC000610

150. Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 150 of the Complaint, and, therefore, the allegations are denied.

151. Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 151 of the Complaint, and, therefore, the allegations are denied.

152. The allegations contained in paragraph 152 of the Complaint are denied.

**COUNT FOUR:**
**BREACH OF FIDUCIARY DUTY**

153. Falwell repeats and realleges his answers to the allegations in the foregoing paragraphs as if set forth fully herein.

154. The allegations in paragraph 154 state legal conclusions to which no response is necessary. To the extent a response is deemed necessary, Falwell denies the allegations in paragraph 154 of the Complaint and denies he breached any fiduciary duty to Liberty.

155. Falwell denies the allegations contained in paragraph 155.

156. Falwell denies the allegations contained in paragraph 156.

157. Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 157 of the Complaint and, therefore, denies same.

158. Falwell denies the allegations contained in paragraph 158.

159. Falwell denies the allegations contained in paragraph 159.

160. Falwell denies the allegations contained in paragraph 160. Falwell further states that Liberty's website indicates an enrollment record for Fall 2021. *See https://www.liberty.edu/champion/2021/08/liberty-sets-student-enrollment-record-in-2021/* (last accessed October 8, 2021).

161. Falwell denies the allegations contained in paragraph 161.

23

162.     Falwell denies the allegations contained in paragraph 162. Falwell further denies he breached his fiduciary duty to Liberty and demands strict proof of damages asserted.

**COUNT FIVE:**
**STATUTORY CONSPIRACY**

163.     Falwell repeats and realleges his answers to the allegations in the foregoing paragraphs as if set forth fully herein.

164.     The allegations contained in paragraph 164 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

165.     With regard to the allegations contained in paragraph 165, Falwell admits the business of Liberty is the provision of higher education through the perspective of Christian Values. Falwell denies administrators and faculty are expected to comport themselves to the *Liberty Way*. Falwell further states the *Liberty Way* is applicable to students. Responding further, Falwell admits all Liberty Board members and officers must observe applicable fiduciary duties.

166.     Falwell denies the allegations contained in paragraph 166.

167.     Falwell denies the allegations contained in paragraph 167.

168.     The allegations contained in paragraph 168 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

169.     Falwell denies the allegations contained in paragraph 169.

170.     Falwell lacks sufficient information to either admit or deny the allegations contained in paragraph 170 of the Complaint and, therefore, denies same.

171.     Falwell denies the allegations contained in paragraph 171.

LUADMINREC000612

172.    The allegations contained in paragraph 172 of the Complaint state conclusions of law to which no response is necessary. To the extent an answer is required, the allegations are denied.

173.    Falwell denies the allegations contained in paragraph 173.

174.    Falwell denies the allegations contained in paragraph 174.

175.    Falwell denies the allegations contained in paragraph 175.

176.    Falwell denies the allegations contained in paragraph 176. Falwell demands strict proof of any and all damages.

**COUNT SIX:**
**UNJUST ENRICHMENT**

177.    Falwell repeats and realleges his answers to the allegations in the foregoing paragraphs as if set forth fully herein.

178.    Falwell denies the allegations contained in paragraph 178 to the extent it alleges improper benefits of any type.

179.    Falwell denies the allegations contained in paragraph 179.

180.    Falwell denies the allegations contained in paragraph 180.

181.    Falwell denies the allegations contained in paragraph 181. Falwell demands strict proof of any and all damages.

182.    The remainder of the Complaint states Plaintiff's prayer for relief, to which no response is necessary. To the extent a response is appropriate, all allegations contained therein are denied.

183.    All allegations not specifically admitted are denied.

LUADMINREC000613

## II.   **AFFIRMATIVE DEFENSES**

Having fully answered the allegations contained in the Complaint, Defendant, Jerry L. Falwell, Jr., by counsel, pursuant to the Rules of the Supreme Court of Virginia, submits the following Affirmative Defenses, reserving the right to assert additional affirmative defenses should discovery in this case reveal others.

1.     Falwell denies Plaintiff has suffered damages to the extent alleged, if at all, and calls for strict proof thereof.

2.     Expressly denying any wrongdoing on his part and expressly denying that Plaintiff has been damaged as alleged, Falwell states that Plaintiff has failed to mitigate any damages that it allegedly sustained.

3.     Falwell states that he intends to rely upon the defense, as may be developed through discovery and the evidence, that Plaintiff's action is barred by the doctrines of waiver and estoppel.

4.     Falwell states that he intends to rely upon the defense, as may be developed through discovery and the evidence, that Plaintiff's action is barred by the applicable statute of limitations.

5.     Falwell states that the Complaint fails to state a claim and fails to state facts upon which the relief demanded can be granted against it.

6.     Falwell denies that he is liable to Plaintiff in any amount or in any manner whatsoever.

7.     Falwell states that he intends to rely upon the defense, as may be developed through discovery and the evidence, that Plaintiff's action is barred by the doctrine of unclean hands.

8.     Falwell states that he intends to rely upon the defense, as may be developed through discovery and the evidence, that Falwell performed as required under the contract.

LUADMINREC000614

9.      Falwell states that he intends to rely upon the defense, as may be developed through discovery and the evidence, that Plaintiff's action is barred by the doctrine of laches.

10.     Falwell states he intends to rely on the Indemnity provision in the 2019 Employment Agreement.

11.     Falwell states that Plaintiff has not suffered any damage that it allegedly sustained.

12.     Falwell states that he intends to rely upon any and all other available defenses as may be developed in discovery and the evidence.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendant, Jerry L. Falwell, Jr., respectfully requests that this Court dismiss this Second Amended Complaint filed against him by Plaintiff, Liberty University, Inc., with prejudice, and that he be granted all such other and further relief as this Court deems appropriate under the circumstances.

Dated: October 26, 2022                    JERRY L. FALWELL, JR.


                                           _____
                                           Counsel

Vernon E. Inge, Jr. (Va. Bar No. 32699)
Robert N. Drewry (Va. State Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:      804.977.3301
Facsimile:      804.977.3291
E-Mail:         vinge@wtplaw.com
                rdrewry@wtplaw.com

*Counsel for Defendant, Jerry L. Falwell, Jr.*

LUADMINREC000615

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of October, 2022, a true and correct copy of the foregoing *Defendant's Answer and Affirmative Defenses to Liberty University, Inc.'s Second Amended Complaint* was served *via* e-mail transmission and first-class, postage-prepaid, U.S. Mail upon the following:

Scott C. Oostdyk, Esq.
Andrew F. Gann, Jr., Esq.
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
E-Mail:      soostdyk@mcguirewoods.com
             agann@mcguirewoods.com

*Counsel for Plaintiff, Liberty University, Inc.*

Vernon E. Inge, Jr.

28

V I R G I N I A :

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.

*Plaintiff*,

v.                                                    Case **No. CL21000354-00**

JERRY L. FALWELL, JR.,

*Defendant*.

## DEFENDANT'S OBJECTIONS, ANSWERS, AND RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES, FIRST SET OF REQUESTS FOR ADMISSION, AND SECOND SET OF REQUESTS FOR PRODUCTION

Defendant, Jerry L. Falwell, Jr. ( "**Defendant**" or "**Falwell**"), by counsel, pursuant to Rules 4:1, 4:8, 4:9, and 4:11 of *The Rules of the Supreme Court of Virginia* (the "**Rules**") states the following for his objections, answers, and responses to Plaintiff's Third Set of Interrogatories ("**Interrogatories**"), First Set of Requests for Admission ("**RFAs**"), and Second Set of Requests for Production ("**RFPs**," and together with the Interrogatories and RFAs, the "**Discovery Requests**") served by Plaintiff, Liberty University, Inc. ("**Plaintiff**" or "**Liberty**").

### PRELIMINARY STATEMENT

1.      Defendant objects to the Instructions and Definitions in the Discovery Requests to the extent they purport to impose on Defendant obligations broader than those imposed by the Rules.

2.      Defendant objects to the Discovery Requests to the extent that they call for information and documents protected by the attorney-client privilege and/or work product doctrine.  Inadvertent disclosure of such information shall not operate as a waiver of any applicable

1

privilege and/or protection, and Defendant shall be entitled to the immediate return of such inadvertent disclosures.

3.  By responding to the Discovery Requests, Defendant does not agree with Plaintiff's characterization of the facts.

4.  Defendant's answers and responses are made subject to, and without waiver of, its rights to: (a) contest the admissibility of any evidence disclosed in these answers or in any production of documents or disclosure of information pursuant to any Discovery Request; (b) object to any other Discovery Request that may or may not relate to the answers and responses; (c) seek a protective order pursuant to Rule 4:1(c) of the Rules; and (d) modify and/or amend the answers and responses in any manner.

5.  Because Defendant's investigation of this matter is continuing and ongoing, Defendant expressly reserves the right to supplement any of his answers and responses in the event additional discoverable information is discovered.

## INTERROGATORIES AND REQUESTS FOR ADMISSION

**RFA No. 1:**  Admit You provided factual input to inform the statements made in the what are currently the paragraphs enumerated as 1, 4, 7, 41, 42, 43, 44, 45, 46, 47, 51, 52, 53, 54, 55, 56, 62, 63, 64, 65, 67, 102, and 109 (hereinafter, the "23 paragraphs") of the Complaint filed on October 28, 2020 against Liberty University in the Circuit Court of the City of Lynchburg, VA, copy attached as Exhibit A.

**OBJECTION:**  Defendant objects on the grounds that these RFAs seek information protected by the attorney-client privilege and/or work product doctrine. Defendant also objects to the compound nature of this purportedly single RFA, when in actuality, this RFA is composed of 23 separate RFAs in contravention of Rule 4:11(a), which requires that "[e]ach matter of which is

2

an admission is requested" is to be "separately set forth."   Here, Plaintiff has combined 23 paragraphs without any identification of each matter for which an admission is requested. Defendant also objects to these RFAs as vague and not in keeping with the requestor's duty to phrase these RFAs with clarity and fairness.  *See Erie Ins. Exchange v. Jones*, 236 Va. 10, 14, 372 S.E.2d 126, 128 (1988).  Specifically, these RFAs do not identify what "factual input" is subject to these Requests, nor do they define what is meant by the phrase, "inform the statements." Further, Defendant objects to these RFAs to the extent they are irrelevant to the underlying matter.   In addition, Defendant objects to these RFAs because they are improper.   These RFAs do not seek an admission of fact related to a matter within the scope of Rule 4:1(b), but rather seek information concerning Defendant's communications with counsel.

> **ANSWER:**     Defendant stands on the objections stated herein and therefore denies.

3

**Interrogatory No. 6**:  If your answer to Request for Admission No. 1 was anything but an unqualified admission, state all facts related to your denial including which of the paragraphs into which you provided no factual input.

**OBJECTION:**      Because the preceding RFA does not seek an admission of fact related to a matter within the scope of Rule 4:1(b), but rather seeks information concerning Defendant's communications with counsel, Defendant objects to the predicate for this multiplicious Interrogatory.  Accordingly, Defendant objects on the grounds that the information sought is protected by the attorney-client privilege and/or work product doctrine. Defendant also objects to the compound nature of this purportedly single Interrogatory, when in actuality, this Interrogatory is composed of 23 separate Interrogatories.  Insofar as this Interrogatory is premised on the RFA preceding this Interrogatory, because the RFA does not identify what "factual input" is subject to this RFA, nor does it define what is meant by the phrase, "inform the statements," this Interrogatory is vague.

**ANSWER:**      Subject to and without waiving the foregoing objections, Defendant states there was no extortion by Granda. Defendant further states he used the word "extortion" loosely in an attempt to avoid any future actions by Granda. Granda's actions and claims for money did not occur until late 2019 and were made in connection with Granda attempting to sell his share/interest in Alton Hostel LLC.  Responding further, the only other demands for money came from the Fernandezs, and not Granda, in 2014 and was couched as a breach of contract relating to Alton Hostel LLC.

LUADMINREC000620

**Interrogatory No. 7**: Please list the dates between August 26, 2020 and the present on which You visualized, read, or reviewed (whether in draft or final form) the content currently contained in the "23 paragraphs," as that term is defined by Liberty in RFA No. 1.

**OBJECTION:**     Defendant objects to the compound nature of this purportedly single Interrogatory, when in actuality, this Interrogatory is composed of 23 separate Interrogatories. Defendant also objects on the grounds that the information sought is not relevant to the issues in this litigation, nor is this Interrogatory reasonably calculated to lead to the discovery of admissible evidence.  Defendant also objects on the grounds that the information sought is protected by the attorney-client privilege and/or work product doctrine.

**ANSWER:**     Subject to and without waiving the foregoing objections, Defendant states he is unable to recollect what dates he visualized, read, or reviewed the "23 paragraphs." Defendant states the Complaint filed on October 28, 2020 against Liberty University in the Circuit Court of the City of Lynchburg, VA was not a verified complaint signed by Mr. Falwell, and has since been non-suited. Responding further, Defendant states he did not review the October 28, 2020 complaint word for word until Liberty sued Defendant in the current action. Defendant states there was no extortion by Granda. Defendant further states he used the word "extortion" loosely in an attempt to avoid any future actions by Granda. Any claims for money were not until late 2019 and were the subject of Granda attempting to sell his interest in Alton Hostel, LLC. Responding further, the only other demands for money came from the Fernandezs, and not Granda, in 2014 and was couched as a breach of contract relating to Alton Hostel LLC.

5

**Request for Admission No. 2:**   Admit that the "23 paragraphs," defined by Liberty in Request for Admission No. [1], are to your knowledge factually true.

**OBJECTION:**   Defendant objects to the compound nature of this purportedly single RFA, when in actuality, this RFA is composed of 23 separate RFAs in contravention of Rule 4:11(a), which requires that "[e]ach matter of which is an admission is requested" is to be "separately set forth."  Here, Plaintiff has combined 23 paragraphs without any identification of each matter for which an admission is requested.  As such, these RFAs exceed the maximum allowable number of RFAs permitted by Rule 4:11(e).  Defendant also objects to these RFAs as vague and not in keeping with the requestor's duty to phrase these RFAs with clarity and fairness. *See Erie Ins. Exchange v. Jones*, 236 Va. 10, 14, 372 S.E.2d 126, 128 (1988).  Specifically, these RFAs do not identify which of the "23 paragraphs" are subject to them, and nor do they identify what information in each of the "23 paragraphs" are subject to them.  In addition, Defendant objects to these RFAs because they are improper.  These RFAs do not seek an admission of fact related to a matter within the scope of Rule 4:1(b).  Defendant also objects on the grounds that these RFAs seek information protected by the attorney-client privilege and/or work product doctrine.

**ANSWER:**   Defendant relies on the objections stated herein and therefore denies.

LUADMINREC000622

**Interrogatory No. 8**:  If You contend that the content of any of the "23 paragraphs" defined by Liberty in Request for Admission No. 1 above is untrue, or, to your knowledge factually incorrect in any manner or detail, then state all facts in support of your denial, all reasons You believe a particular enumerated paragraph to be untrue, and state the true facts as You now understand them.

**OBJECTION:**        Defendant objects to the compound nature of this purportedly single Interrogatory.  Defendant also objects on the grounds that this Interrogatory is vague, being as it is unmoored to any time frame.  Defendant further objects to this Interrogatory on the grounds that the information sought is not relevant to the issues in this litigation, nor is this Interrogatory reasonably calculated to lead to the discovery of admissible evidence.  Defendant also objects on the grounds that the information sought is protected by the attorney-client privilege and/or work product doctrine. Defendant also objects to this Interrogatory on the grounds that its only purpose is to harass Defendant.

**ANSWER:**     Subject to and without waiving the foregoing objections, Defendant states there was no extortion by Granda. Defendant further states he used the word "extortion" loosely in an attempt to avoid any future actions by Granda. Any claims for money by Granda did not begin until late 2019 and were the subject of Granda attempting to sell his interest in Alton Hostel, LLC. Responding further, the only other demands for money came from the Fernandezs in 2014 and was couched as a breach of contract relating to Alton Hostel LLC.

7

**Interrogatory No. 9**:   State any medical limitation, impairment, disruption or other physical or psychological impediment that You believe impacted your ability to visualize, read, review, comprehend, and/or understand in advance of their filing the statements in each of the "23 paragraphs" defined by Liberty above in Request for Admission No. 1.

**OBJECTION:**       Defendant objects to this Interrogatory to the extent that it calls for an expert medical opinion, which Defendant is not qualified to give, and as requiring him to speculate with respect to such medical issues.  Defendant also objects to this Interrogatory on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory on the grounds that its only purpose is to harass Defendant.

**ANSWER:**     Subject to and without waiving the foregoing objections, Defendant refers Plaintiff to the previously produced documents bates numbered FalwellProd00001–FalwellProd00011.

LUADMINREC000624

**Interrogatory No. 10**:  If you claim any impairment in connection with your pre-review of the "23 paragraphs" defined by Liberty in Request for Admission No. 1, please identify by name, location of practice and hospital affiliation all medical doctors and treatment providers that informed You of that diagnosis, describing the medical condition that You understand precipitated your claimed impairment, including the causative aspects of the condition that You understand to have rendered you unable to review and/or comprehend the 23 paragraphs.  Please specify the date(s) of all particular medical evaluation(s) that resulted in the diagnosis that You were debilitated in connection with Your review and understanding of the "23 paragraphs," as defined by Liberty in Interrogatory 15 [*sic*] above.

**OBJECTION:**    Defendant objects to this Interrogatory as being compound. Defendant further objects to this Interrogatory to the extent that it calls for an expert medical opinion, which Defendant is not qualified to give, and as requiring him to speculate with respect to such medical issues.  Defendant also objects to this Interrogatory on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory on the grounds that its only purpose is to harass Defendant.

**ANSWER:**    Subject to and without waiving the foregoing objections, *see* response to Interrogatory No. 9. Responding further, Defendant states he was admitted to Sharon Hospital, part of Nuvance Health, in Sharon, Connecticut, on or around September 14, 2020.

LUADMINREC000625

**Interrogatory No. 11**:  On how many times from March 13, 2012 to the present (whether five times, one time, or a different number) have You observed in person, from the proximity of the same room or from an immediately adjacent room or area, your wife Becki Falwell ("Becki") engage sexually with Giancarlo Granda ("Granda") for any length or duration?  Please understand the term "engage sexually" to mean what You and Your legal team contemplated in paragraph 52 of Exhibit A.  This request includes but is not limited to the times you watched or observed Becki and Granda live, for any duration, during acts of either sexual intercourse, body-to-body contact while partially or totally unclothed, repeated kissing on the lips or genitalia, or any other sexually-oriented relations.  For each such observation, state the date, time of day, duration of the observation, and the place that You made the observation—and whom, if anyone, You told about each of the observations.

**OBJECTION**:       Defendant objects to this Interrogatory on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.  Defendant also objects to this Interrogatory on the grounds that its only purpose is to harass Defendant.

**ANSWER:**     Subject to and without waiving the foregoing objections, Defendant states he walked in and discovered Granda and Ms. Falwell engaging in a sexual affair two or three times approximately ten years ago in, at least one instance, a Miami hotel room, while Granda and Ms. Falwell were being careless. Responding further, Mr. Falwell is unsure of the exact specifics regarding the encounter, including the specific date, time of day, total duration, or place, but states the visualization and realization of the affair was traumatizing and his observation was limited.

LUADMINREC000626

**Interrogatory No. 12:**  From March 13, 2012 to the present, on how many occasions (whether five times, one time, or a different number) did You (a) photograph, or (b) create electronic images, of your wife Becki "engag[ing] sexually" with Granda (as You used the term "engage sexually" in paragraph 52 of Exhibit A, attached hereto). For each such observation, identify the date, time of day, and place that You made the observation, whom you told about the observation, and where any image or Document of the engagement is currently stored.

**OBJECTION:**      Defendant also objects to this Interrogatory on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory on the grounds that its only purpose is to harass Defendant.

**ANSWER:**      Subject to and without waiving the foregoing objections, Defendant states he does not recall taking any images, but in the heat of the moment may have taken a picture as proof of the affair. Responding further, Defendant is unable to recall the specific date, time of day, or place, and further states he is unaware where any image, if such image was taken, exists, or if it still exists, as such event occurred approximately ten years ago.

11

**Interrogatory No. 13**:  From March 13, 2012 to the present, on how many occasions did You store, file, maintain, collect and/or destroy images of Becki and Granda "engag[ing] sexually" with Granda (as You used the term in Paragraph 52 of Exhibit A, attached hereto.)  This request includes your storage in any way of videos you were making or receiving that of images you made or stored in whatever form that related to Becki engaging in physical intimacy with Granda including, but not limited to, acts of sexual intercourse, body-to-body contact while partially or totally nude, repeated kissing on the lips, fellatio, cunnilingus, or any other sexually-oriented relations.  For each such observation, identify the date, time of day, and place You made the observation, whom You told about it, and where you stored or how You destroyed the particular video or image that you made or watched or destroyed, and where it was or is currently stored.

**OBJECTION:**      Defendant objects to this Interrogatory on the grounds that it is vague, compound, and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or work product doctrine. Defendant also objects to this Interrogatory on the grounds that its only purpose is to harass Defendant.

**ANSWER:**     Subject to and without waiving the foregoing objections, *see* response to Interrogatory No. 12. Responding further, Defendant states he has neither made, stored, or collected, any videos related to Granda and Ms. Falwell's engaging in physical intimacy.

12

**Interrogatory No. 14**:  Identify all Communications, from March 13, 2012 to the present, in which Granda threatened to expose to someone other than you or Becki the fact of his sexual affair with Becki, or to expose images either depicting Becki engaging sexually with Granda or portraying her personal nudity. For each such Communication, please state the date, means or mode of communication by which Granda made or initiated the threat, summarize the Communication, and state all information describing the threat.

**OBJECTION:**      Defendant objects to this Interrogatory on the grounds that it is vague, compound, and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects that the use of the word "threatened" or "threat" is vague, ambiguous, and subjective.

**ANSWER:**     Subject to and without waiving the foregoing objections, Defendant states he is unaware of any direct communications threatening to directly expose the affair or images depicting Ms. Falwell. Responding further, Defendant is aware of text messages from Granda in or around June 2020, wherein he stated something to the effect of "Since you're okay with ruining my life, I am going to take the kamikaze route." Defendant states he was unsure at the time what Granda meant by kamikaze, but understood the text to be the purported threat of an act; however, Defendant was unsure of what specific act Granda would take and states any characterization of the purported threatening acts is subjective.

13

**Interrogatory No. 15**:  With respect to Your statement presented to the *Washington Examiner,* and published therein on or about August 23, 2020 (copy attached hereto as Exhibit B), in which it states on the third page of Exhibit B that Granda "became increasingly angry and aggressive[;][e]ventually, he began threatening to publicly reveal this secret relationship with Becki [hereinafter "Secret Relationship"] to deliberately embarrass my wife, family, and Liberty university unless we agreed to pay him a substantial amount of money," please state the date, time, and place of each occurrence of Granda's "threatening" act, and state how much total money was implicated by Granda in each stated threat.

**OBJECTION:**      Defendant objects to this Interrogatory on the grounds that it is vague, compound, and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects that the use of the word "threatening" is vague, ambiguous, and subjective.

**ANSWER:**   Subject to and without waiving the foregoing objections, Defendant incorporates his response to Interrogatory No. 14. Defendant states any purported threats by Granda were not accompanied by a demand for money. Responding further, in late 2019, Granda sought to obtain money by selling his interest in Alton Hostel LLC and Defendant is unaware whether the threats were connected to Granda's 2019 request for money in connection with Alton Hostel LLC. Responding further, Granda, based on Defendant's recollection, did not say his goal was to "embarrass."

14

**Request for Admission No. 3:** Admit that Granda at one point demanded from You up to $2 million in financial compensation if he was to refrain from publicly revealing his "Secret Relationship" with Becki, as that term is defined by Liberty in Interrogatory No. 15 above.

**OBJECTION:** Defendant objects to this RFA, which in combination with the preceding RFAs, exceeds the maximum allowable number of RFAs permitted by Rule 4:11(e). In addition, Defendant objects to this RFA because it is improper, beyond the scope of a matter subject to discovery under Rule 4:1(b), and not reasonably calculated to lead to the discovery of admissible evidence in seeking an admission related to matters that are irrelevant to the issues in this case. Defendant also objects to this RFA as vague and not in keeping with the requestor's duty to phrase this RFA with clarity and fairness. *See Erie Ins. Exchange v. Jones*, 236 Va. 10, 14, 372 S.E.2d 126, 128 (1988). Specifically, this RFA is vague as to the meaning of "up to $2 million in financial compensation" and as to the meaning of "at one point."

**ANSWER:** Subject to and without waiving the foregoing objections, Defendant denies. Defendant states Granda's $2 million demand occurred in late 2019 and was in exchange for his interest in Alton Hostel, LLC.

15

**Request for Admission No. 4**: Admit that Granda at one point demanded from You $600,000 or more in financial compensation to him if he was to refrain from publicly revealing his "Secret Relationship" with Becki, as that term is defined by Liberty in Interrogatory No. 15 above.

**OBJECTION:**       Defendant objects to this RFA, which in combination with the preceding RFAs, exceeds the maximum allowable number of RFAs permitted by Rule 4:11(e).  In addition, Defendant objects to this RFA because it is improper, beyond the scope of a matter subject to discovery under Rule 4:1(b), and not reasonably calculated to lead to the discovery of admissible evidence in seeking an admission related to matters that are irrelevant to the issues in this case.  Defendant also objects to this RFA as vague and not in keeping with the requestor's duty to phrase this RFA with clarity and fairness.  *See Erie Ins. Exchange v. Jones*, 236 Va. 10, 14, 372 S.E.2d 126, 128 (1988).  Specifically, this RFA is vague as to the meaning of "$600,000 or more in financial compensation" and as to the meaning of "at one point."

**ANSWER:**       Subject to and without waiving the foregoing objections, Defendant denies. Defendant states Granda's request for financial compensation in the amount of $600,000.00 or more was with respect to his interest in Alton Hostel, LLC and the value to Granda as a gain for any potential sale of the Alton Hostel, LLC business to outside entities.

LUADMINREC000632

**Interrogatory No. 16:**  If your answer to Requests for Admission Nos. 3 and 4 were anything other than a complete admission, state all facts in support of Your denial and Identify all documents which You believe support Your denial.

**OBJECTION:**        Defendant incorporates the objections to the corresponding RFAs above.  In addition, Defendant objects to this Interrogatory as being compound.

**ANSWER:**      Subject to and without waiving the foregoing objections, *see* response to RFAs Nos. 3 and 4, respectively.

LUADMINREC000633

**Interrogatory No. 17**:  With respect to Your statement submitted to the *Washington Examiner,* and attributed to You (copy attached hereto as Exhibit B), Identify all persons who advised you regarding the content of the statement to the *Washington Examiner*, all persons who supplied any materials or content used to compose the statement, all persons who edited drafts, and Identify all materials you relied upon in the preparation of the statement.

**OBJECTION:**       Defendant objects to this Interrogatory on the grounds that it is vague, compound, and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or work product doctrine.

**ANSWER:**    Subject to and without waiving the foregoing objections, Defendant provided Mr. Mark Serrano and Proactive Communications a summary of the facts regarding the events that occurred between 2012 and 2020. Responding further, Defendant states he provided information to Mr. Mark Serrano, but is unsure which, if any, additional writers were involved.

LUADMINREC000634

**Interrogatory No. 18**:  Identify all Communications, from March 13, 2012 to the present, in which any person has threatened to reveal or expose — to persons other than you and Becki — any nude, partially-nude, or sexually-involved images of Becki.  For each such Communication, state the person who made the threat, the means or mode by which the threat was made, and summarize the Communication.

**OBJECTION**:       Defendant objects to this Interrogatory on the grounds that it is vague, compound, and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory on the grounds that its only purpose is to harass Defendant.

**ANSWER**:     Subject to and without waiving the foregoing objections, Defendant is unaware of any communications that exist that relate to any person threatening to reveal or expose any nude, partially-nude, or sexually-involved images of Ms. Falwell.

LUADMINREC000635

**Interrogatory No 19**:  Identify all persons whom You told from March 13, 2012 to August 23, 2020 about the "Secret Relationship," as that term is defined in Interrogatory No. 15 above.

**OBJECTION:**        Defendant objects to this Interrogatory on the grounds that it is vague, compound, and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege or protection.

**ANSWER:**        Subject to and without waiving the foregoing objections, Defendant states among the individuals he discussed Granda and Ms. Falwell's affair include Mr. Steven Snyder, former member of the Liberty University Board of Trustees; Mr. Jerry Prevo, interim President of Liberty University and former Chairman of Liberty University's Board of Trustees; and former counsel. Defendant incorporates his response to Interrogatory No. 17 above and No. 25 below. Defendant will supplement to the extent other Persons are later identified.

LUADMINREC000636

**Interrogatory No. 20**:  State the date and content of the strategy/plan prepared for you by Matthew Hiltzik, https://hstrategies.com/matthew-hiltzik/, and/or Hiltzik Strategies, to help manage and protect Your reputation in the event that Granda revealed or exposed to the public the "Secret Relationship," as that term is defined by Liberty in Interrogatory No. 15 above.

**OBJECTION:**       Defendant objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or work product doctrine. Defendant also objects to this Interrogatory on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.

**ANSWER:**     Defendant stands on the objections to this Interrogatory stated herein.

LUADMINREC000637

**Interrogatory No. 21**:  Identify the present location of what Granda indicates on p. 98 of his 2022 book *Off the Deep End* (page attached hereto as Exhibit C) to be a "box full of portable hard drives, with some thumb drives and the cube-shaped ones that are usually fire-and waterproof," which box Granda says he viewed in your home office while you showed him a genealogy of your family lineage back to the 1600s. Identify if any of these portable hard drives, thumb drives, or cube-shaped drives have been removed from the box described in Exhibit C, or elsewhere from your personal office, since Granda's visit to your personal office—and if so state the current location of those relocated materials.

**OBJECTION:**      Defendant objects to this Interrogatory on the grounds that it is vague, compound, and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.

**ANSWER:**      Subject to and without waiving the foregoing objections, Defendant states he does not recollect ever taking Granda into his home office or showing him any copies of the genealogy of Defendant's family and states there was never a "box full of portable hard drives, with some thumb drives and the cube-shaped ones." Responding further, Mr. Falwell states he has occasionally used an external hard drive to back up a computer. Defendant will supplement to the extent any external hard drive is later located upon a reasonable search.

22

**Interrogatory No. 22**: State every time while employed by Liberty that You conversed with or discussed with any Liberty University employee, agent, or trustee, included Becki while she was employed by Liberty, concerning the obligation they owed to Liberty relating to the disclosure of matters within their private lives that also impacted their duties for Liberty.  Identify the person or persons with whom You had such a conversation or discussion, the means of Communication by which You conducted it, and describe the substance of the conversation or discussion.

**OBJECTION**:        Defendant objects to this Interrogatory to the extent that it seeks information protected by the spousal privilege. Defendant also objects to this Interrogatory on the grounds that it is vague, compound, and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.  In addition, Defendant objects to this Interrogatory because it is based on false predicate that such a duty exists and that such a duty, even if it did exist, was at issue.

**ANSWER**:    Defendant stands on the objections stated herein.

LUADMINREC000639

**Interrogatory No. 23**:  Identify all persons whom, prior to October 28, 2020, whom You ever told, including your counsel at Ropes & Gray LLP, about any of the content contained in the "23 paragraphs," as defined by Liberty in Request for Admission No. 1 above, and/or any aspects of the "Secret Relationship," as the term is defined by Liberty in Interrogatory No. 15 above.

**OBJECTION:**     Defendant objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or work product doctrine. Defendant also objects to this Interrogatory on the grounds that it is vague, compound, and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.

**ANSWER:**     Subject to and without waiving the foregoing objections, Defendant states among the individuals he discussed Granda and Ms. Falwell's affair, he told Mr. Steven Snyder about the affair and relationship between Ms. Falwell and Granda. Additionally, Mr. Prevo was aware. Defendant incorporates his response to Interrogatory No. 19. Responding further, Defendant has no recollection of discussing the "23 paragraphs" or the "Secret Relationship" with Ropes and Gray LLP, and in the event discussions were had, such discussions are privileged and Defendant relies on his objection. Further, Defendant states there was no extortion by Granda. Defendant further states he used the word "extortion" loosely in an attempt to avoid any future actions by Granda. Any claims for money by Granda did not begin until late 2019 and were the subject of Granda attempting to sell his interest in Alton Hostel, LLC. Responding further, the only other demands for money came from the Fernandezs in 2014 and was couched as a breach of contract relating to Alton Hostel LLC. Defendant will supplement to the extent other Persons are later identified.

LUADMINREC000640

**Interrogatory No. 24:**  Prior to August 23, 2020, did you inform Ropes & Gray that Granda had threatened to disclose the "Secret Relationship," as the term is defined by Liberty in Interrogatory No. 15, or to allege You participated in Becki's affair with Granda, or to reveal nude pictures or sexually-oriented videos containing images of Becki?  If so, Identify the date(s) on which You told Ropes & Gray, the means or mode of Communication, and summarize the Communication.

**OBJECTION:**       Defendant objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or work product doctrine. Defendant also  objects to this Interrogatory on the grounds that it is vague, compound, and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.

**ANSWER:**    Defendant stands on the objections stated herein.

LUADMINREC000641

**Interrogatory No. 25**: From Your understanding, when did Your children and their spouses first learn of Becki's "Secret Relationship" with Granda, as that term is defined by Liberty in Interrogatory No. 15? For each of Your children and/or their spouses, state the date of each point of what you understand to be their initial knowledge, and whether it was You or Becki that told them about the affair, or, if not, from what source you understand they found out about Becki's affair with Granda.

**OBJECTION**: Defendant objects to this Interrogatory on the grounds that it is vague, compound, and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this Interrogatory because it improperly requires Defendant to engage in speculation about information within the knowledge of other people. In addition, Defendant objects to this Interrogatory on the grounds that it seeks information irrelevant to this litigation.

**ANSWER**: Subject to and without waiving the foregoing objections, all of Mr. Falwell's children, as well as their respective spouses, if any, learned of the affair between Ms. Falwell and Granda at the same time- the Summer of 2020, in or around August 21/22 when both Ms. Falwell informed them of the affair, either in person or on the phone, with Mr. Falwell present.

LUADMINREC000642

**RFA No. 5**:  Admit You had a duty to disclose to Liberty the text communications that You identified in ¶¶ 55, 56 of Exhibit A attached hereto, texts in which you indicate therein that Granda advised he would take the "kamikaze" route against You?

**OBJECTION:**        Defendant objects to this RFA, which in combination with the preceding RFAs, exceeds the maximum allowable number of RFAs permitted by Rule 4:11(e).  In addition, Defendant objects to this RFA as being improper and seeking an admission regarding a conclusion of law rather than an admission relating "to statements or opinions of fact or of the application of law to fact."  *See Piney Meeting House Invs., Inc. v. Hart*, 284 Va. 187, 196-97, 726 S.E.2d 319, 324-25 (2012).

**ANSWER:**        Defendant stands on the objections stated herein and therefore denies.

27

**Interrogatory No. 26:**  If Your answer to Request for Admission No. 5 was anything but a complete admission, state all facts in support of your denial, Identify all persons with knowledge about the denial, and Identify any Documents relating to your response.

**OBJECTION:**        Defendant incorporates his objections to the corresponding RFA above.  In addition, Defendant objects to this Interrogatory as being compound.

**ANSWER:**        Defendant incorporates his response to the corresponding RFA above and subject to and without waiving his objection, states while no duty existed, at least one reason is it is unclear what Granda meant by the texts indicating he would take the "kamikaze" route and the texts were vague and concerning a personal matter.

28

**Interrogatory No. 27**:  As of July 20, 2020, were you being subjected by Granda to an "extortion scheme" as described in Exhibit A, ¶¶ 55, 56?  If so, state all facts in support.  If not, state all facts in support.

**OBJECTION:**        Defendant objects to this Interrogatory on the grounds that it is vague, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.

**ANSWER:**        Subject to and without waiving the foregoing objections, Defendant states there was no "extortion scheme." Defendant states he used the word "extortion" loosely in an attempt to avoid any future actions by Granda. In 2020, at the time Granda indicated he would take the "kamikaze" route, his intentions are subjective and individuals can and have drawn different conclusions as to what that text meant or implied.

29

## ADDITIONAL REQUESTS FOR ADMISSION

**RFA No. 6**: Admit that the document attached hereto as Exhibit A is a true and authentic copy of the lawsuit you filed against Liberty University October 28, 2020 in the Circuit Court of the City of Lynchburg, VA.

**OBJECTION:**    Defendant objects to this RFA because it is improper, beyond the scope of a matter subject to discovery under Rule 4:1(b), and not reasonably calculated to lead to the discovery of admissible evidence in seeking an admission related to matters that are irrelevant to the issues in this case.

**ANSWER:**    Subject to and without waiving the foregoing objections, Mr. Falwell admits Exhibit A is the lawsuit filed against Liberty University on October 28, 2020, in the Circuit Court of the City of Lynchburg, VA, which was later non-suited shortly after filing.

**RFA No. 7**: Admit that the document attached hereto as Exhibit B is a true and authentic copy of the statement you submitted to the *Washington Examiner*.

**OBJECTION:**    Defendant objects to this RFA because it is improper, beyond the scope of a matter subject to discovery under Rule 4:1(b), and not reasonably calculated to lead to the discovery of admissible evidence in seeking an admission related to matters that are irrelevant to the issues in this case.

**ANSWER:**    Subject to and without waiving the foregoing objections, Mr. Falwell admits Exhibit B is the statement Mr. Mark Serrano provided to the *Washington Examiner*.

30

**RFA No. 8:** Admit that the document attached hereto as Exhibit C is a true and authentic copy of page 98 of "Off the Deep End" by Giancarlo Granda.

**OBJECTION:**    Defendant objects to this RFA because it is improper, beyond the scope of a matter subject to discovery under Rule 4:1(b), and not reasonably calculated to lead to the discovery of admissible evidence in seeking an admission related to matters that are irrelevant to the issues in this case.

**ANSWER:**    Subject to and without waiving the foregoing objections, Mr. Falwell lacks sufficient information to either admit or deny Exhibit C is a true and authentic copy of page 98 of "Off the Deep End," and therefore denies same.

**RFA No. 9:**  Admit that Exhibit D is a true and authentic copy of an 2019 employment agreement between You and Liberty University.

**ANSWER:**    Subject to and without waiving the foregoing objections, Mr. Falwell admits Exhibit D is the 2019 employment agreement between Mr. Falwell and Liberty University.

**RFA No. 10:**  Admit that Exhibit E is a true and authentic copy of an agreement among Liberty University and Falwell to establish a Rabbi Trust for the benefit of Falwell (hereinafter, the "Rabbi Trust").

**ANSWER:**    Subject to and without waiving the foregoing objections, Mr. Falwell denies as stated, but admits Exhibit E is the agreement detailing the Supplemental Executive Retirement Plan, as required by Section 4.1(d) of the 2019 employment agreement between Mr. Falwell and Liberty University.

LUADMINREC000647

**RFA No. 11:**  Admit that that document attached hereto as Exhibit F is a true and authentic copy of a document You submitted to Liberty in attempt to compel payment by Liberty of the proceeds of the Rabbi Trust.

**OBJECTION:**     Although having some characteristics of an RFA requesting an admission as to the authenticity of a document, this RFA is not of that species.  Accordingly, Defendant objects to this RFA, which in combination with the preceding RFAs, exceeds the maximum allowable number of RFAs permitted by Rule 4:11(e).  In addition, Defendant objects to this RFA as vague and not in keeping with the requestor's duty to phrase these RFAs with clarity and fairness.  *See Erie Ins. Exchange v. Jones*, 236 Va. 10, 14, 372 S.E.2d 126, 128 (1988).  The subject exhibit is a document that speaks for itself, and this RFA improperly and unfairly ascribes a motive with respect to the submission of the document ("submitted to Liberty in an attempt to compel payment by Liberty") for which there is no predicate and, in any event, is subjective. Defendant objects to this RFA because it is improper, beyond the scope of a matter subject to discovery under Rule 4:1(b), and not reasonably calculated to lead to the discovery of admissible evidence in seeking an admission related to matters that are irrelevant to the issues in this case.

**ANSWER:**     Subject to and without waiving the foregoing objections, Mr. Falwell denies Request for Admission No. 11 as stated, but admits Exhibit F is the document Defendant sent the Executive Committee of Liberty University's Board of Trustees appealing, pursuant to Section 503 of the Employee Retirement Income Security Act of 1974 and Section 7(a) of the Supplement Executive Retirement Plan, the December 13, 2022 denial of the Supplemental Executive Retirement Plan Benefits payable to Defendant.

LUADMINREC000648

**RFA No. 12**:   Admit that Exhibit E constitutes the entire obligation of the University to provide supplemental retirement benefits to You.

**OBJECTION:**        Although having some characteristics of an RFA requesting an admission as to the authenticity of document, this RFA is not of that species.   Accordingly, Defendant objects to this RFA, which in combination with the preceding RFAs, exceeds the maximum allowable number of RFAs permitted by Rule 4:11(e).   In addition, Defendant objects to this RFA as being improper and seeking an admission regarding a conclusion of law rather than an admission relating "to statements or opinions of fact or of the application of law to fact."   *See Piney Meeting House Invs., Inc. v. Hart*, 284 Va. 187, 196-97, 726 S.E.2d 319, 324-25 (2012). Defendant objects to the RFA as vague and overbroad.

**ANSWER:**     Subject to and without waiving the foregoing objections, Mr. Falwell admits Exhibit E contains the obligation of Liberty to provide supplemental retirement benefits. Responding further, Mr. Falwell states he maintains other retirement accounts afforded to all Liberty University employees and Liberty maintains a split-dollar life insurance policy on Defendant.

LUADMINREC000649

**Interrogatory No. 28**:  If Your response to Request for Admission No. 12 is anything other than an unequivocal admission, state all facts in support of your response and Identify all supporting documents and materials.

**OBJECTION:**      Defendant incorporates his objections to the corresponding RFA above.  In addition, Defendant objects to this Interrogatory as being compound.

**ANSWER:**      Subject to and without waiving the foregoing objections, Mr. Falwell refers Plaintiff to his response to Request for Admission No. 12.

34

**RFA No. 13**:  Admit that Exhibit D contains no statement of the dollar-level payment and conditions of payment to be applied by Liberty to the "Rabbi Trust."

**OBJECTION:**       Defendant objects to this RFA, which in combination with the preceding RFAs, exceeds the maximum allowable number of RFAs permitted by Rule 4:11(e).  In addition, Defendant objects to this RFA as being improper because the document speaks for itself.

**ANSWER:**   Defendant relies on the objections stated herein, states the referenced document speaks for itself, and therefore denies.

35

**Interrogatory No. 29:**  If Your response to Request No. 13 is anything other than an unequivocal "admit," state all facts in support of your response and Identify all supporting documents and materials.

**OBJECTION:**      Defendant incorporates his objections to the corresponding RFA above.  In addition, Defendant objects to this Interrogatory as being compound.

**ANSWER:**    Defendant incorporates his response to the corresponding RFA above and relies on the objections stated herein. Responding further, Defendant states the document speaks for itself.

36

**RFA No. 14:**   Admit that, to supply content for the statements contained in the "23 paragraphs" that were defined by Liberty in Request for Admission No. 1, You communicated information to attorneys at Quinn, Emmanuel, Urquhart and Sullivan, LLP, specifically Robert L. Raskopf and Julia M. Beskin.

**OBJECTION:**   Defendant objects on the grounds that these RFAs seek information protected by the attorney-client privilege. Defendant objects to the compound nature of this purportedly single RFA, when in actuality, this RFA is composed of 23 separate RFAs in contravention of Rule 4:11(a), which requires that "[e]ach matter of which is an admission is requested" is to be "separately set forth." Here, Plaintiff has lumped 23 paragraphs together without any identification of each matter.  As such, these RFAs exceed the maximum allowable number of RFAs permitted by Rule 4:11(e).  Defendant also objects to these RFAs as vague and not in keeping with the requestor's duty to phrase these RFAs with clarity and fairness. *See Erie Ins. Exchange v. Jones*, 236 Va. 10, 14, 372 S.E.2d 126, 128 (1988).  Specifically, these RFAs do not identify which of the "23 paragraphs" are subject to them, and nor do they identify what statements in each of the "23 paragraphs" are subject to them.  Defendant objects to these RFAs because they are improper, beyond the scope of a matter subject to discovery under Rule 4:1(b), and not reasonably calculated to lead to the discovery of admissible evidence in seeking admissions related to matters that are irrelevant to the issues in this case.

**ANSWER:**   Defendant stands on the objections contained herein, specifically attorney-client privilege, and therefore denies.

LUADMINREC000653

**RFA No. 15:**   Admit that, to supply content for the statements contained in the "23 paragraphs" that Liberty defined in Request for Admission No. 1, You communicated information to GSBR Attorneys LLP, specifically either James Gilbert (VSB #38229), Timothy S. Bird (VSB #38139) and Jordan K. Sharpes (VSB #79394), or all of them.

**OBJECTION:**        Defendant objects on the grounds that these RFAs seek information protected by the attorney-client privilege. Defendant objects to the compound nature of this purportedly single RFA, when in actuality, this RFA is composed of 23 separate RFAs in contravention of Rule 4:11(a), which requires that "[e]ach matter of which is an admission is requested" is to be "separately set forth." Here, Plaintiff has lumped 23 paragraphs together without any identification of each matter. As such, these RFAs exceed the maximum allowable number of RFAs permitted by Rule 4:11(e). Defendant also objects to these RFAs as vague and not in keeping with the requestor's duty to phrase these RFAs with clarity and fairness. *See Erie Ins. Exchange v. Jones*, 236 Va. 10, 14, 372 S.E.2d 126, 128 (1988). Specifically, these RFAs do not identify which of the "23 paragraphs" are subject to them, and nor do they identify what statements in each of the "23 paragraphs" are subject to them. Defendant objects to these RFAs because they are improper, beyond the scope of a matter subject to discovery under Rule 4:1(b), and not reasonably calculated to lead to the discovery of admissible evidence in seeking admissions related to matters that are irrelevant to the issues in this case.

**ANSWER:**   Defendant stands on the objections contained herein, specifically attorney-client privilege, and therefore denies.

LUADMINREC000654

**RFA No. 16**: Admit that the article attached as Exhibit G is a true copy of Aram Roston's piece in *Reuters* regarding among other things, Granda.

**OBJECTION:**      Although having some characteristics of an RFA requesting an admission as to the authenticity of document, this RFA is not of that species.  Accordingly, Defendant objects to this RFA, which in combination with the preceding RFAs, exceeds the maximum allowable number of RFAs permitted by Rule 4:11(e).  In addition, Defendant objects to this RFA as being improper and seeking an admission regarding Plaintiff's characterization of what Exhibit G concerns rather than an admission relating "to statements or opinions of fact or of the application of law to fact."  The subject exhibit is a document that speaks for itself.  Defendant further objects to this RFA because it is improper, beyond the scope of a matter subject to discovery under Rule 4:1(b), and not reasonably calculated to lead to the discovery of admissible evidence in seeking an admission related to matters that are irrelevant to the issues in this case.

**ANSWER:**     Subject to and without waiving the foregoing objections, Mr. Falwell lacks sufficient information to either admit or deny Exhibit G is a true copy of Aram Roston's *Reuters* article, and therefore denies same.

LUADMINREC000655

**RFA No. 17:** Admit that the article attached as Exhibit H is a true copy of Gabe Sherman's piece in *Vanity Fair* regarding among other things, Falwell.

**OBJECTION:** Although having some characteristics of an RFA requesting an admission as to the authenticity of document, this RFA is not of that species. Accordingly, Defendant objects to this RFA, which in combination with the preceding RFAs, exceeds the maximum allowable number of RFAs permitted by Rule 4:11(e). In addition, Defendant objects to this RFA as being improper and seeking an admission regarding Plaintiff's characterization of what Exhibit G concerns rather than an admission relating "to statements or opinions of fact or of the application of law to fact." The subject exhibit is a document that speaks for itself. Defendant further objects to this RFA because it is improper, beyond the scope of a matter subject to discovery under Rule 4:1(b), and not reasonably calculated to lead to the discovery of admissible evidence in seeking an admission related to matters that are irrelevant to the issues in this case.

**ANSWER:** Subject to and without waiving the foregoing objections, Mr. Falwell lacks sufficient information to either admit or deny Exhibit H is a true copy of Gabe Sherman's *Vanity Fair* article, and therefore denies same.

40

## REQUESTS FOR PRODUCTION

**Requests for Production No. 4:**    Please produce all documents you relied upon or referred to in responding to the Requests for Admission No. 1-17 and Interrogatories No. 6–29.

**OBJECTION:**        Defendant incorporates by reference his objections to RFAs Nos. 1-17 and Interrogatories Nos. 6-29.  Defendant further objects to this RFP to the extent that it seeks documents that may be protected by the attorney-client privilege, attorney work-product doctrine, or other similar legal or personal doctrines protecting documents or materials from disclosure.

**RESPONSE:**        Subject to and without waiving the foregoing objections, Defendant will produce any responsive, non-privileged, documents within his possession, custody, or control on a rolling basis that are located through a reasonable search.


**Requests for Production No. 5**: Please produce all Documents and Communications You exchanged with Granda, sent or received.

**OBJECTION:**        Defendant objects to this RFP on the grounds that it is vague overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this RPF because it does not conform with Rule 4:9's requirement that a request "describe each item and category with reasonable particularity."  As drafted, this RFP fails to provide any particularity whatsoever and is in the nature of a fishing expedition.  Defendant further objects to this RFP to the extent that it seeks documents that may be protected by the attorney-client privilege, attorney work-product doctrine, or other similar legal or personal doctrines protecting documents or materials from disclosure.

41

**RESPONSE**:          Subject to and without waiving the foregoing objections, Defendant will produce any responsive, non-privileged, documents within his possession, custody, or control on a rolling basis that are located through a reasonable search.

**Requests for Production No. 6**:  Please produce all documents related to Granda.

**OBJECTION:**          Defendant objects to this RFP on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this RPF because it does not conform with Rule 4:9's requirement that a request "describe each item and category with reasonable particularity."  As drafted, this RFP fails to provide any particularity whatsoever and is in the nature of a fishing expedition.  Defendant further objects to this RFP to the extent that it seeks documents that may be protected by the attorney-client privilege, attorney work-product doctrine, or other similar legal or personal doctrines protecting documents or materials from disclosure.

**RESPONSE**:          Subject to and without waiving the foregoing objections, Defendant will produce any responsive, non-privileged, documents within his possession, custody, or control on a rolling basis that are located through a reasonable search.

**Requests for Production No. 7**:  Please produce all documents related to Granda.

**OBJECTION:**          Defendant objects to this RFP on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this RPF because it does not conform with Rule 4:9's requirement that a request

42

"describe each item and category with reasonable particularity."  As drafted, this RFP fails to provide any particularity whatsoever and is in the nature of a fishing expedition.  Defendant further objects to this RFP to the extent that it seeks documents that may be protected by the attorney-client privilege, attorney work-product doctrine, or other similar legal or personal doctrines protecting documents or materials from disclosure.

**RESPONSE**:          Subject to and without waiving the foregoing objections, Defendant will produce any responsive, non-privileged, documents within his possession, custody, or control on a rolling basis that are located through a reasonable search. Responding further, Defendant refers Liberty to the production made by Mr. Jerry L. Falwell, III ("Trey").

**Requests for Production No. 8**:  Please produce all Documents and Communications related to Becki's "Secret Relationship" with Granda, as defined in Interrogatory No. 15 above.

**OBJECTION**:          Defendant objects to this RFP on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this RPF because it does not conform with Rule 4:9's requirement that a request "describe each item and category with reasonable particularity."  As drafted, this RFP fails to provide any particularity whatsoever and is in the nature of a fishing expedition.  Defendant further objects to this RFP to the extent that it seeks documents that may be protected by the attorney-client privilege, attorney work-product doctrine, or other similar legal or personal doctrines protecting documents or materials from disclosure.

**RESPONSE**:          Subject to and without waiving the foregoing objections, Defendant is unaware of the existence of any such non-privileged documents.

43

**Requests for Production No. 9:**  Please produce all audio recordings in Your custody and/or control that include the image of Granda, or the image of Becki and Granda "engag[ing] sexually," as defined in Interrogatory No. 1 above.

**OBJECTION:**        Defendant objects to this RFP on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE**:        There are no documents responsive to this Request.

**Requests for Production No. 10:**  Please produce all Documents and Communications exchanged with Mark Serrano.

**OBJECTION:**        Defendant objects to this RFP on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this RPF because it does not conform with Rule 4:9's requirement that a request "describe each item and category with reasonable particularity."  As drafted, this RFP fails to provide any particularity whatsoever and is in the nature of a fishing expedition.  Defendant further objects to this RFP to the extent that it seeks documents that may be protected by the attorney-client privilege, attorney work-product doctrine, or other similar legal or personal doctrines protecting documents or materials from disclosure.

**RESPONSE**:        Subject to and without waiving the foregoing objections, Defendant will produce any responsive, non-privileged, documents within his possession, custody, or control on a rolling basis that are located through a reasonable search.

LUADMINREC000660

**Requests for Production No. 11:**  Please produce all Documents and Communications You exchanged with anyone at ProActive Communications.

**OBJECTION:**      Defendant objects to this RFP on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this RPF because it does not conform with Rule 4:9's requirement that a request "describe each item and category with reasonable particularity."  As drafted, this RFP fails to provide any particularity whatsoever and is in the nature of a fishing expedition.  Defendant further objects to this RFP to the extent that it seeks documents that may be protected by the attorney-client privilege, attorney work-product doctrine, or other similar legal or personal doctrines protecting documents or materials from disclosure.

**RESPONSE**:      Subject to and without waiving the foregoing objections, Defendant will produce any responsive, non-privileged, documents within his possession, custody, or control on a rolling basis that are located through a reasonable search. Responding further, Defendant refers Plaintiff to his response to Request for Production No. 10.

**Requests for Production No. 12:**  Please produce all Documents and Communications You exchanged with Matthew Hiltzik.

**OBJECTION:**      Defendant objects to this RFP on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this RPF because it does not conform with Rule 4:9's requirement that a request "describe each item and category with reasonable particularity."  As drafted, this RFP fails to provide any particularity whatsoever and is in the nature of a fishing expedition.  Defendant further

LUADMINREC000661

objects to this RFP to the extent that it seeks documents that may be protected by the attorney-client privilege, attorney work-product doctrine, or other similar legal or personal doctrines protecting documents or materials from disclosure.

**RESPONSE**:          Defendant stands on his objection to this request.

**Requests for Production No. 13**:  Please produce all Documents and Communications You exchanged with anyone at Hiltzik Strategies.

**OBJECTION**:          Defendant objects to this RFP on the grounds that it is vague and overbroad, that the information sought is not relevant to the issues in this litigation, and that it is not reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to this RPF because it does not conform with Rule 4:9's requirement that a request "describe each item and category with reasonable particularity."  As drafted, this RFP fails to provide any particularity whatsoever and is in the nature of a fishing expedition.  Defendant further objects to this RFP to the extent that it seeks documents that may be protected by the attorney-client privilege, attorney work-product doctrine, or other similar legal or personal doctrines protecting documents or materials from disclosure.

**RESPONSE**:          Defendant stands on his objection to this request.

LUADMINREC000662

Dated:  February 13, 2023                    JERRY L. FALWELL, JR.


_____

                                             Counsel


Vernon E. Inge, Jr. (Va. Bar No. 32699)
Robert N. Drewry (Va. Bar No. 91282)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:     804.977.3301 / 804.977.3304
Facsimile:     804.977.3298 / 804.762.6865
E-Mail:        vinge@wtplaw.com
               rdrewry@wtplaw.com

*Counsel for Defendant, Jerry L. Falwell, Jr.*

LUADMINREC000663

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of February, 2023, a true and correct copy of the foregoing ***Defendant's Objections, Answers, and Responses to Plaintiff's Third Set of Interrogatories, First Set of Requests for Admission, and Second Set of Requests for Production*** was served *via* e-mail transmission and first-class, postage-prepaid, U.S. Mail upon the following:

> Scott C. Oostdyk, Esq.
> Andrew F. Gann, Jr., Esq.
> MCGUIREWOODS LLP
> Gateway Plaza
> 800 East Canal Street
> Richmond, Virginia 23219
> E-Mail:      soostdyk@mcguirewoods.com
>                    agann@mcguirewoods.com

*Counsel for Plaintiff, Liberty University, Inc.*

_____

Robert N. Drewry

48

## VERIFICATION

Jerry L. Falwell, Jr., being duly sworn, deposes and says that he is familiar with the matters and facts set forth in the foregoing Objections and Responses to Plaintiff's Second Set of Interrogatories; and further that based on his direct personal knowledge, he avers that the facts and matters set forth in the Objections and Responses to Plaintiff's Second Set of Interrogatories are true and correct to the best of his knowledge, information and belief.

_____
Jerry L. Falwell, Jr.

COMMONWEALTH OF VIRGINIA          )
                                 )        to wit:
County OF Bedford                )

The foregoing instrument was sworn to and acknowledged before me this 23ʳᵈ day of August, 2022, by Jerry L. Falwell, Jr.

Nicole McCabe
Notary Public
Commonwealth of Virginia
ID #263493
My Commission Expires:

_____
Notary Public

My Commission expires: 9.30 2022

My Registration No.: 263493

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.

Plaintiff/Counterclaim Defendant,

v.

JERRY L. FALWELL, JR.,

Defendant/Counterclaim Plaintiff.

Case No. CL21000354-00

## LIBERTY UNIVERSITY, INC.'S RESPONSES TO JERRY L. FALWELL, JR.'S SECOND AND THIRD SETS OF INTERROGATORIES, AND SECOND AND THIRD REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

Plaintiff/Counterclaim Defendant Liberty University, Inc. ("Liberty"), by counsel, and pursuant to Rules 4:8, 4:9, and 4:11 of the Rules of the Supreme Court of Virginia, submits the following Objections and Responses to Defendant/Counterclaim Plaintiff Jerry L. Falwell, Jr.'s ("Falwell Jr.") Second Set of Interrogatories, Third Set of Interrogatories, Second Requests for Production of Documents and Things, and Third Requests for Production of Documents and Things (collectively "Requests").

### PRELIMINARY STATEMENT

Liberty has not fully completed its investigation, discovery, analysis, legal research, and preparation for trial.  The responses and objections contained herein are based only upon the information and documentation presently available and known to Liberty.  Liberty has provided information that is true and correct to the best of its knowledge as of the date of service of these Responses, but it is possible that further investigation, discovery, analysis, legal research and/or

preparation may result in the ascertainment of additional information or documentation, or provide additional meaning to known factual conclusions and legal contentions, all of which may result in the modification of these responses and objections. Accordingly, Liberty reserves the right to modify these responses and objections based on subsequently ascertained or developed information, documentation, facts and/or contentions. Subject to the objections asserted below, Liberty's responses are made in a good faith effort to reasonably respond to these Requests based on presently available information and documentation. These responses and/or objections should not be construed to prejudice Liberty's right to conduct further investigation, discovery, analysis, legal research and/or preparation, or to limit Liberty's right to use any additional evidence that may be developed.

Liberty submits these objections and responses to the Requests without conceding the relevance or materiality of the subject matter of any Interrogatory, and without prejudice to its rights to object to the admissibility at trial or in any other proceeding in this action of any particular document or category of documents. Each of these responses or objections is based on Liberty's understanding of each individual request. To the extent Falwell Jr. asserts an interpretation of any request that is inconsistent with Liberty's understanding, Liberty reserves the right to supplement or amend these responses and/or objections as appropriate.

These responses and objections are made without waiving: (1) the right to raise in any subsequent proceeding or in the trial of this or any other action all questions of relevance, materiality, privilege, and evidentiary admissibility of any response herein or document produced pursuant hereto; (2) the right to object on any grounds to the use or introduction into evidence of such responses or documents in any subsequent proceeding or in the trial of this or any other action;

(3) the right to object on any grounds at any time to these requests; or (4) the right to seek entry of an additional appropriate protective order.

## ANSWERS TO INTERROGATORIES

15. Describe the basis for your assertion in Paragraph 159 of the Complaint that Mr. Falwell "failed to timely disclose and address the issue of his personal impairment by alcohol."

**ANSWER:**  Liberty objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.

Subject to and without waiving the foregoing objections, Liberty submits that it did not learn definitively of Falwell Jr.'s alcohol impairment until Becki Falwell approached three members of the Executive Committee in early August 2020 to alert them to what she described as her husband's excessive use of alcohol.  Falwell Jr. himself did not formally disclose his alcohol impairment to Liberty until an August 7, 2020 Executive Committee meeting.  Therefore, Liberty was not aware of Falwell Jr.'s alcohol impairment when Falwell Jr. negotiated for and entered into the 2019 Employment Agreement and the Supplemental Executive Retirement Plan ("SERP"). Liberty further submits that certain evidence, including but not limited to the following, suggests either the belief by some or the basis of inference that Falwell Jr.'s alcohol impairment was persistent for years: Giancarlo Granda's claims, in his book *Off the Deep End: Jerry and Becki Falwell and the Collapse of an Evangelical Dynasty*, that Falwell Jr. drank frequently during Becki Falwell's affair with Granda (the "Affair"); the August 3, 2021 photo that Falwell Jr. posted on Instagram of himself, pants unzipped and carrying a tumbler of black liquid, with his arm around Becki Falwell's pregnant assistant; Falwell Jr.'s August 5, 2020 call to a local radio station in which Falwell Jr. offered a slurred explanation for the August 3 "unzipped pants" photo; and the August 31, 2020 911 call made by Becki Falwell that brought police to the Falwells' farm due to

Becki's report that Falwell Jr. had locked himself in, stumbled down the stairs, and experienced injuries—seemingly the result of Falwell Jr.'s alcoholic intoxication.

16.    Set forth in detail each Board Member's (in particular, the Executive Committee) discussions with Mr. Falwell from June 1, 2020, through the present.

**ANSWER:**  Liberty objects to this Interrogatory on the grounds that it seeks information already in Falwell Jr.'s possession, custody, or control.  Liberty further objects to this Interrogatory as overbroad, not relevant to any claim or defense, unduly burdensome, and not proportionate to the needs of the case.  Liberty also objects to this Interrogatory as vague and not keeping with the requestor's duty to phrase this Interrogatory with clarity and fairness.  As phrased, this Interrogatory could encompass thousands of conversations that Falwell Jr. may have had with Liberty Board Members regarding, for example, Liberty athletics.  Such conversations are not relevant to any party's claim or defense.  Liberty further objects to the compound nature of this purportedly single Interrogatory, when in actuality, this Interrogatory is composed of separate interrogatories because, as phrased, it seeks information about potentially thousands of different conversations.  Liberty stands on its objections to this Interrogatory.

17.    Set forth in detail each Board Member's (in particular, the Executive Committee) discussions about Mr. Falwell from June 1, 2020, through the present.

**ANSWER:**  Liberty objects to this Interrogatory as overbroad, not relevant to any claim or defense, unduly burdensome, and not proportionate to the needs of the case.  Liberty also objects to this Interrogatory as vague and not keeping with the requestor's duty to phrase this Interrogatory with clarity and fairness.  As phrased, this Interrogatory could encompass thousands of discussions about Falwell Jr. involving topics entirely unrelated to the issues in this litigation, including, for example, discussions about Falwell Jr.'s involvement in and oversight of Liberty athletics.  Such

conversations are not relevant to any party's claim or defense. Liberty further objects to the compound nature of this purportedly single Interrogatory, when in actuality, this Interrogatory is composed of separate interrogatories because, as phrased, it seeks information about potentially thousands of different discussions. Liberty further objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine, particularly as it pertains to discussions after Falwell Jr.'s August 25, 2020 resignation from Liberty. Liberty stands on its objections to this Interrogatory.

18.     Set forth in detail each Board Member's (in particular, the Executive Committee) discussions with Mr. Falwell from regarding the 2019 Employment Agreement.

**ANSWER:**   Liberty objects to this Interrogatory as overbroad, unduly burdensome, and not proportionate to the needs of the case. Liberty further objects to this Interrogatory because it is not limited in time. Liberty also objects to this Interrogatory on the grounds that it seeks information already in Falwell Jr.'s possession, custody, or control.

Subject to and without waiving the foregoing objections, Liberty will produce relevant sections of Board/Executive Committee meeting minutes.

19.     Describe in detail the process Liberty undertook and the actions taken leading up to Mr. Falwell's resignation for good reason on or around August 25, 2020.

**ANSWER:**   Liberty objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Liberty further objects to this Interrogatory to the extent it seeks information already in Falwell Jr.'s possession, custody, or control because Falwell Jr. and/or his attorneys were involved in the process leading to and including "Mr. Falwell's resignation for good reason on or around August 25, 2020.

Subject to and without waiving the foregoing objections, Liberty will produce relevant sections of Board/Executive Committee meeting minutes.

20.     Describe in detail the specific actions constituting Mr. Falwell's alleged breaches of fiduciary duty.

**ANSWER:**  Liberty objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.

Subject to and without waiving the foregoing objections, Liberty submits that there are three dates at which Falwell Jr. breached the fiduciary duties he owed Liberty:

- Falwell breached on **August 29, 2019**, when Falwell Jr. signed the 2019 Employment Agreement—a self-interested transaction—without having officially and properly disclosed to Liberty's leadership that (1) he had facilitated and/or condoned a long-term adulterous affair between Becki Falwell and Giancarlo Granda that contravened Liberty's Biblical values; (2) he was involved in a long-term family business transaction with Granda, the man with whom Becki Falwell had been in an adulterous affair, after learning of the affair; (3) he traveled, socialized, communicated, and vacationed with Granda, the man with whom Becki Falwell had been in an affair, after learning of the affair—including providing a letter of academic recommendation for Granda on Liberty University letterhead, and allegedly offering Granda a job at Liberty;  (4) he was aware of instability and threats by Granda while Granda was in possession of or had potential access to sexually-oriented photos, videos, recordings or other memorialized information that could have proven significantly embarrassing or disadvantageous to the work, reputation, and well-being of Falwell Jr. and Liberty; (5) he believed he was the victim of extortive acts by Granda targeted at Falwell Jr. and Liberty from time to time since late 2014; (6) he was managing a business and public relations strategy to protect himself and Liberty University from suffering adverse consequences from these items 1-5 above, including providing misleading denials to press inquiries directed to Liberty University, some of which were the result of Granda speaking to reporters; (7) he had concluded he was not at his core a religious person, that he had a faith materially different than that of his father Jerry Falwell, Sr., that he did not believe in the church, and that he was not acting as the spiritual leader of Liberty University, as required by the Liberty bylaws; and (8) that he was surreptitiously drinking alcohol on campus and was reportedly drunk while performing duties as President;

- Falwell also breached on **July 21, 2020**, when Falwell Jr. signed the SERP—a self-interested transaction—without having properly disclosed that

LUADMINREC000671

(1) he had facilitated and/or condoned a long-term adulterous affair between Becki Falwell and Giancarlo Granda that contravened Liberty's Biblical values; (2) he remained involved in a long-term family business transaction with Granada, the man with whom Becki Falwell had an adulterous affair, after learning of the affair; (3) he traveled, socialized, communicated, and vacationed with Granda, the man with whom Becki Falwell had been in an affair, after learning of the affair—including providing a letter of academic recommendation for Granda on Liberty University letterhead, and allegedly offering Granda a job at Liberty; (4) he was aware of instability and threats by Granda while Granda was in possession of or had potential access to sexually-oriented photos, videos, recordings or other memorialized information that could have proven significantly embarrassing or disadvantageous to the work, reputation, and well-being of Falwell Jr. and Liberty; (5) he believed he was the victim of extortive acts by Granda targeted at Falwell Jr. and Liberty from time to time since late 2014; (6) he was managing a business and public relations strategy to protect himself and Liberty University from suffering adverse consequences from these items 1-5 above, including providing misleading denials to press inquiries directed to Liberty University, some of which were the result of Granda speaking to reporters; (7) he had concluded he was not at his core a religious person, that he had a faith materially different than that of his father Jerry Falwell, Sr., that he did not believe in the church, and that he was not acting as the spiritual leader of Liberty University, as required by the Liberty bylaws; and (8) that he was surreptitiously drinking alcohol on campus and was reportedly drunk while performing duties as President;

- Falwell breached again in **September 2020**, when Falwell Jr. demanded and accepted the severance payout contemplated by the 2019 Employment Agreement, despite the breaches noted above.

Liberty submits that these specific acts of breach occurred against the backdrop of years of actions that precipitated points at which Falwell Jr. should have officially and properly disclosed the Affair, his involvement therein or facilitation thereof, and/or Granda's attempted extortion of Falwell Jr. and Liberty, including but not limited to:

- In April 2012, Falwell Jr. hosted Becki and Granda at the Gansevoort Hotel in New York City in a suite for which Liberty paid, and, on information and belief, Grand and Becki Falwell engaged in adulterous relations facilitated or condoned by Falwell Jr.;

- In late 2014, when, as stated in the October 28, 2020 Complaint Falwell Jr. filed against Liberty, Falwell Jr. alleged that "in late 2014, Granda repeatedly threatened to publicize the Affair unless the Falwells gave him large sums of money, ranging from $600,000 to $2 million."

- In 2016, when, as Falwell Jr. told *Vanity Fair* in its January 24, 2022 article, "Trump rewarded [Falwell Jr.'s] fealty with an offer to serve in his cabinet as education secretary," an offer that undoubtedly would have triggered concerns by Falwell Jr. that the requisite background check by the FBI—so much so that Falwell Jr. declined the offer without formally and properly reporting all the true reasons to Liberty.

- On July 2, 2018, when Falwell Jr.'s attorney for the negotiation of the 2019 Employment Agreement, Lorretta Richard, sent to Liberty a letter Falwell Jr. approved in which Falwell Jr. formally demanded the inclusion in his contract of a walk-away severance and SERP agreement. By seeking this benefit from Liberty, Falwell Jr. should have considered whether the Affair, and the situations detailed by literary in this answer, gave rise to an affirmative obligation to disclose full information to Liberty to enable negotiation on equal terms.

- On January 16, 2019, after Becki called Granda via FaceTime, a recorded call that features Becki without clothing ushering Granda through places in the Falwell house.  At one point during the call, Falwell Jr. briefly pops into view, standing behind a door. Falwell Jr.'s awareness of this recorded FaceTime video, and of the bevy of other similarly-extortive material potentially in Granda's possession, should have prompted Falwell Jr. to disclose to Liberty his vulnerability during the negotiation of the 2019 Employment Agreement;

- On June 30, 2020, after a text exchange that Falwell Jr. initiated on or about to inform Granda that "in no uncertain terms," would Falwell Jr. "be extorted; he would not give Granda any money; and Granda should cease and desist from contacting the Falwells." This text prompted Granda to threaten he would take "the kamikaze route." The exchange came just weeks before Falwell Jr. signed the self-interested SERP and Rabbi Trust agreements, and it should have prompted Falwell Jr. to make official and proper disclosure of the conditions, risks, circumstances, and potential damages to which Falwell Jr.'s actions exposed Liberty.

21.     Describe, identify, and set forth in detail any and all discussions the Board Members – specifically the Executive Committee – have either individually or collectively relating to or concerning this litigation, including, but not limited to settlement discussions.

**ANSWER:** Liberty objects to the clear overbreadth of this Interrogatory, and objects to the extent it seeks information protected by the attorney-client privilege and the work product doctrine in light of the Interrogatory's request for information about "discussions…relating to or concerning

this litigation."  Moreover, discussions regarding settlement cannot, on their face, be calculated to lead to admissible evidence given their inability to be admitted into evidence.

Subject to and without waiving its objections, Liberty submits that it has discussed this litigation and its settlement with the Honorable J. Michael Gamble (Ret.), the parties' chosen mediator, and among its Board and its Executive Committee.  Liberty further submits that it is aware that Ray Mirra—who, upon information and belief, is Falwell Jr.'s litigation funder —has had individual conversations with some members of Liberty's Executive Committee. Liberty otherwise stands on its objections to this Interrogatory.

22.    Describe, identify, and set forth in detail any and all discussions the Board Members – specifically, the Executive Committee – have had either individually or collectively with any third party relating to or concerning this litigation, including, but not limited to settlement discussions.

**ANSWER:**  Liberty submits that it has discussed this litigation with the Honorable J. Michael Gamble (Ret.), the parties' chosen mediator.  Liberty further submits that it is aware that Ray Mirra—Falwell Jr.'s litigation funder, upon information and belief, has had individual conversations with some members of Liberty's Executive Committee.

23.    Describe, identify, and set forth in detail any and all discussions, conversations, questions asked, or any other forms of Communications any Person, including employees of Liberty, Board Members and the Executive Team, have had regarding any and all claims being investigated by the Department of Justice, the Federal Bureau of Investigation, the Virginia State Police, or any other investigative body regarding any and all criminal or civil investigations pertaining to or involving Mr. Falwell.  In Your response, identify all investigators who have

conducted any investigation, provided any information or asked any questions of Liberty and its employees, Executive Team, or Board Members.

**ANSWER:**  Liberty objects to this Interrogatory as overbroad, not relevant to any party's claim or defenses, unduly burdensome, not proportionate to the needs of the case, and not likely to lead to the discovery of admissible evidence.  Liberty further objects to the extent this Interrogatory seeks information protected by the attorney-client privilege and/or work product doctrine.

Subject to and without waiving the foregoing objections, Liberty submits that it has received and responded to requests for information from the United States Department of Education, the United States Department of Justice and/or the United States Attorney, and the Internal Revenue Service.

### RESPONSES TO REQUESTS FOR PRODUCTION

16.     Any and all documents and communications related to Giancarlo Granda's book, *Off the Deep End: Jerry and Becki Falwell and the Collapse of an Evangelical Dynasty*.

**RESPONSE:**   Liberty objects to this Request as overbroad, unduly burdensome, and not proportionate to the needs of the case.  Liberty further objects to this Request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.

Subject to and without waiving the foregoing objections, Liberty submits that it is not aware of any responsive documents.  Liberty did not knowingly provide any documents or information to Giancarlo Granda for his book, *Off the Deep End: Jerry and Becki Falwell and the Collapse of an Evangelical Dynasty*, with Liberty declining to comment even to the book's publisher's fact checkers.

17.     Any and all documents and communications related to the Hulu production, *God Forbid: The Sex Scandal that Brought Down a Dynasty*.

**RESPONSE:**  Liberty objects to this Request as overbroad, unduly burdensome, not proportionate to the needs of the case, and not likely to lead to the discovery of admissible evidence.  Liberty further objects to this Request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine.

Subject to and without waiving the foregoing objections, Liberty submits that it is not aware of any responsive documents.  Liberty did not knowingly provide any documents, information, license, or permission to Hulu for the production, *God Forbid: The Sex Scandal that Brought Down a Dynasty*.

18.   All documents and communications received by Liberty in response to any subpoena *duces tecum* or other document requests issue or propounded by Liberty in this litigation.

**RESPONSE:**  Liberty submits that it will produce any responsive documents received.

19.   All documents and communications related to Mr. Falwell's purported alcohol abuse as set forth in Paragraph 102 of the Complaint.

**RESPONSIVE:**  Liberty objects to this Request to the extent it seeks information and documents already in Falwell Jr.'s possession, custody, or control, or the possession, custody, or control of third parties.

Subject to and without waiving the foregoing objections, Liberty will produce relevant sections of Board/Executive Committee meeting minutes.  Liberty also incorporates its answer to Interrogatory 15 above.  Liberty further refers Falwell Jr. to other information and documents publicly available to Falwell Jr., including Giancarlo Granda's book, *Off the Deep End: Jerry and Becki Falwell and the Collapse of an Evangelical Dynasty*; the audio of the August 31, 2020 911 call made by Becki Falwell, as referenced in paragraph 109 of Liberty's Second Amended Complaint, and in Liberty's answer to Interrogatory 15 above; the "unzipped pants" photograph

that Falwell Jr. posted on his Instagram account on August 3, 2020, as referenced in paragraphs 76-79 of Liberty's Second Amended Complaint, and in Liberty's answer to Interrogatory 15 above; and other publicly available videos in which Falwell Jr. appears inebriated.

20.     All documents and communications you relied upon or referred to in formulating Your responses to Interrogatories No. 15-22 and that relate to any of the response to Interrogatories No. 15-22.

**RESPONSE:**  Liberty submits that, aside from the documents identified in its answers to interrogatories provided above, it is not aware of any other responsive documents.

21.     All documents and communications by and between Board Members relating to or concerning Mr. Falwell relating to the 2019 Employment Agreement.

**RESPONSE:** Liberty objects to this Request as overbroad, unduly burdensome, not proportionate to the needs of the case, and not likely to lead to the discovery of admissible evidence.  Liberty objects to this request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving the foregoing objections, Liberty will produce relevant sections of Board/Executive Committee meeting minutes.

22.     All documents and communications by and between Board Members relating to or concerning Mr. Falwell from August 25, 2020 to the present.

**RESPONSE:**  Liberty objects to this Request as overbroad, not relevant to any party's claim or defense, unduly burdensome, not likely to lead to the discovery of admissible evidence, and not proportionate to the needs of the case.  Liberty further objects to this Request on the grounds that it seeks information protected by the attorney-client privilege and/or work product protection in that it seeks information from after Falwell Jr.'s resignation from Liberty.  Liberty is not producing documents based on its objections to this Request.

23.     All documents and communications by and between Board Members and/or the Executive Team relating to or concerning Mr. Falwell relating to the 2019 Employment Agreement.

**RESPONSE:**  Liberty objects to this Request as overbroad, unduly burdensome, not proportionate to the needs of the case, and not likely to lead to the discovery of admissible evidence.  Liberty objects to this Request to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving the foregoing objections, Liberty will produce relevant sections of Board/Executive Committee meeting minutes.

24.     All documents and communications by and between Board Members and/or the Executive Team relating to or concerning Mr. Falwell from August 25, 2020 to the present.

**RESPONSE:**  Liberty objects to this Request as overbroad, not relevant to any party's claim or defense, unduly burdensome, not likely to lead to the discovery of admissible evidence, and not proportionate to the reasonable needs of the case.  Liberty further objects to this Request on the grounds that it seeks information protected by the attorney-client privilege and/or work product protection because it seeks information from after Falwell Jr.'s resignation from Liberty.  Liberty is not producing documents based on its objections to this Request.

25.     All documents and communications relied upon or referred to in formulating Your responses to Interrogatories Nos. 23 and that relate to any of the responses to Interrogatories Nos. 23.

**RESPONSE:**  Liberty submits that there are no documents responsive to this Request.

26.     All documents and communications by and between You, including, but not limited to Board Members and the Executive Team, and any governmental agency, including, but not

limited to the Department of Justice regarding any investigation relating to or concerning Mr. Falwell.

**RESPONSE:**  Liberty objects to this Request as overbroad, not relevant to any party's claim or defense, unduly burdensome, not reasonably likely to lead to the discovery of admissible evidence, and not proportionate to the reasonable needs of the case. Liberty further objects to this Request on the grounds that it seeks information protected by the attorney-client privilege and/or work product protection because it is invasive of Liberty's common interest and/or mental impressions of counsel. Liberty is not producing documents based on its objections to this Request.

27.    All documents and communications produced by Liberty in response to a subpoena from a government agency, including, but not limited to the Department of Justice regarding any investigation relating to or concerning Mr. Falwell.

**RESPONSE:**  Liberty objects to this Request as overbroad, not relevant to any party's claim or defense, unduly burdensome, not likely to lead to the discovery of admissible evidence, and not proportionate to the reasonable needs of the case. Liberty further objects to this Request on the grounds that it seeks information protected by the attorney-client privilege and/or work product protection because it is invasive of Liberty's mental impressions of counsel in culling and selecting.  Subject to and without waiving the foregoing objections, Liberty will produce non-privileged documents pursuant to other Requests to the extent such documents exist and are relevant to this Litigation.

Dated: February 15, 2022

Respectfully Submitted,

LIBERTY UNIVERSITY, INC.

_____
Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000 (Telephone)
(804) 775-1061 (Facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

## CERTIFICATE OF SERVICE

I certify that a copy of Liberty's Responses To Jerry L. Falwell, Jr.'s Second and Third

Sets Of Interrogatories, and Second and Third Requests For Production Of Documents and Things

was served via e-mail transmission to Vernon E. Inge Jr. and Robert N. Drewry at Whiteford

Taylor & Preston, on February, 15, 2023.

_____

Scott C. Oostdyk

## **VERIFICATION**

_Cindy Lynn Baebe_____, being duly sworn, deposes and says that she

is _SVP Finance and CIO_ of Liberty University, Inc., and, as such, is familiar with

the matters and facts set forth in the forgoing Answers to Jerry L. Falwell, Jr.'s Second and Third

Sets of Interrogatories; and further that based on her direct personal knowledge, and if she has no

direct personal knowledge, on information supplied to her by other responsible employees or

representatives of Liberty University, Inc., she avers that the facts and matters set forth in the

Answers to Jerry L. Falwell, Jr.'s Second and Third Sets of Interrogatories are true and correct to

the best of her knowledge, information and belief.

LIBERTY UNIVERSITY, INC.

_Cindy L. Gaebe_____

Printed
Name: _Cindy L Gaebe_____
Title: _SVP Finance and CIO_____

COMMONWEALTH OF VIRGINIA          )
                                  ) to wit:
_City_____ OF _Lynchburg_ )
The foregoing instrument was sworn to and acknowledged before me this _15th_ day of
_Feb._____, 202**3**, by _Cindy Gaebe_, _SVP Finance + CEO_ of Liberty
University, Inc., on behalf of the said Liberty University, Inc.
My commission expires _May 31, 2025_____.

_Theresa McNabb_____
Notary Public
Printed
Name: _Theresa McNabb_____
Notary Registration No. _364636_____

(seal: THERESA McNABB / NOTARY PUBLIC / REG. # 364636 / MY COMMISSION EXPIRES / 05/31/2025 / COMMONWEALTH OF VIRGINIA)



Tel: 617-422-0700
Fax: 617-422-0909
www.bdo.com

One International Place
Boston, MA 02110

ATTORNEY-CLIENT PRIVILEGE

June 11, 2018

To:  Loretta Richard
     Dennis Coleman

From:  Mike Conover

Re:  Competitive Analysis – President Falwell

We have completed a competitive analysis for Liberty University ('Liberty') President, Jerry Falwell Jr., and summarized findings resulting from the analysis for use in further discussion of potential changes to his current compensation arrangements that will be more competitive with comparator organizations and better reflect Liberty University's growth and performance under his leadership.

A first step in the analysis focused on identifying a group of institutions to be used as the comparator institutions used as the basis for the competitive assessment. Liberty is an unusual university in light of a combination of factors (e.g. faith-based institution, large enrollment, significant online enrollment, numerous undergraduate through doctoral programs, significant endowment, etc.). In addition, Liberty has undergone transformative change over the past 10 years.

No single characteristic or metric (e.g. enrollment, revenue, assets, endowment, etc.) can adequately capture the totality of Liberty and be used to identify comparators. Accordingly, we used 3 screens to create a comparator group:

- Size – annual revenue, budget, employment, net assets
- Selectivity – % of applicants accepted
- Financial Management – Forbes rating of "B" or better

Using these criteria, we identified a group of 17 institutions for use as the comparator group. These institutions resembled Liberty in two or more of the criteria used. The institutions are:

| American University | Pepperdine University |
| --- | --- |
| Baylor University | Rochester Institute of Technology |
| Carnegie Mellon University | Southern Methodist University |
| Emory University | Texas Christian University |
| Georgetown University | Tufts University |
| Howard University | Tulane University |
| Northeastern University | University of Southern California |

BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.

BDO is the brand name for the BDO network and for each of the BDO Member Firms.



| Northwestern University | Vanderbilt University |
|---|---|

We then constructed a multi-year analysis of President Falwell's compensation in relation to the comparator group for the years 2008 through 2015 using information reported in IRS Form 990 filings. The analysis focused on the following elements of compensation: salary, total cash compensation (salary plus annual cash bonus) and total direct compensation (total cash compensation plus deferred compensation, retirement contributions, other direct payments). The following exhibits show the results of these analyses:

- President Falwell's salary has become very competitive with the comparator institutions over the period:



- Lack of a bonus moves President Falwell's compensation to the mid-range of the comparator group:



2



- Less than competitive deferred compensation / retirement contributions moves President Falwell's compensation to the bottom quartile of the comparator group:



- We also analyzed special benefits / perquisites offered by Liberty in relation to comparator institutions:

| Benefit / Perquisite | Institutions Providing | | | Explanation |
|---|---|---|---|---|
| | # | % | Liberty? | |
| Club Dues | 16 | 94% | | Nearly all institutions provide at least one club explained as 'for business purposes) |
| Travel for Companions | 15 | 88% | X | Most frequently explained as a board-approved policy / payment for President's spouse to attend a function. |
| Housing | 15 | 88% | | Most explain that the President is required to live in university-supplied housing and it is not taxable |
| Other Plan? | 15 | 88% | | Most institutions offer a discretionary bonus plan |
| 1st Class Travel | 13 | 76% | X | Most often explained as a perquisite available for special circumstances (e.g. longer / international flights, etc.) |
| Non-Qualified Plan | 11 | 65% | | Many institutions report that a 457(f) plan or other long-term plan is in place based on continued service or dates / milestones for vesting. |
| Tax Gross Up | 10 | 59% | | Most report the practice, but fail to identify the associated benefit / perquisite |
| Personal Services | 9 | 53% | | Most often - house cleaning and/ or landscaping of university-supplied house and often not taxable |
| Revenue-Based Plan? | 5 | 29% | | Generally refers to plans for investment personnel |
| Disc. Spending Acct | 2 | 12% | | |
| Paid for Residence Use | 1 | 6% | | |
| Net Earnings - Based Plan? | 1 | 6% | | Generally refers to plans for investment personnel |

3

LUADMINREC000684

LUJerry00238249



Our analyses have identified a number of elements of President Falwell's compensation arrangements that we should consider addressing in any future agreement. The table below summarizes our findings for the significant components of compensation and the range of competitive practice for each.

| Compensation Component | Comparator Group Practice / Liberty University Practice | Upper Range / 75th Percentile | Mid-Range / Median |
|---|---|---|---|
| Base Salary | All comparator institutions report a salary for the CEO position. President Falwell is at approximately the 75th percentile. | $1,000,000 | $875,000 |
| Annual Salary Increase | More than half of the comparator institutions had the same CEO for the 2008 thru 2015 Form 990's analyzed and the most received an annual salary adjustment. President Falwell's increased averaged 26% over the period due to significant increases in the earlier years of the analysis. | 6.0% | 4.0% |
| Bonus | Approximately half of the comparators used a bonus for the President during each of the years in the analysis. About one quarter paid a bonus in each of the years. President Falwell has received no bonus in any of the years covered. | 30% | 23% |
| | | 17% (Includes 0's) | 4% (Includes 0's) |
| Total Cash Compensation | Total cash compensation consists of base salary plus bonus (if any) paid for the year. President Falwell's salary-only total cash compensation is at approximately the median of comparators | $1,100,000 | $1,000,000 |
| Retirement / Deferred Compensation | All comparators offer one or more retirement / deferred compensation opportunities for the CEO position. Typically, the President participates in the institution's qualified plan (e.g. 403(b) plan) as well as another non-qualified plan (e.g. 457(b), 457(f) plan) and possibly other arrangements (e.g. insurance-based plan). President Falwell has received an annual contribution averaging 4.6% of salary annually over the period in the analysis. | 28% | 15% |
| Retirement / Deferred Compensation 'Catch Up' Adjustment | Over the 2008 through 2017 period, retirement / deferred contribution amounts for President Falwell have been well-below competitive levels and represent a cumulative deficiency in lost opportunities for investment growth as well. | Catch up' contribution(s) and / or supplemental arrangements (e.g. split-dollar life insurance) put in place to provide a cost and tax-efficient means to deliver a competitive retirement benefit. | A portion of President Falwell's current salary could be considered as at least a partial offset to the less than competitive retirement / deferred compensation benefits provided to him at Liberty. |
| Housing & Related Services | Nearly all comparator institutions are providing housing along with housekeeping and landscaping services as part of the President's employment. Offered as a condition of employment, the benefit is not included as compensation nor is the amount reported. However, this represents a valuable benefit among comparators. Aside from maintenance and reimbursement for expenses associated with the annual picnic for Liberty seniors, no further housing benefit is provided. | Lack of the housing benefit supports President's Falwell expectation that meaningful retirement benefits and formal consideration for an annual bonus should be included in his compensation. | A portion of President Falwell's current salary should be considered as at least a partial offset to the housing benefit not provided to him at Liberty. |
| Severance Protection | A recent survey of 63 higher ed institutions (included no comparator school) was conducted by Mercer and Witt/Kieffer which is the source of this competitive data. President Falwell has a current $5 million severance for termination without cause. | The most generous benefits provide 18 to 24 months salary plus continuation of benefits. Some provide severance for non-renewal of employment. | Typical severance benefit is 12 month salary continuation with benefits. |

LUADMINREC000685

LUJerry00238250



These findings provide a basis for further consideration and discussion of changes to the existing compensation arrangements for President Falwell that would improve the program's effectiveness.

We have identified several specific areas in which improvements could be made. It may not be possible (or advisable) for all of these changes to be made. Adopting multiple, upper range / 75th percentile levels for each component of pay has a compounding effect in terms of the overall level of total direct compensation. It could produce a problematic situation (e.g. adverse stakeholder reactions, regulatory compliance, etc.). However, the competitiveness of President Falwell's compensation in relation to the comparator group can be improved. We note that while President Falwell's cash compensation is low relative to peer institutions, his termination payments significantly exceed those offered by comparators.

The table below provides a general summary of potential improvements on priority basis in terms of their impact on improvement of President Falwell's overall compensation:

| Compensation Component Enhancement | Description |
|---|---|
| Retirement / Deferred Compensation | Implement necessary plan(s) to provide competitive level of retirement benefit. Liberty Univeristy can readily adopt 457(b) and (f) plans to allow contributuons to be made. Amounts deferred into these programs can be structured to optimize the timing of vesting at a specific point(s) in the future or upon separation from employment. |
| Split-Dollar Life Insurance Policy | President Falwell takes out a life insurance policy and Liberty University annually loans him the amount required to pay thepolicy premium. Through a collateral assignment, the University will receive 100% of the premiums loaned for the policy (plus any loan interest not paid by PResident Falwell) when the policy matures. President Falwell has access to the policy's cash value over the amount required to repay policy loans. |
| Severance Protection | Adopt an 18 to 24 month continuation of salary and benefits or add a non-renewal provision to the severance protection provisions. |
| Annual Bonus Consideration | Incorporate formal consideration for a discretionary bonus based on key metrics realted to Liberty's overall performance on an annual basis. Specify a target / 'par' amount (e.g. 15% of salary). Award level to be adjusted upward or downward based on consideration of President Falwell's input and then determined at Board / Compensation Committee's discretion. |

Based on further discussions with President Falwell, the area(s) of interest can be further detailed for additional consideration. Illustrative analyses of a retirement contribution and bonus arrangements are presented on the following page for discussion.

LUADMINREC000686

LUJerry00238251



| Assumptions | | Year # | Retirement / Deferred Comp | | | Performance Bonus | | | Combined Running Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | Salary | Contribution | Running Total | Tgt. | Avg. | Running Total | |
| **Retirement Related** | | 1 | $1,000,000 | $200,000 | **$208,000** | $150,000 | $150,000 | **$150,000** | $358,000 |
| Contribution % | 20.0% | 2 | $1,020,000 | $204,000 | **$428,480** | $153,000 | $153,000 | **$303,000** | $731,480 |
| Salary Increase | 2.0% | 3 | $1,040,400 | $208,080 | **$662,022** | $156,060 | $156,060 | **$459,060** | $1,121,082 |
| Investment Return | 4.0% | 4 | $1,061,208 | $212,242 | **$909,235** | $159,181 | $159,181 | **$618,241** | $1,527,476 |
| | | 5 | $1,082,432 | $216,486 | **$1,170,750** | $162,365 | $162,365 | **$780,606** | $1,951,356 |
| **Bonus Related** | | 6 | $1,104,081 | $220,816 | **$1,447,229** | $165,612 | $165,612 | **$946,218** | $2,393,447 |
| Bonus Target | 15.0% | 7 | $1,126,162 | $225,232 | **$1,739,360** | $168,924 | $168,924 | **$1,115,143** | $2,854,502 |
| Overall Average Bonus Paid | 100.0% | 8 | $1,148,686 | $229,737 | **$2,047,861** | $172,303 | $172,303 | **$1,287,445** | $3,335,306 |
| | | 9 | $1,171,659 | $234,332 | **$2,373,480** | $175,749 | $175,749 | **$1,463,194** | $3,836,674 |
| | | 10 | $1,195,093 | $239,019 | **$2,716,999** | $179,264 | $179,264 | **$1,642,458** | $4,359,457 |

| Estimated Total | | | | **$2,716,999** | | | | **$1,642,458** | **$4,359,457** |
|---|---|---|---|---|---|---|---|---|---|

| Contribution % | | | Avg % of Target Paid | | |
|---|---|---|---|---|---|
| @25% | $3,396,248 | | @100% | $1,642,458 | **$5,038,706** |
| @20% | $2,716,999 | | @85% | $1,396,089 | **$4,113,088** |
| @18.5% | $2,513,224 | | @75% | $1,231,844 | **$3,745,067** |

The suggestion set forth above puts President Falwell's overall package on a current basis that is in a range that is closer to his provided to his peers. It does not, however, compensate him for the lack of retirement pay and bonuses over the past years of service. We note, however, that President Falwell receives a payment equal to 3 times his base pay upon termination of employment. This puts him somewhat closer to his peers and makes up for at least some portion of the lack of retirement pay accumulated and bonuses paid over the past 10+years of service. In addition, President Falwell receives 5 times his base pay (rather than 3 times) in the event of his termination of employment by LU without cause. As noted, the additional 2 times pay comes with the contingency that LU terminates President Falwell without "cause."

For your convenience, attached is a chart that compares President Falwell's payments under his employment agreement to the comparators.

As an alternative to designing a new package, we might suggest that (1) tweaks be make to strengthen his definition of "cause", (2) add a "good reason" resignation as a basis for the 5 times payment, and (3) add an additional retirement plan (at the lower end the spectrum). We also suggest that in any event, a portion of his pay be treated as a housing allowance that is not subject to tax.

LUADMINREC000687

LUJerry00238252

| | |
|---|---|
| **From:** | Mike Conover <wconover@bdo.com> |
| **Sent:** | Wednesday, June 13, 2018 9:59 AM |
| **To:** | J L Falwell <jlfjr@earthlink.net>; |
| **Cc:** | Loretta.Richard@ropesgray.com; Dennis.Coleman@ropesgray.com |
| **Subject:** | Memo - DRAFT Clean Copy |
| **Attachments:** | Summary Memo - v3 061118.pdf; |

President Falwell – this version is easier to read.… No mark up notations.…

Thank you,

# Mike

Mike Conover
Managing Director - Compensation Consulting
617-239-4175 (Office)   315-4175 (Internal)
617-872-4207 (Mobile)   617-422-0909 (Fax)
wconover@bdo.com

BDO USA, LLP
Two International Place
Boston, MA 02110
UNITED STATES 617-422-0700
www.bdo.com

*BDO USA, LLP, a Delaware limited liability partnership, is the U.S. member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.*

*BDO is the brand name for the BDO network and for each of the BDO Member Firms.*

*IMPORTANT NOTICES*

*The contents of this email and any attachments to it may contain privileged and confidential information from BDO USA, LLP. This information is only for the viewing or use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of, or the taking of any action in reliance upon, the information contained in this e-mail, or any of the attachments to this e-mail, is strictly prohibited and that this e-mail and all of the attachments to this e-mail, if any, must be immediately returned to BDO USA, LLP or destroyed and, in either case, this e-mail and all attachments to this e-mail must be immediately deleted from your computer without making any copies hereof. If you have received this e-mail in error, please notify BDO USA, LLP by e-mail immediately.*

LUJerry00238246

| From: | Richard, Loretta R. <Loretta.Richard@ropesgray.com> |
|---|---|
| Sent: | Monday, July 02, 2018 7:12 PM |
| To: | J L Falwell <jlfjr@earthlink.net>; |
| Cc: | Dennis.Coleman@ropesgray.com; wconover@bdo.com |
| Subject: | Letter to King Tower |

Attachments:     69805829_2.docx;

Dear President Falwell:

Here is the letter I propose to send to King Tower to start the conversation on your contract.

Please let me know when you will be available to discuss.

Best regards,

Loretta

Loretta R. Richard
ROPES & GRAY LLP
T +1 617 951 7271 | M +1 617 543 4309
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
loretta.richard@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

LUJerry00262602



ROPES & GRAY LLP
PRUDENTIAL TOWER
800 BOYLSTON STREET
BOSTON, MA 02199-3600
WWW.ROPESGRAY.COM

July 2, 2018

Loretta R. Richard
T 617.951.7271
E--mail: Loretta.Richard@ropesgray.com

**BY E-MAIL**

King F. Tower, Esq.
Woods Rogers
828 Main Street
19th Floor
Lynchburg, VA 24504

Re:     Liberty University President Jerry Falwell - Employment Agreement Renewal

Dear King:

I am following up on our earlier communications regarding the renewal of President Falwell's employment contract with Liberty University ("Liberty"). Because the contract expires by its present terms during 2019, we have begun the process of reviewing the contract to determine whether to propose to any changes. As you know, we have engaged Mike Conover at BDO Seidman ("BDO") to assist us to ensure that the contract is appropriately competitive with comparable institutions in higher education; consistent with best practices; and structured to support retention and motivation of President Falwell's continued successful leadership of Liberty.

During the 2012 to 2018 period, Liberty has undergone a transformation in virtually every aspect of the institution. Growth in Liberty's enrollment, academic offerings, leadership in successful online learning, major additions to campus facilities, competitive athletics, extraordinary growth of Liberty's endowment (which, because of President Falwell's fundraising activities, is not subject to the same restrictions as other universities) and overall financial soundness have received wide spread recognition from numerous sources. These and many other factors are testimony to the successful leadership of President Falwell and his management team.

Our review began with the identification of a group of comparator institutions. Liberty is an unusual university in light of a combination of factors (e.g. faith-based institution, large enrollment, significant online enrollment, numerous undergraduate through doctoral programs, significant endowment, etc.). No single characteristic or metric (e.g. enrollment, revenue, assets, endowment, etc.) can adequately capture the totality of Liberty and be relied upon to identify appropriate comparators. Accordingly, BDO screened non-profit educational institutions for comparability to

69805829_2

ROPES & GRAY LLP

King F. Tower, Esq.            - 2 -       July 2, 2018July 2, 2018**Error! No text of**
**specified style in document.**12/26/2013

Liberty not only in size, but other characteristics such as enrollment/selectivity and sound financial management.

BDO identified a group of 17 institutions as the comparator group.

| American University | Pepperdine University |
|---|---|
| Baylor University | Rochester Institute of Technology |
| Carnegie Mellon University | Southern Methodist University |
| Emory University | Texas Christian University |
| Georgetown University | Tufts University |
| Howard University | Tulane University |
| Northeastern University | University of Southern California |
| Northwestern University | Vanderbilt University |
| Wake Forest University ||

A multi-year comparison of compensation and other benefits was completed using data from Form 990 filings for the group's members. President Falwell's compensation at Liberty was then compared to the information obtained from the comparator group.

Based on our review of President Falwell's current agreement, we observe the following:

- On an overall basis, key terms of President Falwell's existing agreement (as amended in 2017) compare favorably with practices for Presidents of comparator group institutions. Direct compensation (i.e. salary and eligibility for a discretionary bonus) are competitive.

- We note, however, that President Falwell's retirement contribution / deferred compensation levels fall well below the comparator group offerings. While the amended terms of the employment agreement somewhat offset the shortfall with the termination payment (Article 4; 4.1 (c)), additional contributions are needed to make this important benefit fully competitive. We request that President Fallwell's existing contract be amended to provide for additional annual contributions to President Falwell's retirement savings to 15% of salary.

69805829_2

LUADMINREC000691 LUJerry00262604

ROPES & GRAY LLP

King F. Tower, Esq.                              - 3 -        July 2, 2018July 2, 2018**Error! No text of**
**specified style in document.**12/26/2013

- We identified selected terms of President Falwell's employment contract that would benefit from the following updates/changes to better align them with best practices:

  - o  Article 4: Section 4.1 (c) Termination Payment.  President Falwell is clarify the restrictive covenants that apply in connection with his termination payment.

  - o  Article 4: Section 4.9 – these provisions are not applicable to a tax-exempt organization and could be eliminated from the successor agreement.

  - o  Termination for 'Good Reason' – We propose that the agreement be amended to provide for a "good reason" resignation that would allow President Falwell to resign and receive the same termination payments that apply to a "without cause" termination. We propose that the basis for a "good reason" termination include (1) material reductions in duties and responsibilities, (2) change in title, (3) reduction in salary and benefits, or (4) Liberty's material breach of the employment agreement.

Although we have engaged in a review in respect of non-profit institutions, we note that Liberty is among the preeminent institutions with an online university presence. This is comparable to certain for-profit universities with similar offerings. In those cases, the total compensation of the Presidents of those institutions, such as University of Phoenix and Grand Canyon University, far exceed that of President Falwell's. We are not suggesting that President Falwell's total compensation be brought in line with the for-profit institutions, but note that Board of Trustees should recognize that President Falwell's leadership has brought significant value to Liberty.

We believe the recommended changes will bring President Falwell's current agreement into competitiveness among comparable institutions, in support of the effort to motivate and retain President Falwell for the continued success of Liberty University.

We would be pleased to discuss this with you or any member of the Compensation Committee of the Board of Trustees of Liberty University at your convenience.

Yours sincerely,

Loretta R. Richard

69805829_2

| | |
|---|---|
| **From:** | Richard, Loretta R. <Loretta.Richard@ropesgray.com> |
| **Sent:** | Monday, July 30, 2018 7:15 PM |
| **To:** | J L Falwell <jlfjr@earthlink.net>; |
| **Cc:** | Dennis.Coleman@ropesgray.com |
| **Subject:** | RE: Letter to King Tower |

President Falwell,

Accordingly to his e-mail,. he is out of the office this week, and should be back next Monday.  I will push hard on resolving this ASAP.

Best,

Loretta

**Loretta R. Richard**
**ROPES & GRAY LLP**
T +1 617 951 7271 | M +1 617 543 4303
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
Loretta.Richard@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

**From:** J L Falwell <jlfjr@earthlink.net>
**Sent:** Monday, July 30, 2018 7:05 PM
**To:** Richard, Loretta R. <Loretta.Richard@ropesgray.com>
**Cc:** Coleman, Dennis M. <Dennis.Coleman@ropesgray.com>
**Subject:** Re: Letter to King Tower

Loretta,

Hope all is well.  Just curious if you've heard back from King.  I need to get this contract finalized ASAP.

Thanks so much.

Jerry Falwell

Sent from my iPhone

On Jul 3, 2018, at 12:29 PM, Richard, Loretta R. <Loretta.Richard@ropesgray.com> wrote:

It was my pleasure.  You are a joy to work with.

LUJerry00295202

Loretta R. Richard
ROPES & GRAY LLP
T +1 617 951 7271 | M +1 617 543 4303
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
loretta.richard@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

---

**From:** J L Falwell <jlfjr@earthlink.net>
**Sent:** Tuesday, July 03, 2018 11:16 AM
**To:** Richard, Loretta R. <Loretta.Richard@ropesgray.com>
**Cc:** Coleman, Dennis M. <Dennis.Coleman@ropesgray.com>; Mike Conover <wconover@bdo.com>
**Subject:** Re: Letter to King Tower

Thanks again!

Sent from my iPhone

On Jul 2, 2018, at 11:44 PM, Richard, Loretta R. <Loretta.Richard@ropesgray.com> wrote:

President Falwell,

Thank you for your comments. I appreciate the close read, and I apologize for the misspelling of your name.

This will be sent out to King first thing Tuesday morning.

Best,

Loretta

Loretta R. Richard
ROPES & GRAY LLP
T +1 617 951 7271 | M +1 617 543 4303
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
loretta.richard@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

---

**From:** J L Falwell <jlfjr@earthlink.net>
**Sent:** Monday, July 02, 2018 9:11 PM
**To:** Richard, Loretta R. <Loretta.Richard@ropesgray.com>
**Cc:** Coleman, Dennis M. <Dennis.Coleman@ropesgray.com>; Mike Conover <wconover@bdo.com>
**Subject:** Re: Letter to King Tower

LUJerry00295203

Thanks so much, Loretta, for expediting this.  Please send to King as soon as possible.  I noticed a couple typos.  Falwell is spelt with two "Ls" incorrectly in one place and one of the paragraphs is an incomplete sentence.  It says something like "President Falwell is clarify . . ."

Very well done!  Thanks again.

Sent from my iPhone

On Jul 2, 2018, at 7:12 PM, Richard, Loretta R. <Loretta.Richard@ropesgray.com> wrote:

> Dear President Falwell:

> Here is the letter I propose to send to King Tower to start the conversation on your contract.

> Please let me know when you will be available to discuss.

> Best regards,

> Loretta

> Loretta R. Richard
> ROPES & GRAY LLP
> T +1 617 951 7271 | M +1 617 543 4303
> Prudential Tower, 800 Boylston Street
> Boston, MA 02199-3600
> loretta.richard@ropesgray.com
> www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

<69805829_2.docx>

LUJerry00295204



✶ Sibson Consulting

**Liberty University**

# PRESIDENT MARKET ASSESSMENT

## Report of Findings

November 1, 2018

**CONFIDENTIAL DRAFT**

Copyright © 2018 by The Segal Group, Inc. All rights reserved.

# Introduction

Liberty University ("Liberty") engaged Sibson Consulting to benchmark President Jerry Falwell Jr.'s compensation against appropriate institutions and assess Liberty's compliance with Intermediate Sanctions regulations. The President's current contract will expire on June 30, 2019. Prior to renewing the contract, the Board is interested in understanding how President Falwell's total remuneration compares with Liberty's peer institutions.

The primary goals of the study were to:

1. **Define an Executive Peer Group:** Develop a group of peer institutions that are suitable comparisons for executive compensation

2. **Benchmark Compensation Against Form 990 Filings:** Benchmark the President's compensation against the peer institutions using the latest available data from IRS Form 990 filings and The Chronicle of Higher Education (for any public peers), including the following pay components: base salary, bonus and incentives, other compensation, retirement & deferred compensation, and non-taxable benefits

3. **Develop Report of Findings:** Develop a report of findings for the Board of Trustees that summarizes the study objectives and methodology, the results of the competitive benchmarking, and Sibson's opinion on pay reasonableness with regard to Intermediate Sanctions

✻ Sibson Consulting    1

## Competitive Assessment Methodology

> Obtained peer group data from latest available IRS Form 990 filings (for private peers) and The Chronicle of Higher Education (for public peers)

> Aged compensation data to 1/1/19 using a 2.7% annual update factor for base salary, bonus & incentive, other compensation, and retirement & deferred compensation, and an 8% update factor for non-taxable benefits[1]

The following is a summary of President Falwell's compensation data used in this assessment:

| Compensation Component | Amount | Details |
|---|---|---|
| Base Salary | $1,025,000 | Final contract year salary |
| Bonus & Incentive Compensation | $0 | Eligible for discretionary bonuses; no payout in 2018 |
| Other Compensation | $15,000 | Phone and auto allowances |
| Retirement & Deferred Compensation | $24,500 | Contributions to University retirement program |
| Non-Taxable Benefits | $18,880 | Health and welfare benefits, tuition |

> Key compensation terms presented throughout this material include:

- **Total Cash Compensation (TCC):** Reflects base salary and bonus & incentive compensation
- **Total Remuneration (TR):** Reflects total cash compensation, other compensation, retirement & deferred compensation, and non-taxable benefits

---

[1] Source: Sibson's Annual Compensation Planning Survey analyzing salary increase budgets by industry and job classification, and Sibson's annual benefits study.

✳ Sibson Consulting   2

# **Competitive Assessment Methodology** continued

> Peer group data was obtained from two sources:

  1. **Private Institutions:** IRS Form 990 Filings
  2. **Public Institutions:** The Chronicle of Higher Education Executive Compensation at Public Colleges

|  | Source | |
| --- | --- | --- |
|  | IRS Form 990 | Chronicle of Higher Education |
| Base Salary | Base salary | Total base salary provided to the chief executive, including compensation from private university-related foundations |
| Bonus & Incentive Compensation | Bonus & incentive compensation paid | The value of all bonuses and incentive compensation paid out to the chief executive |
| Other Compensation | Perquisites, severance, tax gross-ups, loans, taxable insurance, taxable housing, taxable personal services, deferred comp payouts, etc. | Miscellaneous pay and benefits, including severance payments, tax gross-ups (money an employer provides an employee for taxes paid on benefits), vacation leave cashed out, debt forgiveness, fellowships, employer-provided vehicles and parking, housing payments, travel, meals, moving expenses, entertainment, spending accounts, and club dues. Vested deferred compensation, meaning money set aside in previous years that was paid out to the employee in the current year, can also be included in other pay. May also include interest accrued on deferred compensation |
| Retirement & Deferred Compensation | Employer contributions to qualified retirement plans, nontaxable deferred compensation | Payments made by the university on behalf of the chief executive to a retirement plan that is available to any university employee during the fiscal year. This can include 401(k) plans, state pension plans, and other retirement plans that are broadly available. Deferred compensation set aside in the fiscal year covered that is to be paid out in future years, including contributions to supplemental executive retirement plans |
| Nontaxable Benefits | Nontaxable benefits, nontaxable housing, nontaxable personal services | Health and medical benefits, life insurance, housing provided by the employer, personal legal and financial services, dependent care, adoption assistance, tuition assistance, and cafeteria plans |
| Data Year | Most recent calendar year available (2015 – 2016) | Fiscal Year 2016 – 2017 |

✷ Sibson Consulting    3

LUADMINREC000699

LUJerry00242627

# Executive Summary

> **Peer Group:** As part of the Presidential compensation review, Sibson developed an executive peer group to be used for compensation comparisons.[1] The peer group list was shared with the Executive Committee in October 2018

> **Compensation Comparison to Market:**

- **Base Salary:** President is at 136% of market median (84th percentile)

- **Bonus & Incentive Compensation:** Five (three private, two public) of the fourteen peer institutions paid an incentive/bonus at an average value of approximately $320,000

- **Retirement & Deferred Compensation:** All but one peer provide retirement & deferred compensation; President Falwell is at 48% of market median (15th percentile). All four public peers awarded deferred compensation at an average of approximately $165,000, in addition to retirement contributions

- **Benefits and Perquisites:** Liberty's use of perquisites is consistent with those of its peers

- **Total Remuneration:** President is at 101% of market median (54th percentile)

> **Pay Composition and Mix:** Liberty's pay mix (95% cash / 5% non-cash) is weighted significantly more towards cash compensation (exclusively base salary in 2018) than the peer group (75% cash / 25% non-cash)

---

[1] See Appendix for additional peer group details.

# Market Compensation Summary Overview

The following slides present the competitive assessment findings for:

1. **Total Compensation Summary:** Comparison of Liberty's President to the competitive market for all components of pay. Includes the 25th, 50th (median), 75th, and 90th percentiles of the market as well as Liberty's percent rank (i.e., the President's competitive position within the peer group)

2. **Pay Mix:** A comparison of Liberty's cash to non-cash compensation relative to the market

3. **Total Remuneration and Total Revenue Regression:** A regression showing the strength of the relationship between the President's total remuneration and the institution's total revenue. Since total revenue can be a reflection of the institution's size and complexity, it often has the strongest relationship to compensation among the peer group criteria

4. **Perquisite Summary:** A comparison of Liberty's perquisites relative to the market

5. **Commentary on Proposed Contract Terms:** Sibson's commentary on the appropriateness of the recommendations for new contract terms proposed by President Falwell's attorney, as they relate to the market assessment

✳ Sibson Consulting   5

# Market Compensation Summary Results

> While President Falwell's base salary is at the 84th percentile of peer institutions, non-cash compensation is significantly below market levels, resulting in Total Remuneration at the 54th percentile

## Total Remuneration Summary
### (14 Matches[1])

|  | Base Salary | Bonus & Incentive Compensation | Total Cash Compensation | Other Compensation | Retirement & Deferred Compensation | Non-Taxable Benefits | Total Remuneration |
|---|---|---|---|---|---|---|---|
| **Liberty University** | $1,025,000 | $0 | $1,025,000 | $15,000 | $24,500 | $18,880 | $1,083,380 |
| 25th Percentile | $576,341 | $0 | $618,485 | $751 | $25,875 | $25,956 | $906,103 |
| Median | $753,423 | $0 | $847,620 | $82,487 | $50,576 | $64,558 | $1,077,940 |
| 75th Percentile | $905,291 | $71,667 | $1,064,019 | $131,958 | $226,254 | $173,181 | $1,385,041 |
| 90th Percentile | $1,060,728 | $465,135 | $1,149,277 | $194,162 | $269,918 | $228,424 | $1,604,876 |
| % to Median | 136% | N/A | 121% | 18% | 48% | 29% | 101% |
| Percent Rank | 84th | N/A | 61st | 32nd | 15th | 14th | 54th |

---

[1] Compensation data is not provided for the President of Boston College as the incumbent has taken a vow of poverty. For the University of Notre Dame, the President's compensation is included in the analysis but is paid directly to the order. Brigham Young University is not required to file a IRS Form 990 due to their religious affiliation.

✦ Sibson Consulting    6

LUADMINREC000702

LUJerry00242630

# **Market Compensation Summary Results** continued

> Liberty's pay mix (95% cash / 5% non-cash) is weighted significantly more towards cash compensation (exclusively base salary in 2018) than the peer group (75% cash / 25% non-cash)



---

[1] Cash Compensation = Base Salary + Bonus and Incentive; Non-Cash Compensation = Other Compensation + Retirement & Deferred Compensation + Non-Taxable Benefits.

✦ Sibson Consulting    7

LUADMINREC000703

LUJerry00242631

# Perquisite Summary



**Prevalence of Perquisites**
Percent of Peer Institutions Providing[1]

Housing Allowance or Residence for Personal Use — 93%

Health or Social Club Dues or Initiation Fees — 71% ✓

First Class or Charter Travel — 64% ✓

Travel for Companions — 57% ✓

Personal Services (e.g., Housekeeping, Chauffeur, Chef) — 50% ✓

Tax Indemnification and Gross-Up Payments — 43% ✓

Automobile Allowance or Car — 29% ✓

Payments for Business Use of Personal Residence — 7% ✓

Discretionary Spending Account — 0%

✓ = Denotes that the perquisite is provided by Liberty University[2]

**Liberty's use of perquisites is consistent with the most prevalent of its peers.**

[1] The above data is reported in the Chronicle for Higher Education and the Form 990 and depicts which institutions provide which perquisites, but not on a position-specific basis. In our experience, when these perquisites are offered, they are typically offered to the President.

[2] Perquisites are reported as written into President Falwell's contract; does not indicate the benefit / perquisite was used by the President in 2018.

✴ Sibson Consulting   8

# Commentary on Proposed Contract for President

> Liberty University's Executive Committee provided Sibson with the competitive market assessment results and requested contract updates conducted by President Falwell's personal attorney

> **Peer Group:** While the methodology to develop the peer group differed for Sibson and President Falwell's attorney, the resulting groups share five of the same institutions

> **Total Cash Compensation:** The President's attorney noted that Total Cash Compensation and the eligibility for discretionary bonuses in the President's contract compares favorably to the peer group. This finding is consistent with the results of Sibson's analysis

> **Retirement and Deferred Compensation:** The President's attorney indicated that the value of President Falwell's retirement contribution / deferred compensation falls well below the comparator group offerings. This finding is consistent with the results of Sibson's analysis. There is an opportunity to offer President Falwell deferred compensation as an additional vehicle; the amount would need to be assessed relative to peer compensation levels

✶ Sibson Consulting    9

# Intermediate Sanctions Opinion

> President Falwell's Total Remuneration pay positioning is at the 54[th] percentile. Given his level of experience and contributions to the institution, this positioning may be appropriate, but that is a question for the Board of Trustees to determine in their oversight responsibilities. The facts and circumstances must also be considered, and by all accounts, it is our understanding that President Falwell's performance and contributions to the University have been deemed exceptional by the Board

> **Intermediate Sanctions Opinion:**[1] Based on the data presented in this report and the corresponding Appendix, we find total remuneration levels for the President to be reasonable and compliant with Intermediate Sanctions guidelines according to IRS Final Regulation Section 53.4958-1. There is nothing to suggest concern regarding excess benefits transactions (EBT)

> It is prudent governance practice for the Board to mitigate any potential risk by creating a rebuttable presumption of reasonableness under Intermediate Sanctions regulations. Under Intermediate Sanctions regulations, organizations can protect themselves and mitigate risk by creating a rebuttable presumption of compensation reasonableness. Creating a rebuttable presumption is recommended because if there is an inquiry regarding an excess benefit transaction (EBT), the rebuttable presumption shifts the burden of proof that the compensation constituted an EBT to the IRS, a fairly high standard. Absent the rebuttable presumption, the institution is responsible for proving that such compensation did not constitute an EBT, which takes both time and resources

> Please see the following page for additional detail on creating a rebuttable presumption of reasonableness

Sibson Consulting is a full service human capital consulting firm with an executive compensation advisory practice. We are qualified to, and regularly perform, compensation analyses for tax-exempt organizations to assess compliance with IRS Intermediate Sanctions regulations.

---

[1] Sibson is not a law firm and cannot issue legal opinions. For a definitive statement on reasonableness, please consult legal counsel.

✚ Sibson Consulting    10

# Creating a Rebuttable Presumption of Reasonableness

To obtain the benefit of the rebuttable presumption, the following three conditions must be satisfied:

| Condition | Description |
|---|---|
| 1. Independent Board or Committee Approval | For all disqualified persons, the arrangement must be approved in advance by the Board (or a committee of independent non-employees, thereof, that is composed entirely of individuals who do not have a conflict of interest or a material interest with respect to the arrangement or transaction under consideration). |
| 2. Comparable Data Used | In approving the transaction, the Board or Committee must obtain and rely upon appropriate comparability data:<br>1. The information must be sufficient to allow the Board or Committee to determine whether the transaction is reasonable<br>2. Relevant information may include for-profit or not-for-profit compensation surveys or data compiled by independent firms reflecting the size, complexity, and location of the organization<br>3. All of the elements of compensation should be considered as they relate to functionally comparable positions |
| 3. Documentation[1] (e.g., documentation of decision-making regarding compensation of disqualified persons) | The Board or Committee must adequately and concurrently document the basis for its approval noting the following:<br>1. Terms of the transaction approved and the date approved<br>2. Members of the authorized body present during debate and those who voted<br>3. Comparability data relied on and how it was obtained<br>4. Any actions taken by a member of the authorized body who had a conflict of interest for the transaction<br>5. If the authorized body determined that the reasonable compensation or that the fair market value varied from the range of comparable data obtained, the basis for this determination |

**To the extent that this report is used to make compensation decisions, Liberty University will satisfy one of the above criteria to establish a rebuttable presumption of reasonableness (i.e., Comparable Data Used). Counsel should opine on conditions #1 and #3, provided above.**

[1] To ensure compliance with Intermediate Sanctions, the Board needs to satisfy the five factors listed under the Documentation section.

✲ Sibson Consulting   11

LUADMINREC000707

LUJerry00242635

## Appendix

1. **Peer Group Details**

2. **President Compensation Data Details**

3. **Pay Mix Details**

4. **Perquisite Details**

5. **Executive Committee Interview Findings**



Sibson Consulting  12

LUADMINREC000708

LUJerry00242636

# Appendix 1: Introduction to Comparator Group Development

> Sibson has developed a proposed comparator group of institutions for the Presidential compensation market assessment

> An institution uses comparator (or peer) groups for several reasons, including student and program comparisons and benchmarking institutional performance

> A group for the purposes of compensation benchmarking may or may not be the same as the group(s) used for other purposes; in many cases, there is some overlap in the institutions selected

> In our experience, a compensation comparator group:

- Includes institutions of similar type (i.e., Carnegie Classification) and size (e.g., total expenses, student enrollment), within a reasonable and defensible range
- Considers the compensation implications of institutions located in similar and different cost of living and cost of labor areas (although recruitment may be national in scope)
- May include a small group of aspirational institutions to reflect compensation implications related to the institution's future growth
- May include additional criteria such as funding sources, retention rate, graduation rate, admission yield, student to faculty ratio, etc.

> Based on these factors, Sibson proposes a comparator group using the methodology detailed in the following pages

✶ Sibson Consulting   13

# Appendix 1: Peer Group Development Methodology

The following steps were completed to determine which institutions should be included in the recommended comparator group:

1. Began with all private non-profit, public, Doctoral, and Master's: Larger institutions in the U.S. (n=331)

2. Selected institutions that are religiously affiliated (n=173)

3. Selected institutions with Endowment Assets greater than $750,000,000 (n=13)

4. Removed 3 institutions whose student enrollment was <10,000 (n=10)

5. Added 4 public institutions from Virginia that have student enrollments over 20,000 (n=14)[1]

6. Added 2 institutions with student enrollments larger than 20,000 and >50% of their students exclusively enrolled in online courses (n=16)

**This approach resulted in 16 institutions.**

[1] Even though James Madison University met the student enrollment criterion, it was not included because compensation data are not publicly available for the institution.

★ Sibson Consulting   14

# Appendix 1: Proposed Comparator Group Details

| Institution (n=16)[1] | Location | Carnegie Classification | Total Revenue ($M) | Total Endowment ($M) | Total Student FTE | % of Students Exclusively Enrolled in Online Courses | % of Students Admitted | Graduation Rate |
|---|---|---|---|---|---|---|---|---|
| Baylor University | Waco, TX | Doctoral: Higher Research | $608,623,000 | $1,153,535,000 | 16,482 | 1% | 40% | 74% |
| Boston College | Chestnut Hill, MA | Doctoral: Highest Research | $708,242,637 | $2,109,860,476 | 13,655 | 0% | 31% | 93% |
| Brigham Young University | Provo, UT | Doctoral: Higher Research | $1,007,685,264 | $1,571,803,000 | 31,674 | 0% | 51% | 83% |
| Duke University | Durham, NC | Doctoral: Highest Research | $5,040,245,000 | $6,839,780,000 | 15,256 | 5% | 11% | 95% |
| Emory University | Atlanta, GA | Doctoral: Highest Research | $4,726,165,000 | $6,902,625,000 | 13,088 | 1% | 25% | 91% |
| George Mason University | Fairfax, VA | Doctoral: Highest Research | $883,933,174 | $71,566,373 | 27,929 | 4% | 81% | 70% |
| Georgetown University | Washington, DC | Doctoral: Highest Research | $1,296,379,000 | $1,483,502,000 | 16,005 | 9% | 17% | 94% |
| Saint Louis University | Saint Louis, MO | Doctoral: Higher Research | $677,818,071 | $1,053,035,494 | 13,111 | 7% | 65% | 74% |
| Southern Methodist University | Dallas, TX | Doctoral: Higher Research | $620,925,000 | $1,383,981,000 | 10,054 | 4% | 49% | 79% |
| Southern New Hampshire University | Manchester, NH | Master's: Larger | $533,750,383 | $23,975,222 | 44,379 | 84% | 93% | 58% |
| Texas Christian University | Fort Worth, TX | Doctoral: Higher Research | $411,762,000 | $1,407,057,000 | 10,134 | 2% | 38% | 77% |
| University of Notre Dame | Notre Dame, IN | Doctoral: Highest Research | $1,135,750,000 | $8,748,266,000 | 12,266 | 1% | 19% | 95% |
| University of Virginia | Charlottesville, VA | Doctoral: Highest Research | $2,775,223,193 | $5,774,743,884 | 22,492 | 4% | 30% | 94% |
| Virginia Commonwealth University | Richmond, VA | Doctoral: Highest Research | $1,076,472,768 | $607,418,184 | 27,490 | 3% | 81% | 62% |
| Virginia Polytechnic Institute and State University | Blacksburg, VA | Doctoral: Highest Research | $1,460,122,429 | $835,800,000 | 31,369 | 3% | 71% | 84% |
| Western Governors University | Salt Lake City, UT | Master's: Larger | $426,298,545 | $0 | 84,289 | 100% | - | 26% |
| Liberty University | Lynchburg, VA | Doctoral: Moderate Research | $826,707,629 | $1,082,996,068 | 51,747 | 80% | 24% | 51% |
| | | 25th Percentile | $577,690,662 | $23,975,222 | 13,655 | 2% | 68% | 73% |
| | | Median | $708,242,637 | $1,053,035,494 | 20,727 | 4% | 40% | 81% |
| | | 75th Percentile | $1,135,750,000 | $1,571,803,000 | 31,674 | 78% | 28% | 93% |
| | | Liberty University Percent Rank | 57th | 51st | 96th | 77th | 80th | 5th |

[1] Source of information: IPEDS Data Center

[2] While Colorado Christian University, Grand Canyon University and James Madison University are not currently included in the peer group, they may be included in the future. Colorado Christian University's current institutional characteristics do not align with the current peer group, but may in the future. Grand Canyon University recently obtained non-profit status and a Form 990 should be available in future years. James Madison University is not required to file a Form 990 and has not disclosed compensation information. Institutions in italics were also included in the peer group selected by President Falwell's attorney.

⋆ Sibson Consulting   15

LUADMINREC000711

LUJerry00242639

# Appendix 2: President Compensation Data Details

| Institution (n=14) | Name | Base Salary | Bonus & Incentive Compensation | Total Cash Compensation | Other Compensation | Retirement & Deferred Compensation | Non-Taxable Benefits | Total Remuneration |
|---|---|---|---|---|---|---|---|---|
| Baylor University | Kenneth W. Starr | $856,037 | $506,270 | $1,362,307 | $116,670 | $72,447 | $119,289 | $1,670,713 |
| Duke University | Richard H. Brodhead | $1,029,863 | $0 | $1,029,863 | $137,054 | $159,711 | $94,730 | $1,421,358 |
| Emory University | James W. Wagner | $1,073,956 | $0 | $1,073,956 | $82,717 | $25,834 | $93,581 | $1,276,089 |
| George Mason University | Angel Cabrera | $567,239 | $84,627 | $651,866 | $0 | $94,617 | $20,975 | $767,457 |
| Georgetown University | John J. DeGioia | $607,358 | $0 | $607,358 | $216,641 | $25,997 | $230,093 | $1,080,089 |
| Saint Louis University | Fred P. Pestello | $733,317 | $0 | $733,317 | $3,003 | $28,705 | $3,870 | $768,894 |
| Southern Methodist University | R. Gerald Turner | $776,872 | $369,155 | $1,146,027 | $86,133 | $27,950 | $191,145 | $1,451,256 |
| Southern New Hampshire University | Paul J. LeBlanc | $921,709 | $0 | $921,709 | $82,257 | $24,860 | $30,741 | $1,059,566 |
| Texas Christian University | Victor J. Boschini Jr. | $1,150,669 | $0 | $1,150,669 | $285,665 | $507,298 | $224,531 | $2,168,163 |
| University of Notre Dame | John I. Jenkins | $773,530 | $0 | $773,530 | $79,110 | $0 | $276,009 | $1,128,649 |
| Western Governors University | Robert Mendenhall | $429,579 | $604,628 | $1,034,207 | $0 | $17,223 | $24,362 | $1,075,791 |
| University of Virginia | Teresa A. Sullivan | $603,648 | $0 | $603,648 | $0 | $248,434 | $30,867 | $882,950 |
| Virginia Commonwealth | Michael Rao | $544,616 | $32,786 | $577,403 | $141,712 | $256,447 | $0 | $975,562 |
| Virginia Polytechnic Institute and State University | Timothy D. Sands | $544,884 | $0 | $544,884 | $0 | $275,691 | $35,534 | $856,109 |
| Liberty University | Jerry Falwell, Jr. | $1,025,000 | $0 | $1,025,000 | $15,000 | $24,500 | $18,880 | $1,083,380 |
| | 25th Percentile | $576,341 | $0 | $618,485 | $751 | $25,875 | $25,956 | $906,103 |
| | 50th Percentile | $753,423 | $0 | $847,620 | $82,487 | $50,576 | $64,558 | $1,077,940 |
| | 75th Percentile | $905,291 | $71,667 | $1,064,019 | $131,958 | $226,254 | $173,181 | $1,385,041 |
| | 90th Percentile | $1,060,728 | $465,135 | $1,149,277 | $194,162 | $269,918 | $228,424 | $1,604,876 |
| | Liberty as % of 50th | 136% | N/A | 121% | 18% | 48% | 29% | 101% |
| | Liberty University Percent Rank | 84th | N/A | 61st | 32nd | 15th | 14th | 54th |

✳ Sibson Consulting  16

# Appendix 3: Pay Mix Details

## Pay Mix Detail: Cash vs. Non-cash Compensation[1,2]

| Institution (n=14) | Cash Compensation | | Non-Cash Compensation | | |
|---|---|---|---|---|---|
| | Base Salary | Bonus & Incentive Compensation | Other Compensation | Retirement & Deferred Compensation | Non-Taxable Benefits |
| Baylor University | 51% | 30% | 7% | 4% | 7% |
| Duke University | 72% | 0% | 10% | 11% | 7% |
| Emory University | 84% | 0% | 6% | 2% | 7% |
| George Mason | 74% | 11% | 0% | 12% | 3% |
| Georgetown University | 56% | 0% | 20% | 2% | 21% |
| Saint Louis University | 95% | 0% | 0% | 4% | 1% |
| Southern Methodist University | 54% | 25% | 6% | 2% | 13% |
| Southern New Hampshire University | 87% | 0% | 8% | 2% | 3% |
| Texas Christian University | 53% | 0% | 13% | 23% | 10% |
| University of Notre Dame | 69% | 0% | 7% | 0% | 24% |
| Western Governor's University | 40% | 56% | 0% | 2% | 2% |
| University of Virginia | 68% | 0% | 0% | 28% | 3% |
| Virginia Commonwealth University | 56% | 3% | 15% | 26% | 0% |
| Virginia Polytechnic Institute and State University | 64% | 0% | 0% | 32% | 4% |
| Liberty University | 95% | 0% | 1% | 2% | 2% |
| Peer Group Average | 64% | 10% | 7% | 11% | 8% |

---

[1] Cash Compensation = Base Salary + Bonus and Incentive; Non-Cash Compensation = Other Compensation + Retirement & Deferred Compensation + Non-Taxable Benefits.

[2] Data may not add up to 100% due to rounding.

✳ Sibson Consulting   17

# Appendix 4: Perquisite Details

## Prevalence of Executive Perquisites[1]

| Institution (n=14) | Housing Allowance or Residence for Personal Use | Health or Social Club Dues or Initiation Fees | First Class or Charter Travel | Travel for Companions | Personal Services (e.g., Maid, Chauffeur, Chef) | Tax Indemnification and Gross-Up Payments | Automobile Allowance of Car | Payments for Business Use of Personal Residence | Discretionary Spending Account |
|---|---|---|---|---|---|---|---|---|---|
| Baylor University | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Duke University | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Emory University | ✓ | ✓ | ✓ | ✓ | | ✓ | | | |
| George Mason | ✓ | ✓ | | | | | ✓ | | |
| Georgetown University | ✓ | ✓ | ✓ | ✓ | | ✓ | | | |
| Saint Louis University | ✓ | ✓ | ✓ | | | | | ✓ | |
| Southern Methodist University | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | | |
| Southern New Hampshire University | ✓ | | ✓ | ✓ | ✓ | | | | |
| Texas Christian University | ✓ | ✓ | ✓ | ✓ | ✓ | | | | |
| University of Notre Dame | ✓ | ✓ | ✓ | ✓ | | ✓ | | | |
| Western Governor's University | | ✓ | ✓ | | | | | | |
| University of Virginia | ✓ | ✓ | | | ✓ | | ✓ | | |
| Virginia Commonwealth University | ✓ | | | | ✓ | | ✓ | | |
| Virginia Tech | ✓ | | | | | | ✓ | | |
| Liberty University[2] | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Peer Group Prevalence | 93% | 71% | 64% | 57% | 50% | 43% | 29% | 7% | 0% |

[1] The above data is reported in the Chronicle for Higher Education and the Form 990 and depicts which institutions provide which perquisites, but not on a position-specific basis. In our experience, when these perquisites are offered, they are typically offered to the President.

[2] Perquisites are reported as written into President Falwell's contract; does not indicate the benefit / perquisite was used by the President in 2018.

✴ Sibson Consulting   18

# Appendix 5: Summary of Interview Themes

## Background and Context

> Sibson interviewed three members of the Executive Committee to gather their feedback regarding comparator institutions and the President's current and future compensation packages:

- **Harvey Gainey**, Executive Committee Chair
- **Carroll Hudson**, Executive Committee Member
- **Gilbert "Bud" Tinney, Jr.,** Executive Committee Member

> The Committee members stated that Liberty's primary mission is to be a world-class Christian educational institution

> The President is expected to support and drive the achievement of the following strategic goals over the next 5 to 10 years:

- Maintain Liberty's distinctly Christian culture
- Develop the Liberty brand—including a global focus
- Increase the quality of the academics at the institution through the recruitment of top quality students, staff, and faculty
- Create and maintain superior campus grounds, facilities and infrastructure, including technology
- Grow Liberty's athletic programs to compete with top universities' athletic programs
- Maintain the quality of University leadership by attracting and retaining high quality leaders

✳ Sibson Consulting   19

# Appendix 5: Summary of Interview Themes continued

## Comparator Group

> Committee members agree that Liberty is a fairly unique institution, making the identification of direct peers somewhat difficult

> Interviewees offered the following characteristics of an appropriate comparator group:

1. Christian universities
2. Large Virginia publics
3. Universities with large online programs
4. Universities with large endowments
5. Universities with quality students
6. Universities with successful athletic programs

> Committee members also consistently named the following institutions as comparators for Presidential compensation:

- Baylor University
- Colorado Christian
- Grand Canyon University
- Southern Methodist University
- Southern New Hampshire University
- University of Phoenix

✱ Sibson Consulting  20

# Appendix 6: Summary of Interview Themes continued

## Compensation Approach/Philosophy

> Historically, compensation for the President was determined based on affordability for the University

> As the institution grew, the focus of the President's compensation shifted to a package that was not only competitive with peers, but one that rewarded the President's excellent performance against goals

> Overall, the members feel that the President's compensation package is appropriate for his achievements against established goals and anticipated future performance

> Opportunities for improvement may exist in deferred compensation arrangements and tax liabilities associated with airplane usage. Committee members are also interested in understanding additional market competitive practices

✦ Sibson Consulting   21

| | |
|---|---|
| **From:** | Richard, Loretta R. <Loretta.Richard@ropesgray.com> |
| **Sent:** | Thursday, November 15, 2018 8:01 PM |
| **To:** | J L Falwell <jlfjr@earthlink.net>; Coleman, Dennis M. <Dennis.Coleman@ropesgray.com>; |
| **Cc:** | Bruce.Gaffney@ropesgray.com |
| **Subject:** | Proposal |

**Attachments:**     72200503_3.docx;

President Falwell,

Attached for your review is a proposal to be considered by LU in connection with the renegotiation of your employment agreement.

Bruce Gaffney, an actuary in our office, worked with me to put this together. We are simultaneously revising the employment agreement itself, but wanted to send this over to discuss it before we incorporate it into the written documents.

Please note that this proposal is subject to review by the University's compensation consultant. It is really important that they sign off on the numbers to minimize your risk of "intermediate sanctions" by the IRS.

Could you please let us know if you will be available at any time tomorrow to discuss this?

Best regards,

Loretta

Loretta R. Richard
ROPES & GRAY LLP
T +1 617 951 7271 | M +1 617 543 4303
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
Loretta.Richard@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

LUJerry00232354

| | |
|---|---|
| **From:** | Richard, Loretta R. <Loretta.Richard@ropesgray.com> |
| **Sent:** | Friday, November 16, 2018 4:35 PM |
| **To:** | Tower, King F. <ktower@woodsrogers.com>; Corry, David M (Legal Affairs) <dcorry@liberty.edu>; |
| **Cc:** | Dennis.Coleman@ropesgray.com; Bruce.Gaffney@ropesgray.com; jlfjr@earthlink.net |
| **Subject:** | Pres. Falwell Proposal |
| **Attachments:** | 72200503_4.docx; |

King and David,

On behalf of Pres. Falwell, attached is a proposal regarding certain economic changes to his employment agreement.  Please let me know if you would like us to walk you through this.  We should have a discussion with Sibson, to ensure that they can provide an opinion on the payments for purposes of avoiding intermediate sanctions.  It would also be helpful if we could see their report.

We are simultaneously updating his contract in accordance with the attached.  We understand that the parties want the agreement buttoned up by the end of this month.

Thanks very much, and we look forward to talking with you.

Best regards,

Loretta

Loretta R. Richard
ROPES & GRAY LLP
T +1 617 951 7271 | M +1 617 543 4303
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
loretta.richard@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

LUJerry00231381

| From: | Richard, Loretta R. <Loretta.Richard@ropesgray.com> |
|---|---|
| Sent: | Monday, December 03, 2018 11:14 AM |
| To: | J L Falwell <jlfjr@earthlink.net>; |
| Cc: | Dennis.Coleman@ropesgray.com |
| Subject: | FW: Follow up |
| | |
| Attachments: | Liberty President Assessment Results 11 01 18.pdf; |

FYI

Loretta R. Richard
ROPES & GRAY LLP
T +1 617 951 7271 | M +1 617 543 4303
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
loretta.richard@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

---

**From:** Tower, King F. <ktower@woodsrogers.com>
**Sent:** Monday, December 03, 2018 10:54 AM
**To:** Richard, Loretta R. <Loretta.Richard@ropesgray.com>
**Cc:** Coleman, Dennis M. <Dennis.Coleman@ropesgray.com>
**Subject:** RE: Follow up

Loretta:

Thanks for following up -- as it happens, I was just on the phone with the Executive Committee and I received authorization to share the Sibson analysis (see attached).  I know you have already provided me with the key points from BDO's analysis (in your letter over the summer), but if you want to send me their report to facilitate discussion of the differences with Sibson (if any), please do.  Sibson has also analyzed your contract proposals, and I do not yet have any additional written report, but I can discuss that with you when we talk.

I am open to a call just about any time this week, so just let me know what would work best for you.  Thanks.

King

King Tower

Woods Rogers PLC | Celebrating 125 Years: 1893 - 2018
10 S. Jefferson Street, Suite 1400 | Roanoke, VA 24011
P (540) 983-7541 | F (540) 983-7711
ktower@woodsrogers.com
A member of Interlaw, an International Association of Independent Law Firms

NOTICE: This communication from Woods Rogers PLC, including attachments, if any, is intended as a confidential and privileged communication. If received in error, you should not copy, save or reproduce in any manner or form, but delete immediately and notify the sender.

LUJerry00242622

**From:** Richard, Loretta R. <Loretta.Richard@ropesgray.com>
**Sent:** Monday, December 03, 2018 10:20 AM
**To:** Tower, King F. <ktower@woodsrogers.com>
**Cc:** Coleman, Dennis M. <Dennis.Coleman@ropesgray.com>
**Subject:** Follow up

**EXTERNAL EMAIL**

King,

I am following up on the employment agreement that I sent you. I have been working on the SERP, and will be able to send it. I would appreciate if I could get the Sibson report, because it will facilitate a discussion of the economics.

Can we set up a call to discuss this?

Thanks very much,

Best,

Loretta

Loretta R. Richard
ROPES & GRAY LLP
T +1 617 951 7271 | M +1 617 549 4303
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
loretta.richard@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

LUJerry00242623

| | |
|---|---|
| **From:** | Richard, Loretta R. <Loretta.Richard@ropesgray.com> |
| **Sent:** | Wednesday, December 05, 2018 7:40 PM |
| **To:** | J L Falwell <jlfjr@earthlink.net>; |
| **Cc:** | Dennis.Coleman@ropesgray.com; Bruce.Gaffney@ropesgray.com |
| **Subject:** | Revised Proposal |

**Attachments:**   72658399_1.docx; President Falwell Revised Proposal.pdf;

President Falwell,

Attached for your review is a revised proposal, which responds to comments that King Tower made on Monday, together with a numerical illustration.  As I mentioned earlier, we spoke yesterday with Franklin Graham's financial advisor, and he was very helpful.

1.   King indicated that Sibson (the comp consultant) did not like having a defined benefit plan, because it appeared to be too rich.  Accordingly, we have designed a defined contribution plan that we think gets to a similar result.  The difference is that instead of an annuity for your life, you will receive a lump sum payment, on which you will pay taxes when you receive it (at the earliest of 2 years after termination, death or disability).  You would then invest the money in order to provide yourself with an annual income.  This is similar to Franklin Graham, except that he takes his amount into income each year and pays current taxes on it.  It was designed at a time (more than 10 years ago) when tax rates were lower than they are now.  His financial advisor indicated that they might have addressed the timing of the income differently under the current tax regime.

    a.   The initial balance to the credit of your account at the end of 2018 would be $5,609,883.  This number would grow each year under our proposal by $355,000 minus (1) any contribution that LU makes to the 403(b) plan on your behalf, plus (2) interest on the total outstanding balance at a 6% annual rate.

    b.   You would be paid at the earliest of (1) 2 years following your termination of employment (and compliance with the non-compete), (2) death, or (3) disability.

    c.   If you terminate before age 65, you will not receive additional contributions (except interest credits until the amount is paid).  This is similar to how Franklin Graham's plan works.  For example, if you resign employment at the end of 2020, your total account balance would be $6,982,149, which would continue to accumulate interest at 6% until paid.  Of course at that point, you would be age 59, and you could go to work elsewhere other than for another university.  For example, if you wanted to be a Fox commentator, that would not be precluded by the non-compete.  However, if you resign voluntarily, you would receive no additional compensation payments during the non-compete period.

    d.   If you work to age 65, the total account balance at age 67 should be about $14,882,906.  That is what would get paid out, and you would pay tax on that amount.

        i.   For tax purposes, you will have a tax basis in the payment equal to the $14,882,906, so you would not have to pay tax on that amount again.  However, any future interest/dividends/gains on that balance would be subject to tax.

2.   We have converted your two insurance policies into a "split dollar insurance arrangement."   We did this because King indicated that the combination of L{U's premium payments and the retirement was too rich.  Accordingly, if your insurance companies permit it, instead of borrowing from a bank, LU could pay the premiums.  When the death benefit is paid, the aggregate premiums are repaid to LU.  Assuming 7 years of payments (totaling approximately 1,225,000, the net death benefit would be 7,775,000).  You would not pay them any interest, but you would have to pay tax on the imputed interest on the loan at the applicable federal rate (which is a low interest rate) until the death benefit is paid and the aggregate premiums are repaid to LU.  This arrangement is potentially far less expensive, and significantly more convenient, to you than borrowing from a bank.

LUJerry00251320

3.   We included severance provisions so that if you are terminated without Cause or you resign for Good Reason, you would get a lump sum equal to 2 times your base salary.  The effect of this is to provide you with financial means in the event of an unexpected termination.  The only time, under the current arrangement, when you would not have income is for 2 years after you voluntarily resign (if you die or become disabled your entire retirement account is paid out immediately).  We had dealt with this issue before with a deferred signing bonus, but King's view was that this amount would get included in the overall cash compensation and may be too rich.

Please let me know when you are available to discuss on Thursday.  Other than 10:30-11 am ET, I am available to talk.

Once you sign off on the attached, I will send over to King Tower.

Thank you.

Best regards,

Loretta

Loretta R. Richard
ROPES & GRAY LLP
T +1 617 951 7271 | M +1 617 543 4208
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
loretta.richard@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

LUJerry00251321

**Liberty University Board of Trustees**
**Executive Committee Meeting**
**Thursday, April 4 and Friday April 5, 2019**
**Hancock Welcome Center**

**Call to Order**
Harvey Gainey called the meeting of the Executive Committee to order at 7:52 p.m. on April 4, 2019 in the Board Room of the Handcock Welcome Center.  Present:  members Jerry Falwell, Harvey Gainey, Carroll Hudson, Jerry Prevo, and Bud Tinney; non-members General Counsel David Corry, Executive Vice President and Chief Operating Officer Randy Smith, Executive Vice President of Finance Rob Ritz and Vice President of University Support Services Trey Falwell.  Also attending for a portion of the agenda, attorneys Dennis Coleman, Loretta Richard and King Tower.  Member absent: David Rhodenhizer

The meeting opened in prayer offered by Bud Tinney.



Highly Confidential—Attorney's Eyes Only

LibertyJFJ001158



**Executive Session;**
**Process for Concluding Chancellor/President's Contract Negotiations**
At approximately 8:20 p.m., the committee temporarily excused staff and went into executive session with the attorneys present to conclude the process of negotiating the Chancellor/President's contract. Attorneys Dennis Coleman, Loretta Richard and King Tower were invited into the meeting.

Ms. Richard, an attorney with the Ropes & Gray firm representing President Falwell, articulated the rationale for the counter-proposal for President Falwell's position on terms and conditions for President Falwell's contract, including review of a handout booklet entitled Liberty University President Falwell Compensation Term Sheet (see attached). She presented various changes from the current contract concerning salary, bonus, termination payment, severance payment, retirement benefits, whole life insurance policy premiums, and non-competition clauses. She reviewed the format proposed for a split dollar whole life insurance policy and a supplemental executive retirement plan (SERP) targeting 75% of the President's final annual salary with a Rabbi Trust provision.

Trey Falwell re-entered meeting at this point.

Ms. Richard said the President would like the Executive Committee to agree to the compensation package pending a satisfactory reasonableness opinion from a compensation consultant and to agree to engage FW Cook to review the materials gathered in support of the President's compensation counter-proposal.

There was discussion and questions involving the Executive Committee members and all the attorneys regarding the proposal, including the basis for selection of a target of 75% of final salary, the possible entities who could offer a reasonableness opinion, the considerations for

FW Cook, the operation of Rabbi Trusts and the "at risk" principle, payment of the President's legal fees,

Mr. Coleman, another attorney with Ropes and Gray, encouraged the committee to consider the new leagues President Falwell brought the University into and challenged the committee to treat President Falwell as a university in those leagues would.

At this point, attorneys Coleman and Ricard, President Falwell and Trey Falwell were excused from the meeting.

- A motion was made by Bud Tinney to authorize that additional expense of hiring the FW Cook firm for a reasonableness determination on the President's most recent contract proposal with a cap on their fees of $47,500, specifically looking at the proposed SERP at 75% of the President's final annual salary as well at an alternative option of a SERP at 90% of the President's final annual salary, seconded by Carroll Hudson, and carried by the Committee.

- A motion was made by Jerry Prevo to approve a compensation package for the President consistent with the President's current proposal except that the SERP be targeted to 90% of the President's final annual salary, subject to a satisfactory reasonableness determination by FW Cook, seconded by Carroll Hudson, and carried by the Committee.





Highly Confidential—Attorney's Eyes Only

LUADMINREC000727

LibertyJFJ001161



**Call Back to Order**

Harvey Gainey reconvened the Executive Committee and called a meeting to back to order at 8:00 a.m. on April 5, 2019 in the President's Dining Room off the Handcock Welcome Center. Present: members Harvey Gainey, Carroll Hudson, Jerry Prevo, and Bud Tinney; non-members General Counsel David Corry. Members absent: Jerry Falwell and David Rhodenhizer.

**Process for Concluding Chancellor/President's Contract Negotiations (continued)**

In light of the protracted process for negotiating and evaluating the President's contract, there was discussion about offering to pay the President's legal fees and costs upon the conclusion of the process.

- A motion was made by Bud Tinney to offer to reimburse President Falwell's legal fees and costs associated with contract negotiation of the contract amendment and extension upon execution of the resulting new employment agreement, seconded by Jerry Prevo, and carried by the Committee.



**Adjournment**

Chairman Harvey Gainey adjourned the meeting at approximately 8:40 a.m.

Respectfully submitted this _____6th_____ day of November, 2019.

David Corry
General Counsel, Secretary

Liberty University
Lynchburg, Virginia
(as adopted by the Executive Committee on April 5, 2019)

To:     Jerry L. Falwell, Jr., President, Liberty University

From:   Harvey, Gainey, Chairman, Executive Committee of Liberty University Board of Trustees

Date:   April 5, 2019

Re:     Amendment to your Employment Agreement; Adoption of Retirement Program

This memorandum sets forth the outline of the changes to your employment agreement that the Liberty University ("LU") Executive Committee of the Board of Trustees has agreed to, pending the opinion from LU's independent compensation consultant that the arrangement is reasonable under Code Section 4958. For this purpose, LU will have the study completed no later than June 30, 2019.

<u>457(f) Defined Contribution Retirement Plan</u>

- LU will establish a "457(f)" defined contribution retirement plan (the "Plan") for your benefit.

- LU will create a defined contribution account, to which amounts will be credited annually.

- The initial balance of the account will represent the amount that would have been credited in prior years had the Plan been adopted at the date you assumed leadership of LU in 2007, plus interest.  It's intended that the Plan benefits will take into account that your historical compensation, including retirement benefits, was below market.

- The amount to be credited to your account is designed to accumulate sufficient funds so that the actuarial present value will provide you with an annual benefit equal to 90% of your final salary for your lifetime (and the lifetime of your wife, Becki).

- The annual credit will be offset by the maximum amount eligible to be contributed by LU to the LU 403(b) plan on your behalf.

- LU will cease contributing credits to the account upon your termination of employment.  If you terminate employment prior to age 65, the benefit will be reduced.

- The account balance will accumulate interest at 6% annually.

- The account balance will be paid to you (or your beneficiary) in a single lump sum at the earliest of (1) 2 years after termination of employment for any reason other than death or disability (following the expiration of a non-compete), (2) death, or (3) disability.

- For two years following your termination of employment (other than by death or disability), you will be prohibited from competing with LU by becoming an employee, consultant or owner of any post-secondary educational institution.

- LU will establish a rabbi trust to fund payment of your retirement benefits through an initial deposit and annual allocations.

1

LUJerry00263880

<u>Split Dollar Life Insurance</u>

- LU and the owner of the life insurance policies (of which you are the insured) will enter into an agreement under which LU will pay to the insurance companies the premiums on the policies until they are fully paid up, provided that you remain employed by LU.

- Upon payment of the death benefit (or cancellation of the insurance policy), LU will receive a return of its premiums payments in a single lump sum.

- LU will impute taxable interest annually to you on the contributed premiums at the applicable federal rate.

<u>Severance</u>

- Upon a termination of your employment by LU without Cause, or a resignation by you for Good Reason, LU will pay you a single lump sum equal to two times your final pay, and will continue to pay LU's share of your COBRA premium for eighteen months following termination of employment.

<u>2019 Bonus</u>

- If LU achieves budgeted revenue for FY 2019, then you will receive a discretionary bonus equal to 50% of your target bonus.

- If LU achieves $1 million over budgeted revenue for FY 2019, then you will receive a discretionary bonus equal to your target bonus.

LUJerry00263881

| | |
|---|---|
| **From:** | Richard, Loretta R. <Loretta.Richard@ropesgray.com> |
| **Sent:** | Wednesday, May 22, 2019 7:58 PM |
| **To:** | J L Falwell <jlfjr@earthlink.net>; Coleman, Dennis M. <Dennis.Coleman@ropesgray.com>; |
| **Subject:** | FW: Documents for Tomorrow |
| | |
| **Attachments:** | Falwell Presentation.pdf; Falwell Terms of Agreement.pdf; |

All:

We are meeting with FW Cook in DC tomorrow to discuss the analysis.  Attached is a presentation that we put together, which revises the one we provided to the Executive Committee.  We have designed this so that it uses the relevant language that the IRS likes to see in the analysis.

Please let me know if you have any questions.  I will let you know how it goes.

Best,

Loretta

Loretta R. Richard
ROPES & GRAY LLP
T +1 617 951 7271 | M +1 617 943 4309
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
loretta.richard@ropesgray.com
www.ropesgray.com

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

**From:** Richard, Loretta R. <Loretta.Richard@ropesgray.com>
**Sent:** Wednesday, May 22, 2019 6:29 PM
**To:** Tower, King F. <ktower@woodsrogers.com>
**Cc:** Meyer, Abigail (Baird) <abigail.meyer@ropesgray.com>; Gaffney, Bruce C. <Bruce.Gaffney@ropesgray.com>; Oveis, Alec <Alec.Oveis@ropesgray.com>; Richard, Loretta R. <Loretta.Richard@ropesgray.com>
**Subject:** Documents for Tomorrow

King,

Here are the documents that we intend to discuss tomorrow.  We are bringing hard copies with us to our DC office.

See you tomorrow.

Best,

LUJerry00263867

Loretta

**Loretta R. Richard**
**ROPES & GRAY LLP**
T +1 617 951 7271 | M +1 617 543 4300
Prudential Tower, 800 Boylston Street
Boston, MA 02199-3600
loretta.richard@ropesgray.com
www.ropesgray.com

LUJerry00263868

# Liberty University
# Pres. Falwell Employment Arrangements

## May 23, 2019



ROPES & GRAY LLP

LUJerry00263869

# Background

- Founded in 1971 as Lynchburg Baptist College, it was renamed Liberty Baptist College in 1977 and Liberty University ("LU") in 1985
- LU is a private non-profit university that is Christian academic community, with the primary mission of providing a quality collegiate education
- Jerry L. Falwell, Jr. has served as President of LU since 2007
- Since 2007, Liberty University has grown both in size and financial stability, driven by the vision and efforts of Pres. Falwell
- Since 2007, LU's on-line education and distance learning has grown to be the largest on-line education program in the United States, with programs in business, education, psychology religion, counseling and nursing
- Between 2008 and 2017, the University's enrollment increased from 38,000 to over 101,000, about 267%
- Even with the increase in enrollment, the University's selectivity standards remain strong, with 2017 undergraduate admissions at 26.3% of applicants, and graduate school admissions at 32%.
- Vibrant "bricks and mortar" academic programs, including graduate and undergraduate education programs in business, law, medicine and engineering
- NCAA Division I athletics program

2

ROPES & GRAY

# Background

- LU's financial strength has increased materially during Pres. Falwell's tenure as President

- LU's endowment has increased from $3.5 million in 2008 to $1.3 billion in 2017

- According to the National Associate of College and University Business Officers and Commonfund Institute, out of the top 100 endowments of U.S. colleges that manage $1B or more, LU had the third fastest growth rate from 2016 to 2017 (Carnegie Mellon was second and U. Penn was first)

- LU has made a $1B investment in physical infrastructure over past 10 years

- In an effort to make college affordable, LU has kept tuition and fees manageable: in 2008, the total cost was $21,200, and in 2017, the total cost was $30,500, an increase of only 43%

3

ROPES & GRAY

# Background

- LU's growth is evident in its academic programs, enrollment and financial strength

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| On-campus students | 10,462 | 11,309 | 11,918 | 12,155 | 12,572 | 12,644 | 12,932 | 13,850 | 14,386 | 15,175 |
| On-line students | 27,566 | 36,740 | 51,478 | 64,871 | 82,609 | 92,537 | 95,479 | 98,513 | 94,772 | 86,300 |
| Net Assets* | $214,136 | $290,406 | $435,304 | $637,467 | $851,297 | $1,105,937 | $1,427,332 | $1,626,230 | $1,814,742 | $2,104,009 |
| Unrest'd Assets* | $209,347 | $282,160 | $426,575 | $627,798 | $837,925 | $1,090,894 | $1,411,694 | $1,609,667 | $1,798,655 | $2,097,057 |
| Total Endow'nt* | $3,480 | $7,432 | $50,715 | $54,132 | $58,647 | $101,837 | $126,422 | $1,054,487 | $1,028,996 | $1,290,703 |

* In thousands

- In 2012, the University offered 148 undergraduate programs, 53 graduate programs and 1 doctoral program
- In 2017, the University offered 217 undergraduate programs, 144 graduate programs and 4 doctoral programs

4

ROPES & GRAY

LUADMINREC000737 LUJerry00263872

# Background

- Pres. Falwell's historical and current compensation does not reflect his increasing responsibility and the University's growth

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Base | $355,000 | $372,000 | $463,000 | $779,000 | $871,000 | $897,000 | $927,000 | $933,000 | $961,000 | $990,000 |
| Bonus | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 403(b) Plan | $20,700 | $22,050 | $22,050 | $22,050 | $22,050 | $22,950 | $23,400 | $23,850 | $23,850 | $24,300 |
| Other Comp.* | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 |
| Non-taxable benefits* | $18,800 | $18,800 | $18,800 | $18,800 | $18,800 | $18,800 | $18,800 | $18,800 | $18,800 | $18,800 |
| Total |  | 4.48% | 21.27% | 60.90% | 11.02% | 2.9% | 3.19% | 0.66% | 2.83% | 2.89% |

*Based on 2018 data

5

ROPES & GRAY

LUADMINREC000738

LUJerry00263873

# Overview

| Provision | Current | Tentatively Agreed |
|---|---|---|
| Base Salary | $1,050,000 | $1,050,000, subject to review and increase annually |
| Bonus | Discretionary | Discretionary |
| Termination Payment (resignation or by reason of death or disability) | 3 x base salary | $0 |
| Severance Payment | 5 x base salary (without cause termination) | 2 x base salary (without cause or for good reason termination)

COBRA continuation subsidy for 18 months (post-tax) |
| Retirement (including death or disability) | 403(b) plan (approximately $25,000 per year) | 403(b) plan; Supplemental Executive Retirement Plan (SERP) |
| Other terms and conditions | Auto allowance, vacation, LeHaye Student Center membership, LU tuition assistance, subsidy for principal residence upkeep (necessary for University activities) | No change, except LU will provide advances to pay premiums on existing whole life insurance (with return of principal upon payment of death benefit or policy cancellation) |
| Non-competition | During employment | Two years following termination of employment |

6

ROPES & GRAY

# Split Dollar Life Insurance

- There are two whole life insurance policies for which Pres. Falwell pays annual premiums of approximately $174,000

- LU would advance the premiums to the insurance companies, provided that Pres. Falwell remains employed by LU

- Upon payment of the death benefit (or if the policies are cancelled), the insurance company would return the aggregate premiums to LU before the payment of the death benefit to the beneficiaries

- The interest on the advances to pay premiums would be treated as taxable compensation to Pres. Falwell

7

ROPES & GRAY

LUADMINREC000740

LUJerry00263875

# Supplemental Executive Retirement Plan

- LU would establish a 457(f) defined contribution retirement plan for the benefit of Pres. Falwell

- LU would create a defined contribution account to which amounts would be credited annually

  - Initial balance would represent prior years' accumulations

- Plan would be designed to accumulate sufficient funds to provide Pres. Falwell with retirement income at a target of 90% of final base salary, payable annually beginning at age 65

  - Calculated as if payable over the life of Pres. and Mrs. Falwell

  - The annual accrual would be offset by LU's annual contribution to the 403(b) plan for Pres. Falwell

  - The account balance would accumulate interest at 6% annually

- LU would set up a "rabbi trust" to which annual contributions would be made to fund the benefit

- Benefit would be paid in a lump sum two years after Pres. Falwell's termination of employment or, if earlier, upon death or disability

- Pres Falwell would be subject to a two year post-termination non-compete

8

ROPES & GRAY

LUADMINREC000741

LUJerry00263876

# SERP Projection

- Projected Salary at Retirement:          $1,230,000
    - Assumes 2% annual increases

- Projected Retirement Income Target: $1,107,000 (90%)

- Retirement Income (at age 67):          $17,988,750
    - Reduction for University Provided Benefit
                                                              ($1,069,313)

- Target SERP Account Accumulation   $16,919,437

9

ROPES & GRAY

LUADMINREC000742                                                          LUJerry00263877

# Career Compensation
# (with deferred compensation)

| Year | Age | Compensation | Credited Deferred Comp | Estimated Imputed Interest (Split-Dollar Policy) | Total |
|------|-----|--------------|------------------------|--------------------------------------------------|-------|
| 2007 | 45 | $243,000 | $379,750 | N/A | $622,750 |
| 2008 | 46 | $355,000 | $379,300 | N/A | $734,300 |
| 2009 | 47 | $372,000 | $377,950 | N/A | $749,950 |
| 2010 | 48 | $463,000 | $377,950 | N/A | $840,950 |
| 2011 | 49 | $779,000 | $377,950 | N/A | $1,156,950 |
| 2012 | 50 | $871,000 | $377,500 | N/A | $1,248,500 |
| 2013 | 51 | $897,000 | $377,050 | N/A | $1,274,050 |
| 2014 | 52 | $927,000 | $376,600 | N/A | $1,303,600 |
| 2015 | 53 | $933,000 | $376,150 | N/A | $1,309,150 |
| 2016 | 54 | $961,000 | $376,150 | N/A | $1,337,150 |
| 2017 | 55 | $990,000 | $375,700 | N/A | $1,365,700 |
| 2018 | 56 | $1,019,000 | $375,250 | N/A | $1,394,250 |
| 2019 | 57 | $1,050,000 | $374,800 | $5,742 | $1,430,542 |
| 2020 | 58 | $1,071,000 | $374,296 | $11,484 | $1,456,780 |
| 2021 | 59 | $1,092,420 | $373,782 | $17,226 | $1,483,428 |
| 2022 | 60 | $1,114,268 | $373,258 | $22,968 | $1,510,494 |
| 2023 | 61 | $1,136,554 | $372,723 | $28,710 | $1,537,986 |
| 2024 | 62 | $1,159,285 | $372,177 | $34,452 | $1,565,914 |
| 2025 | 63 | $1,182,471 | $371,621 | $40,194 | $1,594,285 |
| 2026 | 64 | $1,206,120 | $371,053 | $45,936 | $1,623,109 |
| 2027 | 65 | $1,230,242 | $370,474 | $51,678 | $1,652,395 |
| | | | 2028 and forward: | impute interest until principal is repaid | |

ROPES & GRAY

LUADMINREC000743

LUJerry00263878

# Projected SERP Accumulation

| Year | Age | Deferred Compensation | Estimated University Provided Retirement Benefit | Credited Net Deferred Comp Amount | Year-end Pre-tax Accumulation (assumes investment earnings at 6% annually) |
|------|-----|----------------------|--------------------------------------------------|-----------------------------------|--------------------------------------------------------------------------|
| 2007 | 45 | $400,000 | $20,250 | $379,750 | $379,750 |
| 2008 | 46 | $400,000 | $20,700 | $379,300 | $781,835 |
| 2009 | 47 | $400,000 | $22,050 | $377,950 | $1,206,695 |
| 2010 | 48 | $400,000 | $22,050 | $377,950 | $1,657,047 |
| 2011 | 49 | $400,000 | $22,050 | $377,950 | $2,134,420 |
| 2012 | 50 | $400,000 | $22,500 | $377,500 | $2,639,985 |
| 2013 | 51 | $400,000 | $22,950 | $377,050 | $3,175,434 |
| 2014 | 52 | $400,000 | $23,400 | $376,600 | $3,742,560 |
| 2015 | 53 | $400,000 | $23,850 | $376,150 | $4,343,264 |
| 2016 | 54 | $400,000 | $23,850 | $376,150 | $4,980,009 |
| 2017 | 55 | $400,000 | $24,300 | $375,700 | $5,654,510 |
| 2018 | 56 | $400,000 | $24,750 | $375,250 | $6,369,030 |
| 2019 | 57 | $400,000 | $25,200 | $374,800 | $7,125,972 |
| 2020 | 58 | $400,000 | $25,704 | $374,296 | $7,927,827 |
| 2021 | 59 | $400,000 | $26,218 | $373,782 | $8,777,278 |
| 2022 | 60 | $400,000 | $26,742 | $373,258 | $9,677,172 |
| 2023 | 61 | $400,000 | $27,277 | $372,723 | $10,630,525 |
| 2024 | 62 | $400,000 | $27,823 | $372,177 | $11,640,534 |
| 2025 | 63 | $400,000 | $28,379 | $371,621 | $12,710,587 |
| 2026 | 64 | $400,000 | $28,947 | $371,053 | $13,844,275 |
| 2027 | 65 | $400,000 | $29,526 | $370,474 | $15,045,406 |

Amount payable at age 67 (after non-compete period ends):     $16,905,018

11

ROPES & GRAY

LUADMINREC000744

LUJerry00263879

| | |
|---|---|
| **From:** | J L Falwell <jlfjr@earthlink.net> |
| **Sent:** | Friday, July 05, 2019 3:18 PM |
| **To:** | Jerry Prevo <alaskajp@juno.com>; |
| **Subject:** | Re: Proposed Changes to Compensation Package |

Again, I am very grateful!

Sent from my iPhone

On Jul 5, 2019, at 1:51 PM, Jerry Prevo <alaskajp@juno.com> wrote:

> Look this over and let know what u think and if i need to recommend changes
>
> JP
> Sent from IPhone
>
>
> Begin forwarded message:
>
>> **From:** Harvey Gainey <h.gainey@hotmail.com>
>> **Date:** July 5, 2019 at 9:46:04 AM AKDT
>> **To:** "Tower, King F." <ktower@woodsrogers.com>, Carroll Hudson
>> <chudson@englanderstoves.com>, Jerry Prevo <alaskajp@juno.com>, "Gilbert Bud Tinney Jr."
>> <mmtinney@comcast.net>, David Rhodenhizer <paparhody@aol.com>
>> **Cc:** "David M. Corry" <dcorry@liberty.edu>
>> **Subject: Re: Proposed Changes to Compensation Package**
>>
>>
>> King, I think FW Cook has just resolved our problem. If we assume Jerry works another 10 years, and
>> we prepare a chart that shows his current
>> salary of $1,050,000, with a 3% increase for each of the next 10 years; Then prepare a chart that
>> takes his current pay to $1,250,000, with a 3%
>> increase for each of the next 10 years; We get an average salary for the last 5 years of $1,331,766
>> using the current salary, and we get an average
>> of $1,584,865 for the last 5 years if we change the current salary to $1,250,000. So, 90% of
>> $1,331,766 is $1,198,589 for annual retirement benefit;
>> whereas, 75% of $1,584,865 is $1,188,649.
>> So, if we follow their advice, his retirement wage would be virtually the same as we have suggested,
>> PLUS, he would collect $2,358,180 more in
>> salary over the next 10 years, not to mention substantially more in bonuses under the program we
>> just initiated (assuming that LU continues to
>> prosper as it is now doing). Either way, we will have more than accomplished our goals.
>> I vote to go with their suggestion, but we still need a short meeting next week to be certain we are all
>> on the same page. We will need to take a couple
>> of votes on the 2 issues, and I want this to be done in an official Committee meeting so no one can
>> question our actions later.
>> David, let's notice a telephone meeting of the committee for 2:00 P.M. EDT next Tuesday (July 9).
>> Thanks to all!
>>
>> Harvey N. Gainey
>> President
>>
>> Gainey Realty and Investment Corp.
>> 1593 Galbraith Ave SE
>> Suite 202 Box 10
>> Grand Rapids, MI?? 49546
>>
>> 616-575-6008

LUJerry00273870

**From:** Tower, King F. <ktower@woodsrogers.com>
**Sent:** Friday, July 5, 2019 12:59 PM
**To:** Harvey Gainey; Carroll Hudson; Jerry Prevo; Gilbert Bud Tinney Jr.; David Rhodenhizer
**Cc:** David M. Corry
**Subject:** Fwd: Proposed Changes to Compensation Package

All:

Please see the e-mail below and attached document for a summary of FW Cook's proposed changes to the President's compensation package. Just let me know if you have any comments or if you want to regroup for another call.  I will provide this to President Falwell's attorney as well, so we can keep this moving. Thanks.

King

King Tower
Woods Rogers PLC
10 S. Jefferson Street, Suite 1400 | Roanoke, VA 24011
P (540) 983-7541 | F (540) 983-7711
ktower@woodsrogers.com
A member of Interlaw, an International Association of Independent Law Firms

Remember to register for one of our 2019 Labor and Employment Seminars starting October 2. Visit
woodsrogers.com/highstakes2019 to register.

NOTICE: This communication from Woods Rogers PLC, including attachments, if any, is intended as a confidential and privileged communication. If received in error, you should not copy, save or reproduce in any manner or form, but delete immediately and notify the sender.

P Please consider the environment before printing this email

Begin forwarded message:

> **From:** Caroline Cubberly <cecubberly@fwcook.com>
> **Date:** July 5, 2019 at 11:50:34 AM CDT
> **To:** "Tower, King F." <ktower@woodsrogers.com>
> **Cc:** Steve Cross <scross@fwcook.com>
> **Subject: Proposed Changes to Compensation Package**
>
> **EXTERNAL EMAIL**
>
> Hi King,
>
> Hope you had a great 4th and are enjoying your time in West Texas.
>
> Following up on our call last week, the attached document outlines our proposed changes to President Falwell's proposed compensation package. The three changes we've indicated are to 1. Increase his current salary from $1,050,000 to $1,250,000, 2. Bring the target SERP funding from 90% of final pay to 75% of final 5-year average pay, and 3. Ensure that the non-compete applies to the full SERP account balance. Based on our proposed changes, the difference in the target total SERP is nominal (less than $900K) so we don't see a need to change anything else about the structure of the SERP. Note that the document is a working draft so it is open for discussion and feedback.
>
> Let us know if you have any questions or if you would like to set up a call next week to discuss.
>
> Thanks,
> Caroline
>
> Caroline Cubberly
> CONSULTANT
> ------------------------------------------
> Direct: 713.427.8308
> Main: 713.427.8300
> Mobile: 832.248.5622
> Email: caroline.cubberly@fwcook.com
> FW Cook
> Two Allen Center
> 1200 Smith Street, Suite 1100
> Houston, TX 77002
> FWCOOK.COM

LUJerry00273871

LUADMINREC000747

LUJerry00273872

**Liberty University Board of Trustees**
**Executive Committee Meeting Minutes**
**Wednesday, July 10, 2019**

**Call to Order**

Chairman Harvey Gainey called the telephone conference meeting of the Executive Committee to order at 2:05 p.m. on July 10, 2019. **Present:** members Harvey Gainey, Carroll Hudson, David Rhodenhizer and Bud Tinney (Jerry Prevo joined later in the call as noted below); non-members General Counsel David Corry and attorney King Tower.   **Absent:** member Jerry Falwell was excused due to the subject matter of the meeting.

**Discussion of President's Contract and Retirement Benefits**

████████████████████████████████████████████████████████████████████████

At this point, Jerry Prevo joined the telephone conference call.

████████████████████████████████████████████ Chairman Harvey Gainey suggested, in order to act on the recommendations of F. W. Cook, separating the pending question into two points for discussion and motions, the first being employment period compensation and the second being retirement period compensation.  The discussion was thus undertaken.

- A motion was made by Jerry Prevo to offer to President Falwell that the terms of his latest contract proposal generally be amended as follows:  a) extend it from 5 years to 11 years in length; b) increase the 2019-2020 base salary to One Million Two Hundred Fifty Thousand Dollars; and c) continue present practice of annual increases of 3 percent to the base salary for the length of the contract, all subject to a reasonableness determination of F. W. Cook; seconded by Bud Tinney, and carried by the Committee.

- A Motion was made by Carroll Hudson to offer to President Falwell that the terms of his contract include establishment of an annual retirement benefit to achieve annual compensation of seventy-five percent of the average annual salary for his last five years of full time employment as President of the University, subject to a reasonableness determination of F. W. Cook; seconded by David Rhodenhizer, and carried by the Committee.

Highly Confidential—Attorney's Eyes Only
LibertyJFJ001165

**Adjournment**

Chairman Harvey Gainey adjourned the telephone conference meeting at approximately 2:27 p.m.

Respectfully submitted this ___ day of November, 2019

David Corry
General Counsel, Secretary

Highly Confidential—Attorney's Eyes Only

LibertyJFJ001166

| | |
|---|---|
| **From:** | Harvey Gainey <h.gainey@hotmail.com> |
| **Sent:** | Wednesday, July 10, 2019 2:40 PM |
| **To:** | jlfjr@earthlink.net <jlfjr@earthlink.net>; |
| **Subject:** | CONTRACT |

We have just finished our Executive Committee meeting. We adopted two motions:

First one is to amend President Falwell's current contract to reflect:

...11 years in lieu of 5 years;

...Change current base salary to $1,250,000

...Provide for an annual increase of 3% Annually for the length of the contract, subject each year to a favorable review of the President

by the Executive Committee.

The second motion approved is:

...Establish President's Falwell's annual retirement benefit at 75% of the average annual salary for his last 5 years ofn full-time employment as President of LU.

The retirement benefit annually would be $1,188,635 based on all the assumptions in these two motions.


Harvey N. Gainey
President

Gainey Realty and Investment Corp.
1593 Galbraith Ave SE
Suite 202 Box 10
Grand Rapids, MI?? 49546

616-575-6008



DRAFT
8/21/2019

# Liberty University
# President Compensation Review
## Board of Trustees Meeting

Steven L. Cross
Frederic W. Cook & Co., Inc.
1200 Smith Street, Suite 1100
Houston, Texas 77002
scross@fwcook.com
713.427.8300



NEW YORK | CHICAGO | LOS ANGELES | SAN FRANCISCO | ATLANTA | HOUSTON | BOSTON

LUJerry00347324

# Summary of Contents

- Background and Objectives

- Character and Condition of Organization

- Qualifications, Skills and Experience of Incumbent

- Proposed Compensation Arrangements

- Evaluation Approach and Methods

- History of Compensation Program

- Explanation of Proposed SERP Benefit

- Market Summary Findings

- Market Evaluation

- Reasonableness Opinion

- Appendices:

    - A: Peer Group Pay Details

    - B: Compensation Tally Sheet

    - C: Proposed SERP Projection



2

LUJerry00347325

# Background & Objectives

- FW Cook was retained by the Board of Trustees ("Board") of Liberty University ("Liberty" or "the University") to evaluate the proposed compensation arrangements for the President of the University, Mr. Jerry L. Falwell, Jr. ("the President" or "President Falwell") under his employment agreement, which has been proposed for amendment as of April 5, 2019 ("the Proposed Agreement").

- This evaluation was conducted in accordance with our firm's standards for evaluating executive compensation arrangements among tax-exempt organizations pursuant to the requirements of Section 4958 of the Internal Revenue Code, commonly referred to as the "intermediate sanctions" legislation, and is intended to meet these objectives:

  - Provide the Board with current market comparability data for its consideration in evaluating proposed compensation arrangements for President Falwell;

  - Evaluate the market competitiveness of the President's total compensation arrangements, including all material forms of compensation provided (base salary, bonus, deferred compensation, supplemental benefits, and other taxable compensation); and

  - Support the Board with its governance responsibilities by providing our opinion on the reasonableness of the President's total compensation arrangements and helping to establish the "rebuttable presumption of reasonableness" under Section 4958 and applicable regulations.

- This report incorporates our detailed market evaluation process, including appropriate background and context regarding the University and the President, FW Cook's assessment of the President's current and proposed compensation arrangements, and our opinion on the reasonableness thereof.



3

# Character and Condition of Organization
## University Background

- Liberty University is a Christian academic university located in Lynchburg, Virginia with a mission to provide a quality collegiate education.

- The University was founded by Dr. Jerry Falwell in 1971 and is today under the leadership of Dr. Falwell's son, Jerry Falwell Jr., who has served as president and chancellor of the University since 2007.

- Since President Falwell succeeded his father as president, the University has been on an extraordinary growth trajectory. In just over a decade, the University's student body (online and residential) has grown by nearly 270%, $1 billion have been invested into the University's physical infrastructure, and what was a virtually non-existent endowment has grown to over $1.7 billion in cash and investments.

- The following statistics demonstrate the highly unique and prolific nature of the University, which is largely attributable to President Falwell's leadership[1]:

  - Campus: Spans over 7,000 acres with over 380 buildings and structures
  - Enrollment: Exceeds 100,000 students (including online enrollment)
  - Academic Programs: Over 600 unique programs of study and over 17 colleges and schools
  - Faculty: Over 2,500 full and part-time faculty members
  - Athletics: 20 NCAA Division I athletic programs and over 40 Club Sports teams

- President Falwell's dramatic transformation of the University has led it to become the second largest private nonprofit university in the nation and the largest online education and distance learning program.

- According to the National Association of College and University Business Officers and Commonfund Institute, Liberty had the third fastest growth rate from 2016 to 2017[2], and based on information we've obtained from the University, we understand that the current growth rate is expected to continue.

 FW COOK

[1] Source: https://www.liberty.edu/aboutliberty/index.cfm?PID=6925
[2] Out of the top 100 endowments of U.S. colleges that manage $1B or more

4

# Qualifications, Skills and Experience
## Executive Background

- In 1987, President Falwell earned his Juris Doctor and became general counsel of the University and its related organizations. In this role, he was instrumental in keeping the University out of bankruptcy and strengthening the University's financial condition.

- In addition to his legal career, in his early years at the University, President Falwell was also involved in commercial real estate development, enabling him to acquire land for the University and recruit national retail and restaurant chains to the surrounding areas, which contributed significantly to the University's growth.

- For two decades prior to becoming president, President Falwell served as his father's "right-hand man" and strategic advisor, the impact of which was significant to the University's future growth.

- Accordingly, with his multi-faceted skillset and in-depth University experience, President Falwell was able to lead Liberty University to its current position in a reasonably brief period of time. The table below summarizes the significant transformation of the University during President Falwell's tenure as President[1]:

|                     | 2008    | 2017      | Total Growth (%) |
|---------------------|---------|-----------|------------------|
| On-campus Students  | 10,462  | 15,175    | 45%              |
| On-line Students    | 27,566  | 86,300    | 213%             |
| Net Assets          | 214,136 | 2,104,009 | 883%             |
| Unrestricted Assets | 209,347 | 2,097,057 | 902%             |
| Total Endowment     | 209,347 | 1,290,703 | 517%             |

- The University's financial transformation under President Falwell's leadership has enabled it to increase its academic program offerings, expand enrollment (while maintaining selectivity), build and acquire new buildings, expand its footprint, and contribute to significant growth in the Lynchburg community.



[1] Source: University provided financials

5

LUADMINREC000755

LUJerry00347328

# Proposed Compensation Arrangements
## Terms of the Proposed Agreement

Mr. Falwell's compensation arrangements under the terms of the Proposed Agreement include the following:

- Base Salary: $1,250,000 subject to annual review and adjustment by the Board
- Bonus: Discretionary, intended as highly limited and only in cases of extraordinary development
- Retirement:
  - 403(b) plan tax-deferred annuity plan contributions
  - Supplemental Executive Retirement Plan (SERP)[1]
    - ○ Liberty will establish a 457(f) defined contribution plan, to receive annual contribution credits
    - ○ The initial balance would represent prior years' deemed accumulations dating back to 2007
    - ○ The Plan will pay out in a lump sum value designed to target a retirement benefit of 75% of final 5-year average salary, net of tax withholding, payable over the life of President and Mrs. Falwell
    - ○ The annual SERP contribution credit would be offset by Liberty's annual contribution to the 403(b) plan
- Split Dollar Life Insurance: Liberty will pay premiums on existing whole life insurance (with return of principal upon payment of death benefit or policy cancellation) for each year President Falwell remains at Liberty
- Severance: 2x base salary and COBRA continuation subsidy for 18 months (post-tax) on termination without cause or for Good Reason
- Non-competition: Two years following termination of employment
- Other Terms: Auto and mobile phone allowance, vacation, student center membership, tuition assistance, subsidy for residence upkeep

[1] Subject to a substantial risk of forfeiture if President Falwell fails to comply with the terms of his 2-year non-compete commitment future credits subject to future service requirements. Full vesting of account balance to occur in the event of death or disability.

FW COOK

6

LUJerry00347329

# Evaluation Approach and Methods
# Peer Group Development

- To create a peer group of "similarly situated" higher education institutions to Liberty University ("Peer Group"), in accordance with the intermediate sanctions' regulations, FW Cook conducted a peer screening evaluation, including the following work steps:

  1. We first screened for U.S.-based national universities, including only nonprofit, private universities, excluding state public universities where Form 990 total compensation data are not available.

  2. We then refined our list to include universities with comparable reported revenues, assets, and operating expenses defined as approximately one-half to two times Liberty University.

  3. To further refine the list, preference was given: 1) to organizations with religious affiliation, and 2) to those we believe may compete more directly with Liberty University for faculty and students.

  4. We also considered peers previously identified in Liberty's most recent compensation study and included organizations that we believe continue to be most comparable to Liberty, as detailed above.

- The resulting Peer Group includes 24 private universities and colleges that we included in our competitive market assessment of the President's compensation, summarized on the next page.



7

LUJerry00347330

# Evaluation Approach and Methods
## Peer Group Development (cont'd)

- The Peer Group at right includes those universities FW Cook considers to be most comparable to Liberty in terms of mission, size, scope and stature.

- Liberty's annual revenues and assets are near the Peer Group median, with operating budget in the second quartile; student enrollment is top decile.

- In FW Cook's opinion, the Peer Group reflects a competitive group of university peers that are relevant and appropriate for compensation comparison purposes and satisfies the IRC Section 4958 requirements for appropriate "market comparability data."

| Organization | Location | Most Recent Financials ($000s)[1] | | | Student Enrollment[2] |
| --- | --- | --- | --- | --- | --- |
| | | Assets | Revenue | Expenses | |
| Emory University | Atlanta, GA | $ 13,213 $ | 4,066 $ | 3,727 | 14,263 |
| Northwestern University | Evanston, IL | 14,486 | 2,955 | 2,767 | 22,008 |
| Carnegie Mellon University | Pittsburgh, PA | 3,782 | 2,177 | 1,742 | 13,869 |
| University Of Notre Dame | Notre Dame, IN | 14,939 | 2,076 | 1,512 | 12,467 |
| Vanderbilt University | Nashville, TN | 6,818 | 1,622 | 1,492 | 12,592 |
| Georgetown University | Washington, DC | 3,148 | 1,558 | 1,411 | 19,005 |
| Northeastern University | Boston, MA | 2,870 | 1,505 | 1,412 | 21,489 |
| Syracuse University | Syracuse, NY | 2,855 | 1,358 | 1,260 | 22,484 |
| Drexel University | Philadelphia, PA | 1,965 | 1,338 | 1,296 | 24,190 |
| Case Western Reserve University | Cleveland, OH | 3,109 | 1,156 | 1,143 | 11,824 |
| Tulane University | New Orleans, LA | 2,519 | 1,129 | 1,086 | 12,384 |
| Boston College Trustees | Chestnut Hill, MA | 4,694 | 1,082 | 999 | 14,628 |
| Baylor University | Waco, TX | 2,802 | 1,018 | 986 | 17,059 |
| Howard University | Washington, DC | 1,472 | 980 | 951 | 9,392 |
| St. Louis University | St. Louis, MO | 2,267 | 968 | 956 | 14,581 |
| Fordham University | Bronx, NY | 1,909 | 837 | 801 | 16,037 |
| American University | Washington, DC | 2,000 | 815 | 734 | 13,858 |
| St Johns University New York | Jamaica, NY | 1,507 | 781 | 731 | 21,340 |
| Texas Christian University | Fort Worth, TX | 2,931 | 780 | 656 | 10,489 |
| Depaul University | Chicago, IL | 1,625 | 776 | 721 | 22,769 |
| Loyola University Of Chicago | Chicago, IL | 2,143 | 762 | 718 | 16,673 |
| Southern Methodist University | Dallas, TX | 2,884 | 750 | 703 | 11,789 |
| Southern New Hampshire University | Manchester, NH | 645 | 690 | 595 | 90,955 |
| University Of Dayton | Dayton, OH | 1,626 | 687 | 628 | 10,882 |
| 24 Organizations | | | | | |
| 75th Percentile | | 3,306 | 1,518 | 1,412 | 21,377 |
| Median | | 2,828 | 1,050 | 992 | 14,605 |
| 25th Percentile | | 1,951 | 781 | 729 | 12,446 |
| Liberty University | Lynchburg, VA | $ 2,572 $ | 1,111 $ | 877 | 75,044 |

[1] Source: GuideStar - Most recently filed form 990s.

[2] Source: Enrollment figures from National Center for Education Statistics.

FW COOK

8