# History of Compensation Program

- When President Falwell became President of the University in 2007, his salary was less than $250,000 and it remained below $500,000 until 2011.

- From 2011 to 2017, President Falwell's salary ranged from $700,0000 to just under $1,000,000, and it was not until 2018 that his salary exceed $1,000,000.

- Until this point in time, President Falwell received no retirement benefits beyond his University provided 403(b) contributions, the value of which has ranged between $20,000 to $25,000 annually, a significantly below-market situation that the Board wished to rectify.

- President Falwell has not received any bonuses during his tenure as President, despite the extraordinary growth the University experienced under his leadership, and he has received a below-market salary for many years.

- The Board has recently determined that President's Falwell's compensation during his presidency has not been commensurate with his contributions to the University, and that keeping President Falwell engaged at Liberty for his foresight, strategy and leadership is critical to the University achieving its long-range plans for future growth and development.

- These determinations culminated in the Board's decision to provide President Falwell with a supplemental retirement benefit, as described in greater detail on the following page. The benefit is intended to recognize President Falwell's efforts and achievements as President to-date, and to ensure his retention as University President for roughly the next ten years until he retires.



9

LUJerry00347332

# Explanation of Proposed SERP Benefit

- President Falwell's proposed SERP benefit is designed to fund a retirement benefit over the 22-year period beginning in 2007, when President Falwell was appointed President of the University, and ending in 2029, which assumes retirement at age 65 (year 2027), plus an additional two-year non-compete period.

- Based on the terms of the Proposed Agreement, President Falwell's targeted SERP of 75% of final average pay would be funded over his 20 years as President plus the two-year non-compete period, or 3.4% of accrued benefit being credited for each year of service provided (75% ÷ 22 = 3.4%).

- *Mercer's Executive Benefits and Perquisites Report for Tax*-Exempt Organizations reports that the median life income benefit for target (DB) benefit plans is 50% to 65% of final average earnings (defined as base salary plus annual incentive) for 25 to 30 years of service, or approximately 2% benefit accrual per year of service.

- In our experience, executive retirement programs tend to be more generous than all employee plans, and for individuals at the top of the organization (e.g., Presidents and CEOs) annual contributions between 2.5% to 3% is considered market typical; with 3% to 3.5% considered as above-average but still reasonable; and 4% might be considered top of market.

- Accordingly, based on our evaluation of nonqualified retirement plans like that being proposed, we find President Falwell's annual accrual of 3.4% to be above-average but within the range of reasonableness.

- For purposes of this study, President Falwell's SERP benefit was also evaluated on a dollar basis by including the annual accrual (approximately $360,000 net of annual 403(b) contributions) in the calculation of President Falwell's proposed total compensation, which was examined against the Peer Group[1].

- See Appendix C for detail on President Falwell's SERP projection.

FW COOK  [1] Our SERP projections rely on assumptions provided by Ropes & Gray and have been reviewed and verified by Ropes & Gray.   10

# Market Summary Findings
## Total Compensation Assessment

- The table below summarizes President Falwell's proposed total annual compensation compared to the Peer Group findings, inclusive of salary, incentives, deferred compensation and benefits.

  - President Falwell's total annual cash compensation falls between the 75th percentile and 90th percentile.

    o Total annual cash for President Falwell includes base salary under the Proposed Agreement of $1.25M and assumes no bonus payment (President Falwell has historically not received bonuses and under the terms of the Proposed Agreement, discretionary bonus payments are only to be provided in years in which extraordinary development has occurred).

  - The President's proposed total compensation of approximately $1.67M falls just below the Peer Group 75th percentile.

    o Total compensation for President Falwell includes amounts referenced above plus estimated 2019 annual deferred compensation contributions (403(b) and SERP), imputed interest on the split-dollar insurance policy, tax deductible health and welfare benefits, and other allowances and expenses.

  - See Appendix A for Peer Group pay details and Appendix B for the President's total compensation tally sheet.

### President vs Peer Group Findings ($000s)

|  | Liberty (Proposed) | Peer Group Findings[1] | | | Market Findings[2] | | |
|---|---|---|---|---|---|---|---|
|  |  | 50P | 75P | 90P | 50P | 75P | 90P |
| Base Salary | $1,250 | $817 | $919 | $1,091 | 153% | 136% | 115% |
| Total Cash Compensation | $1,250 | $910 | $1,161 | $1,388 | 137% | 108% | 90% |
| Total Compensation | $1,672 | $1,231 | $1,744 | $1,986 | 136% | 96% | 84% |

[1] Peer 990 data are updated to a common effective date of July 1, 2019, using an aging factor of 3.0%

[2] Market findings reflects the President's compensation as a percentage of market data at each percentile



LUADMINREC000761

LUJerry00347334

# Market Summary Findings
## Executive Benefits and Perquisites

- In addition to the annual cash compensation provided to President Falwell, the Proposed Agreement also provides certain benefits and perquisites. Following below is our assessment of each material item in President Falwell's benefit package, based on our understanding of the market for each benefit:

| Provision | Proposed Benefit | FW Cook Observation |
|---|---|---|
| Retirement | • 403(b) plan<br>• SERP funded at 75% of 5-year final average base salary<br>• Estimated annual deferred compensation accrual of $385,000[1]<br>• Liberty will pre-fund that portion of the SERP that has already been accrued based on past service since 2007 | • 75% SERP is an above-average contribution but reasonably places President Falwell at the 75th percentile of market data, commensurate with his superior performance |
| Split Dollar Life Insurance | • University provided split dollar life insurance program<br>• Estimated annual imputed interest of $5,742 | • Not highly prevalent due to significant capital outlay, but highly effective for long-term retention and retirement accumulation<br>• Cost to University is nominal after premium repayment provision is considered |
| Health and Welfare Benefits | • Eligible for all regular health and welfare benefits provided to other regular full-time employees.<br>• Estimated annual value of $16,144 | • Consistent with market practices |
| Automobile Allowance | • Annual allowance of $9,000 for University-provided automobile for business and personal use | • Consistent with market practices among universities nationally |
| Mobile Phone Allowance | • Annual allowance of $6,000 for University-provided mobile device for business and personal use | • Technology allowance of up to $500 per month is reasonable and customary for university presidents |
| Subsidy for Principal Residence Upkeep | • Benefit is available, but has not been used in the past and will likely not be utilized by President Falwell in the future | • Most university presidents are provided with housing, inclusive of all maintenance, utilities and staff support services, typically in a range of $100,000-$250,000 annually<br>• Because the University does not provide this benefit, it is reasonable to consider other compensation or benefits up to this amount, e.g., the SERP, as provided in lieu of housing |

[1]Our SERP projections rely on assumptions provided by Ropes & Gray and have been reviewed and verified by Ropes & Gray.  12

LUADMINREC000762          LUJerry00347335

# Market Evaluation
# Summary of Findings

- Based on President Falwell's significant qualifications, skills, experience, and superior performance by all measures (academic, financial and non-financial), FW Cook assessed his value to Liberty University as being in the upper quartile for comparable roles among private universities.

- FW Cook has reviewed the proposed total compensation program to be provided for President Falwell and, on an overall basis, we find total compensation provided to be reasonable and within the range of market comparability data we obtained for comparison purposes.

  - Compared to the market, FW Cook finds that President Falwell's proposed total compensation amount of approximately \$1.67M falls just below the 75th percentile of the Peer Group of similarly situated higher education universities and is reasonable on that basis.

  - Further, it is FW Cook's opinion that the executive benefits and perquisites provided to President Falwell are typical among like organizations and reasonable on the basis that they are provided for business purposes and ultimately contribute to the advancement of the University.

  - Also, because President Falwell does not receive a housing allowance, typical among university presidents, other compensation provided (e.g., the SERP) can be considered as in lieu of such benefit to the extent it may be above the average retirement benefit, offset by a below average (zero) housing benefit.

  - We also find that President Falwell is uniquely valuable to the University because not only has he successfully transformed the university since his appointment as President, he is a nationally recognized figurehead of the University and is therefore a singularly unique and irreplaceable figure to the University.

- While President Falwell's accomplishments have been significant and the University has experienced tremendous success, his role in executing the University's go-forward vision is essential, particularly related to his foresight, strategy and leadership in achieving the University's long-range plans for university growth and development.

 FW COOK

13

# Reasonableness Opinion

- Tax-exempt organizations are prohibited from using their income for the benefit of "insiders" and private individuals. An exception to this prohibition is the payment of reasonable compensation.  In prior years, violation of the "private inurement / private benefit rule" resulted in loss of the organization's tax-exempt status. Because this sanction was so severe, it was not widely utilized and had not been an effective tool for the IRS. Thus, the IRS sought legislation providing for a less onerous "intermediate sanction" (while retaining the ultimate sanction of revoking tax-exempt status).

- The Taxpayer Bill of Rights 2, signed into law in 1996, enacted new penalty taxes applicable to Section 501(c)(3) or 501(c)(4) organizations that engage in "excess benefit transactions." An "excess benefit transaction" is any economic benefit which is provided to a "disqualified person" at other than fair market value or involves the payment of compensation that is found to be unreasonable. A "disqualified person" is any person in a position to exercise substantial influence over the affairs of the organization, such as officers and directors. Penalties include:

    - A tax on the recipient equal to 25% of the excess benefit, which increases to 200% if the violation is not corrected by repaying the excess to the organization.

    - Penalty taxes can also be imposed on the organization's trustees, directors or officers (the "Organization Managers") who approved the arrangement, if they did so knowing it to be excessive.

    - The tax on Organization Managers is 10% of the excess benefit up to a maximum of $20,000 per transaction on a joint and several basis.



14

LUJerry00347337

# Reasonableness Opinion (cont'd)

- The law contains an important protective provision, referred to as the "rebuttable presumption" of reasonableness. If certain requirements are satisfied, the compensation paid is presumed to be reasonable, unless the IRS can demonstrate it to be unreasonable on the basis of sufficient contrary evidence. The following steps are required to establish this presumption:

  - The compensation arrangement is approved by the independent members of the board (or a committee comprised entirely of independent directors).

  - The board or committee obtains and relies upon appropriate data as to comparability, e.g., compensation paid by similarly-situated organizations for positions of similar scope of responsibility.

  - The board or committee adequately documents the basis for its determination (e.g., the record includes the elements of compensation considered, the decisions made and the rationale for the decision).

- We reviewed the program described herein in accordance with our firm's standards for evaluating executive compensation programs among tax-exempt organizations under the "intermediate sanctions" law, Section 4958 of the Internal Revenue Code and the regulations thereunder, and certify that we regularly perform evaluations of this type on an independent fee basis, and are qualified to express an opinion on the program.

- We compared President Falwell's compensation program to that of functionally comparable positions among similarly situated organizations providing similar services, taking into consideration the comparative market data, the size and scope of the University's operations, organizational complexity, the skills, qualifications, experience and performance of the President, and the President's historical compensation and retirement benefit accruals. In FW Cook's opinion, the compensation program evaluated herein falls within a reasonable range of competitive market practices for like positions among like organizations providing like services and is therefore reasonable.

**FW COOK**

15

# Appendices



16

LUADMINREC000766

LUJerry00347339

## Appendix A

## Liberty University
## Peer Group Pay Details – University President

| | | Cash Compensation ($000s)[1] | | | | Additional Compensation | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Base | Bonus or Incentive Paid | | Total | Retirement & | Nontaxable | Other Cash | Total |
| Organization | Position | Salary | $ Amt | % Base | Cash | Deferred | Benefits | & Expenses | Comp |
| American University | President | $754 | $0 | 0% | $754[2] | $28 | $22 | $1 | $805 |
| Baylor University | President | $502 | $0 | 0% | $502 | $109 | $51 | $37 | $699 |
| Boston College Trustees | Chancellor | n/a | n/a | n/a | n/a[3] | n/a | n/a | n/a | n/a |
| Carnegie Mellon University | President/Ex-Officio Trustee | $899 | $537 | 60% | $1,436[4] | $151 | $52 | $257[5] | $1,897 |
| Case Western Reserve University | President/Ex-Officio Trustee | $779 | $618 | 79% | $1,397 | $323 | $34 | $235[6] | $1,988 |
| Depaul University | President & Trustee | $568 | $223 | 39% | $790 | $24 | $63 | $83 | $960 |
| Drexel University | President | $841 | $236 | 28% | $1,077 | $335 | $17 | $367 | $1,797 |
| Emory University | President | $816 | $0 | 0% | $816 | $130 | $29 | $248 | $1,223 |
| Fordham University | President | n/a | n/a | n/a | n/a[7] | n/a | n/a | n/a | n/a |
| Georgetown University | President & BOD Member | $646 | $484 | 75% | $1,130 | $26 | $199 | $215 | $1,570 |
| Howard University | President | $1,091 | $0 | 0% | $1,091 | $23 | $23 | $152 | $1,288 |
| Loyola University Of Chicago | University President | $356 | $0 | 0% | $356 | $0 | $94 | $0 | $450 |
| Northeastern University | President/Trustee | $926 | $215 | 23% | $1,141 | $172 | $180 | $93 | $1,586 |
| Northwestern University | President | $1,069 | $215 | 20% | $1,304 | $231 | $221 | $213[8] | $1,969 |
| Southern Methodist University | President/Trustee | $792 | $376 | 48% | $1,168 | $28 | $176 | $88 | $1,460 |
| Southern New Hampshire University | President/CEO | $888 | $0 | 0% | $888 | $25 | $24 | $83 | $1,020 |
| St Johns University New York | President | $651 | $0 | 0% | $651 | $33 | $47 | $6 | $737 |
| St. Louis University | President | $739 | $0 | 0% | $739 | $28 | $3 | $3 | $774 |
| Syracuse University | Chancellor & President | $757 | $0 | 0% | $757 | $190 | $142 | $27 | $1,116 |
| Texas Christian University | Chancellor | $1,173 | $0 | 0% | $1,173 | $517 | $207 | $1,699[9] | $3,596 |
| Tulane University | President | $932 | $0 | 0% | $932 | $28 | $16 | $263 | $1,239 |
| University Of Dayton | Secretary of the BOD/President | $818 | $0 | 0% | $818[10] | $7 | $37 | $30 | $892 |
| University Of Notre Dame | President & Trustee | $877 | $0 | 0% | $877 | $0 | $169 | $89 | $1,136 |
| Vanderbilt University | Chancellor | $1,125 | $3,116 | 277% | $4,241 | $319 | $24 | $63 | $4,646 |
| 22 Executives | | | | | | | | | |
| 75th Percentile | | $919 | $233 | 36% | $1,161 | $185 | $163 | $230 | $1,744 |
| Median | | $817 | $0 | 0% | $910 | $31 | $49 | $89 | $1,231 |
| 25th Percentile | | $743 | $0 | 0% | $765 | $25 | $24 | $32 | $909 |

Footnotes:

[1] Peer 990 data are updated to a common effective date of July 1, 2019, using an aging factor of 3.0%
[2] This executive started in June 2017; base salary has been annualized.
[3] This executive does not receive compensation for his services and was excluded from this analysis.
[4] This executive received a severance benefit in conjunction with termination of employment in June 2017; to account for this, captured prior 3-year average retirement and other deferred compensation amount.
[5] Excludes $120,000 of previously reported compensation.
[6] Excludes $237,500 of previously reported compensation.
[7] This executive does not receive compensation for his services and was excluded from this analysis.
[8] Excludes $100,000 of previously reported compensation.
[9] Excludes $1,310,000 of previously reported compensation.
[10] This executive started in July 2016; base salary has been annualized.



17

Liberty University
Compensation Tally Sheet[1]

| Compensation Element | 2015 | 2016 | 2017 | 2018 | 2019 (Est.) | 2020 (Est.) | 2021 (Est.) | 2022 (Est.) |
|---|---|---|---|---|---|---|---|---|
| Cash Compensation | | | | | | | | |
| Base Salary Rate[1] | $933,000 | $961,000 | $990,000 | $1,019,000 | $1,250,000 | $1,275,000 | $1,300,500 | $1,326,510 |
| Discretionary Bonus[2] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Annual Cash | $933,000 | $961,000 | $990,000 | $1,019,000 | $1,250,000 | $1,275,000 | $1,300,500 | $1,326,510 |
| Deferred Compensation | | | | | | | | |
| Annual 403(b) Contributions[1] | $23,850 | $23,850 | $24,300 | $24,750 | $25,200 | $25,704 | $26,218 | $26,742 |
| Annual SERP Contributions[3] | $0 | $0 | $0 | $0 | $359,800 | $359,296 | $358,782 | $358,258 |
| Total Deferred | $23,850 | $23,850 | $24,300 | $24,750 | $385,000 | $385,000 | $385,000 | $385,000 |
| Non-taxable Benefits | | | | | | | | |
| Tax Deductible Health & Welfare Premiums[4] | $14,127 | $14,520 | $14,862 | $15,744 | $16,114 | $16,493 | $16,880 | $17,277 |
| Split Dollar Insurance Coverage | $0 | $0 | $0 | $0 | $5,742 | $11,484 | $17,226 | $22,968 |
| Housing Allowance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Tuition Reimbursement[5] | $5,677 | $6,299 | $6,584 | $3,398 | $0 | $0 | $0 | $0 |
| Total Non-taxable Benefits | $19,804 | $20,819 | $21,445 | $19,142 | $21,856 | $27,977 | $34,106 | $40,245 |
| Taxable Benefits | | | | | | | | |
| Mobile Phone | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 | $6,000 |
| Automobile | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 | $9,000 |
| Total Taxable Benefits | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 |
| Total Annual Compensation | $991,654 | $1,020,669 | $1,050,745 | $1,077,892 | $1,671,856 | $1,702,977 | $1,734,606 | $1,766,755 |

Footnotes:

(1) Assumes proposed 2019 salary per Proposed Agreement and 2% annual increase for years 2020-2022

(2) Assumes no discretionary bonus paid for years 2019-2022 (intended as highly limited and only in cases of extraordinary development)

(3) Annual SERP benefit accrual ($385,000) offset by Liberty's annual contribution to the 403(b) plan

(4) Assumes 2.35% annual increase for 2019-2022

(5) The tuition amount decreased in 2018 because the last remaining dependent at LCA graduated in May 2018, and is now attending Liberty University under scholarships that are directly applied to the student account

[1] All data and assumptions provided by Ropes & Gray.



18

# Appendix C

## Liberty University
### Proposed SERP Projection[1]

- Projected Final 5-year Average Salary at Retirement: $1,408,255 (assumes retirement at age 65)
- Projected Retirement Income Target: $1,056,191 (75% of above amount)
- Projected Target SERP Account Accumulation: $16,093,796 (present value of annuity payable over the life of President and Mrs. Falwell based on a discount rate of 4% and the RP – 2014 Mortality Table adjusted to 2019 with scale MP – 2016, reduced by 403(b) account accumulation)
- To reach the Projected Target SERP Account Accumulation over the course of President Falwell's career as University President, we assumed an annual deferred compensation amount of $385,000, which would result in a net SERP accumulation at age 67 (after two-year non-compete period) that is very close to the Projected Target SERP Account Accumulation (see chart below).

| Year | Age | Salary[1] | Annual Deferred Compensation | Annual 403(b) Contribution[1] | 403(b) Accumulation[2] | Annual Net SERP Contribution | Net SERP Accumulation[2] |
|---|---|---|---|---|---|---|---|
| 2007 | 45 | $243,000 | $385,000 | $20,250 | $20,250 | $364,750 | $364,750 |
| 2008 | 46 | $355,000 | $385,000 | $20,700 | $42,165 | $364,300 | $750,935 |
| 2009 | 47 | $372,000 | $385,000 | $22,050 | $66,745 | $362,950 | $1,158,941 |
| 2010 | 48 | $463,000 | $385,000 | $22,050 | $92,800 | $362,950 | $1,591,428 |
| 2011 | 49 | $779,000 | $385,000 | $22,050 | $120,418 | $362,950 | $2,049,863 |
| 2012 | 50 | $871,000 | $385,000 | $22,500 | $150,143 | $362,500 | $2,535,355 |
| 2013 | 51 | $897,000 | $385,000 | $22,950 | $182,101 | $362,050 | $3,049,526 |
| 2014 | 52 | $927,000 | $385,000 | $23,400 | $216,427 | $361,600 | $3,594,098 |
| 2015 | 53 | $933,000 | $385,000 | $23,850 | $253,263 | $361,150 | $4,170,894 |
| 2016 | 54 | $961,000 | $385,000 | $23,850 | $292,309 | $361,150 | $4,782,297 |
| 2017 | 55 | $990,000 | $385,000 | $24,300 | $334,147 | $360,700 | $5,429,935 |
| 2018 | 56 | $1,019,000 | $385,000 | $24,750 | $378,946 | $360,250 | $6,115,981 |
| 2019 (Est.) | 57 | $1,250,000 | $385,000 | $25,200 | $426,883 | $359,800 | $6,842,740 |
| 2020 (Est.) | 58 | $1,275,000 | $385,000 | $25,704 | $478,200 | $359,296 | $7,612,601 |
| 2021 (Est.) | 59 | $1,300,500 | $385,000 | $26,218 | $533,110 | $358,782 | $8,428,139 |
| 2022 (Est.) | 60 | $1,326,510 | $385,000 | $26,742 | $591,839 | $358,258 | $9,292,084 |
| 2023 (Est.) | 61 | $1,353,040 | $385,000 | $27,277 | $654,626 | $357,723 | $10,207,332 |
| 2024 (Est.) | 62 | $1,380,101 | $385,000 | $27,823 | $721,727 | $357,177 | $11,176,949 |
| 2025 (Est.) | 63 | $1,407,703 | $385,000 | $28,379 | $793,410 | $356,621 | $12,204,187 |
| 2026 (Est.) | 64 | $1,435,857 | $385,000 | $28,947 | $869,961 | $356,053 | $13,292,491 |
| 2027 (Est.) | 65 | $1,464,574 | $385,000 | $29,526 | $951,685 | $355,474 | $14,445,515 |
| 2028 (Est.) | 66 | | | | $1,008,786 | | $15,312,246 |
| 2029 (Est.) | 67 | | | | $1,069,313 | | $16,230,981 |

Because President Falwell's SERP account will not begin to accrue until 2019, the net SERP accumulation for years 2007-2018 (approximately $6M) would be credited to his SERP account in a lump sum upon its establishment.

Footnotes:
(1) Assumes 2% annual increase for years 2020-2029
(2) Assumes account balance would accumulate interest at 6% annually

**FW COOK** [1] Our SERP projections rely on assumptions provided by Ropes & Gray and have been reviewed and verified by Ropes & Gray.

19

LUADMINREC000769

LUJerry00347342

# BYLAWS OF LIBERTY UNIVERSITY, INC.
## (As amended and restated)

## ARTICLE I

## MEETINGS OF THE BOARD OF TRUSTEES

SECTION 1: ANNUAL MEETINGS.  Annually there shall be a meeting of the Board of Trustees in March and November. Such meeting to be held at such place and at such hours as the Chairman of the Board of Trustees or the Chancellor/President shall designate.

SECTION 2: ADDITIONAL REGULAR MEETINGS.  There shall be such additional regular meetings during the calendar year as the Board of Trustees may, from time to time, determine.

SECTION 3: SPECIAL MEETINGS.  The Board of Trustees, or any five (5) members thereof, the Executive Committee, the Chairman of the Board of Trustees, or the Chancellor/President, may call any special meeting of the Board of Trustees.

SECTION 4: NOTICE.  The Secretary of the Corporation shall give each Trustee ten (10) days notice of the date, time and place of each annual, regular or special meeting. Such notice shall be given, either personally or by electronic or regular mail, to the last known address of said Trustees as shown on the corporate records.

A Trustee may waive said notice by delivering to the Secretary of the Corporation a waiver in writing signed by said Trustee at any meeting in which said Trustee failed to receive proper notice.  In addition, waiver will be implied where said Trustee attends any meeting and fails to object to the lack of notice or defective notice at the beginning of said meeting.

SECTION 5:  PLACE.  Regular or special meetings of the Board of Trustees may be held at such place as may be specified in the notice of said meeting.  Special meetings may be conducted through the use of any means of electronic communication by which all Trustees may simultaneously communicate with each other during said meeting.  A Trustee participating in a meeting by this means is deemed to be present in person at the meeting.

SECTION 6: QUORUM.  Except as otherwise provided by law or the Articles of Incorporation, one half of the entire Board of Trustees as constituted from time to time shall at any regular or special meeting of the Board of Trustees constitute a quorum for the transaction of business.

SECTION 7: VOTING. Each individual Trustee shall have one vote at any regular or special meeting at which the Trustee is present. Furthermore, Trustees may vote only in person and no proxy voting will be recognized.

## ARTICLE II

### BOARD OF TRUSTEES

SECTION 1: NUMBER OF TRUSTEES. The Board of Trustees shall consist of not less than five (5) nor more than fifty (50) Trustees.

SECTION 2: TERM OF OFFICE. The term of a Trustee shall be consistent with the provisions in the Liberty University, Inc. Articles of Incorporation fixing said term.

SECTION 3: VACANCIES AND NEW POSITIONS. Any vacancies occurring in the Board of Trustees, whether by death, resignation, removal, or any other cause or new position may be filled by nomination of the Executive Committee and the majority affirmative vote of all members of the Board of Trustees present at such regular or special meeting called for the purpose of appointing a new Trustee. Any Trustee who fails to attend or participate in two (2) consecutive regular meetings of the Board of Trustees shall be deemed to have resigned from the Board of Trustees.

SECTION 4: RESPONSIBILITIES AND POWERS. The Board of Trustees shall have the full and complete management and control of the Corporation and its affairs, and on behalf of the Corporation shall authorize and empower the doing of all acts that the Corporation may lawfully do. The Board of Trustees, as the legal body responsible for the institution, has the duty and authority to approve and ensure that the mission of the institution is implemented. The Board of Trustees shall hold the Chancellor/President and his administration accountable for implementation of Board policy, including personnel matters. In furtherance of the foregoing, the Board of Trustees shall have the authority to adopt such Bylaws and pass such resolutions consistent with the purposes as set forth in the Articles of Incorporation. The Chairman of the Board of Trustees and a majority of the other voting members of the Board of Trustees shall have no contractual employment, personal, familial, or financial interest in the institution.

SECTION 5: REMOVAL. Any member of the Board of Trustees may be removed for cause (as detailed below) in accordance with the Articles of Incorporation. Any member of the Board of Trustees may be removed for cause (as defined below) at a meeting called for that purpose and by a two-thirds (2/3) majority vote of those Trustees present (excluding the member in question). A Trustee, prior to the vote to remove, shall have the opportunity to address the board; provided, however, that a Trustee shall be automatically removed for missing two (2) consecutive meetings. A member of the Board of Trustees may also be removed from the Board for any of the following:

(a) Suspension, revocation, or cancellation of the Trustee's right to practice his/her profession.

LUADMINREC000771

(b) Failure to comply with the reasonable policies, standards and regulations of the Board.

(c) Failure to faithfully and diligently perform the duties of a Trustee.

(d) Total disability, making it impossible for the Trustee to perform the duties of the position.

(e) Conduct that is unethical, unprofessional, immoral, or fraudulent; or being cited for unprofessional or unethical conduct by any board or group having any privilege or right to pass upon the conduct of the Trustee; or should the board member's conduct discredit the institution or be detrimental to the reputation, character, standing or Christian mission of the institution.

Notwithstanding Article II (5) above, the Board of Trustees shall remove any Trustee which the Board of Directors of Thomas Road Baptist Church determines is undermining the mission of the Corporation as reflected in the Liberty University Doctrinal Position attached as Exhibit A. A Trustee shall be given notice and the opportunity to appear before the Board of Directors of Thomas Road Baptist Church prior to its determination. The Doctrinal Position attached as Exhibit A may be amended only by a two-thirds (2/3) majority vote of the entire Board of Trustees of the Corporation and with the consent of the Board of Directors of Thomas Road Baptist Church.

## ARTICLE III

## OFFICERS OF THE CORPORATION AND THEIR DUTIES

SECTION 1: TITLES. The officers of the Corporation shall be: Chancellor/President, Senior Vice Presidents, Executive Vice Presidents, General Counsel, Chief Investment Officer, Treasurer/Chief Financial Officer, Provost, Secretary, Assistant Secretary, and any other such officers as the Board of Trustees may, from time to time, determine.

SECTION 2: CHANCELLOR/PRESIDENT. The Chancellor/President is appointed by the Board of Trustees and is the Chief Executive Officer of the University and is vested with all authority, powers, duties and responsibilities incident to the management and control of the University. The Chancellor/President shall serve as a member of the Board of Trustees and shall see that all orders and resolutions of the Board are carried out under his general supervision. In addition to the foregoing, the Chancellor/President shall be responsible for providing focus and direction for the University and for making policy recommendations to the Board of Trustees. The Chancellor/President shall represent the University and shall be responsible for ensuring that the mission of the University is implemented. The Chancellor/President, or his designee, shall preside over and coordinate all meetings and official convocations of the University, including student and faculty convocations. The Chancellor/President is also the principal liaison between Thomas Road Baptist Church and Liberty University. He provides spiritual and worldview leadership to the University in the pursuit of excellence. The Chancellor/President, in addition to the duties and responsibilities set forth herein,

LUADMINREC000772

shall also be directly responsible for recruiting students and soliciting contributions to support the University. The Chancellor/President may delegate any of his powers to such other officers of the University as he may deem appropriate. The Chancellor/President shall make an annual report to the Board of Trustees of the work, condition, and needs of the University as well as any other matters that may affect the University as it pursues the fulfillment of its mission. The policy and procedure for evaluation of the Chancellor/President is detailed in Article IV, Section 2.

SECTION 3: SENIOR VICE PRESIDENTS AND EXECUTIVE VICE PRESIDENTS. The Senior Vice Presidents are appointed by the Chancellor/President and are the senior administrative officers over various related departments of the University. The Executive Vice Presidents are appointed by the Chancellor/President and are the senior administrative officers over various remaining unrelated departments of the University not administered by Senior Vice Presidents. Each Senior Vice President and Executive Vice President assists, advises and provides oversight along with the Chancellor/President concerning the implementation of the duties and responsibilities associated with that position. Each Senior Vice President and Executive Vice President reports directly to the Chancellor/President and has direct administrative oversight in the departments in his or her designated areas. The Senior Vice President for Academic Affairs is the designated Officer of the University to succeed the Chancellor/President (as Acting Chancellor/President until the Board of Trustee appoints a successor) in the event of the Chancellor's death, disability or resignation.

SECTION 4: PROVOST. The Provost is appointed by the Chancellor/President and is the Chief Academic Officer for the University. This individual serves as the primary voice on academic matters within the administration. The Provost, in collaboration with the deans, the Faculty Senates, and the General Faculty, is responsible for developing and implementing the academic vision and values of the University. These core values are engaged through the various academic programs offered in multiple delivery formats, as well as through the teaching, research and service activities of the academic centers. The Provost, in collaboration with the deans, the Faculty Senates, and the General Faculty, provides leadership in continuously improving undergraduate and graduate instruction and academic support services. The Provost works with the deans and the Chancellor/President to identify and prioritize resource allocations among academic units. The Provost assesses the performance of academic leaders and provides regular feedback to encourage improvement. The Provost, further, has the responsibility to oversee a structured process through which faculty can develop professionally within their disciplines, improve as effective academic communicators, and utilize the wide array of technological tools and resources available to enrich the art of teaching. The Provost serves as the liaison to those external agencies with which the University maintains institutional accreditation. The Provost communicates regularly with the Chancellor/President and the various University constituencies on matters of importance with respect to accreditation. The Provost also serves as the liaison of the administration to the Faculty Senates.

LUADMINREC000773

SECTION 5: SECRETARY.  The Secretary of the Corporation is appointed by the Board of Trustees and shall keep accurate minutes of all meetings of the Board of Trustees, and shall have charge of maintaining such other records as may be required of him or her by the Chancellor/President or the Board.  The Secretary shall act in a like capacity for the Executive Committee or any other committee possessing governing authority and established by the Board of Trustees.  The Secretary shall have charge of the correspondence, notify Trustees of meetings, notify new Trustees of their election, notify officers of their election to office, keep a roll of the Trustees with their addresses, and carry out other duties incident to his or her office as the Chancellor/President may request or the Board of Trustees or Chancellor/President may assign.

SECTION 6: ASSISTANT SECRETARY.  The Assistant Secretary of the Corporation is appointed by the Board of Trustees and may attend all meetings of the Board of Trustees, in order to assist the Chairman or Vice Chairman as they preside over said meetings.  The Assistant Secretary shall also ensure that all of the governing documents or any amendments thereto, are in compliance with any legal requirements that may be applicable to the same.

SECTION 7: TREASURER/CHIEF FINANCIAL OFFICER.  The Treasurer is appointed by the Chancellor/President and shall be the Chief Financial Officer of the University.  The Treasurer of the Corporation shall be responsible for the collection and receipt of all monies due or belonging to the Corporation.  The Treasurer shall cause accurate books and records of the financial condition of the Corporation to be maintained, and at the request of the Chancellor/President, or the Chairman of the Board of Trustees, shall render an account of all monies received or expended during the previous fiscal year.  The Board of Trustees shall have the authority to request an annual audit of the books of the Corporation.  The Chief Financial Officer is responsible for all financial operations of the University including risk management for property and liability insurance.  The Chief Financial Officer also works with senior management on individual and group projects.

SECTION 8:  GENERAL COUNSEL.  The General Counsel is appointed by the Chancellor/President and shall be the Chief Legal Officer of the University in charge of all legal matters pertaining to the Corporation and the University. The General Counsel shall attend meetings of the Board of Trustees and the Executive Committee and shall represent the Corporation in all legal proceedings and advise the Corporation, its Committees, the Officers, and the Chancellor/President on legal questions as may be required; and shall, subject to the direction of the Chancellor/President, oversee the provision of all legal services to the Corporation.

SECTION 9: CHIEF INVESTMENT OFFICER. The Chief Investment Officer is appointed by the Chancellor/President and shall have general charge of all investment matters pertaining to the Corporation. The Chief Investment Officer shall advise the Corporation, its Committees and Officers, the Chancellor/President, and other Officers on investment matters; and shall, subject to the administrative oversight of the Chancellor/President, oversee the provision of all investment services of the Corporation.

5

The Chief Investment Officer shall make such reports of receipts and disbursements of all investments and of such related matters pertaining to the activities of the Chief Investment Officer as shall be requested by the Chancellor/President, the Treasurer/Chief Financial Officer, the Board of Trustees, or the Executive Committee, and shall make an annual report to the Board of Trustees in such form and at such time as the Board may require.

## ARTICLE IV

### COMMITTEES

SECTION 1: COMMITTEES.  The Board of Trustees shall have the following standing committees: Executive Committee, Long Range Planning Committee, Building and Grounds Committee, Seminary Committee, Academic Affairs Committee, Student Affairs Committee, Investment Committee, Finance Committee, Audit Committee, and Law School Committee.  The Board of Trustees shall have the power to appoint any other standing committees as it deems necessary and proper for carrying out the affairs of the University, as well as the appointment of any special committees to aid the Board of Trustees or any standing committee on any particular projects.  Such committees shall be subject to the final authority of the Board of Trustees.

SECTION 2: EXECUTIVE COMMITTEE.  During the intervals between Board of Trustee meetings, the Executive Committee shall have the full and complete management and control of the Corporation and its affairs, and on behalf of the Corporation shall authorize and empower the doing of all acts that the Corporation may lawfully do, except (1) the election of the members of the Executive Committee, (2) the power to amend the Articles of Incorporation or these Bylaws, or (3) to rescind or alter previous action of the Board of Trustees.  The Chairman of the Executive Committee and a majority of the other voting members of the Executive Committee shall have no contractual, employment, personal, familial, or financial interest in the institution.  The Executive Committee shall be composed of no less than five (5) members of the Board of Trustees.  All other provisions of this Article pertaining to standing committees shall be applicable to said Executive Committee.

The Executive Committee shall formally evaluate the Chancellor/President annually. The results of the evaluation shall be attached to the official minutes of the Executive Committee.  A report on the formal evaluation shall be provided by the Chair of the Executive Committee. The Chair shall, after discussion of the evaluation, bring a motion to accept the evaluation. The evaluation shall be according to the following procedures:

a.  The Chairman of the Executive Committee shall distribute to Executive Committee members the evaluation criteria at the meeting of the Committee.
b.  The evaluation may address those items in the University's Strategic Plan that the Executive Committee determines to be within the direct purview of the Chancellor/Presidents well as any other matters of leadership the Executive

LUADMINREC000775

Committee determines to be relevant.  The evaluation criteria and process should be reviewed and updated periodically by the Executive Committee.

c.  Following discussion with the Chancellor/President at the meeting of the Executive Committee, the members of the Committee shall complete the evaluation.

d.  The results of the evaluation shall be attached to the official minutes of the Executive Committee.

e.  The Chairman of the Executive Committee shall provide summary comments concerning the evaluation in his report to the full Board at the Annual Meeting and, following discussion, shall request a motion to accept the report, including a summary of the evaluation.

SECTION 3: ELECTION AND TERMS.  Every member of the Board of Trustees shall be a member of at least one standing committee except for the Chancellor/President, who shall be an ex officio member of all the committees.  Trustees shall be elected to serve on said committees by the majority vote of a quorum (as defined in the Articles of Incorporation) at any regular or special meeting of the Board of Trustees.  The term of any Trustee on said committee shall be consistent with his or her term as Trustee.  Any vacancy on a committee shall be filled in accordance with the same procedures as set forth in the Articles of Incorporation for filling a vacancy on the Board of Trustees.

SECTION 4: COMMITTEE CHAIRMAN.  Every committee shall have a Committee Chairman who shall preside at all meetings of said committee.  The Committee Chairman shall be elected by the majority vote of a quorum (as defined in the Article of Incorporation) at any regular or special meeting of the Board of Trustees.  The Committee Chairman shall be responsible for organizing the committee meetings, preparing and submitting the committee's report and recommendations to the full Board, keeping and maintaining accurate minutes of the committee's meetings and circulating the same to the full Board, and for ensuring that committee members are notified of the time and place of said meetings.  The Committee Chairman shall also perform such other duties as usually pertain to the office of Committee Chairman or that may be required of him or her by the committee or the Board of Trustees.

SECTION 5: COMMITTEE VICE CHAIRMAN. Every committee shall have a Committee Vice Chairman who shall preside at all meetings of said committee in the absence of the Committee Chairman.  The Committee Vice Chairman shall be elected in the same manner as the Committee Chairman.  The Committee Vice Chairman, in the absence of the Committee Chairman, shall assume and discharge all other duties pertaining to the office of Committee Chairman.  The Committee Vice Chairman shall also perform such other duties as usually pertain to the office of Committee Vice Chairman or that may be required of him by the committee of the Board of Trustees.

SECTION 6: COMPOSITION OF COMMITTEE MEMBERS. Committees may include members who are not members of the Board of Trustees so long as each

7

LUADMINREC000776

committee has at least one member of the Board and is chaired by a member of the Board.

SECTION 7: MEETINGS.  The committees shall meet at such time and place as the Committee Chairman of the particular committee shall determine.  Each standing committee shall meet at least once per calendar year.  The Committee Chairman shall give every committee member notice of not less than three (3) days prior to any such meeting.  A committee member may waive said notice by delivering to the Secretary of the Corporation a waiver in writing and signed by said committee member at any meeting in which said committee member fails to receive proper notice.  In addition, waiver will be deemed where said committee member attends any meeting and fails to object to the lack of notice or defective notice at the beginning of said meetings.

SECTION 8: QUORUM.  A quorum at any committee meeting shall consist of a majority of the total number of committee members.  A quorum shall be sufficient to carry on the business of the committee.

SECTION 9: DUTIES AND RESPONSIBILITIES.  The standing committees, excluding the Executive Committee, shall have all the powers, duties and responsibilities as set forth in the Board of Trustees Handbook, and any other such powers, duties and responsibilities as the Board of Trustees shall see fit to confer upon said committees.

## ARTICLE V

### BOARD OF REGENTS

SECTION 1: REGULAR OR SPECIAL MEETINGS.  There shall be held such regular or special meetings as the Chairman of the Board of Trustees or the Chancellor/President shall determine.

SECTION 2: ELECTION.  The Chancellor/President shall appoint certain individuals as members of the Board of Regents.

SECTION 3: DUTIES AND RESPONSIBLITIES.  The Board of Regents shall serve as an advisory board to the Chancellor/President.  The Board of Regents shall also consult with the Chancellor/President on matters concerning the University's mission.  Members of the Board of Regents shall be responsible for providing financial and spiritual support to the University.

## ARTICLE VI

### GENERAL PROVISIONS

SECTION 1: CALENDAR.  The fiscal year of the corporation shall begin on the 1st day of July and end on the 30th day of June.

8

SECTION 2: AMENDMENTS.  The Articles of Incorporation or Bylaws may be amended or restated at any meeting of the Board of Trustees upon receiving the vote of at least two-thirds of the Trustees.

## ARTICLE VII

## DISSOLUTION

SECTION 1: DISSOLUTION.  The Corporation may be dissolved at any time upon the adoption of a resolution to dissolve by the vote of a majority of the Trustees. The dissolution shall be carried out pursuant to the provisions in the Articles of Incorporation relating to dissolution.

Any gender used herein shall be deemed to refer to any other gender more grammatically applicable to the party to whom such gender relates.  The use of singular herein shall be deemed to include the plural and, conversely, the plural shall be deemed to include the singular.

The foregoing was adopted as restated at the Board of Trustees meeting on November 12, 2010 by at least a two-thirds vote of the Trustees in office and amended at the Board of Trustees meeting on November 11, 2011 by at least a two-thirds vote of the Trustees in office.

Sharon J. Hartless
Secretary to the Board of Trustees

9

# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is effective April 1, 2012, and is between LIBERTY UNIVERSITY, a Virginia nonstock corporation (referred to in this Agreement as "LU" or "the University") and JERRY L. FALWELL, JR., a resident of Virginia (referred to in this Agreement as "Falwell" or "the Employee").

WHEREAS, LU is a university centered in the City of Lynchburg, Virginia, which is dedicated to excellence in higher education and scholarship within a Christian context;

WHEREAS, Falwell has served LU in several roles since 1988, including his current positions as Chancellor and President;

WHEREAS, LU acknowledges that Falwell, among others, was instrumental in promoting and furthering the University's debt restructuring and return to a position of financial strength in 1997 after a period of severe financial hardships for the University that began in 1987 and, more recently, in promoting and furthering the rapid expansion and continued success, particularly since 2007;

WHEREAS, since Falwell became President and Chancellor in 2007, Liberty's net assets have increased from approximately $100,000,000 to over $800,000,000 and are projected to exceed $1,500,000,000 within five years and Liberty's enrollment has increased from approximately 9,600 students in residence to over 12,000 students in residence and from approximately 27,000 students studying online to over 75,000 students studying online. During the same period, annual gross revenues have increased from $231,506,554 to $645,350,280 and the University's surplus of revenues over expenditures has increased from

1

LUADMINREC000779

$52,514,469 to $221,188,918. As a result of such financial performance, Standard & Poor's has assigned the University a credit rating of AA for two consecutive years, placing the University among the 80 highest rated universities nationally;

WHEREAS, LU acknowledges that Falwell's annual compensation has been consistently below national standards and norms prevailing in the field of university education, all as documented by the independent consultant's report dated August 11, 2011, by Dixon Hughes Goodman, LLP;

WHEREAS, LU desires to raise its executive compensation to near the median of executive compensation for comparable non-profit colleges and universities, adjusted for geography, performance and tenure.

WHEREAS, in recognition of Falwell's past contributions to the University and in an effort to compensate Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, LU wishes to formalize and reinforce the parties' long term employment relationship by entering into this Agreement; and

WHEREAS, Falwell likewise wishes to continue his employment as President and Chancellor of the University on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, LU and Falwell adopt the foregoing recitals and agree as follows:

<div align="center">2</div>

## ARTICLE 1

## EMPLOYMENT STATUS

1.1    LU hereby agrees to continue employing Falwell and Falwell hereby accepts continued employment by LU as President and Chancellor for the seven (7) year and three (3) month period designated in Article 2 ("the Term") on the terms and subject to the conditions set forth in this Agreement. Falwell shall continue to be classified as a full-time employee for all purposes, including fringe benefits.

## ARTICLE 2

## TERM

2.1    The Term of this Agreement shall be for a period of seven (7) years and three (3) months beginning on April 1, 2012, and expiring on June 30, 2019 ("the Term") subject to earlier termination as provided for in this Agreement. The University is not obligated to offer Falwell employment for any period beyond the expiration of this Agreement.

## ARTICLE 3

## DUTIES AND RESPONSIBILITIES

3.1    Falwell shall continue to provide LU with dedicated, diligent and conscientious full time service in a manner that is generally consistent with the level of service he has provided during the nearly five (5) year period immediately preceding the effective date of this Agreement, with allowances for reasonable time to attend to personal investments.

3

3.2     Falwell's duties shall consist of the tasks, duties and responsibilities he has assumed and performed as President and Chancellor during the nearly five (5) year period immediately preceding the effective dates of this Agreement. These duties shall include but not necessarily be limited to the following:

(a)     ensuring the implementation of the University's mission and purposes as described or defined in the University's Articles of Incorporation, Bylaws, and other foundational documents.

(b)     performing the duties of Chancellor/President as described in the University's Bylaws.

(c)     overseeing the fiscal, administrative, admissions, academic, athletic and other operations, divisions, departments and offices of the University.

(d)     raising funds for the benefit of the University.

(e)     implementing and executing policies, orders and resolutions adopted or established by the LU Board of Trustees and its Executive Committee.

3.3     As Chancellor and President, Falwell shall have the executive and administrative powers to manage and control the day to day operations of the University, provide focus and direction for the University, make policy recommendations to the Board of Trustees, and provide spiritual and worldview leadership to the University in pursuit of excellence, subject to the ultimate authority of the Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws.   That executive and administrative power shall include but not be limited to the absolute authority to hire, retain and dismiss

4

administrative, professional, academic and athletic personnel, subject only to any contractual or tenurial rights of any such employee.  Provided, however, that Falwell shall be accountable to the Board of Trustees for implementing its policies and carrying out his duties, including the handling of personnel matters.

3.4    Falwell shall not undertake compensated work or activities for, or accept any employment or other compensation from, any other institution of higher education for work undertaken prior to the termination of this Agreement without receiving approval of the Board of Trustees or the Executive Committee of the Board of Trustees prior to undertaking such work or activities.

3.5    Falwell shall not author or publish any book or article relating to his employment at Liberty University hereunder without prior consent of the Executive Committee or Board of Trustees, which prior consent may be conditioned upon advance review and approval of the content of said book or article.  This provision does not include letters to the editor or articles in University publications and other University media which are published to carry out Falwell's duties under this Agreement and advance the interests and mission of LU.  Nor does this provision include brief communications on Twitter, Facebook and similar communication vehicles.  The provisions of this subsection shall survive termination of this Agreement.

3.6    The parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings. This prohibition includes defamatory remarks about the employees and members of the Board of Trustees of the University.

5

Neither party, however, waives the protections afforded by otherwise applicable common law privileges and this Section 3.6 shall in no event apply to remarks made during meetings of either the University's Board of Trustees or its Executive Committee.   If Falwell's employment is terminated for cause, the parties may truthfully explain the circumstances forming the basis for the determination of cause. The provisions of this Section 3.6 shall survive termination of this Agreement.

    3.7    Falwell shall continue to have access to confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly disclosed by LU ("Confidential Information") during the course of his employment. Confidential Information remains the property of LU.  Unauthorized disclosure of Confidential Information will cause definite and irreparable harm to LU.  Falwell shall not disclose Confidential Information intentionally within the University except to fulfill the legitimate business purposes of LU and shall not disclose it directly or indirectly, outside the University without the express authorization of the Executive Committee of the Board of Trustees or as required by law or to further the interests of LU. Under no circumstances shall the release of details of this Agreement be considered to further the interests of LU.  Any Confidential Information in tangible form shall be immediately returned to LU upon request.  The provisions of this subsection shall survive termination of this Agreement.

6

## ARTICLE 4

### COMPENSATION

4.1     In consideration of Falwell's continued service as President and Chancellor, LU shall compensate him as follows:

(a)     *Base Salary*.  LU shall pay Falwell an annual base salary which shall rise each year during the Term as itemized below:

(i)     First Year and Three Months = $835,000

(ii)    Second Year = $865,000

(iii)   Third Year = $895,000

(iv)    Fourth Year = $925,000

(v)     Fifth Year = $960,000

(vi)    Sixth Year = 990,000

(vii)   Seventh Year = $1,025,000

(b)     *Discretionary Bonuses*.   Falwell shall be eligible to receive bonuses in such amounts and at such times as the Executive Committee of the Board of Trustees may award based on its assessment of his performance, the financial condition of the University, the rate of inflation and cost of living increases in Lynchburg, Virginia, and other considerations which the Executive Committee of the Board of Trustees in its sole discretion finds relevant.

(c)     *Termination Payment*. In addition to the compensation set forth above in subsection (b) and (c) in this Section 4.1, Falwell shall receive a severance payment at the

7

termination of his employment equal to the amount of one year's annual base salary at the rate in effect at the date of his termination.  Falwell or, in the event of his death or disability his administrator, executor, or other personal representative, shall be entitled to this severance payment regardless of the reason his employment ends.   Provided however, Falwell shall not be entitled to this payment in the event the University terminates his employment for "cause" as that is defined in Article 7 of this Agreement or terminates his employment without cause as described in Article 8 of this Agreement, in which case Falwell's compensation upon termination is detailed in said Articles.

4.2     LU shall provide Falwell the same fringe benefits and the same opportunity to participate in benefit plans that it offers other full-time executive employees. These benefits and programs currently include group family health insurance (medical, vision, dental), group family life insurance and disability insurance, employee assistance programs, retirement, savings and investment programs (including LU's Section 403(B) plan), sick/personal leave, holiday leave and voice and data phone payments under LU's Cellular Phone Policy and similar benefits made available to executive or managerial employees of the University.   During the quarter prior to each formal annual evaluation by the Executive Committee, Falwell shall undergo an annual Comprehensive Executive Medical Health Assessment, the cost of which shall be reimbursed by the institution upon submission of a receipt or statement for same.  The Comprehensive Executive Medical Health Assessment shall include a thorough physical examination by medical doctor(s), a full range of preventive screening tests for early detection of cancer, heart disease and other serious

8

medical problems, a cardiovascular fitness evaluation, including treadmill exercise test, a lifestyle assessment to discuss nutrition, exercise, personal safety and other indicators of risk of disease, a review and update of medications and immunizations, development and assessment of a long-term strategy for prolonged life and wellness, a full report of the test results and recommendations at the conclusion of the examination and a written report sent to Falwell confidentially for his personal use and for consultation with his private physician. Neither the University nor the Executive Committee shall request or be entitled to a copy of the written report but the Executive Committee shall be entitled to receive a copy of the receipt or statement for such services as part of each of its formal annual evaluations of Falwell.

4.3    LU shall provide Falwell with an automobile allowance of Seven Hundred Fifty Dollars ($750) per month in accordance with LU's normal payroll policies and schedule and subject to any reporting and withholding requirements provided by law.

4.4    LU shall reimburse Falwell in accordance with LU's Travel and Entertainment Policy for reasonable and necessary travel and out-of-pocket expenses incurred by him, and where appropriate his spouse, in connection with the performance of his official duties under this Agreement.

4.5    LU shall provide Falwell and members of his immediate family with tuition at the University through the conclusion of each academic year during which he serves as President and/or Chancellor pursuant to LU's Dependent Grant-in-Aid Policy and Continuing Education Policy. "Immediate family" shall be limited to Falwell's wife and

9

children by birth or adoption. Such tuition benefits shall be provided subject to any reporting and withholding requirements provided by law.

4.6    Falwell shall be entitled to six (6) weeks annual vacation during each year of the Term. No unused vacation may be carried forward to subsequent years or paid out as compensation.

4.7    LU agrees to provide memberships at the LaHaye Student Center and Sports Racket for use by Falwell and his immediate family or at another fitness center mutually agreeable to the parties.

4.8    LU agrees to provide general maintenance and upkeep at the primary residence of Falwell, including general repairs, maintenance and lawn care. The parties hereto acknowledge that the primary residence of Falwell is used by the University from time to time for student, faculty and staff events. A portion of the general maintenance and upkeep referenced above shall be deemed a business expense of the University in connection with said student, faculty and staff events and the remainder of said general maintenance and upkeep shall be deemed income to Falwell and reported to the IRS as such by the University.

4.9    Anything in this Agreement to the contrary notwithstanding, in the event that it shall be determined that any payment or distribution by the University to or for the benefit of the Employee, whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, would constitute an "excess parachute payment" within the meaning of §280G of the Internal Revenue Code of 1986, as amended (the "Code") (each such payment, a "Parachute Payment") and would result in the imposition on the Employee

10

of an excise tax under Code §4999, then, in addition to any other benefits to which the Employee is entitled under this Agreement or otherwise, the Employee shall be paid an amount in cash equal to the sum of the excise taxes payable by the Employee by reason of receiving Parachute Payments plus the amount necessary to place the Employee in the same after-tax position (taking into account any and all applicable federal, state and local excise, income or other taxes at the highest possible applicable rates on such Parachute Payments (including, without limitation, any payments under this subsection )) as if no excise taxes had been imposed with respect to Parachute Payments (the "Parachute Gross-up").   Any Parachute Gross-up otherwise required by this subsection shall not be made later than the time of the corresponding payment or benefit hereunder giving rise to the underlying Code §4999 excise tax (to the extent such determination has been made prior to such time), even if the payment of the excise tax is not required under the Code until a later time.   Any Parachute Gross-up otherwise required under this subsection shall be made whether or not payments or benefits are payable under this Agreement and whether or not the Employee's employment with the University shall have been terminated.

<u>ARTICLE 5</u>

OTHER EMPLOYMENT

5.1    Falwell shall refrain from undertaking any other employment or compensated activities that hinder or impede successful performance of the services outlined in this Agreement. Except as provided in this Agreement, Falwell shall not engage in any compensated employment or compensated activities without first obtaining the written

11

approval of the Executive Committee or the Board of Trustees. The University, however, acknowledges that Falwell is licensed by the Virginia State Bar and periodically engages in the practice of law on a limited basis in association with another practitioner on discrete matters. Falwell hereby receives approval for such limited legal work and therefore shall not require any additional approval for such employment by the Executive Committee or the Board of Trustees. Passive investment activity such as buying, holding and selling real estate, stock and securities ("Passive Investment Activity") shall not be considered other employment or compensated activities for purposes of this Agreement and therefore shall not require any additional approval by the Executive Committee of the Board of Trustees.

<u>ARTICLE 6</u>

TERMINATION UPON DEATH

6.1    Falwell's death shall terminate this Agreement. Falwell's executor, administrator or other personal representative shall be entitled to all the compensation and fringe benefits provided in Article 4 of this Agreement through the date of his death, along with the severance payment provided under subsection 4.1(c) and any benefits to which he or his executor, administrator or other personal representative is entitled under any applicable benefit plan as a deceased employee. All benefits available to Falwell's immediate family under subsection 4.5 and 4.7 shall continue in place for the remainder of the Term in addition to any and all survivorship death benefits payable under any savings, retirement, investment and other plans and programs in which Falwell was a participant. Falwell shall not be entitled to receive any other payments or benefits after the date of his death.

12

## ARTICLE 7

### TERMINATION FOR CAUSE OR DISABILITY

7.1    LU may terminate Falwell's employment only for cause or disability as defined below, provided it first delivers to Falwell specific, written notice of the purported grounds for dismissal, and if in the opinion of the Executive Committee the cause or disability can be corrected or cured, a thirty (30) day opportunity to correct or cure the alleged "cause" or "disability".  A dismissal in the absence of a required, thirty (30) day notice is a dismissal without cause.

7.2    If Falwell is terminated for cause, LU shall be obligated to pay Falwell his salary, earned compensation and fringe benefits up to the date of termination only, plus any benefits to which he is entitled under any applicable benefit plan as a former employee. Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination.  Falwell's resignation from the Board of Trustees and its Executive Committee shall be effective immediately upon termination of his employment for cause.

7.3    As used in this Agreement, the term "cause" is defined restrictively to mean only the following:

(a)    the refusal or willful failure of Falwell to comply with the directives of the Board of Trustees so long as such directives are not in conflict with the authority of the

13

Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws, or in conflict with this Agreement;

    (b)    the material failure of Falwell to comply substantially with written policies, standards and regulations of LU as from time-to-time established;

    (c)    the refusal or willful failure of Falwell to faithfully or diligently perform his duties under this Agreement;

    (d)    conviction of or entry of a plea of guilty, no contest or *nolo contendere* to any felony or to a misdemeanor involving moral turpitude (deferred disposition by a court, with or without a finding, admission or adjudication of guilt, such as withholding adjudication or taking the matter under advisement for some set period, meets the threshold for cause intended for Section 7.3 (d));

    (e)    conviction of or entry of a plea of guilty, no contest or *nolo contendere* to any felony or to a misdemeanor involving moral turpitude by others about which Falwell had actual knowledge and could have prevented (deferred disposition by a court, with or without a finding, admission or adjudication of guilt, such as withholding adjudication or taking the matter under advisement for some set time period, meets the threshold for cause intended for Section 7.3 (e));

    (f)    defamatory or slanderous comments in breach of Section 3.6 of this Agreement which cause serious damage to LU's reputation; or

    (g)    advocating a position that is inconsistent with the doctrinal statements found in the University's Articles of Incorporation, with the sole exception of such advocacy

14

in private discussions with the Board of Trustees or Executive Committee in connection with proposed amendments to the Articles of Incorporation.

  7.4 In the event Falwell is the subject of a criminal arrest, criminal indictment, criminal information, criminal warrant for violation, criminal complaint or criminal charge for any felony or is the subject of such for a misdemeanor involving moral turpitude, LU may place Falwell on administrative leave, thereby suspending Falwell from performance of the duties and responsibilities outlined in Sections 3.1, 3.2 and 3.3, at a minimum of one-third (1/3) of the rate of his annual base salary in effect at the date of his suspension, which compensation rate can be increased at the discretion of the Executive Committee.

  7.5 As used in this Agreement the term "disability" is defined restrictively to mean only the following: mental or physical incapacity or disability which prevents Falwell from performing a substantial and material portion of his duties under this Agreement on a continuous basis and that persists for more than 180 days. A termination of Falwell's employment for disability is neither a dismissal with cause within the meaning of Sections 7.2 and 7.3 nor a dismissal without cause within the meaning of Article 8 and Falwell shall be entitled to double the severance payment provided under Section 4.1(c).

<u>ARTICLE 8</u>

TERMINATION BY UNIVERSITY WITHOUT CAUSE

  8.1 LU may terminate Falwell's employment as President and Chancellor at any time upon sixty (60) days advance, written notice to Falwell without cause.  In the event LU elects to terminate Falwell's employment as Chancellor and President without cause, LU

15

shall continue to provide Falwell as liquidated damages his full annual base salary at the rate in effect at the date of his termination  through the remainder of the Term, and any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination. Following termination of his employment, Falwell shall have no obligation to remain at the University or perform any services for the University for the remainder of the Term. Falwell shall have the right but not the obligation to seek and secure alternative employment for the balance of the Term.  Should Falwell secure other employment or engage in  compensated activities prior to the end of the time period for which LU is obligated to compensate him under this Agreement, he shall notify the University of the salary and other compensation he receives from any new employer or compensation source other than Passive Investment Activity sources of compensation. One (1) year after termination, LU shall have the right to reduce, on a month-to-month comparison basis, any remaining continuing payment obligations to Falwell to the extent that he earns such other salary and compensation (excluding compensation from Passive Investment Activity).

      8.2    The parties have bargained for this liquidated damages provision, giving careful consideration to the following circumstances:

          (a)    this Agreement concerns personal services.

16

(b) termination of this Agreement by the University prior to the end of the Term (or at any point after the Term) could cause Falwell to lose compensation opportunities relating to his employment at the University and damage his professional reputation. These and related damages to Falwell are difficult to determine with certainty. Therefore, the parties have agreed upon this liquidated damages provision and stipulate that it is neither a penalty nor an incentive for unsatisfactory performance.

<u>ARTICLE 9</u>

RESIGNATION

9.1 Falwell may resign, retire or otherwise terminate his employment with the University for any reason at any point during the Term (or during any renewal or extended Term) provided he gives the Board of Trustees sixty (60) days advance written notice. In the event Falwell should elect to resign, retire or otherwise terminate his employment prior to the end of the Term, the University shall be obligated to pay Falwell his salary, earned compensation and fringe benefits through the date of termination only along with the severance payment provided under Section 4.1(c) and any benefits to which he is entitled under any applicable benefit plan as a former employee. Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination.

17

## ARTICLE 10

### INDEMNIFICATION

10.1    To the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment. The indemnification afforded Falwell under this Section is in addition to any and all indemnity rights and protections the Employee may have pursuant to statute or under any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies.

## ARTICLE 11

### MISCELLANEOUS PROVISIONS

11.1    Neither party shall disclose this Agreement to anyone without the other party's prior, written consent, unless disclosure is required by law. The parties, however, shall be free to disclose and discuss this Agreement with their respective lawyers, accountants and tax advisors.  Falwell shall be permitted to disclose the Agreement to his spouse.

11.2    For a notice or other communication to be valid under this Agreement, it must be written, signed and sent by at least one of the following methods: (a) personal delivery; (b) first class mail, postage prepaid; (c) registered or certified mail, return receipt requested,

18

and postage prepaid; and (d) nationally recognized overnight courier (e.g., UPS or Federal Express).

11.3    If any provision of this Agreement is determined to be invalid, void, illegal or unenforceable to any extent, the remainder of this Agreement, or application of that provision to any persons or circumstances other than those as to which it is held to be unenforceable, will remain valid, binding and enforceable.

11.4    (a)      The parties may waive a provision in this Agreement only by a writing executed by the party or parties against whom the waiver is sought to be enforced. Waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver by that party of any subsequent breaches.

(b)      No failure or delay in exercising any right or remedy, or in requiring the satisfaction of any condition, under this Agreement, and no act, omission or course of dealing between the parties, shall operate as a waiver or estoppel of any right, remedy or condition.

(c)      A waiver made in writing on one (1) occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver of any future occasion, unless expressly stated as such.

11.5    This Agreement constitutes the final Agreement between the parties concerning the terms and conditions of Falwell's employment with LU. This Agreement supersedes and invalidates any prior or contemporaneous agreement, oral or written, between them regarding the terms of Falwell's employment with LU.  All such prior Agreements

19

between the parties shall become null and void upon the execution of this Agreement. In entering into this Agreement, neither party has relied upon any statement, representation, warranty or agreement of the other party except for those expressly contained in this Agreement. The parties may amend this Agreement only by a written Agreement of the parties that identifies itself as an amendment to this Agreement.

11.6   This Agreement may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one instrument.

11.7   The rule of construction that ambiguity is construed against the drafting party shall have no application in any dispute over the interpretation of this Agreement. The parties represent and warrant to one another that they enter this Agreement with the benefit of counsel based on the independent analysis of each party of the facts and legal principles relevant to the terms and conditions of this Agreement.

11.8   Neither this Agreement as a whole nor any of its individual provisions is assignable by either party.

11.9   The descriptive headings of the articles and sections of this Agreement are for convenience only, do not constitute a part of this Agreement, and do not affect this Agreement's construction or interpretation.

11.10   This Agreement shall be governed by and construed in accordance with the law of the Commonwealth of Virginia without regard to the Commonwealth's choice of law rules.

LUADMINREC000798

11.11   This Agreement shall be binding upon and inure to the benefit of the parties' respective successors, heirs, assigns, receivers and personal representatives.

11.12   The provisions of this Agreement to be performed upon and after termination of Falwell's employment survive termination of this Agreement.

11.13   The parties agree that any legal action or proceeding against the other party arising out of or relating to this Agreement or the University's employment of Falwell shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

IN   WITNESS   WHEREOF,   Falwell   and   the   authorized   representative   of   the University have executed this Agreement on the date(s) written below.

LIBERTY UNIVERSITY, INC.                    JERRY L. FALWELL, JR.

Chairman, Board of Trustees                    Jerry L. Falwell, Jr.

Date: July 6, 2012                    Date: JULY 5, 2012

21

## ADDENDUM TO EMPLOYMENT AGREEMENT

This agreement is an Addendum ("Addendum") to the Employment Agreement ("Agreement") dated April 1, 2012, between LIBERTY UNIVERSITY, a Virginia nonstock corporation (referred to in this Agreement as "LU" or "the University") and JERRY L. FALWELL, JR., a resident of Virginia (referred to in this Agreement as "Falwell" or "the Employee"). The Addendum is effective on May 24, 2017.

The University and Falwell agree that the Agreement is hereby modified in the following respects:

A.    The first sentence of Section 4.1(c) shall be modified such that it reads as follows:

In addition to the compensation set forth above in subsection (b) and (c) in this Section 4.1, Falwell shall receive a severance payment at the termination of his employment equal to the amount of three years' annual base salary at the rate in effect at the date of his termination.

B.    The following language shall be added to the end of Section 4.1(c) of the Agreement:

Provided further, notwithstanding the foregoing, in the event LU elects to terminate Falwell's employment as Chancellor and President without cause pursuant to Section 8.1 of the Agreement, Falwell shall be entitled to the liquidated damages provided in that Section 8.1 in lieu of the termination payment set forth in this section 4.1(c).

C.    Under Section 4.2 of the Agreement, Falwell shall be required to obtain a Comprehensive Executive Medical Health Assessment once every eighteen (18) months (instead of "during the quarter prior to each formal annual evaluation by the Executive Committee").

D.    In addition to the benefits described in Section 4.3 of the Agreement, for each year that the Agreement remains in effect LU shall furnish on an annual basis up to fifty (50) hours of jet transportation on LU's jets for Falwell and members of his immediate family, with any unused hours expiring at the end of each year without further compensation to Falwell. In

**Page 1 of 2**

{#2201669-2, 116311-00009-01}

addition, LU shall indemnify Falwell and his family for any income tax liability they may incur as a result of this fringe benefit through a gross up payments or otherwise in a manner in compliance with applicable Internal Revenue Service regulations.

E.     The following language shall be added to Section 5.1 of the Agreement:

In addition, Falwell shall have the right without seeking approval of the Executive Committee or Board of Trustees to participate as either a paid endorser or principal owner in an asset management venture. Falwell (alone or in conjunction with members of his family and/or others) shall be free to participate in an asset management venture, provided such venture conducts no business with the University or any entity owned or controlled by the University and receives no compensation from the University or any entity owned or controlled by the University.

F.     Section 8.1 of the Agreement is modified such that, in the event LU elects to terminate Falwell's employment as Chancellor and President without cause, Falwell shall be entitled to liquidated damages equal to his full annual salary at the rate in effect at his termination for:  (a) a five (5) year period; or (b) the remainder of the Term of the Agreement, whichever period is longer.

The remainder of the Agreement is unchanged.

IN WITNESS WHEREOF, Falwell and the authorized representative of the University have executed this Agreement on the date(s) written below.

LIBERTY UNIVERSITY, INC.

Chairman, Board of Trustees

Date: _6/21/2017_

JERRY L. FALWELL, JR.

Jerry L. Falwell, Jr.

Date: _JUNE 20, 2017_

2

LUADMINREC000801

# LIBERTY UNIVERSITY, INC.

a Virginia non-stock corporation

## AMENDED AND RESTATED BYLAWS

as amended through March 22, 2013

## ARTICLE I

### MEETINGS OF THE BOARD OF TRUSTEES

SECTION 1: ANNUAL MEETINGS.  Annually there shall be a meeting of the Board of Trustees in March and November. Such meeting to be held at such place and at such hours as the Chairman of the Board of Trustees or the Chancellor/President shall designate.

SECTION 2: ADDITIONAL REGULAR MEETINGS.  There shall be such additional regular meetings during the calendar year as the Board of Trustees may, from time to time, determine.

SECTION 3: SPECIAL MEETINGS.  The Board of Trustees, or any five (5) members thereof, the Executive Committee, the Chairman of the Board of Trustees, or the Chancellor/President, may call any special meeting of the Board of Trustees.

SECTION 4: NOTICE.  The Secretary of the Corporation shall give each Trustee ten (10) days notice of the date, time and place of each annual, regular or special meeting.  Such notice shall be given, either personally or by electronic or regular mail, to the last known address of said Trustees as shown on the corporate records.

A Trustee may waive said notice by delivering to the Secretary of the Corporation a waiver in writing signed by said Trustee at any meeting in which said Trustee failed to receive proper notice.  In addition, waiver will be implied where said Trustee attends any meeting and fails to object to the lack of notice or defective notice at the beginning of said meeting.

SECTION 5:  PLACE.  Regular or special meetings of the Board of Trustees may be held at such place as may be specified in the notice of said meeting.  Special meetings may be conducted through the use of any means of electronic communication by which all Trustees may simultaneously communicate with each other during said meeting.  A Trustee participating in a meeting by this means is deemed to be present in person at the meeting.

SECTION 6: QUORUM.  Except as otherwise provided by law or the Articles of Incorporation, one half of the entire Board of Trustees as constituted from time to time shall at any regular or special meeting of the Board of Trustees constitute a quorum for the transaction of business.

SECTION 7: VOTING. Each individual Trustee shall have one vote at any regular or special meeting at which the Trustee is present. Furthermore, Trustees may vote only in person and no proxy voting will be recognized.

## ARTICLE II

### BOARD OF TRUSTEES

SECTION 1: NUMBER OF TRUSTEES. The Board of Trustees shall consist of not less than five (5) nor more than fifty (50) Trustees.

SECTION 2: TERM OF OFFICE. The term of a Trustee shall be consistent with the provisions in the Liberty University, Inc. Articles of Incorporation fixing said term.

SECTION 3: VACANCIES AND NEW POSITIONS. Any vacancies occurring in the Board of Trustees, whether by death, resignation, removal, or any other cause or new position may be filled by nomination of the Executive Committee and the majority affirmative vote of all members of the Board of Trustees present at such regular or special meeting called for the purpose of appointing a new Trustee. Any Trustee who fails to attend or participate in two (2) consecutive regular meetings of the Board of Trustees shall be deemed to have resigned from the Board of Trustees.

SECTION 4: RESPONSIBILITIES AND POWERS. The Board of Trustees shall have the full and complete management and control of the Corporation and its affairs, and on behalf of the Corporation shall authorize and empower the doing of all acts that the Corporation may lawfully do. The Board of Trustees, as the legal body responsible for the institution, has the duty and authority to approve and ensure that the mission of the institution is implemented. The Board of Trustees shall ensure the institution is free from undue influence of external bodies and protect the institution from such undue influence. The Board of Trustees is the active policy-making body for the institution and is ultimately responsible for ensuring that the financial resources of the institution are adequate and sufficiently stable to provide a sound educational program. The Board of Trustees shall exercise its governing policy-making function through the adoption of Board policy. Board policy is a policy that has broad application throughout the institution, states the University's position on a subject matter, and directly affects and enhances the institution's mission. Some Board policy may also help achieve compliance with applicable laws and regulations or reduce institutional risk. The Board of Trustees shall hold the Chancellor/President and his administration accountable for implementation of Board policy, including personnel matters. In furtherance of the foregoing, the Board of Trustees shall have the authority to adopt such Bylaws and pass such resolutions consistent with the purposes as set forth in the Articles of Incorporation. The Chairman of the Board of Trustees and a majority of the other voting members of the Board of Trustees shall have no contractual employment, personal, familial, or financial interest in the institution.

SECTION 5: REMOVAL. Any member of the Board of Trustees may be removed for cause (as detailed below) in accordance with the Articles of Incorporation. Any member of the Board of Trustees may be removed for cause (as defined below) at a meeting called for that

2

purpose and by a two-thirds (2/3) majority vote of those Trustees present (excluding the member in question). A Trustee, prior to the vote to remove, shall have the opportunity to address the board; provided, however, that a Trustee shall be automatically removed for missing two (2) consecutive meetings. A member of the Board of Trustees may also be removed from the Board for any of the following:

(a) Suspension, revocation, or cancellation of the Trustee's right to practice his/her profession.
(b) Failure to comply with the reasonable policies, standards and regulations of the Board.
(c) Failure to faithfully and diligently perform the duties of a Trustee.
(d) Total disability, making it impossible for the Trustee to perform the duties of the position.
(e) Conduct that is unethical, unprofessional, immoral, or fraudulent; or being cited for unprofessional or unethical conduct by any board or group having any privilege or right to pass upon the conduct of the Trustee; or should the board member's conduct discredit the institution or be detrimental to the reputation, character, standing or Christian mission of the institution.

Notwithstanding Article II (5) above, the Board of Trustees shall remove any Trustee which the Board of Directors of Thomas Road Baptist Church determines is undermining the mission of the Corporation as reflected in the Liberty University Doctrinal Position attached as Exhibit A. A Trustee shall be given notice and the opportunity to appear before the Board of Directors of Thomas Road Baptist Church prior to its determination. The Doctrinal Position attached as Exhibit A may be amended only by a two-thirds (2/3) majority vote of the entire Board of Trustees of the Corporation and with the consent of the Board of Directors of Thomas Road Baptist Church.

## ARTICLE III

### OFFICERS OF THE CORPORATION
### AND THEIR DUTIES

SECTION 1: TITLES.  The officers of the Corporation shall be: Chancellor/President, Senior Vice Presidents, Executive Vice Presidents, General Counsel, Chief Investment Officer, Treasurer/Chief Financial Officer, Provost, Secretary, Assistant Secretary, and any other such officers as the Board of Trustees may, from time to time, determine.

SECTION 2: CHANCELLOR/PRESIDENT. The Chancellor/President is appointed by the Board of Trustees and is the Chief Executive Officer of the University.  The Chancellor/President is vested with all authority, powers, duties and responsibilities incident to the management and control of the University to further its interests, including the authority to enter into contracts and transact business in the name of the University, including the power to purchase, receive, accept, reject, convey, grant, exchange, trade, partition, release, lease, sublease, contribute, donate, secure, encumber, pledge and otherwise develop, grant and dispose of the assets, real property and other property interests of the University.   The

3

Chancellor/President, whose primary responsibility is to the institution, shall serve as a member of the Board of Trustees but not serve as its Chairman. The Chancellor/President shall see that all Board policies and resolutions of the Board are administered and implemented under his general supervision.  The Chancellor/President is responsible for the adoption of administrative policies, rules and regulations that govern the day to day operations of the University, clarify the roles and responsibilities of administrators, staff, faculty and students relating to a specified subject matter, or provide guidance on procedural matters.    In addition to the foregoing, the Chancellor/President shall be responsible for providing focus and direction for the University and for making Board policy recommendations to the Board of Trustees.    The Chancellor/President shall represent the University and shall be responsible for implementing the mission of the University.  The Chancellor/President, or his designee, shall preside over and coordinate all meetings and official convocations of the University, including student and faculty convocations.  The Chancellor/President is also the principal liaison between Thomas Road Baptist Church and Liberty University.  He provides spiritual and worldview leadership to the University in the pursuit of excellence.  The Chancellor/President, in addition to the duties and responsibilities set forth herein, shall have ultimate responsibility for, and exercise appropriate administrative and fiscal control over, the institution's intercollegiate athletics program, and shall also be directly responsible for recruiting students and soliciting contributions to support the University.  The Chancellor/President may delegate any of his powers to such other officers of the University as he may deem appropriate.  The Chancellor/President shall make an annual report to the Board of Trustees of the work, condition, and needs of the University as well as any other matters that may affect the University as it pursues the fulfillment of its mission. The policy and procedure for evaluation of the Chancellor/President is detailed in Article IV, Section 2.

SECTION 3: SENIOR VICE PRESIDENTS AND EXECUTIVE VICE PRESIDENTS. The Senior Vice Presidents are appointed by the Chancellor/President and are the senior administrative officers over various related departments of the University. The Executive Vice Presidents are appointed by the Chancellor/President and are the senior administrative officers over various remaining unrelated departments of the University not administered by Senior Vice Presidents. Each Senior Vice President and Executive Vice President assists, advises and provides oversight along with the Chancellor/President concerning the implementation of the duties and responsibilities associated with that position.  Each Senior Vice President and Executive Vice President reports directly to the Chancellor/President and has direct administrative oversight in the departments in his or her designated areas.  The Senior Vice President for Academic Affairs is the designated Officer of the University to succeed the Chancellor/President (as Acting Chancellor/President until the Board of Trustee appoints a successor) in the event of the Chancellor's death, disability or resignation.

SECTION 4: PROVOST.  The Provost is appointed by the Chancellor/President and is the Chief Academic Officer for the University. This individual serves as the primary voice on academic matters within the administration.  The Provost, in collaboration with the deans, the Faculty Senates, and the General Faculty, is responsible for developing and implementing the academic vision and values of the University.  These core values are engaged through the various academic programs offered in multiple delivery formats, as well as through the teaching, research and service activities of the academic centers. The Provost, in collaboration with the

4

LUADMINREC000805

deans, the Faculty Senates, and the General Faculty, provides leadership in continuously improving undergraduate and graduate instruction and academic support services. The Provost works with the deans and the Chancellor/President to identify and prioritize resource allocations among academic units. The Provost assesses the performance of academic leaders and provides regular feedback to encourage improvement. The Provost, further, has the responsibility to oversee a structured process through which faculty can develop professionally within their disciplines, improve as effective academic communicators, and utilize the wide array of technological tools and resources available to enrich the art of teaching. The Provost serves as the liaison to those external agencies with which the University maintains institutional accreditation. The Provost communicates regularly with the Chancellor/President and the various University constituencies on matters of importance with respect to accreditation. The Provost also serves as the liaison of the administration to the Faculty Senates.

SECTION 5: SECRETARY. The Secretary of the Corporation is appointed by the Board of Trustees and shall keep accurate minutes of all meetings of the Board of Trustees, and shall have charge of maintaining such other records as may be required of him or her by the Chancellor/President or the Board. The Secretary shall act in a like capacity for the Executive Committee or any other committee possessing governing authority and established by the Board of Trustees. The Secretary shall have charge of the correspondence, notify Trustees of meetings, notify new Trustees of their election, notify officers of their election to office, keep a roll of the Trustees with their addresses, and carry out other duties incident to his or her office as the Chancellor/President may request or the Board of Trustees or Chancellor/President may assign.

SECTION 6: ASSISTANT SECRETARY. The Assistant Secretary of the Corporation is appointed by the Board of Trustees and may attend all meetings of the Board of Trustees, in order to assist the Chairman or Vice Chairman as they preside over said meetings. The Assistant Secretary shall also ensure that all of the governing documents or any amendments thereto, are in compliance with any legal requirements that may be applicable to the same.

SECTION 7: TREASURER/CHIEF FINANCIAL OFFICER. The Treasurer is appointed by the Chancellor/President and shall be the Chief Financial Officer of the University. The Treasurer of the Corporation shall be responsible for the collection and receipt of all monies due or belonging to the Corporation. The Treasurer shall cause accurate books and records of the financial condition of the Corporation to be maintained, and at the request of the Chancellor/President, or the Chairman of the Board of Trustees, shall render an account of all monies received or expended during the previous fiscal year. The Treasurer/Chief Financial Officer shall have the authority to enter into contracts and transact business in the name of the University to further its interests up to a limit of $100,000 per transaction. The Board of Trustees shall have the authority to request an annual audit of the books of the Corporation. The Chief Financial Officer is responsible for all financial operations of the University including risk management for property and liability insurance. The Chief Financial Officer also works with senior management on individual and group projects.

SECTION 8: GENERAL COUNSEL. The General Counsel is appointed by the Chancellor/President and shall be the Chief Legal Officer of the University in charge of all legal matters pertaining to the Corporation and the University. The General Counsel shall attend

5

meetings of the Board of Trustees and the Executive Committee and shall represent the Corporation in all legal proceedings and advise the Corporation, its Committees, the Officers, and the Chancellor/President on legal questions as may be required; and shall, subject to the direction of the Chancellor/President, oversee the provision of all legal services to the Corporation.

SECTION 9: CHIEF INVESTMENT OFFICER. The Chief Investment Officer is appointed by the Chancellor/President and shall have general charge of all investment matters pertaining to the Corporation. The Chief Investment Officer shall advise the Corporation, its Committees and Officers, the Chancellor/President, and other Officers on investment matters; and shall, subject to the administrative oversight of the Chancellor/President, oversee the provision of all investment services of the Corporation. The Chief Investment Officer shall make such reports of receipts and disbursements of all investments and of such related matters pertaining to the activities of the Chief Investment Officer as shall be requested by the Chancellor/President, the Treasurer/Chief Financial Officer, the Board of Trustees, or the Executive Committee, and shall make an annual report to the Board of Trustees in such form and at such time as the Board may require.

## ARTICLE IV

### COMMITTEES

SECTION 1: COMMITTEES.  The Board of Trustees shall have the following standing committees: Executive Committee, Long Range Planning Committee, Building and Grounds Committee, Seminary Committee, Academic Affairs Committee, Student Affairs Committee, Investment Committee, Finance Committee, Audit Committee, and Law School Committee.  The Board of Trustees shall have the power to appoint any other standing committees as it deems necessary and proper for carrying out the affairs of the University, as well as the appointment of any special committees to aid the Board of Trustees or any standing committee on any particular projects.  Such committees shall be subject to the final authority of the Board of Trustees.

SECTION 2:  EXECUTIVE COMMITTEE.  During the intervals between Board of Trustee meetings, the Executive Committee shall have the full and complete management and control of the Corporation and its affairs, and on behalf of the Corporation shall authorize and empower the doing of all acts that the Corporation may lawfully do, except (1) the election of the members of the Executive Committee, (2) the power to amend the Articles of Incorporation or these Bylaws, or (3) to rescind or alter previous action of the Board of Trustees.  The Chairman of the Executive Committee and a majority of the other voting members of the Executive Committee shall have no contractual, employment, personal, familial, or financial interest in the institution.  The Executive Committee shall be composed of no less than five (5) members of the Board of Trustees.  The Chancellor/President shall not serve as the Chairman of the Executive Committee.  All other provisions of this Article pertaining to standing committees shall be applicable to said Executive Committee.

The Executive Committee shall formally evaluate the Chancellor/President annually. The results of the evaluation shall be attached to the official minutes of the Executive Committee.  A report

LUADMINREC000807

on the formal evaluation shall be provided by the Chair of the Executive Committee. The Chair shall, after discussion of the evaluation, bring a motion to accept the evaluation. The evaluation shall be according to the following procedures:

    a.  The Chairman of the Executive Committee shall distribute to Executive Committee members the evaluation criteria at the meeting of the Committee.

    b.  The evaluation may address those items in the University's Strategic Plan that the Executive Committee determines to be within the direct purview of the Chancellor/Presidents well as any other matters of leadership the Executive Committee determines to be relevant. The evaluation criteria and process should be reviewed and updated periodically by the Executive Committee.

    c.  Following discussion with the Chancellor/President at the meeting of the Executive Committee, the members of the Committee shall complete the evaluation.

    d.  The results of the evaluation shall be attached to the official minutes of the Executive Committee.

    e.  The Chairman of the Executive Committee shall provide summary comments concerning the evaluation in his report to the full Board at the Annual Meeting and, following discussion, shall request a motion to accept the report, including a summary of the evaluation.

SECTION 3: ELECTION AND TERMS. Every member of the Board of Trustees shall be a member of at least one standing committee except for the Chancellor/President, who shall be an ex officio member of all the committees. Trustees shall be elected to serve on said committees by the majority vote of a quorum (as defined in the Articles of Incorporation) at any regular or special meeting of the Board of Trustees. The term of any Trustee on said committee shall be consistent with his or her term as Trustee. Any vacancy on a committee shall be filled in accordance with the same procedures as set forth in the Articles of Incorporation for filling a vacancy on the Board of Trustees.

SECTION 4: COMMITTEE CHAIRMAN. Every committee shall have a Committee Chairman who shall preside at all meetings of said committee. The Committee Chairman shall be elected by the majority vote of a quorum (as defined in the Article of Incorporation) at any regular or special meeting of the Board of Trustees. The Committee Chairman shall be responsible for organizing the committee meetings, preparing and submitting the committee's report and recommendations to the full Board, keeping and maintaining accurate minutes of the committee's meetings and circulating the same to the full Board, and for ensuring that committee members are notified of the time and place of said meetings. The Committee Chairman shall also perform such other duties as usually pertain to the office of Committee Chairman or that may be required of him or her by the committee or the Board of Trustees.

SECTION 5: COMMITTEE VICE CHAIRMAN. Every committee shall have a Committee Vice Chairman who shall preside at all meetings of said committee in the absence of the Committee Chairman. The Committee Vice Chairman shall be elected in the same manner as the Committee Chairman. The Committee Vice Chairman, in the absence of the Committee Chairman, shall assume and discharge all other duties pertaining to the office of Committee Chairman. The Committee Vice Chairman shall also perform such other duties as usually

LUADMINREC000808

pertain to the office of Committee Vice Chairman or that may be required of him by the committee of the Board of Trustees.

SECTION 6: COMPOSITION OF COMMITTEE MEMBERS. Committees may include members who are not members of the Board of Trustees so long as each committee has at least one member of the Board and is chaired by a member of the Board.

SECTION 7: MEETINGS. The committees shall meet at such time and place as the Committee Chairman of the particular committee shall determine. Each standing committee shall meet at least once per calendar year. The Committee Chairman shall give every committee member notice of not less than three (3) days prior to any such meeting. A committee member may waive said notice by delivering to the Secretary of the Corporation a waiver in writing and signed by said committee member at any meeting in which said committee member fails to receive proper notice. In addition, waiver will be deemed where said committee member attends any meeting and fails to object to the lack of notice or defective notice at the beginning of said meetings.

SECTION 8: QUORUM. A quorum at any committee meeting shall consist of a majority of the total number of committee members. A quorum shall be sufficient to carry on the business of the committee.

SECTION 9: DUTIES AND RESPONSIBILITIES. The standing committees, excluding the Executive Committee, shall have all the powers, duties and responsibilities as set forth in the Board of Trustees Handbook, and any other such powers, duties and responsibilities as the Board of Trustees shall see fit to confer upon said committees.

## ARTICLE V

### BOARD OF REGENTS

SECTION 1: REGULAR OR SPECIAL MEETINGS. There shall be held such regular or special meetings as the Chairman of the Board of Trustees or the Chancellor/President shall determine.

SECTION 2: ELECTION. The Chancellor/President shall appoint certain individuals as members of the Board of Regents.

SECTION 3: DUTIES AND RESPONSIBLITIES. The Board of Regents shall serve as an advisory board to the Chancellor/President. The Board of Regents shall also consult with the Chancellor/President on matters concerning the University's mission. Members of the Board of Regents shall be responsible for providing financial and spiritual support to the University.

8

## ARTICLE VI

## GENERAL PROVISIONS

SECTION 1: CALENDAR.  The fiscal year of the corporation shall begin on the 1st day of July and end on the 30th day of June.

SECTION 2: AMENDMENTS.  The Articles of Incorporation or Bylaws may be amended or restated at any meeting of the Board of Trustees upon receiving the vote of at least two-thirds of the Trustees.

## ARTICLE VII

## DISSOLUTION

SECTION 1: DISSOLUTION.  The Corporation may be dissolved at any time upon the adoption of a resolution to dissolve by the vote of a majority of the Trustees.  The dissolution shall be carried out pursuant to the provisions in the Articles of Incorporation relating to dissolution.

Any gender used herein shall be deemed to refer to any other gender more grammatically applicable to the party to whom such gender relates.  The use of singular herein shall be deemed to include the plural and, conversely, the plural shall be deemed to include the singular.

---

## CERTIFICATION OF

## AMENDED AND RESTATED BYLAWS OF

## LIBERTY UNIVERSITY, INC.

I, David M. Corry, being the duly appointed Secretary of Liberty University, Inc., a Virginia non-stock corporation (the "Corporation"), hereby certify that the foregoing Bylaws are a true and complete copy of the Amended and Restated Bylaws of the Corporation duly adopted by the Corporation's Board of Trustees as amended by the Board of Trustees through March 22, 2013 and in effect as of the date of this certificate.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of July, 2013.

David M. Corry, Secretary

9

## EXHIBIT A

### LIBERTY UNIVERSITY DOCTRINAL POSITION

We affirm our belief in one God, infinite Spirit, creator, and sustainer of all things, who exists eternally in three persons, God the Father, God the Son, and God the Holy Spirit. These three are one in essence but distinct in person and function.

We affirm that the Father is the first person of the Trinity and the source of all that God is and does. From Him the Son is eternally generated and from Them the Spirit eternally proceeds. He is the designer of creation, the speaker of revelation, the author of redemption, and the sovereign of history.

We affirm that the Lord Jesus Christ is the second person of the Trinity.  Eternally begotten from the Father, He is God. He was conceived by the virgin Mary through a miracle of the Holy Spirit. He lives forever as perfect God and perfect man: two distinct natures inseparably united in one person.

We affirm that the Holy Spirit is the third person of the Trinity, proceeding from the Father and the Son and equal in deity. He is the giver of all life, active in the creating and ordering of the universe; He is the agent of inspiration and the new birth; He restrains sin and Satan; and He indwells and sanctifies all believers.

We affirm that all things were created by God. Angels were created as ministering agents, though some, under the leadership of Satan, fell from their sinless state to become agents of evil. The universe was created in six historical days and is continuously sustained by God; thus it both reflects His glory and reveals His truth. Human beings were directly created, not evolved, in the very image of God. As reasoning moral agents, they are responsible under God for understanding and governing themselves and the world.

We affirm that the Bible, both Old and New Testaments, though written by men, was supernaturally inspired by God so that all its words are the written true revelation of God; it is therefore inerrant in the originals and authoritative in all matters. It is to be understood by all through the illumination of the Holy Spirit, its meaning determined by the historical, grammatical, and literary use of the author's language, comparing Scripture with Scripture.

We affirm that Adam, the first man, willfully disobeyed God, bringing sin and death into the world. As a result, all persons are sinners from conception, which is evidenced in their willful acts of sin; and they are therefore subject to eternal punishment, under the just condemnation of a holy God.

We affirm that Jesus Christ offered Himself as a sacrifice by the appointment of the Father. He fulfilled the demands of God by His obedient life, died on the cross in full substitution and payment for the sins of all, was buried, and on the third day He arose physically and bodily from the dead. He ascended into heaven where He now intercedes for all believers.

We affirm that each person can be saved only through the work of Jesus Christ, through repentance of sin and by faith alone in Him as Savior. The believer is declared righteous, born again by the Holy Spirit, turned from sin, and assured of heaven.

We affirm that the Holy Spirit indwells all who are born again, conforming them to the likeness of Jesus Christ. This is a process completed only in Heaven. Every believer is responsible to live in obedience to the Word of God in separation from sin.

We affirm that a church is a local assembly of baptized believers, under the discipline of the Word of God and the lordship of Christ, organized to carry out the commission to evangelize, to teach, and to administer the ordinances of believer's baptism and the Lord's table. Its offices are pastors and deacons, and it is self governing. It functions through the ministry of gifts given by the Holy Spirit to each believer.

We affirm that the return of Christ for all believers is imminent. It will be followed by seven years of great tribulation, and then the coming of Christ to establish His earthly kingdom for a thousand years. The unsaved will then be raised and judged according to their works and separated forever from God in hell. The saved, having been raised, will live forever in heaven in fellowship with God.

---

# LIBERTY UNIVERSITY, INC.

a Virginia non-stock corporation

## AMENDED AND RESTATED BYLAWS

as amended through November 15, 2013

## ARTICLE I

### MEETINGS OF THE BOARD OF TRUSTEES

SECTION 1: ANNUAL MEETINGS.  Annually there shall be a meeting of the Board of Trustees during the Fall Semester and during the Spring Semester of Liberty University. Such meeting to be held at such place and at such hours as the Chairman of the Board of Trustees or the Chancellor/President shall designate.

SECTION 2: ADDITIONAL REGULAR MEETINGS.  There shall be such additional regular meetings during the calendar year as the Board of Trustees may, from time to time, determine.

SECTION 3: SPECIAL MEETINGS.  The Board of Trustees, or any five (5) members thereof, the Executive Committee, the Chairman of the Board of Trustees, or the Chancellor/President, may call any special meeting of the Board of Trustees.

SECTION 4: NOTICE.  The Secretary of the Corporation shall give each Trustee ten (10) days notice of the date, time and place of each annual, regular or special meeting.  Such notice shall be given, either personally or by electronic or regular mail, to the last known address of said Trustees as shown on the corporate records.

A Trustee may waive said notice by delivering to the Secretary of the Corporation a waiver in writing signed by said Trustee at any meeting in which said Trustee failed to receive proper notice.  In addition, waiver will be implied where said Trustee attends any meeting and fails to object to the lack of notice or defective notice at the beginning of said meeting.

SECTION 5:  PLACE.  Regular or special meetings of the Board of Trustees may be held at such place as may be specified in the notice of said meeting.  Special meetings may be conducted through the use of any means of electronic communication by which all Trustees may simultaneously communicate with each other during said meeting.  A Trustee participating in a meeting by this means is deemed to be present in person at the meeting.

SECTION 6: QUORUM.  Except as otherwise provided by law or the Articles of Incorporation, one half of the entire Board of Trustees as constituted from time to time shall at any regular or special meeting of the Board of Trustees constitute a quorum for the transaction of business.

<u>SECTION 7</u>: VOTING. Each individual Trustee shall have one vote at any regular or special meeting at which the Trustee is present.  Furthermore, Trustees may vote only in person and no proxy voting will be recognized.

## ARTICLE II

### BOARD OF TRUSTEES

<u>SECTION 1</u>: NUMBER OF TRUSTEES.  The Board of Trustees shall consist of not less than five (5) nor more than fifty (50) Trustees.  Emeritus Trustees shall not be counted in this number.

<u>SECTION 2</u>: TERM OF OFFICE.  The term of a Trustee shall be consistent with the provisions in the Liberty University, Inc. Articles of Incorporation fixing said term.

<u>SECTION 3</u>: VACANCIES AND NEW POSITIONS.  Any vacancies occurring in the Board of Trustees, whether by death, resignation, removal, or any other cause or new position may be filled by nomination of the Executive Committee and the majority affirmative vote of all members of the Board of Trustees present at such regular or special meeting called for the purpose of appointing a new Trustee. Any Trustee who fails to attend or participate in two (2) consecutive regular meetings of the Board of Trustees shall be deemed to have resigned from the Board of Trustees**.**

<u>SECTION 4</u>: RESPONSIBILITIES AND POWERS.  The Board of Trustees shall have the full and complete management and control of the Corporation and its affairs, and on behalf of the Corporation shall authorize and empower the doing of all acts that the Corporation may lawfully do.  The Board of Trustees, as the legal body responsible for the institution, has the duty and authority to approve and ensure that the mission of the institution is implemented.  The Board of Trustees shall ensure the institution is free from undue influence of external bodies and protect the institution from such undue influence.  The Board of Trustees is the active policy-making body for the institution and is ultimately responsible for ensuring that the financial resources of the institution are adequate and sufficiently stable to provide a sound educational program.  The Board of Trustees shall exercise its governing policy-making function through the adoption of Board policy.  Board policy is a policy that has broad application throughout the institution, states the University's position on a subject matter, and directly affects and enhances the institution's mission.  Some Board policy may also help achieve compliance with applicable laws and regulations or reduce institutional risk.  The Board of Trustees shall hold the Chancellor/President and his administration accountable for implementation of Board policy, including personnel matters.  In furtherance of the foregoing, the Board of Trustees shall have the authority to adopt such Bylaws and pass such resolutions consistent with the purposes as set forth in the Articles of Incorporation.  The Chairman of the Board of Trustees and a majority of the other voting members of the Board of Trustees shall have no contractual employment, personal, familial, or financial interest in the institution.

2

SECTION 5: REMOVAL.  Any member of the Board of Trustees may be removed for cause (as detailed below) in accordance with the Articles of Incorporation. Any member of the Board of Trustees may be removed for cause (as defined below) at a meeting called for that purpose and by a two-thirds (2/3) majority vote of those Trustees present (excluding the member in question). A Trustee, prior to the vote to remove, shall have the opportunity to address the board; provided, however, that a Trustee shall be automatically removed for missing two (2) consecutive meetings. A member of the Board of Trustees may also be removed from the Board for any of the following:

(a) Suspension, revocation, or cancellation of the Trustee's right to practice his/her profession.
(b) Failure to comply with the reasonable policies, standards and regulations of the Board.
(c) Failure to faithfully and diligently perform the duties of a Trustee.
(d) Total disability, making it impossible for the Trustee to perform the duties of the position.
(e) Conduct that is unethical, unprofessional, immoral, or fraudulent; or being cited for unprofessional or unethical conduct by any board or group having any privilege or right to pass upon the conduct of the Trustee; or should the board member's conduct discredit the institution or be detrimental to the reputation, character, standing or Christian mission of the institution.

Notwithstanding Article II (5) above, the Board of Trustees shall remove any Trustee which the Board of Directors of Thomas Road Baptist Church determines is undermining the mission of the Corporation as reflected in the Liberty University Doctrinal Position attached as Exhibit A. A Trustee shall be given notice and the opportunity to appear before the Board of Directors of Thomas Road Baptist Church prior to its determination.  The Doctrinal Position attached as Exhibit A may be amended only by a two-thirds (2/3) majority vote of the entire Board of Trustees of the Corporation and with the consent of the Board of Directors of Thomas Road Baptist Church.

SECTION 6: EMERITUS TRUSTEES.  The honor of being an Emeritus Trustee is available to Board of Trustee members in good standing who have served at least three terms as Trustee.  The term of Emeritus Trustee is for life and no Emeritus Trustee shall be automatically removed for missing two (2) consecutive meetings.  Emeritus Trustees are non-voting members of the Board of Trustees.  Emeritus Trustees have no fiduciary or governance responsibilities or obligations, and may not be elected Chairman or Vice Chairman of the Board or of any of its committees.  Otherwise, Emeritus Trustees may be accorded all the honors and privileges of Board of Trustee members.

3

## ARTICLE III

### OFFICERS OF THE CORPORATION
### AND THEIR DUTIES

SECTION 1: TITLES.  The officers of the Corporation shall be: Chancellor/President, Senior Vice Presidents, Executive Vice Presidents, General Counsel, Chief Investment Officer, Treasurer/Chief Financial Officer, Provost, Secretary, Assistant Secretary, and any other such officers as the Board of Trustees may, from time to time, determine.

SECTION 2: CHANCELLOR/PRESIDENT. The Chancellor/President is appointed by the Board of Trustees and is the Chief Executive Officer of the University.  The Chancellor/President is vested with all authority, powers, duties and responsibilities incident to the management and control of the University to further its interests, including the authority to enter into contracts and transact business in the name of the University, including the power to purchase, receive, accept, reject, convey, grant, exchange, trade, partition, release, lease, sublease, contribute, donate, secure, encumber, pledge and otherwise develop, grant and dispose of the assets, real property and other property interests of the University.  The Chancellor/President, whose primary responsibility is to the institution, shall serve as a member of the Board of Trustees but not serve as its Chairman. The Chancellor/President shall see that all Board policies and resolutions of the Board are administered and implemented under his general supervision.  The Chancellor/President is responsible for the adoption of administrative policies, rules and regulations that govern the day to day operations of the University, clarify the roles and responsibilities of administrators, staff, faculty and students relating to a specified subject matter, or provide guidance on procedural matters.  In addition to the foregoing, the Chancellor/President shall be responsible for providing focus and direction for the University and for making Board policy recommendations to the Board of Trustees.  The Chancellor/President shall represent the University and shall be responsible for implementing the mission of the University.  The Chancellor/President, or his designee, shall preside over and coordinate all meetings and official convocations of the University, including student and faculty convocations.  The Chancellor/President is also the principal liaison between Thomas Road Baptist Church and Liberty University.  He provides spiritual and worldview leadership to the University in the pursuit of excellence.  The Chancellor/President, in addition to the duties and responsibilities set forth herein, shall have ultimate responsibility for, and exercise appropriate administrative and fiscal control over, the institution's intercollegiate athletics program, and shall also be directly responsible for recruiting students and soliciting contributions to support the University.  The Chancellor/President may delegate any of his powers to such other officers of the University as he may deem appropriate.  The Chancellor/President shall make an annual report to the Board of Trustees of the work, condition, and needs of the University as well as any other matters that may affect the University as it pursues the fulfillment of its mission. The policy and procedure for evaluation of the Chancellor/President is detailed in Article IV, Section 2.

SECTION 3: SENIOR VICE PRESIDENTS AND EXECUTIVE VICE PRESIDENTS. The Senior Vice Presidents are appointed by the Chancellor/President and are the senior administrative officers over various related departments of the University. The Executive Vice

4

LUADMINREC000816

Presidents are appointed by the Chancellor/President and are the senior administrative officers over various remaining unrelated departments of the University not administered by Senior Vice Presidents. Each Senior Vice President and Executive Vice President assists, advises and provides oversight along with the Chancellor/President concerning the implementation of the duties and responsibilities associated with that position. Each Senior Vice President and Executive Vice President reports directly to the Chancellor/President and has direct administrative oversight in the departments in his or her designated areas. The Senior Vice President for Academic Affairs is the designated Officer of the University to succeed the Chancellor/President (as Acting Chancellor/President until the Board of Trustee appoints a successor) in the event of the Chancellor's death, disability or resignation.

SECTION 4: PROVOST. The Provost is appointed by the Chancellor/President and is the Chief Academic Officer for the University. This individual serves as the primary voice on academic matters within the administration. The Provost, in collaboration with the deans, the Faculty Senates, and the General Faculty, is responsible for developing and implementing the academic vision and values of the University. These core values are engaged through the various academic programs offered in multiple delivery formats, as well as through the teaching, research and service activities of the academic centers. The Provost, in collaboration with the deans, the Faculty Senates, and the General Faculty, provides leadership in continuously improving undergraduate and graduate instruction and academic support services. The Provost works with the deans and the Chancellor/President to identify and prioritize resource allocations among academic units. The Provost assesses the performance of academic leaders and provides regular feedback to encourage improvement. The Provost, further, has the responsibility to oversee a structured process through which faculty can develop professionally within their disciplines, improve as effective academic communicators, and utilize the wide array of technological tools and resources available to enrich the art of teaching. The Provost serves as the liaison to those external agencies with which the University maintains institutional accreditation. The Provost communicates regularly with the Chancellor/President and the various University constituencies on matters of importance with respect to accreditation. The Provost also serves as the liaison of the administration to the Faculty Senates.

SECTION 5: SECRETARY. The Secretary of the Corporation is appointed by the Board of Trustees and shall keep accurate minutes of all meetings of the Board of Trustees, and shall have charge of maintaining such other records as may be required of him or her by the Chancellor/President or the Board. The Secretary shall act in a like capacity for the Executive Committee or any other committee possessing governing authority and established by the Board of Trustees. The Secretary shall have charge of the correspondence, notify Trustees of meetings, notify new Trustees of their election, notify officers of their election to office, keep a roll of the Trustees with their addresses, and carry out other duties incident to his or her office as the Chancellor/President may request or the Board of Trustees or Chancellor/President may assign.

SECTION 6: ASSISTANT SECRETARY. The Assistant Secretary of the Corporation is appointed by the Board of Trustees and may attend all meetings of the Board of Trustees, in order to assist the Chairman or Vice Chairman as they preside over said meetings. The Assistant Secretary shall also ensure that all of the governing documents or any amendments thereto, are in compliance with any legal requirements that may be applicable to the same.

5

SECTION 7: TREASURER/CHIEF FINANCIAL OFFICER.  The Treasurer is appointed by the Chancellor/President and shall be the Chief Financial Officer of the University.  The Treasurer of the Corporation shall be responsible for the collection and receipt of all monies due or belonging to the Corporation.  The Treasurer shall cause accurate books and records of the financial condition of the Corporation to be maintained, and at the request of the Chancellor/President, or the Chairman of the Board of Trustees, shall render an account of all monies received or expended during the previous fiscal year.  The Treasurer/Chief Financial Officer shall have the authority to enter into contracts and transact business in the name of the University to further its interests up to a limit of $100,000 per transaction.  The Board of Trustees shall have the authority to request an annual audit of the books of the Corporation.  The Chief Financial Officer is responsible for all financial operations of the University including risk management for property and liability insurance.  The Chief Financial Officer also works with senior management on individual and group projects.

SECTION 8:   GENERAL COUNSEL.   The General Counsel is appointed by the Chancellor/President and shall be the Chief Legal Officer of the University in charge of all legal matters pertaining to the Corporation and the University. The General Counsel shall attend meetings of the Board of Trustees and the Executive Committee and shall represent the Corporation in all legal proceedings and advise the Corporation, its Committees, the Officers, and the Chancellor/President on legal questions as may be required; and shall, subject to the direction of the Chancellor/President, oversee the provision of all legal services to the Corporation.

SECTION 9: CHIEF INVESTMENT OFFICER. The Chief Investment Officer is appointed by the Chancellor/President and shall have general charge of all investment matters pertaining to the Corporation. The Chief Investment Officer shall advise the Corporation, its Committees and Officers, the Chancellor/President, and other Officers on investment matters; and shall, subject to the administrative oversight of the Chancellor/President, oversee the provision of all investment services of the Corporation. The Chief Investment Officer shall make such reports of receipts and disbursements of all investments and of such related matters pertaining to the activities of the Chief Investment Officer as shall be requested by the Chancellor/President, the Treasurer/Chief Financial Officer, the Board of Trustees, or the Executive Committee, and shall make an annual report to the Board of Trustees in such form and at such time as the Board may require.

## ARTICLE IV

## COMMITTEES

SECTION 1: COMMITTEES.  The Board of Trustees shall have the following standing committees: Executive Committee, Investment Committee, Audit Committee, and Spiritual Mission Committee.  The Board of Trustees shall have the power to appoint any other standing committees as it deems necessary and proper for carrying out the affairs of the University, as well as the appointment of any special committees to aid the Board of Trustees or any standing

6

committee on any particular projects.  Such committees shall be subject to the final authority of the Board of Trustees.

SECTION 2:  CHARGES.  The standing committees shall have the following charges:

a.      Audit Committee.  Assist the Board in fulfilling its oversight and fiduciary responsibilities for ensuring the adequacy, integrity and reliability of the University's financial reporting process, system of internal control, audit process and auditors, risk management system, and process for monitoring compliance with applicable laws, regulations and codes of conduct.  Review and recommend Board polices regarding such matters, monitor and evaluate such matters for compliance with the University's mission and Board policies, and annually select areas to be audited, internally and externally. Review and evaluate financial audits, government agency audits, NCAA annual financial procedures and compliance reports, insurance audits, conflicts of interest policies, and disclosures of Trustees, Officers and other key employees regarding related-party transactions and conflicts of interest.  Serve as a focal point of open communications between the Board, independent auditor and University administrators.  Resolve any disagreements between auditors and University administrators.  In discharging its oversight role, investigate or cause to be investigated matters within the Audit Committee's charge.  Have a dotted-line reporting relationship with the Internal Auditor. Advise the Chancellor/President or his designee on significant matters within the Audit Committee's charge.

b.      Executive Committee.  During the intervals between Board of Trustee meetings, have the full and complete management and control of the Corporation and its affairs, and on behalf of the Corporation may undertake, authorize and empower the doing of all acts that the Corporation may lawfully do, except (1) elect members of the Executive Committee, (2) amend the Articles of Incorporation or these Bylaws, or (3) rescind or alter previous action of the Board of Trustees.  Consider, recommend and oversee the structure, composition and operation of the Board so as to provide effective governance of the University.  Periodically review the Bylaws and other governance documents and make recommendation to the Board concerning amendment.  Engage in succession planning for the Chancellor/President and Trustees.  Make recommendations to the Board for selection of a Chancellor/President and for nominations of trustees and committee members, as well as re-nominations when terms expire.  Conduct or cause to be conducted Trustee orientations and periodic board effectiveness evaluations. Set, on behalf of the Board, the compensation and benefits of the Chancellor/President. Annually review and evaluate, on behalf of the Board, the compensation and benefits of the Chancellor/President and other Officers of the Corporation and "key employees" as defined for the purposes of IRS Form 990, as well as any other "disqualified persons" as defined in IRC Section 4958.  Neither members of the committee nor staff liaisons may participate in committee votes, discussions or evaluations concerning their own performance or compensation, and should be excused from the committee meetings at such times.  Engage compensation and governance training consultants or experts, as needed.  The Chairman of the Executive Committee and a majority of the other voting members of the Executive Committee shall have no contractual, employment, personal,

7

familial, or financial interest in the institution. The Executive Committee shall be composed of no less than five (5) members of the Board of Trustees. The committee shall have a dotted-line reporting relationship with the General Counsel. It shall advise the Chancellor/President or his designee on significant matters. All other provisions of this Article pertaining to standing committees shall be applicable to the Executive Committee.

The Executive Committee shall formally evaluate the Chancellor/President annually. The results of the evaluation shall be attached to the official minutes of the Executive Committee. A report on the formal evaluation shall be provided by the Chair of the Executive Committee. The Chair shall, after discussion of the evaluation, bring a motion to accept the evaluation. The evaluation shall be according to the following procedures:

a. The Chairman of the Executive Committee shall distribute to Executive Committee members the evaluation criteria at the meeting of the Committee.
b. The evaluation may address those items in the University's Strategic Plan that the Executive Committee determines to be within the direct purview of the Chancellor/Presidents well as any other matters of leadership the Executive Committee determines to be relevant. The evaluation criteria and process should be reviewed and updated periodically by the Executive Committee.
c. Following discussion with the Chancellor/President at the meeting of the Executive Committee, the members of the Committee shall complete the evaluation.
d. The results of the evaluation shall be attached to the official minutes of the Executive Committee.
e. The Chairman of the Executive Committee shall provide summary comments concerning the evaluation in his report to the full Board at the Annual Meeting and, following discussion, shall request a motion to accept the report, including a summary of the evaluation.

The Executive Committee shall also serve in the capacity of a Finance Committee and shall perform these additional functions. Assist the Board in fulfilling its oversight responsibilities for the University's execution of Board-approved budgets, and fulfilling its fiduciary responsibilities pertaining to the financial stability and long-term economic health of the University. Review annual operating and capital budgets presented for Board approval. Annually review the University's debt and any proposals for bond financing and other borrowing presented for Board approval. Advise the Chancellor/President or his designee on matters of significant financial policy and long-range plans and strategies.

c.      Investment Committee. Assist the Board in fulfilling its fiduciary responsibilities to provide oversight of the stewardship of the University's endowment assets, working capital and any other securities in accordance with the Board-approved Investment Policy, the Prudent Management of Institutional Funds Act, the Prudent Investor Act and other applicable laws. Review and recommend any Investment Policy to the Board. Engage, monitor and evaluate investment advisors and consultants. Review and approve,

8

on behalf of the Board, recommendations for the custodian(s) of University investment assets. Review and evaluate portfolio performance. Serve as a focal point of open communication between the Board, investment advisors and/or consultants and University administrators. Advise the Chancellor/President or his designee on significant investment-related matters.

d.      Spiritual Mission Committee. Assist the Board in fulfilling its responsibility to ensure the spiritual mission of the institution is implemented. Review any proposed amendments to the University's Statement of Mission and Purpose, Philosophy of Education, and Doctrinal Position and make recommendation to the Board concerning amendments. Advise the Chancellor/President or his designee on matters of spiritual significance, including the spiritual integrity of academic programs, courses and events. The Pastor of Thomas Road Baptist Church shall serve as the Chairman of the Spiritual Mission Committee.

SECTION 3: COMPOSITION, ELECTION AND TERMS. Committees may include members who are not members of the Board of Trustees so long as each committee has at least one member of the Board. The Chancellor/President shall be an ex officio member of all the committees. Trustees shall be elected to serve on said committees by the majority vote of a quorum (as defined in the Articles of Incorporation) at any regular or special meeting of the Board of Trustees. The term of any Trustee on said committee shall be consistent with his or her term as Trustee. Any vacancy on a committee shall be filled in accordance with the same procedures as set forth in the Articles of Incorporation for filling a vacancy on the Board of Trustees.

SECTION 4: COMMITTEE CHAIRMAN. Every committee shall have a Committee Chairman who shall preside at all meetings of said committee. The Committee Chairman shall be a Board member elected by the majority vote of a quorum (as defined in the Article of Incorporation) at any regular or special meeting of the Board of Trustees. The Committee Chairman shall be responsible for organizing the committee meetings, preparing and submitting the committee's report and recommendations to the full Board, keeping and maintaining accurate minutes of the committee's meetings and circulating the same to the Secretary, and for ensuring that committee members are notified of the time and place of said meetings. The Committee Chairman shall also perform such other duties as usually pertain to the office of Committee Chairman or that may be required of him or her by the committee or the Board of Trustees.

SECTION 5: COMMITTEE VICE CHAIRMAN. Every committee shall have a Committee Vice Chairman who shall preside at all meetings of said committee in the absence of the Committee Chairman. The Committee Vice Chairman shall be elected by a majority vote of a quorum of the committee. The Committee Vice Chairman, in the absence of the Committee Chairman, shall assume and discharge all other duties pertaining to the office of Committee Chairman. The Committee Vice Chairman shall also perform such other duties as may be required of him by the committee or the Board of Trustees.

SECTION 6: MEETINGS. The committees shall meet at such time and place as the Committee Chairman of the particular committee shall determine. The Committee Chairman

9

shall give every committee member notice of not less than three (3) days prior to any such meeting. A committee member may waive said notice by delivering to the Secretary of the Corporation a waiver in writing and signed by said committee member at any meeting in which said committee member fails to receive proper notice. In addition, waiver will be deemed where said committee member attends any meeting and fails to object to the lack of notice or defective notice at the beginning of said meetings.

SECTION 7: QUORUM. A quorum at any committee meeting shall consist of a majority of the total number of committee members. A quorum shall be sufficient to carry on the business of the committee.

SECTION 8: DUTIES AND RESPONSIBILITIES. The standing committees, including the Executive Committee, shall have all the powers, duties and responsibilities as set forth herein and any other such powers, duties and responsibilities as the Board of Trustees shall see fit to confer upon said committees.

## ARTICLE V

### BOARD OF REGENTS

SECTION 1: REGULAR OR SPECIAL MEETINGS. There shall be held such regular or special meetings as the Chairman of the Board of Trustees or the Chancellor/President shall determine.

SECTION 2: ELECTION. The Chancellor/President shall appoint certain individuals as members of the Board of Regents.

SECTION 3: DUTIES AND RESPONSIBLITIES. The Board of Regents shall serve as an advisory board to the Chancellor/President. The Board of Regents shall also consult with the Chancellor/President on matters concerning the University's mission. Members of the Board of Regents shall be responsible for providing financial and spiritual support to the University.

## ARTICLE VI

### GENERAL PROVISIONS

SECTION 1: CALENDAR. The fiscal year of the corporation shall begin on the 1st day of July and end on the 30th day of June.

SECTION 2: AMENDMENTS. The Articles of Incorporation or Bylaws may be amended or restated at any meeting of the Board of Trustees upon receiving the vote of at least two-thirds of the Trustees.

LUADMINREC000822

## ARTICLE VII

## DISSOLUTION

SECTION 1: DISSOLUTION.  The Corporation may be dissolved at any time upon the adoption of a resolution to dissolve by the vote of a majority of the Trustees.  The dissolution shall be carried out pursuant to the provisions in the Articles of Incorporation relating to dissolution.

Any gender used herein shall be deemed to refer to any other gender more grammatically applicable to the party to whom such gender relates.  The use of singular herein shall be deemed to include the plural and, conversely, the plural shall be deemed to include the singular.

---

## CERTIFICATION OF

## AMENDED AND RESTATED BYLAWS OF

## LIBERTY UNIVERSITY, INC.

I, David M. Corry, being the duly appointed Secretary of Liberty University, Inc., a Virginia non-stock corporation (the "Corporation"), hereby certify that the foregoing Bylaws are a true and complete copy of the Amended and Restated Bylaws of the Corporation duly adopted by the Corporation's Board of Trustees as amended by the Board of Trustees through November 15, 2013 and in effect as of the date of this certificate.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of January, 2014.

_____
David M. Corry, Secretary

11

## EXHIBIT A

### LIBERTY UNIVERSITY DOCTRINAL POSITION

We affirm our belief in one God, infinite Spirit, creator, and sustainer of all things, who exists eternally in three persons, God the Father, God the Son, and God the Holy Spirit. These three are one in essence but distinct in person and function.

We affirm that the Father is the first person of the Trinity and the source of all that God is and does. From Him the Son is eternally generated and from Them the Spirit eternally proceeds. He is the designer of creation, the speaker of revelation, the author of redemption, and the sovereign of history.

We affirm that the Lord Jesus Christ is the second person of the Trinity. Eternally begotten from the Father, He is God. He was conceived by the virgin Mary through a miracle of the Holy Spirit. He lives forever as perfect God and perfect man: two distinct natures inseparably united in one person.

We affirm that the Holy Spirit is the third person of the Trinity, proceeding from the Father and the Son and equal in deity. He is the giver of all life, active in the creating and ordering of the universe; He is the agent of inspiration and the new birth; He restrains sin and Satan; and He indwells and sanctifies all believers.

We affirm that all things were created by God. Angels were created as ministering agents, though some, under the leadership of Satan, fell from their sinless state to become agents of evil. The universe was created in six historical days and is continuously sustained by God; thus it both reflects His glory and reveals His truth. Human beings were directly created, not evolved, in the very image of God. As reasoning moral agents, they are responsible under God for understanding and governing themselves and the world.

We affirm that the Bible, both Old and New Testaments, though written by men, was supernaturally inspired by God so that all its words are the written true revelation of God; it is therefore inerrant in the originals and authoritative in all matters. It is to be understood by all through the illumination of the Holy Spirit, its meaning determined by the historical, grammatical, and literary use of the author's language, comparing Scripture with Scripture.

We affirm that Adam, the first man, willfully disobeyed God, bringing sin and death into the world. As a result, all persons are sinners from conception, which is evidenced in their willful acts of sin; and they are therefore subject to eternal punishment, under the just condemnation of a holy God.

We affirm that Jesus Christ offered Himself as a sacrifice by the appointment of the Father. He fulfilled the demands of God by His obedient life, died on the cross in full substitution and payment for the sins of all, was buried, and on the third day He arose physically and bodily from the dead. He ascended into heaven where He now intercedes for all believers.

We affirm that each person can be saved only through the work of Jesus Christ, through repentance of sin and by faith alone in Him as Savior. The believer is declared righteous, born again by the Holy Spirit, turned from sin, and assured of heaven.

We affirm that the Holy Spirit indwells all who are born again, conforming them to the likeness of Jesus Christ. This is a process completed only in Heaven. Every believer is responsible to live in obedience to the Word of God in separation from sin.

We affirm that a church is a local assembly of baptized believers, under the discipline of the Word of God and the lordship of Christ, organized to carry out the commission to evangelize, to teach, and to administer the ordinances of believer's baptism and the Lord's table. Its offices are pastors and deacons, and it is self governing. It functions through the ministry of gifts given by the Holy Spirit to each believer.

We affirm that the return of Christ for all believers is imminent. It will be followed by seven years of great tribulation, and then the coming of Christ to establish His earthly kingdom for a thousand years. The unsaved will then be raised and judged according to their works and separated forever from God in hell. The saved, having been raised, will live forever in heaven in fellowship with God.

———————————

THINKING | PR

DEMOSS

3343 PEACHTREE RD NE   STE 1000   ATLANTA GA 30326   770.813.0000   DEMOSS.COM

To:        Liberty University Executive Committee        cc:  David Corry

From:      Mark DeMoss

Date:      April 10, 2015

Subject:   **Annual Evaluation of the Chancellor (2014)**

In accordance with the amended bylaws of Liberty University adopted on March 7, 2006 (Article IV, Section 2), the Executive Committee of the University Board of Trustees has conducted its annual evaluation of the chancellor/president, Jerry Falwell, Jr. Our committee met in Lynchburg November 7, 2014, in conjunction with the meeting of the full board of trustees.

As we do each year, we consider a series of reports (from the chancellor, provost and various vice presidents and deans) in our evaluation of Chancellor Falwell. We seek to evaluate his leadership as the custodian and implementer of the university's mission. Specifically, we looked at his leadership and oversight of:

- Integrity of our Christian mission
- Academic excellence
- Community service of students
- Athletics
- Technical innovation
- Campus and facilities
- Student life
- Enrollment management
- Financial stability and growth

We commend Chancellor Falwell for the following:

1. Liberty is now ranked 5th among all colleges and universities in America based on enrollment (up from #70 to #5 since 2008). Total enrollment now tops 105,000.

2. Liberty is one of fewer than 10 schools in America with an accredited Law School, Engineering School, Medical College and a certified aviation program.

3. Falwell presides over 8,000+ employees, including 500 resident faculty members. Liberty's local economic impact now exceeds $1 billion.

4. He recruited and hired Senior Vice President for Spiritual Development, David Nasser. This position is most important for maintaining the university's commitment to its mission to "train champions for Christ." The Chancellor's commitment to the Center for Global Engagement is encouraging to the trustees.

THINKING | PR

Chancellor's Evaluation
April 10, 2015
Page 2



5.  Campus facilities continue to be built, including a School of Music, a Science Hall, Observatory and residence housing. Nearly 1 million square feet of new facilities have been initiated or completed in the past year or so.

6.  The university's financial position remains extraordinarily strong in every area of measurement.

We recommend the date and location of Chancellor Falwell's annual physical evaluation be attached to this evaluation for the file.

Pending approval of the Executive Committee of this report, I refer it to the full board of trustees, with an outstanding commendation for Jerry Falwell, Jr., chancellor and president of Liberty University.

/rmd

# AMENDED AND RESTATED
# ARTICLES OF INCORPORATION
# OF
# LIBERTY UNIVERSITY, INC.

## ARTICLE I – NAME

The name of this corporation is Liberty University, Inc.

## ARTICLE II – PRINCIPAL OFFICE

The principal office of the corporation shall be located in the City of Lynchburg, Virginia.

## ARTICLE III – PURPOSES

The Corporation shall exist for the purpose of glorifying God by equipping men and women in higher education in fidelity to the Christian faith expressed through the Holy Scriptures, the orthodox religious and moral foundations of that education being a central and perpetual purpose and mission of the Corporation. Founded by Thomas Road Baptist Church, the Corporation is an expression of the church's sincerely-held religious belief in obedience of its biblical mandate to provide Christian education to the community and the world.

Guided by this overriding and perpetual purpose and mission, the Corporation shall provide and maintain, under the auspices of the Thomas Road Baptist Church, schools or colleges devoted to the study of theology, liberal arts, fine arts, languages, literature, sciences, government, business and finance, law, education and other appropriate fields of spiritual, professional, and intellectual inquiry, and shall grant upon satisfactory completion of prescribed courses of study such undergraduate or graduate degrees, certificates, or diplomas as are appropriate to the level of instruction offered, as well as honorary degrees to persons distinguished for learning, ability, and character in their respective vocations.

The Corporation shall have all other powers granted to corporations similarly situated under the laws of the State of Virginia except that, in fulfilling its stated purposes, the Corporation shall not engage, except to an insubstantial extent of its activities, in any course of action that is not deemed educational, religious, or philanthropic under the applicable sections of the Internal Revenue Code dealing with tax exempt foundations and educational institutions.

The Corporation is organized, and shall at all times be operated exclusively for religious, charitable, and educational purposes, and no part of the net earning or assets of the Corporation shall inure to whole or in part to the benefit of or be distributed to its Trustees, Officers, or to other private persons except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to

make payments and distributions in the furtherance of the purposes set forth in this Article III hereof.

No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office. Notwithstanding any other provision of these articles, the Corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or (b) by a corporation, contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

The Corporation shall have and exercise all other powers granted to Virginia non-stock corporations except as stated in these Articles.

## ARTICLE IV – MEMBERS

This Corporation shall have no members.

## ARTICLE V – TRUSTEES

The Corporation shall be managed and controlled by a Board of Trustees, and the entire voting power, except as provided in these Articles, shall be vested in the Board of Trustees. The Trustees may by resolution passed by a majority of the whole Board of Trustees designate not less than five (5) of their number to constitute an Executive Committee which shall have and exercise the power of the Board of Trustees in the management of the business and affairs of the Corporation during the interim between board meetings to the extent permitted by law, except as limited by these Articles.

Qualifications, election, and term of office of the Trustees shall be as follows:

(1)     The number of Trustees shall be fixed by the Bylaws of the Corporation, and in the absence of a bylaw fixing the number, the number shall in no case be less than five (5). The majority of the membership of the Board of Trustees shall have no contractual, employment, personal, familial, or financial interest in the Corporation.

(2)     Except as to any Trustee elected to fill an unexpired term arising from a vacancy, the term of office of a Trustee shall be three years from the date of the meeting of Trustees wherein said Trustee was elected. Trustees may be elected to succeed themselves.

(3)     Any vacancy occurring in the Board of Trustees, whether by expiration of term, death, resignation, removal, or any other cause or new position may be filled by nomination of the Executive Committee and the majority affirmative vote of all members

2

of the Board of Trustees present at such regular or special meeting called for the purpose of appointing a new Trustee.

(4)     The Board of Trustees is hereby organized as a Christian body governed by the Christian tenants described in the documents listed in this section. No person may be appointed as a member of the Board of Trustees who does not subscribe to the mission and philosophy of the University, reflected in the Liberty University Statement of Purpose and to the tenets of the Christian faith as reflected in the Holy Scriptures and in the Liberty University Philosophy of Education, Liberty University Statement of Mission and Purpose, and Liberty University Doctrinal Position attached hereto as Exhibit A.

(5)     Any member of the Board of Trustees may be removed for cause (as listed below) at a meeting called for that purpose and by a majority vote of those Trustees present (excluding the member in question). A Trustee, prior to the vote to remove, shall have the opportunity to address the Board; provided, however, that a Trustee shall be automatically removed for missing two (2) consecutive meetings.

(6)     A member of the Board of Trustees may also be removed from the Board for any of the following:

(a) Suspension, revocation, or cancellation of the Trustee's right to practice his/her profession.

(b) Failure to comply with the reasonable policies, standards and regulations of the Board.

(c) Failure to faithfully and diligently perform the duties of a Trustee.

(d) Total disability, making it impossible for the Trustee to perform the duties of the position.

(e) Conduct that is unethical, unprofessional, immoral, or fraudulent; or being cited for unprofessional or unethical conduct by a board or group having any privilege or right to pass upon the conduct of the Trustee.

(f) Affirmative efforts that maliciously undermine or attempt to significantly alter the Christian mission of the Corporation.

(g) Any other reason found to be appropriate by a three-fifths (3/5) majority vote of those Trustees present.

(7)     Notwithstanding Article V (5) - (6) above, the Board of Trustees is obligated to act upon a determination by the Board of Directors of Thomas Road Baptist Church that any Trustee has affirmatively engaged in efforts that maliciously undermine or attempt to significantly alter the Christian mission of the Corporation insofar as that

3

mission is reflected in the Liberty University Doctrinal Position attached as Exhibit A. Such a determination shall be made only after the Trustee is given notice and the opportunity to appear before the Board of Directors of Thomas Road Baptist Church to address its concerns prior to its determination. If requested, the Trustee shall be given notice and the opportunity to appear before the Board of Trustees to address any determination of the Board of Directors of Thomas Road Baptist Church. The Board of Trustees may request that the Board of Directors of Thomas Road Baptist Church reconsider its determination and take into account the information submitted to it by the Board of Trustees. The Doctrinal Position attached as Exhibit A may be amended only by a two-thirds (2/3) majority vote of the entire Board of Trustees of the Corporation and with the consent of the Board of Directors of Thomas Road Baptist Church.

(8)     The Executive Committee shall have all the powers of the Board of Trustees, except that it shall have no power to establish Board policy, to fill vacancies of the Board, or to change the membership of or to fill vacancies of any Committee, or to make, amend, repeal, or adopt Articles of Incorporation or Bylaws of the Corporation, or to fix the compensation of the Trustees for serving on the Board or on any Committee thereof, or to hire or fire the Chancellor/President without the express authorization of the Board of Trustees, or to amend or repeal any resolution of the Board that by its terms shall not be so amendable or repealable.

(9)     One-half of the entire Board of Trustees as constituted from time to time shall at any regular or special meeting of the Board of Trustees constitute a quorum for the transaction of business. Unless otherwise specified in these Articles or in the Bylaws, a majority vote of the duly constituted quorum shall determine the outcome of the matter under consideration.

## ARTICLE VI – INDEMNIFICATION OF TRUSTEES/OFFICERS

Each person now or hereafter a Trustee or Officer of the Corporation (and his heirs, executors and administrators) shall be indemnified by the Corporation against all claims, liabilities, judgments, settlements, costs and expenses, including all attorney's fees imposed upon or reasonably incurred by him in connection with or resulting from, any action, suit, proceeding or claim to which he is or may be made a party by reason of his being or having been a Trustee or Officer of the Corporation (whether or not he is a Trustee or Officer at the time such costs or expenses are incurred by, or imposed upon, him) so long as he conducted himself in good faith; believed that his conduct in his official capacity was in the best interests of the Corporation; in all other cases, that his conduct was not opposed to the best interests of the Corporation, and in the case of any criminal proceeding, he had no reasonable cause to believe that his conduct was unlawful. The Corporation will not indemnify any Trustee or Officer in such action, suit or proceeding if it is determined that said Trustee or Officer was liable as a result of gross negligence, willful misconduct, or a knowing violation of criminal law. In the event of any judgment against such Trustee or Officer or in the event of a settlement, the indemnification shall be made only if the Corporation shall be advised, in case none of the persons involved shall be or have been a Trustee, by the Board of Trustees of the

4

Corporation, and otherwise by independent counsel to be appointed by the Board of Trustees, that in its or his opinion such Trustee or Officer was not guilty of gross negligence, willful misconduct, or a knowing violation of the criminal law, and in the event of a settlement, that such settlement was or is in the best interest of the Corporation. If such determination is made by the Board of Trustees, it may rely as to all questions of law, on the advice of counsel.

## ARTICLE VII – DURATION

The period of duration of the Corporation is unlimited.

## ARTICLE VIII – DISSOLUTION

In the event of the dissolution of the Corporation, all assets remaining after the payment of all lawful debts will be distributed to the Thomas Road Baptist Church, an entity recognized as tax-exempt by the Internal Revenue Service. Upon said dissolution of the Corporation, the Board of Trustees shall secure and preserve all academic records of the University.

However, if the named recipient is not then in existence or not longer a qualified distributee, or unwilling or unable to accept the distribution, then the assets of this Corporation shall be distributed to a fund, foundation or corporation organized and operated exclusively for the purposes specified in Section 501(c)(3) of the Internal Revenue Code.

## ARTICLE IX – AMENDMENTS

These Articles of Incorporation may be amended only by two-thirds majority vote of the entire Board of Trustees.

## CERTIFICATION OF
## AMENDED AND RESTATED ARTICLES OF INCORPORATION OF
## LIBERTY UNIVERSITY, INC.

I, David M. Corry, being the duly appointed Secretary of Liberty University, Inc., a Virginia non-stock corporation (the "Corporation"), hereby certify that the foregoing Articles of Incorporation are a true and complete copy of the Amended and Restated Articles of Incorporation duly adopted by the Corporation's Board of Trustees as amended by the Board of Trustees through July 27, 2016 and in effect as of the date of this certificate.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of November, 2016.

_____
David M. Corry, Secretary

5

LUADMINREC000832

## EXHIBIT A

## LIBERTY UNIVERSITY PHILOSOPHY OF EDUCATION

Liberty University is a Christian academic community in the tradition of evangelical institutions of higher education.  As such, Liberty continues the philosophy of education which first gave rise to the university, and which is summarized in the following propositions.

God, the infinite source of all things, has shown us truth through scripture, nature, history, and above all, in Christ.

Persons are spiritual, rational, moral, social, and physical, created in the image of God. They are, therefore, able to know and to value themselves and other persons, the universe, and God.

Education as the process of teaching and learning, involves the whole person, by developing the knowledge, values, and skills which enable each individual to change freely.  Thus it occurs most effectively when both instructor and student are properly related to God and each other through Christ.

## LIBERTY UNIVERSITY STATEMENT OF MISSION AND PURPOSE

Maintaining the vision of the founder, Dr. Jerry Falwell, Liberty University develops Christ-centered men and women with the values, knowledge, and skills essential to impact the world.

Through its residential and online programs, services, facilities, and collaborations, the University educates men and women who will make important contributions to their workplaces and communities, follow their chosen vocations as callings to glorify God, and fulfill the Great Commission.

Liberty University will:

1. Emphasize excellence in teaching and learning.
2. Foster university-level competencies in communication, critical thinking, information literacy, and mathematics in all undergraduate programs.
3. Ensure competency in scholarship, research, and professional communication in all graduate programs and undergraduate programs, where appropriate.
4. Promote the synthesis of academic knowledge and Christian worldview in order that there might be a maturing of spiritual, intellectual, social and physical value-driven behavior.
5. Enable students to engage in a major field of study in career-focused disciplines built on a solid foundation in the liberal arts.
6. Promote an understanding of the Western tradition and the diverse elements of American cultural history, especially the importance of the individual in maintaining democratic and free market processes.

7. Contribute to a knowledge and understanding of other cultures and of international events.
8. Encourage a commitment to the Christian life, one of personal integrity, sensitivity to the needs of others, social responsibility and active communication of the Christian faith, and, as it is lived out, a life that leads people to Jesus Christ as the Lord of the universe and their own personal Savior.

## LIBERTY UNIVERSITY DOCTRINAL POSITION

We affirm our belief in one God, infinite Spirit, creator, and sustainer of all things, who exists eternally in three persons, God the Father, God the Son, and God the Holy Spirit. These three are one in essence but distinct in person and function.

We affirm that the Father is the first person of the Trinity and the source of all that God is and does. From Him the Son is eternally generated and from Them the Spirit eternally proceeds. He is the designer of creation, the speaker of revelation, the author of redemption, and the sovereign of history.

We affirm that the Lord Jesus Christ is the second person of the Trinity. Eternally begotten from the Father, He is God. He was conceived by the virgin Mary through a miracle of the Holy Spirit. He lives forever as perfect God and perfect man: two distinct natures inseparably united in one person.

We affirm that the Holy Spirit is the third person of the Trinity, proceeding from the Father and the Son and equal in deity. He is the giver of all life, active in the creating and ordering of the universe; He is the agent of inspiration and the new birth; He restrains sin and Satan; and He indwells and sanctifies all believers.

We affirm that all things were created by God. Angels were created as ministering agents, though some, under the leadership of Satan, fell from their sinless state to become agents of evil. The universe was created in six historical days and is continuously sustained by God; thus it both reflects His glory and reveals His truth. Human beings were directly created, not evolved, in the very image of God. As reasoning moral agents, they are responsible under God for understanding and governing themselves and the world.

We affirm that the Bible, both Old and New Testaments, though written by men, was supernaturally inspired by God so that all its words are the written true revelation of God; it is therefore inerrant in the originals and authoritative in all matters. It is to be understood by all through the illumination of the Holy Spirit, its meaning determined by the historical, grammatical, and literary use of the author's language, comparing Scripture with Scripture.

We affirm that Adam, the first man, willfully disobeyed God, bringing sin and death into the world. As a result, all persons are sinners from conception, which is evidenced in

2

their willful acts of sin; and they are therefore subject to eternal punishment, under the just condemnation of a holy God.

We affirm that Jesus Christ offered Himself as a sacrifice by the appointment of the Father. He fulfilled the demands of God by His obedient life, died on the cross in full substitution and payment for the sins of all, was buried, and on the third day He arose physically and bodily from the dead. He ascended into heaven where He now intercedes for all believers.

We affirm that each person can be saved only through the work of Jesus Christ, through repentance of sin and by faith alone in Him as Savior. The believer is declared righteous, born again by the Holy Spirit, turned from sin, and assured of heaven.

We affirm that the Holy Spirit indwells all who are born again, conforming them to the likeness of Jesus Christ. This is a process completed only in Heaven. Every believer is responsible to live in obedience to the Word of God in separation from sin.

We affirm that a church is a local assembly of baptized believers, under the discipline of the Word of God and the lordship of Christ, organized to carry out the commission to evangelize, to teach, and to administer the ordinances of believer's baptism and the Lord's table. Its offices are pastors and deacons, and it is self governing. It functions through the ministry of gifts given by the Holy Spirit to each believer.

We affirm that the return of Christ for all believers is imminent. It will be followed by seven years of great tribulation, and then the coming of Christ to establish His earthly kingdom for a thousand years. The unsaved will then be raised and judged according to their works and separated forever from God in hell. The saved, having been raised, will live forever in heaven in fellowship with God.

LUADMINREC000835

**LIBERTY UNIVERSITY, INC.**
a Virginia non-stock corporation

**AMENDED AND RESTATED BYLAWS**
as amended through November 3, 2017

## ARTICLE I

## MEETINGS OF THE BOARD OF TRUSTEES

SECTION 1: ANNUAL MEETINGS.  Annually there shall be a meeting of the Board of Trustees during the Fall Semester and during the Spring Semester of Liberty University. Such meeting to be held at such place and at such hours as the Chairman of the Board of Trustees or the Chancellor/President shall designate.

SECTION 2: ADDITIONAL REGULAR MEETINGS.  There shall be such additional regular meetings during the calendar year as the Board of Trustees may, from time to time, determine.

SECTION 3: SPECIAL MEETINGS.  The Board of Trustees, or any five (5) members thereof, the Executive Committee, the Chairman of the Board of Trustees, or the Chancellor/President, may call any special meeting of the Board of Trustees.

SECTION 4: NOTICE.  The Secretary of the Corporation shall give each Trustee ten (10) days notice of the date, time and place of each annual, regular or special meeting.  Such notice shall be given, either personally or by electronic or regular mail, to the last known address of said Trustees as shown on the corporate records.

A Trustee may waive said notice by delivering to the Secretary of the Corporation a waiver in writing signed by said Trustee at any meeting in which said Trustee failed to receive proper notice.  In addition, waiver will be implied where said Trustee attends any meeting and fails to object to the lack of notice or defective notice at the beginning of said meeting.

SECTION 5:  PLACE.  Regular or special meetings of the Board of Trustees may be held at such place as may be specified in the notice of said meeting.  Special meetings may be conducted through the use of any means of electronic communication by which all Trustees may simultaneously communicate with each other during said meeting.  A Trustee participating in a meeting by this means is deemed to be present in person at the meeting.

SECTION 6: QUORUM.  Except as otherwise provided by law or the Articles of Incorporation, one half of the entire Board of Trustees as constituted from time to time shall at any regular or special meeting of the Board of Trustees constitute a quorum for the transaction of business.

SECTION 7: VOTING. Each individual Trustee shall have one vote at any regular or special meeting at which the Trustee is present. Furthermore, Trustees may vote only in person and no proxy voting will be recognized.

## ARTICLE II

## BOARD OF TRUSTEES

SECTION 1: NUMBER OF TRUSTEES. The Board of Trustees shall consist of not less than five (5) nor more than fifty (50) Trustees. Emeritus Trustees shall not be counted in this number.

SECTION 2: TERM OF OFFICE. The term of a Trustee shall be consistent with the provisions in the Liberty University, Inc. Articles of Incorporation fixing said term.

SECTION 3: VACANCIES AND NEW POSITIONS. Any vacancies occurring in the Board of Trustees, whether by death, resignation, removal, or any other cause or new position may be filled by nomination of the Executive Committee and the majority affirmative vote of all members of the Board of Trustees present at such regular or special meeting called for the purpose of appointing a new Trustee. Any Trustee who fails to attend or participate in two (2) consecutive regular meetings of the Board of Trustees shall be deemed to have resigned from the Board of Trustees.

SECTION 4: RESPONSIBILITIES AND POWERS. The Board of Trustees shall have the full and complete management and control of the Corporation and its affairs, and on behalf of the Corporation shall authorize and empower the doing of all acts that the Corporation may lawfully do. The Board of Trustees, as the legal body responsible for the institution, has the duty and authority to approve and ensure that the mission of the institution is implemented. The Board of Trustees shall ensure the institution is free from undue influence of external bodies and protect the institution from such undue influence. The Board of Trustees is the active policy-making body for the institution and is ultimately responsible for ensuring that the financial resources of the institution are adequate and sufficiently stable to provide a sound educational program. The Board of Trustees shall exercise its governing policy-making function through the adoption of Board policy. Board policy is a policy that has broad application throughout the institution, states the University's position on a subject matter, and directly affects and enhances the institution's mission. Some Board policy may also help achieve compliance with applicable laws and regulations or reduce institutional risk. The Board of Trustees shall hold the Chancellor/President and his administration accountable for implementation of Board policy, including personnel matters. In furtherance of the foregoing, the Board of Trustees shall have the authority to adopt such Bylaws and pass such resolutions consistent with the purposes as set forth in the Articles of Incorporation. The Chairman of the Board of Trustees and a majority of the other voting members of the Board of Trustees shall have no contractual employment, personal, familial, or financial interest in the institution.

SECTION 5: REMOVAL. Any member of the Board of Trustees may be removed for cause (as detailed below) in accordance with the Articles of Incorporation. Any member of the

LUADMINREC000837

Board of Trustees may be removed for cause (as listed below) at a meeting called for that purpose and by a majority vote of those Trustees present (excluding the member in question). A Trustee, prior to the vote to remove, shall have the opportunity to address the board; provided, however, that a Trustee shall be automatically removed for missing two (2) consecutive meetings. A member of the Board of Trustees may also be removed from the Board for any of the following:

(a) Suspension, revocation, or cancellation of the Trustee's right to practice his/her profession.
(b) Failure to comply with the reasonable policies, standards and regulations of the Board.
(c) Failure to faithfully and diligently perform the duties of a Trustee.
(d) Total disability, making it impossible for the Trustee to perform the duties of the position.
(e) Conduct that is unethical, unprofessional, immoral, or fraudulent; or being cited for unprofessional or unethical conduct by a board or group having any privilege or right to pass upon the conduct of the Trustee.
(f) Affirmative efforts that maliciously undermine or attempt to significantly alter the Christian mission of the Corporation.
(g) Any other reason found to be appropriate by a three-fifths (3/5) majority vote of those Trustees present.

Notwithstanding Article II (5) above, the Board of Trustees is obligated to act upon a determination by the Board of Directors of Thomas Road Baptist Church that any Trustee has affirmatively engaged in efforts that maliciously undermine or attempt to significantly alter the Christian mission of the Corporation insofar as that mission is reflected in the Liberty University Doctrinal Position attached as Exhibit A. Such a determination shall be made only after the Trustee is given notice and the opportunity to appear before the Board of Directors of Thomas Road Baptist Church to address its concerns prior to its determination. If requested, the Trustee shall be given notice and the opportunity to appear before the Board of Trustees to address any determination of the Board of Directors of Thomas Road Baptist Church. The Board of Trustees may request that the Board of Directors of Thomas Road Baptist Church reconsider its determination and take into account the information submitted to it by the Board of Trustees. The Doctrinal Position attached as Exhibit A may be amended only by a two-thirds (2/3) majority vote of the entire Board of Trustees of the Corporation and with the consent of the Board of Directors of Thomas Road Baptist Church.

SECTION 6: EMERITUS TRUSTEES. The honor of being an Emeritus Trustee is available to Board of Trustee members in good standing who have served at least three terms as Trustee. The term of Emeritus Trustee is for life and no Emeritus Trustee shall be automatically removed for missing two (2) consecutive meetings. Emeritus Trustees are non-voting members of the Board of Trustees. Emeritus Trustees have no fiduciary or governance responsibilities or obligations, and may not be elected Chairman or Vice Chairman of the Board or of any of its committees. Otherwise, Emeritus Trustees may be accorded all the honors and privileges of Board of Trustee members.

LUADMINREC000838

# ARTICLE III

## OFFICERS OF THE CORPORATION
## AND THEIR DUTIES

SECTION 1: TITLES. The officers of the Corporation shall be: Chancellor/President, Chief Operating Officer, General Counsel, Treasurer/Chief Financial Officer, Provost, Secretary, Assistant Secretary, and any other such officers as the Board of Trustees may, from time to time, determine.

SECTION 2: CHANCELLOR/PRESIDENT. The Chancellor/President is appointed by the Board of Trustees and is the Chief Executive Officer of the University. The Chancellor/President is vested with all authority, powers, duties and responsibilities incident to the management and control of the University to further its interests, including the authority to enter into contracts and transact business in the name of the University, including the power to purchase, receive, accept, reject, convey, grant, exchange, trade, partition, release, lease, sublease, contribute, donate, secure, encumber, pledge and otherwise develop, grant and dispose of the assets, real property and other property interests of the University. The Chancellor/President, whose primary responsibility is to the institution, shall serve as a member of the Board of Trustees but not serve as its Chairman. The Chancellor/President shall see that all Board policies and resolutions of the Board are administered and implemented under his general supervision. The Chancellor/President is responsible for the adoption of administrative policies, rules and regulations that govern the day to day operations of the University, clarify the roles and responsibilities of administrators, staff, faculty and students relating to a specified subject matter, or provide guidance on procedural matters. In addition to the foregoing, the Chancellor/President shall be responsible for providing focus and direction for the University and for making Board policy recommendations to the Board of Trustees. The Chancellor/President shall represent the University and shall be responsible for implementing the mission of the University. The Chancellor/President, or his designee, shall preside over and coordinate all meetings and official convocations of the University, including student and faculty convocations. The Chancellor/President is also the principal liaison between Thomas Road Baptist Church and Liberty University. He provides spiritual and worldview leadership to the University in the pursuit of excellence. The Chancellor/President, in addition to the duties and responsibilities set forth herein, shall have ultimate responsibility for, and exercise appropriate administrative and fiscal control over, the institution's intercollegiate athletics program, and shall also be directly responsible for recruiting students and soliciting contributions to support the University. The Chancellor/President may delegate any of his powers to such other officers of the University as he may deem appropriate. The Chancellor/President shall make an annual report to the Board of Trustees of the work, condition, and needs of the University as well as any other matters that may affect the University as it pursues the fulfillment of its mission. The policy and procedure for evaluation of the Chancellor/President is detailed in Article IV, Section 2.

SECTION 3: CHIEF OPERATING OFFICER. The Chief Operating Officer is appointed by the Chancellor/President, reports to the Chancellor/President and shall be responsible on behalf of the Chancellor/President for the leadership and guidance of senior administrative

4

management of the University. This shall include, but is not limited to, developing strategy and policy initiatives, budgeting, oversight of day-to-day operations, fostering University alignment with strategic goals and keeping the Chancellor/President apprised of significant events.

SECTION 4: PROVOST. The Provost is appointed by the Chancellor/President and is the Chief Academic Officer for the University. This individual serves as the primary voice on academic matters within the administration. The Provost, in collaboration with the deans, the Faculty Senates, and the General Faculty, is responsible for developing and implementing the academic vision and values of the University. These core values are engaged through the various academic programs offered in multiple delivery formats, as well as through the teaching, research and service activities of the academic centers. The Provost, in collaboration with the deans, the Faculty Senates, and the General Faculty, provides leadership in continuously improving undergraduate and graduate instruction and academic support services. The Provost works with the deans and the Chancellor/President to identify and prioritize resource allocations among academic units. The Provost assesses the performance of academic leaders and provides regular feedback to encourage improvement. The Provost, further, has the responsibility to oversee a structured process through which faculty can develop professionally within their disciplines, improve as effective academic communicators, and utilize the wide array of technological tools and resources available to enrich the art of teaching. The Provost serves as the liaison to those external agencies with which the University maintains institutional accreditation. The Provost communicates regularly with the Chancellor/President and the various University constituencies on matters of importance with respect to accreditation. The Provost also serves as the liaison of the administration to the Faculty Senates. The Provost is the designated Officer of the University to succeed the Chancellor/President (as Acting Chancellor/President until the Board of Trustee appoints a successor) in the event of the Chancellor/President's death, disability or resignation.

SECTION 5: SECRETARY. The Secretary of the Corporation is appointed by the Board of Trustees and shall keep accurate minutes of all meetings of the Board of Trustees, and shall have charge of maintaining such other records as may be required of him or her by the Chancellor/President or the Board. The Secretary shall act in a like capacity for the Executive Committee or any other committee possessing governing authority and established by the Board of Trustees. The Secretary shall have charge of the correspondence, notify Trustees of meetings, notify new Trustees of their election, notify officers of their election to office, keep a roll of the Trustees with their addresses, and carry out other duties incident to his or her office as the Chancellor/President may request or the Board of Trustees or Chancellor/President may assign.

SECTION 6: ASSISTANT SECRETARY. The Assistant Secretary of the Corporation is appointed by the Board of Trustees and may attend all meetings of the Board of Trustees, in order to assist the Chairman or Vice Chairman as they preside over said meetings. The Assistant Secretary shall also ensure that all of the governing documents or any amendments thereto, are in compliance with any legal requirements that may be applicable to the same.

SECTION 7: TREASURER/CHIEF FINANCIAL OFFICER. The Treasurer is appointed by the Chancellor/President and shall be the Chief Financial Officer of the University. The Treasurer of the Corporation shall be responsible for the collection and receipt of all monies due

LUADMINREC000840

or belonging to the Corporation. The Treasurer shall cause accurate books and records of the financial condition of the Corporation to be maintained, and at the request of the Chancellor/President, or the Chairman of the Board of Trustees or the Audit Committee, shall render an account of all monies received or expended during the previous fiscal year. The Treasurer/Chief Financial Officer shall have the authority to enter into contracts and transact business in the name of the University to further its interests up to a limit of $100,000 per transaction. The Board of Trustees shall have the authority to request an annual audit of the books of the Corporation. The Chief Financial Officer is generally responsible for financial operations of the University except as separately delegated by these Bylaws and by the Chancellor/President. The Chief Financial Officer shall also act as the Chief Investment Officer and have general charge of all investment matters pertaining to the Corporation, subject to direction of the Board of Trustees. The Chief Financial Officer shall advise the Corporation, its Committees and Officers, the Chancellor/President, and other Officers on investment matters; and shall, subject to the administrative oversight of the Chancellor/President, oversee the provision of all investment services of the Corporation. The Chief Financial Officer shall make such reports of receipts and disbursements of all investments and of such related matters pertaining to the activities of the Chief Financial Officer as shall be requested by the Chancellor/President, the Board of Trustees, the Investment Committee and the Executive Committee. The Chief Financial Officer also works with senior management on individual and group projects.

SECTION 8: GENERAL COUNSEL. The General Counsel is appointed by the Chancellor/President and shall be the Chief Legal Officer of the University in charge of all legal matters pertaining to the Corporation and the University. The General Counsel shall attend meetings of the Board of Trustees and the Executive Committee and shall represent the Corporation in all legal proceedings and advise the Corporation, its Committees, the Officers, and the Chancellor/President on legal questions as may be required; and shall, subject to the direction of the Chancellor/President, oversee the provision of all legal services to the Corporation.

## ARTICLE IV

### COMMITTEES

SECTION 1: COMMITTEES. The Board of Trustees shall have the following standing committees: Executive Committee, Investment Committee, Audit Committee, and Spiritual Mission Committee. The Board of Trustees shall have the power to appoint any other standing committees as it deems necessary and proper for carrying out the affairs of the University, as well as the appointment of any special committees to aid the Board of Trustees or any standing committee on any particular projects. Such committees shall be subject to the final authority of the Board of Trustees.

SECTION 2: CHARGES. The standing committees shall have the following charges:

a.      Audit Committee. Assist the Board in fulfilling its oversight and fiduciary responsibilities for ensuring the adequacy, integrity and reliability of the University's

6

financial reporting process, system of internal control, audit process and auditors, risk management system, and process for monitoring compliance with applicable laws, regulations and codes of conduct. Review and recommend Board polices regarding such matters, monitor and evaluate such matters for compliance with the University's mission and Board policies, and annually select areas to be audited, internally and externally. Review and evaluate financial audits, government agency audits, NCAA annual financial procedures and compliance reports, insurance audits, conflicts of interest policies, and disclosures of Trustees, Officers and other key employees regarding related-party transactions and conflicts of interest. Serve as a focal point of open communications between the Board, independent auditor and University administrators. Resolve any disagreements between auditors and University administrators. In discharging its oversight role, investigate or cause to be investigated matters within the Audit Committee's charge. Have a dotted-line reporting relationship with the Internal Auditor. Advise the Chancellor/President or his designee on significant matters within the Audit Committee's charge.

b.      Executive Committee. During the intervals between Board of Trustee meetings, have the full and complete management and control of the Corporation and its affairs, and on behalf of the Corporation may undertake, authorize and empower the doing of all acts that the Corporation may lawfully do, except (1) elect members of the Executive Committee, (2) amend the Articles of Incorporation or these Bylaws, or (3) rescind or alter previous action of the Board of Trustees. Consider, recommend and oversee the structure, composition and operation of the Board so as to provide effective governance of the University. Periodically review the Bylaws and other governance documents and make recommendation to the Board concerning amendment. Engage in succession planning for the Chancellor/President and Trustees. Make recommendations to the Board for selection of a Chancellor/President and for nominations of trustees and committee members, as well as re-nominations when terms expire. Conduct or cause to be conducted Trustee orientations and periodic board effectiveness evaluations. Set, on behalf of the Board, the compensation and benefits of the Chancellor/President. Annually review and evaluate, on behalf of the Board, the compensation and benefits of the Chancellor/President and other Officers of the Corporation and "key employees" as defined for the purposes of IRS Form 990, as well as any other "disqualified persons" as defined in IRC Section 4958. Neither members of the committee nor staff liaisons may participate in committee votes, discussions or evaluations concerning their own performance or compensation, and should be excused from the committee meetings at such times. Engage compensation and governance training consultants or experts, as needed. The Chairman of the Executive Committee and a majority of the other voting members of the Executive Committee shall have no contractual, employment, personal, familial, or financial interest in the institution. The Executive Committee shall be composed of no less than five (5) members of the Board of Trustees. The committee shall have a dotted-line reporting relationship with the General Counsel. It shall advise the Chancellor/President or his designee on significant matters. All other provisions of this Article pertaining to standing committees shall be applicable to the Executive Committee.

LUADMINREC000842

The Executive Committee shall formally evaluate the Chancellor/President annually. The results of the evaluation shall be attached to the official minutes of the Executive Committee. A report on the formal evaluation shall be provided by the Chair of the Executive Committee. The Chair shall, after discussion of the evaluation, bring a motion to accept the evaluation. The evaluation shall be according to the following procedures:

a. The Chairman of the Executive Committee shall distribute to Executive Committee members the evaluation criteria at the meeting of the Committee.

b. The evaluation may address those items in the University's Strategic Plan that the Executive Committee determines to be within the direct purview of the Chancellor/Presidents well as any other matters of leadership the Executive Committee determines to be relevant. The evaluation criteria and process should be reviewed and updated periodically by the Executive Committee.

c. Following discussion with the Chancellor/President at the meeting of the Executive Committee, the members of the Committee shall complete the evaluation.

d. The results of the evaluation shall be attached to the official minutes of the Executive Committee.

e. The Chairman of the Executive Committee shall provide summary comments concerning the evaluation in his report to the full Board at the Annual Meeting and, following discussion, shall request a motion to accept the report, including a summary of the evaluation.

The Executive Committee shall also serve in the capacity of a Finance Committee and shall perform these additional functions. Assist the Board in fulfilling its oversight responsibilities for the University's execution of Board-approved budgets, and fulfilling its fiduciary responsibilities pertaining to the financial stability and long-term economic health of the University. Review annual operating and capital budgets presented for Board approval. Annually review the University's debt and any proposals for bond financing and other borrowing presented for Board approval. Advise the Chancellor/President or his designee on matters of significant financial policy and long-range plans and strategies.

c. Investment Committee. Assist the Board in fulfilling its fiduciary responsibilities to provide oversight of the stewardship of the University's endowment assets, working capital and any other securities in accordance with the Board-approved Investment Policy, the Prudent Management of Institutional Funds Act, the Prudent Investor Act and other applicable laws. Review and recommend any Investment Policy to the Board. Engage, monitor and evaluate investment advisors and consultants. Review and approve, on behalf of the Board, recommendations for the custodian(s) of University investment assets. Review and evaluate portfolio performance. Serve as a focal point of open communication between the Board, investment advisors and/or consultants and University administrators. Advise the Chancellor/President or his designee on significant investment-related matters.

8

d.      Spiritual Mission Committee.  Assist the Board in fulfilling its responsibility to ensure the spiritual mission of the institution is implemented.  Review any proposed amendments to the University's Statement of Mission and Purpose, Philosophy of Education, and Doctrinal Position and make recommendation to the Board concerning amendments.  Advise the Chancellor/President or his designee on matters of spiritual significance, including the spiritual integrity of academic programs, courses and events.  The Pastor of Thomas Road Baptist Church shall serve as the Chairman of the Spiritual Mission Committee.

SECTION 3: COMPOSITION, ELECTION AND TERMS.  Committees may include members who are not members of the Board of Trustees so long as each committee has at least one member of the Board.  The Chancellor/President shall be an ex officio member of all the committees.  Committee members, both Trustees and non-Trustees, shall be elected annually to serve one year terms on said committees by the majority vote of a quorum (as defined in the Articles of Incorporation) at any regular or special meeting of the Board of Trustees.  Any vacancy on a committee shall be filled in accordance with the same procedures as set forth in the Articles of Incorporation for filling a vacancy on the Board of Trustees.

SECTION 4: COMMITTEE CHAIRMAN.  Every committee shall have a Committee Chairman who shall preside at all meetings of said committee.  The Committee Chairman shall be a Board member elected annually for a one-year term by the majority vote of a quorum (as defined in the Article of Incorporation) at any regular or special meeting of the Board of Trustees.  The Committee Chairman shall be responsible for organizing the committee meetings, preparing and submitting the committee's report and recommendations to the full Board, keeping and maintaining accurate minutes of the committee's meetings and circulating the same to the Secretary, and for ensuring that committee members are notified of the time and place of said meetings.  The Committee Chairman shall also perform such other duties as usually pertain to the office of Committee Chairman or that may be required of him or her by the committee or the Board of Trustees.

SECTION 5: COMMITTEE VICE CHAIRMAN.  Every committee shall have a Committee Vice Chairman who shall preside at all meetings of said committee in the absence of the Committee Chairman.  The Committee Vice Chairman shall be elected by a majority vote of a quorum of the committee.  The Committee Vice Chairman, in the absence of the Committee Chairman, shall assume and discharge all other duties pertaining to the office of Committee Chairman.  The Committee Vice Chairman shall also perform such other duties as may be required of him by the committee or the Board of Trustees.

SECTION 6: MEETINGS.  The committees shall meet at such time and place as the Committee Chairman of the particular committee shall determine.  The Committee Chairman shall give every committee member notice of not less than three (3) days prior to any such meeting.  A committee member may waive said notice by delivering to the Secretary of the Corporation a waiver in writing and signed by said committee member at any meeting in which said committee member fails to receive proper notice.  In addition, waiver will be deemed where said committee member attends any meeting and fails to object to the lack of notice or defective notice at the beginning of said meetings.

LUADMINREC000844

SECTION 7: QUORUM.  A quorum at any committee meeting shall consist of a majority of the total number of committee members.  A quorum shall be sufficient to carry on the business of the committee.

SECTION 8: DUTIES AND RESPONSIBILITIES.  The standing committees, including the Executive Committee, shall have all the powers, duties and responsibilities as set forth herein and any other such powers, duties and responsibilities as the Board of Trustees shall see fit to confer upon said committees.

## ARTICLE V

## BOARD OF REGENTS

SECTION 1: REGULAR OR SPECIAL MEETINGS.  There shall be held such regular or special meetings as the Chairman of the Board of Trustees or the Chancellor/President shall determine.

SECTION 2: ELECTION.  The Chancellor/President shall appoint certain individuals as members of the Board of Regents.

SECTION 3: DUTIES AND RESPONSIBLITIES.  The Board of Regents shall serve as an advisory board to the Chancellor/President.  The Board of Regents shall also consult with the Chancellor/President on matters concerning the University's mission.  Members of the Board of Regents shall be responsible for providing financial and spiritual support to the University.

## ARTICLE VI

## GENERAL PROVISIONS

SECTION 1: CALENDAR.  The fiscal year of the corporation shall begin on the 1st day of July and end on the 30th day of June.

SECTION 2: AMENDMENTS.  The Articles of Incorporation or Bylaws may be amended or restated at any meeting of the Board of Trustees upon receiving the vote of at least two-thirds of the Trustees.

LUADMINREC000845

## ARTICLE VII

### DISSOLUTION

SECTION 1: DISSOLUTION.  The Corporation may be dissolved at any time upon the adoption of a resolution to dissolve by the vote of a majority of the Trustees.  The dissolution shall be carried out pursuant to the provisions in the Articles of Incorporation relating to dissolution.

Any gender used herein shall be deemed to refer to any other gender more grammatically applicable to the party to whom such gender relates.  The use of singular herein shall be deemed to include the plural and, conversely, the plural shall be deemed to include the singular.

---

### CERTIFICATION OF

### AMENDED AND RESTATED BYLAWS OF

### LIBERTY UNIVERSITY, INC.

I, David M. Corry, being the duly appointed Secretary of Liberty University, Inc., a Virginia non-stock corporation (the "Corporation"), hereby certify that the foregoing Bylaws are a true and complete copy of the Amended and Restated Bylaws of the Corporation duly adopted by the Corporation's Board of Trustees as amended by the Board of Trustees through November 3, 2017 and in effect as of the date of this certificate.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of April, 2018.

David M. Corry, Secretary

11

# EXHIBIT A

## LIBERTY UNIVERSITY PHILOSOPHY OF EDUCATION

Liberty University is a Christian academic community in the tradition of evangelical institutions of higher education. As such, Liberty continues the philosophy of education which first gave rise to the university, and which is summarized in the following propositions.

God, the infinite source of all things, has shown us truth through scripture, nature, history, and above all, in Christ.

Persons are spiritual, rational, moral, social, and physical, created in the image of God. They are, therefore, able to know and to value themselves and other persons, the universe, and God.

Education as the process of teaching and learning, involves the whole person, by developing the knowledge, values, and skills which enable each individual to change freely. Thus it occurs most effectively when both instructor and student are properly related to God and each other through Christ.

## LIBERTY UNIVERSITY STATEMENT OF MISSION AND PURPOSE

Maintaining the vision of the founder, Dr. Jerry Falwell, Liberty University develops Christ-centered men and women with the values, knowledge, and skills essential to impact the world.

Through its residential and online programs, services, facilities, and collaborations, the University educates men and women who will make important contributions to their workplaces and communities, follow their chosen vocations as callings to glorify God, and fulfill the Great Commission.

Liberty University will:

1. Emphasize excellence in teaching and learning.
2. Foster university-level competencies in communication, critical thinking, information literacy, and mathematics in all undergraduate programs.
3. Ensure competency in scholarship, research, and professional communication in all graduate programs and undergraduate programs, where appropriate.
4. Promote the synthesis of academic knowledge and Christian worldview in order that there might be a maturing of spiritual, intellectual, social and physical value-driven behavior.
5. Enable students to engage in a major field of study in career-focused disciplines built on a solid foundation in the liberal arts.
6. Promote an understanding of the Western tradition and the diverse elements of American cultural history, especially the importance of the individual in maintaining democratic and free market processes.

7. Contribute to a knowledge and understanding of other cultures and of international events.
8. Encourage a commitment to the Christian life, one of personal integrity, sensitivity to the needs of others, social responsibility and active communication of the Christian faith, and, as it is lived out, a life that leads people to Jesus Christ as the Lord of the universe and their own personal Savior.

## LIBERTY UNIVERSITY DOCTRINAL POSITION

We affirm our belief in one God, infinite Spirit, creator, and sustainer of all things, who exists eternally in three persons, God the Father, God the Son, and God the Holy Spirit. These three are one in essence but distinct in person and function.

We affirm that the Father is the first person of the Trinity and the source of all that God is and does. From Him the Son is eternally generated and from Them the Spirit eternally proceeds. He is the designer of creation, the speaker of revelation, the author of redemption, and the sovereign of history.

We affirm that the Lord Jesus Christ is the second person of the Trinity. Eternally begotten from the Father, He is God. He was conceived by the virgin Mary through a miracle of the Holy Spirit. He lives forever as perfect God and perfect man: two distinct natures inseparably united in one person.

We affirm that the Holy Spirit is the third person of the Trinity, proceeding from the Father and the Son and equal in deity. He is the giver of all life, active in the creating and ordering of the universe; He is the agent of inspiration and the new birth; He restrains sin and Satan; and He indwells and sanctifies all believers.

We affirm that all things were created by God. Angels were created as ministering agents, though some, under the leadership of Satan, fell from their sinless state to become agents of evil. The universe was created in six historical days and is continuously sustained by God; thus it both reflects His glory and reveals His truth. Human beings were directly created, not evolved, in the very image of God. As reasoning moral agents, they are responsible under God for understanding and governing themselves and the world.

We affirm that the Bible, both Old and New Testaments, though written by men, was supernaturally inspired by God so that all its words are the written true revelation of God; it is therefore inerrant in the originals and authoritative in all matters. It is to be understood by all through the illumination of the Holy Spirit, its meaning determined by the historical, grammatical, and literary use of the author's language, comparing Scripture with Scripture.

We affirm that Adam, the first man, willfully disobeyed God, bringing sin and death into the world. As a result, all persons are sinners from conception, which is evidenced in

2

their willful acts of sin; and they are therefore subject to eternal punishment, under the just condemnation of a holy God.

We affirm that Jesus Christ offered Himself as a sacrifice by the appointment of the Father. He fulfilled the demands of God by His obedient life, died on the cross in full substitution and payment for the sins of all, was buried, and on the third day He arose physically and bodily from the dead. He ascended into heaven where He now intercedes for all believers.

We affirm that each person can be saved only through the work of Jesus Christ, through repentance of sin and by faith alone in Him as Savior. The believer is declared righteous, born again by the Holy Spirit, turned from sin, and assured of heaven.

We affirm that the Holy Spirit indwells all who are born again, conforming them to the likeness of Jesus Christ. This is a process completed only in Heaven. Every believer is responsible to live in obedience to the Word of God in separation from sin.

We affirm that a church is a local assembly of baptized believers, under the discipline of the Word of God and the lordship of Christ, organized to carry out the commission to evangelize, to teach, and to administer the ordinances of believer's baptism and the Lord's table. Its offices are pastors and deacons, and it is self governing. It functions through the ministry of gifts given by the Holy Spirit to each believer.

We affirm that the return of Christ for all believers is imminent. It will be followed by seven years of great tribulation, and then the coming of Christ to establish His earthly kingdom for a thousand years. The unsaved will then be raised and judged according to their works and separated forever from God in hell. The saved, having been raised, will live forever in heaven in fellowship with God.

LUADMINREC000849

**LIBERTY UNIVERSITY, INC.**
a Virginia non-stock corporation

**AMENDED AND RESTATED BYLAWS**
as amended through April 5, 2019

## ARTICLE I

## MEETINGS OF THE BOARD OF TRUSTEES

SECTION 1: ANNUAL MEETINGS. Annually there shall be a meeting of the Board of Trustees during the Fall Semester and during the Spring Semester of Liberty University. Such meeting to be held at such place and at such hours as the Chairman of the Board of Trustees or the President shall designate.

SECTION 2: ADDITIONAL REGULAR MEETINGS. There shall be such additional regular meetings during the calendar year as the Board of Trustees may, from time to time, determine.

SECTION 3: SPECIAL MEETINGS. The Board of Trustees, or any five (5) members thereof, the Executive Committee, the Chairman of the Board of Trustees, or the President, may call any special meeting of the Board of Trustees.

SECTION 4: NOTICE. The Secretary of the Corporation shall give each Trustee ten (10) days notice of the date, time and place of each annual, regular or special meeting. Such notice shall be given, either personally or by electronic or regular mail, to the last known address of said Trustees as shown on the corporate records.

A Trustee may waive said notice by delivering to the Secretary of the Corporation a waiver in writing signed by said Trustee at any meeting in which said Trustee failed to receive proper notice. In addition, waiver will be implied where said Trustee attends any meeting and fails to object to the lack of notice or defective notice at the beginning of said meeting.

SECTION 5: PLACE. Regular or special meetings of the Board of Trustees may be held at such place as may be specified in the notice of said meeting. Special meetings may be conducted through the use of any means of electronic communication by which all Trustees may simultaneously communicate with each other during said meeting. A Trustee participating in a meeting by this means is deemed to be present in person at the meeting.

SECTION 6: QUORUM. Except as otherwise provided by law or the Articles of Incorporation, one half of the entire Board of Trustees as constituted from time to time shall at any regular or special meeting of the Board of Trustees constitute a quorum for the transaction of business.

SECTION 7: VOTING. Each individual Trustee shall have one vote at any regular or special meeting at which the Trustee is present. Furthermore, Trustees may vote only in person and no proxy voting will be recognized.

## ARTICLE II

### BOARD OF TRUSTEES

SECTION 1: NUMBER OF TRUSTEES. The Board of Trustees shall consist of not less than five (5) nor more than fifty (50) Trustees. Emeritus Trustees shall not be counted in this number.

SECTION 2: TERM OF OFFICE. The term of a Trustee shall be consistent with the provisions in the Liberty University, Inc. Articles of Incorporation fixing said term.

SECTION 3: VACANCIES AND NEW POSITIONS. Any vacancies occurring in the Board of Trustees, whether by death, resignation, removal, or any other cause or new position may be filled by nomination of the Executive Committee and the majority affirmative vote of all members of the Board of Trustees present at such regular or special meeting called for the purpose of appointing a new Trustee. Any Trustee who fails to attend or participate in two (2) consecutive regular meetings of the Board of Trustees shall be deemed to have resigned from the Board of Trustees.

SECTION 4: RESPONSIBILITIES AND POWERS. The Board of Trustees shall have the full and complete management and control of the Corporation and its affairs, and on behalf of the Corporation shall authorize and empower the doing of all acts that the Corporation may lawfully do. The Board of Trustees, as the legal body responsible for the institution, has the duty and authority to approve and ensure that the mission of the institution is implemented. The Board of Trustees shall ensure the institution is free from undue influence of external bodies and protect the institution from such undue influence. The Board of Trustees is the active policy-making body for the institution and is ultimately responsible for ensuring that the financial resources of the institution are adequate and sufficiently stable to provide a sound educational program. The Board of Trustees shall exercise its governing policy-making function through the adoption of Board policy. Board policy is a policy that has broad application throughout the institution, states the University's position on a subject matter, and directly affects and enhances the institution's mission. Some Board policy may also help achieve compliance with applicable laws and regulations or reduce institutional risk. The Board of Trustees shall hold the President and his administration accountable for implementation of Board policy, including personnel matters. In furtherance of the foregoing, the Board of Trustees shall have the authority to adopt such Bylaws and pass such resolutions consistent with the purposes as set forth in the Articles of Incorporation. The Chairman of the Board of Trustees and a majority of the other voting members of the Board of Trustees shall have no contractual employment, personal, familial, or financial interest in the institution.

SECTION 5: REMOVAL. Any member of the Board of Trustees may be removed for cause (as detailed below) in accordance with the Articles of Incorporation. Any member of the

2

Board of Trustees may be removed for cause (as listed below) at a meeting called for that purpose and by a majority vote of those Trustees present (excluding the member in question). A Trustee, prior to the vote to remove, shall have the opportunity to address the board; provided, however, that a Trustee shall be automatically removed for missing two (2) consecutive meetings. A member of the Board of Trustees may also be removed from the Board for any of the following:

(a) Suspension, revocation, or cancellation of the Trustee's right to practice his/her profession.
(b) Failure to comply with the reasonable policies, standards and regulations of the Board.
(c) Failure to faithfully and diligently perform the duties of a Trustee.
(d) Total disability, making it impossible for the Trustee to perform the duties of the position.
(e) Conduct that is unethical, unprofessional, immoral, or fraudulent; or being cited for unprofessional or unethical conduct by a board or group having any privilege or right to pass upon the conduct of the Trustee.
(f) Affirmative efforts that maliciously undermine or attempt to significantly alter the Christian mission of the Corporation.
(g) Any other reason found to be appropriate by a three-fifths (3/5) majority vote of those Trustees present.

Notwithstanding Article II (5) above, the Board of Trustees is obligated to act upon a determination by the Board of Directors of Thomas Road Baptist Church that any Trustee has affirmatively engaged in efforts that maliciously undermine or attempt to significantly alter the Christian mission of the Corporation insofar as that mission is reflected in the Liberty University Doctrinal Position attached as Exhibit A. Such a determination shall be made only after the Trustee is given notice and the opportunity to appear before the Board of Directors of Thomas Road Baptist Church to address its concerns prior to its determination. If requested, the Trustee shall be given notice and the opportunity to appear before the Board of Trustees to address any determination of the Board of Directors of Thomas Road Baptist Church. The Board of Trustees may request that the Board of Directors of Thomas Road Baptist Church reconsider its determination and take into account the information submitted to it by the Board of Trustees. The Doctrinal Position attached as Exhibit A may be amended only by a two-thirds (2/3) majority vote of the entire Board of Trustees of the Corporation and with the consent of the Board of Directors of Thomas Road Baptist Church.

SECTION 6: EMERITUS TRUSTEES. The honor of being an Emeritus Trustee is available to Board of Trustee members in good standing who have served at least three terms as Trustee. The term of Emeritus Trustee is for life and no Emeritus Trustee shall be automatically removed for missing two (2) consecutive meetings. Emeritus Trustees are non-voting members of the Board of Trustees. Emeritus Trustees have no fiduciary or governance responsibilities or obligations, and may not be elected Chairman or Vice Chairman of the Board or of any of its committees. Otherwise, Emeritus Trustees may be accorded all the honors and privileges of Board of Trustee members.

LUADMINREC000852

## ARTICLE III

## OFFICERS OF THE CORPORATION
## AND THEIR DUTIES

SECTION 1: TITLES.   The officers of the Corporation shall be: President, Chief Operating Officer, General Counsel, Treasurer/Executive Vice President of Finance, Chief Investment Officer, Provost, Online Provost, Secretary, Assistant Secretary, and any other such officers as the Board of Trustees may, from time to time, determine.

SECTION 2: PRESIDENT. The President is appointed by the Board of Trustees and is the Chief Executive Officer of the University.  The President is vested with all authority, powers, duties and responsibilities incident to the management and control of the University to further its interests, including the authority to enter into contracts and transact business in the name of the University, including the power to purchase, receive, accept, reject, convey, grant, exchange, trade, partition, release, lease, sublease, contribute, donate, secure, encumber, pledge and otherwise develop, grant and dispose of the assets, real property and other property interests of the University.  The President, whose primary responsibility is to the institution, shall serve as a member of the Board of Trustees but not serve as its Chairman. The President shall see that all Board policies and resolutions of the Board are administered and implemented under his general supervision.  The President is responsible for the adoption of administrative policies, rules and regulations that govern the day to day operations of the University, clarify the roles and responsibilities of administrators, staff, faculty and students relating to a specified subject matter, or provide guidance on procedural matters.  In addition to the foregoing, the President shall be responsible for providing focus and direction for the University and for making Board policy recommendations to the Board of Trustees.  The President shall represent the University and shall be responsible for implementing the mission of the University.  The President, or his designee, shall preside over and coordinate all meetings and official convocations of the University, including student and faculty convocations.  The President is also the principal liaison between Thomas Road Baptist Church and Liberty University.  He provides spiritual and worldview leadership to the University in the pursuit of excellence.  The President, in addition to the duties and responsibilities set forth herein, shall have ultimate responsibility for, and exercise appropriate administrative and fiscal control over, the institution's intercollegiate athletics program, and shall also be directly responsible for recruiting students and soliciting contributions to support the University.  The President may delegate any of his powers to such other officers of the University as he may deem appropriate.  The President shall make an annual report to the Board of Trustees of the work, condition, and needs of the University as well as any other matters that may affect the University as it pursues the fulfillment of its mission. The policy and procedure for evaluation of the President is detailed in Article IV, Section 2.

SECTION 3: CHIEF OPERATING OFFICER.  The Chief Operating Officer is appointed by the President, reports to the President and shall be responsible on behalf of the President for the leadership and guidance of senior administrative management of the University.  This shall include, but is not limited to, developing strategy and policy initiatives, budgeting, oversight of day-to-day operations, fostering University alignment with strategic goals and keeping the President apprised of significant events.

LUADMINREC000853

SECTION 4: PROVOST.   The Provost is appointed by the President and is the designated Chief Academic Officer for the University. This individual serves as the primary voice on residential program academic matters within the administration.   The Provost, in collaboration with the deans, the Faculty Senate, and the General Faculty, is responsible for developing and implementing the academic vision and values of the University through its residential academic program.   These core values are not only engaged through the various academic programs offered in multiple delivery formats, they are also engaged through the teaching, research and service activities of the academic centers. The Provost, in collaboration with the deans, the Faculty Senate, and the General Faculty, provides leadership in continuously improving undergraduate and graduate residential instruction and academic support services. The Provost works with the deans and the President to identify and prioritize resource allocations among academic units. The Provost assesses the performance of academic leaders serving the residential program and provides regular feedback to encourage improvement.   The Provost, further, has the responsibility to oversee a structured process through which faculty serving the residential program can develop professionally within their disciplines, improve as effective academic communicators, and utilize the wide array of technological tools and resources available to enrich the art of teaching. The Provost serves as the liaison to those external agencies with which the University maintains institutional accreditation.   The Provost communicates regularly with the President, the Online Provost and the various University constituencies on matters of importance with respect to accreditation. The Provost also serves as the liaison of the administration to any Faculty Senate concerning the residential program.   The Provost is the designated Officer of the University to succeed the President (as Acting President until the Board of Trustee appoints a successor) in the event of the President's death, disability or resignation.

SECTION 5: ONLINE PROVOST.   The Online Provost is appointed by the President. This individual serves as the primary voice on online program academic matters within the administration.   The Online Provost, in collaboration with the deans, the Faculty Senate, and the General Faculty, is responsible for developing and implementing the academic vision and values of the University though its online program.   These core values are not only engaged through the various academic programs offered in multiple delivery formats, they are engaged through the teaching, research and service activities of the academic centers. The Online Provost, in collaboration with the deans, the Faculty Senate, and the General Faculty, provides leadership in continuously improving undergraduate and graduate online instruction and academic support services. The Online Provost works with the deans and the President to identify and prioritize resource allocations among academic units. The Online Provost assesses the performance of academic leaders serving the online program and provides regular feedback to encourage improvement. The Online Provost, further, has the responsibility to oversee a structured process through which faculty serving the online program can develop professionally within their disciplines, improve as effective academic communicators, and utilize the wide array of technological tools and resources available to enrich the art of teaching. The Online Provost coordinates closely with the Provost to provide support relating to the online program that is helpful and necessary for interactions with those external agencies with which the University maintains institutional accreditation.   The Online Provost communicates regularly with the President, the Provost and the various University constituencies on matters of importance with respect to accreditation. The Online Provost also serves as the liaison of the administration to any Faculty Senate concerning the online program.

LUADMINREC000854

SECTION 6: SECRETARY.  The Secretary of the Corporation is appointed by the Board of Trustees and shall keep accurate minutes of all meetings of the Board of Trustees, and shall have charge of maintaining such other records as may be required of him or her by the President or the Board.  The Secretary shall act in a like capacity for the Executive Committee or any other committee possessing governing authority and established by the Board of Trustees.   The Secretary shall have charge of the correspondence, notify Trustees of meetings, notify new Trustees of their election, notify officers of their election to office, keep a roll of the Trustees with their addresses, and carry out other duties incident to his or her office as the President may request or the Board of Trustees or President may assign.

SECTION 7: ASSISTANT SECRETARY.  The Assistant Secretary of the Corporation is appointed by the Board of Trustees and may attend all meetings of the Board of Trustees, in order to assist the Chairman or Vice Chairman as they preside over said meetings.  The Assistant Secretary shall also ensure that all of the governing documents or any amendments thereto, are in compliance with any legal requirements that may be applicable to the same.

SECTION 8: TREASURER/EXECUTIVE VICE PRESIDENT OF FINANCE.  The Treasurer is appointed by the President and shall be the Executive Vice President of Finance of the University.  The Treasurer of the Corporation shall be responsible for the collection and receipt of all monies due or belonging to the Corporation.  The Treasurer shall cause accurate books and records of the financial condition of the Corporation to be maintained, and at the request of the President, or the Chairman of the Board of Trustees or the Audit Committee, shall render an account of all monies received or expended during the previous fiscal year.  The Treasurer/Executive Vice President of Finance shall have the authority to enter into contracts and transact business in the name of the University to further its interests up to a limit of $100,000 per transaction.  The Board of Trustees shall have the authority to request an annual audit of the books of the Corporation and select an external auditor.  The Executive Vice President of Finance is generally responsible for financial operations of the University except as separately delegated by these Bylaws and by the President.  The Executive Vice President of Finance shall advise the Corporation, its Committees and Officers, the President, and other Officers on financial matters; and shall, subject to the administrative oversight of the President, oversee the provision of all financial services of the Corporation.  The Executive Vice President of Finance shall make such reports of receipts and disbursements of all investment and non-investment funds and of such related matters pertaining to the activities of the Executive Vice President of Finance and the Chief Investment Officer as shall be requested by the President, the Board of Trustees, the Audit Committee, the Investment Committee and the Executive Committee.  The Executive Vice President of Finance also works with senior management on individual and group projects.

SECTION 9:  CHIEF INVESTMENT OFFICER.  The Executive Vice President of Finance shall also directly supervise and oversee the Chief Investment Officer appointed by the President.  The Chief Investment Officer shall have general charge of all investment matters pertaining to the Corporation, subject to direction of the Board of Trustees. The Chief Investment Officer shall advise the Corporation, its Committees and Officers, the President, and other Officers on investment matters; and shall, subject to the ultimate administrative oversight of the

6

President, oversee the provision of all investment services of the Corporation. The Chief Investment Officer shall make such reports of receipts and disbursements of all investments and of such related matters pertaining to the activities of the Chief Investment Officer to the Executive Vice President of Finance as shall be requested by the President, the Board of Trustees, the Executive Vice President of Finance, the Audit Committee, the Investment Committee and the Executive Committee.

SECTION 9: GENERAL COUNSEL. The General Counsel is appointed by the President and shall be the Chief Legal Officer of the University in charge of all legal matters pertaining to the Corporation and the University. The General Counsel shall attend meetings of the Board of Trustees and the Executive Committee and shall represent the Corporation in all legal proceedings and advise the Corporation, its Committees, the Officers, and the President on legal questions as may be required; and shall, subject to the direction of the President, oversee the provision of all legal services to the Corporation.

## ARTICLE IV

## COMMITTEES

SECTION 1: COMMITTEES. The Board of Trustees shall have the following standing committees: Executive Committee, Investment Committee, Audit Committee, and Spiritual Mission Committee. The Board of Trustees shall have the power to appoint any other standing committees as it deems necessary and proper for carrying out the affairs of the University, as well as the appointment of any special committees to aid the Board of Trustees or any standing committee on any particular projects. Such committees shall be subject to the final authority of the Board of Trustees.

SECTION 2: CHARGES. The standing committees shall have the following charges:

a.       Audit Committee. Assist the Board in fulfilling its oversight and fiduciary responsibilities for ensuring the adequacy, integrity and reliability of the University's financial reporting process, system of internal control, audit process and auditors, risk management system, and process for monitoring compliance with applicable laws, regulations and codes of conduct. Review and recommend Board polices regarding such matters, monitor and evaluate such matters for compliance with the University's mission and Board policies, review and recommend auditors, and annually select areas to be audited, internally and externally. Review and evaluate financial audits, government agency audits, NCAA annual financial procedures and compliance reports, insurance audits, conflicts of interest policies, and disclosures of Trustees, Officers and other key employees regarding related-party transactions and conflicts of interest. Serve as a focal point of open communications between the Board, independent auditor and University administrators. Resolve any disagreements between auditors and University administrators. In discharging its oversight role, investigate or cause to be investigated matters within the Audit Committee's charge. Have a dotted-line reporting relationship with the Internal Auditor. Advise the President or his designee on significant matters within the Audit Committee's charge.

7

b.      Executive Committee.  During the intervals between Board of Trustee meetings, have the full and complete management and control of the Corporation and its affairs, and on behalf of the Corporation may undertake, authorize and empower the doing of all acts that the Corporation may lawfully do, except (1) elect members of the Executive Committee, (2) amend the Articles of Incorporation or these Bylaws, or (3) rescind or alter previous action of the Board of Trustees.  Consider, recommend and oversee the structure, composition and operation of the Board so as to provide effective governance of the University.  Periodically review the Bylaws and other governance documents and make recommendation to the Board concerning amendment.  Engage in succession planning for the President and Trustees.  Make recommendations to the Board for selection of a President and for nominations of trustees and committee members, as well as re-nominations when terms expire.  Conduct or cause to be conducted Trustee orientations and periodic board effectiveness evaluations. Set, on behalf of the Board, the compensation and benefits of the President.  Annually review and evaluate, on behalf of the Board, the compensation and benefits of the President and other Officers of the Corporation and "key employees" as defined for the purposes of IRS Form 990, as well as any other "disqualified persons" as defined in IRC Section 4958.  Neither members of the committee nor staff liaisons may participate in committee votes, discussions or evaluations concerning their own performance or compensation, and should be excused from the committee meetings at such times.  Engage compensation and governance training consultants or experts, as needed.  The Chairman of the Executive Committee and a majority of the other voting members of the Executive Committee shall have no contractual, employment, personal, familial, or financial interest in the institution. The Executive Committee shall be composed of no less than five (5) members of the Board of Trustees.  The committee shall have a dotted-line reporting relationship with the General Counsel.  It shall advise the President or his designee on significant matters. All other provisions of this Article pertaining to standing committees shall be applicable to the Executive Committee.

The Executive Committee shall formally evaluate the President annually.  The results of the evaluation shall be attached to the official minutes of the Executive Committee.  A report on the formal evaluation shall be provided by the Chair of the Executive Committee. The Chair shall, after discussion of the evaluation, bring a motion to accept the evaluation. The evaluation shall be according to the following procedures:

a.  The Chairman of the Executive Committee shall distribute to Executive Committee members the evaluation criteria at the meeting of the Committee.
b.  The evaluation may address those items in the University's Strategic Plan that the Executive Committee determines to be within the direct purview of the Presidents well as any other matters of leadership the Executive Committee determines to be relevant.  The evaluation criteria and process should be reviewed and updated periodically by the Executive Committee.
c.  Following discussion with the President at the meeting of the Executive Committee, the members of the Committee shall complete the evaluation.

8

d. The results of the evaluation shall be attached to the official minutes of the Executive Committee.

e. The Chairman of the Executive Committee shall provide summary comments concerning the evaluation in his report to the full Board at the Annual Meeting and, following discussion, shall request a motion to accept the report, including a summary of the evaluation.

The Executive Committee shall also serve in the capacity of a Finance Committee and shall perform these additional functions. Assist the Board in fulfilling its oversight responsibilities for the University's execution of Board-approved budgets, and fulfilling its fiduciary responsibilities pertaining to the financial stability and long-term economic health of the University. Review annual operating and capital budgets presented for Board approval. Annually review the University's debt and any proposals for bond financing and other borrowing presented for Board approval. Advise the President or his designee on matters of significant financial policy and long-range plans and strategies.

c. Investment Committee. Assist the Board in fulfilling its fiduciary responsibilities to provide oversight of the stewardship of the University's endowment assets, working capital and any other securities in accordance with the Board-approved Investment Policy, the Prudent Management of Institutional Funds Act, the Prudent Investor Act and other applicable laws. Review and recommend any Investment Policy to the Board. Engage, monitor and evaluate investment advisors and consultants. Review and approve, on behalf of the Board, recommendations for the custodian(s) of University investment assets. Review and evaluate portfolio performance. Serve as a focal point of open communication between the Board, investment advisors and/or consultants and University administrators. Advise the President or his designee on significant investment-related matters.

d. Spiritual Mission Committee. Assist the Board in fulfilling its responsibility to ensure the spiritual mission of the institution is implemented. Review any proposed amendments to the University's Statement of Mission and Purpose, Philosophy of Education, and Doctrinal Position and make recommendation to the Board concerning amendments. Advise the President or his designee on matters of spiritual significance, including the spiritual integrity of academic programs, courses and events. The Pastor of Thomas Road Baptist Church shall serve as the Chairman of the Spiritual Mission Committee.

SECTION 3: COMPOSITION, ELECTION AND TERMS. Committees may include members who are not members of the Board of Trustees so long as each committee has at least one member of the Board. The President shall be an ex officio member of all the committees. Committee members, both Trustees and non-Trustees, shall be elected annually to serve one year terms on said committees by the majority vote of a quorum (as defined in the Articles of Incorporation) at any regular or special meeting of the Board of Trustees. Any vacancy on a committee shall be filled in accordance with the same procedures as set forth in the Articles of Incorporation for filling a vacancy on the Board of Trustees.

LUADMINREC000858

SECTION 4: COMMITTEE CHAIRMAN. Every committee shall have a Committee Chairman who shall preside at all meetings of said committee. The Committee Chairman shall be a Board member elected annually for a one-year term by the majority vote of a quorum (as defined in the Article of Incorporation) at any regular or special meeting of the Board of Trustees. The Committee Chairman shall be responsible for organizing the committee meetings, preparing and submitting the committee's report and recommendations to the full Board, keeping and maintaining accurate minutes of the committee's meetings and circulating the same to the Secretary, and for ensuring that committee members are notified of the time and place of said meetings. The Committee Chairman shall also perform such other duties as usually pertain to the office of Committee Chairman or that may be required of him or her by the committee or the Board of Trustees.

SECTION 5: COMMITTEE VICE CHAIRMAN. Every committee shall have a Committee Vice Chairman who shall preside at all meetings of said committee in the absence of the Committee Chairman. The Committee Vice Chairman shall be elected by a majority vote of a quorum of the committee. The Committee Vice Chairman, in the absence of the Committee Chairman, shall assume and discharge all other duties pertaining to the office of Committee Chairman. The Committee Vice Chairman shall also perform such other duties as may be required of him by the committee or the Board of Trustees.

SECTION 6: MEETINGS. The committees shall meet at such time and place as the Committee Chairman of the particular committee shall determine. The Committee Chairman shall give every committee member notice of not less than three (3) days prior to any such meeting. A committee member may waive said notice by delivering to the Secretary of the Corporation a waiver in writing and signed by said committee member at any meeting in which said committee member fails to receive proper notice. In addition, waiver will be deemed where said committee member attends any meeting and fails to object to the lack of notice or defective notice at the beginning of said meetings.

SECTION 7: QUORUM. A quorum at any committee meeting shall consist of a majority of the total number of committee members. A quorum shall be sufficient to carry on the business of the committee.

SECTION 8: DUTIES AND RESPONSIBILITIES. The standing committees, including the Executive Committee, shall have all the powers, duties and responsibilities as set forth herein and any other such powers, duties and responsibilities as the Board of Trustees shall see fit to confer upon said committees.

## ARTICLE VI

## GENERAL PROVISIONS

SECTION 1: CALENDAR. The fiscal year of the corporation shall begin on the 1st day of July and end on the 30th day of June.

LUADMINREC000859

SECTION 2: AMENDMENTS.   The Articles of Incorporation or Bylaws may be amended or restated at any meeting of the Board of Trustees upon receiving the vote of at least two-thirds of the Trustees.

## ARTICLE VII

### DISSOLUTION

SECTION 1: DISSOLUTION.  The Corporation may be dissolved at any time upon the adoption of a resolution to dissolve by the vote of a majority of the Trustees.  The dissolution shall be carried out pursuant to the provisions in the Articles of Incorporation relating to dissolution.

Any gender used herein shall be deemed to refer to any other gender more grammatically applicable to the party to whom such gender relates.  The use of singular herein shall be deemed to include the plural and, conversely, the plural shall be deemed to include the singular.

---

### CERTIFICATION OF

### AMENDED AND RESTATED BYLAWS OF

### LIBERTY UNIVERSITY, INC.

I, David M. Corry, being the duly appointed Secretary of Liberty University, Inc., a Virginia non-stock corporation (the "Corporation"), hereby certify that the foregoing Bylaws are a true and complete copy of the Amended and Restated Bylaws of the Corporation duly adopted by the Corporation's Board of Trustees as amended by the Board of Trustees through April 5, 2019 and in effect as of the date of this certificate.

IN WITNESS WHEREOF, I have hereunto set my hand this 31th day of May, 2019.

David M. Corry, Secretary

11

# EXHIBIT A

## LIBERTY UNIVERSITY DOCTRINAL POSITION

We affirm our belief in one God, infinite Spirit, creator, and sustainer of all things, who exists eternally in three persons, God the Father, God the Son, and God the Holy Spirit. These three are one in essence but distinct in person and function.

We affirm that the Father is the first person of the Trinity and the source of all that God is and does. From Him the Son is eternally generated and from Them the Spirit eternally proceeds. He is the designer of creation, the speaker of revelation, the author of redemption, and the sovereign of history.

We affirm that the Lord Jesus Christ is the second person of the Trinity. Eternally begotten from the Father, He is God. He was conceived by the virgin Mary through a miracle of the Holy Spirit. He lives forever as perfect God and perfect man: two distinct natures inseparably united in one person.

We affirm that the Holy Spirit is the third person of the Trinity, proceeding from the Father and the Son and equal in deity. He is the giver of all life, active in the creating and ordering of the universe; He is the agent of inspiration and the new birth; He restrains sin and Satan; and He indwells and sanctifies all believers.

We affirm that all things were created by God. Angels were created as ministering agents, though some, under the leadership of Satan, fell from their sinless state to become agents of evil. The universe was created in six historical days and is continuously sustained by God; thus it both reflects His glory and reveals His truth. Human beings were directly created, not evolved, in the very image of God. As reasoning moral agents, they are responsible under God for understanding and governing themselves and the world.

We affirm that the Bible, both Old and New Testaments, though written by men, was supernaturally inspired by God so that all its words are the written true revelation of God; it is therefore inerrant in the originals and authoritative in all matters. It is to be understood by all through the illumination of the Holy Spirit, its meaning determined by the historical, grammatical, and literary use of the author's language, comparing Scripture with Scripture.

We affirm that Adam, the first man, willfully disobeyed God, bringing sin and death into the world. As a result, all persons are sinners from conception, which is evidenced in their willful acts of sin; and they are therefore subject to eternal punishment, under the just condemnation of a holy God.

We affirm that Jesus Christ offered Himself as a sacrifice by the appointment of the Father. He fulfilled the demands of God by His obedient life, died on the cross in full substitution and payment for the sins of all, was buried, and on the third day He arose physically and bodily from the dead. He ascended into heaven where He now intercedes for all believers.

12

We affirm that each person can be saved only through the work of Jesus Christ, through repentance of sin and by faith alone in Him as Savior. The believer is declared righteous, born again by the Holy Spirit, turned from sin, and assured of heaven.

We affirm that the Holy Spirit indwells all who are born again, conforming them to the likeness of Jesus Christ. This is a process completed only in Heaven. Every believer is responsible to live in obedience to the Word of God in separation from sin.

We affirm that a church is a local assembly of baptized believers, under the discipline of the Word of God and the lordship of Christ, organized to carry out the commission to evangelize, to teach, and to administer the ordinances of believer's baptism and the Lord's table. Its offices are pastors and deacons, and it is self governing. It functions through the ministry of gifts given by the Holy Spirit to each believer.

We affirm that the return of Christ for all believers is imminent. It will be followed by seven years of great tribulation, and then the coming of Christ to establish His earthly kingdom for a thousand years. The unsaved will then be raised and judged according to their works and separated forever from God in hell. The saved, having been raised, will live forever in heaven in fellowship with God.

---

13

# LIBERTY UNIVERSITY.

August 24, 2022

**By Electronic Mail and Express Mail**
John J. Regan
Managing Partner & Chief Investment Officer
Permanens Capital
410 Park Avenue, Suite 430
New York, NY 10022

### Re:  Rabbi Trust Agreement Payment Schedule and Authorized Instructions

Dear John:

I am writing with regard to the Rabbi Trust Agreement ("Trust Agreement") that was effected on July 22, 2020 between yourself as trustee ("Trustee") and Liberty University ("Liberty").  The Trust Agreement identifies the "Participant" of the Trust Agreement as Jerry L. Falwell Jr. ("Falwell").  We have attached a copy of that agreement hereto as Exhibit A. Pursuant to Section 2(f) of the Trust Agreement, Liberty has formally designated me with full authority to provide you with "Authorized Instructions" about the timing of the eventual payment of the Rabbi Trust.[1] These Authorized Instructions encompass within them the "Payment Schedule" as defined in Section 2(a) through 2(g) of the Agreement. As you know, you are empowered by the Trust Agreement to "rely on…direction from an Authorized Party…." Section 2(f).

For completeness, I also provide the other documents that set out the terms of the Rabbi Trust, namely the Employment Agreement effective August 30, 2019 ("Employment Agreement), attached as Exhibit B, and the Supplemental Executive Retirement Plan letter agreement ("SERP"), effective July 21, 2020, attached as Exhibit C.

In the Trust Agreement, the parties vested with Liberty the sole responsibility to designate the point at which the Trustee is permitted to make payments out of Rabbi Trust proceeds. It is the Authorized Party who issues a Payment Schedule, *see* Section 2(a) and 2(c), and the "Trustee shall make payments to the Participant and his beneficiaries in accordance with such Payment Schedule…." Section 2(c) specifies that the "Authorized Party…shall have the exclusive responsibility, and the Trustee shall not have any responsibility or duty under the Trust Agreement for determining that the Payment Schedule is in accordance with the terms of the SERP and applicable law."

---

[1] Section 2(f) of the Trust Agreement requires the Trustee to act on the direction of the "Authorized Party (or a person that the Trustee reasonably believes to be an Authorized Party)…." To the extent you wish to see confirmation of my designation as Authorized Party, Liberty would be pleased to provide you certification from the corporate secretary of the designation decision of the Executive Committee acting on behalf of the Board of Trustees or other proof of my formal designation as Authorized Party. I can categorically state that Falwell is not an Authorized Party with respect to Authorized Instructions.

While such powers of the designated Authorized Representative are sufficient authority alone for following the directions contained in this letter, it is instructive to note the trust document's discussion of examples of disputes. In the Trust Agreement, the parties contemplated certain preconditions and circumstances that might give rise to a delay in the contemplated timing of any Rabbi Trust payouts. One of these is the pendency of "any disagreement or dispute in connection with the Trust," *see* Section 9(i). This provision encompasses "without limitation *any dispute* between the Trustee, the University, and/or the Participant, *or between the University, the Participant* and/or any person not a party of the Trust…" *Id.* (emphasis added). The unlimited range of potential disputes that properly gives rise to a payment pause includes a conflict arising under the common law and any other issues arising in connection with the formation of the Rabbi Trust or impacting the viability of its corpus.

Such a "dispute" has arisen. As you may know, on April 22, 2021, Liberty filed a Complaint against Falwell in the Circuit Court of the City of Lynchburg, VA, alleging various common law claims with impact on the Rabbit Trust. On September 30, 2021, Liberty updated this suit, filing an Amended Complaint against Falwell. On June 30, 2022, Liberty filed its Second Amended Complaint, including certain additional allegations against Falwell. Liberty's Second Amended Complaint asserts four causes of actions, namely: (1) Breach of Contract; (2) Detinue; (3) Breach of Fiduciary Duty; and (4) Statutory Conspiracy/Common Law Conspiracy. This dispute against Falwell remains pending before the Lynchburg circuit court. The case number is CL21000354-00. The Second Amended Complaint is attached to this letter as Exhibit D.[2]

As it relates to these Instructions, the core of the Second Amended Complaint is that Falwell failed to properly notify the University that Giancarlo Granda ("Granda") was allegedly extorting him at the time Falwell extracted from Liberty the agreement to establish and fund the Rabbi Trust. As you know, it was Section 4.1(d) of the 2019 Employment Agreement that gave rise to the Supplemental Executive Retirement Plan ("SERP"), which ultimately led to the execution of the Trust Agreement by the parties. It is Liberty's claim that the University would have never agreed to execute the SERP, as executed, and the Trust Agreement, as written, if properly notified in advance of Granda's extortive efforts. Liberty contends Falwell's fiduciary duty required him to disclose fully the allegedly-extortive actions of Granda. Based on Falwell's own admissions, he secretively withheld from Liberty's Executive Committee until August 2020 that he and his wife Becki had allegedly been extorted by Granda related to allegations that Falwell was a physical participant in the affair. Accordingly, Liberty contends Falwell is not entitled to the proceeds of the funds paid into the Rabbi Trust created and funded pursuant to the SERP.

**Given that the preconditions to payment of the SERP are legally in dispute, Liberty directs you not to issue any payments to the Participant, or to any beneficiary, until such**

---

[2] The Second Amended Complaint awaits acceptance by the Court as a cognizable amendment to Liberty's claim, a formality. Participant has filed no objection to amendment. In the unlikely event the Second Amendment Complaint is not accepted by the court, the parties would revert to litigating the First Amended Complaint, which contains the same common law issues impacting the Trust Agreement as the Second Amended Complaint.

LUADMINREC000864

**time as Liberty advises you by further Authorized Instructions that an order of a Virginia court or action of the parties has resolved the litigation between Liberty and Falwell, and that the dispute over payment of the Rabbi Trust proceeds has been fully and finally resolved.**[3]

We understand that the Agreement provides certain rights and duties to you as Trustee with respect to generating Rabbi Trust payments. Liberty recognizes that under Section 9(i) of the Trust Agreement if you have a "good faith" concern over following the instructions of the Authorized Party, then you may, in the circumstances as they exist, interplead the subject matter of the Trust Agreement with the Circuit Court in the City of Lynchburg, thereby joining the pending action between Liberty and Falwell as interested third party. We do not foresee the need for the Trustee to do so in this case, but that is a course of action open to the Trustee in the event of dissent to the Authorized Instructions. We note, however, that unilateral payment to the Participant against the mandate of a Payment Schedule, an Authorized Instruction, is not a path open to the Trustee under the Trust Agreement. Liberty would adamantly oppose any payment of Rabbi Trust proceeds to Falwell, if such action is premature.

The University also recognizes and accepts that the Trustee can, pursuant to Section 9(i) recover reasonable attorneys' fees, expenses, and costs in connection with any such interpleader lodged in good faith. Liberty acknowledges its obligation to pay reasonable attorneys' fees in connection with any good faith actions by the Trustee that result in an interpleader and asks that you regularly submit your legal bills through Liberty's counsel in the event that you engage legal services in pursuit of such activity.

Should you or your attorneys have any questions or concerns about these Instructions, please communicate with Liberty's counsel Scott C. Oostdyk at McGuireWoods LLP, at 804-775-4743 or soostdyk@mcguirewoods.com.

Sincerely yours,

Robert L. Ritz, Ph.D.
Chief Financial Officer

cc:  Scott Oostdyk, McGuireWoods LLP
     Carroll Hudson, Chairman of the Executive Committee, Liberty University
     Tim Lee, Chairman of the Board of Directors, Liberty University

---

[3] Section 2(g) of the Trust Agreement permits the Authorized Party to issue "directions and instructions to the Trustee" by "writing" and specifies that this writing may be transmitted by "mail or by facsimile or shall be an electronic transmission." Liberty is emailing this direction letter to the Trustee but, as a precaution, has also sent a copy to the Trustee by express mail.

LUADMINREC000865

# EXHIBIT A

LUADMINREC000866

Execution Version

# LIBERTY UNIVERSITY
# RABBI TRUST AGREEMENT

**THIS RABBI TRUST AGREEMENT** is made this 22nd day of July, 2020, by and between **Liberty University**, a not-for-profit corporation organized under the laws of the Commonwealth of Virginia (the "*University*"), and **John J. Regan**, an individual who is a resident of the State of New York, as trustee (the "*Trustee*").

## RECITALS

**WHEREAS,** the University has entered into a Supplemental Executive Retirement Plan dated July 22, 2020 and effective July 1, 2019 (the "*SERP*") with Jerry L. Falwell, Jr. (the "*Participant*") that provides for payment of "deferred compensation" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended (the "*Code*") upon the Participant's death, Disability, or the second anniversary following termination of employment with the University for any reason other than Cause (which terms "*Disability*" and "*Cause*" having the meanings as defined in the Employment Agreement dated July 1, 2019 between the University and the Participant); and

**WHEREAS,** in accordance with the requirements of the SERP and to finance its potential obligations to the Participant, the University desires to establish a trust (the "*Trust*") and to contribute to the Trust assets that shall be held therein, subject to the claims of creditors of the University in the event of Insolvency (as herein defined), until paid to the Participant and his beneficiaries in such manner and at such times as are specified in the SERP or paid to the University in accordance herewith; and

**WHEREAS,** it is the intention of the parties that the Trust shall constitute an unfunded arrangement and shall not affect the status of the SERP as an unfunded agreement maintained for the purpose of providing deferred compensation for the Participant as a select individual from management and a highly compensated employee according to Title I of the Employee Retirement Income Security Act of 1974 as amended; and

**WHEREAS,** it is the intention of the University to make contributions to the Trust to provide a source of funds to pay benefits under the SERP;

**NOW, THEREFORE,** the parties do hereby establish the Trust and agree that the Trust shall be comprised, held and disposed of as follows:

79511141_5

LUADMINREC000867

**Section 1.** **ESTABLISHMENT OF TRUST**

(a)      The University hereby deposits with Trustee in trust $7,635,927, which shall become the principal of the Trust to be held, administered and disposed of by the Trustee as provided in this Trust Agreement.  Within 30 days following the University's fiscal year (ending June 30), the University shall deposit the amount required, if any, such that the balance of the Trust, net of any fees or compensation paid, is no less than the balance of the Account under the SERP, determined as of June 30th of each year.     The University shall have the right to make additional deposits from time to time in its sole discretion.

(b)      The Trust hereby established shall be irrevocable.

(c)      The Trust is intended to be a grantor trust, of which the University is the grantor, within the meaning of Subpart E, part I, subchapter J, chapter I, subtitle A of the Code, and shall be construed accordingly.

(d)      The principal of the Trust, and any earnings thereon shall be held separate and apart from other funds of University and shall be used exclusively for the uses and purposes of the Participant and general creditors as herein set forth.  The Participant and his beneficiaries shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust.  Any rights created under the SERP and this Trust Agreement shall be mere unsecured contractual rights of the Participant and his beneficiaries against the University.  All assets held by the Trust will be subject to the claims of the University's general creditors under federal and state law in the event of the Insolvency as defined in Section 3(a) herein.

(e)      The University, in its sole discretion, may at any time, or from time to time, make additional deposits of cash or other property in Trust with the Trustee to augment the principal to be held, administered and disposed of by the Trustee as provided in this Trust Agreement.  Neither the Trustee nor the Participant or his beneficiaries shall have any right to compel such additional deposits.

(f)      The Trustee agrees to accept additional deposits made by the University pursuant to Section 1(a) hereof, in accordance with the terms of this Trust Agreement.  Such additional deposits and contributions shall be in cash or in such other form that may be acceptable to the Trustee, including but not limited to policies of life insurance.  The Trustee shall have no duty to determine or collect contributions under the SERP and shall have no responsibility for any property until it is received and accepted by the Trustee.  The University shall have the sole duty and responsibility for the determination of the accuracy and sufficiency of the deposits and contributions to be made under the SERP, the transmittal of the same to the Trustee and compliance with any statute, regulation or rule applicable to contributions.

**Section 2.** **PAYMENTS TO PARTICIPANT AND BENEFICIARIES**

(a)      The University may produce a schedule (the "*Payment Schedule*") that indicates the amounts payable in respect of the Participant (and his beneficiaries), that provides a formula or other instructions for determining the amounts payable, the form in which such amounts are to be paid (as provided for or available under the SERP), and the time of commencement for payment of such amounts.  Except as otherwise provided herein, the Trustee shall make

2

LUADMINREC000868

payments to the Participant and his beneficiaries in accordance with such Payment Schedule. Trustee shall make provision for the reporting and withholding of any federal, state or local taxes that may be required to be withheld with respect to the payment of benefits pursuant to the terms of the SERP and shall pay amounts withheld to the appropriate taxing authorities or determine that such amount have been reported, withheld and paid by the University.   The benefits contemplated by the SERP and this Trust are intended to comply with Section 409A of the Code and are intended to be subject to a substantial risk of forfeiture under Section 457(f) of the Code through the date of payment.

(b)    Upon the receipt by the Trustee of (i) a written notice from the University, indicating that the SERP has been completely terminated and (ii) a Payment Schedule, indicating how payments shall be made as a result of the termination of the SERP, the Trustee shall pay to the Participant his account balance under the SERP in accordance with the terms of such Payment Schedule.   Notwithstanding the foregoing, upon the termination of the SERP the University shall be entitled to make payment of benefits directly to the Participant or his beneficiaries in accordance with subsection (e) below.

(c)    The University hereby agrees that an Authorized Party (as defined below) shall have the exclusive responsibility, and the Trustee shall not have any responsibility or duty under this Trust Agreement for determining that the Payment Schedule is in accordance with the terms of the SERP and applicable law, including without limitation, the amount, timing or method of payment and the identity of each person to whom such payments shall be made.   The Trustee shall have no responsibility or duty to determine the tax effect of any payment or to see to the application of any payment.

(d)    The entitlement of the Participant or his beneficiaries to the benefits under the SERP shall be determined by the University or such party as it shall designate under the SERP, and any claim for such benefits shall be considered and reviewed under the procedures set out in the SERP.

(e)    The University may make payment of benefits directly to the Participant or his beneficiaries as they become due under the terms of the SERP.   The University shall notify the Trustee of its decision to make payment of benefits directly to the Participant or his beneficiaries. If the University makes payments according to this subsection (e) the University shall make provision for the reporting and withholding of any federal, state or local taxes that may be required to be withheld with respect to the payment of benefits pursuant to the terms of the SERP and shall pay amounts withheld to the appropriate taxing authorities.   In addition, if the principal of the Trust, and any earnings thereon, are not sufficient to make payments of benefits in accordance with the terms of the SERP, the University shall make the balance of each such payment as it falls due.   The Trustee shall notify the University where principal and earnings are not sufficient.

(f)    University shall furnish Trustee with a written list of the names, signatures and extent of authority of all persons authorized to direct Trustee and otherwise act on behalf of the University under the terms of this Trust Agreement (an "*Authorized Party*").   The Trustee shall be entitled to rely on and shall be fully protected in acting upon direction from an Authorized

79511141_5

LUADMINREC000869

Party (or a person that the Trustee reasonably believes to be an Authorized Party) until notified in writing by the University, as appropriate, of a change in the identity of an Authorized Party.

(g)     In accordance with the procedures mutually acceptable to the University and Trustee, all directions and instructions to Trustee from an Authorized Party, including but not limited to the Payment Schedule, shall be in writing, transmitted by mail or by facsimile or shall be an electronic transmission, provided Trustee may, in its discretion, accept oral directions and instructions and may require confirmation in writing ("*Authorized Instructions*").

**Section 3.** **TRUSTEE RESPONSIBILITY REGARDING PAYMENT TO TRUST BENEFICIARY WHEN UNIVERSITY IS INSOLVENT**

(a)     The Trustee shall cease payments of benefits to the Participant and his beneficiaries if it receives written notice that the University is Insolvent. Such written notice shall also be provided to the Participant.  The University is  considered "*Insolvent*" for purposes of this Trust Agreement if (i) it is unable to pay its debts as they become due, or (ii) it is subject to a pending proceeding as a debtor under the United States Bankruptcy Code.

(b)     At all times during the continuance of this Trust, the principal and income of the Trust shall be subject to the claims of general creditors of the University under federal and state law, as set forth below.

(1)     The Board of Directors and the chief financial officer of the University shall have the duty to inform the Trustee in writing of the Insolvency of the University.  If a person claiming to be a creditor of any such entity alleges in writing to the Trustee that such entity has become Insolvent, the Trustee shall determine whether such entity is Insolvent and, pending such determination, the Trustee may discontinue payments of benefits to the Participant and his beneficiaries.

(2)     Unless the Trustee has actual knowledge of the University's Insolvency, or has received written notice from any such entity or from a person claiming to be a creditor alleging that any such entity is Insolvent, the Trustee shall have no duty to inquire whether any such entity is Insolvent. The Trustee may, in all events, rely on such evidence concerning the Insolvency of any such entity as may be furnished to the Trustee and that provides the Trustee with a reasonable basis for making a determination concerning the entity's Insolvency. For purposes of this Subsection, with respect to a corporate Trustee, the Trustee shall be deemed to have actual knowledge only of information known to its personnel administering this Trust.

(3)     If, at any time, the Trustee has determined that the University is Insolvent, the Trustee shall discontinue payments to the Participant and his beneficiaries and shall hold the Trust assets for the benefit of the general creditors of the Insolvent entity. Nothing in this Trust Agreement shall in any way diminish any rights of the Participant or his beneficiaries to pursue their rights as general creditors of the University with respect to benefits due under the terms of the SERP or otherwise.

(4)     The Trustee shall resume the payment of benefits to the Participant or his beneficiaries in accordance with Section 2 of this Trust Agreement only after the Trustee has

4

LUADMINREC000870

determined that the University is not Insolvent (or is no longer Insolvent). The Trustee may rely on such evidence concerning Insolvency as may be furnished to the Trustee and that provides the Trustee with a reasonable basis for making a determination concerning Insolvency. At any time during the term of this Trust Agreement, if there is a dispute about Insolvency, the Trustee shall have the right to require the University to employ and pay for the services of an independent expert to render a written opinion to the Trustee addressing the question of Insolvency.

(c)     Provided that there are sufficient assets, if the Trustee discontinues the payment of benefits from the Trust in accordance with the foregoing provisions of this Section and then subsequently resumes such payments, the first payment following such discontinuance shall include the aggregate amount of all payments due to a Participant or his beneficiaries according to the terms of the SERP in lieu of the payments provided for hereunder during any such period of discontinuance, less the aggregate amount of any payments made to the Participant or beneficiaries by the University in lieu of payments provided for hereunder during any such period of discontinuance.

## Section 4.  PAYMENTS TO UNIVERSITY

(a)     Except as provided in Sections 3 and in this Section 4, because the Trust is irrevocable the University shall not have the right or the power to direct the Trustee to return to the University or to divert to others any of the Trust assets before all payment of benefits have been made to Participant or his beneficiaries pursuant to the terms of the SERP.

(b)     In the event the University makes payment of benefits directly to the Participant pursuant to Section 1(e) hereof, the University may file proof of such payment with the Trustee and request to be reimbursed for said payment.  The Trustee shall reimburse the University for amounts not exceeding the amount the University pays to a Participant. The Trustee shall not be obligated to verify the amount of payment beyond receipt of reasonable proof (e.g. cancelled check).  Such reimbursement shall be made after all payment of benefits have been made to the Participants or their beneficiaries pursuant to the terms of the SERP.

## Section 5.  INVESTMENT AUTHORITY

(a)     The Trustee shall invest and reinvest the principal and income of the Trust as directed by University or an Authorized Party which directions may be changed from time to time.  To the maximum extent permitted by law, the Trustee shall have no duty or responsibility (i) to advise with respect to, or inquire as to the propriety of, any such investment direction or (ii) for any investment decisions made with respect to the Trust by the University.  In the absence of investment direction, the Trustee shall have no obligation to invest Trust assets, but may invest Trust assets in any manner permitted under Section 5(c).

(b)     All rights associated with assets of the Trust shall be exercised by the Trustee and shall in no event be exercised by or rest with the Participant, except that voting rights with respect to Trust assets will be exercised by the University, unless an investment adviser has been appointed and voting authority has been delegated to such investment adviser.

5

LUADMINREC000871

(c)      In administering the Trust and carrying out the instructions of the University, the Trustee shall be specifically authorized to:

(1)      To invest and reinvest the Trust assets, together with the income there from, in common stock, preferred stock, convertible preferred stock, bonds, debentures, convertible debentures and bonds, mortgages, notes, commercial paper and other evidences of indebtedness (including those issued by the Trustee), shares of mutual funds (including but not limited to mutual funds for which Trustee or its affiliates serve as advisor or perform other services and receive a fee therefor), guaranteed investment contracts, bank investment contracts, other securities, policies of life insurance, other insurance contracts, annuity contracts, options, options to buy or sell securities or other assets, and all other property of any type (personal, real or mixed, and tangible or intangible);

(2)      To deposit or invest all or any part of the assets of the Trust in savings accounts or certificates of deposit or other deposits in a bank or savings and loan association or other depository institution (including but not limited to the Trustee), provided such deposits bear a reasonable interest rate;

(3)      To submit or cause to be submitted to the University all information received by the Trustee regarding ownership rights pertaining to property held in the Trust;

(4)      To hold, manage, improve, repair and control all property, real or personal, forming part of the Trust; to sell, convey, transfer, exchange, partition, lease for any term, even extending beyond the duration of this Trust, and otherwise dispose of the same from time to time;

(5)      To make, execute and deliver any and all documents, agreements or other instruments in writing as are necessary or desirable for the accomplishment of any of the powers and duties set forth in this Trust Agreement;

(6)      To hold in cash, without liability for interest, such portion of the Trust as is pending investment, or payment of expenses, or the distribution of benefits;

(7)      To take such actions as may be necessary or desirable to protect the Trust from loss due to the default on mortgages held in the Trust including with the consent of an Authorized Party the appointment of agents or trustees in such other jurisdictions as may seem desirable, the transfer of property to such agents or trustees as is necessary, or the grant to such agents such powers as are necessary or desirable to protect the Trust.

(8)      To vote in person or by general or limited proxy, as directed by an Authorized Party, any securities in which the Trust is invested and similarly to exercise, personally or by general or limited power of attorney, as directed by an Authorized Party, any right appurtenant to any authorized investment held in the Trust.

(9)      To maintain accounts at, execute transactions through, and lend on an adequately secured basis stocks, bonds or other securities to, any brokerage or other firm, including any firm which is an affiliate of Trustee;

6

LUADMINREC000872

(10)     To exercise all of the further rights, powers, options and privileges granted, provided for, or vested in trustees generally under the laws of the state in which the Trustee has its principal place of business so that the powers conferred upon the Trustee herein shall not be in limitation of any authority conferred by law, but shall be in addition thereto.

(d)     The Trustee may exercise the powers described in this Section 5 with or without Authorized Instructions, but where the Trustee acts on Authorized Instructions, the Trustee shall be fully protected as described in Section 9.

## Section 6.  ADDITIONAL POWERS OF TRUSTEE.

(a)     To the extent necessary or which it deems appropriate to implement its powers or otherwise to fulfill any of its duties and responsibilities as Trustee of the Trust, the Trustee shall have the following additional powers and authority:

(1)     To register securities, or any other property, in its name or in the name of any nominee, including the name of any affiliate or the nominee name designated by any affiliate, with or without indication of the capacity in which property shall be held, or to hold securities in bearer form and to deposit any securities or other property in a depository or clearing corporation;

(2)     To make, execute and deliver, as Trustee, any and all deeds, leases, mortgages, conveyances, waivers, releases or other instruments in writing necessary or appropriate for the accomplishment of any of the powers listed in this Trust Agreement; and

(4)     Generally to do all other acts which the Trustee deems necessary or appropriate for the protection of the Trust.

(b)     The Trustee at the direction of the University may appoint a custodian of investments (a "*Custodian*") to safeguard the assets of the Trust.  The University hereby authorizes and directs the Trustee to enter into such agreements with a Custodian as may be necessary to establish an account with a Custodian.  For administrative purposes, contributions deposited to the appointed Custodian shall be deemed as contributions deposited with the Trustee on behalf of the Trust.

## Section 7.  DISPOSITION OF INCOME.

During the term of this Trust, all income received by the Trust, net of expenses and taxes, shall be accumulated and reinvested.

## Section 8.  ACCOUNTING BY TRUSTEE.

The Trustee shall keep accurate and detailed records of all investments, receipts, disbursements, and all other transactions required to be made, including such specific records as shall be agreed upon in writing between the University and the Trustee.  Within 30 days following the end of each fiscal year of the University (ending June 30) and within 30 days after removal or resignation of the Trustee, the Trustee shall deliver to the University a written account of its administration of the Trust during such calendar month or during the period from

7

LUADMINREC000873

the end of the last preceding calendar month to the date of such removal or resignation, setting forth all investments, receipts, disbursements and other transactions effected by it, including a description of all securities and investments purchased and sold with the cost or net proceeds of such purchases or sales (accrued interest paid or receivable being shown separately), and showing all cash, securities and other property held in the Trust at the end of such month or as of the date of such removal or resignation, as the case may be (the "*Report*").  Within 30 days following the University's fiscal year end (ending June 30), the Trustee shall provide a copy of the Report covering such fiscal year

> To the Participant or his beneficiaries:
> Jerry L. Falwell, Jr.
> 2100 Old Cifax Road
> Goode, VA 24566

> And to his counsel of record:
> Abigail Meyer
> Ropes & Gray, LLP
> 800 Boylston Street
> Boston, MA 02199

## Section 9.  RESPONSIBILITY AND INDEMNITY OF THE TRUSTEE.

(a)    The Trustee shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

(b)    The Trustee shall incur no liability to any person for any action, or inaction that it (or the Custodian) takes pursuant to a direction, request or approval given by the University or an Authorized Party in writing which is contemplated by, and in conformity with, the terms of the SERP and this Trust  In the event of a dispute between the University and the Participant, the Trustee may apply to a court of competent jurisdiction to resolve the dispute before taking action.

(c)    The Trustee may, at the expense of the University, consult with legal counsel (who may also be counsel for the University generally) with respect to any of its duties or obligations hereunder.

(d)    The University hereby indemnifies the Trustee and each of its affiliates (collectively, the "*Indemnified Parties*") against, and shall hold them harmless from, any and all loss, claims, liability, and expense, including reasonable attorneys' fees, imposed upon or incurred by any Indemnified Party (i) as a result of any acts taken, or any failure to act, in accordance with the written directions from the University or an Authorized Party, (ii) or by reason of the Indemnified Party's good faith execution of its duties with respect to the Trust, including, but not limited to, its holding of assets of the Trust and investing the assets of the Trust, and (iii) as a result of any action, or inaction, taken by the Trustee pursuant to advice of counsel.  The University's obligations in the foregoing regard are to be satisfied promptly by the University, provided that in the event the loss, claim, liability or expense involved is determined

8

LUADMINREC000874

by a no longer appealable final judgment entered in a lawsuit or proceeding to have resulted from the gross negligence or willful misconduct of the Trustee, the Trustee shall promptly on request thereafter return to the University any amount previously received by the Trustee under this Section 9(d) with respect to such loss, claim, liability or expense.  If the University does not pay such costs, expenses and liabilities in a reasonably timely manner, the Trustee may obtain payment from the Trust without direction from the University.

(e)     The Trustee may, at the expense of the University, hire agents, accountants, actuaries, investment advisers, financial consultants or other professionals (including any financial advisory firm of which the Trustee is an owner or employee) to assist it in performing any of its duties or obligations hereunder.

(f)     The Trustee shall have, without exclusion, all powers conferred on the Trustee by applicable law, unless expressly provided herein, provided, however, that if an insurance policy is held as an asset of the Trust, the Trustee shall not have the power to name a beneficiary of the policy other than the Trust, to assign the policy (as distinct from conversion of the policy to a different form) other than to a successor trustee, or to loan to any person the proceeds of any borrowing against such policy.

(g)     Notwithstanding any powers granted to the Trustee pursuant to this Trust Agreement or applicable law, the Trustee shall not have any power that could give this Trust the objective of carrying on a business and dividing the gains therefrom, within the meaning of section 301.7701-2 of the Procedure and Administrative Regulations promulgated pursuant to the Code.

(h)     The Trustee shall not be liable for any expense, loss, claim or damage (including counsel fees) suffered by the Participant arising out of or caused by any delay in, or failure of, performance by the Trustee, in whole or in part, arising out of, or caused by, circumstances beyond the Trustee's control, including without limitation: acts of God, interruption, delay in, or loss (partial or complete) of electrical power or external computer (hardware or software) or communication services (including access to book-entry securities systems maintained by Federal Reserve Bank of New York and/or any clearing corporation); act of civil or military authority; sabotage; natural emergency; epidemic; war or other government actions; civil disturbance; flood, earthquake, fire, other catastrophe; strike or other labor disturbance by employees of non-affiliates; governmental, judicial, or self-regulatory organization order, rule or regulation; riot; energy or natural resource difficulty or shortage; and inability to obtain materials, equipment or transportation.

(i)     If (1) there is any disagreement or dispute in connection with the Trust or the subject matter hereof, including without limitation any dispute between the Trustee, the University and/or the Participant, or between the University, the Participant and/or any person not a party to the Trust or (2) there are adverse or inconsistent claims or demands upon, or inconsistent instructions to the Trustee, or (3) the Trustee in good faith is in doubt as to what action to take pursuant to the Trust, the Trustee may at its election refuse to comply with any such claims, demands or instructions, or refuse to take any other action pursuant to this Trust until (i) the rights of all persons involved in the dispute have been fully and finally adjudicated by a court of competent jurisdiction or the Trustee has resolved any such doubts to its good faith

9

LUADMINREC000875

satisfaction; or (ii) all disputes have been resolved between the persons involved and the Trustee has received written notice thereof satisfactory to it from all such persons. Without limiting the generality of the foregoing, the Trustee may at its election interplead the subject matter of this Trust Agreement with a court of competent jurisdiction, or commence judicial proceedings for a declaratory judgment, and the Trustee shall be entitled to recover from the University the Trustee's attorneys' fees, expenses and costs in connection with any such interpleader or declaratory judgment action.

(j)     The Trustee is not a party to, and has no duties or responsibilities under, the SERP other than those that may be expressly contained in this Trust Agreement. In any case, in which a provision of this Trust Agreement conflicts with any provision of the SERP, the SERP shall control.

## Section 10.     COMPENSATION AND EXPENSES OF TRUSTEE

The Trustee shall be entitled to compensation for services under this Trust Agreement, which fees shall be charged to and collected from the University. The Trustee shall also be entitled to reimbursement for reasonable expenses incurred by it in the discharge of its duties under this Trust Agreement. All such fees and expenses shall be charged to and collected from the University. If the Trustee advances cash or securities for any purpose, including the purchase or sale of foreign exchange or of contracts for foreign exchange, or in the event that the Trustee shall incur or be assessed taxes, interest, charges, expenses, assessments, or other liabilities in connection with the performance of this Trust Agreement, except such as may arise from its own grossly negligent action, grossly negligent failure to act or willful misconduct, any property at any time held for the Trust shall be security therefor and the Trustee shall be entitled to collect from the University sufficient cash for reimbursement, and if such cash is insufficient, dispose of the assets of the Trust to the extent necessary to obtain reimbursement. To the extent the Trustee advances funds to the Trust for disbursements or to effect the settlement of purchase transactions, the Trustee shall be entitled to collect from the University either (i) with respect to domestic assets, an amount equal to what would have been earned on the sums advanced (an amount approximating the "federal funds" interest rate) or (ii) with respect to non-domestic assets, the rate applicable to the appropriate foreign market. In the event that any fee, expense or reimbursement is not paid by the University, then such payment shall be made from the Trust to the extent of accumulated income of the Trust.

## Section 11.     RESIGNATION AND REMOVAL OF TRUSTEE

(a)     The Trustee may resign at any time by written notice to the University, which shall be effective 30 days after receipt of such notice unless the University and the Trustee agree otherwise.

(b)     The Trustee may be removed by the University on 60 days' notice or upon shorter notice accepted by the Trustee.

(c)     Upon resignation or removal of the Trustee and appointment of a successor trustee, all assets shall subsequently be transferred to the successor trustee. The transfer shall be

10

LUADMINREC000876

completed within 120 days after receipt of notice of resignation, removal or transfer, unless the University extends the time limit.

(d)     If Trustee resigns or is removed, a successor shall be appointed, in accordance with Section 12 hereof, by the effective date of resignation or removal under paragraphs (a) or (b) of this Section.  If no such appointment has been made, the Trustee may apply to a court of competent jurisdiction for appointment of a successor or for instructions.  All expenses of the Trustee in connection with the proceeding shall be allowed as administrative expenses of the Trust.

## Section 12.     APPOINTMENT OF SUCCESSOR.

(a)     If the Trustee resigns or is removed in accordance with Section 11(a) or (b) hereof, subject to the requirements of Section 11, the University may appoint any third party, such as a bank trust department or other entity that may be granted corporate trustee powers under state law, as a successor to replace the Trustee upon resignation or removal.  The appointment shall be effective when accepted in writing by the new trustee, who shall have all of the rights and powers of the former trustee, including ownership rights in the Trust assets.  The former trustee shall execute any instrument necessary or reasonably requested by the University or the successor trustee to evidence the transfer.

(b)     The successor trustee need not examine the records and acts of any prior trustee and may retain or dispose of existing Trust assets, subject to Sections 8 and 9 hereof.  The successor trustee shall not be responsible for and the University shall indemnify and defend the successor trustee from any claim or liability resulting from any action or inaction of any prior trustee or from any other past event, or any condition existing at the time it becomes successor trustee.

## Section 13.     AMENDMENT OR TERMINATION

(a)     This Trust Agreement may be amended by a written instrument executed by the Trustee and the University.  Notwithstanding the foregoing, no such amendment shall conflict with the terms of the SERP or shall make the Trust revocable.

(b)     The Trust shall not terminate until the date on which the Participant and his beneficiaries are no longer entitled to benefits pursuant to the terms of the SERP.  Upon termination of the Trust, any assets remaining in the Trust shall be returned to the University.

(c)     Upon written approval of the Participant or his beneficiaries entitled to payment of benefits pursuant to the terms of the SERP, the University may terminate this Trust prior to the time all benefit payments under the SERP have been made.  All assets in the Trust at termination shall be returned to the University.

## Section 14.     MISCELLANEOUS.

(a)     Any provision of this Trust Agreement prohibited by law shall be ineffective to the extent of any such prohibition, without invalidating the remaining provisions hereof.

LUADMINREC000877

(b)     Benefits payable to the Participant and his beneficiaries under this Trust Agreement may not be anticipated, assigned (either at law or in equity), alienated, pledged, encumbered or subjected to attachment, garnishment, levy, execution or other legal equitable process.

(c)     This Trust Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia.

(d)     Neither the University nor the Trustee may assign this Trust Agreement without the prior written consent of the other.  This Trust Agreement shall be binding upon, and inure to the benefit of, the University, the Trustee and their respective successors and permitted assigns. With respect to a corporate  Trustee, any entity, which shall by merger, consolidation, purchase, or otherwise, succeed to substantially all the trust business of the Trustee shall, upon each succession and without any appointment or other action by the University, be and become successor trustee hereunder, upon notification to University.

(e)     The provisions of this Trust Agreement are intended to benefit only the parties hereto, their respective successors and assigns, and the Participant and his beneficiaries under the SERP.  There are no other third party beneficiaries.

(f)     The University and the Trustee hereby each represents and warrants to the other that it has full authority to enter into this Trust Agreement upon the terms and conditions hereof and that the individual executing this Trust Agreement on its behalf has the requisite authority to bind the University or the Trustee to this Trust Agreement.

(g)     This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and such counterparts shall constitute but one and the same instrument and may be sufficiently evidenced by one counterpart.


[SIGNATURE PAGE TO FOLLOW]


12

LUADMINREC000878

IN WITNESS WHEREOF, the University and the Trustee have executed this Rabbi Trust Agreement as of the 22nd day of July, 2020.

UNIVERSITY:

LIBERTY UNIVERSITY

By: _Jerry Prevo_

Name: _JERRY PRIEVO_

Title: _CHAIRMAN OF BOARD_

TRUSTEE:

_____

John J. Regan

13

79511141_5

LUADMINREC000879

IN WITNESS WHEREOF, the University and the Trustee have executed this Rabbi Trust Agreement as of the 22nd day of July, 2020.

**UNIVERSITY:**

**LIBERTY UNIVERSITY**

By: _____

Name: _____

Title:_____

**TRUSTEE:**

_____

**John J. Regan**

13

LUADMINREC000880

# EXHIBIT B

LUADMINREC000881

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement') is hereby adopted effective July 1, 2019 between LIBERTY UNIVERSITY, a Virginia nonstock corporation (referred to in this Agreement as "LU" or "the University") and JERRY L. FALWELL, JR., a resident of Virginia (referred to in this Agreement as "Falwell" or "the Employee").

WHEREAS LU is a university centered in the City of Lynchburg, Virginia, which is dedicated to excellence in higher education and scholarship within a Christian context;

WHEREAS, Falwell has served LU in several roles since 1988, including his current positions as Chancellor and President and in connection therewith had entered into a series of employment agreements;

WHEREAS, LU acknowledges that Falwell, among others, was instrumental in promoting and furthering the University's debt restructuring and return to a position of financial strength in 1997 after a period of severe financial hardships for the University that began in 1987 and in promoting and furthering the rapid expansion and continued success of the University, particularly since 2007;

WHEREAS, since Falwell became President and Chancellor in 2007, Liberty's net assets have increased from approximately $100,000,000 to over $2.1 billion in 2017 and Liberty's enrollment has increased from approximately 9,600 students in residence to over 15,000 students in residence and from approximately 27,000 students studying online to over 86,000 students studying online. During the same period, annual gross revenues have increased from $231,506,554 to  $1,111,316,499 and the University's surplus of revenues over expenditures has increased from $52,514,469 to $331,142,834.  As a result of LU's strong financial performance, Standard & Poor's has assigned the University a credit rating of AA since 2011, placing the University among the 80 highest rated universities nationally;

{2625067-1, 116311-00009-01}

WHEREAS, in 2019 LU engaged FW Cook, a national consulting firm with expertise in compensation of executives in tax-exempt organizations, to review Falwell's compensation to determine whether it is in line with national standards, taking into account LU's growth and financial achievements and Falwell's historical compensation, and to make recommendations for program changes as needed to ensure that he is retained at LU for the long term and provided with a competitive and motivating compensation program;

WHEREAS, LU desires to adjust its executive compensation program so that it remains competitive with executive compensation programs of other comparable non-profit colleges and universities, adjusted for geography, performance and tenure;

WHEREAS, in recognition of Falwell's many significant contributions to the University and in an effort to compensate Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, LU wishes to formalize and reinforce the parties' long term employment relationship by entering into this Agreement; and

WHEREAS, Falwell likewise wishes to continue to contribute to the future success of LU through his employment as President and Chancellor of the University on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, LU and Falwell adopt the foregoing recitals and agree as follows:

## ARTICLE 1

### EMPLOYMENT STATUS

1.1     LU hereby agrees to continue employing Falwell and Falwell hereby accepts continued employment by LU as President and Chancellor on the terms and subject to the conditions set forth in this Agreement. Falwell shall continue to be classified as a full-time employee for all purposes, including fringe benefits.  Subject to the provisions of Article 7 and 8

LUADMINREC000883

hereof, Falwell is an at will employee of LU, and serves at the pleasure of the LU Board of Trustees.

## ARTICLE 2

## TERM

2.1     This Agreement shall commence on July 1, 2019 and shall continue until the earlier of: (a) June 30, 2030; or (b) the date the Agreement is terminated pursuant to Articles 6 through 9, inclusive, of this Agreement (the "Term").

## ARTICLE 3

## DUTIES AND RESPONSIBILITIES

3.1     Falwell shall continue to provide LU with dedicated, diligent and conscientious full time service in a manner that is generally consistent with the level of service he has provided during the nearly five (5) year period immediately preceding the effective date of this Agreement, with allowances for reasonable time to attend to personal investments.

3.2     Falwell's duties shall consist of the tasks, duties and responsibilities he has assumed and performed as President and Chancellor during the nearly five (5) year period immediately preceding the effective dates of this Agreement. These duties shall include but not necessarily be limited to the following:

(a)     ensuring the implementation of the University's mission and purposes as described or defined in the University's Articles of Incorporation, Bylaws, and other foundational documents.

(b)     performing the duties of Chancellor/President as described in the University's Bylaws.

(c)     overseeing the fiscal, administrative, admissions, academic, athletic and other operations, divisions, departments and offices of the University.

LUADMINREC000884

(d)     raising funds for the benefit of the University.

(e)     implementing and executing policies, orders and resolutions adopted or established by the LU Board of Trustees and its Executive Committee.

3.3     As Chancellor and President, Falwell shall have the executive and administrative powers to manage and control the day to day operations of the University, provide focus and direction for the University, make policy recommendations to the Board of Trustees, and provide spiritual and worldview leadership to the University in pursuit of excellence, subject to the ultimate authority of the Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws. That executive and administrative power shall include but not be limited to the absolute authority to hire, retain and dismiss administrative, professional, academic and athletic personnel, subject only to any contractual or tenurial rights of any such employee. Provided, however, that Falwell shall be accountable to the Board of Trustees for implementing its policies and carrying out his duties, including the handling of personnel matters.

3.4     Compliance with Rules Applicable to Athletics Program.

(a)     Falwell agrees to abide by and comply with the Constitution, Operating Bylaws, legislation and interpretations of the National Collegiate Athletic Association ("NCAA") (or any other conference in which the University becomes affiliated), and all NCAA and University rules and regulations relating to the conduct and administration of the University's general athletics program (collectively, the "Program") as now constituted or as any of the same may be amended or enacted during the term of Falwell's employment by the University.  In the event that Falwell becomes aware, or has reasonable cause to believe, that violations of any of the aforementioned rules or regulations may have taken place, he shall promptly report the same to the Board and the NCAA (or other applicable governing body).  Falwell agrees to adhere to, respect and follow the

LUADMINREC000885

academic standards and requirements of the University and the NCAA with regard to the recruitment and eligibility of prospective and current student athletes.  All academic standards, requirements and policies of the University and the NCAA shall also be observed at all times by Falwell and he shall use Best Efforts (as defined below) to ensure that the athletic director and members of the Program staff do the same.

(b)     If Falwell is involved in an act or omission that constitutes a violation by the Athletic Director, any University coach or the University of any legislation, rule, regulation, constitutional provision, bylaw, policy, procedure or guideline of the NCAA (or NCAA interpretation), including but not limited to failing to use Best Efforts to promote an atmosphere of compliance by the athletic director, coaches, their staffs or student-athletes in the Program or to monitor their activities for compliance with NCAA rules, or if he fails to notify the Board or NCAA of any such violations of which he has knowledge, Falwell shall be subject to disciplinary or corrective action as set forth in NCAA enforcement procedures and/or policies, procedures and guidelines established from time to time by the University for its administrators, including but not limited to, probation, suspension with or without pay (for up to thirty (30) days) or termination of employment.  Such disciplinary action may include termination for Cause (as defined in Section 7.3(g)). Notwithstanding the foregoing, before any such disciplinary action is imposed, Falwell will be provided with written notice of the alleged violation or violations and no less than fifteen (15) days to remedy the same, provided that such violation or violations are capable of cure, as determined in the reasonable and good faith judgment of the University.

(c)     For purposes of this Agreement, "Best Efforts" means with respect to Falwell, those efforts that a responsible and experienced President (other than Falwell) desirous of successfully achieving the specified result would use in similar circumstances; and (ii) with respect

to the University, those efforts that a prudent university desirous of successfully achieving the specified result would use in similar circumstances.

3.5     Falwell shall not undertake compensated work or activities for, or accept any employment or other compensation from, any other institution of higher education for work undertaken prior to the termination of this Agreement without receiving approval of the Board of Trustees or the Executive Committee of the Board of Trustees (the "Executive Committee") prior to undertaking such work or activities.

3.6     Falwell shall not author or publish any book or article relating to his employment at Liberty University hereunder without prior consent of the Executive Committee or Board of Trustees, which prior consent may be conditioned upon advance review and approval of the content of said book or article. This provision does not include letters to the editor or articles in University publications and other University media which are published to carry out Falwell's duties under this Agreement and advance the interests and mission of LU. Nor does this provision include brief communications on Twitter, Facebook and similar communication vehicles. The provision of this subsection shall survive termination of this Agreement.

3.7     The parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings. This prohibition includes defamatory remarks about the employees and members of the Board of Trustees of the University. Neither party, however, waives the protections afforded by otherwise applicable common law privileges and this Section 3.6 shall in no event apply to remarks made during meetings of either the University's Board of Trustees or its Executive Committee. If Falwell's employment is terminated for cause, the parties may truthfully explain the circumstances forming the basis for the determination of cause. The provision of this Section 3.6 shall survive termination of this Agreement.

LUADMINREC000887

3.8      Falwell shall continue to have access to confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly disclosed by LU ("'Confidential Information") during the course of his employment. Confidential Information remains the property of LU. Unauthorized disclosure of Confidential Information will cause definite and irreparable harm to LU. Falwell shall not disclose Confidential Information intentionally within the University except to fulfill the legitimate business purposes of LU and shall not disclose it directly or indirectly, outside the University without the express authorization of the Executive Committee or as required by law or to further the interests of LU. Under no circumstances shall the release of details of this Agreement be considered to further the interests of LU. Any Confidential Information in tangible form shall be immediately returned to LU upon request. The provisions of this subsection shall survive termination of this Agreement.

ARTICLE 4

COMPENSATION

4.1      In consideration of Falwell's continued service as President and Chancellor, LU shall compensate him as follows:

(a)      *Base Salary.* During the Term, LU shall pay Falwell an annual base salary at the rate of $1,250,000 per year, payable in accordance with the normal payroll practices of LU for its executives as in effect from time to time (but not less frequently than monthly).  The annual base salary shall not be reduced during the Term of the Agreement.  On an annual basis, the Board shall review Falwell's performance and consider in its discretion approval of an increase in base salary, with such approved increases to take effect on July 1, of each year. Such base salary, as so increased, is hereafter referred to as the "Base Salary."

LUADMINREC000888

(b)     *Discretionary Bonuses.* Falwell shall be eligible to receive bonuses in such amounts and at such times as the Executive Committee of the Board of Trustees may award based on its assessment of his performance, the financial condition of the University, and other considerations which the Executive Committee of the Board of Trustees in its sole discretion finds relevant.  The Board shall consider the award of such discretionary bonus no less often than annually.

(c)     *Severance Benefit*.  In the event the University terminates Falwell's employment without Cause, or Falwell resigns his employment with Good Reason, the University shall pay to Falwell a single lump sum payment in an amount equal to two times his Base Salary.  Such amount shall be paid to Falwell within thirty (30) days following his termination of employment, subject to his execution of a release of claims (provided that if the period over which Falwell has to consider the execution of the release crosses tax years, the payment shall be made no earlier than the first business day of the second tax year).

(d)     *Supplemental Executive Retirement Plan.* The University agrees to adopt a defined contribution supplemental executive retirement plan for the benefit of Falwell ("SERP" or the "Plan") pursuant to a separate agreement that will (1) provide for annual credits designed to target a retirement benefit over the life of Falwell and Mrs. Falwell in an amount equal to seventy-five percent (75%) of Falwell's average Base Salary over the five (5) year period prior to his termination of employment, net of any required tax withholding, (2) have an initial notional account balance that represents prior years' deemed accumulations during Falwell's presidency through June 30, 2019 and (3) be paid in a lump sum.  This lump sum shall be payable on the first day of the calendar month following the earliest of (1) provided that Falwell does not engage in any Competitive Activity during the Non-Competition Period, as defined in Section 5.2 herein, the

LUADMINREC000889

second anniversary of his termination of employment, (2) Falwell's death, or (3) Falwell's Disability, as defined in Section 6.6 herein.

4.2     Except as set forth herein, LU shall provide Falwell the same fringe benefits and the same opportunity to participate in benefit plans that it offers other full-time executive employees. These benefits and programs currently include group family health insurance (medical, vision, dental), group family life insurance and disability insurance, employee assistance programs, retirement, savings and investment programs (including LU's Section 403(B) plan), sick/personal leave, holiday leave and voice and data phone payments under LU's Cellular Phone Policy and similar benefits made available to executive or managerial employees of the University. In addition to such benefits, conditioned on Falwell's continued employment, on each April 1 LU shall pay on Falwell's behalf an amount equal to the life insurance premiums owed in respect of whole life insurance policies issued by each of Pacific Life Insurance Company (issued October 3, 2016) and Protective Insurance Company (issued April 8, 2016) (together, the "Policies") on Falwell's life, except to the extent that such premiums are paid by the dividends accruing on the cash value of such Policies.  For this purpose such payment shall be made pursuant to a separate "split dollar agreement" pursuant to which the premium payments in respect of the Policies shall be repaid, without interest, to the University upon the payment of the death benefit or earlier termination of the Policies.  Once every eighteen months (18) months, Falwell shall undergo an annual Comprehensive Executive Medical Health Assessment, the cost of which shall be reimbursed by the institution upon submission of a receipt or statement for same.  The Comprehensive Executive Medical Health Assessment shall include a thorough physical examination by medical doctor(s), a full range of preventive screening tests for early detection of cancer, heart disease and other serious medical problems, a cardiovascular fitness evaluation,

LUADMINREC000890

including treadmill exercise test, a lifestyle assessment to discuss nutrition, exercise, personal safety and other indicators of risk of disease, a review and update of medications and immunizations, development and assessment of a long-term strategy for prolonged life and wellness, a full report of the test results and recommendations at the conclusion of the examination and a written report sent to Falwell confidentially for his personal use and for consultation with his private physician.  Neither the University nor the Executive Committee shall request or be entitled to a copy of the written report but the Executive Committee shall be entitled to receive a copy of the receipt or statement for such services as part of each of its formal annual evaluations of Falwell.

4.3     LU shall provide Falwell with an automobile allowance of Seven Hundred Fifty Dollars ($750) per month in accordance with LU's normal payroll policies and schedule and subject to any reporting and withholding requirement provided by law.  In addition, for each year that the Agreement remains in effect LU shall furnish on an annual basis up to fifty (50) hours of jet transportation on LU's jets for Falwell and members of his immediate family, with any unused hours expiring at the end of each year without further compensation to Falwell.   Any personal use of the jet transportation benefit described herein will be reported as a taxable benefit to Falwell. LU shall reimburse Falwell in accordance with LU's Travel and Entertainment Policy for reasonable and necessary travel and out-of-pocket expenses incurred by him, and where appropriate his spouse, in connection with the performance of his official duties under this Agreement.

4.4     LU shall provide Falwell and members of his immediate family with tuition at the University through the conclusion of each academic year during which he serves as President and/or Chancellor pursuant to LU's Dependent Grant-in-Aid Policy and Continuing Education

LUADMINREC000891

Policy. "Immediate family" shall be limited to Falwell's wife, children by birth or adoption and grandchildren by birth or adoption. Such tuition benefits shall be provided subject to any reporting and withholding requirements provided by law.

4.5     Falwell shall be entitled to six (6) weeks annual vacation during each year of the Term. No unused vacation may be carried forward to subsequent years or paid out as compensation.

4.6     LU agrees to provide memberships at the LaHaye Student Center and Sports Racket for use by Falwell and his immediate family or at another fitness center mutually agreeable to the parties.

4.7     LU agrees to provide general maintenance and upkeep at the primary residence of Falwell, including general repairs, maintenance and lawn care. The parties hereto acknowledge that the primary residence of Falwell is used by the University from time to time for student, faculty and staff events. A portion of the general maintenance and upkeep referenced above shall be deemed a business expense of the University in connection with said student, faculty and staff events and the remainder of said general maintenance and upkeep shall be deemed income to Falwell and reported to the IRS as such by the University.

<u>ARTICLE 5</u>

OTHER EMPLOYMENT

5.1     Falwell shall refrain from undertaking any other employment or compensated activities that hinder or impede successful performance of the services outlined in this Agreement. Except as provided in this Agreement, Falwell shall not engage in any compensated employment or compensated activities without first obtaining the written approval of the Executive Committee or the Board of Trustees. The University, however, acknowledges that Falwell is licensed by the Virginia State Bar and periodically engages in the practice of law on a limited basis in association

LUADMINREC000892

with another practitioner on discrete matters. Falwell hereby receives approval for such limited legal work and therefore shall not require any additional approval for such employment by the Executive Committee or the Board of Trustees. Passive investment activity such as buying, holding and selling real estate, stock and securities ("Passive Investment Activity") shall not be considered other employment or compensated activities for purposes of this Agreement and therefore shall not require any additional approval by the Executive Committee of the Board of Trustees.  In addition, Falwell shall have the right without seeking approval of the Executive Committee or Board of Trustees to participate as either a paid endorser or principal owner in an asset management venture. Falwell (alone or in conjunction with members of his family and/or others) shall be free to participate in an asset management venture, provided such venture conducts no business with the University or any entity owned or controlled by the University and receives no compensation from the University or any entity owned or controlled by the University.

      5.2    In view of the unique and valuable services rendered by Falwell to LU and in connection with the SERP benefits to be paid to Falwell at or following termination of employment, Falwell agrees that during employment and for a period of two (2) years thereafter ("Non-Competition Period"), whether with our without compensation, directly or indirectly, as an owner, principal, partner, member, shareholder, independent contractor, consultant, joint venturer, investor, licensor, lender or in any other capacity whatsoever, alone, or in association with any other Person, he will not carry on, be engaged or take part in, or render services (other than services which are generally offered to third parties) or advice to, own, share in the earnings of, invest in the stocks, bonds or other securities of, or otherwise become financially interested in, any other college or university, whether for-profit or non-profit ("Competitive Activity").  The  record or beneficial ownership by Falwell of up to one percent (1%) of the shares of any corporation whose shares are publicly traded on

LUADMINREC000893

a national securities exchange or in the over-the-counter market shall not of itself constitute a breach hereunder.

## ARTICLE 6

### TERMINATION UPON DEATH

6.1     Falwell's death shall terminate this Agreement.  Falwell's executor, administrator or other personal representative or beneficiary, as applicable, shall be entitled to all the compensation and fringe benefits provided in Article 4 of this Agreement through the date of his death, along with the benefits payable pursuant to the SERP under subsection 4.l(e), and any benefits to which he or his executor, administrator or other personal representative or beneficiary, as applicable, is entitled under any applicable benefit plan as a deceased employee.  In addition, Falwell's executor, administrator or other personal representative or beneficiary, as applicable, shall be entitled to any and all survivorship death benefits payable under any savings, retirement, investment and other plans and programs in which Falwell was a participant.  Except as provided herein, Falwell shall not be entitled to receive any other payments or benefits after the date of his death, except that Falwell's surviving spouse or other eligible dependents shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at his date of death.

## ARTICLE 7

### TERMINATION FOR CAUSE OR DISABILITY

7.1     LU may terminate Falwell's employment only for Cause or Disability, as each such term is defined below, provided it first delivers to Falwell specific, written notice of the purported grounds for dismissal, and if in the reasonable opinion of the Executive Committee the Cause or Disability can be corrected or cured, a thirty (30) day opportunity to correct or cure the alleged Cause or Disability.  A dismissal in the absence of required, thirty (30) day notice is a dismissal

LUADMINREC000894

without Cause.  For avoidance of doubt, if Falwell is terminated for Cause based on a violation of Section 7.3(g) and the applicable governing body renders a final determination establishing facts indicating that Cause does not exist, provided there are no other facts or circumstances justifying termination for Cause, the termination shall be treated as a termination without Cause under Article 8 and the provisions of Article 8 shall apply.

7.2    If Falwell is terminated for Cause, LU shall be obligated to pay Falwell his salary, earned compensation and fringe benefits up to the date of termination (collectively, his "Accrued Compensation"), plus any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination.  Falwell's resignation from the Board of Trustees and its Executive Committee shall be effective immediately upon termination of his employment for Cause.

7.3    As used in this Agreement, the term "Cause" is defined restrictively to mean only the following:

(a)    the willful refusal or willful failure of Falwell to comply with the reasonable directives of the Board of Trustees, so long as such directives are not in conflict with the authority of the Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws, or in conflict with this Agreement; provided that such refusal or failure results in (or is substantially likely to result in) a material adverse consequence to LU;

LUADMINREC000895

(b)     the material failure of Falwell to comply substantially with written policies, standards and regulations of LU as from time-to-time established in writing, provided that such failure results in (or is substantially likely to result in) a material adverse consequence to LU;;

(c)     the willful refusal or willful failure of Falwell to faithfully or diligently perform his duties under this Agreement, provided that such refusal or failure results in (or is substantially likely to result in) a material adverse consequence to LU;

(d)     conviction of or entry of a plea of guilty, no contest or *nolo contendere* to any felony or to a misdemeanor involving moral turpitude (deferred disposition by a court, with or without a finding, admission or adjudication of guilt, such as withholding adjudication or taking the matter under advisement for some set period, meets the threshold for cause intended for Section 7.3 (d));

(e)     defamatory or slanderous comments in breach of Section 3.6 of this Agreement which cause serious damage to LU's reputation;

(f)     Any significant violation (which, for the avoidance of doubt, shall not include any Level III or Level IV violation) or repetitive violation (other than of a de minimis nature) of any legislation, rule, regulation, constitutional provision, bylaw, policy, procedure or guideline of the NCAA (or NCAA interpretation) by Falwell arising from any act or omission of Falwell (or Falwell's knowledge of any act or omission of another person and failure to take prompt and appropriate responsive action or Falwell's failure to monitor, supervise or report another person for whom Falwell has or, at the relevant time had, supervisory responsibility), or;

(g)     advocating a position that is materially inconsistent with the doctrinal statements found in the University's Articles of Incorporation, with the sole exception of such

LUADMINREC000896

advocacy in private discussions with the Board of Trustees or Executive Committee in connection with proposed amendments to the Articles of Incorporation.

7.4     In the event Falwell is the subject of a criminal arrest, criminal indictment, criminal information, criminal warrant for violation, criminal complaint or criminal charge for any felony or is the subject of such for a misdemeanor involving moral turpitude, LU may place Falwell on administrative leave, thereby suspending Falwell from performance of the duties and responsibilities outlined in Sections 3.1, 3.2 and 3 3, at a minimum of one-third (1/3) of the rate of his annual base salary in effect at the date of his suspension, which compensation rate can be increased at the discretion of the Executive Committee.

7.5     As used in this Agreement the term "Disability" is deemed restrictively to mean only the following: mental or physical incapacity or disability which prevents Falwell from performing a substantial and material portion of his duties under this Agreement on a continuous basis and that persists for more than 180 consecutive days.  A termination of Falwell's employment for Disability is neither a dismissal with Cause within the meaning of Sections 7.2 and 7.3 nor a dismissal without Cause within the meaning of Article 8 and Falwell shall be entitled to (1) Accrued Compensation, and (2) immediate commencement of benefits under the SERP, as provided under subsection 4.1(e) herein.


## ARTICLE 8

### TERMINATION BY UNIVERSITY WITHOUT CAUSE OR BY FALWELL FOR GOOD REASON

8.1     LU may terminate Falwell's employment as President and Chancellor at any time upon sixty (60) days advance, written notice to Falwell without Cause, and Falwell may resign his employment for "Good Reason" as set forth in Section 8.2. In the event LU elects to terminate

LUADMINREC000897

Falwell's employment as Chancellor and President without Cause or Falwell resigns his employment for "Good Reason," LU shall pay to Falwell as liquidated damages the severance benefit provided under subsection 4.1(c), and any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible (1) to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination, and (2) for benefits under the SERP, as provided under subsection 4.1(d).  Following termination of his employment, Falwell shall have no obligation to remain at the University or perform any services for the University.

8.2    For purposes of this Agreement, the term "Good Reason" shall mean (i) any action by LU that results in a material diminution in Falwell's position, authority, duties or responsibilities as President and Chancellor of LU set forth in Article III; (ii)  a reduction by LU in Falwell's Base Salary, or a material failure by LU to pay Falwell any such amounts when due; (iii) a relocation of Falwell's principal place of employment to more than thirty-five (35) miles from LU's Lynchburg, Virginia campus, and (iv) a material breach of this Agreement without Falwell's written consent.  Termination of employment for "Good Reason" shall not be effective (other than with respect to clause (iii) above) until Falwell delivers to the Board of Trustees a written notice specifically identifying the conduct of LU which Falwell believes constitutes "Good Reason" in accordance with this Section 8.2 within ninety (90) days of Falwell's knowledge of the initial occurrence of each specific event constituting Good Reason and Falwell provides the Board of Trustees at least thirty (30) days to remedy such conduct after receipt of such written notice,

LUADMINREC000898

and to the extent not cured, Falwell terminates his employment within thirty (30) days after such failure to cure.

8.3     The parties have bargained for this liquidated damages provision, giving careful consideration to the following circumstances:

(a)     this Agreement concerns personal services.

(b)     termination of this Agreement by the University prior to the end of the Term (or at any point after the Term) could damage his professional reputation. These damages to Falwell are difficult to determine with certainty. Therefore, the parties have agreed upon this liquidated damages provision and stipulate that it is neither a penalty nor an incentive for unsatisfactory performance.

## ARTICLE 9

## RESIGNATION

9.1     Falwell may resign, retire or otherwise terminate his employment with the University other than for Good Reason, provided he gives the Board of Trustees sixty (60) days advance written notice.  In the event Falwell should elect to resign, retire or otherwise terminate his employment other than for Good Reason, the University shall be obligated to pay Falwell his Accrued Compensation and any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible (1) to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") or the time specified by COBRA at the time of termination, and (2) for benefits under the SERP, as provided in Section 4.1(e).

LUADMINREC000899

## ARTICLE 10

## INDEMNIFICATION

10.1    To the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment. The indemnification afforded Falwell under this Section is in addition to any and all indemnity rights and protections the Employee may have pursuant to statute or under any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies.

## ARTICLE 11

## MISCELLANEOUS PROVISIONS

11.1    Neither party shall disclose this Agreement to anyone without the other party's prior, written consent, unless disclosure is required by law. The parties, however, shall be free to disclose and discuss this Agreement with their respective lawyers, accountants and tax advisors. Falwell shall be permitted to disclose the Agreement to his spouse.

11.2    For a notice or other communication to be valid under this Agreement, it must be written, signed and sent by at least one of the following methods: (a) personal delivery; (b) first class mail, postage prepaid; (c) registered or certified mail, return receipt requested, and postage prepaid; and (d) nationally recognized overnight courier (e.g., UPS or Federal Express).

11.3    If any provision of this Agreement is determined to be invalid, void, illegal or unenforceable to any extent, the remainder of this Agreement, or application of that provision to

LUADMINREC000900

any persons or circumstances other than those as to which it is held to be unenforceable, will remain valid, binding and enforceable.

11.4    (a)  The patties may waive a provision in this Agreement only by a writing executed by the party or parties against whom the waiver is sought to be enforced. Waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver by that party of any subsequent breaches.

(b)    No failure or delay in exercising any right or remedy, or in requiring the satisfaction of any condition, under this Agreement, and no act, omission or course of dealing between the parties, shall operate as a waiver or estoppel of any right, remedy or condition.

(c)    A waiver made in writing on one (1) occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver of any future occasion, unless expressly stated as such.

11.5    This Agreement constitutes the final Agreement between the parties concerning the terms and conditions of Falwell's employment with LU. This Agreement supersedes and invalidates any prior or contemporaneous agreement, oral or written, between them regarding the terms of Falwell's employment with LU. All such prior Agreements between the parties shall become null and void upon the execution of this Agreement. In entering into this Agreement, neither party has relied upon any statement, representation, warranty or agreement of the other party except for those expressly contained in this Agreement. The parties may amend this Agreement only by a written Agreement of the parties that identifies itself as an amendment to this Agreement.

11.6    This Agreement may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one instrument.

11.7    The rule of construction that ambiguity is construed against the drafting party shall have no application in any dispute over the interpretation of this Agreement. The parties represent and warrant to one another that they enter this Agreement with the benefit of counsel based on the independent analysis of each party of the facts and legal principles relevant to the terms and conditions of this Agreement.

11.8    Neither this Agreement as a whole nor any of its individual provisions is assignable by either party.

11.9    The descriptive headings of the articles and section of this Agreement are for convenience only, do not constitute a part of this Agreement, and do not affect this Agreement's construction or interpretation.

11.10   This Agreement shall be governed by and construed in accordance with the law of the Commonwealth of Virginia without regard to the Commonwealth's choice of law rules.

11.11   This Agreement shall be binding upon and inure to the benefit of the parties' respective successors, heirs, assigns, receivers and personal representatives.

11.12   The provisions of this Agreement to be performed upon and after termination of Falwell's employment survive termination of this Agreement.

11.13   The parties agree that any legal action or proceeding against the other party arising out of or relating to this Agreement or the University's employment of Falwell shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

LUADMINREC000902

IN WITNESS WHEREOF, Falwell and the authorized representative of the University have executed this Agreement on the date(s) written below.

JERRY L. FALWELL, JR.

LIBERTY UNIVERSITY, INC.

Chairman, Board of Trustees

Jerry L. Falwell, Jr.

Date: 8/30/2019

Date: AUG. 29, 2019

LUADMINREC000903

# EXHIBIT C

LUADMINREC000904

July 22, 2020

Jerry L. Falwell, Jr.
President of Liberty University

      Re:    Supplemental Executive Retirement Plan

Dear President Falwell:

The purpose of this letter is to describe the terms of the deferred compensation arrangement (the "Agreement") between you and Liberty University (the "University"). This Agreement is intended to satisfy the University's obligations set forth in Section 4.1(d) of your employment agreement with the University, dated July 1, 2019 (the "Employment Agreement") and, notwithstanding anything to the contrary in the Employment Agreement, constitutes the entire obligation of the University to provide supplemental retirement benefits to you. This Agreement is effective as of the date hereof.

1.    Deferred Compensation Account. The University has established on its books a supplemental executive retirement account (the "Account") for the purpose of measuring its obligation to pay you supplemental retirement benefits as described below.

2.    Credits to the Account.

    a.    Within thirty (30) days of the date hereof, the University will credit to the Account, as of July 1, 2020, an amount equal to $7,635,927.

    b.    On or about June 30, 2021 and each anniversary thereafter, provided you remain continuously employed as President of the University through each such crediting date, the University will credit to the Account, as of such June 30, an amount equal to Three Hundred Eighty Five Thousand Dollars ($385,000) less the annual employer contribution to the University's 403(b) plan (assuming the maximum employee contribution needed to achieve the maximum employer contribution for the plan year ending on such June 30 is made).

3.    Investment Return to the Account; Rabbi Trust.

    a.    As of each June 30th, as of the last day of the month immediately preceding the month in which payment is to be made under this Letter Agreement, and as of such other times, if any, as the University determines, investment return at an annual rate of 6% shall be credited to the Account. The Account will continue to be adjusted under this Paragraph 3 until all amounts due under this Letter Agreement have been paid to you or your beneficiary(ies) or have been forfeited. Upon full payment or forfeiture of benefits, the balance of the Account will be reduced to zero and no further amounts will be due under this Letter Agreement.

LUADMINREC000905

Jerry L. Falwell, Jr.                                                      July 22, 2020

b.      The University shall establish a so-called "rabbi" trust pursuant to the Trust
Agreement attached hereto (the "<u>Trust</u>") for your benefit and shall deposit an
amount equal to each credit described in Paragraph 2 and the investment return
described in Paragraph 3 of this Letter Agreement within thirty (30) days of the
applicable crediting date; provided, that if the balance of the Trust assets as of
such applicable crediting date is no less than the balance of the Account (after
taking into account the applicable credit and investment return), no such deposit
requirement will apply for such applicable crediting date.  The Trust is intended to
be a grantor trust, of which the University is the grantor, within the meaning of
subpart E, part I, subchapter J, chapter 1, subtitle A of the Internal Revenue Code
of 1986, as amended (the "<u>Code</u>"), and shall be construed accordingly.

4.      <u>Payment of the Account</u>.  Subject to Paragraph 5 below, you (or, in the event of your
death, your beneficiary or estate) will be entitled to receive the balance of the Account attributed
to credits made pursuant to Paragraph 2 (together with the earnings related described in
Paragraph 3) in a single lump sum payment on the first of the month following the earliest to
occur of the following: your death, your Disability (as defined in your Employment Agreement),
and the second anniversary of your termination of employment with the University for any
reason other than Cause (as defined in your Employment Agreement).

5.      <u>Forfeiture of the Account</u>.  Notwithstanding Paragraph 4 above, in the event that your
employment is terminated for Cause (as defined in your Employment Agreement) or you engage
in any Competitive Activity (as defined in your Employment Agreement) during the Non-
Competition Period (as defined in your Employment Agreement), you will forfeit the right to the
balance of the Account.

6.      <u>Designation of Beneficiary</u>.  You may designate one or more beneficiaries in writing,
which designation shall become effective upon receipt by the University. In the absence of an
effective beneficiary designation, any amounts payable hereunder upon your death shall be paid
to your estate.

7.      <u>ERISA; Taxes; Withholding</u>.

a.      This Letter Agreement is intended to constitute a plan which is unfunded and is
maintained primarily for the purpose of providing deferred compensation for a
highly compensated management employee within the meaning of Sections
201(2), 301(a)(3), 401(a)(1) and 4021(b)(6) of the Employee Retirement Income
Security Act of 1974, as amended ("<u>ERISA</u>").  This Letter Agreement shall be
interpreted and administered to the extent possible in a manner consistent with the
foregoing intention.  This Letter Agreement shall be administered by the
Executive Committee of the University's Board of Trustees (the "<u>Committee</u>") in
its full discretion.  Any determination made by the Committee with respect to this
Letter Agreement will be final, binding and conclusive, in the absence of clear
and convincing evidence that the Committee acted arbitrarily and capriciously.

LUADMINREC000906

Jerry L. Falwell, Jr.                                                      July 22, 2020

      The Committee shall be deemed to be the plan administrator with responsibility for complying with any reporting and disclosure requirements of ERISA.  If you believe you are being denied rights or benefits under this Letter Agreement, you (or your authorized representative) may file a claim in writing with the Committee.  If any such claim is wholly or partially denied, the Committee will notify you of its decision in writing and contain such additional information as required by Section 503 of ERISA.  Such notification will be given within 90 days after your claim is received by the Committee.  Within 60 days after the date on which you receive a written notice of a denied claim you (or your authorized representative) may (a) file a written request with the Committee for a review of your denied claim and of pertinent documents and (b) submit written issues and comments to the Committee. The Committee will notify you of its decision in writing. Such notification will contain specific reasons for its decision. The decision on review will be made within 60 days after your request for review is received by the Committee. If the decision on review is not made within such period, your claim will be considered denied.

    b.     All payments made by the University under this Letter Agreement shall be reduced by any tax or other amounts required to be withheld by the University under applicable law.  The payments contemplated by this Letter Agreement are intended to comply with Section 409A of the Code and are intended to be subject to a substantial risk of forfeiture under Section 457(f) of the Code through the date of payment.  In the event that any portion of a payment under this Letter Agreement is deemed to be vested under Section 457(f) of the Code and therefore taxable prior to the time it is paid to you (or your beneficiary or estate), the University will satisfy the additional required withholding from the undistributed portion of any amount payable and treat such undistributed portion as if such amount had been paid to you as wages (in a manner consistent with Section 409A of the Code).  Any amount remitted or paid will be subtracted from the balance of the amounts payable.

    c.     To the extent any amounts payable under this Letter Agreement result in current "wages" for FICA purposes, the University may reduce other pay of yours to satisfy withholding requirements related thereto, or may reduce the amounts payable pursuant to this Letter Agreement (in a manner consistent with Section 409A of the Code) by the amount of the required withholding.  Any amount remitted or paid will be subtracted from the balance of the amounts payable.

8.    <u>Non-alienation; Assignment</u>.  None of the payments hereunder shall be subject to any claim of any creditor, and, in particular, the same shall not be subject to attachment or garnishment or other legal process by any creditor.  You do not have any right to alienate, anticipate, commute, pledge, encumber or assign the payment or proceeds which you or your estate may expect to receive, contingently or otherwise, under this Letter Agreement.

<div align="center">3</div>

July 22, 2020

LIBERTY UNIVERSITY

By: _____

Dr. Jerry Prevo, Chairman, Board of
Trustees

I accept and agree to the terms of the above Letter Agreement.

_____          _____
Date                             Jerry L. Falwell, Jr.

77195221_6                              5

LUADMINREC000908

July 22, 2020

LIBERTY UNIVERSITY

By: _____
Dr. Jerry Prevo, Chairman, Board of
Trustees

I accept and agree to the terms of the above Letter Agreement.

_____          _____
Date                              Jerry L. Falwell, Jr.

7/21/2020

5

LUADMINREC000909

Jerry L. Falwell, Jr.                                                                July 22, 2020

       I hereby designate the following beneficiary(ies) to receive the balance of the Account in the event of my death before the Account has been paid to me in full. The University shall pay each beneficiary equally unless otherwise indicated below. If I elect multiple Primary Beneficiaries and not all survive me, the University shall pay the survivors in proportion to their percentage allocations.

| Primary Beneficiary(ies) | Address | Percentage |
|---|---|---|
| Rebecca T. Falwell | 2100 Old Cifax Road<br>Goode, VA 24556 | 100% |

If I am not survived by any Primary Beneficiary, the balance of the Account will be paid to my designated Contingent Beneficiary(ies), if any. The University shall pay each Contingent Beneficiary equally unless otherwise indicated below. If I elect multiple Contingent Beneficiaries, and not all survive me, the University shall pay the survivors in proportion to their percentage allocations.

| Contingent Beneficiary(ies) | Address | Percentage |
|---|---|---|
| Jerry Lamon Falwell, III | 2819 Campbell Highway<br>Lynchburg, VA 24501 | 1/3 |
| Charles Wesley Falwell | 2899 Hawkins Ridge Road<br>Goode, VA 24556 | 1/3 |
| Caroline Grace Falwell | 2100 Old Cifax Road<br>Goode, VA 24556 | 1/3 |

77195221_6

LUADMINREC000910

# EXHIBIT D

LUADMINREC000911

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

LIBERTY UNIVERSITY, INC.

                    Plaintiff,

v.

JERRY L. FALWELL, JR.,

                    Defendant.

Case No. CL21000354-00

JURY TRIAL DEMANDED

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiff Liberty University, Inc. ("Liberty" or the "University"), by counsel, states as follows for its claims against Defendant Jerry L. Falwell, Jr. ("Falwell Jr.").

### <u>INTRODUCTION</u>

1.      Liberty is one of the largest Christian academic communities in America, annually training over 100,000 online students, and educating more than 15,000 students on its 700-acre campus located at 1971 University Boulevard, Lynchburg, VA.

2.      Until he quit the office August 25, 2020, Falwell Jr., who resides in Goode, VA, was the President and Chancellor of Liberty, a role that he had held since succeeding Liberty's founder, and his father, Dr. Jerry L. Falwell Sr. ("Dr. Falwell").

3.      Liberty asserts this suit for several purposes, including (a) to recover University property that remains in the possession of Falwell Jr. post-resignation, (b) to redress breaches of various fiduciary duties that Falwell Jr. owed to Liberty while serving as the University's President

1

and Chancellor, and (c) to recover damages for violations by Falwell Jr. of Virginia's business conspiracy statute.

4.    Many of the facts supporting Liberty's latter two claims are helpfully spelled out in two writings: (a) a media statement that Falwell Jr. released to the *Washington Examiner* in August 2020, and (b) a lawsuit that Falwell Jr. lodged against Liberty in October 2020, two months after his abrupt resignation from Liberty's presidency.

5.    In the August 23, 2020 media statement Falwell Jr. tendered "exclusively" to the *Washington Examiner*, Falwell Jr. presented a 1,200-word narrative that divulged the saga of a "former family friend" who had an affair with Becki Falwell, the wife of Falwell Jr., and "was threatening to expose it" (the "Statement").

6.    In the Statement, attached hereto as Exhibit 1, and in his interview with the *Washington Examiner*, Falwell Jr. took pains to emphasize that he was divulging the extortive behavior for the first time outside his family.  He stated he and Becki had been "suffering in silence" over it.  He confessed he had wrongly been "bearing those burdens on [his] own."  The *Washington Examiner* confirmed Falwell Jr. was "reveal[ing] his wife Becki's affair for the first time."  The reporter noted Falwell Jr. "appeared to be relieved to have finally divulged the affair and the years-long series of attacks the couple has faced."

7.     On October 28, 2020, Falwell Jr. filed in this Court a two-count, 117-paragraph Complaint against Liberty (the "Complaint.")  In his Complaint, a copy attached hereto as Exhibit 2, Falwell again admits what he disclosed in the Statement – that Becki began an affair with a family friend in March 2012.  Falwell identified the former friend as Giancarlo Granda of Miami ("Granda.") Complaint ¶41. When Becki and Falwell Jr. first met Granda, he was a 20-year old working at the high-end resort hotel at which the Falwells stayed while on one of their frequent

2

family vacations in Miami. Complaint ¶40.  Falwell Jr. admits that Becki – a mother of three adult children – had an on-and-off again sexual affair with Granda that purportedly lasted until 2014. Complaint ¶¶40, 41.

8.      Falwell admits that he knew of Becki's affair, Complaint ¶42, and also concedes he had not disclosed the affair to anyone material.

9.      In the Complaint, Falwell Jr. instead pled that when Becki broke off intimate relations with Granda in 2012, the young man refused to retire from the relationship.  Granda threatened to use the surreptitious sexual intimacy, and surrounding conduct, to "embarrass the Falwells *and Liberty University.*"  Complaint ¶43 (emphasis added). Falwell Jr. and Granda both knew that matters of infidelity, immodesty, and acceptance of a loose lifestyle would stand in stark contrast to the conduct expected of leaders at Liberty.  Granda had amassed considerable leverage over the Falwells, and, accordingly, they worked to keep Granda pacified and quiet.

10.      In the Statement, Falwell Jr. contends that he and Becki were "doing our best to respectfully unravel this 'fatal attraction.'" Accordingly, the Falwells "extended the spirit of fondness to [Granda] with respect and kindness, both for spiritual and religious reasons, and in the hope that we could help him find his way and allow us to put this behind us, without any harm or embarrassment to our family or to the LU community…."  In the Complaint, Falwell Jr. summarized this appeasement as cultivating a "positive relationship" with Granda.  Complaint ¶42.

11.      By filing of the lawsuit against Liberty on October 28, 2020, Falwell Jr. – an attorney and active member of the Virginia State Bar – endorsed the accuracy of the statements made in the Complaint.  Since the time this suit was docketed with this Court by counsel, Falwell Jr. has referred to that Complaint on several occasions in the press without retraction or correction.

LUADMINREC000914

Although he voluntarily dismissed the defamation suit against Liberty in December 2020, Falwell Jr. did so without rescinding or rejecting the factual allegations he made in the Complaint.

12.     Similarly, by issuing the remarks in August 2020, and by providing a phone interview to the *Washington Examiner* about their contents, Falwell Jr. endorsed the facts in the Statement.  He has since then neither contradicted nor corrected any of the factual allegations in the Statement.

### The Liberty Way

13.     The unique concept for Liberty's brand of Christian higher education arose out of the personal vision of Dr. Falwell. Dr. Falwell's unwavering agenda was for Liberty to be a university anchored in the principles of the "Liberty Way," the University's term for a way of life centered on rigorous educational instruction delivered by faculty and administrators who were intentionally committed to a written statement of faith and to Biblical standards of morality.

14.     In 1967, Dr. Falwell first began laying the foundation for Liberty's eventual success, building in Lynchburg a holistic Christian educational system for evangelical youth by establishing Lynchburg Christian Academy, an accredited Christian day school for grades K-12. In 1971, Dr. Falwell reached higher, founding Liberty, an accredited Christian university for evangelical students.  In 1985, Dr. Falwell announced his eventual goal of having 50,000 students attend Liberty.  Today, as noted, Liberty trains more than double that number.

15.     In addition to leading Liberty, Dr. Falwell was also an important public figure in the political spectrum, serving among other things as head of the Moral Majority – a political action group that promoted biblical standards of living as a community value, and forged a coalition of voters active on the "Religious Right."  The Moral Majority – and Dr. Falwell – helped sweep Ronald Reagan to the U.S. presidency in 1980.

LUADMINREC000915

16.     At Liberty, Christian discipleship and academic instruction were integral to a cohesive educational package, and Liberty's policy documents incorporated this commitment. One of the principles that fueled Liberty's growth – and stability – was the Biblical notion of inter-accountability among the Christians who make up the Liberty community.  Liberty's core conduct documents espouse this fundamental belief, pronouncing, as a closely-held religious value, the ability of those following the commonly-held faith to press other Christians toward adherence to Biblical mandates in the event of perceived lapse.

17.     The Liberty Articles of Incorporation, first put in place under Dr. Falwell's leadership, plainly state this principle: "[Education] occurs most effectively when both instructor and student are properly related to God and each other through Christ."  The Faculty Handbook repeats this quote at paragraph 42.

18.     The Liberty University honor code – the *Liberty Way* – puts the practice of inter-accountability in these terms:

> Every student is expected to respect Liberty's Statement of Doctrine and Purpose and should avoid any activity, on or off campus, which would contradict the university's mission or purpose, compromise the testimony or reputation of the university, or disrupt Liberty's Christian learning environment. All members of the Liberty University community are asked to affirm the following: ***"We have a responsibility to uphold the moral and ethical standards of Liberty University and personally confront those who do not."***

(Emphasis in original.)

19.     The following statement from the Liberty University Employee Handbook, under the heading "Philosophy of Education," reflects well these guiding principles, which are taken from the institution's Articles of Incorporation:

> Liberty University is a Christian academic community in the tradition of evangelical institutions of higher education. As such, Liberty continues the

LUADMINREC000916

philosophy of education which first gave rise to the university and which is summarized in the following propositions:

- God, the infinite source of all things, has shown us the truth through the Scripture, nature, history, and above all, Christ.

- Persons are spiritual, rational, moral, social, and physical, created in the image of God. They are, therefore, able to know and value themselves and other persons, the universe, and God.

- Education, as the process of teaching and learning, involves the whole person, by developing the knowledge, values, and skills which enable each individual to change freely. Thus it occurs most effectively when both instructor and student are properly related to God and each other through Christ.

20.    It was Dr. Falwell's vision for the President of Liberty to be a standout spiritual leader for the college.  Under the Bylaws put in place to govern Liberty, it was Dr. Falwell's personal responsibility as President, and later as Chancellor and President simultaneously, to be at the same time Liberty's administrative leader and spiritual exemplar.  During his tenure, Dr. Falwell achieved distinction in both roles in service to the Liberty community.

21.    This tradition of dual duty continues at Liberty. The Amended and Restated Bylaws, adopted by Liberty's Board of Trustees on April 5, 2019, preserves Dr. Falwell's conception of the President's role.  It states, "[The President] provides spiritual and worldview leadership to the University in pursuit of excellence."  Falwell Jr. was among the Board members who voted to adopt these Restated Bylaws, and he later assented in his 2019 Employment Agreement to perform those duties.

22.    Finally, fearing spiritual erosion from the top, it was Dr. Falwell's vision that Liberty would always be subject to the authority of the local church in matters of doctrine and spiritual discipline.  Liberty's Board of Trustees was and is obligated to espouse Biblical principles.  After all, it was the Trustees that fashioned "Board policy" for Liberty.  *See* Bylaws, Article II, Section 4.

6

23.     Guided by the standards of Dr. Falwell and the Liberty Way, the university grew exponentially until Dr. Falwell's untimely death in 2007.  From that point onward, Dr. Falwell's chosen successors, sons Falwell Jr. and Jonathan Falwell ("Jonathan"), assumed aspects of their father's leadership roles.  Jerry Jr. served as Liberty's President, Chancellor, and member of its Board of Trustees.  Jonathan also served as a Liberty Board of Trustee member, as a Vice Chancellor for Spiritual Affairs, and also as Chairman of the Spiritual Mission Committee of the Liberty Board.  Jonathan was further installed as the Head Pastor of Thomas Road Baptist Church, an institution designated to have an important oversight function with respect to Liberty.  He has since acceded to the role of campus pastor at Liberty.

24.     In the Statement, Falwell Jr. indicated he had accepted fully his portion of the mantle of leadership at Liberty.  He stated his "priority was to build on my father's vision and to work hard" doing so in the course of "serv[ing] Christ and community."

25.     One of Falwell Jr.'s attempts to "build on his father's vision" was to bring another generation of Falwell men into the leadership at Liberty.  Effective January 1, 2016, Falwell Jr. extended to his firstborn son Trey Falwell a key employee services agreement ("Trey's Contract").  It designated Trey to function as "Administrative Assistant to the President" for a term ending July 1, 2030 – a span of nearly fifteen years. Trey's Contract elevated his Liberty salary from $65,000 to $88,000 to start, and he was provided a special car allowance that pushed his total initial compensation to $95,200, before accounting for retirement benefits. Trey's Contract came with a mandatory pay increase of 5% per year.

26.     In 2017, Trey was promoted and given the title of "Vice President of University Services." By July 1, 2017, Trey's salary was raised to $195.000, plus the car allowance – which raised his total compensation to $202,200, again before accounting for retirement benefits.  In this

7

new and advanced role, Trey technically reported to either the Chief Operating Officer or Chief Financial Officer, but for all practical purposes he reported to his father, the President and Chancellor of Liberty.  Under the new agreement, Trey was an at-will employee of Liberty.

27.     As a new Vice President and group leader, Trey often accompanied his father into meetings of the Executive Committee of the Liberty Board of Directors ("Executive Committee"). Trey joined these inner circle meetings on at least May 24, 2018, September 12, 2018, and April 4 and 5, 2019.  The latter two of these sessions were in part meetings involving the negotiation of Falwell Jr.'s 2019 employment agreement.

28.     During Falwell Jr.'s tenure, Liberty capitalized on the explosive growth of online education, providing students worldwide with a quality experience of academic and biblical education remotely. Liberty also used the proceeds of on-line education to expand its beautiful campus, and build a sizeable endowment.

## The Granda Allegations

29.     Granda became enmeshed with the Falwells quickly after they met in Miami, in part because of the familial treatment the Falwells accorded him early in the relationship.  In addition to the intimate attention from Becki, Granda received invitations to Falwell family trips and gatherings, and a heady dose of access to important American business leaders.

30.     In 2012, for example. Falwell arranged for Granda to come from Miami to Lynchburg to be introduced to Donald Trump, as the future president made a stop at Liberty to tour campus.  In a keepsake photo capturing the occasion, Granda (right) posed with the future

8

leader of the free world while Becki (far left) and Falwell Jr. (center) looked on.



31.     By participating in close family contact with the Falwells, and by enjoying important associations within the Falwell's Liberty network, Granda came to understand how vulnerable the Falwells had made themselves by permitting his affair with Becki.  Granda became closely exposed to Liberty's high moral standards, which overtly clashed with Liberty's first couple's discordant sexual conduct and provided Granda with a tactical opening.

32.     According to Falwell Jr., Granda began to undertake menacing actions toward the Falwells during this period.  For example, Granda allegedly sold his friends "intimate" pictures of Becki that he had somehow acquired.  Complaint ¶45.  (Falwell Jr. does not say in his Complaint how Granda came into possession of those pictures.)  Falwell Jr. alleges that *Granda's associates* used these covert pictures to "try to extort" the Falwells.  *Id.*

33.     On information and belief, Falwell Jr. was able to quell this particular controversy over the racy photos.  According to news reports, Falwell Jr. allegedly enlisted high-level Washington legal assistance, and the picture problem seemed to have gone away.

LUADMINREC000920

34.     The experience with the racy photos no doubt suggested to Granda that Falwell Jr. could be leveraged, and taught the young man that with persistence, a price might be paid by the Falwells to avoid embarrassment.

35.     According to Falwell Jr., Granda's other aggressive action early on was to record his phone calls and FaceTime communications with Becki, for the purpose of enhancing "extortion attempts" against the Falwells.  Complaint ¶46.  The Complaint does not disclose the content of these calls, but implies the subject matter implicated the Falwells in some embarrassing or prejudicial way – otherwise Falwell Jr. would not contend that the recordings were intended to "strengthen [Granda's] extortion attempts." *Id.*  Reuters has released the contents of one such FaceTime call.   https://mobile.twitter.com/Reuters/status/1297941806970220545

36.     By late 2014, Granda was prepared to push further his scheme to press the Falwells. According to Falwell Jr.'s account, Granda approached Falwell Jr. for a payoff in exchange for staying silent about the Granda Allegations. Complaint ¶47.  Granda allegedly demanded hush money ranging from $600,000 to $2 million.  *Id.*   Falwell Jr. did not inform Liberty's Board of Trustees of this extortive conduct.

37.     The Falwells openly concede that Granda's behavior was targeted toward damaging not only the Falwells but also "Liberty University."   Complaint ¶¶43, 54, 62.  To Granda, threatening Falwell Jr.'s role at Liberty – particularly given Liberty's religious mission and detailed behavioral codes – was the center of his plot.  Complaint ¶¶43, 54.  It was Falwell Jr.'s prominent role at Liberty that fueled the Chancellor and President's vulnerability. *Id.*

38.     On information and belief, Granda had access to plenty of material that could have been deeply damaging to Falwell Jr. in the eyes of the evangelical community.

LUADMINREC000921

39.   The Falwells' dealings with Granda also involved a significant financial investment in 2013 in property located in an underdeveloped part of Miami, which directly benefited Granda. The new company formed to buy the property was substantially financed by Falwell Jr., who loaned the venture $1.8 million.  Ownership of the enterprise was given to Becki, Trey, and Granda.  Once the development company was formed, it continued to house a liquor store despite being a location frequented by college-aged students staying in the on-site hostel, and despite Liberty's general discouragement of the use of alcohol.

40.   When the Miami business dealings between Granda, Falwell Jr., and Trey resulted in litigation, questions began to swirl about Falwell Jr.'s business ethics and other issues arising from the transactions.  On information and belief, Granda was in position to expound on many such concerns, to the detriment of Falwell Jr., and thus, vicariously, to the detriment of Liberty.

41.   Most damaging, Falwell Jr. knew that Granda would be able to provide detail about the fact of the affair with Becki, its duration, Falwell Jr.'s role in abetting it, the attendant circumstances of the affair, and the specific activities in which Granda, Falwell Jr., and Becki engaged during and after the affair ("the Granda Allegations").

42.   There is little doubt that Granda maintains a cache of material harmful to the Falwells.  At times since August 2020, media outlets have reported they were shown compromising documents, photographs, texts, and videos by Granda – material Granda shared with the media to bolster his credibility.  Granda has implied in the media that he has more such information within his possession.

43.   Since 2014, Falwell Jr. had every reason to fear what Granda might do with the Granda Allegations and supporting material.  In his Complaint, in fact, Falwell Jr. emphasizes that

LUADMINREC000922

at various times from 2014 to 2019 Granda was not only acting opportunistically toward the Falwells, but even proceeding illegally.  See Complaint ¶¶44, 45, 46, 47.

44.     Falwell Jr. also took great pains to assert Granda's overall volatility during this dark time.  From Falwell Jr.'s own observation, Granda was demonstrating behavior that was "deeply disturbed," "unstable," "unbalanced," "erratic," "manipulative," "self destructive," "crazy," and "verbally abusive."  Complaint ¶¶42, 44, 48, 49.

45.     Falwell Jr. further accumulated some third-party assessments of Granda's state of mind.  In his Complaint, Falwell Jr. indicates that he was advised by some in Granda's close circle that the young man was "racist," "legitimately scary," and someone with "unresolved psychological issues," who was given to "rages," and capable of tearing up his parents' house.  Complaint ¶¶49, 50.

46.     Clearly, given Granda's perceived plan to "destroy [the Falwells'] lives," and Granda's decaying stability, Falwell Jr. came to believe that something drastic and protective had to be done.   After all, Falwell Jr. was the Chancellor, President, and a Trustee of Liberty, one of the country's premier evangelical universities.

**Falwell Jr.'s "Granda Plan"**

47.     Instead of divulging to Liberty's Board of Trustee's Granda's active attempts at extortion, Falwell Jr. instead led a scheme to cover up the illicit conduct.  As alleged in the Complaint, Falwell worked diligently to coopt Granda into total confidentiality about the most perilous details of the young man's relationship with the Falwells, and to suppress the damaging Granda Allegations.

48.     The Falwells knew they shared a unity of interests with Granda.  They had an important goal in common: silence about the Falwells' salacious acts. The Falwell needed silence

LUADMINREC000923

from Granda in order to safeguard their personal reputation, Jerry Jr.'s professional standing, and his employment with America's leading evangelical university.

49.     Granda needed the Falwells to remain silent, too; Granda could not afford to let his "dirt" on the Falwells leak.  If the media reported the bad facts that Granda had stored up about Falwell Jr. and Becki before Falwell Jr. paid hush money to Granda, then all leverage was lost. Granda's scheme for a pay day from Falwell Jr would be valueless.  Clearly Granda wanted to pressure Falwell Jr., but only so as to secure payment in exchange for Granda's promise to hush the controversy.

50.     Faced with Granda's mounting extortive pressure, the Falwells had a decision to make: either they had to go public and expose Granda to Liberty, the authorities, and/or the media, or Falwell Jr. had to pay Granda off, and convince Granda to remain quiet forever.  Despite his clear duties as an executive and officer at Liberty, Falwell Jr. chose personal protection.  He committed himself to non-disclosure, and actively developed an approach to muzzle Granda.

51.     To effectuate Granda's silence, Falwell Jr. and Becki accelerated efforts to build Granda's friendship in the hopes that the young man would mature, would accept Becki's rejection, and would move forward in a way that would result in everyone involved being able to live a productive life.

52.     The Falwells drew Granda ever closer into their family life, effectuating a "Granda Plan."  They attempted to make Granda loyal to their family in order to curb Granda's bent toward the destruction of Falwell Jr., and his role at Liberty.

53.     For six years – from 2014 to 2020 – the Granda Plan worked. Although they described Granda as a "deeply disturbed and unstable individual," Complaint ¶42, the Falwells managed to cultivate a "positive relationship" with him.  Complaint ¶44.  It is evident that the

LUADMINREC000924

Falwells' aim was to "placate" Granda, and in large part they succeeded for a long time. *Id.* According to the Statement, they "manage[d] [Granda's] increasingly erratic behavior…."

54.    The following were among the acts of appeasement that the Falwells used over the years to maintain Granda's cooperative silence:

    a.    The Falwells hosted Granda socially at their Virginia farm, pairing him with their son Trey on an ATV outing around their sprawling country property;

    b.    Granda joined the Falwells in the Florida Keys.  During this trip, Falwell Jr. posed with Granda paternalistically – arm around him, drink in hand:



    c.    Posing outside the Liberty jet, the Falwells took pictures with Granda and former Miami business partner Gordon Bello.



    d.    The Falwells also brought Granda along for other family excursions, pairing him with Trey.  For example, on September 6, 2018, the Falwells arranged

14

for then-Congressman Bob Goodlatte to host them on a tour of the U.S Capitol.    Granda joined with Jerry, Becki, Trey, and Trey's wife Sarah. Granda once again appeared in the family photos – one set on a rooftop vista atop the Capitol, and another of the group gathered in front of the Thomas Jefferson statute.



(Granda is third from the left, in the rear.)



(Granda is second from the left.)

15

     e.    Finally, the Falwells befriended some of Granda's girlfriends.  These proactive relationships helped the Falwells amass useful information about Granda, permitting them to understand his tendencies and manage Granda with more awareness.  Complaint ¶¶ 48-50.

55.    As 2019 began, Falwell Jr. had shrewdly controlled Granda for nearly five years. In that span, Granda had not disclosed externally the sensitive information about the Falwells. Given what Falwell Jr. had observed of Granda's troubled character, and of the voracious appetite of the media for negative news about Liberty, Falwell Jr. had no reason to believe the détente he had built with Granda at Liberty's expense would much longer hold.

56.    Falwell Jr.'s employment contract at Liberty was set to expire June 30, 2019, and Falwell Jr. knew the negotiation of a new agreement was the optimal time to profit personally from Liberty's considerable growth in finances and enrollment that occurred during his tenure. Falwell Jr. took space in his Complaint to proudly display that financial legacy.  The time for Falwell Jr. to cash in on Liberty's prodigious success had arrived.

### Outside Pressures on the Falwell Presidency

57.    While he had overseen a one billion dollar building campaign on Liberty's campus, and had set in place a plan to create a sizeable endowment, Falwell Jr. had also launched a substantial campaign to attract notable public and private figures to Liberty's campus. Through this process, Falwell Jr. was augmenting the school's growing reputation as a forum for the discussion of important public issues.  But Falwell Jr.'s success was also attracting national attention, and his outspoken personal support for major public figures was engendering opponents that harshly criticized and targeted him personally.

LUADMINREC000927

58.      In 2016, Falwell Jr. surprised the evangelical world by endorsing Donald Trump for the presidency. This move was particularly delicate because Senator Ted Cruz, a leading Trump competitor in the primaries, had used an earlier appearance at Liberty to give his first speech after announcing a presidential candidacy of his own.

59.      According to his lengthy Facebook post of January 27, 2016, Falwell Jr. became convinced that Trump was the optimal choice for President due to his business acumen and conservative social principles. Falwell Jr. thought Trump could get things done, even if it meant disrupting entrenched special interests. Trump was an outsider, distanced from the usual suspects who were toiling away in the engine room of Washington politics.

60.      The problem for Falwell Jr. was that Trump – a thrice-married man – was hardly a natural cultural hero for evangelicals.  Falwell Jr. took steps to redress this challenge.  Falwell Jr. committed to work with his peer evangelicals to help make Trump's checkered past something Christian leaders could accept and overlook.

61.      To address this agenda, Falwell Jr. endeavored to sidestep defending Trump's character and instead advance a theological argument to persuade Christian leaders and voters to forgive Trump rather than judge him.  Like Jesus, Falwell Jr. exhorted his evangelical colleagues to examine the sin in their own lives and then reconsider their criticism of candidate Trump accordingly.

62.      Falwell Jr. took to major social media platforms and news outlets to advocate this apologetic stance. The following are a few examples of that message:

a.       In the aforementioned Facebook post of 2016, Falwell Jr. wrote that no Christian voter has standing to dismiss Trump's spiritual fitness because "all of us are sinners and only Jesus was perfect."  Embracing evangelical

17

doctrine, Falwell Jr. pointed to a "sinner" class – and then included within it Trump, himself, and every potential evangelical critic and voter.

b.   In the same Facebook post, Falwell Jr. advised the evangelical community to refrain from picking the best Christians as Presidential candidates – because no one but God could ever really know their heart. Falwell Jr. argued that Christians do not get to play God because "we are all sinners."

c.   On January 25, 2018, Falwell Jr. returned to this theme during a CNN interview conducted by anchor Erin Burnett. Falwell Jr. repeated the justification that Trump deserved to be a political leader embraced by Christians because "we're equally bad, we are all sinners; we all need Christ's forgiveness. That's why evangelicals are so quick to forgive."

https://www.cnn.com/videos/politics/2018/01/25/jerry-falwell-jr-trump-forgiveness-ebof-sot.cnn

d.   Later in 2018, Falwell Jr. once again appeared on CNN, and he again advanced this theme, stating "we are all sinners; nobody understands that better than evangelicals. That's why we're Christians because we all know we need forgiveness."

https://www.cnn.com/videos/us/2020/08/24/jerry-falwell-jr-public-controversies-athena-jones-pkg-ebof-vpx.cnn

63.   As 2019 approached, Falwell Jr. openly conceded that he was worrying about what had become the omnipresent "threat that [Granda] posed." Complaint ¶44.  In fact, the stress of managing Granda and avoiding discovery was wearing Falwell down.  At any moment, Falwell Jr. knew Granda could destroy Falwell's reputation as a Christian leader and reduce to rubble his

18

value to Liberty as a business asset.  Falwell Jr. would then be in the well-known category of leaders requiring substantial forgiveness.  Falwell Jr. was wracked with "constant anxiety." *Id*.  He desperately needed to cut Granda off completely, a course fraught with substantial risk.  Because Falwell Jr. wanted more financial protection to weather the fallout if he could no longer manage Granda, Falwell Jr. began to fashion a well-resourced exit strategy.

64.     To confront the Granda Allegations with more than the shaky barrier of the Granda Plan, Falwell Jr. fashioned a deceitful scheme to manipulate the Executive Committee of Liberty. In the course of the employment contract negotiations, Falwell Jr. planned to accentuate to the Executive Committee the new leagues into which Falwell Jr. had brought Liberty, and that some of the actions he undertook in that league, such as the rough-and-tumble of Presidential politics, might damage Falwell Jr.'s utility to the non-profit Liberty.  There could come a time when the school might need to separate from Falwell Jr. for non-material actions.  Falwell Jr. planned to use his growing awareness of personal attack which he had encountered in honorable service raising Liberty's profile in his attempt to relax the severance policies in the President's existing contract. Falwell wanted to create a new contract that permitted Liberty the option to part with Falwell amicably while making it palatable financially for Falwell to accept that protective action.  In 2019, Falwell Jr. acted on this undertaking.

<u>The 2019 Falwell Jr. Employment Agreement</u>

65.     On or about July 6, 2012, Falwell Jr. had entered into a Presidential employment agreement with Liberty (the "2012 Employment Agreement").  This deal, which became effective April 1, 2012, provided for a seven-year compensation schedule that rewarded Falwell Jr. with annual raises.  It also provided, in Section 9, that if Falwell resigned he would receive *one year* of compensation as severance.

LUADMINREC000930

66.     The 2012 Employment Agreement expired on June 30, 2019. In Section 3.1 of the 2012 Employment Agreement, the parties agreed that "[t]he University is not obligated to offer Falwell employment for any period beyond the expiration date of this Agreement."

67.     By the time Falwell Jr. and Liberty had to announce a new agreement, Falwell Jr. knew he was under active threat of extortion from Granda. Falwell Jr. also knew that Liberty's Executive Committee did not know that fact.  Although he was President and Chancellor, and had the highest level of obligation to be candid and truthful with Liberty's board, Falwell Jr. did not inform the Executive Committee about Granda's extortive threats during the 2019 contract negotiations, or give the Liberty board any reason to understand the serious reputational damage to Liberty that Granda's threats represented.

68.     True to his previous plan, Falwell Jr. did not reveal to the Executive Committee the danger that Granda represented to Liberty. Instead, Falwell Jr. sought from the Executive Committee to provide him with a safety valve to protect him from such actions as having raised his profile in 2016 by being the first major evangelical leader to personally endorse Donald Trump for President.  Falwell Jr. claimed that he wanted an escape hatch for political and personal fallout.

69.     After negotiation, the Executive Committee agreed to a new services deal (the 2019 Employment Agreement). Falwell Jr. succeeded in sweetening the new deal in at least the following material ways: first, he negotiated a significant annual raise to $1,250,000 a year, which became his "permanent" pay all the way through 2030; second, in Section 8 and Section 9 of the 2019 Employment Agreement, Falwell Jr. arranged for a severance of *two years' pay,* or $2,500,000 if he resigned for "Good Reason," or if Liberty terminated his employment without "Cause."  Third, he obtained a catch-up "rabbi trust" plan for retirement benefits that would cover his entire career of service at Liberty but had not been part of any previous employment agreement.

20

70.     Falwell Jr. wanted Liberty to pay severance and retirement benefits to him if Granda revealed the Granda Allegations, and Falwell Jr. thus knowingly withheld from Liberty material information that would have altered the nature of the negotiations of the 2019 Employment Agreement.  Falwell Jr. said nothing of his belief that procuring Granda's silence might in time require a higher price unless Granda was confronted and completely managed.  To be sure, Falwell Jr. knew that family photos taken in nice places would not contain Granda forever.

**Falwell's Auspicious Acts of August of 2020**

71.     The pressure of Granda's threats was increasingly getting to Falwell Jr.  With his new 2019 contract in hand, and with Liberty none the wiser about Granda's extortive behavior, Falwell Jr. had an opportunity to take a firmer stand against his blackmailer.

72.     Emboldened by the financial security that he had negotiated for himself, Falwell Jr. struck out at Granda, unleashing the obvious prospect of damaging retaliation by Granda. Falwell Jr. states in his Complaint that on June 30, 2019, he told Granda in electronic communication that Falwell Jr. would provide no payday and the extortion attempts would have to end.  Complaint ¶¶55, 56.

73.     To manage his stress, Falwell Jr. began drinking significantly.  There were concerns that he smelled of alcohol during work interactions, but to the outside world, Falwell Jr. remained mostly within the baselines of his obligations. That ended in August 2020.

74.     The Falwell family took some floating vacations on yachts provided by business partners of Liberty.  One such excursion took place during late July 2020.  During that span, the Falwells held a costume party centered around the characters of the Canadian mockumentary the *Trailer Park Boys*. https://www.swearnet.com/shows/trailer-park-boys.  Promotional copy for the show bills the series as exploits by "three lovable career criminals as they rob liquor stores, fence

21

stolen goods and dream of pulling off one last, big score." Overall, the tone and content of the show is vulgar.

75.     The most crafty of the three prime characters is ex-convict Julian, whose trademark look is a black goatee, black T-shirt, pair of black jeans, and an omnipresent glass of rum and Coke in his hand.  Julian runs illegal businesses.  A sidekick, Trinity, is a redheaded woman who becomes pregnant in one episode and, due to a hapless mix-up, later delivers a baby bearing on his birth certificate the moniker "The Motel."  The little boy became nicknamed "Mo."

76.     Falwell Jr.'s entire immediate family was part of this event with attendees dressing as *Trailer Park Boys* characters of their respective choosing.  Falwell Jr. also invited his personal assistant, Sam Stone, and Stone's wife, Kathleen, who was a Liberty employee, to come on the trip.  During this event, Falwell, Jr. outfitted himself in a costume to emulate the character Julian, Falwell Jr.'s beard blackened in part for the occasion. Kathleen Stone, who was pregnant at the time, dressed up correspondingly as "Trinity," mother of the character Mo, which meant she donned a pair of Daisy-Duke cutoff jeans, unbuttoning them to accommodate her real-life pregnancy.  Falwell, Jr., as "Julian," similarly unbuttoned his jeans – in apparent solidarity with "Trinity's" actual condition.  "Julian" toted his obligatory tumbler of black liquid in his left hand.

77.     Over Kathleen and Sam Stone's objections, Becki Falwell took a picture of "Julian" and "Trinity" posing in character, pants both unbuttoned.  Falwell Jr. promised not to show this photo to others.

78.     On August 3rd, Falwell Jr. – breaking his promise to the Stones – shared this image with his entire Instagram following.  The picture went viral and became an immediate internet sensation.  It was paired soon thereafter with a video of the Falwells' *Trailer Park Boys* party that

22

also went viral on the internet.  https://pulpitandpen.org/2020/08/04/bizzare-jerry-falwell-jr-yacht-

pictures-were-from-trailer-park-boys-themed-party/.

79.     Following is Falwell Jr.'s Instagram post, and one commentator's reaction.



80.     Media reaction to the Falwells' exploit was swift, and harsh. Critical articles soon

appeared in numerous high-profile media outlets, including the *Washington Post*, *Huffington* Post,

and *Politico*, and from commentators on CNN and the View.

23

81.     One online commentator performed an analysis to attempt to gauge the punishment that a Liberty student might endure for posing in this photo, based on the code of conduct in the *Liberty Way.*  The analyst concluded there were 63 counts of potential violation, which would conceivably net a student up to $9,000 in collective financial fines, with a further punishment possible of up to 900 hours of community service.

82.      Realizing that he had made a serious mistake – Falwell Jr. deleted the Instagram post shortly after its August 3rd release.  But Falwell Jr. soon made a compounding blunder. Rather than engage Liberty's public relations group to assist with the fallout, Falwell Jr. instead took to the airwaves attempting his own clean up.  He called in to a local Lynchburg radio station on August 5, 2020 and offered a slurred explanation of the unzipped pants photo, dismissing it as "good fun" and drawling that he had apologized to his family and promised going forward he would be a "good boy." https://pulpitandpen.org/2020/08/07/liberty-pres-jerry-falwell-jr-justifies-scandalous-yacht-pictures-whatever-whatever-it-was-all-in-good-fun/.

83.     Commentators on social media questioned Falwell's sobriety during the radio show call-in. While he addressed the world about this unseemly subject through radio access, Falwell Jr. issued no August 5th apology to the Board at Liberty regarding the incident, nor did he issue a promise to Liberty of improved behavior going forward.

84.      At this low juncture for Falwell Jr., his wife Becki stepped in.  After the radio show incident, she contacted three members of the Liberty Executive Committee to alert them to what she described as her husband's excessive use of alcohol.  She expressed concern that drinking was adversely overtaking Falwell Jr.'s thinking and actions.  She believed he needed to go away for treatment, and that it was time to take that course. Becki's heartfelt appeal made an impact on

LUADMINREC000935

Liberty's leaders and helped provide a context for understanding Falwell's questionable public comments, worrying behavior, and inappropriate social media posts.

85.     On August 7, 2020, the Executive Committee conferred with Falwell Jr, and he concurred it was best that he take time off to heal physically and spiritually.  In the meeting, Falwell Jr. conceded that he had fallen short of Presidential standards and he took full responsibility for his actions.  He committed to a sabbatical to treat and refresh, which the Executive Committee was inclined to support.

86.     Importantly, Falwell Jr. indicated in the August 7th meeting that he had considered providing deeper detail about personal matters that might have driven him to lodge the offending vacation posts, but he concluded he did not think it was necessary. This comment did not strike the Executive Committee as particularly compelling at the time, although it would become pivotal as events unfolded.

87.     On a more superficial level, Falwell Jr. did muse in the meeting that he might have become bored during the slowdown caused by COVID-19.  Falwell conceded he had been doing silly things that he should not have let distract him.  The prospect of a cure to a pattern of antics heartened Liberty's Board leaders.

88.     The August 7th meeting ended with the Executive Committee's expression of love for Falwell Jr. and the members' commitment to pray for him. It was agreed that Liberty would place Falwell Jr. on a leave of absence during which it would pay for Falwell Jr.'s rehab. The Executive Committee further agreed to recommend this course of action to the full Board for ratification, and determined that it would release a brief statement followed by a more expansive one.  The Executive Committee lastly decided that President Falwell Jr. *would not* issue a statement of his own.

LUADMINREC000936

89.     True to plan, Liberty briefly announced Falwell Jr.'s leave of absence immediately, and circumspectly.  Once that message was out, communication professionals worked on a longer statement from the Chairman of the Board of Trustees.  The Executive Committee then proceeded toward resolving a treatment plan for Falwell Jr., leaving latitude for him to define details within the parameters of the previously-understood course.

90.     As the days wore on, however, it was obvious Falwell Jr. was forming a vastly different conception about the leave of absence than Liberty had outlined.  By August 17, 2020, Falwell Jr. was suggesting more superficial approaches, while Liberty continued to insist on residential treatment acceptable to the Executive Committee.

91.     If there was a breaking point in Falwell Jr.'s relationship with the Executive Committee, it was arriving at the appropriate type of treatment that had been in discussion since Becki had called for it.  Falwell Jr.'s change of heart, and the lapse into denial that it reflected, deeply worried the Executive Committee.

92.     On August 24, 2020, Falwell Jr. arced yet another bombshell into the Executive Committee's path.  On that day, the Executive Committee learned from counsel that the day before, on August 23, 2020, Falwell Jr. had submitted the Statement to the *Washington Examiner,* his attempt to pre-empt a tell-all feature that Granda himself had been preparing to publish with *Reuters.* This revelation was coupled with a suggestion to Liberty by Falwell Jr. and his attorneys that the Liberty President could just tender his resignation under the contract as a viable resolution to the swirl of controversy that would inevitably ensue on the heels of the disclosure of the dueling versions of the long-concealed extra-marital affair and attempt at extortion.

93.      Falwell Jr.'s employment contract forbade him from publishing without the Liberty Executive Committee's prior assent to the copy. The Executive Committee had expressly

LUADMINREC000937

forbidden a post about Falwell's sabbatical.  Regardless, with the briefest of advance notice to Liberty, Falwell Jr. self-issued the Statement, a 1200-word statement that the *Washington Examiner* published verbatim, bracketed by some reporting and analysis by the publication, and Falwell' Jr.'s own commentary.  In the Statement, Falwell Jr.'s "confession," Falwell Jr. advised the *Washington Examiner* about matters he never revealed to the Liberty Executive Committee.

94.     In the Statement, Falwell Jr. acknowledged it was wrong of him to have suppressed the information about Granda's extortion from his Board and the wider Liberty family.  He admitted that "the Liberty community deserved to hear" the salacious story directly.  He concluded that "the only way to stop [Granda's] predatory behavior [was] to go public."  He conceded that "I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from mental health professionals…."  Falwell Jr. ended his admission with an appeal for the community to extend to the Falwells their "forgiveness."

95.     Through these media communications, Falwell Jr. offered detail to Liberty that the Executive Committee never had at the time of the 2019 Employment Agreement, namely the sordid backstory behind his August 2020 blow-up with Granda, and the demise of the Granda Plan that was prompted by Falwell's alleged final rejection of Granda's demands on June 30, 2020.

96.     By choosing to release the Statement to the public before fully vetting the Granda Allegations to Liberty, Falwell Jr. deprived  Liberty of the ability to handle this matter as a purely internal Liberty employment affair.

97.     At the time of his soul-searching August 23 disclosure to the *Washington Examiner*, Falwell Jr. knew that his new Employment Agreement was signed. He also knew that he had negotiated a severance and retirement package that credited him with more base pay, twice the

LUADMINREC000938

severance, a funded retirement plan, and a right, perhaps, to collect all of that *even if Liberty fired him*.

98.     On August 24, 2020, Granda unveiled his side of the sordid story, in the form of an explosive *Reuters* article. https://www.reuters.com/investigates/special-report/usa-falwell-relationship/. Video and audio recordings supporting some key details of Granda's story were posted online.

99.     Granda struck out at Falwell Jr. while the Liberty President was being pilloried in the media.  Granda's retaliation took full advantage of Falwell Jr.'s self-inflicted wounds over the "unzipped pants" picture. Granda unveiled all the embarrassing details that Falwell Jr. had worked with Granda since 2014 to suppress. Granda and *Reuters* spun an account of predatory action by the Falwells against a boy the age of a Liberty student.

100.    Out of the *Reuters* piece came Granda's version of the longstanding affair between Becki and Granda, and a cover-up process led by Falwell Jr.  These were issues about which Falwell Jr. had actively kept Liberty in the dark, as Falwell Jr. had confessed for the very first time the day earlier to a third party, in his unauthorized *Washington Examiner* submission. The media coverage from other outlets mostly used Falwell Jr.'s own statement from the *Washington Examiner* to bolster Granda's credibility.

101.    After consultation, the Executive Committee authorized negotiations to take Falwell Jr. up on his offer to resign.  After considering delay, the Executive Committee and the Board advised Falwell Jr. that he should resign at once or face the prospect that the Executive Committee would recommend his termination to the full Board.

102.    The Executive Committee's decision was driven by a number of factors: the litany of compromising decisions entered into by Falwell Jr., Becki's revelation about the alcohol abuse

LUADMINREC000939

that was fueling this erratic string of events, Falwell Jr.'s denial of an alcohol problem. Falwell Jr.'s resistance to commit to treatment deemed appropriate by the Executive Committee, Falwell's now-admitted concealment and misrepresentation of the Granda Allegations, and Falwell Jr.'s unwillingness to take seriously the grave threat that his aggregate actions posed to Liberty.

103.    On August 25, 2020, Falwell Jr. finally conceded that complete resignation was in his best interest.  He did so, however, after changing his mind about resignation and trying to negotiate for more in separation from Liberty than his contract afforded him.

104.    While Falwell, Jr. agreed to step aside, it was with shallow appreciation for the far-ranging damage he had caused. In unauthorized commentary to the media, Falwell stated: "The board put me on leave for showing my belly in a picture and my contract doesn't allow that…I'm 58 years old, and I think there's something else in the cards for me. And so the board was gracious in accepting my resignation ... and it's time to move on." https://wset.com/news/local/we-have-the-strongest-relationship-becki-speaks-out-on-affair-denies-jerry-watched.

## Falwell Migrates From Forgiveness-Seeker to Fighter

105.    Falwell Jr.'s resignation from the Presidency did not unfold as contemplated. The Executive Committee became growingly concerned that Falwell Jr. was honoring neither his commitment to leave nor his contract. On information and belief, and according to news reports, Falwell Jr. – a practicing Virginia lawyer – had conferred improperly about his employment situation with counsel that Liberty had retained on other cases in which Falwell Jr. had been a fiduciary of the Board, and witness. https://www.reuters.com/article/us-usa-falwell-relationship-exclusive/exclusive-business-partner-of-falwells-says-he-had-long-affair-with-evangelical-power-couple-idUSKBN25K1ZO.  The subject matter of the interaction with *Liberty's* chosen

29

counsel was Falwell Jr.'s personal employment rights *against Liberty.* As Falwell Jr. knows, Virginia ethics laws do not permit such consultation.

106.    Falwell Jr. soon retained appropriate, non-conflicted counsel. Falwell Jr. began pushing back against the terms of his resignation. Falwell Jr. improperly and errantly announced to the media a $10.5 million expectation for his severance. The agreement Falwell Jr. negotiated specified $2,500,000 – two years' pay, at the President's newly-negotiated and expanded rate.

107.    Liberty was unsure if Falwell Jr.'s representation to the media was just puffery and bragging or some attempt to set up a claim for additional compensation above and beyond what appeared in Falwell Jr.'s contract as stated pay for resignation.

108.    On August 28, 2020, the Executive Committee agreed to satisfy Falwell Jr.'s demand for a "Good Reason"- resignation, together with its severance payout.   Falwell Jr. was thus able to take advantage of the escape hatch that he had negotiated into the 2019 Employment Agreement, his insurance policy against the simmering Granda Allegations that he told the *Washington Examiner* was "predatory behavior," and a "'fatal attraction' type situation."

**Falwell Jr.'s Hard Fall**

109.    A 911 call on August 31, 2020 brought police to the Falwells farm on Becki's report that Falwell Jr. had locked himself in, and had stumbled down stairs, experiencing injuries. Police and medics attended.  Falwell Jr. was reported to present with abrasions and slurred speech. Media obtained the 911 call and subsequent reports. First responders spotted alcoholic beverage containers about the premises.  While Falwell Jr. advised the *Washington Examiner* on August 23rd that he was in the "early stages of addressing" issues of mental health, the process appeared not have proceeded very far.

30

110.    Though momentarily humbled by news media's extensive examination of and criticism about his private failings, Falwell Jr. had re-emerged willing again to practice his particular brand of disdain for those who would challenge him – even those who built the platform that made him the household name Falwell Jr. is today.  On October 28, 2020 Falwell filed a lawsuit against Liberty alleging defamation.

111.    In the Complaint, Falwell in the main blames Becki for the Granda affair and cover-up.  He shows little empathy for the woman who sought treatment for him for alcohol abuse, and whose loyalty and fear for his well-being fueled her outreach to Liberty's Executive Committee.

## COUNT ONE: BREACH OF CONTRACT

112.    Liberty incorporates paragraphs 1 to 111 above.

113.    The 2019 Employment Agreement, at Section 3.8, permits Falwell Jr. access to "confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly disclosed by LU ('Confidential Information.')  Confidential Information remains the property of LU."

114.    During his employment, Falwell Jr. worked independently on many of the deals, strategies, negotiations, and undertakings impacting Liberty.  He had complete access to files, records, notes, emails, data, and information pertinent to the categories of Confidential Information detailed above.

115.    Falwell Jr. also had access to a wide variety of key Liberty documents including, but not limited to: email, letters, correspondence, memoranda, telegrams, notes, reports, compilations, data, notebooks, laboratory, notebooks, work papers, graphs, charts, blueprints, books, pamphlets, brochures, circulars, manuals, instructions, ledgers, drawings (including

31

engineering, assembly and detail drawings), sketches, photographs, diaries, sales literature, advertising literature, agreements, meeting minutes, punch cards, magnetic tape or wire, other machine producible records including films, video and sound reproductions, printout sheets, electronic records such as text messages, summaries or records of telephone conversations, personal conversations or interviews, and any and all other writings, typings, printings, drafts, copies and/or mechanical, magnetic, optic, or photographic reproductions or recordings ("Documents").

116.    There are several distinct but intersecting sources rooted in employee and contractual obligations that imposed a duty upon Falwell Jr. to preserve and return Liberty property, including Documents and Confidential Information.

117.    First, as Liberty's Chief Executive Officer, Falwell Jr. was tasked with abiding by and administering the enforcement of Liberty's technology policies, including those related to computer data and storage policies.  For example:

a.      Section 2.7 of the Liberty University Employee Handbook provides that "[a]ny and all materials and information ('Confidential Information') provided by the University, any related subsidiaries, its employees or agents during the course of an employee's employment by the University and thereafter shall remain the property of the University."  Section 2.7 also provides that "[u]pon termination of employment, the employee shall return all such Confidential Information to the University."

b.      -Section 7.3 of the Handbook (Computer Use) provides that "All information created or contained on the University's computers and

32

network, including electronic mail (E-mail), remains the property of the University."

    c.    Section 7.15 of the Handbook (Return of Property) provides that "On or before the employee's last day of work, the employee is required to return all property."

118.    Second, the technology security policy governing all Liberty-affiliated technology, to which all users must consent as a condition to accessing Liberty-owned technology, ensures that all Documents and Confidential Information remain the property of Liberty.

119.    Third, to cater to Falwell Jr.'s executive convenience, on information and belief, Liberty paid for and provided Falwell Jr. with a variety of devices and systems which allowed Falwell Jr. to store Documents and Confidential Information both within and outside of Liberty's technology systems.  These devices and systems include, but are not limited to: (a) an Aruba Cape Sensor and yearly technical support; (b) Lumos Inc. internet wiring; (c) a Surface Pro 3 laptop, bearing serial number 57462443253; (d) an Apple MacBook Pro 11 with expanded storage memory, bearing serial number C02LG708FH00; (e) an HP EliteOne 1000 G2, bearing serial number 8CC9204VH0; (f) an Apple iMac 27" with expanded storage memory, bearing serial number C02YH3HRJV40; (g) a Carbonite Backup cloud backup system for which Liberty was paying as early as August 2, 2016; (h) a Dropbox cloud storage account for which Liberty was paying as early as January 27, 2018; and (i) a personal Earthlink email account to which Falwell Jr. forwarded all emails that he sent and received at his assigned liberty.edu email address.

120.    Falwell Jr. used these Liberty-provided devices and systems, among others, to create, receive, and store Liberty Documents and Confidential Information.

LUADMINREC000944

121.    Fourth, Liberty's general document preservation and retention policy imposed a duty upon all Liberty employees, including Falwell Jr., to preserve and, upon termination of employment, return all Liberty Documents and Confidential Information.

122.    Fifth, Section 3.8 of the 2019 Employment Agreement expressly provides that "Confidential Information remains the property of LU."

123.    In addressing the timing of the return of Confidential Information, the Agreement treats tangible and non-tangible information differently.  Specifically, Section 3.8 provides that "[a]ny Confidential Information in tangible form shall be *immediately* returned to LU upon request" (emphasis added).  Section 3.8 thus required Falwell Jr. to return any tangible property immediately upon demand, and any non-tangible property within a reasonable time frame thereafter.

124.    Six, Liberty's governance documents, including its Bylaws and Articles of Incorporation, imposed a duty upon Falwell Jr. to administer and follow all Liberty policies.  For example, Article III, Section II of Liberty's Amended and Restated Bylaws provides that the "President is responsible for the adoption of administrative policies, rules and regulations that govern the day to day operations of the University."  Such policies include technology and property preservation and retention policies.

125.    Seventh, during his employment with Liberty, first as General Counsel, then as President and Chancellor, Falwell Jr. was subject to various legal holds.  These legal holds imposed a duty upon Falwell Jr. to retain and preserve certain Liberty Documents and Confidential Information.

LUADMINREC000945

126.     Thus, upon termination of his employment, Falwell Jr. had a contractual duty, drawn from multiple sources, including those specified above, to return all Liberty property, including Documents and Confidential Information.

127.     Falwell Jr. breached his contractual duty by failing to fully return all Liberty property after termination of his employment even though Liberty has asked for its return, a demand Falwell has heretofore breached

128.     On information and belief, Liberty has been damaged in an amount in excess of $250,000, a number that it may have to revisit as discovery progresses.

## COUNT TWO: BREACH OF CONTRACT– EXCESS BENEFITS TRANSACTIONS

129.     Liberty incorporates paragraphs 1 to 128 above.

130.     Falwell Jr. has also engaged in other actions in violation of contractual provisions that resulted in improper excess benefits to Falwell Jr. and his family.

131.     Pursuant to the 2012 Employment Agreement, as amended effective May 24, 2017, attached hereto as Exhibit 3, and the 2019 Employment Agreement, attached hereto as Exhibit 4, Falwell Jr. was Liberty's President and Chancellor.  As Liberty's President and Chancellor, Falwell Jr. was tasked with overseeing the implementation and enforcement of Liberty's policies and procedures.

132.     Specifically, Sections 3.2 of the 2012 Employment Agreement and the 2019 Employment Agreement task Falwell Jr. with "ensuring the implementation of the University's mission and purposes as described or defined in the University's Articles of Incorporations, Bylaws, and other foundational documents," "overseeing the fiscal, administrative, admissions, academic, athletic and other operations, divisions, departments and offices of the University," and

35

"implementing and executing policies, orders and resolutions adopted or established by the LU Board of Trustees and its Executive Committee."

133.    Moreover, Sections 3.3 of the 2012 Employment Agreement and the 2019 Employment Agreement provide that Falwell Jr. "shall be accountable to the Board of Trustees for implementing its policies and carrying out his duties."

134.    Article III, Section 2 of the Liberty Bylaws, which are incorporated into the 2012 Employment Agreement and the 2019 Employment Agreement, provides that Falwell Jr., as President, "shall see that all Board policies and resolutions of the Board are administered and implemented under his general supervision."

135.    As such, under the 2012 Employment Agreement, as amended, the 2019 Employment Agreement, and the incorporated foundational documents, Falwell Jr. had a contractual duty to administer and implement all Liberty policies and procedures.

136.    One such duty was Falwell Jr.'s personal obligation to ensure that accurate factual information and supporting documentation were submitted to persons responsible for financial controls such that proper determinations could be made regarding which of an employee's claimed expenses were Liberty business and which were in fact personal.  Under Liberty's policies and practices, it was the employee's non-delegable duty to ensure that correct information and contemporaneous documentation were provided to those involved in achieving compliance with Liberty's expense policies and practices.

137.    Another such duty was Falwell Jr.'s obligation to ensure Liberty's compliance with applicable IRS standards and regulations.  As part of this larger duty, Falwell Jr. not only had a nondelegable duty to properly classify and submit any paperwork and explanations he offered to Liberty's compliance managers personally or through designees, but then to also approve any final

LUADMINREC000947

expense reports prepared on the basis of and reflecting his representations, and to properly direct those individuals responsible for processing financial matters.

138.    From 2017 to 2020, Falwell Jr. breached this duty at times by improperly classifying personal expenses as authorized Liberty business expenses.  Falwell Jr. directly benefited from these transactions personally as Liberty has already paid for or provided fringe benefits, and Falwell Jr. has not reimbursed Liberty for them.

139.    Liberty has advised Falwell Jr. on multiple occasions that, based on the standards set forth in section 4958 of the Internal Revenue Code of 1986, as amended (26 U.S.C. § 4958), and the IRS' underlying regulations, Liberty had identified various excess benefit transactions ("EBTs"). These EBTs were ascribed to Falwell Jr. and totaled approximately $1,188,750.  Liberty advised Falwell Jr. that Liberty would be forced to report these EBTs to the IRS, and would seek to be reimbursed.

140.    In response, Falwell Jr., through his counsel, largely denied that the transactions were EBTs.  Falwell Jr., through his counsel, offered only a token reimbursement of $9,087 to Liberty demand for reimbursement for all of the EBTs to which Falwell Jr. benefitted.

141.    Liberty filed its Form 990 in May 2022, as required by the Internal Revenue Code. Form 990 requires the reporting of any excess benefit transactions as required by Internal Revenue Code section 4958.  Federal tax law requires Liberty to reasonably pursue collection of EBTs, as part of Liberty's efforts to maintain the requirements of its tax exempt status under Internal Revenue Code section 501(c)(3).

142.    From May 13, 2022, to June 30, 2022, Falwell Jr. did nothing to reimburse Liberty for these EBTs except to tender to Liberty $9,087 against a reported obligation of $1,188,750, plus interest.

LUADMINREC000948

143.    On June 27, 2022, counsel for Liberty again notified counsel for Falwell Jr. regarding Falwell Jr.'s chance once again to reimburse Liberty for a subset of these EBTs, a proposed compromise Liberty was willing to effect in view of the costs of litigation and debt collection.

144.    In sum, Falwell Jr. breached the 2012 Employment Agreement and 2019 Employment agreement, and the applicable Liberty policies and procedures, by classifying unauthorized personal expenses improperly as authorized Liberty business expenses, which resulted in the EBTs described above.  Liberty seeks reimbursement of the $786,413.78, plus interest, that it paid for in excess of 120 EBTs received by Falwell Jr. for which he has not reimbursed Liberty.

145.    For more detail on the EBTs that Falwell Jr. wrongfully incurred, Liberty incorporates its 2022 IRS Form 990 filing.

146.    On information and belief, Liberty has been damaged in an amount in excess of $786,413.78, a number that it may have to revisit as discovery progresses.

## COUNT THREE: DETINUE

147.    Liberty incorporates paragraphs 1 to 146 above, and also, in order to preserve issues on appeal, incorporates Count One of its Initial Complaint as considered by the Court's Order of September 10, 2021

148.    Liberty is the sole lawful owner of the property described above, including Documents and Confidential Information that Falwell created, received, or stored, at any point, on devices or systems provided by Liberty.

LUADMINREC000949

149.    For several reasons enumerated above, Liberty has an immediate right to possession of this property, including Documents and Confidential Information, because Falwell Jr.'s employment with Liberty terminated on August 25, 2020.

150.    Liberty's Documents and Confidential Information are easily identifiable because they are currently or were at one time located or stored on devices or systems provided by Liberty. Falwell Jr. also knows of their identity and location.

151.    Liberty's Documents and Confidential information are highly valuable to Liberty because they contain confidential and proprietary information related to a variety of deals, strategies, and negotiations impacting Liberty's business.  They are also necessary for Liberty to defend and prosecute various lawsuits, both pending and contemplated.

152.    Liberty has asked for the return of its Documents and Confidential Information, but Falwell Jr. has failed to fully return all such property that remains in his possession and/or control.

## COUNT FOUR: BREACH OF FIDUCIARY DUTY

153.    Liberty incorporates paragraphs 1 to 152 above.

154.    As Liberty's President, Chancellor, and a member of its Board of Trustees, Falwell had a fiduciary duty to provide material information to the Board, refrain from acts harmful to the interests of Liberty, avoid conflicts of interest, and reject opportunities to benefit his personal interests to the detriment of Liberty.

155.    Falwell Jr. refused to disclose to Liberty the Granda Allegations and Granda's extortive threats while the Liberty President was negotiating for and entering into a 2019 Employment Agreement that raised Falwell Jr.'s pay, created a retirement plan and enriched his severance. The sweetened severance provision and funded retirement plan advantaged Falwell Jr. if adverse conditions caused him to choose resignation knowing he was impaired by extortion

LUADMINREC000950

threats, and by therefore passing the financial risk to Liberty that Granda's extortion would end Falwell Jr.'s employment with Liberty.

156.   Falwell Jr. breached his fiduciary duties to Liberty by accepting a severance payment from Liberty in 2020 that Liberty was required to pay pursuant to the 2019 Employment Agreement.

157.   Had Liberty's Executive Committee known in 2018 or 2019 that Granda was attempting to extort Falwell Jr., and thus planning to damage Liberty, and had it known the full circumstances of Granda's extortion of Falwell Jr., then the Executive Committee would have refrained from entering into the 2019 Employment Agreement.

158.   On information and belief, Falwell Jr. procured Liberty's outside counsel to advise him with respect to his personal causes of action, including those against Liberty, in derogation of Falwell's duty.

159.   Falwell Jr. failed to timely disclose and address the issue of his personal impairment by alcohol, which impairment led Falwell Jr. to actions and courses of conduct detrimental to the spiritual mission of Liberty.

160.   The several actions of Falwell Jr. in breach of his fiduciary duty have induced injury to Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the improper 2019 Employment Agreement, and damaged Liberty's reputation.

161.   Falwell Jr.'s actions in breaching the fiduciary duty he owed to Liberty were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

162.   For this count, Liberty seeks damages in excess of $10,000,000 plus pre- and post-judgment interest, and punitive damages at the statutory limit of $350,000.

**COUNT FIVE:  STATUTORY CONSPIRACY / COMMON LAW CONSPIRACY**

LUADMINREC000951

163.    Liberty incorporates paragraphs 1 to 162 above.

164.    Virginia Code. § 8.01-499, 500 prohibits two or more persons from agreeing to injure another in their trade or business.

165.    The business of Liberty is the provision of higher education through the perspective of Christian values.  High moral standards are a part of the educational experience at Liberty and administrators and faculty are expected to comport themselves in a way that promotes the Liberty Way, and upholds the values in Liberty's foundational documents.  Additionally, officers and Board members like Falwell, Jr. must observe applicable fiduciary duties.

166.    Up to August 2020, Falwell Jr., Becki and Granda, and potentially others, acted in concert under a preconceived plan to conceal the Granda Allegations and Granda's extortive acts from disclosure to Liberty's Board of Trustees.

167.    Falwell Jr., Becki and Granda, and potentially others acted intentionally, purposefully and without lawful justification, and thus with legal malice.

168.    Falwell Jr, as leader of the Falwell/Granda conspiracy, had a fiduciary duty to disclose Granda's extortive actions, and to disclose the potential for serious harm to Liberty once the Granda Allegations were in fact disclosed to the Liberty's Executive Committee.

169.    Instead of disclosure, Falwell Jr. furthered the conspiracy of silence and negotiated a 2019 Employment Agreement that contained a higher salary from Liberty. Moreover, anticipating revival of Granda's threats, Falwell Jr. also negotiated a revised severance provision that doubled the separation benefits provided in the 2012 Employment Agreement and a funded retirement plan.

170.    Had Liberty's Executive Committee known in 2018 and 2019 that Granda was attempting to extort Falwell Jr., and thus planning to damage Liberty, and had it known the full

41

circumstances of Granda's extortion of Falwell, then the Executive Committee would have refrained from entering into the 2019 Employment Agreement.

171.    The actions of Falwell Jr. and Granda have injured Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the 2019 Employment Agreement that proved detrimental to Liberty's interests, and damaged Liberty's reputation.

172.    By operation of Va. Code 18.2 §500(A), Liberty's damages must be trebled.  That section also provides for Liberty recover reasonable attorneys' fees. *See* Va. Code 18.2 §500 (A) and (B).

173.    Falwell Jr.'s actions were willful and wanton and disregarded the rights of Liberty, thus exposing him to punitive damages.

174.    In the alternative, Falwell Jr., Becki, Granda, and potentially others, acted in concert under a preconceived plan to unlawfully conceal the Granda Allegations and Granda's extortive acts from disclosure to Liberty's Board of Trustees in violation of Falwell Jr.'s fiduciary duties.

175.    The conspiracy between Falwell Jr., Becki, and Granda injured Liberty's enrollment, impacted its donor base, disrupted its faculty, enabled the 2019 Employment Agreement that proved detrimental to Liberty's interests, and damaged Liberty's reputation.

176.    Liberty seeks $10,000,000 in compensatory damages, trebled as provided by statute, and the statutory limit of $350,000 in punitive damages plus any other damages provable at trial. Liberty additionally seeks pre-judgment and post-judgment interest and attorneys' fees.

## COUNT SIX: UNJUST ENRICHMENT (IN THE ALTERNATIVE)

177.    Liberty incorporates paragraphs 1 to 176 above.

178.    As detailed above, Liberty has conferred numerous benefits on Falwell Jr.

LUADMINREC000953

179.   Falwell Jr. has not reimbursed or paid Liberty for these benefits.

180.   If Falwell Jr. is not required to reimburse Liberty, Falwell Jr. will be unjustly enriched in an amount in excess of $11,000,000, plus interest.

181.   In the alternative, Liberty seeks damages for unjust enrichment in an amount in excess of $11,000,000.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, Defendant Liberty requests this Court to:

   a.   Award Liberty the damages identified above;

   b.   Award Liberty punitive damages;

   c.   Award Liberty its statutory attorneys' fees;

   d.   Award Liberty its pre-judgment and post-judgment interest;

   e.   Enjoin Falwell from retaining possession of property belong to Liberty; and

   f.   Provide any other relief this Court deems appropriate.

Liberty demands trial by jury of its claim.

LUADMINREC000954

DATE: 6/30/22

Respectfully submitted,

LIBERTY UNIVERSITY, INC.

Scott C. Oostdyk (VSB # 28512)
Andrew F. Gann, Jr. (VSB # 89189)
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
(804) 775-1000
(804) 775-1061 (facsimile)
soostdyk@mcguirewoods.com
agann@mcguirewoods.com

44

Exclusive: Falwell says Fatal Attraction threat led to depression                          Page 1 of 5

≡  Q  𝕴



# Exclusive: Falwell says *Fatal Attraction* threat led to depression

𝕍  𝕗  in

by Paul Bedard, Washington Secrets Columnist | ✉ | August 23, 2020 09:32 PM

**Just In...**

Cuomo, top lawmakers reach deal for $212 billion New York budget, including tax hike for high earners

Those doomsday predictions for post-mask Texas? They are now coming true, but in Michigan

Majority of Michigan voters, 72%, support voter ID laws, including 58% of black voters: Poll

'Nothing is off the table' in sending vaccines and help to Michigan amid pandemic surge, Biden administration says

'Woke' hiring: Endorsing Trump is top reason for job rejection

Why corporate America is lining up against tax hikes

Daily on Energy: Carbon capture industry sees huge boost within reach

Jerry Falwell Jr., suspended as president of Virginia's Christian-focused Liberty University after a string of embarrassing acts, said that he has suffered depression caused by a former family friend who had an affair with his wife and who has been threatening to expose it.

In a statement exclusively to Secrets, Falwell revealed his wife Becki's affair for the first time and said that it was short lived and that the two reconciled quickly.

But, they claimed, her former lover has threatened them over the past several years and that they are done with it hanging over their heads.

"I'm just tired of it," said Falwell of the anxiety he's felt about the affair becoming public and embarrassing his family and Liberty. "It's just got to end," he added.

The 1,200-word statement, shown below, followed the Liberty board's decision to put Falwell on paid leave after he posted a "costume party" picture of him with his pants partially unzipped and his arm around his wife's assistant.

His social media presence has raised eyebrows in the Liberty community, though he is often praised for his success at building up the school and keeping the coronavirus at bay from the university. He has also drawn fire for his strong support of President Trump.

The board's statement about Falwell on Friday referred to "various rumors and claims," which may be related to indications that a news service planned to air new claims from the man whom Becki Falwell had the affair with, a pool attendant the Falwells met and befriended in 2012 while staying at the Fontainebleau Miami Beach.

The statement did not name the attendant, but he has been identified as Giancarlo Granda in dozens of news stories.

In the statement and phone call with Secrets, Falwell appeared to be relieved to have finally divulged the affair and yearslong series of attacks the couple has faced.

"It was like living on a roller coaster," he said in the statement. "While completely dedicating ourselves to Liberty, we were also suffering in silence during our personal time together,



LUADMINREC000956

Exclusive: Falwell says Fatal Attraction threat led to depression

Unaccompanied children at Fort Bliss regularly tested for coronavirus in expanding Defense Department role

While simultaneously trying to manage through this increasingly threatening behavior, which only worsened over time. We were doing our best to respectfully unravel this 'fatal attraction' type situation to protect our family and the university."

He said that while they tried to remain friendly with the man and his family, the threats and texts demanding huge amounts of money led them to cut him off.

"While we tried to distance ourselves from him over time, he unfortunately became increasingly angry and aggressive. Eventually, he began threatening to publicly reveal this secret relationship with Becki and to deliberately embarrass my wife, family, and Liberty University unless we agreed to pay him substantial monies," the couple said.

In 2012, the Falwells said they were impressed with the pool assistant and wanted to help him start in business. Falwell's wife worked a deal to buy a Miami hostel and put him in charge. The deal has been tangled in legal challenges.

It was while Jerry Falwell was working long hours to build up the university, which he took over after his father Jerry Falwell Sr. died in 2007, that Becki had the affair.

At the time, Falwell was working overtime to build Liberty into an online powerhouse and expand its modern campus.

Granda, who was 21 at the time, dismissed the charges of threats in an email to Secrets. He emailed, "Any allegation of extortion is falsely, defamatory and belied by clear documentary evidence. The Falwell's attempt to sandbag me, and the *Examiner*, with a last minute story without providing the *Examiner* clear evidence that this was not simply an 'affair' with concocted allegations of extortion reeks desperation. The WHOLE truth will come out."

Falwell's team provided emails and texts that it said substantiate its allegations.

After Falwell found out about the affair, he said in the statement, he lost 80 pounds and suffered mental stress, especially as Granda switched from being thankful for Falwell's help to demanding money.

"Becki and I forgave each other, because while her indiscretion may have been more obvious and apparent, I realized that there were important smaller things I needed to do better too," he said.

Falwell said that now that his family has revealed its troubles, he plans to urge others in stressful situations to seek mental help.

"Even though I continued successfully working with our entire Liberty team to achieve so many of our goals, I am now dealing with things in a way that I should have done before — including seeking to address the emotional toll this has taken. I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from the mental health professionals

LUADMINREC000957

Exclusive: Falwell says Fatal Attraction threat led to depression                    Page 3 of 5

≡   Q

who could have alleviated this pain sooner. I am now committed to speaking out and sharing with others at Liberty the importance of seeking counseling instead of thinking you need to be tough and try to bear these burdens on your own. I am in the early stages of addressing these issues," he wrote.

And, he added, "The trauma of this experience has brought us to a very challenging point in our lives, but we are strong, our faith in Christ is greater than ever, and with His help and with those in the community who we love and who appreciate the impact of forgiveness, we will get through this. We ask for your prayers and support."

STATEMENT BY JERRY FALWELL, JR.

Aug. 23, 2020

*My family has been blessed with the opportunity to serve Christ and our community over the past 50 years— from when my father founded Liberty in the early 1970's through today. When my father suddenly passed away in 2007, I quickly and unexpectedly went from being the lawyer working in the background on the business aspects of the school to becoming a very public person, having to overcome my fears of speaking in front of audiences of tens of thousands, with many more responsibilities to the Liberty community and to my own family.*

*My priority was to build on my father's vision and to work hard. Thanks to the help of the Board and the extraordinary Liberty faculty, executives, staff and community, we have ensured the University's sustained growth and financial health while providing the best and most modern on-campus and online educational and spiritual resources to a wider range of students both in person and through digital platforms.*

*My commitment to Liberty became and has remained my primary focus— and while I am so grateful and thankful for our collective successes, I also realize in hindsight that there was a toll that this took on me, which extended to my family too. During this time of reflection for us and this especially challenging year, and even more so following the events of the past few weeks, my wife Becki and I agreed that this was the right time for me to share more of our story, because the Liberty community deserves to hear it directly from me and from us.*

*During a vacation over eight years ago, Becki and I met an ambitious young man who was working at our hotel and was saving up his money to go to school. We encouraged him to pursue an education and a career and we were impressed by his initiative in suggesting a local real estate opportunity. My family members eventually made an investment in a local property, included him in the deal because he could play an active role in managing it, and became close with him and his family.*

*Shortly thereafter, Becki had an inappropriate personal relationship with this person, something in which I was not involved— it was nonetheless very upsetting to learn about.*

LUADMINREC000958

☰  Q

*After I learned this, I lost 80 pounds and people who saw me regularly thought that I was physically unwell, when in reality I was just balancing how to be most supportive of Becki, who I love, while also reflecting and praying about whether there were ways I could have been more supportive of her and given her proper attention. I came to realize that while it may be easy to judge others on their behavior, the King James Bible reminds us— "Thou shalt not commit adultery, but I sayeth unto you, that whoever looketh upon a woman to lust after her hath committed adultery with her in his heart." In fact, there are ways we may all be sinning, but the Lord believes in this self-reflection.*

*I was and have always remained fully devoted to Becki and we have shared many private conversations to better understand and support each other and to strengthen our marriage. Thankfully, our love has never been stronger. Becki and I forgave each other, because while her indiscretion may have been more obvious and apparent, I realized that there were important smaller things I needed to do better too.*

*In Ephesians 4:32 we learn— "Be kind to one another, tender hearted, forgiving as God in Christ forgave you."*

*We extended the spirit of forgiveness to this man with respect and kindness, both for spiritual and religious reasons, and in the hope that we could help him find his way and allow us to put this behind us, without any harm or embarrassment to our family or to the LU community to which we have dedicated our lives.*

*During the years that followed, we got to know his family and other loved ones, good people who also really care about him. They shared and confirmed to us that he has periodically demonstrated emotionally unstable behaviors with some destructive tendencies, seemingly in response to his inability to achieve his professional goals. Based on information from other sources, we believe that he may have targeted other successful women in similar ways.*

*While we tried to distance ourselves from him over time, he unfortunately became increasingly angry and aggressive. Eventually, he began threatening to publicly reveal this secret relationship with Becki and to deliberately embarrass my wife, family, and Liberty University unless we agreed to pay him substantial monies. While this was very upsetting, we had been advised by trusted legal counsel that it was best to maintain contact with this person, as we tried to manage his increasingly erratic behavior and unreasonable demands while extricating ourselves from him both on a personal level and from that real estate transaction.*

*It was like living on a roller coaster.*

*While completely dedicating ourselves to Liberty, we were also suffering in silence during our personal time together, while simultaneously trying to manage and deal with this increasingly threatening behavior, which only worsened over*

LUADMINREC000959

Case 6:23-cv-00011-RSB Document 33 Filed 08/30/23 Page 202 of 300 Pageid#: 2218



≡ 🔍

[illegible]time. We were doing our best to [illegible] this 'fatal [illegible]ttraction' type situation to protect our fa[illegible]y and the University.

*Even years after the improper relationship had ended, this person continued to be aggressive with Becki and me in a variety of ways. We finally decided that we had to further withdraw completely from him, which resulted in him stepping up his threats to share more outrageous and fabricate claims about us (under the guise of that business entity). He clearly moved forward with this plan through a specific member of the media who has continued to badger us, as well as other members of the media, regarding the false claims about the nature of the relationship based on the individual's misrepresentations. Over the course of the last few months this person's behavior has reached a level that we have decided the only way to stop this predatory behavior is to go public.*

*We have categorically rejected this person's demands while dealing with him and this particular member of the media who seemed just as obsessed with the prurient, untrue aspects of this story, however fantastic.*

*Even though I continued successfully working with our entire Liberty team to achieve so many of our goals, I am now dealing with things in a way that I should have done before—including seeking to address the emotional toll this has taken. I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from the mental health professionals who could have alleviated this pain and stress. I am committed to speaking out and sharing with others at Liberty the importance of seeking counseling instead of thinking you need to be tough and try to bear these burdens on your own. I am in the early stages of addressing these issues.*

*Proverbs 3:5-6 says "trust in the Lord with all your heart and lean not on thine own understanding in all your ways acknowledge him and he will guide straight thy path."*

*The trauma of this experience has brought us to a very challenging point in our lives, but we are strong, our faith in Christ is greater than ever, and with His help and with those in the community who we love and who appreciate the impact of forgiveness, we will get through this. We ask for your prayers and support.*

Receipt : 20000019518

Page 1 of 1

OFFICIAL RECEIPT
LYNCHBURG CIRCUIT COURT
CIVIL

DATE : 10/28/2020                    TIME : 15:52:18
RECEIPT # : 20000019518    TRANSACTION # : 20102800068
CASHIER : NRS              REGISTER # : C705
CASE COMMENTS : F v. L
SUIT AMOUNT : $0.00
ACCOUNT OF : F
PAID BY : F
     CHECK : $86.00        CHECK NUMBER : 10776
DESCRIPTION 1 : COM:COMPLAINT - CATCH-ALL
     2 : PLAINTIFF: F
     3 : NO HEARING SCHEDULED

CASE # : 680CL2000105100

FILING TYPE : COM                    PAYMENT : FULL PAYMENT

| ACCOUNT CODE | DESCRIPTION | PAID |
|---|---|---|
| 049 | WRIT TAX (CIVIL) | $5.00 |
| 106 | TECHNOLOGY TRST FND | $5.00 |
| 123 | LEGAL AID SERVICES | $9.00 |
| 147 | INDIGENT ASSISTANCE (INA) | $1.00 |
| 170 | COURT TECHNOLOGY FUND | $10.00 |

| ACCOUNT CODE | DESCRIPTION | PAID |
|---|---|---|
| 219 | LAW LIBRARY | $4.00 |
| 229 | COURTHOUSE MAINTENANCE FEE (CHMF) | $2.00 |
| 304 | CIVIL FILING FEE (LAW & EQUITY) | $50.00 |

TENDERED : $    86.00
AMOUNT PAID : $    86.00

CLERK OF COURT : TODD SWISHER

PAYOR'S COPY


EXHIBIT
2
ALL-STATE LEGAL®

RECEIPT COPY 1 OF 2

LUADMINREC000961

**COVER SHEET FOR FILING CIVIL ACTION**   Case No. ..................................................
COMMONWEALTH OF VIRGINIA                                                    (CLERK'S OFFICE USE ONLY)

.......................................... City of Lynchburg .............................................................. Circuit Court

.................... Jerry Falwell, Jr. .................... v./In re: .................... Liberty University ....................
PLAINTIFF(S)                                                          DEFENDANT(S)

.......................................................................................... ..........................................................................................

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing
the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

**GENERAL CIVIL**
**Subsequent Actions**
[ ] Claim Impleading Third Party Defendant
  [ ] Monetary Damages
  [ ] No Monetary Damages
[ ] Counterclaim
  [ ] Monetary Damages
  [ ] No Monetary Damages
[ ] Cross Claim
[ ] Interpleader
[ ] Reinstatement (other than divorce or
    driving privileges)
[ ] Removal of Case to Federal Court
**Business & Contract**
[ ] Attachment
[ ] Confessed Judgment
[ ] Contract Action
[ ] Contract Specific Performance
[ ] Detinue
[ ] Garnishment
**Property**
[ ] Annexation
[ ] Condemnation
[ ] Ejectment
[ ] Encumber/Sell Real Estate
[ ] Enforce Vendor's Lien
[ ] Escheatment
[ ] Establish Boundaries
[ ] Landlord/Tenant
  [ ] Unlawful Detainer
[ ] Mechanics Lien
[ ] Partition
[ ] Quiet Title
[ ] Termination of Mineral Rights
**Tort**
[ ] Asbestos Litigation
[ ] Compromise Settlement
[ ] Intentional Tort
[ ] Medical Malpractice
[ ] Motor Vehicle Tort
[ ] Product Liability
[ ] Wrongful Death
[X] Other General Tort Liability

**ADMINISTRATIVE LAW**
[ ] Appeal/Judicial Review of Decision of
    (select one)
  [ ] ABC Board
  [ ] Board of Zoning
  [ ] Compensation Board
  [ ] DMV License Suspension
  [ ] Employee Grievance Decision
  [ ] Employment Commission
  [ ] Local Government
  [ ] Marine Resources Commission
  [ ] School Board
  [ ] Voter Registration
  [ ] Other Administrative Appeal

**DOMESTIC/FAMILY**
[ ] Adoption
  [ ] Adoption – Foreign
[ ] Adult Protection
[ ] Annulment
  [ ] Annulment – Counterclaim/Responsive
      Pleading
[ ] Child Abuse and Neglect – Unfounded
    Complaint
[ ] Civil Contempt
[ ] Divorce (select one)
  [ ] Complaint – Contested◆
  [ ] Complaint – Uncontested◆
  [ ] Counterclaim/Responsive Pleading
  [ ] Reinstatement –
      Custody/Visitation/Support/Equitable
      Distribution
[ ] Separate Maintenance
  [ ] Separate Maintenance Counterclaim

**WRITS**
[ ] Certiorari
[ ] Habeas Corpus
[ ] Mandamus
[ ] Prohibition
[ ] Quo Warranto

TESTE: TODD SWISHER, CLERK

BY: ...........................................

**PROBATE/WILLS AND TRUSTS**
[ ] Accounting
[ ] Aid and Guidance
[ ] Appointment (select one)
  [ ] Guardian/Conservator
  [ ] Standby Guardian/Conservator
  [ ] Custodian/Successor Custodian (UTMA)
[ ] Trust (select one)
  [ ] Impress/Declare/Create
  [ ] Reformation
[ ] Will (select one)
  [ ] Construe
  [ ] Contested

**MISCELLANEOUS**
[ ] Amend Death Certificate
[ ] Appointment (select one)
  [ ] Church Trustee
  [ ] Conservator of Peace
  [ ] Marriage Celebrant
[ ] Approval of Transfer of Structured
    Settlement
[ ] Bond Forfeiture Appeal
[ ] Declaratory Judgment
[ ] Declare Death
[ ] Driving Privileges (select one)
  [ ] Reinstatement pursuant to § 46.2-427
  [ ] Restoration – Habitual Offender or 3rd
      Offense
[ ] Expungement
[ ] Firearms Rights – Restoration
[ ] Forfeiture of Property or Money
[ ] Freedom of Information
[ ] Injunction
[ ] Interdiction
[ ] Interrogatory
[ ] Judgment Lien-Bill to Enforce
[ ] Law Enforcement/Public Official Petition
[ ] Name Change
[ ] Referendum Elections
[ ] Sever Order
[ ] Taxes (select one)
  [ ] Correct Erroneous State/Local
  [ ] Delinquent
[ ] Vehicle Confiscation
[ ] Voting Rights – Restoration
[ ] Other (please specify)

FILED IN THE CLERK'S OFFICE OF THE CIRCUIT
COURT OF THE CITY OF LYNCHBURG

OCT 28 2020    TIME .................. M.

TESTE: TODD SWISHER, CLERK

BY: ...........................................  Dep. Clerk

[ ] Damages in the amount of $ .................................. are claimed.

........10/28/2020........
DATE

[ ] PLAINTIFF   [ ] DEFENDANT   [X] ATTORNEY FOR   [X] PLAINTIFF   [ ] DEFENDANT

James I. Gilbert, IV VSB #38229
PRINT NAME

310 S. Jefferson Street
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

Roanoke, VA 24011

jgilbert@absattorneys.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

FORM CC-1416 (MASTER) PAGE ONE 07/16

◆"Contested" divorce means any of the following matters are in
dispute: grounds of divorce, spousal support and maintenance,
child custody and/or visitation, child support, property distribution
or debt allocation. An "Uncontested" divorce is filed on no fault
grounds and none of the above issues are in dispute.

LUADMINREC000962

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF LYNCHBURG

JERRY FALWELL, JR.,

               Plaintiff,

v.

LIBERTY UNIVERSITY,

               Defendant.

Case No. _____

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Jerry Falwell, Jr., as and for his Complaint against Defendant Liberty University ("Liberty" or the "University"), by and through undersigned counsel, hereby alleges as follows:

## INTRODUCTION

1.    This defamation action against Liberty University by its former President and Chancellor, Jerry Falwell, Jr., is necessitated by Liberty's abdication of its legal, contractual, and moral obligations not to defame him. Jerry Falwell, Jr., has dedicated much of his adult life to Liberty University, which was founded by his father, Jerry Falwell, Sr. ("Dr. Falwell"), in 1971. Following his father's death in 2007, Jerry Falwell, Jr. stepped in as President and Chancellor of the University, saving the institution from financial collapse and developing Liberty into the world's leading evangelical university and the largest private nonprofit university in the nation. In return, Liberty set out to destroy Mr. Falwell's reputation through numerous defamatory statements that affirm the outrageous lies of an unstable individual who attempted to extort the Falwells and who, on information and belief, conspired against Mr. Falwell with politically

LUADMINREC000963

motivated backers, including Aaron Resnick and the political action committee The Lincoln Project.

2.     Under Mr. Falwell's stewardship, Liberty University's stature increased exponentially by almost every metric, especially enrollment and financials. Between just 2007 and 2020 alone, attendance increased from 9,600 students in residence and 27,000 students online to 15,000 students in residence and 108,000 students studying online. And, after decades of financial hardship, Liberty now boasts a $1.6 billion endowment—one of the nation's largest. More students enrolled and more donors gave because of Mr. Falwell's tireless efforts in carrying out his father's vision for Liberty.

3.     When Mr. Falwell and his family became the targets of a malicious smear campaign incited by anti-evangelical forces, Liberty University not only accepted the salacious and baseless accusations against the Falwells at face value, but directly participated in the defamation. This action seeks redress for the damage Liberty has caused to the reputation of Mr. Falwell and his family.

4.     For years, Mr. Falwell and his wife, Rebecca Falwell, have been the victims of an ongoing extortion scheme by Giancarlo Granda—efforts which have recently been absorbed into a smear campaign by political operatives who are opposed to Mr. Falwell's support of President Trump. Granda repeatedly demanded enormous cash payments from the Falwells to stay silent about a brief affair with Mrs. Falwell that ended in 2014. Granda is an unstable and manipulative individual who saw the Falwells' kindness, and his involvement with Mrs. Falwell, as opportunities ripe for exploitation.

5.     The Falwells refused to pay, and Granda's disturbing behavior became increasingly erratic and threatening.

2

LUADMINREC000964

6.     On information and belief, Granda began conspiring with political operatives to defame Mr. Falwell.  Granda recently admitted in an ABC News interview that he is being represented free of charge by Kurt Bardella, a senior advisor to The Lincoln Project.  The Lincoln Project is a political action committee that has a self-described mission to "Defeat President Trump and Trumpism at the ballot box."  The Lincoln Project's animosity towards Mr. Falwell presumably arises from the fact that President Trump's evangelical support is often attributed to Mr. Falwell's early endorsement of him during the 2016 primaries.  It has been reported that Bardella is also arranging Granda's interviews with the press.  Granda further admitted to being introduced to The Lincoln Project by his attorney, Aaron Resnick, a politically prominent lawyer in Miami, Florida.  On information and belief, Resnick has been financing Granda's personal expenses.

7.     In June 2020, Mr. Falwell made clear to Granda in no uncertain terms that he would not be extorted, no payments would be forthcoming, and Granda should cease and desist from contacting him. Shortly thereafter, Granda—backed by The Lincoln Project—embarked on a hit job against Mr. Falwell in the press.  On August 24, 2020, Granda stated publicly for the first time the outrageous, false, and defamatory lies that Mr. Falwell had "looked on" and "watched" as Granda had sex with his wife and participated in the affair.

8.     The lies had the effect that Granda and The Lincoln Project intended. Within a day, Liberty turned on Mr. Falwell and forced his resignation as University President and Chancellor.  Liberty conducted zero investigation into Granda's lies and willfully ignored information demonstrating their falsity.  Soon after his resignation, the University began to systematically erase Mr. Falwell from Liberty University history: scrubbing any mention of him from the University website; removing portraits of Mr. Falwell from campus (including a portrait

3

of Mr. Falwell as a boy attending a University football game with his late father); prohibiting Liberty faculty and staff members from speaking with him; and banning him from visiting campus grounds—which include the gravesites of his mother and father.

9.     The University also moved quickly to destroy Mr. Falwell's reputation in the Liberty community and nationwide.  On August 26, 2020, in its high-profile and publicly-broadcasted Community Service event, before thousands of gathered students and faculty—and the world—Liberty lent credence to Granda's lies, stating that Mr. Falwell had engaged in "disobedient" behavior "in secret" that was "shameful" and a "sin."  Liberty then repeated similar statements in a press release and its official magazine.

10.     Up until that point, Granda's lies were just that—lies, vigorously denied by Mr. Falwell.  But Liberty gave those lies an air of truth and righteousness.  With the exercise of even the slightest diligence, Liberty would have quickly confirmed that Granda's outrageous lies are false.  Instead, Liberty gave Granda's lies an air of truth by immediately forcing Mr. Falwell's resignation and publicly defaming him.

11.     Liberty's actions are antithetical to the teachings of Christ.  Liberty's conduct has damaged Mr. Falwell's standing among Liberty faculty, students, and alumni, the broader evangelical community, and beyond.  Liberty's conduct has also damaged *Liberty* itself, and the evangelical community, by playing right into the hands of sinister operatives with ulterior motives.  Liberty has rejected Mr. Falwell's attempts to reach an amicable resolution, forcing Mr. Falwell to bring this action to restore his reputation.

## THE PARTIES

12.     Plaintiff Jerry Falwell, Jr. is a citizen and resident of Virginia.  He currently resides in Bedford County, Virginia.  Mr. Falwell has a Juris Doctorate from the University of

4

LUADMINREC000966

Virginia and was a practicing lawyer for many years. Mr. Falwell began working at Liberty University in 1988 as General Counsel, a position that he held until May 2007. Following the death of Dr. Falwell in May 2007, Mr. Falwell served as the President and Chancellor of Liberty University until his August 25, 2020 resignation.

13.     Defendant Liberty University is a Virginia nonstock corporation headquartered in Lynchburg, Virginia with its principal office located at 1971 University Blvd, Lynchburg, Virginia 24515.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter pursuant to Va. Code §§ 17.1-513, 8.01-328.1. Defendant is organized as a nonstock corporation under the laws of the Commonwealth of Virginia and has its principal office in the Commonwealth of Virginia.

15.     Venue properly lies in this Court under Va. Code Ann. §§ 8.01-257 and 8.01-262 because it is a forum convenient to the parties and witnesses, where justice can be administered without prejudice or delay. Liberty University's principal office is located in Lynchburg, Virginia.

16.     Furthermore, the Employment Agreement entered into between Mr. Falwell and Liberty, which provides the basis for at least one of the claims in this action, specifies that any legal action or proceeding arising out of or relating to the Employment Agreement shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

## FACTUAL BACKGROUND

### A. The Falwell Family and the Founding of Liberty University

17.     Born on June 17, 1962 in Lynchburg, Virginia, Mr. Falwell comes from storied Virginian roots. His late father, Dr. Falwell, is among the most respected leaders in the

5

evangelical Christian community, described by The Economist as a "quintessentially American type: a poor man who won fame and fortune by preaching the Word."

18. In 1952, Dr. Falwell decided to dedicate his life to Christ and preaching Christianity. After graduating college, he returned home to Lynchburg to start a church in a disused soda-bottling plant with a congregation consisting of just 35 adults and their families.

19. Dr. Falwell steadily grew his congregation using nothing but his charisma, and, at first, his own two feet, visiting 100 or so homes a day to seek new congregation members, carrying only a yellow legal pad and a Bible.

20. Dr. Falwell's breakthrough came from using the technology of the era to spread the gospel. Soon after his church opened, he began a half-hour daily radio broadcast, like the ones his mother would play on Sunday nights. And only a few months later, he began televising his services, which quickly gained him a national audience. He called the show "Old-Time Gospel Hour," and it started to skyrocket his congregation's numbers almost immediately. In the first year, his congregation grew from 35 to nearly a thousand, and that was only the beginning. By the 1970s, his church sat thousands, and Old-Time Gospel Hour was broadcast nationally to hundreds of thousands of homes.

21. In 1971, just a few blocks from his church, Dr. Falwell founded Lynchburg Baptist College, which would eventually become known as Liberty University. The school's mission was "Training Champions for Christ," and like Dr. Falwell's church, it originally started small, with only 154 students, a tuition of $200, and four full-time faculty members. It quickly began to grow. Just 10 years after its founding, over 3,500 students were enrolled, and by 1988 it had become the largest private university in Virginia with a combined enrollment of 11,000 students from all 50 states and 30 nations.

LUADMINREC000968

22.     While Liberty University grew, Dr. Falwell became a titan in Christian evangelicalism as well as American politics. In 1979, after hosting a series of "I Love America" rallies across the country to raise awareness of social issues, Dr. Falwell founded the Moral Majority, a political organization headquartered in Lynchburg, Virginia, that, at its height, claimed more than four-million members and two-million donors.

23.     Although Dr. Falwell became a national figure through his work with the Moral Majority and the Old-Time Gospel Hour, his passion lay in being a pastor and a Christian educator. And in 1989, he disbanded the Moral Majority, allowing himself more time to concentrate his efforts on heading his church and Liberty University. Dr. Falwell dreamed that Liberty would grow to 50,000 students and be to fundamentalist Christians what The University of Notre Dame is to Catholics and Brigham Young University is to Mormons.

**B.     Mr. Falwell's Contributions to Liberty University**

24.     Despite Dr. Falwell's best efforts, he had difficulty keeping Liberty afloat financially. Donors and family friends had had to step in to help manage the finances and arrange for companies to write-off Liberty's debt, and even with their help, by the 1990s, Liberty University was on the verge of financial collapse.

25.     Fortunately, when the school was nearing its financial nadir, facing bankruptcy and potential collapse, Jerry Falwell, Jr. was fully grown and able to assist his father in not only keeping the school alive, but achieving Dr. Falwell's dream for Liberty University. In 1987, Jerry Falwell, Jr. was a practicing lawyer and commercial real estate developer. In 1988, he joined Liberty as General Counsel.

26.     While Dr. Falwell focused on maintaining the school's religious education, Mr. Falwell worked to keep the creditors at bay, which was no small feat. By 1990, the school had

7

LUADMINREC000969

nearly $100 million in debt. Liberty's accrediting body, the Southern Association of Colleges and Schools Commission on Colleges, had even placed it on a one-year probation and was scrutinizing its every move, going so far as to issue Liberty more than 100 "recommendations" to maintain its accreditation, most of which centered around restructuring the school's debt.

27.    With Mr. Falwell's assistance, Liberty University not only climbed out of its financial hole, but began to thrive. As Dr. Falwell himself put it, "God sent [Jerry Falwell, Jr.] to me just in time. He is more responsible, humanly speaking, for the miraculous financial survival of this ministry than any other single person."

28.    In 2000, Mr. Falwell joined Liberty University's Board of Trustees, and in 2003 he became the school's Vice Chancellor. As a board member and Vice Chancellor, he assisted his father with running the school's day-to-day operations and managed the University's debt for years.

29.    On May 15, 2007, Dr. Falwell passed away. In accordance with his wishes, upon his passing, his two sons took control of the two pinnacles of his legacy: Jonathan took over his church, Thomas Road Baptist Church, and Jerry, Jr. became President and Chancellor of Liberty University.

30.    Mr. Falwell rose to the occasion. He has been widely recognized as having led Liberty University not only through difficult financial straits, but also for steering its transformation into the world's leading evangelical university.

31.    Dr. Falwell passed away before Liberty University achieved his dream of 50,000 enrolled students. Under Mr. Falwell's stewardship, however, Dr. Falwell's dream was achieved, and then surpassed: during his tenure as President and Chancellor, Mr. Falwell grew Liberty University's enrollment from 38,000 to 110,000 students, making it the one of the largest

8

LUADMINREC000970

evangelical Christian universities in the world, and one of the largest private non-profit universities in the United States.

32. Under Mr. Falwell's leadership, Liberty University's finances have transformed from being crippled by debt to possessing nearly $3.5 billion in net assets and one of the largest and fastest-growing endowments of any university in the nation. The University's sports teams play in Division 1 of the National Collegiate Athletic Association (alongside The University of Notre Dame and Brigham Young University, as Dr. Falwell always wanted). In 2017, its football team joined the Football Bowl Subdivision, college sports' most competitive level. Its sprawling campus, which overlooks Lynchburg, Virginia, comprises 7,000 acres and 17 colleges. Under Mr. Falwell's stewardship, Liberty has built a $50 million library with a high-tech robotic book-retrieval system (one of only a few in the country); renovated its 25,000-seat football stadium (Williams Stadium); and built a year-round outdoor ski slope (the only one of its kind in North America) that is free for students. In January 2017, President Donald Trump gave the commencement speech at Liberty University—one of his very first speeches as President of the United States.

## C. Liberty Recognizes Mr. Falwell's Outstanding Leadership in the 2019 Employment Agreement

33. Mr. Falwell's outstanding leadership of Liberty endeared him to students, faculty, alumni, and donors alike. Indeed, Liberty students would often chant his name when he appeared at school events. And his success with donors is undeniable: as noted above, in the first ten years of Mr. Falwell's tenure as President and Chancellor, Liberty's endowment grew exponentially.

9

34.   In 2019, Liberty University and Mr. Falwell negotiated and entered into the Employment Agreement, which was intended to fairly compensate Mr. Falwell for his significant contributions and to bring his compensation in line with market compensation.

35.   In light of his proven track record as President and Chancellor, in 2019, the University took steps to ensure that Mr. Falwell was properly compensated for the success his stewardship had brought Liberty. The University retained FW Cook, a national consulting firm with expertise in the compensation of executives in tax-exempt organizations, to review Mr. Falwell's compensation. The University tasked FW Cook with determining whether Mr. Falwell's compensation was in line with national standards, taking into account Liberty University's growth and financial achievements and Mr. Falwell's historical compensation. FW Cook made recommendations for program changes as needed to ensure that Mr. Falwell was retained at Liberty University for the long term and provided with a competitive and motivating compensation program.

36.   In recognition of Mr. Falwell's numerous significant contributions to Liberty University, and in an effort to compensate Mr. Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, under advisement from FW Cook, Liberty University entered into the Employment Agreement.

37.   As Liberty University specifically recognized in the Employment Agreement:

a)   In his first ten years with Liberty University, Mr. Falwell was instrumental in promoting and furthering the University's debt restructuring and returning the University to a position of financial strength by 1997 from a period of severe financial hardship.

10

b)      During Mr. Falwell's tenure with Liberty University, he was instrumental in promoting and furthering the rapid expansion and continued success of the University, especially since 2007, when Mr. Falwell became President and Chancellor.

c)      Under Mr. Falwell's leadership, between 2007 and 2017 Liberty University's net assets increased from approximately $100 million to over $2.1 billion. During the same time period, the University's annual gross revenues increased from $231,506,554 to over $1 billion, and its surplus of revenues over expenditures increased from $52,514,469 to $331,142,834.

d)      Likewise, under Mr. Falwell's leadership, between 2007 and 2017 Liberty University's attendance increased from 9,600 students in residence and 27,000 students online in 2007 to 15,000 students in residence and 86,000 students studying online in 2017.

e)      As a result of its strong financial performance under Mr. Falwell's leadership, Liberty University's Standard & Poor's credit rating has been AA since 2011, placing Liberty among the 80 highest rated universities nationally.

38.     The Employment Agreement includes a non-disparagement clause, which provides that "[t]he parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings." It further provides that the parties may, if Mr. Falwell is terminated for cause, "truthfully explain the circumstances forming the basis for the determination of cause." This non-disparagement provision expressly survives termination of the Employment Agreement.

39.     The Employment Agreement provides indemnification rights above and beyond "any and all indemnity rights and protections [Mr. Falwell] may have pursuant to statute or under

11

any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies." Section 10.1 of the Employment Agreement provides that:

> [t]o the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment.

## D.   Granda's Attempts to Extort the Falwells

### (i) Granda's Lies Regarding the Affair

40.    Jerry and Rebecca Falwell have been married since 1987 and have three children together.  In March of 2012, Mr. and Mrs. Falwell were on vacation with their family, as well as two other families, at the Fontainebleau Miami Beach hotel in Miami, Florida.  There, they met Giancarlo Granda, who was employed at the resort as a pool attendant.  At first, Granda impressed the Falwells with his entrepreneurial attitude and ambition, and the Falwells befriended him.  With the Falwell's help and encouragement, Granda decided to return to college and received his bachelor's degree in finance from Florida International University.

41.    Unbeknownst to Mr. Falwell, on rare occasions between 2012 and 2014, Mr. Granda and Mrs. Falwell engaged in an affair.  The Falwells later learned that Granda used his job at the Fontainebleau Miami Beach hotel to prey on hotel guests, especially women.

42.    When Mr. Falwell learned of the affair, he was heartbroken.  However, after working on their marriage, he and Mrs. Falwell reconciled.  Unfortunately, Mr. and Mrs. Falwell's reconciliation did not put an end to the trouble Granda would cause their family. Notwithstanding all the support the Falwell family gave to Granda, he soon revealed himself to be a deeply disturbed and unstable individual who was bent on continually threatening the

12

Falwells and exploiting the affair to his financial advantage. As explained below, when it became clear the Falwells would not be extorted and would never pay for his silence, he publicly unleashed falsehoods in an attempt to destroy their lives.

43.     When the affair ended in 2014, the Falwells initially attempted to distance themselves from Granda, but Granda responded with aggression and threats to publicize his relationship with Mrs. Falwell to publicly embarrass the Falwells and Liberty University.

44.     Granda's threats placed an enormous amount of strain on the Falwells' well-being—the constant anxiety contributed to Mr. Falwell losing 80 pounds over just two years. Although the Falwells wished to distance themselves from Granda completely, given the threat that he posed, the Falwells believed it best to maintain a positive relationship with him to placate his increasingly erratic behavior and manage his extortive demands while extricating themselves. Granda became obsessed, however, with the prospect of leveraging his relationship with the Falwells into a payday.

45.     For example, Granda had sold intimate pictures of Mrs. Falwell to his friends, who then used those pictures to try to extort the Falwells for money. When Granda learned of his friends' extortion attempt, rather than apologize for the emotional and financial toll it took on the Falwells, Granda expressed awe that he had possessed pictures that were apparently so valuable, and that the friends to whom he had sold the pictures stood to gain more than he had from selling them to them.

46.     Granda also illegally recorded phone calls and FaceTime communications with Mrs. Falwell without her consent. On information and belief, he made these recordings to strengthen his extortion attempts and to support his later public allegations with out-of-context clips that purportedly verified his ludicrous allegations.

13

LUADMINREC000975

47.     Afterwards, in late 2014, Granda repeatedly threatened to publicize the affair unless the Falwells gave him large sums of money, ranging from $600,000 to $2 million.

*(ii) Granda's History of Unstable Behavior.*

48.     Recently, Granda's ex-girlfriends, with whom the Falwells grew close in their effort to maintain a positive relationship with Granda, have confided in the Falwells that Granda was unbalanced and manipulative.

49.     On more than one occasion, Granda's (now ex) girlfriends texted the Falwells to seek their help in managing Granda's self-destructive and unbalanced behavior, stating that Granda was "crazy and verbally abusive" to his girlfriend, his family, and anyone that grew close to him; and that he exhibited frequent "rages," including virtually destroying his parents' house and "saying really [expletive] up stuff to others."

50.     One ex-girlfriend told the Falwells that Granda often hurled racist insults at her and her family. As she put it, "he had truly unresolved psychological issues that make him hurt people who love him . . . he did the same to his family growing up and now he is doing it to me . . . his snapping and explosive behavior is legitimately scary." She further described that he would say "the most [expletive] up things about my family" and her, and that she had "never heard such disgusting racist [expletive] in [her] life."

*(iii) Granda's Efforts to Extort The Falwells*

51.     While the Falwells were successful in placating Granda for a time, his extortive threats never stopped. Indeed, they only became more outrageous and potentially damaging.

52.     When the Falwells eventually decided to attempt disengaging with Granda completely, it was then that Granda changed the threat behind his extortion to something more damaging. Rather than just reveal the affair Granda had engaged in with Mrs. Falwell, Granda

14

LUADMINREC000976

threatened to falsely claim that Mr. Falwell had been a willing participant in the affair, even watching the two engage sexually.

53.    This was not true. Mr. Falwell did not participate in the affair and he certainly did not watch Granda having sex with his wife.

54.    Upon information and belief, Granda had cooked up this lie hoping that it would provide him a more powerful threat for purposes of accomplishing his intended extortion of the Falwells. He was aware of Mr. Falwell's role at Liberty University, an evangelical institution, his father's legacy as a national evangelical leader, and his involvement with the Republican Party.

55.    On June 30, 2020, Mr. Falwell communicated to Granda, in no uncertain terms, that he would not be extorted; he would not give Granda any money; and Granda should cease and desist from contacting the Falwells. Granda has not ceased contacting the Falwells and has continued to attempt to communicate with the Falwells though texts and calls, including in harassing communications as recently as October 2020.

56.    After receiving the June 30 communication and apparently realizing his extortion scheme would fail, rather than refrain from contacting the Falwells, Granda then set out to destroy them in public. In other words, if the Falwells would not pay Granda to stay silent, perhaps someone else would pay him to go public.

57.    The Presidential election season and Mr. Falwell's long-standing and vocal support for the President in media and public appearances, including his early endorsement of the President in 2016, gave Granda the perfect opportunity.

58.    On information and belief, by this point Granda was no longer acting alone on his plan to publicly reveal his lies but was now conspiring with political operatives to defame Mr.

15

LUADMINREC000977

Falwell. Because of the salacious nature of Granda's false allegations, and because of Mr. Falwell's family name, reputation among evangelicals, and public and vocal support for President Trump, political operatives who are opposed to President Trump's re-election worked with Granda on his defamatory media campaign against Mr. Falwell.

59.    Among these individuals was Kurt Bardella, a Senior Advisor to The Lincoln Project—a political organization that accused President Trump of "crimes, corruption and corrosive nature" and that has dedicated its efforts to "defeating President Trump and Trumpism at the ballot box." On information and belief, Bardella and The Lincoln Project have been advising Granda in an attempt to use his defamatory statements to harm President Trump's chances at re-election. Further, Granda recently admitted in an ABC News interview that he is being represented free of charge by a senior adviser to The Lincoln Project, to whom he was introduced by his attorney. It has also been publicly reported that Bardella was organizing interviews for Granda.

60.    The Lincoln Project was reportedly brought in by Aaron Resnick, Granda's attorney, who is a politically prominent lawyer in Miami, Florida.

61.    Furthermore, on information and belief, Mr. Bardella, The Lincoln Project, and potentially other questionably motivated supporters of Granda have gone so far in their support for his false allegations that they have financially compensated Granda and paid his bills. Granda has been observed paying for expenses with a credit card that was not his own. On information and belief, this card belongs to Resnick.

62.    On August 23, 2020, faced with Granda's threat to not only his wife but his own reputation, and the reputation of Liberty University, Mr. Falwell decided that the best thing to do

16

LUADMINREC000978

was to try and explain the suffering he and his family had endured from Granda's attempted extortion over the past years. Mr. Falwell gave a statement to the Washington Examiner.

63.   Notably, Mr. Falwell's statements to the Examiner detailed the Falwells' interactions with Granda and made clear that Granda had attempted to extort the Falwells through salacious allegations that were utterly false.

64.   The next day, on August 24, 2020, Granda followed through with his extortive threat to accuse Mr. Falwell of participating in Granda's affair with Mrs. Falwell. In a *Reuters* article titled *The Falwell Affair*, Granda made the outrageously false claim that Mr. Falwell participated in Granda's affair with Becki Falwell and "enjoyed watching" them have sex. The *Reuters* article also noted that Mr. Falwell "categorically denies" the allegations.

65.   Even the article's headline revealed that its purpose, and indeed the entire motive behind Granda and his co-conspirators' defamation of Mr. Falwell, was to attack Mr. Falwell *and* the institutions with which he was connected: Liberty University and President Trump. The byline reads, "[Granda] says he had sex with Becki Falwell while Jerry Falwell, Jr., *head of Liberty University and a staunch supporter of President Trump*, looked on." (emphasis added).

E.   Liberty Forces Mr. Falwell's Resignation Without Investigation of Granda's Lies

66.   On the same day that *Reuters* published Granda's false and defamatory statements, the Executive Committee of Liberty University's Board of Trustees forced Mr. Falwell to tender his resignation as President and Chancellor of the University.

67.   On information and belief, the Board of Trustees and the Executive Committee were aware of Mr. Falwell's August 23, 2020 statement in the Washington Examiner noting that he was the subject of extortive attempts by an individual who was using an affair with Mrs.

17

Falwell to fabricate outrageous claims regarding Mr. Falwell to harm his reputation, as well as his categorical denial in the *Reuters* article.

68.     Moreover, at the time of Mr. Falwell's resignation, Liberty further possessed information that Granda's statements were false because Mr. Falwell had previously disclosed information regarding the affair to a top official who was then, and is now, a member of the University's Board of Trustees.

69.     Yet, despite this knowledge, when the *Reuters* article was published, not one member of the Board or the Executive Committee asked Mr. Falwell about the veracity of Granda's lies before forcing Mr. Falwell's resignation and then defaming him by repeating and endorsing the lies. Liberty still has not inquired with Mr. Falwell about Granda's lies. Further, Liberty performed no investigation whatsoever into the veracity of Granda's claims before forcing Mr. Falwell's resignation or before making its defamatory statements.

70.     Upon information and belief, certain key individuals directly involved in the decisions and actions to force Mr. Falwell's resignation and then defame him were fulfilling a long-held goal to end Mr. Falwell's fruitful thirty-two-year relationship with the University. Purportedly acting in the University's interest to disassociate the University from Mr. Falwell's alleged indiscretions, these individuals had engaged, or were engaged, in various illegal, unlawful, and immoral or otherwise dubious acts in their stewardship of other institutions and otherwise which, if known to the public generally, would unquestionably tarnish the reputation of Liberty University by association. It is therefore hypocritical in the extreme for these key individuals to cast any action of Mr. Falwell as disqualifying Mr. Falwell from leading Liberty, as he had done successfully for many years.

18

71.     Mr. Falwell was told to tender his resignation from Liberty, or he would be forced to resign. On August 24, 2020, Mr. Falwell provided Liberty University with written notice of his resignation for "good reason," as that term was defined in the Employment Agreement.

72.     On August 25, 2020, Liberty University accepted Mr. Falwell's resignation for good reason through a vote of its Executive Committee, which was affirmed on the same day through a full vote of the Board of Trustees, thus terminating Mr. Falwell's employment with the University.

73.     By forcing Mr. Falwell's resignation from Liberty immediately following Granda's false and defamatory statements, Liberty sent the unmistakable message to the public that Granda's false statements were, in fact, true.

**F.     Liberty University Defames Mr. Falwell Following His Resignation**

74.     After severing his relationship from Liberty, and despite Liberty's acceptance of Granda's false story, Mr. Falwell looked forward to the next chapter in his life. Liberty, however, immediately began a campaign to tarnish, minimize, and outright destroy the legacy of the Falwell family and Mr. Falwell's reputation.

75.     The very next day, on August 26, 2020, David Nasser, Liberty University's Senior Vice President for Spiritual Development, presented a speech at the University's Community Service, an event at the start of a new school year where thousands of students and faculty were present and which Liberty also broadcasted online.

76.     Nasser helped secure a wide-spread attendance and media presence for this event by promoting it, including at Liberty's Convocation, which was held earlier that day, broadcasted online, and considered mandatory for all staff, faculty, and students. During Liberty's

19

Convocation, Nasser told the audience that he would be discussing the events leading to Mr. Falwell's resignation that night.

77.   On information and belief, Nasser's speech later that day at Community Service was largely scripted; other Liberty employees participated in drafting the speech, and Mr. Nasser was reading from a script during his speech.

78.   Nasser began the defamatory portion of the speech by stating, "There are those who have told me to lay low and to not mention any of the things that lead to Jerry Falwell's resignation yesterday." Moments later, Nasser tells the audience, "you're also right if you wanna see stern and swift accountable action for sinful behavior." A moment later, he tells the audience, "the embarrassment that's been brought upon you as a Liberty student and more importantly brought upon the name of Christ is wrong." A moment later, he tells the audience, "Your concerns, if you're concerned, are valid. If you're not concerned, you should be concerned." Later in the speech, Nasser returns to the topic, again prefacing his remarks by referring to Granda's lies: "Then the summer came to a close, and we opened the semester with a series of revelation about Jerry Falwell that can only be described as shameful. That's okay, by the way, to say it. It's okay to call sin, sin. Paul says in Ephesians. Have nothing to do with the fruitless deeds of darkness but rather, expose them. It is shameful to even mention what the disobedient do in secret. But everything exposed by the light becomes visible." A moment later, he proceeds to state again, "It's okay to call sin, sin." These remarks together are referred to herein as the "Defamatory Speech."

79.   The Defamatory Speech is false and defamatory. Taken together, Liberty's statements repeat, as a statement of fact, Granda's lies that Mr. Falwell watched him have sex with his wife and participated in their affair. Granda's lies were first reported in the *Reuters*

20

article two days before the speech and instantly garnered national press attention. Upon information and belief, every or virtually every Liberty student and faculty member present for the speech was aware of Granda's lies and understood that they were "the things that led to Jerry Falwell's resignation yesterday," as Nasser put it. Upon information and belief, that is exactly what Liberty intended to convey and intended for listeners to understand and what the audience in fact understood. By saying, "[y]our concerns, if you're concerned, are valid," referring to the subject matter of Granda's lies as "sinful behavior" and a "sin," and as something "shameful" the "disobedient do in secret," Liberty unequivocally told its audience and the world that Mr. Falwell had done what Granda had falsely said he did, in other words, that Granda's lies were "valid."

80.     The Defamatory Speech was the subject of much media attention and was attended by members of the national press, as Liberty was no doubt aware it would be.

81.     Liberty published a video of the Defamatory Speech online to its website, and it remains online as of the time of this filing.

82.     On information and belief, Nasser was authorized to speak on behalf of Liberty at the Community Service event. In fact, Nasser did so in the course and scope of his employment and in furtherance of Liberty's interests, and was acting as Liberty's agent in his role as Senior Vice President. Furthermore, the Community Service event was an official Liberty University event where thousands of Liberty students were in attendance, alongside Liberty's faculty and leadership, including its acting President and Chairman Jerry Prevo.

83.     On August 31, 2020, Liberty University issued a press release affirming its prior condemnation of Mr. Falwell. In the statement, Liberty accused Mr. Falwell of a "lack of spiritual stewardship" and suggested that he had not "demonstrate[d] a full commitment to the spiritual mission of Liberty University by words, actions, and example." Liberty clearly

21

connected its accusation of a lack of spiritual leadership with Granda's false allegations by noting that "all the signs were not there until the start of last week," *i.e.*, when Granda's false allegations were publicized, and that while Liberty "still didn't' know the full scope of the matter, [it] had learned enough . . . ." This statement was posted online, and it remains online as of the time of this filing. These statements together are referred to as the "Defamatory Press Release."

84.    The Defamatory Press Release is false and defamatory because, as with the Defamatory Speech, it suggests that Mr. Falwell's presidency came to an end because of Granda's lies and that, by claiming Mr. Fallwell "lack[ed] spiritual stewardship" and conducted himself inconsistently with the "spiritual mission" of Liberty, said lies were truthful.

85.    Liberty has also defamed Mr. Falwell in the pages of its own publication, providing statements that it knew would be disseminated by a media biased against Mr. Falwell. For example, a number of articles in the September 24, 2020 issue of the *Liberty Journal*, an official magazine published by the University and distributed nationally to media outlets and alumni, further accused Mr. Falwell of inappropriate behavior.    Specifically, one article republished Liberty's August 31, 2020 accusation in the Defamatory Press Release of a "lack of spiritual stewardship" from Mr. Falwell.  Another article said that "[r]ecent events involving Liberty's fourth president, Jerry Falwell, Jr., have broken trust for most in Liberty University, and some question Liberty's commitment to its nearly 50-year mission of *Training Champions for Christ*." These statements together are referred to as the "Defamatory Journal Articles."

86.    Liberty published this issue of the *Liberty Journal* online, and it remains online as of the time of the filing of this Complaint.  The *Liberty Journal* is also distributed publicly by mail, nationwide.

22

87.     The Defamatory Journal Articles are false and defamatory because, as with the Defamatory Speech and Defamatory Press Release, they suggest that Mr. Falwell's presidency came to an end because of Granda's lies, including by asserting the lies are true by claiming Mr. Falwell "lack[ed] spiritual stewardship" and that he had "broken trust for most in Liberty University."

88.     The Defamatory Speech, Defamatory Press Release, and Defamatory Journal Articles are herein referred to as the "Defamatory Statements."

89.     In tandem with their attempts to savage Mr. Falwell's reputation, Liberty has engaged in a campaign to erase history and blot out the Falwell family's legacy at Liberty. Liberty has prohibited Mr. Falwell from speaking to its staff; prohibited faculty from speaking to Mr. Falwell; and banned Mr. Falwell from visiting campus, despite the fact that both of Mr. Falwell's parents are interred on Liberty's grounds. The University has even gone so far as to take down photos of Mr. Falwell, including a portrait of a young Mr. Falwell standing with his father, Dr. Falwell, on the sidelines of Liberty University's first football game in 1973.

90.     Again, prior to making the Defamatory Statements and taking these actions, on information and belief, Liberty was aware of Mr. Falwell's August 23, 2020 statement in the Washington Examiner and categorical denial in the *Reuters* article. Indeed, at the time of the Defamatory Statements, Liberty was even aware of the fact that Mr. Falwell was receiving therapy for stress-induced depression, which Mr. Falwell incurred in part because of the anxiety Granda's attempted extortion was causing. Yet, not one member of the Board or the Executive Committee asked Mr. Falwell about the veracity of Granda's allegations, and on information and belief, Liberty never undertook its own investigation.

23

91.    In fact, for Liberty the issue has never actually been about whether Mr. Falwell did anything wrong.  On information and belief, Liberty forced Mr. Falwell's resignation and issued these statements because certain high-ranking individuals (for reasons known only to themselves now but are to become known broadly during this litigation) wanted him replaced as President and Chancellor of Liberty University.  Upon information and belief, Liberty engaged in this defamatory campaign to seal the deal and ensure the permanent termination of Mr. Falwell's relationship with the school his father founded.

92.    Yet, as recently as October 23, 2020, Liberty's acting President and Chairman, Jerry Prevo, noted that "in the time I have been here I have not seen any wrong-doing on [Mr. Falwell's part]."  Nevertheless, despite acknowledging that there had not been any wrongdoing, Liberty apparently stands by its Defamatory Statements against Mr. Falwell as each remains publicly available on Liberty's website, and Liberty has never apologized or retracted the Defamatory Statements.

## G.    Harm to Mr. Falwell As a Result of Liberty's Defamation

93.    As a direct and proximate result of the Defamatory Statements, Mr. Falwell's reputation, profession, and future employment prospects and business opportunities have been harmed.

94.    Upon information and belief, there is widespread knowledge of the Defamatory Statements within the Liberty University community, the evangelical community, the real estate industry, the academic field, the political world, and media outlets.

95.    As a direct and proximate result of the Defamatory Statements, Mr. Falwell has a drastically reduced ability to attach his name to, or be otherwise publicly involved in, business

24

and charity organizations and events without a real and justifiable fear that his damaged reputation will erode the reputation of such organizations.

96.     For instance, prior to Liberty's statements, Mr. Falwell received a number of invitations to appear on television or at public events to discuss, among other things, Liberty, evangelicalism, and politics.   Indeed, Mr. Falwell has considered becoming a recurring contributor on news outlets.  Since Liberty's Defamatory Statements, Mr. Falwell has received no such invitations and has lost any prospect of becoming a contributor.

97.     As a direct and proximate result of Liberty's Defamatory Statements, Mr. Falwell has a drastically reduced ability to attend industry-related academic, political, or real-estate conferences, and to seek business and professional opportunities in those fields, without a real and justifiable fear that any new business contacts he develops will have knowledge of the Defamatory Statements and associate his damaged reputation with any companies he establishes, manages, and/or owns.  In the past, Mr. Falwell has attended a number of such conferences per year.

98.     As a direct and proximate result of the Defamatory Statements, Mr. Falwell has a drastically reduced ability to attend community social events, such as events at his relatives' school and with his neighborhood association, without a real and justifiable fear that any people he meets will have knowledge of the Defamatory Statements and associate him with such statements.

99.     Both the Defamatory Statements and the attendant fear that others will associate Mr. Falwell's businesses, charities, family, and friends with his damaged reputation have caused Mr. Falwell significant anguish and humiliation.

25

LUADMINREC000987

100.   That Mr. Falwell now rarely speaks or appears publicly on behalf of the businesses and charity organizations he supports—a form of support that Mr. Falwell formerly enjoyed—has also caused Mr. Falwell significant anguish.   In addition, the Defamatory Statements have caused Mr. Falwell immense anguish as he now is deeply concerned that third parties will hold horribly false impressions of him.

101.   As a direct and proximate result of Liberty's statements, Mr. Falwell has also become the subject of much ire and hatred over the "sin" Liberty claimed he committed in its Defamatory Statements.   Upon information and belief, members of the public have written numerous hateful messages on social media in reliance on Liberty's Defamatory Statements.

## COUNT ONE: DEFAMATION

102.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 101 with the same force and effect as if fully stated herein.

103.   Liberty made and published the Defamatory Statements, which are statements of fact of and concerning Mr. Falwell.   These statements are false and exposed Mr. Falwell to contempt, ridicule, hatred, and obloquy.

104.   The Defamatory Statements are also defamatory *per se* because they impute to Mr. Falwell unfitness to perform the duties of an office or employment and prejudice him in his profession or trade.

105.   Liberty made and published the Defamatory Statements knowing that such statements would be disseminated throughout the world.

106.   Liberty made and published the Defamatory Statements without any applicable privilege.

26

LUADMINREC000988

107.   Liberty made and published the Defamatory Statements with knowledge that they were false and/or with reckless disregard for the truth or falsity of the statements, or with at least negligent disregard for the truth or falsity of the statements.

108.   As a direct and proximate result of the Defamatory Statements, Mr. Falwell has suffered damage to his reputation, damage to his profession, humiliation, and anguish, lost business opportunities, and suffered other pecuniary damage.

## COUNT TWO: BREACH OF CONTRACT

109.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 108 with the same force and effect as if fully stated herein.

110.   On July 1, 2019, Mr. Falwell and Liberty University executed the Employment Agreement.

111.   Pursuant to Section 3.7 of the Employment Agreement, Liberty University was barred from "mak[ing] defamatory or slanderous remarks about [Mr. Falwell] in public fora and settings."

112.   Liberty breached the foregoing provision by making and publishing the Defamatory Statements.

113.   Furthermore, pursuant to Section 3.7 of the Employment Agreement, Liberty University was permitted to discuss the reasons for the conclusion of Mr. Falwell's employment only if Mr. Falwell was terminated for cause.

114.   Liberty breached the foregoing provision because Mr. Falwell was not terminated for cause and therefore Liberty was not allowed to discuss the circumstances surrounding the conclusion of Mr. Falwell's employment as it did by making and publishing the Defamatory Statements.

27

115.   The terms of Section 3.7 survive termination of the Employment Agreement.

116.   As a direct and proximate result of Liberty's breach of contract, Mr. Falwell has suffered damage to his reputation, damage to his profession, humiliation, and anguish; lost business opportunities; and suffered other pecuniary damage.

### PRAYER FOR RELIEF

117.   WHEREFORE, for the reasons set forth herein, Plaintiff Jerry Falwell, Jr. respectfully requests this Honorable Court:

a)   Enter judgment in Mr. Falwell's favor;

b)   Award Mr. Falwell damages for Liberty's acts in defaming him and breaching the Employment Agreement;

c)   Award Mr. Falwell punitive damages;

d)   Award Mr. Falwell pre-judgment interest;

e)   Award Mr. Falwell his attorney's fees and costs incurred in prosecuting this action pursuant to Section 10 of the Employment Agreement;

f)   Enjoin Liberty University from repeating the Defamatory Statements regarding Mr. Falwell; and

g)   Provide any other relief this Court deems appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff Jerry Falwell, Jr. hereby demands a trial by jury.

28

Respectfully submitted,

GBSR ATTORNEYS, LLP

James J. Gilbert, IV (VSB #38229)
Timothy S. Bird (VSB # 38139)
Jordan K. Sharpes (VSB #79394)
13595 Booker T. Washington Highway
Moneta, VA 24121
phone - 540-721-5110
fax- 540-721-5112
jgilbert@gbsrattorneys.com
tsbird@gbsrattorneys.com
jsharpes@gbsrattorneys.com

Dated: October 28, 2020
Lynchburg, VA

### QUINN-EMANUEL URQUHART & SULLIVAN LLP

Robert L. Raskopf
   (pro hac vice application pending)
Julia M. Beskin
   (pro hac vice application pending)
robertraskopf@quinnemanuel.com
juliabeskin@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000 (tel.)
(212) 849-7100 (fax)

*Attorneys for Plaintiff Jerry Falwell, Jr.*

29

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is effective April 1, 2012, and is between LIBERTY UNIVERSITY, a Virginia nonstock corporation (referred to in this Agreement as "LU" or "the University") and JERRY L. FALWELL, JR., a resident of Virginia (referred to in this Agreement as "Falwell" or "the Employee").

WHEREAS, LU is a university centered in the City of Lynchburg, Virginia, which is dedicated to excellence in higher education and scholarship within a Christian context;

WHEREAS, Falwell has served LU in several roles since 1988, including his current positions as Chancellor and President;

WHEREAS, LU acknowledges that Falwell, among others, was instrumental in promoting and furthering the University's debt restructuring and return to a position of financial strength in 1997 after a period of severe financial hardships for the University that began in 1987 and, more recently, in promoting and furthering the rapid expansion and continued success, particularly since 2007;

WHEREAS, since Falwell became President and Chancellor in 2007, Liberty's net assets have increased from approximately $100,000,000 to over $800,000,000 and are projected to exceed $1,500,000,000 within five years and Liberty's enrollment has increased from approximately 9,600 students in residence to over 12,000 students in residence and from approximately 27,000 students studying online to over 75,000 students studying online. During the same period, annual gross revenues have increased from $231,506,554 to $645,350,280 and the University's surplus of revenues over expenditures has increased from

1



$52,514,469 to $221,188,918. As a result of such financial performance, Standard & Poor's has assigned the University a credit rating of AA for two consecutive years, placing the University among the 80 highest rated universities nationally;

WHEREAS, LU acknowledges that Falwell's annual compensation has been consistently below national standards and norms prevailing in the field of university education, all as documented by the independent consultant's report dated August 11, 2011, by Dixon Hughes Goodman, LLP;

WHEREAS, LU desires to raise its executive compensation to near the median of executive compensation for comparable non-profit colleges and universities, adjusted for geography, performance and tenure.

WHEREAS, in recognition of Falwell's past contributions to the University and in an effort to compensate Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, LU wishes to formalize and reinforce the parties' long term employment relationship by entering into this Agreement; and

WHEREAS, Falwell likewise wishes to continue his employment as President and Chancellor of the University on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, LU and Falwell adopt the foregoing recitals and agree as follows:

2

## ARTICLE 1

### EMPLOYMENT STATUS

1.1    LU hereby agrees to continue employing Falwell and Falwell hereby accepts continued employment by LU as President and Chancellor for the seven (7) year and three (3) month period designated in Article 2 ("the Term") on the terms and subject to the conditions set forth in this Agreement. Falwell shall continue to be classified as a full-time employee for all purposes, including fringe benefits.

## ARTICLE 2

### TERM

2.1    The Term of this Agreement shall be for a period of seven (7) years and three (3) months beginning on April 1, 2012, and expiring on June 30, 2019 ("the Term") subject to earlier termination as provided for in this Agreement. The University is not obligated to offer Falwell employment for any period beyond the expiration of this Agreement.

## ARTICLE 3

### DUTIES AND RESPONSIBILITIES

3.1    Falwell shall continue to provide LU with dedicated, diligent and conscientious full time service in a manner that is generally consistent with the level of service he has provided during the nearly five (5) year period immediately preceding the effective date of this Agreement, with allowances for reasonable time to attend to personal investments.

3

LUADMINREC000994

3.2    Falwell's duties shall consist of the tasks, duties and responsibilities he has assumed and performed as President and Chancellor during the nearly five (5) year period immediately preceding the effective dates of this Agreement. These duties shall include but not necessarily be limited to the following:

(a)    ensuring the implementation of the University's mission and purposes as described or defined in the University's Articles of Incorporation, Bylaws, and other foundational documents.

(b)    performing the duties of Chancellor/President as described in the University's Bylaws.

(c)    overseeing the fiscal, administrative, admissions, academic, athletic and other operations, divisions, departments and offices of the University.

(d)    raising funds for the benefit of the University.

(e)    implementing and executing policies, orders and resolutions adopted or established by the LU Board of Trustees and its Executive Committee.

3.3    As Chancellor and President, Falwell shall have the executive and administrative powers to manage and control the day to day operations of the University, provide focus and direction for the University, make policy recommendations to the Board of Trustees, and provide spiritual and worldview leadership to the University in pursuit of excellence, subject to the ultimate authority of the Board of Trustees as set forth in the University's Articles of Incorporation and Bylaws.  That executive and administrative power shall include but not be limited to the absolute authority to hire, retain and dismiss

4

administrative, professional, academic and athletic personnel, subject only to any contractual or tenurial rights of any such employee. Provided, however, that Falwell shall be accountable to the Board of Trustees for implementing its policies and carrying out his duties, including the handling of personnel matters.

3.4    Falwell shall not undertake compensated work or activities for, or accept any employment or other compensation from, any other institution of higher education for work undertaken prior to the termination of this Agreement without receiving approval of the Board of Trustees or the Executive Committee of the Board of Trustees prior to undertaking such work or activities.

3.5    Falwell shall not author or publish any book or article relating to his employment at Liberty University hereunder without prior consent of the Executive Committee or Board of Trustees, which prior consent may be conditioned upon advance review and approval of the content of said book or article. This provision does not include letters to the editor or articles in University publications and other University media which are published to carry out Falwell's duties under this Agreement and advance the interests and mission of LU. Nor does this provision include brief communications on Twitter, Facebook and similar communication vehicles. The provisions of this subsection shall survive termination of this Agreement.

3.6    The parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings. This prohibition includes defamatory remarks about the employees and members of the Board of Trustees of the University.

5

Neither party, however, waives the protections afforded by otherwise applicable common law privileges and this Section 3.6 shall in no event apply to remarks made during meetings of either the University's Board of Trustees or its Executive Committee.   If Falwell's employment is terminated for cause, the parties may truthfully explain the circumstances forming the basis for the determination of cause. The provisions of this Section 3.6 shall survive termination of this Agreement.

3.7     Falwell shall continue to have access to confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly disclosed by LU ("Confidential Information") during the course of his employment. Confidential Information remains the property of LU.  Unauthorized disclosure of Confidential Information will cause definite and irreparable harm to LU.   Falwell shall not disclose Confidential Information intentionally within the University except to fulfill the legitimate business purposes of LU and shall not disclose it directly or indirectly, outside the University without the express authorization of the Executive Committee of the Board of Trustees or as required by law or to further the interests of LU. Under no circumstances shall the release of details of this Agreement be considered to further the interests of LU.  Any Confidential Information in tangible form shall be immediately returned to LU upon request.  The provisions of this subsection shall survive termination of this Agreement.

6

ARTICLE 4

COMPENSATION

4.1     In consideration of Falwell's continued service as President and Chancellor,

LU shall compensate him as follows:

(a)     *Base Salary*.  LU shall pay Falwell an annual base salary which shall

rise each year during the Term as itemized below:

(i)      First Year and Three Months = $835,000

(ii)     Second Year = $865,000

(iii)    Third Year = $895,000

(iv)    Fourth Year = $925,000

(v)     Fifth Year = $960,000

(vi)    Sixth Year = 990,000

(vii)   Seventh Year = $1,025,000

(b)     *Discretionary Bonuses*.   Falwell shall be eligible to receive bonuses in

such amounts and at such times as the Executive Committee of the Board of Trustees may

award based on its assessment of his performance, the financial condition of the University,

the rate of inflation and cost of living increases in Lynchburg, Virginia, and other

considerations which the Executive Committee of the Board of Trustees in its sole discretion

finds relevant.

(c)     *Termination Payment*. In addition to the compensation set forth above

in subsection (b) and (c) in this Section 4.1, Falwell shall receive a severance payment at the

7

termination of his employment equal to the amount of one year's annual base salary at the rate in effect at the date of his termination. Falwell or, in the event of his death or disability his administrator, executor, or other personal representative, shall be entitled to this severance payment regardless of the reason his employment ends. Provided however, Falwell shall not be entitled to this payment in the event the University terminates his employment for "cause" as that is defined in Article 7 of this Agreement or terminates his employment without cause as described in Article 8 of this Agreement, in which case Falwell's compensation upon termination is detailed in said Articles.

4.2    LU shall provide Falwell the same fringe benefits and the same opportunity to participate in benefit plans that it offers other full-time executive employees. These benefits and programs currently include group family health insurance (medical, vision, dental), group family life insurance and disability insurance, employee assistance programs, retirement, savings and investment programs (including LU's Section 403(B) plan), sick/personal leave, holiday leave and voice and data phone payments under LU's Cellular Phone Policy and similar benefits made available to executive or managerial employees of the University. During the quarter prior to each formal annual evaluation by the Executive Committee, Falwell shall undergo an annual Comprehensive Executive Medical Health Assessment, the cost of which shall be reimbursed by the institution upon submission of a receipt or statement for same. The Comprehensive Executive Medical Health Assessment shall include a thorough physical examination by medical doctor(s), a full range of preventive screening tests for early detection of cancer, heart disease and other serious

8

medical problems, a cardiovascular fitness evaluation, including treadmill exercise test, a lifestyle assessment to discuss nutrition, exercise, personal safety and other indicators of risk of disease, a review and update of medications and immunizations, development and assessment of a long-term strategy for prolonged life and wellness, a full report of the test results and recommendations at the conclusion of the examination and a written report sent to Falwell confidentially for his personal use and for consultation with his private physician. Neither the University nor the Executive Committee shall request or be entitled to a copy of the written report but the Executive Committee shall be entitled to receive a copy of the receipt or statement for such services as part of each of its formal annual evaluations of Falwell.

4.3     LU shall provide Falwell with an automobile allowance of Seven Hundred Fifty Dollars ($750) per month in accordance with LU's normal payroll policies and schedule and subject to any reporting and withholding requirements provided by law.

4.4     LU shall reimburse Falwell in accordance with LU's Travel and Entertainment Policy for reasonable and necessary travel and out-of-pocket expenses incurred by him, and where appropriate his spouse, in connection with the performance of his official duties under this Agreement.

4.5     LU shall provide Falwell and members of his immediate family with tuition at the University through the conclusion of each academic year during which he serves as President and/or Chancellor pursuant to LU's Dependent Grant-in-Aid Policy and Continuing Education Policy. "Immediate family" shall be limited to Falwell's wife and

9

children by birth or adoption. Such tuition benefits shall be provided subject to any reporting and withholding requirements provided by law.

4.6    Falwell shall be entitled to six (6) weeks annual vacation during each year of the Term. No unused vacation may be carried forward to subsequent years or paid out as compensation.

4.7    LU agrees to provide memberships at the LaHaye Student Center and Sports Racket for use by Falwell and his immediate family or at another fitness center mutually agreeable to the parties.

4.8    LU agrees to provide general maintenance and upkeep at the primary residence of Falwell, including general repairs, maintenance and lawn care. The parties hereto acknowledge that the primary residence of Falwell is used by the University from time to time for student, faculty and staff events. A portion of the general maintenance and upkeep referenced above shall be deemed a business expense of the University in connection with said student, faculty and staff events and the remainder of said general maintenance and upkeep shall be deemed income to Falwell and reported to the IRS as such by the University.

4.9    Anything in this Agreement to the contrary notwithstanding, in the event that it shall be determined that any payment or distribution by the University to or for the benefit of the Employee, whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, would constitute an "excess parachute payment" within the meaning of §280G of the Internal Revenue Code of 1986, as amended (the "Code") (each such payment, a "Parachute Payment") and would result in the imposition on the Employee

10

of an excise tax under Code §4999, then, in addition to any other benefits to which the Employee is entitled under this Agreement or otherwise, the Employee shall be paid an amount in cash equal to the sum of the excise taxes payable by the Employee by reason of receiving Parachute Payments plus the amount necessary to place the Employee in the same after-tax position (taking into account any and all applicable federal, state and local excise, income or other taxes at the highest possible applicable rates on such Parachute Payments (including, without limitation, any payments under this subsection )) as if no excise taxes had been imposed with respect to Parachute Payments (the "Parachute Gross-up").   Any Parachute Gross-up otherwise required by this subsection shall not be made later than the time of the corresponding payment or benefit hereunder giving rise to the underlying Code §4999 excise tax (to the extent such determination has been made prior to such time), even if the payment of the excise tax is not required under the Code until a later time.   Any Parachute Gross-up otherwise required under this subsection shall be made whether or not payments or benefits are payable under this Agreement and whether or not the Employee's employment with the University shall have been terminated.

## ARTICLE 5

### OTHER EMPLOYMENT

5.1    Falwell shall refrain from undertaking any other employment or compensated activities that hinder or impede successful performance of the services outlined in this Agreement. Except as provided in this Agreement, Falwell shall not engage in any compensated employment or compensated activities without first obtaining the written

11

LUADMINREC001002

approval of the Executive Committee or the Board of Trustees. The University, however, acknowledges that Falwell is licensed by the Virginia State Bar and periodically engages in the practice of law on a limited basis in association with another practitioner on discrete matters. Falwell hereby receives approval for such limited legal work and therefore shall not require any additional approval for such employment by the Executive Committee or the Board of Trustees. Passive investment activity such as buying, holding and selling real estate, stock and securities ("Passive Investment Activity") shall not be considered other employment or compensated activities for purposes of this Agreement and therefore shall not require any additional approval by the Executive Committee of the Board of Trustees.

<div align="center">

ARTICLE 6

TERMINATION UPON DEATH

</div>

6.1   Falwell's death shall terminate this Agreement. Falwell's executor, administrator or other personal representative shall be entitled to all the compensation and fringe benefits provided in Article 4 of this Agreement through the date of his death, along with the severance payment provided under subsection 4.1(c) and any benefits to which he or his executor, administrator or other personal representative is entitled under any applicable benefit plan as a deceased employee. All benefits available to Falwell's immediate family under subsection 4.5 and 4.7 shall continue in place for the remainder of the Term in addition to any and all survivorship death benefits payable under any savings, retirement, investment and other plans and programs in which Falwell was a participant. Falwell shall not be entitled to receive any other payments or benefits after the date of his death.

<div align="center">

12

</div>

ARTICLE 7

TERMINATION FOR CAUSE OR DISABILITY

7.1    LU may terminate Falwell's employment only for cause or disability as defined below, provided it first delivers to Falwell specific, written notice of the purported grounds for dismissal, and if in the opinion of the Executive Committee the cause or disability can be corrected or cured, a thirty (30) day opportunity to correct or cure the alleged "cause" or "disability".  A dismissal in the absence of a required, thirty (30) day notice is a dismissal without cause.

7.2    If Falwell is terminated for cause, LU shall be obligated to pay Falwell his salary, earned compensation and fringe benefits up to the date of termination only, plus any benefits to which he is entitled under any applicable benefit plan as a former employee. Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination.  Falwell's resignation from the Board of Trustees and its Executive Committee shall be effective immediately upon termination of his employment for cause.

7.3    As used in this Agreement, the term "cause" is defined restrictively to mean only the following:

(a)    the refusal or willful failure of Falwell to comply with the directives of the Board of Trustees so long as such directives are not in conflict with the authority of the

13

Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws, or in conflict with this Agreement;

    (b)    the material failure of Falwell to comply substantially with written policies, standards and regulations of LU as from time-to-time established;

    (c)    the refusal or willful failure of Falwell to faithfully or diligently perform his duties under this Agreement;

    (d)    conviction of or entry of a plea of guilty, no contest or *nolo contendere* to any felony or to a misdemeanor involving moral turpitude (deferred disposition by a court, with or without a finding, admission or adjudication of guilt, such as withholding adjudication or taking the matter under advisement for some set period, meets the threshold for cause intended for Section 7.3 (d));

    (e)    conviction of or entry of a plea of guilty, no contest or *nolo contendere* to any felony or  to a misdemeanor involving moral turpitude by others about which Falwell had actual knowledge and could have prevented (deferred disposition by a court, with or without a finding, admission or adjudication of guilt, such as withholding adjudication or taking the matter under advisement for some set time period, meets the threshold for cause intended for Section 7.3 (e));

    (f)    defamatory or slanderous comments in breach of Section 3.6 of this Agreement which cause serious damage to LU's reputation; or

    (g)    advocating a position that is inconsistent with the doctrinal statements found in the University's Articles of Incorporation, with the sole exception of such advocacy

14

in private discussions with the Board of Trustees or Executive Committee in connection with proposed amendments to the Articles of Incorporation.

7.4    In the event Falwell is the subject of a criminal arrest, criminal indictment, criminal information, criminal warrant for violation, criminal complaint or criminal charge for any felony or is the subject of such for a misdemeanor involving moral turpitude, LU may place Falwell on administrative leave, thereby suspending Falwell from performance of the duties and responsibilities outlined in Sections 3.1, 3.2 and 3.3, at a minimum of one-third (1/3) of the rate of his annual base salary in effect at the date of his suspension, which compensation rate can be increased at the discretion of the Executive Committee.

7.5    As used in this Agreement the term "disability" is defined restrictively to mean only the following:   mental or physical incapacity or disability which prevents Falwell from performing a substantial and material portion of his duties under this Agreement on a continuous basis and that persists for more than 180 days. A termination of Falwell's employment for disability is neither a dismissal with cause within the meaning of Sections 7.2 and 7.3 nor a dismissal without cause within the meaning of Article 8 and Falwell shall be entitled to double the severance payment provided under Section 4.1(c).

## ARTICLE 8

## TERMINATION BY UNIVERSITY WITHOUT CAUSE

8.1    LU may terminate Falwell's employment as President and Chancellor at any time upon sixty (60) days advance, written notice to Falwell without cause.  In the event LU elects to terminate Falwell's employment as Chancellor and President without cause, LU

15

shall continue to provide Falwell as liquidated damages his full annual base salary at the rate in effect at the date of his termination  through the remainder of the Term, and any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination. Following termination of his employment, Falwell shall have no obligation to remain at the University or perform any services for the University for the remainder of the Term. Falwell shall have the right but not the obligation to seek and secure alternative employment for the balance of the Term.  Should Falwell secure other employment or engage in  compensated activities prior to the end of the time period for which LU is obligated to compensate him under this Agreement, he shall notify the University of the salary and other compensation he receives from any new employer or compensation source other than Passive Investment Activity sources of compensation. One (1) year after termination, LU shall have the right to reduce, on a month-to-month comparison basis, any remaining continuing payment obligations to Falwell to the extent that he earns such other salary and compensation (excluding compensation from Passive Investment Activity).

8.2    The parties have bargained for this liquidated damages provision, giving careful consideration to the following circumstances:

(a)    this Agreement concerns personal services.

16

(b)     termination of this Agreement by the University prior to the end of the Term (or at any point after the Term) could cause Falwell to lose compensation opportunities relating to his employment at the University and damage his professional reputation.  These and related damages to Falwell are difficult to determine with certainty. Therefore, the parties have agreed upon this liquidated damages provision and stipulate that it is neither a penalty nor an incentive for unsatisfactory performance.

## ARTICLE 9

## RESIGNATION

9.1    Falwell may resign, retire or otherwise terminate his employment with the University for any reason at any point during the Term (or during any renewal or extended Term) provided he gives the Board of Trustees sixty (60) days advance written notice.  In the event Falwell should elect to resign, retire or otherwise terminate his employment prior to the end of the Term, the University shall be obligated to pay Falwell his salary, earned compensation and fringe benefits through the date of termination only along with the severance payment provided under Section 4.1(c) and any benefits to which he is entitled under any applicable benefit plan as a former employee.   Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination.

17

## ARTICLE 10

### INDEMNIFICATION

10.1   To the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment. The indemnification afforded Falwell under this Section is in addition to any and all indemnity rights and protections the Employee may have pursuant to statute or under any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies.

## ARTICLE 11

### MISCELLANEOUS PROVISIONS

11.1   Neither party shall disclose this Agreement to anyone without the other party's prior, written consent, unless disclosure is required by law. The parties, however, shall be free to disclose and discuss this Agreement with their respective lawyers, accountants and tax advisors.  Falwell shall be permitted to disclose the Agreement to his spouse.

11.2   For a notice or other communication to be valid under this Agreement, it must be written, signed and sent by at least one of the following methods: (a) personal delivery; (b) first class mail, postage prepaid; (c) registered or certified mail, return receipt requested,

18

and postage prepaid; and (d) nationally recognized overnight courier (e.g., UPS or Federal Express).

11.3   If any provision of this Agreement is determined to be invalid, void, illegal or unenforceable to any extent, the remainder of this Agreement, or application of that provision to any persons or circumstances other than those as to which it is held to be unenforceable, will remain valid, binding and enforceable.

11.4   (a)   The parties may waive a provision in this Agreement only by a writing executed by the party or parties against whom the waiver is sought to be enforced. Waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver by that party of any subsequent breaches.

(b)   No failure or delay in exercising any right or remedy, or in requiring the satisfaction of any condition, under this Agreement, and no act, omission or course of dealing between the parties, shall operate as a waiver or estoppel of any right, remedy or condition.

(c)   A waiver made in writing on one (1) occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver of any future occasion, unless expressly stated as such.

11.5   This Agreement constitutes the final Agreement between the parties concerning the terms and conditions of Falwell's employment with LU. This Agreement supersedes and invalidates any prior or contemporaneous agreement, oral or written, between them regarding the terms of Falwell's employment with LU.  All such prior Agreements

19

between the parties shall become null and void upon the execution of this Agreement. In entering into this Agreement, neither party has relied upon any statement, representation, warranty or agreement of the other party except for those expressly contained in this Agreement. The parties may amend this Agreement only by a written Agreement of the parties that identifies itself as an amendment to this Agreement.

11.6   This Agreement may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one instrument.

11.7   The rule of construction that ambiguity is construed against the drafting party shall have no application in any dispute over the interpretation of this Agreement. The parties represent and warrant to one another that they enter this Agreement with the benefit of counsel based on the independent analysis of each party of the facts and legal principles relevant to the terms and conditions of this Agreement.

11.8   Neither this Agreement as a whole nor any of its individual provisions is assignable by either party.

11.9   The descriptive headings of the articles and sections of this Agreement are for convenience only, do not constitute a part of this Agreement, and do not affect this Agreement's construction or interpretation.

11.10   This Agreement shall be governed by and construed in accordance with the law of the Commonwealth of Virginia without regard to the Commonwealth's choice of law rules.

20

11.11  This Agreement shall be binding upon and inure to the benefit of the parties' respective successors, heirs, assigns, receivers and personal representatives.

11.12  The provisions of this Agreement to be performed upon and after termination of Falwell's employment survive termination of this Agreement.

11.13  The parties agree that any legal action or proceeding against the other party arising out of or relating to this Agreement or the University's employment of Falwell shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

IN WITNESS WHEREOF, Falwell and the authorized representative of the University have executed this Agreement on the date(s) written below.


LIBERTY UNIVERSITY, INC.                    JERRY L. FALWELL, JR.


_____                    _____
Chairman, Board of Trustees                Jerry L. Falwell, Jr.

Date: July 6, 2012                         Date: July 5, 2012

21

## EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement') is hereby adopted effective July 1, 2019 between LIBERTY UNIVERSITY, a Virginia nonstock corporation (referred to in this Agreement as "LU" or "the University") and JERRY L. FALWELL, JR., a resident of Virginia (referred to in this Agreement as "Falwell" or "the Employee").

WHEREAS LU is a university centered in the City of Lynchburg, Virginia, which is dedicated to excellence in higher education and scholarship within a Christian context;

WHEREAS, Falwell has served LU in several roles since 1988, including his current positions as Chancellor and President and in connection therewith had entered into a series of employment agreements;

WHEREAS, LU acknowledges that Falwell, among others, was instrumental in promoting and furthering the University's debt restructuring and return to a position of financial strength in 1997 after a period of severe financial hardships for the University that began in 1987 and in promoting and furthering the rapid expansion and continued success of the University, particularly since 2007;

WHEREAS, since Falwell became President and Chancellor in 2007, Liberty's net assets have increased from approximately $100,000,000 to over $2.1 billion in 2017 and Liberty's enrollment has increased from approximately 9,600 students in residence to over 15,000 students in residence and from approximately 27,000 students studying online to over 86,000 students studying online. During the same period, annual gross revenues have increased from $231,506,554 to $1,111,316,499 and the University's surplus of revenues over expenditures has increased from $52,514,469 to $331,142,834.  As a result of LU's strong financial performance, Standard & Poor's has assigned the University a credit rating of AA since 2011, placing the University among the 80 highest rated universities nationally;

{2625067-1, 116311-00009-01}

EXHIBIT

4

ALL-STATE LEGAL®

WHEREAS, in 2019 LU engaged FW Cook, a national consulting firm with expertise in compensation of executives in tax-exempt organizations, to review Falwell's compensation to determine whether it is in line with national standards, taking into account LU's growth and financial achievements and Falwell's historical compensation, and to make recommendations for program changes as needed to ensure that he is retained at LU for the long term and provided with a competitive and motivating compensation program;

WHEREAS, LU desires to adjust its executive compensation program so that it remains competitive with executive compensation programs of other comparable non-profit colleges and universities, adjusted for geography, performance and tenure;

WHEREAS, in recognition of Falwell's many significant contributions to the University and in an effort to compensate Falwell fairly in keeping with national standards applicable to presidents of comparable non-profit colleges and universities, LU wishes to formalize and reinforce the parties' long term employment relationship by entering into this Agreement; and

WHEREAS, Falwell likewise wishes to continue to contribute to the future success of LU through his employment as President and Chancellor of the University on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, LU and Falwell adopt the foregoing recitals and agree as follows:

<div align="center">

ARTICLE 1

EMPLOYMENT STATUS

</div>

1.1    LU hereby agrees to continue employing Falwell and Falwell hereby accepts continued employment by LU as President and Chancellor on the terms and subject to the conditions set forth in this Agreement. Falwell shall continue to be classified as a full-time employee for all purposes, including fringe benefits.  Subject to the provisions of Article 7 and 8

{2625067-1, 116311-00009-01}                    -2-

hereof, Falwell is an at will employee of LU, and serves at the pleasure of the LU Board of Trustees.

## ARTICLE 2

### TERM

2.1     This Agreement shall commence on July 1, 2019 and shall continue until the earlier of: (a) June 30, 2030; or (b) the date the Agreement is terminated pursuant to Articles 6 through 9, inclusive, of this Agreement (the "Term").

## ARTICLE 3

### DUTIES AND RESPONSIBILITIES

3.1     Falwell shall continue to provide LU with dedicated, diligent and conscientious full time service in a manner that is generally consistent with the level of service he has provided during the nearly five (5) year period immediately preceding the effective date of this Agreement, with allowances for reasonable time to attend to personal investments.

3.2     Falwell's duties shall consist of the tasks, duties and responsibilities he has assumed and performed as President and Chancellor during the nearly five (5) year period immediately preceding the effective dates of this Agreement. These duties shall include but not necessarily be limited to the following:

(a)     ensuring the implementation of the University's mission and purposes as described or defined in the University's Articles of Incorporation, Bylaws, and other foundational documents.

(b)     performing the duties of Chancellor/President as described in the University's Bylaws.

(c)     overseeing the fiscal, administrative, admissions, academic, athletic and other operations, divisions, departments and offices of the University.

LUADMINREC001015

(d)     raising funds for the benefit of the University.

(e)     implementing and executing policies, orders and resolutions adopted or established by the LU Board of Trustees and its Executive Committee.

3.3     As Chancellor and President, Falwell shall have the executive and administrative powers to manage and control the day to day operations of the University, provide focus and direction for the University, make policy recommendations to the Board of Trustees, and provide spiritual and worldview leadership to the University in pursuit of excellence, subject to the ultimate authority of the Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws. That executive and administrative power shall include but not be limited to the absolute authority to hire, retain and dismiss administrative, professional, academic and athletic personnel, subject only to any contractual or tenurial rights of any such employee. Provided, however, that Falwell shall be accountable to the Board of Trustees for implementing its policies and carrying out his duties, including the handling of personnel matters.

3.4     Compliance with Rules Applicable to Athletics Program.

(a)     Falwell agrees to abide by and comply with the Constitution, Operating Bylaws, legislation and interpretations of the National Collegiate Athletic Association ("NCAA") (or any other conference in which the University becomes affiliated), and all NCAA and University rules and regulations relating to the conduct and administration of the University's general athletics program (collectively, the "Program") as now constituted or as any of the same may be amended or enacted during the term of Falwell's employment by the University.  In the event that Falwell becomes aware, or has reasonable cause to believe, that violations of any of the aforementioned rules or regulations may have taken place, he shall promptly report the same to the Board and the NCAA (or other applicable governing body).  Falwell agrees to adhere to, respect and follow the

LUADMINREC001016

academic standards and requirements of the University and the NCAA with regard to the recruitment and eligibility of prospective and current student athletes. All academic standards, requirements and policies of the University and the NCAA shall also be observed at all times by Falwell and he shall use Best Efforts (as defined below) to ensure that the athletic director and members of the Program staff do the same.

      (b)    If Falwell is involved in an act or omission that constitutes a violation by the Athletic Director, any University coach or the University of any legislation, rule, regulation, constitutional provision, bylaw, policy, procedure or guideline of the NCAA (or NCAA interpretation), including but not limited to failing to use Best Efforts to promote an atmosphere of compliance by the athletic director, coaches, their staffs or student-athletes in the Program or to monitor their activities for compliance with NCAA rules, or if he fails to notify the Board or NCAA of any such violations of which he has knowledge, Falwell shall be subject to disciplinary or corrective action as set forth in NCAA enforcement procedures and/or policies, procedures and guidelines established from time to time by the University for its administrators, including but not limited to, probation, suspension with or without pay (for up to thirty (30) days) or termination of employment. Such disciplinary action may include termination for Cause (as defined in Section 7.3(g)). Notwithstanding the foregoing, before any such disciplinary action is imposed, Falwell will be provided with written notice of the alleged violation or violations and no less than fifteen (15) days to remedy the same, provided that such violation or violations are capable of cure, as determined in the reasonable and good faith judgment of the University.

      (c)    For purposes of this Agreement, "Best Efforts" means with respect to Falwell, those efforts that a responsible and experienced President (other than Falwell) desirous of successfully achieving the specified result would use in similar circumstances; and (ii) with respect

{2625067-1, 116311-00009-01}      -5-

to the University, those efforts that a prudent university desirous of successfully achieving the specified result would use in similar circumstances.

3.5 Falwell shall not undertake compensated work or activities for, or accept any employment or other compensation from, any other institution of higher education for work undertaken prior to the termination of this Agreement without receiving approval of the Board of Trustees or the Executive Committee of the Board of Trustees (the "Executive Committee") prior to undertaking such work or activities.

3.6 Falwell shall not author or publish any book or article relating to his employment at Liberty University hereunder without prior consent of the Executive Committee or Board of Trustees, which prior consent may be conditioned upon advance review and approval of the content of said book or article. This provision does not include letters to the editor or articles in University publications and other University media which are published to carry out Falwell's duties under this Agreement and advance the interests and mission of LU. Nor does this provision include brief communications on Twitter, Facebook and similar communication vehicles. The provision of this subsection shall survive termination of this Agreement.

3.7 The parties to this Agreement shall not make defamatory or slanderous remarks about the other in public fora or settings. This prohibition includes defamatory remarks about the employees and members of the Board of Trustees of the University. Neither party, however, waives the protections afforded by otherwise applicable common law privileges and this Section 3.6 shall in no event apply to remarks made during meetings of either the University's Board of Trustees or its Executive Committee. If Falwell's employment is terminated for cause, the parties may truthfully explain the circumstances forming the basis for the determination of cause. The provision of this Section 3.6 shall survive termination of this Agreement.

LUADMINREC001018

3.8     Falwell shall continue to have access to confidential information of LU pertaining to students, athletes, employees, donors, operations, processes, strategies, finances, suppliers, vendors, contracts and other matters not publicly disclosed by LU ("'Confidential Information") during the course of his employment. Confidential Information remains the property of LU. Unauthorized disclosure of Confidential Information will cause definite and irreparable harm to LU. Falwell shall not disclose Confidential Information intentionally within the University except to fulfill the legitimate business purposes of LU and shall not disclose it directly or indirectly, outside the University without the express authorization of the Executive Committee or as required by law or to further the interests of LU. Under no circumstances shall the release of details of this Agreement be considered to further the interests of LU. Any Confidential Information in tangible form shall be immediately returned to LU upon request. The provisions of this subsection shall survive termination of this Agreement.

## ARTICLE 4

## COMPENSATION

4.1     In consideration of Falwell's continued service as President and Chancellor, LU shall compensate him as follows:

(a)     *Base Salary.* During the Term, LU shall pay Falwell an annual base salary at the rate of $1,250,000 per year, payable in accordance with the normal payroll practices of LU for its executives as in effect from time to time (but not less frequently than monthly). The annual base salary shall not be reduced during the Term of the Agreement. On an annual basis, the Board shall review Falwell's performance and consider in its discretion approval of an increase in base salary, with such approved increases to take effect on July 1, of each year. Such base salary, as so increased, is hereafter referred to as the "Base Salary."

LUADMINREC001019

    (b)    *Discretionary Bonuses.* Falwell shall be eligible to receive bonuses in such amounts and at such times as the Executive Committee of the Board of Trustees may award based on its assessment of his performance, the financial condition of the University, and other considerations which the Executive Committee of the Board of Trustees in its sole discretion finds relevant. The Board shall consider the award of such discretionary bonus no less often than annually.

    (c)    *Severance Benefit*. In the event the University terminates Falwell's employment without Cause, or Falwell resigns his employment with Good Reason, the University shall pay to Falwell a single lump sum payment in an amount equal to two times his Base Salary. Such amount shall be paid to Falwell within thirty (30) days following his termination of employment, subject to his execution of a release of claims (provided that if the period over which Falwell has to consider the execution of the release crosses tax years, the payment shall be made no earlier than the first business day of the second tax year).

    (d)    *Supplemental Executive Retirement Plan.* The University agrees to adopt a defined contribution supplemental executive retirement plan for the benefit of Falwell ("SERP" or the "Plan") pursuant to a separate agreement that will (1) provide for annual credits designed to target a retirement benefit over the life of Falwell and Mrs. Falwell in an amount equal to seventy-five percent (75%) of Falwell's average Base Salary over the five (5) year period prior to his termination of employment, net of any required tax withholding, (2) have an initial notional account balance that represents prior years' deemed accumulations during Falwell's presidency through June 30, 2019 and (3) be paid in a lump sum. This lump sum shall be payable on the first day of the calendar month following the earliest of (1) provided that Falwell does not engage in any Competitive Activity during the Non-Competition Period, as defined in Section 5.2 herein, the

second anniversary of his termination of employment, (2) Falwell's death, or (3) Falwell's Disability, as defined in Section 6.6 herein.

    4.2     Except as set forth herein, LU shall provide Falwell the same fringe benefits and the same opportunity to participate in benefit plans that it offers other full-time executive employees. These benefits and programs currently include group family health insurance (medical, vision, dental), group family life insurance and disability insurance, employee assistance programs, retirement, savings and investment programs (including LU's Section 403(B) plan), sick/personal leave, holiday leave and voice and data phone payments under LU's Cellular Phone Policy and similar benefits made available to executive or managerial employees of the University. In addition to such benefits, conditioned on Falwell's continued employment, on each April 1 LU shall pay on Falwell's behalf an amount equal to the life insurance premiums owed in respect of whole life insurance policies issued by each of Pacific Life Insurance Company (issued October 3, 2016) and Protective Insurance Company (issued April 8, 2016) (together, the "Policies") on Falwell's life, except to the extent that such premiums are paid by the dividends accruing on the cash value of such Policies. For this purpose such payment shall be made pursuant to a separate "split dollar agreement" pursuant to which the premium payments in respect of the Policies shall be repaid, without interest, to the University upon the payment of the death benefit or earlier termination of the Policies. Once every eighteen months (18) months, Falwell shall undergo an annual Comprehensive Executive Medical Health Assessment, the cost of which shall be reimbursed by the institution upon submission of a receipt or statement for same. The Comprehensive Executive Medical Health Assessment shall include a thorough physical examination by medical doctor(s), a full range of preventive screening tests for early detection of cancer, heart disease and other serious medical problems, a cardiovascular fitness evaluation,

LUADMINREC001021

including treadmill exercise test, a lifestyle assessment to discuss nutrition, exercise, personal safety and other indicators of risk of disease, a review and update of medications and immunizations, development and assessment of a long-term strategy for prolonged life and wellness, a full report of the test results and recommendations at the conclusion of the examination and a written report sent to Falwell confidentially for his personal use and for consultation with his private physician. Neither the University nor the Executive Committee shall request or be entitled to a copy of the written report but the Executive Committee shall be entitled to receive a copy of the receipt or statement for such services as part of each of its formal annual evaluations of Falwell.

4.3     LU shall provide Falwell with an automobile allowance of Seven Hundred Fifty Dollars ($750) per month in accordance with LU's normal payroll policies and schedule and subject to any reporting and withholding requirement provided by law. In addition, for each year that the Agreement remains in effect LU shall furnish on an annual basis up to fifty (50) hours of jet transportation on LU's jets for Falwell and members of his immediate family, with any unused hours expiring at the end of each year without further compensation to Falwell.     Any personal use of the jet transportation benefit described herein will be reported as a taxable benefit to Falwell. LU shall reimburse Falwell in accordance with LU's Travel and Entertainment Policy for reasonable and necessary travel and out-of-pocket expenses incurred by him, and where appropriate his spouse, in connection with the performance of his official duties under this Agreement.

4.4     LU shall provide Falwell and members of his immediate family with tuition at the University through the conclusion of each academic year during which he serves as President and/or Chancellor pursuant to LU's Dependent Grant-in-Aid Policy and Continuing Education

LUADMINREC001022

Policy. "Immediate family" shall be limited to Falwell's wife, children by birth or adoption and grandchildren by birth or adoption. Such tuition benefits shall be provided subject to any reporting and withholding requirements provided by law.

4.5     Falwell shall be entitled to six (6) weeks annual vacation during each year of the Term. No unused vacation may be carried forward to subsequent years or paid out as compensation.

4.6     LU agrees to provide memberships at the LaHaye Student Center and Sports Racket for use by Falwell and his immediate family or at another fitness center mutually agreeable to the parties.

4.7     LU agrees to provide general maintenance and upkeep at the primary residence of Falwell, including general repairs, maintenance and lawn care. The parties hereto acknowledge that the primary residence of Falwell is used by the University from time to time for student, faculty and staff events. A portion of the general maintenance and upkeep referenced above shall be deemed a business expense of the University in connection with said student, faculty and staff events and the remainder of said general maintenance and upkeep shall be deemed income to Falwell and reported to the IRS as such by the University.

ARTICLE 5

OTHER EMPLOYMENT

5.1     Falwell shall refrain from undertaking any other employment or compensated activities that hinder or impede successful performance of the services outlined in this Agreement. Except as provided in this Agreement, Falwell shall not engage in any compensated employment or compensated activities without first obtaining the written approval of the Executive Committee or the Board of Trustees. The University, however, acknowledges that Falwell is licensed by the Virginia State Bar and periodically engages in the practice of law on a limited basis in association

LUADMINREC001023

with another practitioner on discrete matters. Falwell hereby receives approval for such limited legal work and therefore shall not require any additional approval for such employment by the Executive Committee or the Board of Trustees. Passive investment activity such as buying, holding and selling real estate, stock and securities ("Passive Investment Activity") shall not be considered other employment or compensated activities for purposes of this Agreement and therefore shall not require any additional approval by the Executive Committee of the Board of Trustees.  In addition, Falwell shall have the right without seeking approval of the Executive Committee or Board of Trustees to participate as either a paid endorser or principal owner in an asset management venture. Falwell (alone or in conjunction with members of his family and/or others) shall be free to participate in an asset management venture, provided such venture conducts no business with the University or any entity owned or controlled by the University and receives no compensation from the University or any entity owned or controlled by the University.

5.2     In view of the unique and valuable services rendered by Falwell to LU and in connection with the SERP benefits to be paid to Falwell at or following termination of employment, Falwell agrees that during employment and for a period of two (2) years thereafter ("Non-Competition Period"), whether with our without compensation, directly or indirectly, as an owner, principal, partner, member, shareholder, independent contractor, consultant, joint venturer, investor, licensor, lender or in any other capacity whatsoever, alone, or in association with any other Person, he will not carry on, be engaged or take part in, or render services (other than services which are generally offered to third parties) or advice to, own, share in the earnings of, invest in the stocks, bonds or other securities of, or otherwise become financially interested in, any other college or university, whether for-profit or non-profit ("Competitive Activity"). The  record or beneficial ownership by Falwell of up to one percent (1%) of the shares of any corporation whose shares are publicly traded on

LUADMINREC001024

a national securities exchange or in the over-the-counter market shall not of itself constitute a breach hereunder.

## ARTICLE 6

### TERMINATION UPON DEATH

6.1     Falwell's death shall terminate this Agreement.  Falwell's executor, administrator or other personal representative or beneficiary, as applicable, shall be entitled to all the compensation and fringe benefits provided in Article 4 of this Agreement through the date of his death, along with the benefits payable pursuant to the SERP under subsection 4.l(e), and any benefits to which he or his executor, administrator or other personal representative or beneficiary, as applicable, is entitled under any applicable benefit plan as a deceased employee.  In addition, Falwell's executor, administrator or other personal representative or beneficiary, as applicable, shall be entitled to any and all survivorship death benefits payable under any savings, retirement, investment and other plans and programs in which Falwell was a participant.  Except as provided herein, Falwell shall not be entitled to receive any other payments or benefits after the date of his death, except that Falwell's surviving spouse or other eligible dependents shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at his date of death.

## ARTICLE 7

### TERMINATION FOR CAUSE OR DISABILITY

7.1     LU may terminate Falwell's employment only for Cause or Disability, as each such term is defined below, provided it first delivers to Falwell specific, written notice of the purported grounds for dismissal, and if in the reasonable opinion of the Executive Committee the Cause or Disability can be corrected or cured, a thirty (30) day opportunity to correct or cure the alleged Cause or Disability.  A dismissal in the absence of required, thirty (30) day notice is a dismissal

{2625067-1, 116311-00009-01}                              -13-

without Cause. For avoidance of doubt, if Falwell is terminated for Cause based on a violation of Section 7.3(g) and the applicable governing body renders a final determination establishing facts indicating that Cause does not exist, provided there are no other facts or circumstances justifying termination for Cause, the termination shall be treated as a termination without Cause under Article 8 and the provisions of Article 8 shall apply.

7.2    If Falwell is terminated for Cause, LU shall be obligated to pay Falwell his salary, earned compensation and fringe benefits up to the date of termination (collectively, his "Accrued Compensation"), plus any benefits to which he is entitled under any applicable benefit plan as a former employee. Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination. Falwell's resignation from the Board of Trustees and its Executive Committee shall be effective immediately upon termination of his employment for Cause.

7.3    As used in this Agreement, the term "Cause" is defined restrictively to mean only the following:

(a)    the willful refusal or willful failure of Falwell to comply with the reasonable directives of the Board of Trustees, so long as such directives are not in conflict with the authority of the Board of Trustees as set forth in in the University's Articles of Incorporation and Bylaws, or in conflict with this Agreement; provided that such refusal or failure results in (or is substantially likely to result in) a material adverse consequence to LU;

LUADMINREC001026

(b)     the material failure of Falwell to comply substantially with written policies, standards and regulations of LU as from time-to-time established in writing, provided that such failure results in (or is substantially likely to result in) a material adverse consequence to LU;;

(c)     the willful refusal or willful failure of Falwell to faithfully or diligently perform his duties under this Agreement, provided that such refusal or failure results in (or is substantially likely to result in) a material adverse consequence to LU;

(d)     conviction of or entry of a plea of guilty, no contest or *nolo contendere* to any felony or to a misdemeanor involving moral turpitude (deferred disposition by a court, with or without a finding, admission or adjudication of guilt, such as withholding adjudication or taking the matter under advisement for some set period, meets the threshold for cause intended for Section 7.3 (d));

(e)     defamatory or slanderous comments in breach of Section 3.6 of this Agreement which cause serious damage to LU's reputation;

(f)     Any significant violation (which, for the avoidance of doubt, shall not include any Level III or Level IV violation) or repetitive violation (other than of a de minimis nature) of any legislation, rule, regulation, constitutional provision, bylaw, policy, procedure or guideline of the NCAA (or NCAA interpretation) by Falwell arising from any act or omission of Falwell (or Falwell's knowledge of any act or omission of another person and failure to take prompt and appropriate responsive action or Falwell's failure to monitor, supervise or report another person for whom Falwell has or, at the relevant time had, supervisory responsibility), or;

(g)     advocating a position that is materially inconsistent with the doctrinal statements found in the University's Articles of Incorporation, with the sole exception of such

LUADMINREC001027

advocacy in private discussions with the Board of Trustees or Executive Committee in connection with proposed amendments to the Articles of Incorporation.

7.4    In the event Falwell is the subject of a criminal arrest, criminal indictment, criminal information, criminal warrant for violation, criminal complaint or criminal charge for any felony or is the subject of such for a misdemeanor involving moral turpitude, LU may place Falwell on administrative leave, thereby suspending Falwell from performance of the duties and responsibilities outlined in Sections 3.1, 3.2 and 3 3, at a minimum of one-third (1/3) of the rate of his annual base salary in effect at the date of his suspension, which compensation rate can be increased at the discretion of the Executive Committee.

7.5    As used in this Agreement the term "Disability" is deemed restrictively to mean only the following: mental or physical incapacity or disability which prevents Falwell from performing a substantial and material portion of his duties under this Agreement on a continuous basis and that persists for more than 180 consecutive days. A termination of Falwell's employment for Disability is neither a dismissal with Cause within the meaning of Sections 7.2 and 7.3 nor a dismissal without Cause within the meaning of Article 8 and Falwell shall be entitled to (1) Accrued Compensation, and (2) immediate commencement of benefits under the SERP, as provided under subsection 4.1(e) herein.

## ARTICLE 8

### TERMINATION BY UNIVERSITY WITHOUT CAUSE OR BY FALWELL FOR GOOD REASON

8.1    LU may terminate Falwell's employment as President and Chancellor at any time upon sixty (60) days advance, written notice to Falwell without Cause, and Falwell may resign his employment for "Good Reason" as set forth in Section 8.2. In the event LU elects to terminate

{2625067-1, 116311-00009-01}                    -16-

Falwell's employment as Chancellor and President without Cause or Falwell resigns his employment for "Good Reason," LU shall pay to Falwell as liquidated damages the severance benefit provided under subsection 4.1(c), and any benefits to which he is entitled under any applicable benefit plan as a former employee. Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible (1) to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") for the time specified by COBRA at the time of termination, and (2) for benefits under the SERP, as provided under subsection 4.1(d). Following termination of his employment, Falwell shall have no obligation to remain at the University or perform any services for the University.

8.2     For purposes of this Agreement, the term "<u>Good Reason</u>" shall mean (i) any action by LU that results in a material diminution in Falwell's position, authority, duties or responsibilities as President and Chancellor of LU set forth in Article III; (ii) a reduction by LU in Falwell's Base Salary, or a material failure by LU to pay Falwell any such amounts when due; (iii) a relocation of Falwell's principal place of employment to more than thirty-five (35) miles from LU's Lynchburg, Virginia campus, and (iv) a material breach of this Agreement without Falwell's written consent. Termination of employment for "Good Reason" shall not be effective (other than with respect to clause (iii) above) until Falwell delivers to the Board of Trustees a written notice specifically identifying the conduct of LU which Falwell believes constitutes "Good Reason" in accordance with this Section 8.2 within ninety (90) days of Falwell's knowledge of the initial occurrence of each specific event constituting Good Reason and Falwell provides the Board of Trustees at least thirty (30) days to remedy such conduct after receipt of such written notice,

LUADMINREC001029

and to the extent not cured, Falwell terminates his employment within thirty (30) days after such failure to cure.

8.3    The parties have bargained for this liquidated damages provision, giving careful consideration to the following circumstances:

(a)    this Agreement concerns personal services.

(b)    termination of this Agreement by the University prior to the end of the Term (or at any point after the Term) could damage his professional reputation. These damages to Falwell are difficult to determine with certainty. Therefore, the parties have agreed upon this liquidated damages provision and stipulate that it is neither a penalty nor an incentive for unsatisfactory performance.

## ARTICLE 9

## RESIGNATION

9.1    Falwell may resign, retire or otherwise terminate his employment with the University other than for Good Reason, provided he gives the Board of Trustees sixty (60) days advance written notice.  In the event Falwell should elect to resign, retire or otherwise terminate his employment other than for Good Reason, the University shall be obligated to pay Falwell his Accrued Compensation and any benefits to which he is entitled under any applicable benefit plan as a former employee.  Falwell shall not be entitled to receive any payments or benefits that become due after the date of termination, except that Falwell shall remain eligible (1) to purchase continued health insurance pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") or the time specified by COBRA at the time of termination, and (2) for benefits under the SERP, as provided in Section 4.1(e).

LUADMINREC001030

ARTICLE 10

INDEMNIFICATION

10.1    To the fullest extent permitted by law, the University shall indemnify the Employee and hold him harmless from all liability and claims by any person or entity, whether meritorious or meritless, including the cost of prosecution or defense thereof (including attorneys' fees, expert witnesses and other litigation expenses of any kind) which have arisen or accrued or which hereafter may arise or accrue and are based upon any act or omission which the Employee has taken or committed or hereafter may take or commit on behalf of or in connection with the University or which arise out of his employment. The indemnification afforded Falwell under this Section is in addition to any and all indemnity rights and protections the Employee may have pursuant to statute or under any of the University's Articles of Incorporation, Bylaws or other foundation documents or policies.

ARTICLE 11

MISCELLANEOUS PROVISIONS

11.1    Neither party shall disclose this Agreement to anyone without the other party's prior, written consent, unless disclosure is required by law. The parties, however, shall be free to disclose and discuss this Agreement with their respective lawyers, accountants and tax advisors. Falwell shall be permitted to disclose the Agreement to his spouse.

11.2    For a notice or other communication to be valid under this Agreement, it must be written, signed and sent by at least one of the following methods: (a) personal delivery; (b) first class mail, postage prepaid; (c) registered or certified mail, return receipt requested, and postage prepaid; and (d) nationally recognized overnight courier (e.g., UPS or Federal Express).

11.3    If any provision of this Agreement is determined to be invalid, void, illegal or unenforceable to any extent, the remainder of this Agreement, or application of that provision to

LUADMINREC001031

any persons or circumstances other than those as to which it is held to be unenforceable, will remain valid, binding and enforceable.

11.4    (a)  The patties may waive a provision in this Agreement only by a writing executed by the party or parties against whom the waiver is sought to be enforced. Waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver by that party of any subsequent breaches.

(b)    No failure or delay in exercising any right or remedy, or in requiring the satisfaction of any condition, under this Agreement, and no act, omission or course of dealing between the parties, shall operate as a waiver or estoppel of any right, remedy or condition.

(c)    A waiver made in writing on one (1) occasion is effective only in that instance and only for the purpose stated. A waiver once given is not to be construed as a waiver of any future occasion, unless expressly stated as such.

11.5    This Agreement constitutes the final Agreement between the parties concerning the terms and conditions of Falwell's employment with LU. This Agreement supersedes and invalidates any prior or contemporaneous agreement, oral or written, between them regarding the terms of Falwell's employment with LU. All such prior Agreements between the parties shall become null and void upon the execution of this Agreement. In entering into this Agreement, neither party has relied upon any statement, representation, warranty or agreement of the other party except for those expressly contained in this Agreement. The parties may amend this Agreement only by a written Agreement of the parties that identifies itself as an amendment to this Agreement.

11.6    This Agreement may be executed in multiple counterparts, each of which will be deemed an original, but all of which together will constitute one instrument.

LUADMINREC001032

11.7    The rule of construction that ambiguity is construed against the drafting party shall have no application in any dispute over the interpretation of this Agreement. The parties represent and warrant to one another that they enter this Agreement with the benefit of counsel based on the independent analysis of each party of the facts and legal principles relevant to the terms and conditions of this Agreement.

11.8    Neither this Agreement as a whole nor any of its individual provisions is assignable by either party.

11.9    The descriptive headings of the articles and section of this Agreement are for convenience only, do not constitute a part of this Agreement, and do not affect this Agreement's construction or interpretation.

11.10   This Agreement shall be governed by and construed in accordance with the law of the Commonwealth of Virginia without regard to the Commonwealth's choice of law rules.

11.11   This Agreement shall be binding upon and inure to the benefit of the parties' respective successors, heirs, assigns, receivers and personal representatives.

11.12   The provisions of this Agreement to be performed upon and after termination of Falwell's employment survive termination of this Agreement.

11.13   The parties agree that any legal action or proceeding against the other party arising out of or relating to this Agreement or the University's employment of Falwell shall be filed and adjudicated only in a state or federal court sitting in Lynchburg, Virginia.

LUADMINREC001033

IN WITNESS WHEREOF, Falwell and the authorized representative of the University have executed this Agreement on the date(s) written below.

LIBERTY UNIVERSITY, INC.

Chairman, Board of Trustees

Date: 8/30/2019

JERRY L. FALWELL, JR.

Jerry L. Falwell, Jr.

Date: AUG. 29, 2019

LUADMINREC001034

# Business partner of Falwells says he had affair with the power couple



'IDEAL TARGET': Giancarlo Granda, who says he had a years-long sexual relationship with the Falwells that began when he was 20, said he now believes the Falwells preyed upon him. "Whether it was immaturity, naïveté, instability, or a combination thereof, it was this 'mindset' that the Falwells likely detected in deciding that I was the ideal target for their sexual escapades," he said. REUTERS/Jonathan Ernst

Giancarlo Granda says his sexual relationship with the Falwells began when he was 20. He says he had sex with Becki Falwell while Jerry Falwell Jr, head of Liberty University and a staunch supporter of President Trump, looked on.

By ARAM ROSTON

WASHINGTON – In a claim likely to intensify the controversy surrounding one of the most influential figures in the American Christian conservative movement, a business partner of Jerry Falwell Jr has come forward to say he had a years-long sexual relationship involving Falwell's wife and the evangelical leader.

Giancarlo Granda says he was 20 when he met Jerry and Becki Falwell while working as a pool attendant at the Fontainebleau Miami Beach hotel in March 2012. Starting that month and continuing into 2018, Granda told Reuters that the relationship involved him having sex with Becki Falwell while Jerry Falwell looked on.

Granda showed Reuters emails, text messages and other evidence that he says demonstrate the sexual nature of his relationship with the couple, who have been married since 1987. "Becki and I developed an intimate relationship and Jerry enjoyed watching from the corner of the room," Granda said in an interview. Now 29, he described the liaisons as frequent – "multiple times per year" – and said the encounters took place at hotels in Miami and New York, and at the Falwells' home in Virginia.

His friendship with the Falwells eventually soured, Granda told Reuters, in part because he wanted to dissolve his ties with the couple and fell into a business dispute with them.



STAUNCH SUPPORTER: Jerry Falwell Jr's decision to endorse Donald Trump for the presidency in 2016 helped swing evangelical Christians toward Trump. REUTERS/Scott Morgan

Granda first emerged as a figure in the Falwells' circle two years ago, when BuzzFeed News reported that the couple had befriended Granda and gone into business with him, buying a Miami Beach youth hostel in 2013. At the time of the BuzzFeed article, a representative of the Falwell family said Granda was "offered a share" in Alton Hostel LLC because Granda lived in Miami and would act as a manager of the youth hostel. Corporate records show that Granda currently has a stake in that venture.

Becki Falwell did not respond to emails or phone and text messages from Reuters. After Reuters presented its initial reporting early last week to the Falwells, a lawyer for Jerry Falwell, Michael Bowe, said the evangelical leader "categorically denies everything you indicated you intend to publish about him."

On Sunday night, however, as Reuters was preparing to publish this article, Jerry Falwell issued a statement to the Washington Examiner in which he said that his wife had had an affair with Granda and that Granda had been trying to extort money from the couple over the matter. Granda denies any such intent, saying he was seeking to negotiate a buyout from a business arrangement he says he had with the couple.

In this recording from a 2018 phone call that Giancarlo Granda provided to Reuters, Granda said he and the Falwells discussed Becki Falwell's jealousy about Granda dating other women.



0:00 / 1:51

In this recording from a 2018 phone call that Giancarlo Granda provided to Reuters, Granda said he and the Falwells discussed Becki Falwell's jealousy about Granda dating other women.

Falwell's statement Sunday to the Examiner said nothing about Granda's account alleging that the evangelical leader had his own role in the affair, and Falwell didn't address questions from Reuters about it. In the statement quoted by the Examiner, Falwell said that "Becki had an inappropriate personal relationship with this person, something in which I was not involved."

Several hours after the Reuters article appeared, the Washington Post and other U.S. media reported that Falwell had stepped down as head of Liberty University, the Christian school he has run since 2007. But later Monday, Falwell disputed those accounts. "I have not resigned," he told Politico. "I will be on indefinite leave."

Liberty and Falwell did not respond to Reuters requests for comment on his status.

Falwell, 58, had taken an indefinite leave of absence earlier this month from Liberty. That step, announced in a terse statement from the school's board of trustees, came days after Falwell posted, then deleted, an Instagram photo of himself with his pants unzipped, standing with his arm around a young woman whose pants were also partly undone. Falwell later told a local radio station that the picture was meant as a good-natured joke.

If Falwell does step down, his departure from that high-profile perch would represent a remarkable fall from grace for a man who has been a potent force in American conservative politics. His surprise 2016 endorsement of Donald Trump helped the twice-divorced New Yorker win the Republican nomination for president.

Becki Falwell, 53, is a political figure in her own right. She served on the advisory board of the group Women for Trump, which advocates for the president's reelection campaign. She also spoke as part of a panel with her husband and Donald Trump Jr at last year's Conservative Political Action Conference, or CPAC, the signature annual gathering of conservatives. Jerry Falwell and others refer to her as "the first lady of Liberty University."

The university, based in Lynchburg, Virginia, was founded in 1971 by Falwell's televangelist father, the Rev. Jerry Falwell. The younger Falwell took over in 2007. Today, the university boasts an online and on-campus enrollment that exceeds 100,000 students and holds those who attend to an exacting honor code. "Sexual relations outside of a biblically ordained marriage between a natural-born man and a natural-born woman are not permissible at Liberty University," the code reads.

The material Granda showed Reuters includes screenshots from what Granda said was a FaceTime conversation he had with the Falwells in 2019. During that call, Granda said, Becki was naked as the two discussed their relationship while Jerry peeked from behind a door. Reuters was able to verify Granda's description of the screenshots.

Granda also shared an audio recording that he says captures a conversation he had with the Falwells in 2018. In it, Becki complained about Granda describing his relationships with other people: "He's like telling me every time he hooks up with people. Like I don't have

feelings or something." Jerry then chimed in: "You're going to make her jealous." "I'm not trying to do that," Granda replied.

Earlier texts show a friendly and romantic dynamic between Granda and Becki Falwell. One 2012 text message, which Granda said came from Becki, read in part: "Right now I am just missing you like crazy .... Have you had this effect on all of your lady friends?"

Other more recent text messages, such as an exchange from this June that Granda provided to Reuters, show Granda growing angry and frustrated as his relationship with the Falwells frayed.

"Since you're okay with ruining my life, I am going to take the kamikaze route," Granda wrote to Jerry Falwell. "It really is a shame because I wanted to reach a peaceful resolution and just move on with our lives but if conflict is what you want, then so be it."

In the same message string, Falwell replied: "You should by now understand that I will not be extorted. I have always treated you fairly and been restrained in response to your threats because I did not wish to ruin your life. Going forward, stop contacting me and my family."

Granda said that while he entered into the sexual relationship with the Falwells willingly, today he feels the couple preyed upon him. "Whether it was immaturity, naïveté, instability, or a combination thereof, it was this 'mindset' that the Falwells likely detected in deciding that I was the ideal target for their sexual escapades," Granda said.

In a statement released Friday, before news of the relationship with Granda became public, Liberty University said its "decision whether or not to retain Falwell as president has not yet been made." Its board of trustees, the statement read, "requested prayer and patience as they seek the Lord's will and also seek additional information for assessment."

*Editor's note: This story was updated after publication to reflect conflicting news reports that Jerry Falwell Jr had stepped down from Liberty University.*



POWER COUPLE: Liberty University President Jerry Falwell Jr and his wife, Becki Falwell, join U.S. Vice President Mike Pence and his wife, Karen Pence, in a prayer after the 2019 commencement ceremonies at Liberty. REUTERS/Jonathan Drake

**The Falwell Affair**

By Aram Roston

Photo editing: Stelios Varias

Video: Megan Revell

Design: Pete Hausler

Edited by Blake Morrison

LUADMINREC001040

WASHINGTON SECRETS

# Exclusive: Falwell says *Fatal Attraction* threat led to depression

by Paul Bedard, Washington Secrets Columnist |
August 23, 2020 09:32 PM

But, they claimed, her former lover has threatened them over the past several years and that they are done with it hanging over their heads.

"I'm just tired of it," said Falwell of the anxiety he's felt about the affair becoming public and embarrassing his family and Liberty. "It's just got to end," he added.

The 1,200-word statement, shown below, followed the Liberty board's decision to put Falwell on paid leave after he posted a "costume party" picture of him on a yacht with his pants partially unzipped and his arm around his wife's assistant.

His social media presence has raised eyebrows in the Liberty community, though he is often praised for his success at building up the school and keeping the coronavirus at bay from the university. He has also drawn fire for his strong support of President Trump.

The board's statement about Falwell on Friday referred to "various rumors and claims," which may be related to indications that a news service planned to air new claims from the man whom Becki Falwell had the affair with, a pool attendant the Falwells met and befriended in 2012 while staying at the Fontainebleau Miami Beach.

The statement did not name the attendant, but he has been identified as Giancarlo Granda in dozens of news stories.

In the statement and phone call with Secrets, Falwell appeared to be relieved to have finally divulged the affair and yearslong series of attacks the couple has faced.

"It was like living on a roller coaster," he said in the statement. "While completely dedicating ourselves to Liberty, we were also suffering in silence during our personal time together, while simultaneously trying to manage and deal with this increasingly threatening behavior, which only worsened

over time. We were doing our best to respectfully unravel this 'fatal attraction' type situation to protect our family and the university."

He said that while they tried to remain friendly with the man and his family, the threats and texts demanding huge amounts of money led them to cut him off.

"While we tried to distance ourselves from him over time, he unfortunately became increasingly angry and aggressive. Eventually, he began threatening to publicly reveal this secret relationship with Becki and to deliberately embarrass my wife, family, and Liberty University unless we agreed to pay him substantial monies," the couple said.

In 2012, the Falwells said they were impressed with the pool assistant and wanted to help him start in business. Falwell's wife worked a deal to buy a Miami hostel and put him in charge. The deal has been tangled in legal challenges.

It was while Jerry Falwell was working long hours to build up the university, which he took over after his father Jerry Falwell Sr. died in 2007, that Becki had the affair.

At the time, Falwell was working overtime to build Liberty into an online powerhouse and expand its modern campus.

Granda, who was 21 at the time, dismissed the charges of threats in an email to Secrets. He emailed, "Any allegation of extortion is falsely, defamatory and belied by clear documentary evidence. The Falwell's attempt to sandbag me, and the *Examiner*, with a last minute story without providing the *Examiner* clear evidence that this was not simply an 'affair' with concocted allegations of extortion reeks desperation. The WHOLE truth will come out."

Falwell's team provided emails and texts that it said substantiate its allegations.

After Falwell found out about the affair, he said in the statement, he lost 80 pounds and suffered mental stress, especially as Granda switched from being thankful for Falwell's help to demanding money.

"Becki and I forgave each other, because while her indiscretion may have been more obvious and apparent, I realized that there were important smaller things I needed to do better too," he said.

Falwell said that now that his family has revealed its troubles, he plans to urge others in stressful situations to seek mental help.

"Even though I continued successfully working with our entire Liberty team to achieve so many of our goals, I am now dealing with things in a way that I should have done before — including seeking to address the emotional toll this has taken. I shouldn't have been afraid to admit my vulnerabilities and to reach out for assistance from the mental health professionals who could have alleviated this pain and stress. I am committed to speaking out and sharing with others at Liberty the importance of seeking counseling instead of thinking you need to be tough and try to bear these burdens on your own. I am in the early stages of addressing these issues," he wrote.

And, he added, "The trauma of this experience has brought us to a very challenging point in our lives, but we are strong, our faith in Christ is greater than ever, and with His help and with those in the community who we love and who appreciate the impact of forgiveness, we will get through this. We ask for your prayers and support."

## STATEMENT BY JERRY FALWELL, JR.

Aug. 23, 2020

*My family has been blessed with the opportunity to serve Christ and our community over the past 50 years — from when my father founded Liberty in the early 1970's through today. When my father suddenly passed away in 2007, I quickly and unexpectedly went from being the lawyer working in the background on the business aspects of the school to becoming a very public person, having to overcome my fears of speaking in front of audiences of tens of thousands, with many more responsibilities to the Liberty community and to my own family.*

*My priority was to build on my father's vision and to work hard. Thanks to the help of the Board and the extraordinary Liberty faculty, executives, staff and community, we have ensured the University's sustained growth and financial health while providing the best and most modern on-campus and online educational and spiritual resources to a wider range of students both in person and through digital platforms.*

*My commitment to Liberty became and has remained my primary focus — and while I am so grateful and thankful for our collective successes, I also realize in hindsight that there was a toll that this took on me, which extended to my family too. During this time of reflection for us and this*

*especially challenging year, and even more so following the events of the past few weeks, my wife Becki and I agreed that this was the right time for me to share more of our story, because the Liberty community deserves to hear it directly from me and from us.*

*During a vacation over eight years ago, Becki and I met an ambitious young man who was working at our hotel and was saving up his money to go to school. We encouraged him to pursue an education and a career and we were impressed by his initiative in suggesting a local real estate opportunity. My family members eventually made an investment in a local property, included him in the deal because he could play an active role in managing it, and became close with him and his family.*

*Shortly thereafter, Becki had an inappropriate personal relationship with this person, something in which I was not involved — it was nonetheless very upsetting to learn about. After I learned this, I lost 80 pounds and people who saw me regularly thought that I was physically unwell, when in reality I was just balancing how to be most supportive of Becki, who I love, while also reflecting and praying about whether there were ways I could have been more supportive of her and given her proper attention. I came to realize that while it may be easy to judge others on their behavior, the King James Bible reminds us — "Thou shalt not commit adultery, but I sayeth unto you, that whoever looketh upon a woman to lust after her hath committed adultery with her in his heart." In fact, there are ways we may all be sinning, but the Lord believes in this self-reflection.*

*I was and have always remained fully devoted to Becki and we have shared many private conversations to better understand and support each other and to strengthen our marriage. Thankfully, our love has never been stronger. Becki and I forgave each other, because while her indiscretion may have been more obvious and apparent, I realized that there were important smaller things I needed to do better too.*

*In Ephesians 4:32 we learn — "Be kind to one another, tender hearted, forgiving as God in Christ forgave you."*

*We extended the spirit of forgiveness to this man with respect and kindness, both for spiritual and religious reasons, and in the hope that we could help him find his way and allow us to put this behind us, without any harm or embarrassment to our family or to the LU community to which we have dedicated our lives.*

*During the years that followed, we got to know his family and other loved ones, good people who also really care about him. They shared and*

*confirmed to us that he has periodically demonstrated emotionally unstable behaviors with some destructive tendencies, seemingly in response to his inability to achieve his professional goals. Based on information from other sources, we believe that he may have targeted other successful women in similar ways.*

*While we tried to distance ourselves from him over time, he unfortunately became increasingly angry and aggressive. Eventually, he began threatening to publicly reveal this secret relationship with Becki and to deliberately embarrass my wife, family, and Liberty University unless we agreed to pay him substantial monies. While this was very upsetting, we had been advised by trusted legal counsel that it was best to maintain contact with this person, as we tried to manage his increasingly erratic behavior and unreasonable demands while extricating ourselves from him both on a personal level and from that real estate transaction.*

*It was like living on a roller coaster.*

*While completely dedicating ourselves to Liberty, we were also suffering in silence during our personal time together, while simultaneously trying to manage and deal with this increasingly threatening behavior, which only worsened over time. We were doing our best to respectfully unravel this 'fatal attraction' type situation to protect our family and the University.*

*Even years after the improper relationship had ended, this person continued to be aggressive with Becki and me in a variety of ways. We finally decided that we had to further withdraw completely from him, which resulted in him stepping up his threats to share more outrageous and fabricate claims about us (under the guise of that business entity). He clearly moved forward with this plan through a specific member of the media who has continued to badger us, as well as other members of the media, regarding the false claims about the nature of the relationship based on the individual's misrepresentations. Over the course of the last few months this person's behavior has reached a level that we have decided the only way to stop this predatory behavior is to go public.*

*We have categorically rejected this person's demands while dealing with him and this particular member of the media who seemed just as obsessed with the prurient, untrue aspects of this story, however fantastic.*

*Even though I continued successfully working with our entire Liberty team to achieve so many of our goals, I am now dealing with things in a way that I should have done before — including seeking to address the emotional toll this has taken. I shouldn't have been afraid to admit my vulnerabilities and*

*to reach out for assistance from the mental health professionals who could have alleviated this pain and stress. I am committed to speaking out and sharing with others at Liberty the importance of seeking counseling instead of thinking you need to be tough and try to bear these burdens on your own. I am in the early stages of addressing these issues.*

*Proverbs 3:5-6 says "trust in the Lord with all your heart and lean not on thine own understanding in all your ways acknowledge him and he will guide straight thy path."*

*The trauma of this experience has brought us to a very challenging point in our lives, but we are strong, our faith in Christ is greater than ever, and with His help and with those in the community who we love and who appreciate the impact of forgiveness, we will get through this. We ask for your prayers and support.*

| | |
|---|---|
| Document title: | 'She was the aggressor': Former Liberty student alleges sexual encounter with Becki Falwell - POLITICO |
| Capture URL: | https://www.politico.com/news/2020/08/27/becki-falwell-affair-liberty-university-student-band-jerry-402559 |
| Page loaded at (UTC): | Thu, 09 Mar 2023 21:01:34 GMT |
| Capture timestamp (UTC): | Thu, 09 Mar 2023 21:04:26 GMT |
| Capture tool: | 10.20.11 |
| Collection server IP: | 3.226.24.124 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.0.5359.215 Safari/537.36 |
| Operating system: | Windows_NT (Node 16.17.1) |
| PDF length: | 14 |
| Capture ID: | iza4YWopCCQRhWX63ed2XR |
| User: | mcguirewoods |

PDF REFERENCE #:        9zW9Q9mFwSRt2DXorrMVjc

LUADMINREC001047

# POLITICO

CONGRESS MINUTES   MAG   E&E NEWS


PRICE DROP
Brown
-10%
-10%
I NEVER ARGUE
Shopping revolution on Temu
Temu

**EXCLUSIVE**

## 'She was the aggressor': Former Liberty student alleges sexual encounter with Becki Falwell

A former student at the evangelical university opens up about a 2008 incident with the wife of the school's president.



AP

By BRANDON AMBROSINO
08/27/2020 06:26 PM EDT

  🔗 •••

*Brandon Ambrosino is a writer living in Delaware. His articles have appeared in the New York Times, Boston Globe and the BBC, among other outlets.*

A former Liberty University student says Becki Falwell, the wife of the university's then-President Jerry Falwell Jr., jumped into bed with him and performed oral sex on him while he stayed over at the Falwell home after a band practice with their eldest son in 2008.

The student was 22 at the time of the encounter, near the start of Liberty's fall semester. He said she initiated the act, and he went along with it. But despite his rejection of further advances, he said, Falwell continued pursuing him, offering him gifts and engaging in banter through Facebook messages.

Advertisement

INNOVATING AT
HYPERSONIC SPEED.


INNOVATING AT
HYPERSONIC SPEED.

 

Advertisement





"She was the aggressor," he said.

The messages, screenshots of which were provided by the former student to POLITICO, suggest a flirtatious relationship that went beyond what might be expected of a mother communicating with her son's bandmate.

One referenced a mutual friend who "said that she wants you to cut [your] bangs when you get your hair cut. I think that you are beautiful just like you are," Becki Falwell wrote in a message sent in September 2008. "You don't want to cover up those killer eyes of yours and you know the bandana drives me wild … 😊"

In another, sent in December 2008, after the student says he made clear he did not want any romantic involvement with Falwell, she wrote: "Maybe time will heal whatever wounds that I have caused and your Christian heart will allow you to forgive me."

Advertisement





[Redacted] said that she wants you to cut [your] bangs when you get your hair cut. [I] think that you are beautiful just like you are," Becki Falwell wrote in a Facebook direct message to a then-Liberty University student in Sept. 2008. "[Y]ou don't want to cover up those killer eyes of yours and you know the bandana drives me wild … 😊" | Obtained by Brandon Ambrosino/POLITICO

In a statement, Jerry and Becki Falwell said of the former student's allegations, "It is unfortunate that the coverage of our departure has turned into a frenzy of false and fantastic claims about us. These false and mean spirited lies have hurt us and our family greatly and we will respond fully with the truth at an appropriate time. At this time, however, we think it is best to move on and help the Liberty community focus on its very bright future…"

Advertisement




Document title: 'She was the aggressor': Former Liberty student alleges sexual encounter with Becki Falwell - POLITICO
Capture URL: https://www.politico.com/news/2020/08/27/becki-falwell-affair-liberty-university-student-band-jerry-402559
Capture timestamp (UTC): Thu, 09 Mar 2023 21:04:26 GMT                LUADMINREC001049                        Page 2 of 13



INNOVATING AT
HYPERSONIC SPEED.

LOCKHEED MARTIN

Another member of the former student's band, who spoke to POLITICO on the condition of anonymity, said the student told him of the oral-sex encounter with Becki Falwell within a month of it occurring. Two former Liberty University employees, also speaking under a condition of anonymity, recalled that the band members practiced at the Falwell Farm in 2008, but did not know of the alleged encounter between Falwell and the former student.

The allegation by the former student casts light on the behavior of Jerry and Becki Falwell, who have been under intense scrutiny for inappropriate relationships and misuse of their positions at the university. On Sunday, Jerry Falwell Jr. acknowledged that Becki had had an affair with Giancarlo Granda, a pool attendant at the Fountainbleau Hotel in Miami Beach with whom they entered a real estate deal. Granda told POLITICO and other outlets that the affair began when he was 20 and continued for seven more years, during which time her husband sometimes watched him and Becki have sex.

Earlier this summer, the couple was vacationing with friends and family aboard a yacht owned by a Liberty University supporter when Jerry posted and quickly deleted a photo of himself with his pants unzipped and arm around Becki's assistant. POLITICO has also reported that Liberty has given a contract to a company owned by the Falwells' son and sold property to friends and family without always making proper tax disclosures.

Jerry Falwell Jr. resigned as Liberty president on Tuesday, in exchange for a severance package worth $10.5 million, two days after his acknowledgment of Becki's affair with Granda.

Granda, however, was not a student. At Liberty University, students aren't allowed to have sex outside of marriage. Those who violate the rule risk punishment, up to and including expulsion, according to "The Liberty Way," the school's honor code for students. The university, like many Christian institutions, regards premarital sex as sinful, a corruption of a Christian's bodily "temple."

In a statement provided to POLITICO by Liberty University senior vice president Scott Lamb, the school reiterated that it has "policies against employees having sexual relationships with students, as well as having other inappropriate relationships outside of marriage, whether consensual or not. Becki Falwell was an employee in 2008 and such policies would have fully applied to her as spouse of the then-university Chancellor and President. Liberty University has checked its Human Resources and Title IX records and finds no complaints were ever lodged against Becki Falwell for any inappropriate relationship nor were any investigations of such matters conducted. This is a fresh allegation, as far as we can tell."

Advertisement



INNOVATING AT
HYPERSONIC SPEED.

LOCKHEED MARTIN

POLITICO first contacted the former student in 2019, after hearing of his alleged sexual encounter with Falwell from former classmates. He confirmed

○ MOST READ



1  California to halt $54M Walgreens contract over company's policy on abortion drug sales

2  Trump 2020 lawyer admits misrepresenting stolen election claims

3  White House goes after Tucker Carlson by name over Jan. 6 coverage

4  DOJ takes on the Jan. 6 Tucker Carlson tapes

5  Opinion | The Tucker Carlson Schtick Melts Away

POLITICO first contacted the former student in 2019, after hearing of his alleged sexual encounter with Falwell from former classmates. He confirmed the encounter but didn't want to go public with it until recent weeks, when the Falwells' behavior came under scrutiny. POLITICO granted the former student anonymity to describe what he considered inappropriate advances from a woman who was herself a university employee and wife of the university president.

He said he did not feel comfortable discussing the encounter earlier because he suffered from feelings of guilt and depression, feared exposure, and didn't want to cause harm to the Falwell family.



**POLITICO DISPATCH: AUGUST 28**

Protests are ongoing after the police shooting of Jacob Blake. Pro athletes are striking to draw attention to racial injustice. And BLM organizers are looking to channel that momentum into policy changes.

Subscribe on Apple Podcasts | Subscribe on Google Podcasts

He said he grew up in a North Carolina home where the Falwell name loomed large. His mother admired Liberty's founder, the Rev. Jerry Falwell Sr., and was a true believer in the conservative Christian values that Liberty developed a reputation for cultivating in young people. For the then-student, the incident with Becki Falwell incited a long struggle with both his faith and mental health. He said he did not tell family members of the cause of his distress, and only confided in a few close friends.

"It made [him] feel bad. It was a depressing thing; he struggled with depression [afterwards]," the former bandmate told POLITICO.

"I don't want to be a homewrecker," the former student said. "That took a toll on the soul."

The former student, who is now 34, said he had not heard from Becki Falwell in more than eight years until this week, during which her relationship with Granda came to light. He said she texted him to say hello, and commiserate over the controversy that an engulfed her family. "This is a nightmare. It just keeps getting worse," Falwell texted him on Monday night, shortly before Jerry Falwell Jr. officially resigned as president.

Advertisement



**BOSTON UNIVERSITY**

**Cybercrime Investigation**

Master's Degree or Grad Certificate in Cybercrime Investigation & Cybersecurity from BU.

Learn More

The former student said he responded the following day by texting that he was praying for her.

\* \* \*

**It was early in the summer of 2008** when a member of his rock band suggested a new guitarist who, he said, knew every Led Zeppelin song and could play like Jimmy Page. He was younger than them by a few years — they were in their early 20s, and he was fresh out of high school. But there was another reason for hesitation: His name was Trey Falwell. He was the eldest son of Jerry and Becki Falwell.

could play like Jimmy Page. He was younger than them by a few years — they were in their early 20s, and he was fresh out of high school. But there was another reason for hesitation: His name was Trey Falwell. He was the eldest son of Jerry and Becki Falwell.

"If we get this kid in the band, we're gonna have Falwell's name attached to it," the former student remembered thinking.

Still, Trey Falwell could play. And his parents were supportive of the band, even offering to let the guys practice in an abandoned church next to their home, which is sometimes referred to as Falwell Farm, in Goode, Virginia.

"They had this old church on their lot, and said, 'If you guys go in and fix it up, you can play there whenever you want,'" the former student said. "So we went in and put egg crates and lighting everywhere. The lighting was with the help of the Falwells. From the very get-go, they wanted to come across as very warm and compassionate." The band christened the space the "House of the Holy," a nod to a 1973 album by Led Zeppelin.

Members of the band recall Becki Falwell's habit of showing up to their rehearsals. At first, the guys didn't think much of it — she was friendly and hospitable, and always offered them food and snacks. "It wasn't just a one-time thing," the former student said. "It was, 'Oh hey, guys, I brought you some lemonade.' And then she'd always stick around."

"She was like, 'Hey, I know I'm a mom, but I wanna be friends with everyone,'" recalled the former bandmate. Eventually, it got awkward, he recalls: "It was, like, a 'Dude, why is somebody's Mom chilling with us?' type thing."

Pretty soon, his bandmates thought they might have an answer.

"I could tell she was giving me looks, but [I] wanted to downplay it," the former student said. "I would think, 'Am I reading too much into this?' She would speak almost ... she'd always give little innuendos. Almost like she was speaking in code."

Advertisement



Sponsored content from JBS

The crucial campaign to reduce agriculture's carbon footprint

Crafted by POLITICO FOCUS

READ NOW

Still, he figured, he was imagining things. "I'm just seeing this wrong," he recalled thinking.

Shortly before classes resumed for Liberty's fall 2008 semester, the then-student and a few friends were clearing boxes out of the rehearsal space on the Falwells' property. Becki met them in the driveway.

"We were all hot and sweaty. She goes, 'Hey, can you help me with something?' I said, 'Sure, heck yeah, I can help you!' I figure she needed some heavy lifting. I'll never forget, she corners me and goes, 'Have you told your friends?' I say, 'Excuse me?' She goes, 'Have you told your friends that I think you're hot?'" the former student recalled. "She's standing there with her eyes locked on me, waiting to see what I'd say. I probably laughed it off, like, 'Haha. No, I haven't told them that one.'"

Still, they showed up because they had gigs to practice for, including one in September at the Campus Artist Series, a showcase of bands comprised of Liberty students and held at the university's newly opened Tilley Center, which is named after Becki's father, Tom Tilley, who partially financed the construction of the building.

September at the Campus Artist Series, a showcase of bands comprised of Liberty students and held at the university's newly opened Tilley Center, which is named after Becki's father, Tom Tilley, who partially financed the construction of the building.

Often, the band would practice into the evening. Some nights, it would just be the then-student and Trey jamming together. "I was working weird hours at a restaurant, so I wasn't around when Trey and [the then-student] would chill," the former bandmate told POLITICO. Trey Falwell and the former student would stay up drinking whiskey and picking out tunes on their guitars until the early morning. If it was really late, or if he'd had too much to drink, the then-student would spend the night, crashing on the bed from a fold-out couch in the guest room next to Trey's bedroom.

"One night [in August or September], we were up till one or two, and we went back to his room. We had a decent amount of Jack Daniels," the former student said. He remembered walking into the guest room, just as he'd done many times, closing the door behind him, and preparing the bed.

"I'm laying in the bed and I hear, like, giggling to the side of me on the floor. And, pardon my French, but I was like, 'What the fuck is that?' I look over and it's Becki," he said. "Just, you know, in my room. I'm like, 'You can't be in here. This can't happen.'"

Advertisement



Real business impact. Right now.

Learn More ›   ripple

He was a 22-year-old student at Liberty. She was the wife of the president of the school. The Falwells were, effectively, the First Family of conservative evangelicalism in America.

After some prodding, he coaxed Falwell into leaving. He slept, woke up and acted like things were normal.

A few nights later, he stayed the night again. Again, Falwell came into the guestroom where the then-student was in bed.

This time, she was more aggressive. The former student remembers that Falwell climbed into bed with him, and quickly took down his pants.

"I was like, 'uh, what are you doing?" the former student said. Falwell then proceeded to give him oral sex.

Over the last year, the former student has recounted this story several times in interviews with POLITICO. He maintained that while some of the details from the 12-year-old encounter are fuzzy, there are others that are clear. He remembers lying on the "right side of the cot." He remembers thinking the room "looked like an Embassy Suites." He remembers that Jerry Jr. was away that weekend, and that Wesley, the Falwells' second son, wasn't there.

Also clear is the fallout. The encounter, the former student said, "really put a hurt on [me] because I trusted her as a friend."

In the case of this then-student, these feelings were compounded by Becki Falwell's position at Liberty University, and in Evangelical Christianity more broadly. He was concerned that word would get out, and that he would in some way be responsible for any injury that would besmear the legacy of Jerry Falwell Sr., who had died a year earlier.

Falwell's position at Liberty University, and in Evangelical Christianity more broadly. He was concerned that word would get out, and that he would in some way be responsible for any injury that would besmear the legacy of Jerry Falwell Sr., who had died a year earlier.

So he kept the sexual encounter secret, save for a few close friends. He said he did not tell Trey Falwell what his mother had done. But the encounter had changed the dynamic between them.

"We started to slowly push Trey out of the band," the former student said. "From that point forward, it was a weird dynamic. We weren't as inviting."

Trey wanted to stay in the band long enough to play an important show with them — a Christmas show Liberty holds every December — and the band agreed. The concert went poorly, the former student said, recalling that their transition from "Carol of the Bells" into a Led Zeppelin song was booed by the audience. The response rattled Trey. Whereas the other members of the band had played gigs at bars with hostile crowds, Trey lacked that experience. It would be the last time the group performed together.

Advertisement



INNOVATING AT HYPERSONIC SPEED.

LOCKHEED MARTIN

But all through that fall, as the band was slowly separating, the former student said he continued to receive messages and requests from Becki Falwell.

\*\*\*

**When Falwell first contacted** the then-student over social media, she posed as a blonde North Carolina woman in her early 20s, he said. "She created a fake account, with a fake picture and a fake name," he told POLITICO.

At first, he didn't know who it was. Then he realized something was amiss.

"She was saying stuff a 20 and 21-year-old wouldn't say," he said. "[It was] like real Southern charm. Stuff that older people say. And I said [to myself], 'Hold up, not only is this an old person, it's Becki.'"

"So I said, 'I think I have a feeling who this is. Why are you doing this right now on this account?'" the former student recalled. "I think she was embarrassed, because I kinda remember her being defensive about it."

From then on, Falwell messaged him from her personal Facebook account.

The former student provided POLITICO with screenshots of several of these conversations. The dates of Facebook's timestamps range from September 2008 to December 2008, which overlaps with the six-month period Trey was in the band. (These messages, with identifying aspects redacted, are pictured here.)



Becki Falwell
This attachment may have been removed or the person who shared i...

11/7/08, 2:37 PM

I just wanted you to know how proud I am of what an amazing lead singer that you are for the band. I love watching you before a



In this Facebook message from November 2008, Becki Falwell complimented a then-Liberty University student (name redacted here) on the performance of his band. "I love watching you before a show," she wrote. "I can always tell that you are a little nervous by how you tap your hands on your pants. ... It was so neat to see people singing along to shady grove (of course through the tears in my eyes... that song always gets to me)." | Obtained by Brandon Ambrosino/POLITICO

"I love watching you before a show," she wrote him on Nov. 7, 2008. "I can always tell that you are a little nervous by how you tap your hands on your pants." He remembers feeling uncomfortable because of how closely she seemed to be watching him.

Her praise of the then-student's talents became effusive. "What you did at the Battle of the Bands was truly genius, getting everyone to stand up and come near the stage. It was so neat to see people singing along to shady grove (of course through the tears in my eyes ... that song always gets to me.)."

Advertisement

THE FIRST CRITICAL ANALYSIS OF HOW WHITENESS DROVE THE OPIOID CRISIS

WHITEOUT

"Becki thought [he] wrote that song about her," the bandmate said.

It wasn't, the former student said. He recalled Falwell frequently asking him to write a song for her. "I think she just wanted to believe" that "Shady Grove" was about her, he said. *"My dear, I love your mess and everything in between,"* the song lyrics read. *"If we slow down long enough, I can show you what I mean."*

Even as the then-student tried to stay away from Falwell, he said, she continued making advances. "I was getting phone call after phone call after phone call after phone call from her — I'm in class! — leaving me a message, like, the corniest thing you could do, like [singing the James Blunt song] 'You're Beautiful,' leaving it on my [voicemail]," he remembered. "I just said, 'This can't happen anymore.'"

But Falwell was persistent. "She got too brash with stuff," he said. In one instance, Becki approached the then-student in a public place on Liberty's campus to hand him concert tickets. "She was buying Kings of Leon tickets and showing up and handing [them] to [me in front of] people!"

For the then-student, a line was crossed when Falwell befriended his mother, who had driven to Lynchburg to see one of his band's shows.

For the then-student, a line was crossed when Falwell befriended his mother, who had driven to Lynchburg to see one of his band's shows.

"[Falwell said], 'Oh, let's get your mother's number,'" the former student said. "My poor mother worships the ground Jerry Falwell Sr. walks on, just considering what he did for American Evangelicals. So she was getting the biggest kick out of Becki calling her. I had to tell [Falwell], 'Hey, please do not contact my family.'"

In December 2008, months after he began trying to distance himself from her, she started to get the point. In one Facebook message provided to POLITICO, Falwell vents frustration that he is not responding to her messages quickly enough. "I've got you an incredible ray lamontage cd. Call me (since your text is dead) and i'll get the cd to you," she wrote in one. Six hours later, without receiving a response, Falwell sent another message: "never mind. don't call. I'll give the cd to someone who will appreciate it." Later that night, he replied explaining that he'd been off Facebook because he had a "busy day."



In a Facebook private message sent at 12:39 A.M. on Dec. 3, 2008, Becki Falwell told a then-Liberty University student she had a gift for him. "hey mr. legend, it was great finally seeing you tonight after a month or forever. i've got an incredible ray lamontage cd. call me (since your text is dead) tomorrow and i'll get it to you." When the student hadn't responded by 6:54 p.m. that day, she messaged him again: "never mind. don't call. i'll give the cd to someone else who will appreciate it." | Obtained by Brandon Ambrosino/POLITICO

"It was nice knowing you," Falwell wrote in another message. The then-student replied, "What in the world are you talking about??"

In another, Falwell wrote, "is anyone there????????? I really need to talk to you please........."



Document title: 'She was the aggressor': Former Liberty student alleges sexual encounter with Becki Falwell - POLITICO
Capture URL: https://www.politico.com/news/2020/08/27/becki-falwell-affair-liberty-university-student-band-jerry-402559
Capture timestamp (UTC): Thu, 09 Mar 2023 21:04:26 GMT



"It was nice knowing you. sorry you had to leave," Becki Falwell wrote in a Facebook direct message to a then-Liberty student in Dec. 2008. "What in the world are you talking about??" he replied. | Obtained by Brandon Ambrosino/POLITICO

One of the last messages Falwell sent reads simultaneously supportive and apologetic.

"I am so thrilled that you have found a girlfriend!!!! I knew it wouldn't be long before someone noticed all of the great qualities that you have. I just want you to be happy and it hurts to realize that remaining friends with me must not make you that way. Please just be kind enough to let me know whether or not you have received my texts. I am sorry that 6 months of friendship has ended this way. Maybe time will heal whatever wounds that I have caused and your Christian heart will allow you to forgive me.
Always,
BF"

Advertisement

INNOVATING AT
HYPERSONIC SPEED.

LOCKHEED MARTIN

But for the former student, those words, and what he described as the "insurmountable guilt" they brought to mind, weighed heavily on his conscience.

He contacted Becki Falwell again in June 2011, according to emails provided by a person close to the situation, and referred to his disappointment over his failure to finish his degree. He asked for her help in getting a job to offset his student-loan debt as he returned to classes: "I don't know if I should do the call center, or grounds...what do you think?? I am a hard worker and can learn and adapt very quickly."

She replied almost a week later, offering to help him and asking after his mother. "Have you put in an application at Liberty? I don't know what jobs are available but I think they list them on the website somewhere."

He said he returned to Liberty and finished his degree in 2012.

He said he and Falwell have not been in contact for eight years, before this week.

While the former student said he considered coming forward with his story in the past, he was worried about damaging the reputation of the school that Rev. Jerry Falwell Sr. founded. "I respect Jerry Sr. and what he did for the school, for the kids, and I believe the Lord had a mission on his life to do that," he said. Several times, he expressed his desire to maintain anonymity, saying that he did not want to be treated like former White House intern Monica Lewinsky — his name reduced to a salacious punchline.

Several times, he expressed his desire to maintain anonymity, saying that he did not want to be treated like former White House intern Monica Lewinsky — his name reduced to a salacious punchline.

In the end, he decided to come forward with his story because of what he now sees as an abuse of power on the part of Becki Falwell. He believes now that that day in the driveway when she asked if he had told his friends that "I think you're hot," she was testing him.

"Usually I think about a middle-aged man grooming someone," the former student said. "It's funny how it happened with the whole, 'Me Too' [movement]. I'm on the other end of the spectrum [from] men harassing women. I found [that] a lot of the traits that these guys had, [Falwell] had as well."

The former student also believes that Falwell trusted him to keep their secret because "she knew that I cared about her school and the soul-winning aspect. I did not want to corrupt that by any means," the former student said. "I don't want that on my back, that I took down the school."

Advertisement



INNOVATING AT HYPERSONIC SPEED.

LOCKHEED MARTIN

Over the past year, the former student has described in a variety of ways the conflict that has gone on inside him in the wake of his sexual encounter with Falwell. One is a comparison he makes between himself and a famous biblical character.

"Afterwards, I just felt like Joseph for many years," the former student said. "I know you get the analogy — from that story of Joseph and his coat of many colors, when that woman tried to seduce him."

He was referring to a story from the Hebrew Bible, recounted in Genesis 39, when Joseph found himself cornered by a woman who wanted to have sex with him. The woman was married to Potiphar, the politically powerful captain of Pharaoh's guard. Potiphar's wife aggressively tried to seduce Joseph, an unwilling recipient of her advances, and stripped off his clothes. Before he could be violated, Joseph fled the scene, establishing himself in Biblical teaching as a symbol of integrity and honor.

The former student brought up the story of Joseph not to compare himself to a Biblical hero, but to emphasize their differences.

"I didn't run. I stayed," he said. "I felt that guilt."

FILED UNDER: LIBERTY UNIVERSITY, JERRY FALWELL



**Huddle**
A play-by-play preview of the day's congressional news

EMAIL

Your Email

INDUSTRY                    EMPLOYER

Select Industry            Employer

By signing up you agree to allow POLITICO to collect your user information and use it to better recommend content to you, send you email newsletters or updates from POLITICO, and share insights based on aggregated user information. You further agree to our privacy policy and terms of service. You can unsubscribe at any time and can contact us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SIGN UP